# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: <u>6:09–cv–00105–RAW</u>

| | |
|---|---|
| Barrett v. USA | Date Filed: 03/16/2009 |
| Assigned to: Judge Ronald A. White | Date Terminated: 03/28/2019 |
| Case in other court:  10th Circuit, 12–07086 | Jury Demand: None |
| 10th Circuit, 19–07049 | Nature of Suit: 535 Death Penalty – Habeas Corpus |
| ED/OK, 6:04–cr–115 | Jurisdiction: U.S. Government Defendant |

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

**Petitioner**

| | | |
|---|---|---|
| **Kenneth Eugene Barrett** | represented by | **David B. Autry** |

**David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405–521–9600
Fax: 405–521–9669
Email: <u>dbautry77@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carrie L. Ward**
Federal Public Defender – Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916–498–6666
Email: <u>carrie_ward@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender – Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–5706
Email: <u>joan.fisher@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Karl J. Saddlemire**
Federal Public Defender – Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: <u>karl_saddlemire@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender – Sacramento

801 I St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*TERMINATED: 11/26/2018*

V.

**Respondent**

**USA**                                       represented by   **Christopher J. Wilson**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202–305–8910
Fax: 202–353–9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
*TERMINATED: 11/24/2010*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |

| | | | |
|---|---|---|---|
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |

| | | | |
|---|---|---|---|
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |

| | | | |
|---|---|---|---|
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | |

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |

| | | | |
|---|---|---|---|
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | |

| | | | |
|---|---|---|---|
| | | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas |

| | | | |
|---|---|---|---|
| | | | Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript |

| | | | |
|---|---|---|---|
| | | | may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to R&R due by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following |

| | | | |
|---|---|---|---|
| | | | documents under seal: Petitioners Motion to Vacate or Modify Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |

| | | | |
|---|---|---|---|
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |
| 03/06/2013 | 227 | | RECORD on Appeal Sent to Circuit Court (Record includes: Volume 1 – Pleadings 1, 2, 3, 4, 5, 6, 7, 45, 51, 52, 57, 58, 59, 61, 62, 66, 67, 68, 69, 70, 91, 94, 95, 96, 100, 102, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 157, 161, 170, 171, 174, 178, 179, 199, 200, 201, 206, 207, 208, 209, 210, 212, 213, 214, 216, 217, 220, 221, 222; Volume 2 – Sealed Pleadings #8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 97, 101, 162, 163, 164, 168, 175, 181, 184, 185, 186, 187, 193, 197, 198 and 215; Volume 3 – Transcripts: Show Cause Hearing held 10/6/2009 and Motion/Status Hearing held 3/31/10.) Also included from 04–cr–115–JHP – Volume 1 – Pleadings 1 – 15, 17 –19, 22, 26 – 29, 31 – 36, 38, 41 – 45, 47 – 49, 52 – 56, 58 – 60, 62, 63 – 66, 69 – 82, 85 – 87, 90, 92 – 94, 96, 97, 99, 101, 102, 104 – 106, 114, 115, 117, 120 – 122, 124, 125, 127, 128, 132 – 137, 139 – 142, 145 – 147, 152 – 155, 157, 158, 163 – 167, 169 – 175, 177, 178, 180 – 190, 192 – 194, 199, 201 – 206, 209 – 213, 215 – 218, 226, 228, 229, 231, 239, 240 – 243, 245 – 249, 252, 253, 255 – 258, 260, 263, 267, 268, 276, 279, 280, 282 – 285, 287, 288, 290, 291, 293, 302, 306 – 308, 359 – 367, 374, 382, 384, 387, 390, 391, 397, 400 – 405, 410 – 412, 415, 417 and 421; Volume 2– Sealed Pleadings 23 – 25, 50, 51, 57, 107, 113, 116, 118, 208, 214, 232, 237, 238, 264 – 266, 274, 301, 368 – 371, 375, 377, 379, 380, 383, 392, 394 – 396, 398, 399 and 416; Volume 3 – Sealed Transcripts (5): Budget Hearing held 12/09/04, Ex Parte Hearing held 01/07/05, Motion Hearing held 3/22/05, Telephone Conference held 5/12/05 and Hearing on Governments Motion held 9/13/05; Volume 4 – Sealed Presentence Report; Volume 5 – Transcripts (54): Proceedings held 10/25/04, Arraignment held 11/17/04, Status Conference held 1/07/05, Proceedings held 2/15/05, Status Conference held 3/22/05, Status Conference held 5/18/05, Telephone Conference held 6/02/05, Motion |

| | | | |
|---|---|---|---|
| | | | to Continue held 6/5/05, Status Conference held 7/15/05, Status Conference 8/12/05, Criminal Pretrial held 8/31/04, Telephone Conference held 9/06/05, Status Hearing held 9/9/05, Sealed Hearing 9/12/05, Individual Juror Qualification Stage One Proceedings held 9/12 through 9/16/05, (5 transcripts), Hearing on USA Motion for Order Delaying Production of Witness Names and Protective Order held 9/13/05 – (Vol 1 and 2), Pretrial Hearing held 9/20/05, Courts Rulings on Motions held 9/26/05, Jury Trial (27 Transcripts, Vol 1 through 27) held 9/26/05 through 11/17/05, Ex Parte Budget Hearing held 10/3/05, Partial Transcript of Proceedings dated 11/10/05, Sentencing held 12/19/05; Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. Under separate mailing 03/06/2013, certified #7009–3410–0001–4052–7584 – (Videotape – attachment to Pleading 237) and (Disk – Attachment to Pleading 265). (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) Modified on 12/1/2016 ***Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND FLOOR VAULT (See 268 LETTER from Circuit Court)*** (cjt, Deputy Clerk). Modified on 5/10/2019 ***to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK, both filed in CR–04–115–RAW, returned to 10th Circuit (See Pleading 485 LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 03/06/2013) |
| 03/06/2013 | | | ***Remark: Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 03/07/2013) |
| 03/11/2013 | | | ***Remark: Notice of receipt of Record on Appeal by 10th Circuit Court of Appeals (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 03/12/2013) |
| 02/21/2014 | 228 | | ORDER from Circuit Court (Re: 222 Notice of Appeal – Final Judgment) directing Clerk to transmit supplemental record (With attachments) (cjt, Deputy Clerk) (Entered: 02/21/2014) |
| 02/26/2014 | 229 | | SUPPLEMENTAL RECORD on Appeal Sent to Circuit Court (Record includes: Per Order of the 10th Circuit Court of Appeals entered 2/21/14 228 , supplemental record sent to 10th Circuit Court of Appeals consisting of CJA Voucher Forms with attachments (Voucher #060125000010 for period of service from 12/1/05 to 1/10/06; Voucher #051216000002 for period of service from 11/1/05 to 11/30/05; Voucher #051216000001 for period of service from 10/1/05 to 10/31/05; Voucher #051213000016 for period of service from 9/1/05 to 9/30/05; #051213000015 for period of service from 8/1/05 to 8/31/05; Voucher #050922000006 for period of service from 7/1/05 to 7/31/05; Voucher #050922000005 for period of service from 6/1/05 to 6/30/05; Voucher #050715000012 for period of service from 5/1/05 to 5/31/05; Voucher #050516000003 for period of service from 4/1/05 to 4/30/05; Voucher #050506000011 for period of service from 3/1/05 to 3/31/05; Voucher #050506000009 for period of service from 2/1/05 to 2/28/05; and Voucher #050506000008 for period of service from 10/25/04 to 1/31/05. Supplemental record transmitted to 10th Circuit Court of Appeals by Federal Express #8723–8982–6061.) (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 02/27/2014) |

| | | | |
|---|---|---|---|
| 08/19/2015 | 230 | | DECISION from Circuit Court Reverse and Remand death sentence for evidentiary hearing; Affirm in all other respects, denying motion for certificate of appealability – Decision of the District Court (awaiting mandate) (Re: 222 Notice of Appeal – Final Judgment) (With attachments) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 08/19/2015 | 231 | | JUDGMENT from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 10/26/2015 | 232 | | MANDATE letter from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/28/2015) |
| 11/30/2015 | 233 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 6/2/2016 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/30/2015) |
| 12/06/2015 | 234 | | MOTION PERMIT INSPECTION OF THE EXPANDED RECORD by USA. Responses due by 12/21/2015(Kahan, Jeffrey) (Entered: 12/06/2015) |
| 12/08/2015 | 235 | | MINUTE ORDER by District Judge James H. Payne: Directing response by 12/15/2015 (Re: 234 GOVERNMENT'S UNOPPOSED MOTION TO PERMIT INSPECTION OF THE EXPANDED RECORD) (cjt, Deputy Clerk) (Entered: 12/08/2015) |
| 12/14/2015 | 236 | | Unopposed RESPONSE to Motion (Re: 234 MOTION PERMIT INSPECTION OF THE EXPANDED RECORD ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 12/14/2015) |
| 12/17/2015 | 237 | | ORDER by District Judge James H. Payne: denying 234 Government's Unopposed Motion to Permit Inspection of the Expanded Record; striking 233 Order Setting Hearing, including Evidentiary Hearing set for 6/2/2016 at 9:30 AM and all other deadlines set in said order (cjt, Deputy Clerk) (Entered: 12/17/2015) |
| 01/11/2016 | 238 | | NOTICE OF EXTENSION OF TIME TO FILE PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/11/2016) |
| 02/16/2016 | 239 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari deadline for filing has been extended to 3/14/2016 (U.S. Supreme Court Case Number: 15A644) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 02/17/2016) |
| 03/16/2016 | 240 | | NOTICE OF FILING OF PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/16/2016) |
| 03/17/2016 | 241 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been filed on 3/14/2016 (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 03/17/2016) |
| 06/24/2016 | 242 | | ORDER from the Tenth Circuit, re: motion for authorization to file second or successive 2255 (dma, Deputy Clerk) (Entered: 06/24/2016) |
| 10/03/2016 | 243 | | |

| | | | |
|---|---|---|---|
| | | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been denied (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/03/2016) |
| 11/07/2016 | 244 | | ORDER from Circuit Court: denying authorization to file the proposed second Sec. 2255 motion (Re: 242 Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 245 | | ORDER from Circuit Court: denying authorization to file proposed second Sec. 2255 motion (Re: 242 Order, 244 USCA Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 246 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 2/16/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/10/2016 | 247 | | Unopposed MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett Responses due by 11/24/2016(Fisher, Joan) (Entered: 11/10/2016) |
| 11/15/2016 | 248 | | ORDER by District Judge James H. Payne: denying 247 Petitioner's Unopposed Motion to Modify Scheduling Order (cjt, Deputy Clerk) (Entered: 11/15/2016) |
| 11/18/2016 | 249 | | MOTION for Discovery *Leave to Conduct Civil Discovery* by Kenneth Eugene Barrett Responses due by 12/2/2016(Fisher, Joan) (Entered: 11/18/2016) |
| 11/18/2016 | 250 | | MOTION for Discovery *of Counsel's File* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 251 | | MOTION for Discovery *(Deposition of Experts)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 252 | | MOTION for Discovery *(Interrogatories)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 253 | | MOTION for Psychiatric Evaluation of Defendant by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) Modified on 11/22/2016 to edit event and text (dma, Deputy Clerk). (Entered: 11/18/2016) |
| 11/18/2016 | 254 | | MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 255 | | MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 256 | | MOTION to Unseal Document(s) (Report of Dr. Randall Price) (Re: 67 Order) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 257 | | MOTION to Unseal Document(s) (Re: 24 Sealed Document, 12 Sealed Document, 16 Sealed Document, 21 Sealed Document, 143 Exhibit(s) in Support of Document(s), 14 Sealed Document, 9 Sealed Document, 20 Sealed Document, 22 Sealed Document, 11 Sealed Document, 19 Sealed Document, 145 Exhibit(s) in Support of Document(s), 8 Sealed Document, 13 Sealed |

| | | | |
|---|---|---|---|
| | | | Document, 17 Sealed Document, 15 Sealed Document, 27 Sealed Document, 42 Sealed Document, 25 Sealed Document, 26 Sealed Document, 18 Sealed Document, 142 Exhibit(s) in Support of Document(s), 141 Exhibit(s) in Support of Document(s), 28 Sealed Document, 43 Sealed Document, 23 Sealed Document, 10 Sealed Document ) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/23/2016 | 258 | | RESPONSE to Motion (Re: 250 MOTION for Discovery *of Counsel's File* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 259 | | RESPONSE to Motion (Re: 251 MOTION for Discovery *(Deposition of Experts)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 260 | | RESPONSE to Motion (Re: 252 MOTION for Discovery *(Interrogatories)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 261 | | RESPONSE to Motion (Re: 254 MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 262 | | RESPONSE to Motion (Re: 255 MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 263 | | RESPONSE to Motion (Re: 256 MOTION to Unseal Document(s) *(Report of Dr. Randall Price)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 264 | | RESPONSE to Motion (Re: 257 MOTION to Unseal Document(s) ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 265 | | RESPONSE to Motion (Re: 253 MOTION ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/25/2016 | 266 | | RESPONSE to Motion (Re: 249 MOTION for Discovery *Leave to Conduct Civil Discovery* ) by USA ;(Kahan, Jeffrey) (Entered: 11/25/2016) |
| 11/28/2016 | 267 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby strikes the Evidentiary Hearing set herein on 2/16/2017 at 9:00 AM. The Court will set a new Evidentiary Hearing date as soon as all pending motions have been ruled upon. (cjt, Deputy Clerk) (Entered: 11/28/2016) |
| 11/29/2016 | 268 | | LETTER from Circuit Court with enclosed pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP (Re: 222 Notice of Appeal – Final Judgment, 227 RECORD on Appeal Sent to Circuit Court) ***STORED IN CLERK'S OFFICE 2ND FLOOR VAULT*** (cjt, Deputy Clerk) Modified on 5/10/2019 to reflect #237 and #265, with original pleadings, VIDEOTAPE AND DISK, both filed in CR–04–115–RAW, returned to Tenth Circuit (See 485 Letter to Circuit Court) (cjt, Deputy Clerk). (Entered: 11/29/2016) |
| 12/06/2016 | 269 | | ORDER re: DISCOVERY by District Judge James H. Payne: denying 249 Petitioner's Motion to Conduct Discovery; granting 250 Government's Motion to Secure Trial Counsel's Files; denying in part and granting in part 251 Government's Motion to Obtain Discovery from Defense Experts; denying 252 |

| | | | |
|---|---|---|---|
| | | | Government's Motion to Propound Interrogatories; granting 253 Government's Motion for Psychiatric Evaluation of Defendant; denying 254 Government's Motion to Serve Discovery on Third Parties; denying 255 Government's Motion to Serve Subpoenas Duces Tecum; granting 256 Government's Unopposed Motion to Permit Inspection of Expanded Record; denying in part and granting in part 257 Government's Unopposed Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/06/2016 | 270 | | SCHEDULING ORDER by District Judge James H. Payne: Evidentiary Hearing set for 3/13/2017 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/12/2016 | 271 | | MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT by Kenneth Eugene Barrett Responses due by 12/26/2016(Fisher, Joan) (Entered: 12/12/2016) |
| 12/13/2016 | 272 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 12/15/2016 (Re: 271 Petitioner's MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT) (cjt, Deputy Clerk) (Entered: 12/13/2016) |
| 12/13/2016 | 273 | | Unopposed MOTION to Continue Hearing(s) by USA (With attachments) Responses due by 12/27/2016(Kahan, Jeffrey) (Entered: 12/13/2016) |
| 12/14/2016 | 274 | | ORDER by District Judge James H. Payne: denying 273 Motion for Continuance of Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 12/14/2016) |
| 12/15/2016 | 275 | | RESPONSE in Opposition to Motion (Re: 271 MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 12/15/2016) |
| 12/15/2016 | 276 | | ORDER by District Judge James H. Payne: denying 271 Petitioner's Motion for Order of Access to Petitioner by Mental Health Expert (cjt, Deputy Clerk) (Entered: 12/15/2016) |
| 12/19/2016 | 277 | | MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* (Re: 276 Ruling on Motion for Miscellaneous Relief ) by Kenneth Eugene Barrett Responses due by 1/3/2017(Fisher, Joan) (Entered: 12/19/2016) |
| 12/20/2016 | 278 | | RESPONSE in Opposition to Motion (Re: 277 MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* ) by USA ;(Kahan, Jeffrey) (Entered: 12/20/2016) |
| 12/21/2016 | 279 | | ORDER by District Judge James H. Payne: denying 277 Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Re: 271 MOTION, 276 Order) (cjt, Deputy Clerk) (Entered: 12/21/2016) |
| 01/03/2017 | 280 | | NOTICE of Petitioner's Written Summaries of Anticipated Testimony of Experts (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 281 | | MOTION for Reconsideration *of the Court's Order Denying The Government's Unopposed Motion for Reconsideration* (Re: 274 Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 282 | | Unopposed MOTION Order to Transport Petitioner to Personally Attend Evidentiary Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/11/2017 | 283 | | ORDER by District Judge James H. Payne: granting in part 281 Petitioner's Motion for Reconsideration; Evidentiary Hearing as to Roger Hilfiger's testimony ONLY is RESET from 3/31/2017 to 3/30/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 274 Order) (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 284 | | MINUTE ORDER by District Judge James H. Payne: granting 282 Petitioner's Unopposed Motion to Transport Petitioner to Evidentiary Hearing. Government is directed to secure Petitioner's presence at said hearing commencing on 3/13/2017 at 9:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK. (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 285 | | Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. by Kenneth Eugene Barrett Responses due by 1/25/2017(Fisher, Joan) (Entered: 01/11/2017) |
| 01/12/2017 | 286 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 1/13/2017 (Re: 285 Petitioner's Opposed MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, M.D.). (cjt, Deputy Clerk) (Entered: 01/12/2017) |
| 01/13/2017 | 287 | | RESPONSE in Opposition to Motion (Re: 285 Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. ) by USA ;(Kahan, Jeffrey) (Entered: 01/13/2017) |
| 01/18/2017 | 288 | | ORDER by District Judge James H. Payne: granting 285 Petitioner's Motion for Access to Petitioner by George Woods, M.D. (cjt, Deputy Clerk) (Entered: 01/18/2017) |
| 01/30/2017 | 289 | | MOTION to Exclude Proposed Witnesses by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 01/30/2017) |
| 02/01/2017 | 290 | | MOTION to Exclude a Proposed Witness by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 291 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 289 MOTION to Exclude Proposed Witnesses, 290 MOTION to Exclude a Proposed Witness) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 292 | | MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 293 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 294 | | Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 295 | | MOTION in Limine *to Preclude Post–Hoc Rationalizations, and Supporting Brief* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 296 | | MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 297 | | Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* by Kenneth Eugene Barrett Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 298 | | Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 299 | | MOTION to Expand the Record with Exhibits 206 through 220 by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 300 | | MOTION for Order Barring Witness Collusion and Brief in Support by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 301 | | MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 302 | | MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s)) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 303 | | MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 304 | | MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 305 | | |

| | | | |
|---|---|---|---|
| | | | MOTION in Limine *to Exclude Testimony by Randall Price* by Kenneth Eugene Barrett (With attachments); Responses due by 2/8/2017(Schardl, Tivon) (Entered: 02/01/2017) |
| 02/03/2017 | 306 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited deadlines as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court*, 296 MOTION for Additional Time to File *Motion in Limine Regarding Dr. Steven Pitt*, 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony*, 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails*, 299 MOTION to Expand the Record, 300 MOTION for Order Barring Witness Collusion, 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing, 302 MOTION for Reconsideration of Order Denying Deposition of Roger Hilfiger) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/03/2017 | 307 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations*, 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony*, 305 MOTION in Limine *to Exclude Testimony by Randall Price*) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/08/2017 | 308 | | Unopposed MOTION to Seal Document *Response to Docket Entry 305* by USA (With attachments) Responses due by 2/22/2017(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 309 | | RESPONSE in Opposition to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 310 | | RESPONSE in Opposition to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 311 | | RESPONSE in Opposition to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 312 | | RESPONSE in Opposition to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 313 | | RESPONSE in Opposition to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 314 | | RESPONSE in Opposition to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 315 | | RESPONSE to Motion (Re: 296 MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* ) by USA ;(Wilson, |

| | | | |
|---|---|---|---|
| | | | Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 316 | | MINUTE ORDER by District Judge James H. Payne: granting 308 Government's Unopposed Motion to Seal Response in Opposition to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price*). (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 317 | | RESPONSE to Motion (Re: 299 MOTION to Expand the Record with Exhibits 206 through 220 ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 318 | | RESPONSE in Opposition to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 319 | | RESPONSE in Opposition to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 320 | | RESPONSE in Opposition to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 321 | | SEALED RESPONSE in Opposition to Motion (Re: 305 MOTION in Limine to Exclude Testimony by Randall Price) by USA (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 322 | | RESPONSE in Opposition to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/08/2017 | 323 | | RESPONSE in Opposition to Motion (Re: 289 MOTION to Exclude Proposed Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/15/2017 | 324 | | REPLY to Response to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 325 | | REPLY to Response to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 326 | | REPLY to Response to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 327 | | REPLY to Response to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 328 | | REPLY to Response to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 329 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/15/2017) |
| 02/15/2017 | 330 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 331 | | REPLY to Response to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 332 | | REPLY to Response to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 333 | | REPLY to Response to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 334 | | REPLY to Response to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 335 | | REPLY to Response to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/15/2017 | 336 | | REPLY to Response to Motion (Re: 289 MOTION to Exclude Proposed Witnesses , 290 MOTION to Exclude a Proposed Witness ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/16/2017 | 337 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to Extend Scheduling Order Dates for Motion in Limine regarding Dr. Steven Pitt (Dkt # 296 ) is granted as follows: Expert reports shall be exchanged by 12:00 p.m. Central Standard Time on 3/3/2017. Motions in Limine regarding Dr. Steven Pitt, D.O. and/or Dr. George Woods, M.D. shall be filed by close of business on 3/8/2017. Responses shall be filed by noon on 3/10/2017. (cjt, Deputy Clerk) (Entered: 02/16/2017) |
| 02/16/2017 | 338 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 02/16/2017) |
| 02/16/2017 | 339 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/16/2017) |
| 02/16/2017 | 340 | | STIPULATION *Joint Pre-Hearing Statement* by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/16/2017) |
| 02/21/2017 | 341 | | MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett (With attachments) Responses due by 3/7/2017(Fisher, Joan) (Entered: 02/21/2017) |
| 02/22/2017 | 342 | | Unopposed MOTION to Seal Document *Motion for Partial Summary Judgment* by USA (With attachments) Responses due by 3/8/2017(Kahan, Jeffrey) (Entered: 02/22/2017) |
| 02/23/2017 | 343 | | MINUTE ORDER by District Judge James H. Payne: granting 342 Government's Unopposed Motion to File Sealed Motion for Partial Summary |

| | | | |
|---|---|---|---|
| | | | Judgment. (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 344 | | Unopposed MOTION to Amend *Joint Statement* (Re: 340 Stipulation ) by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 345 | | Unopposed MOTION Permit Use of Computers in the Courthouse During Hearing by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 346 | | Unopposed MOTION for Authorization to Serve Subpoenas Without Tendering Fees and Mileage by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 347 | | SEALED MOTION for Partial Summary Judgment by USA (With attachments); Responses due by 3/9/2017 (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 348 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is directed to file an expedited response to Government's SEALED MOTION for Partial Summary Judgment (Re: 347 SEALED MOTION). Said Response is due by Close of Business on 2/27/2017 (dma, Deputy Clerk) (Entered: 02/23/2017) |
| 02/24/2017 | 349 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 294 Motion to Recuse and Disqualify, pursuant to 28 U.S.C. Section 455, is denied for reasons previously set out in 66 Order filed herein on 9/11/2009. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 350 | | MINUTE ORDER by District Judge James H. Payne: granting 290 Government's Motion to Exclude a Proposed Witness. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 351 | | ORDER by District Judge James H. Payne: granting 292 Government's Motion to Exclude Evidence of Unavailable Witnesses by Declaration Alone (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 352 | | MINUTE ORDER by District Judge James H. Payne: denying 295 Petitioner's Motion in Limine to Preclude Post–Hoc Rationalizations. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 353 | | MINUTE ORDER by District Judge James H. Payne: denying 297 Petitioner's Motion for Production of 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 354 | | MINUTE ORDER by District Judge James H. Payne: denying 298 Petitioner's Motion for Reconsideration of Order denying Discovery of Trial Counsel's Emails. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 355 | | MINUTE ORDER by District Judge James H. Payne: denying 299 Motion to Expand the Record with Exhibits 206 through 220 as these documents are already part of the court records in this case. See, Dkt. # 178 . If counsel desires the Court to consider these or any other documents contained within the court record, the documents must be introduced and properly admitted at the evidentiary hearing in accordance with the Federal Rules of Evidence, Rule 1101(e). (cjt, Deputy Clerk) (Entered: 02/24/2017) |

| | | | |
|---|---|---|---|
| 02/24/2017 | 356 | | MINUTE ORDER by District Judge James H. Payne: denying 300 Petitioner's Motion for Order Barring Witness Collusion. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 357 | | MINUTE ORDER by District Judge James H. Payne: 301 Petitioner's Motion to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing is moot. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 358 | | MINUTE ORDER by District Judge James H. Payne: denying 302 Petitioner's Motion for Reconsideration of Order denying the deposition of Roger Hilfiger (Dkt. # 302 ) as the Court has previously indicated it prefers to hear live testimony of counsel, see Dkt. # 246 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 359 | | MINUTE ORDER by District Judge James H. Payne: denying 303 Petitioner's Motion in Limine to Rely upon Declarations for Direct Examination Testimony. While declarations may be admissible, Petitioner will be required to seek permission to admit each declaration at the evidentiary hearing scheduled herein and the Government will be granted an opportunity to object to such admission pursuant to the Federal Rules of Evidence. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 360 | | ORDER by District Judge James H. Payne: denying 304 Petitioner's Motion in Limine to Exclude Novel Theories of Aggravation; denying 305 Petitioner's Motion in Limine to Exclude Testimony from J. Randall Price (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 361 | | ORDER by District Judge James H. Payne: granting in part 289 Government's Motion to Exclude Proposed Witnesses; Amended Joint Pre–Hearing Statement due by close of business on 3/3/2017 (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 362 | | MINUTE ORDER by District Judge James H. Payne: denying 341 Petitioner's Unopposed Motion for Extension of Time to File Expert Report. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 363 | | MINUTE ORDER by District Judge James H. Payne: denying as moot 344 Petitioner's Unopposed Motion to Amend Joint Statement. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 364 | | MINUTE ORDER by District Judge James H. Payne: granting 345 Petitioner's Unopposed Motion for Authorization to Use Computers in the Courthouse during Evidentiary Hearing. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/27/2017 | 365 | | MINUTE ORDER by District Judge James H. Payne: granting in part 346 Petitioner's Unopposed Motion for Authorization to Serve Subpoenas Without Tendering Fees and Mileage. Pursuant to 28 U.S.C. § 1825(b) and (c), the court finds witness fees for lay witnesses whose testimony has not been excluded by previous order of the court shall be paid by the United States Marshal as provided by statute. (cjt, Deputy Clerk) (Entered: 02/27/2017) |
| 02/27/2017 | 366 | | RESPONSE in Opposition to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 02/27/2017) |
| 02/28/2017 | 367 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Directing expedited reply by close of business on 3/1/2017 (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 02/28/2017 | 368 | | MOTION to Exclude Witnesses by USA; Responses due by 3/14/2017(Wilson, Christopher) (Entered: 02/28/2017) |
| 02/28/2017 | 369 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM Central Standard Time on 3/2/2017 (Re: 368 Opposed MOTION to Exclude Witnesses). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 03/01/2017 | 370 | | Unopposed MOTION to Seal Document *Reply in Support of Motion for Partial Summary Judgment* by USA Responses due by 3/15/2017(Kahan, Jeffrey) (Entered: 03/01/2017) |
| 03/01/2017 | 371 | | MINUTE ORDER by District Judge James H. Payne: granting 370 Government's Unopposed Motion to File Sealed Reply (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/01/2017 | 372 | | SEALED REPLY (Re: 347 SEALED MOTION for Partial Summary Judgment) by USA (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/02/2017 | 373 | | RESPONSE in Opposition to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 03/02/2017) |
| 03/02/2017 | 374 | | MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett (With attachments) Responses due by 3/16/2017(Schardl, Tivon) (Entered: 03/02/2017) |
| 03/02/2017 | 375 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby directs Petitioner to file a Sur–Reply to 347 Government's SEALED MOTION for Partial Summary Judgment by close of business on Monday, 3/6/2017. Said Sur–Reply shall specifically address whether or not Petitioner contests the 38 facts contained within the Government's Reply. (cjt, Deputy Clerk) (Entered: 03/02/2017) |
| 03/03/2017 | 376 | | EXPERT WITNESS REPORT *Proffered for Excluded Witnesses* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/03/2017) |
| 03/03/2017 | 377 | | NOTICE of Exchange of Rule 26 Disclosures of George W. Woods, Jr. M.D. (Re: 337 Ruling on Motion to Extend Scheduling Order Dates) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/03/2017 | 378 | | ORDER by District Judge James H. Payne: Bifurcating 3/13/2017 evidentiary hearing (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 379 | | MINUTE ORDER by District Judge James H. Payne: Counsel for Petitioner is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 376 Petitioner's |

| | | | |
|---|---|---|---|
| | | | Proffer of Expert Testimony) (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 380 | | RESPONSE in Opposition to Motion (Re: 374 Opposed MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 381 | | MINUTE ORDER by District Judge James H. Payne: denying 374 Petitioner's Motion to Supplement Response in Opposition to Government Motion for Partial Summary Judgment. (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 382 | | REPLY to Response to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 383 | | AMENDED Joint Pre–Hearing Statement (Re: 361 Ruling on Motion to Exclude) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/06/2017 | 384 | | SURREPLY to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/06/2017) |
| 03/06/2017 | 385 | | Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies (Re: 378 Order) by Kenneth Eugene Barrett; Responses due by 3/20/2017(Fisher, Joan). Added MOTION to Stay and edited text on 3/7/2017 (cjt, Deputy Clerk). (Entered: 03/06/2017) |
| 03/07/2017 | 386 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM on 3/8/2017 (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and Motion to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies). (cjt, Deputy Clerk) (Entered: 03/07/2017) |
| 03/07/2017 | 387 | | Second Amended Joint Pre–Hearing Statement (Re: 383 Stipulation) by USA (Wilson, Christopher) (Entered: 03/07/2017) |
| 03/07/2017 | 388 | | RESPONSE in Opposition to Motion (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies ) by USA ;(Kahan, Jeffrey) (Entered: 03/07/2017) |
| 03/08/2017 | 389 | | MINUTE ORDER by District Judge James H. Payne: granting 368 Government's Second Motion to Exclude Proposed Witnesses. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 390 | | MINUTE ORDER by District Judge James H. Payne: In light of the stipulation of the parties submitted on 3/7/2016, 347 Government's Motion for Partial Summary Judgment is moot. After the submission of testimony herein, the government can reurge its motion if the facts are different than what the parties anticipated at the time of the filing of their proposed findings of fact filed on 2/16/2017. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 391 | | MINUTE ORDER by District Judge James H. Payne: After consideration of 385 Petitioner's Motion to Reconsider, the motion is granted and this Court will allow the parties to submit all of their evidence in one evidentiary hearing subject to the Federal Rules of Evidence. Pursuant to 28 U.S.C. Section 636(b)(1)(B), the evidentiary hearing is referred to Magistrate Judge Steven P. Shreder for Findings and Recommendation. The evidentiary hearing is |

| | | | |
|---|---|---|---|
| | | | continued to 3/27/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/10/2017 | 392 | | Unopposed MOTION to Continue Hearing(s) *in Part* by USA Responses due by 3/24/2017(Wilson, Christopher) (Entered: 03/10/2017) |
| 03/10/2017 | 393 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Government's Motion for Partial Continuance of Evidentiary Hearing (Dkt. Entry No. 392 ) is hereby GRANTED. The evidentiary hearing scheduled on March 27, 2017 will proceed as scheduled. The Court will, however, hear testimony from the government's experts (Dr. Randall Price and Dr. Steven Pitt), beginning on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/10/2017) |
| 03/14/2017 | 394 | | NOTICE of Availability of Ruth Harris to Testify (Re: 387 Stipulation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/14/2017) |
| 03/21/2017 | 395 | | Unopposed MOTION to Unseal 10/20/05 Budgetary Hearing Transcript (Re: 67 Order) by Kenneth Eugene Barrett; Responses due by 4/4/2017(Fisher, Joan) (Entered: 03/21/2017) |
| 03/21/2017 | 396 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is requesting the court enter an order unsealing the transcript of the "second sealed" hearing on budgetary matters; however, no such transcript was ever filed with the court and, therefore, there is nothing for the court to unseal. Accordingly, 395 Petitioner's Unopposed Motion to Unseal Transcript of 10/20/2005 Hearing is denied. (cjt, Deputy Clerk) (Entered: 03/21/2017) |
| 03/24/2017 | 397 | | NOTICE of Appearance by Kenneth Eugene Barrett [NOTE: Attorney Karl J. Saddlemire added to party Kenneth Eugene Barrett(pty:pet)]. (Saddlemire, Karl) (Entered: 03/24/2017) |
| 03/27/2017 | 398 | | NOTICE of Presentation of Additional Exhibits 96–101 by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/27/2017) |
| 03/27/2017 | 399 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 3/27/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Main Document 399 replaced on 4/20/2017 to reflect Rule of Sequestration invoked 3/27/17. NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/27/2017) |
| 03/27/2017 | 400 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/28/2017 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/27/2017) |
| 03/28/2017 | 401 | | MOTION to Compel *Compliance with Discovery Order* by USA (With attachments) Responses due by 4/11/2017(Kahan, Jeffrey). (Attachments 1–8 and 10 replaced with redacted versions on 4/6/2017 per Docket Entry No. 415; NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/28/2017) |
| 03/28/2017 | 402 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 401 USA's MOTION to Compel |

| | | | |
|---|---|---|---|
| | | | *Compliance with Discovery Order.* (cjt, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 403 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day two) held on 3/28/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 404 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/29/2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 405 | | STIPULATION OF FACT. (tls, Deputy Clerk) (Entered: 03/29/2017) |
| 03/28/2017 | 406 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 401 MOTION to Compel Compliance with Discovery Order by USA. Accordingly, any documents currently in custody of Petitioner's counsel, which have not already been produced, shall be provided to the Government forthwith. All non–privileged documents acquired from attorney Jack Gordon relating to Kenneth Eugene Barrett shall be produced no later than 4/21/2017, along with a detailed privilege log pursuant to LCvR 26.2. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 407 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day three) held on 3/29/2017. (Court Reporter: Karla McWhorter) (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 408 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/30/2017 at 10:30 a.m in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 409 | | NOTICE of Filing Proffer of Testimony from Richard H. Burr by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/29/2017) |
| 03/30/2017 | 410 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day four) held on 3/30/2017. (Court Reporter: Karla McWhorter) (tls, Deputy Clerk) (Entered: 03/30/2017) |
| 04/05/2017 | 411 | | Unopposed MOTION to Seal Document *401, Exhibits 1–8 & 10* by USA Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/05/2017 | 412 | | Unopposed MOTION for Leave to File Redacted Substitute Exhibits to Doc. 401 *Exhibits 1 to 8 & 10* by USA (With attachments) Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/06/2017 | 413 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 411 Unopposed MOTION to Seal Document 401 , Exhibits 1–8 & 10 by USA. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 414 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder continuing Evidentiary Hearing on 6/12/17 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder (dma, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 415 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 412 Unopposed MOTION for Leave to File Substitute Exhibits by USA. |

| | | | |
|---|---|---|---|
| | | | Accordingly, Exhibits 1 to 8 & 10 of Docket Entry No. 401 are hereby ordered replaced with redacted versions. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/19/2017 | 416 | | Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration by USA Responses due by 5/3/2017(Wilson, Christopher) (Entered: 04/19/2017) |
| 04/20/2017 | 417 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 416 Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration. (cjt, Deputy Clerk) (Entered: 04/20/2017) |
| 04/20/2017 | 418 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 416 Unopposed Motion to Exclude Expert Witnesses from Court's Order of Sequestration by USA. (ndd, Deputy Clerk) (Entered: 04/20/2017) |
| 04/21/2017 | 419 | | NOTICE of Petitioner's Privilege Log (Re: 406 Ruling on Motion to Compel,, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 04/21/2017) |
| 05/02/2017 | 420 | | NOTICE of Petitioner's Fourth Proffer of Testimony by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 05/02/2017) |
| 05/03/2017 | 421 | | Unopposed MOTION to Seal Document *Motion for Copy of Videotape* by Kenneth Eugene Barrett (With attachments) Responses due by 5/17/2017(Schardl, Tivon) (Entered: 05/03/2017) |
| 05/04/2017 | 422 | | MINUTE ORDER by District Judge James H. Payne: granting 421 Petitioner's Unopposed Motion to File Motion and Exhibits Under Seal. (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 423 | | SEALED Unopposed MOTION for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/05/2017 | 424 | | Unopposed MOTION for Leave to Appear by Video Conference by Kenneth Eugene Barrett Responses due by 5/19/2017(Fisher, Joan) (Entered: 05/05/2017) |
| 05/09/2017 | 425 | | MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation by Kenneth Eugene Barrett Responses due by 5/23/2017(Schardl, Tivon) (Entered: 05/09/2017) |
| 05/09/2017 | 426 | | MINUTE ORDER by District Judge James H. Payne: denying 424 Petitioner's Motion to Attend Evidentiary hearing June 12–14, 2017 with Counsel by Video Conference. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 427 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 423 Motion for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 is hereby granted. The Court Clerk is directed to make copies of the videotape, attached to Dkt. # 237 in Criminal Case CR–04–115–JHP, and provide a copy of the same to counsel for both parties. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 428 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 5/15/2017 (Re: 425 Petitioner's MOTION to |

| | | | |
|---|---|---|---|
| | | | Exclude Testimony of J. Randall Price). (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/10/2017 | 429 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/27/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 1–250). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 399 Minutes of Evidentiary Hearing, ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/10/2017 | 430 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/28/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 251–514). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 403 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/11/2017 | 431 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: In light of the Court's denial of Petitioner's 424 Unopposed Motion for Leave to Appear by Video Conference, the Government is directed to secure Petitioner's presence at said Evidentiary Hearing commencing on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 05/11/2017) |
| 05/11/2017 | 432 | | MOTION to Exclude Witness Steven Pitt by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017 (Schardl, Tivon) (Additional attachment(s) added per 434 MINUTE ORDER on 5/12/2017: # 4 Sealed Exhibit A) (cjt, Deputy Clerk). (Entered: 05/11/2017) |
| 05/11/2017 | 433 | | Unopposed MOTION to Seal Document *: Exhibit A to Motion to Exclude Witness Steven Pitt* by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017(Schardl, Tivon) (Entered: 05/11/2017) |
| 05/12/2017 | 434 | | MINUTE ORDER by District Judge James H. Payne: granting 433 Petitioner's Unopposed Motion to File Exhibit Under Seal (Re: 432 MOTION to Exclude Witness Steven Pitt) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 435 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 5/19/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 436 | | RESPONSE in Opposition to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by USA ;(Wilson, Christopher) (Entered: 05/12/2017) |
| 05/12/2017 | 437 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/19/2017. (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 438 | | WAIVER of Presence at Evidentiary Hearing (Re: 431 Minute Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/12/2017) |
| 05/18/2017 | 439 | | REPLY to Response to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/18/2017) |
| 05/19/2017 | 440 | | RESPONSE in Opposition to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by USA ;(Kahan, Jeffrey) (Entered: 05/19/2017) |
| 05/19/2017 | 441 | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/26/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/19/2017) |
| 05/25/2017 | 442 | | REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/25/2017) |
| 05/25/2017 | 443 | | Corrected REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/25/2017) |
| 05/30/2017 | 444 | | MINUTE ORDER by District Judge James H. Payne: denying 425 Motion to Exclude Testimony of J. Randall Price Due to Discovery Violation. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 05/30/2017 | 445 | | MINUTE ORDER by District Judge James H. Payne: denying 432 Petitioner's Motion to Exclude Witness Steven Pitt. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 06/04/2017 | 446 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 29, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 515 – 642). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 407 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |
| 06/04/2017 | 447 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 30, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 643–762). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 410 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |

| | | | |
|---|---|---|---|
| 06/12/2017 | 448 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day five) held on 6/12/2017. (Court Reporter: Brian Neil) (tls, Deputy Clerk) (Entered: 06/12/2017) |
| 06/12/2017 | 449 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/13/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/12/2017) |
| 06/13/2017 | 450 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume V held on 6/12/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 763–944). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 448 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Main Document 450 replaced on 6/14/2017) (dma, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 451 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day 6) held on 6/13/2017 (Court Reporter: K.Sidwell and B. Neil) (tls, Deputy Clerk) (tls, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 452 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/26/2017 at 10:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/13/2017) |
| 06/15/2017 | 453 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VII held on 6/13/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 1084–1136). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Entered: 06/15/2017) |
| 06/15/2017 | 454 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VI held on 6/13/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 945–1083). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 06/15/2017) |
| 06/16/2017 | 455 | | MOTION Leave to Present Additional Witnesses by USA Responses due by 6/30/2017(Kahan, Jeffrey) (Entered: 06/16/2017) |

| | | | |
|---|---|---|---|
| 06/16/2017 | 456 | | MINUTE ORDER by District Judge James H. Payne directing Petitioner to file an expedited Response to Respondent's 455 MOTION to Call Additional Rebuttal Witnesses. Response is due by noon on Monday, 6/19/2017 (dma, Deputy Clerk) (Entered: 06/16/2017) |
| 06/19/2017 | 457 | | RESPONSE in Opposition to Motion (Re: 455 MOTION Leave to Present Additional Witnesses ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/19/2017) |
| 06/19/2017 | 458 | | MINUTE ORDER by District Judge James H. Payne: The Government's Motion to Call Additional Rebuttal Witnesses is referred to Magistrate Judge Steven P. Shreder as it involves matters arising out of the evidentiary hearing previously referred to him on 03/08/2017. (Re: 455 MOTION Leave to Present Additional Witnesses ) (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/19/2017 | 459 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: 455 Government's Motion to Call Additional Rebuttal Witnesses is GRANTED IN PART to the extent that the USA may call Dr. Faust Bianco as a rebuttal witness to the testimony of Dr. Miora on Monday, 6/26/2017. Motion is otherwise DENIED. (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/21/2017 | 460 | | MOTION for Disclosure , MOTION for Discovery *Report of Faust Bianco's Opinions, the Bases and Reasons Therefor* by Kenneth Eugene Barrett (With attachments) Responses due by 7/5/2017(Schardl, Tivon) (Entered: 06/21/2017) |
| 06/21/2017 | 461 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Since the Petitioner has indicated that Dr. Miora will not implicate Dr. Bianco's testimony, it appears Dr. Bianco will not testify at the hearing set for Monday, June 26, 2017, at 10:00 a.m. Consequently, Petitioner's Motion For Immediate Production Of Report From Expert Witness (Docket No. 460 ) is hereby DENIED. (tls, Deputy Clerk) (Entered: 06/21/2017) |
| 06/23/2017 | 462 | | Third Amended EXHIBIT LIST by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 06/23/2017) |
| 06/26/2017 | 463 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 6/26/2017. (Court Reporter: Karla McWhorter) (Attachments: # 1 Petitioner's Witness List, # 2 Petitioner's Exhibit List, # 3 Government's Witness List, # 4 Government's Exhibit List)(tls, Deputy Clerk) (Main Document 463 replaced on 6/30/2017 to reflect correct dates hearing held; NEF regenerated) (tls, Deputy Clerk). (Exhibit Lists replaced on 7/10/2017 to reflect admitted date; NEF regenerated) (tls, Deputy Clerk). Modified on 4/15/2019 ***Pursuant to Dkt. #482, all Exhibits from these evidentiary hearings are maintained by the Clerk and located in the Clerk's Office, 2nd Floor Vault.*** (cjt, Deputy Clerk). (Entered: 06/27/2017) |
| 07/13/2017 | 464 | | TRANSCRIPT of Proceedings (Unredacted) of Motions Hearing Volume VIII held on June 26, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1137–1366). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public |

| | | | |
|---|---|---|---|
| | | | terminal. There is no charge to view the transcript at the court public terminal. (Re: 463 Minutes of Evidentiary Hearing) (ksm, Court Reporter) (Entered: 07/13/2017) |
| 07/31/2017 | 465 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 07/31/2017) |
| 07/31/2017 | 466 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 07/31/2017) |
| 08/10/2018 | 467 | | REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder (Re: (391) Minute Order by District Judge James H. Payne referring Evidentiary Hearing to Magistrate Judge Steven P. Shreder for Findings and Recommendation). Objections to R&R due by 8/24/2018. (ndd, Deputy Clerk) (Entered: 08/10/2018) |
| 08/20/2018 | 468 | | MOTION to Extend Deadline to File Objection to Magistrate Judge's Report and Recommendation by USA Responses due by 9/4/2018(Wilson, Christopher) (Entered: 08/20/2018) |
| 08/21/2018 | 469 | | ORDER by District Judge James H. Payne: granting 468 Government's Motion for Extension of Time to Object to Magistrate's Report and Recommendation; Objections to R&R due by 10/23/2018; Responses to Objections due by 11/26/2018 (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder) (cjt, Deputy Clerk) (Entered: 08/21/2018) |
| 10/12/2018 | 470 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/12/2018) |
| 10/23/2018 | 471 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by USA (Kahan, Jeffrey) (Entered: 10/23/2018) |
| 11/26/2018 | 472 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION and 470 Objection to Report and Recommendation) by USA (Kahan, Jeffrey) Modified on 11/27/2018 to edit text and add links (dma, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 473 | | NOTICE of Substitution and Appearance of Counsel by Joan M. Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified text on 11/27/2018 (cjt, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 474 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder, 471 Objection to Report and Recommendation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 11/26/2018) |
| 12/10/2018 | 475 | | REPLY (Re: 471 Objection to Report and Recommendation ) by USA (Kahan, Jeffrey) (Entered: 12/10/2018) |
| 12/10/2018 | 476 | | REPLY (Re: 472 Response ) by Kenneth Eugene Barrett (Ward, Carrie) (Entered: 12/10/2018) |
| 01/31/2019 | 477 | | MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald |

| | | | |
|---|---|---|---|
| | | | A. White. All documents filed in this case in the future shall reflect the new case number CIV–09–105–RAW. (cjt, Deputy Clerk) (Entered: 01/31/2019) |
| 03/28/2019 | 478 | | OPINION AND ORDER by Judge Ronald A. White: affirming in part and denying in part 467 Report and Recommendation; Petitioner's 2255 motion is denied as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial; Certificate of Appealability granted. dismissing/terminating case (case terminated) (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | 479 | | JUDGMENT by Judge Ronald A. White entering judgment in favor of USA against Kenneth Eugene Barrett on his challenge to the legality of his sentence. (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 04/10/2019 | 480 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: It is ordered that each party is directed to withdraw their respective exhibits offered and admitted into evidence at the evidentiary hearings conducted on 3/27/2017, 3/28/2017, 3/29/2017, 3/30/2017, 6/12/2017, 6/13/2017 and 6/26/2017, the same to be kept and maintained for possible appeal purposes. (cjt, Deputy Clerk) Modified on 4/15/2019 ***VACATED per Dkt #482 Minute Order*** (cjt, Deputy Clerk). (Entered: 04/10/2019) |
| 04/11/2019 | 481 | | Unopposed MOTION to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals (Re: 480 Minute Order) by Kenneth Eugene Barrett; Responses due by 4/25/2019(Fisher, Joan) Modified text on 4/12/2019 (cjt, Deputy Clerk). (Entered: 04/11/2019) |
| 04/15/2019 | 482 | | MINUTE ORDER by Judge Ronald A. White: granting 481 Petitioner's Unopposed Motion to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals. The Clerk is directed to maintain the exhibits until further order of the Court. (Re: 480 Minute Order) (cjt, Deputy Clerk) (Entered: 04/15/2019) |
| 04/24/2019 | 483 | | MOTION to Alter or Amend Judgment and Brief in Support (Re: 479 Judgment, 478 Ruling on Report and Recommendation, Granting Certificate of Appealability) by Kenneth Eugene Barrett Responses due by 5/8/2019(Fisher, Joan) (Entered: 04/24/2019) |
| 05/07/2019 | 484 | | RESPONSE to Motion (Re: 483 MOTION to Alter Order/Judgment ) by USA ;(Kahan, Jeffrey) (Entered: 05/07/2019) |
| 05/09/2019 | 485 | | LETTER to 10th Circuit Court of Appeals returning pleadings, videotape and disks included in the Record on Appeal 222 Notice of Appeal and 227 Record on Appeal (With attachments)(jcb, Deputy Clerk) (Entered: 05/09/2019) |
| 05/17/2019 | 486 | | REPLY to Response to Motion (Re: 483 MOTION to Alter Order/Judgment ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/17/2019) |
| 06/11/2019 | 487 | | ORDER from Circuit Court denying authorization to file second or successive 2255 motion (See Dkt. #451 in CR–04–115–RAW and Dkt. #3 in CIV–19–152–RAW) (cjt, Deputy Clerk) (Entered: 06/13/2019) |
| 08/13/2019 | 488 | | ORDER by Judge Ronald A. White: denying 483 Petitioner's Motion to Alter or Amend Judgment, with the exception of the clarification described in the Order (cjt, Deputy Clerk) (Entered: 08/13/2019) |

| | | | |
|---|---|---|---|
| 10/07/2019 | 489 | | NOTICE OF APPEAL to Circuit Court (Re: 479 Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/07/2019) |
| 10/08/2019 | 490 | | Transmission of Notice of Appeal and Docket Sheet to U.S. Court of Appeals (Re: 489 Notice of Appeal – Final Judgment ) (With attachments)(jcb, Deputy Clerk) (Main Document 490 replaced on 10/10/2019) (jcb, Deputy Clerk). (Entered: 10/08/2019) |
| 10/08/2019 | 491 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 19–7049 (Re: 489 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 10/08/2019) |
| 10/21/2019 | 492 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |
| 10/21/2019 | 493 | | DESIGNATION of Record on Appeal (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF**

---

46

**TABLE OF CONTENTS**

I.   Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Grounds for Disqualifying Trial Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Events Leading to the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   The Alleged Offense and the Bench Warrant . . . . . . . . . . . . . . . . . . 8

        2.   The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.   September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.   Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Claim 1.   Actions of the Trial Court Violated Mr. Barrett's Right to Due Process,
              his Sixth Amendment Right to Counsel and to Cross-Examine
              Witnesses, and his Right to Equal Protection of the Laws, and Federal
              Statutes and Guidelines for the Appointment and Compensation of
              Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated
              Mr. Barrett's Right to Effective Assistance of Appellate Counsel . . . . . 17

    Claim 2.   Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed
              by 18 U.S.C. § 3006A and the Sixth Amendment to the United States
              Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        A.   Unreasonable Acts and Omissions Affecting the First and Second
            Stages of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . 44

Evidence of Constitutionally Deficient Representation . . . . . . . . 48

1.     Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978). . . . . . . 48

Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . 60

2.     Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.     Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4.     But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder. . . . . . . . . 76

     a.     Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 78

     b.     Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 86

     c.     Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . . 94

          1.     Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment. . . . . . . . . . . . . . . . . . . . . . . . 94

          2.     Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole. . . . . . . 113

     d.     Randy Weaver . . . . . . . . . . . . . . . . . . . . . . . . . . 119

  e.  Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 121

  f.  Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

  g.  Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

5.  Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

6.  The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

7.  Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . 144

8.  Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . 149

  a.  Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

  b.  Alvin Hahn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

9.  Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . . . . 154

10.   Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 160

11.   The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . 175

12.   Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

13.   Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.  . . . . . . . . . . . . 180

      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.   Unreasonable Acts and Omissions Affecting the Second Stage of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1.   Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

*2.*   Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

      a.   The family, social, and medical background of Kenny Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

           Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

           Family History of Mental Illness  . . . . . . . . . . . . . . . . . . . 191

           Maternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . 191

           Paternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . . 193

           Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . . . 195

           Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . . 198

           Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Infancy and Childhood Development . . . . . . . . . . . . . . 207

Onset of Mental Illness . . . . . . . . . . . . . . . . . . . . . . . . . 216

b.    Kenny Barrett's mental illness and organic
brain dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

c.    The prosecution's exploitation of trial counsel's
deficient performance . . . . . . . . . . . . . . . . . . . . . . . . . . 231

3.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Expert and Investigative Assistance under 18
U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Claim 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution Were
Violated by the Use of False Information in Obtaining the
No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search
Warrant Obtained by Clint Johnson Was Invalid under *Franks v.
Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was
Ineffective for Failing to Raise the Issue on Direct Appeal . . . . . . . . . . 247

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process,
his Sixth Amendment Rights to Counsel and Confrontation, and his
Eighth Amendment Right to a Fair and Reliable Capital Sentencing
Process Due to the Government's Suppression of Exculpatory
Evidence, Knowing use of Perjured Testimony, and Failures to
Correct False Testimony; Mr. Barrett is Entitled to Relief
from his Conviction and Sentence Based on Newly
Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

A.    Suppressed Exculpatory Evidence, Evidence of Knowing use of
Perjured Testimony, and Newly Discovered Evidence . . . . . . . 257

1.    Evidence regarding informant witnesses Charles
"Monk" Sanders, Travis Crawford, Cindy Crawford,
Brandie Zane Price, Karen Real and Randy Turman
entitles Mr. Barrett to relief from his convictions and
sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.    Charles "Monk" Sanders . . . . . . . . . . . . . . . . . 257

        b.     Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 262

        c.     Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 267

        d.     Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . . 273

        e.     Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

        f.     Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

    2.     The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

B.     The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

    1.     Evidence of Clint Johnson's illicit activities . . . . . . . . . 280

    2.     David Michael Littlefield's illicit activities . . . . . . . . . . 286

    3.     John Philpot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

D.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 297

Claim 6.     Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . . 303

Claim 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . 310

Claim 9.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue. . . . . . . 314

Claim 10.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Claim 11.      Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Claim 12.      The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

Claim 13.      Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Claim 14.      Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.  . . . . . . . . . . . . . . . . . . . . . . . . 348

Claim 15.      Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

Claim 17       Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case . . . . . . . . . . . . 354

IV.     Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315, 318

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 311

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Brecht v. Abrahamson, supra, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264, 266, 271

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Driscoll v. Delo, 71 F.3d 701 (8th  Cir. 1995),
*cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 139

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 175

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262, 257

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
*cert. denied*, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 292

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 175

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Hodge v. Hurley, 426 F.3d 368 (6th Cir.  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
*cert. denied,* 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . . 128

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 343

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308, 343, 344

Iimbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305, 306

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . 47, 137, 165

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 254

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302, 304, 307

Marchu v. United States, 926 F.3d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 311

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279, 286

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 302

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334, 351

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Def's § 2255 Mot.        xii        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 291

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304, 307

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 290

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Taylor v. Kentucky, 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
*cert. denied*, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . 322

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . 322

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. ex rel. Gregory Madef, 223 F. Supp. 2d 968
(N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . . 322

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
cert. denied, 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

United States v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 253, 255

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 174

United States v. Rich, 580 F.2d 929 (9th Cir.),
*cert. denied*, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 344

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Serawop, 410 F.3d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
(D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Viereck, v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 181

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 18

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 179, 335

**STATE CASES**

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 141

**DOCKETED CASES**

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 90

State of Oklahoma v. Richard Loy Gray, Jr. Cherokee County Case No. CF-2007-28 . . . 283, 284

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

**FEDERAL STATUTES**

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 42, 236

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293, 294, 351

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 334

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

28 U.S.C. §§ 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Fed. R. Civ.P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R  Crim.P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R. Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Fed. R. Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Fed. R. Evid. 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

Def's § 2255 Mot. *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF**

---

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his

undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule

2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court

grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct

the sentence.  Through counsel, Mr. Barrett states the following grounds for granting this motion:

**I.      Preliminary Matters**

    **A.      Statement Regarding Form**

        In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this

Motion sets forth only the facts and claims entitling Mr. Barrett to relief.  It does not contain

legal argument or citation.  Mr. Barrett will shortly file a separate motion seeking permission and

a schedule by which to file a Memorandum in Support of the Motion.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to this Motion are by the name of the exhibit;

- All other references are self-explanatory or based on the Blue Book.

**B.      Grounds for Disqualifying Trial Judge**

In Claim 1 and elsewhere in this Motion, Mr. Barrett relies upon evidence of the trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte* communications with prosecutors.  The evidence that must be considered in evaluating this Motion disqualifies the trial judge from making any rulings affecting the process for adjudicating this Motion or the merits of any claims stated herein.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991) (specific allegations about off-the-record actions of trial judge required that § 2255 motion be heard by different judge). Therefore, this Motion requests that the trial judge recuse himself without making any further rulings in the case.

Mr. Barrett will make a separate motion to recuse.  However, the principle that no person can be a judge in his own case, *In re Murchison*, 349 U.S. 133, 136 (1955), is sufficiently well established and invoked by the facts presented herein that recusal should not await a formal

Def's § 2255 Mot.                              2                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

motion.  It would be a violation of due process for the trial judge to make any rulings regarding this motion.  *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813 (1986).

**C.      Introduction**

Kenneth Eugene Barrett was acquitted of the murder for which he now sits on death row.  After an Oklahoma jury convicted him of manslaughter, the Government presided over an unfair trial in this court in order to obtain a death sentence in response to anger over the result of the state proceedings.  The trial in this court could fairly be described as a travesty.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the Government much needed "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he intended to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Oklahoma Highway Patrol Trooper David "Rocky" Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose license to practice law is currently in peril based on charges filed by the Oklahoma Bar Association as a result of his child abuse case.

Def's § 2255 Mot.                                       3                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial.  The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train.  Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony.  Karen Real, serving a fourteen year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death.  Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy.  In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced.  Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not.  The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct

false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible to forestall any effective defense investigation.  As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on the motion.  As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial and already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses.  The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation.  In passing, AUSA Littlefield let slip he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors.  What had occurred was misrepresented to defense counsel.  There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with.  Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to

Def's § 2255 Mot.                              5                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

interview the informant witnesses.  However, except in one instance, these witnesses refused to speak to the defense.  Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke.  Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The court's furtherance of these

interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end. Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial. Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants. Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase. Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom. Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued. A competent mitigation investigation would have shown the truth about him. Severe mental illness has plagued Mr. Barrett's family for generations. As shown in this motion, Kenneth Barrett has

Def's § 2255 Mot.                    7                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.     Statement of the Case

### 1..     Events Leading to the Offense

#### 1.     The Alleged Offense and the Bench Warrant

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the court appointed an attorney for him. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

On January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.    The Search Warrant

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At trial the confidential informant was identified as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Clerk signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

Def's § 2255 Mot.                             9                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence. The Tact Team decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.      September 24, 1999

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private driveway to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell. He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house. Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window. As Mr. Barrett approached the window, he was shot in the lower portion of his body. Mr. Barrett grabbed his Colt Sporter rifle, which was loaded with two full and one partially full magazine of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin. As it had been approaching, the second and third vehicles entered the property. They stopped slightly behind Hamilton's vehicle. Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground. Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds. At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

Def's § 2255 Mot.                         11                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B.      Three Trials

#### 1.      State Trials

Mr. Barrett was tried in Oklahoma State court, twice, as set out more fully in the Procedural History. The state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

#### 2.      Federal Trial

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase, most notably different was the testimony of seven informants, who did not testify in either

Def's § 2255 Mot.                                    12                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

of the state trials. The identity of these snitches was not made known to the defense until days before the trial was about to start. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.	Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.	Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.	Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.	Charles "Monk" Sanders, who testified that he overheard Mr. Barrett on the phone in jail while they were both incarcerated. Sanders said he heard Mr. Barrett say that they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.    Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr.
Barrett ran a police check point and he pursued him until he ran off the
road and ran away on foot.

6.    Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was
present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast
that two police officers had to jump out of the way. Smith also testified
that on a different occasion he saw Mr. Barrett slapping his wife. Smith
said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith
"he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.    William DeWeese, Rocky Eales' best friend from the Marine Corps, who
testified that Trooper Eales was an outstanding person, an outstanding
marine and like a brother to him.

2.    Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales
was a wonderful person and a wonderful brother. Ms. Stalcup stated that
Trooper Eales' death had a deteriorating effect on her health for which she
had to receive medical care.

3.    Bobbie Eales, Rocky Eales' mother, who testified about her son and read a
five-page written statement into the record that described her loss and
pain.

4.    Gene Hise, an Oklahoma State Highway Patrolman and good friend of
Rocky Eales, who testified about informing Kelli Eales of Rocky's death

and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.  Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered. Mrs. Eales also read into the record statements her children had writ

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.  Maudeen Vann, First Deputy County Clerk, Sequoyah, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.  Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.  Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.  Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame

5.  Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

Def's § 2255 Mot.                              15                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

6.   Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time. This was a very friendly exchange that took place three to six months before the raid.

7.   Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.   Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.   Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case. Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.   Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11.   Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr.

Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

## III.     Claims for Relief

**Claim 1.     Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Motion and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Motion rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense.  Mr. Barrett respectfully submits that the law requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv);  *In re Murchison*, 349 U.S. 133, 136 (1955); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991).  Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, <u>466 U.S. 648</u> (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, <u>422 U.S. 853</u> (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, <u>406 U.S. 605, 612</u> (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, <u>368 U.S. 52, 55</u> (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, <u>365 U.S. 570</u> (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *Woods v. Georgia*, <u>450 U.S. 261</u> (1981).

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, <u>528 U.S. 562, 564</u> (2000). *See also*, *Bush v. Gore*, <u>531 U.S. 98, 104-05</u> (2000).

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at the same time.

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Decl. Julia O'Connell; Decl. John D. Echols).  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation.  (Decl. Julia O'Connell).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation.  Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases.  (Decl. Julia O'Connell; Decl. John D. Echols).  To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma.  *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)).  The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal."  *(Id.* at ¶ 6.02(F)).  The trial court in this case required a high degree of specificity, and

Def's § 2255 Mot.                                20                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." Letter from Hon. James H. Payne to John David Echols dated 2/22/05 ("Payne Letter to Echols").

Judge Payne expressed a desire that the case rapidly proceed to trial. (Decl. John Echols). On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. Docs. 50, 51. On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but

Def's § 2255 Mot.                                          21                            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

not about Mr. Hilfiger's representation.  (Payne Letter to Echols).  Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials.  *Ibid.*  Mr. Echols responded by letter on February 28, 2005.  (Letter from John David Echols to Hon. James H. Payne dated 2/28/05).

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality.  The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution.  In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial."  (Payne Letter to Echols at 2).  Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols  informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule.  (Echols letter to Payne at 5).  The court did not rule on the defense's budget proposal until March 18, 2005.  Doc. 97.  At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005.  (Scheduling Order filed 12/11/04 (Doc. 22)).

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC").  (Decl. Richard Burr; Decl. John D. Echols).[2]  As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases."  (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107).  Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests.  (Echols letter to Payne).

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial."  (Order filed 3/18/05 at 2.)  However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case.  *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants.  (*See* Decl. Richard H. Burr).  The trial court's order evidences no consideration of these norms or practice, whether adversarial and judicial.  The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests.  The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

---

[2]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance.  (Decl. Richard Burr).

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[]      It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time.  If the expenditure of attorney time thereafter begins to depart in substantial ways from these projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107).

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the

defense.  (Doc. 51; Echols letter to Payne).  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."  (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added]).

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  Order filed 5/5/05 at 3 n.1.  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  *(See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he lost $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC.  Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case.  The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized.  The average number of hours approved for fact investigation in authorized cases is closer to 500 hours.  The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107).  The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial.  The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3).  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3).  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8).  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484).

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services. The court stated no basis for any denial or reduction related to the facts or circumstances of the case. Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique. Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work." (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107). Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." *Id.* Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert." *Id.*

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Decl. Julia O'Connell). The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

Def's § 2255 Mot.                                    27                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." *Id.* at 5. Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. *(See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Claim 2A, *infra.*

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part

of the budget.  The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigency.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases.  The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases.  *(See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation.  As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased.  (Decl. Julia O'Connell).  In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant."  (Payne letter to Echols).

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests.  On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets.  The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable.  Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for

their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work.  The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118).  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Decl. Richard Burr; Decl. John D. Echols).  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are

Def's § 2255 Mot.            30            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. Doc. 113. Mr. Hilfiger had urged Mr. Echols not to file the motion. (Decl Richard Burr; Decl. John D. Echols). However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Decl. John D. Echols).

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." *Ibid.*

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates

Def's § 2255 Mot.                                 31                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

spending' on each of several categories." *Ibid.* (quoting Order filed 1/29/05 (Doc. 38)).  The

record shows Mr. Echols filed lengthy budget requests describing the specific needs of the

defense and, most, but not all the time, describing with particularity the experts he sought to hire

and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page

single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in

state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols.

During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the

budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I

think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze

that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr.

10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not

be unduly compensated for work if his prior representation of Mr. Barrett made further labors

unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On

May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation

rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of

work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again

unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel

based, in part, on the assertion that the case loads of appointed counsel interfered with their

ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a

response to the motion.  There was no hearing on the motion.

Def's § 2255 Mot.                              32                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  Doc. 137.  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case."  *Id.* at 2.  Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date.  Doc. 138.  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action."  (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Echols letter to Payne at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.)  The court admonished counsel to give the case the "highest priority." *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.)  On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case,

Def's § 2255 Mot.                              34                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

*including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set at the counsel table with us during the selection." *Ibid.* The court recognized Ms. Cole's name and identified her as a jury consultant. *Ibid.* Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial. *Ibid.* If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

Def's § 2255 Mot.                    35                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly.  Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel.  During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel.  At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted Mr. Hilfiger to show a lack of diligence and inattention to budget matters. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 9, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

Def's § 2255 Mot.                                        37                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance. It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me."  (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues."  *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows."  *Ibid.*  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed."  *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position.  The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger.  *Id.* at 20.  The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses.  Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives.  *(Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 9 *ex parte* hearing.  On September 14, 2005, after jury selection

---

[3]  Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts.  (Doc. 97.)

proceedings ended, the court raised the issue of the unidentified witnesses.  The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday.  (R. 840.)  The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office.  (R. 841.)  Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday."  *Ibid.*  The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal."  (R. 843.)

It is a violation of due process for the Government to attempt to restrict defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present.  *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present.  (ABA Standard 3-3.1(c) (commentary)).  The trial court permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial.  Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial.  (Decl. Mark Henricksen).  Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely

Def's § 2255 Mot.                                       40                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence.  (Decl. Mark Henricksen). To the extent, Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Decl. Mark Henricksen).  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.       Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell

below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

### A. Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel.  As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel.  Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.  *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

Def's § 2255 Mot.                                43                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1.  Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27

Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel was ineffective for failing to raise the *Franks* issue.

2. Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms. This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3. Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the affects of Mr. Barrett not taking prescribed medications during trial. Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4. By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel was not able to effectively investigate and challenge the testimony of these witnesses. In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available. Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5.       Trial counsel was professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6.        Trial counsel was professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7.       Counsel was professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel was also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.       Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.       Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel was professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had

an active warrant, and was making "preparations" to meet any police presence with force.

Similarly, trial counsel unprofessionally failed to develop and present available evidence that

Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or

so before the raid, and inspected Mr. Barrett's weapons without incident.  This evidence would

have supported the motion to suppress and shown that a no-knock warrant and an armed raid on

Mr. Barrett's property in the middle of the night by numerous law enforcement officers was

completely unnecessary and unfounded.  Additionally, this evidence could have been used to

effectively impeach Government witnesses and the Government's theory of the case.

10.     Trial counsel was professionally unreasonable for failing to object to the

expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet

the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S.

579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999).  To the

extent this issue was framed by the record, direct appeal counsel was ineffective for failing to

raise it.

11.     Trial counsel was professionally unreasonable in failing to object to

certain matters that were raised on direct appeal, but were reviewed under the onerous plain error

standard due to trial counsel's failure to object.

12.     Trial counsel unreasonably failed to seek appropriate jury instructions at

both stages of trial including instructions on the theory of the defense, lesser included offenses,

the questionably reliability of testimony from drug addicts and informants, and residual doubts

about the manner in which the shooting occurred.  If these instructions had been given, there is a

reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel was professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in both stages of trial.

**Evidence of Constitutionally Deficient Representation**

**1.     Failure to professionally re-urge the motion to suppress under *Franks v. Delaware*, <u>438 U.S. 154</u> (1978).**

Trial counsel was professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was

revealed, for the first time, that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant state the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

> The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

> The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

> This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

> The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

> This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

> This affiant received information from the informant on at least five (5) occasions.
> Each time that this informant has provided information, the information proved to
> be true and accurate and resulted in the confiscation of illegal substances.

Affidavit for search warrant signed by Clint Johnson and warrant signed by Sequoyah County

Judge Dennis Sprouse on September 20, 1999.

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the

information that was contained in the search warrant affidavit, and which allegedly supplied

probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates

that the search warrant affidavit was knowingly based on false information, or that this

"information" was supplied to the Sequoyah County District Court with reckless disregard for the

truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient

evidence to establish probable cause, let alone probable cause for a no-knock warrant. In

contrast to the representations made in the search warrant affidavit, Sanders testified to the

following on cross-examination:

1. That he never saw Mr. Barrett manufacture methamphetamine on his

property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr.

Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2. That when he first met with Johnson after having been to Mr. Barrett's

residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's

property. He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him

on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.      In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

4(a).      After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

4(b).      Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

Def's § 2255 Mot.                                   51                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

a no-knock warrant, Johnson mislead the court.  Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

5.      Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there.  On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.  Therefore, Sanders testified, based on his alleged July trips to Mr. Barrett's property, Sanders told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

residence was when he and Movant, who was also a methamphetamine user, shot

methamphetamine together.  (R. 2625-28).

After Sanders's cross-examination testimony also belied Johnson's claims (a) that

Sanders informed him that Mr. Barrett conducted drug transactions at night because there were

fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night

because he believed the police could not conduct a nighttime search.  Of course, no "large

quantity" of drugs were found when Mr. Barrett's residence and property were searched by the

authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom

break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his

testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied

anything was discussed except how much longer he would be on the stand.  In the next breath, he

then admitted that Littlefield "may have" asked him whether he was confused about dates.

Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-

examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage

inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a

matter of a few minutes of the cross-examination having ended, certain aspects of the testimony

he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone

demonstrates that this is a witness who cannot be believed about anything, and demonstrates that

he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the

search warrant affidavit.

Def's § 2255 Mot.                                        53                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself in the same breath about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense

---

[5]  "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Decl. Janesse Thomas.)

counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's

testimony on cross-examination, the warrant was based on "faulty" information. Clint Johnson,

who had been questioned about the search warrant affidavit during the hearing on the motion to

suppress, related certain information contained in the affidavit that Sanders specifically denied

giving. Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had

advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr.

Barrett present a quantity of white powder, which Mr. Barrett represented was

methamphetamine. On cross-examination, Sanders stated there had been no discussion about

what Sanders thought was methamphetamine in Mr. Barrett's kitchen. According to Sanders's

testimony on cross-examination, there had been no representation that this substance was

methamphetamine, and no presentation of the white powder to Sanders. The search warrant

affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a

portion of white powder for a quantity of money. Sanders testified on cross-examination that this

did not happen. Defense counsel pointed out they were confronted with all this by the answers

Sanders gave on cross-examination; there had been no opportunity to interview Sanders before

he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the

motion to suppress, had testified under oath what he had been told by the C.I., and what facts had

formed the basis for the search warrant affidavit. (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the

Government to respond in writing. The court stated that it would either hold a hearing, if such

was deemed necessary, or would rule on the pleadings. (R. 2679.) As pointed out by the

Government in its response to the renewed suppression motion:

Def's § 2255 Mot.                                   55                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> The entire basis of defendant's Motion to Reurge the Motion to Suppressarises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic] Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc. 231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing. (Doc. 253.) In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial. Rather, it had been alleged that the C.I. did not really exist. The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr. Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful." Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported." Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable." Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth." Doc. 253 at 7.

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been

sustained.  Moreover, as shown below, the court's order is seriously flawed.  Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks*. These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface.  Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated in the re-urged, counsel could have argued the following:

(1) that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at this house;

(2) that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

(3) that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he

"probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

(4) that Johnson knew Sanders had not reliably brought back evidence of methamphetamine activity as shown by Sanders's testimony that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs

available, but there was no methamphetamine, and the three of them simply smoked marijuana;

(5) that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

(6) that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured.  Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth.  Sanders testified he was in regular contact with Johnson and continued to use drugs steadily.  Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately. Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions. Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, Sanders repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what Sanders supposedly observed. This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant. These false statements negate *the entirety of the warrant affidavit*. At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant. *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth. Had these matters been urged, there is a reasonable probability that the outcome of the

renewed suppression motion would have been different.  At a minimum, had all the evidence

from Sanders's cross-examination been marshaled, the defense surely would have been entitled

to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the

pleadings.  *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226

(1992).

In its order, the court seemed to rely on the testimony of other informant witnesses

to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a

reasonable investigation (or had the time to conduct a reasonable investigation), have impeached

many of these other witnesses (see below), the court could not properly rely on years-after-the-

fact testimony to find that the search warrant affidavit, founded solely on information from

Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless

disregard of the truth.

### Ineffective Assistance of Appellate Counsel

The question of the As set forth *supra*, the *Franks* issue, and counsel's failure to

effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on

direct appeal.  Because the issue was obviously meritorious, even with the record that was made,

there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was

professionally unreasonable.  Because it was shown above that the *Franks* issue, in conjunction

with a claim of ineffective assistance of trial counsel for failing to competently argue it, would

have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue

---

[6] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  This is addressed in a separate claim for relief.

Def's § 2255 Mot.                                   60                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002)(counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001)(direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard).   While an action under 28 U.S.C. section 2255 is not intended as a second direct appeal, and issues framed by the trial record and which could been, but were not, raised on direct appeal, are ordinarily considered procedurally barred *United States v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate counsel provides ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

>    **2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 was that Mr. Barrett intentionally killed the victim, knowing or

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate.  Rather than the intentional and remorseless killer one who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court.  Due to  counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to

be the antithesis of the Government's picture.[7]  Professional norms of criminal practice,

particularly in capital cases, tell attorneys that they should secure expert assistance.  Counsel's

failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues,

in light of the defense arguments made at trial respecting how the shooting occurred, constitute

deficient performance.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510

(2003).

The results of an accurate and reliable mental health evaluation demonstrate that

trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified

psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic

evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical

certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by

psychiatric illness and significant brain damage, which prevented him from knowing or

deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods

concluded that at the time of charged offenses, Mr. Barrett suffered from several major brain

disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in

the areas that are necessary to exercise judgment and reasoning.  Among the most significant

functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

annihilation coupled with an inability to understand or regulate his reactions – including

overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense,

---

[7] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

Def's § 2255 Mot.                        63                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Decl. of George Woods.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, as well as witness accounts, which documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to decl. of Myla Young, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Decl. of Myla Young at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment."  (Decl. of Myla Young at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or

highly stressful situations." (Decl. of Myla Young at 24.) Mr. Barrett is a "concrete thinker,"

whose executive function, which controls the ability to think, organize, problem solve, and

change actions based on the information he receives, is severely compromised. (Decl. of Myla

Young at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he

has difficulty processing visual information and is abnormally subject to feelings of fear and

paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Decl. of Myla

Young at 13.) Mr. Barrett's ability to actively process and comprehend information, including

visual information, in the "here and now," or as it unfolds, is severely compromised. (Decl. of

Myla Young at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately

perceive and process what is going on around him, a dysfunction that is especially heightened, as

noted, in stressful situations. (Decl. of Myla Young at 14, 24.) Mr. Barrett has moderate to

significant impairments in his ability to visually scan and accurately recognize information.

(Decl. of Myla Young at 20.) The "fluency" with which Mr. Barrett interprets visual

information, and the manner in which he processes such information, is also significantly

impaired. (Decl. of Myla Young at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's

neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test
> protocols and across the battery of tests. When administered across a broad variety
> of testing instruments, congruent results further confirm the accuracy and
> reliability of test results. The successful manipulation of test data to exaggerate
> measures of neurological impairment in a manner that eluded detection by
> imbedded validity scales would have required Mr. Barrett to have specific
> knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods

concluded:

[¶]     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR? for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregultion primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, the argument that Mr. Barrett was unaware that the police were on his property, and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even

if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state. In addition to providing contemporaneous, real world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question. Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (See, e.g., Decls. of Abby Stites, Toby Barrett, Sylvia Gelene Dotson, Mark Dotson, Ruth Harris, Kathy Trotter, Ernest Barrett, Steve Barrett, Ada Blount, Nona Reich, and Carolyn Joseph.) None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so.  In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder.  In 1995, he was again hospitalized because he was "losing [his] mind."  On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction.  Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw.  *(See* Eastern State Hospital Records, Wagoner Community Hospital records, and Bill Willis Mental Health Center records.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts.  (Decl. of George Woods.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[8]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), para. 2.  Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of

---

[8] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.  *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing Lofton's holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other

indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different.  This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of was voluntary manslaughter.

**3.     Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's

underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent (see, e.g., *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836 (1966)), "judges must depend to some extent on counsel to bring [competence] issues into focus." (*Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).)  Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation.  *(Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).)  Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court.  (Id.; Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).)

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice.  Counsel unreasonably failed wholly or adequately to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems." (*Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).)

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct any of testing and other evaluation necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, a chronic major mental illness, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD). Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency. (See, e.g., *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant

had been diagnosed with and treated for mental illness); see, also, *Barnett v. Hargett*, <u>174 F.3d</u> <u>1128, 1135-36</u> (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").)

   To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *(Hull v. Kyler*, <u>190 F.3d 88, 105</u> (3d Cir. 1999) (citing *Eddmonds v. Peters*, <u>93 F.3d</u> <u>1307, 1317</u> (7th Cir. 1996), cert. denied, <u>520 U.S. 1172</u> (1997); and *Felde v. Butler*, <u>817 F.2d</u> <u>281, 282</u> (5th Cir. 1987)); see also *Williamson*, supra, <u>110 F.3d at 1519</u> (same.).)  "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *(Williamson*, <u>110</u> <u>F.3d</u>, at 1519.)  The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that consistent the results of testing, employing reliable neuropsychological instruments for assessing brain impairment, have measured Mr. Barrett in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning.  Mr. Barrett's previous, psychiatric  diagnosis of Bipolar Disorder, made by independent, state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources.  Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Def's § 2255 Mot.                                      75                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted; and unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial."  (Decl. of George Woods, M.D., at  81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at  80.)  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at  80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at  59, 80.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process."  (*Williamson v. Ward*, 110 F.3d, at 1519.)  Accordingly, Mr. Barrett should be granted a new trial.  (Id.)

**4.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper ex parte hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses.  During this hearing, the court criticized the Government for failing to raise the issue sooner.  The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger.  The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified.  The court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing.  Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find out what they were going to say.  (Tr. 9/13/05 Hr'g at 27; R. 840-43.)  There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind.  The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense.  The

obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course,  was not taken.  As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand.  Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing.  Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[9]

A wealth of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel discovering the evidence independently.  Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

**a.      Travis Crawford[10]**

---

[9]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance.  Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  Decl. of Mark Henricksen.  Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[10]  Mr. Barrett is in possession of newly discovered evidence that eviscerates the credibility of Travis Crawford's trial testimony.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (Claim 5A, B)

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[11] (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been

---

[11] This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

Def's § 2255 Mot.                                    79                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

142

fired from his job if he absented himself for the interview.  He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him.  (R. 468-69.)  Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him.  (R 469.)  Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be.  (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government.  He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[12]  (R. 470.)  Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales.  Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If

---

[12] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation.  *See Brady/*newly discovered evidence claim.

Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23rd regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether or he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[13]  Had counsel asked about this,

---

[13]  *See* Mr. Barrett's *Brady* claim.

and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23rd, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22nd, and stayed until around 9:00 p.m. on September 23rd. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23rd, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Travis Crawford was regarded as a "flake," and it was well known that he had acted as a police snitch in the past. (Decl. of Rick Lunsford.)

Def's § 2255 Mot.        82        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so.  Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs.  Toby Barrett and Mr. Lunsford stayed, and the others left.  Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage.  Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family.  (Decl. of Rick Lunsford.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory."  Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett.  Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person.  (Decl. of Rick Lunsford.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community.  (Fed.R.Evid. 608(a).)  In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed.  Mr. Crawford was not only a heavy drug user, but also dealt drugs.  Mr. Crawford would sell bad dope to people and "rip them off."  Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble.  Travis Crawford was known in the community for his dishonesty and untrustworthiness.  (Decl. of Rick Lunsford.)  Even if Mr. Lunsford would have been

prevented from giving "extrinsic evidence" regarding his knowledge of specific dishonest and bad acts on Crawford's part, they could have been inquired into during Crawford's cross-examination, because they were probative of his truthfulness or untruthfulness.  Fed.R.Evid. 608(b).

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Decl. of Rick Lunsford.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Decl. of Brandy Hill.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Decl. of Brandy Hill.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Decl. of Brandy Hill. *See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Decl. of Brandy Hill.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23rd, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Decl. of Toby Barrett.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness.  Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford.  (Decl. of Carolyn Joseph.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial.  It is her personal belief that Crawford is not an honest or trustworthy person.  Nor does Mr. Crawford have a reputation for honesty in the community at large.  (Fed.R.Evid. 608(a).) (Decl. of Carolyn Joseph.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen.  Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs.  Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage.  Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property.  Crawford simply pocketed the money and never built the well house.  Crawford never repaid the money he took for a job he never did.  The materials that had been purchased for construction of the well house were later stolen.  Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials.  Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her.  Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident.  Decl. of Carolyn Joseph.

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. (Fed.R.Evid. 608(b).) Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b.    Cindy Crawford[14]

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

---

[14] Movant is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony. Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. *See* Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18.  She used the drug for nine years, and would either snort it or shoot it.  She stated or implied on direct examination that she was currently drug and alcohol free.  (R. 3161.)  While on a "meth run," the longest she had stayed up was five days.  While using methamphetamine, she would often stay up for three to four days at a time.  (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time.  To her, time was just a blur that played tricks on her mind.  (R. 3073.)  She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant.  Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999.  (R. 3072.)  While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs.  (R. 3072.)  With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users.  (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him.  He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her.  (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination in a weak effort to impeach Cindy Crawford.  Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems.  In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage.  A reasonable investigation would have uncovered evidence regarding her mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and her overall credibility.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  Medical records of Cindy Crawford, filed under seal.

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-04-63.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Because counsel made no court record search, he neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial

commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-0463.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandy Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed. (File, Sequoyah County Case No. PO-03-390.) Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that in his personal opinion, Cindy Crawford was completely dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to

escape prosecution and punishment for her own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders.  Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty.  He is Cindy Crawford's father in law, and has known her for years.  (Decl. of Roger Crawford.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford.  Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford.  He has also known her for years.  He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf.  Had he been contacted, he could have testified that in his opinion, Cindy Crawford is thoroughly dishonest and untrustworthy.  Her reputation for honesty in the community is abysmal.  Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across.  Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him.  Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members.  According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs.  Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble.  Decl. of Mike Mackey.

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into

during cross-examination of Crawford.  (Fed.R.Evid. 608(b).)  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case.  (18 U.S.C. § 3593(c).)

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's honesty.  As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Decl. of Brandy Hill.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Decl. of Sean Hill.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a

twelve year old child.  In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful."  Ms. Crawford's reputation in the community for honesty is, to put it mildly,  poor.  No one Ms. Joseph knows would trust or believe anything Cindy Crawford said. Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Decl. of Carolyn Joseph.)

Still another witness who could have testified regarding Cindy Crawford's bedrock lack of honesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years.  In her opinion, Cindy Crawford is thoroughly and totally dishonest.  Cindy Crawford is well known in the community for her dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself.  (Decl of Gwendolyn Crawford.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to a leg and threatened to kill her, allegedly because she would not have sex with him, could have been conclusively impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred.  (Decl. of Richard Barrett.)

### c.      Charles "Monk" Sanders

1.       **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to Sanders.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel's unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Not only did counsel fail to capitalize on the entirety of Sanders's cross-examination testimony when the motion to suppress was re-urged, but counsel failed to effectively impeach him, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he

supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies that Clint Johnson only helped with "some" of his cases, had not gotten out of "a lot" of trouble, and that he was not both working as an informant and free to commit whatever crimes he wanted to.  (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions.  Counsel stated that he had looked at Sanders's D.O.C. "sheet."  This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted.  Counsel confronted Sanders with the fact that he had far more than the four priors Sanders's acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.)  *See* Claim 5, *infra*.

Counsel superficially asked[15] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4)

---

[15]  R. 2524-36.

a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to do five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

(1)     Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (File in Sequoyah County Case No. CF-92-91.)

Def's § 2255 Mot.                                98                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

(2)     In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: Concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. *(See* File in Sequoyah County Case No. CF-97-9.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also because he failed to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather

"evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

(3)     In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (File in Sequoyah County Case No. CF-97-75.)

(4)     In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

(5)     In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting

Def's § 2255 Mot.                                    100                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

defendant with even one prior felony conviction from receiving a deferred sentence).[16]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

(6)     In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, CRF-92-91 and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998.  Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by the District Attorney's office.  The sentences were also ordered to run concurrently with a conviction

Sanders obtained in Creek County.  CF-98-128 was case was later dismissed with costs, as is discussed below.  (File in Sequoyah County Case No. CF-98-128.)

It was unreasonable for Mr. Barrett's trail counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

---

[16]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

Def's § 2255 Mot.                              101                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

(7)     In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed. (22 O.S. 1991, section 51; 22 O.S. 1991, section 991c.)[17]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the department of corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in

---

[17] Again, as with the statute governing deferred, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Def's § 2255 Mot.                              102                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Sequoyah County Case No. CF-98-363; (d) a *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases.  Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions.  Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State.  (File in Sequoyah County Case No. 98-346.)

(8)     In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument.  The same previous felony convictions noted in the cases

above were alleged on page 2 of the information, meaning Sanders was facing twenty to life.  On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314.  Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections.  Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed.  A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered.  A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, were also filed in connection with this case.  On April 17, 2004, the court entered a second order revoking Sander's suspended sentence.  As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors.  (File in Sequoyah County Case No. CF-98-363.)

(9)     In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty.  Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination.  Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun.  Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies.  In addition to the same three prior Sequoyah County felony that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail.  Yet again, Sanders faced twenty to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1.  In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright.  Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

Def's § 2255 Mot.                                    105                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case.  As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years.  He would revert to full probationary status upon completion of a Department of Corrections drug program.  The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively.  As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one.  (File in Sequoyah County Case No. CF-99-562.)

(10)    In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer.  He was also charged

with a misdemeanor for possession of drug paraphernalia.  The state alleged in page two of the information that Sanders committed the felony larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363 and CF-99-562).  With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs.  On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (File in Sequoyah County Case No. CF-01-314.)

(11)    In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor).  Sanders was charged with the felony offenses in this case after having been convicted of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case,

Def's § 2255 Mot.                            107                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (File in Sequoyah County Case No. CF-03-124.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly prejudicial evidence.  The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

(12)   In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90, 144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.  The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years

imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed. The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124. (File in Sequoyah County Case No. CF-04-19.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

(13)    In Cherokee County Case No. CF-98-111, Sanders was (and still is) charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively. Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear. A bench warrant was issued on May 15, 1998. Sanders had a second failure to appear on March 24, 2000. On May 3, 2001, he was ordered released to a bondsman. The case is still pending today. The last docket entry, for November 25, 2008, shows that Sanders could not make it to court as scheduled because of eye surgery. (File in Cherokee County Case No. CF-98-111.)

Counsel was professionally unreasonable for failing to cross-examine Sanders about this pending case, the existence of which could have been discovered easily. Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been

filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

(14)   In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Files in Muskogee County Case Nos. CF-93-131 and CF-93-772.)

(16)   In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (File in Tulsa County Case No. CF-94-1503.)

(17)   In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into

on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (File in Tulsa County Case No. CM-03-6603.)

(18)    In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005.  On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005.  On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody."  On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended.  (File in Tulsa County Case No. CM-04-1187.)

Mr. Barrett's trial counsel unreasonably failed to discover the facts and cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

(19)    In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest.  On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest).  On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea.  Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty.  (File in Sequoyah County Case No. CM-00-389.)

(20)     In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana.  He also attempted to resist arrest.  Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (File in Sequoyah County Case No. CM-03-365.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the

Def's § 2255 Mot.                    112                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

surface, cross-examining Sanders generally (and inaccurately) about the number of previous

felony convictions, what they were for, and that he received little jail or prison time.  Counsel

neglected altogether to cross-examine Sanders about his misdemeanor cases involving

dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's

convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his

credibility would have been completely destroyed in the eyes of any rational jury.  Impeachment

of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County

law enforcement officials, not to mention the Government then relying upon him to seek a death

sentence.  These omissions alone, or in conjunction with counsel's other failures to investigate

the informant witnesses and prosecution evidence, undermines confidence in the verdict.  If trial

counsel had presented the available evidence, the jury would have had an entirely different and

more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on

the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar,

drug addict, and opportunistic snitch.

> **2.      Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to

investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

Def's § 2255 Mot.                                  113                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

176

investigation into readily available evidence and witnesses that would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning police raid on Mr. Barrett's property. Littlefield told the jury Sanders was present around 5:00 p.m. to 6:00 p.m. on September 23rd, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23rd. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Of course, Mr. Lunsford was never contacted by defense counsel. Had he been contacted,

he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23rd. (Decl. of Rick Lunsford.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Decl. of Sean Hill.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Decl. of Brandy Hill.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[18] He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas. She was an available witness. Had counsel located and interviewed her, she would have testified that Sanders was lying. Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting. She also would have testified that on the occasions she did go to Mr. Barrett's she never went with Sanders. Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him. On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any

---

[18] Her true name is Janesse Thomas.

drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Decl. of Janesse Thomas.)

Counsel unreasonably failed to investigate and produce some of the witnesses discussed immediately above, and others, who could have testified that Sanders is a pathological liar whose word was worthless.  Not only did these witnesses have personal opinions that Sanders was dishonest and completely untrustworthy, but they were well aware that Sanders's reputation for truth and veracity in the community was horrendous.  These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past.  Sanders was a heavy drug user, who also dealt drugs.  In Mr. Lunsford's opinion, Sanders is a totally dishonest person.  Mr. Lunsford would not believe anything Sanders said.  Sanders was even dishonest in his drug dealings.  Sanders often sold bad dope to people and ripped them off.  Of course, he never seemed to get in trouble for his drug dealings.  Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis.  Not only does Mr. Lunsford have a personal opinion that Sanders is wholly dishonest, but he has a well known, and richly deserved, reputation for dishonesty in the community.  Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened

harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Decl. of Rick Lunsford.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified that in her personal opinion, Sanders is completely dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself.  Sanders's reputation for honesty in the community is horrible.  Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him.  On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help.  Thomas left Sanders, and was picked up by Mr. Barrett.  Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas.  Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother.  Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders.  (Decl. of Janesse Thomas.)  Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill could have testified that in his personal opinion, Charles Sanders is a liar who had no credibility whatever.  Sanders's reputation in the community for truth and veracity is abysmal; Sanders is known as a thief, a liar and a snitch.  It was known in the wider community that Sanders lies about others in order to get favorable treatment from law enforcement.  When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record.  In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed.  Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr.

Barrett actions that routinely occurred.  Mr. Hill would have informed the jury that when Sanders is in jail, it is known that he is routinely beaten up by other inmates because he is a liar.  (Decl. of Sean Hill.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is completely unbelievable and untrustworthy.  Sanders is extremely dishonest even when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Decl. of Sally Davis Johnson.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders in the first stage of trial, even if she could not have given "extraneous evidence" on these matters in the first stage.  Ms. Johnson could have testified to these acts, however, in the penalty phase.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him.  Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of

being held by Sanders, he turned himself in to the police on an outstanding charge.  At this point,

Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another

two to three days.  The police finally rescued Ms. Johnson.  Evelyn Sanders tried to cover up Ms.

Johnson's many bruises with make-up.  A police report was made by Ms. Davis about what

Sanders did to her.  (Decl. of Sally Davis Johnson.)[19]

Ms. Johnson could have told defense counsel, had she been contacted, about an

act of threatened violence committed by Sanders.  Sanders once threatened Ms. Johnson's

mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was.

Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms.

Johnson and cut her tongue out.  (Decl. of Sally Davis Johnson.)

Ms. Johnson, had she been contacted by defense counsel, also could have

informed the defense about other specific acts of dishonesty committed by Sanders.  Sanders

once took her along on a stealing spree, during which Sanders stole from virtually everyone he

knew in order to get money to buy drugs.  The police were informed about this by Ms. Johnson.

Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs.

Sanders was so pathetically dishonest he once stole  Ms. Johnson's children's toys in order to

pawn them for drug money.  (Decl. of Sally Davis Johnson.)

Finally, one of Sanders's own relatives could have testified, had he been contacted

by the defense, that Charles "Monk" Sanders is a completely untrustworthy and unbelievable

individual.  Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.

According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a

---

[19]  Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

pick-up truck."  Sanders, who has been in trouble his whole life, is unbelievable in everything he says.  Mr. Poindexter would not believe his nephew about anything.  Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law.  Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for.  Mr. Poindexter states also that he is aware that Sanders's reputation in the community for truthfulness is awful.  Had Mr. Poindexter been contacted by Mr. Barrett's trial lawyers, he would have testified. (Decl. of Billy Poindexter.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks.*  This evidence would demonstrate conclusively that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[20]

### d.      Randy Weaver

Randall Weaver testified in the first stage of Mr. Barrett's trial.  He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the spring and summer of that year.  Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 year looking at cars.  On that occasion, Weaver and Mr. Barrett used methamphetamine together.  Weaver went to Mr. Barrett because he was a good mechanic.  Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property.  Weaver testified he

---

[20] *See also,* Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson.

bought $20.00 of methamphetamine from Mr. Barrett.  Weaver claimed Mr. Barrett told him that

he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued.  (R.

1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb

in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's

federal case by Littlefield, who came to his tattoo shop in Arkansas.  Weaver had previously

done time on an Arkansas cocaine charge.  When Littlefield came to see him at the tattoo shop,

he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it

was against federal law for Weaver to possess ammunition because of his previous conviction.

Weaver told Littlefield he never sold ammunition to Mr. Barrett.  Littlefield's statement to Mr.

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he

had nothing to worry about because he had done nothing wrong.  (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and

Mr. Barrett lived in, people don't drive up without warning in the middle of the night.  If a gate is

closed, people should not go onto somebody else's property.  It makes no sense to do such a

thing.  (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the

defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his

court case, or at any other time during the Spring and Summer of 1999, he ever said words to the

effect that he would blast the first policeman who came onto his property, would "go out in a

blaze of glory," or had in any way, at any time, threatened the police.  Had he been asked these

questions at trial, Weaver would have testified that Mr. Barrett never made such statements to

him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would

ever do violence to anyone.  (Decl. of David Autry.)

### e.        Brandie Zane Price

Brandie Price testified she first met Mr. Barrett in August or September, 1999,

and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a

week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding

warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the

police arrived, those present should either grab a gun or hit the floor, because he "was going to

take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[21]

who would drive her vehicle through the ditch area the police went through when they raided Mr.

Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she

made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14

at his residence, which were unlike the weapons she described on cross-examination.  She also

stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied

doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's

residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been

easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

---

[21]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with her at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September, 1999.  (R. 4117-23, 4182-83.)

Def's § 2255 Mot.                    122                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Decls. of Sean Hill and Brandy Hill.)

Counsel also failed to call any witnesses who could testify to their personal opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the police.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Decl. of Sean Hill.  *See also* Claim 5, *infra*.)  Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.

### f.      Karen Real

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Claim 5, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Def's § 2255 Mot.                                   123                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Decl. of Sean Hill.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim.

### g.     Randy Turman

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that

would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute, possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and

possession of a firearm with an altered serial number.  The charges were based on evidence recovered during the execution of a search warrant.  Turman posted an appearance bond on September 20, 2002.  A preliminary hearing was set for April 17, 2003.  The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003.  According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice."  The motion to dismiss was granted by written order the same day it was filed.  (File in Sequoyah County Case No. CF-02-477.)

Counsel was professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years.  Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony.

Counsel was also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty.  Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin."  (Decl. of Sean Hill.)

## Conclusion

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The concealed evidence, there and in Mr. Barrett's case would have shown that witnesses had motive to lie and had colluded in their stories. *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness). *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing

to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

<blockquote>

**5.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

</blockquote>

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials.  Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials.  The court authorized $4,000.00 for a crime scene reconstructionist.  After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that it had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator.  Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence.  *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness.  Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance.  Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert advice was deficient performance.  *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government.  Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property.  The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied.  Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief.  (Report and curriculum vitae of Edward Hueske.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury.  "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components."  For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender.  Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right."  Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco.  Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet.  (Hueske report at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass.  If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass.  Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene."  Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco.  When asked by defense counsel for examples, Dalley could not come up with any.  (Hueske report at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Hueske report at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation."  (Hueske report at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1)      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting.  Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis.  There is also an unresolved question as to how wide the passenger door was open when shots were fired.  No measurements were taken.  Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured.  (Hueske report at 3.)

2)      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence.  Placing trajectory rods

in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and state she saw none.  (R. 3399.)  Hueske report at 3.

3)      To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  Hueske report at 3.

4)      The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire") (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Hueske report at 3.)

5)      Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of bullet penetration/perforation in a variety of substrates."  This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle.  Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for.  Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

Def's § 2255 Mot.                           133                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446. Hueske report at 4.)

6)      Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur

frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Hueske report at 4.)

Def's § 2255 Mot.                                134                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

7)      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident."  (Hueske report at 5.)

8)      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Hueske report at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9)      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to

confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Hueske report at 5.)

10) Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Hueske report at 5.)

11) Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions. It was particularly important here to determine the angle of fire after the Bronco came to a stop. However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco to where it came to rest before being moved. (Hueske report at 5.)

12)     Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements of the hole locations.  (Hueske report at 5.)

13)     Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation."  *Ibid.*

14)     Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window.  Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used.  (Hueske report at 6.)

15)     In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Hueske report at 6.)

16)     In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Hueske report at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999).  Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at

Def's § 2255 Mot.                                    138                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

strengthening the Government's case, were scientifically unreliable.  At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community.  *Daubert* 509 at 593-94.  While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable.  Dalley just made it up as she went along in service of her goal of assisting the Government to obtain convictions.  Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony

Def's § 2255 Mot.                                  139                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified.  Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent.  *Snowden v. Singleterry,* 135 F.3d 732, 738 (11ᵗʰ Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8ᵗʰ Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not just Mr. Barrett's current lawyers who say Ms. Dalley, far from being an objective scientific witness, is a partisan advocate who dresses up her personal opinions in the

guise of "science."  The Oklahoma Court of Criminal Appeals has chastised her, recently

reversing a first degree murder conviction due to Dalley' 's unreliable, unscientific testimony,

including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl.

Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris

Dalley's conclusions and computer-generated animations were not based on objective scientific

findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.

Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used

improper methodologies and techniques to "package" evidence already heard by the jury,

offering conclusions based on an incompetent and unscientific evaluation of the evidence.

   In addition to trial counsel's other failings with respect to Dalley's testimony,

counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr.

Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had

been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the

criminal defense community.

    **6.**  **The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death**

   The methods used by the Oklahoma Highway Patrol tactical team were highly

questionable.  Based on all the circumstances surrounding the mission, it was ill-conceived and

should have been aborted.  Instead, even though the element of surprise – the motivation behind

the plan to begin with – had been totally lost because the "drive-by" vehicle was spotted the

afternoon before the raid; Toby Barrett was in the yard when the police arrived and yelled a

Def's § 2255 Mot.      141     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

warning; the lights were on in Mr. Barrett's house, meaning he was still awake; and ultimately the lead, unmarked vehicle, with no police lights on, actually ran into Mr. Barrett's house, plan went forward, with tragic results for Trooper Eales.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert to show that the raid was plagued by numerous tactical errors that contributed to Trooper Eales's death.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures.  (Doc. 50.)  The court authorized some funds for this evidence.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert Mr. Echols wanted to retain.  Trial counsel's omission was not an informed tactical decision.

During the trial, Mr. Barrett's counsel informed the court that a law enforcement witness, Chuck Choney, who testified for the prosecution in state court and had provided favorable evidence on cross-examination, was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense.  (Tr. 10/03/05 Hr'g at 6-7.)  Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify."  *Id.* at 6.

Trial counsel knew or should have known that it was necessary to retain another expert to assist the defense because of Mr. Choney's affinity with law enforcement.  Mr. Echols had known this, and requested authorization to retain another, independent, expert.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney.  But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by

telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness counsel knew would not cooperate.  If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, the evidence would have shown that Trooper Hamilton's errors in conceiving the raid and carrying it out meant, among other things, a) that Mr. Barrett did not have visual evidence that the lead Bronco was a law enforcement vehicle, and had no signs of law enforcement until after the shooting; b) that the lead vehicle lacked necessary cover from a sniper; c) that the lead Bronco advanced onto the property from a tactically disadvantageous position; d) that the team lost the element of surprise; e) that the situation was dangerous for non-tactical personnel; f) that the presence of observers made a violent altercation more likely, though unnecessary; g) that the lead Bronco's approach and the  position of other vehicles unnecessarily exposed Trooper Eales to both friendly fire and hostile fire.

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena.  He turned out to be a Government witness rather than a defense witness.  He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant.  However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination.  In his opinion, while hindsight might suggest other alternatives to

Def's § 2255 Mot.                        143                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the action taken, there was no compelling need to have aborted the mission.  His bottom line was devastating to the defense: the tactical team did nothing wrong.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, in *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002).  In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired.  Hooper had once attended anger management counseling.  His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper.  Counsel then hired a forensic psychologist to review the other psychologist's report.  Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems.  These conclusions could not be reached, however, unless the defendant were examined personally.  At the eleventh hour, defense counsel subpoenaed the second psychologist to testify.  He was extremely hostile to the defense because he had warned counsel he could reach no conclusions without examining the defendant himself.  He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating.  He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed.  The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems.  The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney.  He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement.  He made it clear that he did not want to testify

for the defense.  He appeared only when compelled by a subpoena.  Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination.  On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors.  As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial.  *Strickland v. Washington,* 466 U.S. 668 (1984).  As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues.  If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.

> **7.      Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials**

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense.  The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent.  Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared.  Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved a pipe dream. At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett would have known the police were on his property because the emergency lights on some of the vehicles were engaged. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, crucial opportunities for impeachment in this area were lost.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at

747.)  Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed.  In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on.  (2nd St. Tr. TX at 448, 461.)  At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on.  Trooper Pettingill did not activate his lights.  (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road.  He was impeached with a prior statement in which he said he only saw taillights, not emergency lights.  Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights.  (2nd St. Tr. TX at 25, 49, 51.)  In the federal trial, Johnson said nothing on direct examination about any lighting.  Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.)  Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

The issue of whether Mr. Barrett or the police opened fire first was obviously critical.  At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  He heard shots as

he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence.  (2nd St. Tr. TX at 757, 766.)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approach the front of the house at the time he recalled hearing gunfire, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started, supporting Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. TX 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation any father would react to.  In federal court, Hamilton stated the gunfire began

earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in his home was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error appeared during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but five of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.  This damaging answer, given only because counsel opened the door, just

hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility

of the informant witnesses due to these "prior reports" from "several" sources.[22]

Counsel's failures to impeach were professionally unreasonable, and not

motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in

counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

officers' accounts of the raid.  Counsel's elicitation of damaging evidence from Johnson was

highly prejudicial under the *Strickland* test, because it tended to invest credibility – however

spurious it might have been, and however false Johnson's testimony was – that they otherwise

lacked.

> **8.    Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

### a.    Toby Barrett

The primary contention of the defense in the first stage of trial was that when Mr.

Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police

vehicle, and was unaware that several police vehicles had driven onto his property.  It was

undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle.

---

[22] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and

able to be prepared by trial counsel to testify in the federal trial. (Decl. Toby Barrett. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Trial Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, Toby Barrett's testimony is consistent with Trooper Hamilton's for example, in confirming that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Trial Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Trial Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Decl. of Toby Barrett.) He denied telling the police he saw flashing lights.

Def's § 2255 Mot.                          152                  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

(1st St. Trial Tx at 1809.)  Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Trial Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  He never really saw his father at all, except for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Trial Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Trial Tx at 1807.)  The entire incident happened very quickly.  (Decl. of Toby Barrett.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Decl. of Toby Barrett.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that Mr. Barrett intentionally killed Trooper Eales knowing he was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up was important to trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to

Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here."  (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify.  In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial.  He said yes each time, but he never called me.  He never asked me about the incident, my father's mental problems, my home life or about me or my mom."  (Decl. of Toby Barrett.)

### b.  Alvin Hahn

Alvin Hahn was a neighbor of Mr. Barrett's.  On the night of the shooting, he was asleep and was awakened by gunfire.  When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on.  (Decl. of Alvin Hahn.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate.  Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Because the testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and supported the defense claim that Mr. Barrett had no idea he was shooting at the police, Mr. Barrett was prejudiced.  Viewed

individually, and especially collectively, with all the evidence defense counsel failed to prepare

and produce in the first stage of trial to counter the Government's case, there is a reasonable

likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses.

*Strickland v. Washington,* 466 U.S. 668 (1984).

> **9. Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

The Government made much of the "fact" that Mr. Barrett was well aware there

was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah

County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the

Government, Mr. Barrett anticipated the police were going to arrest him at any time on this

warrant, and was therefore making preparations to repel the police with deadly force. This theory

was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy

Crawford, Brandie Price and Karen Real, who, as noted, testified that Mr. Barrett told them about

the warrant, and stated he would kill the first policeman who came on his property and would

"go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the

fulfillment of Mr. Barrett's "plan."

Trial counsel did virtually nothing to rebut this claim other than rely on cross-

examination. Had counsel been paying sufficient attention to certain testimony that was

introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45),

testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk, and had they conducted

anything approaching a reasonable, professional investigation, the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

The Government called Ms. Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/26/05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified,

with a return receipt requested.  (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.  *Rompilla v. Beard*, *supra*.

Mr. Rogers, the last attorney to represent Mr. Barrett in this case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant.  Mr. Rogers is now deceased.  In connection with this 2255 motion, his widow, Mary Rogers, was contacted by a defense investigator.  Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case.  Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest.  Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services.  (Decl. of Leonard Post; Bill Ed Rogers's attorney file.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time.  This fact alone, or in conjunction with other set forth herein, would have convinced jurors that the State had unnecessarily sought the no-knock warrant.  This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants,

would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

Had Mr. Barrett's trial counsel conducted a reasonable investigation there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[23]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was

---

[23] *See also* Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

firing a gun into the air. Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence. The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him. There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[24] (Decl. of Janice Sanders.) Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness. When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness. To his surprise, Mr. Hilfiger said "no." (Decl. of Janice Sanders.)[25]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property. Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support. He had been doing this long before the "warrant" was issued. Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house. Had the police simply contacted Mr. Barrett's family, they would have

---

[24] During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett. In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently. Decl. of Janice Sanders. On this occasion, Sheriff Philpot arrived after the other officers. When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers. One of the weapons being inspected appeared to be an SKS. Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant. Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant. Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected. Philpot Deposition.

[25] In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Def's § 2255 Mot.                                    159                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Decl. of Sylvia Gelene Dotson.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Decl. of Ruth Harris.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road.  On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do.  Ms. Crawford told if the police really wanted them, he should simply go with them.  Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down.  (Decl. of Phyllis Crawford.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years.  Police drove by Mr. Barrett's property all the time.  When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett.  Mr. Barrett was used to the regular police patrols and police presence in the area.  His attitude was, he was there if the police wanted him.  Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up.  (Decl. of Sean Hill.)

Brandy Hill could have given similar testimony.  She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week.  Mr. Barrett was used to the police presence and was not bothered by it. (Decl. of Brandy Hill.)

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case.  Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

> **10.  Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of  irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress"  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their testimony in the previous state court trials. (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress." (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two terms in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[26]

---

[26]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[27] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.   While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does." (R. 880.)  However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

---

[27]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993).

Def's § 2255 Mot.                    163                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

After testimony from Horn running to some forty printed pages (R. 849-889), including his narrating what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[28] confabulation (R. 906),[29] and contamination of memory through contact with others.  (R. 900-901.)[30]  In fact, Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or

---

[28]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[29]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[30]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities."  (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  And, inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed.R.Evid. 702. The fact was equally clear on the basis of the two state trial transcripts.  As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592.*  Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant.  *Id.  Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals. (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.) Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[31] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[32] When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[33] For example, 30% of the necessary points required for Board

---

[31]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

[32]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[33]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009). The National Center for Crisis Management offers no fewer than

Def's § 2255 Mot.                    167                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[34]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[35]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the

---

fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[34]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[35]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

"Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[36] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing.  He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not

---

[36]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

Def's § 2255 Mot.                                    169                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[37]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

raid.  (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental

health expert and only at below-market rates of compensation, and only for a number of hours far

below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent

Mr. Barrett as part of a plan to develop a panel for future capital cases (Decl. of Julia O'Connell),

declined to join his former lead counsel in requesting additional funds from the court.  (Decl. of

John Echols.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him

questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not

contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until

late September, 2005, at the earliest.

---

[37]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

Def's § 2255 Mot.                        170                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him.  A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter.  Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged.  Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions.  (R. 939.)  While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[38]  Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-

___

[38]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds.  To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses.  Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

Def's § 2255 Mot.                                  171                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

emptive violation of FED. R. EVID. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[39]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[40] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that

---

[39]*See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

[40]The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

Def's § 2255 Mot.           172           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

should never have come in at the guilt phase.[41]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant."  *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

---

[41]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Def's § 2255 Mot.                                  173                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005.  This delay can only have allowed the evidence to sink into the jury's consciousness.  By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required.  Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony.  "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.)  The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder.  It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial.  *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial.  The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony.  The court had

recognized the appropriateness of giving an instruction to disregard, although the instruction

actually given was inadequate.  Defense counsel could and should have argued that the jury's

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial.  There

was no downside to a motion for mistrial and therefore no strategic reasons for failing to make

the motion.  Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a

government witness that his client's statement had been given after he had already involved his

rights, a trial court suppressed the statement.  However, only a cautionary instruction was given

and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C.

2004).  Counsel's performance was held to be deficient in the circumstances of that case, where

"any reasonable defense lawyer would have jumped at the chance to start the trial afresh."  *Id.* at

37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a

mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir.

2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory

closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing

to move for mistrial after repeated references to defendant's exercise of right to remain silent);

*Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial

after court gave improper parole instructions).

To the extent the issue could have been fully resolved on the record, direct appeal

counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance

provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or

correct that error through a stronger instruction or a mistrial.  However, as indicated here, there is

extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own

expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not waive these issues.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.  *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).  The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **11.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349,

360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, an instruction on Oklahoma's "make-my-day" law, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.  These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledge at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000).  *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978).

Def's § 2255 Mot.                                177                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony. Karen Real Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandi Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

[¶] You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in the drug manufacture or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**12.     Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious**

**claims on direct appeal being evaluated under the
onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to: 1) the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90): 2) the improper execution of search warrants by federal officers (*id.* at 1090); 3) the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91); 4) the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91); 5) the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96); 6) the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* At 1096-97); 7) the improper admission of victim impact evidence (*id.* at 1097-1101; 8) the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06); 9) the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108); 10) the lack of constitutionally required proportionality review (*id.* at 1108-09); 11) the violation of *Woodson v. North Carolina,*

428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10); 12) the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* At 1110); 13) the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and 14) the government's improper failure to timely provide the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill.  *(Id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668 (1984). The American Bar Association ("ABA") guidelines provide a guide in determining what constitutes reasonable performance in capital cases.  *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Under the ABA guidelines, trial counsel have a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim."  (ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, COMMENTARY TO STANDARD 10.8), 31 *Hofstra L.Rev*. 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Def's § 2255 Mot.                                  180                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**13.      Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

### Conclusion

The unprofessional and prejudicial errors of counsel permeated the first stage of trial.  From the failure to properly attack the search warrant, to the failure to impeach witnesses; to the failure to produce witnesses who could eviscerate the credibility of the Government's witnesses and otherwise support Mr. Barrett's defense; to the failure to properly secure and utilize expert witnesses; to failure to object to improper experts called by the Government; to the failure to investigate, be prepared, and demand the time to be prepared, no rational observer could be left with any other conclusion than that counsel ineffectively represented Mr. Barrett in the guilt/innocence phase of trial.  While several instances of ineffectiveness, standing alone, are sufficient to warrant vacating Mr. Barrett's convictions, taken together, the conclusion that counsel was ineffective in the first stage of trial is inescapable. *E.g., United States v. ex rel. Gregory Madef,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002) (viewing evidence that formed basis for ineffective claim in the aggregate, and not individually).

Accordingly, Mr. Barrett is entitled to relief from each of the three counts of conviction.

**B.** **Unreasonable Acts and Omissions Affecting the Second Stage of Trial**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

**1.** ***Deficient Performance***

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Claim 1, *supra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  *(See also* Docs. 50, 51, 57, 97, 128; Decl. John Echols; Decl. Richard Burr.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Letter from John Echols to Honorable James H. Payne dated 2/2/8/2005; Decl. John Echols.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available.  (Decl. Steve Leedy; Decl. John Echols).  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Decl. Frank Gordon; Decl. John Echols).  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with a major medical disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist. (Doc. 97). The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline 10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005. (Docs. 46 and 50). Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses. (Doc. 97). *See* Claim 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50). Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey, and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the

client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Decl. Brandie Hill; Decl. Carolyn Joseph; Decl. Issac Barrett; Decl. Doris Barrett; Decl. Ernest Barrett; Decl. Gwen Crawford; Decl. Kathy Trotter; Decl. Janice Sanders (partial interview by trial counsel); Decl. Paul Lunsford; Decl. Shawn Hill; Decl. Toby Barrett).

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done

to prepare for a penalty trial.  (Echols letter to Payne; Decl. John Echols; Doc. 113; Decl. Richard Burr).

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Frank Gordon, and Steve Leedy, show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator.  (Decl. Julia O'Connell).  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Decl. Steve Leedy; Decl. John Echols; Decl. Frank Gordon).  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Decl. Richard Burr.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage

Def's § 2255 Mot.                                  187                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

investigation if it hadn't already been completed, even if Mr. Hilfiger were able to secure the

services of a mitigation investigator or investigators.  (Decl. Julia O'Connell).

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or

other trained mitigation investigator.  Although the court authorized trial counsel to retain

Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or

requested any investigation for Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated

9/24/08).

As the Supreme Court has held, where there is a failure to investigate, alleged

"strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense

practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that

will be effective in connection with both guilt and penalty, and should seek to minimize any

inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059,

1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that

can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to

threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury

could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett

"used drugs and suffered significant head injuries during his life," and that this history indicated

a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that

the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett

suffers from any identifiable psychological or physiological deficits, including possible organic

brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."
*Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment.  *See* Claim 3, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Decl. Richard Burr; Doc. 107).  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in

2003 in anticipation of the second state trial.  Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Federal Rule of Criminal Procedure 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41).

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43).  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41).  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7).  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41).  Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator.  However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

### 2.     *Prejudice*

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration; (4)

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete; a reflection of counsel's lack of investigation.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett. Jurors would have learned the following about Mr. Barrett, his background, and character:

<blockquote>

**a.      The family, social, and medical background of Kenny Barrett**

**<u>Introduction</u>**
</blockquote>

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history. The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California. The Trail of Tears[42] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

---

[42]In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory. The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee. It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Kenny 's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Gelene Dotson, Genealogy Memorandum; Abe Dotson Marriage Certificate; Ida Melton, Death Certificate; Allen Real, Death Certificate) With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

### Family History of Mental Illness

Kenny  meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  His family has long struggled with their vulnerability to mental illness.  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.  Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric

institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny 's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny 's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny 's mother's family "had to deal with mental illness for a long time." (Decl. Phyllis Crawford.)  Kenny 's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.  Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  (Decl.  Carolyn Joseph; Carolyn Joseph, Medical Records; Carolyn Joseph, Marriage Certificate.)  One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Decl. Carolyn Joseph.)  Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Decl. Mark Dotson.)

One of Kenny 's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  (Decl. Gwendolyn Crawford; Gwen Crawford, School Records;  Decl. Brandy Hill; Brandy Hill, Medical Record.)  Gwendolyn's two children both have significant mental impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Decl. Gwendolyn

Def's § 2255 Mot.            193            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Crawford; Brandon Smith, Social Security Earned Income Statement; Brandon Smith, Guardianship Proceedings.) Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d) with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens. (Decl. Brandy Hill; Brandy Hill Medical Records.)

Travis Crawford, another of Kenny 's first cousins, also receives medication for anxiety and reported a history depression. (Decl. Travis Crawford; Travis Crawford Medical Records.) Travis has had "a long struggle with drugs and ha[s) anxiety and panic attacks" and his "mind does not work that well." (Decl. Travis Crawford.) Travis understands that "psychological problems run in [his) family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it." (Decl. Travis Crawford.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime. It never goes away." (Decl. Nona Reich.)

In the maternal family, depression and mood disorders trace back to Kenny 's grandmother's (Hattie Gertrude Dotson) generation. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century. (Decl. Carolyn Joseph; Hattie Gertrude Dotson, Death Certificate.) Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[43] who

---

[43]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson. (Hugh Dotson, Death Certificate.)

described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Wallace Dotson Lunacy Record)

**<u>Paternal Family Mental Illness</u>**

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Kenny 's great great grandfather, as did his great grandfather, his grandfather and finally Kenny himself. (A. J. Barrett, Mental Health Record; A. J Barrett, Eastern State Hospital Record; Decl. Issac Barrett) As Kenny 's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Decl. Kathy Trotter.) Kenny 's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (A.J. Barrett, Certificate of Lunacy.) Kenny 's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Decl. Issac Barret and Linda Riley; Isaac Clifford Barrett, Death Certificate.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny 's grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Decl. Linda Riley.), raped one of his daughters who became pregnant and placed the baby for adoption (Decl. Issac Barrett), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (A.J. Barrett Certificate of Lunacy.)

His family believed he "was bipolar." (Decl. Linda Riley.) A.J. was able to work only "sporadically." His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce." (A.J. Barrett Eastern State Hospital Records; Decl. Linda Riley; A. J. Barrett, Death Certificate.)

A.J.'s maternal family also faced the tragedy of mental illness. A.J.'s mother (and Kenny 's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (A.J. Barrett, Eastern State Hospital Records), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Decl. Issac Barrett.) She "died very confused." (A.J. Barrett, Eastern State Hospital Records; Mary Ellen Barrett, Death Certificate.) Mary's brother, Howard, was "Looney Tunes" (Decl. Issac Barrett), and Howard's son, Billy Dean who was a disabled veteran with a history of schizophrenia, committed suicide. (Billy Dean Maxwell Death Certificate; Billy Dean Maxwell Mental Health Record.) Kenny 's great aunt, Elnora Long, is bipolar and requires significant doses of medication. (Decl. Kathy Trotter and Issac Barrett.) Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." (Decl. Kathy Trotter.) Kathy, Kenny 's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings. (Decl. Kathy Trotter; Kathy Trotter Medical Records.) Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder. His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Linda Riley Medical

Records.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

### **Maternal Family History**

Kenny 's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose every day life reflected the travails and successes Indians in eastern Oklahoma.  Hugh, who grew up in an Indian orphanage became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[44] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Decl. Warren Dotson.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Decl. Warren Dotson and Carl Cook; Sequoyah County Times; Minnie Andrews, Death Certificate.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[44]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

Def's § 2255 Mot.                    197               *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and it appears that at least one of the men who shot and killed them did so with impunity.[45] (Oklahoma v. Henry Edwards; The Vian Press; The Sequoyah Times.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Hugh Dotson Marriage Certificate), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny 's mother.  (Sylvia Gelene Dotson Birth Certificate.)  Hugh "barely earned enough to live on."  (Decl. Gelene Dotson.)  Hugh, Hattie and their growing family lived in " tumble down" houses that "were in pretty bad shape even by standards back then."  (Decl. Gelene Dotson.)  The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."

World War II intervened, and Hugh served in the U.S. Army.  When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm.  (Decl. Gelene Dotson.) Gelene " always heard" her family was "part Indian and that [she) was 3/16 Cherokee."  (Decl. Gelene Dotson.)

---

[45]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Decl. Gelene Dotson.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Decl. Gelene Dotson.) After a year at Menaul Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Decl. Carl Cook.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Decl. Gelene Dotson.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Decl. Gelene Dotson.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Decl. Gelene Dotson.) Gelene explained that "[l)and is just something very important" to her family and "always has been." (Decl. Gelene Dotson.)

Hugh and his wife Hattie were dedicated to their dream of owning land. Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never

considered working less." (Decl. Gelene Dotson.) Children in the family "always knew [they] went out there to make enough money to buy [their) own place back home." (Decl. Gelene Dotson.) When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California. Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five. Kenneth Barrett eventually built his shack for $150.00 on a spit of his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather enjoyed a fine reputation in Sequoyah County. From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor. Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden. (Decl. Issac Barrett.) Issac "had his burdens to carry after he married" Mary. She had a "mental breakdown" (A.J. Barrett Eastern State Hospital Records), and "walked around the yard talking to herself. At night, she would wake up, wash jars, and think she was canning." (Decl. Issac Barrett.) According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was involuntarily committed to the state mental institution four times over a ten year period before he committed suicide by shooting himself in the head. (Decl. Issac Barrett; Billy Dean Maxwell Death Certificate; Billy Jean Maxwell, Record of Mental Health Proceeding.) Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November

24, 1952. (Decl. Issac Barrett.) Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left." (Decl. Issac Barrett.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Decl. Issac Barrett.) A. J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard." (Decl. Kathy Trotter; A. J. Barrett, Marriage Certificate.) Ada's mother, Ida Melton, was an Indian (Ida Melton Death Certificate) married to Sam Hatter. (Sam Hatter Marriage Certificate.) Ida and Sam divorced, and Ida married A.J.'s brother John. (Sam Hatter, Divorce Proceedings; Sam Hatter, Marriage Certificate to Bessie) Ida and John had one child, Elnora Barrett Long, who was debilitated by

her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life." (Decl. Issac Barrett.) Three children "died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains." (Decl. Issac Barrett.) The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father. Ernie and his the four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W)ell water was not usable for humans, although it was all right for animals and crops." (Decl. Issac Barrett.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." [A.J. Barrett, Eastern State Hospital Records.)  Unable to support his family, "[t)he entire family had to work in the fields traveling from one crop to the next."  (Decl. Issac Barrett.)  State Hospital records described their economic status as "marginal," and the family "had a tough time getting by."  [A.J. Barrett, Eastern State Hospital Records)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields."  Decl. Ernest Barrett .)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Decl. Ernest Barrett.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them."  (Decl. Linda Riley.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month.  (A.J. Barrett, Eastern State Hospital Records.)  None of his children "wanted him to be at home because of the crazy things

he did." (Decl. Issac Barrett.)  He suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior.  (A.J. Barrett, Eastern State Hospital Records.)  Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous."  (A.J. Barrett, Eastern State Hospital Records.)  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  (Decl. Issac Barrett.)  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Decl. Issac Barrett), but he "was difficult to figure out because he was also a decent guy when he was sober."  (Decl. Ernie Barrett.)   A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  (Decl. Issac Barrett.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his) way."  The children left home as soon as they could.  (A.J. Barrett, Eastern State Hospital Records.)  Family members reported that A.J. had "two different personalities" and "angry spells about three times a week."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. had "enormous moods swings from being an alright guy to being totally out of control."  (Decl. Ernest Barrett.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were) going to kill him."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

(A.J. Barrett, Eastern State Hospital Records.)  A physician examining A.J. when he was

admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of
> five digits but is unable to repeat them in reverse with any degree of
> facility.  Serial subtraction of eight from one hundred is done with much
> hesitation and inaccuracy.  His general intelligence seems inaverage and
> dull normal.  His reasoning and judgement are limited.  His insight is poor.

(A.J. Barrett, Eastern State Hospital Records.)

Ernie and his siblings were powerless to protect themselves or their mother from

A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not

divorce" him (Decl. Linda Riley; A.J. Barrett, Eastern State Hospital Records), even though

"nothing could stop him from attacking" them."  (Decl. Ernest Barrett.)  Ada "was churchgoing

and devout; she did not believe in leaving a marriage no matter how bad it was."  (Decl. Ernest

Barrett.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life

between my father being half crazy and always poor."  (Decl. Ernest Barrett.)   Ernie tried "[a)s

the oldest boy in the family," to protect his mother and the other children, but he was "no match"

for his father until he was "half grown."  (Decl. Ernest Barrett.)  Because Ernie tried to "get

between" his father mother" when A.J. attacked her, he "got beaten more than the other

children."  (Decl. Ernest Barrett.)

Ernie developed characteristic responses to the life threatening trauma he

witnessed and experienced.  He "learned never to cry" when his father hit him and he does not

remember "feeling a hell of a lot."  (Decl. Ernest Barrett.)   High school for Ernie was

"different."  (Decl. Ernest Barrett .)  In a community known for its poverty, Ernie's family stood

out as still poorer than most.  Other students "made fun of [Ernie) and laughed at [him) because

of the way [he) dressed."  (Decl. Ernest Barrett.)  Ernie responded to the taunts with fighting

"every boy in [his] high school class to hold any respect." (Decl. Ernest Barrett.) Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." [Decl. Issac Barrett.) Ernie's brother described him as "pretty cruel." (Decl. Issac Barrett.) He treated his younger siblings "pretty rough," and when he made them cry, "he thought it was funny." (Decl. Issac Barrett.) Ernie's brother thought Ernie was "a lot like [his] father," A.J. (Decl. Issac Barrett.) An aunt who taught Ernie in elementary school described him as "mean child." (Decl. Ruth Harris.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess. He was three months short of 17 the last time he stepped between his father and mother to try and protect her. His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open." He still has a scar from it. (Decl. Ernest Barrett.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others. I was 6'3" and weighed 187 pounds." (Decl. Ernest Barrett.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting. They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought. (Decl. Ernest Barrett and Gelene Dotson; Ernest Barrett Marriage Certificate.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he) knew as a child growing up," he had little notion of family life or fatherhood.  (Decl. Ernest Barrett.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Decl. Ernest Barrett.)

Ernie "almost immediately started running around with other women" (Decl. Ernest Barrett.) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  (Decl. Ernest Barrett.)  After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  (Decl. Ernest Barrett.) Ernie "did pretty much whatever [he) wanted to. [He) would go out, drink as much as [he) wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a time."  (Decl. Ernest Barrett.)  Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his) children what they needed and be the kind of parent they deserved."  (Decl.  Ernest Barrett.)  At the time he and Gelene started their family, his only measurement of success was being able to work himself  "up from pushing brooms to production manager."  (Decl. Ernest Barrett.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Decl. Gelene Dotson.) She was "a heavy drinker with dramatic mood swings."  (Decl. Mark Dotson.)   She had planned on going to college but discovered she was "crazy about Ernie" who " came home kind of like a knight in shining armor."  (Decl. Gelene Dotson.)  She did not realize, until after they married that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better."  (Decl. Gelene Dotson.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her), but for the children [they) had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Decl. Gelene Dotson.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Decl. Gelene Dotson.)  Throughout their 13-year marriage, Ernie 'had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis, who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Decl. Phyllis Crawford.)

Kenny 's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I)t drove [her) crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Decl. Gelene Dotson.)   They "split up and got back together and threatened to leave each other over and over."  (Decl. Gelene Dotson.) They " always had a difficult time of it. " (Decl. Gelene Dotson.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Kenneth Barrett, Birth Certificate.)  He was followed by his younger brother, Richard, born June 24, 1964 (Decl. Gelene Barrett; Richard Barrett, Birth Certificate.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore." (Decl. Ernest Barrett.) Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his) mind as much as [he) could."  (Decl. Ernest Barrett.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his) mind" and he reunited with Gelene in 1967.  (Decl. Ernest Barrett.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  (Decl. Ernie Barrett.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Decl. Gelene Dotson; Stephen Barrett, Birth Certificate.)  Gelene and Ernie "both drank as much as [they) could," and Ernie "still stayed away from home."  (Decl. Ernest Barrett.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time."  (Decl.  Ernest Barrett.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Decl. Gelene Dotson.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Decl.  Gelene Dotson.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her) lip."  (Decl. Gelene Dotson.)  Gelene "was at the end of her rope" and left Ernie for good in Lake

Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene

divorced June 20, 1973.  (Decl. Gelene Dotson; Sylvia Gelene Barrett, Divorce Proceedings.)

**Infancy and Childhood Development**

Kenny  has long standing neurologic deficits that were apparent early in his

infancy, continued throughout his childhood and adolescence, and affected his behavior and

understanding over the course of his life.  Although it is difficult if not impossible to determine

with precision the etiology of his neurological deficits, there is no doubt that they are present and

significant.  These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and

young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one

or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes

as "very difficult."  (Decl. Gelene Dotson.)  She was in "constant pain," uncomfortable, and

depressed. (Decl. Gelene Dotson.)  She described her pregnancy as "battling with Kenny before

he was born."  (Decl. Gelene Dotson.)  Gelene drank throughout her pregnancy with Kenny,

unaware of alcohol's potentially devastating effect on a developing fetus's brain.  (Decl. Gelene

Dotson; Decl. Linda Riley.)  Gelene's in laws commented on her early alcoholism and stated she

"was a drunk right out of high school."  (Decl. Kathy Trotter.)

Kenny  had a difficult infancy and "exhausted" his mother.  (Decl. Gelene

Dotson.)  His "days and nights were mixed up," and he "was colicky" and unable to be

comforted.  (Decl. Gelene Dotson.)  He cried and fussed "all the time," making Gelene think all

babies must be like him.  After she had her other two children and observed their development,

she "realized something was wrong with Kenny."  (Decl. Gelene Dotson.)  Gelene received no

help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him.  He was colicky and cried all the time." (Decl. Ernest Barrett.)  Kenny was born with a large lump on the back of his head.  (Decl. Gelene Dotson.)

Kenny  failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Kenneth Barrett, Baby Book Excerpt) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny  did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  Kenny's mother nursed him. [Kenneth Barrett, Baby Book excerpt, KEB 501 953)

At nine months, Kenny  did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent," or make stepping movements when feet are touched to floor."  [Kenneth Barrett, Baby Book excerpts)

At one year, Kenny 's delays were more obvious.  His mother noted he "had trouble learning to walk." (Decl. Gelene Dotson.)  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching." (Kenneth Barrett, Baby Book excerpts.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyper activity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Decl. Gelene Dotson.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Decl. Gelene Dotson.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Decl. Phyllis Crawford.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Decl. Ada Blount.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Decl. Ernest Barrett.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Decl. Janice Sanders.) She also noticed that Kenny "had strong feelings" (Decl. Janice Sanders), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and

saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Decl. Nona Reich.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Decl. of Phyllis Crawford.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." [Phyllis Crawford) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental. (Decl. Kathy Trotter.) His mother reported that "any little thing could upset him, but it took a lot to

Def's § 2255 Mot.                    211                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

calm him." (Decl. Gelene Dotson.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Decl. Ernest Barrett.) When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything. He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Decl. Gelene Dotson.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Decl. Gelene Dotson.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny 's impairments by punishing him. Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still." (Decl. Gelene Dotson.) It "almost drove [her] crazy." (Decl. Gelene Dotson.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Decl. Gelene Dotson.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Decl. Ernest Barrett.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Decl. Kathy Trotter.) Children were "afraid of her." (Decl. Kathy Trotter.) Kenny suffered "more verbal abuse from her than her other two children." (Decl. Kathy Trotter.) Kenny 's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Decl. Gelene Dotson.) Kenny had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely

able to keep pace with his peers.  He had difficulty learning to read.  (Decl. Gelene Dotson; Kenneth Barrett school records.)

Ernie "hardly had anything to do with [Kenny ) after the divorce, and everyone could see how much it hurt Kenny."  Even when Ernie made a semi- annual trips to town to see his sons, family reported he was insensitive to his children's needs.  He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear."  (Decls. Issac Barrett and Phyllis Crawford.)  Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives.  Ernie has always been for Ernie."  (Decl. Ruth Harris.)  Ernie "went his way and let Gelene take care of the kids."  (Decl. Ruth Harris.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma."   (Decl. Ernest Barrett.)  Kenny  "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Decl. Ernest Barrett.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."  (Decl. Phyllis Crawford.)  Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him."  (Decl. Phyllis Crawford.)   Gelene "seldom gave Kenny a kind word" and "screamed at him over anything." (Decl. Phyllis Crawford.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of his room.  Phyllis and her husband went to Gelene's house and talked to Kenny .  Kenny  told them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was

to scream." (Decl. Phyllis Crawford.) Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings." (Decl. Steve Barrett.) When Gelene "lost control of herself," she whipped the boys, but "there was no real parenting." (Decl. Steve Barrett.)

Gelene was harsher with Kenny , "verbally and physically," than she was with her other two sons. (Decl. Steve Barrett.) Gelene used a strap to whip Kenny, and Kenny "hated" it. (Decl. Steve Barrett.) Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny. When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him. (Decl. Steve Barrett The dog was run over by a car.

Steve, Kenny 's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family. Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Decl. Steve Barrett.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Decl. Steve Barrett.) Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Decl. Steve Barrett.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade." (Decl. Steve Barrett.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Decl. Steve Barrett.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him) in their love and guidance."  (Decl. Steve Barrett.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Decl. Steve Barrett.) School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Decl. Steve Barrett.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of every day life, or to tolerate the routine activity of growing boys."  (Decl. Steve Barrett.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Decl. Steve Barrett.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Decl. Steve Barrett.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny

completed ninth grade." (Decl. Ernest Barrett.) Kenny resented Ernie's wife Diana and "it got

the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest.

(Diana Barrett, Marriage Certificate.) He went flying slamming against the wall." (Decl. Ernest

Barrett.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it

"caused some of Kenny's problems." (Decl. Gelene Dotson.) She knew that "Kenny never

adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Decl.

Gelene Dotson.) Kenny "got pretty depressed and lost interest in school." (Decl. Gelene

Dotson.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Decl. Steve

Barrett.) He could tell "how much Kenny missed [their) dad by the way he acted when Kenny

was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny."

(Decl. Steve Barrett.) Extended family members knew that "Kenny never had much of a father,"

and "never had any guidance." (Decl. Ada Blount.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Decl.

Ernest Barrett.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the

second time at Tommy Spear Junior High in Sallisaw. He was placed in special education

classes in English and staff made "some adjustments to the curriculum" for him. [Kenneth

Barrett School Records) At the end of the academic year, he showed improvement in two courses

(math and social sciences) and decline in one course (science.) It was a very difficult year for

Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Ada Mae Barrett, Death

Certificate.) Ada Mae "adored" him, and "[w)hen she died . . . Kenny was just 14. It was as if

the only adult who ever cherished him had gone." (Decl. Kathy Trotter.) Ada Mae's death was

the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Decl. Kathy Trotter.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science.) [Kenneth Barrett School Records) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Decl. Ernest Barrett.)

When Kenny was 17, Kenny was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. [FBI memorandum) The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Decl. Gelene Dotson.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny , then a manic-depressive, brain damaged youth with a low I.Q., directly affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a

shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Decl. George Woods, M.D.)

### Onset of Mental Illness

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had

worked steadily since he left high school, and "his bosses liked him." He was "a good worker, strong, and able" and was "proud of his work." (Decl. Gelene Dotson.) By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Kenneth Barrett, Marriage Certificate) Their only child, Toby, was born December 1, 1980. [Toby Barrett, Birth Certificate) Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other." (Decl. Gelene Dotson.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage. (Decl. Abby Stites.) Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs. Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment. Abby reported that "Gelene made Kenny get up from bed and party with crack and pot." (Decl. Abby Stites.) Gelene never treated "her other sons the way she treated Kenny." (Decl. Abby Stites.) She and Kenny had a "terrible relationship." (Decl. Abby Stites.) Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Pulice v. Barrett, Application for Temporary Order; Gelene Dotson, Marriage Certificate to Paul Dudley; Gelene Dudley, Divorce Proceedings.)

Kenny tried "to bury his problems under constant work and activity." (Decl. Steve Barrett.) Kenny measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own. Depressive episodes overtook him, and he would "get real depressed and sleep all the time." (Decl. Abby Stites.) The only antidote to his

depression was drugs.  His wife knew that "he smoked a lot of pot, but without it he never got

motivated. He turned to drugs to make himself feel better." (Decl. Abby Stites.)  He used

methamphetamine as an antidepressant and discovered that he could work well under its

influence.  Abby observed that Kenny  "would work hard and then sleep all the time. . . .[He) did

the drugs to make himself feel better, because otherwise he would just sleep."  (Decl. Abby

Stites.)

Kenny 's behavior easily fit the pattern of bipolar mood disorder, and his family

knew he was "deeply troubled."  (Decl. Kathy Trotter.)  His wife thought he was "like a manic

depressive, hot one minute and depressed and even immobile the next."  (Decl. Abby Stites.)

Kenny had "racing thoughts."  (Decl. Abby Stites.)  He did things without thinking and "then

regretted them" (Decl. Abby Stites.)  Abby knew that Kenny  "did not act the way normal people

act" and that he "got swept away in his emotions."  (Decl. Abby Stites.)  When Kenny lost

control of himself, he hit Abby and later "would come back crying, begging" Abby to take him

back. (Decl. Abby Stites.)  He was genuinely "remorseful" and would "be good as he could

be—he would go the extra mile,. . . . but he could not keep it up."  (Decl. Abby Stites.)

Kenny 's cousin, Brandy recognized Kenny 's bipolar mood disorder created

severe problems for his marriage.  Brandy compared Kenny 's behavior to her own behavior and

reported that her "mood swings" made it "hard" on her husband because she "used to attack him,

kind of the way Kenny and Abby fought."  (Decl. Brandy Hill; Brandy Hill, Oklahoma

Department Mental Health and Substance Abuse Service.)

Kenny  and Abby separated and reunited frequently; his mood fluctuations and

deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of

Def's § 2255 Mot.                                219                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the separations, he went to his father's home where Ernie found work for him. Ernie described

his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense.
> Sometimes he would be very down but other times he would be manic, always on
> the go and upbeat. Kenny cried a lot when he and Abby were separated. He
> bawled like a baby when he talked about it. In 1986, when Kenny was separated
> from Abby and was very depressed, he stayed with Doris and me. I got him a job
> with Kerr Glass and he was making real good money. Kenny had a truck. He
> worked about three months and then left in the middle of a shift, just walked away
> from a $200,000 machine that he left running. Soon after that, he tried to kill
> himself by shooting himself in the chest with a shotgun I had lent his youngest
> brother Steve.

(Decl. Ernest Barrett.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek

psychiatric treatment. (Decl. Abby Stites.) Abby recognized that she "was the only stable thing

he ever had in his life" and that she "kept him together." (Decl. Abby Stites.) She opposed his

drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep

edge." (Decl. Abby Stites.) Kenny's brother reported, "[a)s troubled as Kenny was, he worked

all the time." (Decl. Steve Barrett.) Kenny 's use of drugs allowed him to keep working, despite

his serious mental illness. Kenny increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple. He needed

methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder. In 1986, Kenny

attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Kenneth Barrett, Sequoyah Memorial Hospital Records, 1986.) Kenny's brother Steve was

home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself. I was home with
> Monty and Podgy in the living room watching Carl Sagan kind of stuff on

television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Decl. Steve Barrett.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Decl. Abby Stites.)  Elavil was extremely helpful and made a big difference in Kenny, but- he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Kenneth Barrett,  Eastern State Hospital Records; Kenneth Barrett, Record of Mental Health Proceeding.) The admitting psychiatrist provisionally diagnosed Kenny with  "depressive neurosis with suicidal potential extremely high."  (Kenneth Barrett Eastern State Hospital Records) The nursing assessment reported that Kenny did "not recognize problems."   (Kenneth Barrett Eastern State Hospital Records) Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."   (Kenneth Barrett Eastern State Hospital Records)

On mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Kenneth Barrett  Eastern State Hospital Records)   His insight and judgment were impaired. Staff found Kenny to be "courteous, cooperative."  (Kenneth Barrett Eastern State Hospital Records) Kenny acknowledged that he had "a hot temper."  (Kenneth

Def's § 2255 Mot.                            221                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Barrett  Eastern State Hospital Records) Kenny's highest level of functioning in the preceding year was "poor." (Kenneth Barrett  Eastern State Hospital Records)    Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work." (Kenneth Barrett  Eastern State Hospital Records)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed." (Decl. Nona Reich.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Decl. Nona Reich.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Kenneth Barrett Social Security Administration Determination of Eligibility) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to his right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Kenneth Barrett Sequoyah Memorial Hospital Records)

When Kenny 's marriage ended after 14 years, he "never recovered." (Decl. Abby Stites; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and

severe mood swings that came at unpredictable times and derailed their lives.  By the end of their marriage, Abby "felt like (they) were more like brother-sister than wife and husband because (she) was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."  (Decl. Abby Stites.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill."  (Decl. Abby Stites.)  It pained Abby to leave Kenny because "(t)here were times he could be good. . . .and would try so hard to be good.  (Decl. Abby Stites.)  She also knew that "he could not function without her."  (Decl. Abby Stites.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently.  He was hospitalized January 20, 1995, given "10 mg of Haldol IM,"  and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind."  (Kenneth Barrett, Wagoner Community Hospital) Hospital staff noted he was "extremely agitated."  (Kenneth Barrett, Sequoyah Memorial Hospital) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days."  (Kenneth Barrett, Wagoner Community Hospital)  He demonstrated "lack of concentration" and "rapid thought process."  (Kenneth Barrett, Wagoner Community Hospital)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health,"  but he did not follow through. (Kenneth Barrett, Wagoner Community Hospital; Bob Willis Community Mental Health Center; Muskogee County Jail) Kenny "moved back home" and "built a little shack" next door to his mother's trailer.  (Decl. Steve Barrett.)  His brother visited it and observed that the shack was "almost Waldenish in its own way."  (Decl. Steve Barrett.)  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  (Decl. Steve Barrett;

Def's § 2255 Mot.                                   223                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Decl. Gelene Dotson and Attachment.)   Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Decl. Gelene Dotson.)   Gelene prepared his meals for him, and he ate at her trailer.   Kenny 's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Decl. Toby Barrett.)   Even as a teenager, Toby " knew something was wrong with him because he had mood changes that were not normal." (Decl. Toby Barrett.)   Toby observed that his "dad could be in the best of moods one minute, then the worst" who was "a very paranoid and "a very scared person." (Decl. Toby Barrett.)

Everyone in the family and Kenny 's ex wife knew he could not "live on his own." (Decl. Gelene Dotson.)   During his and Abby's frequent separations, "Kenny always came home" to his mother. (Decl. Gelene Dotson.)   An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him. (Decl. Ruth Harris.)   Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property." (Decl. Toby Barrett.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to (her) and just worked on his cars and fixed things for people, he might be able to make it." (Decl. Gelene Dotson.)   He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him. (Decl. Rick Lunsford, Brandy Hill and Sean Hill.)   Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him." (Decl. Alvin Hahn.)

As Kenny 's paranoia increased, so too did his dependency on family.   His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years." (Decl. Shawn Hill.)   His aunt Phyllis understood that he "was never able to be

Def's § 2255 Mot.                             224                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

independent as a grown man.  His emotions got in the way of his being able to live too far from

home."  Phyllis described an incident that explained how he relied on family when his emotions

overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears,
> crying,  "The laws are after me. They're coming! What should I do?" I told him
> we were going to walk out of the house and that he was going to get in the police
> car and that's just what he did. Kenny had been afraid to go to jail because at that
> time the papers had said someone had been beaten to death at the jail.

(Decl. Phyllis Crawford.)

Despite the limitations of his mental impairments, Kenny "would give you the

shirt off his back if you needed it."  (Decl.  Phyllis Crawford.)  He "tried to stay close to home,

always worked hard and took pride in his work."  (Decl.  Phyllis Crawford.)  Kenny's family and

friends uniformly reported that Kenny was not violent or dangerous to them.  His great aunt Ada

stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him."

(Decl. Ada Blount.)  Janice, his cousin, grew irritated and inpatient with Kenny on more one

occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny

and "was never afraid of him."  (Decl. Janice Sanders.)  Kenny's maternal aunt Ruth found him

to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness."

(Decl. Ruth Harris.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how

he could straighten out his life" were never afraid of him" and did not "believe he would

intentionally hurt anyone."  (Decl. Ruth Harris.)  Relatives visited and talked with Kenny.  His

second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Decl.

Nona Reich.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the
> time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny
> was studying life and thinking deeply, trying to figure things out. I remember he

said, "'Aunt Nona, how do you know there's a God?" I took him to the window
and said, "See how beautiful that is." He agreed but asked me "Why can't we see
God?" I tried to explain to him that the Bible says we should worship God in
spirit and we will see His truth.

(Decl. Nona Reich.)

Friends and family thought at times Kenny would be alright. A friend and

neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who

was fair." (Decl. Rick Lunsford.) A cousin, Brandy Hill, remembered that "Kenny was very

generous, and his auto repair business was getting more solid every day. People would pay him

hundreds of dollars in cash to replace an engine or a transmission." (Decl. Brandy Hill.) Despite

Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and

helping him work on cars." (Decl. Toby Barrett.) Toby was intimate with Kenny's fears but

knew that Kenny "was not dangerous," and Toby "was not afraid of him." (Decl. Toby Barrett.)

Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to

him" that helped "offset the pain of having a dad with mental problems." (Decl. Toby Barrett.)

The family hoped that Kenny could recover. His mother described their

observations:

> As time went on, he did a little better, built a garage and fixed everything from
> appliances to cars, trucks, and trailers for friends and neighbors. He stayed more
> and more to himself, though, and did not like to leave the property. Friends
> bought him food and went grocery shopping for him. He ate most of his meals at
> my trailer, and I cooked for him. I hoped and prayed he was going to make it. At
> least, I believed, with him living right next door, he was safe and I could keep an
> eye on him. We had our arguments; that's for sure. He was so paranoid and crazy
> at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Decl. Gelene Dotson).

### b.      Kenny Barrett's mental illness and organic brain dysfunction

If trial counsel had followed prevailing norms and provided experts the documented evidence of Mr. Barrett's background and character Mr. Barrett's jury would have heard and considered extensive evidence of mental illness and neurologic impairment.  As explained by Dr. Young:  "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Decl. Myla Young at ¶ 28.)

Dr. Young explains that the areas of the brain in which Mr. Barrett experiences dysfunction are important because of their functions:

> The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex provides a mechanism to control execution of movement of limbs, hands, feet and fingers.  The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues.   The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia.  The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning."  Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received.   More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

> [¶]     The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system.  Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones

and emotional meaning.  The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions.  Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities.  Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years.  Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

(Decl. Myla Young, Ph.D. at ¶¶ 26-27.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing including intelligence testing, clinical interview including a history, review of educational records, and reviews of medical and psychiatric treatment.  As explained by George W. Woods, Jr., M.D., a psychiatrist who also examined Mr. Barrett:

neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.

(Decl. George W. Woods, Jr., M.D. at ¶ 62.)

The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing

Def's § 2255 Mot.                                    228                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Decl. George W. Woods, Jr., M.D. at ¶ 58.)

In addition to these neuropsychological deficits (and others detailed in Dr. Young's declaration), Mr. Barrett suffers from severe mental illness:

Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]      Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986).
Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

(Decl. George W. Woods, Jr. M.D. at ¶¶ 66-67.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect." (Decl. George W. Woods, Jr., M.D. at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Motion, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

> [¶]   Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

> [¶]   The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan

effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (*Id.* at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

\* \* \*

[¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual

Def's § 2255 Mot.                    231                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the

environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 69-78.)

Courts, including the Supreme Court, have repeatedly held that evidence of mental impairment such as the devastating history Mr. Barrett has experienced, when it is kept from the jury due to counsel's unreasonable omissions, undermines confidence in the verdict. That should be this Court's judgement here.

### c.      The prosecution's exploitation of trial counsel's deficient performance

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments.  Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process.  Left unsaid

Def's § 2255 Mot.                                     233                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

was what kind of father he was.  The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of trooper Eales, and that his stepmother had only had contact with him after he was in jail.  As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them.  Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.   Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison.  Making short  work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on

the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356).

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.   Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

Def's § 2255 Mot.                                         235                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett.  Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.  If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct.  Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase.  Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst."  Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim.  (R. 5417-20).

### 3.    Conclusion

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005.  By the beginning of July, trial counsel were searching about for a mitigation specialist.  In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history.  In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December.  The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation.  Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel.  This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

Def's § 2255 Mot.                          236                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The evidence of prejudice is greater, too.  Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parent's inability to sustain a life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage.  Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to.  The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 3.     Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Expert and Investigative Assistance under <u>18 U.S.C. § 3006A</u>**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                          237                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985). Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." (18 U.S.C. § 3005 [emphasis added]). Mr. Barrett therefore had a right, as secured by statute, the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at the same level and to the same extent as provided or otherwise available to similarly situated persons.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert,

independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial

counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Claim 1, *supra*.

Mr. Barrett had a history psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Decl. George Woods). Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Eastern State Hospital Records of Kenneth Barrett; Muskogee County Jail Medical Records of Kenneth Barrett; Decl. Roseann Schaye). In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore he has a multi-generational predisposition to developing serious

mental illness, including the bipolar disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Dec. Roseann Schaye; Dec. Myla Young; Dec. George Woods). Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions. (Decl. Richard H. Burr dated 4/4/05 (Exh. C to Doc. 107) at 4, 8). To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms. (ABA Guideline 10.4(C)(2)(a), as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator,

and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"; ABA Guideline 10.11(F)(2), counsel have duty to seek appropriate expert assistance). *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances. (Docs. 107, 112; Decl. Richard H. Burr). "The standard practice in federal capital trials is to provide the services of more than one mental health expert." (Decl. Richard H. Burr, Exh. C to Doc. 107). Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial. (Docs. 107, 112; Decl. Richard Burr).

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial. As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. *(Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97)). Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases entail a higher level of due process, and contrary to

the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. *(See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. *(See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Dec. Richard H. Burr, Exh. C to Doc. 107, at 8). The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants. (Doc. 107). That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. *(Id.* at 3-4.) The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction. (Doc. 50 at 8). Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain

damage, and that he had suffered significant head injuries during his life. *Ibid.* Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation. (Doc. 97 at 3). This summary denial was highly prejudicial to Mr. Barrett. As the attached declaration of Myla Young, Ph.D., shows, Mr. Barrett's history of head injury resulted in significant impairments in his functioning. *See* Claim 2, *supra*.

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs. Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial. (Docs. 50, 107). A mitigation specialist is an essential member of the team in a capital case. (ABA Guideline 10.7.) Without explanation, the court limited the mitigation investigation to 100 hours and no travel.[46] As resource counsel informed the court at the time,

> The number of hours requested by the defense is well below average. The average number of hours worked by mitigation specialists in federal capital cases is 600 hours. In a number of cases, mitigation specialist services have exceeded 1000 hours. Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive. The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation. Measured against the number of hours authorized for mitigation specialist services in every other

---

[46] The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour. *(See* Doc. 107.)

capital case in which the death penalty has been authorized, the 100 hours approved by the Court is grossly inadequate.

(Decl. Richard H. Burr (Exh. C to Doc. 107) at 4).

The court's withholding of resources was highly prejudicial.  As shown in the social history presented in Claim 2, section B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4).  The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2). "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours."  (Decl. Richard H. Burr (Exh. C to Doc. 107) at 3).  The Court knew in fact that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  (Order filed 3/18/05 (Doc. 97) at 2 n.2).  The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense Service ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Decl. Steve Leedy).

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Def's § 2255 Mot.                                244                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $ 200 per hour, in addition to $ 1,000 for lodging, travel and incidentals.  (Doc. 50 at 7).  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3).  Moreover, the court did not authorize any lodging or travel expenses at all whatsoever.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense.  *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

(a)     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

(b)     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

(c)     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

(d)     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)     Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings;

Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)     Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)     Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)    Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)     Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Report Edward Hueske).

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 4.** **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was Ineffective for Failing to Raise the Issue on Direct Appeal**. .

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in

support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability,

and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict.  Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history

of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders lack of reliability, and Johnson himself intentionally ignored evidence of Sanders then-current drug usage, crimes of dishonesty, and Sanders inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.   Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Decls. of Rick Lunsford, Brandy Hill, Sally Davis Johnson, Janesse Thomas, Sean Hill, and Billy Poindexter.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's honesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption, including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence. Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced. In sum, Johnson and Sanders were birds of a feather: both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Decl. of Rodney Floyd.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false

statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime

warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  Especially in light of the fact there were numerous issues raised on appeal that were reviewed under a plain error standard, because there had been no contemporaneous objection or record, it was professionally unreasonable to omit this issue, and to argue that the court erred in failing to conduct an evidentiary hearing.  Mr. Barrett was prejudiced by this omission.  *Strickland v. Washington,* 466 U.S. 668 (1984).  Decl. of Mark Henricksen.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent.  He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 5.**   **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Conviction and Sentence Based on Newly Discovered Evidence**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

**Introduction**

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under

section 2255.  *E.g., United States v. Hernandez,* 94 F.3d 606 (10ᵗʰ Cir. 1996)(rejecting newly

discovered evidence claim raised in initial 2255 petition, which was filed during pendency of

direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly

discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that

failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not

merely impeaching in character; 4) the evidence is material to the principal issues involved; and

5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable

probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d

888, 890 (10ᵗʰ Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10ᵗʰ Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United*

*States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10ᵗʰ Cir. 1999).  Whether the claims made below

constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief

from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial,

exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these

witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles

Sanders, deals he received in other cases because of his supposed work as an informant, were not

disclosed.  Threats to witnesses to get them to cooperate with the Government were not

disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike

Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in

Muskogee County District Court to charges of physically abusing his own children.  Among

other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant

witnesses that was made known to the court during the improper *ex parte* hearing on the

Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  *See* Claim 1.

Some of the evidence discussed below  was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  It could also be said that the Government sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  *See Giglio v. United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386 U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S.

103 (1959).  If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – a new trial is required.

> **A.      Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**
>
> **1.      Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences**
>
> **a.      Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant secured by his alleged handler Clint Johnson was issued.  Sanders's testimony was

Def's § 2255 Mot.                259                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine. Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain. Two applications to revoke Sanders's suspended sentence were filed. Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program. The revocation was ordered to run concurrent with similar dispositions in Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124. (File in Sequoyah County Case CF-98-346.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346. Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19. (File in Sequoyah County Case No. CF-98-363.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (File in Sequoyah County Case No. CF-99-562.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. In CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (File in Sequoyah County Case No. CF-03-124.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement.  On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon

Def's § 2255 Mot.                              261                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (File in Sequoyah County Case No. CF-04-19.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***."  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files (emphasis added).)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett''s trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

Def's § 2255 Mot.                                      262                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Decl. of Dale Anderson.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search

warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the

situation, it sponsored materially false testimony.  *Giglio v. United States,* <u>405 U.S. 150</u> (1972).

At a minimum, the Government failed in its duty to correct false testimony.  *Giles v. Maryland*,

<u>386 U.S. 66</u> (1966); *Alcorta v. Texas*, <u>355 U.S. 28</u> (1957).

### b.  Travis Crawford

During the investigation conducted for this 2255 motion, Mr. Barrett has

discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about

material matters.  Travis Crawford supplied testimony critical to the Government's case for

malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was

also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's

testimony was summarized in the claim regarding ineffective assistance of counsel in the first

stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11,

2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr.

Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years

before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended

that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for

his arrest on the  Sequoyah County drug charge.  (Decl. of Leonard Post.)

Mr. Crawford stated that he has anxiety and psychological problems, something

he was not cross-examined on at trial.  Although he was a long-time methamphetamine addict, he

told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before

finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding

Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Decl. of Leonard Post.)

Def's § 2255 Mot.                                   264                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Decl. of Leonard Post.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion

will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told

Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was

otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Decl. of

Leonard Post.)

Travis Crawford's recantation is corroborated by witnesses who were present at

Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Claim 2,

section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never

made such a statement.  (Decls. of Rick Lunsford and Brandy Hill.)

Because the Government and its agents knew or had reason to know that

Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he

testified at trial, the Government was obligated to disclose this information under *Brady.*  Due

process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs.  The same is true of at least some of the other

informant witnesses, whom Mr. Crawford states were high at the time of their testimony.

Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's

threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991,

998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to

murder of police officer, and failed to disclose material information as to who was seen carrying

the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he

had previously worked as a snitch for local law enforcement, setting up drug buys at the direction

of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated

that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so.  Decl. of Leonard Post.  Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents.  Crawford's work as a snitch was exculpatory evidence affecting his credibility.  By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident.  (Decl. of Leonard Post.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid.  *See* Claim 2.  As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats.  Mr. Barrett was not arrested on his outstanding failure to appear warrant.  (Decl. of Rodney Floyd.)  This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it.  Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law.  Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant. (Decl. of Leonard Post.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement.  Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft.  (Decl. of Leonard Post.)

A defense investigator reduced to writing what Mr. Crawford stated when he was interviewed.  When the investigator presented the writing to Mr. Crawford, he refused to read it or "sign anything," siting the advice of his psychiatrist.  (Decl. Leonard Post.)  However, even in this tale, Mr. Crawford was caught in a contradiction.  (*Id.* at 5.)

However, Mr. Crawford's parents, Roger and Phyllis Crawford, witnessed his recantation.  They have signed declarations attesting to their son's statements to Mr. Post, statements which destroy the credibility of his trial testimony against Mr. Barrett.  (Decls. of Roger and Phyllis Crawford.)  Of course, as noted above, Mr. Post has also executed a declaration detailing Travis Crawford's recantation.  (Decl. of Leonard Post.)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense.  Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial.  Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a

fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c.      Cindy Crawford

As outlined in the first stage ineffective assistance of counsel argument (Claim 2, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson.  (Decl. Leonard Post.)  Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's

office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Decls. of Leonard Post and Dale Anderson.)

Armed law enforcement officers were also present during the interview. They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her. Littlefield told her she need to work with him and testify against Mr. Barrett. Otherwise, she was going to prison. Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case. Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[47] While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care. Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview. (Decls. of Leonard Post and Dale Anderson.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony. Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him. Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Decls. of Leonard Post and Dale Anderson.)

---

[47] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property. She had done drugs at Mr. Barrett's residence, but did not know who supplied them. Ms. Crawford never bought drugs from Mr. Barrett. Decls. of Leonard Post and Dale Anderson.

Def's § 2255 Mot.                                270                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Decls. of Leonard Post and Dale Anderson.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Decls. of Leonard Post and Dale Anderson.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Decls. of Leonard Post and Dale Anderson.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If

you had ever crashed from a meth high, you would know that you would not be in your right mind." (Decls. of Leonard Post and Dale Anderson.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[48] (Cindy Crawford medical records, filed under seal.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Decls. of Leonard Post and Dale Anderson.)

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident

---

[48] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

Def's § 2255 Mot.                    272                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Crawford described nor anything like it ever happened.  (*See* Claim 2; Decl. Richard Barrett; Decl. of Leonard Post.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats.  The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent.  To quote Ms. Crawford, "They [the Government] were very angry.  They scared me and threatened me."  Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case.  (Decls. of Leonard Post and Dale Anderson.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford.  Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect.  The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's

failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999). The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More seriously, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law. *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-04-63 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (File in Sequoyah County Case No. CF-04-63.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this

impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits for her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (File in Sequoyah County Case No. CF-08-224.)

### d.      Brandie Zane Price

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield,

Def's § 2255 Mot.                    275                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams, et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving one delivery and as many as three deliveries a week.  (Doc. 18, CR-07-16-RAW.)  Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine.  A plea agreement, in which Price agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into.  (Doc. 121, CR-07-16-RAW.)

Price was ultimately sentenced to sixty months imprisonment.  (Doc. 218, CR-07-16-RAW.)  She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*

Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." News article, Ft. Smith Times Record. Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[49]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government. Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.    Karen Real

---

[49] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Def's § 2255 Mot.                    277                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense.  (R. 3076-77.)  At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[50]  During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation.  Real initially answered "[n]o, sir."  Littlefield then asked, "Did I talk about anything I'd say to the court?"  Real responded, "Well, you just mentioned that, you know, what I did.  And that it would be up to the judge."  (R. 3080-81.)  On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything.  (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded.  On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett.  (Doc. 148 in Case No. 6:00-cr-21-FHS.)  On April 25, 2005, the sentencing court reduced Real's

---

[50]  In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5).  Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3.  (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion)

sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.)

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. This Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f.      Randy Turman

It was argued in Claim 2 that counsel was ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447, and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let

Def's § 2255 Mot.                              279                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

him give false testimony anyway.  This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  This constitutes newly discovered evidence.

### 2.   The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when

Def's § 2255 Mot.                              280                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

B.      **The Judgements of Conviction and Sentence Should be
Vacated Based on the Suppression and New Discovery of
Evidence Undermining the Credibility of Key Law
Enforcement Personnel**

The Government suppressed exculpatory evidence that would have shown Clint

Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing

Johnson had no credibility, the suppressed evidence would have also supported a motion to

suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed

exculpatory evidence that would have torpedoed not only the warrant, but its seven informant

witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been

to Mr. Barrett's residence with other officers less than a month before the September 24, 1999

incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's

criminal activities supports claims by some of the informant witnesses that they were threatened

and coerced into giving testimony.

### 1.      **Evidence of Clint Johnson's illicit activities**

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the

nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's

tragic death never would have occurred.  The Government or its agents knew that Johnson, just

like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of

areas.  To the extent the impeachment evidence discussed below was generated after Mr.

Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of

this evidence, or had a duty to become aware of it, and has once again failed to fulfill its

*continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not

only could have been used to attack the overall testimony of Johnson and Sanders, but could have

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office. Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed. Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Movant's case had been involved in a series of crimes involving the misuse of their office. On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had

acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.)  These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (*In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's

possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation. (Log of events from November, 2005 to January, 2006 by Jeff Sheridan). It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations. In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT"). During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from

counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released

funds seized from defendants to defense counsel, and then obtained kickbacks from defense

counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private

ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and

purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad

checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's

lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned

of this information in February, 2009, when they obtained a copy of the court reporter's transcript

of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case.  Mr.

Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial

misconduct, and will amend this motion to include new details about the breadth and scope of

this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's conviction.

An evidentiary hearing was conducted on Mr. Barrett's motion to suppress on January 26, 2005

(Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search

warrant he obtained was based on information he received from a confidential informant (later

identified as Charles Sanders).  Johnson had used this particular informant at least five times, and

the informant had "never been wrong."  (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court

proceedings, he had never revealed the name of the confidential informant, and that defense

counsel John Echols (who examined Johnson at the motion hearing) was the only one who had

asked for the identity.  Johnson admitted writing the name of the C.I. on a piece of paper, which

was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.)

However, Johnson stated that he had revealed the name of the C.I. to the United States

Attorney's Office.  (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in

criminal activity leading to formal charges.  (Tr. 1/ 26/05 Hr'g at 82-83.)  When counsel asked

Johnson whether the informant had been involved in other criminal activity since September

1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel

responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05,

Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s

identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of

course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was

the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to

commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The

Government did not want it brought out at the suppression hearing that Johnson's C.I. had

continued to commit crimes with impunity and was therefore an unreliable source.  The

Government, who had been informed of Sanders's identity, was well aware of the litany of

crimes he had committed since 1999, and knew that his identity was not being protected because

of an "ongoing investigation." *(E.g., Giglio v. United States,* 405 U.S. 150 (1972).)

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug

transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning

drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that

I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Decls. of Rick Lunsford and Sean Hill.)  Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed.  By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.      David Michael Littlefield's illicit activities

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
> for his work as chief prosecutor in the case; and to Sequoyah County Sheriff

Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Tehleqhah *Daily Press.*)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Motion.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).  Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[51]  (Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of*

---

[51]  The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Def's § 2255 Mot.                              289                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

*Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  As of the date of the filing of Mr. Barrett's 2255 motion, the Bar action against Littlefield is still pending.

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.  The Bar Association action against him is still pending.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, but is also relevant to Mr. Barrett's claim of prosecutorial

misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Decl. of Janice Sanders.)

### 3.    John Philpot

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Decl. of Rodney Floyd.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime,

no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have discredited the seven snitches, some of whom claimed that were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot.  This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers.  Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

### Conclusion

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses,

were known and became known to the Government and its agents.  This evidence  was

unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this

evidence would have created a reasonable probability of a different outcome.  *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v.*

*Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have

been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and

would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the

seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various

prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because

these deals were in the works or promised all along, and because the prosecution's duty under

*Brady* is continuing – would have shown the various snitch witnesses to have no credibility

whatever.  *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in section

2254 case where exculpatory evidence, even if it could only be used for impeachment purposes,

was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir.

2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing

on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in

section 2254 case where prosecution failed to disclose material evidence impeaching a key

prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies

the prosecution's theory of intent and could have been used to impeach the credibility of other

witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been

known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true.  The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson.  This evidence clearly affected the outcome of trial.  Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness.  The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant.  Mr. Barrett's fundamental constitutional rights were violated.  He should be granted relief from his convictions and sentences.

### C.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses.  *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses.  (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").)  "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights."  *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).  Thus courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused."  *Ibid.*  Thus,

"counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness.  (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price.  Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor.  (Decl. Roger Crawford; Decl. Leonard Post.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness."  The Government did not reveal the identities of its seven key witnesses until September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3592, the Government filed a baseless motion for a protective order.  The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense. (Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of." *Id.* at 19.[52]

During an *in camera* the hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield was making inconsistent claims. On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because the Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because, the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b)

---

[52] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact, information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.  *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court.  (Tr. 9/13/05 Hr'g at 10, 12.)  The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present.  *Id.* at 27.  In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense.  *See* Claim 1, *supra*.  Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense.  To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses.  The Government's promise of restricted access was itself illusory.  Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial.  The delays also prevented or impeded meaningful investigation of the witnesses.  As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different.  In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital

murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

###### D. Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument

Throughout the penalty phase of Mr. Barrett's trial prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses. *(See* ABA Standard 3-5.6.) These improper questions, together with the prosecutor's "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples: The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts. (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real

by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.)  As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object.  The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate.  Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

Def's § 2255 Mot.                    300              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)  The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[53] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[53] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[54], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. R. 5414-15. *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. R. 5415. This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense

---

[54] This was a knowing false statement on the prosecutor's part. As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

enough to put them on the stand.  Sperling was well aware they *could not have testified by law* because the case never got past the first stage.

Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]."  R. 5419. The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  R. 5420-21.  There were additional comments on Mr. Barrett's supposed lack of remorse.  R. 5419-20, 5421-22.  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck, v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).  Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warned the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time."  (R. 5423.)  This was little better than telling the

jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Claim 2. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in the second stage of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Based on the fact the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.      Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                                305                         *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims.  *Rock v. Arkansas*, 483 U.S. 44 (1987).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986).  Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of

Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Police Report dated September 29, 1999.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards."  (R. 5356.)  With Mr. Barrett's expressions of remorse excluded, the United State Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer."  (R. 5423.)  During closing argument, Mr. Barrett's counsel argued, as a factor in aggravation, that Mr. Barrett expressed remorse for his crimes.  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.  *U.S. v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remores were highly relevant and admissible. Remorse is "an important mitigating factor."  *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument."  *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all.

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced

the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel was ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr.

Barrett during the trial without a finding that Mr. Barrett was or would be a security risk.

Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist.  The belt left

an unusual bulge that was visible through Mr. Barrett's clothing.  The marshals ability to send an

electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired

his ability fully to observe and participate in the trial, including communicating with his

attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant

without a particularized finding of necessity violates due process and can impair a defendant's

Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to

a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment.  *Deck

v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v.

Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that

there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of

danger or escape.  The Court opined that the mere fact that a stun belt had been used against

other capital defendants without their lawyers complaining was a ground to permit its use.  Mr.

Barrett had been through two previous capital trials related to the same events and during that

time never posed any security risk or risk of escape.  In sum, none of the constitutionally required

circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett

during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of

whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal service.  This

ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and

impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge

stated that "probably any capital case where I was the presiding judge a stun belt would be used

just because of the nature of the potential punishment.  It just seems that it's a common – almost

a common sense call under those circumstances."  (Tr/ 9/13/05 ex parte Hr'g at 13.)  The

Supreme Court requires much more than a "common sense call" before a defendant can be

restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable

by the jury.  (Decl. Doris Barrett). In addition, Mr. Barrett was known by the Government and

Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  Indeed, the jury

found that Mr. Barrett had suffered abuse from Philpot.  The Government and Court also were

aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in

the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that

he would be stunned by the marshals on the slightest perceived provocation, and as this issue was

raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's

movements and communications with counsel in court.  After all, he was to be restrained even

though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun

belt due to conductive steel wire in his chest and abdomen area.  (Tr. 9/9/05 Hr'g at 27.)  (Trial

counsel's statement at this hearing reveals that three days before the trial began trial counsel

Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case

of x-rays, depict – the metal wires in Mr. Barrett's chest.)  Trial counsel's statements informed

Def's § 2255 Mot.                           311                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.      Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel

in conducting the defense.  *Drope v. Missouri*, <u>420 U.S. at 172</u>; *see* <u>18 U.S.C. § 4241</u>.  Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability

to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, <u>517 U.S. 348</u> (1996); *Bouchillon v. Collins*, <u>907 F.2d 589</u> (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then.  *Odle v. Woodford*, <u>238 F.3d 1084, 1090</u> (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, <u>86 F.3d 796,802</u> (8th Cir. 1996); see, also, *Gilbert v. Mullen*, <u>302 F.3d 1166, 1178</u> (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, <u>110 F.3d 1508, 1519</u> (10th Cir. 1997).  Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Declaration of Myla H. Young, Ph.D., at ¶¶ 36-38;  Declaration of George W. Woods, Jr. M.D., at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Decl. of George Woods, Jr., M.D., at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated

by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (*Id.* at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which prevented Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at ¶¶ 59, 80.)

As discussed more fully in Claim 13 the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960). The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty. *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. section 1112.)  The United

States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury

could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994).  "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational

jury to find him guilty of the lesser offense and acquit him of the greater.  *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense.  The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life.  "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct.  "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force.  Voluntary heat of passion manslaughter is "murder without malice."  (Tenth Circuit Pattern Jury Instruction 2.54.)  *See also, e.g., United*

*States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent.  The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being.  The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent.  *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute.  The crux of the whole case was knowledge and intent.  The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties.  The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired.  This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial*.

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

It is truly inexplicable why this issue was not raised on direct appeal. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. Decl. of Mark Henricksen. Had this issue been raised, there is at

the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

>**Claim 10.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life.  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached on cross-examination.  As argued elsewhere in this Motion, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented.  Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred.  The trial ruling excluding such evidence treated the issue as one of guilt or innocence.  Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of

Trooper Eales was not brought about in the manner which the Government claimed in the federal

proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as

well as state courts, had held that residual doubt is a valid mitigation circumstance.  Trial counsel

received from Federal Death Penalty Resource Counsel lists of cases that included references to

cases in which residual doubt was considered in mitigation, and where the defendant received a

sentence less than death.

Capital juries are called upon to express the community's reasoned moral

response to the crime.  Knowledge that two prior juries had been unconvinced that the crime was

committed in a manner consistent with capital murder would have been important to the federal

jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would

have argued to the court that evidence of the prior jury's conclusion was relevant to the defense

evidence presented in the first stage of trial.  For example, during some of their cross-

examination, trial counsel attempted to show the jury that nearly all the Government's informant

witnesses who provided evidence of malice aforethought had not come forth with their claims

during the previous six years of investigation and litigation. (R. 481, testimony of Travis

Crawford; R. 3128, testimony of Karen Real.)  Reasonably diligent defense counsel would have

argued that these witnesses' testimony was an insufficiently reliable foundation for a death

sentence, and informed the jury that another jury representing the community had concluded,

without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally

culpable manner.

Def's § 2255 Mot.                                     324                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case). The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.**   **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                         326                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

All that is required for a juror to sit in a capital case is the jurors willingness to consider the range of punishment options.  A juror cannot be forced to commit that he or she will actually vote for the death penalty.  A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience.  So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and following the court's instructions, the juror is qualified to serve.  Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments.  *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]"

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life. Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration." Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty." The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" R. individual jury selection 824-25.

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  R. individual

jury selection 825-26.

The court asked additional death-qualification questions of the juror:

Q.     ... If I instructed you that the law requires you to consider both the death
       penalty and life imprisonment without the possibility of release, are your
       personal opinions about the death penalty so strong that you would not be
       able to follow my instructions?

A.     If you told me I had to, I would do it, because that's my duty, but I would
       probably live with it for the rest of my life.  But if you told me I had to do
       it, and I thought that he actually – the crime was so heinous that he should

       have the death penalty, because I was instructed to do it, and I
       thought it was, I could do it.  I would do it.  But I do not – I would
       live –

Q.     So you understand, I realize that no one, probably, if they were asked,
       wants to serve on the jury where that's a possibility.

A.     I understand that.

Q.     And – but if you were selected – otherwise selected as a juror, would you
       be willing to put your, what I know are strong, personal beliefs aside, and
       fairly consider the imposition of the death penalty?

A.      I would consider it, yes.

Q.     And, of course, when you say "consider it," couched in the –  in the history
       of how you've answered these questions, it prompts me to say: Would you
       consider it fairly?  I mean, in this case, the first thing that would have to
       happen, before we got to even a sentencing stage, is there would have to
       be a finding –

A.     Right.

Q.     – that justified – I wouldn't turn the case over to you for sentencing until
       there had been a conviction for murder that, under the law,  justified either
       death or imprisonment for life without the possibility of release.  So, under
       those circumstances, then the Government would have to follow through
       with their obligation and put on aggravating factors.  And aggravating
       factors are those factors that would suggest that death is the appropriate
       punishment.  Then the defendant would have the opportunity to put on

Def's § 2255 Mot.                        329                  *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.     I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.     Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.     Uh-huh.

Q.     And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  R. individual jury selection 829.  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes."  R. individual jury selection 829-30.  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

Def's § 2255 Mot.                              330                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The juror again stated she understood the court would not tell her what sentence to impose. The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]" the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this. And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it. So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this. But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it. So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad." In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be." (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty.  Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q.    All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.    I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.
>
> Q.    Okay.  Well, at the end of the day –
>
> A.    Okay.
>
> Q.    – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?
>
> A.    Like I say, it depends on what he has done and how bad I think it is And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.[55]

(R., individual jury selection 832-33.)

---

[55]  This is certainly a fair point.  The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder.  *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury. Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I would have to say no

right now. I know no other thing except to say no, I could not sign it." (R., individual jury selection 834.)

What else could the juror say to such a question? This is on par with saying, as rational people would, that they could not convict until hearing the evidence. Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty. The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.      ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

A.      Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.      And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.      Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly

she could consider the death penalty.   She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 12.     The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt

standard governed the ultimate penalty determination in this case.  *Ring v. Arizona*, <u>536 U.S. 584, 600</u> (2002); *Apprendi v. New Jersey*, <u>530 U.S. 466</u> (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors.  *See* <u>18 U.S.C. § 3593(e)</u>.

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances

that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating  factors outweighed the mitigating factors beyond a reasonable doubt.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instructions on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been grated a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 13.   Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause.  Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions.  Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contra indicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [sic]. Take me out of the courtroom. I don't want to

be here.  And then the marshals, you know, asked you if they could take him out.  Before that they were trying to put him back down in the chair.  His move as I saw at that point was he was saying, you know, take me out of the courtroom.  I want to get out of here.  It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now."  (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes.  And at about that same time, the Defendant indicated he also wanted to leave."  (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals."  (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant."  (R. 5434.)

Mr. Hilfiger requested no instructions.  (R. 5434.)  When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other.  I don't object, I don't approve."  (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters.  (R. 5436-37.)  They recommended that his alleged desires regarding presence in court be revisited.  *Ibid.*  However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined.  (R. 5437.)  Trial counsel did not have a private conversation with

Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal.  (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints."  (R. 5438.)  The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems."  (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him.  (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Mr. Barrett:    Yes, Your Honor.

The Court:      Do you have any questions of the Court about that?

Mr. Barrett:    No, sir.

The Court:      I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:   One more.  Does that include the verdict?

Mr. Barrett:    Yes, Your Honor.

The Court:      Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:    Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

> Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems.  *See* Claim 2, *supra*.  Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regiment to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regiment interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and prepared him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regiment, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense.  Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail.  If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's ability to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings.  *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring).  Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the affects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity.  *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial.  The Confrontation Clause of the Sixth

Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the

right to be present during all critical stages of the case.  *Illinois v. Allen*, 397 U.S. 337 (1970).

Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by
> the judge that he will be removed if he continues his disruptive behavior, he
> nevertheless insists on conducting himself in a manner so disorderly, disruptive,
> and disrespectful of the court that his trial cannot be carried on with him in the
> courtroom.

*(Id.*, 397 U.S. at 343 [emphasis added]).  The trial court's order – which the court initially did not

reveal on the record – that marshals remove Mr. Barrett without warning did not comport with

the requirements of law.  (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding

Mr. Barrett's actions, was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As

reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give

the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the

marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice

of the jury having witnesses him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be

absent from court during the prosecutor's closing argument and the court's instructions violated

Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts

must indulge every reasonable presumption against the loss of constitutional rights." *Allen*,

*supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints

besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right. Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself rom the courtroom during critical stages (closing argument, jury instructions) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 f. 3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concur.). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the

marshals acted in response to Mr. Barrett's threatening behavior toward someone in the

courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.).  Similarly,

Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his

absence.  Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error

from his absence devalues the constitutional right to be present, and ignores the assistance that a

defendant can provide to his counsel during trial.  If we were to require that a defendant show

with specificity how his presence might have changed the course or outcome of a trial, then the

right to be present would cease to exist in many cases in which the evidence of guilt is strong.

The right to be present at one's own trial is not that weak.  *See Riggins,* 504 U.S., at 137.

"Efforts to prove or disprove actual prejudice from the record before us would be futile, and

guesses whether the outcome of the trial might have been different [in the absence of drugging]

would be purely speculative."; *United States v. Novaton*, 271 F.3d. At 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the

additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present

in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts

regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the affects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].) According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations. Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects. Mr. Hilfiger twice stated that he could not think of an instruction to give the jury. (R. 5426-28.) Unable to decide, he said, "I don't care."

Def's § 2255 Mot.                              349                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal.  Had counsel raised the issues presented in this claim it is reasonably probably that the court would have found the numerous violation of federal law were not harmless beyond a reasonable doubt, or constitute plain error.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 14.   Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were

presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzalez, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[56]  (2007 Decl. of Kevin McNally)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (2008 Decl. of Kevin McNally.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.

---

[56]      Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

Def's § 2255 Mot.                               352                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."  (Decl. of Lauren Cohen Bell.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[57]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e.

---

[57]     Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim.  Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel was ineffective in failing to pursue and develop the issue.

Def's § 2255 Mot.                             353                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.**  **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial b y a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16      Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett her Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice.  Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.  Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17      Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case**

Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness.  *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due

process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claim presented in this Motion individually justifies reversal , when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV. Prayer for Relief

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1. Disqualify itself and have all proceedings regarding this Motion reassigned randomly to another judge;

2. That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

3. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4. Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

6. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

7. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8. Permit oral argument as appropriate and required;

9. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10. Grant such further and additional relief as may be just.

DATED:   March 15, 2009

423

Respectfully submitted,

 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**APPENDIX A**

**PROCEDURAL HISTORY**

**I.     State Court Proceedings**

1.      On September 24, 1999, Movant was charged by Information in the District Court of Sequoyah County, Oklahoma with one count of first-degree murder and three counts of shooting with intent to kill. The information was subsequently amended to charge Movant with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. (Case No. CR 99-493, Garrett, J.)

2.      The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.      Movant was re-tried on the same charges in January and February of 2004. The jury rejected the first-degree murder charge and instead found Movant guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Movant guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Movant on the two counts of discharge of a firearm with intent to kill.

4.      On April 19, 2004, Movant was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively.

5.      Movant did not appeal his convictions or sentences.

6.      At both state trials, Movant was represented by John David Echols, Esq., and the State was represented by Darrell Dowty, Asst. Dist. Atty.

## II.    Federal District Court Proceedings

7.   On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.   On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.    On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.    On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.    The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12. On November 9, 2005, the second-stage proceedings began.

13. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the government's assertion that Movant was likely to commit criminal acts of violence in the

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count). All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for his crimes.

16. Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

17. On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

18. Movant filed a timely Notice of Appeal of his convictions and his death sentence to the United States Court of Appeals for the Tenth Circuit on December 28, 2005 (Case No. 06-7005).

19. Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these proceedings. The Government was represented by Sheldon Sperling, U.S. Atty. and D. Michael Littlefield, Asst. U.S. Atty.

III. Federal Court of Appeals Proceedings

20. In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

a. The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b. Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c. The district court allowed admission of improper victim impact evidence.

d. The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e. The government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f. Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportional review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g. Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h. The government did not present sufficient evidence of "intent to kill."

i.     The government failed to produce names and addresses of key witnesses.

k.     The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.     The government failed to follow the *Petite* policy.

m.     Movant asserted cumulative error.

21.    On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22.    A timely Petition for Certiorari was filed on October 12, 2007.

23.    The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24.    Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

**APPENDIX B**

**INDEX TO EXHIBITS**

**NON-SEALED EXHIBITS**

<u>**VOLUME I**</u>

Exhibit 1          Marriage Certificate for A.J. and Ada Barrett

Exhibit 2          Marriage Certificate for Abe and Minnie Dotson

Exhibit 3          Marriage Certificate for Allen and Ida Real

Exhibit 4          Marriage Certificate for David and Carolyn Joseph

Exhibit 5          Marriage Certificate for Ernest and Sylvia Gelene
                   Barrett

Exhibit 6          Declaration of Rodney Floyd

Exhibit 7          Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8          Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9         Marriage Certificate for Sam and Ida Hatter

Exhibit 10         Marriage Certificate for Sam and Bessie Hatter

Exhibit 11         Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12         Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13         Declaration of Janesse Thomas

Exhibit 14         Declaration of Dale Anderson

Exhibit 15         Divorce File for Isaac and Marilyn Barrett

Exhibit 16         *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                   December 15, 1917 (Commitment to Penitentiary)

Exhibit 17         *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                   November 12, 1915 (Assault with the Intent to Kill)

| | |
|---|---|
| Exhibit 18 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill) |
| Exhibit 19 | *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon) |
| Exhibit 20 | *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place) |
| Exhibit 21 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place) |
| Exhibit 22 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry) |
| Exhibit 23 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense) |
| Exhibit 24 | Declaration of David Autry |
| Exhibit 25 | *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary) |
| Exhibit 26 | *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 |
| Exhibit 27 | *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918 |
| Exhibit 28 | *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital |
| Exhibit 29 | Declaration of Mark Henricksen |
| Exhibit 30 | *Ada Blount vs. Kathleen Blake*, Case Number 13026 |
| Exhibit 31 | Declaration of Leonard Post |
| Exhibit 32 | *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948 |
| Exhibit 33 | *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding |
| Exhibit 34 | Declaration of John Echols |
| Exhibit 35 | Excerpts from Kenneth Barrett's Baby Book |

Exhibit 36                  Letter from Kenneth Barrett

Exhibit 37-58               Intentionally Left Blank, No Exhibits

Exhibit 59                  *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60                  *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                            Docket (Cultivation of Mari)

Exhibit 61                  *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                            CF-97-00086

Exhibit 62                  *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                            (Disposing of Mortgaged Property)

Exhibit 63                  *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                            (Manslaughter in the First Degree)

Exhibit 64                  Letter from John Echols to Honorable James H. Payne, dated February 28,
                            2005

Exhibit 65                  Letter from Honorable James H. Payne to John Echols, dated February 22,
                            2005

Exhibit 66                  Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67                  Declaration of Julia O'Connell

Exhibit 68                  *United States of America vs. Karen Real*, Case Number, Case Number
                            CR-00-21-FHS

Exhibit 69                  *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                            2007

Exhibit 70                  *Drug Offender Receives Break*, Times Record

Exhibit 71                  Letter to the Editor, *She Questions Sheriff's Department*, dated October
                            17, 1999

Exhibit 72                  *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73                  Photographs of Kenneth Barrett's shack

Exhibit 74                  Declaration of Ada Blout

Def's § 2255 Mot.                        371                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Exhibit 77          Declaration of Brandy Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

## VOLUME II

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett

Def's § 2255 Mot.                    372                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

| | |
|---|---|
| Exhibit 97 | Declaration of Sylvia Gelene Dotson |
| Exhibit 98 | Declaration of Mark Dotson |
| Exhibit 99 | Declaration of Steve Barrett |
| Exhibit 100 | Declaration of Warren Dotson |
| Exhibit 101 | Declaration of Nona Reich |
| Exhibit 102 | Declaration of Carl Cook |
| Exhibit 103 | Declaration of Abby Stites |
| Exhibit 104 | Declaration of Richard Barrett |
| Exhibit 105 | Declaration of Doris Barrett, March 5, 2009 |
| Exhibit 106 | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson |
| Exhibit 107 | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 |
| Exhibit 108 | Excerpt from the Deposition of John Philpot |
| Exhibit 109 | Report by Edward E. Hueske |
| Exhibit 110 | Curriculum Vitae of Edward E. Hueske |
| Exhibit 111 | Declaration of Steve Leedy |
| Exhibit 112 | Declaration of Lauren Cohen Bell |
| Exhibit 113 | 2008 Declaration of Kevin McNally |
| Exhibit 114 | Declaration of Rodney Floyd |
| Exhibit 115 | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 |
| Exhibit 116 | 2007 Declaration of Kevin McNally |
| Exhibit 117 | Declaration of Dr. George Woods |

Exhibit 118          Declaration of Roseann Schaye

**SEALED EXHIBITS**

Exhibit 119          Birth Certificate of Kenneth Barrett

Exhibit 120          Birth Certificate of Sylvia Gelene Dotson

Exhibit 121          Birth Certificate of Richard Barrett

Exhibit 122          Birth Certificate of Toby Barrett

Exhibit 123          Birth Certificate of Stephen Barrett

Exhibit 124          Death Certificates of Allen M. Real and Allen
                     Cleveland Real

Exhibit 125          Death Certificate of A.J. Barrett

Exhibit 126          Death Certificate of Ada Melton Barrett

Exhibit 127          Death Certificate of Albert Maxwell

Exhibit 128          Death Certificate of Billy Maxwell

Exhibit 129          Death Certificate of Hattie Dotson

Exhibit 130          Death Certificate of Death Certificate of Hugh Dotson

Exhibit 131          Death Certificate of Ida Melton

Exhibit 132          Death Certificate of Isaac Barrett

Exhibit 133          Death Certificate of Mary Barrett

Exhibit 134          Death Certificate of Minnie Andrews

Exhibit 135          Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136          Educational Records for Kenneth Barrett

Exhibit 137          Educational Records for Gwendolyn Barrett

Exhibit 138          Educational Records for Ernest Barrett

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandy Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

Exhibit 144          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

Exhibit 147          Medical Records for Kenneth Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Def's § 2255 Mot.                                 375                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2204-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
                     Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
                     *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Exhibit 185          *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603

Exhibit 186          *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187

Exhibit 187          *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389

Exhibit 188          *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186

Exhibit 189          *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369

Exhibit 190          *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774

Exhibit 191          *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244

Exhibit 192          *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572

Exhibit 193          *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988

Exhibit 194          Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999

Exhibit 195          *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 1**

7209

## MARRIAGE RECORD

STATE OF OKLAHOMA, Sequoyah County, ss.      IN COUNTY COURT

I, A. J. Barrett, the undersigned, hereby apply for a Marriage License to be issued to Mr. A. J. Barrett, aged 21 years, whose residence is Akins, State of Okla. and Miss Ada May Hatter, aged 18 years, whose residence is Akins, State of Okla., and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am 21 years of age, and legally competent to take an oath, and that I reside at Akins, County of Sequoyah, State of Oklahoma.

A. J. Barrett

Subscribed and sworn to before me, this 25 day of January, 193 6.

By Frances Tinney Deputy      Horace Moore Court Clerk

I, the undersigned, _____ of _____ named in the application as being of the age of _____ years, do hereby consent to _____ marriage to _____

Dated at _____ Oklahoma, this _____ day of _____, 193_

_____
Parent or Guardian

STATE OF OKLAHOMA, Sequoyah County, ss

Before me, _____ a _____ in and for said County and State, on the _____ day of _____, 193_ personally appeared _____ to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

Witness my hand and official seal, the day and date above written.

My commission expires _____ 193_

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.      IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. A. J. Barrett of Akins, County of Sequoyah, State of Okla, aged 21 years, and Miss Ada May Hatter of Akins, County of Sequoyah, State of Okla, aged 18 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, this 2nd day of January, 193 6.

My credentials are recorded in Ministers' Credentials, book _____, page _____.

By Frances Tinney Deputy.      Horace Moore Court Clerk.

Recorded this 2nd day of January, 193 6.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, N. B. Burrow, Minister, Baptist, of Maple, in Sequoyah County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the 2nd day of Jan. A. D., 193 6, at Akins, in Sequoyah County, State of Oklahoma, in the presence of Tom Allen of Akins, Okla, and Georgia Liles of _____

N. B. Burrow
Baptist Minister Official Designation

Returned and recorded this 27 day of Jan 193 6.

Horace Moore Court Clerk
By Frances Tinney Deputy

443

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 2**

---

1036

# MARRIAGE RECORD

STATE OF OKLAHOMA,
_Sequoyah_ County, ss.                IN COUNTY COURT.

I, _Abe Datson_, the undersigned, hereby apply for a
MARRIAGE LICENSE, to be issued to Mr. _Abe Datson_ ... _Okla_ ... aged _28_ years,
whose residence is _Marble City_ ... State of _Okla_ ... and
M... _Minnie Andrews_ ... aged _18_ years,
whose residence is _Marble City_ ... State of _Okla_ ... and
for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places
of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering
into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _28_ years of age, and
reside at _Marble City_ ... County of _Sequoyah_
State of _Okla_ ... _Abe Datson_ ..................Applicant.
Subscribed and sworn to before me, this _8_ day of _July_ 1911.
_M. D. Jones_ ................County Judge.
................Clerk County Court.

I, the undersigned,..............................of..........................
named in the above application as being of the age of........................years, do hereby
consent to..........................marriage to..............................
Dated at..............................., Oklahoma, this..............day
of..........................19.......
..............................Parent or Guardian.

STATE OF OKLAHOMA,
..............................County. ss.

Before me,..............................
in and for said County and State, on the..............day of..............19.......
personally appeared..............................
to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that..............................
executed the same as..............................free and voluntary act and deed for the uses and purposes therein set forth.
WITNESS my hand and official seal, the day and date above written.

My commission expires..............................19.......

## MARRIAGE LICENSE

STATE OF OKLAHOMA,
_Sequoyah_ County. ss.              IN COUNTY COURT.

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—GREETING:
You are hereby authorized to join in marriage Mr _Abe Datson_
of _Marble City_, County of _Sequoyah_, State of _Oklahoma_
aged _28_ years, and Miss _Minnie Andrews_, of _Marble City_
County of _Sequoyah_, State of _Oklahoma_ ... aged _18_ years.
And of this License you will make due return to my office within thirty days from this date.
Witness my hand and official seal, at..............in said County, this _8_ day of _July_ A. D. 1911
_N. N. Littlejohn_ ................County Judge.
By _M. D. Jones_ ................Clerk County Court.
Recorded this _8_ day of _July_ 19 11 _M. D. Jones Clerk_

STATE OF OKLAHOMA,
_Sequoyah_ County. ss.         CERTIFICATE OF MARRIAGE

I, _R L Horn_
NAME
_Justice of the Peace_
OFFICIAL DESIGNATION.       COURT OR CONGREGATION.
of _McKey_ ... in _Sequoyah_ ................County, State of Oklahoma, do hereby
certify that I joined in marriage the persons named in and authorized by this License to be married, on the _8_
day of _July_ A. D. 1911, at _R B Horn_ ... in _McKey_
County, State of Oklahoma, in the presence of _Lafayette Horn_ of _McKey_
and _Junie Horn_ of _McKey_
_R L Horn_
_Justice of the Peace_
Returned and recorded this _11_ day of _July_ 1911 _M. D. Jones_
_Clerk County Court_

444

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 3**

---

This Certifies that

Allen C. Real

of Quinton I. T. and

Ida Goodwin

of Quinton, I. T.

were by me united in

# Matrimony

according to the ordinance of GOD and the

laws of

at Quinton

on the eighteenth day of Feb.

in the year of our Lord 19 07

Witnesses

Frank Bean

Alfred Goodwin

447

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 4**

MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.                                    IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY — GREETING:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. _David A. Joseph_ , of _Pensacola_ ,

County of _Escambia_ , State of _Florida_ , age _21_ years, and

Miss _Carolyn Watson_ , of _Sallisaw_ ,

County of _Sequoyah_ , State of _Oklahoma_ , age _18_ years; and by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at Stilwell, Oklahoma, this _24th_

day of _Sept_ 19 _64_ _Virginia Harper_ Court Clerk

(SEAL)                          By_____ Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

_____(1) Physician's and laboratory technician's statements required by Statute, relative to the examination and health of either or both of the parties.

___✓___(2) An order of the County Judge, with memoranda of reasons for the order dispensing with Statutory requirements relative to the examination and health of either or both of the parties.

_____(3) An order of the County Judge with accompanying memoranda of reasons for the order extending the 30 day period following the examination to 90 days or less together with papers complying with the requirements of Number (1) above.

_____(4) Affidavits of Consent to Marriage of parent or guardian, in lieu of personal appearance as provided by House Bill No. 688 of the 1959 Legislative Session.

All the above and foregoing recorded on this _24th_ day of _Sept_ A. D., 19 _64_ , and thereafter said License delivered according to Law.

_Virginia Harper_ Court Clerk

By_____ Deputy

CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.

I, _E. B. Arnold_ , _Co. Judge_ _Adair Co. Court_
(Name)                      (Official Designation)              (Court or Congregation)

of _Stilwell_ in Adair County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized

by this License to be married, on the _24th_ day of _Sept_ , A. D., 19 _64_ at _Stilwell_

in Adair County, State of Oklahoma, in the presence of _Phyllis Crawford_ of _Sallisaw, Okla_

and _Ruth Harris_ of _"_ _"_

My credentials of authority are recorded in Minister's Credentials

_____Book_____, 

at page_____of_____County, Oklahoma.

_E. B. Arnold_
(Person Performing Ceremony)

_Co. Judge_
(Official Designation)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book _20_ at page _31/1_

on this the _24th_ day of _Sept_ , 19 _64_ _Virginia Harper_ Court Clerk

By_____ Deputy

I, Shawna Baird, Court Clerk, for Adair County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in the Court Clerk's Office of Adair County, Oklahoma, this _2nd_ day of _April 2001_

By: _Shawna Baird_
Clerk/Deputy

448

KEB400570

449

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 5**

*Exhs. § 2255 Motion*                              *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

449

Subscribed and sworn to before me this................................................................ day of.............................................................................................. Parent or Guardian.

(SEAL)

............................................................................................, 19...........

By ................................................................................... Court Clerk.

....................................................................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.   MARRIAGE LICENSE

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:   IN COUNTY COURT

You are hereby authorized to join in marriage Mr. *Ernest E. Barrett*

of ____*Stilwell*____ County of *Sequoyah* State of *Oklahoma* aged *21* years,

and M *Sylvia H. Dotson*

of ____*Stilwell*____ County of *Sequoyah* State of *Oklahoma* aged *10* years,

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at ____*Stilwell*____ in said County, this *8th* day of

............................. A. D. 19 *60* *Jesse Harper* Court Clerk.

Recorded this *8th* day of ................. By ...................................................... Deputy.

19 *60*

By ............................ *Jesse Harper* Court Clerk.

....................................................................................... Deputy.

STATE OF OKLAHOMA, Adair County, ss.   CERTIFICATE OF MARRIAGE

I, *E. B. Arnold*

NAME ............ *County Judge* .......... *Adair County Court*

of *Stilwell* in *Adair* County, State of Oklahoma, do hereby certify

OFFICIAL DESIGNATION   COURT OR CONGREGATION

that I joined in marriage the persons named in and authorized by this License to be married, on the *8th* day of

................. A. D. 19 *60* at *Stilwell* in *Adair* County,

State of Oklahoma, in the presence of *Johnny Simmngrudo* of *Stilwell, Okla*

and ............................ *Marufured* of *Stilwell, Okla*

My credentials are recorded in Minister's Credentials

Book............ Page............ *E. B. Arnold*

of............................................................ *County Judge*

.................................................. County, Oklahoma.

Returned and recorded this *8th* day of ................. 19 *60*

*Jesse Harper* Court Clerk.

By .................................................... Deputy.

451

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 6**

452

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this ⎯11⎯ day of ⎯⎯⎯March⎯⎯⎯, 2009, in

⎯Lincoln⎯ County, Oklahoma.

Rodney Floyd

453

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )      **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 7**

---

532

## MARRIAGE RECORD No. 33

SEI No. 100 (1968)  MID-WEST - SAPULPA, OKLAHOMA

### APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                    IN DISTRICT COURT

We, the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name  Kenneth Eugene Barrett ............................................., Age  18

of  Sallisaw ................, County of  Sequoyah ......, State of  Oklahoma

Name  Abigail Teague ................................................., Age  16

of  Sallisaw ................, County of  Sequoyah ......, State of  Oklahoma

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows;

(First Party) ........................................  (Second Party) ..................................
and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

Kenneth Eugene Barrett ..... Applicant    Auby Deague ......... Applicant

Subscribed and sworn to before me this  28  day of  April ................ A. D. 19  80

                                                    THEODORE STITES, Court Clerk
                              By  Pamela Dyer ................. Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the  mother  of  Abigail Teague  named in the above application as being of the age of  16  years, and in the presence of the issuing official, I do hereby consent to  her  marriage to  Kenneth Eugene Barrett

In the presence of                Signed this  28  day of  April  19 80   Virginia Teague  Signature

                    THEODORE STITES, Court Clerk

By  Pamela Dyer ....................... Deputy

### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ............... of ...................... named in the above application as being of the age of ............ years, and in the presence of the issuing official, I do hereby consent to ...................... marriage to

In the presence of                Signed this ........ day of ........, 19 .... ...................... Signature

                    THEODORE STITES, Court Clerk

By ...................... Deputy

### MARRIAGE LICENSE

NO. ......................

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                    IN DISTRICT COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr.  Kenneth Eugene Barrett ......................... of  Sallisaw ......................

County of  Sequoyah ......................, State of  Oklahoma ......, Age  18  years, and

M  Abigail Teague ......................... of  Sallisaw ......................

County of  Sequoyah ......................, State of  Oklahoma ......, Age  16  years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this  7th  day of  May ......, 1980.

                                                    THEODORE STITES, Court Clerk
                              By  Pamela Dyer ................. Deputy

(SEAL)

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

Filed (1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

............(2) An order of the District Court with memoranda of reasons for this order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

............(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

............(4) Affidavits of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.

............(5) Affidavits of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

............(6) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent. 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this  28  day of  April ......, 19 80

                    THEODORE STITES, Court Clerk    By  Pamela Dyer ...................... Deputy

All the above and foregoing recorded on this ........ day of ......................, A. D., 19 ..., and thereafter said License delivered according to Law.

By ...................... Deputy                THEODORE STITES, Court Clerk

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I,  Jerry Harris  (NAME)  Ordained Minister  (OFFICIAL DESIGNATION)

Deborah Altman  (COURT OR CONGREGATION)  of  Sallisaw  (TOWN)

In  Sequoyah  County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married on the  10th  day of  May  A. D., 19 80  at  Sallisaw , in Sequoyah County, State of Oklahoma, in the

presence of  Angela Klasek  of  Carolyn Joseph

and  Jeff Keal  of  Henry Hodges

My credentials or authority are recorded in Minister's                Jerry Harris (PERSON PERFORMING CEREMONY)

Credentials ............ Book ......................

at page ........ of ......................, County,                ...................... (OFFICIAL DESIGNATION)
Oklahoma.

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 33 at page ..........

on this the  14th  day of  May ......, 19 80      By  Norma Edwards ...................... Deputy

                    THEODORE STITES, Court Clerk

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 8**

**181**

## MARRIAGE RECORD

THE STAR PRINTERY, INC., BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA

STATE OF OKLAHOMA, Sequoyah County, ss.                                     IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to

Mr. Hugh Dotson _____, age 21

Color W., residence McKey _____ County of Sequoyah, State of Okla

and Miss Hattie Read _____, age 18

Color W., residence McKey _____ County of Sequoyah, State of Okla

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am 21 years of age, and reside at McKey, County of Sequoyah, State of Okla

Hugh Dotson, Applicant.

Subscribed and sworn to before me, this 3 day of July, A. D. 1939.

By _____, Deputy Court Clerk.    Lillie Rosson, Court Clerk.

I, the undersigned, _____ of _____

named in the above application as being of the age of _____ years, do hereby consent to _____

marriage to _____

Dated at _____, Oklahoma, this _____ day of _____, 19____.

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State,

on the _____ day of _____, 19____, personally appeared _____

to me known to be the identical person ____ who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires _____, 19____.    _____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                                     IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. Hugh Watson

of McKey, County of Sequoyah, State of Okla

aged 21 years, and Miss Hattie Real

of McKey, County of Sequoyah, State of Okla

aged 18 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this 3 day of July, 1939.

By _____, Deputy.    Lillie Rosson, Court Clerk.

Recorded this 3 day of July, 1939.    Lillie Rosson, Court Clerk.

(seal)    _____, Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, Rev Lewis Young, Minister of The Gospel of Baptist Church
   Name          Official Designation          Court or Congregation

of Vian, in Sequoyah County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the 3rd day of July, A. D. 1939, at Resident, in Sequoyah County, State of Oklahoma, in the presence of Eugene Masterson

of McKey Okla, and Margue Goodman

of McKey Okla    Rev Lewis Young
                 Vian Okla    Official Designation.

My credentials are recorded in Ministers' Credentials, book 1, page 73

Returned and recorded this 8 day of July, 1939.    Lillie Rosson, Court Clerk.

By _____, Deputy.

457

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 9**

2147

## MARRIAGE RECORD

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.                    IN COUNTY COURT

I, _Sam Hatter_ the undersigned, hereby apply for a MARRIAGE LICENSE to be issued
to Mr. _Sam Hatter_ aged _21_ years, whose residence
is _Okla_ State of _Okla_, and
Miss _Ida Melton_, aged _19_ years, whose residence
is _Okla_, State of _Okla_, and
for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names,
ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or in-
capable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by
law. That I am of _21_ years of age, and reside at _Okla_ County of _Sequoyah_ State
of _Okla_

Subscribed and sworn to before me, this _3_ day of _Feby_ 191_9_.

_Sam Hatter_ Applicant.

_Joe E. Thornton_ Court Clerk.
By _____ Deputy.

I, the undersigned, _____ of _____
named in the application as being of the age of _____ years, do hereby consent to _____ marriage to

_____

Dated at _____ Oklahoma, this _____ day of _____ 191_____.

_____ Parent or Guardian.

STATE OF OKLAHOMA, _____ COUNTY, ss.

Before me, _____ a _____ in and for said County and State, on
the _____ day of _____ 191___, personally appeared _____

to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____
executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.
Witness my hand and official seal, the day and date above written.

My commission expires _____ 191_____.

_____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.                    IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM AND SOLEMNIZE THE MARRIAGE CEREMONY—GREETING:

You are hereby authorized to join in marriage Mr. _Sam Hatter_ of _Okla_
County of _Sequoyah_ State of _Oklahoma_ aged _21_ years,
and Miss _Ida Melton_ of _Okla_ County of _Sequoyah_
State of _Oklahoma_, aged _19_ years,
And of this License you will make due return to my office within thirty days from this date. _7 Feby_
Witness my hand and official seal, this _2_ day of _Feby_ 191_9_.

_Joe E. Thornton_ Court Clerk.
By _____ Deputy.

Recorded this _3rd_ day of _Feby_ 191_9_

_Joe E. Thornton_ Court Clerk
By _Louise Hall_ Deputy

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, SEQUOYAH COUNTY, ss.

I, _W. A. Carlile, County Judge_
of _Sallisaw_ in _Sequoyah_ County, State of Oklahoma, do hereby certify that I
joined in marriage the persons named in and authorized by this License to be married, on the _3rd_ day of _February_
A. D. 191_9_, at _Sallisaw_ in _Sequoyah_ County, State of Oklahoma,
in the presence of _W. M. Combs_ of _Sallisaw Okla_ and _Mose Sanders_
of _Sallisaw Okla_

_W. A. Carlile_
_County Judge of Sequoyah County Okla._

Returned and recorded this _3rd_ day of _Feby_ 191_9_

_Joe E. Thornton_

459

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
        *Plaintiff,*    )
    )
v.    )    **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
        *Defendant.*    )

---

**EXHIBIT 10**

---

*Exhs. § 2255 Motion*        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

459

copy, mail
3/18-55

625

## MARRIAGE RECORD

9644

THE STAR PRINTERY, INC. BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA—55

STATE OF OKLAHOMA, Sequoyah County, ss.                                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be issued to Mr. Sam Hatter
Color W, residence Akins, County of Sequoyah, State of Okla, age 41,
and Miss Bessie Reed
Color W, residence Akins, County of Sequoyah, State of Okla, age 22,
and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degree prohibited by law. That I am 41 years of age, and reside at Akins, County of Sequoyah, State of Okla, Applicant.

Subscribed and sworn to before me, this 26 day of Oct, A. D. 1940.
Sam Hatter
By _____, Deputy Court Clerk. Lillie Rosson, Court Clerk.

I, the undersigned, _____ of _____ named in the above application as being of the age of _____ years, do hereby consent to _____ marriage to _____

Dated at _____, Oklahoma, this _____ day of _____, 19_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State, on the _____ day of _____, 19__, personally appeared _____ to me known to be the identical person____who executed the within and foregoing instrument, and acknowledged to me that_____executed the same as_____free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires_____, 19____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                          IN COUNTY COURT
To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. Sam Hatter of Akins, County of Sequoyah, State of Okla, aged 41 years, and Miss Bessie Reed of Akins, County of Sequoyah, State of Okla, aged 22 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this 26 day of Oct, 19 40.
By _____, Deputy. Lillie Rosson, Court Clerk.
Recorded this 26 day of Oct, 19 40. Lillie Rosson, Court Clerk.

(seal)

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.
I, O. W. White, Minister, Baptist
Name        Official Designation        Court or Congregation
of Short in Sequoyah County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the 27 day of October, A. D., 1940, at Short, in Sequoyah County, State of Oklahoma, in the presence of Marie Lizzie White of Short Okla, and Mrs. Della Reed of Sallisaw R/
O. W. White
Baptist Minister, Official Designation.

My credentials are recorded in Ministers' Credentials, book 1, page 46.
Returned and recorded this 2 day of November, 1940. Lillie Rosson, Court Clerk.
By F L Smith, Deputy.

(seal)

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 11**

_____

507

MARRIAGE RECORD No. 35

## APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                     IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name .....Paul Dudley.................................................................................................., Age ..43......

of ..........Sallisaw.............................................., County of .....Sequoyah............, State of ....Oklahoma.......

Name .........Sylvie Gelene Barrett...................................................................... .. .., Age ..42......

of ..........Sallisaw.............................................., County of ......Sequoyah..........., State of .....Oklahoma......
and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows;

(First Party) .............................................................. (Second Party) ....................................................
and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

.................................................,Applicant          ..............................................Applicant

Subscribed and sworn to before me this.....18...day of ...October.............................A. D. 1982.

THEODORE STITES, Court Clerk

By..Pamela Dyer.......................................Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the ....................... of ....................... named in the above application as being

of the age of ......... .... years, and in the presence of the issuing official, I do hereby consent to ....... ........ ........................... marriage to

............................................................

In the presence of          Signed this ....... day of ......... .. .. ....... , 19 .... .........................Signature

THEODORE STITES, Court Clerk

By ...................................................... Deputy

### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ...... ... of ......... . .. ....... named in the above application as being

of the age of ........ ..... years, and in the presence of the issuing official, I do hereby consent to ............................. marriage to

............................................................

In the presence of          Signed this ... .. .. day of.... ... .. ..... , 19 ....................................Signature

THEODORE STITES, Court Clerk

By ...................................................... Deputy

## MARRIAGE LICENSE

NO.......................                                IN DISTRICT COURT

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS;

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. ......Paul Dudley............................................................ of .....Sallisaw...............

County of ........Sequoyah.................................., State of ....Oklahoma................, Age ........43..., years, and

M ......Sylvie Gelene Barrett........................................... of .....Sallisaw...............

County of ..........Sequoyah..............................., State of ....Oklahoma...................., Age ....42...... years, and
by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this.....18day of......Oct....., 19.82.

THEODORE STITES, Court Clerk

(SEAL)                         By..Pamela Dyer.......................Deputy

ENDORSEMENT; By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstances indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

__Filed__(1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

..............(2) An order of the District Court with memoranda of reasons for the order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

..............(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

..............(4) Affidavits of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by feature 43 O. S. Supp. 1967, par. 3.

..............(4) Affidavits of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

..............(4) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent, 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this ....18......... day of .....October..............., 1982.

THEODORE STITES, Court Clerk          By ........Pamela Dyer................. Deputy

All the above and foregoing recorded on this ............. day of ................................ A. D., 19. .., and thereafter said License delivered according to Law.

By ...................................................... Deputy          THEODORE STITES, Court Clerk

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I, ........Billy Ray Jackson ................................. . .............Minister......................
                    (NAME)                                        (OFFICIAL DESIGNATION)

....................Baptist.................................... of .......Sallisaw......................
            (COURT OR CONGREGATION)                                (TOWN)

In Sequoyah........... County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married on the ....18th.. day of .......October........, A. D., 19.82, at....Sallisaw........., in Sequoyah County, State of Oklahoma,

in the presence of .......Bernell Edwards... .... ..................... of ....Sallisaw., Okla..................

and ...................Kathy Reed............................. of ....Sallisaw, Okla........................

My credentials of authority are recorded in Minister's
Credentials .................. Book ....2.....,          ..........Billy Ray Jackson.........

at page .......33... of .....Sequoyah.... County,                    (PERSON PERFORMING CEREMONY)
Oklahoma.                                          Minister......................
                                                    (OFFICIAL DESIGNATION)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 34 at page...507....

on this the ....18th.... day of ......October.......... , 19..82.

THEODORE STITES, Court Clerk          By.Kathy Reed.................................Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 12**

---

236

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

Plaintiff, )
)
)
)
-vs-                                          )
)
)
ERNEST BARRETT,                               )
Defendant.    )

No. D-73-50

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 20 1973

THEODORE STILES, Court Clerk

By _____ Deputy

DECREE OF DIVORCE

On this 20th day of JUNE , 1973, the above entitled and numbered cause comes on for trial on its merits. The plaintiff, Sylvia Gelene Barrett, appears in person and by her attorney, John Robert Montgomery, of Scoufos and Montgomery, and the defendant appears not, having heretofore executed and filed sufficient Waiver of Service of Summons and Entry of Appearance, same having been filed on the 19 th day of JUNE , 1973.

The Court having ordered that the allegations contained in said Petition be taken as confessed, and having examined the files and records in this case and having heard the oral testimony of witnesses sworn and examined in open Court, having fully considered the evidence, and being fully advised in the premises, finds: That all material facts alleged in plaintiff's Petition are true; that the parties hereto were legally married at Stilwell, Oklahoma, on the 8th day of July, 1960, and have since that time been husband and wife though said parties have been separated since September 12, 1972; and that of said marriage three (3) children have been born, namely: Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen Barrett, age 4; that the plaintiff is now and has been for more than six (6) months next preceding the filing of plaintiff's Petition herein a bona fide resident in good faith of the State of Oklahoma, and is now and has been for more than thirty (30) days prior to the filing of plaintiff's Petition an actual resident in good faith of Sequoyah County, Oklahoma; that the plaintiff is entitled to a divorce upon the grounds of adultery in that the defendant has repeatedly engaged in unlawful voluntary sexual intercourse with persons of the opposite sex during the marriage of the parties, as alleged in plaintiff's Petition; that the plaintiff is a fit and proper person

464

page two, Barrett
Decree of Divorce

237

to be awarded the exclusive care and custody of the minor children, subject to the

defendant's right of reasonable visitation, and that the defendant should be required to

pay reasonable child support during their minority, or until further order of the Court,

in the amount of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of

said children; that during said marriage of the parties hereto they have acquired no real

property and have acquired certain person property, to wit:  One 1973 Pontiac automobile,

household furniture and goods, including but not limited to a television, living room suit

and living room rug, of which said person property the said 1973 Pontiac automobile

should be awarded to the defendant as his sole and separate property and the household

furniture and goods, including the television, living room set and living room rug should

be awarded to the plaintiff as her sole and separate property.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE

COURT that Sylvia Gelene Barrett, plaintiff herein, be and she is hereby awarded an

absolute decree of divorce from the defendant, Ernest Barrett, and the bonds of matri-

money heretofore existing between said parties are hereby dissolved, set aside and held

for naught, and both parties are released therefrom; PROVIDED, that this part of the

decree does not become absolute and final until six (6) months from the date hereof,

during which time the parties are enjoined from marrying any other party.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT

that the plaintiff be and she is hereby granted the exclusive care and custody of the minor

children, Kenneth Barrett, Richard Barrett and Stephen Barrett; and the defendant is

granted rights of visitation with said children at reasonable times, and under reasonable

conditions; and the defendant is ordered and directed to pay, as reasonable child support,

the sum of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of said

children during their minority, or until further order of the Court, the initial child sup-

port payment to be made on or before the _2nd_ day of ___July___, 1973, by

cash, cashier's check or money order through the Clerk of the District Court of Sequoyah

County, Oklahoma, and like payments on or before the __1st__ day of each week thereafter.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT

that the defendant be, and he is hereby, awarded the 1973 Pontiac automobile and his

page three, Barrett
Decree of Divorce

personal effects and belongings as his sole and separate property, free and clear of

any claims, rights, or interest whatsoever of the plaintiff, and the plaintiff be, and she

is hereby, awarded the household furniture and goods, including but not limited to a

television, living room suit and living room rug, and her personal effects and belongings

and those of the children as her sole and separate property, free and clear of any claims,

rights or interest whatsoever of the defendant.

　　　　IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT

that each of the parties hereto are hereby ordered and directed forthwith to execute and

deliver to the other such assignments, bills of sale, deeds or conveyances of record

that may be necessary to carry the terms of the division of property into effect, and in

the event either of said parties fail to do so within five (5) days from this date, then this

decree shall operate as such conveyance.

　　　　　　　　　　　　　　　　BILL ED ROGERS
　　　　　　　　　　　　　　　　Associate Judge of the District Court

APPROVED:

SYLVIA GELENE BARRETT, Plaintiff

ERNEST BARRETT, Defendant

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

                  Plaintiff,   )
                             )
                             )
                             )

-vs-                           )     No.  **D-73-50**
                             )
                             )     **SEQUOYAH COUNTY, OKLAHOMA**
                             )     **FILED**
                             )     **IN DISTRICT COURT**
ERNEST BARRETT,                 )
              Defendant   )     **JUN 19 1973,**

ENTRY OF APPEARANCE AND WAIVER  **THEODORE STITES, Court Clerk**

        Comes now the defendant herein, the undersigned, and acknowledges

receipt of a copy of the petition filed and on file herein, states that he has read

and understands the same, hereby waives the issuance, service, and return of

procees upon him in this action, enters a voluntary appearance in this cause, waiv-

ing all time and right to plead, answer or appear in this action, and consents that

the same may be set down for trial and heard by the Court at any time hereafter without

notice to, and in the absence of, this defendant.

                           ERNEST BARRETT, Defendant

STATE OF WEST VIRGINIA

COUNTY OF  CABELL    )  SS

        Before me, the undersigned, a Notary Public within and for the State of
West Virginia, on this 6 day of June 1973, personally appeared the above named

defendant, Ernest Barrett, to me known to be the identical person who executed

the above and foregoing entry of appearance and waiver, and personally acknowledged

to me that he has read, understood and signed the same, and that he executed the

same as his free and voluntary act and deed for the uses and purposes therein set

forth.

        IN WITNESS WHEREOF I have hereunto affixed my signature and official

seal the date and date theretofore stated.

                         NOTARY PUBLIC

        My commission expires the 27 day of  September  , 19 73 .

467

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

.Plaintiff,      )
                 )
                 )
                 )
-vs-             )
                 )
                 )
                 )
ERNEST BARRETT,  )
                 )
        ·Defendant  )

No. **D-73-50**

SEQUOYAH COUNTY, OKLAHOMA
**FILED**
IN DISTRICT COURT

MAR 14 1973

THEODORE STITES, Court Clerk
By_____Deputy

PETITION

The plaintiff, Sylvia Gelene Barrett, for cause of action against the defendant, Ernest Barrett, alleges and states:

I

That the plaintiff is now and has been for more than six (6) months next preceding the filing of the petition herein an actual resident, in good faith, of the State of Oklahoma, and a resident of Sequoyah County for thirty (30) days at the time her petition was filed herein.

II

That the parties hereto were married on or about the 8th day of July, 1960, at Stilwell, Adair County, Oklahoma and have been since that time, and are at the present time, husband and wife.

III

That of said marriage aforesaid three (3) children, now minors, have been born, to wit: Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen Barrett, age 4.

IV

That as grounds for divorce the plaintiff alleges that the defendant has, during the marriage of the parties, been guilty of adultery in that the defendant has repeatedly engaged in unlawful voluntary sexual intercourse with persons of the opposite sex, by reason of which the plaintiff is entitled to a decree of divorce from the defendant.

468

page two, Barrett
Petition

V

That during the marriage of the parties hereto they have acquired no

real property and the following personal property, to wit:

One 1973 Pontiac automobile
Household furniture and goods, including but not limited to
a television, living room suit and living room rug.

VI

That the Court should award the said 1973 Pontiac automobile to the

defendant as his sole and separate property and should award the household furniture

and goods, including the television, living room set and living room rug to the

plaintiff as her sole and separate property.

VII

That the defendant is a healthy man regularly and profitably employed

with current gross earnings of approximately ONE THOUSAND FIVE HUNDRED DOL-

LARS ($1,500.00) per month, and that he should be ordered and directed to make

regular periodic payments of child support through the office of the Court Clerk of

the District Court of Sequoyah County, Oklahoma, for the maintenance and support

of the children of the parties hereto, in the amount of SEVENTY FIVE DOLLARS

($75.00) per week.

VIII

That the plaintiff is a fit and proper person to have custody of the minor

children of the parties and that custody of said children should be awarded to the

plaintiff subject to the right of the defendant to visit with said children at reasonable

times and places.

IX

That plaintiff does not have an adequate means of support and the Court

should require the defendant to pay her attorney's fee in the reasonable amount of

ONE HUNDRED FIFTY DOLLARS ($150.00) and the Court costs herein.

469

page three, Barrett
Petition

WHEREFORE, premises considered, the plaintiff prays that upon hearing this cause the Court grant and award the plaintiff a decree of divorce from the defendant; custody of the minor children of the parties with reasonable visitation privileges to the defendant; child support; attorney fees in the amount of ONE HUNDRED FIFTY DOLLARS ($150.00); a fair and equitable division and distribution of the property accumulated by the parties by awarding the defendant the 1973 Pontiac automobile and awarding the plaintiff the household furniture and goods, including but not limited to the television, living room rug and living room set; Court costs; and such other and further relief as to which the plaintiff may be entitled and which may be deemed just and proper by the Court.

SYLVIA GELENE BARRETT

By _____
JOHN ROBERT MONTGOMERY
SCOUFOS & MONTGOMERY
Attorneys at Law
P. O. Box 787
Sallisaw, Oklahoma  74955
Attorneys for Plaintiff

STATE OF OKLAHOMA )
) SS
COUNTY OF SEQUOYAH )

Sylvia Gelene Barrett, being first duly sworn upon oath says: That she is the plaintiff above named, that she has read the foregoing Petition and knows the contents thereof, and that the facts therein set forth are true.

_____
SYLVIA GELENE BARRETT

Subscribed and sworn to before me this 14th day of March, 1973.

_____
NOTARY PUBLIC

My Commission Expires:

November 1, 1976

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                                    Plaintiff,          )
                                                        )
                                                        )
                                                        )
-vs-                                                    )          No. ___D-73-50___
                                                        )
                                                        )          SEQUOYAH COUNTY, OKLAHOMA
                                                        )          F I L E D
ERNEST BARRETT,                                         )          IN DISTRICT COURT
                                    Defendant           )
                                                                   MAR 14 1973

AFFIDAVIT FORMA PAUPERIS          THEODORE STITES, Court Clerk
                                                      By ___Arlene Day___ Deputy

I, Sylvia Gelene Barrett, petitioner, above named, do solemnly swear

that the cause of action set forth in the petition hereto prefixed is just, and I do

further swear that by reason of my poverty, I am unable to give security for costs.

_____Sylvia Gelene Barrett_____
SYLVIA GELENE BARRETT

Subscribed and sworn to before me this _14th_ day of March, 1973.

_____Sandra Saylor_____
NOTARY PUBLIC

My Commission Expires:

_November 1, 1976_

O. K. to file this _14th_ day of _March_,
1973.

_____Bill Ed Rogers_____
Judge of the District Court

472

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 13**

---

473

## DECLARATION OF JANESSE THOMAS

I, Janesse Thomas, declare the following:

I know Charles "Monk" Sanders. At one time, over a decade ago, I was Monk Sanders ███friend. I also know Kenny Barrett.

I was at Kenny Barrett's residence perhaps two or three times while Monk Sanders was there. Mr. Sanders and I did not got to Kenny Barrett's place together. I never went to Kenny Barrett's residence to buy drugs with Monk Sanders. I never bought drugs from Kenny Barrett on any occasion I was at his residence. I never witnessed any drug transaction between Kenny Barrett and Monk Sanders. Kenny Barrett did not like or trust Monk Sanders, and did not want him around his property.

I am aware that Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial in Muskogee. It is my understanding that Monk Sanders testified that two to three days before the trooper was killed, he and I went to Kenny Barrett's and bought drugs, and that he and I went to Mr. Barrett's property on other occasions in the summer of 1999 to buy drugs. This never happened, so if Mr. Sanders testified to these things, his testimony was false. As I said, I never bought drugs from Kenny Barrett, and I never saw Kenny Barrett sell Monk Sanders any drugs at any time, let alone two to three days before the trooper was killed.

On one occasion while I was Monk Sanders's girlfriend, he was harassing me and I got away from his place. I called Kenny Barrett to come pick me up so I could get away

1

from Mr. Sanders. Mr. Barrett did pick me up, and Monk Sanders and his mother followed us for a while. He was yelling at me that I needed to go back with him, but I didn't. It appeared that Monk was mad at Kenny Barrett for picking me up and getting me away from him.

Based on my contact with Mr. Sanders, it is my personal opinion that he is completely dishonest and untrustworthy. I would not believe a word he said about anything. I am also aware that in the community, Monk Sanders's reputation for honesty and trustworthiness is about as bad as could be. Nobody trusts or believes him.

I was not contacted by any of Kenny Barrett's lawyers or anybody working for them at the time of Kenny Barrett's federal trial. If they had contacted me, I would have given them the information stated above, and would have testified to these things if asked.

I did not write this declaration. I related the above information to one of Mr. Barrett's current lawyers and an investigator working for Kenny Barrett. I have carefully read the contents of this declaration, and it accurately states what I told the lawyer and investigator.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this ___ day of March, 2009, in ___Sequoyah___ County, Oklahoma.

2

Janesse Thomas

3

475

476

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 14**

### DECLARATION OF DALE ANDERSON

I, Dale Anderson, declare the following:

I am one of the investigators working on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I and another investigator, Leonard Post, interviewed Cindy Crawford. Cindy Crawford testified in both stages of Mr. Barrett's trial. During this interview, Cindy Crawford told Mr. Post and me the following:

Cindy stated that she testified as a government witness in Kenny Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Kenny Barrett. She stated that as of 1999, she had known Kenny Barrett for approximately 4 years.

Cindy Crawford told Mr. Post and I that one to 2 weeks before her initial testimony against Kenny Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She got into Mr. Philpot's car, and he drove her to Muskogee. There, she met AUSA Mike Littlefield and several men wearing guns who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

1

Cindy Crawford told us that the men wearing guns showed her several firearms that looked similar to ones that belonged to Kenny Barrett. Cindy stated that she was told by Mr. Littlefield that she needed to work with him and testify against Kenny Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a 5-year deferred sentence in a drug case. Mr. Littlefield told her that Kenny Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenny Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated that she had never seen Kenny Barrett cook methamphetamine at any time.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford told us that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Littlefield told her that in her testimony, she should make things look as violent and ominous as possible, and there was imminent danger in being around Kenny Barrett. Cindy stated during our interview that Mr. Littlefield discussed with her the possibility that she could be charged with perjury if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her

2

479

if she did not testify against Kenny Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that she was interviewed by Mr. Littlefield and the government about Kenny Barrett's federal case separately from her husband, Travis Crawford. Cindy related that she was told by Travis that John Philpot told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. Cindy stated that she was told by Mike Littlefield, and later by John Philpot, that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Post and I that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenny

3

Barrett, she never bought drugs from him, but just used drugs with him. She told us that when she was interviewed by Mr. Littlefield in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy told us that "if you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy told us during our interview that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Kenny Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, and Kenny Barrett's mood and actions at the time, due to her PTSD. Cindy stated that other than this incident, which she very well could have exaggerated or embellished, Kenny Barrett had always been nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenny Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law

4

enforcement asked her about this incident after her first stage testimony. She stated it is her belief that they must have gotten this information from Kenny Barrett's brother, Richie Barrett.

Cindy Crawford told us that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenny Barrett's place. Cindy stated they were also upset when she said she never saw Kenny Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she was not hurting Kenny Barrett enough. She stated, "They were very angry. They scared me and threatened me." Cindy related that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped them and hurt Kenny Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenny Barrett's property not too long before the shooting of the trooper to check Kenny Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Kenny Barrett and John Philpot acted like they were old buddies.

During the course of this investigation, I attempted on several occasions to interview Charles "Monk" Sanders. I was unsuccessful. On February 12, 2009, I went to the home of Evelyn Sanders, Mr. Sanders's mother. She lives in Oolagah, Oklahoma. Ms. Sanders told me that her son, Charles, had been promised things by the federal

5

prosecutors in exchange for his testimony against Mr. Barrett that he never received.  Mr.

Sanders, Mrs. Sanders and the Sanders family were upset about this.

I declare under penalty of perjury that the foregoing 6 page declaration is true and

correct.

Executed by me this _12_ day of ___March_____, 2009, in

_Oklahoma_____ County, Oklahoma.

_____
Dale Anderson

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 15**

_____

SEQUOYAH COUNTY, OKLAHOMA
**F I L E D**
IN DISTRICT COURT

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY

STATE OF OKLAHOMA        JAN - 2 1992

KATHY REED, Court Clerk

By_____*Vb*_____Deputy

ISSAC C. BARRETT          )
                     Plaintiff,  )
                                  )
vs.                               )          Case No. D92-    J
                                  )
MARILYN S. BARRETT                )
                     Defendant.   )

PETITION FOR DIVORCE

COMES NOW the Plaintiff and for his cause of action against the Defendant alleges and states as follows:

1.    That prior to the filing of this Petition, the Plaintiff has been a resident in good faith of the County of Sequoyah and the State of Oklahoma for thirty (30) days and six (6) months respectively;

2.    That the parties hereto were legally married on or about the 26th day of July, 1989 in Ft. Smith, Arkansas;

3.    That as grounds for divorce, the Plaintiff alleges incompatibility;

4.    That of the marriage, no children have been born, nor is the Defendant now pregnant;

5.    That during the marriage of the parties, they have acquired certain property which should be equitably and fairly divided by the Court;

6.    That during the marriage of the parties, they have incurred certain indebtedness which should be fairly and equitably divided by the Court;

LIAM K. ORENDORFF
ATTORNEY AT LAW
06 N. OAK STREET
ALLISAW, OKLAHOMA
74955

KEB400196

## VERIFICATION

STATE OF OKLAHOMA   )
                        )   ss:
COUNTY OF SEQUOYAH   )

     **ISSAC C. BARRETT**, of full age being first duly sworn upon his oath deposes and states:

     That he is the Plaintiff in the above and foregoing instrument; that he has read and understands the contents contained therein and further states that the same are true and correct as he verily believes.

                                 _____
                                 ISSAC C. BARRETT

     SUBSCRIBED AND SWORN to before me this _3lot_ day of
_December_, 199_1_.

                          _____
                            NOTARY PUBLIC

My Commission Expires:

_5/31/95_

KEB400197

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, OKLAHOMA

STATE OF OKLAHOMA

**FILED**
IN DISTRICT COURT

JAN 2 9 1992

KATHY REED, Court Clerk

By_____Deputy

ISSAC C. BARRETT

Plaintiff,  )

vs.                                                   Case No. D92-1

MARILYN S. BARRETT

Defendant.  )

### ENTRY OF APPEARANCE AND WAIVER

COMES NOW the Defendant herein, the undersigned, d acknowledges receipt of a copy of the Petition filed and on f herein, and states that she has read and understands the sa hereby waives the issuance of service and return of process u her in this action, enters a voluntary appearance in this cau waiving all time and right to plead, answer or appear in t action, and consents that the same may be set down for trial heard by the Court at any time hereafter without notice to, in the absence of this Defendant.

The Defendant acknowledges that this Entry of Appearance Waiver has been prepared by the attorney for the Plaintiff fully understands that the attorney for the Plaintiff is un no obligation to protect and/or enforce any of the rights which the Defendant might be entitled, including the right seek the advice of counsel.

I have been presented with a (proposed) DECREE OF DIVC to be presented to the Judge who tries this case. My signat of approval has been endorsed thereon for the benefit of

JAM K. ORENDORFF
ATTORNEY AT LAW
16 N. OAK STREET
LISAW, OKLAHOMA
74055

486

KEB400198

BARRETT ENTRY OF APPEARANCE AND WAIVER
Page 2

Court in acknowledgement of the proposed property settlement

these parties.

*Marilyn S. Barrett*

SUBSCRIBED AND SWORN to before me this 31st day of *December* 1991.

*[signature]*
NOTARY PUBLIC

My Commission Expires:

7/32/92

487

KEB400199

#6402.divdec

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 3 1992

KATHY REED, Court Clerk
By_____ Deputy

ISSAC C. BARRETT

                 Plaintiff,  )

vs.

MARILYN S. BARRETT

                 Defendant. )   Case No. D-92-1

## DECREE OF DIVORCE

ON THIS 3rd day of February, 1992 the above entitled matter comes on for trial; Plaintiff appears in person and with counsel William K. Orendorff, and Defendant appears not; the Court examines the records, heard the evidence and statements of counsel, and based thereon finds:

That Defendant has executed and filed sufficient Entry of Appearance and Waiver; that the Court has jurisdiction over the parties and subject matter of this action;

That prior to the filing of the Petition herein, the Plaintiff had been a resident in good faith of the County of Sequoyah and the State of Oklahoma for thirty (30) days and six (6) months respectively;

That the parties hereto were legally married on or about the 26th day of July, 1989, in Fort Smith, Arkansas;

That the parties hereto are entitled to a divorce on the grounds of incompatibility;

488

KEB400200

That during the marriage the parties have acquired certain proper which should be equitably divided as specifically set for hereinafter;

That during the marriage, the parties incurred certa indebtedness which should be equitably divided as specifically s forth hereinafter;

That prior to the marriage of the parties, the Defenda acquired certain property which should be awarded to Defendant her separate property as specifically set forth hereinafter;

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Cou as follows:

That the parties are hereby granted a Decree of Divorc from each other on the grounds of incompatibility, and thei marriage relationship is dissolved and both parties release therefrom; provided, neither party shall marry any other person i the State of Oklahoma for six (6) months from the date hereof;

That the Plaintiff is awarded as his sole and separat property, free and clear of any right, title, or interest of th Defendant, the following:

The appliances which are secured for the debt to Arkansas Best Federal Credit Union;

Real Estate situated in Sequoyah County, Oklahoma, to-wit:

E$\frac{1}{2}$ NE$\frac{1}{4}$ SW$\frac{1}{4}$ and SE$\frac{1}{4}$ SE$\frac{1}{4}$ NW$\frac{1}{4}$ Section 8, Township 12 North, Range 25, Sequoyah County, Oklahoma; provided, however, that said property is subject to a lien in favor of the Defendant to secure the payment of the sum of $40,000 to the Defendant as hereinafter provided;

The Mobile Home subject to the indebtedness

2

KEB400201

thereunto;

Plaintiff's personal belongings;

That the Defendant shall divest herself of any intere whatsoever in the above described real property once the lienab claim of the Defendant has been fully satisfied.

That the Defendant is awarded as her sole and separa property , free and clear of any right, title or interest of tl Plaintiff, the following:

1990 GMC Pickup

Bedroom Suite

All furniture she owned prior to marriage

Stock Trailer

1983 Olds Cutlass

All real estate located in Crawford County, Arkansas, to wit;

TRACT 1

All that part of the Southeast Quarter of the Southeast Quarter of Section 18, Township 9 North, Range 32 West lying South and East of the Town of Dora, Arkansas, and South and East of the right of way of Interstate Highway 40; ALL that part of the Fractional Northeast Quarter of Section 19, Township 9 north, Range 32 West, lying South and East of the right of way of Interstate Highway 40, South and East of platted Town of Dora, Arkansas, and North of the right of way of Missouri Pacific Railroad EXCEPT a part of the Southeast Quarter of the Northeast Quarter of Section 19, Township 9 North, Range 32 West heretofore deeded for Dora Cemetery and described as follows: Commencing at the 73d mile post on Oklahoma-Arkansas line, setting in the Southwest part of said Quarter, thence North 45 degrees East 7.5 chains for a point of beginning; thence North 63 degrees East 6.44 chains; thence North 3 degrees West 6.22 chains; thence South 79 degrees West 6.5 chains;

3

490

KEB400202

thence South 13 degrees East 4.57 chains to the point of beginning, containing 4.67 acres more or less; and, ALL that part of the West Half of the West Half of the Northwest Quarter of Section 20, Township 9 North, Range 32 West lying North of the right of way of the Missouri Pacific Railroad, being the same property described in that certain deed appearing in Book 237, page 285, Blakemore to Hogan; EXCEPT that part Commencing at the Southwesterly Corner of the Dora Cemetery which is described as an exception in that certain deed wherein Mrs. Glenn A. Blakemore was grantor and Joe Ray Hogan and Juanita Hogan, Husband and Wife, were grantees, recorded in Book 237, page 285, thence North along the Westerly line of said Dora Cemetery to the Southeasterly Corner of the Gene C. Smith property; thence Westerly along the South line of the Gene C. Smith property to the West line of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 19, Township 9 North, Range 32 West; thence South along the Westerly line of said Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) to the Missouri Pacific right-of-way; thence in an Easterly direction to the point of beginning; EXCEPT FURTHER the two-acre tract deeded to MARCIA BARNES by her father and mother, Joe Ray Hogan and Juanita Hogan, during their lifetimes; and SUBJECT TO that certain easement granted to Bob Bordelon by Joe Ray Hogan and Juanita Hogan, which, among other things, runs along the South end of the above-described property and along the South end of the two-acre tract deeded by Joe Ray Hogan and Juanita Hogan to MARCIA BARNES; to which both MARILYN SUE REICHERT and MARCIA BARNES, their heirs, and assigns shall have joint right of use.

TRACT 2

Lots 5 and 6, Block 5, Town of Dora, Arkansas.

TRACT 3

A part of the West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of Section 20, Township 9 North, Range 32 West, more particularly described as follows: Commencing at the intersection of the East line of the said West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of

4

KEB400203

said Section 20, with the northerly right-of-way line of the Missouri Pacific Railroad Company, thence north along said East line of the said W½ NW¼ NW¼ aforesaid, a distance of 420 feet to a point; thence West 210 feet; thence South to the northerly right-of-way line of the Missouri Pacific Railroad Company, thence North and East along said Missouri Pacific Railroad Company northerly right-of-way line to the point of beginning, containing two acres, more or less.

That the Plaintiff shall divest himself of any interest whatsoever in the above described real property by executing a Quit Claim Deed to Defendant within ten (10) days from the date of this Decree, however, should Plaintiff fail to do so, then this Decree shall be sufficient to effect the conveyance of Plaintiff's interest in said real property to the Defendant;

That as part of the property division Plaintiff shall pay to the Defendant the sum of forty-thousand ($40,000.00) dollars as soon as he is able to secure sufficient financing and the Defendant is hereby granted a lien on the real estate hereunder awarded to the Plaintiff to secure the payment of said sum which shall be paid to the Defendant within thirty (30) days from the date hereof.

As a further part and parcel of the property settlement agreement, the Plaintiff agrees that he shall pay any and all attorney's fees and costs that may have arisen by virtue of litigation over an easement pertaining to the above described Crawford County property, and shall hold the Defendant harmless therefore.

That the Plaintiff shall pay the following indebtedness:

The debt on the Discover Card;

The note at First National Bank of Sallisaw on the Stock

KEB400204

trailer and 1983 Olds Cutlass;

The indebtedness on the Mobile Home, and hold tl Defendant harmless from same.

That the Defendant shall pay the following indebtednes:

The debt to Arkansas Best Federal Credit Union on the 19￼ GMC Pickup;

The debt to Arkansas Best Federal Credit Union on the household appliances;

The Personal Note to Arkansas Best Federal Credit Union and hold Plaintiff harmless from same.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Cour as a part and parcel of the property settlement agreement betwee the parties, and as a part and parcel of the division an distribution of said property, that the parties hereto shall fil a joint income tax return for the year 1991 and they shall equall; divide any refund received therefrom or shall equally pay the tа obligation created thereby.

_____
WILLIAM K. ORENDORFF OBA #11950
Attorney for Plaintiff
P.O. Box 260
Sallisaw, Oklahoma   74955
(918) 775-4436

_____
ISSAC C. BARRETT, Plaintiff

_____
ASSOCIATE DISTRICT JUDGE

_____
MARILYN S. BARRETT, Defendant

6

493

KEB400205

#6402.

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

ISSAC C. BARRETT

                Plaintiff, )

vs. )

MARILYN S. BARRETT )

               Defendant. )

Case No. D-92-1

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 18 1992

KATHY REED, Court Clerk
By_____
                   Deputy

## RELEASE AND SATISFACTION OF JUDGMENT

The undersigned Defendant does hereby acknowledge recei[p]t from ISSAC C. BARRETT, Plaintiff in the above-entitled cause, th[e] sum of $40,000.00 dollars, the amount due upon the judgment rendere[d] in said cause on the 3rd day of February, 1992, which said sum [is] received and accepted in full payment and satisfaction of sa[id] judgment with interest and costs, and in full payment an[d] satisfaction of all fees, liens, and claims in said cause and in a[nd] to the proceeds of said judgment, and the undersigned does here[by] release, acquit, and forever discharge the said Plaintiff, of an[d] from all liability to and demand of the undersigned, in respect t[o] said cause and judgment.

This release shall be filed in the Office of the Clerk [of] said Court, and the said Clerk is hereby authorized and directed t[o]

494

KEB400206

enter said release on the judgment docket of said Court and to release the said judgment of record.

Dated this 5th day of February, 1992.

_Marilyn S. Barrett_
MARILYN S. BARRETT, Defendant

LAW OFFICES OF HARRY SCOUFOS, P.C.
Attorneys at Law
P. O. Box 787
Sallisaw, OK  74955
(918) 775-5546

By: _Harry Scoufos_
HARRY SCOUFOS  O.B.A.  #8031

2

KEB400207

496

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 16**

---

290

MONDAY DECEMBER 10th—Continued.

And after hearing the testimony offered, by both the plaintiff and defendant, instructio
from the court as to the law governing in this cause the jury retires in care if sworn ba
consider its verdict thereafter returning into open court their verdict, as follows, to-w
State of Oklahoma
Sequoyah County.      IN DISTRICT COURT.

The State of Oklahoma
          vs.
Bob Burchett, Defendant

     We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths
the defendant Bob Burchett guilty of burglary in the second degree as charged in the info
herein. We fail to agree upon punishment.
                                             S.E.Winfrey,Foreman.
     Their verdict is received and the jury is discharged from any further service in this ca
and the jury failing to agree as to the punishment the court sets Saturday December 15th
9 o'clock A.M. for sentence.
                    Saturday December 15th 1917.
     The District Court of Sequoyah County, State of Oklahoma met in the court room at Salli
Saturday December 15th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Prese
presiding the honorable John H.Pitchford, Judge, C?E?Holder Sheriff and Joe E.Thornton, Cl
Court is regularly opened by public proclamation and the following proceedings had to-wit
1850                       State of Oklahoma vs. Bob Burchett
     The defendant having on yesterday been tried and convicted of the crime of burglar
he is now sentenced to serve a term of three years in the penitentiary ay McAlester, Okla
             :::::::::::::::::::::::::::::
                    WEDNESDAY DECEMBER 12th 1917.
             :::::::::::::::::::::::::::::

The District court met in regular session pursuant to adjournment as of Tuesday December
present and presiding Hon. John H.Pitchford, Judge, thereof, C.E.Holder, Sheriff and Joe
Clerk.and after court being regularly and duly opened by proclamation the following proce
had and entered:
1784                      State of Oklahoma vs. Howard Henson et al.
     This case coming on for trial, present in person and by their attorneys Thomas J.
Defendants Howard Henson and Robert Tabor ask permission to withdraw their plea of not gu
Court grants the permission,and defendant files a general demurrer, Demurrer is by the co
led, defendant excepts. Defendant Ed Gant is three times called and answers not and is
adjudged in default, the Clerk is ordered to draw a jury to try the cause as to Howard He
and Robert Tabor and the following named jurors are drawn and sworn to try the cause.
R.Garrison, D.L.Creekmore      Ed Cox            J.B.Shrum
S.E.Harp         Fonce Holland      S.E.Winfrey      A.P.Flowers
                 R.H.Thompson    W.J.Webb          W.B.Briley
J.A.Irwin
     The hearing of testimony is begun, at the conclusion of which the court instructs the ju
as to the law governing in this cause and argument of counsel being waived the jury retir
in care of a sworn bailiff to consider its verdict, thereafter returning into open court
their verdict as follows to-wit:

State of Oklahoma
Sequoyah County        IN DISTRICT COURT.

The State of Oklahoma            1784)
          vs.
Howard Henson and Robert Tabor, D
     We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths
find the defendants Howard Henson and Robert Tabor not guilty as charged in the informatio
herein.                                      S.E.Winfrey, Foreman.
     Their verdict is received and the jury is discharged from any further service in this
case. Defendants are discharged and their bondsmen exonerated.
                    ::::::::::::::::::::::
                    THURSDAY DECEMBER 13th 1917.
The District Court of Sequoyah County State of Oklahoma met in the Court room at Sallisa
Oklahoma Thursday December 13th 1917 at 9 o'clock A.M. pursuant to adjournment of yester
present and presiding Hon. John H.Pitchford, Judge, there being also present C.E.Holder
Sheriff and Joe E.Thornton, Clerk. Court is regularly opened by public proclamation and
the following proceedings had to-wit:
1862                      State of Oklahoma vs. Joe Morgan
          Stricken for lack of evidence on motion of the County Attorney.
                    :::::::::::::::::::::
1866                      State of Oklahoma vs. Bob Tabor and George Tabor.
          Continued by agreement.
                    :::::::::::::::::::::::
                    FRIDAY DECEMBER 14th, 1917.
                    ::::::::::::::::::::::::::
The District Court of Sequoyah County, Oklahoma met in the court room at Sallisaw, Oklaho
Friday December 14th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Present
and presiding Hon. John H.Pitchford, Judge, C.E.Holder, Sheriff and Joe E.Thornton, Clerk
Court is regularly opened by public proclamation and the following proceedings had to-wit
1660                      State of Oklahoma vs. Lafayette Horn
     The court orders the mandate of the Crimnal Court of Appeals spread of record.
                    :::::::::::::::::::::::
1638                      State of Oklahoma vs. Geo.Williams
          The Court orders the mandate of the Crimnal Court of Appeals spread of record.
                    :::::::::::::::::::::::
1672                      State of Oklahoma vs. E.L.Lemley
          The court orders mandate of the Crimnal Court of appeals spread of record.
                    ::::::::::::::::
1727                      State of Oklahoma vs. Abe Dotson.
          The court orders the mandate of the Crimnal Court of Appeals spread of record.
                    ::::::::::::::::
1871

KEB502745

State of Oklahoma vs. Levi Chuculate.
dant present in court and waives arraignment and pleads guilty as charged.
ives time for sentence and is by the court sentenced to serve a term of
in the penitentiary at McAlester, Oklahoma and suspends sentence until
y of the next term of the District Court.
:::::::::::::::::::::::::::
SATURDAY DECEMBER 15th, 1917.
:::::::::::::::::::::::::::

ict Court of Sequoyah County, State of Oklahoma met in the court room at
Oklahoma Saturday December 15th 1917 at 9 o'clock A.M. pursuant to adjournment of
resent and presiding Hon. John H.Pitchford, Judge, C.E.Holder, Sheriff and
on, Clerk. Court is regularly opened by public proclamation and the following
had to-wit:
State of Oklahoma vs. Lafayette R.Horn.
orders the defendant committed to the penitentiary for the term of 20 years
ce with the mandate of the supreme court.
:::::::::::::::::::::::::::::
State of Oklahoma vs. George Williams
orders the defendant committed to the penitentiary for the term of five years
ce with the mandate of the supreme court.
:::::::::::::::::::::
State of Oklahoma vs. E.L.Lemley
orders the defendant committed to the penitentiary for the term of one year
the mandate of the supreme court.
:::::::::::::::::::::::::::::
State of Oklahoma vs. Abe Dotson.
orders the defendant committed to the penitentiary for a term of one year and
compliance with the mandate of the supreme court.
:::::::::::::::::::::::::::::::::

KEB502746

499

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 17**

1703 INFORMATION.                    RECORD OF INFORMATIONS.

THE STATE OF OKLAHOMA
vs.
Abe Dotson, J. H. Stout
C. B. Stout,
                    Defendant

In the _____District_____ Court,

of _____Sequoyah_____ County, Oklahoma.

In the Name and by the Authority of the State of Oklahoma,

Now comes _____J. B. Allen_____ the duly qualified and acting County Attorney, in and

for _____Sequoyah_____ County, State of Oklahoma, and gives the _____District_____ Court of

_____Sequoyah_____ County, State of Oklahoma, to know and be informed that _____the above named_____

fendants, Abe Dodson, J. H. Stout and C. B. Stout

did, in _____Sequoyah_____ County, and in the State of Oklahoma, on or about the _____Twenty-eighth_____ day

of _____June_____ in the year of our Lord One Thousand Nine Hundred and _____fifteen_____

and anterior to the presentment hereof, commit the crime of _____a felony, to wit, to wit: an assault_____

_____with intent to kill_____

in the manner and form as follows, to-wit: That is to say the said Abe Dodson, J. H. Stout,

and C. B. Stout, in the county and state aforesaid and on

or about the day and date aforesaid, then and there being

did then and there, with certain dangerous and deadly weapons,

to-wit: an axe and a hammer, which they, the said Abe Dodson

H. Stout, and C. B. Stout then and there had and held in their hands

intentionally, wrongfully, unlawfully, purposely, wilfully, and feloniously,

sault, strike, stab, cut, and wound one Henry Hart with force & energy, to cause

death, with the felonious intent on the part of them the said Abe Dotson, J. H.

Stout and C. B. Stout, him the said Henry Hart then and there wilfully,

unlawfully, intentionally, purposely, wrongfully, and feloniously to kill and

murder,

contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State.

                                        J. B. Allen
                                        County Attorney.

STATE OF OKLAHOMA,
_____Sequoyah_____ County. } ss.   I, _____J. B. Allen_____, being duly sworn, on oath

state, that I have read the above and foregoing Information and know the contents thereof and that the facts stated therein are true.

                                        J. B. Allen,

Subscribed and sworn to before me, this _____12_____ day of _____Nov_____ 1915

                                        Fred Mershon
                                        Court Clerk.

ENDORSEMENTS.

No. 1727                              NAMES OF WITNESSES.

THE STATE OF OKLAHOMA                 Henry Hart, Marble City, Okla.
vs.                                   Henry Lippkin        "      "     "
Abe Dotson, et al.                    Mattie Lippkin       "      "     "
                                      Susie Lippkin        "      "     "
                                      Irene Lippkin        "      "     "
INFORMATION.                          C. M. Gay      Bullisaur Okla.
                                      Dr. J. L. Holcomb   Marble City.
In the _____District_____ Court of
_____Sequoyah_____ County, Oklahoma.

Filed _____Nov 12_____ 1915
        Fred Mershon
        Court Clerk.

I Hereby Certify that the above and foregoing is a full, true, correct and complete copy of the original Information, together

with the endorsements thereon, now on file in my office. Dated_____19_____

By_____Deputy.        _____of_____Co., Okla

KEB503078

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 18**

---

Infor Rec. on Vogue, '4    No. 1227.

# APPEARANCE DOCKET—CRIMINAL

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|

STATE OF OKLAHOMA

vs.

Abe Dotson

Assault with intent to kill,

12/7/15. Jury Trial, Guilty as to Abe Dotson. Not guilty as to J.H. & O.B. Sent. Abe Dotson, sent to Pen for 1 year & 1 day

| | CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | CREDITS |
|---|---|---|---|---|---|
| To Fil Tran, Comp, 3 Warrants 30 | 50 | | | | |
| " & Rep Appr Bond | 1 10 | | | | |
| To Dock Fees | 2 00 | | | | |
| To J.P. Cost | | | 8 30 | | |
| Court Cost | | | 10 55 | | |
| To Dock Notice (Total 2365) | 1 00 | | | | |
| To Fil & Rec Infor | 35 | | | | |
| To " Prae + subp | 35 | | | | |
| | 35 | | | | |
| & Is 5 copies | 1 25 | | | | |
| fil & End Sheriff's Ret | 20 | 6 15 | | | |
| To fil Rhaf. | 10 | | | | |
| Instruction | 10 | | | | |
| To fil Mo for New trial | 10 | | | | |
| " " in arrest of Judgment | 10 | | | | |
| " off | 10 | | | | |
| To fil & approving Supersedeas Bond | 1 10 | | | | |
| Taking ack. to same | 20 | | | | |
| To Wit fees | | | 19 50 | | |
| To Appr, Waive 30, Plea 50, Mo 10, Order 30 | 1 30 | | | | |
| Swear Jurors 100, Writ 50, Order 30, Verdict 10 | 1 90 | | | | |
| Appr 10, Order 30, Verdict 10, Order 30 | 70 | | | | |
| Mo 10, Order 30, Mo 10, Order 30, Mo 10, Order 30 | 1 20 | | | | |
| | 40 | | | | |
| To fil Notice of Appeal | 70 | | | | |
| " " & Rec Judgment & Sheriff's Ret | 1 90 | | | | |

KEB503096

*Infor. Rec. on Page, 483,*

134
17=

# APPEARANCE DOCKET—CRIMINAL

No. *1227*

| CLERK'S Costs | SHERIFF'S Costs | MISCELLA- NEOUS | DISBURSE MENTS | CREDITS |
|---|---|---|---|---|

FAHL DODSWORTH BOOK CO LEAVENWORTH KAN  NO 21816

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|

STATE OF OKLAHOMA

vs.

*Abe Dotson*

*Assault with intent to kill,*

*12/7/15. Jury Trial, Guilty as to Abe Dotson. Not guilty as to JF. & BB. State v Abe Dotson, sent to Pen for 1 year & 1 day.*

| | CLERK'S Costs | SHERIFF'S Costs | MISCELLA- NEOUS | DISBURSE MENTS | CREDITS |
|---|---|---|---|---|---|
| To Fil Tran 10, Comp 10, 3 Warrants 30 | 50 | | | | |
| " & Rep Appr Bond | 1 10 | | | | |
| To Dock Fees | 2 00 | | | | |
| To JP Cost | | | 8 30 | | |
| Court Cost | | | 10 55 | | |
| To Dock & Notice | 10 | | | | |
| To Fil & Rec Infor   (Total 2365) | 1 10 | | | | |
| To " Proc & Jt Ind | 35 | | | | |
| " " " " | 35 | | | | |
| " " " " | 35 | | | | |
| " " Ex 5 copies | 1 25 | | | | |
| fil & Ent Sheriffs Ret | 20 | 6 15 | | | |
| To fil Chas. | 10 | | | | |
| Instruction | 10 | | | | |
| To fil Mo for New trial | 10 | | | | |
| " " " in arrest of Judgment | 10 | | | | |
| " " aff | 10 | | | | |
| To fil & approving Supersedeas Bond | 1 10 | | | | |
| " Taking ack. to same | 20 | | | 19 50 | |
| To fil & approving Supersedeas Bond | | | | | |
| To Appr 10 Waive 30, Plea 50, Mo 10 & Order 30 | 1 30 | | | | |
| " Swear Jurors 100, Writ 50, Order 30, Verdict 10 | 1 90 | | | | |
| " Appr 10 Order 30, Verdict 10 Order 30, | 70 | | | | |
| " " 10 " 30, Mo 10, Order 30, Mo 10, Order 30 | 1 20 | | | | |
| " Mo 10, Order 30 | 40 | | | | |
| To fil Notice of Appeal | 30 | | | | |
| " " " & Rec'd Judgment & Sheriffs Ret | 1 20 | | | | |

KEB503097

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )       **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 19**

---

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

# APPEARANCE DOCKET—Criminal

3

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|----|---------------|-----------------|-----------|
| 3. | THE STATE OF OKLAHOMA vs. Abe Dotson, | Carrying Weapon. | W. L. Curtis County Atty for State J. H. Jarmon for the Defendant, |

| 190_ | | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscel-laneous | Disburse-ments | Credits |
|------|--|--|------------------------|------------------------|---------|-----------------|----------------|---------|
| Nov 21 | Verifying Complaint | | 25 | | | | | |
| | Issuing Warrant | | 25 | | | | | |
| | Filing Complaint | | 5 | | | | | |
| | " Warrant | | 5 | | | | | |
| | Entering Plea Guilty | | 10 | | | | | |
| | Making Entry | | 10 | | | | | |
| | Approving Stay Bond | | 25 | | | | | |
| | Entering Judgement | | 25 | | | | | |
| | Rendering " | | 25 | | | | | |
| | Continuance | | 10 | | | | | |
| | | | 1 65 | | | | | |
| | Sheriffs Fees | | | | | | | |
| | Serving Warrant | | | | 50 | | | |
| | Returning " | | | | 50 | | | |

Reported

$2765

SEP 30 1936
No funds in Depository
Acct for this Case
R. L. Seaman, Deputy S. E. &L.

KEB503073

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 20**

---

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

# CRIMINAL TRIAL DOCKET.

3

1691.

GEO. D. BARNARD & CO., PRIN

| No. | TITLE | ATTORNEY | PRESENT STATUS OF CASE OR PREVIOUS ORDERS |
|---|---|---|---|
| 9. | THE STATE OF OKLAHOMA, vs. Charles Nelson Defendant Charge Selling intoxicating Liquors, | W. L. Curtis County Atty. | Trial in Court. |
| 10 | THE STATE OF OKLAHOMA, vs. Abe Detson Charge Being Drunk in a public, | W. L. Curtis. | Trial in Court, |
| 11 | THE STATE OF OKLAHOMA, vs. W. P. White Charge Disposing mortgaged Property & False pretense and cheats, | | |
| 12, | THE STATE OF OKLAHOMA, vs. C. F. Ixey Charge, Bartering Selling & giving away intoxicating Liquors | | |

KEB503080

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

---

**EXHIBIT 21**

---

# APPEARANCE DOCKET—Criminal

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS | | | | | |
|---|---|---|---|---|---|---|---|
| THE STATE OF OKLAHOMA vs. Abe Dotson Defendant | Being Drunk in a public Place | W. L. Curtis County atty for the State | | | | | |

| | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscel-laneous | Disburse-ments | Credits |
|---|---|---|---|---|---|---|---|
| 2 9 | Affidavit to Complaint | 25 | | | | | |
| | Issuing Warrant | 25 | | | | | |
| | Filing Complaint 5 Entering Same 10 | 15 | | | | | |
| | Entering warrant 10 Filing warrant 5 | 15 | | | | | |
| | Docket entry of Same | 10 | | | | | |
| 3 | Plaintiffs appearance 10 Defendants appearance 10 | 20 | | | | | |
| | Statement of money paid to Justice | 10 | | | | | |
| | By whom paid Berry Dotson. | 10 | | | | | |
| | Entering plea of Defendant | 10 | | | | | |
| | Defendant Stand Committed | 10 | | | | | |
| | For rendering Judgment | 25 | | | | | |
| | Filing 3 papers | 15 | | | | | |
| | For Issuing Order to bring Defend into Court | 25 | | | | | |
| | "    "    Commitment | 25 | | | | | |
| | | 3 40 | | | | | |
| | sheriffs fees | 6 10 | | 6 10 | | | 6 10 |
| 5 | one it by cash   court cost | | | | | | 2 40 |
| | "   "   "   "   Sheriffs cost | | | | | | 6 10 |
| | | 8 50 | | | | | 8 50 |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

**EXHIBIT 22**

*Exhs. § 2255 Motion*                                        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS | |
|----|---------------|-----------------|-----------|---|
| 5 | THE STATE OF OKLAHOMA vs. Abe Datson, Defendant. | Larceny. | W. L. Curtis County Atty. For the State, J. H. Jarman for the Defendant, | ✓ |

| 190_7_ | | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|--------|--|--|-----------------------|------------------------|---------|---------------|---------------|---------|
| 22 | Verifying complaint | | 25 | | | | | |
| | Issuing Warrant | | 25 | | | | | |
| | Filing complaint | | 5 | | | | | |
| | " Warrant | | 5 | | | | | |
| | Entering Plea | | 10 | | | | | |
| | Issuing Subpoena. | | 25 | | | | | |
| | Rendering Judgement | | 25 | | | | | |
| | Recording | | 25 | | | | | |
| | Swearing Witnesses | | 10 | | | | | |
| | Issuing Complaint Commitment | | 25 | | | | | |
| | Approving Bond | | 25 | | | | | |
| 1909 | Making Transcript | | 25 | | | | | |
| 2 | Transmitting papers. | | 25 | | | | | |
| 2 | Certificate | | 25 | | | | | |
| | | | 2 80 | | | | | |
| | Sheriffs Fees | | | | | | | |
| | Serving Warrant | | | | 50 | | | |
| | Returning " | | | | 50 | | | |

SFD on 1909
No funds in Depository
Account for this Case
R. L. Seaman Deputy

KEB503074

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 23**

# APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|
| 1 | THE STATE OF OKLAHOMA<br>vs.<br>Abe Dodson<br>Defendant. | Obtaining money under false pretenses and threats, Examination. | W. L. Curtis county Atty. for the State and J. H. Jarmon & R. E. Jackson for the Defendant. |

190..7..

The defendant brought before the court on the 21st day of Nov 1907

| | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|
| Nov 20 | Making entry on Docket | 10 | | | | | |
| " " | Issuing information, | 25 | | | | | |
| | Issuing Writ | 25 | | | | | |
| | Filing Information | 5 | | | | | |
| | " Writ. | 25 | | | | | |
| | Approving Bond before Trial | 25 | | | | | |
| | Swearing to Complaint | 25 | | | | | |
| | Issuing Subpoena | 25 | | | | | |
| | Swearing Witness | 10 | | | | | |
| | Approving Bond after Trial | 25 | 25 | | | | |
| | Transcript of Docket 5 folios. | 50 | | | | | |
| | Transmitting Papers to District Court | 25 | | | | | |
| | Entering Judgement | 25 | | | | | |
| | To Continuance | 25 | | | | | |
| | Certificate to record, | 25 | | | | | |
| | | 3 30 | | | | | |
| | Sheriffs Fees | | | | | | |
| | Serving Warrant | | | | | 30 | |
| | Returning " | | | | | 50 | |

*Reported.*

SEP 30 1996
No funds in Depository
Account for this Case
R. L. _____ Deputy S. E. _____

KEB503072

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 24**

---

# DECLARATION OF DAVID AUTRY

I, David Autry, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma, the United States Court of Appeals for the Tenth Circuit, the United States District Court for the Western and Eastern Districts of Oklahoma, and the Northern District of Texas.

I am one of Kenneth Eugene Barrett's lawyers in his motion to vacate convictions and sentences pursuant to 28 U.S.C. section 2255. On February 18, 2009, I interviewed Randy Weaver, one of the witnesses who testified for the Government in the first stage of Mr. Barrett's case. Mr. Weaver gave me information that was largely consistent with his trial testimony. During my interview of Mr. Weaver, I asked him whether, in his contact with Mr. Barrett, he ever heard Mr. Barrett state that if the police came on his property, he would "go out in a blaze of glory," or anything else that would indicated he would confront the police with violence if they came on his property. Mr. Weaver informed me that Mr. Barrett never said anything like that to him or in his presence. Mr. Weaver told me that such a statement or statements would be out of character for Mr. Barrett.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this 12th day of March, 2009, in Oklahoma County, Oklahoma.

_____
David Autry

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )     **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 25**

---

KEB503095

# APPEARANCE DOCKET—CRIMINAL

No. 1715

122

| CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|---|---|---|
| | | | | STATE OF OKLAHOMA vs. Sam Maxwell et al | Burglary | 5/3.15- Cont. for Sentence. 1/6/15- Continued 5/1/16. Cause Continued. 12-4-16 Cause Cont, 12/3-17 Cause Cont Dismissed |

| | | CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | CREDITS |
|---|---|---|---|---|---|---|
| To fil Tray Comp Wad Commit | | 40 | | | | |
| " Dock fee | | 200 | | 570 | | |
| " J.P. Costs | | | | 2450 | | |
| " Const " | | | | | | |
| " fil & Rec'd Transfr | | | | | | |
| fees 50 Order 30 | | 110 | | | | |
| fees 50 fee 30 | | 80 | | | | |
| To fil & Rec'd apr. Bond | | 110 | | | | |
| To Dock Notice (Bal 3570) | | 10 | | | | |
| " To fil P.B | | 10 | | | | |
| " appro. & Order 30 | | 40 | | | | |
| To Docket & Notice        3630 | | 10 | | | | |
| " fee P.B | | 10 | | | | |
| To Docket & Notice | | 10 | | | | |
| To fil Pet | | 10 | | | | |
| appearance 10 Order 30 Cont. 20 | | 60 | | | | |
| to Docket & Not | | 10 | | | | |
| Paid Sam Maxwell | | | | | | 1870 |
| Will Dustman | | | | | | 1870 |
| Report act character | | | | | | |
| paid Treasurer | | | | | | 3740 |
| To Dock & fee | | 10 | | | | |

SEP 20 1916
No funds in Depository
Acc'd for his Case
A. L. Beaumont Deputy C. Ben.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 26**

---

*Exhs. § 2255 Motion*                     *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF............................................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Billy Dean Maxwell } No. MH-82-12

| Date Filed | | | Date Case Filed............ Date of Hearing.............. | Items Recorded. | | Cost Accruals | | | | Date Paid | | | Voucher No. |
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | 'Clerk's Cost | Sheriff's Cost | Misc. | On Court Order | Mo. | Da. | Yr. | |
| 5 | 6 | 82 | Petition | | | | | | | | | | |
| ~ | ~ | ~ | Order for Hrg. | | | | | | | | | | |
| ~ | ~ | ~ | Notice of Hrg. issued (Vinita)(Craig Co.) | | | | | | | | | | |
| 5 | 11 | 82 | Order of admission ret'd | | | | | | | | | | |
| 5 | 10 | 82 | Minute: Case coming on for probable cause hearing, defendant appeared in person with attorney, J.Q. adams, state represented by M. Doctors Robbins, Herndon, & oliver appeared. Witnesses sworn test. heard, doctors examination, finding probable cause, Court ordered defendant committed to Eastern State Hospital. ajh | | 5-315 | | | | | | | | |
| 5 | 13 | 82 | Notice Let (rec. too late) | | | | | | | | | | |
| 5 | 25 | 82 | Pd. J.Q. adams v# 2426 $50.00 | | | | | | | | | | |
| ~ | ~ | ~ | Pd. Dr. Fred oliver v# 2432 $20.00 | | | | | | | | | | |
| ~ | ~ | ~ | Pd. Dr. Rick Robbins v#2433 $20.00 | | | | | | | | | | |
| ~ | ~ | ~ | Pd. Dr. Jim Herndon v# 2436 $20.00 | | | | | | | | | | |
| | | | MH 90-29 Re: Gary Ledford | | | | | | | | | | |
| 3 | 21 | 90 | pet. | | | | | | | | | | |
| 3 | 21 | 90 | Motion to Dismiss & order 95-914 | | | | | | | | | | |
| ~ | ~ | ~ | Min - Motion to dismiss of st is sustained as per order ajh | | | | | | | | | | |
| 3 | 23 | 90 | Licensed mental health professional's statement | | | | | | | | | | |

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ........................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Billy Dean Maxwell    }    No. MH-85-17

| Date Filed | | | Date Case Filed.......... Date of Hearing.......... | Items Recorded | | Cost Accruals | | | | Date Paid | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Other Fees Miscl. | On Court Order | Mo. | Da. | Yr. |
| 9 | 11 | 85 | petition | | | | | | | | | |
| ✓ | ✓ | ✓ | Order for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | notice for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | Order of detention issued | | | | | | | | | |
| 9 | 16 | 85 | Report of symptoms | | | | | | | | | |
| ✓ | ✓ | ✓ | certificate of examine | | | | | | | | | |
| ✓ | ✓ | ✓ | issued Order of admission | | | | | | | | | |
| 9 | 17 | 85 | Order of admission filed | | | | | | | | | |
| ✓ | | | Admission Notification | | | | | | | | | |
| 9 | 19 | 85 | Order of Detention filed | | | | | | | | | |
| 9 | 24 | 85 | Pd Dennis M. Sprouse V#2854 | | $50 00 | | | | | | | |
| — | — | — | Pd Bert N. Curley MD V#2059 | | 50.00 | | | | | | | |
| — | — | — | Pd Kish Robbin Do V#2060 | | 50.00 | | | | | | | |
| 1 | 10 | 86 | Discharge from Hospital (letter) | | | | | | | | | |

MH-92-27  Jimmy Wright

| 5 | 26 | 92 | Petition | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | — | — | Order essued | | | | | | | | | |
| 5 | 27 | 92 | Temp Order filed | | | | | | | | | |
| 5 | 28 | 92 | Notice of Certification | | | | | | | | | |
| ✓ | ✓ | ✓ | Order of admission issued | | | | | | | | | |
| 6 | 29 | 92 | Letter from Eastern of Asehere | | | | | | | | | |
| 6 | 30 | 92 | Appl for Order allowing | | | | | | | | | |
| 7 | 1 | 92 | Order allowing w/Dg att. | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )     **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

**EXHIBIT 27**

State Examiner and Inspector's Form. No. 1382.                                    News-Dispatch Ptg. & Audit Co., Shawnee, O.

| IN THE MATTER OF | STATE OF OKLAHOMA, | In The |
|---|---|---|
| the Sanity of | County of Sequoyah | COUNTY COURT |
| A. J. Barrett | No. 141 | |

## PETITION

Date Filed  Aug. 12th 1918

Date of Hearing ............................. 19......

By Whom  W. R. Barrett

Address  Maple Okla.

## ORDER OF ADMISSION.

Date Issued ....................... 19......   Delivered to Sheriff. ...................19....

To ........................................ Oklahoma State Hospital

At ..................................................... Oklahoma

Received at Hospital By Medical Superintendent ........................19....

## PHYSICIANS.

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total Allow- |
|---|---|---|---|---|---|
| 19 | J. W. Hudson | 10 | $5.00 | $ | |
| 19 | J. A. Merrow | 10 | $5.00 | $ | |

## GUARDIAN AD LITEM.

| Date of Appointm't | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

## PLEADINGS / PROCESS

| Date Filed | NAME | Date Issued | NAME | Date Returned | BY WHOM SERVED | Officer's |
|---|---|---|---|---|---|---|
| | | | | | | |

## MINUTES OF PROCEEDINGS.

522

KEB503066

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

**UNITED STATES OF AMERICA,**     )
                                  )
    *Plaintiff,*     )
                                  )
**v.**                             )  **Case No. 6:04-CR-00115-JHP-SPS**
                                  )
**KENNETH EUGENE BARRETT,**       )
                                  )
    *Defendant.*     )

---

**EXHIBIT 28**

---

51

## IN THE MATTER OF

the Sanity of

A. J. Barrett

**STATE OF OKLAHOMA**

County of Sequoyah

No. 709

In the

COUNTY COUI

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|
| Date Filed | Date of Hearing | Date Issued 8-19— 1966 | 8-19— Delivered to Sherifi 19 |
| 8-18— 19 66 | 8-18— 19 66 | To Eastern Oklahoma State Hospital | |
| By Whom Ada Mae Barrett | | At Vinita Oklal | |
| Address | | Received at Hospital By Medical Superintendent 19 | |

### PHYSICIANS

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total / |
|---|---|---|---|---|---|
| 19 | | 19 | $ | $ | $ |
| 19 | | 19 | $ | $ | $ |

### GUARDIAN AD LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

| PLEADINGS | | PROCESS | | | | |
|---|---|---|---|---|---|---|
| Date Filed | NAME | Date Issued | NAME | Date Returned | BY WHOM SERVED | Offi |
| | | | | | | |

### MINUTES OF PROCEEDINGS

9-20-66 Discharged with Rest. to Comp.

9-20-66 Cert of Restoration to Comp.

JOURNAL

STATE OF OKLAHOMA,           } ss.          IN THE COUNTY COURT OF SAID COUNTY.
County of _Sequoyah_
In the Matter of the Sanity of          No. _709_

_A. J. Barrett_          PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL.

To the County Court of Said County, and to the Honorable Judge Thereof:
    Your petitioner respectfully alleges that_____he is a resident of the County of _Sequoyah_____and State
of _Okla._____ That _A. J. Barrett_____is an actual bona fide resident of the
County of _Sequoyah_____, State of Oklahoma, is a_____male person of about the age
of_____49_____years, and is now within the said county and living with _wife_
at or near the town—city of _Sallisaw_
    That your petitioner has good reason to, and does believe that the said_____A. J. Barrett_
is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is_____
necessary that_____he be taken into custody and detained pending final hearing hereof.
    That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows: _Has at_
_different times threatened his wife and children, accusing them_
_of untruths, threatens to kill wife, is belligerent, overbearing, accuses_
_wife of out with other men, etc._
    Your petitioner further alleges that_____he is informed and verily believes that the following named persons, of full age, whose names and places
of residence respectively are as follows, are related to the said insane person, to-wit:

| NAME | RELATIONSHIP | POSTOFFICE | STATE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

    Your petitioner is the_____wife_____of the said insane person_____or that
he is the_____of said County and State, and by reason of such fact is authorized to institute this proceeding.
(Official Title)
    Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the
approximate value, as follows: Real Property $_____, Personal Property $_____, Total Value
$_____. Said estate is situated in_____County, State of_____
    Wherefore, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that
two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person, and that
said physicians make report of their findings, as by law required; and that said_____be
brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the Court by proper
order make provision for the support and maintenance of the said person.
Form by the Attorney General—State Examiner and Inspector's Form No. 1363.          _Ada Mae Barrett_
                                                                                           Petitioner.

STATE OF OKLAHOMA,           }
County of _____          } ss.          CERTIFICATE.
    It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompe-
tency; and upon h_____next of kin, of full age, on account of their non-residence of the county and state, or uncertainty of location, and upon the person
with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense
with such personal service; and _____

it is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed._____

                                                                                           County Judge.
Filed _____19_____ _____ Court Clerk. By_____Deputy.
Form by the Attorney General—State Examiner and Inspector's Form No. 1370.

STATE OF OKLAHOMA,           } ss.          IN THE COUNTY COURT OF SAID COUNTY.
County of _Sequoyah_
In the Matter of the Sanity of          No. _709_
_A. J. Barrett_
                                           ORDER FOR ADMISSION TO STATE HOSPITAL.
    Now, on this _19_ day of _August_, 19_66_ the above entitled matter came on to be heard before the County Court of
_Sequoyah_ County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing
of the petition filed herein by _Ada Mae Barrett_____alleging the insanity
of _A. J. Barrett_, and praying an order for h_is_ admission to the State Hospital for the
Insane, has been given as required by law and as directed by the Court.
    Thereupon, the court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians
appointed to examine the said _A. J. Barrett_____and to report to this Court as to h_is_
sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said _A. J. Barrett_
_____is insane; and that_____he should be admitted to a State Hospital for the Insane, there to be treated and kept as a
_mental_____patient.
    It Is Therefore Ordered by the Court that said_____A. J. Barrett_
be admitted to the _Eastern_____Oklahoma _State_____ Hospital
at _Vinita_____, Oklahoma, as a _mental_____patient, there to be detained and kept until legally discharged.
    It Is Further Ordered that the sheriff of said county of_____Sequoyah_____, be and he is hereby authorized and directed
forthwith to transport the said_____A. J. Barrett_____, so adjudged to be insane to the said
hospital and to deliver h_is_, together with a certified copy of this order and of the physician's final certificate herein to the medical superintendent of the
said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.
    It Is Further Ordered that the said sheriff shall cause the said medical superintendent to acknowledge hereon the receipt of the above-named insane person,
and forthwith to make return hereof showing the manner in which he has executed this order.
    Done in open court this the day first above written.          _Roy Frye Sr._
                                                                                           County Judge.

RECEIPT FOR PATIENT.

    Receipt is hereby acknowledged of_____the insane person named in the
within order, and I hereby certify that at the time_____he was delivered to me there was in attendance with said person_____
_____ Sheriff, with _____
and _____ guards.
    Dated at_____ this_____day of_____19_____.

    Medical Superintendent of _____Oklahoma_____ Hospital.

SHERIFF'S RETURN
STATE OF OKLAHOMA, COUNTY OF_____, ss.
    Received the within order on the_____day of_____, 19_____,
at_____o'clock_____M., and in pursuance of the command thereof, executed the same
by transporting the within named_____to the
_____Oklahoma_____Hospital at
_____, Oklahoma, and there delivering h_____ on the_____day of
_____, 19_____, at_____o'clock_____M., into the custody of
the Medical Superintendent of said institution, together with a certified copy of this order
and of the physician's final certificate.
                                        _____,Sheriff
                    By_____, Deputy—Under-sheriff.
Filed_____, 19_____.

SHERIFF'S FEES
EXPENSES—Receipts attached:
    Executing order and making return thereof - $  .50
    _____miles travel  -  -  -  -  -  -  _____

| TOTAL FEES | - | - | - | - | $_____ |
| Transportation for | - | - | - | - | $_____ |
| Hotel and lodging for | - | - | - | - | $_____ |
| TOTAL EXPENSE | - | - | - | - | $_____ |

                                        _____Court Clerk.
                    By_____, Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 29**

---

## DECLARATION OF MARK HENRICKSEN

I, Mark Henricksen, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma. I am also licensed to practice in the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. I am in private practice in Oklahoma City, Oklahoma.

I was appointed to represent Kenneth Eugene Barrett as lead counsel in his direct appeal to the United States Court of Appeals for the Tenth Circuit. Mr. Barrett's lead trial counsel, Roger Hilfiger, was also appointed on the appeal.

Based on my knowledge of the case and discussions with trial counsel, Bret Smith, Mr. Hilfiger's second chair, was put in charge of the defense penalty phase case, even though he had no experience in capital cases. Mr. Hilfiger did not like his client, Kenny Barrett. It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted. There was effectively no second stage investigator for Mr. Barrett. Mr. Hilfiger and Mr. Barrett never really got along, and Mr. Barrett wanted his former lawyer, John Echols back as his lawyer. Overall, there was a poor attorney/client relationship between Mr. Hilfiger and Mr. Barrett. Based on my dealings with Mr. Hilfiger, he had a blasé attitude toward the case. Mr. Hilfiger gave the distinct impression of wanting to get the case

1

behind him because he was with a small law firm and the case was consuming too much of his time.

During my work on Mr. Barrett's direct appeal, I spoke with John Echols, who had represented Mr. Barrett in state court and was originally his lead attorney in the federal prosecution. I reviewed, of course, various budgetary requests Mr. Echols made, and the manner in which the trial court dealt with them. It was evident that Judge Payne wanted remarkably detailed budget requests from Mr. Echols. Mr. Echols, in my opinion, did not have time to jump through the various administrative and budgetary hoops that had been placed in his way by Judge Payne, and work up the trial of the case, which is the reason he withdrew from representing Mr. Barrett. In contrast, it was also evident that Judge Payne was not nearly as exacting when it came to requests made by Mr. Hilfiger, although the budgets that were approved for investigators, experts and the like were extremely limited.

Mr. Echols informed me that the strictures placed on him by Judge Payne made the case virtually impossible to defend in an effective manner. By moving to withdraw, he thought he was going to call the judge's bluff, but Judge Payne rather quickly granted Mr. Echols's motion to withdraw.

When I was appointed to handle Mr. Barrett's direct appeal, Judge Payne told the Federal Defender for the Western District of Oklahoma, Susan Otto, that he wanted either Mr. Hilfiger or Mr. Smith appointed on the appeal also. This was in furtherance of Judge Payne's plan to develop a local capital defense bar in the Eastern District. It is my view that

2

this is also why Bret Smith, with no capital experience, was appointed co-counsel with Mr. Hilfiger for the trial of Mr. Barrett's case after Mr. Echols withdrew. I learned from Susan Otto that Mr. Barrett's case was to be the inaugural or "test case" for this plan.

During my representation of Mr. Barrett, I consulted on several occasions with Dick Burr, federal capital resource counsel. Mr. Burr informed me that he had consulted with Mr. Echols when Mr. Echols was lead counsel, but was not consulted after Mr. Hilfiger and Mr. Smith took over the case.

As anyone who has read the direct appeal opinion in Mr. Barrett's case can see, many of the issues raised were reviewed under the "plain error" standard because of a lack of contemporaneous objections at trial. When I asked Mr. Hilfiger about the failure to object, he said he was trying to "win" the case and did not want to "offend" the jury by making unsuccessful objections. Mr. Hilfiger also did not want to "offend" Judge Payne by making too many objections, which he felt were likely to be overruled, although not necessarily because they lacked merit.

During the trial, it was revealed that Charles "Monk" Sanders was the alleged confidential informant whose information supplied the authorities probable cause for a no-knock search warrant of Mr. Barrett's property, and for Mr. Barrett's arrest. However, during his trial testimony, Mr. Sanders testified that he never told the authorities various things that supplied the basis for the no-knock warrant. A very weak record was made on this. When I inquired of Mr. Hilfiger why he did not strenuously object and forcefully ask

3

to re-open the search warrant issue, he stated that he was afraid of Judge Payne's reaction and did not want to "interrupt" the trial. He believed that he had little chance of success on this point with Judge Payne based on his understanding that the court wanted to get the trial underway.

As to the seven informant or "snitch" witnesses who appeared at Mr. Barrett's trial, and who were sprung on the defense during jury selection, I asked Mr. Hilfiger why he did not move for a continuance in order to investigate these witnesses. I also asked him why he acceded to an arrangement that permitted him to interview the witnesses in the presence of AUSA Mike Littlefield and law enforcement, particularly when the witnesses more or less refused to talk to him, there was no discovery of what these witnesses said to Littlefield, and there was little time to try to counteract their testimony. Mr. Hilfiger told me that he agreed to the arrangement because it meant he would at least get to interview the witnesses himself, even though this did not turn out as planned. He also said that because the trial was ongoing, he did not want to antagonize the judge by asking for a continuance, even after the witnesses more or less refused to talk to him. Mr. Hilfiger believed that since there was some time before the witnesses actually testified, some investigation could be done into them. Of course, no witnesses for the defense who could impugn the credibility of these seven witnesses were called, and the defense relied solely on cross-examination to try to attack their stories. Mr. Hilfiger said that he believed that no continuance was possible due to Judge Payne's desire to stay on schedule, and that this compromise was better than

4

nothing.

Some of the following paragraphs include propositions identified by Mr. Barret's current lawyers. I am not presently in a position to evaluate the merit of each in comparison to the propositions I chose to raise, and therefore cannot say I would have made the same decisions if I had recognized some of these issues at the time. The Tenth Circuit initially permitted the appellant's brief to be 14,000 words. I applied for an oversized brief of 24,000 words. The court ruled that the brief was limited to 20,000 words and that no further amendments to the case management order would be considered prior to submitting the appellant's brief. I had to edit it to reduce the brief to the 20,000 word threshold. Although I agree that the following issues should have been considered, every appeal involves some triage of issues.

I did not raise on direct appeal a search and seizure issue based on "Monk" Sanders' trial testimony that he had not told the police the matters that were included in the affidavit for search warrant to justify a no-knock warrant. I did not raise this issue because I believed it had not been adequately preserved by Mr. Hilfiger. I could have raised this issue, and had no legitimate strategic reason for not raising it, because the issue was, however inadequately, framed by the record. As noted, there were several issues raised on appeal for which no contemporaneous objection or record had been made at trial.

I did not raise issues relating to the lack of defense theory instructions or lesser included instructions because, again, I believed that a less than adequate job had been done

5

by trial counsel in arguing these issues. Again, I could have raised this issue, since some record was made. This is particularly true because self-defense was basically the defense raised at trial, and there was testimony in the record to indicate that if anything, Mr. Barrett was guilty of manslaughter or some lesser offense, not first degree murder as framed by the counts in the indictment. Of course, the jury in the state case acquitted Mr. Barrett of first degree murder and convicted him of manslaughter.

I was aware from my reading of the record that Mr. Barrett wore a "stun belt" under his clothing throughout trial. The defense objected. I discussed the stun belt with Mr. Hilfiger, who told me that while he believed the stun belt was not visible, it did detract from Mr. Barrett's communications with counsel in the courtroom. I did not recognize as a viable issue for appeal the stun belt's affect on Mr. Barrett's communication with counsel, and therefore did not reject it.

I was aware from my reading of the record that an ex parte hearing was conducted between the Government and Judge Payne regarding the Government's motion, which was originally placed under seal, to delay disclosure of the identity of the seven informant witnesses. During the ex parte hearing, Judge Payne stated that he could see a long continuance coming based on the fact that the identities of these witnesses had not been revealed and the Government wanted to delay disclosure. Mr. Hilfiger did not move for a continuance. I did not have a strategic reason for failing to raise issues surrounding this ex parte hearing. I was disappointed that trial counsel had acquiesced on this issue between the

6

time of the <u>ex parte</u> hearing and the resumption of open court. I interviewed Mr. Hilfiger repeatedly on this point. He consistently said that an application for a continuance was pointless and that he hoped to gain some useful information from this compromise. In my opinion, there was no professional basis for such a judgment. A reasonable lawyer would have demanded a continuance, and funds with which to conduct an investigation.

Although this was a lead argument in Mr. Barrett's appeal, I anticipated that trial counsel had failed to preserve the record.

In fact, the alleged compromise was meaningless in practice, and Mr. Barrett did not receive the benefit of pre-trial investigation or an adequately preserved record of this failure of due process.

I did not draft all of this declaration. The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, when he interviewed me about the case. I was also interviewed by another of Mr. Barrett's current lawyers, Tim Schardl. The information in this declaration also reflects what I told him. I have carefully reviewed this declaration, and it states accurately what I told these lawyers.

I declare, under penalty of perjury, that the foregoing 7 page declaration is true and correct.

Executed by me this _13_ day of ___March___, 2009, in Oklahoma County, Oklahoma.

_____
Mark Henricksen

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 30**

---

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                          Plaintiff

vs                             No.13026

Kathleen E.Blake, et al.          Defendants

### ORDER APPOINTING ATTORNEY FOR DEFENDANTS

Now on this _29th_ day of ___December___ ,195_8_, there comes on to be heard the motion of the plaintiff to appoint an attorney of this bar to appear and represent the interests of such of the defendants, Kathleen E.Blake, Ethel J. Bourdon, Henry C. Bourdon, George R.Bourdon, William R. Bourdon, J. H. Brodie, Embra Marie Cloud, Jeanette Cox, Elizabeth Duncan, R.T.Kelleam, George A.Ralph, Sarah Louise Sprague, A.J.Stone, Hazel B.Walter, if living and or if deceased, the unknown heirs, executors, administrators, devisees, trustees and assigns, immeddate and remote of those who are deceased, the successors, assigns and trustees of Limited Oil Company and of Graves Newman Investment Company, both dissolved or defunct Corporations, the heirs, executors, administrators, devisees, trustees and assigns, immediateand remote of Sarah Smith nee McCoy, a Fullblood Cheorkee Indian, enrolled opposite Roll No.20713, deceased and of Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No.17144, deceased, as are in or awaiting induction into the Military service of the United Statse or some allied nation in the above styled cause of action and the plaintiff appearing by his attorney, W.S.Agent, and presenting the motion to the court, being duly and sufficiently advised finds.

That the defendants hereby have been served with notice by publication and have made default in appearance and pleading; that plaintiff has moved for default judgment and that an attorney should be appointed to appear and represent the interests of said defendants in this cause.

IT IS THEREFORE ORDERED AND DECREED THAT _Fred B. Green_ Be and is hereby appointed to appear and represent the interests of said defendants and that said attorney is hereby granted leave to file answer herein for and on behalf of said defendants.

_(signature)_
DISTRICT JUDGE

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN _____ COURT
DEC 29 1958
At _____ O'Clock _____ M. and Recorded in
Book _____ Page _____
By _____ Court Clerk
Deputy

535

KEB503090

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                                                    Plaintiff,

vs.                                                           NO. 13026

Kathleen E. Blake, Ethel J. Bourdon, Henry
C. Bourdon, George R. Bourdon, William R.
Bourdon, J. H. Brodie, Embra Marie Cloud,
Jeanette Cox, Elizabeth Duncan, R. T. Kelleam,
George A. Ralph, Sarah Louise Sprague, A. J.
Stone, Hazel B. Walter, if living and or if
deceased, the unknown heirs, executors,
administrators, devisees, trustees and assigns,
immediate and remote of those who are deceased,
the successors, assigns and trustees of Limited
Oil Company and of Graves Newman Investment
Company, both dissolved or defunct Corporations,
the heirs, executors, administrators, devisees,
trustees and assigns, immediate and remote of
Sarah Smith nee McCoy, a Fullblood Cherokee Indian,
enrolled opposite Roll No. 20713, deceased,
and of Jesse L. Harmon, a One-Half Degree Cherokee
Indian, enrolled opposite Roll No. 17114, deceased,
the Oklahoma Tax Commission and the Board of County
Commissioners, County Treasurer and County Assessor
of Sequoyah County, Oklahoma,                                 Defendants.

SEQUOYAH COUNTY, OKLAHOMA

FILED

IN _____

At _____ O'Clock ____ M. and in
Book _____ Page _____

JOURNAL ENTRY

This cause coming on to be heard this 29th day of December, ___
pursuant to special assignment on the trial docket and plaintiff
appearing by her attorney, W. S. Agent and the defendants, Board of
County Commissioners, County Treasurer and County Assessor of Sequoyah
County, Oklahoma, appearing by R. F. Campbell, Jr., County Attorney of
Sequoyah County, and the Oklahoma Tax commission having filed herein
its Disclaimer and the Superintendent of the Five Civilized Tribes
having filed his election not to remove said cause to the Federal
Courts and those defendants who are in or awaiting induction into the
military service of the United States appearing by the attorney appointed
to represent said defendants and all other defendants appearing not in
in person or by counsel are adjudged to be in default.

Thereupon, the court examined the pleadings and evidence as to
the service in this cause, and finds that each and all of the defendants
have been due and legally served with notice of the pendency of this
action as prescribed by the laws of the State of Oklahoma, and that
service is good and sufficient to give the court jurisdiction to proceed
with the trial of this case.

KEB503091

The Court finds after having heard the statements of counsel and examined the pleadings and evidence, all material allegations contained in Plaintiffs petition to be true and that plaintiff is the owner of and in the actual possession of the following described real estate, located in Sequoyah County, Oklahoma, to-wit:

TRACT 1

S½ NE SE SE of Section 28, Township 12 North, Range 23 East,

TRACT 2

The East 70 yards of the NE NW NE of Section 33, Township 12 North, Range 23 East,

TRACT 3

E½ W½ SW NE of Section 33, Township 12 North, Range 23 East,

TRACT 4

N½ NE NE, & SE NE NE of Section 33, Township 12 North, Range 23 East,

TRACT 5

SE SE NE Section 33, Township 12 North, Range 23 East,

TRACT 6

S½ SE SE of Section 28, Township 12 North, Range 23 East, and SE NW NE & SW NE NE & E½ SW NE & W½ SE NE, & NE SE NE of Section 33, Township 12 North, Range 23 East, and NW SW NW & W½ NW NW & NE NW NW of Section 34, Township 12 North, Range 23 East,

The court further finds, that Embra Marie Cloud, if living and if deceased, the unknown heirs, executors, administrators, devisees trustees and assigns, immediate and remote of Embra Marie Cloud is claiming some right, title, interest or estate in and to that real estate described as Tract 1, but that in truth and fact said defendant has no interest therein and plaintiff has owned and held the open, notorious and adverse possession of the same for more than 15 consecutive years immediately preceding the filing of this petition, to-wit:  Since 1919 and that plaintiff is entitled to a decree quieting her title against said defendant or defendants.

The court further finds, that the defendants, J. H. Brodie, and J. Stone, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of said defendants are claiming some right, title, interest or estate in and to that real estate described as Tract 2, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

KEB503092

The court further finds that Sarah Smith nee McCoy, a fullblood Cherokee Indian enrolled opposite Roll No. 20713 died intestate on the 15 day of March, 1915 a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, the wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

The court further finds that the defendants., R. T.Kelleam, Kathleen E. Blake, George A. Ralph, Sarah Louise Sprague, Elizabeth Duncan, Ethel J. Bourdon, William R. Bourdon, George R. Bourdon, Henry C. Bourdon, Jeanette Cox and Hazel B. Walter, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of those who are deceased are claiming some right, title, interest or estate in and to that real estate described as Tract 5, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

The court further finds that the Limited Oil Company is a dissolved or defunct Corporation and that the successors, assigns and trustees of said dissolved or defunct Corporation are claiming some interest in or lien upon all of said real estate by virtue of that certain mortgage recorded in Book 162 at page 176 in the office of the County Clerk of Sequoyah County, Oklahoma, but that in truth and fact said mortgage has been paid and the indebtedness satisfied in full and plaintiff is entitled to a decree quieting her title against said defendants.

The court further finds that the Board of County Commissioners, County Treasurer and County Assessor of Sequoyah County, Oklahoma, are claiming some interest in or lien upon all of said real estate for taxes due and unpaid thereupon or for errors or omissions in the proceedings leading to the sale of said real estate for the non payment of taxes, that in truth and fact said defendants have no interest therein and is entitled to a decree from this court quieting her title against said defendants and the further order quieting her title against said defendants and the further order enjoining said defendants and successors in office from hereafter claiming any interest in or lien upon said real estate.

The court further finds that the Oklahoma Tax Commission by its own pleading claims and has no interest in said real estate or any part thereof.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED by the court that plaintiffs title and possession be and is hereby quieted and set at rest in Plaintiff against each and all of the defendants and that said defendants and all persons claiming by, through or under any defendants since the institution of this action be and are hereby enjoined from hereafter claiming or attempting to claim any right, title, interest or estate or equity of redemption in and to said real or any part thereof.

KEB503093

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that on 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident Sequoyah County, Oklahoma seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that the 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

DISTRICT JUDGE

KEB503094

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 31**

---

## DECLARATION OF LEONARD POST

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

1



himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

2

Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3

Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his

4

parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when l asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5



Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6



possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

7

547

Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8

resembling it ever took place.  I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house.  Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine.  She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry.  They scared me and threatened me."  Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem.  Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature.  After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would.  Cindy stated that she would not read the declaration.  She then asked me to leave.  When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to.  Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.



As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she



told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11


551

I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

_____
Leonard Post

12

552

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 32**

---

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

# LUNACY RECORD

State Examiner & Inspector's Form No. 1382     WARDEN COMPANY, OKLAHOMA CITY

IN THE MATTER OF THE SANITY OF

*Wallace Dotson*

*Vian R2 - McKey )*

STATE OF OKLAHOMA

COUNTY OF *Sequoyah*

No. *266*

IN THE COUNTY COURT

| PETITION | | ORDER OF ADMISSION |
|---|---|---|

DATE FILED       DATE OF HEARING

*May 4*_____, 19*48*_____, 191___

By Whom *Tom Dotson*

Address *Vian R+2 - Okla*

ORDER OF ADMISSION

DATE ISSUED      DELIVERED TO SHERIFF

_____, 191___ _____, 191___

To_____ Oklahoma State Hospital

at_____ Oklahoma

Received at Hospital by Medical Superintendent_____, 191___

## PHYSICIANS

| Date of Appointment | NAME | REPORT FILED | FEES ALLOWED | EXPENSES | TOTAL ALLOW |
|---|---|---|---|---|---|
| 5/4  19*48* 191 | *Ja Chul* | 191 | $ | $ | $ |
| | | 191 | $ | $ | $ |

## GUARDIAN AD-LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 191 | | |

| PLEADINGS | | | PROCESS | | | | |
|---|---|---|---|---|---|---|---|
| DATE FILED | NAME | DATE ISSUED | NAME | DATE RETURNED | BY WHOM SERVED | OFFICER' |
| | *Pet. Order of Het. Order appt. Report* | *5-3-48* | | *5-4-48* | *Chas. Hutchins under Sheriff* | |

## MINUTES OF PROCEEDINGS

*6-4-48  Paroled by Institution*

*6-8-48  Discharged from records of Eastern State Hospital*

KEB502739

# JOURNAL

STATE OF OKLAHOMA, COUNTY OF _Sequoyah_____, SS.     IN THE COUNTY COURT OF SAID COUNTY

IN THE MATTER OF THE SANITY OF _Wallace Dotson_____     No._366_____

### PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL

To the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that __he is a resident of the County of _Sequoyah_____ and State of _Oklahoma_____

That _Tom Dotson_____ is an actual bona fide resident of the County of _Sequoyah___ State of Oklahoma, is a __male person about the age of _22_ years, and is now within the said County and is living with _his father_____at or near the town—city of _Marble City_

That your petitioner has good reason to, and does believe that the said _Wallace Dotson_____is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is_____necessary that__he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows:_____

_has some kind of spells, but now he is completely out of his mind, threw some brick at some members of the family, hasn't been asleep in 3 days and nights_____

Your petitioner further alleges that __he is informed and verily believes that the following named persons, of full age, whose names and places of residence respectfully are as follows, are related to the said insane person, to-wit:

| Name | Relationship | Post Office | State |
|---|---|---|---|
| Tom Dotson & Lucindia Dotson | father & mother | Vian R 2 | Okla |
| D. & Charley Dotson | brothers | | |
| Hooly Dotson | | Braggs | |
| Mrs. Mandy Halcomb | sister | Perry | |
| Mrs. Lillie Taylor | | Ft. Gibson | |

Your petitioner is the _father_____ of the said insane person—or—that he is the_____(Official Title)_____of said County and State, and by reason of such fact is authorized to institute this proceeding.

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the approximate value, as follows: Real Property $_None__Personal Property $_____, Total Value $_____ Said estate is situated in_____County, State of_____

WHEREFORE, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person and that said physicians make report of their findings, as by law required; and that said_Wallace Dotson_____be brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the court by proper order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1368.     _Tom L. Dotson_____, Petitioner.

Witness to mark
Florsmith—Deputy

### CERTIFICATE

STATE OF OKLAHOMA, COUNTY OF_____, SS.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompetency; and upon h____next of kin, of full age, on account of their non-residence of the said County and State, or uncertainty of location, and upon the person with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense with such personal service; and_____

It is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed.

_____, County Judge.

Filed_May 4_____, 1948.

_T B Taylor_____
By _Florsmith_____, Court Clerk.
_____, Deputy.

Form by the Attorney General. State Examiner & Inspector's Form No. 1370.

STATE OF OKLAHOMA, COUNTY OF_Sequoyah____SS.     IN THE COUNTY COURT OF SAID COUNTY
IN THE MATTER OF THE SANITY OF_Wallace Dotson_____     No._266____

### ORDER FOR ADMISSION TO STATE HOSPITAL.

NOW, on this_4_day of_May_____, 1948, the above-entitled matter came on to be heard before the County Court of_Sequoyah___County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing of the petition filed herein by_Tom Dotson_____alleging as the insanity of_Wallace Dotson_____and praying an order for h_is_ admission to the State Hospital for the Insane, has been given as required by law and as directed by the Court.

THEREUPON, the Court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians appointed to examine the said_Wallace Dotson_____and to report to this Court as to h_is sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said_Wallace Dotson_____is insane; and that____he should be admitted to a State Hospital for the Insane, there to be treated and kept as _Charity_____patient.

IT IS, THEREFORE, ORDERED by the Court that said_Wallace Dotson_____be admitted to the_Eastern____Oklahoma_State hospital at_Vinita_____, Oklahoma, as a_Charity_____patient, there to be detained and kept until legally discharged.

IT IS FURTHER ORDERED, That the sheriff of said county of_Sequoyah_____, be and he is hereby authorized and directed forthwith to transport the said_Wallace Dotson_____, so adjudged to be insane, to the said hospital, and to deliver h____, together with a certified copy of this order and of the physicians' final certificate herein to the medical superintendent of the said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.
IT IS FURTHER ORDERED, That the said sheriff shall cause said medical superintendent to acknowledge hereon the receipt of the above-named insane person, and forthwith make return hereof showing the manner in which he has executed this order.
Done in open court, this the day first above written.

_J T Brockman_____, County Judge.

### RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of _Wallace Dotson____, the insane person named in the within order, and I hereby certify that at the time __he was delivered to me there was in attendance with said person_Chas Hutchens_sheriff, with_Tom Dotson_and_____, guards.

Dated at _Vinita_____ this_4th_day of_May_____, 1948.

_Edward K. Witchey M D_
Medical Superintendent of_____Oklahoma_Eastern Hospital

### SHERIFF'S RETURN.

STATE OF OKLAHOMA, COUNTY OF_Sequoyah_____, SS.
Received the within order on the_7_day of_May_____, 1948, at_____o'clock__M., and in pursuance of the command thereof, executed the same by transporting the within named_Wallace Dotson__to the_Eastern___Oklahoma_Hospital at_Vinita_____, Oklahoma, and there delivering h_im on the_7_day of_May_____, 1948, at_5_o'clock__M., into the custody of the medical Superintendent of said institution, together with a certified copy of this order and of the physician's final certificate.

_Henry Jones_____, Sheriff.
By_Charley Hutchens_Deputy—Under-sheriff.

Filed_5 — 4_____, 1948.

| SHERIFF'S FEES | | |
|---|---|---|
| Executing order and making return thereof | $ | .50 |
| miles travel - - - - | | 25.00 |
| TOTAL FEES - - - | $ | 25.00 |
| EXPENSES—Receipts attached: | | |
| Transportation for - - - | | 25.00 |
| Hotel and lodging for - - - | $ | 3.15 |
| TOTAL EXPENSE - - - | $ | 28.15 |

_T B Taylor_____
By_____, Court Clerk.
_____, Deputy.

KEB502740

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 33**

---

# RECORD OF MENTAL HEALTH PROCEEDING

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF........................................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Kenneth Barrett

No. MH-86-29

| Date Filed | | | Date Case Filed........... Date of Hearing................ | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | |
| 10 | 9 | 86 | Pet. | | | | | | | | | | |
| | | | Peace Officer's aff. | | | | | | | | | | |
| | | | Professional Statement | | | | | | | | | | |
| | | | Temp Order issued | | | | | | | | | | |
| 10 | 10 | 86 | notice of certification | | | | | | | | | | |
| ✓ | ✓ | ✓ | copy of Drs. progress notes | | | | | | | | | | |
| ✓ | ✓ | ✓ | issue order of admissions not to exceed 28 days from initial admission | | | | | | | | | | |
| 10 | 10 | 86 | Admission Notification (ESH) | | | | | | | | | | |
| 10 | 13 | 86 | Temp order ret'd (ESH 10-10-86) | | | | | | | | | | |
| 10 | 10 | 86 | min - coming on for 72 hr. hrg. Barrett appeared in person w/atty: John Adams, State rep. by Higgins, deft. admitted to East St. Hosp. for period not to exceed 28 days from initial date of admissions. cyt 11 302 | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | MH-92-64       In Re: Johnny Johnson ✓ | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 11 | 16 | 92 | Pet | | | | | | | | | | |
| | | | Aff. for detention | | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————————

**EXHIBIT 34**

———————————————————

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District.  I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit.  I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales.  Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial.  Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial.  During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper.  We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case.  Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase.  In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter.  He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW).  On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted.  Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

1

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges.  When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case.  The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair.  I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett.  Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh.  Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel.  In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton.  It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh.  Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

for the Eastern District, he had handled the prosecution of a client of mine in a Savings and Loan matter.  That matter was resolved successfully for my client.  After Mr. Hilfiger was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base.  Those who access the site are identified when they visit the site.   I was able to track who visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's case, Judge Payne stated that he wanted the case tried quickly and that this should be no problem, because I had handled Kenny's state case.  I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial.  For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done.  Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings.  The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

3

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship. As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting. I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case. Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne. As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

4

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category. Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks. This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted. This included time spent conferring with experts regarding the needs of the defense. These conferences were necessary for two reasons. First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the second state court trial. Judge Payne initially opposed our request based in part upon his stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to hire an investigator to complete the investigation of mental state issues and law enforcement practices. The rate I was quoted for private investigative services in the area was Fifty Dollars ($50.00) per hour. At that rate, I would have been able to engage Dale Eberle, who had formerly participated in the NDOK drug task force, and who was therefore particularly qualified to conduct the drug subculture investigation which we needed to defend the federal case. Judge Payne, however, said he would authorize a maximum of only Thirty Dollars ($30.00) per hour for such services, because that was the rate charged OIDS by an investigator who withdrew for health reasons prior to the first state court trial.

Judge Payne authorized only 100 hours of investigation. Based on the information I received from consulting with the Federal Death Penalty Resource Counsel, which I shared with Judge Payne, it was my understanding that the hours I requested constituted only 3/5 of the average hours authorized by federal courts for fact investigation in capital cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

6

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro. Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly. Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000. Judge Payne approved only 100 hours at $150 per hour, and no travel expenses. I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court. Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

7

analyst, and a trajectory and crime scene reconstruction expert.  Although the requested hourly rate for these experts was well within the range established by national practice at the time of compensating such qualified experts between $125 and $250 per hour, Judge Payne authorized only $100 per hour.  Judge Payne also denied most of the requests for the experts' travel and other out-of-pocket expenses.  The reduced hourly rate approved by Judge Payne and the lack of expenses again made it unworkable to obtain the services of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness and hypervigilant overreaction to perceived threats of annihilation.  My request for a total of $24,000 was well under the average authorization for a federal death penalty case at the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well below the range of hourly rates authorized by federal courts in death penalty cases for the services of a psychologist ($150-250) and psychiatrist ($250-350).  Judge Payne nevertheless approved the retention of only one mental health expert for 40 hours of work, limited compensation to a rate of $100 an hour for an expert who was a psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000.  Based on the data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge Payne, the limitation on the number of experts, hours, rate of compensation, as well as the denial of expenses, were all completely out of line with the standards of practice prevailing in federal death penalty cases, and precluded meaningful investigation of

8

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them.  To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator.  Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request.  Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable.  In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity.  In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

9

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel.  Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research.  I did my best to comply with these requirements, and obtained pre-approved authorization from the court.  When I submitted vouchers, however, my compensation was routinely cut significantly.  I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004.  In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier.  Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses.  This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005.  As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs.  We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely.  I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center.  After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

<div align="center">12</div>

D.C. for the D.O.J. meeting, as described above.  At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne.  Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse.  I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase.  I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete.  Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt.  In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness.  Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence.  I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence.  For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial.  Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing.  Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials.  I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

14

investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug Task Force simply made up a C.I. out of whole cloth.  In my opinion Charles "Monk" Sanders was not the alleged confidential informant (C.I.) used to secure the search and arrest warrants that were prepared in advance of the raid on Mr. Barrett's home.  Despite our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the identity of the C.I. was not disclosed during the state trials.  Prior to the second state trial, Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that was then placed in an envelope, sealed and placed in the state court file.  It is my understanding that the envelope was opened just prior to the federal trial, and that the name of  Charles "Monk" Sanders was written on the paper.  In my opinion, Mr. Sanders was an informant, but that he did not actually fill the C.I.'s alleged role.  In fact, Mr. Monk's federal trial testimony conflicted with the averments made in the affidavits supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial, the government disclosed for the first time its intention to call informant or "snitch" witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

intention to harm law enforcement officers.  The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony.  It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events.  I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me.  Based on those interviews, this declaration was drafted for my signature.  I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

16

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.

/S/
John David Echols

17

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 35**

---

## am I supposed to do all this ? ?

(Mother will check if I do)

### AT ABOUT THREE MONTHS   MORE OR LESS

Lift chest clear of surface when placed face down_____ (weeks)

Straighten knees when held erect_____ (weeks)

Hold head erect and steady when held to shoulders?_____

Sit on lap, hold head erect and steady with support of ribs only_____

Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____

Smile in response to Mother's voice_____

Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____

Manipulate object placed in hand_____ Splash in bath_____

Make stepping movements when held erect_____

Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried_____

Sit alone on flat surface momentarily_____

Stand firmly with help when held erect_____

Roll from back to stomach and vice-versa on flat surface_____

Reach and grasp for an object when in sitting position_____

Pick up one-inch cube with fingers_____

Scoop up ⅛-inch cube_____ Discover feet_____

Look at object with which am playing_____

Look at floor for fallen toy when in high-chair or lap_____

Make various vocalizations_____

Notice difference between familiar persons and strangers_____

Not much affected by strangers, new scenes or solitude_____

Crow and coo actively when pleased_____

Cry and fret when toy is taken_____

[ 20 ]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance_____

Crawl on stomach, making some progress_____

Creep on hands and knees_____

Bang table with toys or other objects_____

Knock down block houses in play_____

Oppose thumb and forefinger in picking up one-inch cube_____

Wave "bye-bye" or play "peek-a-boo" instinctively_____

Take bottle in and out of mouth_____

Respond to animated facial expressions_____

Bowel control_____ Respond when name is called_____

Express vocal sounds upon recognition of familiar person or object_____

Associate outdoor clothing with being taken out_____

May react to strangers_____

Reach for objects persistently_____

Say "ma-ma" or "da-da" or equivalent_____

Make stepping movements when feet are touched to floor_____

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture_____

Walk with help_____ Creep actively and rapidly_____

Comprehend simple verbal commands and commissions_____

May cooperate in dressing and undressing_____

May climb steps_____ Hold and drink from cup_____

Pile one block on another when shown_____

Say two or three words indicating want_____

Play "pat-a-cake" or similar demonstrable game_____

Pick up small object with finger and thumb_____

Show preference for one hand in reaching_____

Make rhythm movements to music_____

Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[ 21 ]



KEB501953

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 36**

---

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

Rodger,

Maybe I seem hasty to you. But at this time. I don't know what I'm doing or going to do. Or should do. With John gone I feel like things are going to take a turn. You need to know that it's nothing against you or Bret. It could have been to other lawyers and I would have done the same. One day I feel one way and the next I feel another. I guess I have no choice now than to let you do your best. Rodger, this case was close to being beat the second time. Everything we need to be it is there. The reason I feel the way I do is because I felt John would finally win it this time. I don't want to go back to prison to were I'm screwed around on my levels to were It takes me twice as long to get out. Screw the politics. Just try your hardest to beat this to were I can go home. I have gave 6 years of my life for something that they caused to happen. I've got alot of things that are good for this case. So hopefully now that there is no-other means for me but to beat this. we can put this behind us and start over and do this right and win. I'll try my best to act right. I've got so much riding on this. Everything to get my life back in order is waitin. A good Job a good woman. I've got two grand kids. I've never even seen. After 6 years of this It, gets old Rodger. Please understand that!

Thank you   Kenneth Barrett

579
KEB009690

# INTENTIONALLY LEFT BLANK
# EXHIBIT NUMBERS 37-58 NOT USED

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 59**

---

*Exhs. § 2255 Motion*                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

SEQUOYAH COUNTY, OKLAHOMA

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 792 | STATE OF OKLAHOMA vs. Henry Edwards | Manslaughter | A.D.P.  J. M. McCombs |

| DATE 1925 | FILINGS, PROCEEDINGS AND RETURNS | Clerk's Costs Plaintiff | Clerk's Costs Defendant | Sheriff's Costs | Miscellaneous | Credits | Disbursements |
|---|---|---|---|---|---|---|---|
| 7 16 | To file Transcript Docket fee | 1 00 | | | | | |
| 20 | To file Præce & Issue Summ  Reg Summ | 35 | | | 1 00 | | |
| 7 | To file & Record Information | 95 | | | | | |
| 12 | To file & Record Verdict | 50 | | | | | |
| | | | | Acquitted 9-11-25 | | | |

SEP 30 1936
No fees in Territory
Acct. for to R. L. case
R. L. Edwards Court Clerk

582

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## EXHIBIT 60

---

## CRIMINAL APPEARANCE DOCKET

573

| STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|
| State of Oklahoma | Cultivation of Mari | District Attorney |
| vs. Deborah Everly Marilyn Crawford | | For Defendant |

| Return Day_____ 19___ Answer Day_____ '19___ | ITEMS RECORDED Book / Page | CLERK'S COSTS | SHERIFF'S COSTS | MISC. FEES | WITNESS FEES | DEPOSIT IN CASE | DISBURSED | BALANCE CASH ON HAND |
|---|---|---|---|---|---|---|---|---|
| Inf. | | | | | | | | |
| Minute - Defs. pres., St. JPA, depree of of Inf, bond set at $1000 each, Arraign passed to 6-1-77 at 1:30 P.M. | | | | | | | | |
| Bond (D.C.) Everly | 14363 | | | | | | | |
| Bond (D.C.) Crawford | 34 364 | | | | | | | |
| Minute - def pres St JPA, def pres w/att John Ayres, P.N.G, Pre. Hrg set 6-1-77 at 10 A.M., bond lowered to $900 | | | | | | | | |
| Order dismissing | 6-1-77 | | | | | | | |

KEB503076

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
                                       )
                   *Plaintiff,*   )
                                         )
v.                                 )       Case No. 6:04-CR-00115-JHP-SPS
                                         )
KENNETH EUGENE BARRETT,   )
                                       )
                 *Defendant.*  )

---

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF,

## TO VACATE, SET ASIDE, OR CORRECT SENTENCE,

## AND FOR A NEW TRIAL

---

**TABLE OF CONTENTS**

I.   Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Grounds for Disqualifying Trial Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Events Leading to the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   The Alleged Offense and the Bench Warrant . . . . . . . . . . . . . . . . . . . . 8

        2.   The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.   September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.   Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Claim 1.   Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel . . . . . 17

    Claim 2.   Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        A.   Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . 44

Evidence of Constitutionally Deficient Representation . . . . . . . . 48

1.       Failure to professionally re-urge the motion to suppress
         under *Franks v. Delaware,* 438 U.S. 154 (1978).  . . . . . . 48

Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . 60

2.       Trial counsel unreasonably failed to investigate and
         introduce evidence of eyewitnesses as well as mental
         impairment and illness that would have rebutted the
         prosecution's theory of the case, supported the defense
         theory, and formed the basis for conviction of a lesser
         offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.       Due to the unreasonable failure of Mr. Barrett's trial
         counsel to retain expert assistance, Mr. Barrett was tried
         while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4.       But for trial counsel's unreasonable omissions it is
         reasonably probable that the jury would have rejected the
         testimony of the Government's eleventh hour "snitch"
         witnesses and, like the two juries before them, refused
         to convict Mr. Barrett of premeditated murder. . . . . . . . . 76

         a.       Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 78

         b.       Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . 86

         c.       Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . . 94

                  1.       Failure to adequately investigate and
                           prepare to cross-examine Sanders about
                           his previous convictions, charges against
                           him that were dismissed, and the favorable
                           treatment he often secured to escape
                           punishment. . . . . . . . . . . . . . . . . . . . . . . . 94

                  2.       Counsel was professionally unreasonable
                           for failing to investigate and produce
                           witnesses who could have impeached
                           specific claims made by Sanders, and
                           Sanders's credibility as a whole. . . . . . . 113

         d.       Randy Weaver . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Def's § 2255 Mot.                           ii                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

e.      Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 121

f.      Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

g.      Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

5.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

6.      The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

7.      Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . 144

8.      Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

a.      Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

b.      Alvin Hahn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

9.      Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . . . . . 154

10. Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 160

11. The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . . 175

12. Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

13. Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.  . . . . . . . . . . . . 180

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B. Unreasonable Acts and Omissions Affecting the Second Stage of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1. Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

2. Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

a. The family, social, and medical background of Kenny Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Family History of Mental Illness  . . . . . . . . . . . . . . . . . . 191

Maternal Family Mental Illness . . . . . . . . . . . . . . . . . . . 191

Paternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . 193

Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . . 195

Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . 198

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Infancy and Childhood Development  . . . . . . . . . . . . . . 207

Onset of Mental Illness  . . . . . . . . . . . . . . . . . . . . . . . . . 216

b.     Kenny Barrett's mental illness and organic
brain dysfunction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

c.     The prosecution's exploitation of trial counsel's
deficient performance  . . . . . . . . . . . . . . . . . . . . . . . . . . 231

3.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Claim 3.     Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Expert and Investigative Assistance under 18
U.S.C. § 3006A  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Claim 4.     Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution Were
Violated by the Use of False Information in Obtaining the
No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search
Warrant Obtained by Clint Johnson Was Invalid under *Franks v.
Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was
Ineffective for Failing to Raise the Issue on Direct Appeal . . . . . . . . . . 247

Claim 5.     Mr. Barrett was Denied his Fifth Amendment Right to Due Process,
his Sixth Amendment Rights to Counsel and Confrontation, and his
Eighth Amendment Right to a Fair and Reliable Capital Sentencing
Process Due to the Government's Suppression of Exculpatory
Evidence, Knowing use of Perjured Testimony, and Failures to
Correct False Testimony; Mr. Barrett is Entitled to Relief
from his Conviction and Sentence Based on Newly
Discovered Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

A.     Suppressed Exculpatory Evidence, Evidence of Knowing use of
Perjured Testimony, and Newly Discovered Evidence  . . . . . . . 257

1.     Evidence regarding informant witnesses Charles
"Monk" Sanders, Travis Crawford, Cindy Crawford,
Brandie Zane Price, Karen Real and Randy Turman
entitles Mr. Barrett to relief from his convictions and
sentences  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.     Charles "Monk" Sanders  . . . . . . . . . . . . . . . . . 257

       b.       Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 262

       c.       Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 267

       d.       Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 273

       e.       Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

       f.       Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 277

    2.     The Government failed to reveal exculpatory evidence
of a witness who failed to corroborate
Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

B.     The Judgements of Conviction and Sentence Should be
Vacated Based on the Suppression and New Discovery of
Evidence Undermining the Credibility of Key Law
Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

    1.     Evidence of Clint Johnson's illicit activities . . . . . . . . . 280

    2.     David Michael Littlefield's illicit activities . . . . . . . . . . 286

    3.     John Philpot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
Interference with Defense Counsel's Investigation
of Key Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

D.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 297

Claim 6.     Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to
the United States Constitution were Violated Due to the Court's
Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . 303

Claim 8.     Mr. Barrett was Tried while Incompetent in Violation of the Fifth,
Sixth, and Eighth Amendments to the United States Constitution . . . . 310

Claim 9.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments
to the United States Constitution were Violated When the Trial Court
Failed to Instruct on a Lesser Included Homicide Offense.  Direct
Appeal Counsel Was Ineffective for Failing to Raise this Issue. . . . . . . 314

Claim 10.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments
              to the United States Constitution were Violated Due to the Trial
              Court's Refusal to Instruct the Jury that they Could Consider Residual
              Doubts as a Mitigation Factor ................................. 319

Claim 11.     Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated
              When the Trial Court Excused for Cause a Juror Who, While  Personally
              Opposed to the Death Penalty, Could Nonetheless Consider it as a
              Punishment Option.  Appellate Counsel Was Ineffective for Failing to
              Raise this Issue on Direct Appeal. ............................. 324

Claim 12.     The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights
              under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the
              Jury was Not Required to Find that Death was an Appropriate
              Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process
              Rights were Violated by Appellate Counsel's Unreasonable Failure to
              Raise this Issue ........................................... 333

Claim 13.     Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth
              Amendments were Violated Due to the Effects of Drugs he was Given
              in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the
              Trial Court's Removal of Mr. Barrett from the Courtroom in the
              Presence of the Jury without Cause or Inquiry, and Mr. Barrett's
              Absence from Critical Stages of the Proceedings without Valid Waiver;
              To the Extent Appellate Counsel Failed to Raise the Issue on Appeal,
              Counsel were Ineffective .................................... 336

Claim 14.     Mr. Barrett Was Denied Due Process of Law, Equal Protection of the
              Law, the Right to Be Free of Cruel and Unusual Punishment, and
              Effective Assistance of Counsel Because the Federal Death Penalty, as
              Administered, Is Disproportionately and Unconstitutionally Applied
              According to the Race of the Victim, and Trial and Appellate Counsel
              Made No Objection Based on this Fact.  ........................ 348

Claim 15.     Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth
              Amendments were Violated due to the Government's Failure to Include
              Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights
              were Violated by Appellate Counsel's Unreasonable Failure to Raise this
              Issue on Appeal .......................................... 351

Claim 17      Mr. Barrett's Conviction and Sentence Must be Vacated Due to the
              Cumulative Prejudicial Effect of the Errors in this Case ............ 354

IV.      Prayer for Relief ................................................ 355

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315, 318

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 311

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Brecht v. Abrahamson, supra, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264, 266, 271

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Driscoll v. Delo, 71 F.3d 701 (8th  Cir. 1995),
*cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 139

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 175

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262, 257

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . 301

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
cert. denied, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 292

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 175

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Hodge v. Hurley, 426 F.3d 368 (6th Cir.  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Def's § 2255 Mot.                              X                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . . 128

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 343

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308, 343, 344

Iimbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305, 306

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . 47, 137, 165

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 254

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302, 304, 307

Marchu v. United States, 926 F.3d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 311

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279, 286

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 302

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334, 351

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 291

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304, 307

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 290

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Taylor v. Kentucky, 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
*cert. denied*, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . 322

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . 322

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. ex rel. Gregory Madef, 223 F. Supp. 2d 968
(N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . . 322

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
cert. denied, 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

United States  v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 253, 255

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 174

United States v. Rich, 580 F.2d 929 (9th Cir.),
*cert. denied*, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 344

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Serawop, 410 F.3d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
(D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Viereck, v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 181

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 18

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 178, 179, 335

## STATE CASES

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 141

## DOCKETED CASES

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 90

State of Oklahoma v. Richard Loy Gray, Jr. Cherokee County Case No. CF-2007-28 . . . 283, 284

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

## FEDERAL STATUTES

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 42, 236

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293, 294, 351

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 334

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

28 U.S.C. §§ 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Fed. R. Civ.P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R  Crim.P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R. Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Fed. R. Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Fed. R. Evid. 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,            )
                                     )
                    *Plaintiff,*     )
                                     )
v.                                   )          **Case No. 6:04-CR-00115-JHP-SPS**
                                     )
KENNETH EUGENE BARRETT,              )
                                     )
                    *Defendant.*     )

═══════════════════════════════════

### DEFENDANT'S MOTION FOR COLLATERAL RELIEF

═══════════════════════════════════

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence.  Through counsel, Mr. Barrett states the following grounds for granting this motion:

## I.      Preliminary Matters

### A.      Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Motion sets forth only the facts and claims entitling Mr. Barrett to relief.  It does not contain legal argument or citation.  Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Motion.

Def's § 2255 Mot.                            1                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the

trial transcripts:  Tr. [date] Hr'g;

- References to documents filed with the court such as pleadings, motions,

and orders cite the docket number:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr.

Tx at *xxx*;

- References to the exhibits to this Motion are by the name of the exhibit;

- All other references are self-explanatory or based on the Blue Book.

**B.      Grounds for Disqualifying Trial Judge**

In Claim 1 and elsewhere in this Motion, Mr. Barrett relies upon evidence of the

trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte*

communications with prosecutors.  The evidence that must be considered in evaluating this

Motion disqualifies the trial judge from making any rulings affecting the process for adjudicating

this Motion or the merits of any claims stated herein.  28 U.S.C. §§ 455(a), (b)(1), (b)(3),

(b)(5)(iv); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991) (specific allegations about

off-the-record actions of trial judge required that § 2255 motion be heard by different judge).

Therefore, this Motion requests that the trial judge recuse himself without making any further

rulings in the case.

Mr. Barrett will make a separate motion to recuse.  However, the principle that no

person can be a judge in his own case, *In re Murchison*, 349 U.S. 133, 136 (1955), is sufficiently

well established and invoked by the facts presented herein that recusal should not await a formal

motion.  It would be a violation of due process for the trial judge to make any rulings regarding this motion.  *Aetna Life Insurance Company v. Lavoie*, <u>475 U.S. 813</u> (1986).

## C.     Introduction

Kenneth Eugene Barrett was acquitted of the murder for which he now sits on death row.  After an Oklahoma jury convicted him of manslaughter, the Government presided over an unfair trial in this court in order to obtain a death sentence in response to anger over the result of the state proceedings.  The trial in this court could fairly be described as a travesty.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the Government much needed "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he intended to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Oklahoma Highway Patrol Trooper David "Rocky" Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose license to practice law is currently in peril based on charges filed by the Oklahoma Bar Association as a result of his child abuse case.

Def's § 2255 Mot.                              3                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, serving a fourteen year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not. The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct

Def's § 2255 Mot.                              4                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible to forestall any effective defense investigation.  As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on the motion.  As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial and already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses.  The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation.  In passing, AUSA Littlefield let slip he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors.  What had occurred was misrepresented to defense counsel.  There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with.  Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to

Def's § 2255 Mot.                5               *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

interview the informant witnesses.  However, except in one instance, these witnesses refused to speak to the defense.  Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke.  Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The court's furtherance of these

Def's § 2255 Mot.                                      6                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in this motion, Kenneth Barrett has

struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.   Statement of the Case

### 1..   Events Leading to the Offense

#### 1.   The Alleged Offense and the Bench Warrant

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the court appointed an attorney for him. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

Def's § 2255 Mot.                    8                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

On January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.    The Search Warrant

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At trial the confidential informant was identified as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Clerk signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence. The Tact Team decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.      September 24, 1999

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private driveway to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Def's § 2255 Mot.                              10                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell. He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house. Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window. As Mr. Barrett approached the window, he was shot in the lower portion of his body. Mr. Barrett grabbed his Colt Sporter rifle, which was loaded with two full and one partially full magazine of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin. As it had been approaching, the second and third vehicles entered the property. They stopped slightly behind Hamilton's vehicle. Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground. Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds. At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

**B.      Three Trials**

**1.      State Trials**

Mr. Barrett was tried in Oklahoma State court, twice, as set out more fully in the Procedural History. The state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

**2.      Federal Trial**

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase, most notably different was the testimony of seven informants, who did not testify in either

of the state trials. The identity of these snitches was not made known to the defense until days

before the trial was about to start. These snitches came forward with statements that Mr. Barrett

allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony

with respect to victim impact and future dangerousness. In the category of future dangerousness,

the government presented the following witnesses:

1.  Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.  Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.  Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.  Charles "Monk" Sanders, who testified that he overheard Mr. Barrett on the phone in jail while they were both incarcerated. Sanders said he heard Mr. Barrett say that they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.  Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.  Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.  William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.  Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.  Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.  Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death

and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.      Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered. Mrs. Eales also read into the record statements her children had writ

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.      Maudeen Vann, First Deputy County Clerk, Sequoyah, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.      Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.      Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.      Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame

5.      Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6. Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time. This was a very friendly exchange that took place three to six months before the raid.

7. Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8. Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9. Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case. Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10. Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11. Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr.

Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.    Claims for Relief**

**Claim 1.        Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Motion and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Motion rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense.  Mr. Barrett respectfully submits that the law requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv);  *In re Murchison*, 349 U.S. 133, 136 (1955); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991).  Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Def's § 2255 Mot.                              17                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *Woods v. Georgia*, 450 U.S. 261 (1981).

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

Def's § 2255 Mot.                                    18                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, <u>273 U.S. 510, 535</u> (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, <u>475 U.S. 813</u> (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, <u>500 U.S. 110, 125</u> (1991), quoting and citing, *Gardner v. Florida*, <u>430 U.S. 349, 357</u> (1977).

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. <u>18 U.S.C. § 3005</u>. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at the same time.

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Decl. Julia O'Connell; Decl. John D. Echols).  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation.  (Decl. Julia O'Connell).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation.  Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases.  (Decl. Julia O'Connell; Decl. John D. Echols).  To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma.  *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)).  The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal."  *(Id.* at ¶ 6.02(F)).  The trial court in this case required a high degree of specificity, and

Def's § 2255 Mot.                              20                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." Letter from Hon. James H. Payne to John David Echols dated 2/22/05 ("Payne Letter to Echols").

Judge Payne expressed a desire that the case rapidly proceed to trial. (Decl. John Echols). On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. Docs. 50, 51. On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but

Def's § 2255 Mot.                    21                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

not about Mr. Hilfiger's representation. (Payne Letter to Echols). Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Letter from John David Echols to Hon. James H. Payne dated 2/28/05).

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Payne Letter to Echols at 2). Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule. (Echols letter to Payne at 5). The court did not rule on the defense's budget proposal until March 18, 2005. Doc. 97. At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22)).

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project

("FDPRC").  (Decl. Richard Burr; Decl. John D. Echols).[2]  As Mr. Burr stated to the court at the

time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on

the defense services provided in such cases."  (Decl. Richard Burr re attorney compensation

dated 4/4/05 and filed as Exh. B to Doc. 107).  Mr. Barrett's counsel relied upon the data

collected by the FDPRC in making his funds requests.  (Echols letter to Payne).

The trial court's funding decisions were based on the judge's subjective view of

what was "'reasonably necessary' to provide fair compensation and to provide the defense with

necessary tools for a fair trial."  (Order filed 3/18/05 at 2.)  However, the court's reasoning in

denying specific requests was inconsistent with the Sixth Amendment role of counsel in

exercising independent professional judgment and providing an adversarial testing of the

prosecution's case.  *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding

the prevailing professional norms of capital defense practice in federal death penalty cases,

including courts' decisions validating these norms through the allocation of funds to similarly

situated defendants.  (*See* Decl. Richard H. Burr).  The trial court's order evidences no

consideration of these norms or practice, whether adversarial and judicial.  The trial judge's order

evidences no consideration for the specific needs of counsel as expressed in their funds requests.

The trial judge's limitations on funds were not based on any evidence of or expressed concern for

fiscal limitations.

---

[2]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any
assistance.  (Decl. Richard Burr).

As expert counsel advised the court at the time,

> in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.
>
> []   It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.
>
> For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time.  If the expenditure of attorney time thereafter begins to depart in substantial ways from these projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107).

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the

defense.  (Doc. 51; Echols letter to Payne).  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed.*"  (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added]).

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  Order filed 5/5/05 at 3 n.1.  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  *(See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he lost $20.00 for every hour spent working on Mr. Barrett's case.

Def's § 2255 Mot.                              25                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107). The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ." (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial. The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert. (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3). At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial." (Order filed 3/18/05 at 3). Trial counsel did not consult a crime scene reconstruction expert. (Tr. 10/3/05 Hr'g at 8). The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination. Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence. (*See* R. 3154-3484).

Def's § 2255 Mot.                    26                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services. The court stated no basis for any denial or reduction related to the facts or circumstances of the case. Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique. Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work." (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107). Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." *Id.* Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert." *Id.*

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Decl. Julia O'Connell). The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses.  (Order filed 3/18/05 at 4.)  The court's reasoning is contrary to the purpose of the right to counsel.  Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case.  If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same."  *Id.* at 5.  Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.  *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein."  (Order filed 3/18/05 at 6.)  The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005.  *(See* Doc. 23.)  Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court.  The delay also impeded or prevented defense counsel's preparation for cross-examination.  *See* Claim 2A, *infra.*

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings.  (Order filed 3/18/05 at 6.)  This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part

of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigency.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. *(See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Decl. Julia O'Connell). In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Payne letter to Echols).

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for

632

their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available. All of these efforts are in direct service to the client. Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel. Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118). The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting. (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel. Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not. (Decl. Richard Burr; Decl. John D. Echols). Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers. These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are

quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. Doc. 113. Mr. Hilfiger had urged Mr. Echols not to file the motion. (Decl Richard Burr; Decl. John D. Echols). However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Decl. John D. Echols).

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." *Ibid.*

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates

Def's § 2255 Mot.                                31                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

spending' on each of several categories." *Ibid.* (quoting Order filed 1/29/05 (Doc. 38)).  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel. Doc. 137. The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ." (Order filed 5/24/05 (Doc. 137) at 2 n.2.) The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2. Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. Doc. 138. Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.) Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion. Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing. On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary. (Tr. 10/3/05 Hr'g at 3.) Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Echols letter to Payne at 1 n.1.) On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.) In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.) The court admonished counsel to give the case the "highest priority." *Ibid.* In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.) In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.) Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.) On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case,

Def's § 2255 Mot.                                      34                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

*including* legal research and writing and preparation for and in all court proceedings.  (Tr. 10/3/05 Hr'g at 5.)  Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation.  The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma."  (Doc. 97 at 3.)  If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request.  On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant.  (Tr. 9/9/05 Hr'g at 10.)  Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks.  She's going to set at the counsel table with us during the selection."  *Ibid.*  The court recognized Ms. Cole's name and identified her as a jury consultant.  *Ibid.*  Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial.  *Ibid.*  If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly.  Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel.  During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel.  At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed.  Judge Payne permitted Mr. Hilfiger to show a lack of diligence and inattention to budget matters.  Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders. (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 9, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b). (Tr. 9/13/05 Hr'g at 25-27.) During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day. (Tr. 9/13/05 Hr'g at 4-5.) The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense. The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

Def's § 2255 Mot.                              37                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance.  It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me." (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions. The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference. (Tr. 9/13/05 Hr'g at 26.) The court said they had been discussing "security issues." *Ibid.* The court said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows." *Ibid.* The transcript shows the court drastically understated the true scope of the *ex parte* communications. Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.* Mr. Barrett's trial counsel were entitled to rely upon the court's representations. The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. *(Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 9 *ex parte* hearing. On September 14, 2005, after jury selection

---

[3] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

Def's § 2255 Mot.                      39                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

proceedings ended, the court raised the issue of the unidentified witnesses.  The United States

Attorney informed the court that the Government and Mr. Barrett's counsel had reached an

agreement that the witnesses' names, contact information, criminal histories and (allegedly)

promises made to them would be revealed the following Monday.  (R. 840.)  The United States

Attorney further advised the court that the defense would, possibly, have access to some of the

witnesses at the prosecutor's office.  (R. 841.)  Mr. Hilfiger stated that he had no objection to the

arrangement, "based on what we talked about yesterday."  *Ibid.*  The court then stated that this

would make a "clear record" and the parties' "announcement . . . resolves everything that is

under seal."  (R. 843.)

It is a violation of due process for the Government to attempt to restrict defense

access to witnesses, for example, by telling the witnesses they should only agree to defense

interviews if the Government is present.  *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir.

1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for a prosecutor to

condition a witness's interview with defense counsel on the prosecutor being present.  (ABA

Standard 3-3.1(c) (commentary)).  The trial court permitted defense counsel for Mr. Barrett to

agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the

weaknesses in the Government's motion for a protective order that the court had freely discussed

with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly

prejudicial.  Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and

other restrictions on his access to information about the witnesses because he believed Judge

Payne would not grant a continuance of the trial.  (Decl. Mark Henricksen).  Judge Payne's

views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely

different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Decl. Mark Henricksen). To the extent, Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work. (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Decl. Mark Henricksen). However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

### Claim 2.  Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. The acts and omissions described herein fell

below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

A.      **Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial**

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel.  As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel.  Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.  *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1. Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27

Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel was ineffective for failing to raise the *Franks* issue.

2.     Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms. This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3.     Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the affects of Mr. Barrett not taking prescribed medications during trial. Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4.     By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel was not able to effectively investigate and challenge the testimony of these witnesses. In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available. Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5. Trial counsel was professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6. Trial counsel was professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7. Counsel was professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses. Counsel was also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8. Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9. Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case. This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police. Likewise, trial counsel was professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case. This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had

an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident. This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was completely unnecessary and unfounded. Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10. Trial counsel was professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999). To the extent this issue was framed by the record, direct appeal counsel was ineffective for failing to raise it.

11. Trial counsel was professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12. Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionably reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred. If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel was professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in both stages of trial.

### Evidence of Constitutionally Deficient Representation

**1.      Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* <u>438 U.S. 154</u> (1978).**

Trial counsel was professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was

revealed, for the first time, that Sanders was the alleged informant who supplied the information

providing probable cause.  (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant state the

following:

On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.  The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions."  The CI further stated that while in the above-described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

> This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

Affidavit for search warrant signed by Clint Johnson and warrant signed by Sequoyah County Judge Dennis Sprouse on September 20, 1999.

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1. That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2. That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property. He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.       In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

4(a).       After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

4(b).       Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

Def's § 2255 Mot.                                  51                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

a no-knock warrant, Johnson mislead the court.  Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

     5.     Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there.  On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.  Therefore, Sanders testified, based on his alleged July trips to Mr. Barrett's property, Sanders told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

     Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together.  (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search.  Of course, no "large

quantity" of drugs were found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied anything was discussed except how much longer he would be on the stand.  In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself in the same breath about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense

---

[5]  "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Decl. Janesse Thomas.)

counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's

testimony on cross-examination, the warrant was based on "faulty" information.  Clint Johnson,

who had been questioned about the search warrant affidavit during the hearing on the motion to

suppress, related certain information contained in the affidavit that Sanders specifically denied

giving.  Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had

advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr.

Barrett present a quantity of white powder, which Mr. Barrett represented was

methamphetamine.  On cross-examination, Sanders stated there had been no discussion about

what Sanders thought was methamphetamine in Mr. Barrett's kitchen.  According to Sanders's

testimony on cross-examination, there had been no representation that this substance was

methamphetamine, and no presentation of the white powder to Sanders.  The search warrant

affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a

portion of white powder for a quantity of money.  Sanders testified on cross-examination that this

did not happen.  Defense counsel pointed out they were confronted with all this by the answers

Sanders gave on cross-examination; there had been no opportunity to interview Sanders before

he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the

motion to suppress, had testified under oath what he had been told by the C.I., and what facts had

formed the basis for the search warrant affidavit.  (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the

Government to respond in writing.  The court stated that it would either hold a hearing, if such

was deemed necessary, or would rule on the pleadings.  (R. 2679.)  As pointed out by the

Government in its response to the renewed suppression motion:

Def's § 2255 Mot.                           55                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc. 231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Rather, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr. Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful."  Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported."  Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable."  Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth."  Doc. 253 at 7.

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been

sustained.  Moreover, as shown below, the court's order is seriously flawed.  Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks*.  These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface.  Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated in the re-urged, counsel could have argued the following:

(1) that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at this house;

(2) that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

(3) that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he

"probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

(4) that Johnson knew Sanders had not reliably brought back evidence of methamphetamine activity as shown by Sanders's testimony that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs

available, but there was no methamphetamine, and the three of them simply smoked marijuana;

(5) that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

(6) that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured.  Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth.  Sanders testified he was in regular contact with Johnson and continued to use drugs steadily.  Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately.  Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence.  This demonstrated Johnson could not rely reasonably on Sanders for anything.  Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions.  Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure

asking him questions.  Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, Sanders repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what Sanders supposedly observed.  This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate *the entirety of the warrant affidavit*.  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.  *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the

662

renewed suppression motion would have been different.  At a minimum, had all the evidence

from Sanders's cross-examination been marshaled, the defense surely would have been entitled

to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the

pleadings.  *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226

(1992).

In its order, the court seemed to rely on the testimony of other informant witnesses

to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a

reasonable investigation (or had the time to conduct a reasonable investigation), have impeached

many of these other witnesses (see below), the court could not properly rely on years-after-the-

fact testimony to find that the search warrant affidavit, founded solely on information from

Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless

disregard of the truth.

### Ineffective Assistance of Appellate Counsel

The question of the As set forth *supra*, the *Franks* issue, and counsel's failure to

effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on

direct appeal.  Because the issue was obviously meritorious, even with the record that was made,

there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was

professionally unreasonable.  Because it was shown above that the *Franks* issue, in conjunction

with a claim of ineffective assistance of trial counsel for failing to competently argue it, would

have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue

---

[6] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  This is addressed in a separate claim for relief.

been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002)(counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001)(direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard). While an action under 28 U.S.C. section 2255 is not intended as a second direct appeal, and issues framed by the trial record and which could been, but were not, raised on direct appeal, are ordinarily considered procedurally barred *United States v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate counsel provides ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

> **2.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived. This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties. (Doc. 52.) This is the count of conviction for which Mr. Barrett received the death penalty. (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 was that Mr. Barrett intentionally killed the victim, knowing or

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate.  Rather than the intentional and remorseless killer one who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court.  Due to  counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to

be the antithesis of the Government's picture.[7] Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance. Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute

deficient performance. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial. George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted. Dr. Woods concluded that at the time of charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning. Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats. Thus, when the events unfolded at the time of the offense,

---

[7] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Decl. of George Woods.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, as well as witness accounts, which documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to decl. of Myla Young, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Decl. of Myla Young at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment."  (Decl. of Myla Young at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or

highly stressful situations." (Decl. of Myla Young at 24.) Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Decl. of Myla Young at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Decl. of Myla Young at 13.) Mr. Barrett's ability to actively process and comprehend information, including visual information, in the "here and now," or as it unfolds, is severely compromised. (Decl. of Myla Young at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Decl. of Myla Young at 14, 24.) Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Decl. of Myla Young at 20.) The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Decl. of Myla Young at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results. The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods concluded:

[¶]     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR? for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]      He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]      Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregultion primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]      Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]      Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, the argument that Mr. Barrett was unaware that the police were on his property, and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even

if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state. In addition to providing contemporaneous, real world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question. Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (See, e.g., Decls. of Abby Stites, Toby Barrett, Sylvia Gelene Dotson, Mark Dotson, Ruth Harris, Kathy Trotter, Ernest Barrett, Steve Barrett, Ada Blount, Nona Reich, and Carolyn Joseph.) None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so. In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. *(See* Eastern State Hospital Records, Wagoner Community Hospital records, and Bill Willis Mental Health Center records.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Decl. of George Woods.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[8]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), para. 2. Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of

---

[8] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing Lofton's holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other

673

indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different.  This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of was voluntary manslaughter.

> **3.      Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's

Def's § 2255 Mot.                              72                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent (see, e.g., *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836 (1966)), "judges must depend to some extent on counsel to bring [competence] issues into focus." (*Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).)  Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation.  *(Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).)  Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court.  (Id.; Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).)

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice.  Counsel unreasonably failed wholly or adequately to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems." (*Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).)

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct any of testing and other evaluation necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, a chronic major mental illness, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD). Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency. (See, e.g., *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant

Def's § 2255 Mot.                                            74                           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

had been diagnosed with and treated for mental illness); see, also, *Barnett v. Hargett*, <u>174 F.3d 1128, 1135-36</u> (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").)

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *(Hull v. Kyler*, <u>190 F.3d 88, 105</u> (3d Cir. 1999) (citing *Eddmonds v. Peters*, <u>93 F.3d 1307, 1317</u> (7th Cir. 1996), cert. denied, <u>520 U.S. 1172</u> (1997); and *Felde v. Butler*, <u>817 F.2d 281, 282</u> (5th Cir. 1987)); see also *Williamson*, supra, <u>110 F.3d at 1519</u> (same).).  "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *(Williamson*, <u>110 F.3</u>d,  at 1519.)  The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that consistent the results of testing, employing reliable neuropsychological instruments for assessing brain impairment, have measured Mr. Barrett in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning.  Mr. Barrett's previous, psychiatric  diagnosis of Bipolar Disorder, made by independent, state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources.  Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Def's § 2255 Mot.                                          75                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted; and unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Decl. of George Woods, M.D., at  81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at  80.)  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at  80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at  59, 80.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process." (*Williamson v. Ward*, 110 F.3d, at 1519.)  Accordingly, Mr. Barrett should be granted a new trial.  (Id.)

679

**4.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper ex parte hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses.  During this hearing, the court criticized the Government for failing to raise the issue sooner.  The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger.  The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified.  The court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing.  Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find out what they were going to say.  (Tr. 9/13/05 Hr'g at 27; R. 840-43.)  There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind.  The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense.  The

Def's § 2255 Mot.                                77                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

679

obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course,  was not taken.  As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand.  Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing.  Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[9]

A wealth of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel discovering the evidence independently.  Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.        Travis Crawford[10]

_____

[9]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance.  Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  Decl. of Mark Henricksen.  Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[10]  Mr. Barrett is in possession of newly discovered evidence that eviscerates the credibility of Travis Crawford's trial testimony.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (Claim 5A, B)

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin. Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed. Crawford claimed to have walked over to Mr. Barrett's property from his parents' house. Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police. Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant. With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck." Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions. (R. 462-66.) Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[11] (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support. He was also arrested on hot check charges many years before. He admitted to having used a lot of drugs. His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict. (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been

---

[11] This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett. This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

682

fired from his job if he absented himself for the interview. He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him. (R. 468-69.) Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him. (R 469.) Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be. (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government. He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[12] (R. 470.) Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales. Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified. He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett. "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court. If

---

[12] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. *See Brady/*newly discovered evidence claim.

Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23rd regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag.  (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether or he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate.  (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[13]  Had counsel asked about this,

---

[13]  *See* Mr. Barrett's *Brady* claim.

and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted.  Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23rd, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22nd, and stayed until around 9:00 p.m. on September 23rd.  Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him.  Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23rd, Mr. Barrett and others were standing near the fence to Mr. Barrett's property.  Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line.  Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back.  Crawford stated he believed the individuals in the SUV were law enforcement officers.  Mr. Barrett did not take Crawford seriously, because he did not trust Crawford.  Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement.  Travis Crawford was regarded as a "flake," and it was well known that he had acted as a police snitch in the past.  (Decl. of Rick Lunsford.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Decl. of Rick Lunsford.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Decl. of Rick Lunsford.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. (Fed.R.Evid. 608(a).) In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Decl. of Rick Lunsford.) Even if Mr. Lunsford would have been

prevented from giving "extrinsic evidence" regarding his knowledge of specific dishonest and bad acts on Crawford's part, they could have been inquired into during Crawford's cross-examination, because they were probative of his truthfulness or untruthfulness.  Fed.R.Evid. 608(b).

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Decl. of Rick Lunsford.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Decl. of Brandy Hill.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Decl. of Brandy Hill.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Decl. of Brandy Hill. *See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Decl. of Brandy Hill.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23rd, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Decl. of Toby Barrett.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness.  Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford.  (Decl. of Carolyn Joseph.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial.  It is her personal belief that Crawford is not an honest or trustworthy person.  Nor does Mr. Crawford have a reputation for honesty in the community at large.  (Fed.R.Evid. 608(a).) (Decl. of Carolyn Joseph.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen.  Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs.  Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage.  Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property.  Crawford simply pocketed the money and never built the well house.  Crawford never repaid the money he took for a job he never did.  The materials that had been purchased for construction of the well house were later stolen.  Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials.  Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her.  Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident.  Decl. of Carolyn Joseph.

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts.  (Fed.R.Evid. 608(b).)  Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b.      Cindy Crawford[14]

Cindy Crawford testified for the Government in both stages of trial.  Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them.  (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs.  Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble.  He knew there was a chance the police could come to his house; that was why he had guns for protection.  According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory."  (R. 3063-69.)

---

[14]  Movant is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony.  Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement.  *See* Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18.  She used the drug for nine years, and would either snort it or shoot it.  She stated or implied on direct examination that she was currently drug and alcohol free.  (R. 3161.)  While on a "meth run," the longest she had stayed up was five days.  While using methamphetamine, she would often stay up for three to four days at a time.  (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time.  To her, time was just a blur that played tricks on her mind.  (R. 3073.)  She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant.  Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999.  (R. 3072.)  While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs.  (R. 3072.)  With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users.  (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him.  He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her.  (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination in a weak effort to impeach Cindy Crawford.  Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

Def's § 2255 Mot.                              88                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems.  In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage.  A reasonable investigation would have uncovered evidence regarding her mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and her overall credibility.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  Medical records of Cindy Crawford, filed under seal.

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-04-63.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Because counsel made no court record search, he neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial

commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.  (Files in Sequoyah County Case Nos. CF-99-645 and CF-0463.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandy Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Def's § 2255 Mot.                    90                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed. (File, Sequoyah County Case No. PO-03-390.) Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that in his personal opinion, Cindy Crawford was completely dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to

Def's § 2255 Mot.                                    91                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

escape prosecution and punishment for her own criminal activities. Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders. Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty. He is Cindy Crawford's father in law, and has known her for years. (Decl. of Roger Crawford.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that in his opinion, Cindy Crawford is thoroughly dishonest and untrustworthy. Her reputation for honesty in the community is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. Decl. of Mike Mackey.

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into

during cross-examination of Crawford.  (Fed.R.Evid. 608(b).)  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case.  (18 U.S.C. § 3593(c).)

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's honesty.  As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Decl. of Brandy Hill.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless."  (Decl. of Sean Hill.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a

twelve year old child.  In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful."  Ms. Crawford's reputation in the community for honesty is, to put it mildly,  poor.  No one Ms. Joseph knows would trust or believe anything Cindy Crawford said.  Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Decl. of Carolyn Joseph.)

Still another witness who could have testified regarding Cindy Crawford's bedrock lack of honesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years.  In her opinion, Cindy Crawford is thoroughly and totally dishonest.  Cindy Crawford is well known in the community for her dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself.  (Decl of Gwendolyn Crawford.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to a leg and threatened to kill her, allegedly because she would not have sex with him, could have been conclusively impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett.  Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred.  (Decl. of Richard Barrett.)

### c.      Charles "Monk" Sanders

     **1.**       **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to Sanders.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel's unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Not only did counsel fail to capitalize on the entirety of Sanders's cross-examination testimony when the motion to suppress was re-urged, but counsel failed to effectively impeach him, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he

supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies that Clint Johnson only helped with "some" of his cases, had not gotten out of "a lot" of trouble, and that he was not both working as an informant and free to commit whatever crimes he wanted to. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors Sanders's acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra*.

Counsel superficially asked[15] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4)

---

[15] R. 2524-36.

a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to do five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

Def's § 2255 Mot.                    97                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

(1)     Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (File in Sequoyah County Case No. CF-92-91.)

Def's § 2255 Mot.                              98                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

(2)     In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: Concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. *(See* File in Sequoyah County Case No. CF-97-9.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also because he failed to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather

"evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach

Sanders on those grounds, trial counsel failed to present these records to the jury.

(3)     In Sequoyah County Case No. CF-97-75, Sanders was charged with the

felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open

container, and reckless driving.  Although prior felony conviction enhancements could have been

filed to increase the range of punishment on the running a roadblock felony charge, they were

not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what

is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was

questioned on none of this by defense counsel.  (File in Sequoyah County Case No. CF-97-75.)

(4)     In Sequoyah County Case No. CF-97-140, Sanders was charged with

concealing stolen property and felony possession of methamphetamine.  It was alleged on page

two of the information that he had three prior felony convictions, all out of Sequoyah County, in

Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90144

(sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S.

section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the

state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-

examine Sanders on this gift from the state prosecutors.

(5)     In Sequoyah County Case No. CF-98-22, Sanders was charged with

concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false*

*information to a police officer*.  Despite his many prior convictions, Sanders received an illegal

deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting

defendant with even one prior felony conviction from receiving a deferred sentence).[16]  Counsel

was professionally unreasonable for failing to question Sanders about how he managed to get a

deferred sentence from Sequoyah County authorities when, due to his record, the deferment was

absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been

lost or destroyed.)

(6)     In Sequoyah County Case No. CF-98-128, Sanders was charged with the

felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged

in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, CRF-92-91

and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended

information alleging the same charges and same "after-formers" was filed on July 7, 1998.

Miraculously, the state dismissed the after former conviction allegations, and Sanders received

patently illegal five year deferred sentences, running concurrently, with costs waived by the

District Attorney's office.  The sentences were also ordered to run concurrently with a conviction

Sanders obtained in Creek County.  CF-98-128 was case was later dismissed with costs, as is

discussed below.  (File in Sequoyah County Case No. CF-98-128.)

It was unreasonable for Mr. Barrett's trail counsel not to discover and use on

cross-examination records showing that Sanders, who faced the prospect of life in prison on this

offense alone, received illegal deferred sentences, and that even those illegally lenient sentences

eventually were lifted.

---

[16]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons
to receive a deferred sentence, but only on motion and waiver by the State.

(7)     In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed. (22 O.S. 1991, section 51; 22 O.S. 1991, section 991c.)[17]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the department of corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in

---

[17] Again, as with the statute governing deferred, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Def's § 2255 Mot.                    102                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Sequoyah County Case No. CF-98-363; (d) a *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (File in Sequoyah County Case No. 98-346.)

(8)      In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases

above were alleged on page 2 of the information, meaning Sanders was facing twenty to life.  On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314.  Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections.  Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed.  A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered.  A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, were also filed in connection with this case.  On April 17, 2004, the court entered a second order revoking Sander's suspended sentence.  As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors.  (File in Sequoyah County Case No. CF-98-363.)

(9)   In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty.  Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination.  Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun.  Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies.  In addition to the same three prior Sequoyah County felony that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail.  Yet again, Sanders faced twenty to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1.  In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright.  Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

Def's § 2255 Mot.                                      105                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9.  As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case.  As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years.  He would revert to full probationary status upon completion of a Department of Corrections drug program.  The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively.  As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one.  (File in Sequoyah County Case No. CF-99-562.)

(10)    In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer.  He was also charged

with a misdemeanor for possession of drug paraphernalia.  The state alleged in page two of the information that Sanders committed the felony larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363 and CF-99-562).  With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (File in Sequoyah County Case No. CF-01-314.)

(11)    In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case,

filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (File in Sequoyah County Case No. CF-03-124.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly prejudicial evidence.  The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

(12)    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90, 144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.  The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years

Def's § 2255 Mot.                           108                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed.  The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124.  (File in Sequoyah County Case No. CF-04-19.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

(13)     In Cherokee County Case No. CF-98-111, Sanders was (and still is) charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies.  Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively.  Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear.  A bench warrant was issued on May 15, 1998.  Sanders had a second failure to appear on March 24, 2000.  On May 3, 2001, he was ordered released to a bondsman.  The case is still pending today.  The last docket entry, for November 25, 2008, shows that Sanders could not make it to court as scheduled because of eye surgery.  (File in Cherokee County Case No. CF-98-111.)

Counsel was professionally unreasonable for failing to cross-examine Sanders about this pending case, the existence of which could have been discovered easily.  Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been

filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

(14)   In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Files in Muskogee County Case Nos. CF-93-131 and CF-93-772.)

(16)   In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (File in Tulsa County Case No. CF-94-1503.)

(17)   In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into

on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (File in Tulsa County Case No. CM-03-6603.)

(18)     In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005.  On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005.  On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody."  On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended.  (File in Tulsa County Case No. CM-04-1187.)

Mr. Barrett's trial counsel unreasonably failed to discover the facts and cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

(19)     In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest.  On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest).  On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea.  Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty.  (File in Sequoyah County Case No. CM-00-389.)

(20)    In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana.  He also attempted to resist arrest.  Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (File in Sequoyah County Case No. CM-03-365.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the

surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time.  Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury.  Impeachment of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence.  These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict.  If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

> **2.    Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

Def's § 2255 Mot.                                113                       *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

investigation into readily available evidence and witnesses that would have impeached Sanders's

credibility and shown him to be completely unworthy of belief about anything and everything.

Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination

alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited

Mr. Barrett's property.  Based on one reasonable interpretation of the dates Sanders claimed to

have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was

at Mr. Barrett's on the afternoon of September 23, 2009,  just hours before the early morning

police raid on Mr. Barrett's property.  Littlefield told the jury Sanders was present around 5:00

p.m. to 6:00 p.m. on September 23rd, around the time the gate to Mr. Barrett's driveway was

locked.  (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct

one, they could have produced Rick Lunsford as a witness to rebut this claim.  As noted in the

discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on

September 22, 1999, and stayed until approximately 9:00 p.m. on September 23rd.  Lunsford

states that Sanders was never at Mr. Barrett's property on either September 22 or September 23,

1999.  Of course, Mr. Lunsford was never contacted by defense counsel.  Had he been contacted,

he would have been willing to testify that Sanders was never on Mr. Barrett's property on the

afternoon and early evening of September 23rd.  (Decl. of Rick Lunsford.)

Likewise, trial counsel failed to contact and interview another witness who could

have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw

methamphetamine and a drug sale, according to his direct testimony, in September, 1999.  Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Decl. of Sean Hill.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Decl. of Brandy Hill.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[18] He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas. She was an available witness. Had counsel located and interviewed her, she would have testified that Sanders was lying. Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting. She also would have testified that on the occasions she did go to Mr. Barrett's she never went with Sanders. Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him. On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any

---

[18] Her true name is Janesse Thomas.

drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Decl. of Janesse Thomas.)

Counsel unreasonably failed to investigate and produce some of the witnesses discussed immediately above, and others, who could have testified that Sanders is a pathological liar whose word was worthless.  Not only did these witnesses have personal opinions that Sanders was dishonest and completely untrustworthy, but they were well aware that Sanders's reputation for truth and veracity in the community was horrendous.  These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past.  Sanders was a heavy drug user, who also dealt drugs.  In Mr. Lunsford's opinion, Sanders is a totally dishonest person.  Mr. Lunsford would not believe anything Sanders said.  Sanders was even dishonest in his drug dealings.  Sanders often sold bad dope to people and ripped them off.  Of course, he never seemed to get in trouble for his drug dealings.  Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis.  Not only does Mr. Lunsford have a personal opinion that Sanders is wholly dishonest, but he has a well known, and richly deserved, reputation for dishonesty in the community.  Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened

harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Decl. of Rick Lunsford.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified that in her personal opinion, Sanders is completely dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders. (Decl. of Janesse Thomas.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill could have testified that in his personal opinion, Charles Sanders is a liar who had no credibility whatever. Sanders's reputation in the community for truth and veracity is abysmal; Sanders is known as a thief, a liar and a snitch. It was known in the wider community that Sanders lies about others in order to get favorable treatment from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr.

Def's § 2255 Mot.                              117                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Barrett actions that routinely occurred.  Mr. Hill would have informed the jury that when Sanders is in jail, it is known that he is routinely beaten up by other inmates because he is a liar.  (Decl.of Sean Hill.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is completely unbelievable and untrustworthy. Sanders is extremely dishonest even when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Decl. of Sally Davis Johnson.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders in the first stage of trial, even if she could not have given "extraneous evidence" on these matters in the first stage.  Ms. Johnson could have testified to these acts, however, in the penalty phase.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of

Def's § 2255 Mot.                          118                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Decl. of Sally Davis Johnson.)[19]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Decl. of Sally Davis Johnson.)

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders. Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs. The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole Ms. Johnson's children's toys in order to pawn them for drug money. (Decl. of Sally Davis Johnson.)

Finally, one of Sanders's own relatives could have testified, had he been contacted by the defense, that Charles "Monk" Sanders is a completely untrustworthy and unbelievable individual. Billy Poindexter is Sanders's uncle, and has known Sanders his entire life. According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a

---

[19] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

pick-up truck." Sanders, who has been in trouble his whole life, is unbelievable in everything he says. Mr. Poindexter would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter states also that he is aware that Sanders's reputation in the community for truthfulness is awful. Had Mr. Poindexter been contacted by Mr. Barrett's trial lawyers, he would have testified. (Decl. of Billy Poindexter.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks*. This evidence would demonstrate conclusively that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[20]

### d.      Randy Weaver

Randall Weaver testified in the first stage of Mr. Barrett's trial. He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the spring and summer of that year. Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 year looking at cars. On that occasion, Weaver and Mr. Barrett used methamphetamine together. Weaver went to Mr. Barrett because he was a good mechanic. Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property. Weaver testified he

---

[20] *See also,* Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson.

bought $20.00 of methamphetamine from Mr. Barrett. Weaver claimed Mr. Barrett told him that

he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued. (R.

1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb

in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's

federal case by Littlefield, who came to his tattoo shop in Arkansas. Weaver had previously

done time on an Arkansas cocaine charge. When Littlefield came to see him at the tattoo shop,

he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it

was against federal law for Weaver to possess ammunition because of his previous conviction.

Weaver told Littlefield he never sold ammunition to Mr. Barrett. Littlefield's statement to Mr.

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he

had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and

Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is

closed, people should not go onto somebody else's property. It makes no sense to do such a

thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the

defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his

court case, or at any other time during the Spring and Summer of 1999, he ever said words to the

effect that he would blast the first policeman who came onto his property, would "go out in a

blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these

questions at trial, Weaver would have testified that Mr. Barrett never made such statements to

Def's § 2255 Mot.                                121                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would

ever do violence to anyone.  (Decl. of David Autry.)

### e.  Brandie Zane Price

Brandie Price testified she first met Mr. Barrett in August or September, 1999,

and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a

week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding

warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the

police arrived, those present should either grab a gun or hit the floor, because he "was going to

take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[21]

who would drive her vehicle through the ditch area the police went through when they raided Mr.

Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she

made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14

at his residence, which were unlike the weapons she described on cross-examination.  She also

stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied

doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's

residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been

easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

---

[21]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to
Mr. Barrett's house with her at any time, and that he never would have driven her car through the
depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's
in August and September as she claimed, because he was jailed on August 4, 1999, and remained
in jail through the entire month of September, 1999.  (R. 4117-23, 4182-83.)

Def's § 2255 Mot.                          122                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Decls. of Sean Hill and Brandy Hill.)

Counsel also failed to call any witnesses who could testify to their personal opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the police.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Decl. of Sean Hill.  *See also* Claim 5, *infra*.)  Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.

### f.      Karen Real

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Claim 5, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Def's § 2255 Mot.                                      123                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Decl. of Sean Hill.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim.

### g.    Randy Turman

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that

Def's § 2255 Mot.                              124                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute, possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and

possession of a firearm with an altered serial number.  The charges were based on evidence recovered during the execution of a search warrant.  Turman posted an appearance bond on September 20, 2002.  A preliminary hearing was set for April 17, 2003.  The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003.  According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice."  The motion to dismiss was granted by written order the same day it was filed.  (File in Sequoyah County Case No. CF-02-477.)

Counsel was professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years.  Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony.

Counsel was also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty.  Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin."  (Decl. of Sean Hill.)

## Conclusion

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court.  Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges.  Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses.  Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.  *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed.  The concealed evidence, there and in Mr. Barrett's case would have shown that witnesses had motive to lie and had colluded in their stories.  *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness).  *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing

to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials.  Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials.  The court authorized $4,000.00 for a crime scene reconstructionist.  After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that it had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator.  Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence.  *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness.  Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance.  Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert advice was deficient performance.  *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government.  Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property.  The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied.  Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief.  (Report and curriculum vitae of Edward Hueske.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Hueske report at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene." Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco. When asked by defense counsel for examples, Dalley could not come up with any. (Hueske report at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Hueske report at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation."  (Hueske report at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1)      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting.  Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis.  There is also an unresolved question as to how wide the passenger door was open when shots were fired.  No measurements were taken.  Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured.  (Hueske report at 3.)

2)      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence.  Placing trajectory rods

in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and state she saw none.  (R. 3399.)  Hueske report at 3.

3)      To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  Hueske report at 3.

4)      The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire") (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Hueske report at 3.)

5)      Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of bullet penetration/perforation in a variety of substrates."  This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle.  Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for.  Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

Def's § 2255 Mot.                                   133                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446. Hueske report at 4.)

6)       Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur

frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Hueske report at 4.)

Def's § 2255 Mot.                                134                                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

7)      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment." ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident."  (Hueske report at 5.)

8)      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Hueske report at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9)      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to

confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Hueske report at 5.)

10) Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Hueske report at 5.)

11) Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions. It was particularly important here to determine the angle of fire after the Bronco came to a stop. However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco to where it came to rest before being moved. (Hueske report at 5.)

Def's § 2255 Mot.                         136                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

12)     Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements of the hole locations.  (Hueske report at 5.)

13)     Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation."  *Ibid.*

14)     Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window.  Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used.  (Hueske report at 6.)

15)     In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Hueske report at 6.)

16)     In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Hueske report at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999).  Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at

strengthening the Government's case, were scientifically unreliable.  At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community.  *Daubert* 509 at 593-94.  While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable.  Dalley just made it up as she went along in service of her goal of assisting the Government to obtain convictions.  Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony

Def's § 2255 Mot.                                        139                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

742

been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified.  Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent.  *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not just Mr. Barrett's current lawyers who say Ms. Dalley, far from being an objective scientific witness, is a partisan advocate who dresses up her personal opinions in the

Def's § 2255 Mot.                    140                    *U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

guise of "science."  The Oklahoma Court of Criminal Appeals has chastised her, recently reversing a first degree murder conviction due to Dalley''s unreliable, unscientific testimony, including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.  Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

**6.      The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death**

The methods used by the Oklahoma Highway Patrol tactical team were highly questionable.  Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted.  Instead, even though the element of surprise – the motivation behind the plan to begin with – had been totally lost because the "drive-by" vehicle was spotted the afternoon before the raid; Toby Barrett was in the yard when the police arrived and yelled a

warning; the lights were on in Mr. Barrett's house, meaning he was still awake; and ultimately the lead, unmarked vehicle, with no police lights on, actually ran into Mr. Barrett's house, plan went forward, with tragic results for Trooper Eales.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert to show that the raid was plagued by numerous tactical errors that contributed to Trooper Eales's death.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures.  (Doc. 50.)  The court authorized some funds for this evidence.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert Mr. Echols wanted to retain.  Trial counsel's omission was not an informed tactical decision.

During the trial, Mr. Barrett's counsel informed the court that a law enforcement witness, Chuck Choney, who testified for the prosecution in state court and had provided favorable evidence on cross-examination, was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense.  (Tr. 10/03/05 Hr'g at 6-7.)  Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify."  *Id.* at 6.

Trial counsel knew or should have known that it was necessary to retain another expert to assist the defense because of Mr. Choney's affinity with law enforcement.  Mr. Echols had known this, and requested authorization to retain another, independent, expert.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney.  But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by

telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness counsel knew would not cooperate.  If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, the evidence would have shown that Trooper Hamilton's errors in conceiving the raid and carrying it out meant, among other things, a) that Mr. Barrett did not have visual evidence that the lead Bronco was a law enforcement vehicle, and had no signs of law enforcement until after the shooting; b) that the lead vehicle lacked necessary cover from a sniper; c) that the lead Bronco advanced onto the property from a tactically disadvantageous position; d) that the team lost the element of surprise; e) that the situation was dangerous for non-tactical personnel; f) that the presence of observers made a violent altercation more likely, though unnecessary; g) that the lead Bronco's approach and the  position of other vehicles unnecessarily exposed Trooper Eales to both friendly fire and hostile fire.

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena.  He turned out to be a Government witness rather than a defense witness.  He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant.  However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination.  In his opinion, while hindsight might suggest other alternatives to

Def's § 2255 Mot.                           143                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the action taken, there was no compelling need to have aborted the mission. His bottom line was devastating to the defense: the tactical team did nothing wrong.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, in *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002). In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired. Hooper had once attended anger management counseling. His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper. Counsel then hired a forensic psychologist to review the other psychologist's report. Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems. These conclusions could not be reached, however, unless the defendant were examined personally. At the eleventh hour, defense counsel subpoenaed the second psychologist to testify. He was extremely hostile to the defense because he had warned counsel he could reach no conclusions without examining the defendant himself. He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating. He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed. The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems. The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney. He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify

for the defense.  He appeared only when compelled by a subpoena.  Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination.  On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors.  As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial.  *Strickland v. Washington,* 466 U.S. 668 (1984).  As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues.  If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.

<div style="text-align:center">

**7.      Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials**

</div>

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense.  The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent.  Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared.  Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

Def's § 2255 Mot.                        145                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial.  At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.)  This proved a pipe dream.  At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony.  At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed.  (Tr. 8/31/05 Hr'g at 38-39.)  The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett would have known the police were on his property because the emergency lights on some of the vehicles were engaged.  Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, crucial opportunities for impeachment in this area were lost.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory.  (R. 1412.)  However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out.  (2nd St. Tr. Tx. at

747.)  Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed.  In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on.  (2nd St. Tr. TX at 448, 461.)  At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on.  Trooper Pettingill did not activate his lights.  (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road.  He was impeached with a prior statement in which he said he only saw taillights, not emergency lights.  Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights.  (2nd St. Tr. TX at 25, 49, 51.)  In the federal trial, Johnson said nothing on direct examination about any lighting.  Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.)  Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

The issue of whether Mr. Barrett or the police opened fire first was obviously critical.  At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  He heard shots as

he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence.  (2nd St. Tr. TX at 757, 766.)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approach the front of the house at the time he recalled hearing gunfire, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started, supporting Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. TX 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation any father would react to.  In federal court, Hamilton stated the gunfire began

Def's § 2255 Mot.                          148                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in his home was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error appeared during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but five of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.  This damaging answer, given only because counsel opened the door, just

Def's § 2255 Mot. 149 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility

of the informant witnesses due to these "prior reports" from "several" sources.[22]

Counsel's failures to impeach were professionally unreasonable, and not

motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in

counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

officers' accounts of the raid.  Counsel's elicitation of damaging evidence from Johnson was

highly prejudicial under the *Strickland* test, because it tended to invest credibility – however

spurious it might have been, and however false Johnson's testimony was – that they otherwise

lacked.

**8.      Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

**a.      Toby Barrett**

The primary contention of the defense in the first stage of trial was that when Mr.

Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police

vehicle, and was unaware that several police vehicles had driven onto his property.  It was

undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle.

---

[22] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and

able to be prepared by trial counsel to testify in the federal trial. (Decl. Toby Barrett. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Trial Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, Toby Barrett's testimony is consistent with Trooper Hamilton's for example, in confirming that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Trial Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Trial Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Decl. of Toby Barrett.) He denied telling the police he saw flashing lights.

Def's § 2255 Mot.           152           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

(1st St. Trial Tx at 1809.)  Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Trial Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  He never really saw his father at all, except for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Trial Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Trial Tx at 1807.)  The entire incident happened very quickly.  (Decl. of Toby Barrett.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Decl. of Toby Barrett.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that Mr. Barrett intentionally killed Trooper Eales knowing he was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up was important to trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to

Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here."  (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify.  In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial.  He said yes each time, but he never called me.  He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Decl. of Toby Barrett.)

### b.      Alvin Hahn

Alvin Hahn was a neighbor of Mr. Barrett's.  On the night of the shooting, he was asleep and was awakened by gunfire.  When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on.  (Decl. of Alvin Hahn.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate.  Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Because the testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and supported the defense claim that Mr. Barrett had no idea he was shooting at the police, Mr. Barrett was prejudiced.  Viewed

Def's § 2255 Mot.                    154                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984).

> **9.** **Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

The Government made much of the "fact" that Mr. Barrett was well aware there was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the Government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and was therefore making preparations to repel the police with deadly force. This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

Trial counsel did virtually nothing to rebut this claim other than rely on cross-examination. Had counsel been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45), testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk, and had they conducted

anything approaching a reasonable, professional investigation, the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

The Government called Ms. Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/ 26/ 05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/ 26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified,

with a return receipt requested. (Tr. 1/ 26/05 at 39-43, 45.) For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.* The evidence was already in the record. Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events. *Rompilla v. Beard*, *supra*.

Mr. Rogers, the last attorney to represent Mr. Barrett in this case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant. Mr. Rogers is now deceased. In connection with this 2255 motion, his widow, Mary Rogers, was contacted by a defense investigator. Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case. Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest. Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Decl. of Leonard Post; Bill Ed Rogers's attorney file.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other set forth herein, would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants,

would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

Had Mr. Barrett's trial counsel conducted a reasonable investigation there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[23]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was

---

[23] *See also* Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

firing a gun into the air.  Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence.  The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him.  There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[24] (Decl. of Janice Sanders.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Decl. of Janice Sanders.)[25]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have

---

[24]  During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett.  In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently.  Decl. of Janice Sanders. On this occasion, Sheriff Philpot arrived after the other officers.  When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers.  One of the weapons being inspected appeared to be an SKS.  Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant.  Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  Philpot Deposition.

[25]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Decl. of Sylvia Gelene Dotson.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Decl. of Ruth Harris.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road.  On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do.  Ms. Crawford told if the police really wanted them, he should simply go with them.  Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down.  (Decl. of Phyllis Crawford.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years.  Police drove by Mr. Barrett's property all the time.  When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett.  Mr. Barrett was used to the regular police patrols and police presence in the area.  His attitude was, he was there if the police wanted him.  Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up.  (Decl. of Sean Hill.)

Brandy Hill could have given similar testimony.  She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week.  Mr. Barrett was used to the police presence and was not bothered by it. (Decl. of Brandy Hill.)

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case.  Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

> **10.    Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of  irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress"  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

Def's § 2255 Mot.                                        161                             *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their testimony in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two terms in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[26]

---

[26]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Def's § 2255 Mot.                                        162                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[27] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question. While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.) In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations. (R. 852-4, 858, 859, 860.) However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing. Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does." (R. 880.) However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself. (R. 881.)

---

[27]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, <u>509 U.S. 579</u> (1993).

Def's § 2255 Mot.                    163                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

After testimony from Horn running to some forty printed pages (R. 849-889), including his narrating what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[28] confabulation (R. 906),[29] and contamination of memory through contact with others.  (R. 900-901.)[30]  In fact, Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or

---

[28]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[29]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[30]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

Def's § 2255 Mot.                              164                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  And, inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed.R.Evid. 702. The fact was equally clear on the basis of the two state trial transcripts.  As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592*.  Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant.  *Id.  Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals. (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[31] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[32]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[33]   For example, 30% of the necessary points required for Board

---

[31]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

[32]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[33]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than

Def's § 2255 Mot.                              167                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[34]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.  For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[35]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the

---

fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[34]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[35]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

"Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[36] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing.  He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not

---

[36]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

Def's § 2255 Mot.                    169                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

have an expert come up and tell the other side of the stories *per se.*" (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[37]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

raid.  (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental

health expert and only at below-market rates of compensation, and only for a number of hours far

below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent

Mr. Barrett as part of a plan to develop a panel for future capital cases (Decl. of Julia O'Connell),

declined to join his former lead counsel in requesting additional funds from the court.  (Decl. of

John Echols.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him

questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not

contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until

late September, 2005, at the earliest.

---

[37]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

Def's § 2255 Mot.                            170                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him. A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged. Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions. (R. 939.) While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[38] Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-

---

[38]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds. To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses. Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

Def's § 2255 Mot.                              171                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

emptive violation of FED. R. EVID. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[39]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[40] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that

---

[39]*See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

[40]The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

Def's § 2255 Mot.                   172                   *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

should never have come in at the guilt phase.[41]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant."  *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

---

[41]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Def's § 2255 Mot.                    173                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had

recognized the appropriateness of giving an instruction to disregard, although the instruction

actually given was inadequate.  Defense counsel could and should have argued that the jury's

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial.  There

was no downside to a motion for mistrial and therefore no strategic reasons for failing to make

the motion.  Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a

government witness that his client's statement had been given after he had already involved his

rights, a trial court suppressed the statement.  However, only a cautionary instruction was given

and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33 (D.D.C.

2004).  Counsel's performance was held to be deficient in the circumstances of that case, where

"any reasonable defense lawyer would have jumped at the chance to start the trial afresh."  *Id.* at

37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a

mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir.

2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory

closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing

to move for mistrial after repeated references to defendant's exercise of right to remain silent);

*Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial

after court gave improper parole instructions).

To the extent the issue could have been fully resolved on the record, direct appeal

counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance

provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or

correct that error through a stronger instruction or a mistrial.  However, as indicated here, there is

extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not waive these issues.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.  *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).   "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).  The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

**11.      The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349,

360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, an instruction on Oklahoma's "make-my-day" law, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.  These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledge at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See*, *e.g.*, *United States v. Humphrey*, <u>208 F.3d 1190, 1206</u> (10th Cir. 2000).  *See also United States v. Bridwell*, <u>583 F.2d 1135, 1142</u> n.6 (10th Cir. 1978).

Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony. Karen Real Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandi Price were all drug addicts at relevant times.

Courts have long instructed juries that the

> testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.
>
> [¶] You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in the drug manufacture or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**12.      Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious**

Def's § 2255 Mot.                                    178                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

781

**claims on direct appeal being evaluated under the
onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10ᵗʰ Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to: 1) the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90): 2) the improper execution of search warrants by federal officers (*id.* at 1090); 3) the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91); 4) the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91); 5) the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96); 6) the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* At 1096-97); 7) the improper admission of victim impact evidence (*id.* at 1097-1101; 8) the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06); 9) the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108); 10) the lack of constitutionally required proportionality review (*id.* at 1108-09); 11) the violation of *Woodson v. North Carolina,*

428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10); 12) the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* At 1110); 13) the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and 14) the government's improper failure to timely provide the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill.  *(Id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668 (1984). The American Bar Association ("ABA") guidelines provide a guide in determining what constitutes reasonable performance in capital cases.  *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Under the ABA guidelines, trial counsel have a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim."  (ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, COMMENTARY TO STANDARD 10.8), 31 *Hofstra L.Rev.* 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited."  *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim."  *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

> **13.     Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

### Conclusion

The unprofessional and prejudicial errors of counsel permeated the first stage of trial.  From the failure to properly attack the search warrant, to the failure to impeach witnesses; to the failure to produce witnesses who could eviscerate the credibility of the Government's witnesses and otherwise support Mr. Barrett's defense; to the failure to properly secure and utilize expert witnesses; to failure to object to improper experts called by the Government; to the failure to investigate, be prepared, and demand the time to be prepared, no rational observer could be left with any other conclusion than that counsel ineffectively represented Mr. Barrett in the guilt/innocence phase of trial.  While several instances of ineffectiveness, standing alone, are sufficient to warrant vacating Mr. Barrett's convictions, taken together, the conclusion that counsel was ineffective in the first stage of trial is inescapable.  *E.g., United States v. ex rel. Gregory Madef,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002) (viewing evidence that formed basis for ineffective claim in the aggregate, and not individually).

Accordingly, Mr. Barrett is entitled to relief from each of the three counts of conviction.

Def's § 2255 Mot.                                    182                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

**B.      Unreasonable Acts and Omissions Affecting the Second Stage of Trial**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

*1.      Deficient Performance*

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Claim 1, *supra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  *(See also* Docs. 50, 51, 57, 97, 128; Decl. John Echols; Decl. Richard Burr.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase.  (ABA Guideline 4.1(A)(2).)  Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel.  (Letter from John Echols to Honorable James H. Payne dated 2/2/8/2005; Decl. John Echols.)  However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available. (Decl. Steve Leedy; Decl. John Echols).  Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial.  (Decl. Frank Gordon; Decl. John Echols).  The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with a major medical disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

Def's § 2255 Mot.                              184                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

specialist. (Doc. 97). The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline 10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005. (Docs. 46 and 50). Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses. (Doc. 97). *See* Claim 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50). Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey, and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the

client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed. However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. (*See*, *e.g.*, Decl. Brandie Hill; Decl. Carolyn Joseph; Decl. Issac Barrett; Decl. Doris Barrett; Decl. Ernest Barrett; Decl. Gwen Crawford; Decl. Kathy Trotter; Decl. Janice Sanders (partial interview by trial counsel); Decl. Paul Lunsford; Decl. Shawn Hill; Decl. Toby Barrett).

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols. The court also appointed Bret A. Smith. Mr. Hilfger had only worked on one prior federal death penalty case. Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial. Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender. As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done

to prepare for a penalty trial. (Echols letter to Payne; Decl. John Echols; Doc. 113; Decl. Richard Burr).

Mr. Hilfiger did not seek an amendment of the budget. His failure to do so was unreasonable. On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery. Mr. Hilfiger stated in his motion that he was not familiar with the materials. In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case. On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial. These statements, and the declarations of John Echols, Frank Gordon, and Steve Leedy, show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Decl. Julia O'Connell). Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case. (Letter from Ron Lax to Tivon Schardl dated 9/24/08). Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation. (Decl. Steve Leedy; Decl. John Echols; Decl. Frank Gordon). Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance. Trial counsel did not contact him. (Decl. Richard Burr.) At that time, the trial was approximately ten weeks away. As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage

Def's § 2255 Mot.                                    187                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

investigation if it hadn't already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Decl. Julia O'Connell).

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic

brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."
*Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment.  *See* Claim 3, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Decl. Richard Burr; Doc. 107).  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in

2003 in anticipation of the second state trial. Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Federal Rule of Criminal Procedure 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition. (Tr. 9/9/05 Hr'g at 41).

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase. (Tr. 9/9/05 Hr'g at 43). Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials. *Ibid.* Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett. *Id.* at 41. Dr. Russell had "examined" Mr. Barrett, however. At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you." (Tr. 9/9/05 Hr'g at 41). The court generously described the defense's preparation as "still work in progress." *Id.* at 42.

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist. (Tr. 10/3/05 Hr'g at 7). Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert. *Ibid.* However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation. (Tr. 9/9/05 Hr'g at 41). Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator. However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

### 2.    *Prejudice*

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration; (4)

Def's § 2255 Mot.                              190                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete; a reflection of counsel's lack of investigation.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett. Jurors would have learned the following about Mr. Barrett, his background, and character:

> **a.      The family, social, and medical background of Kenny Barrett**

> **Introduction**

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history. The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California. The Trail of Tears[42] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

---

[42]In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory. The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee. It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Kenny 's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Gelene Dotson, Genealogy Memorandum; Abe Dotson Marriage Certificate; Ida Melton, Death Certificate; Allen Real, Death Certificate) With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

**<u>Family History of Mental Illness</u>**

Kenny  meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  His family has long struggled with their vulnerability to mental illness.  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric

Def's § 2255 Mot.                                192                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny 's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny 's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny 's mother's family "had to deal with mental illness for a long time." (Decl. Phyllis Crawford.)   Kenny 's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  (Decl.  Carolyn Joseph; Carolyn Joseph, Medical Records; Carolyn Joseph, Marriage Certificate.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Decl. Carolyn Joseph.)   Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Decl. Mark Dotson.)

One of Kenny 's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  (Decl. Gwendolyn Crawford; Gwen Crawford, School Records;  Decl. Brandy Hill; Brandy Hill, Medical Record.)  Gwendolyn's two children both have significant mental impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Decl. Gwendolyn

Crawford; Brandon Smith, Social Security Earned Income Statement; Brandon Smith, Guardianship Proceedings.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d) with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.  (Decl. Brandy Hill; Brandy Hill Medical Records.)

Travis Crawford, another of Kenny 's first cousins, also receives medication for anxiety and reported a history depression.  (Decl. Travis Crawford; Travis Crawford Medical Records.)  Travis has had "a long struggle with drugs and ha[s) anxiety and panic attacks" and his "mind does not work that well."  (Decl. Travis Crawford.)  Travis understands that "psychological problems run in [his) family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."  (Decl. Travis Crawford.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Decl. Nona Reich.)

In the maternal family, depression and mood disorders trace back to Kenny 's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Decl. Carolyn Joseph; Hattie Gertrude Dotson, Death Certificate.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[43] who

_____

[43]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Hugh Dotson, Death Certificate.)

Def's § 2255 Mot.                    194                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Wallace Dotson Lunacy Record)

**Paternal Family Mental Illness**

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Kenny 's great great grandfather, as did his great grandfather, his grandfather and finally Kenny himself. (A. J. Barrett, Mental Health Record; A. J Barrett, Eastern State Hospital Record; Decl. Issac Barrett) As Kenny 's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Decl. Kathy Trotter.) Kenny 's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (A.J. Barrett, Certificate of Lunacy.) Kenny 's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Decl. Issac Barret and Linda Riley; Isaac Clifford Barrett, Death Certificate.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny 's grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Decl. Linda Riley.), raped one of his daughters who became pregnant and placed the baby for adoption (Decl. Issac Barrett), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (A.J. Barrett Certificate of Lunacy.)

His family believed he "was bipolar." (Decl. Linda Riley.) A.J. was able to work only "sporadically." His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce." (A.J. Barrett Eastern State Hospital Records; Decl. Linda Riley; A. J. Barrett, Death Certificate.)

A.J.'s maternal family also faced the tragedy of mental illness. A.J.'s mother (and Kenny 's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (A.J. Barrett, Eastern State Hospital Records), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Decl. Issac Barrett.) She "died very confused." (A.J. Barrett, Eastern State Hospital Records; Mary Ellen Barrett, Death Certificate.) Mary's brother, Howard, was "Looney Tunes" (Decl. Issac Barrett), and Howard's son, Billy Dean who was a disabled veteran with a history of schizophrenia, committed suicide. (Billy Dean Maxwell Death Certificate; Billy Dean Maxwell Mental Health Record.) Kenny 's great aunt, Elnora Long, is bipolar and requires significant doses of medication. (Decl. Kathy Trotter and Issac Barrett.) Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." (Decl. Kathy Trotter.) Kathy, Kenny 's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings. (Decl. Kathy Trotter; Kathy Trotter Medical Records.) Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder. His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Linda Riley Medical

Records.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

## Maternal Family History

Kenny 's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose every day life reflected the travails and successes Indians in eastern Oklahoma.  Hugh, who grew up in an Indian orphanage became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[44] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Decl. Warren Dotson.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Decl. Warren Dotson and Carl Cook; Sequoyah County Times; Minnie Andrews, Death Certificate.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[44]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

Def's § 2255 Mot.                                    197                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and it appears that at least one of the men who shot and killed them did so with impunity.[45] (Oklahoma v. Henry Edwards; The Vian Press; The Sequoyah Times.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep. Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility. Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers. They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Hugh Dotson Marriage Certificate), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother. (Sylvia Gelene Dotson Birth Certificate.) Hugh "barely earned enough to live on." (Decl. Gelene Dotson.) Hugh, Hattie and their growing family lived in "tumble down" houses that "were in pretty bad shape even by standards back then." (Decl. Gelene Dotson.) The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."

World War II intervened, and Hugh served in the U.S. Army. When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook. Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm. (Decl. Gelene Dotson.) Gelene " always heard" her family was "part Indian and that [she) was 3/16 Cherokee." (Decl. Gelene Dotson.)

---

[45]Cherokee Census Cards M2799 and 3294.

Def's § 2255 Mot.                    198                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school.  She was her mother's least favorite no matter that she was the most attentive to her mother's needs.  (Decl. Gelene Dotson.)  The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico.  Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands.  (Decl. Gelene Dotson.)  After a year at Menaul Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri.  The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine.  (Decl. Carl Cook.)  Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton.  Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Decl. Gelene Dotson.)  The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield.  Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids."  (Decl. Gelene Dotson.)  It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land.  (Decl. Gelene Dotson.)  Gelene explained that "[l)and is just something very important" to her family and "always has been."  (Decl. Gelene Dotson.)

Hugh and his wife Hattie were dedicated to their dream of owning land.  Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never

considered working less." (Decl. Gelene Dotson.) Children in the family "always knew [they]

went out there to make enough money to buy [their) own place back home." (Decl. Gelene

Dotson.) When they had saved enough, the family returned to its roots and soon after their

youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her

siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy

of her few years in California. Years later, Hugh gave each of his five children seven of his

treasured 40 acres and retained five. Kenneth Barrett eventually built his shack for $150.00 on a

spit of his grandfather's land adjacent to his mother's house, on land that Gelene expected she

would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather enjoyed a

fine reputation in Sequoyah County. From 1917 to 1943, Issac managed a 20,000-acre ranch

owned by a Kansas doctor. Issac married Mary Ellen Maxwell, who was one of ten children born

in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's

falling on hard times, shared the bounty of his own garden. (Decl. Issac Barrett.) Issac "had his

burdens to carry after he married" Mary. She had a "mental breakdown" (A.J. Barrett Eastern

State Hospital Records), and "walked around the yard talking to herself. At night, she would

wake up, wash jars, and think she was canning." (Decl. Issac Barrett.) According to Issac

Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean

Maxwell was involuntarily committed to the state mental institution four times over a ten year

period before he committed suicide by shooting himself in the head. (Decl. Issac Barrett; Billy

Dean Maxwell Death Certificate; Billy Jean Maxwell, Record of Mental Health Proceeding.)

Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November

24, 1952.  (Decl. Issac Barrett.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left."  (Decl. Issac Barrett.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w)hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Decl.  Issac Barrett.)  A. J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Decl. Kathy Trotter; A. J. Barrett, Marriage Certificate.)  Ada's mother, Ida Melton, was an Indian (Ida Melton Death Certificate) married to Sam Hatter.  (Sam Hatter Marriage Certificate.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (Sam Hatter,  Divorce Proceedings; Sam Hatter, Marriage Certificate to Bessie)  Ida and John had one child, Elnora Barrett Long, who was debilitated by

her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Decl. Issac Barrett.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Decl. Issac Barrett.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his the four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W)ell water was not usable for humans, although it was all right for animals and crops."  (Decl. Issac Barrett.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." [A.J. Barrett, Eastern State Hospital Records.)  Unable to support his family, "[t)he entire family had to work in the fields traveling from one crop to the next."  (Decl. Issac Barrett.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." [A.J. Barrett, Eastern State Hospital Records)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields."  Decl. Ernest Barrett .)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Decl. Ernest Barrett.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Decl. Linda Riley.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month.  (A.J. Barrett, Eastern State Hospital Records.)  None of his children "wanted him to be at home because of the crazy things

he did." (Decl. Issac Barrett.)  He suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior.  (A.J. Barrett, Eastern State Hospital Records.)  Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous."  (A.J. Barrett, Eastern State Hospital Records.)  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  (Decl. Issac Barrett.)  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Decl. Issac Barrett), but he "was difficult to figure out because he was also a decent guy when he was sober."  (Decl. Ernie Barrett.)   A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  (Decl. Issac Barrett.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his) way."  The children left home as soon as they could.  (A.J. Barrett, Eastern State Hospital Records.)  Family members reported that A.J. had "two different personalities" and "angry spells about three times a week."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. had "enormous moods swings from being an alright guy to being totally out of control."  (Decl. Ernest Barrett.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were) going to kill him."  (A.J. Barrett, Eastern State Hospital Records.)  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

(A.J. Barrett, Eastern State Hospital Records.)  A physician examining A.J. when he was

admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of
> five digits but is unable to repeat them in reverse with any degree of
> facility.  Serial subtraction of eight from one hundred is done with much
> hesitation and inaccuracy.  His general intelligence seems inaverage and
> dull normal.  His reasoning and judgement are limited.  His insight is poor.

(A.J. Barrett, Eastern State Hospital Records.)

Ernie and his siblings were powerless to protect themselves or their mother from

A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not

divorce" him (Decl. Linda Riley; A.J. Barrett, Eastern State Hospital Records), even though

"nothing could stop him from attacking" them."  (Decl. Ernest Barrett.)  Ada "was churchgoing

and devout; she did not believe in leaving a marriage no matter how bad it was."  (Decl. Ernest

Barrett.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life

between my father being half crazy and always poor."  (Decl. Ernest Barrett.)   Ernie tried "[a)s

the oldest boy in the family," to protect his mother and the other children, but he was "no match"

for his father until he was "half grown."  (Decl. Ernest Barrett.)  Because Ernie tried to "get

between" his father mother" when A.J. attacked her, he "got beaten more than the other

children."  (Decl. Ernest Barrett.)

Ernie developed characteristic responses to the life threatening trauma he

witnessed and experienced.  He "learned never to cry" when his father hit him and he does not

remember "feeling a hell of a lot."  (Decl. Ernest Barrett.)   High school for Ernie was

"different."  (Decl. Ernest Barrett .)  In a community known for its poverty, Ernie's family stood

out as still poorer than most.  Other students "made fun of [Ernie) and laughed at [him) because

of the way [he) dressed."  (Decl. Ernest Barrett.)  Ernie responded to the taunts with fighting

"every boy in [his) high school class to hold any respect." (Decl. Ernest Barrett.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." [Decl. Issac Barrett.)  Ernie's brother described him as "pretty cruel."  (Decl. Issac Barrett.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  (Decl. Issac Barrett.)  Ernie's brother thought Ernie was "a lot like [his) father," A.J. (Decl. Issac Barrett.)  An aunt who taught Ernie in elementary school described him as "mean child."  (Decl. Ruth Harris.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his) shoulder wide open."  He still has a scar from it.  (Decl. Ernest Barrett.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Decl. Ernest Barrett.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines,  reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Decl. Ernest Barrett and Gelene Dotson; Ernest Barrett Marriage Certificate.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning. Although Ernie was very "determined not to live in the kind of poverty [he) knew as a child growing up," he had little notion of family life or fatherhood. (Decl. Ernest Barrett.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them." (Decl. Ernest Barrett.)

Ernie "almost immediately started running around with other women" (Decl. Ernest Barrett.) and was gone for days at a time. He had his "mind set on doing whatever" he wanted, as long as he worked. (Decl. Ernest Barrett.) After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home. (Decl. Ernest Barrett.) Ernie "did pretty much whatever [he) wanted to. [He) would go out, drink as much as [he) wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended. He "drank a fifth at a time." (Decl. Ernest Barrett.) Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his) children what they needed and be the kind of parent they deserved." (Decl. Ernest Barrett.) At the time he and Gelene started their family, his only measurement of success was being able to work himself "up from pushing brooms to production manager." (Decl. Ernest Barrett.)

Gelene was "pretty depressed" and "miserable" in the marriage. (Decl. Gelene Dotson.) She was "a heavy drinker with dramatic mood swings." (Decl. Mark Dotson.) She had planned on going to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in shining armor." (Decl. Gelene Dotson.) She did not realize, until after they married that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better." (Decl. Gelene Dotson.) Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her), but for the children [they) had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Decl. Gelene Dotson.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Decl. Gelene Dotson.)  Throughout their 13-year marriage, Ernie 'had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis, who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Decl. Phyllis Crawford.)

Kenny 's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I)t drove [her) crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Decl. Gelene Dotson.)   They "split up and got back together and threatened to leave each other over and over."  (Decl. Gelene Dotson.) They " always had a difficult time of it. " (Decl. Gelene Dotson.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Kenneth Barrett, Birth Certificate.)  He was followed by his younger brother, Richard, born June 24, 1964 (Decl. Gelene Barrett; Richard Barrett, Birth Certificate.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore." (Decl. Ernest Barrett.) Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his) mind as much as [he) could."  (Decl. Ernest Barrett.)

Def's § 2255 Mot.                             207                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The three-year separation ended when Ernie was not able to "keep the boys out of [his) mind" and he reunited with Gelene in 1967.  (Decl. Ernest Barrett.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  (Decl. Ernie Barrett.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969. (Decl. Gelene Dotson; Stephen Barrett, Birth Certificate.)  Gelene and Ernie "both drank as much as [they) could," and Ernie "still stayed away from home."  (Decl. Ernest Barrett.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant. Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time."  (Decl.  Ernest Barrett.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Decl. Gelene Dotson.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Decl.  Gelene Dotson.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her) lip." (Decl. Gelene Dotson.)  Gelene "was at the end of her rope" and left Ernie for good in Lake

Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene

divorced June 20, 1973.  (Decl. Gelene Dotson; Sylvia Gelene Barrett, Divorce Proceedings.)

### Infancy and Childhood Development

Kenny  has long standing neurologic deficits that were apparent early in his

infancy, continued throughout his childhood and adolescence, and affected his behavior and

understanding over the course of his life.  Although it is difficult if not impossible to determine

with precision the etiology of his neurological deficits, there is no doubt that they are present and

significant.  These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and

young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one

or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes

as "very difficult."  (Decl. Gelene Dotson.)  She was in "constant pain," uncomfortable, and

depressed. (Decl. Gelene Dotson.)  She described her pregnancy as "battling with Kenny before

he was born."  (Decl. Gelene Dotson.)  Gelene drank throughout her pregnancy with Kenny,

unaware of alcohol's potentially devastating effect on a developing fetus's brain.  (Decl. Gelene

Dotson; Decl. Linda Riley.)  Gelene's in laws commented on her early alcoholism and stated she

"was a drunk right out of high school."  (Decl. Kathy Trotter.)

Kenny  had a difficult infancy and "exhausted" his mother.  (Decl. Gelene

Dotson.)  His "days and nights were mixed up," and he "was colicky" and unable to be

comforted.  (Decl. Gelene Dotson.)  He cried and fussed "all the time," making Gelene think all

babies must be like him.  After she had her other two children and observed their development,

she "realized something was wrong with Kenny."  (Decl. Gelene Dotson.)  Gelene received no

help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him.  He was colicky and cried all the time." (Decl. Ernest Barrett.)  Kenny was born with a large lump on the back of his head.  (Decl. Gelene Dotson.)

Kenny  failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Kenneth Barrett, Baby Book Excerpt) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny  did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  Kenny's mother nursed him. [Kenneth Barrett, Baby Book excerpt, KEB 501 953)

At nine months, Kenny  did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent," or make stepping movements when feet are touched to floor."  [Kenneth Barrett, Baby Book excerpts)

At one year, Kenny 's delays were more obvious.  His mother noted he "had trouble learning to walk."  (Decl. Gelene Dotson.)  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."  (Kenneth Barrett, Baby Book excerpts.)

Def's § 2255 Mot.                        210                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Kenny  early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyper activity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Decl. Gelene Dotson.)  Gelene described him as "a handful" who "could not be still" and "was more than hyper."  (Decl. Gelene Dotson.)  An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still."  (Decl. Phyllis Crawford.)  Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still."  (Decl. Ada Blount.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Decl. Ernest Barrett.)  Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen.  (Decl. Janice Sanders.)  She also noticed that Kenny "had strong feelings" (Decl. Janice Sanders), a common symptom of children who develop bipolar mood disorder.  Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive."  (Decl. Nona Reich.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children."  (Decl. of Phyllis Crawford.)  Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . .  He would break down and cry easily."  [Phyllis Crawford) His cousin remembered that "back then we called Kenny hyper.  He was erratic and temperamental.  (Decl. Kathy Trotter.)  His mother reported that "any little thing could upset him, but it took a lot to

calm him." (Decl. Gelene Dotson.)  Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Decl. Ernest Barrett.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Decl. Gelene Dotson.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Decl. Gelene Dotson.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny 's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still." (Decl. Gelene Dotson.)  It "almost drove [her) crazy." (Decl. Gelene Dotson.)  She thought he "was emotional about things that did not matter.  He would cry and scream like there was no tomorrow." (Decl. Gelene Dotson.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time.  She had a bad habit of saying cruel things not just to me but to the boys, too." (Decl.  Ernest Barrett.)  Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Decl. Kathy Trotter.) Children were "afraid of her." (Decl. Kathy Trotter.)  Kenny suffered "more verbal abuse from her than her other two children." (Decl. Kathy Trotter.)  Kenny 's neurologic impairments and his chaotic home life took their toll on his school work.  Gelene stated he "had a difficult time in school and was in special classes part of the time." (Decl. Gelene Dotson.)  Kenny  had difficulty almost immediately in school.  He failed reading and arithmetic in the first grade and was barely

able to keep pace with his peers.  He had difficulty learning to read.  (Decl. Gelene Dotson;

Kenneth Barrett school records.)

Ernie "hardly had anything to do with [Kenny ) after the divorce, and everyone

could see how much it hurt Kenny."  Even when Ernie made a semi- annual trips to town to see

his sons, family reported he was insensitive to his children's needs.  He came "by to show off his

new Corvette when his children did not have shoes or decent clothes to wear."  (Decls. Issac

Barrett and Phyllis Crawford.)  Ernie's sister in law did not think Ernie was "a good husband or

father. Ernie did not come around and visit his children the way he should have.  He was absent

in their lives.  Ernie has always been for Ernie."  (Decl. Ruth Harris.)  Ernie "went his way and

let Gelene take care of the kids."  (Decl. Ruth Harris.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did

not want to go with his mother back to Oklahoma."   (Decl. Ernest Barrett.)  Kenny  "wanted to

stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Decl. Ernest

Barrett.)


Gelene's emotional needs took precedence over Kenny .  Her sister recalled that

Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected

Kenny badly."  (Decl. Phyllis Crawford.)  Gelene brought different men into the house when

Kenny was entering his teenage years, and "it was very confusing for him."  (Decl. Phyllis

Crawford.)   Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."

(Decl. Phyllis Crawford.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of

his room.  Phyllis and her husband went to Gelene's house and talked to Kenny .  Kenny  told

them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was

to scream." (Decl. Phyllis Crawford.) Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings." (Decl. Steve Barrett.) When Gelene "lost control of herself," she whipped the boys, but "there was no real parenting." (Decl. Steve Barrett.)

Gelene was harsher with Kenny , "verbally and physically," than she was with her other two sons. (Decl. Steve Barrett.) Gelene used a strap to whip Kenny, and Kenny "hated" it. (Decl. Steve Barrett.) Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny. When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene  and not let her near him. (Decl. Steve Barrett The dog was run over by a car.

Steve, Kenny 's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family. Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Decl. Steve Barrett.)

Steve and Kenny  "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Decl. Steve Barrett.) Steve  benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Decl. Steve Barrett.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade." (Decl. Steve Barrett.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Decl. Steve Barrett.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him) in their love and guidance."  (Decl. Steve Barrett.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Decl. Steve Barrett.) School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Decl. Steve Barrett.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of every day life, or to tolerate the routine activity of growing boys."  (Decl. Steve Barrett.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Decl. Steve Barrett.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Decl. Steve Barrett.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny

completed ninth grade." (Decl. Ernest Barrett.) Kenny resented Ernie's wife Diana and "it got

the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest.

(Diana Barrett, Marriage Certificate.) He went flying slamming against the wall." (Decl. Ernest

Barrett.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it

"caused some of Kenny's problems." (Decl. Gelene Dotson.) She knew that "Kenny never

adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Decl.

Gelene Dotson.) Kenny "got pretty depressed and lost interest in school." (Decl. Gelene

Dotson.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Decl. Steve

Barrett.) He could tell "how much Kenny missed [their) dad by the way he acted when Kenny

was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny."

(Decl. Steve Barrett.) Extended family members knew that "Kenny never had much of a father,"

and "never had any guidance." (Decl. Ada Blount.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Decl.

Ernest Barrett.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the

second time at Tommy Spear Junior High in Sallisaw. He was placed in special education

classes in English and staff made "some adjustments to the curriculum" for him. [Kenneth

Barrett School Records) At the end of the academic year, he showed improvement in two courses

(math and social sciences) and decline in one course (science.) It was a very difficult year for

Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Ada Mae Barrett, Death

Certificate.) Ada Mae "adored" him, and "[w)hen she died . . . Kenny was just 14. It was as if

the only adult who ever cherished him had gone." (Decl. Kathy Trotter.) Ada Mae's death was

the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Decl. Kathy Trotter.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science.) [Kenneth Barrett School Records) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Decl. Ernest Barrett.)

When Kenny was 17, Kenny was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. [FBI memorandum) The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Decl. Gelene Dotson.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny , then a manic-depressive, brain damaged youth with a low I.Q., directly affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a

shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Decl. George Woods, M.D.)

### Onset of Mental Illness

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had

worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  (Decl. Gelene Dotson.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny  met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Kenneth Barrett, Marriage Certificate) Their only child, Toby, was born December 1, 1980. [Toby Barrett, Birth Certificate)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Decl. Gelene Dotson.)

Kenny  "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Decl. Abby Stites.) Kenny 's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny 's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Decl. Abby Stites.)  Gelene never treated "her other sons the way she treated Kenny."  (Decl. Abby Stites.)  She and Kenny had a "terrible relationship."  (Decl. Abby Stites.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Pulice v. Barrett, Application for Temporary Order; Gelene Dotson, Marriage Certificate to Paul Dudley; Gelene Dudley, Divorce Proceedings.)

Kenny  tried "to bury his problems under constant work and activity."  (Decl. Steve Barrett.)  Kenny  measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."  (Decl. Abby Stites.)  The only antidote to his

Def's § 2255 Mot.                                      218                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

depression was drugs.  His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better."  (Decl. Abby Stites.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny  "would work hard and then sleep all the time. . . .[He) did the drugs to make himself feel better, because otherwise he would just sleep."  (Decl. Abby Stites.)

Kenny 's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled."  (Decl. Kathy Trotter.)  His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next."  (Decl. Abby Stites.)  Kenny had "racing thoughts."  (Decl. Abby Stites.)  He did things without thinking and "then regretted them" (Decl. Abby Stites.)  Abby knew that Kenny  "did not act the way normal people act" and that he "got swept away in his emotions."  (Decl. Abby Stites.)  When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Decl. Abby Stites.)  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up."  (Decl. Abby Stites.)

Kenny 's cousin, Brandy recognized Kenny 's bipolar mood disorder created severe problems for his marriage.  Brandy compared Kenny 's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought."  (Decl. Brandy Hill; Brandy Hill, Oklahoma Department Mental Health and Substance Abuse Service.)

Kenny  and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of

the separations, he went to his father's home where Ernie found work for him.  Ernie described

his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Decl. Ernest Barrett.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek

psychiatric treatment.  (Decl. Abby Stites.)  Abby recognized that she "was the only stable thing

he ever had in his life" and that she "kept him together."  (Decl. Abby Stites.)  She opposed his

drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep

edge."  (Decl. Abby Stites.)  Kenny's brother reported, "[a)s troubled as Kenny was, he worked

all the time."  (Decl. Steve Barrett.)  Kenny 's use of drugs allowed him to keep working, despite

his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple.  He needed

methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny

attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Kenneth Barrett, Sequoyah Memorial Hospital Records, 1986.)  Kenny's brother Steve was

home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on

television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Decl. Steve Barrett.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Decl. Abby Stites.)  Elavil was extremely helpful and made a big difference in Kenny, but- he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Kenneth Barrett,  Eastern State Hospital Records; Kenneth Barrett, Record of Mental Health Proceeding.) The admitting psychiatrist provisionally diagnosed Kenny with  "depressive neurosis with suicidal potential extremely high."  (Kenneth Barrett Eastern State Hospital Records) The nursing assessment reported that Kenny did "not recognize problems."   (Kenneth Barrett Eastern State Hospital Records) Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."   (Kenneth Barrett Eastern State Hospital Records)

On mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Kenneth Barrett  Eastern State Hospital Records)   His insight and judgment were impaired. Staff found Kenny to be "courteous, cooperative."  (Kenneth Barrett Eastern State Hospital Records) Kenny acknowledged that he had "a hot temper."  (Kenneth

Barrett  Eastern State Hospital Records) Kenny's highest level of functioning in the preceding year was "poor." (Kenneth Barrett  Eastern State Hospital Records)   Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work." (Kenneth Barrett  Eastern State Hospital Records)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed." (Decl. Nona Reich.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Decl. Nona Reich.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Kenneth Barrett Social Security Administration Determination of Eligibility) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to his right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Kenneth Barrett Sequoyah Memorial Hospital Records)

When Kenny 's marriage ended after 14 years, he "never recovered." (Decl. Abby Stites; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and

Def's § 2255 Mot.                222                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

severe mood swings that came at unpredictable times and derailed their lives.  By the end of their

marriage, Abby "felt like (they) were more like brother-sister than wife and husband because

(she) was always bailing him out of trouble and taking care of him" and "trying to keep up with

his mood swings."  (Decl. Abby Stites.)  Kenny was too impaired to take care of Abby, and she

recognized that "he was mentally ill."  (Decl. Abby Stites.)  It pained Abby to leave Kenny

because "(t)here were times he could be good. . . .and would try so hard to be good.  (Decl. Abby

Stites.)  She also knew that "he could not function without her."  (Decl. Abby Stites.)

After their final separation, Kenny spiraled downward, as Abby had predicted.

His multiple impairments made it impossible for him to function independently.  He was

hospitalized January 20, 1995, given "10 mg of Haldol IM,"  and diagnosed with bipolar mood

disorder after telling hospital staff, "I'm losing my mind."  (Kenneth Barrett, Wagoner

Community Hospital) Hospital staff noted he was "extremely agitated."  (Kenneth Barrett,

Sequoyah Memorial Hospital) During his three day hospitalization, staff reported he was "very

agitated" and not able to sleep "for a few days."  (Kenneth Barrett, Wagoner Community

Hospital)  He demonstrated "lack of concentration" and "rapid thought process."  (Kenneth

Barrett, Wagoner Community Hospital)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis

Community Mental Health,"  but he did not follow through. (Kenneth Barrett, Wagoner

Community Hospital; Bob Willis Community Mental Health Center; Muskogee County Jail)

Kenny "moved back home" and "built a little shack" next door to his mother's trailer.  (Decl.

Steve Barrett.)  His brother visited it and observed that the shack was "almost Waldenish in its

own way."  (Decl. Steve Barrett.)  The shack was constructed from discarded and used materials,

did not have electricity or plumbing and only had "the essential stuff."  (Decl. Steve Barrett;

Decl. Gelene Dotson and Attachment.)   Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Decl. Gelene Dotson.)  Gelene prepared his meals for him, and he ate at her trailer.   Kenny 's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Decl. Toby Barrett.)  Even as a teenager, Toby " knew something was wrong with him because he had mood changes that were not normal." (Decl. Toby Barrett.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" who was "a very paranoid and "a very scared person." (Decl. Toby Barrett.)

Everyone in the family and Kenny 's ex wife knew he could not "live on his own." (Decl. Gelene Dotson.)  During his and Abby's frequent separations, "Kenny always came home" to his mother.  (Decl. Gelene Dotson.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Decl. Ruth Harris.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property." (Decl. Toby Barrett.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to (her) and just worked on his cars and fixed things for people, he might be able to make it." (Decl. Gelene Dotson.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Decl. Rick Lunsford, Brandy Hill and Sean Hill.)  Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him." (Decl. Alvin Hahn.)

As Kenny 's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years." (Decl. Shawn Hill.)  His aunt Phyllis understood that he "was never able to be

independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Decl. Phyllis Crawford.)

Despite the limitations of his mental impairments, Kenny "would give you the shirt off his back if you needed it."  (Decl.  Phyllis Crawford.)  He "tried to stay close to home, always worked hard and took pride in his work."  (Decl.  Phyllis Crawford.)  Kenny's family and friends uniformly reported that Kenny was not violent or dangerous to them.  His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him." (Decl. Ada Blount.)  Janice, his cousin, grew irritated and inpatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him."  (Decl. Janice Sanders.)  Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." (Decl. Ruth Harris.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were never afraid of him" and did not "believe he would intentionally hurt anyone."  (Decl. Ruth Harris.)  Relatives visited and talked with Kenny.  His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Decl. Nona Reich.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he

said, "'Aunt Nona, how do you know there's a God?" I took him to the window
and said, "See how beautiful that is." He agreed but asked me "Why can't we see
God?" I tried to explain to him that the Bible says we should worship God in
spirit and we will see His truth.

(Decl. Nona Reich.)

Friends and family thought at times Kenny would be alright. A friend and
neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who
was fair." (Decl. Rick Lunsford.) A cousin, Brandy Hill, remembered that "Kenny was very
generous, and his auto repair business was getting more solid every day. People would pay him
hundreds of dollars in cash to replace an engine or a transmission." (Decl. Brandy Hill.) Despite
Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and
helping him work on cars." (Decl. Toby Barrett.) Toby was intimate with Kenny's fears but
knew that Kenny "was not dangerous," and Toby "was not afraid of him." (Decl. Toby Barrett.)
Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to
him" that helped "offset the pain of having a dad with mental problems." (Decl. Toby Barrett.)

The family hoped that Kenny could recover. His mother described their
observations:

> As time went on, he did a little better, built a garage and fixed everything from
> appliances to cars, trucks, and trailers for friends and neighbors. He stayed more
> and more to himself, though, and did not like to leave the property. Friends
> bought him food and went grocery shopping for him. He ate most of his meals at
> my trailer, and I cooked for him. I hoped and prayed he was going to make it. At
> least, I believed, with him living right next door, he was safe and I could keep an
> eye on him. We had our arguments; that's for sure. He was so paranoid and crazy
> at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Decl. Gelene Dotson).

### b.   Kenny Barrett's mental illness and organic brain dysfunction

If trial counsel had followed prevailing norms and provided experts the documented evidence of Mr. Barrett's background and character Mr. Barrett's jury would have heard and considered extensive evidence of mental illness and neurologic impairment.  As explained by Dr. Young:  "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex."  (Decl. Myla Young at ¶ 28.)

Dr. Young explains that the areas of the brain in which Mr. Barrett experiences dysfunction are important because of their functions:

> The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex provides a mechanism to control execution of movement of limbs, hands, feet and fingers.  The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues.   The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia.  The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning."  Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received.   More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

> [¶]    The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system.  Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones

and emotional meaning.  The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions.  Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities.  Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years.  Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

(Decl. Myla Young, Ph.D. at ¶¶ 26-27.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing including intelligence testing, clinical interview including a history, review of educational records, and reviews of medical and psychiatric treatment.  As explained by George W. Woods, Jr., M.D., a psychiatrist who also examined Mr. Barrett:

neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.

(Decl. George W. Woods, Jr., M.D. at ¶ 62.)

The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing

Def's § 2255 Mot.                          228                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing. Mr. Barrett suffers significantly impaired functioning in all these domains.

(Decl. George W. Woods, Jr., M.D. at ¶ 58.)

In addition to these neuropsychological deficits (and others detailed in Dr.

Young's declaration), Mr. Barrett suffers from severe mental illness:

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81. He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex. Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

> [¶] Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983). Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986).
> Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

(Decl. George W. Woods, Jr. M.D. at ¶¶ 66-67.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect." (Decl. George W. Woods, Jr., M.D. at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Motion, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

> [¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

> [¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan

Def's § 2255 Mot.                    230                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (*Id.* at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

> [¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.
>
> * * *
>
> [¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual

Def's § 2255 Mot.                    231                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the

environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 69-78.)

Courts, including the Supreme Court, have repeatedly held that evidence of mental impairment such as the devastating history Mr. Barrett has experienced, when it is kept from the jury due to counsel's unreasonable omissions, undermines confidence in the verdict. That should be this Court's judgement here.

> **c.     The prosecution's exploitation of trial counsel's deficient performance**

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments.  Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process.  Left unsaid

was what kind of father he was. The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them. Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs. As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply. Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child. Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison. Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently. This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards." Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on

the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356).

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.   Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett. Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed. If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct. Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase. Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst." Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim. (R. 5417-20).

### 3. Conclusion

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005. By the beginning of July, trial counsel were searching about for a mitigation specialist. In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history. In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December. The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation. Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel. This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

Def's § 2255 Mot.                    236                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The evidence of prejudice is greater, too.  Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parent's inability to sustain a life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage.  Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to.  The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 3.**     **Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Expert and Investigative Assistance under 18 U.S.C. § 3006A**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                              237                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985). Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." (18 U.S.C. § 3005 [emphasis added]). Mr. Barrett therefore had a right, as secured by statute, the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at the same level and to the same extent as provided or otherwise available to similarly situated persons.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert,

independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a

drug analyst, crime scene reconstruction expert, and a jury consultant.  The complete or partial

denial of these expert and investigative resources was prejudicial both individually and in

combination.

In addition to the denial of expert and investigative assistance afforded other

capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of

pretrial hearings, including hearings in which witnesses testified who would later testify at trial.

(Order filed 3/18/05 (Doc. 97) at 6-7.)  Mr. Barrett was plainly entitled to those transcripts

pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the

Administration of the Criminal Justice Act.  Effective trial counsel, or the trial judge, should

have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the

court reporter would normally be independently compensated through the Criminal Justice Act.

The trial court's decision to reject these Judicial Conference guidelines was arbitrary and

capricious.  The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial

counsel access to the trial court's *ex parte* communications with the prosecutors until it was too

late.  *See* Claim 1, *supra*.

Mr. Barrett had a history psychiatric treatment, including involuntary

hospitalization and forced medication with psychotropic drugs.  (Decl. George Woods).  Trial

counsel were aware, or should have been aware, of this history.  (*See* Doc. 208; Eastern State

Hospital Records of Kenneth Barrett; Muskogee County Jail Medical Records of Kenneth

Barrett; Decl. Roseann Schaye).  In addition, Mr. Barrett had a history of illicit drug use and of

head injuries.  Furthermore he has a multi-generational predisposition to developing serious

mental illness, including the bipolar disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Dec. Roseann Schaye; Dec. Myla Young; Dec. George Woods). Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions. (Decl. Richard H. Burr dated 4/4/05 (Exh. C to Doc. 107) at 4, 8). To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms. (ABA Guideline 10.4(C)(2)(a), as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator,

Def's § 2255 Mot.                    240                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments";  ABA Guideline 10.11(F)(2), counsel have duty to seek appropriate expert assistance).  *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Decl. Richard H. Burr).  "The standard practice in federal capital trials is to provide the services of more than one mental health expert." (Decl. Richard H. Burr, Exh. C to Doc. 107).  Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Decl. Richard Burr).

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence.  *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation.  *(Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97)).  Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases entail a higher level of due process, and contrary to

Def's § 2255 Mot.                              241                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. *(See* Order filed 3/18/05 (Doc. 97) at 3.)  Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. *(See* Doc. 50 at 5-6.)  Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour.  This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases.  (Dec. Richard H. Burr, Exh. C to Doc. 107, at 8).  The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants.  (Doc. 107).  That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. *(Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction.  (Doc. 50 at 8).  Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain

damage, and that he had suffered significant head injuries during his life.  *Ibid.*  Except to the

extent the assistance of such an expert was included in the authorization for a psychologist, the

court denied this request without explanation.  (Doc. 97 at 3).  This summary denial was highly

prejudicial to Mr. Barrett.  As the attached declaration of Myla Young, Ph.D., shows, Mr.

Barrett's history of head injury resulted in significant impairments in his functioning.  *See* Claim

2, *supra*.

> Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death

Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist

would require more than 333 hours and $5,000.00 in travel costs.  Counsel and the mitigation

specialist based this estimate on the knowledge gained in a preliminary investigation conducted

before Mr. Barrett's first state-court trial.  (Docs. 50, 107).  A mitigation specialist is an essential

member of the team in a capital case.  (ABA Guideline 10.7.)  Without explanation, the court

limited the mitigation investigation to 100 hours and no travel.[46]  As resource counsel informed

the court at the time,

> The number of hours requested by the defense is well below average.  The average
> number of hours worked by mitigation specialists in federal capital cases is 600
> hours.  In a number of cases, mitigation specialist services have exceeded 1000
> hours.  Investigating a client's life history thoroughly - through gathering and
> reviewing documents and interviewing scores of witnesses who are often difficult
> to find - and working with counsel and other experts to develop the themes of
> mitigation and the way in which mitigation will be presented, is extremely labor
> intensive.  The modest number of hours requested by the defense here reflects the
> hope that the mitigation investigation previously conducted, but not completed in
> the state prosecution will be of use in the current investigation.  Measured against
> the number of hours authorized for mitigation specialist services in every other

---

[46]  The court authorized "100 hours at $150.00 per hour" apparently without realizing that
the mitigation specialist counsel had consulted quoted a rate of $75 per hour.  *(See* Doc. 107.)

> capital case in which the death penalty has been authorized, the 100 hours
> approved by the Court is grossly inadequate.

(Decl. Richard H. Burr (Exh. C to Doc. 107) at 4).

The court's withholding of resources was highly prejudicial.  As shown in the social history presented in Claim 2, section B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4).  The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2). "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours."  (Decl. Richard H. Burr (Exh. C to Doc. 107) at 3).  The Court knew in fact that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  (Order filed 3/18/05 (Doc. 97) at 2 n.2).  The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense Service ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Decl. Steve Leedy).

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Def's § 2255 Mot.                                244                 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $ 200 per hour, in addition to $ 1,000 for lodging, travel and incidentals.  (Doc. 50 at 7).  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3).  Moreover, the court did not authorize any lodging or travel expenses at all whatsoever.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense.  *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

(a)     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

(b)     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

(c)     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

(d)     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)     Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings;

Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)     Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)     Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)    Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)     Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Report Edward Hueske).

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim.  Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial.  Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial.  The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Def's § 2255 Mot.                              248                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 4.**   **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under _Franks v. Delaware,_ 438 U.S. 154 (1978).  Appellate Counsel Was Ineffective for Failing to Raise the Issue on Direct Appeal**. .

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

As shown in Claim 2, _supra_, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under _Franks v. Delaware,_ 438 U.S. 154 (1978).  Suppressed _Brady_ material and other evidence gathered in

support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case _was_ Sanders.  _Illinois v. Gates,_ 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability,

and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict.  Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history

of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders lack of reliability, and Johnson himself intentionally ignored evidence of Sanders then-current drug usage, crimes of dishonesty, and Sanders inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.   Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Decls. of Rick Lunsford, Brandy Hill, Sally Davis Johnson, Janesse Thomas, Sean Hill, and Billy Poindexter.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's honesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption, including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence. Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced. In sum, Johnson and Sanders were birds of a feather: both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Decl. of Rodney Floyd.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false

statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime

Def's § 2255 Mot.                      253                      *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  Especially in light of the fact there were numerous issues raised on appeal that were reviewed under a plain error standard, because there had been no contemporaneous objection or record, it was professionally unreasonable to omit this issue, and to argue that the court erred in failing to conduct an evidentiary hearing.  Mr. Barrett was prejudiced by this omission.  *Strickland v. Washington,* 466 U.S. 668 (1984).  Decl. of Mark Henricksen.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent.  He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 5.     Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Conviction and Sentence Based on Newly Discovered Evidence**

Def's § 2255 Mot.                                      254                            *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

**Introduction**

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under

section 2255.  *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed.  Threats to witnesses to get them to cooperate with the Government were not disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children.  Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the

Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  *See* Claim 1.

Some of the evidence discussed below  was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  It could also be said that the Government sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  *See Giglio v. United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386 U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S.

103 (1959).  If the jury's verdict could be affected by false testimony presented by the

prosecution – as it surely was here – a new trial is required.

> **A.**     **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

> **1.**     **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences**

> **a.**     **Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah

and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In

examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would

speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation,

implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of

Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah

County cases, and more favors shortly thereafter, all due to a "plea agreement with feds."

Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's

trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to

Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing

the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion.

The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady*

evidence.

Of course, Sanders's alleged information was the basis upon which the no-knock

warrant secured by his alleged handler Clint Johnson was issued.  Sanders's testimony was

Def's § 2255 Mot.                                   259                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrent with similar dispositions in Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  (File in Sequoyah County Case CF-98-346.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (File in Sequoyah County Case No. CF-98-363.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (File in Sequoyah County Case No. CF-99-562.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. In CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (File in Sequoyah County Case No. CF-03-124.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement.  On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon

Def's § 2255 Mot.                                  261                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (File in Sequoyah County Case No. CF-04-19.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***."  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files (emphasis added).)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett''s trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

Def's § 2255 Mot.                                    262                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied.  Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview.  However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received.  (Decl. of Dale Anderson.)  This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim.  Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search

warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the

situation, it sponsored materially false testimony. *Giglio v. United States,* <u>405 U.S. 150</u> (1972).

At a minimum, the Government failed in its duty to correct false testimony. *Giles v. Maryland*,

<u>386 U.S. 66</u> (1966); *Alcorta v. Texas*, <u>355 U.S. 28</u> (1957).

### b.  Travis Crawford

During the investigation conducted for this 2255 motion, Mr. Barrett has

discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about

material matters.  Travis Crawford supplied testimony critical to the Government's case for

malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was

also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's

testimony was summarized in the claim regarding ineffective assistance of counsel in the first

stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11,

2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr.

Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years

before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended

that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for

his arrest on the  Sequoyah County drug charge.  (Decl. of Leonard Post.)

Mr. Crawford stated that he has anxiety and psychological problems, something

he was not cross-examined on at trial.  Although he was a long-time methamphetamine addict, he

told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before

finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding

Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Decl. of Leonard Post.)

Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Decl. of Leonard Post.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion

will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told

Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was

otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Decl. of

Leonard Post.)

Travis Crawford's recantation is corroborated by witnesses who were present at

Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Claim 2,

section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never

made such a statement.  (Decls. of Rick Lunsford and Brandy Hill.)

Because the Government and its agents knew or had reason to know that

Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he

testified at trial, the Government was obligated to disclose this information under *Brady.*  Due

process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs.  The same is true of at least some of the other

informant witnesses, whom Mr. Crawford states were high at the time of their testimony.

Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's

threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991,

998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to

murder of police officer, and failed to disclose material information as to who was seen carrying

the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he

had previously worked as a snitch for local law enforcement, setting up drug buys at the direction

of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated

that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. Decl. of Leonard Post. Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Decl. of Leonard Post.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Claim 2. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Decl. of Rodney Floyd.) This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply

Def's § 2255 Mot.                    267                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

assumed that having an active case meant the same thing as having an active arrest warrant. (Decl. of Leonard Post.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft. (Decl. of Leonard Post.)

A defense investigator reduced to writing what Mr. Crawford stated when he was interviewed. When the investigator presented the writing to Mr. Crawford, he refused to read it or "sign anything," siting the advice of his psychiatrist. (Decl. Leonard Post.) However, even in this tale, Mr. Crawford was caught in a contradiction. (*Id.* at 5.)

However, Mr. Crawford's parents, Roger and Phyllis Crawford, witnessed his recantation. They have signed declarations attesting to their son's statements to Mr. Post, statements which destroy the credibility of his trial testimony against Mr. Barrett. (Decls. of Roger and Phyllis Crawford.) Of course, as noted above, Mr. Post has also executed a declaration detailing Travis Crawford's recantation. (Decl. of Leonard Post.)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a

fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation

also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus

lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a

warrant out for his arrest.

<div align="center">

**c.      Cindy Crawford**

</div>

As outlined in the first stage ineffective assistance of counsel argument (Claim 2,

section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug

activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law

enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified

that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his

residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and

threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's

case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband,

Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs.

Post and Anderson.  (Decl. Leonard Post.)  Mr. Post's and Mr. Anderson's declarations detail

what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According

to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah

County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice

but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's

office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office.  (Decls. of Leonard Post and Dale Anderson.)

Armed law enforcement officers were also present during the interview.  They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her.  Littlefield told her she need to work with him and testify against Mr. Barrett.  Otherwise, she was going to prison.  Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case.  Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[47]  While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care.  Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview.  (Decls. of Leonard Post and Dale Anderson.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony.  Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him.  Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner.  Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Decls. of Leonard Post and Dale Anderson.)

---

[47]  Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property.  She had done drugs at Mr. Barrett's residence, but did not know who supplied them.  Ms. Crawford never bought drugs from Mr. Barrett.  Decls. of Leonard Post and Dale Anderson.

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Decls. of Leonard Post and Dale Anderson.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Decls. of Leonard Post and Dale Anderson.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Decls. of Leonard Post and Dale Anderson.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If

you had ever crashed from a meth high, you would know that you would not be in your right mind." (Decls. of Leonard Post and Dale Anderson.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2)  Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[48]  (Cindy Crawford medical records, filed under seal.)  According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out.  She admitted that when she is under stress, she may not perceive things correctly.  This causes her to exaggerate what is going on around her.  Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident.  At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it.  She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Decls. of Leonard Post and Dale Anderson.)

However, even Ms. Crawford's claim to have overreacted is a fabrication.  A readily available witness to the alleged event, Richie Barrett, states that neither the incident

---

[48]  Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

Def's § 2255 Mot.                    272                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Crawford described nor anything like it ever happened.  (*See* Claim 2; Decl. Richard Barrett; Decl. of Leonard Post.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats.  The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent.  To quote Ms. Crawford, "They [the Government] were very angry.  They scared me and threatened me."  Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case.  (Decls. of Leonard Post and Dale Anderson.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford.  Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect.  The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's

Def's § 2255 Mot.                                       273                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7ᵗʰ Cir. 1999). The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More seriously, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law. *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-04-63 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (File in Sequoyah County Case No. CF-04-63.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this

impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits for her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (File in Sequoyah County Case No. CF-08-224.)

### d.      Brandie Zane Price

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield,

Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, any drug related activity. (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy. *United States v. McAdams, et al.,* No. CR-07-16-RAW. The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007. Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving one delivery and as many as three deliveries a week. (Doc. 18, CR-07-16-RAW.) Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine. A plea agreement, in which Price agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-16-RAW.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-16-RAW.) She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*

Def's § 2255 Mot.                    276                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." News article, Ft. Smith Times Record. Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[49]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government. Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.    Karen Real

---

[49] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Def's § 2255 Mot.                               277                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[50] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) On April 25, 2005, the sentencing court reduced Real's

---

[50] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion)

sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody.  (Doc. 158 in Case No. 6:00-cr-21-FHS.)

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real.  The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  This Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

**f.      Randy Turman**

It was argued in Claim 2 that counsel was ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447, and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial.  Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let

him give false testimony anyway.  This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  This constitutes newly discovered evidence.

> **2.      The Government failed to reveal exculpatory evidence
> of a witness who failed to corroborate Charles Sanders**

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when

Def's § 2255 Mot.                                          280                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

**B.** **The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

**1.** **Evidence of Clint Johnson's illicit activities**

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have

Def's § 2255 Mot. 282 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office. Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed. Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Movant's case had been involved in a series of crimes involving the misuse of their office. On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had

acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances. He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (*In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.) In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him. (Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray). On November 23, 2005, Sheridan noted Johnson's

possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation.  (Log of events from November, 2005 to January, 2006 by Jeff Sheridan).  It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations.  In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT").  During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from

counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released funds seized from defendants to defense counsel, and then obtained kickbacks from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad checks as early as May, 2003. *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's lawyers; it is obvious they intentionally concealed it. Mr. Barrett's current counsel first learned of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case. Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's conviction. An evidentiary hearing was conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which

was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.)

However, Johnson stated that he had revealed the name of the C.I. to the United States

Attorney's Office.  (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in

criminal activity leading to formal charges.  (Tr. 1/ 26/05 Hr'g at 82-83.)  When counsel asked

Johnson whether the informant had been involved in other criminal activity since September

1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel

responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05,

Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s

identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of

course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was

the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to

commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The

Government did not want it brought out at the suppression hearing that Johnson's C.I. had

continued to commit crimes with impunity and was therefore an unreliable source.  The

Government, who had been informed of Sanders's identity, was well aware of the litany of

crimes he had committed since 1999, and knew that his identity was not being protected because

of an "ongoing investigation."  *(E.g., Giglio v. United States,* 405 U.S. 150 (1972).)

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug

transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning

drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that

I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Decls. of Rick Lunsford and Sean Hill.)  Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed.  By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.      David Michael Littlefield's illicit activities

Following Mr. Barrett's conviction

[United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff

Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Motion.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).  Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[51]  (Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of*

---

[51]  The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Def's § 2255 Mot.                                289                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

*Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  As of the date of the filing of Mr. Barrett's 2255 motion, the Bar action against Littlefield is still pending.

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.  The Bar Association action against him is still pending.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, but is also relevant to Mr. Barrett's claim of prosecutorial

misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Decl. of Janice Sanders.)

### 3.      John Philpot

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Decl. of Rodney Floyd.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime,

no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have discredited the seven snitches, some of whom claimed that were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot.  This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers.  Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

### Conclusion

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses,

were known and became known to the Government and its agents.  This evidence  was

unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this

evidence would have created a reasonable probability of a different outcome.  *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v.*

*Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have

been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and

would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the

seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various

prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because

these deals were in the works or promised all along, and because the prosecution's duty under

*Brady* is continuing – would have shown the various snitch witnesses to have no credibility

whatever.  *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in section

2254 case where exculpatory evidence, even if it could only be used for impeachment purposes,

was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir.

2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing

on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in

section 2254 case where prosecution failed to disclose material evidence impeaching a key

prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies

the prosecution's theory of intent and could have been used to impeach the credibility of other

witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been

known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

**C.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses. *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses. (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").) "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978). Thus courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.* Thus,

"counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness.  (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price.  Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor.  (Decl. Roger Crawford; Decl. Leonard Post.)  Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness."  The Government did not reveal the identities of its seven key witnesses until September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3592, the Government filed a baseless motion for a protective order.  The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense.  (Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of." *Id.* at 19.[52]

During an *in camera* the hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield was making inconsistent claims. On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because the Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because, the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b)

---

[52] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

Def's § 2255 Mot.                                     296                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact, information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.  *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

Def's § 2255 Mot.                              297                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.) The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present. *Id.* at 27. In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense. *See* Claim 1, *supra*. Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense. To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital

Def's § 2255 Mot.                    298                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

murder.  As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill.  As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*.  But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses.  It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

> **D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**

Throughout the penalty phase of Mr. Barrett's trial prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  *(See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutor's "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real

by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.)  As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object.  The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate.  Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

Def's § 2255 Mot.                              300                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)  The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[53] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[53] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[54], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify.  R. 5414-15.  *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them.  To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. R. 5415.  This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense

---

[54] This was a knowing false statement on the prosecutor's part.  As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett.  "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

enough to put them on the stand.  Sperling was well aware they *could not have testified by law* because the case never got past the first stage.

Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]."  R. 5419. The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  R. 5420-21.  There were additional comments on Mr. Barrett's supposed lack of remorse.  R. 5419-20, 5421-22.  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck, v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).  Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warned the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time."  (R. 5423.)  This was little better than telling the

jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.  *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections.  *See* Claim 2.  *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.*  This was not a runaway case for the death penalty.  The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

Prosecutorial misconduct was not raised on direct appeal.  Because the misconduct of the prosecutors in the second stage of trial was so glaring, no reasonable strategy excused the failure to raise the claim.  Based on the fact the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.** 	**Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot. 	305 	*U.S. v. Barrett,* 6:04-CR-115-JHP-SPS

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims.  *Rock v. Arkansas*, 483 U.S. 44 (1987).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986).  Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of

Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Police Report dated September 29, 1999.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards."  (R. 5356.)  With Mr. Barrett's expressions of remorse excluded, the United State Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer."  (R. 5423.)  During closing argument, Mr. Barrett's counsel argued, as a factor in aggravation, that Mr. Barrett expressed remorse for his crimes.  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.  *U.S. v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remores were highly relevant and admissible.  Remorse is "an important mitigating factor."  *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005).  *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument."  *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all.

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced

Def's § 2255 Mot.                              308                   *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the jury's verdict.  *Brecht v. Abrahamson*, *supra*, <u>507 U.S. 619, 638</u> n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel was ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina,* <u>476 U.S. 1</u> (1986); *Eddings v. Oklahoma,* <u>455 U.S. 104</u> (1982); *Lockett v. Ohio,* <u>438 U.S. 586</u> (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* <u>469 U.S. 387</u> (1985); *Strickland v. Washington,* <u>466 U.S. 668</u> (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.  Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr.

Def's § 2255 Mot.                                309                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape. The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use. Mr. Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal service. This

Def's § 2255 Mot.                                310                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Decl. Doris Barrett). In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances.  Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors.  The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient.  Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.**       **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel

in conducting the defense.  *Drope v. Missouri*, <u>420 U.S. at 172</u>; *see* <u>18 U.S.C. § 4241</u>.  Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, <u>517 U.S. 348</u> (1996); *Bouchillon v. Collins*, <u>907 F.2d 589</u> (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then.  *Odle v. Woodford*, <u>238 F.3d 1084, 1090</u> (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, <u>86 F.3d 796,802</u> (8th Cir. 1996); see, also, *Gilbert v. Mullen*, <u>302 F.3d 1166, 1178</u> (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, <u>110 F.3d 1508, 1519</u> (10th Cir. 1997).  Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Declaration of Myla H. Young, Ph.D., at ¶¶ 36-38;  Declaration of George W. Woods, Jr. M.D., at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Decl. of George Woods, Jr., M.D., at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated

by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (*Id.* at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which prevented Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at ¶¶ 59, 80.)

As discussed more fully in Claim 13 the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

Def's § 2255 Mot.                                    316                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice.  *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960).  The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty.  *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense.  This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder.  *Beck v. Alabama,* 447 U.S. 625 (1980).  *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter.  (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. section 1112.)  The United

States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury

could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational

jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United*

*States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent.  The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being.  The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent.  *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute.  The crux of the whole case was knowledge and intent.  The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties.  The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired.  This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial.*

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

It is truly inexplicable why this issue was not raised on direct appeal. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. Decl. of Mark Henricksen. Had this issue been raised, there is at

Def's § 2255 Mot.                    321                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 10.**   **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life.  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached on cross-examination.  As argued elsewhere in this Motion, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented.  Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred.  The trial ruling excluding such evidence treated the issue as one of guilt or innocence.  Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance.  Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime.  Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial.  For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.)  Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case). The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.** **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Def's § 2255 Mot.                                   326                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

All that is required for a juror to sit in a capital case is the jurors willingness to consider the range of punishment options.  A juror cannot be forced to commit that he or she will actually vote for the death penalty.  A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience.  So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and following the court's instructions, the juror is qualified to serve.  Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments.  *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]"

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life. Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration." Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty." The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" R. individual jury selection 824-25.

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  R. individual

jury selection 825-26.

The court asked additional death-qualification questions of the juror:

Q.      ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.      If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should

have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.      So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.      I understand that.

Q.      And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.       I would consider it, yes.

Q.      And, of course, when you say "consider it," couched in the –  in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.      Right.

Q.      – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on

what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.      I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.      Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.      Uh-huh.

Q.      And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  R. individual jury selection 829.  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes." R. individual jury selection 829-30.  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

Def's § 2255 Mot.                                330                        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The juror again stated she understood the court would not tell her what sentence to impose.  The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.)  Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]" the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this.  And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it.  So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this.  But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it.  So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad."  In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be."  (R., individual jury selection 832.)

Def's § 2255 Mot.                              331                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty.  Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

Q.      All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?

A.      I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.

Q.      Okay.  Well, at the end of the day –

A.      Okay.

Q.      – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?

A.      Like I say, it depends on what he has done and how bad I think it is And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.[55]

(R., individual jury selection 832-33.)

---

[55]  This is certainly a fair point.  The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder.  *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

Def's § 2255 Mot.                              332                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury. Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I would have to say no right now. I know no other thing except to say no, I could not sign it." (R., individual jury selection 834.)

What else could the juror say to such a question? This is on par with saying, as rational people would, that they could not convict until hearing the evidence. Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty. The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

Q.      ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

A.      Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.      And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.      Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly

Def's § 2255 Mot.                              334                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

she could consider the death penalty.   She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 12.**    **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt

standard governed the ultimate penalty determination in this case.  *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors.  *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances

that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating  factors outweighed the mitigating factors beyond a reasonable doubt.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

Def's § 2255 Mot.                              337                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instructions on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been grated a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause.  Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions.  Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contra indicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to

Def's § 2255 Mot.                    340                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

be here.  And then the marshals, you know, asked you if they could take him out.
Before that they were trying to put him back down in the chair.  His move as I saw
at that point was he was saying, you know, take me out of the courtroom.  I want
to get out of here.  It wasn't an aggressive move towards anybody, just he wanted
to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now."  (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes.  And at about that same time, the Defendant indicated he also wanted to leave."  (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals."  (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant."  (R. 5434.)

Mr. Hilfiger requested no instructions.  (R. 5434.)  When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other.  I don't object, I don't approve."  (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters.  (R. 5436-37.)  They recommended that his alleged desires regarding presence in court be revisited.  *Ibid.*  However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined.  (R. 5437.)  Trial counsel did not have a private conversation with

Def's § 2255 Mot.                                341                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal.  (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints."  (R. 5438.)  The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems."  (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him.  (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Mr. Barrett:   Yes, Your Honor.

The Court:   Do you have any questions of the Court about that?

Mr. Barrett:   No, sir.

The Court:   I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:   One more.  Does that include the verdict?

Mr. Barrett:   Yes, Your Honor.

The Court:   Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:   Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

> Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm is "to keep the client from making suicidal choices about the case."  (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems.  *See* Claim 2, *supra*.  Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regiment to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regiment interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and prepared him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regiment, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense.  Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail.  If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's ability to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings.  *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring).  Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the affects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity.  *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial.  The Confrontation Clause of the Sixth

Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the

right to be present during all critical stages of the case.  *Illinois v. Allen*, <u>397 U.S. 337</u> (1970).

Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*(Id.*, <u>397 U.S. at 343</u> [emphasis added]).  The trial court's order – which the court initially did not

reveal on the record – that marshals remove Mr. Barrett without warning did not comport with

the requirements of law.  (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding

Mr. Barrett's actions, was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As

reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give

the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the

marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice

of the jury having witnesses him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be

absent from court during the prosecutor's closing argument and the court's instructions violated

Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts

must indulge every reasonable presumption against the loss of constitutional rights." *Allen*,

*supra*, <u>397 U.S. at 343</u>, when it (a) ordered that Mr. Barrett be placed in additional restraints

besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right. Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself rom the courtroom during critical stages (closing argument, jury instructions) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless.  In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him.  His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts.  In the context of jury instructions, prejudice has been found wherever defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction.  See, e.g. *United States v. Rosales-Rodriguez,* 289 f. 3d 1106, 1110 (9th Cir. 2002).  Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction.  "I really don't care one way or the other."  (R. 5435.)   Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse.  *See Riggins*, 504 U.S., at 144 (Kennedy, J., concur.).  Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the

marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

> Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.).  Similarly,

Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his

absence.  Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error

from his absence devalues the constitutional right to be present, and ignores the assistance that a

defendant can provide to his counsel during trial.  If we were to require that a defendant show

with specificity how his presence might have changed the course or outcome of a trial, then the

right to be present would cease to exist in many cases in which the evidence of guilt is strong.

The right to be present at one's own trial is not that weak.  *See Riggins,* 504 U.S., at 137.

"Efforts to prove or disprove actual prejudice from the record before us would be futile, and

guesses whether the outcome of the trial might have been different [in the absence of drugging]

would be purely speculative."; *United States v. Novaton*, 271 F.3d. At 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the

additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present

in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts

Def's § 2255 Mot.                     348                *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the affects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury."  (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore."  (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem. The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues presented in this claim it is reasonably probably that the court would have found the numerous violation of federal law were not harmless beyond a reasonable doubt, or constitute plain error.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

Def's § 2255 Mot.                    350                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 14.** **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were

presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzalez, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[56]  (2007 Decl. of Kevin McNally)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (2008 Decl. of Kevin McNally.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.

---

[56]     Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

Def's § 2255 Mot.                                352                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."  (Decl. of Lauren Cohen Bell.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[57]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e.

---

[57]     Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim.  Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel was ineffective in failing to pursue and develop the issue.

Def's § 2255 Mot.                              353                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial b y a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

> "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16      Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury.  Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process.  Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment.  Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett her Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial.  Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Def's § 2255 Mot. 356 *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17     Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case**

Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due

Def's § 2255 Mot.                              357                              *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claim presented in this Motion individually justifies reversal , when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV.    Prayer for Relief

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1. Disqualify itself and have all proceedings regarding this Motion reassigned randomly to another judge;

2. That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

3. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4. Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

6. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

7. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8. Permit oral argument as appropriate and required;

9. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10. Grant such further and additional relief as may be just.

962

DATED:   March 15, 2009

Respectfully submitted,

 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

Def's § 2255 Mot.                         360                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

**APPENDIX A**

**PROCEDURAL HISTORY**

**I.     State Court Proceedings**

1.     On September 24, 1999, Movant was charged by Information in the District Court of Sequoyah County, Oklahoma with one count of first-degree murder and three counts of shooting with intent to kill. The information was subsequently amended to charge Movant with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. (Case No. CR 99-493, Garrett, J.)

2.     The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.     Movant was re-tried on the same charges in January and February of 2004. The jury rejected the first-degree murder charge and instead found Movant guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Movant guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Movant on the two counts of discharge of a firearm with intent to kill.

4.     On April 19, 2004, Movant was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively.

5.     Movant did not appeal his convictions or sentences.

6.     At both state trials, Movant was represented by John David Echols, Esq., and the State was represented by Darrell Dowty, Asst. Dist. Atty.

## II.   Federal District Court Proceedings

7.   On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.   On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

Def's § 2255 Mot.                    362                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.   On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.   On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.   The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper

Eales with malice aforethought).

12.   On November 9, 2005, the second-stage proceedings began.

13.   On November 17, 2005, at the conclusion of all the second-stage evidence,

the jury found, in pertinent part, that Movant was at least eighteen years

old at the time of the offenses of conviction, and that, with respect to each

of the three counts of conviction, he intentionally killed Trooper Eales.

14.   As for the statutory aggravating factors, the jury found, with respect to

Counts 1 and 2, that Movant killed or attempted to kill more than one

person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single

criminal episode, and committed the offenses after substantial planning

and premeditation to cause the death of a person. (The jury rejected the

statutory aggravating factor that Barrett knowingly created a grave risk of

death to persons other than Hamilton and Eales.) With respect to Count 3,

the jury found that Movant, in the commission of the offense or in

escaping apprehension for the offense, knowingly created a grave risk of

death to one or more persons in addition to Trooper Eales, and that

Movant committed the offense after substantial planning and

premeditation. As for the non-statutory aggravating factors, the jury found,

with respect to all three counts of conviction, that Movant caused injury,

harm, and loss to the victim's family, but rejected the government's

assertion that Movant was likely to commit criminal acts of violence in the

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count). All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for his crimes.

16. Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

17. On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

18. Movant filed a timely Notice of Appeal of his convictions and his death sentence to the United States Court of Appeals for the Tenth Circuit on December 28, 2005 (Case No. 06-7005).

19. Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these proceedings. The Government was represented by Sheldon Sperling, U.S. Atty. and D. Michael Littlefield, Asst. U.S. Atty.

III. Federal Court of Appeals Proceedings

20. In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

a. The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b.     Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c.     The district court allowed admission of improper victim impact evidence.

d.     The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.     The government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.     Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportional review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.     Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.     The government did not present sufficient evidence of "intent to kill."

Def's § 2255 Mot.                           367                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

     i.     The government failed to produce names and addresses of key witnesses.

     k.     The district court erred by failing to dismiss the indictment on double jeopardy grounds.

     l.     The government failed to follow the *Petite* policy.

     m.     Movant asserted cumulative error.

21. On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22. A timely Petition for Certiorari was filed on October 12, 2007.

23. The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24. Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

**APPENDIX B**

**INDEX TO EXHIBITS**

**NON-SEALED EXHIBITS**

<u>**VOLUME I**</u>

Exhibit 1          Marriage Certificate for A.J. and Ada Barrett

Exhibit 2          Marriage Certificate for Abe and Minnie Dotson

Exhibit 3          Marriage Certificate for Allen and Ida Real

Exhibit 4          Marriage Certificate for David and Carolyn Joseph

Exhibit 5          Marriage Certificate for Ernest and Sylvia Gelene
                   Barrett

Exhibit 6          Declaration of Rodney Floyd

Exhibit 7          Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8          Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9         Marriage Certificate for Sam and Ida Hatter

Exhibit 10         Marriage Certificate for Sam and Bessie Hatter

Exhibit 11         Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12         Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13         Declaration of Janesse Thomas

Exhibit 14         Declaration of Dale Anderson

Exhibit 15         Divorce File for Isaac and Marilyn Barrett

Exhibit 16         *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                   December 15, 1917 (Commitment to Penitentiary)

Exhibit 17         *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                   November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18     *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19     *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20     *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23     *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24     Declaration of David Autry

Exhibit 25     *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26     *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27     *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28     *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29     Declaration of Mark Henricksen

Exhibit 30     *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31     Declaration of Leonard Post

Exhibit 32     *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33     *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34     Declaration of John Echols

Exhibit 35     Excerpts from Kenneth Barrett's Baby Book

Def's § 2255 Mot.        370        *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Exhibit 36                Letter from Kenneth Barrett

Exhibit 37-58             Intentionally Left Blank, No Exhibits

Exhibit 59                *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60                *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                          Docket (Cultivation of Mari)

Exhibit 61                *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                          CF-97-00086

Exhibit 62                *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                          (Disposing of Mortgaged Property)

Exhibit 63                *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                          (Manslaughter in the First Degree)

Exhibit 64                Letter from John Echols to Honorable James H. Payne, dated February 28,
                          2005

Exhibit 65                Letter from Honorable James H. Payne to John Echols, dated February 22,
                          2005

Exhibit 66                Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67                Declaration of Julia O'Connell

Exhibit 68                *United States of America vs. Karen Real*, Case Number, Case Number
                          CR-00-21-FHS

Exhibit 69                *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                          2007

Exhibit 70                *Drug Offender Receives Break*, Times Record

Exhibit 71                Letter to the Editor, *She Questions Sheriff's Department*, dated October
                          17, 1999

Exhibit 72                *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73                Photographs of Kenneth Barrett's shack

Exhibit 74                Declaration of Ada Blout

Def's § 2255 Mot.                        371                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

974

Exhibit 75       Declaration of Alvin Hahn

Exhibit 76       Declaration of Billy Poindexter

Exhibit 77       Declaration of Brandy Hill

Exhibit 78       Declaration of Carolyn Joseph

Exhibit 79       Declaration of Dewey Padgett

Exhibit 80       Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81       Declaration of Ernest Barrett

Exhibit 82       Declaration of Frank Gordon

Exhibit 83       Declaration of Gwendolyn Crawford

Exhibit 84       Declaration of Issac Barrett

Exhibit 85       Declaration of Janice Sanders

Exhibit 86       Declaration of Kathy Trotter

Exhibit 87       Declaration of Linda Riley

## **VOLUME II**

Exhibit 88       Declaration of Mike Mackey

Exhibit 89       Declaration of Dr. Myla Young

Exhibit 90       Declaration of Paul Rickie Lunsford

Exhibit 91       Declaration of Phyllis Crawford

Exhibit 92       Declaration of Roger Crawford

Exhibit 93       Declaration of Ruth Harris

Exhibit 94       Declaration of Sally Davis Johnson

Exhibit 95       Declaration of Shawn Hill

Exhibit 96       Declaration of Toby Barrett

| | |
|---|---|
| Exhibit 97 | Declaration of Sylvia Gelene Dotson |
| Exhibit 98 | Declaration of Mark Dotson |
| Exhibit 99 | Declaration of Steve Barrett |
| Exhibit 100 | Declaration of Warren Dotson |
| Exhibit 101 | Declaration of Nona Reich |
| Exhibit 102 | Declaration of Carl Cook |
| Exhibit 103 | Declaration of Abby Stites |
| Exhibit 104 | Declaration of Richard Barrett |
| Exhibit 105 | Declaration of Doris Barrett, March 5, 2009 |
| Exhibit 106 | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson |
| Exhibit 107 | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 |
| Exhibit 108 | Excerpt from the Deposition of John Philpot |
| Exhibit 109 | Report by Edward E. Hueske |
| Exhibit 110 | Curriculum Vitae of Edward E. Hueske |
| Exhibit 111 | Declaration of Steve Leedy |
| Exhibit 112 | Declaration of Lauren Cohen Bell |
| Exhibit 113 | 2008 Declaration of Kevin McNally |
| Exhibit 114 | Declaration of Rodney Floyd |
| Exhibit 115 | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 |
| Exhibit 116 | 2007 Declaration of Kevin McNally |
| Exhibit 117 | Declaration of Dr. George Woods |

Exhibit 118          Declaration of Roseann Schaye

**SEALED EXHIBITS**

Exhibit 119          Birth Certificate of Kenneth Barrett

Exhibit 120          Birth Certificate of Sylvia Gelene Dotson

Exhibit 121          Birth Certificate of Richard Barrett

Exhibit 122          Birth Certificate of Toby Barrett

Exhibit 123          Birth Certificate of Stephen Barrett

Exhibit 124          Death Certificates of Allen M. Real and Allen
                     Cleveland Real

Exhibit 125          Death Certificate of A.J. Barrett

Exhibit 126          Death Certificate of Ada Melton Barrett

Exhibit 127          Death Certificate of Albert Maxwell

Exhibit 128          Death Certificate of Billy Maxwell

Exhibit 129          Death Certificate of Hattie Dotson

Exhibit 130          Death Certificate of Death Certificate of Hugh Dotson

Exhibit 131          Death Certificate of Ida Melton

Exhibit 132          Death Certificate of Isaac Barrett

Exhibit 133          Death Certificate of Mary Barrett

Exhibit 134          Death Certificate of Minnie Andrews

Exhibit 135          Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136          Educational Records for Kenneth Barrett

Exhibit 137          Educational Records for Gwendolyn Barrett

Exhibit 138          Educational Records for Ernest Barrett

Exhibit 139       Medical Records for Carolyn Joseph

Exhibit 140       Medical Records for Kathy Trotter

Exhibit 141       Medical Records for Brandy Hill

Exhibit 142       Medical Records for Toby Barrett

Exhibit 143       Medical Records for Travis Crawford

Exhibit 144       Medical Records for Cynthia Crawford

Exhibit 145       Medical Records for Linda Riley

Exhibit 146       Medical Records for A.J. Barrett

Exhibit 147       Medical Records for Kenneth Barrett

Exhibit 148       Report of Interview with Kenneth Barrett by the Oklahoma State Bureau
                  of Investigation, dated October 11, 1999

Exhibit 149       Marriage Certificate for Ernest and Diana Barrett

Exhibit 150       Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151       Divorce File for Kenneth and Abigail Barrett

Exhibit 152       *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153       *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154       *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155       Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156       *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157       *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158       *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159       *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160       *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Def's § 2255 Mot.                    375                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2204-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
                     Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
                     *State of Oklahoma vs. Richard Loy Gray* and Exhibits

| | |
|---|---|
| Exhibit 182 | Bill Ed Rogers's File |
| Exhibit 183 | *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111 |
| Exhibit 184 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503 |
| Exhibit 185 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 |
| Exhibit 186 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 |
| Exhibit 187 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 |
| Exhibit 188 | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 |
| Exhibit 189 | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 |
| Exhibit 190 | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 |
| Exhibit 191 | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 |
| Exhibit 192 | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 |
| Exhibit 193 | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 |
| Exhibit 194 | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999 |
| Exhibit 195 | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 |

**VERIFICATION UNDER PENALTY OF PERJURY**

My name is Tivon Schardl.  I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a supervising assistant federal defender in the Capital Habeas Unit of the Federal Defender Office for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I am filing the motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents prepared during investigation of this Motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this Motion.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

Def's § 2255 Mot.                                   378                     *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

I declare, under penalty of perjury, that the foregoing is true and correct.

/s/  Tivon Schardl
Tivon Schardl

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 61**

_____

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Sequoyah - **County Last Updated: 03/13/2009 08:00** |
| **Case:** | CF-97-00086<br>STATE OF OKLAHOMA vs. BARRETT, KENNETH EUGENE |
| **Date Filed:** | 03/24/1997 |
| **Amount Owed:** | $0.00 (as of 03/13/2009 08:00) |

## OFFENSE

UNLAWFUL DELIVERY OF CONTROLLED DRUG

| Parties | |
|---|---|
| Defendant | BARRETT, KENNETH EUGENE - VIAN OK |
| Attorney | ECHOLS, JOHN DAVID - TULSA OK |
| DA | DISTRICT ATTORNEY OF SEQ. CO - SALLISAW OK |
| Officer | BLOUNT, LARRY - SALLISAW OK |
| Judge | PAYTON, JEFF |
| Agency | SALLISAW POLICE DEPT. - SALLISAW OK |

| Case Entries | | |
|---|---|---|
| **Date:** | **Case Entries** | **Amount** |
| 03/24/1997 | PRE COMPUTER | |
| 08/04/1997 | FILE IS READY FOR INSPECTION | |
| 08/27/1997 | CM: DMS DEF. APPEARS W/ATTY ROGERS, STATE REP. BY BARNES, CASE SET THIS DATE FOR PREL; WITNESSES SWORN, TESTIMONY HEARD, DEF. BOUND OVER FOR TRIAL, DCA SET FOR OCT 9, AT 1:30 P.M. BEFORE JCG. 27-84 | |
| 10/09/1997 | CM: JCG STATE APPEARS BY S BARNES, DEF WITH ATTY B. ROGERS. DEF ENTERS PLEA NOT GUILTY. SET FOR NEXT JURY DOCKET. 27-148 | |
| 10/16/1997 | TRANSCRIPT OF PROCEEDINGS PRELIMINARY HEARING HAD ON THE 27TH DAY OF AUGUST 1997 BEFORE JUDGE SPROUSE-1 ORIGINAL | |
| 06/12/1998 | LETTER FROM EASTERN STATE HOSPITAL (FILED IN WRONG CASE SHOULD BE FILED IN CF-98-86 ST VS. PAUL E. WARFORD) | |
| 09/02/1998 | LETTER FROM DA TO ATTY K.BARRETT | |
| 09/02/1998 | MOTION TO PRODUCE | |
| 09/03/1998 | SUBPOENA ISSUED BACK TO DA | |
| 09/08/1998 | MOTION FOR EX PARTE HEARING | |
| 09/11/1998 | MOTION TO WITHDRAW | |
| 09/14/1998 | ORDER FOR HEARING 9/24 AT 9AM. | |
| 12/14/1998 | APP FOR COURT APPT ATTY | $40.00 |
| 01/19/1999 | SUBP'S ISSUED-5 ST | |
| 01/27/1999 | CM: AJH; DEFENDANT FAILED TO APPEAR FOR JURY TRIAL. BENCH WARRANT. 29-17 | |
| 01/28/1999 | B/W ISSUED | $20.00 |

| | | |
|---|---|---|
| | (Entry with fee only) | $5.00 |
| 09/27/1999 | BW FILED | |
| 02/24/2000 | SUBPOENA'S ISSUED (5) ST | |
| 02/25/2000 | LETTER FROM DA TO ATTY | |
| 03/01/2000 | ENTRY OF APPEARANCE -ECHOLS | |
| 03/01/2000 | OBJECTION TO 22 O.S. | |
| 03/06/2000 | MOTION TO CONTINUE TRIAL SETTING | |
| 09/18/2000 | ORDER FOR HEARING, JURY TRIAL | |
| 04/29/2004 | NOTICE OF APPOINTMENT OF SPECIAL VOLUNTEER ASSISTANT DISTRICT ATTORNEY | |
| 05/17/2004 | ENTRY OF APPEARANCE | |
| 05/24/2004 | MOTION FOR ORDER PROHIBITING THE APPEARANCE OF PURPORTED SPECIAL PROSECUTORD AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 06/24/2004 | MOTION FOR OARDER PROHIBITING THE APPEARANCE OF PURPORTE SPECIAL PROSECUTORS AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 02/03/2005 | COURT MINUTE-ORDER | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/22/2007 | CM: JP DISMISSED AS MOOT. 39-112 | |
| 03/16/2007 | DISMISSING COSTS | $-20.00 |
| | (Entry with fee only) | $-5.00 |
| **Total:** | | **$40.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 01/28/1999 | | Date Action: ISSUE BENCH WARRANT FAIL TO APPEAR Completed : 09/27/1999 |
| 02/03/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/18/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/10/2006 | 1:30P | Date Action: DISPOSITION DOCKET |
| 02/22/2007 | 1:30P | Date Action: PAYTON HEARING CRIMINAL |
| 02/22/2007 | | Date Action: ST DISMISSED/SETTLED |

| Date: | Receipts: | Amount: |
|---|---|---|
| 12/14/1998 | R1-011914 BARRETT, KENNETH EUGENE | $40.00 |

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## EXHIBIT 62

---

# CRIMINAL APPEARANCE DOCKET

### SEQUOYAH COUNTY, OKLAHOMA

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 300 5 | STATE OF OKLAHOMA vs Tom Dotson | Disposing of Mortgaged Property | Ed. J. Armstrong |

| DATE 1938 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSE-MENTS |
|---|---|---|---|---|---|---|---|
| Sept 8 | Docket Fee | 2 00 | | | | | |
| " " | To file Transcript | 10 | | | 1 85 | | |
| " " | To file & record Bond | 1 10 | | | | | |
| " " | To file & record Information | 1 10 | | | | | |
| Oct 27 | case continued for the term – Book 2 page 341 | | | | | | |
| 11-21-41 | case Dismissed B. 2. P. 362 | | | | | | |

KEB503071

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

_____

**EXHIBIT 63**

_____

# CRIMINAL APPEARANCE DOCKET
### SEQUOYAH COUNTY, OKLAHOMA

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| NO. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 2763 | STATE OF OKLAHOMA vs Tom Dotson & Hooley Dotson | Man-slaughter 1st degree | J. Fred Green |

| DATE 1933 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSE-MENTS |
|---|---|---|---|---|---|---|---|
| Dec 8 | Docket fee | 3 00 | | | | | |
| " " | To file transcript | 10 | | | | | |
| " " | " " record Information | 1 10 | | | | | |
| Feb. 22 | Issue alias Warrant Hooley Dotson | 50 | | | | | |
| " 28 | " file Warrant & enter sheriff's ret. | 20 | | 9 00 | | | |
| Mar. 26 | " " Motion to set aside plea of Guilty — | 10 | | | | | |
| " " | " " & record appearance Bond — | 1 10 | | | | | |

KEB503068

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

═══════════════════════════════

**EXHIBIT 64**

═══════════════════════════════

# *John David Echols*                       *Attorney at Law*

SUBMITTED *EX PARTE* AND UNDER SEAL

*VÍA HAND DELIVERY TO THE CLERK*          Monday, February 28, 2005

Honorable James H. Payne
Chief Judge
Eastern District of Oklahoma
101 N. 5th Street
Muskogee, OK  74401

<div align="center">

In Re:  US v. Barrett
EDOK Case No. CR-04-115-P
</div>

Your Honor:

Thank you for your letter of February 22, 2005.  For mutual convenience, I am responding to your inquires in the order in which they appear in your letter.

1.      Savings due to prior representation.

The budget which I submitted was based in part on materials which I received from Federal Death Penalty Resource Counsel, and from review of materials on the FDPRC website, capdefnet.org.  These materials indicate that the time I "budgeted" for attorneys is in line with the time and fees expended in other federal capital prosecutions.[1]

In my view, the principal advantage from my prior representation of Mr. Barrett is not that I can represent him more cheaply, but that I can represent him more effectively.  Having said that, I do believe that another attorney without my case-specific experience would need to expend a great deal of additional time and effort absorbing the unique history of the case as it played out in state court.

I found it very difficult to predict the time, particularly to break it down into categories as I was ordered to do.  It may well be that my estimates are overly pessimistic.  However, from my perspective, I believe that the proposed budget for attorney time does take into account the fact that I am not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts.  I also know that whatever the budgeted amounts, the Court will have an opportunity to review the actual time expended prior to approval.[2]

2.      Fair compensation.

The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour.  The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the

---

[1]     In addition, in my experience it is generally more expensive in time and effort to move a case quickly on all fronts, than to allow the case to proceed in a more linear way.

[2]     The entries for Mr. Hilfiger were based on projections he provided.  As noted in our Sixth and Seventh *Ex Parte* motions, I broke the attorney budget out from the experts budget so that consideration of attorney fees would not delay presentation of the experts portion to the Circuit Court of Appeals.

---

**Bank of America Bldg., Suite 2112**                                **Voice: 918.299.3802**
**P.O. Box 701196**                                                  **Fax:  918.299.9765**
**Tulsa, OK  74170-1196**                                  **defender@pianosa.com**

KEB013596

Honorable James H. Payne
February 28, 2005
Page 2 of 6

OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.

I received approximately $72,229.00 for the first state court trial, although the bulk of this was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.

In both trials, I bore the expenses of my own secretary, and staying in Sallisaw. I also believe that the time which I recorded and submitted to OIDS was at least 20% low, particularly through the first trial.

In the first trial, OIDS hired or provided the following to assist me:[3]

- an outside investigator, Jim Allison. Mr. Allison was paid approximately $10,000. However, he became seriously ill before the first trial and was not able to participate fully, and OIDS agreed to assign two of its "in house" investigators, Steve Leedy and Jack Stringer to assist me as the case developed to trial.

- an outside mitigation investigator, Roseanne Schaye. Ms. Schaye received approximately $20,000 for her services, but she abruptly resigned prior to the first trial because she was not given an additional unlimited budget authorization. She then refused to submit a summary of her findings and/or tasks remaining unless OIDS paid her an additional $4 or $5,000 fee. Steve Leedy, listed above, retrieved the documents she had accumulated and assumed her responsibilities.

- a SWAT team tactics expert, Monroe Earl Simpson. Mr. Simpson received approximately $5,000 for his services. He was available to testify, but we elected not to present any defense witnesses. I was also very disappointed in the quality of his work, and did not request the use his services for the second trial.

- a psychologist, Faust Bianco. Mr. Bianco charged $150 per hour for testing and evaluating Mr. Barrett. I believe his compensation was under $4,000 for the first case. Mr. Bianco and Ms. Schaye disagreed completely concerning Mr. Barrett's mental well being. OIDS in house psychologist Kathy Lafortune, who is also an attorney, was then involved in the case and was prepared to testify in any second stage proceeding.

- a forensics expert, Ron Singer. Mr. Singer was retained with a $5,000 budget, but because the case took so long to bring to trial, he was compelled to withdraw before he devoted any specific time to the case. OIDS then provided the use of two of its in house

---

[3]   I do not have available the hourly billing records for the outside experts, but I believe these estimates based on my recollection are reasonably accurate. The OIDS in house employees are salaried and did not submit time records through me. Also, this reflects only the OIDS staff members who were specifically assigned significant duties for the defense. Throughout the two trials, many other OIDS lawyers and employees consulted with us whenever we requested.

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

KEB013597

Honorable James H. Payne
February 28, 2005
Page 3 of 6

forensics experts, Laura Schile for scientific issues, and Lisa Cooper for issues relating to weapons, trajectory analysis and the like. Ms. Cooper sat with me at counsel table throughout both trials.

• a jury consultant, Ernest Harper. Mr. Harper was an in house OIDS employee who specialized in the use of a computer database as an aid to jury selection. Mr. Harper worked with us for approximately two weeks, and returned to other duties after *voir dire*.

In the second trial, and at our specific request, OIDS agreed to assign the same "in house" personnel to the case.[4] In addition, OIDS contracted with Ed Hueske, in place of Mr. Singer, and Jeannie Russell, in place of Mr. Bianco. Mr. Hueske was paid approximately $4,000 for forensic testing and consultation, and he was present and ready to testify concerning weapons related issues if needed. Ms. Russell tested Mr. Barrett, consulted with me, and was prepared to testify in a second stage proceeding. She worked principally with my second chair, Jack Gordon, Jr.. I do not have a clear recollection of her total billings, but I believe they were less than $5,000.

3. Legal research.

You are correct that we reviewed many similar legal issues in the state court trials. However, I believe that the dynamics of the state court cases differ considerably from this federal case. Judge Garrett preferred to discuss anticipated legal issues informally with the prosecution and defense. For example, in discussing issues relating to jury selection and search and seizure, he would "telegraph" his anticipated ruling based on his understanding of the law. Knowing his position in advance, on issues for which he indicated he would rule against us, we concentrated on being certain that a proper record was made to preserve the issue for any prospective appeal. While this required significant preparation, it was not what I would term "thoroughly" researched.

This was true in relation to death penalty issues as well. His position was known, based upon our discussions and his own experience in capital trials. Moreover, Judge Garrett had ruled that, in the event of a first stage verdict of guilty as charged, there would be at least a two week delay before the beginning of any second stage proceeding.[5] We deferred finalizing our position on these issues until and unless that became necessary. For example, although we prepared drafts, we never presented finalized second stage proposed instructions to Judge Garrett in either trial.

In just the past week, the FDPRC counsel have provided me with two resent opinions from other federal district courts which total almost 300 pages in length. Both opinions, *U.S. v. Sampson*[6] and *U.S. v. Johnson*,[7] emphasize the limited amount of clear precedent concerning

---

[4] Steve Leedy, Jack Stringer, Kathy Lafortune, Laura Schile, and Lisa Cooper. By the time of the second trial, Mr. Harper was no longer with OIDS, and he was replaced in the jury selection role by another OIDS employee, Angie Cole.

[5] This hiatus between first and second stages is, in my opinion, a sound concept, even if second stage legal issues are resolved prior to the first stage.

[6] District Judge Mark L. Wolf, USDC Massachusetts, Cr. No. 01-10384-MLW, issued August 26, 2004.

[7] Chief Judge Mark W. Bennett, USDC Northern District of Iowa, No. CR 01-3046-MWB, issued on February 18, 2005.

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK 74170-1196

Voice: 918.299.3802
Fax: 918.299.9765
defender@pianosa.com

992

KEB013598

Honorable James H. Payne
February 28, 2005
Page 4 of 6

federal death penalty law, and the subtle distinctions between §848 provisions and the balance of federal death penalty law. We will be in large part "writing the book as we go," and in my view this is a more demanding task than locating and following [or objecting to] clear precedent. Add in possible *Apprendi*, *Blakely* and *Booker* issues, and I believe we will need to do far more than merely "update" the previous research.

4.      The use of an investigator.

When I first approached the budgeting issue, I basically thought as you have suggested. However, by the time of my first conference with Magistrate Shreder, I had begun to realize that we are not receiving the same level of cooperation from the United States Attorneys Office that we did from the state court prosecutors.[8] I also became increasingly aware that the government hopes to hang the "drug king pin" label on Mr. Barrett even though the search after his arrest revealed little other than a modest amount of precursors and trace amounts of methamphetamine.

Judge Garrett indicated early on that he considered drug abuse testimony to be troubling because of its potential for prejudicial impact. While drugs were referred to frequently, the only "druggie" whom the state called to testify, was Steven Carl Smith, who got no further than a hearing outside the presence of the jury, in which he admitted that he had committed perjury during that very hearing. Judge Garrett ordered him arrested for perjury and the state then withdrew its notice of intention to call him.[9]

The drug culture in southeastern Oklahoma is both elusive and ingrained. Throughout both state court trials we received rumors of all sorts concerning organized criminal activities and political corruption. Those rumors continue, and a thorough fact investigation could conceivably turn up evidence that Mr. Barrett was targeted not for drug activities, but in retaliation for his having angered local criminal interests.

In my opinion, we will need to be more informed generally about the drug evidence. As soon as we succeed in learning the identity of the government's intended witnesses, we will need to be thoroughly informed about those individuals and their relationship to organized criminal activities and law enforcement agencies.

With respect to the relative costs of fact investigators vs. mitigation investigators [with fact investigators less expensive], I based my opinion on my prior experiences along with anecdotal information from other attorneys. When I sought mitigation services before the first trial, most of the recognized mitigation specialists received fees in the $100 to $150 per hour range. Ms. Schaye was a "beginner" with little experience, but a good resume. She agreed to work for OIDS for $70 per hour, but as I indicated above, she was just beginning in the business and agreed to a lower than usual rate.

---

[8]   The state court prosecutors made all of their witnesses and evidence available to us at our request. In contrast, the government has refused virtually every informal discovery request, and has simply refused to reply to our request that they be responsible for summoning the law enforcement witnesses to hearings or trial.

[9]   In a typical miscarriage of justice, Mr. Smith plead guilty and was placed on an illegal suspended sentence with the concurrence of the prosecutors and the Drug Task Force. This for a man who had admitted committing perjury in a capital case!

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax: 918.299.9765**
**defender@pianosa.com**

993

KEB013599

Honorable James H. Payne
February 28, 2005
Page 5 of 6

I also note that Inquisitor, Inc., the agency which I have requested, charges only $75 per hour, which is lower than I anticipated, but still higher than the rate of $50 per hour requested for Mr. Eberle. There is still a differential, but it is smaller than I anticipated.

5.      The existence of a clear plan for the defense.

I believe that my previous comments address this issue for the most part. Also, while I do think that we have a clear idea of the foundation of Mr. Barrett's first and second stage defenses, I continue to disagree that this knowledge allows me to predict, "how much time [I] plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case."

I also note that in both trials, the state court prosecutors endeavored to present a complete picture to the juries. They basically called all available witnesses. I do not expect the government to simply retry the case that has twice failed to convince a jury that Mr. Barrett intended to kill anyone. They will, in my opinion try a bare bones case that barely, if at all, touches on the statutory elements. It will therefore fall to us to give the jury the complete truth, a task which will take more time and effort than relying on cross-examination.

6.      Ex-parte proceedings.

With respect to particular experts who will be either interacting with the government [such as receiving evidence for independent testing] or certainly testifying at trial, I agree that disclosure of the name of that person *after they have been approved* will not damage Mr. Barrett. However, the disclosure of the justification advanced for each individual expert would necessarily disclose privileged attorney client information. Moreover, I think that if an expert of one sort or the other is approved, and the name and general purpose of the expert is revealed to the government, then the Court could entertain any government objection before the requested funds have been entirely expended.[10]

Generally, exposing Mr. Barrett's attorneys' plans and strategies infringes on his Sixth Amendment rights, and could irreparably harm his defense. I believe also that this is the reason the government has not objected to *ex parte* proceedings concerning the funding of his defense.

7.      Finally, I would like to respectfully express something of my own views about this process.

I am frankly concerned that Mr. Barrett cannot wait much longer to engage the requested experts if we are to be expected to meet the Court's present schedule. Recognizing your responsibility to protect the public purse, it may be that we are simply attempting to meet a schedule which is unrealistic.[11]

---

[10]     With respect to psychological or physiological experts, even the identity of the approved expert should not be revealed until we determine to give notice under Rule 12.2.

[11]     I won't expand upon this point here, because the government is not privy to this correspondence. However, Mr. Littlefield has expressed similar concerns, particularly concerning the transcript of the second trial.

---

**Bank of America Bldg., Suite 2112**                          **Voice: 918.299.3802**
**P.O. Box 701196**                                            **Fax:  918.299.9765**
**Tulsa, OK 74170-1196**                                       **defender@pianosa.com**

994

KEB013600

Honorable James H. Payne
February 28, 2005
Page 6 of 6

I am also concerned that Your Honor may view these budgets and budgeted amounts as being set in stone, or a ceiling above which Mr. Barrett's defense should or may not go. This cuts both ways, and it may be that I have subconsciously over estimated some items out of concern that Your Honor will not take kindly to "upward departures." Then again, I have also been instructed that I am to make this case my "highest priority," which I am endeavoring to do.

I was literally sickened when informed by a reporter that the September 23, 2004, Complaint had been filed on the day the statue of limitations ran for drug offenses. From our perspective, this case should never have been filed, and zero dollars should have been needed for this defense. Nevertheless, there is a small constituency to which the government responds that insists on a third trial, and then possibly a fourth or even a fifth if this one doesn't turn out as they wish. Based on what we know now, our sincere efforts to convince the government not to file [Petite Policy] and not to seek the death penalty [Authorization by the Justice Department] amounted to a fool's errand. We anticipate that the government will continue to present one public face to the Court and the defense, while seeking every fair *and unfair* advantage.

I appreciate the opportunity to respond to your concerns. My strong preference would be that we continue to communicate our concerns to one another, and that, on Mr. Barrett's behalf, we be granted the flexibility to alter and amend our plan as the case progresses to trial.

Sincerely,

John David Echols

JDE:am
cc: Roger Hilfiger

---

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

995

KEB013601

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

## EXHIBIT 65



## UNITED STATES DISTRICT COURT
### EASTERN AND NORTHERN DISTRICTS OF OKLAHOMA

February 22, 2005

Chambers of
JAMES HARDY PAYNE
Chief Judge
Eastern District of Oklahoma

!OI N. 5th Street, Muskogee, OK 74401
P.O. Box 2459, Muskogee, OK 74402
(918) 684-7940 (phone)
(918) 684-7941 (fax)

Mr. John David Echols
Attorney at Law
P.O. Box 701196
Tulsa, OK 74170-1196

      Re:     *United States of America* v. *Kenneth Eugene Barrett*
               Case No. CR-04-115-P

Dear Mr. Echols:

I have reviewed a copy of the eight ex parte budget requests you have submitted in the above referenced case. After reviewing your preliminary litigation budget, I have several questions I would like you to address prior to any action being taken in this matter.

First, while I recognize this is a death penalty case, the total number of hours you estimate will be expended is more than four times the number of hours billed in the most complex criminal case that has come before this court to date. Because you have defended Mr. Barrett in two earlier state prosecutions based on the underlying facts of this indictment, it was my understanding from both you and the Public Defender there would be a substantial savings in the amount of time that would be required for you to represent the defendant. Specifically, what, if any, savings do you foresee because of the previous trials? Further, how are those savings reflected in the proposed budget now before the court?

Second, the statute requires that I establish the amount of compensation necessary to provide "fair compensation." In order to determine the amount of compensation that would be fair in this particular case, I am requesting that you advise me of the amounts paid for you to represent Mr. Barrett in each of the two previous state trials, including the number of hours that was billed to the Oklahoma Indigent Defense System for each of those trials. Additionally, I would like to know the amounts paid for experts and investigators in each of the state trials and how many hours work was required by each expert and investigator?

Third, the number of hours you have requested for legal research on items such as search and seizure, jury selection, and the death penalty appear to be issues that undoubtedly would have been researched thoroughly prior to the state court trials. Can you explain why you would need to do anything other than update your previous research? From what I understand of this case, the facts are the same. The only difference is the federal criminal statute which your client is now charged with violating. Why do you need anything other than updating your previous research?

KEB010540

Mr. John David Echols
February 22, 2005
Page Two

Fourth, other than service of subpoenas, for what purpose do you anticipate using an investigator? Can you not use the documents which you obtained through the state court investigators? Also, you have indicated a fact investigator will charge less than a mitigation investigator. In addition, please explain why you anticipate a higher per hourly rate for the mitigation investigator vs. the fact investigator.

It appears the Magistrate Judge has, on at least two occasions, advised you that your budget request should be specific enough for this court to determine what legal services you intend to provide. While Judge White entered an order, prior to my assignment of this case, authorizing all motions and pleadings to be filed ex parte and under seal, this court is prepared to modify that order if counsel does not disclose sufficient information to justify the budget submitted. See 18 US.c. ¬ 3006A(d)(4)(D). To the extent you have dealt with what I believe to be the essential facts of this case in two state prosecutions, I assume you have developed a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case).

Finally, regarding your Sixth Motion for Funding of Expert, 21 US.C. ¬ 848(q)(9) provides "[n]o ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality." As I understand the history of this matter, you have litigated the central facts of this case in two state court proceedings, using many of the experts you are now requesting authority to engage. What, if anything, is unique about the federal case that would prevent disclosure of your intent to rehire the same individuals (e.g., would such revelation divulge attorney/client privilege or work product)? See 18 US.C. ¬ (d)(4)(D). It appears this information might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility and perhaps allowing the court to rule on the admissibility issues prior to expenditure offunds for experts which might not be allowed to testify at trial.

I request you give this inquiry your earliest possible attention.

Sincerely,

James H. Payne

cc:    Mr. Roger Hilfiger
Attorney at Law
P.O. Box 791
Muskogee, OK 74402

998

KEB010541

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
        )
        *Plaintiff,*    )
        )
v.        )    **Case No. 6:04-CR-00115-JHP-SPS**
        )
KENNETH EUGENE BARRETT,    )
        )
        *Defendant.*    )

---

**EXHIBIT 66**

---

*Exhs. § 2255 Motion*        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP



INVESTIGATIVE SERVICES

364 SOUTH FRONT STREET
MEMPHIS, TN 38103
PHONE (901) 526-6576
FAX (901) 523-9281

September 24, 2008

Mr. Tivon Schardl
Asst. Federal Defender
Office of the Federal Defender
Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA 95814

Re: *United States vs. Kenneth Eugene Barrett*
CR 04-115-JHP

Dear Mr. Schardl:

After our conversation this past Friday and receipt of your letter dated September 18, 2008, we have checked our records and have no record that we ever conducted any investigative work on behalf of Kenneth Barrett. I have spoken with Glori Shettles, one of our mitigation specialists, and she recalls receiving a telephone call from an Assistant Federal Defender in Oklahoma informing her that the Assistant Federal Defender was going to recommend Ms. Shettles' services to John Echols. I also recall having a brief conversation with Mr. Echols where he also expressed a desire to use our services; however, we heard nothing further from him.

I am sorry, but at this point we have no records in our office regarding Kenneth Barrett. If I can be of further service, please do not hesitate to contact me.

Sincerely,

Ronald L. Lax

RLL:nb

1000

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 67**

## DECLARATION OF JULIA O'CONNELL

I, Julia O'Connell, declare the following:

I am currently the Federal Defender for the Northern and Eastern Districts of Oklahoma. I am licensed to practice law in the State of Oklahoma, the various federal district courts in Oklahoma, and the United States Court of Appeals for the Tenth Circuit.

I am familiar with issues surrounding the appointment of counsel for Kenneth Eugene Barrett in his federal capital trial in the Eastern District of Oklahoma. At the time Mr. Barrett was charged, I was an Assistant Federal Defender. Paul Brunton was the Federal Defender for the Northern and Eastern Districts. When Mr. Barrett was initially charged, we received notice that the Court intended to appoint our office to represent him. Mr. Brunton and I met with Judge Payne regarding Mr. Barrett's representation, because we did not feel our office could effectively represent Mr. Barrett, due to the fact that our office was very small and we were already appointed in another death penalty case that we were preparing for trial. *United States v. Edward Leon Fields,* No. CR-03-73-RAW. The *Fields* case was taxing our office resources and I was the only trial lawyer in the office with death penalty trial experience. We explained to Judge Payne that we did not feel it was feasible for our office to effectively represent Mr. Barrett because I was already representing Mr. Fields in his pending capital case.

Mr. Brunton and I asked that John Echols— who represented Mr. Barrett throughout his state court prosecution and had already effectively tried the case (twice)—

1

1002

and Rob Nigh of Tulsa-- who had federal death penalty experience in the Timothy McVeigh case-- be appointed to represent Mr. Barrett.  Both Mr. Echols and Mr. Nigh are highly qualified capital attorneys.  Based on discussions Mr. Brunton and I had with these two lawyers, we knew they were willing to represent Mr. Barrett. We asked Mr. Echols and Mr. Nigh if they would accept appointment in the Barrett case because we knew that the government would likely seek the death penalty against Mr. Barrett, and we knew our office could not accept the case because of the other pending capital case.  Thus, we wanted to get commitments from well-qualified lawyers who were willing to be appointed for Barrett's federal capital trial, so that we could assist the Court by recommending attorneys we felt the judge could rely on to try the case effectively as an alternative to the Federal Public Defender.

Judge Payne initially indicated that he wanted our office appointed, but Mr. Brunton told him that I was the only attorney in the office with capital trial experience and that I could not effectively handle two capital trials scheduled so closely to one another.  This led to a discussion of the statutory requirement to appoint "learned counsel" as first chair.  Judge Payne or his staff had evidently researched the issue, and the Judge explained that he felt "learned counsel" was not defined in the materials he had reviewed.  Judge Payne further explained that it seemed that the federal death penalty cases that were being filed in Oklahoma were being prosecuted in the Eastern District, and he expressed the idea that if counsel from the Eastern District were appointed, that

2

lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future.

My recollection is that Judge Payne did not appoint Mr. Nigh to represent Mr. Barrett. Instead, he appointed John Echols and Roger Hilfiger, the former United States Attorney for the Eastern District, as Mr. Barrett's lawyers. Mr. Echols eventually withdrew from the case. Judge Payne elevated Roger Hilfiger to first chair and appointed Bret Smith second chair. To my knowledge, Mr. Smith had no capital experience.

On June 21, 2005, I forwarded copies of orders the district court had issued in *United States v. Fell,* No. 2:01-CR-12-01 from the District of Vermont regarding fact-specific voir dire in capital cases to Mr. Hilfiger. I sent these orders to him hoping it would impress upon him the importance of mitigation in a capital case, because I suspected that the Barrett trial attorneys were not fully versed on how to investigate and utilize mitigation evidence. At the time I sent the e-mail, neither of the Barrett attorneys had consulted with me regarding the case.

Mr. Hilfiger called my office on June 30, 2005. I was away from the office, so he left me a voice message, asking if my mitigation specialist was going to be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation. Although I do not remember the exact wording of his message, I remember that it alarmed me. I got the distinct impression that Mr. Hilfiger did not know what was expected from a defense lawyer during the punishment phase of a federal capital trial.

3

The message led me to believe Mr. Hilfiger thought "mitigation" merely entailed a short meeting with my mitigation specialist (who was in no way involved in or familiar with his client's case) within a few weeks of commencement of trial. I suspected that Mr. Hilfiger did not understand the nature, value or extent of adequate, effective death penalty mitigation. I was taken aback by Mr. Hilfiger's inquiry, because Mr. Barrett's trial was imminent, and there was not sufficient time to do an adequate mitigation investigation. At a minimum, in my opinion, it would take a mitigation investigator or investigators at least six months to conduct an adequate penalty phase investigation.

I responded by e-mail on July 3, 2005, when I returned to the office and received his message. My e-mails to Mr. Hilfiger are attached to this declaration. In my July 3 e-mail response to Mr. Hilfiger, I gave him contact information for Dick Burr, one of the federal capital resource attorneys. I gave him Mr. Burr's contact information because I knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases, and knew that he was willing to help every lawyer who sought his assistance. I do not know whether Mr. Hilfiger ever contacted Mr. Burr or any other capital resource counsel regarding a mitigation specialist. In any event, as mentioned above, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage investigation if it hadn't been substantially completed on June 30, even if Mr. Hilfiger had been able to secure the services of a mitigation investigator or investigators at that late date.

<div align="center">4</div>

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this 28 day of February , 2009, in

Tulsa County, Oklahoma.

_Julia L. O'Connell_
Julia O'Connell

5

1006

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## EXHIBIT 68

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,               )
                                        )
         *Plaintiff*,                   )
                                        )
v.                                      )        Case No. CR-00-21-S
                                        )
THOMAS DOSS GANN,                       )
RALPH DOUGLAS GANN,                     )
KAREN JEAN REAL and                     )
IRENE MARIE GANN also known             )
as Irene Baker,                         )
                                        )
         *Defendants*.                  )

### MOTION FOR REDUCTION OF SENTENCE
### FOR DEFENDANT KAREN JEAN REAL
### PURSUANT TO RULE 35

COMES NOW the plaintiff, the United States of America, by and through Sheldon J.

Sperling, United States Attorney for the Eastern District of Oklahoma, and D. Michael

Littlefield, Assistant United States Attorney for the Eastern District of Oklahoma, and moves this

Honorable Court for a reduction of the sentence of Karen Jean Real pursuant to Rule 35(b),

Federal Rules of Criminal Procedure, for the following reasons:

Rule 35(b)(2) states, in pertinent part, upon the government's motion:

> made more than one year after sentencing, the court may reduce the
> sentence if the defendant's substantial assistance involved (C)
> information, the usefulness of which could not reasonably have
> been anticipated by the defendant until more than one year after
> sentencing and which was promptly provided to the government
> after its usefulness was reasonably apparent to the defendant.

Karen Real testified on behalf of the government in the case of *United States v. Kenneth Eugene Barrett*, and her testimony, in the estimation of the undersigned, constituted substantial assistance warranting a reduction of sentence.

The government filed a complaint alleging capital murder against Kenneth Eugene Barrett in September 2004. In preparation for the Indictment, the undersigned caused Karen Jean Real to be writted to the Eastern District of Oklahoma from the Federal Correctional Institution in which she was incarcerated. The undersigned was aware that Ms. Real had common associations with Barrett. It was hoped that Ms. Real had information that would be of assistance in the prosecution of Kenneth Eugene Barrett and that she would be willing to provide that information. Upon Ms. Real's return to the Eastern District of Oklahoma, the undersigned met with her and learned that Ms. Real had, in fact, associated directly with Mr. Barrett for a substantial period of time during the calendar years of 1997 and 1998. Ms. Real was willing to speak truthfully and freely about information relating to Barrett, his drug dealing activities, and his involvement with firearms. Ms. Real spoke freely, openly, and in the opinion of the undersigned, truthfully. The undersigned advised Ms. Real that there was the possibility that she would be utilized as a witness in the ultimate trial against Kenneth Eugene Barrett. She expressed a willingness to testify without hesitation or reluctance.

One of the strategies utilized by the government in the Barrett prosecution was to establish Barrett's substantial drug distribution activities as well as his extensive involvement with firearms and his willingness to utilize those firearms in the advancement of his drug distribution activities, including the utilization of those firearms against law enforcement officials. Ms. Real testified regarding Mr. Barrett's providing her with methamphetamine as well

2

as his commercial methamphetamine business operations of which she was aware. Ms. Real further testified freely at his trial regarding the firearms that Barrett had in his residence. Her testimony revealed that Barrett always carried firearms with him in relation to his drug distribution activities. Ms. Real further testified that any time a vehicle with which Barrett was unfamiliar would approach his residence, he would retrieve a firearm.

Ms. Real met on more than one occasion in preparation for trial testimony with the undersigned. During those pretrial meetings, Ms. Real was fully cooperative, answering all questions to the best of her ability, and suggesting areas about which she might be able to testify which could potentially be beneficial to the government. Especially impressive to the undersigned, Ms. Real freely advised when she was unaware of information in response to specific questions asked of her. While Ms. Real spoke freely about matters of which she was familiar and aware, it was clear that Ms. Real restricted herself to only those items about which she absolutely certain. She never "guessed" in an effort to enhance her testimony, even though it might enure to her benefit. Ms. Real was uncertain as to the exact dates of her involvement with Barrett and her observations of his commercial drug operations. She limited the time frames about which she was able to testify to periods of which she was certain, even though she knew there was the possibility that the Court could rule those time periods to be too remote to allow her testimony even though such would limit her ability to assist the government to her personal disadvantage. The undersigned has no doubt that Ms. Real's testimony was truthful and was limited to subject matters about which she was certain.

While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government.

<div align="center">3</div>

The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.

While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward . She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

D. MICHAEL LITTLEFIELD, OBA # 5461
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100

## CERTIFICATE OF MAILING

I hereby certify that on this 1st day of March, 2006, a true and correct copy of the foregoing was mailed, with proper postage fully prepaid thereon, to: Michael Abel, Attorney for Karen Real, One West Third Street, Suite 1225, Tulsa, OK 74103-3532.

DML:ljh

4

1011

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )      No. CR-00-21-FHS
                                    )
KAREN JEAN REAL,                    )
                                    )
            Defendant.              )

### ORDER

The government has moved the court pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure for an order reducing the sentence of incarceration previously imposed upon Defendant for the following convictions: (1) conspiracy to manufacture, possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. § 846 (Count One), (2) maintaining a place for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count Three), and (3) possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count Five).   Having considered the government's motion, the court concludes a reduction of Defendant's sentence of incarceration is warranted under the facts and circumstances as outlined in the government's motion.

Defendant was originally sentenced to a term of 108 months of incarceration on Count One, a concurrent term of 60 months of incarceration on Count Three, and a consecutive term of 60 months of incarceration on Count Five.   The total sentence imposed was 168 months (fourteen years) of incarceration.   Defendant has been in federal custody since March 2000 - some six years into her fourteen-year sentence.   The government's motion under Rule 35 is

1

1012

based upon Defendant's cooperation and testimony during the investigation and subsequent trial of Kenneth Barrett. During the course of the prosecution of Kenneth Barrett, Defendant provided the government with significant information about Kenneth Barrett – information relevant to his drug dealing activities and his involvement with firearms. In the court's opinion, substantial assistance was provided by Defendant in the government's successful federal court prosecution of Kenneth Barrett. Under these circumstances, the court finds Defendant is entitled to some sentencing relief for her substantial assistance provided to the federal authorities.

Turning to the extent of the reduction, the court finds that after having considered the factors enumerated under the policy statement of United States Sentencing Guideline § 5K1.1, a reduction in Defendant's sentence to time served on each of the three counts of conviction is warranted. Consequently, it is ordered that Defendant's sentence be reduced to time served on each of Counts One, Three, and Five, and that Defendant be released from custody forthwith. The original terms of supervised release imposed in this case shall remain in effect.

**IT IS SO ORDERED** this 25th day of April, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma

2

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case (NOTE: Identify Changes with Asterisks (*))
Case 6:00-cr-00021-FHS  Document 160  Filed in USDC ED/OK on 05/11/2006  Page 1 of 6

Sheet 1

# UNITED STATES DISTRICT COURT

Eastern _____   District of _____ Oklahoma

| UNITED STATES OF AMERICA | AMENDED JUDGMENT IN A CRIMINAL CASE |
|---|---|

**V.**

KAREN JEAN REAL

| | |
|---|---|
| Case Number: | CR-00-00021-003-S |
| USM Number: | 03760-063 |

**FILED**

**MAY 1 1 2006**

Date of Original Judgment: **February 27, 2001**
(Or Date of Last Amended Judgment)

Michael A. Abel
Defendant's Attorney

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

■ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or
☐ 18 U.S.C. § 3559(c)(7)

☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

■ was found guilty on count(s)   **1, 3, and 5 of the Superceding Indictment.**
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:846 | Conspiracy to Manufacture, Possess w/ Intent to Distribute, and Distribution of Methamphetamine. | March 2, 2000 | 1 |
| 21:856(a)(1) & 18:2 | Maintaining a Place for the Purpose of Manufacturing, Distributing and Using Methamphetamine. | March 2000 | 3 |
| 18:924(c) & 2 | Possession of a Firearm During and in Relation to a Drug Trafficking Offense. | January 12, 1999 | 5 |

The defendant is sentenced as provided in pages 2   **through 6**   of this judgment. The sentence is imposed pursuant to the provisions of 18 U.S.C. § 3553(a).

☐ The defendant has been found not guilty on count(s) _____

■ Count(s)   **6 and 7 of the Superseding Indictment**   ☐ is   ■ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 25, 2006
Date of Imposition of Judgment

Signature of Judge

FRANK H. SEAY, U.S. DISTRICT JUDGE
Name and Title of Judge

EOD:   5/11/06
Date

AO 245 Case 6:00-cr-00021-FHS in Document 160    Filed in USDC ED/OK on 05/11/2006    Page 2 of 6
Sheet 2 — Imprisonment                                                      (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___2___ of ___6___

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of :

* Time Served on each of Counts One, Three and Five, and that the defendant be released from custody forthwith.

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___6___

DEFENDANT:      KAREN JEAN REAL
CASE NUMBER:    CR-00-00021-003-S

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of
5 years on each of Counts One and Three, and a term of 3 years on Count Five.  Said terms of supervised release shall run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

■   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer.  (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement; and

14)   the defendant shall submit to urinalysis testing as directed by the probation officer.

1016

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 3C — Supervised Release                           (NOTE: Identify Changes with Asterisks (*))

Judgment—Page __4__ of __6__

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## SPECIAL CONDITIONS OF SUPERVISION

(1)    The defendant shall participate in a program approved by the United States Probation Office for the treatment of narcotic addiction, drug dependency, or alcohol dependency, which will include testing to determine if she has reverted to the use of drugs or alcohol.  If it is determined by the Probation Officer that the defendant is in need of a residential drug/alcohol treatment program, the defendant shall participate in such treatment as directed by the Probation Officer and remain in the treatment facility until discharged.

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties                                              (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___5___ of _____6_____

DEFENDANT:           KAREN JEAN REAL
CASE NUMBER:         CR-00-00021-003-S

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | __Assessment__ | __Fine__ | __Restitution__ |
|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ |

☐  The determination of restitution is deferred until_____. An *Amended Judgment in a Criminal Case* (AO 245C) will be
   entered after such determination.

☐  The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise
   in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid
   before the United States is paid.

| __Name of Payee__ | __Total Loss*__ | __Restitution Ordered__ | __Priority or Percentage__ |
|---|---|---|---|
| | | | |

| **TOTALS** | $ | $ |
|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the
   fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject
   to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

   ☐  the interest requirement is waived for   ☐  fine   ☐  restitution.

   ☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or
after September 13, 1994, but before April 23, 1996.

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
           Sheet 6 — Schedule of Payments                                      (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___6___ of ___6___

DEFENDANT:      KAREN JEAN REAL
CASE NUMBER:    CR-00-00021-003-S

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A   ☐  Lump sum payment of $ _____ due immediately, balance due

       ☐  not later than _____ , or
       ☐  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ■  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ■ F below); or

C   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

E   ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ■  Special instructions regarding the payment of criminal monetary penalties:

       A special assessment of $100 on each of Counts One, Three and Five, for a total of $300, is due immediately and shall be made
       payable to the U.S. Court Clerk for the Eastern District of Oklahoma, P.O. Box 607, Muskogee, OK 74402.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and
    corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 69**

---

**Hugh Downs Reports:**
Artery cleaning breakthrough from Nobel Prize Winner.
Drops high blood pressure by as much as 60 points. Bottom Line

HOME DELIVERY | SUBSCRIBER SERVICES | CONTACT US | ABOUT US | SITE MAP | Buy a Classified

Sat, Feb 28 2009

**TAHLEQUAH DAILY PRESS Online** NEWS

Currently
**27**
H: 31 L: 19
Click for more weather

travelocity
Choose from over

Homepage | Local News | Features | Obituaries | Letters to editor | Sports | Homes | Monster Jobs | Buy a Classified | Classifieds | Wheels | Seasonal Content |

**Resources**

- Print this story
- E-mail this story
- Post to del.icio.us
- Discuss this story

Ads by Google
- Oklahoma Teacher Jobs
- Rug Cleaning Oklahoma
- Florist Enid Oklahoma
- Flowers Moore Oklahoma

Published July 27, 2007 09:45 am - MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

# Barrett death sentence upheld

**Press staff reports**

MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

"Barrett was sentenced on Nov. 18, 2005, to death for intentionally killing a state law enforcement officer engaged in the performance of his duty," Sperling said in a press release.

Barrett was also sentenced to life imprisonment without possibility of release for both using or carrying a firearm during and in relationship to a drug trafficking crime with death resulting and using or carrying a firearm during and in relationship to a federal crime of violence, with death resulting.

"Out of a dark, murderous tragedy, we see today a bright ray of judicial light," said Sperling. "The appellate road is long and challenging. We will continue the battle to uphold courageous jury and judicial decisions in this epic case.

"I am so thankful for a discerning judge, jury, and appellate panel. It's clearly affirmed. There is no open season on law enforcement in the Eastern District of Oklahoma.

Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

"The Oklahoma State Bureau of Investigation, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms, and Explosives, The Sequoyah County Sheriff's Office, and other agents and investigators worked together to investigate this case and see justice done so far," said Sperling.

Barrett was sentenced in 2005 for killing Oklahoma Highway Patrol Trooper David "Rocky" Eales, 49, by shooting him in the arm and chest outside Barrett's home. Eales and other law enforcement officials were conducting a raid on Barrett's home near Vian when the shooting occurred.

Barrett's lawyers have argued Barrett was defending his home and son against people he could not see in the dark; and that to prove the suspect intentionally killed a law enforcement officer, prosecutors had to prove Barrett knew the person he was shooting was a law enforcement officer, according to briefs filed in Barrett's original appeal.

Prosecutors argued that several witnesses testified Barrett "expected law enforcement officers to come upon his premises and that he intended to kill as many of them as he could rather than allowing himself to be taken into custody."

Barrett's first state trial ended in a hung jury; and during his second state trial, jurors found Barrett guilty of manslaughter in the death of Eales and felony assault and battery with a firearm for wounding another trooper.

**I need affordable auto insurance.**
My age is:
- 16-19 years old
- 20-24 years old
- 25-29 years old
- 30-34 years old
- 35-39 years old
- 40-49 years old
- 50+ years old

Go »

I have had my driver's license for:
- 1-5 years    - 11-15 years    - 21-25 years
- 6-10 years    - 16-20 years

RateMarketplace





BARDELL & BARDELL Insurance Agency | Tahlequah, OK 918-456-6129 | Click here for more info | Serving All of Oklahoma

**monster**
Coast to Coast. Around the Corner
**Find your perfect car.**
Select A Make    Search

**Find a business:**
Business name or type...
**Location:**
Tahlequah, OK
Maps, Menus, Store hours, Coupons, and more...
HyperLocal    SEARCH



IT'S W TO S BEF YOU
CONSUMER



**Popular business directory searches**

**Premium Jobs**

**Help Wanted:**
Oaks Mission- Now accepting Applications for High School Secretary. Position open until filled. Send resumes to: Wyma...>MORE

**Help Wanted:**
Restaurant Of The Cherokees now taking applications for full and part time help. No Phone Calls Please!...>MORE

**Help Wanted:**
The Salvation Army Heart O' Hills Camp and Conference Center is hiring for the summer season. We have part-time kitchen ...>MORE

**Help Wanted:**
Wanted: Front Office Medical Help plus cleaning. Call 458-9888...>MORE

**Help Wanted:**
Part-time Caregiver needed. $8.00 hour. (918)456-6290...>MORE

**Help Wanted:**
CNA/ CHHA Immediate openings in Tahlequah Area. Call 351-8652...>MORE

**Help Wanted:**
The City of Tahlequah is accepting applications for a Part-time Computer Tech in the Managerial Department. Application...>MORE

See all ads

**Premium cars**

**SELL YOUR AUTO HERE**
CONTACT BRENDA OR HANNAH TO PLACE YOUR AUTO FOR SALE HERE! 918-456-8833 extension 10 or 11...>MORE

**Used Car For Sale:**
1998 Pontiac Sunfire, standard shift, good condition, good mileage. $2500 OBO 456-2707...>MORE

See all ads

**Premium Homes**

House For Rent:

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 70**

---

**Drug Offender Receives Break**

*By Wanda Freeman*

TIMES RECORD • WFREEMAN@SWTIMES.COM

One of two Oklahoma residents sentenced Wednesday for federal drug offenses received a sentence break because she cooperated in another case, the prosecutor announced.

Brandie Zane Price, 28, and Leslie Barnard Johnson, 40, both of Muldrow, were sentenced in connection with a methamphetamine possession case prosecuted in U.S. District Court for the Eastern District of Oklahoma in Muskogee.

Each pleaded guilty in April to one count of possession of more than 500 grams of a mixture or substance containing a detectable quantity of methamphetamine with intent to distribute.

The offenses took place between May 2006 and February 2007 in Sequoyah County. The Sequoyah County Sheriff's Office, the Fort Smith Police Department, the Cherokee Nation Marshal Service and the federal Bureau of Alcohol Tobacco, Firearms and Explosives investigated the case.

The offense is punishable by 10 years to life in prison and/or a fine of up to $4 million, plus at least five years of supervised release to follow the prison term, according to plea agreements on record with the court.

Price was sentenced to 60 months in prison plus 36 months of supervised release and ordered to pay a $100 special assessment.

Johnson was sentenced to 70 months in prison plus 36 months of supervised release and ordered to pay $100 special assessment.

Price's sentence was "significantly impacted" by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon J. Sperling stated in a news release.

"In this case, the court's sentence reaffirmed a very important principle. Truthful cooperation with law enforcement officers should be encouraged and rewarded," Sperling commented.

Barrett was sentenced to death in December 2005 for the September 1999 killing of Oklahoma State Trooper David "Rocky" Eales during a raid on his rural McKey home. The 10th U.S. Circuit Court of Appeals affirmed his conviction and sentence July 25.

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

### EXHIBIT 71

---

# OPINION

ah County

JOYAH COUNTY TIMES
USPS No. 490-840
NDEPENDENT Democratic NEWSpaper
MAYO          FLORENCE B. MAYO
75            1904-1986

Itcn and edited to merit your confidence
N. Oak. St., Sallisaw, Okla. 74955-4637
-Mail address: info@seqcotimes.com
ne (918) 775-4433    Fax (918) 775-3023
Published each Thursday and Sunday
By Cookson-Hills Publishers, Inc.

JIM MAYO, Publisher
ALLY MAXWELL, Managing Editor
MIKE ERWIN, Sports Editor
DRIDGE STIMMEL, County Reporter
TY MAYO, Educational Services Director
ANNA NUTTER, Advertising Manager
T TYLER, Advertising Representative
MSTRONG, Classified Advertising Representative
GAYLA EAKLE, Advertising Design
CHARD MAYO, Production Manager

MEMBER OF:
OKLAHOMA PRESS ASSOCIATION
INTERNATIONAL SOCIETY OF
WEEKLY NEWSPAPER EDITORS
TIONAL NEWSPAPER ASSOCIATION

SUBSCRIPTION RATES:
e Area ..................................$18.00 Per Year
ue in Okla. ...........................$35.00 Per Year
nt To Oklahoma ...................$35.00 Per Year
tome and Adjacent States .....$45.00 Per Year

Is Postage Paid At Sallisaw, Oklahoma 74955
: Send address changes to Sequoyah County Times,
Oak Street, Sallisaw, Oklahoma  74955-4637



THE CITY OF SEMINOLE, ONCE KNOWN AS TIDMORE, IN 1926 EXPERIENCED ONE OF THE GREATEST BOOMS IN THE STATE'S HISTORY WHEN OIL WAS DISCOVERED NEARBY! THE ROCK ISLAND RAILROAD'S INCOME FROM SEMINOLE IN 6 MONTHS, MORE THAN $1,000,000, WAS SAID TO BE EXCEEDED ONLY BY CHICAGO.

A SAUK AND FOX INDIAN, JIM THORPE OF SHAWNEE, WON BOTH THE DECATHLON AND THE PENTATHLON IN THE 1912 OLYMPICS IN SWEDEN AND CAME BACK TO LEAD LITTLE CARLISLE INDIAN SCHOOL TO FOOTBALL VICTORIES OVER HARVARD AND ARMY. HE WAS VOTED THE ALL STAR ALL AMERICA ATHLETE FOR THE FIRST HALF OF THE 20TH CENTURY.

WHIRL WIND, CHEYENNE HEAD CHIEF AND ONE TIME CUSTER FOE, WHOSE DEATH FROM A HEART ATTACK REVEALED THAT HE HAD WILLED HIS PIPE AND HIS WIFE AND FOUR CHILDREN TO U.S. DEPUTY MARSHAL CHRIS MADSEN. AND THEY BROUGHT THE PIPE WITH THEM TO THE MADSEN HOME, THEN IN EL RENO, AND ALL MOVED IN!

EL RENO · SHAWNEE · SEMINOLE

## Letters to the Editor

### Cherokee Water Claim

when someone (former mayor of Sallisaw, included) rokee Nation claims all the water that falls from the n enough to run him out of town; or laugh him out. hanged! I don't presume the Cherokees have at any ade such grandiose claims on Mother Nature, and in oma, so you know there must be money involved – eler, money for the Tribe, money for the politicians, collection – 40 cents added to your monthly water or that, we are a bunch of guilt-ridden taxpayers! ises undertaken by the Tribe have been what I term xpensea of personal (bad) habits, I guess 40 cents off ls would fit very closely into that category. Let's see, beauty of the Cherokee Casino, in Roland, for tine little smoke shops dotting the landscape as we nute; and now that we taxpayers have established lies that have conveniently filled with their rainfall the sound of change tumbling through the slot I ChaChing! ChaChing!....time again. It seems as Peoples and taxpayers we are subsidizing our own legislated by the Federal Government! I'd be better ashioned way of duking it out. ) be in touch with my Congressman, as this is our s to me current Tribal events make Oklahoma look t just visually, but economically and in terms of w businesses, and those existing ones, adjusting to rce under federal, state and now Cherokee Tribal y, I think it's time to look matters squarely in the within a nation, withdraw some of these recent by the Tribes, and have the courage to say, "Now,

proud heritage, what they're becoming now is a ckpockets! Let your representatives know how n of owning water that falls from the sky, sounds to

Mary Ann Cosner
Gans

### obacco Money Wisely

ommunity hospital, I know the cost of the insurance loyees – all of them. I don't smoke and neither do s, yet over the years I have seen the cost of health eadily increase to cover the costs associated with

) some relief from this unnecessary burden. ) Attorney General signed on to a multi-state bacco companies to cover the billions of dollars year to cover tobacco-related health costs. The ll pay these steadily increasing costs through higher I higher taxes. ettlement provides Oklahoma with a unique ss the settlement money is used for tobacco If find itself right back in the financial hole created caring for the current generation of teen smokers

### She Questions Sheriff's Department
Dear Editor:

Everyone has been saddened by the death of the state trooper, especially the McKey community. There are many questions being asked as to how this could have happened. One of these questions is why did the local sheriff's department allow the gun and drug situation to escalate to that point. It should be known that the sheriff's department was contacted many times over the last three years and nothing was done. There were times they would drive by and simply turn around and leave. Sometimes they would not even respond to calls that were made. If the sheriff's department had done what they are paid to do this man's family would not be mourning him now.

Meredith Lawson
Sallisaw

### Comments on Cherokee Pay Raise
Dear Editor:

I worked along with my family in the past Cherokee Tribal election to try to get a chief for the Cherokee Nation who is above the rest in character and morals. While he didn't get elected, I was happy to see a few tribal councilors elected that I thought had integrity.

When I found out last week that the tribal councilors were going to vote themselves a big pay raise, I was sickened. If they feel that $16,800 a year is not enough let them resign and give the job to someone that would be thrilled with the present salary. I thought Cherokee Nation was hurting financially. We are either broke or we have money and if we have money, why not spread it around to the average Indian person just trying daily to survive.

Remember elected officials, you were voted in and you can get voted out. I'm sure all tribal members were watching you vote on Oct. 11.

Suzanne Garrett
Bunch

### Favors Cockfighting
Dear Editor:

Cockfighting and goose killing. Our elected officials, who congregate at 23rd and Lincoln Boulevard in Oklahoma City, have in the past made decisions concerning industry that have killed "the goose that laid the golden egg." Now the pressure is on the legislature to make another decision concerning an Oklahoma industry. Oklahoma is one of only three states that allow cockfighting. Do we follow the 47 states that have outlawed the sport or do we capitalize on being one of only three?

Cockfighting has been going on not just for years or decades, but for centuries. The fowl have been bred for this so long that fighting is part of their nature. Those who breed and keep game fowl take excellent care of them. By the way, this promotes Oklahoma agriculture. The purse money at many cockfights exceeds the purses at our racetracks and attracts many fans. People come from all over the world and bring their stock to participate. Motels fill to capacity and restaurants flourish in areas of our state that need the revenue generated by the sport. Why not take advantage of an opportunity that enhances the economy of some of our financially stressed counties?

What is right about allowing the populated metropolitan areas of the state to determine what is right for less populated areas where

### A Response to Peters' Comments
Dear Editor,

I was some amused by the news report of the Oct. 2 Sequoyah County Republican meeting, wherein Grand Republican Booh-Bah Joe F. Peters, Sr., did "welcome with delight into our fold the Mayo brothers."

Obviously, Joe hallucinated and thought he was present at the end of the world. Once more, Tailgunner Joe wrote like he rides--backward--in the airplane.

I'll not honor his gas attack with reiteration or dissection of my Kansas City Southern column, since any Sequoyah Countian with half an education knows what I said and what I meant. If Tailgunner Joe couldn't understand it he should enroll in night classes and, hopefully, come up to speed with the rest of the world. I would have thought they taught reading comprehension at the U.S. Air Force Academy, but maybe Joe was out tailgunning back then, too.

In today's political discussion (that's what Tailgunner Joe is trying to make of this), charges and claims can be cast with little or no regard for the truth, meaning or intent.

Tailgunner Joe is an excellent imitation of his mentor, the late U.S. Senator Joseph R. (Tailgunner Joe) McCarthy. They both cast the illusion they are "on to something," when actually they have nothing more than bad gas.

Take a Rolaid, Joe, turn around and ride with both eyes looking forward. Who knows, it might even help you shoot straight.

Dick Mayo
Sallisaw

### Thanks for Helping Tori Mills
Dear Editor:

This is to thank all that helped with the fundraiser for Tori Mills.

Thank you for your donations of food, money and time. The bake sale at the Grapes of Wrath was a great success.

This is a great community, thanks again.

Friends of Tori Mills

### Appreciate Help
Dear Editor,

First of all we want to thank our wonderful Lord and Savior for sparing our son's (Chad Sutton) life.

Special thanks to Police Chief Randy Reed, all the officers and entire staff at the Fort Smith Police Department.

Our heartfelt thanks to the many, many people who came and stood by our side. For all the visits, flowers, cards, phone calls, prayers and every act of kindness shown to us during Chad's hospital stay.

To Dr. Anderson, ambulance drivers, all the nurses and staff at Sparks Regional Medical Center.

We can never thank you enough. We love and appreciate each and every one of you.

God bless you all and keep you safe from harm.

Officer Chad Sutton and Family
Doug, Viola (Bobbie) and Dena

### Children And Divorce
Dear Editor:

People wake up! What are we doing to our children? Has anyone

KEB503252

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 72**

---

*Court file missing*

| Case No. | TITLE OF CAUSE | NATURE OF CHARGE | ATTORNEYS |
|---|---|---|---|
| CF-1998-00022 | STATE OF OKLAHOMA<br>VS.<br>CHARLES EDMOND (MONK) SANDERS | COUNT 1. KNOWINGLY CONCEALING STOLEN PROPERTY<br>COUNT 2. UNLAWFUL USE OF POLICE RADIO<br>COUNT 3. GRAND LARCENY<br>COUNT 4. FALSE INFORMATION TO POLICE OFFICER | |

Judge:                                    Case Information:
                                          Comments: CO-DEF=J BROWN=22A,

| Date | Entries | Book | Page | Fees | Cat. |
|---|---|---|---|---|---|
| 01-23-1998 | INFORMATION | | | | |
| 01-23-1998 | AFFIDAVIT | | | | |
| 01-23-1998 | WARRANT ISSUED-BOND $10000 | | | | |
| 01-29-1998 | MOTION TO DISMISS AND ORDER-WARRANT RECALLED PER JUDGE | | | | |
| 02-27-1998 | WARRANT CANCELLED | | | | |
| 06-11-1998 | CM: AJH;  DEFENDANT ENTERS PLEA OF NOT GUILTY. SET FOR<br>PLEA 6-26-98, AT 11AM. BEFORE JUDGE NELSON.  28-64 | | | | |
| 12-08-1999 | ORDER ACCELERATAING DEFERRED SENTENCE | | | | |

Total Fees
Total Unassigned

Amount Due:        $0.00

1027

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

―――――――――――――――――――――――――

**EXHIBIT 73**

―――――――――――――――――――――――――

*Exhs. § 2255 Motion*                         *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP











**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 74**

## Declaration of Ada Blount

I, Ada Blount, declare as follows:

I am Kenneth Barrett's maternal great aunt.  My sister is Gelene Dotson's mother.  I live with my daughter, Janice Sanders.

Kenny was a hyper little boy who could not sit still.  He grew up and built a shack next to his mother's place and tried to make a living fixing cars.  I never felt threatened by Kenny.  He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise. He was living by himself and got mad at himself sometimes.  Once he shot himself.

Kenny never had much of a father, never had any guidance.  We all still love him very much.

An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1 page declaration is true and correct.

Executed by me this ___27___ day of ___Feb.___ 2009, in _____Sef._____ County, Oklahoma.

_Ada Blount_

Ada Blount

1

1033

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 75**

---

## Declaration of Alvin Hahn

I, Alvin Hahn, declare the following:

I am a neighbor of Kenneth Barrett and am also related to him by marriage. My wife's mother, Janice Sanders, is Ada Blount's daughter.

Kenny and I were more like neighbors than friends or bosom buddies. I went by Kenny's no more than once a month. I never saw Monk Sanders at Kenny's and I never saw Kenny make or sell drugs.

Kenny was paranoid. Kenny told me he thought there were satellites watching him. Kenny never spoke about killing cops or killing anyone, or committing suicide by cops. Kenny never told me there was a warrant out for his arrest. I never saw Kenny do anything violent.

On the night of the incident, I had been sleeping and was awakened by gunfire. I remember the sound of different guns, but I cannot remember which came first or even whether I was awakened by the first shots because I had grown somewhat used to Kenny shooting at night. By the time I looked outside, about 15 seconds after the shooting stopped, there was at least one vehicle with its police lights on.

An investigator working on Kenny's case recently asked me about Kenny and the night of the raid. Then the investigator came back to me with the information I gave him in this declaration. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that this 2-page declaration is true and correct.

Executed by me this 27 day of Feb. 2009, in Sea                    A H

Page 1 of 2

County, Oklahoma.

Alvin Hahn

1036

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 76**

---

## DECLARATION OF BILLY POINDEXTER

I, Billy Poindexter, declare the following:

I am the uncle of Charles "Monk" Sanders. I have known Monk Sanders his entire life. He has been in trouble his whole life and you can believe him about as far as you could throw a pick-up truck. In other words, my nephew Monk Sanders is unbelievable in everything he says. I would not believe him about anything. I am aware that when my nephew Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial, he was doing so in order to get out of his own troubles with the law. After my nephew Monk Sanders testified against Kenny Barrett, he served no jail or prison time on anything he was in trouble for.

Not only is it my personal opinion that Monk Sanders is a completely untruthful person, but I am aware that in the community, Monk Sanders' reputation for honesty and truthfulness is extremely poor.

I was not contacted by any lawyers representing Kenny Barrett on his federal case, or any investigator working for Mr. Barrett on his federal case at the time it went to trial. Had I been contacted, I would have provided the above information and would have been willing to testify for Mr. Barrett regarding my nephew Monk Sanders' lack of honesty and truthfulness.

An investigator currently working on Kenny Barrett's case asked me to provide this declaration. I did not write this declaration myself, but I have read it carefully, and it

1

1038

says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing one page declaration is true and correct.

Executed by me this 1 day of _March_, 2009, in _Sequoyah_ County, Oklahoma.

_Bill Poindexter_
Billy Poindexter

2

1039

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )     **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 77**

---

## DECLARATION OF BRANDY HILL

I, Brandy Hill, declare the following:

I am Kenneth Barrett's maternal second cousin.  My grandmother, Phyllis Crawford, is a sister of Gelene Dotson, Kenny's mother.  My mother is Gwen Crawford, and her mother is Phyllis Crawford.  I am married to Shawn Hill, and we live with our two children in Sallisaw, Oklahoma.  My youngest baby's middle name is Kenny, named after Kenny Barrett.

My family has learned first hand about bipolar disorder and depression.  My mother has bipolar disorder, and I battle with depression.  I was treated at Bill Willis several years ago where they prescribed anti depressants for me, but I stopped taking them.  I am afraid of being a guinea pig.  I had a problem with drugs, but have been clean for years.  I was arrested for using methamphetamine and received a five- year suspended sentence.  I completed drug court.

My mood swings make it hard on my husband.  I used to attack him, kind of the way Kenny and Abby fought.  Kenny told me to stop beating on Shawn because it was embarrassing.  On more than one occasion, I took all of Shawn's belongings, piled them outside, and burnt them. This parallels Kenny's behavior toward Abby, both to lesser and greater degrees.  My husband understands now that my mood swings control me more than I control them.  He and my mother encourage me to get treatment, and I am considering it.

My husband lived with Kenny from June through October 1998.  Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission.  Kenny also bought and sold cars. He might buy one and flip it the same day.

I have known Travis Crawford and Cindy Crawford for years.  Travis is my uncle on my

1


1041

mother's side. Cindy is his wife. I know that Travis and Cindy testified against Kenny when he was on trial in Muskogee for the killing of an Oklahoma Highway Patrol Trooper.

I was at Kenny's on September 23 when Travis came over to tell Kenny about the white vehicle that had gone by that Travis thought was cops. Rick was there, as was Toby, Kenny and Bubba Thompson, little Debbie Thompson's son. Most of us were by the garage on the side right next to Gelene's fence. Travis said Grandpa said he had seen a white SUV go past the house down to the bottoms, which is a dead end, and that it had not come out. Travis said that either he or Roger thought they were likely cops; I'm not sure which one. Travis did not come onto the property at that time, but just kind of leaned over the fence and then went back home. Shawn was just pulling up at the time and I left with him soon after.

There was no talk about killing police or going down in a blaze of glory. Kenny did not act as if it were anything but normal that the police had come by. The police drove by all the time, sometimes three times a week, from around 1996 to 1999.

Cindy Crawford is completely dishonest and totally untrustworthy. In my opinion, she has no conscience whatsoever. I am also aware that she has a very bad reputation for honesty in the community. She is extremely manipulative.

Cindy has stolen from me and my family several times. She would steal to get money for drugs.

Cindy intentionally hurts other people with her lies and by trying to get them in trouble for things they never did. The only reason she would have testified against Kenny would be to get something for herself.

My uncle Travis told me he and Cindy were paid for their testimony against Kenny.

2

Uncle Travis also told me that he did two shots of dope immediately before his testimony and was under the influence of drugs when he testified.

I am aware that Cindy has long acted as a police informant, and has gotten out of trouble because of it. For example, she was enrolled in drug court, but did not have to attend their sessions. Most times when a person fails to abide by the conditions of drug court, they are terminated from the program and charged. Cindy told me this didn't happen to her and she didn't have to attend drug court because "they lost her paperwork."

Around 2001 or 2002, Shawn and I were brought into ADA Robbie Cowan's office. We were asked to roll on Chip Teague, Boss Green and Diane Wynn and to tell whatever they knew about these individuals and the drug trade. We declined. Shortly after that, Cowan was out of office.

At the time of Kenny's trial in Muskogee no one working for his case talked to me about my family or what I knew about Travis and Cindy's honesty. When an investigator working on Kenny's case asked me about these things recently, I told him the information in this declaration. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 3-page declaration is true and correct.

Executed by me this 27 day of Feb. , 2009, in

Sequoyah County, Oklahoma.

Brandy Hill
Brandy Hill

3

1043

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 78**

**DECLARATION OF CAROLYN JOSEPH**

I, Carolyn Joseph, declare the following:

I am the maternal aunt of Kenneth Eugene Barrett.  Kenny's mother, Gelene, is my oldest sister.  I am the youngest of three daughters and am 17 years older than my only brother Mark Dotson. I live in Fort Smith, Arkansas, where I moved about a year ago to be closer to my sister Ruth. Ruth and I are Jehovah's Witnesses, and it's comforting to be close to her.

I used to live on family land but moved into town after my son Dewitt was killed in an automobile accident on November 25, 1997, when he was only 30 years old. I could not live there any more because of the memories.  Dewitt was Mark Dotson's best friend. Dewitt had a Masters degree in chemistry. I depended on him so much; he came home on weekends. I am only now beginning to come to terms with losing him.  He was a mannerly boy, just a really good son. I work at a small hospital, Booneville Community Hospital where I am the only lab tech on weekends, the only shifts I work. I went back to school at 47 to become a lab technician. I am now 62.  Prior to being a lab tech, I was a bookkeeper for Doug Stites and later for Ed Stites. Mike Stites who is married to Abby, Kenny's ex wife, is Ed Stites's nephew.  It is a small community around Sallisaw, so we all know each other.

We have had serious mental health problems in my family.  I have bipolar disorder and have bouts of depression, sometimes severe. I take Welbutrin for it every day. At one time, I had it really bad. I try now to live for the little things and not to think about the big things. I have seen a psychologist for my condition for years.  Ingram Goodwin, who was the son of my mother's sister (a Real until she married), killed his wife and then himself. His wife had just finished medical school. My daughter Stephanie has mental health issues. She is divorced. She is a nice

1

girl, but used to be flighty.  Like Kenny, she was hyper when she was little.  She is outgoing, but is very, very moody. Living with her is awful.

My daddy was not a falling down drunk and could hide how much he drank.  My mother thought he had quit drinking, and that Daddy was doing well near the end of his life.  My mother was surprised when I showed her where Daddy had been stashing vodka bottles in the barn.

I do not want to run Gelene down, because she has had a hard life, working and raising three boys alone, but she was more a drunk who would drink to being sloppy, which Daddy would not do. I think she did it because of the stress she was under.  When I got divorced after my mother passed away, Gelene wanted me to move in with her and I did for a while. She has a big heart, but she does have a drinking problem.

When I was thirteen, my mother and I went to Joliet to help Gelene when Kenny was supposed to be born, but we ended up staying five weeks, because Kenny was born a month late. I paid Gelene and Ernie a visit again when I was 17.  Gelene was drinking up a storm. She was drinking beer and was stinky drunk and unhappy.  Kenny was four. Ernie was dating a woman named Jerry and Ernie ran around all the time. He was a good-looking guy and it went to his head. Ernie was hardly around their home.

Kenny was more than a hyper child. I think he had ADD or something; you could not pin that boy down. He was the most hyper kid I have ever seen. I remember when he was little, he was so loving. He would climb up on you and put his arm around your neck and say, "I love you." He was the sweetest little boy, and then he would change to being loud and kicking for no reason I could see.

Most of the time Kenny was in a high mood, then he would fly off the handle all at once.

2

Kenny had low self-esteem.  He would duck his little head a lot and act like he was not as good as those around him.  His mother put him down a lot rather than build him up and make him feel good about himself. I do not think you should condemn a child and Kenny had a lot of that. Gelene got worse toward him when he was 11 or 12, around the time of the divorce.

We all felt for Kenny.  Maybe we should have stepped in and done something about it. Kenny did not have much of a chance.  Gelene always took out on him the frustrations she had about Ernie.  Kenny was defenseless.  The damage gets done and there's not much to do about it.  A child should not have to be raised like that.  It was easier for Steve because Gelene treated him better than Kenny.  She babied him when he was little, spoiled him rotten, even in high school. She took him and gave him whatever he wanted.  Richie has his problems, too.  He can be downright mean.

Kenny's divorce was hard on him and his wife, Abby.  Abby dearly loved Kenny. Abby has told me more than once she loved him.  Abby explains it as just one of those things that did not work out because Kenny would be so emotional. Kenny moved back home after he and Abby divorced, and I could never figure out why Kenny lived next door to his mother.  They did not get along.  Kenny would have done anything for Gelene, but they argued all the time. She fussed at him constantly over any little thing. It seemed like Gelene and Kenny were a whole lot alike. They argued a lot.

The whole tragedy would never have happened if Ruth had been Kenny's mother.  Ruth is a fortress.  If I have problems, I turn to her.  She's the reason I moved to Fort Smith.  I call her twice a day.  If Ruth had been Kenny's mother from infancy, he would have been taught what was correct.  What a difference that would have made for him.

3

I have never known Kenny to hurt anybody. He gets emotional, but as far as hurting anybody, he is not a dangerous person. My car broke down when I was living on the Dotson property in the little brick house. Kenny came over. He was so mannerly and he fixed my car. He never treated me disrespectfully. He could not have been nicer to me when I did see him, but I worried about him.

Kenny was going downhill, and because I have experience with bipolar disorder I recognized some symptoms in Kenny. I thought if he stopped using drugs, he could improve. Gelene and I met with Kenny in my kitchen to talk about how to get him help. We called the sheriff, asking for help but received none. I am sure that Kenny hallucinated and believed that he was constantly under surveillance. I called the authorities because I thought they could get Kenny off the drugs, that they would get him help. I wanted them to get him in a drug program. I did not want them to hurt him. They would not do anything to help. I made my last call to OSBI just days before the raid on Kenny's property, but I never got past a dispatcher.

I was not the only one to call the law enforcement. Janice Sanders often called the sheriff on Kenny with noise complaints. Janice is one of Kenny's cousins and lived across the road from Kenny. My mother's sister had married Coy Blount whose daughter, Janice, married Tom Sanders. One particular time, that got blown out of proportion at the trial, was when Kenny got miffed that Janice had called the police on him for either shooting his gun in the air or for playing the radio too loud. Kenny had yelled across his property a threat to burn down Janice's house. Neither Janice nor I thought for a moment that Kenny would carry out his threat. He was not vindictive or mean or violent. He was just mad at Janice for calling the police on him. He was just shooting off his mouth. Janice testified about this incident at the trial.

4

Kenny's trial attorney only met me for a few minutes.  He asked me about Kenny threatening to burn down Janice's house.  I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second. He never gave me a chance to tell him.  The attorney just told me my testimony would not be required. The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would. My answer would have been no. Kenny never had done anything to anyone. The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family.  I would have answered any questions the attorneys asked and I would have answered them truthfully.

My daughter, Meredith Broomfield, wrote a letter to the *Sequoyah Times* about our family's pleas for help.  At first, they would not publish it, but she insisted they do and they finally agreed if she came down to the paper and signed it.

I know Travis Crawford and Cindy Crawford.  Travis is my nephew, and he was married to Cindy.  Kenny's attorneys in the federal trial never asked me about Travis or Cindy.  If they had asked me about them, I could have testified about Travis and Cindy's honesty, not just my opinion, but their reputations.

Cindy Crawford was a heavy drug user, and I could see that her drug use affected her mentally.  She seemed to have the mind and attitude of a 12 year old.  Cindy is so deceitful and dishonest that it is pitiful.  No one I know trusts Cindy or believes anything she says.  This is not only my personal opinion.  Her reputation for honesty in the community is poor.

It is also my opinion that Travis Crawford, who was also a heavy drug user during the time of Kenny's federal case, is not an honest person.  Travis does not have a reputation in this

5

community as an honest person.

Every time Cindy or Travis Crawford came to my home, something turned up missing. They would steal to get money to buy drugs. Travis and Cindy were people who would say one thing and do the other. I once paid Travis $400.00 to build a well house on my property. The materials were delivered. The well house never got built, and the materials were stolen. The only people who could have stolen the materials were Travis and Cindy. No one ever paid me back the money I gave to Travis to build the well house.

On several occasions, Travis asked me for help when he and Cindy were out of money, then he'd steal things from my home and property. Travis once stole four rolls of barbed wire from my barn. The police were notified, and Travis later admitted to me that he had stolen the barbed wire. After my son DeWitt Joseph was killed in an automobile accident some years ago, Travis stole things from his property.

I have not seen or associated with Travis and Cindy Crawford since they testified at Kenny's trial. The things I'm telling about here happened before Kenny's federal trial.

Two investigators who said they were working on Kenny's federal case asked me to talk to them and one of them came back to me with this declaration, and asked me if it says what I told them. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, as provided in the laws of the United States of America, and the State of Oklahoma, that the foregoing 7-page declaration is true and correct.

6

Executed by me this _15th_ day of _February_ , 2009, in _Sebastian_

County, Arkansas.

_Carolyn Joseph_

Carolyn Joseph

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 79**

---

**DECLARATION OF DEWEY PADGETT**

I, Dewey Padgett, declare the following:

I have been a Sallisaw town barber for fifty years. I see all kinds in my business and I hear most things about everything that goes on in this town. My place of business, Padgett's Barber Shop, at 202 N Oak Street, is just down the block from the courthouse where the police, sheriff's and highway patrol have their offices.

I was Kenny Barrett's barber for many years. Kenny was always respectful to me and my other customers. When I heard about what happened up at Kenny's, of course my first thoughts were for Rocky Eales and his family. Soon the talk around town was that there was no reason for the police to do Kenny like they did. Most people think that he had a right to protect his son and his property and that there were other ways to arrest Kenny that would not have put anyone in danger.

Of course, that wasn't Rocky's fault, and as I said we all feel for him and his family. There are those in the community who think that he had a right to defend himself, but most of us felt that it was fair that Kenny got some punishment. We felt that the manslaughter conviction in state court was punishment enough. We felt that trying him again after there was a verdict was pretty much un-American and against everything we were taught in school about justice and double jeopardy.

Παγε 1 οφ 2

1053

Again, I say, and the vast majority of my customers feel this way, that the police didn't have to do Kenny the way they did because they could have arrested him peaceably any time they wanted. And then to do him again like they did in the courts—people don't like that.

Of course, I have some customers who would disagree, but that's how I and most of the town feel.

An Investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told him and how I feel.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this _26_ day of _July_____, 2009, in

_Seq._____ County, Oklahoma.

_____
Dewey Padgett

1054

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )          **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

_____

**EXHIBIT 80**

_____

## DECLARATION OF DORIS BARRETT

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I am Ernie Barrett's third wife. Kenny Barrett is my stepson. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, both in state and federal court. Before and during the state trials, I had frequent contact with Kenny's lawyers and investigators.

I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

I had some contact with Kenny's lead federal lawyer, Roger Hilfiger, before and during Kenny's trial, but we never discussed Kenny's family life or history. Mostly, he just outlined the day for me, told me who was going to testify that day. In fact, he only told my husband Ernie and me that we were going to testify on the day we testified in the penalty phase of Kenny's trial. He did not even tell Ernie or me what questions he was going to ask us. No investigator or investigators working for the defense in Kenny's federal case spoke with us.

I did have quite a few conversations with Mr. Hilfiger's co-counsel, Bret Smith, during Kenny's federal trial. Mr. Smith was very upset with what he considered to be Mr. Hilfiger's incompetency and lack of effort and interest on Kenny's behalf. From where I

1

sat in court I could see Mr. Smith become upset at Mr. Hilfiger's failure to object to inadmissible evidence, and at Mr. Hilfiger failing to object to the prosecutor, Mr. Sperling, referring to Kenny as "the murderer" even before the case had been submitted to the jury in the first part of the trial. Many times there would be people on the stand and Brett would say Mr. Hilfiger needed to object and Mr. Hilfiger would say, "no." Mr. Smith had a real problem with a lot about what Mr. Hilfiger did. At times, Mr. Smith complained to me in private about Mr. Hilfiger's failure to object or do other things to represent Kenny properly. While Mr. Smith and I spoke many, many times, neither he nor Mr. Hilfiger spoke to me about or interviewed me about Kenny's family life or history.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 2 page declaration is true and correct.

Executed by me this _10_ day of _February_ , 2009, in _Creek_ County, Oklahoma.

_Doris Barrett_
Doris Barrett

1057

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 81**

---

**Declaration of Ernest Eugene Barrett**

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Edward Barrett, the oldest of three sons born to me and Gelene Dotson Barrett during our marriage. At the time I married Gelene, even before we had children, I almost immediately started running around with other women. When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father. Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved. At the time, though, I had my mind set on doing whatever I wanted as long as I was working.

I always worked and was determined not to live in the kind of poverty I knew as a child growing up. I went into the glass business and worked myself up from pushing brooms to production superintendent. When I retired, I was earning about $76,000 a year and had a good life. It was a far cry from the way I lived as a youngster.

I grew up dirt poor, in a log cabin with a dirt floor, no running water and an outhouse in Akins, Oklahoma, outside of Sallisaw. We had a wood stove for heat and a wood cook stove. We all worked and barely scratched out a living for my mother, father, two brothers and two sisters. I was the oldest child who survived and was born August 8, 1938. Three other babies were born, but they died. The next oldest who survived, Margaret, was born December 26, 1941. She died from cancer in 1995. After Margaret, there was Ike, born May 31,1944, Linda, born May 30, 1946, and then came Gary, who was born January 23, 1948.

1

1059

One of my earliest memories is being taken out of school to work in the fields alongside my parents.  As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sun up to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done.  I went to school when I could during the times when my family came back to Akins from working cotton and other crops.  I went to school off and on through the eighth grade in Akins and then started high school.  High school was different for me than for most of the other students. I met Gelene in high school before I had to quit after finishing the eleventh grade.   We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country.   I made the football team but had to quit because I could not get to after school practices.  We lived far out in the country and no one could pick me up and drive me back and forth.  Lots of students came from poor families, but my family had it even tougher.  Other students made fun of me and laughed at me because of the way I dressed.  I wore my shoes and clothes until they wore out,

2

and then we had to patch them and keep wearing them. I figure I had to fight every boy in my high school class to hold any respect.

My family had some pretty serious mental problems that folks whispered about back in those days.  My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness.  My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine. My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown.  My father beat my mother and us children with his fists and with anything he could get his hands on. I tried to get between him and my mother when he attacked her.  I got beaten more than the other children and learned never to cry when my father hit me.  I figure I have a very high pain threshold because I do not remember feeling a hell of a lot. Gary was the only child to hit my father back and that happened when Gary got bigger than Dad.  My father was 5'11" and weighed 185. Gary was 5'11" and weighed 270. Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between  my father and mother to try and protect her.  My father hit me across the shoulder with a 19-inch metal file that busted my shoulder wide open. My shoulder still has a scar. I left home that day just running because I knew that if I stayed at home I

3

would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds.   My mother stayed with him all those years and put up with his abuse but I could not.  My mother, Ada, was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was.  Plus, my father was difficult to figure out because he was also a decent guy when he was sober.   He worked on a pipeline for two or three weeks and then come home, went on a bender, and just went crazy.  There was no stopping him.  He died at the age of 52, sitting on the back porch with a cup of coffee in his hand.  He just laid his head back and died. The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it. I moved to Tulsa, where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955.  In March 1957, I lost my job because of a recession and had to return home for two months.  I joined the Marines and got my first lesson in drinking and chasing women.  I was in such good physical shape that basic training was a walk in the park for me.  I had been tossing hay bales since I was 12.  I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma, where they were picking cotton.

After I came home, I saw Gelene in Sallisaw; she was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois. They had helped her get a job at Walgreens.  I had been planning to apply for a job with Oklahoma Highway Patrol, a civil service job, when I ran into her. She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon I knew she had had a lot of experience with men. I was swept away by

4

how beautiful she was. Gelene called her aunt and uncle in Joliet, and they talked me into coming to Joliet. They told me I could make a lot of money at Kerr glass, and they could get me a job.

When we got married, I was a physical supernatural. I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep and go back to work. I was strong as a bull and would fight anybody that wanted to fight. I did not beat them up so that they couldn't work. Once I knocked them down I did not kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them. I would go out, drink as much as I wanted, and chase women. I kept that up for years until I met Doris, my third wife in 1985. I tried to keep my drinking away from the house and in bars. I was a Canadian Club (whiskey) straight with a water chaser drinker and drank a fifth at a time. Marriage brought out the worst in Gelene. She drank right from the beginning of the marriage and straight through when she was pregnant. She was miserable and complained constantly about how unhappy she was. She got mad over any little thing and had foul moods. When she got pregnant, she was miserable. Her bickering was constant. I stayed away from home as much as I could, working 16 hours shifts. I'd rather work a straight 16 hours than listen to her. I was a trouble-shooter at the plant and could memorize machinery blueprints. At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up. I preferred staying at the plant rather than facing Gelene and her drinking.

5

I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him.  He was colicky and cried all the time.  When he got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing. I cannot sit around either, but I am not as bad off as Kenny was.  Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished. I liked taking Kenny with me hunting.  Sometimes his little legs would give out and I had to carry him on my shoulders.  Boy, he loved that.  Kenny was fearless, but that he was a sensitive little boy too who cried if you hurt his feelings.

When I went home, I would never know which Gelene I would get, what condition she would be in.  I did not want to turn into my father and beat my wife and children.  One time Gelene cut up the front of my shirt with a knife when I was wearing it. I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985.  When I was married to Gelene I stayed away from home every few months for a night or two with other women.   Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys.  Gelene was always running back to Sallisaw where she was her daddy's number-one girl.

6

I felt bad about leaving my two boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved in to the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could, and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for a year. It was my nature and I was out of control when it came to fighting and drinking.

I called a friend in New Jersey and he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time.

Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too. Kenny was always upsetting her because he could not sit still and was always into everything. He loved my tools and he was always getting into them. I would find them all over the yard and in the woods. It made

7

me pretty mad.  Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work.  Besides, Gelene would not hear of it.  Kenny kicked and screamed to stay with me.  He was 10 or 11 years old and did not want to go with his mother back to Oklahoma. The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game, which she returned to their wives, and left me with forty-seven cents. I stayed single for five years before I married my second wife and then for six years before I married Doris.  I was married to Diane Kay Wilson from 1977-1979, and we lived in Dunkirk, Indiana. I paid Gelene child support, $150.00 per child until each reached 18 and also gave Gelene extra money for the children's school clothes every fall.  I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money. Years later, I showed Kenny canceled checks to prove I had paid because he did not believe me.  I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me.  I let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me.  I lost control when he sassed her, and I hit him pretty hard in the chest.  He went flying slamming against the wall.  One time I overheard Kenny and some boys talking about running from a fight.  I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight."  Kenny did not show any interest in learning to

8

fight or any interest in fighting.  Kenny was not much of a fighter.  Now his brother Steve, he was different.   He would have taken your lights out.  Kenny went back to Sallisaw after that summer and soon quit school for good.  He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma, around 1979.  I was still drinking, but no longer getting drunk or getting into fights at bars.  I worked and made a decent living.  We got Kenny a job and made a down payment on a Camero for him.  Kenny did alright for two or three months but he could not stay away from Sallisaw.  Kenny quit his job and went home.  I had to take the Camero back when Kenny could not meet the payments.  It hurt Kenny that I took the car back.  Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985.  Doris and I married in Fort Smith, Arkansas, on December 28, 1990.

Kenny had bouts of depression and did things that did not make any sense.  Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.  Kenny worked hard when he worked, but he never

9

seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

My father died in 1969, and my mother died in 1977. She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor. I believe in calling a spade a spade, and I would never call myself a good father. I still kick myself over the way I lived my life and the way I treated my children, I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is. I've tried to make it up to him by standing by him since all this trouble. I went to both state trials every day. I had just started a new job when the federal trial happened so I could only go to that once or twice a week.

Kenny's trial attorney, Mr. Hilfiger, only interviewed me a few minutes before I testified. I did not know what kind of information could help my son, so I just answered questions the best I could.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when we talked.

I declare, under penalty of perjury, that the foregoing ten (10) page declaration is true and correct.

Executed by me this __10th__ day of 2009, in ___Creek___ County, Oklahoma.

Ernest Eugene Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 82**

_____

## DECLARATION OF JACK GORDON

I, Jack Gordon, declare the following:

I am a lawyer admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court.

I was second chair counsel to attorney John David Echols in Kenneth Eugene Barrett's second trial in state court. I was primarily responsible for the second stage of trial, which never occurred, because Mr. Barrett was acquitted of first degree murder and was convicted of manslaughter.

Our second stage psychological expert witness was Dr. Jeanne Russell of Tulsa, Oklahoma. I had prepared her testimony and the testimony of other witnesses based on the investigation and reports that were generated by the investigators working with us on the state case, including Roseann Schaye, who had acted as a mitigation investigator for Mr. Echols before Mr. Barrett's first state trial.

I am aware that after Mr. Barrett's second state trial, he was charged in federal court. I am also aware that Mr. Echols, for a time, represented Mr. Barrett in federal court, but withdrew before the trial. I am aware that Roger Hilfiger and Bret Smith of Muskogee represented Mr. Barrett in his federal trial.

I was never contacted by either Mr. Hilfiger or Mr. Smith regarding the work I did on Mr. Barrett's state case for the penalty phase. Nor did either Mr. Hilfiger or Mr.

1

Smith, or anyone working for them, retrieve my file in Mr. Barrett's case.

I did not write this declaration. The above information was related to one of Mr. Barrett's current counsel. I have read carefully the contents of this declaration, and it accurately reflects what I told one of Mr. Barrett's current lawyers.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this 2 day of March, 2009, in Rogers County, Oklahoma.

Jack Gordon

-2-

1071

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 83**

---

**DECLARATION OF GWENDOLYN CRAWFORD**

I, Gwendolyn Crawford, declare the following:

I am Kenneth Barrett's maternal cousin.  My mother, Phyllis Crawford, is Kenny's mother's sister.

My family has struggled with mental illness a lot.  I have bipolar disorder and am treated for it.  For a long time, my family had no idea what to make of my moodiness.  When I was a child, I paid a terrible price because family and friends thought I could control my mood swings.  I used to smoke a lot of marijuana, before I figured out that it was the exact wrong treatment for what ails me.  I am taking prescription drugs now, and it has allowed me to control my moods much, much better.

Both my children have mental problems.  My 24-year-old son Brandon cannot speak and is clearly developmentally challenged. He is a dear boy, warm and responsive.  My daughter, Brandie Hill, also has depression, and is possibly bipolar, but she is fearful of treatment.  Her husband, Shawn Hill and I encourage her to get treatment, and we are hopeful she will make the right decision some day.

For a while, I lived in a trailer just below Kenny's shack on the other side of the ditch that OHP came though when they raided Kenny's.  Sometimes Shawn and Brandy lived with me there, too.  It would have been impossible for a Mazda to go through the two-foot deep ditch without bottoming out and destroying her transmission and oil pan as Brandie Price had testified.

–1–

1073

I know Kenny, and he would not talk about killing police or going down in a blaze of glory.  That would not have been Kenny.

I have known Cindy Crawford for years.  She is married to my brother, Travis Crawford.

It is my personal opinion that Cindy Crawford is a totally dishonest person.  I am also aware that her reputation in the community for honesty and truthfulness is extremely poor.  I would describe Cindy Crawford as one of the biggest manipulators I have ever seen.  She can turn the "water works" on and off to get what she wants, and can also be charming when she needs to be to get something of advantage to herself.  Cindy Crawford has broken into my house and stolen from me on numerous occasions in order to get money to buy drugs.  She is basically a compulsive thief and a liar.  Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding my family.  It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself.

My problems with Cindy Crawford reached the point where I actually took a shot at her, and had to go to court over it.  The court case was resolved with me being put on probation.  When I was in court to resolve my case, a lady came up to me and asked if I needed her to testify for me because Cindy Crawford, on the previous day, had beaten this lady's daughter severely with a beer bottle.

–2–

1074

I love my brother Travis very much, but there was no helping him when he was around Cindy and taking drugs.  Travis told me that before he testified in Kenny Barrett's trial, he did two hits of methamphetamine, and was under the influence of the drug when he testified.

I was aware that Kenny was on trial in 2005.  No defense attorney or investigator ever spoke to me about my immediate family or Kenny regarding Kenny's case until last month.  Until recently, no one working on Kenny's case asked me about Cindy Crawford's honesty, either.  If someone had asked me to testify about the things in this declaration, I would have done so.

After investigators working on Kenny's case asked me about my family and Cindy, one of them came back and showed me this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this _27_ day of _February_ 2009, in _Sequoyah_ County, Oklahoma.

_Gwendolyn Crawford_
Gwendolyn Crawford

–3–

1075

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 84**

_____

## Declaration of Issac Barrett

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother.

My wife, Oleta, and I lived on a nice little ranch in Akins, Oklahoma, on land that was inherited by various members of my family. We have a few horses, a few head of cattle, a good dog, and six cats that are self-taught copperhead killers. We also have cougars, coyotes, and bear around here, and we have to keep an eye out for them. I used to hunt but don't care about it anymore. Oleta and I feed deer and wild turkeys all winter, always at the same time of day. If we're late, the deer make a sound and let us know it. Our property is surrounded by woods, and lots of people would think it is pretty idyllic. My grandfather owned 1/3 of this land by himself and 2/3 of this land, twenty acres, with my Uncle John. They died intestate as did my parents. Uncle John's only child Elnora Long, my half-aunt and half cousin, got John's ten acres, which I bought from her. The remaining 20 acres was divided among my grandfather's and Uncle John's grandchildren. We each got 11/144. I bought out most of my family and paid better than the appraised value, and traded for the rest or acquired it by quiet title. Before I bought it, it had lain dormant from 1962-1980; no one lived on it or worked it.

We are able to enjoy life now because we worked hard for it; Barretts are hard working people. Busted my leg twice and my collarbone once. I drive a construction truck for a small outfit now. Before that, I was a production supervisor for 10 years at an open pit, strip surface mine, in Huntington, Arkansas. My job at the mine eventually became a union job. I spent two years in college at West Arkansas College. When I was

<div align="center">–1–</div>

1077

growing up, I worked on ranches.  When I was 15 or 16, I broke horses for $15.00 a horse.  I rode a horse every day for six weeks, and if the horse got broken in, I got paid.

From 1917 to 1943, my grandfather and namesake, Isaac Clifford Barrett, managed a 20,000-acre ranch owned by a Kansas doctor, B.B. Ralph. The ranch has since been carved up some, but much of it is a hunting preserve.

My family goes back a ways around here, and we heard interesting stories about them.  My grandfather Isaac married Mary Ellen Maxwell whose mother was Mattie Newby. Mattie married William Maxwell.  Mattie and William had nine other children besides my grandmother Mary: Hazel, Opal, Ivy Harold, Howard, Jim, a boy named Ann, Sam and Albert.  Isaac didn't like to ride in cars. He used a wagon and a team of mules. He was a walker most of all. He didn't have much to say. He chewed tobacco. We called him Papa. We always had a big garden.

Isaac was a fair man.  When I was three or four Isaac told me, "I'm going to take Mr. Rogers some green beans, radishes and new potatoes—he's been sick, bad off— he's our neighbor; we need to share with him." "Please let me go!" I asked. At first he said no because the grass was so high and he was carrying two large buckets. I begged him, "Please!" Isaac agreed and said, "All right, but you have to keep up with me," and I did.  Coming home, we passed a pear orchard and I asked if we could pick one. He said, "No, they're not our pears."  I tried to argue with him and pointed out that he just gave Mr. Rogers all that food, but he explained, "That's because we have plenty—that doesn't entitle us to these pears." That's the way he was.

Isaac sure had his burdens to carry after he married into Mary Maxell's family. She walked around the yard talking to herself.  At night, she would wake up, wash jars,

–2–

1078

and think she was canning.  Mary's brother, Howard Maxwell, who worked for Douglas Aircraft in Tulsa, was Loony Tunes and his son Dean Maxwell put a gun to his head and pulled the trigger about 10 to 15 years ago.  Dean is buried in Akins Cemetery.

Papa (Isaac) committed suicide by ingesting a remedy for black leg cattle disease. My mother told me he killed himself because he had a broken heart.  The range was open in Isaac's day. Isaac eventually assembled a small herd, and was cow rich.  His son Wilson, they called him Barney, hounded him to sell the herd and invest the money. Finally, Isaac gave in. He sold the herd and never saw the money again after giving it to his son.  Took away Isaac's way of life.  He had nothing left.  He killed himself November 24, 1952, and is buried in Akins cemetery.  My grandmother died a little more than ten years later, on December 25, 1963.

Whatever good Isaac had in him, and there was plenty of it, did not pass down to his son, A.J., who was my father.  A. J. married my mother, Ada Mae Hatter.  I loved my father because he was my father, but as a person he was the sorriest man I ever met in my life.  I was born in Marble City, Oklahoma, and then my family moved to Akins, Oklahoma. Both are in Sequoyah County.  We lived a hard life. I had three other brothers who died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains.

The cabin we lived in had no electricity or running water. Our well water was not usable for humans, although it was all right for animals and crops. We had to haul our water.  My parents got electricity in 1957. Six years later, they got water and a drain. The entire family had to work in the fields traveling from one crop to the next.  We worked strawberry crops, and one time we went to California to pick potatoes.

1079

My father was an abusive alcoholic and a bully who only cared about himself. He mortgaged cattle that he didn't own and left it to us kids, every one of us, to pay the debt off by picking cotton and green beans. His mom and dad once bought him a pair of shoes—we were so poor—he didn't like them so he threw them in the fireplace. He would destroy his own stuff. His attitude was always, "I'm bigger than you—the hell with you." My brother Ernie is a lot like my father.

If my father was in a bad mood, he hit me or the other kids with any damn thing, belt, club, board, or limb. He hit all of us and my mother. I never knew from one day to the next what was going to happen. He was drunk for two weeks at a time. I could never bring my friends around. Sometimes he was away, working pipeline or the lime quarry. Nobody wanted him to be at home because of the crazy things he did. He raped and impregnated one of my sisters, Margaret. He beat her bad if she came home from a date late, and once she said, "Beat me some more, I don't care; you've done everything else." I didn't know what she meant at the time, but now I do. My sister went to New Orleans, had the baby, and gave it up for adoption. My father went to Vinita to the state mental hospital but came back after a month. He was constantly messing around with other women, and rumors flew around that he fathered another child.

When I turned 14, I had had enough of him beating my mother and us kids. The next time he hit my mother, I hit him back with a fireplace poker that opened a five-inch gash. I knocked him out cold. When he came to, I said, "You touch my mother again and I'll kill you." I think he knew I would. He never hit her again when I was around, but he hit her plenty when I wasn't there, busting her eardrum one time when he slapped her. As I got older, I just stayed away from him.

-4-

Some of my family had some pretty serious problems as they grew up. Kids in school called my brother Ernie "Loco" because of the way he acted, and he never completely straightened out. Ernie was pretty cruel and treated us kids pretty rough. When he made us cry, he thought it was funny. He would destroy what little things we might have. My sister Linda is not mentally stable and has treatment by a psychiatrist. My other sister Margaret left home, moved to Bloomington, Illinois, married Morris Cochran and had three boys with him (Kurt, Kent, and Kelly). She died from cancer in 1995. My brother Gary seems to be doing pretty well, but he struggles with a dark side he keeps hidden pretty well.

Ernie married Gelene, and I felt sorry for her. Ernie was Mr. Playboy and good for that one thing only--to use and to walk on women. He botched his marriage. He was always flashing dollars, but he didn't mind taking money from others, even our poor mother. In the Marine Corps, he got in trouble and was going to go to jail unless Mama sent him $1,000. She borrowed it. We picked cotton to pay it back. In 1969 when dad died, mama had to send Ernie money so he could come home for the funeral, but he always acted like Mr. Big.

My mother knew there was something wrong in the head with Ernie, but she covered up as best she could. Ernie would roll dad if he was drunk and passed out and dad had any money. Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him. The children were wearing worn, ragged clothes. I said, "Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful. The less Ernie wanted Kenny, the more Kenny

–5–

1081

worshipped him.

Gelene had something wrong with her, too. I would come over and some new boyfriend would just be getting out of bed—you never had any idea who was going to be there in the morning. My mother used to keep Kenny and Richie. When Gelene was at Mama's she did not drink, but when she had money, Mama would not see her again until she drank it up. Gelene was a drunk when she was in high school. I met a man who said that when Gelene worked in Walgreens in Joliet right after high school, before she met Ernie, she would get drunk with him, strip for him, and sleep with him. Gelene had two extremes—alcoholic and Jehovah's Witness—and she was definitely in the alcoholic mode when she begat Kenny.

Gelene's dad, Hugh Dotson, was a strange duck. He could not sit down and talk, like he was paranoid, looking around all the time.

There was a pattern in my family that went right down the line—the two suicides and Kenny's attempted suicide—mental illnesses of one kind or another that showed itself in so many ways. The dots connect. Look at Ernie, our father, grandfather and great grandfather. Ellie Long, who is my grandmother's daughter, but is so close to our age we called her "Sis," has serious mental problems. She's a nut out. Where I'm going with this is that I think Kenny was a very paranoid person. Something was wrong with him even when he was a little one. As he got older, Kenny's moods were all over the place.

I was aware that my nephew Kenny Barrett was tried in federal court in 2005. Before or during his trial, no lawyer or investigator working on Kenny's case contacted me. Had I been contacted, I would have provided the information in this declaration and would have testified if asked to do so.

—6—

1082

–7–

An investigator currently working on Kenny's case asked me to tell him about my family. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when he asked me.

l declare, under penalty of perjury, that the foregoing 7-page declaration is true and correct.

Executed by me this 2 day of March, 2009, in Sequoyah County, Oklahoma.

Issac C. Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

———————————————————

**EXHIBIT 85**

———————————————————

Exhs. § 2255 Motion                                          *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

**Declaration of Janice Sanders**

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and neighbor. I presently live with my mother, Ada Blount, who is Gelene Dotson's mother's sister. My husband Tom Sanders is Monk Sanders's uncle. My husband and I are presently separated. He lives just down the road from us in the house we used to live in together.

Kenny was a hyper little boy, the most hyper child I have ever seen. Kenny could not sit still, no matter what. Kenny also had strong feelings.

I love Kenny and was never afraid of him. That did not stop me from calling the police on Kenny on several occasions for playing the radio too loud or because I thought a bullet had accidently whizzed by my mother one afternoon when Kenny was firing his gun and she was outside. That call to the sheriff brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting Kenny's rifle to see if it was legal. I watched them there from across the road. I saw the police drive onto Kenny's property and saw him hand the rifle to John Philpot, the Sheriff. John looked at the rifle and gave it back, and the police left.

Carolyn Joseph told me that Kenny once threatened to burn my house down because of my calling the police on him, but neither of us took it seriously, not for a minute. Once when I was walking by his property Kenny threatened my dog, if it ever came on to his property. I never did take it seriously. Kenny would never hurt anyone or anything.

In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more

Page 1 of 4

apologetic.  The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened.  About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler.  He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

About a week before the incident, and about two weeks after Johnny Philpot had come by and visited Kenny on his porch, I drove over to Kenny's house.  The gate was open. I asked Kenny if I could give him a Bible. He took it and he could not have been any sweeter. I told him we cared about him.

I was awake at the time of the raid on September 24, 1999, and living with my husband. I had awakened to go to the bathroom and had just gone back to bed when the shooting started. I did not see any police lights when I got out of bed, although from the way my house is situated, unless I went to the kitchen or the front door I could not have seen the road.  I did not go to the kitchen when I went to the bathroom.

When the first rounds were fired, I assumed it was Kenny, because Kenny often fired into the air at night. Kenny did not fire what sounded like semi-automatic or automatic weaponry when he fired into the night or when he fired during the day. It was always one or more distinctly separate shots.  Soon, I no longer thought it was Kenny because of the large number of rounds fired and the rapid firing. I had no idea what was going on outside, who was shooting, and then it stopped as suddenly as it had begun. It all happened so fast. My mother called me after the shooting had stopped for a minute or two and said she saw police lights.

<div align="center">Page 2 of  4</div>



I have always wondered if there were really a warrant out for Kenny's arrest, as I learned later after the raid. Why didn't they arrest Kenny then, when John Philpot came out a few weeks earlier or when they had his weapons and there were five police cars on his property?

At the state trial, the prosecution subpoenaed me and made me read aloud the words on the sign that Kenny had on the gate. This upset me, both because the sign was meaningless and because I had never read the sign before they showed it to me.

Mr. Littlefield came to see me. Johnny Philpot accompanied him. Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced. Mr. Littlefield said, "You want him living next door to you again?" And I said, "Why not?" I told him that I thought the state sentence was fair and that I wasn't afraid of Kenny. Mr. Littlefield was very hateful to me.

Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way.

I recently told an investigator working on Kenny's case the information I am saying in this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that this 4-page declaration is true and

Page 3 of 4

correct.

Executed by me this _27_ day of _Feb_ 2009, in _Sequoyah_ County, Oklahoma.

Janice Sanders

Janice Sanders

1088

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| ) | |
| KENNETH EUGENE BARRETT, ) | |
| ) | |
| *Defendant.* ) | |

——————————————————————

**EXHIBIT 86**

——————————————————————

## Declaration of Kathy Trotter

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin. My parents are Ike and Ruth Barrett. Ernie Barrett is my uncle.

I grew up in Fort Smith from the second grade through the seventh, when we moved to Alma, Arkansas, where I spent my eighth and ninth grades. I moved to Sallisaw in my sophomore year where I stayed with my father. My parents divorced in 1977. I stayed in Sallisaw until the middle of my senior year in high school when I went back to Arkansas to live with my mother because I found my dad too demanding and controlling. I drove back to Sallisaw every weekend to see my friends. My brother Glenn, who is four years younger than I am spent 20 years in the U.S. Navy, married a Japanese woman and moved to Japan upon his retirement.

You cannot pick your family, so I have learned to live with mine. Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression. My aunt Linda, who is my father's sister, is mentally ill, as are Ernie Barrett and Elnora Long. My dad calls Elnora, "Sis" because they are about the same age, even though she is his grandmother's daughter. I call her Ellie. She is very emotionally unstable. All the children loved her, but she flip-flops and her moods are unpredictable. She will say she loves you on one extreme and that you are dirt on the other. She is prone

K.T.

to snap, start shaking really badly, and whatever is on her mind comes flying out of her mouth. She is manic-depressive.

I have also had mental health issues. In 1985, I was an inpatient at Harbor View in Fort Smith for one week for a chemical imbalance, anxiety and depression. Two years ago, I weaned myself off medication I was prescribed in 2006 by Dr. Tom Coburn of Muskogee.

Kenny had a tough time coming up with the parents he had. His mother Gelene used to drop Kenny and his two brothers off at the home of their grandmother, Ada Mae Barrett so she could party with my Aunt Linda Riley. My parents told me Gelene was a drunk right out of high school and I never saw a reason to doubt that. I always thought Gelene was mean, that she had a mean spirit. The way she would talk to us kids was angry. I was afraid of her. Maybe because Kenny was older, Kenny did suffer more verbal abuse from her than her other two children.

Back then we called Kenny hyper. He was erratic and temperamental. He did not have a family that loved him or cared for him, and it was apparent to me that Kenny was deeply troubled. He would do irrational things, like ride bikes down a dangerously steep, extremely bumpy hill. He could be very kind and generous and he could be very agitated and mischievous. I had to be a tough girl to hang with him, but it was something I wanted to do. I love Kenny; I care about him

Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction. Ada Mae was very well thought of, and was someone who worked extremely hard. My father is a lot like she was.

Mr. Smith, one of Kenny's lawyer's, spoke to me a few minutes before I testified. When I was on the witness stand, he did not ask me any of the questions that he asked me when we spoke beforehand. He never asked me about our family's history of mental health issues, either before I testified or on the witness stand. I thought my testimony was pointless.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it says what I told him when we talked, and if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct. Executed by me this 24th day of February, 2009, in Sequoyah County, Oklahoma.

_Kathy Trotter_
Kathy Trotter

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 6:04-CR-00115-JHP-SPS |
| | ) |
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| Defendant. | ) |

**EXHIBIT 87**

Exhs. § 2255 Motion                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

**<u>Declaration of Linda Riley</u>**

I, Linda Riley, declare the following:

My husband, Fred Riley is a former barber who receives disability for PTSD, a consequence of his service in Viet Nam during the war. I have twin daughters, Stephanie and Jennifer, both of whom struggle with bipolar disorder. Stephanie's seven-year-old son, Ben Thomas, has been diagnosed with Asperger's Syndrome. Jennifer's' disorder was discovered when she was training in the military during the first Gulf War, and she now receives disability from the U.S. Air Force.

Growing up was difficult because of what we had to go through. My mother was Ada Mae Hatter Barrett, who was born September 10, 1919. My father was A.J. Barrett, and he was a drunk. We all had a lot of resentment toward mom for staying with him. We loved her and respected her, but there was a part that didn't because of what we had to go through growing up with the humiliation and the shame. Wearing old clothes, clothes with holes, starting high school and not having the clothes we needed. I got along a lot better with my mom in her later years. All those bad feelings about my mom were very strong until my daddy died. After he died, I was getting more mature, I looked back, and I saw how incredible she was. She fixed her own sewing machine, cooked from scratch, and raised five children. She had two breach babies at home by herself. Women didn't have the choices to leave back then that they have now. They had nowhere to go and no one to help them.

My father had plenty of rage in him. Dad worked for St. Clair Lime in Marble City driving a truck, but his drinking caused him to lose his job. Mom started to work in

1094

1951 when my brother Gary and I were little. We stayed with Granny Bell and Papa (Isaac Clifford) when she worked. She did not work long at first but went back to work when I was 12. She worked in the Sallisaw hospital laundry from 1958 until her death, March 24, 1976. She was a hard working woman. My dad did not want her to work, but we would have starved without her income. Granny Ida knew a lady who had a field of purple hull peas. The lady said my mom could have what was left for our cattle, but we picked them and that's what we ate for two whole weeks, that and cornbread. That was in 1958.

My mother was a very unhappily married woman. Although she loved my father, she nagged him. When he had had enough, he went to town and got a bottle of whiskey. My mom did not like my grandparents and had great resentment towards her mother-in law, Granny Bell (Mary Ellen Barrett) and her sister-in law, Esther Marie Barrett Floyd.

My grandparents had plenty of nice things, and my mom thought they should have shared more with her. My grandparents were wonderful to me, and I was Aunt Esther's favorite. She told me so. Aunt Esther tried to give me her 10-acre pasture in 1991, but I had two daughters starting college and besides 1 could never live in Akins again because of the shame of growing up there.

I am not like my brothers. I moved away from the family right after Mom died. I did not want to be like them, fighting all the time, with no loyalty or kindness for each other. My sister Margaret felt the same way and moved to Bloomington, Illinois. I worked as a machine operator at Planter's Peanuts for some 21 years and before that I worked for two years at McDonnell Douglas in Tulsa.

Page 2 of 8

1095

We think my dad was bipolar. My mom sent him to the insane asylum in Vinita. This is the same place where my father's granddad, whose name was also Andrew Jackson Barrett. died. My dad's granddad is buried at Maple Cemetery and has a military stone.

My dad used to puncture the tires on my mom's car and would threaten to cut her throat.  On the other hand, when I was pregnant with Craig, my daddy said he would buy me two pantsuits if I had a boy. When Craig was born, he took his money from digging graves and we went shopping together. He kept his promise. He was so proud.

I was not afraid of my father.  One time, my mother had been hiding from him in the woods all day and I found her. Daddy had cut the phone lines, which he often did. He could be meaner after a drunk than when he was drinking. I went to the house and called him a son of a bitch and told him I was going to the neighbor's to call the sheriff. Dad said if I walked off that hill, he would shoot me. I walked out and was going down the hill when I saw the gravel skip near my feet before I heard the shot, but I kept going.  I called E.W. Floyd, Pretty Boy's brother, the sheriff. He arrested my father, but Mom had him out by sundown. It made me resent her and that's when I decided she was on her own.

The last time I saw my dad alive, I had driven down from Broken Arrow to see my mother.  I walked into the kitchen and I could see from Mama's face that Daddy had slapped her and daddy had messed up the house like he did when he went berserk. I confronted Dad, and he told me to get my ass in my truck and go back where I came from.  Mama gave me a look and I knew if would be best for her if I left. That was the

1096

last time I saw him alive. The next time I saw him he was on the slab and I said, "I love you daddy, but you were one mean drunk old son of a bitch."

Daddy was a cruel person at times. My sister Margaret told me in 1994 that my dad had raped my mother's younger sister, Wanda, when she was 13-years old, soon after Mama and Daddy were married. When Mama asked him why, he said because he wanted to be the first one. Granny Ida later took Wanda to Rocky Point, Oklahoma, to have a clothes-hanger abortion, so there's no telling how many times he abused Wanda. We never knew why our girl cousins couldn't come to our house, but now that questioned is answered.

I went to family therapy by myself more than once. I take Welbutrin, which is prescribed by my family doctor. I felt like I needed something. I didn't think I was depressed, but my family did. I married Fred Riley on September 30, 1980, in Poteau, Oklahoma; he is my fifth husband. I did not have children with Fred or with two of my other husbands. I married Jimmy Holden in March 1976 in Fort Smith and divorced him the same year. I married Bill Harris April 7, 1979 in Fort Smith and divorced him a few months later. I married Pat Sherrard in Inola, and divorced him in Sallisaw.

Ernie and Gelene had a volatile marriage. They got married on a dare.

They were wild. Gelene always drank. There is no doubt in my mind she drank all through her pregnancy with Kenny. To be fair, we had no knowledge back then of how bad alcohol could be for the fetus. In 1968, Richard, my first ex husband, took Craig when he was a baby and me to visit them. Gelene would get out of control. One night we drove into Chicago. We went to a supper club, ate, and had a good time until Gelene got

up on the table and started dancing. She was famous for that. She wanted attention; she was a doll, but she did not have to do that. When Gelene had Stevie, the marriage was over. It was a funny marriage – they both loved the children, loved to party and they were both wild. Whatever their marriage was, it worked for them sometimes. Ernie loved them all. He is very complex.

In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma. It was the winter and she moved in with my mom and dad.

Mom worked and daddy would go squirrel hunting every day. Gelene would stay in bed all day with Richie, every day. She did not get out of bed until my mother had dinner on the table. Kenny was three and a half. He would cry when my mother went to work. My mother showed Kenny so much love and tenderness. Kenny would just wander around in the cold house alone without a wood fire to warm the place. Gelene did not change Richie's diapers.

Gelene was depressed. She did not drink around my parents. She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut. Kenny had nothing to eat. Gelene would not even get out of bed to feed him. I would come and he would have a box of Rice Krispies in his hand. Mom took Kenny to see Dr. Bob Mitchell because Kenny was so frail and wouldn't eat anything but those Rice Krispies. They discovered then that he had a heart murmur and Dr. Mitchell had mom put Kenny on beer to help him gain weight, but that didn't last long because my daddy would drink the beer, so Kenny

Page 5 of 8

remained frail and thin.

Kenny never had a chance.  I remember when they were living with my parents, I found Kenny standing on one of the chairs, looking out the window. "What you doing bubby?" I asked.  "My daddy's going to come get me," he said. "He has a fast car." It was that way forever. Sometimes I would find him sitting next to his mom's bed waiting for her to wake up. I feel like I abandoned him when I moved away around this time to Broken Arrow.

Gelene, Kenny and Richie stayed at my parent's house for five months. At first, Gelene felt safe at my parents.  She could not go to her own people.  Hugh was a strange man.  Then one day A.J. told Gelene he was going into town to get condoms and that when he came home he was going to have sex with her.  Gelene moved Kenny and Richie to Aunt Ruth's before A.J. got back.  At that time, my mother did not believe Gelene, but when Mama was on her deathbed, she begged for Gelene to come. Mama told Gelene that she was so sorry she hadn't believed her.  There is no telling what Kenny saw and heard back then, when he was wandering around alone at mom and dad's house.

Kenny was the cutest boy.  He had the sweetest smile.  He loved everybody.  He didn't have anybody looking out for him after my mom died. Steve was whining and crying.  Richie was tattling. Kenny was just yelled at by Gelene.  Kenny's whole life she screamed at him.  He once told his Aunt Phyllis that he would lay awake nights because he couldn't get her voice out of his head. Kenny just wanted to be left alone by her, to avoid her, but she never gave him a break. He didn't have a moment's peace; she was incessantly nagging and screaming at him. He had to have taken himself somewhere else

Page 6 of 8

1099

emotionally and mentally to endure this.

Gelene would do anything in the world for anyone.  Nothing is any trouble for her.  What would be an inconvenience for others is not for her.  She is a Jekyll and Hyde – you never know who you're going to get. To her Kenny was always trouble, like she took Ernie out on him. He was always doing something wrong, could never do anything right. He was left to watch his brothers all the time while she partied. She wanted them not to love their daddy. She would tell them stuff you don't tell your kids, like when her child support was late.

When Gelene was in a Jehovah's Witness mode, one Christmas she brought the children out to my mother's, and would not allow the children to receive the gifts we had bought them.  Jehovah's Witnesses do not celebrate Christmas in the manner of most other Christian faiths. I took her into another room and I told her in no uncertain terms she was not going to take Christmas away from the children or my mother. If she refused, I would have taken her down like a dog.  Gelene left, and the children got their presents.

I love Kenny; I did not go to the trial but I was always praying for him.

After I spoke with an investigator working on Kenny's case, he asked me if I would provide the information I gave him to the court.  I did not write out this declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct.

Executed by me this 28 day of February 2009, in

1100

_Sebastian_ County, Arkansas.

Linda Riley

1101

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 88**

## DECLARATION OF MIKE MACKEY

I, Mike Mackey, declare the following:

I have known Cindy Crawford for several years. It is my understanding that she testified against Kenneth Eugene Barrett at his federal trial in Muskogee for the murder of an Oklahoma Highway Patrol Trooper.

Before or during Mr. Barrett's federal trial, I was not contacted by any attorneys or investigators working on his behalf. Had I been contacted, I would have given them the following information about the honesty of Cindy Crawford, and would have been willing to testify.

To put it bluntly, Cindy Crawford is the most wickedly evil person I have ever run across. She will do or say anything to get other people in trouble, if she can get something out of it and if she thinks she will benefit. She is totally dishonest, and lies constantly. This is not only my personal belief, but I am also aware that her reputation for honesty in the community is horrible. In the past, Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding me and my step son, who is mentally handicapped, and has also used false information in an effort to get victim protective orders. For example, I once saw her walking down the road while I was driving by. I did not stop and speak to her, and did nothing to her. Within days of this non-incident, she sought a victim protective order against me. She has made false claims of wrongdoing against other members of her family. Cindy Crawford has broken into my

1

1103

home on numerous occasions and stolen things in order to buy drugs. It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time and has managed to stay out of trouble herself because of this. She "works the system" in order to get whatever she can that will benefit her.

An investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this ___1___ day of _____March_____, 2009, in ___Sequoyah___ County, Oklahoma.

_Michael W. Mackey_

2

1104

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

---

**EXHIBIT 89**

---

**DECLARATION OF MYLA H. YOUNG, Ph.D.**

I, Myla H. Young, declare as follows:

1.      I am a clinical psychologist licensed to practice in the State of California, specializing in neuropsychology and neuropsychological assessments.   I am Board Certified in Neuropsychology by the American Board of Professional Neuropsychology (ABN).   I am a member in good standing of the American Psychological Association and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the National Academy of Neuropsychology; the International Neuropsychological Society; and the Society of Personality Assessment.

2.      I am currently in private practice and conduct neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients.   I have conducted neuropsychological evaluations of children, adolescents, and adults.   I am an instructor of continuing education courses in the Neuropsychological Evaluation of Criminal Offenders and Introduction to Neuropsychology at the University of California, Berkeley, and at Alliant University.

3.      I hold a doctorate in Clinical Psychology from Alliant University, formally known as the California School of Professional Psychology in San Francisco, California.   I received my Masters Degree in Experimental Psychology from Towson State University in Baltimore, Maryland, in 1977.   I earned my Bachelor of Arts Degree in 1975 with a major in Psychology from the University of Guam.

4.      From 1984 to 1985, I completed a pre-doctoral internship at Garfield Geropsychiatric Hospital in Oakland, California.   During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, or psychiatric disorders.

5.      I completed a pre-doctoral internship at the McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California, from 1985 to 1987.   While at St. Mary's Hospital I conducted neuropsychological and psychological evaluations of children, adolescents, and adults

1

who were hospitalized for psychiatric treatment, and provided treatment to these same individuals. I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurosurgery, neurological and other medical disorders.

6.     In 1989, I completed a post-doctoral fellowship in neuropsychology at San Francisco General Hospital/University of California, San Francisco. During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders. I conducted neuropsychological and psychological evaluations of children and adolescents who had been referred to the Child and Adolescent Sexual Abuse Resource Center. In addition, I participated in research that evaluated the neuropsychological, neurophysiological (evoked potential), and psychological functioning of men and women who tested positive and negative for the human immunodeficiency virus (HIV).

7.     From 1990 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility, a California State Prison, in Vacaville, California. During this period I served as a staff psychologist, providing neuropsychological and psychological assessments of individuals who had been admitted for acute and sub-acute psychiatric treatment while confined in the California Department of Corrections. I was part of an interdisciplinary treatment team and served as the clinical coordinator responsible for the development, implementation, and evaluation of a behavioral milieu treatment program. I provided staff training in neuropsychological assessment and behavioral treatment and psycho-diagnostic evaluation, and supervised pre-licensed Ph.D. candidates. I also trained and supervised pre-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children at Oakes Children's Center in San Francisco, California. I trained and supervised pre- and post-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children, adolescents and adults at the McAuley Institute of St. Mary's Hospital in San Francisco, California.

8.     From 1995 to 2000, I served as the Program Consultant for Psychology for the California Department of Mental Health facility located within the Correctional Medical Facility at

2

Vacaville, California, and served from 2000 to 2005 as the Senior Supervising Psychologist in the same prison's psychiatric treatment program. In these positions, I was the psychology consultant to the Executive Director, Medical Director, and Program Directors, was responsible for research and program evaluation, provided clinical supervision and consultation, and provided direct inmate/patient care. I was also the principal investigator for research, program evaluation, and treatment outcome measurement. I developed, accomplished accreditation of, and served as the director for an American Psychological Association accredited psychology intern training program, provided seminars in neuropsychological assessment, and provided individual and group supervision to psychology pre-doctoral interns and post-doctoral fellows.

9. From January 1990 to June 2004, I served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology where I taught courses on neuropsychological assessment. I was the dissertation chairperson for several doctoral students and served on the dissertation committees of numerous other doctoral students. The students pursued varied and wide-ranging areas of investigation involving both children and adults, psychotic and non-psychotic individuals, and persons confined in penal institutions as well as persons not so confined. I am the primary author of several studies which have appeared in peer-reviewed publications involving the prison population and the secondary author of several additional peer-reviewed publications.

10. I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology. I have been qualified as an expert witness in criminal cases in state and federal criminal courts in California, Nevada, Washington and Hawaii and in civil cases in California state courts. Further description of my education and professional experiences is included as Addendum A.

11.     I was asked by the current post-conviction attorneys for Kenneth Barrett to complete a neuropsychological evaluation of Mr. Barrett to determine if he experiences brain damage and, if brain damage exists, the nature, severity and functional impact of that brain damage.

### A.     Introduction: Brain Functioning and Neuropsychological Assessment

12.     The science of clinical neuropsychology studies the relationship between the brain and behavior.  Because the brain is the human organ that drives behavior, any injury or insult has the potential to adversely affect a person's actions, thought processes, cognitive abilities and psychological functioning.  Conversely, observable behavioral deficits, including failure to meet developmental milestones and impaired scholastic, occupational and/or social functioning may suggest compromised brain anatomy or neurophysiology.  Consequently, historical, academic, vocational, medical/psychiatric, family, and social history information may provide reasons to suspect brain dysfunction or damage and make a comprehensive neuropsychological evaluation appropriate and/or medically indicated.

13.     A competent evaluation of neuropsychological functioning requires administration of a full battery of standardized neuropsychological tests, review of information from documents that are available, interviews or reports of interviews of those who have knowledge of the individual's history, and interviews with the individual being evaluated.  Focus of information sought includes family, medical, psychiatric, and social histories, circumstances of prenatal development, circumstances of childhood and adolescent development, educational, work, offense information, and description of current functioning.

14.     A comprehensive neuropsychological testing battery also includes measures of different aspects of brain functioning, including general mental ability (intelligence), sensory perception, motor functions, attention and concentration, verbal and visual memory and learning, expressive and receptive language, psychomotor and executive functioning (abilities to think, organize, reason, plan, inhibit impulses, think and act flexibility).  Based on knowledge of brain anatomy, brain functioning, and neurological disorders, instruments used in a neuropsychological evaluation are developed to identify and measure cognitive deficits caused by brain dysfunction,

1109

and, if impairment is demonstrated, to provide an indication of the potential cognitive and behavioral consequences of disrupted brain functioning for the individual.

15.    Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is supported and relied upon by contemporary neuroscientists in understanding brain function and dysfunction.

16.    Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to maintain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and frontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

17.    In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a predictable and unchangeable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

18.    In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language

5

1110

academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and frontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

19.     As the brain develops, those brain regions that are maturing the most are also those brain regions that are most vulnerable to brain damage, identified as the "vulnerability hypothesis." Consequently, the child who experiences brain trauma between the ages of approximately 8 – 12 years is most vulnerable to subsequent severe leaning disabilities. The adolescent who experiences brain injury between the ages of 12 and 16 years is most vulnerable to subsequently impaired executive functions. Additionally, brain insult(s) as a child interferes with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

### B. Risk Factors and Indications of Neuropsychological Dysfunction

20.     Social and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial indicated the existence of several risk factors and potential etiologies for congenital and/or acquired brain dysfunction. The pertinent information I reviewed included excerpts of academic records from Tommie Spear Junior High School, Sallisaw, Oklahoma and Jan County High School, Portland Indiana; Universal Cumulative Record, Plainfield Community Consolidated School District, Plainfield, Illinois; medical records from Sequoyah Memorial Hospital, Sallisaw, Oklahoma, St. Francis Hospital, Tulsa, Oklahoma, Wagoner Community Hospital, Wagoner, Oklahoma, and Bill Willis Community Mental Health Center, Sallisaw, Oklahoma; and a Disability Determination Unit Record, Sallisaw, Oklahoma. I also reviewed psychological evaluation test data obtained by Faust Bianco, Ph.D., Tulsa, Oklahoma, in August 2000 and psychological evaluation test data and a report prepared by Bill Sharp, Ph.D., Norman, Oklahoma, in October 2002. These data suggested potential insults to Mr. Barrett's brain functioning resulting from head trauma(s), both in childhood and as an adult; possible prenatal insult and brain development abnormality; and adolescent and adult abuse of alcohol and other drugs. Documented symptoms of possible

6

psychiatric disorders were also indicative of neurological brain substrate abnormality and consequent brain dysfunction.

21.     Mr. Barrett's history of potential head trauma(s) include a childhood injury, at age eight or nine years when he was struck in the head with some type of "steel ball" on the school yard. Mr. Barrett's description of the incident ("I just remember waking up and them picking me up") suggests loss of consciousness as a result of this incident, and as an adult, Mr. Barrett has a skull indentation which he attributes to this childhood injury.   At the approximate age of 22, Mr. Barrett also may have suffered a head injury, with consequent loss of consciousness, in a motorcycle accident.   He was treated at Sequoyah Memorial Hospital, Sallisaw, Oklahoma, and the Emergency Room Records describe "treatment for MVA," right periorbital area pain, edema, and possible head trauma. Immediately following his arrest in 1999 for his current commitment offense, Mr. Barrett was treated at St. Francis Hospital, Tulsa, Oklahoma, for multiple gunshot wounds and "bruising to the left eye and superficial abrasions to forehead…superficial blunt head trauma").

22.     Head traumas may cause damage to the cellular units of the brain (neurons), which transmit and store information.   The blood vessels transmitting oxygen and nutrients through the brain are also damaged.   Multiple small, and/or single large bleeds (hematomas) within the brain can occur.   The brain swells, pressing against the rigid bony skull, causing further damage to the brain.   Extensive research describing the damaging effects of head trauma as a child and head trauma as an adult is currently known and was well established in 1999.   Two sources which provide a representative description of this historical and current research are found in Kolb & Wishaw (2003) and  Silver, McAllister, & Yudofsky (2005).

23.     Mr. Barrett also may have been exposed to dysgenic disorder as the result of teratogenic effects of substance use by his mother during her pregnancy with him, as well as secondary to his mother's psychopharmacological treatment for depression during her pregnancy.   These factors are known to be associated with brain development abnormality, brain dysfunction and abnormal development of the fetal brain (Rasansen, 1999; Steissguth 1990; Tizabi, 1997; Cornelius, 2001; DiPietro; 2002, Ernst; 2001; Huizink, 2004; Weizman, 2002).   Mr. Barrett reports childhood

7

1112

exposure to alcohol beginning at age seven, when his father provided alcohol to him and his brother, resulting in his severe intoxication and subsequent emesis.  He indicates that he then consumed alcohol and other drugs "on a regular basis" beginning at approximately the age of 14 years, with particularly severe drug abuse between the ages of 16 and 18.  Drug use was then reportedly intermittent until age 32 when it again became severe until the time of the offense for which he was incarcerated.  The research describing the damaging neurocognitive effects of alcohol and drug abuse is currently known, and was well known in 1999.  Two resources which provide a representative description of this past and current research include Tapert (1999) and Heimer (2003), as well as Kolb & Wishaw, 2003 and Adams, 2009.

24.     Medical records dating from several years before Mr. Barrett's arrest documented his hospitalization for a suicide attempt, as well as medically indicated need for psychopharmacological treatment with antidepressant and with antipsychotic medications.  Brain abnormalities and consequent neuropsychological impairments associated with  major psychiatric disorders have been known for more than a decade.  There is substantial research describing the neurological bases of psychiatric disorders, particularly the neurological bases of depression, bipolar, and psychotic disorders, and there is substantial research describing the neuropsychological patterns of impairment associated with these psychiatric disorders (Heaton, 1998; McIntosh, 2005; Savitz, 2008) to site a few sources of this extensive literature.

25.     This information about Mr. Barrett's history indicated the appropriateness of conducting a comprehensive neuropsychological assessment both in 1999 and currently.

### C. Nature and Circumstances of the Neuropsychological Evaluation

26.     I conducted approximately 16 hours of neuropsychological evaluation of Kenneth Barrett over the course of three days on February 9 - 11, 2009.  Mr. Barrett is a 47 year old White male. The evaluation was conducted at the United States Penitentiary, Terra Haute, Indiana in a confidential room without distraction or interruption.  The examination room was reasonably quiet, reasonably private and with adequate ventilation and climate control.  Mr. Barrett was not physically restrained during the evaluation and the evaluation proceeded uninterrupted.  Multiple breaks in testing were taken, and Mr. Barrett was provided drink and snack.   Mr. Barrett's

clinical presentation, which I observed during the evaluation, was consistent with the results of neuropsychological testing.

27. Mr. Barrett completed 9 years of formal education, and school records for his 8th and 9th grade school experiences, as well as cumulative record from his 1st and 2nd grades were available at the time of this evaluation. It is unclear from these school records, but Mr. Barrett reports that he repeated the 8th grade of school and that he participated in special education for learning disability. He has attempted to complete a General Education Degree (GED) at several points in time, but has not been able to pass the required test. Mr. Barrett indicated that he is currently studying to take the GED examination again. He reports that he has taken several "pre-tests," but has not been able to successfully pass these pre-examinations.

28. From the results of testing measures and from my own observations, Mr. Barrett fully cooperated with the evaluation, gave his best effort on all tests, and made no attempt to manipulate, fake or exaggerate his neurological dysfunction. Specific evaluation of Mr. Barrett's effort on and attitude toward the assessment was obtained through administration of tests that were specifically developed to determine the validity of the individual's effort on and attitude towards testing, including the 15 Item Test, the Test of Malingering Memory (TOMM), Green's Word Memory Test (WMT) and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II). These tests have demonstrated validity and reliability in distinguishing between individuals who are known to be attempting to manipulate their test ability and those who are not, with as high as 93% accuracy (Lee, 1992; Millis, 1995; Rees, 1998) for some of these tests. Mr. Barrett's abilities on these tests indicate that he was expending his best efforts in this evaluation and was not attempting to feign or exaggerate any deficits in his abilities.

29. Mr. Barrett's attitude towards and effort on testing was also evaluated considering the expected consistency of his test ability within each test, across different measures of the same test, and across different neuropsychological tests that are known to be measuring the same brain region and functions. Mr. Barrett's attitude and effort on testing were further evaluated considering events in his personal history, what is known about potential brain damage

9

associated with those events of his personal history, and the consistency of Mr. Barrett's history, his brain function/dysfunction, and his neuropsychological testing abilities/disabilities.

30.     In addition to these validity testing measures, my own clinical observations of Mr. Barrett confirmed that he was cooperating and putting forth exceptional effort on testing.   He worked consistently, attempted all tasks that were requested of him and persisted until tasks were completed or terminated.   He was intent on completing the tasks asked of him and was particularly intent on trying to accomplish tasks that were difficult for him.  On several occasions Mr. Barrett asked me if he could re-attempt a previously administered test which was difficult for him. These observations were consistent indications that Mr. Barrett was marshalling all of his resources to complete neuropsychological testing and was putting forth an earnest effort to perform well.

31.     Consideration of all of these elements indicates that Mr. Barrett was putting forth substantial effort to complete neuropsychological testing, was cooperating with testing, and was not attempting to manipulate his abilities.  This evaluation is considered to be a valid measure of Mr. Barrett's neuropsychological profile, and can be relied upon in establishing conclusions about his brain functioning.

32.     Although he reported a history of what he identified as migraine headache, Mr. Barrett reported that he was not experiencing headache nor was he experiencing any other unusual pain on the days of testing.  On each day of testing he indicated that his sleep and eating were no different from his usual patterns. He indicated that he did not require glasses and was able to see all information that was presented to him.  He was not experiencing any peripheral numbness in his hands or fingers.  Mr. Barrett reported a history of tinnitus, but indicated that he was not experiencing tinnitus on the days of testing, and that he was able to hear all information that was given to him.  Although he reported several serious medical disorders (Hepitis A, Hepitis C, prostate disorder, persisting staph infection and consequent eczema, and chronic ulcers) he indicated that he was not experiencing any unusual pain or discomfort on days of testing.  Mr. Barrett reported that although he has been prescribed both antidepressant and antipsychotic medications in the past that he was not currently prescribed and was not currently taking any

10

psychotropic medications. Although he has a history of past suicide attempt and psychiatric treatment, Mr. Barrett reported that his mood was reasonably stable, that he was not experiencing perceptual alternations such as hallucination, was not experiencing other psychotic symptoms and did not experience suicidal ideation or plan.

33. Mr. Barrett reported that he was taking an anti-inflammatory medication but did not know the name or dosage, and that he was taking Prilosec for treatment of ulcers. He reported that he had not experienced any additional medical disorders of note since his incarceration at United States Penitentiary, Terra Haute, Indiana (USP Terra Haute, Indiana) for this offense. Mr. Barrett has an extensive past drug use history. Although he acknowledged availability of drugs in incarcerations facilities, he reported that he had not used any drug or alcohol since his incarceration at USP Terra Haute, Indiana. Mr. Barrett has a history of prior tobacco use. He indicated, however, that his last tobacco use was in 2005.

34. Kenneth Barrett expressed his willingness to participate in this evaluation. He was advised of, understood and agreed to limits to his confidentiality. Although testing conditions were quite adequate, functional manifestation of Mr. Barrett's neuropsychological deficits made evaluation challenging at times. He presented as mildly hypomanic. His speech was rapid, he often started to respond to a question before the question was completed, at times was tangential, and often arbitrarily changed the focus of his discussion without warning indicating likely racing thought ("sometimes I just think too fast"). When attempting to provide information, Mr. Barrett often exhibited circumstantial speech, describing extensive, often irrelevant details. He responded to all requests, but often "talked around" the topic, rather than providing a direct response. He was not able to provide a simple "yes" or "no" response to questions that clearly called for only such a response. Although he provided many details, Mr. Barrett's thinking often was overly concrete and he often did not appear to fully understand testing instructions, often requiring test instructions to be presented several times, and in several different ways. Mr. Barrett appeared to be somewhat aware of his presentation, at times acknowledging that he sometimes "talked too much" and at times apologized for beginning to answer a question or provide a response before I had completed my question. Mr. Barrett responded positively to

11

appropriate clinical interventions, however, further assuring that all information obtained is valid and reliable.

35.    All neuropsychological tests administered have appropriate and documented standardization, reliability and validity.  All tests administered are often used and are generally accepted in the neuropsychology community.  In addition to the previously described validity tests (15 Item Test, Test of Malingering Memory (TOMM), Green Word Memory Test, CVLT II Forced Choice Subtest), the neuropsychological tests administered to Mr. Barrett included the following instruments:  Wechsler Adult Scale of Intelligence Test (WAIS IV); Wide Range Achievement Test – Third Edition (WRAT-III); Smell Identification Test, Reitan-Klove Sensory Perception Examination, Finger Tapping Test, Grooved Pegboard, Seashore Rhythm, Speech Perception Test, California Verbal Learning Test (CVLT-II), Wechsler Memory Test (WMS IV), Rey Complex Figure Test; Executive Functioning Test (EFT), Wisconsin Card Sorting Test, and Short Category Test (SCT).  Attempt was made to administer the Paced Auditory Serial Addition Test (PASAT).  Mr. Barrett was quite cooperative with his attempts to complete this test, but he was simply unable to understand the instructions.  Instructions were provided in the standardized format.  Instructions were then also repeated several times, paraphrased several different ways, and demonstrated with examples.  The PASAT was discontinued after the third trial.  The administered neuropsychological battery consists of the most sensitive and reliable standardized tests currently available for measuring neuropsychological functioning that are also compatible with the testing conditions at USP Terra Haute, Indiana.  All of these tests – or their predecessor editions – the methodology, and the research on which I based my conclusions were available and accepted in the neuropsychological community, and valid at the time of Mr. Barrett's arrest and trial in 1999.

### D.    Results of Testing

36.    Overview:  For Mr. Barrett, understanding of his brain dysfunction is particularly dependent on understanding the functions associated with the frontal cortex, temporal cortex, and interconnecting systems between these brain cortices.  The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex

provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

37.    The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones and emotional meaning. The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions. Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities. Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years. Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

38.    The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex. The impairment of cognitive functioning produced by these deficits is manifested in a pattern of ability and disability indicating that although Mr. Barrett is generally able to reasonably access and provide information that is long-standing and that he has rehearsed and learned, his ability to actively attend to, take in, and learn and recall new information is significantly impaired.   While his previously learned information remains reasonably stable and accessible, Mr. Barrett's ability to actively process and comprehend new information in the "here and now" is significantly compromised.  Indicative of extensive dysfunction in Mr. Barrett's prefrontal cortex regions, his test performance was significantly impaired on executive functioning tasks which primarily required cognitive flexibility, particularly the ability to flexibly inhibit and change his thinking and actions in response to requirements of the task or situation (perseveration).  Also typical of individuals with significant prefrontal cortex impairment, Mr. Barrett exhibited multiple instances of confabulation, where he unknowingly provided information that had no real relationship to the problem at hand.   He presented that information in a self-assured way, seemingly not recognizing the errors—at time even absurdity —in his thinking.  Mr. Barrett was not purposefully "making up" information but, as is typical in prefrontal cortex damage, he reported information that was inaccurate, at times illogical.

39.    <u>Intellectual Functioning:</u>  Mr. Barrett's general mental ability was evaluated using the most recent revision of the Wechsler Adult Intelligence Scale (WAIS IV), which was published in January 2009.  WAIS-IV consists of 15 subtests, 10 of which are required.  Four Composite Indexes are developed (Verbal Comprehension Index (Vocabulary, Similarities, Information); Perceptual Reasoning Index (Block Design, Matrix Reasoning, Visual Puzzles); Working Memory Index (Digit Span Arithmetic Letter-Number Sequencing); and Processing Speed Index (Symbol Search, Coding).

40.    Mr. Barrett's abilities on this test demonstrate overall intellectual functioning in the low average range.  His full scale intelligence quotient (FSIQ) is 84 (95% Confidence Index = 80 –

14

88), placing him in the 14th %ile. His acquired knowledge, verbal reasoning, and attention to verbal material is in the average range (VCI = 95, 37th %ile) (95% Confidence Index = 90 – 101). His fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration is in the low average – average range (Perceptual Reasoning Index = 92, 30th %ile) (95% Confidence Index = 86 – 99). His ability to actively receive, organize and recall information (Working Memory Index) was, however, significantly lower and in the borderline - low average range (WMI = 83, 13th %ile) (95% Confidence Index = 77 – 91). His ability to attend and concentrate, recall information, and reproduce the information that he recalls (Processing Speed Index) was even lower and in the borderline range (PS = 76, 5th %ile) (95% Confidence Index = 70 – 87).

41.     Significantly lower abilities to actively receive, attend and concentrate, organize, recall and reproduce information as measured on the WAIS-IV Working Memory and Processing Speed indexes, are particularly relevant to understanding Mr. Barrett's brain dysfunction, including the pronounced disparity between his ability to access his stable fund of knowledge and his significant inability to appreciate and make sense of new information.

42.     Compromised prefrontal, temporal, and connecting systems (Orbitofrontal Paralimbic Connection; Hippocampal Paralimbic Connection; Frontal Subcortical Connection) relaying information from the frontal cortex to all other brain regions is particularly indicated. This pattern of brain function and dysfunction provides explanation as to why Mr. Barrett's overall intellectual quotient can be in the low average range even in the face of significant current brain dysfunction. This pattern also explains why at some point in time his overall intellectual quotient may have been measured as higher.

43.     Sensory and Motor Functioning: Mr. Barrett's sensory functioning was evaluated using the Smell Identification Test (SIT) and the Reitan-Klove Sensory-Perceptual Examination (SPE). His olfactory sensory abilities on the SIT were in the normal range (4 errors, 49th %). His abilities to accurately receive bilateral simultaneous auditory, visual, and tactile stimulation were normal. His tactile-finger recognition was normal. Mr. Barrett's finger-tip number writing perception, however, was significantly bilaterally impaired. He had 10 errors for his right hand

15

(T = 34, mild-moderate impairment) and 8 errors for his left hand (T = 32, mild-moderate impairment). Whereas other sensory-perceptual abilities in this examination represent simple sensory perception, finger-tip number writing perception is more complex. This ability requires more concentrated attention and more communication of information from the sensory strip in the posterior area of the frontal cortex through the frontal-hippocampal-limbic connection to and from the parietal cortex. This sensory perceptual ability also requires more complex communication across the corpus callosum to and from the right and left brain hemispheres. Dysfunction of the sensory cortex and communication of the sensory cortex to other brain regions is indicated for Mr. Barrett.

44.    Mr. Barrett's motor coordination and repetition were evaluated using the Finger Tapping and Grooved Pegboard tests. He experienced mild-moderate bilateral impairment on both of these measures (Finger Tapping Right T-34; L T=32; Grooved Pegboard Right SS = -1; Left SS = -1). Dysfunction within the frontal motor cortex and communication of information from the frontal motor cortex to other brain regions is indicated.

45.    <u>Attention and Concentration</u>:  Mr. Barrett's attention and concentration were evaluated using Seashore Rhythm and Speech Sounds Perception tests. As has been previously described, Mr. Barrett was not able to comprehend and carry out instructions to complete the Paced Auditory Serial Addition Test (PASAT) and this test was discontinued after the third trial.

46.    There are multiple indications that Mr. Barrett experiences impaired attention and concentration. During testing he frequently had to be re-directed to the task at hand and when he was not able to sustain his attention, frequent breaks on tests which had multiple subtests were needed.    Additionally, his abilities on several neuropsychological tests which are strongly weighted to the ability to attend and concentrate (WAIS IV Digit Span, Letter-Number Sequencing, Symbol Search, Coding; Executive Functioning Trail Making Tests) were particularly impaired. Attention and concentration is primarily mediated by the prefrontal cortex, subcortical reticular activating system, and communication between these two brain regions through the frontal-subcortical connecting system, indicating dysfunction of these brain structures and connections for Mr. Barrett.

47.     Memory and Learning:  Multiple aspects of Mr. Barrett's memory and learning were evaluated assessing his ability to learn and recall information that was presented both verbally and visually and—in both of these modalities—assessing his immediate, delayed, free recall, interference, recognition and forced choice recall of information.   Memory and learning were evaluated using the California Verbal Learning Test (CVLT II), Wechsler Memory Scale (WMS IV), memory trials of the Rey Complex Figure Test (Rey), and Working Memory Index of the WAIS IV.   Mr. Barrett's abilities across these measures of memory and learning portray a distinct pattern of memory function and dysfunction.   On several measures his memory was within or above the normal range (Rey Complex Figure Immediate Recall T = 59, 82%; Rey Complex Figure Delayed Recall T = 59, 82%; Rey Recognition T = 51, 54%; WMS IV Auditory Memory = 95, 37th %ile; Immediate Memory = 108, 70th %ile; Delayed Memory = 100, 50th %; On CVLT II, his standard scores ranged from normal to mild-moderate impairment = +1.5 to -1.5).  On other measures of memory and learning, however, his ability was significantly impaired.    Mr. Barrett's ability to actively receive, organize and recall information (WAIS IV working memory) and his ability to concentrate, recall and reproduce information (WAIS IV processing speed) were within the borderline-low average range.   On the Wechsler Memory Scale (WMS IV) his Visual Working Memory (VWMI) was in the extremely low to borderline range (VWMI = 70, 2nd %ile), his delayed recall of word pairs was in the borderline range (WMS IV Paired Associates Delay = SS 8, 25th %ile ), his ability to store, manipulate, and ignore irrelevant or competing information was in the mildly impaired range  (Spatial Addition = SS 6, 9th %ile), and his ability to keep a mental image of a design in mind and to recall the relative spatial position of this information was in the moderately impaired range (Symbol Span SS = 4, 2nd %ile ).    Also of note, Mr. Barrett had a significant number of repetition errors indicating perseverative thinking (CVLT repetition errors = -1, mild impairment).  This same impairment of his ability to flexibly shift his thinking and acting was demonstrated across multiple tests of executive functioning, as described below.   Memory and learning is primarily mediated by the limbic system hippocampus, temporal cortex, prefrontal cortex and connecting systems among

these brain structures (Frontal-subcortical connecting system; Orbitofrontal Connecting System; Frontal-hippocampal Connecting System).

48. <u>Language</u>: Mr. Barrett's secondary language was evaluated using the Wide Range Achievement Test (WRAT3). This test measures academic achievement in three areas: Reading Word Recognition, Spelling, and Arithmetic Skills. Mr. Barrett's abilities on the WRAT3 placed him in the 25th percentile in reading recognition (high school equivalent), but in the 5th percentile (6th grade equivalent) in spelling, and the 7th percentile in arithmetic (7th grade equivalent).

49. <u>Executive Functioning</u>: As previously described, executive functioning is an umbrella construct, which encompasses abilities to think, reason, problem solve, make reasoned decisions, anticipate consequences of decisions and actions, and modify actions in response to information received from the environment. Executive functioning includes abilities to initiate, monitor and change actions depending on needs of the situation. Executive functioning also includes abilities to inhibit thinking and actions, understand and develop ways to accommodate complex situations, and inhibit thinking and actions as required by the situation. Executive functioning is mediated by the frontal cortex, predominantly by the prefrontal cortex, and through connections from the frontal cortex to all other brain regions. Intact executive functions are necessary for managing a wide range of experiences in daily living. Accommodating stressful situations, understanding complex constructs and situations, being able to plan and deliberate potential ways of solving a problem or situation, being able to describe why actions are selected or not selected for action, anticipating the consequences of those decisions, and changing decisions and actions based on understanding of the problem or situation are all examples of executive functioning abilities. Adequate executive functioning is demanded when a situation or problem is complex and/or stressful and requires the ability to understand, as well as to act thoughtfully. More specifically, executive functioning requires the individual to incorporate feedback concerning the effect of each piece of information and then consider how the new information affects subsequent actions or choices or requires the individual to modify his thinking and actions or change a course of action as needed by the problem or situation. The executive

18

functioning process is dynamic in that it requires continuous attention to, evaluation of, and incorporation of new information and inhibits thinking and actions as needed to solve the problem or situation (Delis, Kaplan & Kramer, 2001; Gioia, Isquith, Guy & Kenworthy, 1996/1998/2000). Mr. Barrett was significantly impaired across multiple tests of executive functioning, with his impairment ranging from mild to severe.

50.     The frontal cortex is the largest brain structure in the human brain, comprising 20-25% of all brain tissue. The frontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration and repetition of motor abilities. The mesial region primarily regulates emotion, motivation, drive, spontaneity, motor aspects of speech, and the ability to monitor actions. The dorsolateral lateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize information and memory, and—in combination with the mesial region— the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional lability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a particularly interactive role with the limbic system, assessing and altering emotional responsivity and inhibition of thought and actions. Knowledge of executive functioning and the role of executive functioning has been known by neuroscientists for many years, since and prior to 1996 (Benson, 1996; Casey, 1997; Constantine, 2004; Frank, 2006; Hinson, 2003; Janowsky, 1989; Kritchevsky, 1989; Lyketsos, 2004; Nagahama, 2005).

51.     Mr. Barrett's executive functioning was evaluated using tests that make up the Executive Functioning Test (EFT) (Trail Making Tests, Verbal Fluency Tests, Design Fluency Tests, Color-Word Interference Tests, Sorting Tests, Twenty Questions, and Tower Test), Wisconsin Card Sorting Test (WCST), and Short Category Test (SCT). Across EFT subtests, Mr. Barrett was able to accurately complete some tasks. He was, however, significantly impaired in his abilities on other tasks of executive functioning, with his impairment ranging from mild to

19

1124

severe.   A distinct pattern in the nature of Mr. Barrett's impairment on EFT measures was apparent.

52.     With the exception of his ability to complete the Twenty Questions subtest of the EFT, Mr. Barrett had some significant impairment on each of the EFT subtests.   Trail Making Test is a series of four individual tests which primarily evaluate visual-scanning, attention, motor and the ability to flexibly switch thinking and actions. Mr. Barrett's ability to quickly scan the task was moderately impaired (SS = 4); his ability to sequentially process numbers was in the borderline range (SS = 8); his ability to sequentially process letters was mildly impaired (SS = 7) and his ability to flexibly shift his thinking and actions was mildly impaired (SS = 7).   Of particular note, Mr. Barrett made multiple errors of several types on Trail Making.   He had a significant number of errors where he was not able to effectively scan information, focusing on the relevant and ignoring the irrelevant (Omission Errors = 13%th, mild impairment); he had a significant number of errors correctly moving information in the expected order (Sequencing Errors = 16th ile – below average); and he had a significant number of errors where he could not order numbers and letters of the alphabet while sequentially and flexibly switching from number to letter (Set Loss Errors = 22% - below average).   Overall, the number of errors that Mr. Barrett had on Trail Making Tests was impaired (SS = 7, mild impairment).

53.     Verbal Fluency Tests evaluate the ability to initiate and report verbal information, and this was a relative strength for Mr. Barrett.   He was successfully able to retrieve and report letters and words and he was able to switch his verbal descriptions (Letter Fluency SS = 8; Category Fluency = 10; Category Switching SS = 10).   Mr. Barrett again, however, had a significant number of errors in this process (Switching Accuracy SS = 5, mild impairment; Percent Switching Accuracy SS = 4, moderate impairment).

54.     On tests which evaluate fluency of visual information, Mr. Barrett's abilities were similar to his fluency with verbal information.   Design Fluency was a relative strength for him (Filled Stimuli SS = 12; Empty Stimuli SS = 10; Design Switching SS = 10).   Mr. Barrett's accuracy in carrying out these tasks was, however, significantly impaired (Percent Switching Accuracy SS = 8, borderline impairment).

20

55.     A similar pattern of ability/disability was demonstrated on EFT tests of the ability to name colors and words and his ability to withhold the familiar while reporting the accurate but less familiar (Color-Word Interference Tests (Color Naming SS = 10, average range; Word naming = SS 7, mild impairment; Inhibition = SS = 9, average range; Inhibition Switching SS = 10, average range).   Again, despite his ability to simultaneously process this information was significantly impaired (Inhibition Errors = SS 6, mild impairment; Inhibition/Switching Errors SS = 7, mild impairment).

56.     On tests of concept formation and conceptual knowledge (Sorting Tests) Mr. Barrett was successfully able to develop concepts (Free Sorting SS = 8 and 9, below average - average range).   His ability to transfer his skills to understand and describe concepts presented to him, however, was significantly impaired (Recognition Description SS = 3, moderate-severe impairment).

57.     Mr. Barrett's ability to view a problem and, using his hands, to manipulate objects (Tower Test) was within the normal range (SS = 11, average range).   In the process, however, Mr. Barrett's ability to accomplish this task while inhibiting his thinking and action was severely impaired.  Mr. Barrett reports substantial work history as an automobile mechanic.  He reports with pride that he could approach a difficult automobile mechanical problem and fix it but he could not explain *how* he went about fixing the problem, *why* he did what he did to fix the problem, or to *replicate* the process at another time on another vehicle.  Completing the EFT Tower Test is somewhat similar to completing an automotive repair project.  Completion of the Tower Test has two simple rules…move one piece at a time and always put a small object on top of a larger object.  Mr. Barrett was not able to inhibit his responding and he broke the "rule" a significant number of times ((Move Accuracy Ratio SS = 3-severe, moderate impairment; Rule Violations SS = 7, mild impairment).   Persistent errors on tests of executive functioning, as well as on tests of memory and learning, represent significant perseverative thinking and acting (tendency to rigidly repeat the same thought and action even though the situation or problem has changed) and tendency towards confabulation (the recitation of inaccurate often absurd experiences to unknowingly fill in gaps of memory) for Mr. Barrett.

58.    The entire frontal cortex system is required to complete these tests on the EFT. The pattern of Mr. Barrett's success and failures across the tests, however, indicate that the greatest prefrontal cortex impairment for him is within the dorsolateral and orbitofrontal regions, with relative sparing of structures within the mesial prefrontal system.

59.    The Wisconsin Card Sorting Test (WCST) is one of the oldest, most researched, and most utilized tests of executive functioning available to neuropsychologists (Buros, 2009).  It requires the individual to place cards with different symbols, numbers of symbols printed in various colors in piles under four key cards according to a pattern that the individual must deduce from the examiner's feedback to the individual's decisions for placement of the cards.  Although the entire frontal cortex system is involved in successfully completing this test, current neuroimaging research demonstrates particular involvement of the dorsolateral prefrontal region (Nagahama, Okina, Suzuki, Nabatame & Matsuda, 2005).  Mr. Barrett's ability to complete the WCST is significantly impaired, with Mr. Barrett experiencing impairment on 67% of the WCST measures, with impairment severity ranging from mild to severe.  The total number of errors made by Mr. Barrett on the WCST places him equal to or below the 1st %ile. The number of perseverative errors made by Mr. Barrett was impaired (Perseverative Errors = 42nd%ile); and the number of nonperseverative errors was severely impaired $\leq 1^{st}$%ile).

60.    One of several abilities measured by the WCS is the ability to develop a simple concept and then to carry out that simple concept.  Mr. Barrett experienced significant difficulty developing the concept required by this test (Conceptual Level Responses = $\leq 1^{st}$ %).  Of particular concern, Mr. Barrett frequently repeated out loud the "rule" he was using to solve this problem.  Nevertheless, he was unable to carry out the "rule" he had stated (Categories Completed = 0).  When impaired, his impairment was consistently in the severe range.  Current research demonstrates a significant relationship between ability/inability to grasp and to consistently carry out the demands of the WCST and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma (Macklin, Horner, Harvey, & Stevens, 2005).

61. Again, the WCS requires the entire prefrontal system to successfully complete. Dorsolateral and orbitolateral prefrontal regions are, however, primarily involved in completing this test (Nagahama, Okina, Suziki, Nambatome, & Matsuda, 2006).

62. Category Test is another well-known and respected measure of functioning of the prefrontal cortex. Category Test was developed by Halstead in 1979, and one of the first standardizations of the Category Test was in 1985 (Reitan & Wolfson,). The Short Category Test (SCT, 1989) is a current revision of the Category Test. Using stimuli from the original Category Test, the SCT was developed as an instrument that could be more easily transported, more easily administered, and requires less time to accomplish the same goal. SCT and Category Test are significantly related (discriminate validity = .93) and reliable (reliability co-efficient = .81). SCT also has good sensitivity, correctly classifying 83% of individuals who do/do not experience brain damage. This indicates that these two tests are measuring the same construct and same brain region. Category Test and SCT are highly related (.93 to .80), providing confidence in substituting SCT for the longer, more demanding Category Test. (Buros, 2009).

63. Similar to the WCST, the Category Test assesses an individual's ability to solve problems which require abstract concept formation, use abstract principles, and understand complex information. Whereas neuroimaging has demonstrated the WCST to be primarily mediated by the dorsolateral region of the frontal cortex, the Category Test appears to be primarily mediated by the posterior frontal cortex, anterior parietal cortex, and connecting systems between these brain regions.

64. Like his abilities on the WCST, Mr. Barrett's abilities on the SCT were also severely impaired. SCT requires the individual to develop a concept to solve a problem, carry out the actions needed to accomplish the concept they developed, and flexibly change their thinking and acting in response to information that is actively provided to the individual by the neuropsychologist who is administering the test. The test requires that the neuropsychologist to verbally respond to each choice as being "right" or "wrong" while the test is actively being taken. The objective is for the individual to be able to develop a concept, try the concept out, and if their concept is accurate ("right") continue applying the concept, but if the concept is

inaccurate ("wrong") to change the concept and try out a different concept.   Out of 100 possible responses, Mr. Barrett was wrong 64% of the time, making 64 errors.   The measured significant impairment on this test means that I had to say to Mr. Barrett 64 times that he was "wrong."

65.    Mr. Barrett was not able to learn from the information he was being provided and his abilities on this test were severely impaired (T = <24, <1st%ile).   Again, Mr. Barrett often stated the concept or "rule" he had developed, but then did not carry out that rule that he had just stated. The SCT assesses an individual's capacity for abstract reasoning and complex concept formation, as well as the individual's ability to flexibly change their thinking and actions considering information that they are provided.   SCT is a measure of functioning of the entire prefrontal cortex system, evaluating abilities that are similar to those measured by the WCST.

66.    In summary, Mr. Barrett's abilities and disabilities on neuropsychological testing portray the picture of an individual who, despite reasonably adequate general mental ability, nevertheless experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices, which are necessary for the brain to effectively communicate information and function effectively.   The nature and severity of brain dysfunction would negatively impact all aspects of Mr. Barrett's daily functioning, and would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment.   His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.

67.    I hold each one of the observations, findings, and conclusions I have reached above to a reasonable degree of scientific certainty and would have advised trial counsel and testified in accordance with them if called as a witness during Mr. Barrett's trial.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on March 5, 2009.

Myla H. Young, Ph.D.

24

1130

Addendum A

Myla H. Young, Ph.D., ABN

25

MYLA H. YOUNG, Ph.D., ABPN
Diplomate – American Board of Professional Neuropsychology
PSY 11916

RESUME

*Office:*
1475 North Broadway # 335
Walnut Creek, CA 94596

*Mailing:*
1630 North Main Street #357
Walnut Creek, CA 94596

(925) 952-4350
925  945-8991 (FAX)
mylayoung@sbcglobal.net

LICENSE-Psychology

California        August, 1990        PSY 11916

CERTIFICATION

Board Certification in Neuropsychology – American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

EDUCATION

Ph.D.           Alliant International University
                (Formerly California School of Professional
                Psychology)
                  San Francisco, California
                  Doctor of Philosophy/Clinical Psychology
                  January, 1988

M.A.            Towson State University
                  Baltimore, Maryland
                  Master of Arts/Experimental Psychology
                  June, 1977

B.A.            University of Guam
                  Agana, Guam
                  Bachelor of Arts/Psychology
                  June, 1975

1

**POST-DOCTORAL FELLOWSHIP**

University of California/San Francisco General Hospital
San Francisco, California

January 1988 – January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
San Francisco, California

July 1985 – July 1987

Garfield Geropsychiatric Hospital
Oakland, California

October 1984 – July 1985

**PROFESSIONAL WORK EXPERIENCE – Current**

| | |
|---|---|
| Private Practice | Neuropsychological Assessment<br> Child, Adolescent and Adult<br> Forensic, Medical, Psychiatric, Medico-Legal, Educational |

March 1992 – Present

| | |
|---|---|
| Continuing Education Faculty | Alliant International University<br>Neuropsychological Evaluation of Criminal Offenders |

2000 – Present

| | |
|---|---|
| Continuing Education Faculty | University of California-Berkeley<br>Neuropsychological Evaluation of Criminal Offenders<br>Introduction to Neuropsychological Assessment |

2005 – Present

2

**PROFESSIONAL WORK EXPERIENCE - Prior**

Senior            California Department of Mental Health
Supervising       Correctional Medical Facility
Psychologist      Vacaville, California

                  Psychology Consultant to Executive Director,
                    Medical Director and Program Directors
                   Principal Investigator for Research Project
                   Program Evaluation, Program Development,
                     Treatment Outcome Measurement
                   Director-American Psychological Association
                    (APA) Psychology Intern Training Program
                   Director-Psychology Fellowship Training
                     Program
                    Standards of Practice/Quality Assurance
                    -Psychology Service
                    Staff Selection/Evaluation - Psychology
                     Service
                    Clinical Supervision and Consultation -
                    Psychology Service

             Staff Psychologist - January 1990 - June 1995
             Program Consultant - June 1995 - January 2000
            Senior Psychologist - January 2000 - July 2005


Adjunct           Alliant University - Berkeley/Alameda
Faculty              Instructor: Neuropsychological Assessment
                                 Cognitive Bases of Behavior

                  Dissertation Chairperson:
                          -Neuropsychological Assessment of
                             Psychotic and Non-Psychotic
                             Inmate/Patients
                          -Neuropsychiatric Description of
                             Children in Day Treatment
                          -HIV/AIDS-Affected Children:  A
                            Study Utilizing the Rorschach To
                             Identify Depression
                          -Self Mutilation:  Analysis of
                             a Psychiatric Forensic
                             Population
                           -Relationships of Rorschach and
                              MMPI2 to the PCL-R among
                              Mentally Ill Felons

3

Dissertation Committee:
-Development of Special
Aggression Content Scales for
Rorschach Test Administration
within a Prison Population
-Neuropsychological and Cognitive
Correlates of Academic
Achievement in a Child
Psychiatric Sample
-Emotional Descriptors of
Adolescents Who Have
Committed Homicide
-Rorschach Responses/Piagetian
Cognitive Development in Eight
to Twelve Year Old Children
-Understanding Malingering:
Theory and Treatment

1990 - 2005

Training,
Assessment,
Consultation

Oaks Children's Center
San Francisco, California
Training and Supervision of Pre-Doctoral
Psychology Intern
Seminars in Neuropsychological and
Personality Assessment of Children
1992 - 1995

Training,
Assessment,
Consultation

McAuley Institute of St. Mary's Hospital
San Francisco, California
Training and Supervision of Pre/Post-
Doctoral Psychology Interns/Fellows
Seminars in Neuropsychological Assessment
Of Children, Adolescents, Adults

1992 - 1995

Research
Training

University of California-San Francisco
NIDA Research Grant:  Longitudinal
Study of HIV Related Cognitive
Impairment in Groups of Gay Men and IV
Drug Users

1988 - 1990

4

| Child & Family Counselor | Florida United Methodist Children's Home  Enterprise, Florida |
|---|---|
| | Child & Family Counselor at a Residential  Treatment Facility for Children/Adolescents |
| | Individual and Group Counseling |
| | Parent Education |
| | Court Liaison |
| | Consultation to Residential Group Home |
| | Consultation to Children in Foster Care |

<div align="center">1978 - 1980</div>

| Adjunct Faculty | University of Central Florida |
|---|---|
| | Valencia Community College |
| | Seminole Community College |
| | Lake-Sumter Community College  Orlando, Florida |
| | General Psychology |
| | Developmental Psychology |
| | Child & Adolescent Psychology |
| | Research Methods |
| | Learning Theory and Animal Behavioral  Training Laboratory |

<div align="center">1980 - 1984</div>

## RESEARCH EXPERIENCE

| Principal Investigator | California Department of Mental Health  Correctional Medical Facility-Vacaville  Prospective description of demographic, neuropsychological and emotional functioning in psychiatrically hospitalized males |
|---|---|

<div align="center">1994 - 2005 (Project Completed)</div>

| Principal Investigator | California Department of Mental Health  Correctional Medical Facility-Vacaville  Multimethod description of inmates  referred for psychiatric treatment from  Pelican Bay State Prison |
|---|---|

<div align="center">1994 - 1997 (Project Completed)</div>

5

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program<br><br>1990 - 1993 (Project Completed) |
| Participant | Spine Institute of San Francisco - Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D.<br><br>1996 - 1998 (Project Completed) |
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D.<br><br>1988 - 1990 (Project Completed) |
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D.<br><br>1988 -1990 (Project Completed) |
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development:  A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |
| Master's Thesis | Piagetian Moral Development:  A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez,
     California.  *When juvenile offenders become adult
     offenders:  A prospective look* (July, 2006)

California Psychological Association Conference San Jose,
     California. *The sexual offender in prison psychiatric
     treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference
     Asilomar, California. *The sexual offender in prison
     psychiatric treatment: A multimethod description*
     (March, 2003)

International Organization of Psychophysiology Montreal,
     Canada  *Profiles of Violent Mentally Ill Incarcerated
     Males: Neuropsychology and Psychophysiology* (August,
     2002)

California Psychological Association Conference Pasadena,
     California *Research in Prison Psychiatric Treatment*
     (May, 2002)

American Correctional Health Services Association
     Conference Costa Mesa, California *Profiles in Violence*
     (September, 2001)

Forensic Mental Health Association of California Conference
     Asilomar, California *Profiles in Violence* (March,
     2001)

Behavioral Health Institute Conference – Los Angeles, CA.
     *Latinos is Forensic Psychiatric Treatment* (September,
     2000)

Forensic Social Work Conference – Palm Springs, California
     *The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference
     Asilomar, California *Danger to Self and Danger to
     Others:  A description of Inmates Who Harm Themselves
     or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose,
     California
     *Neuropsychological and Psychological Evaluations in
     A Forensic Psychiatric Setting* (March, 2000)

7

Forensic Mental Health Association of California Conference Asilomar, California  *The Violent Psychopath in Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton, California *The Violent Psychopath in Psychiatric Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton, California *Psychopathy in a Forensic Psychiatric Population*(September, 1998)

Forensic Mental Health Association of California Conference Asilomar, California *A Multimethod Approach to Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton, California *Violence in the Community and Assaut in Prison:  A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference Asilomar, California *Patterns of Violence: Demographic, neurocognitive, diagnostic, and emotional descriptions of inmates with high and low violence histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican Bay, California *Description of Inmate/Patient Populations Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Violence* (July, 1996)

California Department of Corrections-Preston School for Boys – Ione, California *Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet Meeting – Sacramento, California *Description of Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional Warden's Meeting – Folsom State Prison *Description of Inmate/Patient Population* (July, 1996)

8

California Department of Corrections-Warden's Meeting – CMF
Vacaville, California *Description of Inmate/Patient Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference. *Development of a Forensic Psychiatric Treatment Program Based on Empirical Description of the Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference. *Opening Address – The Changing Face of Forensic Mental Health: The Challenge Described* (October, 1994)

**PUBLICATIONS**

Young, M. H., Justice, J., & Erdberg, P. (2008). *The Rorschach Test in a prison population.* (Manuscript in press).

Young, M. H., Justice, J., & Erdberg P. (2008). *Sex offenders in prison psychiatric treatment: A biopsychosocial description.* International Journal of Offender Therapy and Comparative Criminology. (in press).

Young, M. H., Justice J., & Erdberg, P. (2007). *A comparison of rape and molest offenders in prison psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H. (2007). *Previously unrecognized cognitive and psychological disorders in patients with chronic neck pain due to whiplash and other forms of cervical trauma.* Pain Medicine, (Manuscript in revision).

Young, M. H., Justice, J., & Erdberg, P. (2006). Risk of harm: Inmates who harm themselves while in prison psychiatric treatment. *Journal of Forensic Sciences, 51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for assault while in Prison Psychiatric Treatment. *Journal of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002). *Managing violence in a Supermax facility: A discussion of research findings and their application to reducing violence in supermax*

9

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 - 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000). Neuro-psychological and personality assessment in a forensic psychiatric setting. *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000). A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono(Ed.) *The Clinical Forensic Assessment of Psychopathy: A Practitioner's Guide* (pp. 313-332). Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999). Risk factors for violence among incarcerated male psychiatric patients: A multimethod approach. *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment. *Archives of Clinical Neuropsychology, 13,* 303 - 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H. (1977). Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally. *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

## PROFESSIONAL AWARDS

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude<br>June, 1975 |
| Towson State<br>University | Graduation - Magna Cum Laude<br>June, 1978 |
| California School of<br>Professional Psychology | Superior Accomplishment Award<br>Dissertation<br>June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health<br>Correctional Medical<br>Facility | Exceptional Job Performance<br>April, 1993 |
| State of California<br>Department of Mental Health<br>Correctional Medical | Superior Accomplishment Award<br>Exceptional Job Performance<br>April, 1995 |
| State of California<br>Award<br>Department of Mental Health<br>Correctional Medical<br>Facility | Outstanding Accomplishment<br><br>Exceptional Job Performance<br>September, 1999 |

## PROFESSIONAL ASSOCIATIONS

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)

April, 2008

11

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 90**

**DELCARATION OF PAUL RICKIE LUNSFORD**

I, Paul Rickie Lunsford, declare the following:

I am a friend of Kenneth Barrett and had known him seven or eight years at the time the police raided his shack in 1999. I am married and have two children with my current wife and two other children by a former runner up to Miss California. I grew up in California in the Bakersfield area and lived in many place in Central California and in the Mammoth Lakes area, which is how I got my Oklahoma nickname, "California Rick."

I am a former baker and cake decorator, a trade I practiced both here in Oklahoma and in California. I baked the cakes for the grand openings of the Wal-Mart super centers in Fort Smith, Arkansas. One of the cakes was an exact replica of the store, about twelve feet long and five-feet high. Every shopper got a piece of the store. I decorated Kenny's birthday cake every year. If I ever needed him, he was always there. There are a lot of people, but few characters and Kenny's a character. Kenny was trustworthy.

I first met Kenny when I brought him my 1992 Ford Escort, a hatchback, to him to repair. I cannot recall what was wrong with it or what Kenny charged, but Kenny had a reputation in the community as an excellent mechanic who was fair. At the time, I lived about a half-mile down the road from Kenny. Kenny and I developed a friendship. Some time prior to the raid, I set up a listening device in Kenny's garage, a security monitor so that Kenny could hear in the house if someone broke in. There were never any other listening devices on the grounds. Kenny set up the motion sensor light at the back door of the house himself. These devices were not to detect police; they were like anyone's burglar alarm.

1

I was at Kenny's house from noon on September 22, 1999 through 9:00 P.M. on September 23, 1999. On 9/22/08, at about noon, I went by Kenny's to drop off a truck I was selling to Kenny. The truck was a 1964 Chevy Custom Cab. I sold it for $1500, some cash, a stereo, and a 30-30. I remained at Kenny's for the next 33 hours.  I parked the truck in front of the garage.

Kenny and I stayed up for the next 33 hours; we were doing methamphetamine. During this time, there were a lot of people coming and going to Kenny's. Monk Sanders never came by during that 33-hour period. However, others, including Travis Crawford, came by to do drugs, which he often did.  In the late afternoon, on September 23, 2008, Kenny, a few others, and I were standing near the fence to Kenny's property. Travis came over from his parents' place and asked Kenny if he had seen the white SUV with tinted windows that went by, which was of particular note because it had gone down a dead end road and not yet returned. Travis said he thought they were police.

Kenny did not trust Travis at all; Travis made him nervous.  Travis was pretending to watch Kenny's back, but Kenny knew better. Kenny was not nervous about the police. He was nervous about Travis. Travis is a real flaky person who was a police informant.  Kenny shrugged Travis off and Travis went back to his house.  Once Travis had left, Kenny told us that anyone who wanted to leave could. Kenny said, "Hey, you guys might want to leave because the car that drove by was cops."  Kenny was concerned the police would come by his place and that we would all get in trouble because we were all holding drugs. Kenny opened the gate to let out anyone out who wanted to go. There were three or four of us.  The others left, but I remained with Kenny. Kenny re-locked the

2

1144

gate and we went back to the house or the garage without our seeing the SUV again.

Kenny never said anything about going down in a blaze of glory. Kenny would not say that or want that. That was not who Kenny was.

Kenny had a case pending at the time.  I knew about the case because once Kenny had borrowed my phone to call his lawyer. I knew Kenny had a case, but I never heard that there was a warrant out for Kenny.

I left about three hours before they raided Kenny's place. Toby, Kenny's son, was the only one still there besides Kenny. Toby was living there at the time.

I knew Travis Crawford and Cindy Crawford.  They acted as if they would do anything if their freedom were threatened and therefore their ability to get dope.

I have never been interviewed before or during Kenny's trial by an investigator or defense attorney working on Kenny's behalf.

An investigator working on Kenny's case asked me about Kenny, our friendship, what I knew about the raid, and Travis and Cindy Crawford.  After I told him what I knew, he asked if I would give a written statement.  He showed me this declaration and asked me to read it carefully.  I have and it says what I told the investigator during our meetings.  If I had been asked to testify about the same things at Kenny's trial this declaration is what I would have said.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this _26_ _Feb_ day of 2009, in _Sequoyah_ County, Oklahoma.

<div align="center">3</div>

Paul Rickie Lunsford

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 91**

## Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

1148

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room.  My husband Roger and I went over to their house and talked to Kenny.  Kenny told us that he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream.  That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it.  Gelene, who is three years older than I am, started drinking in high school.  She used to beat me up with her fists.  Now, Gelene drinks beer from the time she gets up until she goes to bed.  She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards.  She cannot control her emotions.  Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.  My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker.  He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny.  Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home.  As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?"  I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been

Page 2 of  4

1149

afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis

Page 3 of 4



had to say about his testimony. My husband, Roger, was here and listened to the conversation, too. I have read the part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _22_ day of _Feb_ 2009, in _Sequoyah_ County, Oklahoma.

Phyllis Crawford

Page 4 of 4

1151

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 92**

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

Page 1 of 6

RC

1153

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

Page 2 of 6



Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years

Page 3 of 6

RC

before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day.  Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth.  He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified.  Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield.  Travis told Mr. Post that anybody who had been around drug addicts would have known that.  Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned.  Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say.  Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied."  Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence.  Travis said that when he gave this answer, he was panicking because he was afraid.  Travis told Mr. Post that Mr. Littlefield told him he knew things about him.  Travis repeated that he was extremely

<div align="center">Page 4 of 6</div>



scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

Page 5 of 6

*RC*

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed.  Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody.  According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed.  After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post.  I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this _22_ day of _FEBRUARY_____, 2009, in

_SEQUAYAH_____ County, Oklahoma.

Roger Crawford



1158

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 93**

**Declaration of Ruth Harris**

I, Ruth Harris, declare as follows:

I am Kenneth Barrett's maternal aunt. Kenny's mother, Gelene, is my oldest sister, followed by Phyllis, then me, and then Carolyn. All the girls in the family are about two years apart. Our brother Mark is the youngest child in the family.

My husband, Jerry Harris, and I have been married for 45 years and have two grown children, both doing well. Our daughter Michelle and her husband run two family businesses, a cleaning business and an equipment rental business. Their two boys, Javan, 24, and Alex, 19, are in good health. Our son, Faron, manages a furniture store in Tulsa and has two children, Dallas, 16, and Mandy, 11. Faron was not as fortunate as Michelle in his relationships. He has been married three times. He was hurt badly by his first two wives, both of whom began associating with people outside our religion.

Jerry and I are deeply religious and are Jehovah's Witnesses. We raised our children in the faith, and they are raising their children in the congregation. Jerry and I protected our family from being around those who are not Jehovah's Witnesses so we were not around our sisters and their families very much when our children were growing up. Bad associations spoil useful habits. If we are around people who are cursing and doing bad, it influences us. Peer pressure can make children do bad things, and I tried to keep my children from that.

We made a conscious decision to be around people who are true to the Bible and have the same moral standards as we do. Jehovah's Witnesses all believe the same exact

–1–

1160
RH

way whether we are from Fort Smith or anywhere in the world.  We share the same doctrine that the only answers are in God's Kingdom and that Jesus is King.  We pay taxes, and we respect the government, but we do not vote because our allegiance is to God's Kingdom. The Bible teaches us that the only true government is the Kingdom of God. As Jehovah's Witnesses, we love everyone and do not hate the person doing wrong. We avoid talking about the bad side of people, but I make an exception for Kenny's father.

Ernie Barrett was not a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives.  I know he regrets that now. Ernie has always been for Ernie. My aunt Mary Real taught Ernie at Marble City Elementary School and said Ernie was a mean child. I do not feel good when I say bad things about people. I hope Ernie is a better person than he used to be because he was not a good father—he went his way and let Gelene take care of the kids.

My family also had problems that they have had to deal with.  My father had a drinking problem and was high-strung and quick tempered, but he tried to be a good father and he lived up to his responsibilities.  My sister Carolyn has depression, and one of her daughters also has depression.  Phyllis's son, Travis, is doing very poorly mentally, which is made worse by his use of drugs.

Gelene moved back to Oklahoma with the boys when Kenny was around nine. Kenny took the divorce very hard and probably blamed himself for it as children commonly do.  We planned for Kenny to live with me and my family to help him adjust

–2–

better. It did not work out. He wouldn't come home with us; he wanted to go with his dad. Gelene did not have a husband to help her raise her children the way Jerry helped me. She had to raise three bronchy boys alone. She was strapped financially. She drank the way she did because that was her way of dealing with adversity. She did not set any boundaries for the boys who were allowed to do whatever they wanted

Kenny was a sweet boy as a child, but I knew there was something emotionally wrong with him. He was hyper, never sitting still, moving all the time. He was more hyper than any child I ever saw. He had a short attention span. He needed a lot of structure and support, but he did not receive any. The boys got to running around with other kids who were bad associations.

As an adult, Kenny was a sweet person, nice, and respectful. I am prejudiced because I love him. Kenny loved Abby, who was really sweet, and their son was a doll. I believe that Kenny had a family substance abuse problem that may have hidden his mental illness. After he and Abby divorced, we tried to help him. His only security was with Gelene because he did not have anybody else. My husband went to see Kenny to talk about the Bible and how he could straighten out his life. We were never afraid of him and do not believe he would intentionally hurt anyone.

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny. Kenny is a very kind person who does not want to bring harm to others. We attended Kenny' two state trials every day and his federal trial twice because we cared for him.

-3-

After speaking with an investigator working on Kenny's case, I have made this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _15_ day of 2009, in __LeFlore__ County, Oklahoma.

_____Ruth Harris_____

Ruth Harris

—4—

1163

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

**EXHIBIT 94**

## DECLARATION OF SALLY DAVIS Johnson

I, Sally Davis, declare the following:

I knew Monk Sanders for a period of several years, and last saw him in 2004. I lived with him for a period of one year. I lost track of him when he went to prison for arson and robbery of a Chinese restaurant.

On one occasion, Monk Sanders used fraud and lies to get me to go somewhere with him. During our relationship, he came to my ~~school~~ house one day and said he needed to talk to me. I told him I could talk to him, but not for long, because I had to get back to school. At his request, I left with him in his car. After I got in his car, he drove me to Vian, Oklahoma and kidnapped and held me against my will for 8 days. During this period of time, he stabbed me and beat me on a daily basis. He kept lying to me, telling me he would take me home when my bruises healed, but since he kept beating me, the bruises would not heal. At one point when I tried to escape, Monk Sanders threw a knife at me and stabbed me in the foot. At another point, Monk Sanders cut me from my neck to my chin. This wound bled very profusely. After 5 days of being kidnapped by Monk Sanders, he finally turned himself in on another charge. I was held against my will by his mother, Evelyn Sanders, for another 2 or 3 days. At the end of this, the police finally came and got me. Evelyn Sanders tried to cover up my bruises with make-up. A police report was made regarding this incident.

Monk Sanders is an extremely dishonest person even when he is sober, but he is

1

100 times more dishonest when he is on drugs.  I could never believe anything he said about any subject.  He is extremely untrustworthy, and took me along on a stealing spree where he stole from practically everyone he knew in order to get money for drugs.  I informed the police about this, because I wanted out of it.  Monk Sanders has stolen from me before and also stole from my family in order to get drugs.  He even once stole my children's toys and pawned them for drug money.

On one occasion, Monk Sanders has threatened my mother Linda Davis because she would not tell him where I was.  He told her that if she did not reveal where I was, when he found me he was going to cut my tongue out.

I know Kenny Barrett.  My ex-husband and I would occasionally hang out with Kenny Barrett and his wife.  I never knew Monk Sanders to have any association with Kenny Barrett.

I was never contacted or interviewed by any lawyers representing Kenny Barrett during his federal trial.  Had I been contacted, I would have given them the above information and would have testified if asked to do so.

An investigator working on Mr. Barrett's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully, and it says what I told the investigator during our meetings.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

2

1166

Executed by me this __l__ day of __March__ , 2009, in

__Sequoyah__ County, Oklahoma.

Sally Davis Johnson

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 95**

## Declaration of Shawn Hill

I, Shawn Hill, declare the following:

I am related to Kenneth Barrett by marriage. My wife, Brandy Hill, is the granddaughter of Phyllis Crawford, who is Kenny's mother's sister. My wife's mother is Gwen Crawford who is Phyllis Crawford's daughter. I am a contractor and work every day to support my wife and our two children.

My wife and I both had drug problems, which we have handled and dealt with successfully. I served eighteen months, with the remainder of a 20-year prison sentence suspended upon completion of a drug program, for possession of methamphetamine.

I know Kenny pretty well. I lived with him from June through October 1998. My wife and I also lived off and on with Gwen, my wife's mother, in a trailer just below Kenny's shack on the other side of the ditch that OHP came though. It would be impossible for a Mazda to go through the two-foot deep ditch, as Brandy Price testified at trial, without tearing out its undercarriage and making the Mazda inoperable. You don't need to know much about cars to know that.

Kenny hardly left his property for several years, long before his arrest for selling any drugs. Kenny did not talk about killing police or going down in a "blaze of glory." He was not the kind of person to say something like that. The police drove by his place all the time, and they knew he would not shoot at them. Tom Sanders would sometimes call the cops over noise disturbances, and the police would drive by. Kenny was used to it. He acted as if "I'm here if you want me." What I mean by that is that his attitude was not threatening; I mean he wasn't hiding.

1

1169

The sign on Kenny's gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night before and awakened him. It had nothing to do with the police.

I was out at Kenny's frequently and know some of the people who testified against him in his federal trial.

Brandie Price is known in the community as a dope whore who would do or say anything to obtain drugs.

Monk Sanders has a reputation in this community as a thief, a liar, and a snitch. He was never in Kenny's house because Kenny would never have let him in. We all stayed far away from Monk. I could not believe they let him on the witness stand because he had been arrested so many times. He is well known as someone who lies to get favorable treatment. When Monk is in jail, he gets beaten up by other inmates for the lies he tells. Monk was addicted to pain killers.

Cindy Crawford's reputation around here is that she's dishonest, evil and worthless.

Karen Real is pretty messed up. Kenny and Karen were life-long friends. She stayed for a while in Kenny's house. She has been arrested numerous times and she informed on her boyfriend Doss Gann in exchange for favorable treatment. Some people will take what they got coming and some will do anything to get out of it. She is known to be the latter.

Randy Thurman is as low as you get. He is known around here as a thief who will testify against anyone to save his own skin.

In 2001 or 2002, my wife Brandy and I were brought into ADA Robbie Cowan's office and asked to roll on Chip Teague, Boss Green and Diane Wynn. They wanted us to say whatever we knew about these individuals and the drug trade. We declined. Ten days later, Cowan was no longer a D.A. He had resigned.



I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

Had I been asked to testify at Kenny's trial about what is in this declaration, I would have.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this 26 day of February 2009, in Sequoyah County, Oklahoma.

Shawn Hill

3

1171

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )     **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

**EXHIBIT 96**

## Declaration of Toby Barrett

I, Toby Barrett, declare the following:

Kenneth Barrett is my father, and Abby Stites is my mother. I am their only child.

I was born and raised around Sallisaw. I went to Brushy Elementary School and Central High in Sallisaw. My mother had me held back in the first grade because she was not satisfied with my progress. I stayed in school throughout the 11th grade, when I withdrew. It was hard for me to focus my attention on school.

When I was 12 or 13 my parents separated for good. I lived mostly with my mom, but lived with my dad and Gelene, my grandmother, for most of a year when my parents first split up. Gelene drank beer like most of us drink water, but she drinks more moderately now. I moved back in with my dad when I was 18 for several months before the incident. He wanted me to return to school. We were working on the Camaro the night of the raid so that I could use it to go back to school. The raid changed everything, but I finally obtained a diploma from a Christian school.

Now I work on an offshore oilrig for two weeks at a time, two weeks on and two weeks off. I make pretty good money, which is important because I do not want to go in debt since I have two sons to raise. When I'm home in Sallisaw, I stay to myself mostly and with my girlfriend who just moved here, other than spending time with my sons, Toby Joe who is six and Ty Lee who is four. Their mom married a fellow who treats the boys well, so I get along with him. The boys spend more time with their stepfather than with me, which is all right because I am not a jealous person. I just want what is best for my boys.

1173

and it is nothing he would have hid from me.

Just before they raided the place, the first thing I saw were taillights that went past the driveway and then a flash of light—maybe like the interior light of a car when somebody opened a door to get out. Then an SUV and a Crown Vic went up my great grandma's driveway and then the Bronco turned toward the house and I yelled "Dad." I don't recall how many times I yelled it. It all happened so fast. I thought I saw dad come onto the porch for just a second, and then the Bronco was just coming over the ditch made a boom, like it bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

If my dad went to the roll top desk to get his handgun when he saw the headlights coming, which he said he did, for sure they could have seen his silhouette through the curtain. If he went into that room, they would have seen his silhouette.

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to

want me to testify at the trial.  He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again.

I have been interviewed by an investigator who told me he is working on my dad's case.  Later he asked me if I would give him a declaration of what I told him.  He showed me this declaration and I have read it carefully.  It says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___23___ day of ___Feb._____2009, in

___Seq._____ County, Oklahoma.

_____
Toby Barrett

Page 4 of 4

1175

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 97**

## DECLARATION OF SYLVIA GELENE DOTSON

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother. He is the first of three children born to me and his father, Ernest Eugene Barrett, during our marriage. To understand Kenny you have to know something about my family, how he fit into it, and how he came to live in his little shack on our family's property.

Family and hard work meant everything to my parents whose families go back generations in this part of Oklahoma. My parents and their parents always helped out each other and their children by finding jobs that let them feed their families in tough economic times, working together, and working land near each other. Through the years, my family has lived through wars, droughts, and lean economic times. We have worked our way back and forth across this country, all the way to California and up to Joliet. We had to deal with real poverty even when we worked from sunup to sundown. We dealt with mental illness and suicides, and more than our share of problems with alcohol and drugs, but we survived it as a family.

My father, Hugh Dotson, was one of six children (Hugh, Eleanor, Warren, Lela, John E. and Christine) whose great grandparents were from around Sallisaw, Oklahoma. Dad's wiife, Hattie Gertrude Real, who is my mother, was born in 1921 in rural Vian, Oklahoma. The Reals worked a piece of property north of the Dotsons. Hattie parents, Alan Real and Ida Goodwin Real, were my maternal grandparents. They were farmers like everyone else. They grew anything they could—mainly peanuts and cotton. No one had running water or

1

1177

electricity until the later1940s.  They knew the value and the cost of hard labor because nothing was easy or taken for granted in those days.

Dad's younger brother, Warren, is 90 or so and lives in Kellyville, outside of Tulsa, about two and a half hours from Sallisaw.  His children are Nona, who lives with him; Linda Rogers who lives in Sapulpa; Judy who lives in Kellyville; and Karen who lives in Bunch, Oklahoma.  One of Dad's sisters, Christine Cook, lived in Sallisaw.  Dad's sister, Eleanor, married Gene Masterson, and they moved off to Joliet, Illinois, had two children, Nelda, who died recently, and Jim, who lives in Antioch, California.  Lela, another one of Dad's sisters, lived in Wichita, Kansas. The Joliet connection ended up being pretty important in my life because that's where Kenny's dad, Ernie, and I lived after we married.

Back when Dad married my mother, he did odd jobs and barely earned enough to live on.  I was born in 1940 in an old tumble down house in Vian. We moved out of that house before my sister Phyllis was born in 1942 to a house owned by my Grandpa Alan Real. That house is now gone but the land is still in the family and my cousin Mike lives on it. Not too long passed before we moved to what was known as the Granny Golden Place before my next sister Ruth was born, then back to that old tumbledown house. After that, we moved less than a mile away to another house where my youngest sister Carolyn was born. All the houses were in pretty bad shape even by standards back then. We had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking.  All that moving made Dad all the more set on owning his own land, but it took a good many more years for him to be in a position to buy

2

1178


40 acres.  At the time, I just figured this was the way life was.  I did not have aspirations back then.

After Dad got out of the army, he went to classes in agriculture on the G.I. Bill in Sallisaw. Uncle Carl Cook, who was married to Dad's sister Christine, taught agriculture there. It was night classes, not college, more like a technical school. Dad learned how to run a farm, a big farm, not just a home farm.  When I was six, the family moved to the Dwight Mission School, an Indian school run by the Presbyterians. I always heard we were part Indian and think that I am 3/16 Cherokee.

Dad ran Dwight Mission's farm. The school provided a house for our family that had electricity and plumbing. There was no kindergarten in those days and I went to first and 2nd grade at Dwight Mission, and then they shut the school down.  They sent Dad, who took us along, to the Menaul School in Albuquerque, New Mexico.  It was a high school. Dad ran the cattle and vegetable farm. The kids that went to the school were the farm hands and Dad was the overseer.  I spent third grade in Albuquerque, and then we moved to Missouri when I was nine.

The fellow who had been the superintendent of Dwight Mission stayed in contact with my dad. When the Presbyterian Church started an orphanage in Farmington, Missouri, and purchased another farm, the superintendent asked Dad to run it. I loved Missouri. We had good neighbors and kids to play with. We had pigs and went sledding in the snow on the hills above the farm.  I had started the sixth grade when the superintendent lost his job and we had to move back to

3



Oklahoma where we lived for two or three months with Uncle Carl and Aunt Christine.  There was no work around there.  I was eleven years old and wanted to go to school in Blunt, Oklahoma, but the school was closed when we first got there because a lot of families chopped cotton in the spring and pulled cotton balls in the fall. Most of the country schools shut down because kids joined their parents in working in the fields and traveling to where the cotton needed tending.

My Uncle Jim and Aunt Rosy Newton, Rosy Real Newton, Mom's sister, had a place here in Oklahoma but they had to go to California part of every year to make money working on a ranch. I don't know why they called it a ranch, because they raised crops, but they called them ranches. We ended up going to California with them when Christmas vacation came.  We moved to Shafter, just outside of Bakersfield, California, in 1952. Aunt Valerie, my paternal grandmother's sister, was married to Monroe Bell, and they lived in Weedpatch, California. Their son-in-law was the accountant for Pelletier Farms, which owned a big farm, and he helped Dad get hired as an irrigator.  I was almost 12.

In 1952, I attended a school in Maricopa that was flattened by an earthquake so classes in the seventh, eighth and half the ninth grades were held in a Quonset hut. I made many friends. There were 30 or 40 houses on the farm, all with kids. We were not migrant workers, but people who lived there permanently.  We went from one person's house to another. The children were welcomed wherever they went. We played Kick the Can and other children's games.  It was a joyful time, and I was a happy child. My mother, Hattie, was unhappy about a whole lot of things, but she was happy when we lived at the

4

1180

California farm.

My mother's unhappiness seemed mainly to be about the family not owning their own place. She was not happy after they returned to Oklahoma until she and Dad were finally able to get their own place.  Land is just something very important to us and always has been.  Out in California, Dad worked seven day weeks, 12 hour-days, and got two weeks vacation during which we came back home to Oklahoma.  He was tired from too much work but he never considered working less. He didn't take us to California to stay.  Oklahoma was home, and we always knew we went out there to make enough money to buy our own place back home.

After my brother, Mark, the youngest child, was born in 1961, Dad finally saved enough to buy 40 acres.  By that time, I had left home and was already married to Ernie. Much later, Dad gave each of his five kids 8 acres. He had lived to see his dream come true.  Kenny was living on that land when the shooting happened.

Dad was strict with his children and was not one to show favors, but Mom favored Carolyn until Mark was born.  Mom did things for Mark and his kids that she did not do for the rest of her children.  I always felt it took something away from me and my children.

I was about to turn 15 in April 1955 when, in January, we picked up stakes. I didn't want to leave. I had friends on the farm and at Maricopa High School.  I was interested in my friends more than anything else.  I was really good at English, but I didn't know enough to be interested in it. When we moved

5

118 J.W

back to Oklahoma Dad rented a place for us to live.  I rode a school bus to Sallisaw High School, and a man with a station wagon picked up my sisters Phyllis, Carolyn and Ruth and drove them to McKey Grade School.  In high school, I was in FHA (Future Homemakers of America), but had to drop out because Dad could not pick me up.  I had to ride home on the school bus. I took a class in dramatics and the teacher said I was a natural born actress, but I couldn't be in the junior or senior plays because Dad would not come and get me. Dad wanted me to play basketball. In Maricopa, I played volleyball and I was good. We didn't lose one match. But the girls at Sallisaw High had been playing basketball since the sixth or seventh grade and I was getting too late a start to catch up to them. I regret I didn't play basketball.  I had a couple of boyfriends, but nothing serious.  I even dated Ernie a couple of times.

I really planned on going to college after I graduated from Sallisaw High School in 1958. I made arrangements to go to Connors College, but I didn't know what I wanted to do. Dad's sister Eleanor (Masterson) asked me to spend the summer in Joliet and helped me get a job as a waitress at Walgreen's, which had full-service restaurants back then. I still planned on going to school. I was making new friends. My teachers in high school pressed me to be an English teacher. I thought about that. I read and still do read mysteries all the time, like Jane Withers and the Hardy Boys. I was always interested in them. I am presently a member of the Mystery Guide Book Club. Back then, though, I just didn't have the initiative to go to college.  One of my customers at Walgreens was an air force recruiter and I thought about going in that direction.

6

Right when I was trying to figure out what to do with my life, I came home to Sallisaw on vacation and ran into Ernie again. He was just back from the Marines. I was crazy about Ernie and remembered him from high school where he was ahead of me.  Ernie left high school, served in the Marines and came home kind of like a knight in shining armor. He was a handsome fellow. I was so taken by him that I didn't realize he was not the same boy I knew in high school and that he had changed, none for the better. We were not the same people we were back in high school, but I never imagined that life with Ernie could be so terrible, not just for me, but for the children we had together.

My cousins were pushing me to marry him, telling me what beautiful children we would have. I thought it would be the real American dream.  My mom and dad had worked together and stayed together to get the things they wanted, to own their own land, and to raise their children among family.  I married Ernie on July 8, 1960, and Kenny was born in Joliet on June 29, 1961.  We had a very difficult marriage right from the start but we were young and neither one of us really understood what lay ahead.  I try not to think about those years.

Ernie did not want a family or a wife, much less children.  He left me for other women right after we married. I think he had a lot of problems that made him have to have all those women to make himself feel like a man.  When I was pregnant with Kenny, he left me one night and did not come back for days. He did this all the time I was pregnant with Kenny.  Whenever he took off like that, my Aunt Eleanor would come by and bring me food, because he left me no money and he would have the pickup.  I was pretty miserable then, and Eleanor

7

tried to keep me company. We would have a few beers, talk, and plan what to do next. Eleanor and I would go looking for him—he would be out drinking. We would go to bars and they would tell me he wasn't there. It was a constant thing. Once I even went to a woman's apartment looking for Ernie—the woman said he wasn't there, but I heard his voice. It was humiliating and embarrassing and hurt a lot. I was alone, pregnant, and really depressed. I wish we had known then what we know now about how having just a little beer can affect your baby—none of us would have had a drop. I couldn't believe what I had gotten myself into and wondered if there would ever be a way out of it.

I started battling with Kenny before he was born. My pregnancy with Kenny was very difficult. I was in constant pain above my pelvis. He moved all the time and kicked me all the time. I could never get comfortable.

Kenny was born with a lump on top of his head, larger than a knot, which went away in a about two or three years. His days and nights were mixed up when he was a baby. He did not sleep at night and slept in the daytime. I was exhausted by it. Kenny was a very difficult baby and child. He was colicky and nothing could comfort him, not even breastfeeding him, which I did for six months. He cried and fussed all the time. At first I thought all babies must be like this, but after I had my other two sons I realized something was wrong with Kenny. He was very, very active and moved around without thinking about what he was doing. Still, by the time he was one he did not walk and this worried me. But by the time he was 18 months, he was walking all right.

When he was a toddler, he had to go to the hospital for several different

8

accidents. He got into everything.  He had to have his stomach pumped two different times after he managed to climb to a top cabinet. Once he ate baby aspirins and the other time he ate ex-lax.  I also had to rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting his head open and raising a big knot. He could not be still.  Any little thing could upset him, but it took a lot to calm him. I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him. This was not true with my other boys. Kenny had the measles once and ran a fever so high it scared me. I took him to the doctor and he was so concerned he prescribed a fever reducer. My other two boys got the measles' vaccine, which didn't exist before Kenny caught them.

My second son, Richard Andrew, was born June 24, 1964, in Joliet, almost three years to the day after Kenny. Soon after Richie was born, Ernie and I separated for three years.  Kenny, Richie, and I lived with another woman who had two boys of her own for a while but we had to move back to Sallisaw for two years. I could not support two boys on my own. Kenny really loved his dad and missed him a lot when we were separated.  I always wondered if that separation caused some of Kenny's problems because he never got over it. That's one reason Ernie convinced me to go back to him.  My third son, Steve was born in January 1969 in Joliet, Illinois.  Ernie still had his other women, though. There was never a time he did not have other women.

Kenny was a handful, and I did not get any help from my husband with the

9

1185

children. Kenny had a difficult time in school and was in Special Ed classes part of the time.  He failed reading and arithmetic in the first grade and had a hard time keeping up with the other kids.  It was very difficult for him to read. In the second grade, when they taught phonics he never grasped it.  He never did well in school and he finally gave up. I didn't know what I could do.

Ernie would not even talk to me about what was going on with me, the kids and him.  It drove me crazy.  I tried to talk to him about it because it is not in my nature to be a passive person. I begged, pleaded, threatened, and cried with Ernie about his women.  Ernie would just tell me it was none of my business and to shut up.  We split up and got back together and threatened to leave each other over and over. We always had a difficult time of it.  Ernie did not drink at home but drank at bars away from home and could not hold his liquor. I was very depressed at times.

We left Joliet and moved to New Jersey to try and find a place where we could start our lives over.  He said he wanted to have a fresh start, straighten himself out, but that's not what happened. Even having a job at Thatcher Glass where he worked didn't help. He started seeing another woman almost as soon as we got there. He moved out on me and the kids and lived with her, but I let him move back in.  Ernie would leave and move in with other women or not come home for days on end. He gave me gonorrhea twice. We got into some pretty bad fights because I couldn't stand his not coming home nights anymore, and he gave me two black eyes and split my lip. There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not

10

1186

knowing how to make us stop fighting, and then the time he hit me.

I liked Hopatcong, New Jersey; I liked the people and I liked the country; I wish I could have afforded to stay, but I finally left Ernie, told him I was leaving for good. I'm the one who left that time; all the other times it was him. He asked me to stay. He said his behavior didn't have anything to do with his love for me or the kids. He said, "Someday I'll get too old to do this and we'll have a good life." I agreed to stay, but I wanted to move into my own room and he would have to leave me alone—I mean not have sex with me anymore. He said no, that it wasn't going to be that way.

Dad had always insisted I stick it out, but now he said he wanted me to come home. Daddy paid for the ticket. My parents did not hate Ernie—they just didn't like the way he did me. Ernie went from one woman to the next before he finally settled down with Doris, his wife now.

I don't even hate Ernie; I just have no use for him, not so much for what he did to me but for what he didn't do for the kids. He was always talking about how big he was and telling the boys "'you ain't never going to be as big as me."

I came home to Oklahoma in 1972, and Ernie and I divorced June 20, 1973. I dated and had a few boyfriends before I married Paul Dudley in 1982, when Stephen was 12. Paul and I owned a bar together but he did not know how to be a husband. He was violent and attacked me, beating me black and blue. I divorced him after three years but we were in the process of getting back together when he was murdered in Las Vegas. I took my maiden name back.

When Kenny and his brothers were growing up, I had my hands full with

11

three boys and basically no husband.  A woman is not cut out for discipline, and it is not a good role for a woman to play.  I whooped my kids with a belt or a switch, the same way I was raised. Spare the rod, spoil the child. Ernie did not beat the kids because his dad beat him and Ernie hated it.  I had to make up for the discipline Ernie would not give the boys.  I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy.  He was more than hyper.  He was emotional about things that did not matter.  He would cry and scream like there was no tomorrow.

Kenny never adjusted after we moved back to Sallisaw for good.  He really missed his dad, but his dad did not show him any affection.  His dad came every year or so to see the boys but used it as a time to show off a new car for a few minutes rather than spend any real time with the boys, although once or twice he would take them hunting, which is the only way he ever related to the boys. Kenny got pretty depressed and lost interest in school. He had to repeat the eighth grade.  He went to live with Ernie and Ernie's new wife in Dunkirk, Indiana, but that didn't work out and he came back to Sallisaw as soon as he finished ninth grade.  I told him he had to work, and he got a job at the local racetrack. When school started up again he went for a few days and then just quit and went to work full time.

When he was 16 or 17, Kenny was beaten up by police officer John Philpot who broke his own hand while breaking my boy's face after Kenny was arrested for squealing his tires. The FBI investigated the whole thing. Kenny always loved working on cars. They were his pride and joy.  He was out driving

12

1188

one of his souped-up cars and got arrested, taken to jail, and beaten all over his face. His nose was bloodied, and his jaw and collarbone broken. A highway patrolman held my son's head back by the hair while John Philpot beat him. An assistant district attorney said he just stepped out of the room and missed what happened. Everyone in law enforcement interviewed by the FBI gave a different story. You should have seen the pictures of his face, made you so mad and want to cry at the same time. I think they would have brought a case, but Kenny wanted the FBI to drop it he was so afraid. It was a big thing in Kenny's life and really traumatized and terrified him.

Kenny always worked hard and his bosses liked him. He was a good worker, strong, and able. By the time Kenny was 18, he was working on pipelines and oilrigs and traveling all over, not just in Oklahoma but to other states. He was a builder and could frame and put up apartments. He was proud of his work.

Kenny met and fell in love with Abby Stites, a wonderful girl. I love her like a daughter to this day. Kenny was 19 and Abby was 16 when they married in 1980. Kenny and Abby's marriage was always rocky, though, and they were more unhappy than happy even though they loved each other. They were too young and Kenny was far too mentally unstable. Their son, Toby, was born December 1, 1980. Toby, Kenny and Abby lived with me a lot of the time when Toby was little.

Kenny had terrible mood swings and periods of depression that lasted for days. He withdrew—anything upset him—and he was paranoid about

13

everything.  Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him.  She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.

He tried to kill himself in January 1986 in my front yard.  He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself.  We all ran out of the house and thought we had lost him for sure.  He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage.  Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness.  Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995.  Kenny never recovered.

Kenny was not able to live on his own.  When he and Abby would separate, Kenny always came home to me. After he and Abby broke up for good, he moved back home. He was a lost soul. Nothing in his life ever mattered but Abby and Toby. Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it. He just couldn't do it no matter how hard he tried. It was so sad, so he came home to me.

He asked his grandfather and got his blessings to build a place to live on a piece of land next to my house. This was on the part of a few acres he still owned that I knew he planned to give me, which he did before he died.

With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud. He showed it off to everybody, but it was nothing much,

14

 

pretty bare, three tiny rooms and an attic space for sleeping. It had no water, or toilet, or electricity. He put a porch on it though.

He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer.  He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner.

I knew he had serious mental problems but I hoped if he lived close to me and just worked on his cars and fixed things for people, he might be able to make it.  My family has seen a lot of mental illness, alcoholism and suicide so I know what depression does to people.  Sometimes, Kenny was manic and thought everything was wonderful, but he became frustrated and irritable over any little thing and was depressed and withdrawn at times.  His moods changed from one extreme to the other.  We knew he was mentally disturbed and suffering.

As time went on, he did a little better, built a garage—more like a storage shed—and fixed cars and pickup trucks for friends and neighbors. Cars were his only other love besides Abby and Toby.

Friends brought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

15



The night of the shooting, I got home after working a 12-hour shift, saw Kenny and Toby working on a car by the garage, and was too tired even to say hello. I knew Kenny and Toby were already over and ate, because there had been food in the icebox for them and it was gone. I was sound asleep when I woke up to gunshots. At first, I thought it was Kenny shooting skunks, and then there was so much shooting and then it stopped like it never happened. I looked out the window and all I could see was a cloud of dust and a lot of people yelling, and the phone rang—it was Phyllis, my sister across the way, who wanted to know what was happening because she was scared to go out and she was wondering where Travis, her son, was—because he had been home just before. I told her I hadn't seen him. I walked back to my room and I saw a black and white police car in my driveway without any lights and then a black and white police car coming through Kenny's gate with just its headlights on. One thing I know is they did not have their red and blue lights on.

I never believed there would come a time when the police would come in the middle of the night to arrest him. If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all. They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble. If fact, John Philpot had been out to talk to him just a few weeks before this all happened.

Mr. Hilfiger and Mr. Smith, Kenny's lawyers, never talked to me about my

16

family's history in Oklahoma, how much our land meant to us, how we always worked for what we had, and how some of our people, including Kenny, had mental problems.  Our people go back for generations in these parts and we are close to each other even though we have our misunderstandings from time to time.  I know my family would have answered any questions they had about Kenny, his life, and his problems, but the lawyers only talked to us in a hurried way. They came to my house once, more to see where Kenny lived than to talk to me. They didn't ask me anything except about what I saw the night they came for Kenny. The day I came to testify, they didn't tell me what they wanted me to talk about in court or what they would be asking me except if I loved Kenny and would miss him if he was executed,

An investigator working on Kenny's case now asked me to give the information in this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings. I have looked at copies of five photographs the investigator showed me that he said would be attached to my declaration. They are pictures of the shack next to my place that Kenny built. The shack looks like it looked around 1999. I have put my initials on the copies he showed me. The investigator also showed me copies of two pages from a baby book that I had given him. The stuff not checked is stuff Kenny could not do when he was supposed to and it really worried me. Funny the things you can remember like how he couldn't follow the light when I shined a flashlight at his eyes and moved it. I have initialed the pages the investigator showed me.

17

I declare, under penalty of perjury, that the foregoing 18-page declaration is true and correct. Executed by me this ___9___ day of March 2009, in _Sequoyah_ County, Oklahoma.

Sylvia Gelene Dotson

18

am I supposed to do all this ?

(Mother will check if I do)

## AT ABOUT THREE MONTHS   MORE OR LESS

Lift chest clear of surface when placed face down___

Straighten knees when held erect___

Hold head erect and steady when held to shoulders___

Sit on lap, hold head erect and steady with support of ribs only___

Follow flashlight with eyes: vertically___ horizontally___ circularly___

Smile in response to Mother's voice___

Observe anyone speaking___ Inspect hand___ Laugh aloud___

Manipulate object placed in hand___ Splash in bath___

Make stepping movements when held erect___

Open mouth at sight of nipple before lips are touched___

## AROUND SIX MONTHS

Hold head erect when carried___

Sit alone on flat surface momentarily___

Stand firmly with help when held erect___

Roll from back to stomach and vice-versa on flat surface___

Reach and grasp for an object when in sitting position___

Pick up one-inch cube with fingers___

Scoop up 1/8-inch cube___ Discover feet___

Look at object with which am playing___

Look at floor for fallen toy when in high-chair or lap___

Make various vocalizations___

Notice difference between familiar persons and strangers___

Not much affected by strangers, new scenes or solitude___

Crow and coo actively when pleased___

Cry and fret when toy is taken___

[ 20 ]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance___

Crawl on stomach, making some progress___

Creep on hands and knees___

Bang table with toys or other objects___

Knock down block houses in play___

Oppose thumb and forefinger in picking up one-inch cube___

Wave "bye-bye" or play "peek-a-boo" instinctively___

Take bottle in and out of mouth___

Respond to animated facial expressions___

Bowel control___ Respond when name is called___

Express vocal sounds upon recognition of familiar person or object___

Associate outdoor clothing with being taken out___

May react to strangers___

Reach for objects persistently___

Say "ma-ma" or "da-da" or equivalent___

Make stepping movements when feet are touched to floor___

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture___

Walk with help___ Creep actively and rapidly___

Comprehend simple verbal commands and commissions___

May cooperate in dressing and undressing___

May climb steps___ Hold and drink from cup___

Pile one block on another when shown___

Say two or three words indicating want___

Play "pat-a-cake" or similar demonstrable game___

Pick up small object with finger and thumb___

Show preference for one hand in reaching___

Make rhythm movements to music___

Indicate need of toilet___

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)___

[ 21 ]

















**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) |
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Defendant.* | ) |

_____

**EXHIBIT 98**

_____

<u>**DECLARATION OF MARK DOTSON**</u>

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle. Kenny's mother, Gelene Dotson, is my sister; I am 23 years younger than she is. I am a podiatrist with a private practice in Fort Smith, Arkansas. My wife, who is a dentist, and I have three wonderful children who are doing well. My daughter is 20 years old and in college, and my two boys, who are 16 and 11, attend public schools. Our home is in Vian, Oklahoma, on land passed down by my parents.

I recognize that we are fortunate to have healthy children who enjoy and appreciate their lives, do well in school, and are not disadvantaged by problems that affect my extended family. My wife and I have not had to deal with depression, alcoholism, and attention deficits that have affected many members of the Dotson family. My children do not appear to have been bitten by the Dotson bug.

Two of my sisters, Ruth and Phyllis, have been relatively mentally healthy, but two of them, Gelene and Carolyn, have struggled with serious impairments. Gelene, Kenny's mother, is a heavy drinker with dramatic mood swings. Some days she is pleasant, and some days she is rough. She is so unpredictable and unpleasant that I try to keep my distance from her. Kenny was very hyper as a kid. He was not a normal child. Kenny often stayed to himself. Most of us went to the movies or out to eat, but as far as I can recall I do not remember his ever doing those things.

All three of Gelene's sons had problems. Richie is not quite right mentally and no longer works. He is odd. Steve was extremely hyper, the most hyper child I have ever

*AltD*

Page 1 of 4

seen. Grandpa used to say, "If there was a knob they would turn it." I thought Steve was retarded, but he turned out not to be and is now a principal. A difference between Kenny and Steve was that Kenny would get things and tear them up, which Steve would not.

Kenny had difficulty figuring out social situations. I used to watch the Andy Griffith show; I still enjoy it. A running gag of the show is that Andy pretends that Barney was a good deputy, although Andy knew that Barney was really bumbling and afraid. It would make me laugh, but it would frustrate and confuse Kenny that Barney believed he was good when he was incompetent. Kenny could not see the humor.

Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.

Kenny's home life was his mother drinking a lot and having men in and out. Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny. Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene.

Phyllis's children also suffered with ADD. My nephew, Travis Crawford who is Phyllis's son, had attention deficit disorder as a child that was not treated. He is nervous to an extreme. He was raised in an extremely lenient home that set no boundaries. This did not serve Travis well and nourished his problems. As a kid, we got a kick out of

*MKO*

Page 2 of 4

he had a better family life and got the help he needed, I can't help but believe things would not have turned out this way. A year before the incident, Ruth went over to speak to Kenny and tried to tell him that his lifestyle needed changing.

A lot of us had backed off from Kenny, but not Ruth. I wish now that I had talked to him. I and my family let him down. The truth is our family's failure to help Kenny begins at the core of Gelene. What I mean by that is he either lived next door to Gelene or with her, and Gelene being who she was made us want to stay away. It is not a very good excuse for the family not stepping in to help Kenny, but there you have it.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it was an accurate account of what I told him, and if it was if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _8th_ day of March 2009, in _Sequoyah_ County, Oklahoma.

Mark Dotson

1202

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 99**

## Declaration of Steve Barrett

I, Steve Barrett, declare the following:

I am Kenneth Barrett's youngest brother; I was born on January 1, 1969, when Kenny was seven years old. Because of the seven-year gap in our ages, we were exposed to vastly different environments and experiences during our formative years that help explain how I was able to overcome many of the challenges I faced and how those challenges affected Kenny.

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children. Even though I love my parents very much and recognize they did not understand the damage they did to their children, I have had to come to terms with the impact of alcoholism, mental illness, and family instability on my own life.

The primary difference in our upbringing is that I was raised by a village and lived in an extended support structure, something Kenny never had. My mother moved to the country to live on family land amidst her relatives when I was an adolescent. We moved in to the same trailer in which my mother now lives, where I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him. Kenny idolized Ernie, while I barely knew him. My parents

1

1204

divorced when I was two, and my two brothers and I stayed with our mother. I could tell when Ernie visited how much Kenny missed him, that Kenny was enamored. Kenny made sure to stay in close proximity, while I would wander off. Ernie was a god to Kenny. I have no recollections of being close to my father in childhood, although as a teenager and young adult I was able to develop a relationship with him, long after Kenny had become an adult. My father's absence in my childhood and adolescence was replaced by attentive older men and women relatives who rooted me in their love and guidance.

Finally, while I was able to succeed academically, Kenny had great difficulty with his education. Kenny failed in school, but I was one of those lucky students who was always good at school and a decent athlete. High school athletes in my small town were just about the only ones who got noticed. We got sort of pampered treatment.

School became the focal point for me. In some ways, it replaced the value system that I never got at home. I would often stay at friends' houses to avoid the high stress environment at home. My mother's ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings.

One of my first memories of Kenny doing something bizarre, was when I was about five years old. Gelene whipped Kenny for something. Kenny had built these intricate scale models of cars—Mustangs and Chevelles—that were perfect. Kenny became so upset he smashed them all.

Gelene whipped us boys with a strap, but I was able to stay out of trouble pretty much. Kenny was constantly on the go, though, and Mom was pretty harsh with him,

2

1205

verbally and physically. Kenny hated being whipped. We had a German shepherd that Ernie had given Kenny. The dog was very protective of Kenny and when Mom would try to beat him, Kenny would hide behind the dog and the dog would growl at Mom and not let her near him. The dog was run over by a car.

Mom did not have regular discipline or rules for the house; she went from one extreme to the next. When she lost control of herself, she whipped us, but there was no real parenting. Sometimes she came into my room after she had been drinking, when she thought I was sleeping, and she would cry about things she had and had not done. She went in and out of being a Jehovah's Witness, but we did not regularly attend church. We never discussed education, how we were doing in school, or how to prepare for the future. We mostly just raised ourselves as best we could.

After we moved to the country, I often ate breakfast with Hattie and Hugh, my maternal grandparents. They were real grandparents. Friends and relatives took an active part in my and each others' lives. Janice and Tom Sanders taught me how to play cards. I hung out with my cousins Rodger, Jr. (Podgy), Travis and my Uncle Mark. It made all the difference in the world to have that support structure. It was a pivotal part of my life. I had positive experiences and influences that Kenny never had. Aunt Phyllis gave me girlfriend advice. Phyllis and Rodger were instrumental in helping me. Uncle Mark was like an older brother who showed me how to do stuff, who spent time with me. I fed cows and hunted and fished with Podgy and Jeff Sanders on the Real property, which was just north of the Dotson section. I went with Podgy Travis, Mark, and Hugh to get alfalfa for winter animal feed. I loved the outdoors.

My own family was always dysfunctional. My mother was never able to have

3

meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys. She did everything to the extreme, whether it was drinking excessively or becoming a devout member of a religious group. I once found some diary-type notes of hers when I was young; her notes were very depressive and full of blackness and darkness. If I were to find the same kind of writing today, I would know to get that person professional mental health treatment.

Life wore my mother down. She certainly did not know how to respond to Kenny's special needs as a youngster with profound psychological problems. She was not able to meet my fairly normal needs. In my junior and senior years in high school, I started in every (varsity) football game and she only came to two. I ran track in 40 or 50 meets, in conference championships, and she saw me one time.

It seems like much of my childhood was a real blur. It was weird in some ways; I was an observer. I saw things that children should not see. My mom always drank and had men around, but when she married her second husband, Paul Dudley, her life spiraled totally out of control, and I witnessed it. Paul was an amazing alcoholic, who was around from about 1982-1986. I remember Mom having a gun put to her head by Paul, when he was drunker than Cotton Brown, until she talked him down. I remember mom in the kitchen drunk with a knife in her hand, threatening to stab Paul who ended up leaving her.

Kenny left home and tried to make it on his own, but he never succeeded. He married young, had a son, and worked hard, trying to bury his problems under constant work and activity. Sometimes Kenny and I worked together. We once packed stalls at the racetrack; it was hard labor. We had a great time. We loved it. We kicked some butt, the

4

1207

amount of work we accomplished.  I have a genuine fondness for Kenny. Kenny and I were close; we understood each other. We were pedal to the metal kinds of kids.

As troubled as Kenny was, he worked all the time.  In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. Phyllis came over and was so freaked out she rolled in the grass. Paul wanted to drive Kenny to the hospital, but Phyllis' friend was there—a nurse—and she would not let him. She covered Kenny with a blanket and said not to give him any liquids. Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

After Kenny and his wife divorced, he moved back home, next door to Mom and built a little shack.  I visited it once when Kenny was constructing it. Kenny was showing me how he was building it. I was intrigued even though I have an inherent belief in quality. The shack was almost Waldenish in its own way. Kenny lived life with great determination; he got it down to the essential stuff.

While I benefitted from coming along later in mother's life when she was surrounded by family, I still had to overcome considerable problems. I had a rough go from ages 17 to 19.  I was involved with drugs, including crank, marijuana and psilocybin.  I had a job at the local racetrack and had been using crank for several

5

consecutive days when I overdosed and was hospitalized at Sallisaw General for two days. It was the turning point in my life.

My grandfather Hugh Dotson let me borrow his beat up car in which I could see the road through the floor and I went to the old Liberty Grade School that was by then an adult school, a general educational college of sorts, where I studied algebra. Right after that I moved away from Sallisaw in an attempt to escape the constant family drama. I moved in with my dad and his wife, Doris, and worked at Kerr Glass, where my father worked. They provided stability at that point in my life. Education was a lifesaver for me. I went to Tulsa Junior College for 18 months, while still living with my father. Ernie paid my tuition, which was about $1100 a year. I went on to Oklahoma University where I received a B.A. and a Masters in Education, majoring in physical sciences.

I have a career in education that has allowed me to help youngsters like Kenny who have multiple impediments to learning. I have taught chemistry, physics, and physical science and have coached football. I also have served as a sergeant in the National Guard for 11 years but had to withdraw when it interfered significantly with my coaching responsibilities. As an NCO I was randomly drug tested, which was a deterrent to using drugs. I am currently a principal in a junior high school, where I routinely see students in all stages of crises, many from stressful homes with alcoholic, mentally ill, and abusive parents. In our district, we consider these children emotionally disturbed (E.D.), which is a catchall phrase for distressed students who may develop prolonged or chronic mental illness the way Kenny did. We take care not to label students unless they have prolonged or chronic mental issues. I see such a parallel with some of my students and Kenny. They are students from low socio-economic backgrounds in high stress

6

get it before the jury for their consideration.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct. Executed by me this $5^{7H}$ day of March, 2009, in

Cleveland County, Oklahoma.

Steve Barrett

8

1210

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 100**

---

## DECLARATION OF WARREN DOTSON

I, Warren Dotson, declare as follows:

I am Hugh Dotson's youngest brother, which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle. An investigator for Kenny asked me to tell him about myself and the family. He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.

I am an ordained evangelical minister in the First Baptist Church in Kellyville, but I do not believe in denominations. I was saved when I was 34 years old.

I live with my daughter Nona in Kellyville, Oklahoma, about 25 miles outside of Tulsa, in a house my wife and moved into in 1965. Another daughter, Linda Rogers, lives several miles away. Linda is my only daughter to have married just once. She married Rodger Dan Rogers. The family refers to him as "Rodger Dan the Mountain Man," because" Dan is something of a recluse who likes to hunt and trap. My family is very fond of Dan. Nona has been married five times, but is single now, and after my wife died two years ago, Nona moved in with me. I have four daughters, who are all good women, but too often pick the wrong men to marry.

I have been married twice. My first marriage was to Lela Warren whose father was a U.S. Marshall. The Dotsons and Morgans are mentioned in a book, "The Outlaws of Cooks and Hill." Lela divorced me around 1939 or 1940, when I

—1—

sheriff had come to the house looking for stolen bridles, that Dad knew nothing about them and none was found. Dad later found them hidden in his barn and turned them in to the Feds. Mama always thought he was killed over the bridles and that he knew more about those bridles than he told.

Dad's death left Mama with six children to raise alone. She gave four of them to Dwight Mission School to raise: Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook. Mama kept me and my sister Lela, but she was not able to keep us long. I was only four years old and Lela was two. Mama had to give me to her sister, Francis Stites who was married to Andrew Payne. They lived in Muskogee. When I was fourteen, I went out on my own. Lela was first given to welfare people and then to Uncle George Dotson, my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and then later to Thomas McClendon.

I was never mad at my mother. What choice did she have? If I had to forgive her, that would be a wrong way of thinking. It hurts to lose your family. I remember crying when I saw her so many years later because she was a stranger.

I have worked my whole life. I was a welder and a factory repairman and learned never to stay at a job for more than a few years. If I found a company that would pay me more, I went there. If management insulted me, I would move on even if it was for less money. I worked as a helper for four years in Muskogee

—3—

1213

for seventy-five cents an hour. I then hired on as an acetylene welder and later worked welding gas and steam lines. I also have done heavy maintenance work that involved welding. I went where I could make better—nobody paid overtime.

My brother Hugh was a shy man who liked to hunt and fish. I was at Hugh's bedside when he died.  Hugh worked all his life so he could buy land and have something to leave to his children. They live on land he left them.

Kenny, Hugh's grandson, lived out there on Hugh's land.  Kenny was a good worker, too, and was never disrespectful.  My daughters took care of him after he got out of the mental hospital.

The law did not have to go to Kenny's place in the middle of the night to arrest him. Our people live all around Kenny's place and know that he was not dangerous. It breaks my heart what happened out there that night.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _6_ day of March 2009, in _Creek_ County, Oklahoma.

_Warren Dotson_

Warren Dotson

–4–

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 101**

## DECLARATION OF NONA REICH

I, Nona Reich, declare as follows:

I am Kenneth Barrett's maternal second cousin. My father, Warren Dotson, and Kenny's maternal grandfather, Hugh Dotson, were brothers. Kenny's mother, Gelene Dotson, is my paternal aunt.

Marriages are easy to get into; they can get you a lot screwed up and they are hard to straighten out. I have been married five times, some more successful than others, but probably my best marriage was to my second husband. I first married when I was only 16. I divorced two years later because my husband did not want children. I had my only two children, both sons, with my second husband, and we were married for 13 years. My youngest son, Marty, has had a difficult time with life and spent 11 years in prison for crimes related to methamphetamine. He has been out of prison two years but life as an ex convict is hard. I was married to my third husband seven years. My fourth husband was in the penitentiary when I married him in 1988; he was an alcoholic. Our marriage lasted two years. My fifth marriage lasted seven years. I have been single since 1999. When the preacher's wife wanted to introduce me to a man recently, I told her I was not interested. I must have stupid written across my forehead. Even if a man had "God sent me to you" tattooed on his forehead, I would question it. My greatest regret is not staying with my second husband and making our marriage work.

Gelene and Ernie had a terrible marriage and she got no affection from him. Gelene was hard on Kenny. Something about him reminded her of Ernie and she took it

–1–

N1216

said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind.  We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

I feel bad about what has happened. I have beaten myself up a hundred thousand times for letting Kenny down at a time when he was asking for help, wondering what I could have done, knowing that I should have done more. My only excuse is that my mother was dying at the time.  I feel like the whole family failed him. I know I have. I feel it in my heart. I really do love Kenny. The pity of all this is I know Kenny and he was not a violent person, troubled but not violent.

An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this __5__ day of March 2009, in ___Creek___ County, Oklahoma.

*Nona Reich*

Nona Reich

—3—

12 NR

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |


**EXHIBIT 102**

## Declaration of Carl Cook

I, Carl Cook, declare the following:

I married into the Dotson family on December 31, 1939, when Christine Dotson became my bride. We were married 61 years before her death March 31, 2001. Christine was Hugh Dotson's sister, and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle. Through the years, I learned the Dotson family history.

The Dotson family history was passed down through the generations orally. I was naturally interested in history so I paid attention to it. I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history. I should start with something of my own history, however, as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma. My mother was a Latimer, and my father was a Cook. One of my mother's ancestors was a colonel in the Revolutionary War. Some of her family fought for the Confederacy in the Civil War. After the Civil War, they were allotted land. My father, Lewis Cook, died in 1928. He was gassed in World War I, got TB and went to Arizona to recuperate where he died. I followed the military tradition of my family and served in World War II. I fought under General Patton in Czechoslovakia and liberated several concentration camps. The most horrible thing I ever saw was a flat car piled high with dead bodies. I was saved by Jesus in Le Havre, France, during the war, and credit Jesus with my long life. I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

1

The Dotson family history also goes back to the Civil War. The Dotsons moved from North Carolina to Arkansas, south of Huntsville, in 1835. Their old grandma at that time claimed to have been a friend of Davey Crockett's. They loaned the town, now Huntsville, the money to incorporate. According to family lore, the Dotsons were moneyed slaveholders. The head of the Dotson clan and his two sons fought for the Confederacy, leaving the youngest boy at home with his mother. Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman. She had buried the family savings but told the scalawags she was penniless. They hung her two different times, but still she denied having any money. Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden. She relented and they took the entire Dotson fortune.

The Dotsons came to Oklahoma in 1900—I imagine they were poor. They moved to Marble City. It was wild territory back then, "still Indian." The area was riddled with bank robbers and it was a profession many took to. Even I had an uncle who did 10 years for bank robbery—Monroe Cook, from Muldrow. The Dotsons were tenant farmers. Christine and Hugh's dad, Abe, was killed in 1925. He was shot by a man in a fight over a woman they both Minnie seeing even though both of the men were married.

Abe's wife, Minnie, could not raise her six children alone. There was no welfare back then. Minnie put four of her children, including Hugh and Christine, in the Dwight Mission School, a Presbyterian School established by missionaries in 1820 in Indian Territory. I think the school went up to the eighth grade. People at the school told Minnie not to visit her children once she left them at the Mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor.

2

Mattie kept the other two children: Warren and a girl. Minnie never came around to the school.  It turned the children against Minnie because they felt in the back of their minds that Mattie deserted them.

Eventually all the siblings connected up. I liked all of them.  John E was an alcoholic, and Hugh drank quite a bit when he was young.  Hugh raised his four kids; one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family, and we visited quite a bit. Hugh loved to tease and so did I.  We got along good. You could depend on what he said. He told the truth, quite an attribute; now you don't know what people are thinking.

When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even the mountains. Someone told me that it was a fact that there was more corn raised in Sequoyah County in 1920 than in any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in the early 1990s.

I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it.  I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them.

After I told the investigator working on Kenny's case about my family, he came back to me with this declaration.  I have read this declaration over carefully and it says what I told the investigator during our meetings.  I would have testified to these things in

*ac*

3

Kenny's trial if anyone had asked me to,

      I declare, under penalty of perjury, that this 4-page declaration is true and correct.

      Executed by me this ___7___ day of March 2009, in _Sequoyah_ County, Oklahoma.

_____Carl Cook_____

**Carl Cook**

4

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 103**

## DECLARATION OF ABBY STITES

I, Abby Stites, declare the following:

I was nine days short of 16 when I married Kenneth Barrett and was two months pregnant with my only child, Toby. Kenny was only 18 and married me because he felt sorry for me. My father did not speak to me throughout my pregnancy. I was one of ten, seven girls and three boys. My mom had her first baby when she was sixteen, so there was not much my mother could say.

Gelene was not a good mother to Kenny; when she wasn't working, she was partying. Kenny and I stayed with Gelene after Toby was born. I had my new baby, and Gelene brought in people from work and everyone was partying with crack and pot. Gelene made Kenny get up from bed and party with them. She was always bringing men home when the children were still living with her. Stevie was still a child. She wasn't there for her kids. She was always running around. She didn't know what her kids were doing.

Gelene was always cussing Kenny and had a terrible relationship with him. I never saw Gelene treat her other sons the way she treated Kenny. Gelene had a good side to her, even if she did not show it to Kenny much. She did not have to take me in when I was pregnant. It was just that her morals and mine were different.

Ernie, Kenny's father, was not much of a father or husband, either. He gave Kenny things and then took them back. Ernie was always running around. After the divorce, Ernie would come by the children's house to show off his new Corvette and the kids did not even have shoes, several family members told me. Ernie was for Ernie. I



think he paid Gelene some child support for all three kids but he made a lot of money. He was a big deal in the glass company where he worked.

I learned in my marriage to Kenny that Kenny had mental problems. He would do bad things and then have remorse. He did things on impulse and then regretted them. During one of his remorseful periods, I convinced him to go to Willis mental health facility in Sallisaw, and Mike Fry had him picked up by the sheriff and taken to Eastern State Hospital in Vinita, Oklahoma, an inpatient facility. They could have kept him a month and it might have done him some good, but Gelene came and got him out after two weeks when Kenny asked her to.

Kenny was like a manic depressive, hot one minute and depressed and even immobile the next. He would work hard and then sleep all the time. I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep. Kenny did not act the way normal people act. Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions. He went out with other women and then came home, expecting me to forgive him. Kenny would hit me, and I hit back.

I always thought he was mentally ill. The whole 14 years we were together, I was always trying to help Kenny. I felt like we were more like brother-sister than wife and husband because I was always bailing him out of trouble and taking care of him. He was never able to take care of me. I spent 14 years trying to keep up with his mood swings. There were times he could be good, but every time I got a new car he would tear it up; every time I got new furniture he would tear it up. He would get very upset over any little

Page 2 of 4



thing, but then he would try so hard to be good.  He would mow the lawn and take care of things and fix things and it would last for two months.  Then he would start running around with women and be gone for two months.

I got the stay-away orders, not to just keep him from trying to come back, but to keep me from going back.  He would come back crying, begging me to take him back, so remorseful.  He could be good as he could be—he would go the extra mile, trim the tree if it meant my taking him back, but he could not keep it up.  This was from the beginning of our marriage.  He came home one time and accused me of having an affair with somebody I worked with, and cracked my nose and left bruises on me.  I had to call the police and go to the emergency room.  Kenny came back, crying, very sincere, and could not believe he had done all that.  He went out of his way to make up, to be good-hearted. I knew he had mental issues.

He was always doing crazy things on motorcycles. He never wore a helmet. Once when Toby was about eighteen-months-old we were living in Elk City, Oklahoma, where Kenny worked oilrigs. I was watching him dirt biking in a field and he didn't see the barbed-wire fence. He went smack over it and landed on his head, He was unconscious for a while. It really scared me. He had a bunch of cuts and scratches, too.

Kenny was a hard worker but it would not last long. He would get real depressed and sleep all the time.  He smoked a lot of pot, but without it he never got motivated.  He turned to drugs to make himself feel better.

I was the only stable thing he ever had in his life.  I kept him together. Without me, he could not function.  I did not care for his drugs when he started into that, but I



tried to keep him from falling off the deep end.  Kenny needed more than I could give.  I have two sisters like Kenny; that's why I tried to help him.

Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about.  They did not ask me anything about his family history either.  Even though I wasn't happy about testifying at the trial, I did, and I would have testified about the things in this declaration if they had asked me about it.

I recently gave this information to a man who told me he was an investigator working on Kenny's case.  I did not write the declaration myself.  When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully.  It says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___9___ day of March  2009, in ___Seq.___ County, Arkansas.

_Abby Stites_

Abby Stites

Page 4 of  4

1227

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 104**

---

**Declaration of Richard Barrett**

I, Richard (Richie) Barrett, declare the following:

Kenneth (Kenny) Barrett is my older brother by a few days short of three years.

An investigator who told me that he works for lawyers representing Kenny recently asked me if I had seen my brother and Cindy Crawford in any kind of altercation. Cindy Crawford is married to our cousin Travis Crawford.

I told the investigator that I had once seen Kenny dress Cindy down. Cindy was sitting in a car at the time on my brother's property and Kenny was standing next to it. I heard him say something like, "Who the fuck do you think you are?"

The investigator then asked me if anything else took place. I had no idea what he was getting at. Then he asked me if I ever saw my brother point a gun, a shotgun or any weapon at Cindy Crawford.

I told him that I never saw my brother point any kind of weapon at her.

He then asked me if I had ever seen Kenny put a gun, shotgun or any weapon against her leg. I told him that I had never seen anything like that, that I had never seen Kenny put a gun, shotgun or anyway weapon against her leg or any part of her body, and that anybody who said that I saw that is a flat out liar.

The investigator who asked me these questions asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed by me this ____9____ day of March, 2009, in ____Sequoyah____ County, Oklahoma.

_Richard Barrett_
Richard Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

—————————————————————

**EXHIBIT 105**

—————————————————————

## Declaration of Doris Barrett

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, in both state and federal court. I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

In Kenny's federal trial, I noticed a bulge around Kenny's waist. It was there every day. I asked Kenny's lawyer what it was. He told me it was a shock belt, there to shock Kenny if he tried to escape or hurt someone. If it was obvious to me, it must have been obvious to others.

Kenny wore nothing like that in the state trials.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1-page declaration is true and correct.

Executed by me this 5th day of March 2009, in Creek County, Oklahoma.

_Doris Barrett_
Doris Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 106**

_____

Case 6:09-cv-00105-RAW Document 8-4 Filed 03/16/09 Page 23 of 125

# Sequoyah County Democrat

EQUOYAH COUNTY DEMOCRAT VOL. XIX. NO. 28 SALLISAW, OKLAHOMA, JULY 10, 1925. STAR-GAZETTE, VOL. 31, NO. 28

THE OFFICIAL COUNTY PAPER—THE PAPER THAT IS READ

# EQUOYAH COUNTY LEADS AT TAHLEQUAH NORMAL

## rollment Records Show This County Far Ahead

hrough the courtesy of J. H. Dod- superintendent of the Roland ols and now instructor at the sum- term at Northeastern State hers College at Tahlequah, we are to give below a list of one hun- twenty-two Sequoyah county ty folks enrolled there this year itudy and training in their chosen ssions. The list is an extended and we are advised that Sequoyah ty heads the honor list in attend- this year. This speaks well in- for the county and discloses a e on the part of those in the ing profession to increase their of knowledge and better equip uelves to place Sequoyah county ols in higher rank in every de- ment. Prof. Dodson also enclosed interesting notes relative to the s of the Sequoyah county colony, will be of interest to our read- Following is the list of names:

Acton Joyce Akins, Edmund strong, Lola Aston, Theo Brodie, ie Barnes, Pearl Barnes, Bess lek, J. F. K. Bass, Glenn Bange, lean Lackard, J. V. Downing, Ver- Brackett, Mrs. Lyda Bradley, ie Bradman, Thelma Brison, Hol- rown, Leonard Bumpers, Fannie rell, Theodore Casey, Nettye Con- Thelma Deese, A. W. Dodson, Mrs. . Dodson, Maurice Dodson, J. H. on, Mrs. Kate Dorcas, Lola Dor- R. E. Downing, Winnie Estep, thy Eichling, Ida Eppler, Max uson, Jewell Fine, Clara Folsom, Fox, Harriett Frye, Fray Fulton, a ulton, Lola Garretson, Norma ston, J. W. Gilbert, Mrs. Flora rt, Ida Gilbert, Stratton Goins, Hammett, Leta Harden, G. S. ton, Mrs. G. S. Harmon, Sula s, E. R. Haskins, Ruby Walton, Watkins, Marie Watkins, Bon- Wilson, Mrs. Margaret Wilson, ale Wofford, Jettie Wood, Floyd kins, Elizabeth Ratcliff, Harris , M. M. Black, Otal Wilson, J. lson, Mae Pinkerton, Pearl Pin- n, Zula King, Mrs. E. R. Has- Margaret Hastings, Ezza Helms, as Hill, Max Holcomb, John Hol- Farris Holcomb, R. L. Howell, E. Howell, James Humphrey, Humphrey, Lucille Jones, Edith n, Essie Keck, S. E. Kirk, Eu- Kuykendall, Mrs. Byrda Kuyken- Ora Lee, Lee J. Lewis, Mrs. Lee wis, Mittie Lillard, Mayme Lin- Vanora Mays, Ben F. Mills, Mrs. Mills, Ruth Miss, Winnie Moss, Vida Nichols, B. F. Oliver, Ed- Oliver, Edna Pattycord, Edith r, Ora Lee Pinner, Gertie Reed, Noel Ross, Elvis Rowland, Othel und, Mrs. Mary Scott, Guy R. Sharp, Wade H. Shumate, in Anderson, Pansy Stewart, J. aylor, Margie Thompson, Ruth r, J. H. Walkup, Mrs. J. H. p, Minnie Walker.

### Normal Notes

W. Gilbert principal of Liberty , Sallisaw, was elected president graduating class of the Junior s.

hold serum is being given to all ts who wish to take it. Many king advantage of this opportun-

ty of the Sequoyah county teach- are spending the week end tak- the picnic.

a, the daughter of Mr. Floyd kins who is instructor in Salli- ity schools, contracted a case of ing cough and was taken by her r to Tulsa, Oklahoma, to the of Mrs. Tompkins' mother.

Humphrey of Akins was president of Sequoyah county's rs who are in attendance at N. S. T. C. and Floyd O. Tomp- Sallisaw, secretary.

uoyah county stayed in for the h both boys and girls basket- being defeated in the finals by Cherokee boys and girls.

ty of the Sequoyah county teach- to receive their life certifi- at the close of the summer term few their degree.

k Weaver has reopened his repair shop on front street [illegible]

# Abe Dotson, Well Known Marble City Farmer, Shot to Death

## Killed at Home of John Wallace, a Near Neighbor

Sequoyah county's long list of homicides was made larger on Wednesday of this week, when Abe Dotson well known farmer and stockman of Marble City was shot and killed five miles northwest of that town by Henry Edwards, aged 24, at the home of John Wallace, farmer.

The killing occured about 9:00 a. m. and within one hour and a half thereafter, Sheriff John E. Johnston and County Attorney Harry Pitchford were at the scene making full investigation and securing statements from those who knew any details whatever as to causes surrounding the case.

From the meagre information at hand, it seems that Abe Dotson, Tom Dotson, Henry Edwards, Merl Edwards and John Wallace live in the same immediate community, and that Wednesday morning Abe Dotson and the Edwards boys went to the Wallace home to get some barber work done. While there a minor quarrel started which was thought nothing of and to which no one took any exception. When Dotson and the Edwards boys started away from the house, it is said that Dotson drew a butcher knife and started after Henry Edwards. Edwards ran back into the Wallace house grabbed a double barreled 12 guage shotgun, turned in the doorway and called to Dotson to halt. Dotson took a step forward at the gate and Edwards fired, the shot striking Dotson in the right shoulder and breast. He fell and rolled four or five steps from the gate, and according to one eye witness, Edwards fired another shot which struck Dotson in the left ear and temple. Mrs. Wallace witnessed the tragedy, but her husband was at the barn back of the house. Dotson lived fifteen or twenty minutes but was unconscious and could make no statement. The Edwards boys, who are cousins, left soon after the tragedy and rode to the home of Deputy Campbell Bellor, who lives near Sycamore school house, and surrendered. Ben Crawford, deputy sheriff at Marble City, happened to be in the vicinity of the killing and rode up to the Wallace home very shortly after the killing and shortly after the departure of the Edwards boys. He heard the shots that were fired and which killed Dotson. Deputy Bellor brought Henry Edwards to Sallisaw at once, and placed him in the custody of Sheriff Johnston. Merl Edwards, the cousin who witnessed the tragedy accompanied them to Sallisaw. All of the parties made statements to Sheriff Johnston and County Attorney Pitchford. Edwards was lodged in jail pending his preliminary hearing which will be held probably next week.

Tom Dotson, a brother of Abe Dotson had some personal difficulties with John Wallace at whose home the tragedy occurred, last Saturday and was brought to Sallisaw and placed under arrest yesterday. It is not believed however that this trouble had any connection whatever with Wednesday's killing. None of the parties were drinking, as was at first reported and all were in good humor and good spirits apparently. The quarrel and the killing occurred so suddenly that it hardly seemed possible.

Abe Dotson was a brother of Berry Dotson who was killed by Constable Nicholson at Ramona, Oklahoma, about two years ago. He was also an uncle of Mack Dotson who was killed on the streets of Marble City on March 9, 1923 by Jeff Kirk. He was the third member of the family to 'die with his boots on' within a period of two years. Bee Dotson, a son of Berry Dotson and nephew of Abe Dotson, is a fugitive from justice at this time and has been wanted for more than a year upon bank robbing charges. He is thought to be in hiding in the Cookson country and by many is credited with having assumed leadership of the band formerly led by [illegible]

### TWO NEWSPAPER BOYS ARE PROUD FATHERS

Cas A. Carr, formerly connected with The Democrat but associated with the Johnson Credit company since last November is the proud father this week of a fine seven pound baby girl who arrived last Sunday. The mother and babe are doing fine and Cas wears a smile that will not come off.

On Monday, July sixth, Fred Green became the proud and adoring father of a nine pound baby boy. He (Fred) joined The Democrat staff on that same date that the boy arrived but has found it hard to get his mind centered upon his new work. The mother and boy are both making splendid progress.

### JIM TAYLOR RENAMED COUNTY COMMISSIONER CHAIRMAN

When the new board of county commissioners qualified last Monday morning and proceeded to organize, J. A. (Jim) Taylor from district number three was unanimously chosen as chairman to succeed himself. He has served for two years past in this important position and the honor bestowed upon him Monday is well deserved, for no man in the county perhaps knows county affairs and the county's business as thoroughly as does Mr. Taylor. J. A. Wofford, able and qualified Commissioner from district one has served for two years past also and rendered splendid service. His work was well enough thought of by his people that he was returned to office following a most bitter fight and in a district thought by many to be Republican in politics. R. L. Horn, who replaces W. E. McConnell in district two, is the third member of the new Board and returns to official duties following a lapse of several years. He comes well equipped to render excellent service, by reason of his previous service on the Board and his wide knowledge of road affairs and county business generally. The new Board is indeed an able one and the county may expect big doings during the next two years.

The newly organized Board got down to business immediately and cleared the decks for action. Much important road and bridge work faces the three members and they expect to map out and carry into effect an extensive program. The estimates of the various county offices are to be examined soon also, preparatory to final examination by the county excise board. Many road overseers and seekers for official places were here on Monday also, presenting their claims and applications for reappointment. The Board met again on Tuesday to complete its work started on Monday and to consider any unfinished business that might be presented.

### FRED MERSHON ASSUMES DUTIES AS SUPT. OF SCHOOLS

Monday of this week witnessed assumption of the duties of County Superintendent of Schools by Fred Mershon, elected last November by the voters of Sequoyah county. He took over the reins of office from Lee J. Lewis who retires to enter school work in Muskogee county. Mr. Mershon is not a novice in school work and comes to this office with a world of knowledge and experience gained in earlier years in this part of Oklahoma. He is ofttimes referred to as "the father of Sequoyah county schools" and has done more perhaps to establish and build up the school system in this county than any other man. He held the office a number of years ago, but retired from offiial life during 1922 and 1923 and engaged in the oil business at Eldorado, Arkansas, following the opening of that big field. He returned to Sallisaw more than a year ago and the lure of office attracted him to enter the race for county superintendent. He won the nomination over Lee J. Lewis and Dewey Patton and then won the race in November over his Republican opponent. J. M. Barton, a former school man will serve as his assistant in the office. Both of these men entered actively upon their duties last Monday, July sixth.

### MRS. CALLIE LEATHERS IS SERIOUSLY ILL

Friends of Mrs. Callie Leathers are greatly worried the past week because of the serious illness which she has been suffering since Thursday, July 2, when she became suddenly stricken immediately following the noon meal and as she had started back to her duties in the county treasurer's office. It was at first thought that the attack was acute indigestion, but this idea was soon dispelled and it became apparent that the illness came from a serious ailment at the base of the brain. She has been unconscious since the day of the attack and close family friends fear for her recovery. Attending physicians are keeping close vigil, and a trained nurse was called into service on Monday of this week. Relatives of the family have arrived throughout the week, to render whatever assistance and aid that it was possible to give. As we go to press the belief prevails that the chances of recovery are remote.

### OAK STREET TO BE OPENED AT ONCE

The city commissioners in session Tuesday evening, passed the necessary resolution ordering the opening of Oak street north across the Missouri-Pacific tracks. The news will be most welcome to those citizens who live north of the tracks and who have hoped for years that a good street might be opened to traffic. This has been impossible heretofore because of title to the land, and complications arising out of the original plat made and the way the streets and the city were laid out. The new street extends north from the First National Bank and Citizens National Bank corners, across the track, and past the R. T. Kelleam and George Daniel homes. The street will pass between those two houses and the small alleyway on the east side of the Kelleam home will be closed to traffic. Sidewalks can now be builded and a well graded street can be maintained. Many of the nicest homes in the city are located on the north side and many new homes will be builded in future, with the opening of this important street.

### HINES WINNER IN GOLF TOURNEY

Leland Hines is golf champion of the Sallisaw Country club. He won this title when he defeated Roy Frye, 5 up. Frye was at first the picked winner, but Hines worked himself up from the start and defeated everything coming his way. Leslie Hines is winner of class B, and Mrs. J. L. McDonald is winner of the ladies tilt. Leslie Hines defeated Floyd Green in a close match, 2 up. Mrs. J. L. McDonald, a champion since the organization of the club won her match easily from the very star,t defeating Miss Bess Hall, 7 up in the finals.

### CHRISTIAN CHURCH TO OPEN BIG REVIVAL

Announcement was made this week by officials of the Christian church that a big revival meeting would open next Sunday, July twelfth in their church, led by Evangelist Harrison Lewis of Muskogee. This revival follows closely the recent revival of the Nazarene church. A good choir is being organized to conduct the musical service. Evangelist Lewis delivered a sermon here quite recently and impressed his hearers as being a most effective speaker, and arrangements were started at once to open a big revival meeting. He is a noted evangelist and comes very highly recommended. The meeting will be conducted for two weeks at least, and possibly for a longer period. Everyone is invited and urged to attend the nightly meetings.

### COTTONWOOD

The revival meeting is getting better all the time. Houston Martin, Wade Vaughan, Hanna Turner and Jeff Shackelford were converted Saturday night.

Son Wolf and Ferier Hibbs were married Wednesday night.

Lewis [illegible] and Lola Martin [illegible]

### BIG PIE SUPPER TO CLOSE CHAUTAUQUA

The chautauqua course has occupied the time of everyone this week, with both afternoon and night programs each day. The course ends tonight (Friday) with a splendid number— "The Musical Moores," featuring Baby Harold Chester. The Friday evening program also includes Neil Woodman, cartoonist. The week of varied entertainment started off on Monday with Woods quartet and bell ringers and continued each afternoon and night with good attendance and close attention. Many complimentary remarks have been heard from those who listened to each number. The humorous lecture on Tuesday evening by Denton C. Crowl was particularly appreciated, picturing as it did the everyday problems of life and pointing the way to a solving of those problems. The ticket sales were far from what was expected and fell far short. The guarantors whose names were affixed to the contract were forced to make good the deficit.

Tonight a big pie supper and popularity contest is to be had. The doors will be thrown open free to everyone who wishes to come. The regular program will be given as usual and immediately following, the pie supper and contest for the most popular young lady and handsomest young man, will be carried on. This big pie supper is being arranged to help clear the big deficit and everyone should respond and should bring with them one or more friends. The program will be worth attending, and following the big fun will start.

### WALTER HAMPTON TO OPEN MODERN GARAGE

Walter Hampton this week closed a deal for the purchase of the large brick building immediately east of the Bonham hotel, occupied recently by the L. C. Corley garage, and is working out plans for the opening of a modern garage and filling station. His plans contemplate tearing out the present front and building a drive-in filling station. He has been connected with the Ranger-Frye Motor Co. for several years past and is an experienced mechanic and garage man. The location is a splendid one and has been used for years past as a garage and auto sales room. The present occupants have made no definite plans as to a new location, and will probably not vacate the present room until next month.

### FRED GREEN OF AKINS JOINS DEMOCRAT STAFF

Fred Green, superintendent of the Akins schools this week joined the working staff of The Democrat and assumed his new duties on Monday. He served as superintendent of the Akins schools last year and had contracted to teach the summer term starting this month, but obtained a substitute when acceptance was made of the offer to enter the newspaper game. He is new in newspaper work but is entering with the intention of making it his life's work. Enjoying a wide acquaintance in the eastern part of the county, and also in the teaching fraternity, and being a graduate of Sallisaw high school equips him admirably for entrance into newspaper work in Sequoyah county. The Democrat force welcomes him and believes that the public generally will feel that a wise choice has been made. He will take over the advertising and news features of the paper just as quickly as experience can equip him for that work.

### RAYMOND DRAKE NARROWLY ESCAPES SERIOUS ILLNESS

Raymond Drake, popular and efficeint clerk of the district court, is slowly recovering from a ten day attack of fever which for a time threatened to become serious. Attending physicians felt that for days he was on verge of an attack of typhoid fever but by careful treatment and watchful care, the attack was avoided. He was confined to his bed for more than one week but is now able to be back at work a part of the time. During [illegible]

### MANY ATTEND I.O.O.F. HOMECOMING AT CHECOTAH

Several Sallisaw members and their families attended the annual Odd Fellow homecoming held at the Orphanage at Checotah last Monday July 6. More than 1500 members of the order from over the state were in attendance at the affair. A great picnic and program was held in the afternoon.

Those who attended the affair from Sallisaw were: Mr. and Mrs. Chas. W. Anderson, Mr. and Mrs. J. H. Thompson and family, Mr. and Mrs. E. S. Spears and family, Mr. and Mrs. Aulda Rosson and family, Mrs. Tucker and son John, Carnell Leach, Looney McCoy and Mr. and Mrs. William A. Timmerman.

### ROSS TAYLOR MAKES FIRST DONATION IN ORPHAN DRIVE

Ross Taylor, member of Carnie Welch post here and a sick and disabled world war veteran has the honor of being the first person in Sequoyah county to donate to the big Legion Endowment Fund drive which starts today (Friday). He is in the Government hospital at Little Rock, Arkansas, and on Tuesday of this week mailed his check to County Chairman Harry Pitchford for $10 with the wish that he could give more. He has been a government patient for three years past, suffering from illness and disability receive while doing service in France and his magnanimity and big hearted desire to 'do his bit' in this greatest drive since the war ended, proves beyond question that the effort will succeed and that it is worthy. Ross has a wife and three small kiddies who live here in Sallisaw and who depend entirely upon his limited hospital pay for a livlihood, but he saved out a sufficient amount to start off the big drive and show his fine spirit in putting Sequoyah county over the top in the fund drive. He spent three weeks here this spring with his family and had laid his plans to be here and assist in every possible way when the drive started, but last month became so ill that he was forced to return to the hospital. If this donation by one of Sallisaw's sick and disabled vets is a criterion, then the quota for Sequoyah county will go over in great shape—and possibly will be doubled.

### POOL HALL APPLIED FOR AT MOFFETT

County Judge W. S. Moore on Wednesday of this week held a public hearing in the district court room in connection with the recent application made by L. N. Cantrell and J. W. Pressley for a permit to open a pool and billard hall in the town of Moffett. The hearing was largely attended by citizens of Moffett who came here to testify and offer personal views as to the advisability of granting such a permit. The Oklahoma laws vest the county judge of each county with authority to grant permits of this character. No pool or billard halls have been permitted to run in Sequoyah county since soon after statehood and opposition has been voiced each time that individuals have taken steps to secure such a permit. The applicants in this case were represented before the county court by Judge Thos. J. Watts who presented the reasons for believing that a pool and billard hall would not prove offensive or a nuisance. Fifteen or more citizens were questioned closely by Judge Moore concerning the effect that a pool hall would have upon the town from every conceivable angle. The application by Messrs. Cantrell and Pressley was made soon after the closing of the pool and billiard rooms in Fort Smith last month. Judge Moore continued the hearing until Wednesday, July 15, at which time additional information will be secured and other citizens examined and questioned concerning the advisability of granting such a permit.

Mr. and Mrs. L. T. Newton and daughter, Betty, returned home first part of the week after spending sev- [illegible]

KEB401082

# The Vian American

VOLUME 1     VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 19, 1923.     NUMBER 3

## OB TOWRY KILLED BY TRUCK

### Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sand Springs that R. L. Towry, brother of N. H. Towry of this city had been thrown from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at a high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of man-slaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where funeral service were held and the body interred in the City cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, and established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. O. C. Towry and five brothers and three sisters, viz: Brothers— J. J. and D. O. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters— Mrs. J. R. Plunkett of Charleston, Arkansas, Mrs. Ed Craven of Scranton, Arkansas and Mrs. Jas. Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock the boys working at test well Gans Gans let the bait wheel get away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery.

Those who were at the scene at the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in record time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been so referred, even a reasonable campaign of education would have resulted in the overwhelming adoption for the late legislature enacted no more constructive beneficial law. Factional politics and demagogic pretense done instanced the attempt to make of that law something injurious to the public and its interests.

It may be the matter will yet go to represent the state in the electoral college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs. Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED BY HENRY EDWARDS

### Home of John Wallace Scene of Tragedy Wednesday Morning

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed to his home, about four miles northwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here gave some demonstrations in this work with some of our poultry men of the county, explaining to them the methods employed by the government in classing an d grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided in three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean strong and infertile. Standards— Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand, which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were still

take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Benher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Fee and family and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip one bit and the few mosquito bites helped each one to realize they were out on the river in a camp and act at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished breakfast for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

### Household Appliances Would Be Installed Where New Rate Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 7.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the rate would be allowed in too elaborate in which appliance having a capacity of at least three kilowatt hours per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification, Stockwell

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY , NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to an announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reager will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Morehan.

Commissioners—Bud Horn, District No. 2; A. Taylor, District No. 3; — Ford, District No. 1.

---

## Our Motto:

# "Safety First"

# Men and Money

## Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because



## RIDE 'IM, COWBOY

An animated tornado on four legs, 1,200 pounds of living dynamite, is the "outlaw" break, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for five days, beginning August 18. Wild and daring contest which furnish injury—such is the buckaroo. Standard type of the men who will fight it out with the "bad" horses in the Chicago contests.

Broncho busting calls forth all the courage that is maintained in western ranges and a great part of the 600,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the man who will fight to stay for a reckoning on the hurricane decks of the "sunfishing," "skyscraping," squealing, kicking chronic. When the courage of the buckaroo clashes with the fearless spirit of the

KEB401083

# The Vian American

VOLUME 1       VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 13, 1923.       NUMBER 3

## OG TOWRY KILLED BY TRUCK

Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sulphur Springs that R. L. Towry, brother of N. H. Towry of this city had been drawn from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of manslaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where for a at and the body interred in the City cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, had established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. G. C. Towry and five brothers and three sisters, viz: Brothers— J. J. and D. E. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters— Mrs. J. R. Plunkett of Charleston, Arkansas, Mrs. Ed Cravens of Scranton, Arkansas and Mrs. Joe Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock two boys working at test well near Gans got the bus wheel got away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery. Those who were at the scene of the time say it was a wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in second time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been carried, even a reasonable complaint of education would have resulted in its overwhelming adoption for the better legislature enacted no more constructive beneficial law. Factional politics and demagogic pretense alone bottomed the attempt to make of that law something injurious to the public and its interests.

It may be the matter will go on to remove the state in the several college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED BY HENRY EDWARDS

Home of John Wallace Scene of Tragedy Wednesday Morning

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by a wife and five children. His body was removed from where it lay, about four miles southwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with the county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the vicinity, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided into three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean, strong and infertile. Standards— Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were out of the egg market on account of not

## (right columns)

...take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

### TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Bonher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Foe and family, and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip; one hit and the few mosquito bites helped each one to realize they were out on the river in a camp and at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished the fish for a great fish fry, which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

Household Appliances Would Be Installed Where New Tare Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with R. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents net per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 5.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter, instead of the two votes would be allowed in households in which appliances having a capacity of at least three kilowatts, such as per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell

Ed Gore of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reager will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November, and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Mershon.

Commissioners—Bud Horn, District No. 2; J. B. Taylor, District No. 3; J. A. Mumford, District No. 1.

As a matter of cold fact, there is a large abundance of parking space about seven miles from the place you intend to stop.

## Our Motto:

# "Safety First"

## Men and Money

### Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because



### RIDE 'IM, COWBOY

(Copyright by R. R. Doubleday)

An animated tornado on four feet, 1,200 pounds of living dynamite—such is the "outlaw" bronk, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days, beginning August 18. Wiry and daring, coolest when facing almost certain injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses in the Chicago contests.

Broncho busting calls forth all the courage that is traditional on the western ranges and a great part of the $50,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay for a few seconds on the hurricane decks of the "sunfishing," "skygrazing," squealing outlaws. When the courage of the buckaroo clashes with the untamed spirit of the broncho, the ride is always a sensational finish. Tex Austin, famous

KEB401084

**SEQUOYAH COUNTY DEMOCRAT**

FRIDAY, JULY 10, 1925

FRIDAY, JULY, 10, 92



# oyah County Democrat

Published every Friday at Sallisaw, Oklahoma

RAY O. WEEMS, Editor and Publisher

*A Democratic Newspaper*

## WOUNDED PRISONER BELIEVED TO BE FUGITIVE

The belief prevails with Sheriff John E. Johnston and his force of deputies that F. T. Daley who was wounded last week in a gun battle near Gans with Robert Russell, special agent for the K. C. S. railroad, may be a fugitive from justice.

## BROTHER OF E. S. TOWRY DIES AT SAND SPRINGS

E. S. Towry of this city, accompanied by Mrs. Towry, D. E. Towry of Stilwell and H. N. Towry of Vian, were called to Sand Springs last Friday following receipt of a message that R. L. Towry, a brother, had been instantly killed in a serious auto accident on that day.

## PRESBYTERIAN CHURCH

A. E. Arnfield, pastor

Sunday school 9:45. Our closing assembly will be utilized as a Junior church service.

## COMMISSIONERS PROCEEDINGS

July 6, 1925

The board of county commissioners met pursuant to recess with all members present and transacted the following business, to-wit:

## To My Patrons

I am back at my old stand east of First National Bank and am prepared to take care of your flat tires. I vulcanize tubes.

Phone 384

**Frank Weaver**

## Don't Endure Foot Troubles

Don't let tired, aching feet, callouses, corns, bunions, weak and broken down arches mar your comfort and happiness. Come to our Foot Comfort Department today and let our Foot Comfort Expert show you how quickly and easily you can secure your Foot Comfort through the proper fitting of shoes and Dr. Scholl's Foot Comfort Appliances.

No charge for this service.

**McDonald & Matthews**
"We Sell Everything"

# SOCIETY
## and Loc
## Happen

## SUPPORT
The Legion Endowment Drive
IT IS WORTHY
Adv. No. 671

## THE NEW PICTORIAL REVIEW SIMPLIFIED PRINTED PATTERNS

are perforated, notched and cut and ready for use.

**Cherry & Winter**
"We Appreciate your Business"
SALLISAW, OKLA.



The man who wakes up famous hasn't been asleep.

A BANK ACCOUNT IS A PACIFYING THING

"Ask the man who has one."



YOUR BANK CAN HELP YOU

**FIRST** NATIONAL BANK IN SALLISAW
1901   1925

## CADDIES TOURNAMENT AROUSING GREAT INTEREST

A great deal of interest is being aroused by the caddies of the Sallisaw Country Club in their annual tournament now being held at the golf links west of Sallisaw.

## MARBLE CITY CITIZEN DIES

The many friends of the family of John Cole were shocked last Sunday when it became known, that he had been called to death on Saturday, July 4.

## FINE COTTON PROSPECT

Oklahoma City, July 2—Oklahoma may exceed last year's banner crop by approximately 15,000 bales this year, according to present indications.



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 107**

---

DESCRIPTION NARRATIVE

| MONTH | DAY | YEAR | 24 HOUR TIME | COUNTY | | SHEET 1 OF 1 SHEETS |
|---|---|---|---|---|---|---|
| 9 | 29 | 99 | 1230 | Sequoyah | | ADMINISTRATIVE |

ON 9.29.99 AT ABOUT 1230 HRS GARY PHILPOT, SALLISAW POLICE CHIEF & MYSELF (GLEN SMITHSON) WERE AT THE SALLISAW CITY JAIL WATCHING SHERIFF JOHNNY PHILPOT DRESS THE GUNSHOT WOUNDS ON KENNETH BARRET THE SHOOTING SUSPECT OF TROOPER ROCKY EALES. GARY MADE THE STATEMENT TO ME THAT TROOPER EALES AFTER HE WAS KILLED LEFT A LITTLE BOY & A WIFE. I SAID YES HE HAD A LITTLE 2YR OLD BOY & A SIX YEAR OLD GIRL. & THEY WILL NEVER REMEMBER THEIR DADDY WHEN THEY GROW UP. AT THIS TIME KENNETH BARRET SPOKE UP & SAID AS I RECALL, YEA THE WRONG PERSON GOT KILLED I WISH IT HAD OF BEEN ME. I SAID TO HIM THAT YOU ARE THE ONE THAT PULLED THE TRIGGER & PICKED YOUR TARGET HE SAID YEA BUT THEY SHOT FIRST.

END OF STATEMENT

Trooper M. Smith 468

Glen Smithson

Troop C

Muskogee OK 74401

INVESTIGATOR'S SIGNATURE & BADGE NO                                           DATE

ACCIDENT DESCRIPTION NARRATIVE SHOULD CONSIST OF THE FOLLOWING PARTS:
1. SYNOPSIS
2. NOTIFICATION AND ARRIVAL
3. LOCATION DESCRIPTION
4. ARRIVAL AT SCENE
5. DRIVER IDENTIFIER
6. VEHICLE IDENTIFIER
7. PASSENGER STATEMENT(S)
8. WITNESS STATEMENT(S)
9. INVESTIGATION AT SCENE
10. OFFICER'S OPINION/CONCLUSION

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 108**

---

5

files on our confidential informants and keep track of the money that's paid to them.

Q   How would you, for instance --

A   In the form of a receipt with a -- a signed receipt with a thumb print on it in a confidential file.

Q   Each and every payment would have such a --

A   Yes.

Q   -- receipt?  Without identifying any person by name, do you know whether or not the confidential informant that was the basis for the issuance of the search warrant used to raid Mr. Barrett's home was ever paid money through your office?

A   No.  Whoever it was was not ours, no sheriff's department informant.

Q   Do you have any knowledge of the identity of that person?

A   No, sir, I do not.  I never did.

Q   Has anyone since the time of the trial asked you if you could provide information about a particular individual, whether he be reliable or whatnot, anything of that kind?

A   In reference to this particular informant?

Q   Yes.

A   No.

Q   Now, back in our -- all of the stuff that we've received in this case, there's a reference to a time when one or more people from your office went out to Mr. Barrett's

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.   800-626-6313

1240

00002403

KEB312947

6

home and inspected some weapons.

A     Uh-huh.

Q     Do you recall, generally, a reference to that?

A     I remember one specific incident where I went out.  After the officers had already been there, I arrived there.

Q     Fill me in on that instance.

A     I think the call was he was supposedly shooting out there; and if I remember right, a deputy by the name of Shelton Fare was the first officer there.  And when I got there I think another one had arrived and I don't remember who it was.  They had some firearms they were inspecting when I arrived.  Kenny was in the house and they were running the serial numbers and, in effect, looking at the guns.

Q     And was there a AR15-type weapon that was being looked at then?

A     Not that I remember, no.  I believe the one they had actually looking at when I got there was a -- I think it was an SKS or it looked like it.  I didn't inspect it.  I just saw it.

Q     Did you have any dealing with Mr. Barrett at that time?

A     Yes.  I walked up to the porch and talked to him.

Q     What do you recall about your conversation?

A     Mostly about -- some of it was about shooting.  I guess about shooting.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

00002404

KEB312948

7

Q   You were kind of telling him to calm down, that kind of thing?

A   Did I tell him to calm down?

Q   No, I don't mean calm down.  I mean but to tell him to behave himself a little better as a neighbor?

A   Yeah, shooting in general around a residential area.  You had to be careful and all of this stuff, and then I called his attention to a misdemeanor warrant that was outstanding on him.

Q   And what did you tell him about the misdemeanor warrant?

A   I told him there was one.  And he said he was planning on going in and appearing on that and taking care of it or doing whatever.  He promised me that he would.

Q   Did Mr. Barrett threaten you when you were out there?

A   No.

Q   Prior to the time that this search warrant was executed out at his place, did anybody ask you for advice concerning whether or not there might have been a different way of proceeding?

A   In the execution of the warrant?

Q   Yeah.  When the task force obtained this no-knock warrant and brought in the tact team, did anybody talk with you about whether it was necessary to bring in the tact team in order to deal with Mr. Barrett?

A   It was discussed at one point before the warrant -- way

1242
00002405
KEB312949

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

──────────────────────────

**EXHIBIT 109**

──────────────────────────

Exhs. § 2255 Motion                           *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

# Forensic Training & Consulting, LLC

1544 Valley Creek Rd.
Denton, Texas 76205

Ph: 940-383-8668
E-mail: xprtwit@aol.com

March 10, 2009

David Autry
1021 NW 16th Street
Oklahoma City, OK 73106

Re *United States of America vs. Kenneth Barrett* (FT&C Case # 03-5767) – Review of Testimony by Terrence Higgs and Iris Dalley

## Introduction

I was requested to review transcripts of trial testimony by Terrence Higgs and Iris Dalley in United States vs. Kenneth Barrett. I was provided both transcripts, along with a directory of court exhibits and 4 CDs containing demonstrative exhibits used by Iris Dalley, videos of the scene and images of the scale model used at trial. This is the report of my findings concerning that review.

## Higgs testimony

My review of the testimony given by Terrence Higgs revealed some issues of minor concern, but nothing of substantive concern in my opinion. The specific issues that I would categorize as being of only minor concern are as follows:

1. In his testimony concerning the number of shots that might have been fired by the officers' H&K MP5 9mm submachine gun, Mr. Higgs failed to point out that the MP5, according to H&K, should not be loaded to full magazine capacity due to the potential for jamming. Thus, basing the number of shots potentially fired on starting with a fully loaded magazine is unreliable unless it can be confirmed that the OSBI does not follow the H&K recommendation.
2. In his testimony concerning ejection characteristics for fired casings, Mr. Higgs failed to mention that, from time to time, anomalous ejection paths do result. That means a weapon that typically ejects to the right, all else being equal, may occasionally eject to the left and so on.

In his testimony concerning bullet spin, Mr. Higgs gave a flawed explanation that opined that, for a time, bullet spin overcomes the effects of gravity during its flight. In response to that, I would point to the classic ballistics question: "If a bullet is fired from a weapon held parallel to the ground and at the moment that the bullet exits the muzzle, a similar bullet is dropped to the ground from the same height the gun barrel is above the ground, which bullet would hit the ground first?" The answer, of course, is that they would hit the ground at the same time

since gravity acts on them equally and neither the horizontal velocity nor the spin stabilization of the fired bullet has any effect of the force of gravity.

4. Mr. Higgs testified that he "would expect a ricochet" for bullet impact angles of 60 degrees or less. The reality is more like 20 degrees or less.

5. Mr. Higgs expressed the opinion that many examiners have historically had in regard to the production of photographs as demonstrative exhibits in firearms examinations of fired bullet and cartridge case markings (i.e. photomicrographs). I would point out, however, that many firearms examiners do produce such photographs in court contrary to the old argument that "beauty lies in the eye of the beholder".

As already stated, I consider all these statements to be of only minor concern. The majority of Mr. Higgs' testimony is very credible and forthright. I am unable to assess the validity of any of the actual comparisons of bullets/fragments and cartridge cases on the basis of this verbal testimony alone. To do so would require my access to both the bench notes of Mr. Higgs and the photographs he states he took of his comparisons, at the least, and possibly the evidence itself.

**Dalley testimony**

Based upon my review of the testimony given by Iris Dalley, there are, in my opinion, some minor issues as well as some substantive issues of concern. My specific concerns are as follows:

Minor issues

Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components. Specifically, these are the terms that were inappropriately used:

1. The term "front quarter panel" is used to refer to the front fender.
2. The terms "left" and "right" are used when "driver side" and "passenger side" are appropriate.
3. The term "side wall", which is a term for part of the anatomy of a tire, is used several times to describe an inner body panel on the Ford Bronco.
4. The term "projectile", typically misused by non-firearms trained individuals, is applied to anything and everything presumably responsible for impacts/perforations rather than the appropriate terms "bullet", "bullet fragment", "bullet jacket", "jacket fragment", "bullet core" and "bullet core fragment".
5. Ms/ Dalley's explanation of bullet fragmentation upon impact with glass is flawed. She states that the bullet impacts the glass, perforating it and then exiting it whereupon it fragments. The reality is fragmentation begins upon impact.
6. Ms. Dalley, by her own admission, is not a firearms examiner, but states she seeks out the assistance of firearms examiners when she has a "ballistics" question. Arguably, one can reconstruct a shooting incident without being a firearms examiner, but a basic understanding of firearms and ammunition components is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

2

1245

essential to being able to recognize what one is viewing at a shooting scene. This lack of understanding/familiarity was exemplified when she stated that there might be some caliber similar to a 223 that could have made some of the bullet holes in the Bronco but when asked by the defense attorney for an example she could not name one.

The use of inappropriate terminology and ambiguous statements in testimony makes it difficult for anyone to understand, but particularly so for lay individuals. This is no doubt reflective of the fact that Ms. Dalley is not a trained firearms examiner and is also apparently not very well versed in vehicle component terminology. The use of incorrect terminology constitutes only a minor concern in my opinion, however.

Substantive issues

There are, in my opinion, a number of substantive issues with regard to both Ms. Dalley's approach to shooting incident reconstruction in general and this reconstruction in particular. These concerns are as follows:

1.  From her various responses to questions from both the prosecution and the defense, it appears that Ms. Dalley did not follow widely accepted protocol used in shooting incident reconstruction. This protocol includes the following:

    a.  The dimensions of the Bronco were not determined. Standard protocol involves determining, at a minimum, length, width and height of vehicles involved in shootings. Similarly, there was a question as to how wide one of the Bronco's doors was open for several shots but no measurements were taken and the explanation "the door was curved so it could not be measured" was given.

    b.  Prior to inserting trajectory rods into bullet holes (or otherwise altering them), one is well advised to examine the hole margins, interior surfaces and area surrounding them for trace evidence. Ms. Dalley was specifically asked about gunshot residue around some of the bullets holes at the scene but stated "she did not see any" (pg 3399). A legitimate evaluation of areas around bullet holes for trace evidence requires close inspection with a hand lens and/or making a lift for lab testing. Likewise, the presence of blood, tissue, hair, fibers, etc. should be looked for in and around bullet holes.

    c.  Whenever bullet holes appear to be symmetrical and devoid of significant distortion, the length and width of the holes should be determined using a pair of dial calipers. The width can be related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates. Ms. Dalley testified that she could not determine the caliber of any of the responsible bullets striking the Bronco (pg 3298). Measurement of some of the holes, based upon the photographs included in the materials received, appears to have been something that could have been reliably carried out.

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

3

1246

d. The proper placement of trajectory rods in bullet holes in order to reliably approximate the responsible bullet trajectories requires an understanding of the characteristics of bullet penetration/perforation in a variety of substrates. This is particularly true with bullets that fragment, such as the 223 bullets in this incident. It is equally important to have sufficient experience to know when calculation of trajectories, rather than use of trajectory rods, is preferable and to know when the use of alternate means are appropriate. For trajectory rods to be a feasible method for reliably representing bullet trajectories, one needs to have a secondary impact that has not resulted from initial impact deflection and/or fragmentation. Ms. Dalley attempted to establish bullet trajectories utilizing fragment impacts into secondary targets based upon the presumption that the core (or a large fragment thereof) travels in a straight path. She correctly testified (pg 3466) that there was no way to determine the "exact path" of each bullet fragment and yet proposes that her trajectories, as represented, are "accurate".

e. Ms. Dalley repeatedly testified that bullets passing through the "partially open" Bronco door would go "straight through" and that bullet core fragments would do likewise (it is presumed that only fragments were recovered because Ms. Dalley testified that "No, I didn't find any [fragments] consistent with being parts of a single bullet." – pg 3298). One need only recall the "magic bullet" path in the John F. Kennedy assassination to recognize the fallacy of proposing that bullets pass through intermediary target undeterred ("straight through"). The situation for bullets that fragment upon impact is even more unpredictable. In order to attempt to make her theory of bullet trajectories being unimpeded by intermediary targets fit the evidence, Ms. Dalley proposed that the door moved to various positions to account for the incongruity of the different trajectories through it (pg 3314). While such movement cannot be excluded, it is more likely that bullet deflections/fragmentation account for the trajectory variations in the door. When bullets impact surfaces with irregular contours (i.e. other than flat surfaces) deflection can and does occur with frequency.

f. Bullet holes in vehicles and other inanimate objects and the trajectory rods placed in those bullet holes are generally referenced by two sets of coordinates (2 linear and 2 angular) in order to establish reproducible data for creating diagrams, animations, etc. that accurately represent the true trajectories (within the limits of measuring uncertainty). Ms. Dalley stated, rather amazingly, that she did not determine any of the angles because she "did not have the necessary equipment" (pg 3275). All that is required is a $30 zero base protractor and a $5 plumb bob. The primary reason for obtaining such linear and angular measurements is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident. Given her testimony that she took no such measurements and that she could not establish "exact paths" using

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

4

1247

trajectory rods alone, it is unclear how the diagrams and animation she produced can be perceived as having any reliability.

g. Ms. Dalley testified that the terrain at the shooting scene could be described as "hilly" but apparently did nothing to establish the exact grade or assess the potential impact any such grade might have on the perceived trajectories of bullets striking the Bronco. At the very least, determining bullet impact angles relative to a common point of reference (plumb line) is the accepted standard.

h. When there are holes of questionable origin, proper procedure calls for on-scene chemical testing for the presence of copper and lead to confirm that they were produced by bullets. Ms. Dalley testified to having knowledge of that type testing but did not testify that she, in fact, conducted any of it.

i. Ms. Dalley testified that she had "no means of sequencing any of the shots" at the scene. The sequencing of shots, while certainly not always possible, can sometimes be accomplished through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets/fragments (glass, fibers, hair, paint, etc.). There was no testimony that would indicate that any of this type examination/testing was ever done, either on-scene or off-scene.

j. In an incident involving a moving vehicle, as with the Bronco in this case, a reenactment would include physically placing the Bronco in various positions and making a determination (typically projecting a laser beam from each bullet hole of interest, where possible) as to the feasibility of the each shot coming a particular position or positions. Of particular importance in this incident are the shots that occurred after the Bronco came to a stop. While Ms. Dalley testified that the Bronco had been moved to another position prior to her arrival, she also testified that there were tire impressions and a fluid deposit in the soil in front of the cabin that could have been used to reestablish the position before moving.

2. Ms. Dalley's approach to establishing the trajectory of bullet holes through the cabin window glass, blinds and curtain ("towel") and the Bronco windows was inappropriate. She testified that her results were unreliable for the cabin window part of her analysis (pg 3389).

a. She had someone hold the trajectory rod rather than set up a tripod and place the laser on the tripod.

b. She took no measurements of the hole locations.

Her methodology, as she testified to it, of placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation.

3. Ms. Dalley testified that she concluded that, not "seeing" any evidence of gunshot residue on the cabin window that was shot through, that the distance of the muzzle would have been "greater than 3 feet" from the glass because that distance has been reported in forensic literature. That testimony was an apparent reference to a general rule of thumb that varies considerably from weapon to weapon and is also dependent upon the particular ammunition used. The correct evaluation of maximum muzzle to target distance would require test firing into glass like that at

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

5

1248

the scene using the incident weapon and ammunition like that used to produce the bullet holes in question.

4. Ms. Dalley testified that she did not attempt to locate any bullets/fragments in the soil. A metal detector should have been used to attempt to locate any bullets/fragments in the soil.

5. Ms. Dalley testified that she did not attempt to collect all of the bullets/fragments inside the Bronco. According to generally accepted protocol in shooting incident reconstruction, all shots need to be accounted for when possible. The location and recovery of bullets/fragments is an essential aspect of that endeavor.

6. Ms. Dalley testified that she concluded that the bullet wound to Trooper Eales' right arm had to take place after he exited the Bronco because of "the absence of tissue inside the Bronco" and the fact that tissue appeared to be missing in the area of the arm wound. She did not, however, testify to finding any tissue outside the Bronco. She did not indicate that she ever attempted to locate tissue outside the Bronco. One way to test for it would have involved spraying luminol on the ground in the area around the Bronco. That apparently was not done. Furthermore, one of the cornerstones of forensic science is "Absence of evidence is not evidence of absence." That refers to the fact that not finding evidence cannot be used to conclude anything other than that no evidence was found. That statement is attributed to one of Ms. Dalley's own colleagues, well-known bloodstain pattern analyst Herbert Leon MacDonnel of Corning, New York.

In summary, Ms. Dalley's testimony indicates that she did not follow accepted protocol in the evaluations she conducted at the shooting scene. Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation. In order to confirm this apparent failure to follow appropriate protocol, it would be necessary to have access to Ms. Dalley's field notes, photographs and other supporting documents in this matter.

These opinions are based upon my 35 years experience as a firearms examiner and shooting reconstruction expert, my independent research in the area of shooting incident reconstruction and specialized training that I have received in firearms, firearms-related issues and shooting incident reconstruction as reflected in my attached curriculum vitae.


Edward E. Hueske
Consulting Forensic Scientist

*Note: The opinions expressed herein are based upon the information that was available at the time of this writing. Should new or different information be forthcoming, the right to modify these opinions accordingly is hereby reserved.*

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

6

1249

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

───────────────────────────

**EXHIBIT 110**

───────────────────────────

# CURRICULUM VITAE
## Edward E. Hueske

**Phone: (940) 383-8668**
**E-mail:** xprtwit@aol.com

**Fax: (940) 383-8668**
**www.edhueske.com**

Present Positions:

- Director, Forensic Training & Consulting, LLC since 1997
- Lecturer/Criminalistics Program Coordinator, University of North Texas, since 1999

Former Positions:

- Instructor of Chemistry, Blinn College, Brenham, Texas 1970-1974
- Assistant Laboratory Director, Fort Worth Police Department, 1974-1983
- Adjunct Instructor of Chemistry, Weatherford College, Weatherford, Texas 1976-1980
- Adjunct Instructor of Criminal Justice, University of Texas at Arlington, 1980-1983
- Supervising Criminalist, Arizona Department of Public Safety, 1983-1996 (retired)
- Adjunct Instructor of Police Science, Northern Arizona University, 1984-1994
- Firearms Examiner, Tulsa Police Department, Tulsa, Oklahoma 1996-1997
- Adjunct Instructor of Police Science, Tulsa Community College, 1997
- Laboratory Manager, Weckerling Scientific Laboratories, Carrollton, Texas 1997-1998
- Criminalist, Forensic Consultant Services, Fort Worth, Texas, 1998-1999

Formal Education:

- B.S., Chemistry, Sam Houston State University, 1968
- M.A., Chemistry, Sam Houston State University, 1971

Special Courses Attended:

- *DEA Forensic Chemist Seminar,* McLean, Virginia, 1975 (40 hrs)
- *FBI Glass Analysis Course,* Quantico, Virginia, 1976 (40 hrs)
- *Applied Molecular Spectroscopy,* Arizona State University, Tempe, Arizona, 1977 (40 hrs)
- *ATF Arson Residue Analysis Course,* Rockville, Maryland, 1980 (40 hrs)
- *FBI Gunshot Residue Analysis Course,* Quantico, Virginia, 1981 (40 hrs)
- *Ballistics and Handloading Course,* Trinidad State College, Trinidad, Colorado, 1982 (40 hrs)
- *Polarized Light Microscopy,* McCrone Institute, Austin, Texas, 1982 (40 hrs)
- *FBI Instrumental Analysis of Paints and Polymers Course,* Quantico, Virginia, 1983 (40 hrs)
- *FBI Symposium on Footwear and Tire Tread Examination,* Quantico, Virginia, 1984 (40 hrs)
- *X-Ray Fluorescence Class,* Tracor Corporation, Flagstaff, Arizona, 1985 (8 hrs)
- *FBI Specialized Techniques in Firearms Identification Course,* Quantico, Virginia, 1987 (40 hrs)
- *Ruger Police Armorer's Course,* Phoenix Police Academy, Phoenix, Arizona, 1987 (40 hrs)
- *Crime Scene Reconstruction Class,* Dr. Henry Lee, Scottsdale, Arizona, 1988 (8 hrs)
- *AFTE Glock Armorer's Class,* Virginia Beach, Virginia, 1989 (8 hrs)
- *AFTE Remington 1100 Service Class,* Houston, Texas, 1991 (8 hrs)
- *Photomicrography Class,* Leitz Corporation, Phoenix, Arizona, 1991 (8 hrs)
- *Crime Scene Photography,* Flagstaff, Arizona 1992 (8 hrs)
- *Wound Ballistics Class,* Dr. Martin Fackler, Glendale, Arizona, 1992 (8 hrs)
- *Blood Spatter Interpretation and Crime Scene Reconstruction,* Scottsdale, Arizona, 1993 (16 hrs)
- *FBI Footwear and Tire Tread Examination Seminar* (presenter), Quantico, Virginia, 1994 (40 hrs)
- *SWAFS Shooting Reconstruction Class,* Colorado Springs, Colorado, 1995 (8 hrs)
- *SWAFS Lamp Bulb Examination Class,* Colorado Springs, Colorado, 1995 (8 hrs)

1

- *Accident Reconstruction and Low-Speed Crash Evaluation,* Texas A&M University, 1996 (16 hrs)
- *Bloodstain Pattern Analysis in Violent Crimes,* University of North Texas, 2000 (40 hrs)
- *Recovery of Buried Remains,* University of North Texas, 2001 (16 hrs)
- *Bloodstain Pattern Analysis in Crimes of Violence – Pt. II,* University of North Texas, 2002 (40 hrs)
- *Blood Wipes, Swipes & Other Patterns,* IAI Training Seminar, Boston, MA, 2006 (2 hrs)
- *Preparation of Demonstrative Exhibits for Bloodstain Pattern Analysis,* IAI Training Seminar, Boston, MA, 2006 (10 hrs)
- *Microscopical Approach to Trace Evidence in Shootings,* AAFS, Denver, CO, 2009 (8 hrs)

Professional Affiliations:

- Fellow of the American Academy of Forensic Sciences
- Distinguished Member of the Association of Firearm and Tool Mark Examiners
- Emeritus Member of the Southwestern Association of Forensic Scientists
- Emeritus Member of the American Society of Crime Laboratory Directors
- Member of the International Association of Bloodstain Pattern Analysts

Papers Presented :

- "Developing Regional Lab-User Agency Communication," Southern and Southwestern Assns. of Forensic Scientists, Baton Rouge , Louisiana, 1986
- "Mikrosil Casting in Firearms Examinations," Assn. of Firearm and Tool Mark Examiners, Houston, Texas, 1991
- "The Jennifer Wilson Homicide: A Study in Trace Evidence," SW Assn. of Forensic Scientists, Tucson, Arizona, 1991
- "The Use of Videomicroscopy in Footwear Comparisons," Southern and Southwestern Assns. of Forensic Scientists, Shreveport, Louisiana, 1992
- "The Reconstruction of a Double Homicide near Ashfork, Arizona," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "Gunshot Residue Testing of Blood Stained Garments," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," Southern and Southwestern Assns. of Forensic Scientists, Little Rock, Arkansas, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Symposium on Footwear/Tire Tread Identification, FBI Academy, Quantico, Virginia, 1994
- "Footwear/Tire Tread Identification-The Northern Arizona Perspective," International Association for Identification, Phoenix, Arizona, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Association for Identification, Phoenix, Arizona, 1994
- "A Bizarre Homicide," SW Assn. of Forensic Scientists, Houston, Texas, 1995
- "The Portable Scopeman-A Powerful New Crime Scene Tool," SW Assn. of Forensic Scientists, Fort Worth, Texas, 1996
- "Defense Experts- The Good, The Bad, and The Ugly," Texas Criminal Defense Lawyers Assn., El Paso, Texas, 1998
- "Forensic Science for the Prosecution and the Defense," University of Texas Law School, 2000
- "The Defense of Shawn Berry," Louisiana Criminal Defense Lawyers Association, Lafayette, Louisiana, 2000
- "The Defense of Shawn Berry," University of Texas Law School, 2000
- "Private Forensic Labs – The Good, The Bad and The Ugly," International Conference of the American Society for Industrial Security, 2001
- "Bloodstain Pattern Interpretation," Oklahoma City University Law School, 2002
- "Crime Scene Deconstruction-Reconstruction," Oklahoma City University Law School, 2002
- "Re-Examination of Physical Evidence – A Defense Perspective," American Academy of Forensic Science Annual Conference, Dallas, Texas, 2004
- "Shooting Incident Reconstruction," 8[th] Annual Public Defender Retreat, Las Vegas, NV, 2008

2

Specialized Forensic Classes Taught:

(List of classes taught from 1984-1998 is available upon request)

- *Shooting Reconstruction,* El Paso Police Department, 1999 (40 hrs)
- *Shooting Reconstruction,* Prince William County Police Training Center, Nokesville, Va.,1999 (40 hrs)
- *Shooting Reconstruction,* Florida Dept. of Law Enforcement, Pensacola, Fla., 1999 (24 hrs)
- *Shooting Reconstruction,* Salt Lake Co. Sheriff's Training Center, Salt Lake City, Ut., 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-County Police Training Center, Fergus Falls, Minn., 1999 (24 hrs)
- *Clandestine Drug Lab Investigation,* Tarrant Co. (TX) Drug Task Force, Cleburne, Tx., 1999 (24 hrs)
- *Blood Spatter Interpretation,* Arlington Police Training Center, Arlington, Texas, 1999 (24 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Ankara, Turkey, 1999 (40 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Istanbul, Turkey, 1999 (40 hrs)
- *Shooting Reconstruction,* Gastonia Police Training Center, Gastonia, N.C., 1999 (24 hrs)
- *Shooting Reconstruction,* Tallahassee Police Department, Tallahassee, Florida, 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-Cities Police Academy, Richardson, Texas, 1999 (24 hrs)
- *Shooting Reconstruction,* West Palm Beach Co. Sheriff, West Palm Beach, FL, 2000 (24 hrs)
- *Crime Scene Investigation,* Office of the Attorney General , Guatemala City, Guatemala, 2000 (40 hrs)
- *Officer –Involved Shooting Incidents,* University of North Texas, Denton, Texas, 2000 (16 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2000 (24 hrs)
- *Shooting Reconstruction,* Las Vegas Metro Police Department, Las Vegas, Nevada, 2000 (24 hrs)
- *Advanced Shooting Reconstruction,* West Palm Beach Police Department, Florida, 2000 (24 hrs)
- *Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas 2000 (24 hrs)
- *Shooting Reconstruction/Adv. Shooting Reconstruction,* NYPD, New York City, New York, 2000 (48 hrs)
- *Shooting Reconstruction,* Grossmont College, San Diego, California, 2000 (24 hrs)
- *Advanced Crime Scene Investigation/Reconstruction,* University of North Texas, Denton, Texas, 2000 (40hrs)
- *Shooting Reconstruction,* Suffolk County Crime Lab, Hauppauge, New York, 2000 (40 hrs)
- *Shooting Reconstruction,* Missouri State Police Academy, Columbia, Missouri, 2001 (24 hrs)
- *Shooting Reconstruction,* Bannock County Sheriff's Office, Pocatello, Idaho, 2001 (40 hrs)
- *Shooting Reconstruction,* Syracuse Police Department, Syracuse, New York, 2001 (40 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2001 (40 hrs)
- *Shooting Reconstruction,* Washington Metropolitan Police, Washington, D.C., 2001 (24 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2001 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2001 (40 hrs)
- *Footwear/Tire Tread Evidence,* Metropolitan Police Department, Washington, D.C., 2001 (24 hrs)
- *Officer-Involved Shootings,* Baton Rouge Police Department, Baton Rouge, Louisiana, 2001 (16 hrs)
- *Officer-Involved Shootings,* East Texas Police Academy, Kilgore, Texas, 2001 (16 hrs)
- *Bio-Terrorism,* Kimberly-Clark Corporation, Dallas, Texas, 2001 (4 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2001 (24 hrs)
- *Shooting Reconstruction,* Santa Barbara County Sheriff's Office, Santa Barbara, California, 2002 (24 hrs)
- *Bio-Terrorism,* Solutions 2000, Austin, Texas, 2002 (8 hrs)
- *Gunpowder and Primer Residues,* University of North Texas, Denton, Texas, 2002 (40 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2002 (24 hrs)
- *Shooting Reconstruction,* Metropolitan Police Department, Washington, D.C., 2002 (total of 72 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2002 (40 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2002 (24 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2002 (40 hrs)
- *Shooting Reconstruction,* El Paso Police Department, El Paso, Texas 2002 (40 hrs)
- *Tool Mark Comparison,* Centre of Forensic Science, Toronto, Ontario, Canada, 2002 (40 hrs)
- *Shooting Reconstruction,* Sioux Falls Police Department, Sioux Falls, South Dakota, 2002 (40 hrs)

3

Specialized Classes Taught (continued):

- *Footwear/Tire Tread Evidence,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Crime Scene Analysis/Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Shooting Incident Analysis/Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2003 (48 hours)
- *Shooting Incident Reconstruction,* St. Louis County Police Academy, St. Louis, MO, 2003 (24 hours)
- *Crime Scene Analysis/Reconstruction,* NYPD, New York, New York, 2003 (24 hours)
- *Bloodstain Pattern Analysis in Crimes of Violence,* NYPD, New York, New York, 2003 (24 Hours)
- *Advanced Trajectory Analysis,* Special Investigations Unit, Mississauga, Ontario, Canada, 2003 (24 hours)
- *The Abuse and Sexual Assault of Children,* East Texas Police Academy, Kilgore Texas, 2003 (16 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* Denton County Sheriff's Training Center, Denton, Texas, 2003 (40 hours)
- *The Analysis/Reconstruction of Crimes of Violence,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Advanced Trajectory Analysis,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Shooting Incident Reconstruction,* Charlotte-Mecklenburg Regional Police Training Center, Charlotte, NC, 2003, (40 hours)
- *Shooting Incident Reconstruction,* Nashville Metro Police Academy, Nashville, Tennessee, 2003 (40 hours)
- *The Investigation of Officer-Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* San Diego Police Department, San Diego, CA, 2003 (40 hours)
- *Crime Scene Analysis/Reconstruction,* Florida Public Defenders Association, Ft. Lauderdale, FL, 2003 (16 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* St. Louis Cty. P.A., St. Louis, MO, 2004 (40 hrs)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Gunpowder & Primer Residues in Distance Determination,* NYPD New York, New York, 2004 (40 hours)
- *Crime Scene Photography,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Advanced Trajectory Analysis,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2004 (40 hours)
- *Shooting Reconstruction Techniques,* Texas Rangers Annual Conference, Cypress, Texas, 2004 (4 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2004 (40 hours)
- *Forensic Photography,* East Texas Police Academy, Kilgore, Texas, 2004 (24 hours)
- *Crime Scene Analysis/Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2004 (24 hours)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Sioux Falls Police Dept. , Sioux Falls, SD, 2004 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Lewis & Clark Co. S.O., Helena, MT, 2004 (40 hrs)
- *Analysis/Reconstruction of Violent Crimes,* St. Louis Co. Reg. Police Academy, St. Louis, MO, 2005 (40 hrs)
- *Investigating Officer-Involved Shootings,* Natick Police Department, Natick, MA, 2005 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Suffolk Co. Crime Lab, Hauppague, NY, 2005 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2005 (40 hours)
- *Sexually-Related Violent Crime,* Texas Rangers Annual Conference, Spring, Texas, 2005 (4 hrs)
- *Introduction to Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (24 hrs)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2005 (40 hours)
- *Introduction to Shooting Reconstruction,* Minneapolis Police Dept., Minneapolis, WI, 2005 (40 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Mississippi State Crime Lab, Jackson, MS 2005 (40 hrs)
- *Processing Violent Crime Scenes,* Federal Bureau of Investigation, Dallas, Texas, 2005 (8 hours)

4

- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (40 hrs)
- *Introduction to Shooting Reconstruction,* Charlottesville PD, Charlottesville, Virginia, 2005 (24 hrs)
- *Homicide Investigation,* Texas DPS Training Academy, Austin, Texas, 2005 (8 hours)
- *Introduction to Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2006 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Austin Police Academy, Austin, TX, 2006 (40 hrs)
- *Footwear/Tire Tread Evidence, ,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *The Analysis & Reconstruction of Violent Crimes,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *Introduction to Bloodstain Pattern Analysis,* Dallas Police Academy, Dallas, TX, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, TX, 2006 (24 hrs)
- *Special Topics in Shooting Reconstruction,* Texas Rangers In-Service Training Conference, Austin, TX, 2006 (4 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2006 (40 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Garland PD, Garland, TX, 2007 (40 hrs)
- *Special Topics in Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *The Analysis & Reconstruction of Violent Crimes,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *Shooting Incident Reconstruction,* Madison PD, Madison, WI, 2007 (24 hrs)
- *Shooting Incident Reconstruction,* Chatauqua County Sheriff's Office, Mayville, NY, 2007 (40 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2007 (40 hrs)
- *Advanced Shooting Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Vancouver P.D., Vancouver, WA, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction,* Texas Tech Univ. Inst. of Forensic Sci., 2008 (24 hrs)
- *Crime Scene Analysis & Reconstruction,* East Texas Police Academy, Kilgore TX, 2008 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2008 (40 hours)
- *Introduction to Crime Scene photography, ,* East Texas Police Academy, Kilgore TX, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* New Hampshire State Police, Concord, NH, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction, ,* New Hampshire State Police, Concord, NH, 2008 (24 hrs)
- *Shooting Incident Reconstruction,* Clackamus Co. Sheriff's Office, Oregon City OR, 2008 (40 hrs)
- *Crime Scene Analysis & Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Officer-Involved Shooting Investigation,* Minneapolis Police Dept., Minneapolis, MN, 2008 (24 hrs)

Academic classes:

I am a full time faculty member of the department of criminal justice at the University of North Texas and regularly teach the following undergraduate classes and coordinate the criminalistics certificate program at the university:

- CJUS 3330 – Introduction to Criminalistics
- CJUS 4360 – Criminal Investigation
- CJUS 4370 – Advanced Criminalistics I

5

- CJUS 4380 – Advanced Criminalistics II
- CJUS 4390 – Crime Scene Investigation

Additionally, I teach the following graduate classes on a rotating basis, each year:

- CJUS 5800 – Crime Scene Reconstruction
- CJUS 5800 – Bloodstain Pattern Analysis
- CJUS 5800 – Shooting Incident Reconstruction
- CJUS 5900 – Directed Studies (graduate research projects conducted under my supervision)

Publications:

- "Reaction of Azobenzene with Triphenylphosphine," co-authored with R.E. Humphrey, *Journal of Organic Chemistry*, 1971
- "A Procedure for the Isolation and Identification of LSD in a Single Dosage Unit (The Microdot Tablet)," *Microgram*, 1976
- "A Comparison of Decomposition Products from Selected Burned Materials with Common Arson Accelerants," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "An Examination of Selected Automobile Rubber Bumper Guards," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review," *Journal of Forensic Sciences*, 1977
- "Tannic Acid as a Field Test for Caffeine," *Microgram*, 1982
- "Toy Store Bomb Paraphernalia," *AFTE Journal*, 1984
- "Forensic Aspects of Shotshell Buffers," *AFTE Journal*, 1984
- "Enhancement of Footwear Impressions on Glass," co-authored with R.A. Erfert, *SWAFS Journal*, 1985
- "Stripping of Lead Bullets in a Browning High Power Pistol," *AFTE Journal*, 1988
- "The Browning of Firearms Serial Numbering System," *AFTE Journal*, 1988
- "An Anti-Splashback Lid for Water Traps," *AFTE Journal*, 1988
- "A Preliminary Report on the Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination," *AFTE Journal*, 1990
- "Class Characteristics of Mossberg C-Lect-Choke Barrels with Factory Porting," *AFTE Journal*, 1990
- "The Examination of Goodyear Neolite Cowboy Walking Boot Heels," *SWAFS Journal*, 1992
- "The Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination- A Further Look," *AFTE Journal*, 1993
- "Calculation of Trajectory Angles Using an Inexpensive Angle Gauge," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *SWAFS Journal*, 1994
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with B.M. Courtney, *SWAFS Journal*, 1994
- "The Portable Scopeman- A Powerful New Crime Scene Tool," *SWAFS Journal*, 1996
- "Some Observations on Blood Back-Spatter," *SWAFS Journal*, 1997
- "A New and Economical Forensic Light Source for Crime Scene and Laboratory Use," *SWAFS Journal*, 2003
- "Recognition and Documentation of Bullet Ricochet Characteristics and Predicting Directionalities," *SWAFS Journal*, 2003
- "A Compact Laser Protractor and its Use in Shooting Reconstruction," *SWAFS Journal*, 2004
- "Estimation of Caliber for Distorted Bullets," *SWAFS Journal*, 2004
- "Determination of Lateral Angles for Bullet Holes in Windshields," *SWAFS Journal*, 2005
- "Making Knife Blade Test Impressions," *SWAFS Journal*, 2007
- "A Simplistic Approach to Demonstrative Evidence in Complex Shootings", *SWAFS Journal*, 2008
- "Pseudo-HVIS: An Empirical Study", *SWAFS Journal*, publication pending
- "A Comparison of Some Selected 00 Buckshot Pellet Patterns", *AFTE Journal*, publication pending
- "Some Thoughts on Accreditation, Certification and Bad Behavior in Crime Labs", *SWAFS Journal*, publication pending

6

Books Contributed To/Written:

- Mozyani, A. and Noziglia, C., "The Forensic Laboratory Handbook" (chapter on Firearm/Tool Mark identification), Humana Press: New Jersey, 2005 (revised 2009)
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2006
- Hueske, E.E., "Fingerprints and Firearms", Essentials of Forensic Science Series, Facts on File: New York, 2009

Training Videos Written/Produced (Through the Law Enforcement Training Network of Carrollton, Texas, 2002-03):

- "Bloodstain Pattern Analysis I"
- "Bloodstain Pattern Analysis II"
- "Blood Spatter in Shooting Incidents"
- "Bloodstain Evidence Documentation"
- "The Proper Use of Trajectory Rods"
- "Bullet Ricochet Phenomena I"
- "Bullet Ricochet Phenomena II"
- "Finding Invisible Footwear Impressions at Crime Scenes"
- "Photographing & Casting Impression Evidence"
- "Tire Tread Evidence Deductions"
- "Producing Test or Elimination Impressions"
- "The Use of Gunshot Residue in Distance Determinations"
- "Cartridge Case Ejection Pattern Testing"

Professional Offices Held:

Association of Firearm and Tool Mark Examiners:

- Reviewer for *AFTE Journal*, 1989-present

Southwestern Association of Forensic Scientists:

- Program Chairman, 1984
- Member, Board of Directors, 1986-1988
- Chair of Professional Development, 1988-1990
- *SWAFS Journal* Editor, 1988-1992
- President, 1993-1994
- Chairman, Board of Directors, 1994-1995
- Fall Meeting Workshop Chair, 1993

American Society of Crime Lab Directors:

- Member, Board of Directors, 1986-1989
- Chair, Publication Committee, 1986-1987
- Chair, Membership Committee, 1987-1989
- Laboratory Accreditation Inspector, 1987-1995
- Laboratory Accreditation Board Member, 1996
- Forensic Science Operations and Program Committee, 1988-1991
- Member, Management Committee, 1992-1994
- Chair, Crime Scene Investigation Standards Committee, 1996

7

Advisory Board Membership

- 2004 served as a member of the NYPD Laboratory Accreditation Advisory Board
- 2006-2007 served as a member of the Crime Laboratory Review Board for the Houston Police Department

Awards/Honors:

- "Distinguished Member Award," AFTE, 1988
- "James Zotter Award," SW Assn. of Forensic Scientists, 1991, ("For Outstanding Dedication and Contributions to the SW Association of Forensic Scientists and Forensic Science.")
- "Best Technical Paper," Southern and SW Assns. of Forensic Scientists, 1992, "The Use of Videomicroscopy in Footwear Comparisons"
- "Best Technical Paper," SW Assn. of Forensic Scientists, 1993, "The Reconstruction of a Double Homicide near Ashfork, Arizona"
- "Best Technical Paper," Southern and SW Associations of Forensic Scientists Joint Conference, 1994, "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with Max Courtney
- Awarded Emeritus status in the American Society of Crime Laboratory Directors, 1996
- Awarded Emeritus status in the Southwestern Association of Forensic Scientists, 1996
- Co-recipient of the annual MLK Award for Community service in 2007 for work done on the Houston Crime Lab project
- Co-recipient of award for "Top 10 Books for Youth" for 2009 for "Fingerprints & Firearms"

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 111**

_____

## DECLARATION OF STEVE LEEDY

I, Steve Leedy, declare as follows:

I am an investigator with the Capital Trial Division of the Oklahoma Indigent Defense System, Sapulpa office. I was one of the investigators assigned to assist John Echols and other defense counsel in the state trials of Kenneth Eugene Barrett. I was assisted by investigator Jack Stringer, also of this office. Before Mr. Barrett's first state trial, Mr. Echols had an "outside" mitigation investigator named Roseann Schaye. It is my understanding that she did mitigation work-up, and exhausted the funds that had been made available to her by OIDS. Ms. Schaye requested additional funding to continue her investigation, but it was not approved. I retrieved her work product, which included life history documents such as school, medical, psychiatric, employment, birth, marriage, and divorce records.

Mr. Stringer and I are former law enforcement officers. I'm not a mitigation expert. Before and during Mr. Barrett's first and second state trials, his attorneys and Mr. Stringer and I investigated guilt/innocence issues. I am generally aware that a proper mitigation investigations entails compiling a complete social and background history on the defendant and his family. I reviewed documents and reports in the file Ms. Schaye provided. I conducted some interviews for the purpose of mitigation.

I am familiar with the fact that John Echols, who was lead counsel for Mr. Barrett in his state case, was appointed to represent him in federal court.

1

At some point, Mr. Echols withdrew. At the OIDS Sapulpa office, we possessed the investigative file that had been compiled with respect to Mr. Barrett's state case. This included, among other things, reports of interviews I did, reports of interviews Mr. Stringer conducted, the reports that had been done by mitigation investigator Roseann Schaye, as wells as records she retrieved, including from Eastern State Hospital, the Bill Willis Community Health Center, and Wagoner Community Hospital concerning Mr. Barrett. I had learned that Roger Hilfiger became lead counsel. During the time Mr. Hilfiger represented Mr. Barrett in federal court, I don't recall being contacted by him. The OIDS investigative file I referred to above remained at the OIDS office, and was not picked up by either Mr. Hilfiger or his staff who worked on Mr. Barrett's federal case. This file was retrieved in I believe 2008 by David Autry, one of Mr. Barrett's current lawyers.

OIDS Capital trial investigators are salaried employees and as a part of our employment do not work on federal trial cases and did not work on Mr. Barrett's 2005 federal trial. I don't recall statements from individuals to the effect that Mr. Barrett had stated repeatedly, or even stated, that he would "go out in a blaze of glory" if the police tried to raid his property. If that statement was made we would have confronted such witnesses at Mr. Barrett's state trial, and a thorough investigation into the records, character, background and reputations of each such witness.

2

The information detailed in the preceding paragraph was related by me to one of

Mr. Barrett's current attorneys and an investigator currently working on Mr. Barrett's

federal case. I have carefully reviewed the contents of this declaration.

I declare under penalty of perjury that the foregoing declaration is to the best of my

recollection true and correct.

Executed by me this _12_ day of March, 2009, in ___Creek_____

County, Oklahoma.

Steve Reedy

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 112**

Declaration of LAUREN COHEN BELL, Ph.D., regarding sentencing dynamics in federal death penalty cases.

1. I am currently Associate Professor of Political Science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, where I have been a faculty member since September 1999. Among the subjects I teach are public policy, judicial process, constitutional law, and research methodology.

2. In my research, I regularly perform quantitative analysis of data and rely on the Statistical Package for the Social Sciences (SPSS) to organize and analyze such data. The use of quantitative analysis in social science and the use of SPSS in particular is an integral part of the research methodology course I teach. I have authored or coauthored a total of 21 books, book chapters, and peer-reviewed articles and have presented nearly 30 academic papers at scholarly meetings. I am a member of the editorial board of *Justice System Journal* and a regular manuscript reviewer for *American Politics Research,* Routledge Publishers, *Journal of Politics*, Congressional Quarterly Press, Longman Publishers, Cambridge University Press, *Law and Society Review, American Journal of Political Science, Justice System Journal, Judicature, Political Studies Quarterly,* and *PS: Political Science and Politics.*

3. Between August 2006 and August 2007, I served as one of four United States Supreme Court Fellows. I was posted at the U.S. Sentencing Commission where I worked closely with the Office of Research and Data on the design and implementation of the Commission's 2007 study of the effect of minor offenses on the calculation of offenders' criminal history scores.

4. I hold Masters and Ph.D. degrees in political science from the University of Oklahoma's Carl Albert Congressional Research and Studies Center. A copy of my *curriculum vitae* is attached.

5. I have been asked to conduct an analysis of federal capital prosecutions focusing on the dynamics of death sentencing in cases involving white victims in comparison with the dynamics of death sentencing in cases not involving white victims.

6. In order to conduct these analyses, I was provided with data maintained by Kevin McNally on behalf of the Federal Death Penalty Resource Counsel Project. I used SPSS to create a database of 403 cases authorized and completed as capital prosecutions by the U.S. Department of Justice between 1989 and August 2008. For purposes of analyzing sentencing dynamics, I excluded from the analysis six cases: one in which the charged offense was treason and there were no identified victims; and five in which there were mass numbers of victims. (These were large-scale terrorist attacks: the Oklahoma City bombing, the September 11 attack, and the bombing of two U.S. embassies in Africa.) The cases were excluded because where there is either no victim or where there are mass casualties it is not possible to isolate a white victim effect on sentencing. This is consistent with the way other researchers have addressed issues of race and gender in sentencing. This left 397 authorized capital prosecutions for analysis.

7. I used statistical procedures generally applied in the analysis of quantitative data to assess whether the death penalty was imposed differently in cases involving defendants who killed white victims as opposed to victims of other races: descriptive statistics provide a "snapshot" of the characteristics of the data; crosstabulations show how two variables interact with one another; and chi-square analysis provides an indicator of whether an

2

observed relationship occurs by chance or because of a systematic interaction between the two variables.

8. My analysis, as reflected in the charts below, demonstrates that defendants who kill white victims receive the death penalty at a substantially higher rate than defendants whose victims are not white and that this correlation between white victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

9. The data used in the analysis have the following characteristics:

| Condition of Interest | Number of Cases | |
|---|---|---|
| All Authorized Cases | 403 | |
| Authorized Cases Involving Victim | 402 (see paragraph 6, above) | |
| Authorized Cases Excluding Mass Killings | 397 (see paragraph 6, above) | |
| Death Penalty Imposed | 60 | |
| Death Penalty Not Imposed | 337 | |
| White Victim (WV) | 146 | |
| No WV | 251 | |
| Sentencing Trial Completed | 182 | |
| Sentencing Trial Involving WV | | 75 |
| Sentencing Trial, No WV | | 107 |
| Death Penalty Imposed, WV | | 37 |
| Death Penalty Imposed, No WV | | 23 |

10. The results of the chi-square analysis for cases involving a white victim are as follows: Table 1 summarizes the analysis of death sentences among the set of 397 authorized federal capital cases. As explained in paragraph 6, this includes all but six authorized prosecutions. Table 1 indicates that defendants in cases involving a white victim were

3

sentenced to death 25.3 percent of the time (in 37 of 146 cases). Defendants in cases not involving a white victim were sentenced to death 9.2 percent of the time (in 23 of 251) cases. Thus, a defendant charged with killing a white victim was nearly three times (2.75) more likely to be sentenced to death than a defendant charged with killing a victim who was not white. These results are statistically significant at the $p<.001$ level, indicating that the probability that this relationship has been observed by chance is essentially zero.

**Table 1: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – All Authorized Cases Except Mass Casualties (N=397)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =146) with White Victim | Death-Sentenced (37) | 25.3 (37 of 146) |
| | Non-Death Sentenced (109) | 74.7 (109 of 146) |
| Set of All Cases (N=251) with no White Victim | Death-Sentenced (23) | 9.2 (23 of 251) |
| | Non-Death-Sentenced (228) | 90.8 (228 of 251) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=337) Not Involving a Death Sentence | Cases with White Victim (109) | 32.3 (109 of 337) |
| | Cases with no WV (228) | 67.7 (228 of 337) |

11. Table 2 looks at the smaller set of authorized capital cases that proceeded through to a capital sentencing trial. It indicates that among those for whom life or death decisions were made by judges or juries, defendants in cases involving a white victim received a death sentence 49.3 percent of the time (in 37 of 75 cases). Defendants in cases where there was no white victim were sentenced to death 21.5 percent of the time (in 23 of 107

4

cases). A defendant in a federal capital trial thus was almost two-and-one-third (2.29) more likely to be sentenced to death in a case involving a white victim than a defendant in a case in which there was no white victim. These results are also statistically significant at the $p < .001$ level, indicating the probability that this relationship has been observed by chance is essentially zero.

**Table 2: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – Sentencing Trial Cases Only (N=182)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =75) with White Victim | Death-Sentenced (37) | 49.3 (37 of 75) |
| | Non-Death Sentenced (38) | 50.7 (38 of 75) |
| Set of All Cases (N=107) with no White Victim | Death-Sentenced (23) | 21.5 (23 of 107) |
| | Non-Death-Sentenced (84) | 78.5 (84 of 107) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=122) Not Involving a Death Sentence | Cases with White Victim (38) | 31.1 (38 of 122) |
| | Cases with no WV (84) | 68.9 (84 of 122) |

12. After reviewing the results of these analyses, it is clear that there is a robust correlation between the presence of a white victim and the imposition of a death sentence. Social scientists consider a result to be robust when changing the assumptions undergirding an analysis would be unlikely to affect its results, which is the case here. Cases in which there is white victim represent 36.7 percent of all authorized prosecutions (146 of 397) and 41.2 percent of authorized prosecutions completing a penalty phase trial (75 of 182);

5

however they represent 61.7 percent of death sentences (37 of 60). These results are highly statistically significant. The generally accepted standard for statistical significance in political science research is $p<.05$, meaning the probability that the results occurred by chance is less than five percent. In the case of these analyses, the findings are statistically significant at a higher level of $p<.001$, meaning the probability they occurred by chance is less than one-tenth of one percent, or one in one thousand. Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of October, 2008.

Lauren Cohen Bell

6

Appendix: SPSS Output Used to Generate the Foregoing Analysis

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 397 | 100.0% | 0 | .0% | 397 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| Death Penalty Imposed | No | Count | 228 | 109 | 337 |
| | | % within Death Penalty Imposed | 67.7% | 32.3% | 100.0% |
| | | % within race2 | 90.8% | 74.7% | 84.9% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 9.2% | 25.3% | 15.1% |
| Total | | Count | 251 | 146 | 397 |
| | | % within Death Penalty Imposed | 63.2% | 36.8% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 18.834[b] | 1 | .000 | | |
| Continuity Correction[a] | 17.594 | 1 | .000 | | |
| Likelihood Ratio | 18.134 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 18.787 | 1 | .000 | | |
| N of Valid Cases | 397 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 22.07.

7

**Case Processing Summary**

|  | Cases | | | | | |
|---|---|---|---|---|---|---|
|  | Valid | | Missing | | Total | |
|  | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 182 | 100.0% | 0 | .0% | 182 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

|  |  |  | White Victim | | Total |
|---|---|---|---|---|---|
|  |  |  | No | Yes |  |
| Death Penalty Imposed | No | Count | 84 | 38 | 122 |
|  |  | % within Death Penalty Imposed | 68.9% | 31.1% | 100.0% |
|  |  | % within race2 | 78.5% | 50.7% | 67.0% |
|  | Yes | Count | 23 | 37 | 60 |
|  |  | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
|  |  | % within race2 | 21.5% | 49.3% | 33.0% |
| Total |  | Count | 107 | 75 | 182 |
|  |  | % within Death Penalty Imposed | 58.8% | 41.2% | 100.0% |
|  |  | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

|  | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 15.463[b] | 1 | .000 |  |  |
| Continuity Correction[a] | 14.229 | 1 | .000 |  |  |
| Likelihood Ratio | 15.422 | 1 | .000 |  |  |
| Fisher's Exact Test |  |  |  | .000 | .000 |
| Linear-by-Linear Association | 15.378 | 1 | .000 |  |  |
| N of Valid Cases | 182 |  |  |  |  |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 24.73.

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 113**

---

**DECLARATION OF KEVIN McNALLY REGARDING TESTIMONY
IN *UNITED STATES V. TAYLOR* (E.D. TN No. 1:04-CR-00160-1)**

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC]. I have served as a Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts. We assist court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.[1]

2. My responsibilities as Federal Death Penalty Resource Counsel include the monitoring of federal capital prosecutions throughout the United States in order to help ensure the delivery of adequate defense services to indigent capital defendants in such cases. This effort, in turn, includes the collection of data on a wide variety of topics regarding federal capital cases, including decisions by the Attorney General to seek or not seek the death penalty and decisions by juries or judges whether to impose the death penalty. This includes the factual scenario, allegations and evidence, the number of homicide victims, the race or ethnic background of the defendant and the victim(s) and the statutory and non-statutory aggravating and mitigating circumstances alleged and found by the jury.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Department of Justice allegations in these

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMEN-DATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ..." *Id.* at 50.

cases. I accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, by reviewing transcripts, reviewing media accounts of trials, reviewing DOJ press releases and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have been asked by appointed counsel for Rejon Taylor to testify before the jury regarding the federal death penalty and issues of race and fairness, including statistics regarding the race of the defendant and victim, the facts and circumstances, the allegations of statutory and non-statutory aggravating circumstances, the jury findings and the results in other federal death penalty cases.

5. Since 1988, the Attorney General has authorized a capital prosecution against 403 defendants as to whom the capital prosecution has been completed, to the extent that a decision imposing or rejecting the death penalty has been made by the Attorney General and/or a jury or a judge. FDPRC has determined the race and gender of the defendants and victims as to each of these 403 "authorized" capital defendants. Additionally, FDPRC has determined the number of homicide victims attributable to each defendant. This information is captured in a report previously filed with the Court [Docket Entry 701, Exhibit B], along with the defendant's name, the district and the indictment number. FDPRC has obtained and reviewed the Notice of Intent to seek the Death Penalty and the jury findings regarding aggravating and mitigating circumstances in these cases.

6. Each of these 403 defendants is categorized in the report by a descriptive name relating to the disposition of the case. The categories, which FDPRC uses in our database, are as follows: "Acquittal," "Authorization withdrawn," "Awaiting resentencing or retrial," "Clemency," "Death Row," "Death Sen Vac & AW," "Dismissal after notice by judge," "Executed," "Guilty plea," "Incompetent after authorization," "Innocent," "Killed or died after authorization," "Lesser included conviction" and "Life sentence."

7. "Acquittal" means that the jury found the defendant not guilty of the capital charge.

8. "Authorization withdrawn" means that the Attorney General withdrew the request for the death penalty either before or during trial.

9. "Awaiting resentencing or retrial" means that the defendant received a sentence of death, but an appellate court has ordered a retrial or resentencing which has not yet occurred.

10. "Clemency" means that the President granted clemency to an individual who was sentenced to death.

11. "Death Row" means that a person is under a sentence of death and is awaiting appellate or post-conviction review.

12. "Death Sentence Vacated and Authorization Withdrawn" (Death Sen Vac & AW) means that a death sentence was reversed by an appellate court and the Attorney General withdrew the request for the death penalty.

13. "Dismissal after notice by Judge" means that a Judge has declined to permit the government to seek the death penalty, due to a legal reason.

14. "Executed" means that the sentence of death was carried out.

15. "Guilty plea" means that a plea agreement involving a non-death sentence (usually life)

- 3 -

was approved by the Attorney General and accepted by the Court, either before or during trial.

16. "Incompetent after authorization" means that the Court found the defendant incompetent, after the Attorney General authorized a capital prosecution.

17. "Innocent" means that the government moved to dismiss the capital count and either prosecuted another individual or the prosecutor admitted he/she was unable to prove the capital charge.

18. "Killed or died after authorization" means that the individual was killed or committed suicide after the Attorney General had authorized a capital prosecution before or during a trial.

19. "Lesser included conviction" means that the jury did not find a statutorily required aggravating circumstance or the required mental state threshold.

20. "Life sentence" means that the jury, or in two cases a judge, sentenced the defendant to life in prison.

21. 110 of the 403 individuals reached a plea agreement with the government that was accepted by the Court. The Attorney General withdrew the request for the death penalty as to an additional 57 individuals for various reasons.

22. 188 of the 403 individuals were tried by a jury or judge.

23. The numerical distribution of these cases is as follows:

| | |
|---|---|
| Acquittals | 13 |
| Authorization withdrawn | 48 |
| Authorization withdrawn at trial | 9 |
| Death sentence | 61 |
| Dismissal of notice by judge | 24 |
| Guilty pleas | 110 |
| Incompetent | 2 |
| Innocent | 3 |
| Killed/Died | 3 |
| Lesser included | 3 |

– 4 –

| | |
|---|---|
| Life sentence | <u>127</u> |
| **Total** | **403** |

24. One defendant of the 403 "authorized" defendants described above was charged with espionage and there was no homicide victim.

25. Five of the 403 defendants were accused of acts of mass murder/terrorism/bombing and were tried by a jury. These individuals were Timothy McVeigh and Terry Nichols (the Oklahoma City bombing), Mohamed Rashed Al'Owhali and Khalfan Khamis Mohamed (the African Embassy bombings) and Zacarias Moussaoui (convicted of participation in the September 11, 2001 attack on the World Trade Center in New York).

26. In cases with multiple murders, if one homicide victim is white, the case is coded as involving a white victim.

27. In the attached report, "M" means male, "F" means female, "W" means white, "H" means Hispanic, "B" means African-American, "A" means Asian, "NA" means Native American, "I" means Indian and "O" means other.

28. I provided the attached data set to Lauren Cohen Bell, Ph.D., and requested that she provide an expert opinion as to whether the race of the victim(s), in particular white victims, in federal capital cases has a statistically significant effect on the death sentencing rate. Her analysis is attached. It indicates that defendants who kill a white victim or victim(s) are nearly three times as likely than other capital defendants to be sentenced to death, that the race of the victim is "highly statistically significant" and that the likelihood that this occurs by chance is "essentially zero."

29. I am able to testify regarding the facts and circumstances of the following cases: *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458); *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M); *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul*

− 5 −

*Al'Owhali* (S.D. NY No. S6 98 CR 1023); *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT); *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531); *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455); *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277); *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK); *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) and *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH). I would testify that each of these individuals were sentenced by a jury to life in prison without release and that all are housed at ADX Florence, the so-called federal "Supermax" prison. This information was obtained from the Bureau of Prisons website.   http://www.bop.gov/iloc2/LocateInmate.jsp (last viewed on October 3, 2008).

30. *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) involved multiple (six) killings: one in '94, four in '96, one in '97. Authorization was granted to seek the death penalty for three murders, including an allegation that Jones ordered his step-brother killed from jail because he feared he was about to become a government witness. Jones also ordered the murder, by the victim's own bodyguards, of a rival Baltimore drug dealer who had earlier attempted to arrange the murder of Mr. Jones. Numerous other homicides, attributed to Jones, were alleged in aggravation. Murder for hire was alleged as an aggravating circumstance. Jones was convicted in 1998, sentenced to life without release. Eight co-conspirators were involved in multiple murders but did not face the death penalty. Jones was sent to the "Control Unit" at "super-max," ADX in Florence, Colorado, where he is under severe communication restrictions for 10 years. The defendants and victims were black.

31. *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M) involved Timothy McVeigh's co-defendant in the Oklahoma City bombing case. He was sentenced in 1998 to life imprisonment in federal court and faced the death penalty in state court where he was also sentenced to life in prison. McVeigh was executed.

32. *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul Al'Owhali* (S.D. NY No. S6 98 CR 1023) involved foreign national accomplices of Usama bin Ladin, the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people, including 12 Americans. More than 5,000 people were injured. Al-'Owhali is a Saudi citizen who was arrested in Nairobi after the bombing. Mohamed and Al'Owhali are members of al-Qaida, an international terrorist organization, led by bin Laden, who has repeatedly issued various "fatwahs" against the United States. A co-defendant stabbed a jail guard in the eye and caused brain damage during an escape attempt.

33. *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT) involved defendants in one of three related multiple murder Mexican Mafia prosecutions. "Chuy" Martinez, 41, was a "drug kingpin," the head of a narcotics organization. There were a total of four murders and 13 conspiracies to commit murder charged. Three men, one a drug dealer and two innocent bystanders, all Hispanic, were killed in a Monticello autobody shop. Martinez orchestrated the killings using a walkie-talkie. Max Torvisco, once Martinez's right hand man, obtained a plea agreement. He admitted ordering 140 murders. Wiretaps show Martinez ordering numerous murders.

34. *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531) involved an inmate killing - an evisceration stabbing of cellmate (in their cell). The aftermath of the murder was recorded on videotape. The letter "S" was written on the cell wall in the victim's blood and his organs

- 7 -

removed and held up for the guards to see. The defendants are foreign nationals, Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. William had a 20 year history of violent crime.

35. *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455) involved a foreign national and co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

36. *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277) the stabbing and killing of an inmate at USP - Allenwood in 1997. There were half a dozen correctional officers who witnessed the end of the stabbing. Both the defendant and victim are white.

37. *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK) were charged in a racketeering indictment of 40 members and associates of the Aryan Brotherhood [AB] for a string of murders and violent attacks allegedly designed to expand the power of the white racist prison gang, which was founded at San Quentin state prison in 1964. Authorities say the gang has about 100 members. In 1980, the federal faction of the AB formed a three-man "Commission" to oversee AB members in federal prisons, and, in 1993, the Federal Commission formed a "Council" to oversee the day-to-day activities of the federal faction. 17 murders were alleged. Multiple (at least six) murders occurred since 1996. Twenty-seven defendants initially were eligible for the death penalty. Mills and Bingham made all major decisions involving the criminal activities of the federal faction. Mills was

– 8 –

also charged with personally committing one murder and involvement in numerous murders. AB members who were selected to face the death penalty were: McIntosh, Knorr, Sahakian, McElhiney, Littrell, Bridgewater, Terflinger, Schwyhart, Houston, Griffin, Chance, Stinson, Mills and Bingham. Mills and Bingham were sentenced to life in prison in 2006, as were Bridgewater and Houston at a separate trial in 2007. The Attorney General dropped the remaining capital prosecutions against the Aryan Brotherhood.

38. *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) involved Kenneth "Supreme" McGriff, the leader of a notorious Queens-based drug gang, "The Supreme Team," that operated in the 1980's. He went to prison after pleading to a Continuing Criminal Enterprise and receiving a 12-year sentence. Upon his release, he resumed drug trafficking. McGriff and co-defendants were charged with two VICAR murders that took place in 2001. All involved are African-American.

39. *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH) involved a 1998 inmate killing at Beaumont FCI.

40. I am also able to testify as to the facts and circumstances of other cases involving the murder of a government informant or witness which have resulted in a life sentence after trial. I previously listed these cases in a declaration filed of record [DE 701, Ex. A, paragraph 7]. Descriptions of the facts and circumstances of these cases have also been previously filed of record [DE 701, Ex. C].

41. I am able to produce the Notice of Intent to Seek the Death Penalty (which contains the Government's allegation of statutory and non-statutory aggravating circumstances) and the jury

- 9 -

findings of statutory and non-statutory aggravating circumstances and statutory and non-statutory mitigating circumstances in all these cases.

42. I am able to testify as to the race of all of these capital defendants and their victims, the number and nature of aggravating and mitigating circumstances and the number of homicide victims in all of these cases.

43. Rejon Taylor's date of birth is September 15, 1984 and the date of the capital offense is August 6, 2003. Therefore, Mr. Taylor was 18 years old at the time of the homicide. If the capital crime had occurred 11 months earlier, Mr. Taylor would not have been eligible for the death penalty. 18 U.S.C. §3591(a). *See Roper v. Simmons,* 543 U.S. 551 (2005).

44. No federal capital defendant who was 18 at the time of the capital offense has been sentenced to death for a single homicide.

45. No federal capital defendant has been sentenced to death in a prosecution involving a struggle for a gun leading to a shooting or a factual scenario similar to that.

46. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2008.

Kevin McNally
Federal Death Penalty Resource Counsel

- 10 -

1282

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 114**

_____

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this __11__ day of _____March_____, 2009, in __Lincoln__ County, Oklahoma.

_____
Rodney Floyd

1284

# EXHIBIT 115

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 115**

_____

June 11, 2001

To:      The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart Senate Office Building, Washington D.C. 20510-4904

From:   David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law, University of Iowa

Re:      DOJ report on the Federal Death Penalty System (June 6, 2001)

I have read U.S. Department of Justice, The Federal Death Penalty System:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review (June 6, 2001) ("the

report"), which supplements the DOJ report of September 12, 2000.  The following comments

explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ

report utterly fails to convince me that there is no significant risk of racial unfairness and

geographic arbitrariness in the administration of the federal death penalty.  I believe there is still

the just as much reason to be concerned about these issues as there was when the September 2000

report was issued.

     1.  The report completely overlooks the evidence of race-of-victim discrimination documented in the September 12, 2000 report.

A main theme of the latest report (p. 10) is that the death penalty authorization rate is

higher for whites (.38) than it is for blacks (.25) and Hispanics (.20).  These are the same figures

that appeared in the September 2000 report.  The latest report's emphasis on these statistics

appears to suggest that white defendants are actually treated more punitively than minority

defendants.

A more plausible explanation for the higher authorization rates for the white defendants is

plainly documented in the September report – (1) white defendants are more likely to have killed

whites[1] and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-

victim cases than they are in minority-victim cases.  For example, data in the September 2000

---

[1] For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

1

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21(81/383) in minority-victim cases -- a 16 percentage point difference that is statistically significant at the .001 level.  The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system.  Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases.  Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases -- a nine percentage-point difference.[2]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*[3]*.*  The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[2] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level.   The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level.  In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[3] 481 U.S. 279 (1987).

2. <u>The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.</u>

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13)  Perhaps, but that is not the question.  The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution.  The report offers no data on that question.  As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty.* (Pp. 17-18)  This is extremely misleading.  The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia.  The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17).  This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3. <u>The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.</u>

3

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19)  The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it  "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements.  This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached.  Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered?  It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases.  Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of  "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[4]

---

[4] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

4

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it.  Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4.  <u>The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.</u>

The report notes a meeting of  "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11)  I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the conduct of such a study would entail a "multi-year research initiative."  Two years would be the likely time line.  In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible.  Quite the opposite.  Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases."  This was certainly not the consensus of the researchers at the January 10 meeting.  On the contrary, the consensus was that such a study would provide the best possible evidence on the question.  Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

*5*

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete. It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study. With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5. <u>The report misconceives the nature of race discrimination in the administration of the federal death penalty.</u>

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11) In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17) This states the issue far too crudely. No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious. More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant. It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists. Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of

the defendant and victim exists in the federal death penalty system, and if so, what causes it.

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 116**

_____

**DECLARATION OF KEVIN McNALLY REGARDING THE GENDER AND
RACE OF VICTIMS IN FEDERAL CAPITAL PROSECUTIONS SINCE 2000**

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC], assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2.   The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1]  This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994."  18 U.S.C. §3591 *et seq.*

3. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant.  FDPRC accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy whenever possible against any

---

[1]In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases.  That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See "*Federal Death Penalty Cases:  Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50.  The Report is available online at  http://www.uscourts.gov/dpenalty/.  The Report's recommendations were later adopted by the Judicial Conference of the United States.

1

available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.   Attorney General Gonzales reviewed 409 potential capital defendants.  In those cases, there were 19 prosecutions involving white female victims.  Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty.  Of those 409 defendants, there were 67 cases involving white male victims.  Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty.  Of those 409 defendants, there were 323 cases involving non-white victims.  Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5.   Attorney General Ashcroft reviewed 626 potential capital defendants.  However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged.  Of those 623 cases, there were 59 cases involving white female victims.  Of those 59, 34 (58%) defendants were selected for a death penalty prosecution.  Of those 623 cases, there were 105 prosecutions involving white male victims.  Of those 105 prosecutions, 18 defendants (17%) were authorized.  Of those 623 cases, there were 459 prosecutions involving non-white victims.  Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6. Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial.  Of those 87 defendants, 25 prosecutions involved white female homicide victims.  15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence.  30% (3 of 10) white male victims cases have resulted in a death sentence.  51 non-white victim prosecutions have completed trial.  Five (10%) of these 51 non-white victims have resulted in a death sentence.

7.  Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have

2

completed trial. Of those, 5 prosecutions involved white female victims. Juries have sentenced 4 of those 5 defendants to death. Seven prosecutions have involved white male victims. Two (29%) of those 7 defendants have been sentenced to a death sentence. 19 non-white victim cases have completed trial. Three (16%) of those 19 defendants have been sentenced to death.

8. The totals for Attorney General Ashcroft and Attorney General Gonzales are as follows:

| Gonzales authorized - 81 | | Gonzales not authorized - 328 | |
|---|---|---|---|
| 52 | Black, Hispanic and other victims | 271 | Black, Hispanic and other victims |
| 19 | White male victims | 48 | White male victims |
| 10 | White female victims | 9 | White female victims |

| Ashcroft Authorized - 139 | | Ashcroft not authorized - 487 | |
|---|---|---|---|
| 86 | Black, Hispanic and other victims | 373 | Black, Hispanic and other victims |
| 18 | White male victims | 87 | White male victims |
| 34 | White female victims | 25 | White female victims |
| 1 | No victim | 2 | No victim |

9. I attach three graphs depicting this information.

10. The victim gender data has not been available before.

11. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of December, 2007.

 /s/ Kevin McNally
Kevin McNally

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBIT 117**

_____

**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1.     I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2.     I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

3.     I am Secretary General-Elect of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.  I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

4.     I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977.  I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology.  In 1981, I completed my psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year.  During my psychiatric residency, I pursued specialized neurological

1

1300

electives at Kaiser Permanente Hospital, Oakland, California. These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

5.      In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general. The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population. Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms. Medical examinations and neurological intervention were frequently required.

6.      From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of

mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment.  Many of these patients Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

7.	From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California.  In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.  During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

8.	The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).  From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center.  The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and

psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

9.      In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

10.     In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology.  I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

11.     In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that

4

predated the bombings.

12.     I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents.  I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

13.     My clinical private practice is based in Oakland, California.  I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

14.     At the request of counsel currently representing Kenneth Barrett, I have performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense.   In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009.  I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites.  These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

**Clinical Presentation**

15.     Clinical observation of Mr. Barrett over the course of lengthy interviews revealed

signs of significant neurologically impaired cognitive and psychosocial functioning, including severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality, hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to sustain lasting relationships secondary to his severe mental illness.

16.     Kenneth Barrett presented as an appropriately groomed White male who appeared to be his stated age of 47 years. His movements were fluid, although his gait was somewhat halting. Mr. Barrett noted he had difficulty with his legs since he had been shot multiple times during the police action that resulted in his arrest and conviction.

17.     Speech was spontaneous and coherent, although he repeated questions often, even after the questions had been answered. He evidenced pressured speech. His ability to utilize complex words or grammatical structures was limited.

18.     Mr. Barrett's thought form was extremely concrete, and his ability to abstract limited.  There was no evidence of prosody or alexithymia, poverty of thought.  On the contrary, Mr. Barrett had significant flight of ideas. He was paranoid and guarded, particularly in discussing the painful memories of separation from his father and the inattention of his mother, due to her own mental illness, during his formative years.  His thinking was also grandiose, manifesting cognitive disinhibition, reflecting neurodevelopmental and/or acquired brain dysfunction.  There was no evidence of perceptual disorders, hallucinations, or delusions.

19.     He was most animated and fluent in describing his attempts to redress perceived injustices (e.g., disrespect and unfair enforcement of rules by prison staff; the misappropriation of his property after his arrest).  His description of his responses in such situations indicated a significant lack of inhibition and age-appropriate defenses and coping skills.

20.     Mr. Barrett's mood was elevated. His affect was often inappropriate to the content of our examination. The affective content of his presentation was incongruent with self-description of his life and current situation.  Mr. Barrett is invested in appearing to be a high-functioning individual, without significant past or present impairment, and who is in control of his life.

21.     Insight and judgment were impaired by his severe mood disorder and executive functioning deficits. His conceptual dysfunction also limited his ability to develop a larger picture, further impinging his insight and judgment.

**Background and Developmental Impact**

22.     Kenneth Barrett was born on June 29, 1961, in Joliet, Illinois.  He is the oldest of three sons born to Ernie Barrett and Gelene Barrett (nee Dotson).  Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

23.     Significant risk factors for, and the symptomatic presentation of multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Barrett's antecedents.  In particular, Mr. Barrett has high genetic loading (risk) for bipolar

7

disorder and other affective disorders. He has multiple multigenerational and first-degree relatives with confirmed diagnoses of such mental illness.  Mr. Barrett's extensive family history of bipolar and associated neuropsychiatric disorders is rare, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

24.     Mr. Barrett's mother, Gelene Dotson, his maternal aunt, Carolyn Joseph, and maternal cousin, Gwendolyn Crawford, satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression and anxiety disorders.  Gwendolyn's daughter, Brandy Hill, suffers with major depression punctuated by episodes of "high euphoria," and is noncompliant with her prescribed medication regimen.  Gwendolyn's 26-year-old son, Brandon, suffers from developmental disabilities that prevent him from speaking or being able to live independently.  Another of Mr. Barrett's first cousins, Travis Crawford, is being treated for anxiety, has a history of depression, and experiences significant cognitive impairment.  Mr. Crawford's oldest daughter has been diagnosed with bipolar disorder, and one of his sons exhibits significantly impaired neurocognitive functioning.  At least two other of Mr. Barrett's cousins each has a son who suffers from diagnosed bipolar disorder.

25.     Medical indications of the incidence of major mood disorders, and related impairments in functioning, can be found in Mr. Barrett's maternal family back to at least the generation of his grandmother, Hattie Gertrude Dotson.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the twentieth century.  Wallace Dotson, a first cousin of Mr. Barrett's maternal grandfather, was involuntarily committed to a state psychiatric hospital by

8

his father, Tom Dotson.  The record of admission documents the senior Dotson's description of his son as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights," a neurovegetative sign of mood disorders.

26.     Mr. Barrett's paternal family presents a comparable degree of genetic loading for major mood disorders and associated neurocognitive substrates.  At least one paternal aunt, Linda Riley, suffers from depression, and both of her adult daughters have been diagnosed with bipolar disorder.  One of Ms. Riley's grandsons has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  Another paternal aunt, Elnora Long, currently meets diagnostic criteria for bipolar disorders and requires treatment with high doses of medication.

27.     The paternal pedigree, neuropsychiatrically indicative of mental illness in Mr. Barrett's family extends back at least four generations.  A Certificate of Lunacy for Mr. Barrett's great-great-grandfather, A.J. (Jack) Barrett, documents his 1918 commitment to a psychiatric hospital in Sequoyah County.  Mr. Barrett's great grandfather, Isaac Clifford Barrett, despite achieving prominence in his social and professional community, manifested a loss of pleasure, called anhedonia, eventually committing suicide.  His oldest son, Mr. Barrett's grandfather, Andrew Jackson Barrett, manifested severe mood imbalances and disordered thinking, which resulted in violent physical and sexual assaults against his wife and children, including the forcible rapes and consequent impregnations of one of his daughters and his 13-year-old sister-in-law; and rampages in public while under the influence of alcohol.  His occupational functioning was severely impaired.  Psychiatric symptoms documented in his Certificate of Lunacy, contemporaneously with his commitment to a state psychiatric hospital, include auditory hallucinations, persecutory delusions and paranoid ideation, which were, in turn, exacerbated by

9

neuropsychological deficits that impaired his intellectual functioning, judgment and reasoning. He suffered severe mood swings, and attempted to self-medicate his psychiatric distress with excessive amounts of alcohol.  When he was sober, his family described him as "a decent guy." When he consumed alcohol, as he did on frequent occasions, he became unpredictable and violent.

28.     A.J. Barrett's disinhibition, affective dysregulation and violent behaviors, including assaults against his wife, traumatized his own son, Ernie Barrett (Kenneth Barrett's father), and impaired Ernie's neurodevelopment and cognitive functioning.  As an adolescent, Ernie Barrett exhibited signs of traumatic stress, becoming emotionally constricted, exhibiting psychic numbing and replicating his father's aggressive behaviors against his own siblings and classmates.   As an adult, Ernie Barrett exhibited a neuropsychiatrically diagnostic symptom cluster of bipolar-related behaviors, including hypersexuality, grandiosity and substance abuse.

29.     Howard Maxwell, the brother of one of Mr. Barrett's paternal great grandmothers, Mary Ellen Maxwell, was colloquially described as exhibiting psychiatric symptoms, and his son, Billy Dean, had a history of Schizophrenia, and also committed suicide.

30.     Kenneth Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency. Mood disorders have an incidence in the United States of approximately 8 percent of the population. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.

31.     Early onset BD appears to have strong polygenetic inheritances, with strong expression in the children of affected parents, and has a higher incidence than reported in the

10

offspring of parents with other types of mood or affective disorders. Children with one parent with BD have a 25% incident of inheriting BD; for children whose parents both have BD, the incidence rises to 50% to 75%. (Faust et al, *Diagnosis and Management of Childhood Bipolar Disorder in the Primary Care Setting*, Primary Pediatrics, November 2006, page 802.)

32.     Based on the research regarding the genetics of schizophrenia and bipolar disorder, it is medically reasonable to conclude that the prevalence and severity of substance dependency in Mr. Barrett's family is largely genetically determined.  His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

33.     *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. (Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.)

34.     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the

11

1310

longest term and most pernicious effects of all such early traumatic experiences.

35.    The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

36.    Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion.  In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

37.    Mr. Barrett was also exposed to neurological insults to his fragile central nervous system *in utero* due to his mother's alcohol use, and during his formative years from his mother's unpredictable beatings and his parents frequent domestic disputes, that were known to end in violence.  E.g., Mr. Barrett's mother describes the "pretty bad fights" she and her husband had

12

whenever she confronted him about his infidelity, and reports that "he gave [her] two black eyes and split [her] lip."

38.     As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not  "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

39.     Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

40.     Initial presentation of childhood or adolescent bipolar disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15

13

minutes, sadness and easy crying, inattention, and impulsiveness. When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

41.     As he approached adolescence and continuing through young adulthood, Mr. Barrett experienced potential neurological insults outside his home that posed further risks of cognitive impairment and traumatogenic sequelae. In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a "steel ball," with indicated loss of consciousness. He recalls only "waking up" as he was being lifted off the ground after being struck.   At age 17, Mr. Barrett reportedly suffered an assault by one or more police officers. Mr. Barrett reportedly declined to pursue an investigation of the officers' actions, but his mother reports that while one officer restrained Mr. Barrett, another one beat him around the face, head and neck, inflicting injuries that included a broken jaw and collar bone, facial contusions and a bloodied nose. When he was approximately 22, and again at age 23, Mr. Barrett was involved in motorcycle accidents, again with apparent loss of consciousness. Mr. Barrett, witness accounts and medical records confirm that at the age of 24, he apparently attempted suicide by shooting himself in the chest with a shotgun; and Mr. Barrett reports that he has made several other unsuccessful attempts to take his life by driving his car or motorcycle off the road at high speeds.   In connection with Mr. Barrett's arrest for the commitment offense, he suffered several gunshot wounds to his legs, facial contusions and abrasions, and superficial

14

blunt trauma to his head.

42.    Mr. Barrett reports that his regular use of alcohol, tobacco and other drugs, including marijuana, started around the age of eleven or twelve, a period when the development of his frontal lobes, the seat of neurological executive functioning, is first beginning.

43.    Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.( Young declaration, page 13)

44.    In an environment in which "mom drank, grandpa drank," Mr. Barrett had easy access to alcohol and soon began drinking "more regular."  In the seventh grade he regularly abused marijuana on a weekly or bi-weekly basis, and increased to more frequent use as he gained greater access to the drug once his use became more widely known among peers, and other users were willing "to turn [him] on."  From late adolescence through early adulthood he reports episodic use of Valium, Lithium, LSD, PCP, psilocybin mushrooms, methamphetamine, cocaine, Quaaludes and Placidyl; and frequent abuse of barbiturates.  By his 30's, Mr. Barrett primarily abused cocaine, methamphetamine and Tuenol.  Mr. Barrett's chemical dependency

15

history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

45.     Mr. Barrett was unable to acquire the skills and means necessary to live independently, and manifested significantly impaired social, relational and occupational functioning throughout his adulthood.  He married at the age of 19, and his son, the couple's only child, was born shortly afterward.  The union was severely strained by the effects of Mr. Barrett's mental instability, which was apparent to lay observers.  Mr. Barrett experienced periods of severe depression, in which he exhibited signs of catatonia, followed by mania and racing thoughts.  Mr. Barrett was unable to maintain a consistent work schedule, and the couple frequently had to live with Mr. Barrett's mother, Gelene Dotson.

46.     Mr. Barrett's former wife reports that during the periods they lived with Ms. Dotson, the effects of Mr. Barrett's attempts to ameliorate symptoms by self-medicating with illicit drugs were exacerbated by his mother's habit of making him "get up from bed and party with crack and pot."

47.     Mr. Barrett and his wife experienced frequent separations followed by unsuccessful attempts at reconciliation.  Mr. Barrett was unable to live independently and resided with his mother or father when living apart from his wife.  Mr. Barrett's efforts at pursuing gainful employment were defeated by feelings of irritability, agitation and dysthymia, and impulsive, unconsidered abandonment of his job.

48.     Mr. Barrett reported to me that he would become so paranoid over time when interacting with others, he would be forced to leave successful attempts at working, often leaving at the point he was experiencing his direst moment. He left Fort Smith, Arkansas, working with his father, overwhelmed with racing thoughts and paranoid ideation

49.     Mr. Barrett's documented suicide attempt in 1986 was followed by psychiatric intervention and treatment with Elavil and Ascendin, antidepressants well known to exacerbate mania. Many antidepressants force a neurological "switch" to occur in bipolar disorder, inducing mania.

50.     Mr. Barrett's bipolar disorder's pattern can best be described as a "mixed phase" disorder, with depressive mood and affect combined with racing thoughts, irritability, paranoia, and disinhibition. Treated most often with antidepressants due to his depressive presentation, the medication regimen had the potential to increase Mr. Barrett's symptomatology, rather than ameliorate it.

51.     Mr. Barrett was medication noncompliant and his condition deteriorated, necessitating involuntary commitment to Eastern State Hospital in October 1986.  At admission, he presented as emotionally labile with impaired insight and judgment, and was provisionally diagnosed as suffering "depressive neurosis with suicidal potential extremely high."   Upon discharge, Mr. Barrett was again unable to live independently, and stayed with relatives.  The results of a Social Security Administration determination of eligibility found that Mr. Barrett was "moderately depressed" and periodically unable to "think clearly."  He required frequent admissions to hospital emergency rooms after reportedly falling down stairs, sustaining a contusion to his right periorbital region of his head; being involved in a motor vehicle accident,

17

in which he experienced rib and chest pain; and suffering a rash "all over." Mr. Barrett's disclosure, during clinical evaluation, of described suicide attempts using motor vehicles indicates that documented motorcycle and automobile accidents may have been unsuccessful suicide attempts, increasing the psychologically traumatic component of such incidents in addition to creating a risk of further neurological insults.

52.     Following a final separation from his wife after being unable to live independently in Fort Smith, Arkansas, Mr. Barrett psychiatrically decompensated and was hospitalized in January 1995. He reported to hospital staff that he was "losing [his] mind," and noted to be extremely agitated, sleep-deprived, unable to concentrate and experiencing racing thoughts. He was diagnosed with bipolar mood disorder and started on a regimen of 10mg. of Haldol, to be injected intramuscularly ("IM"). The requirement of intramuscular administration of psychotropic medication indicates that Mr. Barrett lacked the insight to recognize his medical predicament and that involuntary treatment with neuroleptics was medically necessary. However, Mr. Barrett's symptoms also called for mood stabilizing and cognitive enhancing medication, and Haldol, although an excellent antipsychotic, does neither. Again, Mr. Barrett's symptoms, although identified, were not appropriately or adequately treated, leaving him to become increasingly paranoid and cognitively impaired.

53.     When he was discharged from the psychiatric hospital, Mr. Barrett returned to his mother's property, where he constructed what family members describe as a small "shack," with approximately $150 worth of building supplies and scraps of materials. The structure lacked running water, a toilet or electricity. Mr. Barrett's mother allowed him to run an electrical cord from her house trailer to his shack, to use her bathroom and shower, and eventually to eat in her

18

kitchen.  Mr. Barrett's family and former wife recognized that he could never "live on his own," and his mother allowed him to remain on her property, where he earned a marginal income repairing cars for friends and neighbors.

54.     In the years and months preceding the commitment offense, Mr. Barrett expressed increasingly paranoid thoughts, experienced intolerable irritation at perceived surveillance and harassment by law enforcement authorities and felt threatened by illicit drug users and dealers, some of whom he suspected of being police informants.  He disclosed to others his belief that he was being monitored by satellites and became increasingly withdrawn until he stopped leaving his mother's property.  He relied on others to shop and run errands in the nearby town for him. At other times, he believed the unidentified aircraft "hovering" over his property were "dirigibles," similar to "the ones the U.N. uses," and reinforced with "steel plates on their bottoms."  He described shooting at one and causing it to flee.

55.     In the weeks or days before the commitment offense, Mr. Barrett reportedly displayed a sign on the roadway leading onto his mother's property that warned:  "Keep out.  I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  There was some dispute whether the message was directed at law enforcement, drug dealers or both.

56.     Mr. Barrett's description of the events leading to his arrest indicates that he did not leave his shack before he was shot by the police.  Responding to the sound of his son's voice calling his name, Mr. Barrett rushed to the front porch and observed an unidentified Ford Bronco driving toward his son.  Mr. Barrett retrieved a handgun from inside the shack and placed it in the waistband of his trousers, and began to return to the porch to investigate.  He was struck by a bullet he believes was fired through a window of the shack as the Bronco "hit the front of the

19

house."  Mr. Barrett says "I didn't know what was going on except someone was there to kill me."  At the sight of the Bronco striking his residence, Mr. Barrett "went to firing."  The next recollection he has is of a law enforcement officer ordering him to stand up.  Mr. Barrett has no memory of having fallen, but he does recall he could not stand up due to bullet injuries to his legs.

**Neuropsychological Assessment**

57.     The neuropsychological assessment performed by Dr. Myla Young measured impairments in cognitive performance associated with significant dysfunction in the dorsolateral and orbital portions of the prefrontal lobes of Mr. Barrett's brain.   The measured deficits compromise Mr. Barrett's ability to inhibit cognitive and emotional stimuli, and seriously disrupt executive function including planning (the ability to inhibit short-term goals for long-term objectives), and engaging in reasoned, purposeful, self-regulating goal-directed behavior.  The frontal lobes are also responsible for the integration of motoric and cognitive functioning, including mediation of impulses from the regions of the amygdala and hippocampus.  The amygdala is associated with primordial "fight/flight" responses, as wells as the positive/negative emotional responses of happiness and sadness.  When the amygdala sends an impulse, it is modulated by the orbital frontal lobe before activating striatal responses.  Frontal lobe integration of working memory with limbic impulses enables the brain to contextualize new information, including external stimuli, and make an appropriate response selection.

58.     The prefrontal cortex, the area of most severe damage for Mr. Barrett, is the site of executive functions.  As Dr. Young has indicated, the processes grouped under the label of executive functions can be thought of as multiple processing modules collected together to direct

20

1319

cognitive activity, including mental functions associated with the ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior. These modules perform functions related to overseeing the use of other cognitive processes. As noted by Dr. Young, this array of brain functions include those that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing. Mr. Barrett suffers significantly impaired functioning in all these domains.

59.     In addition to having problems with focusing and sustained attention, manic patients have difficulties shifting attention. Manic patients resemble patients with frontal lobe

21

damage on attentional shifting task such as the Wisconsin Card Sorting Test.  Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect. (Goldberg et al, Cognitive Dysfunction in Bipolar Disorder, American Psychiatric Publishing, 2009, page 29)

60.     Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

**Malingering**

61.     The Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revised (DSM-IV-TR™) explains that "[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, or obtaining drugs."  Mr. Barrett does not "produce" or exaggerate symptoms, rather he minimizes the severity of his symptoms and attempts to present as high functioning, despite acknowledgement of signs of his mental illness.  There is no marked discrepancy between Mr. Barrett's acknowledged symptoms and the objective findings (Malingering criterion #2). Reliable, congruent clinical evidence – including lay witness observations predating Mr. Barrett's arrest, prior psychiatric diagnoses and treatment, and objective neuropsychological testing results – shows that he meets diagnostic criteria for mental illness and suffers cognitive deficits.

62.     In particular, neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

**Etiology and Onset**

63.     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

64.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

65.     Mr. Barrett's family history, the consistency of emotional dysregulation beginning

23

early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

**Clinical Impressions**

66.     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

67.     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed

24

behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

68.     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

**Medicolegal Findings**

69.      Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms, none of which was addressed, either legally or psychiatrically. First, Mr. Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense.

70.     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings, rendering him unable to rationally assist his attorneys. He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

71.      Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

72.      He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

73.      Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

74.      Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

75.      Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

76.      Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He

26

was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

77.     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

78.     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions

1326

before they occurred.

79.     Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain and the reactive immunological reaction he has had to the bullet fragments in his body. Consequently, it is clinically consistent that his constellation of PTSD symptoms would continue through his trial and, to some extent, exist today.

80.     He described symptoms of racing thoughts during his trial, which prevented him from being able to effectively track the proceedings. Mr. Barrett's thoughts were also ruminative, and he was "unable to get unstuck."  He would get his mind on an issue during the trial, and not be able to move to other aspects of the trial.

81.     Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments, his PTSD, Bipolar Disorder, and Dysexecutive Syndrome; were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial.

82.     I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on March 14, 2009.

 /s/ George W. Woods       
George W. Woods, Jr., M.D.

28

1327

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**    ) | |
|           ) | |
|         *Plaintiff,*    ) | |
|           ) | |
| **v.**           ) | **Case No. 6:04-CR-00115-JHP-SPS** |
|           ) | |
| **KENNETH EUGENE BARRETT,**    ) | |
|           ) | |
|         *Defendant.*    ) | |

---

**EXHIBIT 118**

---

Exhs. § 2255 Motion                                        *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

DECLARATION OF ROSEANN SCHAYE

I, ROSEANN SCHAYE, declare under penalty of perjury as follows:

1.  I am a Licensed Professional Counselor and maintain a private practice in Tucson, Arizona.  I received my undergraduate degree, Bachelor of Arts, with a major in sociology in 1978 at the University of Arizona and my Masters in Education also from the University of Arizona in 1981.

2.  In July of 2000, I was self-employed as a Mitigation Specialist providing assistance to court-appointed and retained counsel in capital trials and post conviction proceedings.  In that capacity I routinely investigated and developed evidence relevant to the questions to be decided in the penalty phase of capital cases.  As of July 2000, I had extensive experience in assisting capital defense counsel in formulating and implementing a mitigation investigation consistent with the standards of professional practice prevailing at that time.  I had an understanding of the presumptive scope of the investigation that was necessary to discharge defense counsel's obligation to obtain all reasonably available mitigation evidence necessary for the preparation and presentation of a penalty phase defense.  Based on my training and practical experience, I was also aware of the tasks, hours and expenses that were reasonably necessary to develop the evidence required for a professionally adequate presentation of penalty phase mitigation evidence, including investigation of the client's social and medical history, and the consideration and presentation of potential mental health evidence and mitigation themes.

3. Based on my training and experience, I knew that the timely investigation and preparation of a potential penalty phase defense had to commence in conjunction with the preparation of the guilt phase.  Development of an effective penalty phase presentation

required counsel to have a coherent theory of the case as a whole, and that strategic and tactical decisions made in the guilt phase be informed by counsel's awareness of the evidence that would be presented in mitigation in the event the case proceeded to a penalty phase, or second stage. It was my experience, and that of other qualified mitigation specialists, that preparation of an effective case in mitigation required a command of the guilt phase evidence, including the circumstances of the crime; and that timely investigation of mitigation evidence, such as a client's mental state, could reveal the basis for a guilt phase defense.

4. In July 2000, I was retained by counsel for Kenneth Barrett to conduct an investigation of potential mitigating factors that would be relevant to guilt phase as well as the penalty phase of his trial, in the event the case proceeded to a second stage. The organizing focus of my investigation was the development of information necessary to produce a social and medical history documenting the significant events and factors that shaped Mr. Barrett's development, functioning and behavior over the course of his life, including at the time of the charged offense. The preparation of a social history is recognized by capital litigators as a prerequisite to identifying potential stand-alone mitigation based on a client's frailties and privations, as well as an essential component of a reliable and accurate evaluation of the client's mitigating mental states. In conducting my investigation of Mr. Barrett's social history and other potentially mitigating factors, I followed the professional standards recognized by the American Bar Association for the function of defense counsel in capital cases, as well as observing protocols followed by competent mental health and medical professionals who would be relying on the data I collected to reach their expert opinions.

1330

5.  As of December 2001, I had performed the following tasks:

a)      Completed one non-confidential interview with Mr. Barrett and two confidential interviews to obtain his perception of his social history, including a history of possible mental impairments and history of childhood mistreatment.

b)      Conducted many witness interviews, including with members of Mr. Barrett's biological family who had personal knowledge of the parental abuse of Mr. Barrett, his parents' very frequent separations and regular abandonment by his father, his family's very frequent moves, and poverty of the family when the father left.

c)      Identified and begun to obtain medical, educational, social service and employment records for Mr. Barrett, and those family members who I had interviewed who had a significant role in his life.  The relevant records were necessary both to determine and document family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disorders, including chemical dependencies.

6.      My preliminary investigation revealed a constellation of factors that likely had affected Mr. Barrett's development, functioning and behavior; and reasonably indicated the need for further, in-depth investigation that was likely to uncover and document:

a)      The nature and extent of physical and psychological trauma Mr. Barrett experienced during his childhood at the hands of his parents and, later, other adults;

3

1331

b)       The long term consequences of the trauma, including psychiatric symptoms and disease;

c)       His family's substantial, multi-generational history of mental impairments including a significant prevalence of neurological impairments, mood disorders and chemical dependency;

d)       Mr. Barrett's probable inability to perceive the world around him accurately or to inhibit his trauma-related behavior as a result of brain damage in addition to cognitive deprivation and familial cultural factors.

7.       The standard of care in capital cases in state and federal cases required that a thorough investigation be conducted in Mr. Barrett's case to develop a reliable social and medical history for him.  The contents of records obtained as a result of my preliminary investigation indicated that no such comprehensive history has been conducted on Mr. Barrett's behalf for any purpose.  Developing a social history is the crucial first step in determining the range of mitigation evidence that counsel can offer at penalty phase.  A social history also serves the purpose of allowing counsel to rebut, defeat, or mitigate evidence offered by the prosecution as aggravation.  Finally, the completion of a competent and confidential mental health evaluation by psychiatrists, neurologists, psychologists, or social workers to reliably determine the presence, severity and effect of mental disorders that affected Mr. Barrett's behavior during the course of his life required them to be provided with reliable and independently documented data about Mr. Barrett's social history.

8.       It was also crucial to determine the psychiatric and medical history of Mr. Barrett's biological family, including that of his parents' and grandparents' generations in

4

order to determine and document the existence of a genetic vulnerability to the development of the types of mental disorders that became apparent during the course of the preliminary investigation. It was therefore important to gather appropriate institutional records about other family members who had mental disabilities or histories, which may have affected Mr. Barrett' behavior or functioning. Based on the voluminous social records I initially obtained or identified for Mr. Barrett and his family members, it was evident that the completion of an adequate social history would require the defense to obtain additional records, including:

a) All school records, including transcripts, health records, standardized testing, attendance, special education testing and/or classes, disciplinary action for every school attended;

b) Employment records, including applications, attendance, job assignments and performance evaluations, medical and psychological evaluations, relocations, pay records, Social Security tax records;

c) Family and individual social service records, including Food Stamps, AFDC, WIC, welfare, counseling records, referrals, and medical and mental health treatment. Again, these records are necessary both to determine family patterns of behavior, as well as to determine genetic predisposition to medical and psychiatric disease, including chemical dependency;

d) Medical records, including private physicians, clinics and hospitals;

e) Youth agency and juvenile criminal justice records, including defense counsel's files, pre-trial intervention, community service records, juvenile

5

detention records, and all related medical, educational and intelligence evaluations, treatment plans, field and progress notes, referrals and court files;

f)      Adult criminal records, including police, sheriff and FBI records, jail records including psychological, educational and medical evaluations and notes, daily progress notes, disciplinary reports, work assignments, classification reports, religious reports and visitation logs; all court records; all public defender and prosecution files;

g)      Psychological and psychiatric records, including community mental health clinics, private doctors and counselors, hospitals and substance abuse facilities, to include intake evaluations, treatment interventions, medication logs, physician and nurse progress notes, referrals, and discharge reports.

h)      All military records for significant family members of Mr. Barrett.

There were also potentially significant witnesses who resided in Norman and Oklahoma City, Oklahoma; and the State of Iowa, who needed to be interviewed.

9.      Based on my discussions with Mr. Barrett's attorney, my experience investigating numerous cases at the stage in the legal proceedings that Mr. Barrett's case was at that time, and my consultations with an experienced mitigation expert, it was my professional judgment that the investigation into mitigation for Mr. Barrett's penalty proceeding was still inadequate and incomplete. In my opinion, a competent and reliable investigation of mitigation evidence to be presented at the penalty phase in Mr. Barrett's case would have required an additional minimum of eight to ten months.

10.     The preliminary results of my investigation also made it evident to me that once the social history investigation had been completed, a clinical assessment, including

6

neuropsychological evaluation would have to be conducted.  Based on my interviews with Mr. Barrett, it was my opinion that he would have cooperated fully with the indicated evaluation.  Throughout the course of my interviews with him, he remained willing to disclose and discuss uncomfortable, sensitive information and cooperated fully in describing experiences that were clearly painful for him to share with me.  I explained my purpose in delving into such stressful memories of his life and upbringing, and Mr. Barrett did not in any way restrict the scope of my inquiries or indicate that he would object to the use of any information in the preparation of his mitigation case.

11.     I was not authorized by Mr. Barrett's counsel to perform the additional tasks described above, and my involvement in Mr. Barrett's case was terminated in December 2001.

I declare under penalty of perjury that the foregoing is true and correct.


 /s/ Roseann Schaye
Roseann Schaye

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
        )
       *Petitioner,*   )
        )
v.        )     **Case No. 6:09-cv-00105-JHP**
        )
UNITED STATES OF AMERICA,   )
        )
      *Respondent.*   )

---

**AMENDED MOTION FOR COLLATERAL RELIEF,**

**TO VACATE, SET ASIDE, OR CORRECT SENTENCE,**

**AND FOR A NEW TRIAL**

---

# TABLE OF CONTENTS

I.      Preliminary Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Statement Regarding Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      Grounds for Disqualifying Trial Judge  . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        C.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Events Leading Up to the Raid on the Barrett Home . . . . . . . . . . . . . . . . . . 9

                1.      Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant  . . . . 9

                2.      The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                3.      September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Three Trials  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                1.      State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                2.      Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    Claims for Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        Claim 1.        Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his
                        Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and
                        his Right to Equal Protection of the Laws, and Federal Statutes and
                        Guidelines for the Appointment and Compensation of Counsel; the Failure
                        of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to
                        Effective Assistance of Appellate Counsel  . . . . . . . . . . . . . . . . . . . . . . . 18

        Claim 2.        Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by
                        18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United
                        States Constitution.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                A.      Unreasonable Acts and Omissions Affecting the First and Second Stages
                        of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                        Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . . . . . . 46

Evidence of Constitutionally Deficient Representation . . . . . . . . . . . . . . 49

1.      Failure to professionally re-urge the motion to suppress under
        *Franks v. Delaware,* 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . 49

2.      Trial counsel unreasonably failed to investigate and introduce
        evidence of eyewitnesses as well as mental impairment and illness
        that would have rebutted the prosecution's theory of the case,
        supported the defense theory, and formed the basis for conviction
        of a lesser offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

3.      Due to the unreasonable failure of Mr. Barrett's trial counsel to
        retain expert assistance, Mr. Barrett was tried while
        incompetent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

4.      But for trial counsel's unreasonable omissions it is reasonably
        probable that the jury would have rejected the testimony of the
        Government's eleventh hour "snitch" witnesses and, like the two
        juries before them, refused to convict Mr. Barrett of premeditated
        murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

        a.      Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        b.      Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

        c.      Charles "Monk" Sanders. . . . . . . . . . . . . . . . . . . . . . . . . 97

                1.      Failure to adequately investigate and prepare to
                cross-examine Sanders about his previous convictions,
                charges against him that were dismissed, and the favorable
                treatment he often secured to escape punishment. . . . . . . 97

                2.      Counsel unreasonably failed to investigate and
                produce witnesses who could have impeached specific
                claims made by Sanders, and Sanders's credibility as
                a whole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

        d.      Randy Weaver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

        e.      Brandie Zane Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

        f.      Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

        g.      Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

5.   Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

6.   Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . 143

7.   The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

8.   Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

9.   Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

      a.   Toby Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

      b.    Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

10.  Trial counsel unreasonably failed to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . 172

      a.   Mr. Barrett's "failure to appear". . . . . . . . . . . . . . . . . . 173

      b.   Mr. Barrett's lack of knowledge of the warrant.  . . . . . . 174

      c.   Mr. Barrett's previous cooperation with the law.  . . . . . 177

11.     Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony. . . . . . . . . . . . . . . 181

12.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

13.     The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.  . . . . . . . . . . 197

14.     Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Conclusion.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

B.     Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

1.     Deficient Performance: trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

2.     Prejudice:  abundant, readily available evidence that Mr. Barrett is worthy of life; his neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

a.     The family, social, and medical background of Kenny Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Family History of Mental Illness  . . . . . . . . . . . . . . . . . . 217

Maternal Family Mental Illness . . . . . . . . . . . . . 217

Paternal Family Mental Illness . . . . . . . . . . . . . 219

Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . 221

Paternal Family History  . . . . . . . . . . . . . . . . . . . . . . . 224

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Infancy and Childhood Development  . . . . . . . . . . . . . 232

Onset of Mental Illness  . . . . . . . . . . . . . . . . . . . . . . . 241

b.      Kenny Barrett's mental illness and organic brain
dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

c.      The prosecution's exploitation of trial counsel's deficient
performance.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

Conclusion.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Claim 3.      Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Transcripts, Expert and Investigative Assistance
under 18 U.S.C. §§ 3005 & 3006A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Claim 4.      Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution Were Violated by the Use
of False Information in Obtaining the No-Knock Warrant for his Arrest.
The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was
Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate
Counsel Were Ineffective for Failing to Raise the Issue on
Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

Claim 5.      Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his
Sixth Amendment Rights to Counsel and Confrontation, and his Eighth
Amendment Right to a Fair and Reliable Capital Sentencing Process Due
to the Government's Suppression of Exculpatory Evidence, Knowing use
of Perjured Testimony, and Failures to Correct False Testimony; Mr.
Barrett is Entitled to Relief from his Convictions and Sentences Based on
Newly Discovered Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

A.      Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured
Testimony, and Newly Discovered Evidence  . . . . . . . . . . . . . . . . . . . 289

1.      Evidence regarding informant witnesses Charles "Monk" Sanders,

Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

  a.  Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . . . . . . . 289

  b.  Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

  c.  Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

  d.  Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

  e.  Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

  f.  Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

 2.  The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders . . . . . . . . . . . . . . . . 311

B. The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel. . . . . . . . . . . . . . . . . . . 312

 1.  Evidence of Clint Johnson's illicit activities . . . . . . . . . . . . . . . 313

 2.  David Michael Littlefield's illicit activities . . . . . . . . . . . . . . . 319

 3.  John Philpot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

 Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

C. Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses. . . . . . . . . . . . 326

D. Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

Claim 6. Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . 338

Claim 7. Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

Amended § 2255 Pet.       vi      *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

1342

Claim 8.        Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . . . . . . . 345

Claim 9.        Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.  . . . . . . . . . . . . . . . . . . 350

Claim 10.       Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Claim 11.       Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

Claim 12.       The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368

Claim 13.       Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

Claim 14.       Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.  . . . . . . . . . . . . . . . . . . . . . . . . 384

Claim 15.       Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights

were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

Claim 16.   Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  . . . . . . . . . . . . . . . . . . 389

Claim 17.   Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment. . . 390

Claim 18.   The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 394

A.   Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396

1.   Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government. . . . . . . . . . . . . . . 396

2.   Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under 438 U.S. 154 (1978). . . . . . . . . . . . . . . 397

3.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character. . . . . . . . . . . . . . . . . . . . . . . . . . . 398

4.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.  . . . . . . . . . . . . . . . 398

5.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

6.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

7.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

8.   Appellate Counsel Unreasonably Failed to Raise on Appeal the

Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

9. Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62. . . . . . . 402

10. Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

11. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

13. Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment. . . . . . . . . . . . . 404

B. A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise. . . . . . . . . 405

Claim 19. Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case. . . . . . . . . . . 406

IV. Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

APPENDIX A
    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

    I. State Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

    II. Federal District Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 411

APPENDIX B
    INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

    SEALED EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

VERIFICATION UNDER PENALTY OF PERJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429

## TABLE OF AUTHORITIES

## FEDERAL CASES

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368, 403

Atkins v. Virginia, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391, 392

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 286

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198, 199

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350, 354

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 74, 75, 347

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Brecht v. Abrahamson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 304

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143, 195

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332, 337

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332, 337

Draughton v. Dretke, 427 F.3d 286 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 172

Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995),
     *cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 155

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346, 347

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342, 400

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
     *cert. denied*, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287, 325

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143, 195

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 195, 338

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294, 289

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 201

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
    cert. denied, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 327

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 195

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
    cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Huddleston v. United States, 485 U.S. 681 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343, 380

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

Imbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Johnson v. Texas, 509 U.S. 350 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340, 341

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 141, 158

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . 49, 153, 185

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 287

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
    cert. denied, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337, 339, 342, 400

Lockhart v. McCree, 476 U.S. 162, 181 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 143, 155, 194, 199

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

Mayes v. Gibson, 210 F.3d 1284 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 312, 319

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir.  2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 312

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

Mullaney v. Wilbur, 421 U.S. 421 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 354

Murchu v. United States, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289, 310

Northrop v. Trippett, 265 F.3d 372 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 346, 350, 383

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334, 336

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340, 379, 381, 382

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368, 370, 388

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Roper v. Simmons, 543 U.S. 304 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391, 392

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 325

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998),
    cert. denied, 525 U.S. 1093 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339, 342, 400

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206, 266

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 195

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Steinkuhler v. Meschner, 176 F.3d 441 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 134, 166

Stewart v. Wolfenbarger, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 73, 171

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285, 325

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Taylor v. Kentucky, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
        cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

United States ex rel. Madej v. Schomig, 223 F. Supp. 2d 968 (N.D. Ill. 2002) . . . . . . . . . . . 205

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287, 325

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 267

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . 198, 340, 405, 418

United States v. Biswell, 700 F.2d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 196

United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998), . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 352

United States v. Cherry, 433 F.3d 698 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

United States v. Cook, 45 F.3d 388 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395, 396

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . 142, 358

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Fuller, 938 F. Supp. 731 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

United States v. Hogue, 827 F.2d 660 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 137

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 358

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 196

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
    *cert. denied,* 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 283

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 354

United States v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 136

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 286, 287

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Rich, 580 F.2d 929 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978) . . . . . . . . . . 327

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 381

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 352

United States v. Serawop, 410 F.3d 656. 660-70 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 72

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 71, 353

United States v. Temple, 862 F.2d 821 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 142

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
       (D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

United States v. Toles, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 405

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Viereck v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Washington v. Smith, 219 F.3d 620 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 45

Woods v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 371

**STATE CASES**

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 158

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . . 135

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 358

**DOCKETED CASES**

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 92

State of Oklahoma v. Richard Loy Gray, Jr., Cherokee County Case No. CF-2007-28 . . . . . . 316

<u>United States v. Kenneth Eugene Barrett</u>, Case No. 6:04-CR-00115-JHP-SPS . . . . . . . . . . . . . . 2

<u>United States v. McAdams, et al.</u>, No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

**FEDERAL STATUTES**

<u>21 U.S.C. § 848(e)(1)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

<u>21 U.S.C. § 848(e)(1)(B)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

<u>21 U.S.C. §§ 848(q)(9)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>28 U.S.C. § 2255</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 395, 408, 430

<u>18 U.S.C. § 3005</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

<u>18 U.S.C. §3006A</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 44, 267

<u>18 U.S.C. § 3432</u> (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

<u>18 U.S.C. § 3592</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328, 329

<u>18 U.S.C. § 3592(c)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 388

<u>18 U.S.C. § 3593(e)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 369

<u>18 U.S.C. § 3594</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

<u>18 U.S.C. § 3599(f)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

<u>18 U.S.C. § 4241</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

<u>28 U.S.C. §§ 455(a)</u>,þ(b)(1þ, (b)(3), (b)(5)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

<u>18 U.S.C. § 924(c)(1)(A)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

<u>18 U.S.C. § 924(c)(1)(A)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

<u>Fed.R.Civ.P. 26(g)(1)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

<u>Fed.R.Crim.P. 16</u> ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

<u>Fed. R. Crim. P. 33</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

<u>Fed.R.Crim.P. 35</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198, 417

Fed.R.Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 142

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Fed.R.Evid. 608(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 87

Fed. R. Evid. 608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 88, 93, 94

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 185, 276

Fed.R.Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

## MISCELLANEOUS

ABA Standards for Criminal Justice, Standard 4-4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases
& Commentary to Guidelines, 31 Hofstra L. Rev. 913 (2003) . . . . . . . . . . . . . . . . . . . . . .  passim

ABA, *Special Feature: Recommendation and Report on the Death Penalty
and Persons with Mental Disabilities*, 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

American Psychiatric Association, *Moratorium on Capital Punishment in
the United States* (approved October 2000), APA Document Reference
No. 200006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

Guide to Judiciary Policies and Procedures, Vol, VII, "Appointment of
Counsel in Criminal Cases," Chapter, V.I., §§ 6.02 (F)(3)(c)(i) . . . . . . . . . . . . . . . . . . . . . . . . 25

David H. Barlow, *Clinical Handbook of Psychological Disorders, Third
Edition: A Step-by-Step Treatment Manual*, 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation:
the Necessity of Knowing and Heeding what Capital Jurors Tell us
about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008) . . . . . . . . . . . . . . . . . . . . . . 356

Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 . . . . . . . . . . . . . . . . . . 184

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What
Do Jurors Think?* 98 Colum. L. Rev. 1538, 1563 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 . . . . . . . . . . . 188

J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,        )
                               )
                    *Petitioner,*   )
                               )
v.                             )        **Case No. 6:09-cv-00105-JHP**
                               )
UNITED STATES OF AMERICA,      )
                               )
                    *Respondent.*   )

---

**AMENDED MOTION FOR COLLATERAL RELIEF,
TO VACATE, SET ASIDE, OR CORRECT SENTENCE,
AND FOR A NEW TRIAL**

---

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his

undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule

2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court

grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct

the sentence.  Through counsel, Mr. Barrett states the following grounds for granting this

Petition:

I.      **Preliminary Matters.**

        A.      **Statement Regarding Form**.

                In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this

Petition sets forth only the facts and legal authority necessary to "specify all the grounds for relief

available to the moving party." In conformity with the Rule this Petition does not contain all the legal arguments Mr. Barrett could present to support his entitlement to relief, including those arguments, points, and authorities that would respond to any opposition to this Petition. Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Petition.

References to prior proceedings are as follows:

• References to the consecutively paginated trial transcripts: R. *xxx*;

• References to hearing transcripts not consecutively paginated with the trial transcripts: Tr. [date] Hr'g at *xxx*;

• References to documents filed with the court such as pleadings, motions, and orders cite the docket number for *United States v. Kenneth Eugene Barrett*, Case No. 6:04-CR-00115-JHP-SPS: Doc. *xxx*

• References to the two state trials: 1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

• References to the exhibits to this Amended Petitioner: Exhibit *xx* (an index to the exhibits appears in Appendix B);

• All other references are self-explanatory or based on the Blue Book.

**B.      Grounds for Disqualifying Trial Judge**.

In Claim 1 and elsewhere in this Petition, Mr. Barrett relies upon evidence of the trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte* communications with prosecutors. The evidence that must be considered in evaluating this Petition disqualifies the trial judge from making any rulings affecting the process for adjudicating this Petition or the merits of any claims stated herein. 28 U.S.C. §§ 455(a), (b)(1), (b)(3),

(b)(5)(iv); *Murchu v. United States*, <u>926 F.2d 50, 57</u>, <u>59</u> (1st Cir. 1991) (specific allegations about off-the-record actions of trial judge required that § 2255 motion be heard by different judge). Therefore, this Petition requests that the trial judge recuse himself without making any further rulings in the case.

Mr. Barrett separately has moved to recuse or disqualify the trial judge, and that motion has been denied. It would be a violation of due process for the trial judge to make any rulings regarding this Petition. *Aetna Life Insurance Company v. Lavoie*, <u>475 U.S. 813</u> (1986).

### C.    **Introduction**.

Kenneth Eugene Barrett would not and did not intentionally kill Trooper David "Rocky" Eales. Mr. Barrett defended himself from an unannounced attack on his home and his teenage son by individuals who failed to announce that they were law enforcement officers. In recognition of these facts – although without the benefit of the evidence presented through this Petition – a jury of Oklahoma citizens acquitted Mr. Barrett of the murder for which he now sits on death row. This Petition shows the Government succeeded in overturning that result through an unfair trial in this Court, a trial characterized by judicial misconduct, ineffective defense representation (a product both of a failure to perform according to prevailing professional norms and judicial interference), the withholding of truthful information that would have impeached the Government's key witnesses, and other forms of misconduct by prosecutors and law enforcement officers. Mr. Barrett is a mentally ill, traumatized man under sentence of death for a death that, though tragic, was not murder.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the

prosecution with much needed and inadmissible "evidence" of intent. A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he threatened to kill any law enforcement officer who stepped on his property. Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Trooper Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach. To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford. This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose has been reprimanded by the Oklahoma Supreme Court as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, who, at the time of her testimony was serving a fourteen-year federal sentence in a drug manufacturing and firearms

Amended § 2255 Pet.     4     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

1362

case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after

Mr. Barrett was convicted and sentenced to death.  Brandie Zane Price, a convicted felon who

was depicted as having been delivered from her drug addiction at the time she testified against

Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging

drug conspiracy.  In the indictment filed against her and others, Price was charged with having

started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was

formally sentenced.  Randy Turman, a methamphetamine manufacturer who had a pending six-

count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified

on cross-examination that his case had "done been taken care of," when in fact it had not.  The

Government surely knew Turman was lying, but sat silently by and allowed him to perjure

himself, in derogation of its duty to correct false testimony.  In 2007, after being inactive for

years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient

time and a competent defense investigation, it would take but a few prods for the whole

ramshackle thing to come crashing down.  In order to prevent or forestall any effective

investigation by the defense, the Government contrived to keep the identity of these witnesses

secret for as long as possible.  As the general jury qualification process in Mr. Barrett's trial

began, the Government filed a spurious sealed motion to delay identifying the names and

addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on

the motion.  As the court quickly realized, the Government had zero evidence for its request;

none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel,

their Government adversaries were allowed to speak for them on the question of whether the trial

had already begun, thus precluding the informants from testifying under the applicable notice

Amended § 2255 Pet.                            5                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses. The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation. In passing, AUSA Littlefield revealed to the Court, but not defense counsel, that he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors. What had occurred was misrepresented to defense counsel. There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with. Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke. Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case. Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial. Mr. Barrett had to contend not only with

Amended § 2255 Pet.                              6                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation. Tulsa attorney John Echols successfully represented Mr. Barrett in state court. He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges. The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys. The court's furtherance of these interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end. Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial. Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants. Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase. Because counsel were underfunded and failed to properly prepare, the

Amended § 2255 Pet.                                      7                          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in this motion, Kenneth Barrett has struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life.  This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity.  Kenneth Barrett's upbringing was anything but normal.  As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents.  The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

II.     **Statement of the Case**.

A.     **Events Leading Up to the Raid on the Barrett Home.**

1.     *Mr. Barrett's "Failure to Appear" and the Resulting*
       *Bench Warrant*.

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent.  In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case.  There is no record of a ruling on Mr. Rogers' motion.  The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the Court ever did so. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

The court docket indicates that on January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999.  This was the only notation in the criminal docket regarding the trial for which Mr. Barrett allegedly failed to appear.  The only other information about this alleged trial date was elicited at the hearing on Mr. Barrett's Motion to Suppress Evidence on January 26, 2005, prior to his federal trial. At that hearing, Sequoyah County Court Clerk Bernell Edwards testified that Mr. Barrett's state trial for the drug case had been scheduled for January 25, 1999.  However, juror records examined by Sequoyah County Court Clerk Vickie Beaty show that no citizens were summoned for jury duty on January 25, 1999 or, indeed, for the entire month of January 1999.  Accordingly, the bench warrant issued for Mr. Barrett's arrest arose from his failure to appear for a trial for which no jurors had ever been summoned.

There was never any evidence that Mr. Barrett was aware of the bench warrant. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.      *The Search Warrant.*

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At the federal trial in 2005, law enforcement for the first time identified the confidential informant as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Judge signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force and would then perform the actual search of Barrett's residence. The Tact Team and Task Force were accompanied by an entourage of local dignitaries. The Tact Team allegedly decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos that were unmarked and had extra antennae removed and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

> **3.      September 24, 1999**.

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school. After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer. At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence. What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence. The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private drive to the east of Barrett's residence, but continued with the execution of the no-knock warrant. Hamilton then turned his vehicle westward towards

Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett grabbed his Colt Sporter rifle, to which were attached two full and one partially full magazines of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.  Hamilton then moved towards the rear of his vehicle.  As he did so, he was struck by a bullet in the back of the left

Amended § 2255 Pet.                 12            *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

shoulder.  When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body.  Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him.  Mr. Barrett had been shot at least four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B.      Three Trials.

#### 1.       State Trials.

Mr. Barrett was tried in Oklahoma state court, twice, as set out more fully in the Procedural History (Appendix A hereto).  In the first state trial, the jury was deadlocked and could not reach a verdict. The second state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter.  The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

### 2.     Federal Trial.

Mr. Barrett's federal trial was markedly different from his state trials.  In the first phase the most notable difference was the testimony of seven informants, who did not testify in either of the state trials.  The identity of these snitches was not made known to the defense until after the beginning of jury selection.  These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.     Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.     Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.     Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.     Charles "Monk" Sanders testified that he was present when a female friend of Mr. Barrett's received a telephone call from Mr. Barrett while he was in jail.  According to Sanders's second-stage testimony, he overheard Mr. Barrett,

whose voice he recognized, tell the female friend they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.      Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.      Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.      Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered.  Mrs. Eales also read into the record statements her children had written about the loss of their father.

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.      Maudeen Vann, First Deputy Court Clerk, Sequoyah County, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.      Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.      Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.      Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame.

5.      Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.      Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time.  This was a very friendly exchange that took place three to six months before the raid.

7.      Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.      Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.      Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case.  Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.     Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11.     Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr. Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was like a son to her.

## III.   Claims for Relief.

**Claim 1.**     **Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and 3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act, prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[1]

---

[1] As stated *supra* in § I.B, this claim and others presented in this Petition rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense. Claim 1 also relies upon evidence that Judge James H. Payne engaged in improper *ex parte* communications with the prosecutors prior to trial, that he mislead Mr. Barrett and his counsel regarding the substance of those communications, and that following the *ex parte* communications, Judge Payne deferred ruling on a Government motion and that he was aware that delay conferred benefits upon the Government. Mr. Barrett respectfully submits that the law

(continued...)

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *See Woods v. Georgia*, 450 U.S. 261 (1981).

---

[1](...continued)
requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion. 28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *In re Murchison*, 349 U.S. 133, 136 (1955); *Murchu v. United States*, 926 F.3d 50, 57, 59 (1st Cir. 1991). Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Since the initial Motion to Vacate was filed, Mr. Barrett has filed a separate motion to disqualify and require the recusal of Judge Payne. That motion was denied on September 11, 2009.

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth Amendment's prohibition on cruel and unusual punishment.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's rights under the Fifth and Fourteenth Amendments.

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide

Amended § 2255 Pet.                     20                  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

effective representation."  (CJA Guidelines, ¶ 6.01(B)(1)).  Courts are encouraged to appoint

counsel who "are well qualified, by virtue of their prior defense experience, training and

commitment, to serve as counsel in this highly specialized and demanding litigation."  (CJA

Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to

represent Mr. Barrett.  When the Federal Defender informed Judge Payne that the only attorney

in his office qualified to handle a capital case was already appointed to such a case, Judge Payne

indicated that he anticipated the assistant federal defender who normally worked in the Eastern

District would be responsible.  The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at

the same time.  (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the

court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense

experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense.

(Exhibit 54; Exhibit 67; Exhibit 34).  Judge Payne indicated he preferred to have the Federal

Defender appointed so the court would not have to authorize funds for Mr. Barrett's

representation.  (Exhibit 54; Exhibit 67).

During discussions with these attorneys, the trial judge expressed an interest in

considering factors that are not recognized by the Judicial Conference or national indigent

defense organizations as indicative of an attorney's qualifications to provide effective

representation.  Judge Payne expressed an interest in appointing less-qualified attorneys to

represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could

be formed for representation in capital cases.  (Exhibit 54; Exhibit 67; Exhibit 34).  To this end,

the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)). The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." (*Id.* at ¶ 6.02(F)). The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial. (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,[2] the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65). Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by

---

[2] Eric Freedman, AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES & COMMENTARY TO GUIDELINES, 31 Hofstra L. Rev. 913 (2005).

allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial."  (Exhibit 65 at 2.)  Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols  informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule.  (Exhibit 64 at 5.)  The court did not rule on the defense's budget proposal until March 18, 2005.  (Doc. 97.)  At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005.  (Scheduling Order filed 12/11/04 (Doc. 22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel, John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC").  (Exhibit 118; Exhibit 34.)[3]  As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases."  (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107.)  Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests.  (Exhibit 64.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with

---

[3]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance.  (Exhibit 29; Exhibit 118.)

Amended § 2255 Pet.                              24                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

necessary tools for a fair trial." (Order filed 3/18/05 at 2.) However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case. *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[] It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts. This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel. ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation"). The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services." The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds. Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense. (Doc. 51; Exhibit 64.) The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment. (Order filed 3/18/05 at 2 n.2.) The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." *Ibid.* This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed.*" (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added].)

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual

matters trial counsel deemed necessary through their exercise of independent professional judgment. If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators. (Order filed 5/5/05 at 3 n.1.) In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction. (*See* Order filed 3/18/05 at 2.) This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.) The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ." (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial. The

court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert. (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3.)  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3.)  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8.)  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484.)

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis for any denial or reduction related to the facts or circumstances of the case.  Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique. Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.)  Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services."  (*Id.*)  Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the

services of more than one mental health expert." *Id.* Trial counsel felt the court's restriction of funds was an impediment to preparing a mitigation investigation. (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Exhibit 54; Exhibit 67.) The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.) Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Claim 2, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in

February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant."  (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests.  On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets.  The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable.  Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work.  The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.)  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

1389

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel. Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not. (Exhibit 118; Exhibit 34.) Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers. These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. (Doc. 113.) Mr. Hilfiger had urged Mr. Echols not to file the motion. (Exhibit 118; Exhibit 34.) However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order. (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw: "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols." (Doc. 113 at ¶ 4.) In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work. (Order filed 5/5/05 at 5.) The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols." (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions. (Order filed 5/5/05 at 2-3.) The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories." (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).) The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform. (Docs. 50, 51.) Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005. (Tr. 10/3/05 Hr'g.) In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze

that and get me an amended budget just to -- I mean, just make your best guestimate." (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary. The court had limited Mr. Echols's rate of compensation to $125.00 per hour. On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour. (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned. On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense. (Doc. 135.) Mr. Barrett's counsel did not file a response to the motion. There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel. (Doc. 137.) The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ." (Order filed 5/24/05 (Doc. 137) at 2 n.2.) The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2. Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. (Doc. 138.) Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such

Amended § 2255 Pet.                                34                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case.  (Doc. 50 at 4; Exhibit 64 at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks.  (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule.  (Doc. 31.)  The court admonished counsel to give the case the "highest priority."  *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance.  (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court.  (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs.  (Doc. 51 at 4.)  On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings.  (Tr. 10/3/05 Hr'g at 5.)  Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation.  The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United

States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial. (*Ibid.*) If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts'

testimony inadmissible at trial.  When Mr. Echols left the case due to these restrictions, and Mr.

Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed.

Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of

diligence and inattention to the conduct of the case including obtaining resources, investigative,

and expert assistance.  Under these conditions, Mr. Barrett did not receive independent,

reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of

Judicial Conduct, by conducting *ex parte* communications with the prosecutors.  During an *ex*

*parte* hearing held September 13, 2005, the judge solicited the views of the United States

Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432,

(b) whether the defense should be entitled to a continuance based on delayed disclosure of

witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal

Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for

the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any

information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney

Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate

statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005

proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of

Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b). (Tr. 9/13/05 Hr'g at 25-27.) During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day. (Tr. 9/13/05 Hr'g at 4-5.) The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense. The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance. It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.) Then the prosecutors conferred off the record. (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.) During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and the defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me."  (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues." *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows." *Ibid*.  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The

combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[4]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing. On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. (R. 840.) The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this

---

[4] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal."  (R. 843.)

As shown in Claim 2, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses.  Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

It is a violation of due process for the Government to attempt to restrict defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present.  *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present.  (ABA Standard 3-3.1(c) (commentary)).  The trial court permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial.  Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial.  (Exhibit 29.)  Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation.  If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal.  If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed

differently on appeal.  If Judge Payne had revealed his views on the weakness of the

Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a

continuance and grounds for objecting to restrictions the Government placed on access to

witnesses.  Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had

revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been

disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the

court's private concerns while at the same time failing to accurately disclose those

communications to the defense violated Mr. Barrett's right to due process of law.  The disparate

conduct of the court between the prosecution and defense is evidence of bias.  In a capital case,

courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case.

Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct

appeal, appellate counsel were ineffective.  As stated *supra*, Judge Payne specifically selected

Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at

the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's

appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr.

Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed

the issues related to counsel that are raised in this Claim could not be adequately litigated on

appeal, because they required consideration of extra-record evidence.  (Exhibit 29.)  To the

extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's

Amended § 2255 Pet.                          43                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Exhibit 29.)  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.**  **Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  The acts and omissions described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

Amended § 2255 Pet.                     44                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

A.      **Unreasonable Acts and Omissions Affecting the First and
Second Stages of Trial**.

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel.  As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel.  Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.  *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense.  *See Wood v. Georgia,* 450 U.S. 261 (1981).  This conflict

adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance.

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1.      Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27 Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel were ineffective for failing to raise the *Franks* issue.

2.      Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.  This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3.      Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the effects of Mr. Barrett not taking prescribed medications during trial.  Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4.      By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel were not able to effectively investigate and challenge the testimony of these witnesses.  In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available.  Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5.      Trial counsel were professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6.       Trial counsel were professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

Amended § 2255 Pet.                            47                 *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

7.      Counsel were professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel were also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.      Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the Government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.      Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel were professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident.  This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was

completely unnecessary and unfounded.  Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10.     Trial counsel were professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999).  To the extent this issue was framed by the record, direct appeal counsel were ineffective for failing to raise it.

11.     Trial counsel were professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12.     Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionable reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred.  If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel were professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in the penalty phase of trial.

### Evidence of Constitutionally Deficient Representation.

**1.     Failure to professionally re-urge the motion to suppress under *Franks v. Delaware*, 438 U.S. 154 (1978).**

Trial counsel were professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of

Charles "Monk" Sanders. Counsel's failure in this regard undermines confidence in the jury's first stage verdicts. Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial. Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.) The C.I. did not testify at Mr. Barrett's two state trials. At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file. (Tr. 1/ 26/05 Hr'g. at 88-89). It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was revealed, for the first time, that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant states the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they [sic] were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

The CI went on to state that while in the above described residence they [sic] observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.  The CI stated that they [sic] had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions."  The CI further stated that while in the above-described residence they [sic] overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [*sic*] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

(Exhibit 194.)

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search.  Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the

truth.  Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant.  In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1.      That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2.      That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.      In September, 1999[5], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

---

[5]  Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999.  The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

4(a).     After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property. Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's. According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile. Sanders claimed to have been accompanied by his nephew. Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available. Mr. Barrett apparently had no methamphetamine. The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin. (R. 2618-22);

4(b).     Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's. He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999. To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to a no-knock warrant, Johnson misled the court. Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property. In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons. (R. 2623);

5.     Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there. On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny." Sanders testified that the alleged trip was for the purpose of buying drugs. At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination. Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or

attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett. Therefore, Sanders testified that based on his alleged July trips to Mr. Barrett's property he would have told Johnson *nothing* about Mr. Barrett engaging in drug activities. Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing. Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside. How he saw any alleged drug transaction is therefore a mystery. (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid. Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together. (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search. Of course, no "large quantity" of drugs was found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break." (R. 2630). The real purpose of the break was for Littlefield to talk to Sanders about his testimony. Sanders admitted Littlefield talked to him during the break. At first, he denied

anything was discussed except how much longer he would be on the stand.  In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[6]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be

---

[6] "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Exhibit 13.)

methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information.  Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving.  Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine.  On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen.  According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders.  The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a

portion of white powder for a quantity of money.  Sanders testified on cross-examination that this did not happen.  Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit.  (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing.  The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings.  (R. 2679.)  As pointed out by the Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc.  231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253).  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Instead, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr.*

*Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful." Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported." Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable." Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth." (Doc. 253 at 7).

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been sustained. Moreover, as shown below, the court's order is seriously flawed. Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.* These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money. *Northrop v. Trippett,* 265 F.3d 372, 382-85 (6th Cir. 2001)(counsel ineffective for failing to pursue meritorious motion to suppress; here, counsel was ineffective for failing to professionally and thoroughly re-urge a motion to suppress based on Sanders's trial testimony.)

The one or two areas of impeachment cited by the defense simply scratched the surface. Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been

entitled to an evidentiary hearing and suppression of the evidence.  Aside from what was stated in the re-urged motion to suppress, counsel could have argued the following:

1.      that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at his house;

2.      that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

3.       that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he "probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

4.      that Johnson knew Sanders had not informed him of methamphetamine activity as shown when Sanders testified that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs available, but there was no methamphetamine, and the three of them simply smoked marijuana;

5.      that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

6.      that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired his ability to recall and relate information accurately. Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions. Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, he repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what he supposedly observed.  This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate *the entirety of the warrant affidavit*.  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant. *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the renewed suppression motion would have been different.  At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.  *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226 (1992).

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-

Amended § 2255 Pet.                                61                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

The *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[7] The issue was not raised on direct appeal. Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it. The failure to raise this issue was professionally unreasonable and prejudicial. *See* Claim 19, *infra*.

> **2.     Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property. The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived. This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties. (Doc. 52.) This is the count of conviction for which Mr. Barrett received the death penalty. (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 were that Mr. Barrett intentionally killed the victim, knowing or

---

[7] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record. This is addressed in a separate claim for relief.

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement.  (Exhibit 44.)  In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate.  Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise

the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events.  Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[8]  Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance.  ABA Guidelines 10.7, 10.10.1, and 10.11.  Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods concluded that at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning.  Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

---

[8] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats. Thus, when the events unfolded at the time of the offense, Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him. (Exhibit 117.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation. This information included social and medical history documents, the opinions of experts consulted during prior proceedings, as well as witness accounts that documented Mr. Barrett's personal as well as family history of mental illness. The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis. (Appendix to Exhibit 89, curriculum vitae.) She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records. (Exhibit 89 at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction. This damage primarily involves the prefrontal and temporal cortices of the brain. Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively." The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions

as needed based on information he receives from the environment."  (Exhibit 89 at 24.)  Mr.

Barrett's disabilities are further exacerbated under "conditions of complexity and/or highly

stressful situations."  (Exhibit 89 at 24.)  Mr. Barrett is a "concrete thinker," whose executive

function, which controls the ability to think, organize, problem solve, and change actions based

on the information he receives, is severely compromised.  (Exhibit 89 at 11, 13.)  Because of the

significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual

information and is abnormally subject to feelings of fear and paranoia, with consequent

tendencies to impulsiveness and aggressive outbursts.  (Exhibit 89 at 13.)  Mr. Barrett's ability to

actively process and comprehend information is compromised.  This includes the ability actively

to process visual information, in the "here and now," or as it unfolds.  (Exhibit 89 at 14, 15, 19.)

In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is

going on around him, a dysfunction that is especially heightened, as noted, in stressful situations.

(Exhibit 89 at 14, 24.)  Mr. Barrett has moderate to significant impairments in his ability to

visually scan and accurately recognize information.  (Exhibit 89 at 20.)  The "fluency" with

which Mr. Barrett interprets visual information, and the manner in which he processes such

information, is also significantly impaired.  (Exhibit 89 at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's

neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test
> protocols and across the battery of tests. When administered across a broad variety
> of testing instruments, congruent results further confirm the accuracy and
> reliability of test results.  The successful manipulation of test data to exaggerate
> measures of neurological impairment in a manner that eluded detection by
> imbedded validity scales would have required Mr. Barrett to have specific
> knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods

concluded:

[¶]      Mr. Barrett meets diagnostic criteria in the DSM-IV-TR for Bipolar
Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic,
severe, 309.81.  He also has clinically measured diffuse brain damage, particularly
in the prefrontal, temporal, and limbic system cortices, with the most cognitively
significant impairment located in the orbitofrontal and dorsolateral regions of the
prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive
functioning and behavior that is severely compromised by overlapping symptoms
of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
impairments in higher cortical regions necessary for inhibition, reasoning and
judgment.

[¶]      Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be
categorized on Axis III. "Executive functioning" is a term addressed by many but
coalesced by Lezak to discriminate cognitive functions from the "how" or
"whether" of human behaviors (Lezak 1983).

***

[¶]      Ample anecdotal and congruent documentary evidence confirm that Mr.
Barrett's mental disorders and defects pre-existed the date of the commitment
offense and his trial.

(Exhibit 117 at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]      Mr. Barrett's functioning at the time of the offense was compromised by
multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]      He was suffering from both acute and chronic symptoms of his Post
Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these
disorders, both disorders of mood, were amplified by a disinhibited, disjunctured,
debilitated brain that limited Mr. Barrett's understanding of both the legal
proceedings and the fear, suspicion, racing thoughts, and poor adaptive function
from which he was suffering.

[¶]      Mr. Barrett's chronic PTSD became acutely activated by the event leading
to his arrest. As previously noted, Mr. Barrett had multiple individual stressors
which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's

property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real-world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened.  (See, e.g., Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.)  None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so.  In 1986,

Amended § 2255 Pet.                    70                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. *(See* Exhibit 147.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Exhibit 117.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[9]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), § 2. Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

_____

[9] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing *Lofton*'s holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a

reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter. *Jennings v. Woodford,* 290 F.3d 1006, 1009, 1015-19 (9th Cir. 2002)(counsel ineffective for failing to investigate and produce mental health evidence which would have aided defense that accused lacked the capacity to form the intent to commit first degree murder; defendant was a long-term methamphetamine addict, had previously attempted suicide and was committed to a mental hospital, otherwise had a history of self-injury, and had been diagnosed as a schizophrenic); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999)(counsel ineffective for failing to investigate and produce evidence of defendant's mental problems, including PTSD, which would have served to negate malice and support self-defense claim); *Williamson v. Ward,* 110 F.3d 1508, 1518-21 (10th Cir. 1997)(counsel ineffective for failing to investigate and present evidence of defendant's extensive mental health problems, which would have assisted a claim of incompetency to stand trial and aided in a first stage mental health defense); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call witnesses in support of defense theory (alibi)).

> **3.** **Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent.**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of

materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent, *see*, *e.g.*, *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966), "judges must depend to some extent on counsel to bring [competence] issues into focus." *Drope*, 420 U.S. at 176-77. Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation. *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997). Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. *Id.*; *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel

unreasonably failed to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."  *Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct testing and other evaluation methods necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, chronic major mental illnesses, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).  Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the

domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency. *See*, *e.g.*, *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant had been diagnosed with and treated for mental illness); *see also*, *Barnett v. Hargett*, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial. *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); *see also Williamson*, *supra,* 110 F.3d at 1519 (same).  "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *Williamson*, *supra*, 110 F.3d,  at 1519.  The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that he is in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning.  Mr. Barrett's previous psychiatric  diagnosis of Bipolar

Disorder, made by independent state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted, and left him unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Exhibit 117 at  81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma.  The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder.  *See Williamson v. Ward*, 110 F.3d, at 1519; Exhibit 117 at ¶ 80.  These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Exhibit 117 at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

Trial counsel's unreasonable omissions were exacerbated by the court's infliction of an electric shock belt on Mr. Barrett.  (*See* Claim 7, *infra*.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process."  *Williamson v. Ward*, 110 F.3d, at 1519.  Accordingly, Mr. Barrett should be granted a new trial.  *Ibid.*

> **4.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper *ex parte* hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses.  During this hearing, the Court criticized the Government for failing to raise the issue sooner.  The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger.  The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified.  The Court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing.  Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find

out what they were going to say.  (Tr. 9/13/05 Hr'g at 27; R. 840-43.)  There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind.  The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense.  The obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course,  was not taken.  As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand.  Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing.  Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[10]

A great deal of evidence was available to impeach the Government's key witnesses.  As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel

---

[10]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance.  Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  (Exhibit 29.)  Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

from discovering the evidence independently.  Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.   Travis Crawford.[11]

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin.  Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed.  Crawford claimed to have walked over to Mr. Barrett's property from his parents' house.  Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police.  Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant.  With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck."  Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions.  (R. 462-66.)  Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[12]  (R. 457.)

---

[11]  Mr. Barrett is in possession of newly discovered evidence showing that Travis Crawford's trial testimony was false.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (*See* Exhibit 45; Exhibit 92; Exhibit 31; *see also* Claim 5 §§ A & B.)

[12]  This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator.  Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett.  This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support.  He was also arrested on hot check charges many years before.  He admitted to having used a lot of drugs.  His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict.  (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony.  He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been fired from his job if he absented himself for the interview.  He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him.  (R. 468-69.)  Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him.  (R 469.)  Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be.  (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government.  He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[13]  (R. 470.)  Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales.  Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which

---

[13]  Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation.  (See Claim 5 *infra.*)

he testified.  He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett.  "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23 regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it

"seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[14]  Had counsel asked about this, and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.   (Exhibit 45, Exhibit 92.)

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted.  Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22, and stayed until around 9:00 p.m. on September 23.  Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him.  Mr. Lunsford told investigators

---

[14]  *See* Mr. Barrett's *Brady* claim.

currently working for Mr. Barrett that on the late afternoon of September 23, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Mr. Lunsford would have testified that Travis Crawford was regarded as a "real flaky person" and that he was known to have been a police informant in the past. (Exhibit 90.

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Exhibit 90.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Exhibit 90.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community.  (Fed.R.Evid. 608(a).)  In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed.  Mr. Crawford was not only a heavy drug user, but also dealt drugs.  Mr. Crawford would sell bad dope to people and "rip them off."  Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble.  Travis Crawford was known in the community for his dishonesty and untrustworthiness.  (Exhibit 90.)  Independent of Mr. Lunsford's testimony, his knowledge of Travis Crawford's conduct and record would have provided Mr. Barrett's counsel with additional grounds for impeaching Crawford on cross-examination.  Fed. R. Evid. 608(b) .

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Exhibit 90.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by.  Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Exhibit 77.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory." After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by. According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999. (Exhibit 77.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Exhibit 77.) (*See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Exhibit 77.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he

believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Exhibit 96.)

Like Rick Lunsford, Brandy Hill and Toby Barrett, Robert "Bubba" Thompson was present at Mr. Barrett's on the afternoon of September 23, 1999. Although he cannot recall specifically whether he saw Travis Crawford there that afternoon, he is sure that while he was there, Mr. Barrett never made any statements about expecting the police to raid his house, wanting to kill law enforcement officers, or desiring to go out "in a blaze of glory." (Exhibit 37.) In fact, Mr. Thompson never heard Mr. Barrett make such statements at any time, even though he was a frequent visitor to Mr. Barrett's property in 1999 because he was close friends with Toby Barrett. (Exhibit 37.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness. Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford. (Exhibit 78.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial. It is her personal belief that Crawford is not an honest or trustworthy person. Nor does Mr. Crawford have a reputation for honesty in the community at large. Fed.R.Evid. 608(a). (Exhibit 78.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs.

Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage.  Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property.  Crawford simply pocketed the money and never built the well house.  Crawford never repaid the money he took for a job he never did.  The materials that had been purchased for construction of the well house were later stolen.  Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials.  Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her.  Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident.  (Exhibit 78.)

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts.  (Fed.R.Evid. 608(b).)  Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

b.        **Cindy Crawford.**[15]

Cindy Crawford testified for the Government in both stages of trial.  Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them.  (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs.  Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble.  He knew there was a chance the police could come to his house; that was why he had guns for protection.  According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory."  (R. 3063-69.)

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18.  She used the drug for nine years, and would either snort it or shoot it.  She stated or implied on direct examination that she was currently drug and alcohol free.  (R. 3161.)  While on a "meth run," the longest she had stayed up was five days.  While using methamphetamine, she would often stay up for three to four days at a time.  (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time.  To her, time was just a blur that played tricks on her mind.  (R. 3073.)  She really did not know

_____

[15] Petitioner is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony.  Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement.  *See* Mr. Barrett's *Brady/*newly discovered evidence claim (Claim 5).

when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems. In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence that she had an impaired mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and shown her to be unstable and amenable to pressure

or influence from law enforcement.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  (Exhibit 144.)

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Exhibit 204; Exhibit 170.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Trial counsel neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett.  It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation.

Amended § 2255 Pet.                              91                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(Exhibit 204; Exhibit 170.)  The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence.  The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandie Sell, the grandparents of one of Crawford's children, to District Judge John Garrett.  The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital.  The letter also states that drugs had become "all consuming" for Cindy Crawford.  This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense.  (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390.  The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed.  (Exhibit 176.)  Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not

have been introduced, Crawford certainly could have been cross-examined about them.

(Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett.  In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford.  Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that Cindy Crawford was dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor.  Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury.  Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to escape prosecution and punishment for her own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders.  Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty.  He is Cindy Crawford's father in law, and has known her for years. (Exhibit 92.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that Cindy Crawford is thoroughly dishonest and untrustworthy, and her reputation in the community for honesty is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. (Exhibit 88.)

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into during cross-examination of Crawford. Fed.R.Evid. 608(b). Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case. 18 U.S.C. § 3593(c).

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's lack of honesty. As noted in the discussion of

Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Exhibit 77.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Exhibit 95.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a twelve year old child.  In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful."  Ms. Crawford's reputation in the community for honesty is, to put it mildly,  poor.  No one Ms. Joseph knows would trust or believe anything Cindy Crawford said.  Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Exhibit 78.)

Still another witness who could have testified to Cindy Crawford's bedrock reputation for dishonesty is Gwendolyn Crawford, Travis Crawford's sister. Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years. Gwen Crawford's experience of Cindy informed her opinion that Cindy Crawford is dishonest, and is well known in the community for her dishonesty. Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel. Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself. (Exhibit 83.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to her leg and threatened to kill her, allegedly because she would not have sex with him, could have been further impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett. Richie Barrett was interviewed by a defense investigator in connection with the current action. Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred. (Exhibit 104.)

Cindy Crawford's claim that Mr. Barrett had threatened violence to law enforcement officers if they came on his property could have been impeached had defense counsel investigated and produced witnesses Rick Lunsford, Toby Barrett, Brandy Hill, and Robert "Bubba" Thompson, all of whom state that Mr. Barrett never made such statements around them and would not have done so. (Exhibit 90; Exhibit 96; Exhibit 77; Exhibit 37.) This same point could have been made through Government witness Randy Weaver, had counsel simply asked the obvious. (Exhibit 38.)

c.       **Charles "Monk" Sanders.**

1.       **Failure to adequately investigate and
prepare to cross-examine Sanders about
his previous convictions, charges against
him that were dismissed, and the
favorable treatment he often secured to
escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the

Clint Johnson search warrant, was a professional informant.  He gave wildly conflicting trial

testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He

also testified that at some undetermined time, Mr. Barrett allegedly made statements that he

would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the

penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett,

while incarcerated, supposedly contacted a third party about doing harm to the informant in his

case.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA

Littlefield, that the most the Government was going to do for him in exchange for his testimony

was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's

cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel unreasonably failed to investigate and challenge Sanders from a

myriad of angles the informant's history made readily available.  Trial counsel not only failed to

capitalize on the entirety of Sanders's cross-examination testimony when he re-urged the motion

to suppress, but counsel failed to impeach him effectively, both on cross-examination and with

independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his

prior convictions, counsel failed to conduct a search of court records, not only to demonstrate

that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies including that Clint Johnson only helped with "some" of his cases, that Sanders had not gotten out of "a lot" of trouble, and his denial that he could commit crimes without fear of paying the full consequences as long as he worked as an informant. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors he acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra.*

Counsel superficially asked[16] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in

---

[16] R. 2524-36.

Sequoyah County, for which he received three years incarceration and seven years suspended; (4) a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration and twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to serve five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

1.     Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (Exhibit 168.)

2.      In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not.  (21 O.S. 1991, section 51.)  Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently.  (Exhibit 157.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also by failing to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest.  No disposition is shown for the revocation action.  The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed.  As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution.  If restitution were not paid, Sanders would receive one year in the county jail.  As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather "evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

3.      In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (Exhibit 158.)

4.      In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90-144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

5.      In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting defendant with even one prior felony conviction from receiving a deferred sentence).[17]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a

---

[17]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law. (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

6. In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house. The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, Exhibit 168; and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life. An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998. Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by the District Attorney's office. The sentences were also ordered to run concurrently with a conviction Sanders obtained in Creek County. Later, CF-98-128 was dismissed with costs, as is discussed below. (Exhibit 159.)

It was unreasonable for Mr. Barrett's trial counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

7. In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior

Amended § 2255 Pet.                                          103                              *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed.  (22 O.S. 1991, § 51; 22 O.S. 1991, § 991c.)[18]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the Department of Corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in Sequoyah County Case No. CF-98-363; (d) *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which

---

[18]  Again, as with the statute governing deferred sentences, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Amended § 2255 Pet.                    104                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (Exhibit 160.)

8.      In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314. Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections. Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed. A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered. A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, was also filed in connection with this case. On April 17, 2004, the court entered a second order revoking Sander's suspended sentence. As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (Exhibit 161.)

9. In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly

by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same three prior Sequoyah County felonies that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail. Yet again, Sanders faced twenty years to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1. In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright. Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9. As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case. As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years. He would revert to full probationary status upon completion of a Department of Corrections drug program. The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (Exhibit 162.)

10.     In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged with a misdemeanor for possession of drug paraphernalia. The state alleged in page two of the information that Sanders committed the felony of larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-988-345, CF-98-363, and CF-99-562). (Exhibit 163; Exhibit 160; Exhibit 161; Exhibit 162, Exhibit 168.) With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (Exhibit 163.)

11.	In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case, filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently

with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly impeaching.  The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

12.    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.   The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed.  The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124.  (Exhibit 165.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

13.     In Cherokee County Case No. CF-98-111, Sanders was charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively.  Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear.  A bench warrant was issued on May 15, 1998.  Sanders had a second failure to appear on March 24, 2000.  On May 3, 2001, he was ordered released to a bondsman.  On July 29, 2009, in keeping with the unbelievable sweetheart deals Sanders has received throughout his appalling and protracted criminal career, the felony charges in this case were dismissed on payment of costs of $229.00, with payment to be made beginning September 1, 2009.   (Exhibit 183; Exhibit 57.)

Counsel were professionally unreasonable for failing to cross-examine Sanders about this case, which was pending at the time of Mr.  Barrett's trial.  Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

14.     In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally

unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions. (Exhibit 183.)

15. In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument. This case was dismissed years later, on September 18, 2001. Costs were assessed against the state. Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time. (Exhibit 183.)

16. In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not. Sanders received a one year suspended sentence, fines and costs. Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004. A bench warrant was issued for his arrest on April 12, 2004. An application to revoke his suspended sentence was filed on April 14, 2004. Another bench warrant for Sanders's arrest was issued on May 20, 2004. On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed. Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless. (Exhibit 185.)

17. In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia. On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances. During Mr.

Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty

plea, and the case was set for the jury sounding docket on October 13, 2005.  On that date, again

during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was

passed to November 17, 2005.  On November 17, the last day of Mr. Barrett's trial, the case was

passed to February 2, 2006, because Sanders was "in federal custody."  On December 9, 2005,

Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year

in the county jail on each count, with the jail time suspended.  (Exhibit 186.)

Mr. Barrett's trial counsel unreasonably failed to cross-examine Sanders over the

fact that this case kept getting passed until Sanders performed for the Government at Mr.

Barrett's trial, the obvious implication being that any deals he would receive in that case were

contingent solely on how much he pleased the Government.

18.     In Sequoyah County Case No. CM-00-389, Sanders was charged with

attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding

arrest.  On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted

eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a

one year suspended sentence and a fine on count 3 (eluding arrest).  On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the

court he would fulfill at the time he entered his plea.  Counsel was professionally unreasonable

for failing to cross-examine Sanders on this act of dishonesty.  (Exhibit 187.)

19.     In Sequoyah County Case No. CM-03-365, Sanders was arrested, among

other charges, for possession of marijuana.  He also attempted to resist arrest.  Counsel was

professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior

drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (Exhibit 166.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time.  Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury.  Impeachment

of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County

law enforcement officials, not to mention the Government then relying upon him to seek a death

sentence. These omissions alone, or in conjunction with counsel's other failures to investigate

the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial

counsel had presented the available evidence, the jury would have had an entirely different and

more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on

the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar,

drug addict, and opportunistic snitch.

> **2. Counsel unreasonably failed to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to

investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

investigation into readily available evidence and witnesses that would have impeached Sanders's

credibility and shown him to be completely unworthy of belief about anything and everything.

Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination

alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited

Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to

have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was

at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning

police raid on Mr. Barrett's property. Littlefield told the jury Sanders was present around 5:00

Amended § 2255 Pet.                                   115                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

p.m. to 6:00 p.m. on September 23, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23. Mr. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Mr. Barrett's trial counsel did not contact Mr. Lunsford. Had he been contacted, he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23rd. (Exhibit 90.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Exhibit 95.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Exhibit 77.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[19] He gave conflicting testimony as

---

[19] Her true name is Janesse Thomas.

to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's, she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Exhibit 13.)

Staff Sergeant Robert "Bubba" Thompson, is an eyewitness whom trial counsel could have called to impeach Sanders's and the Government's claim that Sanders was at Mr. Barrett's on the afternoon of September 23, 1999.  Trial counsel never contacted Mr. Thompson, although he was readily available and would have testified had he been asked to do so.  In 1999, Mr. Thompson was a good friend of Toby Barrett's, and often visited the Barrett property.  He was at Mr. Barrett's on the afternoon of September 23, hanging out with Toby Barrett on the front porch.  There were two or three other people visiting with Kenneth Barrett at the time Mr. Thompson was there.  Mr. Thompson is sure that Charles "Monk" Sanders was not at Mr.

Barrett's on the afternoon of September 23.  In fact, Mr. Thompson never saw Sanders at Mr.

Barrett's, even though Thompson was a frequent visitor.  Contrary to the claims of Sanders and

some of the other informant witnesses, Mr. Thompson never heard Mr. Barrett state, on

September 23, 1999, or at any other time, that he wanted to kill police, that he would kill any law

enforcement officer who came on his property, or that he wanted to go out "in a blaze of glory."

(Exhibit 37.)

Counsel unreasonably failed to interview and present at trial some of the

witnesses discussed immediately above, and others who could have testified that Sanders is a

pathological liar whose word should not have been relied upon by Clint Johnson or the jury.

These witnesses were known in the community, had experience with Sanders, had formed the

opinion that Sanders was dishonest and completely untrustworthy, and knew that Sanders had a

horrendous reputation in the community for truth and veracity.  These witnesses also could have

armed counsel with information to cross-examine Sanders, in the first stage of trial, about various

bad acts and acts of dishonesty.  Since Sanders also appeared as a penalty phase witness for the

Government, and because the rules of evidence are relaxed in the second stage of a capital trial,

these witnesses could have given specific testimony on specific bad acts of Sanders and actions

which reflected negatively on his credibility.  The impeachment of Sanders, alone or in

conjunction with doubts about the conduct of the Tact Team, would have provided jurors with

reason to vote for a sentence less than death.

Rick Lunsford could have testified that he knows Sanders, and had done drugs

with him in the past.  Sanders was a heavy drug user, who also dealt drugs.  In Mr. Lunsford's

opinion, Sanders is a dishonest person.  Mr. Lunsford would not believe anything Sanders said.

Sanders was even dishonest in his drug dealings.  Sanders often sold bad dope to people and

ripped them off.  As reflected in court documents, he never seemed to get in trouble for his drug dealings.  Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis.  Mr. Lunsford could have testified to his personal opinion that Sanders is wholly dishonest, and his knowledge that Sanders has a richly deserved reputation for dishonesty in the community.  Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened harm to the police, and never said he would go out in a "blaze of glory" or anything like that.  (Exhibit 90.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified to her well informed opinion that Sanders is dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself.  Sanders's reputation for honesty in the community is horrible.  Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him.  On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help.  Thomas left Sanders, and was picked up by Mr. Barrett.  Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas.  Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother.  Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders.  (Exhibit 13.)  Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill, another person with experience and knowledge of Sanders, could have testified to his opinion, and the community's judgment, that Charles Sanders is a liar who was accorded no credibility whatever, and was known to trade false allegations about others for favors from law enforcement.  When Mr. Hill heard that the Government sponsored Sanders as a

witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr. Barrett actions that routinely occurred without any connection to Mr. Barrett. Mr. Hill would have informed the jury that when Sanders is in jail, he is routinely beaten up by other inmates because he falsely informs on others. (Exhibit 95.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense. She last had contact with Sanders in 2004, before Mr. Barrett's trial. In her personal opinion, Sanders is untrustworthy. Sanders is dishonest when sober, but when he is on drugs, he is "100 times more dishonest." Ms. Johnson could never believe anything Sanders said on any subject. (Exhibit 94.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders either in the first or second stage of trial. This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her. She told him she could talk to him briefly, but had to get back to school. She left with Sanders in his car. Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days. She was beaten on a daily basis by Sanders, and was even stabbed. During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed. Instead, Sanders

simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of being held by Sanders, he turned himself in to the police on an outstanding charge.  At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days.  The police finally rescued Ms. Johnson.  Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up.  A police report was made by Ms. Davis about what Sanders did to her.  (Exhibit 94.)[20]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders.  Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was.  Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out.  (Exhibit 94.)

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders.  Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs.  The police were informed about this by Ms. Johnson.  Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs.  Sanders was so pathetically dishonest he once stole  Ms. Johnson's children's toys in order to pawn them for drug money.  (Exhibit 94.)

One of Mr. Sanders's own relatives could have testified, had he been contacted by the defense, that "Monk" is untrustworthy and his claims are considered uniformly unbelievable.

---

[20]  Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.  According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a pick-up truck."  Mr. Poindexter would have confirmed that Sanders has been in trouble his whole life.  Mr. Poindexter himself would not believe his nephew about anything.  Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law.  Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for.  Mr. Poindexter would have testified that Sanders has a low reputation in the community for truthfulness.  (Exhibit 76.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks.*  This evidence would demonstrate that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[21]

### d.     Randy Weaver.

Randall Weaver testified in the first stage of Mr. Barrett's trial.  He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the Spring and Summer of that year.  Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 looking at cars.  On that occasion, Weaver and Mr. Barrett used methamphetamine together.  Weaver went to Mr. Barrett because he was a good mechanic.  Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property.  Weaver testified he bought

---

[21] *See also* Claim 5 (Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson).

$20.00 of methamphetamine from Mr. Barrett.  Weaver claimed Mr. Barrett told him that he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued.  (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's federal case by Littlefield, who came to his tattoo shop in Arkansas.  Weaver had previously done time on an Arkansas cocaine charge.  When Littlefield came to see him at the tattoo shop, he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it was against federal law for Weaver to possess ammunition because of his previous conviction.  Weaver told Littlefield he never sold ammunition to Mr. Barrett.  Littlefield's statement to Mr. Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong.  (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night.  If a gate is closed, people should not go onto somebody else's property.  It makes no sense to do such a thing.  (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police.  Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone.  (Exhibit 24; Exhibit 38.)

e.      **Brandie Zane Price.**

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[22] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would have testified that it would have been impossible for this low-slung vehicle, no matter how

---

[22]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with Brandie Price at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September 1999.  (R. 4117-23, 4182-83.)

slowly it was going, to navigate the ditch successfully. The undercarriage would have been severely damaged in the attempt. (Exhibit 95; Exhibit 77.)

Counsel also failed to call any witnesses who could testify to their well-informed opinions regarding Price's honesty, or her reputation for honesty in the community. Sean Hill was an available witness never contacted by the defense. If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs. (Exhibit 95. *See also* Claim 5, *infra*.) Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

### f.      Karen Real.

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense. (R. 3076-77.) At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge. (*See* Claim 5, *infra*.) Real had been to Mr. Barrett's on several occasions. She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were. (R. 3085-86.) Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house. (R. 3087-88, 3099, 3091, 3102-03.) According to Real, Mr. Barrett stated he would shoot the police if they came on his property. (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Exhibit 95.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

As with a number of the informant witnesses, trial counsel failed to conduct a search of available state court files to impeach Karen Real. A search of the Sequoyah and Cherokee County Court files would have shown that she had several serious state drug cases that were ultimately dismissed, some shortly before Mr. Barrett's trial. These dismissed charges would have shown Real's bias and motive in testifying against Mr. Barrett. Bias and motive are never "collateral matters" from which a witness can be shielded from cross-examination. Moreover, it is of no significance if some or all of these state charges were dismissed in lieu of Real's federal prosecution. Under the dual sovereign doctrine, Real could have, but for the dismissal of these charges, faced serious prison time in the Oklahoma Department of Corrections. After all, Mr. Barrett was convicted in both state and federal court for a single alleged criminal transaction. There was nothing to guarantee that the state charges against Real

would not be revived if she failed to please the federal prosecutors with her testimony against Mr. Barrett.

In Sequoyah County Case No. CF-97-445A, Real was charged with attempted manufacture of methamphetamine, possession of CDS with intent to distribute, possession of marijuana, two counts of possession of CDS, and two counts of possession of drug paraphernalia. These charges were filed on December 22, 1997. The case was passed, or little action was taken on it, until May 18, 2004, when a motion to dismiss was filed. The motion to dismiss was granted by an order entered on May 24, 2004. (Exhibit 52.)

In Sequoyah County Case No. CF-98-264A, Real was charged with manufacturing methamphetamine, trafficking in methamphetamine, unlawful use of a police radio, possession of CDS, and possession of drug paraphernalia. The charges were filed on July 29, 1998. A bench warrant for failure to appear was issued on June 7, 1999, and was recalled on June 9 or 10, 1999. Nothing happened in the case until May 18, 2004, until a motion to dismiss was filed. The motion was granted on May 24, 2004. (Exhibit 51.)

In Sequoyah County Case No. CF-99-250A, Real was charged with trafficking methamphetamine, possession of marijuana with intent to distribute, unlawful use of a police radio, possession of a firearm in the commission of a felony, and unlawful possession of drug paraphernalia. This case was filed on June 8, 1999, over three months before Trooper Eales was killed. Little or no action was taken on the case before it was dismissed on May 24, 2004, based on a motion filed on May 18, 2004. (Exhibit 49.)

In Sequoyah County Case No. CF-99-251, Real was charged with unlawful possession of CDS. The information was filed June 28, 1999. On February 15, 2001, an order was entered that Real was awaiting sentencing in her federal case and that this state case would

be dismissed after Real was sentenced in federal court.  On September 4, 2001, a motion to dismiss and an order dismissing the case were filed.  The order dismissing was apparently finalized on December 20, 2001.  (Exhibit 50.)

In Cherokee County Case No. CF-99-18,  Real was charged, on January 26, 1999, with trafficking in illegal drugs, manufacture of a controlled dangerous substance, possession of marijuana with intent to distribute, possession of a controlled dangerous substance in the presence of a minor child, and use of a weapon in the commission of a crime.  The case was passed on a number of occasions.  On February 15, 2001, an order was entered that Real was awaiting sentencing in federal court, and that the case would be dismissed after she had received her federal sentence.  On June 4, 2001, a motion to dismiss and an order dismissing were filed.  (Exhibit 47.)

In Cherokee County Case No. CM-99-40, Real was charged with the misdemeanor of possession of drug paraphernalia.  The case was filed on January 26, 1999.  Little happened on the case until February 15, 2001.  An order was entered noting that Real was pending sentencing in federal court, and that the case would be dismissed after Real received her federal sentence.  On September 4, 2001, a motion to dismiss and an order dismissing the case were entered.  (Exhibit 48.)

In Cherokee County Case No. CF-99-251, Real was charged with possession of CDS.  The charge was filed on June 28, 1999.  On February 15, 2001, an order was entered reflecting that Real was awaiting sentence in federal court, and that the case would be dismissed after she received her federal sentence.  On September 4, 2001, a motion to dismiss the case and an order dismissing the case were entered.  (Exhibit 50.)

Because counsel failed to adequately research Real's criminal record, the jury was left with the false impression that the only trouble she had been in stemmed from the federal prosecution on which she was doing time when she testified against Mr. Barrett.[23]  Based on the dismissed state charges, counsel could have drawn her credibility into serious question by pointing out that she had previously avoided the potential of lengthy sentences in state court, which could well have run consecutively to one another and to her federal sentence, and that to prevent the possible revival of her state cases, it was certainly in her interest to cooperate with the Government in Mr. Barrett's prosecution.  Each of these state cases involved separate criminal transactions, and some were apparently dismissed not necessarily in lieu of federal prosecution, but for other reasons.  It certainly could have been strongly implied on cross-examination that some of these cases were dismissed because Real acted as a police informant.  Mr. Barrett's trial counsel's failure to discover Real's state criminal record was professionally unreasonable, and prejudiced Mr. Barrett because her direct testimony was largely unscathed by cross-examination. Thus, the jury was wrongly left with another largely un-impeached witness who regaled it with tales of Mr. Barrett's "plan" to confront law enforcement with deadly force if his property were ever raided.

### g.      Randy Turman.

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine.  (R. 193.)  At the time he testified, Turman had pending state charges for manufacturing methamphetamine.  (R. 193.)  He was at liberty on a $120,000.00 bond.  Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a

---

[23]  Real was rewarded for her testimony against Mr. Barrett when the Government filed a Rule 35 motion to reduce her 14 year sentence to time served.  See Ground 5.

firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, and that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that would suffice. Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped. (R. 434-35, 439-44.) Turman stated he was simply in court to tell the truth. (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot. (R. 364-65.) He "hung out" at Mr. Barrett's and would use methamphetamine there. (R. 366.) He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin. (R. 377.) He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner. Turman stated Mr. Barrett would use these ingredients to cook meth. (R. 383-84.) Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin. (R. 384-85.) Glassware used in the manufacturing process was kept in a water trough. (R. 385-86.) Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process. (R. 387-91.) Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth. (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign" that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Turman testified Mr.  Barrett had expressed concern about law enforcement coming to his property, and allegedly stated there would be a shoot-out if this occurred. According to Turman, Mr.  Barrett expressed the hope that Sheriff Philpot or Frank Loyd would be the first law enforcement officers through the door.  (R.  412).  Turman also testified that on one occasion, late at night, an individual had come to the gate of Mr.  Barrett's property and said he was running from the law and expected law enforcement to arrive at any time.  Mr.  Barrett's response to this, according to Turman, was to go into his cabin and retrieve his Colt Sporter rifle. (R. 414-15).

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was

especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs. It was therefore of paramount importance that Turman be effectively impeached. This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of." The pending felony drug and firearms charges were still open when Turman testified. Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed. The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute; possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and possession of a firearm with an altered serial number. The charges were based on evidence recovered during the execution of a search warrant. Turman posted an appearance bond on September 20, 2002. A preliminary hearing was set for April 17, 2003. The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003. According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice." The motion to dismiss was granted by written order the same day it was filed. (Exhibit 195.)

Amended § 2255 Pet.                    132                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Counsel were professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony. With respect to Turman's testimony regarding Mr. Barrett's supposed comments about law enforcement, counsel were also unreasonable for failing to produce testimony from available witnesses who could have testified, in direct contrast to the informant witnesses, that Mr. Barrett did not and would not threaten violence toward law enforcement. (E.g., Exhibits 37, 77, 90, 96).

Counsel were also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Exhibit 95.)

## Conclusion.

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious

importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. *United States v. Fuller,* 938 F. Supp. 731, 733-34 (D. Kan. 1996) (counsel ineffective for, among other reasons, failing to insist on adequate time to prepare for trial). In Mr. Barrett's case, counsel in effect agreed to a trial by ambush with respect to the seven crucial informant witnesses. Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The concealed evidence, there and in Mr. Barrett's case, would have shown that witnesses had motive to lie and had colluded in their stories. *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)(counsel ineffective for failing to use available evidence to impeach witnesses). In Mr. Barrett's case, counsel failed adequately to investigate the criminal history of the informant witnesses, particularly Sanders and Turman, and failed to research their court files, which would have produced devastating impeachment and demonstrated that they had motives to lie. *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006)

Amended § 2255 Pet.                              134                    *Barrett v. U.S.,* No. 6:09-cv-00105-JHP

and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.    Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts.**

Fed.R.Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The Federal Rules of Evidence generally preclude the use of evidence of crimes or wrongs unrelated to the conduct at issue if that evidence is offered to prove a propensity to behave in a particular manner." *Tanberg v. Sholtis,* 401 F.3d 1151, 1168 (10th Cir. 2005).  For evidence of other crimes or bad acts to be admissible under Rule 404(b), four factors must be satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction.

*United States v. Cherry,* 433 F.3d 698, 700-02 (10th Cir. 2005).  *See also*, *United States v. Brooks,* 161 F.3d 1240, 1243 (10th Cir. 1998), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).  In offering 404(b) evidence, the Government carries the burden of showing how the proffered evidence is relevant to one or more issues in the case; it must specifically articulate the evidentiary hypotheses by which a fact of consequence may be inferred from the other acts evidence.  *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983).  There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.  *Id.* at 1317-18.

Before prior bad acts evidence is admissible, the trial court must find: (1) the evidence tends to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) must also be related to the charge in that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) must have real probative value, not just possible worth; and (4) must be close in time to the crime charged.  If the trial court determines that the prior acts are admissible under 404(b), it must still conduct a separate balancing of the probative value of the evidence and its prejudicial impact under Fed.R.Evid. 403.  *United States v. Temple,* 862 F.2d 821, 823-24 (10th Cir. 1988), *relying on United States v. Morales-Quinones,* 812 F.2d 604, 612 (10th Cir. 1987); *United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987).

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements

to the effect that if law enforcement came on his property, he would shoot them.[24]  The

Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc.

206 at 1-3.)  The Government's filing failed to give notice that informant witness Karen Real

would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett

could respond, the Government's filing said, "The defendant has not complained of lack of

notice."  (Doc. 206 at 4.)

　　　　　The Government's Notice was filed nine days after the trial court, during an *ex*

*parte* hearing, advised the prosecutors that the testimony they intended to present from

informants included evidence covered by Rule 404(b).  (Tr. 8/13/05 Hr'g at 22-23.)  The court

permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the

testimony was not within the scope of the rule.  *Ibid.*  Following the conclusion of that

discussion, when defense counsel were present, the trial court described the content of the *ex*

*parte* discussion without revealing that it included the court stating that the testimony described

*in camera* included 404(b) evidence.  *Id.* at 25-27.

　　　　　On September 27, 2005, trial counsel for Mr. Barrett filed a response to the

Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged

statements, and arguing that the proposed testimony from the informant witnesses was irrelevant

propensity evidence; any marginal relevance or probative value it might possess was outweighed

by the danger of unfair prejudice.  (Doc. 215.)

　　　　　On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice,

the court stated it would rule on admissibility as the evidence developed, and directed the

---

[24] Mr. Barrett's argument concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

Amended § 2255 Pet.　　　　　　137　　　　　*Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so. (R. 174.) Defense counsel filed a proposed limiting instruction on September 28. (Doc. 218.)

Without objection, informant Randy Turman testified that Mr. Barrett expressed concerns that the police were going to come to his property; said there would be a shootout if this happened; that he hoped Sequoyah County Sheriff John Philpot or Frank Loyd would be the first officers through the door; and that he would "take out" as many officers as he could. (R. 412-13.) Turman also testified about a supposed late-night incident where a man came to the gate of Mr. Barrett's property and said he was running from the law and expected the police to arrive. In response to this, Mr. Barrett supposedly went in his cabin and retrieved his Colt Sporter rifle. (R. 414-15.) This testimony was met with an objection, which was overruled. (R. 414.)

Turman testified that he began going to Mr. Barrett's property three to four months before the shooting of Trooper Eales. By his vague estimate, he was last there a month or two before the shooting. (R. 413.) On cross-examination, Turman stated he could not remember the dates and times on which any of the incidents he testified occurred. All Turman could really say was that they had to have occurred in the three to four months preceding the shooting of Trooper Eales that he claimed to have frequented Mr. Barrett's property. (R. 422-23.)

Without objection, Charles Sanders, on direct examination, stated Mr. Barrett told him that if the police came to his property, he would shoot the first officer who came through the door, and that he expected it to be John Philpot. No real time frame was given for this alleged statement. (R. 2515.) On cross-examination, Sanders testified that in September 1999, Clint

Johnson asked if Mr. Barrett had ever made any statements about doing violence to law enforcement. Sanders stated, "I think the response was that me and Kenny Barrett had a discussion about him killing John Philpot if he came through his door." (R. 2612.) Sanders was initially unable to put any kind of time frame on this statement; the statement was simply made "sometime," and he did not know when the alleged conversation occurred. Drifting toward an attempt at some sort of specificity, Sanders then said that while the conversation could not have occurred in 1998, it would have been before July, 1999. (R. 2612, 2614.)

Responding to a leading question by the prosecutor which set the relevant time frame at a month or two before the shooting of Trooper Eales, Cindy Crawford testified Mr. Barrett said he would "go out in a blaze of glory" if the police raided his property. This statement supposedly occurred in the context of Mr. Barrett remarking that he had a misdemeanor warrant outstanding. Crawford admitted she was a heavy drug user at the time of this alleged conversation, that she lost her sense of time when she was on drugs, and that Mr. Barrett's reference to a misdemeanor warrant could have been made long before 1999. (R. 3068, 3070, 3072-73.) No objection was made to Crawford's testimony regarding Mr. Barrett's alleged statements. (R. 3068.)

Brandie Price, who claimed she went to Mr. Barrett's cabin in August and September 1999, testified that a week to ten days before the shooting of Trooper Eales, Mr. Barrett remarked that he had an outstanding warrant and that if the police came to the property, any visitors to his residence should either grab a gun or hit the floor. Mr. Barrett supposedly stated that he would "take out as many" lawmen as he could. Price admitted that her memory was very foggy during this period of time due to her drug use. (R. 3485-86, 3492-93, 3507,

3509.)  No objection was made to Price's testimony regarding Mr. Barrett's purported statements.

Karen Real testified she periodically visited Mr. Barrett at his cabin from 1997 until, by her estimation, early 1999.  (R. 3082-83.)  She told defense counsel it was possible the last time she had been to Mr. Barrett's property was in late 1998.  (R. 3118-20.)   During this time period, according to Real, Mr. Barrett expressed a negative view of law enforcement.  (R. 3090.)  Initially, a defense objection was sustained when the prosecutor asked Real what Mr. Barrett had specifically said about this subject.  (R. 3090.)  A short time later, without objection, when asked what Mr. Barrett had said about the police in late 1998 or early 1999, Real responded Mr. Barrett said he would shoot law enforcement officers who came on his property.  (R. 3106.)   Like the other informant witnesses, Real had been a heavy drug user.  At the conclusion of Real's testimony, defense counsel moved to strike her testimony because it was remote in time.  The prosecution countered that Real's testimony related to a continuing pattern of behavior on Mr. Barrett's part.  The court overruled the objection.  (R. 3135-36.)

The only witness to give testimony respecting alleged statements by Mr. Barrett threatening violence to law enforcement that was in any sense contemporaneous with the shooting of Trooper Eales came from Travis Crawford.  Crawford testified that on September 23, 1999, the afternoon before the shooting, Mr. Barrett said if the police came on his property he would "go out in a blaze of glory."  (R. 462-66.)  As noted in Mr. Barrett's original petition and this amendment, Crawford has since recanted his testimony.  (*See* Claim 5(A)(b), *infra*.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity

evidence in violation of Rule 404(b). Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1985) (counsel's failure to seek suppression of evidence unreasonable where counsel also failed to seek pretrial discovery).

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b). To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government failed to show good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made. The alleged statements made weeks, several months, or many months before the offense could not reliably or relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett.

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and

Karen Real *were not* close in time to the offense itself, and had only "possible worth," not real

probative value. *Temple,* 862 F.2d at 823-24.  Any slight probative value this evidence could

arguably be said to possess was clearly outweighed by the danger of unfair prejudice.

Fed.R.Evid. 403.

Even assuming for the sake of argument Mr. Barrett made these statements (which

he did not), they could not relate to any specific intent to do harm to law enforcement when the

Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the

lead vehicle having all the appearance of a civilian automobile.  This evidence simply covered

Mr. Barrett in a veil of unwarranted suspicion.  With respect to Karen Real, no notice was given

by the Government in its 404(b) filing that she would attribute any threatening statements to Mr.

Barrett.  *United States v. Temple, supra.* (defendant was prejudiced by improper admission of

other crimes or bad act evidence which did not show a common scheme or plan and was

otherwise inadmissible, and commenting that care should be taken to protect the accused as far as

possible from being convicted simply because of past conduct rather than the crime for which he

is being tried).

Although defense counsel filed a response the Government's 404(b) Notice

objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined

above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder

of the evidence complained of here passed without a contemporaneous objection, and a

contemporaneous request for a limiting instruction.  *United States v. Davis,* 766 F.2d 1452, 1458

(10th Cir. 1985)(failure to lodge contemporaneous objections fatal to claim raised on appeal).

Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its

inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally

unreasonable for failing to make adequate, contemporaneous objections.  Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984); *Martin v. Grosshans,* 424 F.3d 588, 591-92 (7th Cir. 2005); *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996); *Crowe v. Sanders,* 864 F.2d 430 (6th Cir. 1989)(counsel deemed ineffective for failing to properly object or seek proper curative measures, including moving for a mistrial).

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice because it was filed untimely.  Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See* Claim 18, *infra*.

> **6.      Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley.  Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in

anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr.

Barrett's two state trials.  Counsel sought authorization to hire Edward Hueske of Denton, Texas.

Mr. Hueske had consulted with the defense during Mr. Barrett's state trials.  The court authorized

$4,000.00 for a crime scene reconstructionist.  After Mr. Echols left the case, trial counsel Roger

Hilfiger informed the court that het had not used available funds to hire a crime scene

reconstructionist, but instead used the funds for an investigator.  Loyd Cobb, the investigator

hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at

least some of which were introduced into evidence.  *See* Claim 1, *supra*, and 3, *infra.*

        As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to

expert assistance to rebut the Government's witness.  Prevailing professional norms of criminal

defense practice advise attorneys to obtain expert assistance.  Mr. Barrett's trial counsel acted

unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert

advice was deficient performance.  *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance

to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,*

539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further

investigation because they lacked sufficient information).

        Iris Dalley was a key witness for the Government.  Her crime scene reconstruction

testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch

when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles

with emergency lights engaged which had descended on his property.  The defense contended

that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by

Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be

Amended § 2255 Pet.                           144                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a

PowerPoint presentation and animations, which were shown to the jury but not introduced as

exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the

services of the independent expert authorized for Mr. Barrett's defense, it could have been shown

that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with

the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection

with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the

exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials

upon which she relied.  Mr. Hueske, a nationally known expert whose credentials, training and

experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was

not worthy of belief.  (Exhibit 109; Exhibit 110.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate

terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not

an intention to confuse, rather than inform, the jury.  "Ms. Dalley repeatedly uses terminology

that is inappropriate both with regard to vehicular descriptions and firearms components."  For

example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven

by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference

the front fender.  Instead of referring to the "driver's side" and "passenger's side" of the vehicle

as points of orientation, she used the confusing terms "left" and "right."  Dalley used the term

"sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an

inner body panel on the Ford Bronco.  Dalley consistently and improperly used the term

"projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet.  (Exhibit 109 at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]"  In reality, fragmentation of a bullet begins when it impacts a surface such as glass.  If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass.  Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene."  Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco.  When asked by defense counsel for examples, Dalley could not come up with any.  (Exhibit 109 at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Exhibit 109 at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident

Amended § 2255 Pet.                           146                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation." (Exhibit 109 at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1.      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting.  Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired.  No measurements were taken.  Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured.  (Exhibit 109 at 3.)

2.      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence.  Placing trajectory rods in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and stated she saw none.  (R. 3399.)  (Exhibit 109 at 3.)

3.      To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  (Exhibit 109 at 3.)

4.      The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to

the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."

Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say

whether any of them were created by "friendly fire"). (R. 3298.) Based on some of the

photographs taken of the bullet holes in the Bronco, it appears they could have been measured to

determine caliber with the appropriate instrument. (Exhibit 109 at 3.)

5. Dalley's heavy reliance on trajectory rods to determine the trajectories of

the fired rounds failed to follow protocols and was based on unwarranted assumptions. Correct

placement of trajectory rods to properly determine trajectories "requires an understanding of

bullet penetration/perforation in a variety of substrates." This is especially true with bullets that

fragment or tend to fragment, like rounds fired from a .233 rifle. Equally important is knowing

when the calculation of trajectories, rather than the use of trajectory rods to determine them, is

called for. Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

trajectories where there is "a secondary impact that has not resulted from initial impact deflection

and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing

fragment impacts into secondary targets based on the presumption" that the bullet core, or a large

part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews

the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as

when she testified (correctly) that the "exact path" of each bullet could not be determined, and

also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate."

(R. 3446; Exhibit 109 at 4.)

6. Dalley relied upon fallacious reasoning to say that bullets would pass

through an intervening target such as the passenger door of the Bronco "undeterred," or straight

through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door

would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Exhibit 109 at 4.)

       7.     Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable. When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates. This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories. Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment." ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob." Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create

diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Exhibit 109 report at 5.)

8.      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction. (Exhibit 109 at 5.) In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9.      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Exhibit 109 at 5.)

10.     Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Exhibit 109 at 5.)

11.     Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the

likelihood of each shot coming from one or more particular positions.  It was particularly

important here to determine the angle of fire after the Bronco came to a stop.  However, the

Bronco itself was not placed in a variety of positions to determine the trajectories of the shots

fired at or into it.  Dalley testified that before she arrived at the scene, the Bronco had been

moved.  However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence.  These markings could have been used to re-position the Bronco

to where it came to rest before being moved.  (Exhibit 109 at 5.)

12.     Dalley employed a fundamentally flawed approach when she attempted to

establish the trajectory of bullets that passed through the window glass, blinds and curtain or

towel hanging over the front window of Mr. Barrett's cabin.  She testified that the results of her

trajectory analysis for these objects were reliable.  (R. 3389.)  First, the accepted method for

reliably determining trajectories is to set up a tripod and place a laser on the tripod.  Dalley had

someone assisting her hold a trajectory rod by hand.  Second, Dalley failed to take measurements

of the hole locations.  (Exhibit 109 at 5.)

13.     Dalley's method of "placing a hand-held laser into bullet holes in the

Bronco window glass is equally flawed since it presumes no deflection resulted from either the

impacts or the fragmentation."  *Ibid.*

14.     Dalley overstated her ability to reach a warranted conclusion regarding the

critical issue of Mr. Barrett's position in relation to the Bronco.  When attempting to determine

the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any

evidence of gunshot residue on the window.  Because of this, she opined that the distance had to

be greater than three feet from the glass, since the literature states that the absence of gunshot

residue at the edges of a bullet hole indicates shots were fired from greater than three feet away

from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used.  To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used.  (Exhibit 109 at 6.)

15.     In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Exhibit 109 at 6.)

16.     In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Exhibit 109 at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589

(1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999).  Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable.  At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community.  *Daubert*, 509 U.S. at 593-94.  While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented.  Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.  Even if the trial court had received Dalley's testimony, there is at least a reasonable probability that the outcome of the trial would have been different.  If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony they would have reached any of several conclusions adverse to the prosecution from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and

compromised memories of the tactical team members who testified.  Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent.  *See Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005) (trial counsel ineffective for failing to present evidence on how fatal shooting occurred, which would have supported defense claims); *Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005) (counsel ineffective in part for failing to object to the inadmissible testimony of two key prosecution witnesses); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998) (counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995) (counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not only Mr. Barrett's current lawyers who say Ms. Dalley is far from being an objective scientific witness, but is a partisan advocate who dresses up her personal opinions in the guise of "science."  The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, recently reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.  Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

> **7.     The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.**

The jury should have heard that methods used by the Oklahoma Highway Patrol tactical team were contrary to established law enforcement standards and practices.  Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted. Even though every piece of information considered by the Task Force and Tact Team called for a daytime, talk-first approach, with prominent insignia of law enforcement and the use of distance and cover, the officers chose a nighttime, close-contact, force-first approach, with no advanced signs of law enforcement.  The results of this provocative assault were foreseeable and tragic for Trooper Eales who, due to poor planning and execution, was exposed to gunfire on all sides.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert who would have revealed to the jury that the midnight raid was reckless and dangerous, as though calculated to provoke a violent response, and that it was foreseeable that these errors would result in harm to a law enforcement officer.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures, Dr. George Kirkham.  (Doc. 50.)  The court authorized some funds for this expert.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert.

Trial counsel knew or should have known that it was necessary to retain an expert to assist the defense.  In the second state trial Chuck Choney, a former FBI agent, testified for the prosecution and, when surprised on cross-examination, provided testimony favorable to Mr. Barrett.  However, trial counsel knew that Mr. Choney, because of his affinity with law enforcement, was unhappy about his testimony and was unwilling to provide any further helpful testimony for Mr. Barrett.  Based on this knowledge, trial counsel requested authorization to retain another, independent expert, Dr. Kirkham.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney. But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

After the court authorized part of the funds trial counsel sought to retain Dr. Kirkham, trial counsel failed to contact him.  Dr. Kirkham received no background materials and had no contact with trial counsel about assisting in Mr. Barrett's defense.  (Exhibit 44)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness who counsel knew would take any opportunity to harm Mr. Barrett's case.

Even after the trial started, trial counsel knew Mr. Choney was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense.  (Tr. 10/03/05 Hr'g at 6-7.)  Trial counsel told the court they were "in the process of trying to get this swat [sic]

team expert to testify." *Id.* at 6. Yet counsel made no effort to learn what opinions Dr. Kirkham would have had if he had been informed of the facts of the case.  Trial counsel could not have made a reasonable decision to forego Dr. Kirkham's assistance because they had not inquired into what that assistance would mean, and they knew they would get no assistance from Choney. *Wiggins*, *supra*, 539 U.S. at 522; *Kimmelman v. Morrison*, *supra*, 477 U.S. at 385.

If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, Dr. Kirkham would have provided the jury with more than reasonable doubt about Mr. Barrett's alleged intent.  Dr. Kirkham would have explained that the jury could assume – against the weight of evidence – that the claims made in Clint Johnson's affidavit were true, and even credit the dubious testimony of the other informants, and still conclude that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers.  The evidence would have shown the raid was contrary to the standards and practices of law enforcement agencies precisely because it increased the chance that the target would be unable to tell whether those attacking him and his teenage son were law enforcement officers.  The Tact Team's errors conceiving the raid and carrying it out meant (a) the first vehicle visible to Mr. Barrett would have no law enforcement markings; (b) the nighttime darkness made it more difficult to identify law enforcement vehicles; (c) there would be no audible indication that law enforcement was involved in the attack; (d) the raid would play into any paranoid fears or legitimate fears of being attacked by drug dealers or other criminals; (e) that the lead vehicle lacked necessary cover from the terrain or a sniper; (f) that the lead Bronco advanced onto the property from a tactically disadvantageous position that drew fire towards Trooper Eales; and (g) that the plan ignored a

variety of tactics deemed by law enforcement experts to be less likely to result in violence. (Exhibit 44 at 3-4.)

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to the action taken, there was no compelling need to have aborted the mission.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, and found constitutionally deficient representation. *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002). In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired. Hooper had once attended anger management counseling. His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper. Counsel then hired a forensic psychologist to review the other psychologist's report. Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems. These conclusions could not be reached, however, unless the defendant had been examined personally. At the eleventh hour, defense counsel subpoenaed the second psychologist to testify. He was extremely hostile to the

Amended § 2255 Pet.                    159                    *Barrett v. U.S.,* No. 6:09-cv-00105-JHP

defense because he had warned counsel he could reach no conclusions without examining the defendant himself. He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating. He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed. The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems. The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney. He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. As in *Hooper,* defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. *Strickland v. Washington,* 466 U.S. 668 (1984). As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty. One indication of this probability is the state-court jury's acquittal of Mr. Barrett on

Amended § 2255 Pet.                                         160                           *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

charges of murder. Had the federal jury known that law enforcement standards and practices counseled against a raid of this type precisely because the failure to give the clearest sign of law enforcement's presence is more likely to provoke an uninformed, violent response, there is a reasonable probability that Mr. Barrett either would not have been convicted of murder, or not have been sentenced to death.

<div style="text-align:center">

**8.   Mr. Barrett's trial counsel unreasonably failed to
impeach law enforcement witnesses with prior
inconsistent statements from the state trials**.

</div>

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved a pipe dream. At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony. At the pretrial hearing on August 31, 2005, it was revealed that little

if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett knew the police were on his property because the emergency lights on some of the vehicles were engaged and visible to him prior to the shooting. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, Mr. Barrett lost crucial opportunities for the impeachment of key prosecution witnesses in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights, as well as his statutory and rule-based rights to counsel, discovery, and cross-examination.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at 747.) Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed. In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on. (2nd St. Tr. Tx at 448, 461.) At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the

property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights. (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road. He was impeached with a prior statement in which he said he only saw taillights, not emergency lights. Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights. (2nd St. Tr. Tx at 25, 49, 51.) In the federal trial, Johnson said nothing on direct examination about any lighting. Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco. (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial. Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

There obviously was a critical question as to whether Mr. Barrett or the police opened fire first. At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house. He heard shots as he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence. (2nd St. Tr. Tx at 757, 766.) None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent. Although Trooper Greninger

professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco. In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approached the front of the house, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started. This statement supported Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view. (2nd St. Tr. Tx 450, 504.) Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him. (2nd St. Tr. Tx 330.) This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation to which any father would react. In federal court, Hamilton stated the gunfire began earlier. Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch. In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield. (R. 534, 603, 674.) Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony. At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house. In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway. Greninger testified the rifle he found in Mr. Barrett's cabin was the one used to fire on the officers. (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error occurred during cross-examination of Clint Johnson. On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored. On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett. When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable. Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but six of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.[25] This damaging answer, given only because counsel opened the door, just

---

[25] As shown elsewhere in this Claim and in Claim 3, trial counsel's blundering cross-examination was most damaging because counsel failed to retain the expert in police tactics whose assistance the Court had authorized in part. Without an independent source of information about the raid, the Government was able to give jurors the *false* impression that the conduct of the tactical team was appropriate under the circumstances Johnson described.

hung in the air. Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses due to these "prior reports" from "several" sources.[26]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy. Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial under the *Strickland* test, because it tended to invest credibility in the informant witnesses – however spurious it might have been, and however false Johnson's testimony was – that these witnesses otherwise lacked. *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003)(counsel found ineffective in part for failing to use impeachment evidence that would have shown key witness had a motive to curry favor with prosecution); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999)(counsel ineffective for failing to use available evidence to impeach witnesses).

Trial counsel's unreasonable failure to investigate what an independent expert would say about the conduct of the tactical team, and their unreasonable failure to impeach Johnson, left the jury with two false impressions: (a) that at the time of the raid Johnson and the tactical team had sources of information other than Monk Sanders; (b) that even if the information they had was true and backed by multiple sources, the raid was reckless and carried

---

[26] Johnson's testimony was surely false. None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials. Surely, if several individuals were reporting this, they would have testified in 2002 and 2004. Counsel failed to point out that Johnson had given no such testimony previously. Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

out in a way that made it hardest for Mr. Barrett to recognize his attackers as law enforcement officers

> **9.     Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

> **a.     Toby Barrett**.

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property.  It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr. Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle. Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police.  The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid.  Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid.  (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers.  Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers.  Toby Barrett testified in two prior state-court trials.  Toby Barrett was prepared for his testimony in those cases and was willing and able to be prepared by trial counsel to testify in the federal trial.  (Exhibit 96.  *See also* 1st State Tr. Tx at 1781.)  Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate.  Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something.  He had one something to that effect, sir."  (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day.  (1st St. Tr. Tx at 1822.)  Toby Barrett's account of being in the front yard with his friend Bubba

Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, the testimony of Toby Barrett and Trooper Hamilton are consistent with each other. For example, Toby Barrett confirmed that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Tr. Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Tr. Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Exhibit 96.) He denied telling the police he saw flashing lights. (1st St. Tr. Tx at 1809.) When Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!" (1st St. Tr. Tx at 1790, 1795.) Toby Barrett never saw his father out on the front porch, shooting. If he saw his father at all it was for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Tr. Tx 1794, 1795, 1796.) He never saw who was firing a weapon. (1st St. Tr. Tx at 1807.) The entire incident happened very quickly. (Exhibit 96.) The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony. (Exhibit 96.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account. The prosecution in state court deemed Toby Barrett a reliable witness

regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that the bullet that killed Trooper Eales was fired by Mr. Barrett with the intention of killing someone who was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up would have been important to defense trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here."  (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify.  In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial.  He said yes each time, but he never called me.  He never

asked me about the incident, my father's mental problems, my home life or about me or my mom." (Exhibit 96.)

### b.      Alvin Hahn.

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Exhibit 75.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Trial counsel's omissions of these known witnesses were unreasonable and prejudicial. The testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and provided jurors with evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement officers. Viewed individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call available witnesses who would have supported defense claim, specifically, in that

case, an alibi defense); *Draughton v. Dretke,* <u>427 F.3d 286</u> (5th Cir. 2005)(counsel ineffective for failing to produce evidence supporting defense theory and in contrast to prosecution testimony on how shooting occurred); *Cargle v. Mullin,* <u>317 F.3d 1196, 1120-22</u> (10th Cir. 2003)(counsel found ineffective, among other reasons, for failing to call available witnesses to contradict testimony of prosecution witnesses, and prosecution's theory as to how homicides were committed).

> **10.     Trial counsel unreasonably failed to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

A key component of the Government's case was its contention that it was a "fact" that Mr. Barrett was well aware there was a warrant out for him for failing to appear in a minor felony drug case.  *See* file, Sequoyah County Case No. CF-97-80,  *State of Oklahoma v. Kenneth Eugene Barrett.*  According to the Government, Mr. Barrett anticipated the police were going to arrest him at any time on this warrant, and he was therefore making preparations to repel the police with deadly force.  This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Randy Turman and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory."  The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the Government's case; yet, trial counsel did virtually nothing to rebut this argument other than rely on cross-examination.  Had counsel conducted anything approaching a reasonable, professional

investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk), the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

### a.      Mr. Barrett's "failure to appear".

Any semblance of a reasonable investigation would have cast doubt on Mr. Barrett's alleged failure to show up for trial and the circumstances surrounding the warrant issued for his arrest. Had trial counsel conducted a reasonable investigation of the court files related to Mr. Barrett's state court charges, they would have discovered that there was not going to be a trial. No citizens had been summoned for jury service on the date of Mr. Barrett's scheduled trial, January 25, 1999. (Exhibit 39.) In fact, when the Clerk of the Sequoyah County Court checked the court records, she found that no citizens were summoned for jury service in January 1999, and no jurors reported to the court during the entire month of January 1999. (Exhibit 39.) This is curious, as Ms. Edwards specifically testified at the suppression hearing that the trial scheduled for January 25, 1999 was a jury trial. (Tr. 1/ 26/05 at 25.) Accordingly, Mr. Barrett was charged with failing to appear for a trial that never was scheduled. He was not the only party who failed to appear; apparently, the entire jury failed to appear because they were never summoned.

The importance of this fact – and the importance of this fact being pointed out to a jury – goes to the defense theory of the suspect circumstances involving every single detail of the state prosecution of Mr. Barrett. The trial that never was is the first shaky detail in the whole house of cards. The first cause of the events leading to Trooper Eales death was a warrant issued

for Mr. Barrett's arrest for his failure to appear for a trial that was not going to happen anyway. The State's "investigation" went downhill from there. The rare no-knock warrant was intended to deny Mr. Barrett notice he was going to be arrested. The warrant was based on the statements of a serial felon, informant, and liar, and a law enforcement officer who proved to be a crook himself. Evidence indicated that Mr. Barrett had cooperated with authorities in the past, and had not been violent toward law enforcement officers. The suspicious confidential informant recanted at trial the information he allegedly gave in the search warrant affidavit. The search warrant was executed with a team of "dignitaries." Once the search warrant was executed, no methamphetamine was ever discovered. Each of these facts is consistent with the conclusion that Mr. Barrett was the target of an unjustified raid that was recklessly conceived and implemented in a manner designed to conceal the fact that law enforcement officers were the raiders. In other words, the fact that there was no jury summoned for the day Mr. Barrett was supposed to be tried supports the conclusion of the state-court jury that this was not a case of a man lying in wait for law enforcement officers. Trial counsel's lack of investigation was inexcusable and caused extreme prejudice to Mr. Barrett.

### b. Mr. Barrett's lack of knowledge of the warrant.

The Government called Ms. Bernell Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued for Mr. Barrett on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

Amended § 2255 Pet.                                     174                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/ 26/ 05 at 36.)  The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers.  Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/ 26/05 at 37-38.)  Mr. Barrett applied for court appointed counsel on December 14, 1998.  Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant.  There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond.  There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest.  The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified, with a return receipt requested. (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events. *Rompilla v. Beard*, 545 U.S. 374 (2005).

Mr. Rogers, the last attorney to represent Mr. Barrett in the state-court distribution case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he

had an outstanding warrant. Mr. Rogers is now deceased. In connection with this Petition, his widow, Mary Rogers, was contacted by a defense investigator. Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case. Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest. Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Exhibit 31; Exhibit 182.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other facts set forth herein, including that no jury was called for the "trial," would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants, would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

### c.      Mr. Barrett's previous cooperation with the law.

Had Mr. Barrett's trial counsel conducted a reasonable investigation, there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.*  Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[27]

Janice Sanders, a relative of Mr. Barrett's, lived near his property.  Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was firing a gun into the air.  Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence.  The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him.  There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[28]

---

[27] *See also* Claim 5, Mr. Barrett's *Brady/*newly discovered evidence claim.  Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

[28] During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett.  In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently.  (Exhibit 85.)  On this occasion, Sheriff Philpot arrived after the other officers.  When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers.  One of the weapons being inspected appeared to be an SKS.  Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant.  Mr. Barrett said he would appear and take care of the matter. Sheriff

(continued...)

(Exhibit 85.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Exhibit 85.)[29]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have brought him in.  Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem.  Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons.  There had been no violence and no problem.  (Exhibit 97.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully.  (Exhibit 93.)

---

[28](...continued)
Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  (Exhibit 108.)

[29]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Amended § 2255 Pet.                    178                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told him if the police really wanted him, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Exhibit 91.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His view was that he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Exhibit 95.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Exhibit 77.)

Trial counsel also unreasonably failed to call in the first stage one of Mr. Barrett's neighbors, Clyde Edgmon, and bail bondsman Martin Daggs. Both these witnesses were known to trial counsel at some point, as they were called to testify in the second stage of trial. In the penalty phase, Mr. Edgmon testified that approximately six months before the raid, two law

enforcement officers, John Owens and Sandy Gerdner, came by his house when Mr. Barrett was working on a truck for him.  The officers talked to Mr. Barrett for some time.  There were no problems, and Mr. Barrett was friendly with the officers.  Mr. Edgmon, Ms. Hill, and other witnesses contradicted the Government's theory that Mr. Barrett was "hiding out" from the law for months before the raid, priming himself for a violent confrontation.  Mr. Edgmon's testimony also would have cast doubt on the claims of several of the informant witnesses that Mr. Barrett was prepared to "go out in a blaze of glory" and would react violently to any police contact.

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case.  Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could have countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty to investigate all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

**11.     Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of  irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress"  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their own testimony in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two tours in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even

during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese, and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[30]

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[31] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question. While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.) In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations. (R. 852-4, 858, 859, 860.) However, he offered no particular opinion concerning the members of the SWAT team in

---

[30]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

[31]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does."  (R. 880.)  However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

After testimony from Horn running to some forty printed pages (R. 849-889), including his narration of what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...".  (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[32] confabulation (R. 906),[33] and contamination of memory through contact with others.  (R. 900-901.)[34]  In fact,

---

[32]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[33]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological

(continued...)

Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

---

[33](...continued)
dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[34]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

> Members of the jury, if you will listen, I'm going to give an instruction. I started to say a special instruction. It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn. So if you would listen to this interim instruction: Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial. As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law. As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial. You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity. (R. 1636-37.) Inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed. R. Evid. 702. The fact was equally clear on the basis of the two state trial transcripts. As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592.* Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho*

*Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or psychiatrist (R. 907), was not focused on research, or with accuracy of recollections,  but with the counseling of individuals.  (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[35] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress

---

[35]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[36]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[37]   For example, 30% of the necessary points required for Board Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[38]   This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

---

[36]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[37]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[38]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[39]   The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the "Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[40] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic

---

[39]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

[40]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist

(R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping

people cope with the stress of unexpected trauma, not with any issue concerning factual

debriefing.  He did not even really purport to be giving his opinions as an expert, seeming

confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying

as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony.

They conceded admissibility, but then had second thoughts when the court ruled the testimony

inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their

opportunity to present their own witness to rebut the matters to which he testified, intending

simply to "develop out of him what we could find useful and move on down the road and not

have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[41]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

---

[41]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

raid. (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental health expert and only at below-market rates of compensation, and only for a number of hours far below the norm for federal capital trials, although the expert had to cover many disparate issues. *See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent Mr. Barrett as part of a plan to develop a panel for future capital cases (Exhibit 67), declined to join his former lead counsel in requesting additional funds from the court.  (Exhibit 34.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until late September, 2005, at the earliest.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him.  A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged.  Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions.  (R. 939.)  While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's

right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[42]  Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[43]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in

---

[42]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds.  To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses.  Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

[43]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

Amended § 2255 Pet. 191 *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[44] suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that should never have come in at the guilt phase.[45]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony." *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

---

[44]  The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

[45]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Amended § 2255 Pet.                    192                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005.  This delay can only have allowed the evidence to sink into the jury's consciousness.  By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required.  Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony.  "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.)  The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial. There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion. Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already invoked his rights, a trial court suppressed the statement. However, only a cautionary instruction was given and counsel did not move for a mistrial. *United States v. Ramsey*, 323 F.Supp.2d 27, 33 (D.D.C. 2004). Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh." *Id*. at 37. Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation. *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir.

2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial after court gave improper parole instructions); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel ineffective for failing to object to bogus "expert" testimony).

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial. *See* Claim 19, *infra*. However, as indicated here, there is extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

> **12.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**.

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt. In this respect, closing argument is an indispensable aspect of the defense function. *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349, 360 (1977). However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories. Absent such an instruction, defense evidence may not be given appropriate effect.

Amended § 2255 Pet.                           195                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000).  *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978). Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their

testimony.  Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis

Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

[¶]  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense

provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308

(10th Cir.2005) (citations omitted).  The defense theories were (a) that at the point in time when

Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained

law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in drug manufacturing or

distribution when the raid took place.  As evidenced by the state-court verdicts, the inconsistent

testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in

this case, there was evidence and legal support for a theory-of-defense instruction.

**13.     The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper

objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied

his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the

effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to the following:

1.     the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90);

2.     the improper execution of search warrants by federal officers (*id.* at 1090);

3.     the violation of Fed. R. Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91);

4.     the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91);

5.     the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96);

6.     the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* at 1096-97);

7.     the improper admission of victim impact evidence (*id.* at 1097-1101);

8.     the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06);

9.     the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108);

Amended § 2255 Pet.                              198                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

10.     the lack of constitutionally required proportionality review (*id.* at 1108-09);

11.      the violation of *Woodson v. North Carolina,* 428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10);

12.     the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* at 1110);

13.     the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and,

14.     the Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill (*id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cf. Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005); *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996). Analogously, in these cases, counsel were found ineffective, in whole or in part, for simply failing to object to prosecutorial misconduct. In Mr. Barrett's case, trial counsel's failures to lodge appropriate objections and to adequately preserve the record for appeal were numerous, were not a function of legitimate trial strategy, and prejudiced Mr. Barrett because the onerous "plain error" standard was applied to judging myriad meritorious issues. Under prevailing professional norms, trial counsel had a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim." ABA Guideline 10.8 and Commentary in 31 Hofstra L. Rev.

at 1028.  10.8, 31 *Hofstra L.Rev.* 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review.  *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo").  However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error.  Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of § 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993).  Furthermore, these

constitutional violations, individually or cumulatively, so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

> **14.      Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase.  The specific instances will not be repeated but are incorporated herein by specific reference.  Faced with arguments that could in no sense be termed appropriate, counsel failed altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

### Conclusion.

But for trial counsel's numerous unreasonable acts and omissions, each one a contravention of prevailing professional norms, there is at least a reasonable probability that jurors would have reached a different verdict in the first stage of trial.

Amended § 2255 Pet.                    201                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Counsel late in the case recognized the need to attack the search warrant based on the trial testimony of the C.I., Charles "Monk" Sanders, but unreasonably omitted key facts and argument from their briefing. A competent and thorough re-urging of the motion to suppress based on *Franks v. Delaware*, 438 U.S. 154 (1978), likely would have resulted in the exclusion of much of the Government's case.

When informed that prosecutors sought to conceal seven informant witnesses, and did conceal them until after the start of jury selection, counsel unreasonably acquiesced to a trial by ambush when they acceded to an arrangement that resulted in these crucial prosecution taking the stand with little or no time to investigate their backgrounds, criminal records, or their motives for testifying. As a result, a wealth of impeachment evidence that could have been used to show them to be the incredible, self-serving witnesses they were was not produced. Because counsel unreasonably failed to seek a continuance, or were induced into not seeking a continuance by prosecutorial and judicial misconduct, counsel left relatively unscathed key prosecution witnesses whose credibility would have been shattered. With reasonable investigation the Government's case for intent, particularly with respect to Count 3 of the superseding indictment, would have been damaged beyond repair.

Trial counsel unreasonably failed to object to the seven informants' testimony to prior bad acts under Fed. R. Evid. 404(b). When the Government failed to give notice that Karen Real would offer such testimony, in violation fo Rule 404(b), trial counsel offered no objection. Trial counsel permitted the prosecutors to use the hearsay evidence for an improper, and highly prejudicial purpose, i.e., to show Mr. Barrett's state of mind at a time far removed from his alleged statements and under circumstances that gave the alleged statements little probative value.

Numerous witnesses were available to rebut the Government's claim that Mr. Barrett had "holed up" on his property, readying himself for an attack on law enforcement, because he feared the authorities would arrest him on an outstanding felony warrant. This spurious claim went virtually unchallenged due to a total failure of investigation. The two witnesses the defense did call that would have challenged this theory – Martin Daggs and Clyde Edgmon – inexplicably did not appear until the sentencing phase of trial, even though their testimony was directly relevant to the guilt/innocence stage. Several other witnesses who could have refuted the prosecution's theory were either never contacted or were interviewed only superficially. Likewise, defense counsel failed to produce readily available witnesses who could have contradicted the testimony of law enforcement regarding the lighting used on the police vehicles, and supported the defense argument that Mr. Barrett reasonably believed he and his property were being attacked by lawless intruders.

Mr. Barrett had a well-documented history of mental impairments that were highly relevant to why he stayed close to his property, what he would have perceived at the time of the raid, and on his intent at the time of the shooting, but, due to both limitations on funds for expert witnesses and counsels' failure to investigate and prepare, the jury heard about none of this. Because of counsels' failures, the Government had a clear path to falsely portraying Mr. Barrett as a deliberate killer. Along the same lines, counsel failed altogether to challenge Mr. Barrett's competency to stand trial, though a thorough investigation would have revealed his mental competency to be very much in doubt.

Trial counsel unreasonably failed to use what funds were available to prepare to impeach prosecution "expert," Iris Dalley, and her dubious "reconstruction" of the manner in which the shooting occurred. Due to trial counsel's failure to retain an expert he asked the court

Amended § 2255 Pet.                     203                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

to authorize, no *Daubert* challenge was made to exclude her testimony and conclusions, and the jury never heard that her methodology and testimony were seriously flawed and lacking in a reliable foundation.  In a related fashion, the version of events testified to by the members of the OHP Tactical Team, which dovetailed with Dalley's "expert testimony," was not impeached with readily available previous testimony they had given in the two state trials.  Any failures of memory on their part, or contradictions in their testimony, were allowed to be explained away by James Horn, another "expert" who held forth for the better part of two days without objection, until the court itself struck his testimony because it so plainly failed to meet the test of *Daubert* and *Kumho Tire*.  The court's curative instruction was inadequate; the bell could not be unrung. Horn never should have been allowed to appear, but counsel's failure to object to his obviously inadmissible testimony ensured that Mr. Barrett would be prejudiced.   Whatever headway counsel did make in casting doubt on the testimony of the officers was swept away in the welter of innocent explanations for their inconsistent testimony offered by Horn.

Trial counsel recognized that it was crucial to present expert testimony to show that the raid by law enforcement was contrary to law enforcement policies and procedures, was inadvisable, ill-conceived, poorly planned, and was met by violence from Mr. Barrett only because law enforcement did not make its presence plainly known.  But trial counsel failed to contact the expert the court authorized them to retain for that purpose.  The effort to support this theory came to grief when the defense inexplicably decided to rely on the testimony of Chuck Choney, even though the witness told trial counsel he was hostile to Mr. Barrett and would not testify for the defense.  What few half-hearted criticisms he may have offered for the manner in which the raid was conducted were more than counterbalanced by his defense at almost every turn of the conduct of the OHP Tactical Team, and his ringing conclusion that they did "nothing

wrong." Had counsel engaged the services of a truly independent expert, the jury would have heard an entirely different story. Dr. Kirkham, an independent, nationally recognized authority whom the Court authorized counsel to hire as the defense's SWAT expert, would have testified that the OHP raid on Mr. Barrett's property was a textbook example in almost every respect of *what not to do,* resulting in Mr. Barrett reacting in the belief that criminal trespassers were on his property.

Symptomatic of counsels' ineffectiveness were also the failure to request appropriate instructions; the failure, on many points eventually raised on direct appeal, to adequately preserve the record with timely objections and motions; and the failure to object to prosecutorial misconduct.

Based on the above evidence, the conclusion is inescapable that trial counsel rendered ineffective assistance in the first stage of trial. As the results of the state prosecution demonstrated, this was a very defensible case, even with (or perhaps especially) the eleventh hour addition of the informant witnesses. The deficiencies of counsel argued above were not grounded in sound strategy, but fell outside the wide range of reasonable professional assistance. Mr. Barrett was clearly prejudiced. Whether the Court views the errors of trial counsel individually or in the aggregate, a different outcome was reasonably likely. *Washington v. Smith,* 219 F.3d 620, 634-35 (7th Cir. 2000); *United States ex rel. Madej v. Schomig,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002).

> **B.     Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to

his background and character and the circumstances of the offense.  *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial.  *Wiggins*, 539 U.S. at 537.  In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct.  *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

> **1.     Deficient Performance: trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death**.

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Claim 1,

Amended § 2255 Pet.                            206                  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

*supra*, and Claim 3, *infra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel. (*See also* Docs. 50, 51, 57, 97, 128; Exhibit 34; Exhibit 118.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase. (ABA Guideline 4.1(A)(2).) Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel. (Exhibit 64 to Honorable James H. Payne dated 2/2/8/2005; Exhibit 34.) However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors. Mental health professionals who were consulted during state proceedings found evidence of paranoia, a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"), and organic brain impairment including deficits in impulse control and processing information, especially under stress.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available. (Exhibit 111; Exhibit 34.) Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial. (Exhibit 82; Exhibit 34.) The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with Bipolar Disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist.  (Doc. 97.)  The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel.  (ABA Guideline 10.4(C).)  Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005.  (Docs. 46 and 50.)  Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses.  (Doc. 97.)  *See* Claims 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales."  (Doc. 50.)  Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho.  Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."  (ABA Guideline 10.11(A).)  Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death."  (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial.  (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.)

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings,

including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Exhibit 67.)  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Exhibit 66.)  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Exhibit 111; Exhibit 34; Exhibit 82.)  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Exhibit 118.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second-stage investigation if it had not already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Exhibit 67.)

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain

Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case. (Exhibit 66.)

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable. In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions. (Doc. 50.) Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." *Ibid.* Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.) This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment. *See* Claim 3, *infra.* It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases. (Exhibit 118; Doc. 107). The court denied Mr. Barrett resources that would exceed the amount

of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Trial counsel obtained a copy of a preliminary report prepared by a mental health expert, Bill Sharp, Ph.D., prior to the first state trial. (Exhibit 55 at ¶ 16.) Dr. Sharp had identified numerous sources of mitigation, and recommended further testing and treatment. (*Id.* at ¶¶ 9-14.) Federal trial counsel never consulted with Dr. Sharp about his findings or how his diagnoses might be relevant to mitigating circumstances. (*Id.* at ¶ 16.) Dr. Sharp's report put trial counsel on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems (*id.* at ¶¶ 3, 14), facts that would have indicated a need to spend more time with Mr. Barrett and to rely on other sources for background information. (ABA Guideline 10.7 and commentary, 31 Hofstra L. Rev. at 1023-24.)

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background. (ABA Guideline 10.11(F)(1).) The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation. (Tr. 9/9/05 Hr'g at 38.) Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion. At no time prior to or during the federal trial did Mr. Hilfiger or Mr. Smith either consult with mental health professionals who had consulted with Mr. Echols during the state-court proceedings or obtain their files.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  (Exhibit 56.)  Dr. Russell had performed an assessment of Mr. Barrett in preparation for the state trial.  In mid-August 2005, federal trial counsel did not have the report she provided to Mr. Echols in 2003.  (*Id.*)  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in 2003 in anticipation of the second state trial, and conduct some research on an unrelated matter.  (*Id.*)  At the time of her report in September 2005 she had conducted no additional interviews.

Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction.  (Exhibit 56.)   Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Fed. R. Cr. P. 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41.)

Mr. Smith asked Dr. Russell whether she would conduct a mitigation investigation.  (Exhibit 56.)  She informed him that she was not qualified to take on that assignment, and that it was too late for anyone to conduct the type of thorough background investigation she viewed as the norm in other capital cases with which she had been involved.  (*Id.*)  Mr. Smith indicated that the trial court's refusal to provide the defense with resources impaired their ability to conduct such an investigation.  (*Id.*)

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43.)  Mr. Smith said he had

contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials. *Ibid.* This hardly should have come as a surprise given (a) that Mr. Echols had informed Mr. Hilfiger and the Court that his preparation for a mitigation case was never fully formed during the state trials, (b) that Mr. Echols withdrew from the case in large part because he believed the Court's limitations on time and resources made reasonable preparation for a penalty phase impossible, and (c) that there was no penalty phase in either state trial. Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett. *Id.* at 41. Dr. Russell had "examined" Mr. Barrett, however. At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you." (Tr. 9/9/05 Hr'g at 41.) The court generously described the defense's preparation as "still work in progress." *Id.* at 42.

By September 15, 2005, when Dr. Russell submitted her "updated" report, she had not had an opportunity to conduct any additional interviews. (Exhibit 56.)

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist. (Tr. 10/3/05 Hr'g at 7.) Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert. *Ibid.* However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation. (Tr. 9/9/05 Hr'g at 41.) Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator. However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

As stated in § A of this Claim, *supra*, trial counsel unreasonably failed to investigate, *inter alia*, (a) the circumstances of the state drugs charges for which trial Mr. Barrett allegedly failed to appear; (b) the Government's evidence of how the raid occurred and the supposed "reconstruction" of the crime scene; (c) whether the conduct of the raid followed law

enforcement protocols for identification and safety; and (d) the unreliability of the Government's eleventh hour informant witnesses. Trial counsel's unreasonable omissions denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial. Their conduct was the essence of deficient performance.

**2.      Prejudice: abundant, readily available evidence that Mr. Barrett is worthy of life; his neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment**.

If trial counsel had investigated the readily available evidence presented in ths Claim, the jury would have had a completely different, more accurate, and exculpatory view of events, including Mr. Barrett's character and actions. Jurors informed by this evidence would have understood that Mr. Barrett would not and did not knowingly or intentionally take the life of a law enforcement officer. Having failed to inform themselves of the readily available evidence, trial counsel presented only a superficial penalty case.

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented: (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony

regarding Mr. Barrett.  Jurors would have learned the following about Mr. Barrett, his background, and character:

     **a.**  **The family, social, and medical background of Kenny Barrett.**

### Introduction

    Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history.  The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *The Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California.  The Trail of Tears[46] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

    Kenny's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Exhibits 155, 2, 131, 124.)  With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

---

  [46] In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory.  The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee.  It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Amended § 2255 Pet.      216      *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

1574

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

### Family History of Mental Illness

Kenny meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  (Exhibit 117.)  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.  Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny's mother's family "had to deal with mental illness for a long time."  (Exhibit 91)   Kenny's mother, Gelene Dotson, has suffered from

clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn

(Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with

a regimen of mood stabilizers and antidepressants.  (Exhibit 4; Exhibit 78; Exhibit 139; Exhibit

202.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is

unable to rear her children.  (Exhibit 78.)   Gelene's brother Mark, the youngest child in her

family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments."

(Exhibit 98.)

        One of Kenny's maternal cousins, Gwendolyn Crawford, also has bipolar mood

disorder that necessitates ongoing treatment and medication.  (Exhibit 83; Exhibit 137; Exhibit

77; Exhibit 41; Exhibit 201.)  Gwendolyn's two children both have significant mental

impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak

or live independently.  (Exhibit 83; Exhibit 135; Exhibit 153.)  Gwendolyn's daughter Brandy

Hill reported that her family "learned first hand about bipolar disorder and depression" and that

Brandy herself "battle[d] with depression," experienced episodes of "high euphoria" and

underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.

(Exhibit 77; Exhibit 141.)

        Travis Crawford, another of Kenny's first cousins (*see* Exhibit 198), also receives

medication for anxiety and reports a history depression.  (Exhibit 45; Exhibit 92; Exhibit 143.)

Travis has had "a long struggle with drugs and ha[s] anxiety and panic attacks" and his "mind

does not work that well."  (Exhibit 45; Exhibit 92.)  He struggled and did not succeed in the

Army, or in his employment.  (Exhibit 196; Exhibit 203.)  Travis understands that "psychological

problems run in [his]family" and reports his oldest daughter, now "a grown young woman" has

bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."

(Exhibit 45; Exhibit 92.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Exhibit 101.)

In the maternal family, depression and mood disorders trace back to Kenny's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Exhibit 78; Exhibit 129.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[47] who described Wallace as being "completely out of his mind," suffering from  "some kind of spells" and not having slept for "three days and nights."  (Exhibit 32.)

### **Paternal Family Mental Illness**

Mental disease and its affects on family life were transmitted down at least four generations of Barretts.  Illness has affected Kenny's great great grandfather, his great grandfather, his grandfather and finally Kenny  himself.  (Exhibit 28; Exhibit 146; Exhibit 84) As Kenny's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Exhibit 86.) Kenny's great great grandfather,  A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.  (Exhibit 27.)  Kenny's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed

---

[47]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Exhibit 130.)

Amended § 2255 Pet.                          219                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide.  (Exhibit 84, Exhibit 87, Exhibit 132.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success.  A.J., Kenny's grandfather (*see* Exhibit 1) , was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety.  A.J. terrorized his wife who hid "in the woods" from him (Exhibit 87), raped one of his daughters who became pregnant and placed the baby for adoption (Exhibit 84), and went on drunken rampages through town.  His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation.  (Exhibit 27.)  His family believed he "was bipolar." (Exhibit 87.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce."  (Exhibit 87; Exhibit 125; Exhibit 146.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (Exhibit 146), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Exhibit 84).  She "died very confused."  (Exhibit 146; Exhibit 133.)  Mary's brother, Howard, was "Looney Tunes" (Exhibit 84), and Howard's son, Billy Dean, who was a disabled veteran with a history of schizophrenia, committed suicide.  (Exhibit 26; Exhibit 128.)  Kenny's great aunt, Elnora Long, is bipolar and requires significant doses of medication.  (Exhibit 84; Exhibit 86.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable."  (Exhibit 86.)  Kathy,

Kenny's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings.  (Exhibit 86; Exhibit 140.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder.  (Exhibit 86; Exhibit 145.)  Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  (Exhibit 86.)

### Maternal Family History

Kenny's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose everyday life reflected the travails and successes of Indians in eastern Oklahoma.  Hugh grew up in an Indian orphanage, and became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[48] an Indian mission school started by the Presbyterian Church.  Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Exhibit 100.)  Hugh's mother, a widow with no ability to support her children, placed her two younger

---

[48]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

Amended § 2255 Pet.                          221                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

children (Lela and Warren) with her husband's relatives. (Exhibit 100; Exhibit 102; Exhibit 106; Exhibit 134.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents. Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee, and it appears that at least one of the men who shot and killed them did so with impunity.[49] (Exhibit 59; Exhibit 106.) Records also show that Abe got into trouble with alcohol, committed violent offenses and stole. (Exhibits 16 through 23.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep. Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility. Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers. They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Exhibit 8), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother. (Exhibit 120.) Hugh "barely earned enough to live on." (Exhibit 97.) Hugh, Hattie and their growing family lived in "tumble down" houses that "were in pretty bad shape even by standards back then." (Exhibit 97.) The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking." (Exhibit 97.)

World War II intervened, and Hugh served in the U.S. Army. When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook. Hugh

_____

[49]Cherokee Census Cards M2799 and 3294.

"learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm. (Exhibit 97.) Gelene "always heard" her family was "part Indian and that [she] was 3/16 Cherokee." (Exhibit 97.)

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Exhibit 97.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Exhibit 97.) After a year at Menual Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Exhibit 102.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Exhibit 97.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Exhibit 97.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Exhibit 97.)

Gelene explained that "[l]and is just something very important" to her family and "always has been." (Exhibit 97.)

Hugh and his wife Hattie were dedicated to their dream of owning land. Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never considered working less." (Exhibit 97.) Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home." (Exhibit 97.) When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California. Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five. Kenneth Barrett eventually built his shack for $150.00 on a spit of his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather, enjoyed a fine reputation in Sequoyah County. From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor. Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden. (Exhibit 84.) Issac "had his burdens to carry after he married" Mary. She had a "mental breakdown" (Exhibit 146), and "walked around the yard talking to herself. At night, she would wake up, wash jars, and think she was canning." (Exhibit 84.) According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was accused of burglary, and was

involuntarily committed to the state mental institution four times over a ten year period before he committed suicide by shooting himself in the head.  (Exhibit 84; Exhibit 25; Exhibit 26; Exhibit 128.)  Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November 24, 1952.  (Exhibit 84.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise.  "He had nothing left."  (Exhibit 84.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Exhibit 84.)  A.J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Exhibit 86; Exhibit 1.)  Ada's mother, Ida Melton, was an Indian (Exhibit 131) married to Sam Hatter.  (Exhibit 9.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (*See* Exhibit 10.)  Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home.  Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Exhibit 84.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Exhibit 84.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." (Exhibit 84.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." (Exhibit 146.)  Unable to support his family, "[t]he entire family had to work in the fields traveling from one crop to the next." (Exhibit 84.)  State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." (Exhibit 146.)

Life for Ernie, Kenny's father, and other children in the family was dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields." (Exhibit 81.)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Exhibit 81.)

"We had a neighbor who raised purple whole peas for animal feed.  My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Exhibit 87.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. (Exhibit 146.)  None of his children "wanted him to be at home because of the crazy things he did." (Exhibit 84.)  He suffered from mood swings that he attempted unsuccessfully to self medicate with copious

amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. (Exhibit 146.) Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous." (Exhibit 146.) His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." (Exhibit 84.) When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Exhibit 84), but he "was difficult to figure out because he was also a decent guy when he was sober." (Exhibit 81.) A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption. (Exhibit 84.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his] way." The children left home as soon as they could. (Exhibit 146.) Family members reported that A.J. had "two different personalities" and "angry spells about three times a week." (Exhibit 146.) A.J. had "enormous moods swings from being an alright guy to being totally out of control." (Exhibit 81.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers." (Exhibit 146.) A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him." (Exhibit 146.) A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality." (Exhibit 146.) A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor. He can retain a number of
> five digits but is unable to repeat them in reverse with any degree of
> facility. Serial subtraction of eight from one hundred is done with much

hesitation and inaccuracy.  His general intelligence seems inaverage and dull normal.  His reasoning and judgement are limited.  His insight is poor.

(Exhibit 146.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Exhibit 87; Exhibit 146), even though "nothing could stop him from attacking them."  (Exhibit 81.)  Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was."  (Exhibit 81.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  (Exhibit 81.)  Ernie tried "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match"  for his father until he was "half grown."  (Exhibit 81.)  Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children."  (Exhibit 81.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  (Exhibit 81.)   High school for Ernie was "different." (Exhibit 81 .)  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed."  (Exhibit 81.)  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect."  (Exhibit 81.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out."  (Exhibit 84.)  Ernie's brother described him as "pretty cruel."  (Exhibit 84.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  (Exhibit 84.)  Ernie's brother thought

Ernie was "a lot like [his] father," A.J.  (Exhibit 84.)  An aunt who taught Ernie in elementary school described him as "a mean child."  (Exhibit 93.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open."  He still has a scar from it.  (Exhibit 81.)  Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Exhibit 81.)

## Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Exhibit 91; Exhibit 97; Exhibit 5.)  Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he] knew as a child growing up," he had little notion of family life or fatherhood.  (Exhibit 81.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Exhibit 81.)

Ernie "almost immediately started running around with other women" (Exhibit 81) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  (Exhibit 81.)  After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  (Exhibit 81.)  Ernie "did pretty much whatever [he] wanted to.  [He] would go out, drink as much as [he] wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a time."  (Exhibit 81.)  Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his] children what they needed and be the kind of parent they deserved."  (Exhibit 81.)  At the time he and Gelene started their family, his only measurement of success was being able to work himself  "up from pushing brooms to production manager."  (Exhibit 81.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Exhibit 97.)  She was "a heavy drinker with dramatic mood swings."  (Exhibit 98.)   She had planned on going to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in shining armor."  (Exhibit 97.)  She did not realize, until after they married, that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better."  (Exhibit 97.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her], but for the children [they] had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Exhibit 97.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Exhibit 97.)  Throughout their 13-year marriage, Ernie "had his other women."  There was never a time he did not have other

women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis (*see* Exhibit 197), who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Exhibit 91.)

Kenny's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Exhibit 97.)   They "split up and got back together and threatened to leave each other over and over."  (Exhibit 97.) They "always had a difficult time of it."  (Exhibit 97.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Exhibit 119.)  He was followed by his younger brother, Richard, born June 24, 1964.  (Exhibit 97; Exhibit 121.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Exhibit 81.)  Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could."  (Exhibit 81.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967.  (Exhibit 81.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Exhibit 81.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Exhibit 97;

Amended § 2255 Pet.                         231                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 123.)  Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home."  (Exhibit 81.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time."  (Exhibit 81.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Exhibit 97.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Exhibit 97.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." (Exhibit 97.)  Gelene "was at the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene divorced June 20, 1973.  (Exhibit 97; Exhibit 12.)

### Infancy and Childhood Development

Kenny  has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life.  Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.  These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes as "very difficult." (Exhibit 97.) She was in "constant pain," uncomfortable, and depressed. (Exhibit 97.) She described her pregnancy as "battling with Kenny before he was born." (Exhibit 97.) Gelene drank throughout her pregnancy with Kenny, unaware of alcohol's potentially devastating effect on a developing fetus's brain. (Exhibit 97; Decl. Linda Riley.) Gelene's in laws commented on her early alcoholism and stated she "was a drunk right out of high school." (Exhibit 86.)

Kenny had a difficult infancy and "exhausted" his mother. (Exhibit 97.) His "days and nights were mixed up," and he "was colicky" and unable to be comforted. (Exhibit 97.) He cried and fussed "all the time," making Gelene think all babies must be like him. After she had her other two children and observed their development, she "realized something was wrong with Kenny." (Exhibit 97.) Gelene received no help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him. He was colicky and cried all the time." (Exhibit 81.) Kenny was born with a large lump on the back of his head. (Exhibit 97.)

Kenny failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Exhibit 35.) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched." Kenny's mother nursed him. (Exhibit 35.)

At nine months, Kenny did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye" or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." (Exhibit 35.)

At one year, Kenny's delays were more obvious. His mother noted he "had trouble learning to walk." (Exhibit 97.) He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching." (Exhibit 35.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Exhibit 97.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Exhibit 97.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Exhibit 91.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Exhibit 74.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Exhibit 81.)  Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen.  (Exhibit 85.)  She also noticed that Kenny "had strong feelings" (Exhibit 85), a common symptom of children who develop bipolar mood disorder.  Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive."  (Exhibit 101.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children."  (Exhibit 91.)  Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . .  He would break down and cry easily."  (Exhibit 91.)  His cousin remembered that "back then we called Kenny hyper.  He was erratic and temperamental."  (Exhibit 86.)  His mother reported that "any little thing could upset him, but it took a lot to calm him."  (Exhibit 97.)  Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings."  (Exhibit 81.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax."  (Exhibit 97.)  Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."  (Exhibit 97.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he

went from one thing to the next" and "was never still." (Exhibit 97.) It "almost drove [her] crazy." (Exhibit 97.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Exhibit 97.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Exhibit 81.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Exhibit 86.) Children were "afraid of her." (Exhibit 86.) Kenny suffered "more verbal abuse from her than her other two children." (Exhibit 86.) Kenny's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Exhibit 97.) Kenny had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read. (Exhibit 97; Exhibit 136.)

Ernie "hardly had anything to do with [Kenny] after the divorce, and everyone could see how much it hurt Kenny." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." (Exhibit 84; Exhibit 91.) Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." (Exhibit 93.) Ernie "went his way and let Gelene take care of the kids." (Exhibit 93.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma."  (Exhibit 81.)  Kenny  "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Exhibit 81.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."  (Exhibit 91.)  Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him."  (Exhibit 91.)  Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."  (Exhibit 91.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of his room.  Phyllis and her husband went to Gelene's house and talked to Kenny.  Kenny told them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream."  (Exhibit 91.)  Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability.  She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings."  (Exhibit 99.)  When Gelene "lost control of herself," she whipped the boys,  but "there was no real parenting."  (Exhibit 99.)

Gelene was harsher with Kenny, "verbally and physically," than she was with her other two sons.  (Exhibit 99.)  Gelene used a strap to whip Kenny, and Kenny "hated" it. (Exhibit 99.)  Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him.  (Exhibit 99.)  The dog was run over by a car.

Steve, Kenny's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family.  Steve, an educator and principal

at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Exhibit 99.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Exhibit 99.) Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Exhibit 99.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade. (Exhibit 99.) Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that "Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie. (Exhibit 99.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance." (Exhibit 99.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education. Kenny failed in school." (Exhibit 99.) School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had." (Exhibit 99.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys." (Exhibit 99.) Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness." (Exhibit 99.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems." (Exhibit 99.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade." (Exhibit 81.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. He went flying slamming against the wall." (Exhibit 81; Exhibit 149.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Exhibit 97.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Exhibit 97.) Kenny "got pretty depressed and lost interest in school." (Exhibit 97.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Exhibit 99.) He could tell "how much Kenny missed [their] dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Exhibit 99.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Exhibit 74.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Exhibit 81.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff

made "some adjustments to the curriculum" for him. (Exhibit 136.) At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science). It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Exhibit 126.) Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. It was as if the only adult who ever cherished him had gone." (Exhibit 86.) Ada Mae's death was the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Exhibit 86.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science). (Exhibit 136.) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Exhibit 81; Exhibit 200.)

When Kenny was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Exhibit 97.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny – then a youth with manic-depressive illness, brain damage and a low I.Q. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Exhibit 117.)

Amended § 2255 Pet.                    240                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

**Onset of Mental Illness**

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits.  He battled "terrible mood swings" and periods of depression that lasted for days.  He hoped that hard work would make his pain go away.  It did not.  He had worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  (Exhibit 97.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny  met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16.  (Exhibit 7.)  Their only child, Toby, was born December 1, 1980.  (Exhibit 122.)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Exhibit 97.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Exhibit 103.)  Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Exhibit 103.)  Gelene never treated "her other sons the way she treated Kenny." (Exhibit 103.)  She and Kenny had a "terrible relationship."  (Exhibit 103.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Exhibit 152; Exhibit 11; Exhibit 150.)

Kenny tried "to bury his problems under constant work and activity." (Exhibit 99.) Kenny measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own. Depressive episodes overtook him, and he would "get real depressed and sleep all the time." (Exhibit 103.) The only antidote to his depression was drugs. His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Exhibit 103.) He used methamphetamine as an antidepressant and discovered that he could work well under its influence. Abby observed that Kenny "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep." (Exhibit 103.)

Kenny's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.) His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Exhibit 103.) Kenny had "racing thoughts." (Exhibit 103.) He did things without thinking and "then regretted them." (Exhibit 103.) Abby knew that Kenny "did not act the way normal people act" and that he "got swept away in his emotions." (Exhibit 103.) When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Exhibit 103.) He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Exhibit 103.)

Kenny's cousin, Brandy, recognized Kenny's bipolar mood disorder created severe problems for his marriage. Brandy compared Kenny's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Exhibit 77; Exhibit 141.)

Kenny and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious. During one of the separations, he went to his father's home where Ernie found work for him. Ernie described his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek psychiatric treatment. (Exhibit 103.) Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together." (Exhibit 103.) She opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge." (Exhibit 103.) Kenny's brother reported, "[a]s troubled as Kenny was, he worked all the time." (Exhibit 99.) Kenny's use of drugs allowed him to keep working, despite his serious mental illness. Kenny increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple. He needed methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder. In 1986, Kenny attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Exhibit 147.)  Kenny's brother Steve was home at their mother's and witnessed Kenny's suicide

attempt:

> In a terrible episode of depression, he tried to kill himself.  I was
> home with Monty and Podgy in the living room watching Carl
> Sagan kind of stuff on television.  Kenny came in to borrow my
> 12-gauge that Dad had lent me. It was loaded with 00 shot. I
> looked out and I saw Kenny leaning against the truck, but I didn't
> see the shotgun. I don't remember hearing the actual shot, but I
> must have. Mom and Paul were in bed sleeping. I woke them up
> and told them to call an ambulance, and then I went outside. You
> couldn't see the hole all the way through because of the wadding. .
> . .Kenny was in and out of it, mumbling, making no sense.  Kenny
> was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he

briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller

coaster."  (Exhibit 103.)  Elavil was extremely helpful and made a big difference in Kenny, but

he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State

Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or

drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Exhibit

147; Exhibit 33.)  The admitting psychiatrist provisionally diagnosed Kenny with "depressive

neurosis with suicidal potential extremely high."  (Exhibit 147.)  The nursing assessment

reported that Kenny did "not recognize problems."  (Exhibit 147.)  Kenny had a nine year history

of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home

in the woods."  (Exhibit 147.)

On the mental status examination, Kenny was noted to be "labile" and to laugh

"inappropriately at times."  (Exhibit 147.)   His insight and judgment were impaired.  Staff found

Kenny to be "courteous, cooperative." (Exhibit 147.) Kenny acknowledged that he had "a hot temper." (Exhibit 147.) Kenny's highest level of functioning in the preceding year was "poor." (Exhibit 147.) Kenny reported being anxious and depressed. He was paranoid and blamed his wife and mother for his being hospitalized. Kenny was discharged early on October 17, 1986 to his cousin. His discharge summary noted he "wants to return to work." (Exhibit 147.)

Kenny was not able to return to work. Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed." (Exhibit 101.) Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her. He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Exhibit 101.)

Kenny sustained repeated head injuries from his work and from car accidents. He was preoccupied and distracted by depression and mania and unable to focus his attention. He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Exhibit 147.) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Exhibit 147.)

When Kenny's marriage ended after 14 years, he "never recovered." (Exhibit 103; Kenneth Barrett, Divorce Proceedings.) He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives. By the end of their

marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings." (Exhibit 103.) Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill." (Exhibit 103.) It pained Abby to leave Kenny because "[t]here were times he could be good. . . .and would try so hard to be good." (Exhibit 103.) She also knew that "he could not function without her." (Exhibit 103.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind." (Exhibit 147.) Hospital staff noted he was "extremely agitated." (Exhibit 147.) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." (Exhibit 147.) He demonstrated "lack of concentration" and "rapid thought process." (Exhibit 147.)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through. (Exhibit 147.) Kenny "moved back home" and "built a little shack" next door to his mother's trailer. (Exhibit 99.) His brother visited it and observed that the shack was "almost Waldenish in its own way." (Exhibit 99.) The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff." (Exhibit 99; Exhibit 97 and Attachment.) Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Exhibit 97.) Gelene prepared his meals for him, and he ate at her trailer. Kenny's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Exhibit 96.) Even as a teenager, Toby "knew something was wrong with him because he had

mood changes that were not normal." (Exhibit 96.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person." (Exhibit 96.)

Everyone in the family and Kenny's ex wife knew he could not "live on his own." (Exhibit 97.)  During his and Abby's frequent separations, "Kenny always came home" to his mother.  (Exhibit 97.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Exhibit 93.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Exhibit 96.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it." (Exhibit 97.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Exhibit 90; Exhibit 77; Exhibit 95.) Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Exhibit 75.)

As Kenny's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Exhibit 95)  His aunt Phyllis understood that he "was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

Amended § 2255 Pet.          247          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(Exhibit 91.)

Despite the limitations created by his mental impairments, Kenny "would give you the shirt off his back if you needed it." (Exhibit 91.) He "tried to stay close to home, always worked hard and took pride in his work." (Exhibit 91.) Kenny's family and friends uniformly reported that Kenny was not violent or dangerous to them. His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him." (Exhibit 74.) Janice, his cousin, grew irritated and impatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him." (Exhibit 85.) Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." (Exhibit 93.) Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone." (Exhibit 93.) Relatives visited and talked with Kenny. His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Exhibit 101.) Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

Friends and family thought at times Kenny would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." (Exhibit 90.) A cousin, Brandy Hill, remembered that "Kenny was very generous,

and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission." (Exhibit 77.)  Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work on cars."  (Exhibit 96.)  Toby was intimate with Kenny's fears but knew that Kenny "was not dangerous," and Toby "was not afraid of him."  (Exhibit 96.)  Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to him" that helped "offset the pain of having a dad with mental problems."  (Exhibit 96.)

The family hoped that Kenny could recover.  His mother described their observations:

> As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors.  He stayed more and more to himself, though, and did not like to leave the property.  Friends bought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door, he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

### b.    Kenny Barrett's mental illness and organic brain dysfunction.

Mr. Barrett's trial counsel had a duty to obtain this information about his family and his own personal history.  This is the story of a unique human being whom jurors never met.  If trial counsel had gathered this readily available information and provided it to a qualified expert, as prevailing professional norms required, the jury would have understood how Mr. Barrett's life history, while intrinsically compelling, also has profound implications for a scientific understanding of his mind and actions.  A competent mental health expert would have

seen significant risk factors in Mr. Barrett's background that would have helped explain who he

is and why he would act as he did.

> Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

(Exhibit 117 at ¶ 22.)

An expert presented with the available background data would have informed the

jury that Mr. "Barrett's own genetically based potential for developing a mental illness was

significantly increased by the circumstances of his upbringing, especially his parents' chemical

dependency."  (Exhibit 117 at ¶ 30.)

> His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

(Exhibit 117 at ¶ 32.)

As Dr. Woods explains, research published by the National Academy of Science

documents the impact of such parenting on a child's developing brain:

> *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain.

They also determined that chronic stress is detrimental to the normal development of the brain. ***

[¶]     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

[¶]     The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated. The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment. The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Mr. Barrett's development. His mother drank when she was pregnant with him. Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction. (Exhibit 89 at ¶ 23, Exhibit 117 at ¶ 37.) Mr. Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood. His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure. Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences. (Exhibit 89 at ¶ 23.)

Mr. Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical

dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

(Exhibit 117 at ¶ 44.)

Jurors would want to know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenny Barrett.  Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

[¶]      Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder.   He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

The life history information that was available to trial counsel includes evidence of other sources of trauma that placed him at risk for organic brain impairment.  (Exhibit 89 at ¶ 21, Exhibit 171 at ¶ 41.)  He was hit in the head with a steel ball when he was eight or nine years old; at age 17, Johnny Philpot beat Mr. Barrett about the face and head, including a blow that

broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a shotgun. *Id.*

If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Mr. Barrett's jury would have heard extensive evidence of mental illness and impaired brain functions due to organic damage. As explained by Dr. Young: "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Exhibit 89 at ¶ 28.)

The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

> More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

(Exhibit 89 at ¶ 26.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and medical records. (Exhibit 89 at ¶¶

20-26.)  The objective testing and historical study performed by Dr. Young constitutes an

accepted, reliable method for assessing cognitive function.  (Exhibit 89 at ¶ 62.)  Based on the

historical data available at the time of trial and the scientific literature, Dr. Young opines that the

damage to Mr. Barrett's prefrontal cortex likely stems from abnormal prenatal development,

traumatic brain injuries Mr. Barrett suffered, and drug abuse.  (Exhibit 89 at ¶¶ 63-65.)

Like any other person, Mr. Barrett has areas of weakness and areas of strength in

the many brain functions evaluated by a neuropsychological test battery.  However, testing shows

Mr. Barrett is impaired in some areas which means that he functions at a level below the average

person, and sometimes far below.  The testing data and congruent findings on psychiatric study

show Mr. Barrett experiences dysfunction in areas of his brain

> that are central to integrated reasoning and thoughtful judgment, such as the
> processes necessary to inhibiting reflexive responding, interrupting, and returning
> to ongoing activity; interacting with and selectively directing attentional processes, screening out
> interference and sustaining attention; shifting cognitive resources to focus on new demands or
> respond to new conditions or information; directing the efficient use of, and alternation between,
> pattern and detail processing; monitoring and regulating speed of information processing;
> monitoring task performance for accuracy and efficiency; overseeing the selection of
> verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering
> performance based on feedback; directing the efficient use of fluid reasoning resources; directing
> the use of working memory resources; directing the efficient and fluent production of language
> when highly specific production demands are made; directing the integration of multiple abilities
> to produce oral or written responses or products that reflect the level of capacity of the
> component abilities involved; directing the efficient placement of information in long-term
> storage; directing the retrieval of information from long-term storage; regulating social behavior;
> regulating emotional control; enabling self-observation and self-analysis; and making use of
> hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly
> impaired functioning in all these domains.

(Exhibit 117 at ¶ 58.)  In less scientific terms, Mr. Barrett has brain damage that makes him less

able than a normal person to process information and formulate a rational response.

Mr. Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in

ways that complement (aggravate) his other impairments, as they relate to culpability in the death

of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning,

interpreting and processing speech and the emotional tones and meaning in speech.  The

temporal cortex is also responsible for processing visual information.  Dysfunction of the

temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and

outbursts of aggression.  (Exhibit 89 at ¶¶ 36-77.)

Based on Dr. Young's findings and his own assessment, psychiatrist George W.

Woods, Jr., M.D. concludes that Mr. Barrett experiences dysfunction in the areas of the brain that

are necessary to sound reasoning, judgment and planning.  That is, "Mr. Barrett . . . suffers from

a Dysexcutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™.

(Exhibit 117 at ¶ 67.)  In other words, Mr. Barrett's ability to accurately and appropriately

process, retain, integrate and respond to information and events as they unfold is significantly

compromised.  (Exhibit 117 at ¶ 58.)

The areas in which Mr. Barrett experiences impairment make understanding his

functioning a necessary part of understanding him as a unique human being trying to get along in

the world, and for understanding the events of September 24, 1999.  The problems Mr. Barrett

has experienced from organic brain impairments are compounded and exacerbated by severe

psychiatric illness.

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder,
> severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe,
> 309.81.  * * * Mr. Barrett's clinical profile medically indicates cognitive
> functioning and behavior that is severely compromised by overlapping symptoms
> of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
> impairments in higher cortical regions necessary for inhibition, reasoning and
> judgment.

(Exhibit 117 at ¶ 66.)  As Dr. Woods states it, Mr. Barrett's cognitive functioning and behavior

"is severely compromised by overlapping symptoms of depression and mania ... and impairments

in [the] higher cortical regions necessary for inhibition, reasoning and judgment." (Exhibit 117 at ¶ 66.)

The development of Mr. Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses. As shown in the attached medical records and summarized *supra* in § B.2.a of this Claim, Mr. Barrett comes from a family plagued with bipolar disorder. The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors. (Exhibit 117 at ¶¶ 63-65.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect." (Exhibit 117 at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Petition, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

[¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

[¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]     Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial."  (Exhibit 117 at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]     Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶]     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder.  The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that

limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening.  Over the course of his life, he had been beaten multiple times by his caregiver and the police.  He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid.  Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction.  This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Mr. Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the

time of the police action on his property.  This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation.  If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings.  (Exhibit 55 at ¶ 16.)  Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods.  (*Id.* at ¶ 23.)

Taking [the social history] information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out.  I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock.  In general, someone in those circumstances will experience some disorientation and difficulty understanding events.  For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over.  For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id.* at ¶ 24.)

Armed with the available information, trial counsel would have been able to persuade the jury on multiple fronts including (a) doubts about the truthfulness and motivations of the prosecution's informants; (b) doubts about the need for a no-knock warrant (including whether Mr. Barrett could have failed to appear for a trial that was not going to happen); (c) the inappropriate nature of the raid and the tactics that call into doubt whether Mr. Barrett could have seen that his attackers were law enforcement officers; (d) that the Tact Team recklessly approached a man who was hyperreactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened; (e) that Mr. Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate; (f) that apart from the conditions existing at the time of the offense, Mr. Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect; (g) that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

As elaborated in the conclusion to Mr. Barrett's second stage ineffective assistance of counsel arguments, trial counsel had a clearly defined duty to investigate, develop and present this mental health evidence in the penalty phase of trial. The mental health evidence that could have and should have been presented on Mr. Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death to one or more persons in addition to Trooper Eales, and that Mr. Barrett committed the offense *after substantial planning and premeditation.*

The evidence presented here shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law, and that there was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal of [Mr. Barrett's] culpability." *Rompilla*, *supra*, 545 U.S. at 393, quoting *Wiggins*, *supra*, 539 U.S. at 538, in turn quoting *Williams*, *supra*, 529 U.S. at 398 (internal quotation marks omitted). Had the jury been able to place the evidence related to both phases of trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. Accordingly, the sentence of death should be vacated. 18 U.S.C. §§ 3593(e), 3594.

### c. The prosecution's exploitation of trial counsel's deficient performance.

Not surprisingly, the inaccurate, incomplete and misleading portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid was what kind of father he was. The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them. Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs. As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply. Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child. Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison. Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently. This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards." Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative

Amended § 2255 Pet.                   262                  *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356.)

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358.)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting

that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave

Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow]

them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr.

Barrett.  Whatever Mr. Barrett had done for his family was vague and undetermined, and was in

any event far outweighed by the crimes he had committed.  If the jurors were tempted to feel any

sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his

family by his own conduct.  Mr. Sperling stated that Mr. Barrett had "victimized" his own family

by making them serve as "props" or witnesses on his behalf in the penalty phase.  Concluding his

remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for

his membership among "the worst of the worst."  Mr. Barrett was simply a murderer who had

killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for

his victim.  (R. 5417-20.)

### Conclusion.

The record and extra record evidence establishes that Mr. Barrett's trial counsel

first possessed some information about Mr. Barrett's background in late May 2005.  By the

beginning of July, trial counsel were searching about for a mitigation specialist.  In August, trial

counsel learned it was essentially too late to develop a social history and mental health diagnoses

informed by that history.  In September, the month the trial began, trial counsel were again

searching about for information they should have had the previous December.  The evidence

shows trial counsel never contacted the mitigation specialist the trial court authorized, and never

obtained all the records of the state-court mitigation investigation.  Trial counsel's statements on

the record establish that they made no effort to obtain a psychiatric or psychological evaluation of

Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel.  This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation, exacerbated by the trial court's funding restrictions (*see* Claim 3), is manifest because the Government's case for death was hardly overwhelming.  The jury rejected the death sentence on Counts 1 and 2.  Even though the death sentence was imposed on Count 3, the jury rejected the non-statutory aggravating circumstance that Mr. Barrett would constitute a continuing threat to society.  The statutory aggravating circumstances the jury did find all revolved around the circumstances of the commission of the offense (which, it should be noted, would have been viewed in an entirely different way had counsel not rendered ineffective assistance in the guilt/innocence stage).  Especially where, as here, the case for death was not overwhelming, prejudice from counsels' unprofessional performance is readily apparent.  *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003) (while counsel was also found to be ineffective in the first stage of trial, he was also ineffective in the penalty phase, particularly in light of the fact that the aggravating circumstances found "over-represented their collective substance," the evidence in support of a death verdict was not overwhelming, and the prosecution's penalty phase case did not indicate much additional "moral egregiousness" above and beyond the *two* murders for which defendant was convicted); *Mayes v. Gibson,* 210 F.3d 1284, 1289 (10th Cir. 2000).  Even where, unlike Mr. Barrett's case, a strong case for death has been presented, the types of failures on the part of counsel that were present here have led to a finding of prejudice.  *Williams v. Taylor,* 529 U.S. 362, 390-93 (2000); *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir. 2004)(prejudice from second stage deficient performance found even though

1623

defendant was convicted of killing his girlfriend and her four children).  Surely, had counsel

presented the powerful case in mitigation that could have been marshaled, but which Mr.

Barrett's jury never heard, at least one juror would have opted not to impose the death penalty.

*Smith v. Mullin, supra, relying on Wiggins v. Smith,* 539 U.S. 510, 534-35 (2003).

The evidence of prejudice is greater, too.  Due to trial counsel's inattention, the

jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his

father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the

psychologically damaging harsher treatment he experienced from his mother, his father's

abandonment of the family, moving from place to place due to the parents' inability to sustain a

life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic

vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the

symptoms of his organic brain damage.  Despite the mania and paranoia, the hypervigilence,

hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local

sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew

had simply asked him to.  The overwhelming weight of the evidence from both stages of a

competently tried case would have shown the jury that law enforcement made tragic errors in

assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett

should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary

circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government

or state law enforcement officials.

**Claim 3.**     **Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3005, 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985).

Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." 18 U.S.C. § 3005 (emphasis added).

Mr. Barrett therefore had a right, as secured by statute, and the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at

the same level and to the same extent as provided or otherwise available to the prosecution and similarly situated defendants.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Claims 1 and 2, *supra*.

Mr. Barrett had a history of psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs.  (Exhibit 117; Exhibit 147.)  Trial counsel were aware, or should have been aware, of this history.  (*See* Doc. 208; Exhibit 147; Muskogee County Jail Medical Records of Kenneth Barrett; Exhibit 118.)  In addition, Mr. Barrett had a history of illicit drug use and of head injuries.  Furthermore, he has a multi-generational predisposition to developing serious mental illness, including the Bipolar Disorder for which he was medically diagnosed prior to the events in question.  These factors, together with his developmental and trauma history, indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest.  (Exhibit 118; Exhibit 89; Exhibit 117.)

Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, and other drugs and injuries, including the significance of any discontinuation of treatment.  Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both.  (Order filed 3/18/05 (Doc. 97).)

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation.  The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of

Amended § 2255 Pet.                    269                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

mental health professionals when considering social history and medical information in the course of forming their opinions.   (Decl. Richard H. Burr dated 4/4/05, filed as Exh. C to Doc. 107, at 4, 8.)  To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms.  *See* ABA Guideline 10.4(C)(2)(a) (as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator, and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"); ABA Guideline 10.11(F)(2) (counsel have duty to seek appropriate expert assistance).  *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Exhibit 53.)  "The standard practice in federal capital trials is to provide the services of more than one mental health expert."  (Decl. Richard H. Burr, filed as Exh. C to Doc. 107.) Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Exhibit 118.)

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  Trial counsel informed Dr. Russell in August 2005 that the court would not fund a thorough investigation for mitigating circumstances.  (Exhibit 56.)  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have

provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. (*Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97).) Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases demand a higher level of due process, and contrary to the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. (*See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. (*See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Exh. C to Doc. 107, at 8.) The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty

Amended § 2255 Pet.                    271                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

defendants.  (Doc. 107.)  That psychologist had been compensated in other similar cases at a rate of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. (*Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction.  (Doc. 50 at 8.)  Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain damage, and that he had suffered significant head injuries during his life.  (*Ibid.*)  Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation.  (Doc. 97 at 3.)  This summary denial was highly prejudicial to Mr. Barrett.  The only expert on whom trial counsel attempted to rely, Dr. Russell, had not evaluated Mr. Barrett for mental illness or organic brain dysfunction.  (Exhibit 56.)  As shown in the attached declaration of Myla Young, Ph.D. (Exhibit 89), Mr. Barrett's history of insults to his brain resulted in significant impairments in his functioning.  (*See* Claim 2, *supra*.)

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs.  Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial.  (Docs. 50, 107.)  A mitigation specialist is an essential member of the team in a capital case.  (ABA Guideline 10.7.)  Without explanation, the court limited the mitigation investigation to 100 hours and no travel.[50]  As resource counsel informed the court at the time,

---

[50]  The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour.  (*See* Doc. 107.)

> The number of hours requested by the defense is well below average.  The average number of hours worked by mitigation specialists in federal capital cases is 600 hours.  In a number of cases, mitigation specialist services have exceeded 1000 hours.  Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive.  The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation.  Measured against the number of hours authorized for mitigation specialist services in every other capital case in which the death penalty has been authorized, the 100 hours approved by the Court is grossly inadequate.

(Exh. C to Doc. 107 at 4.)

The court's withholding of resources was highly prejudicial.  Shortly before trial, trial counsel turned to Dr. Jeanne Russell, for whom the court had approved some funds, and asked her to conduct a mitigation investigation.  (Exhibit 56.)  Dr. Russell was not qualified to perform that role, even if trial counsel had contacted her in time, which he did not.  (*Id.*)  Trial counsel informed Dr. Russell that the defense's efforts were hampered by the court's refusal to approve resources for a comprehensive mitigation investigation.  (*Id.*)  As shown in the social history presented in Claim 2, Part B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour.  (Doc. 50 at 4.)  The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2.)  "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours."  (Exh. C to Doc. 107 at 3.)  The Court was aware that this rate was considered reasonable by experts in relation to the practice in other federal capital cases.  Moreover, despite the

preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." (Order filed 3/18/05 (Doc. 97) at 2 n.2.)  The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense System ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Exhibit 111.)

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $200.00 per hour, in addition to $1,000.00 for lodging, travel and incidentals.  (Doc. 50 at 7.)  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3 *and with* 18 U.S.C. § 3005).  Moreover, the court did not authorize any lodging or travel expenses

Amended § 2255 Pet.        274        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

whatsoever which would have made it impossible for a defense expert to observe the testimony of the Government's expert and impossible for the defense expert to travel to Oklahoma to testify.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation. As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert." To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense. *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial. As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started. Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it. For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

(a)     Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

(b)     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

(c)     Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

(d)     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)     Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)     Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)     Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)     Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)     Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available

Amended § 2255 Pet.                    276                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)      Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings; Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)      Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)      Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)      Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)      Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Exhibit 109.)

The trial court denied Mr. Barrett due process, equal protection, and his statutory rights to develop a defense by denying him meaningful access to an expert in law enforcement tactics.  As stated in Claim 2, *supra*, trial counsel sought funds to retain Dr. George Kirkham, a criminologist, sworn law enforcement officer, and expert in police tactics.  (Doc. 50 at 5.)

Amended § 2255 Pet.                    277                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida.  (*Ibid.*)  The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel.  (Doc. 97 at 3.)

As stated in Claim 2, *supra*, if trial counsel had been able to retain Dr. Kirkham, or had been diligent in pursuing his services, the jury would have heard that the raid on Mr. Barrett's home (a) violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored; (b) was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence; (c) was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and (d) unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.  Dr. Kirkham would have explained how these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.  (Exhibit 44.)  That is, with expert assistance, Mr. Barrett would have been able to show that he did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's claim that he had such intent.  Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. *See* Claim 18, *infra*. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized. *Id.* and Claim 1, *supra*.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 4.** **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest. The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware*, <u>438 U.S. 154</u> (1978). Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress,

the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability, and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane

system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr. Barrett's residence during the critical time.  Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.)  Sanders claimed that he and Janesse Thomas bought

drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty.  As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders.  This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense.  The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Exhibit 6.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for

anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant.  In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth.  Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  (Exhibit 29.)  *See* Claim 18, *infra*.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks*  hearing, or its equivalent.  He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 5.**      **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

### Introduction

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day. *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000). *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155;

*United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1). *Cf. Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25 (1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the

suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under § 2255. *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.) To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different outcome, *i.e.,* acquittal or a lesser sentence. *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999). Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses. Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed. Threats to witnesses to get them to cooperate with the Government were not disclosed. Relevant to this were the ongoing criminal activities of former AUSA Mike

Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, the relevance of which is explained in Claim 5, Part B.2, *infra*. Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense. (*See* Claim 1, *supra*.)

Some of the evidence discussed below was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders. The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking. The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett. At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders. Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson. In any event, the Government failed to

disclose exculpatory evidence of the witness who failed to corroborate Sanders.  The

Government also sponsored false testimony from Travis and Cindy Crawford.  Newly discovered

evidence reveals that their testimony was the product of threats and intimidation.  *See  Giglio v.*

*United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386

U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1959).

If the jury's verdict could be affected by false testimony presented by the prosecution – as it

surely was here – a new trial is required.

> **A.      Suppressed Exculpatory Evidence, Evidence of Knowing use of
>             Perjured Testimony, and Newly Discovered Evidence**
>
> **1.      Evidence regarding informant witnesses Charles
>             "Monk" Sanders, Travis Crawford, Cindy Crawford,
>             Brandie Zane Price, Karen Real and Randy Turman
>             entitles Mr. Barrett to relief from his convictions and
>             sentences.**
>
> **a.      Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah

and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In

examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would

speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation,

implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of

Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah

County cases, and more favors shortly thereafter, all due to a "plea agreement with feds."

Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's

trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to

Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing

the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion.

The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady*

evidence.  Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the

defense Sanders's complete criminal history, which could have and should have been used for

impeachment purposes.  It was argued in Claim 2 that trial counsel were ineffective in failing to

cross-examine Sanders about all his previous criminal convictions and dismissed cases; counsel

unreasonably failed to make a search of Sanders's available court files.  Above and beyond that

failing, the prosecution was obligated under *Brady* to reveal Sanders's complete criminal history

to the defense, since it constituted impeachment evidence.  The prosecution failed to do so,

papering over Sanders's appalling criminal history on direct examination, and leaving defense

counsel to simply scratch the surface based on what counsel was able to glean from the

Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock

warrant was secured..  Sanders's testimony was critical to the drug charges which underlay the

various counts of the superseding indictment, and to the Government's arguments on malice and

intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument

respecting trial counsel's failure to impeach Sanders with the number and nature of his previous

convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these

and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which

he originally received a twenty year suspended sentence, of dubious legality due to his numerous

prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also

charged in this case with a misdemeanor count for possession of drug paraphernalia, which was

dismissed pursuant to plea bargain. Two applications to revoke Sanders's suspended sentence were filed. Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program. The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124. Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346. Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (Exhbit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed. He originally received a twenty year suspended sentence. Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation. Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program. The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19. (Exhibit 162.)

Amended § 2255 Pet.                         291                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***." (Emphasis added).  Finally, on December 8, 2008,

orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs. (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial. In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from November 17 until December 9, 2005. At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Exhibit 14.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken

Amended § 2255 Pet.                                    293                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.  *Giglio v. United States,* 405 U.S. 150 (1972). At a minimum, the Government failed in its duty to correct false testimony.  *Giles v. Maryland*, 386 U.S. 66 (1966); *Alcorta v. Texas*, 355 U.S. 28 (1957).

### b.  Travis Crawford.[51]

During the investigation conducted for this 2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters.  Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

---

[51] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post.  Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing.  (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the  Sequoyah County drug charge.  (Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[52]  Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Exhibit 45.)  Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble.  Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs.

---

[52] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history.  Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial.  Mr. Crawford was not honorably discharged.  (Sealed military records of Travis Crawford.)   He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home.  (Exhibit 143.)

Amended § 2255 Pet.                    295              *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Exhibit 45.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony. Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement. According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time.* (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial. *See* Claim 2,

section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement.  (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*.  Due process and the rules of professional conduct required AUSA Littlefield to correct Travis Crawford's false testimony about being off drugs.  The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony.  Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to murder of police officer, and failed to disclose material information as to who was seen carrying the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so.  (Exhibit 45.)  Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents.  Crawford's work as a snitch was exculpatory evidence affecting his credibility.  By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's

property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot

had gone to Mr. Barrett's residence and inspected his firearms without incident.  (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia

Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law

enforcement agents were at Mr. Barrett's house mere weeks before the raid.  *See* Claim 2.  As

shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at

Mr. Barrett's less than a month before the raid, and encountered no violence or threats.  Mr.

Barrett was not arrested on his outstanding failure to appear warrant.  (Exhibit 6.)  This

exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was

concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the

Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending

state drug charge, he was not overly concerned with it.  Mr. Barrett never told Crawford he had

an outstanding warrant, and was thus laying low and hiding from the law.  Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant.

(Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of

the sign posted on the gate, construing it as a threat to law enforcement.  Mr. Crawford states that

the sign was posted as a warning to anyone coming on the property in order to prevent

trespassing and theft.  (Exhibit 45.)[53]

---

[53]  At the time the original 2255 motion in Mr. Barrett's case was filed, Travis Crawford
had declined to sign a declaration reflecting his statements to a defense investigator currently
working for Mr. Barrett.  Thus, declarations reflecting what Mr. Crawford said were filed by his

(continued...)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory." Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c.    **Cindy Crawford**.

As outlined in the first stage ineffective assistance of counsel argument (Claim 2, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided. In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

---

[53](...continued)
parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the 2255 motion, Mr. Crawford has signed his declaration.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009. Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson. (Exhibit 31.) Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government. According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her. Philpot told her she had to go with him. Although Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot. She was driven by Mr. Philpot to the United States Attorney's office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Exhibit 31; Exhibit 14.)

Armed law enforcement officers were also present during the interview. They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her. Littlefield told her she need to work with him and testify against Mr. Barrett. Otherwise, she was going to prison. Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case. Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[54] While Ms.

---

[54] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property. She had done drugs at Mr. Barrett's residence, but did not know who supplied them. Ms. Crawford never

(continued...)

Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care. Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview. (Exhibit 31; Exhibit 14.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony. Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him. Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Exhibit 31; Exhibit 14.)

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Exhibit 31; Exhibit 14.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Exhibit 31; Exhibit 14.)

---

[54](...continued)
bought drugs from Mr. Barrett. (Exhibit 31; Exhibit 14.)

Amended § 2255 Pet.                      301                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers.  Both told her that she did not have to talk to the defense.  According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Exhibit 31; Exhibit 14.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office.  At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high.  She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If you had ever crashed from a meth high, you would know that you would not be in your right mind." (Exhibit 31; Exhibit 14.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel.  (*See* Claim 2)  Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[55]  (Exhibit 144.)  According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out.  She admitted that when she is under stress, she may not perceive things correctly.  This causes her to exaggerate what is

---

[55]  Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

going on around her.  Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident.  At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it.  She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Exhibit 31; Exhibit 14.)

However, even Ms. Crawford's claim to have overreacted is a fabrication.  A readily available witness to the alleged event, Richie Barrett, states that neither the incident Crawford described nor anything like it ever happened.  (*See* Claim 2; Exhibit 104; Exhibit 31.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats.  The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent.  To quote Ms. Crawford, "They [the Government] were very angry.  They scared me and threatened me."  Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Exhibit 31; Exhibit 14.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford.  Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect.  The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she

gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's failure to reveal these facts is a *Brady* violation as well as newly discovered evidence.  *Crivens v. Roth*, 172 F.3d 991, 998-99 (7th Cir. 1999).  The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility.  More significantly, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law.  *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement.  This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities from acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-2004-613 was handled.  Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction.  On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence.  She received a one year deferred sentence on count 2, which charged

Amended § 2255 Pet.                                304                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

misdemeanor possession of drug paraphernalia.  On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment.  On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear.  On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full."  (Exhibit 170.)  Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed.  *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence.  As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day.  She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008.  The first degree burglary charge carried from seven to twenty years.  The conspiracy charge carried up to ten years.  On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed.  (Exhibit 169.)

### d.      Brandie Zane Price.

Price testified in the first stage of Mr. Barrett's trial.  She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections.  The balance of her sentences were suspended upon her completion of the program.  (R. 3487.)  Responding to feeds by prosecutor Littlefield, Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, was not engaging in any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams, et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving between one delivery and as many as three deliveries a week.  (Doc. 18, CR-07-16-RAW.)  (Exhibit 174.)  Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW.)  (Exhibit 174) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine.  A plea agreement, in which Price

agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into.  (Doc. 121, CR-07-16-RAW.)  (Exhibit 174.)

Price was ultimately sentenced to sixty months imprisonment.  (Doc. 218, CR-07-16-RAW.)  (Exhibit 174.)  She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*  Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release.  In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release."  (Exhibit 70.)  Thus,  Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[56]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing.  This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government.  Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for

---

[56] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Amended § 2255 Pet.                    307                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case.  The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial.  The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.   Karen Real.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense.  (R. 3076-77.)  At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[57] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation.  Real initially answered "[n]o, sir."  Littlefield then asked, "Did I talk about anything I'd say to the court?"  Real responded, "Well, you just mentioned that, you know, what I did.  And that it would be up to the judge."  (R. 3080-81.)  On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything.  (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after

---

[57]  In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5).  Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3.  (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion.)  (Exhibit 68.)

Mr. Barrett's trial concluded.  On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.)  (Exhibit 68.)  On April 25, 2005, the sentencing court reduced Real's sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody.  (Doc. 158 in Case No. 6:00-cr-21-FHS.)  (Exhibit 68.) The Government also violated its *Brady* obligations by failing to disclose the numerous state cases, discussed in Claim 2(4)(f), that were dismissed against Real, and which could have been used as impeachment evidence.  The Government was obligated under *Brady* to disclose to the defense Real's criminal record, and failed to do so.  As with the other *Brady* violations discussed here, Mr. Barrett was prejudiced by the Government's "hide the ball" approach.  Due to its failure to follow the law, the Government was allowed to portray this witness as far more credible than she really was.

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real.  The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  The Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for

her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f. Randy Turman.

It was argued in Claim 2 that counsel were ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447 (Exhibit 195), and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway. This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case. Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  (Exhibit 195.)  This constitutes newly discovered evidence.

### 2. The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders.

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was

evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

**B.**   **The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel.**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

### 1.        Evidence of Clint Johnson's illicit activities.

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Mr.  Barrett's case had been involved in a series of crimes involving the misuse of their office.  On November 1, 2005,

Amended § 2255 Pet.                            313                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Exhibit 181 - Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Exhibit 181 - Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (Exhibit 181 - OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19,

1672

2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (Exhibit 181 - *In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Exhibit 181 - Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation.  (Exhibit 181 - Log of events from November, 2005 to January, 2006 by Jeff Sheridan).  It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations.  In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Exhibit 181 - Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT").  During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released funds seized from defendants to defense counsel, and then obtained kickbacks from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case.  Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial

misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's convictions. At an evidentiary hearing conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection, holding that only what occurred before the no-knock warrant was issued was relevant. Counsel responded that he always believed the C.I. was not a real person, but a composite. (Tr. 1/ 26/05, Hr'g at 83-90.) In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004. Of

course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source.  The Government, which had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation."  *E.g., Giglio v. United States,* 405 U.S. 150 (1972).

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Exhibit 90; Exhibit 95.) Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

Amended § 2255 Pet.                    318          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed.  By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.      David Michael Littlefield's illicit activities.

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Exhibit 69 - Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Petition.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A).  Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was

required to pay court costs. *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007. Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[58] (Exhibit 156 - Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*) On September 14, 2009, the Oklahoma Supreme Court determined that, based on the Bar Complaint filed against Littlefield, he should receive a private reprimand by the Court, scheduled to occur on October 22, 2009

.          In the affidavit for search warrant for Littlefield's home*,* captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case. (Exhibit 189 - Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

          Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007. (Exhibit 189 - Search warrant, SW-07-34.) Various camera and computer equipment were seized in the search. (Exhibit 189 - Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

---

[58] The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea. It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Littlefield did not contest the charges. He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.

The Bar Association action resulted in a private reprimand. (Exhibit 53.) Littlefield was found guilty of violations of Rule 8.4(b) of the Oklahoma Rules of Professional Conduct, and Rule 1.3 of the Rules Governing Disciplinary Proceedings. *Id.* Thus the Oklahoma Supreme Court found Littlefield's actions reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects. *Id.* Just as the Oklahoma Supreme Court found that Littlefield's conduct brought "discredit upon the legal profession," this Court should find that his conduct both in and out of court during Mr. Barrett's trial brings discredit upon the judgment of conviction and sentence of death Littlefield engineered.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case. A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett. This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, and Randy Weaver's assertion that Littlefield tried to intimidate him, but also is relevant to Mr. Barrett's claim of prosecutorial misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Exhibit 85.)[59]

During the penalty trial Littlefield repeatedly questioned Mr. Barrett's ex-wife, Abby Stites, about instances of violence in their marriage.  Each time Ms. Stites put these events in context – including Mr. Barrett's mental illness and her own violence towards him – Littlefield returned the jury's attention to Mr. Barrett.  It is now clear that Littlefield had his own guilt to

---

[59] Since Mr. Barrett's original Motion to Vacate was filed, there has been continuing investigation into Littlefield's Muskogee County child abuse charges, which have been shrouded in secrecy because the file was apparently improperly expunged even before his 2-year deferred sentence expired.  An investigator working on Mr. Barrett's case interviewed Tim Brown, the current chief of police in Webbers Falls, Oklahoma.  Mr. Brown was formerly a lieutenant in the Muskogee County Sheriff's Department.  He was employed with the Muskogee County Sheriff's Office at the time criminal charges were filed against Littlefield.  He was also a member of the Eastern Oklahoma Regional Child Death Review Board.  According to Mr. Brown, Littlefield threatened the sheriff's investigators working on the child abuse case.  Littlefield also dismissed the charges as "bullshit" (a protestation of innocence belied by his later *Alford* plea), and, adopting a victim role, claimed the Muskogee County Sheriff's Office was "trying to get him."  In addition to committing child abuse, it was alleged by Mike and Dawn Littlefield's daughter that her parents smoked marijuana in front of her and her younger brother.

According to Mr. Brown, the prosecutors assigned to Littlefield's criminal case from the Oklahoma Attorney General's Office were scared that Littlefield's prosecution would "open up a can of worms" because Littlefield, while he was employed with the Muskogee County District Attorney's Office, had prosecuted most of the big drug cases brought in that county.  During the continuing defense investigation into this matter, former DHS child abuse investigator Melissa Todd was also interviewed.  While she declined to discuss Littlefield's criminal case because of confidentiality concerns, she attested to the honesty of Tim Brown.  (Exhibit 43.)

Littlefield's conduct lends additional support to Mr. Barrett's claim that Littlefield threatened the informant witnesses he cultivated for Mr. Barrett's federal prosecution.  It shows that Littlefield behaved as a law unto himself, a pattern of conduct indicating he would have few qualms about concealing *Brady* material and sponsoring false testimony.  Mr. Barrett will continue to seek information from the Government about these matters and amend his claims as the information becomes available to him.

---

Amended § 2255 Pet.                                  322                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

project onto Mr. Barrett during this cross-examination.  Although jurors rejected the idea that Mr. Barrett was a future danger, it is likely that Littlefield's harping on the violence in the Barrett marriage had an impact on the jury's assessment of the appropriate punishment.  This Court should not permit a death verdict to stand where it was influenced by the rhetoric of a prosecutor expiating his own sins of abuse on the life of the defendant.

### 3.      John Philpot.

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Exhibit 6.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime, no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have

discredited the seven snitches, some of whom claimed they were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot. This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers. Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

<div align="center">**Conclusion.**</div>

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial. At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot. At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself. The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses, were known and became known to the Government and its agents. This evidence was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome. *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants. Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever. *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in § 2254 case where exculpatory evidence, even if it could only be used for impeachment purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir. 2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in § 2254 case where prosecution failed to disclose material evidence impeaching a key prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police. Likewise, had the former AUSA's violent temper and assaultive behavior against his own children been known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson.  This evidence clearly affected the outcome of trial.  Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness.  The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant.  Mr. Barrett's fundamental constitutional rights were violated.  He should be granted relief from his convictions and sentences.

**C.     Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses.**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses.  *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969).  It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses.  (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").)  "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights."  *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).  Courts cannot tolerate "any governmental conduct that has the purpose or

effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.* Thus, "counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness. (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Exhibit 92; Exhibit 31.) For example, Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. (Exhibit 43.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses. On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness." The Government did not reveal the identities of its seven key witnesses until September 15, 2005. In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3432, the Government filed a baseless motion for a protective order. The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier. (Tr. 9/13/05 Hr'g at 5). The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense.

Amended § 2255 Pet.                              327                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found "there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of."  *Id.* at 19.[60]

During an *in camera* hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court.  The court appeared to recognize that Littlefield was making inconsistent claims.  On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because Littlefield told defense counsel what the witnesses would testify to.  *Ibid.*  The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about."  *Id.* at 11.  Littlefield said it would not be.  This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion.  Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all.  Littlefield could produce no evidence of this "belief" he had.  *Id.* at 12.

---

[60] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere.  *Id.* at 14.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including:  (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b) that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.  *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision);

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court.  (Tr. 9/13/05 Hr'g at 10, 12.)  The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present.  *Id.* at 27.  In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense.  *See* Claim 1, *supra*.  Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense.  To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses.  The Government's promise of restricted access was itself illusory.  Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial.  The delays also prevented or impeded meaningful investigation of the witnesses.  As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different.  In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital murder.  As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill.  As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*.  But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses.  It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

> **D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**.

Throughout the penalty phase of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses. (*See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.)  As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said

anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later

asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[61] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The

---

[61] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[62], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. (R. 5414-15.) *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state

---

[62] This was a knowing false statement on the prosecutor's part. As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand.  Sperling was well aware they *could not have testified by law* because the case never got past the first stage.  Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]."  (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  (R. 5420-21.)  There were additional comments on Mr. Barrett's supposed lack of remorse.  (R. 5419-20, 5421-22.)  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment.  *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir.

2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Claim 2. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006). The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason. *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.** **Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims.  *Rock v. Arkansas*, 483 U.S. 44 (1987).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986).  Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the

bastards." (R. 5356.)  During closing argument, the Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes. *United States v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all."

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel were ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in

capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978). There could be no reasonable strategy for neglecting to raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 7.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr. Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that

Amended § 2255 Pet.                          342                          *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape. The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use. Mr. Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal Service. This ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost

a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.)  The

Supreme Court requires much more than a "common sense call" before a defendant can be

restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable

by the jury.  (Exhibit 80). In addition, Mr. Barrett was known by the Government and Court to be

a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  Indeed, the jury found that

Mr. Barrett had suffered abuse from Philpot.  The Government and Court also were aware that

Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death

of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would

be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by

trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and

communications with counsel in court.  After all, he was to be restrained even though the

marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun

belt due to conductive steel wire in his chest and abdomen area.  (Tr. 9/9/05 Hr'g at 27.)  (Trial

counsel's statement at this hearing reveals that three days before the trial began trial counsel

Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case

of x-rays, depict – the metal wires in Mr. Barrett's chest.)  Trial counsel's statements informed

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him.

This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's

unique medical circumstances.  Since the trial, trial counsel have confirmed that Mr. Barrett felt

intimidated wearing the stun belt throughout the trial.  (Exhibit 29.)

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal. *See* Claim 18, *infra*.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.**    **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Drope v. Missouri*, 420 U.S. at 172; *see* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then.  *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997).  Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Exhibit 117 at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (Exhibit 117 at ¶ 79.)  In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder.  (See *Williamson v. Ward*, 110 F.3d, at 1519; Exhibit 117 at ¶ 80.)  These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain

damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck." (Exhibit 117, at ¶ 80.)  This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

As discussed more fully in Claim 13, the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments.  Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument.  His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals.  Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident.  Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations.  Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense.  Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice.  *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960).  The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty.  *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense.  This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder.  *Beck v. Alabama,* 447 U.S. 625 (1980).  *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter.  (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. section 1112.)  The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in

essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994).  "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater.  *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense.  The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life.  "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct.  "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force.  Voluntary heat of passion manslaughter is "murder without malice."  (Tenth Circuit Pattern Jury Instruction 2.54.)  *See also, e.g., United States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent.  The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being.  The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent.  *Schmuck v. United States,* <u>489 U.S. 705, 716</u> (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute.  The crux of the whole case was knowledge and intent.  The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties.  The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired.  This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense.  *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial.*

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter.  *Beck v. Alabama,* <u>447 U.S. 625</u> (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

As set forth in Claim 18, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly insofar as the error was conceded by the Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court. (Exhibit 29.) Had this issue been raised, there is at the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 10.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life.  Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-

degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached, to a limited and ineffective degree, on cross-examination.  As argued elsewhere in this Petition, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented.  Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred.  The trial ruling excluding such evidence treated the issue as one of guilt or innocence.  Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance.  Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime.  Knowledge that two prior juries had been unconvinced that the crime was

committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have

known, about these cases.  Their existence was discoverable without the need of independent research.  Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case.  *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case).  The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.  *See* Claim 18, *infra*.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.      Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

All that is required for a juror to sit in a capital case is the juror's willingness to consider the range of punishment options.  A juror cannot be forced to commit that he or she will actually vote for the death penalty.  A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience.  So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and

following the court's instructions, the juror is qualified to serve.  Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments.  *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life.  Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration."  Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty." The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" (R. individual jury selection 824-25.)

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that the judge could not change the verdict, the juror said, "I could not do that, huh-uh." (R. individual jury selection 825-26.)

The court asked additional death-qualification questions of the juror:

Q.     ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.     If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not – I would live –

Q.     So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.    I understand that.

Q.    And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.    I would consider it, yes.

Q.    And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly? I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.    Right.

Q.    – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law, justified either death or imprisonment for life without the possibility of release. So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on what's called mitigating factors. And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty. So, do you think you could do that?

A.    I think I could. It would be very hard for me to do that, but if it was my duty.

Q.    Well, I think when you say it would be – that encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.    Uh-huh.

Q.    And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely. I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62. (R. individual jury selection 829.) Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make. Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable. I would still take life in prison, yes." (R. individual jury selection 829-30.) Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

> If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes. That would be my duty. I'm here, and that would be what I'm here for. But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose. The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty

unless the judge told you, you had to[,]"– the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this. And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it. So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this. But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it. So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad." In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be." (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty. Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q.   All right. Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.   I never heard anything so heinous that I even had to think about it. But I would have to give it a lot of thought. But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.

Q.      Okay.  Well, at the end of the day –

A.      Okay.

Q.      – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?

A.      Like I say, it depends on what he has done and how bad I think it is.   And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.[63]

(R., individual jury selection 832-33.)

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict.  (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury.  Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then.  Because, you know, I would have to say no right now.  I know no other thing except to say no, I could not sign it."  (R., individual jury selection 834.)

---

[63]  This is certainly a fair point.  The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder.  *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

Amended § 2255 Pet.                              365                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

What else could the juror say to such a question?  This is on par with saying, as rational people would, that they could not convict until hearing the evidence.  Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty.  The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.  ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?
>
> A.  Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.
>
> Q.  And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?
>
> A.  Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any

Amended § 2255 Pet.                366                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly she could consider the death penalty.   She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 12.**   **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty determination in this case.  *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows.  Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.  The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

Amended § 2255 Pet.                              368                         *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors.  *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 455.  The *Apprendi* principle applies to factfindings necessary to put a capital defendant to death.  *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase.  These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt.  Under the *Apprendi* rationale, Mr. Barrett was entitled to a

jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

Just as the finding of an aggravating circumstance is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating circumstances outweigh mitigating circumstances is a factual one. Indeed, under the federal death penalty statutes applicable to Mr. Barrett's trial, the weighing process leads to the *ultimate* factual finding without which the death penalty may not be imposed. Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi,* 530 U.S. at 490. In other words, while the finding of one or more aggravating circumstances is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed. Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating circumstances outweigh the mitigating circumstances. Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid. This conclusion is proved by the Tenth Circuit's holding in *Rojem v. Gibson,* 245 F.3d 1130, 1135-38 (10th Cir. 2001), where the Court vacated an Oklahoma death row inmate's capital sentence because the trial court failed to give a weighing instruction altogether. If the weighing process is simply "icing on the cake" and does not require both a *necessary and sufficient* factual finding before a death sentence can be rendered, then the absence of a weighing instruction would be of little significance. If, as in *Rojem*, it is constitutional error to forgo a weighing instruction altogether, then the flawed weighing instruction given in Mr. Barrett's case, which did not properly allocate the burden of proof, is equally erroneous.

By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is appropriate beyond a reasonable doubt. Put another way, the trial court's weighing instruction permitted the jury to make the ultimate factual finding without which a death sentence cannot be returned by a preponderance of the evidence only. This plainly violates the Supreme Court's *Apprendi* line of cases.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected

of competent counsel in capital cases.  Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death.  Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.  *See* Claim 18, *infra*.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

> **Claim 13.  Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause. Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions. Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contraindicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid.* However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Amended § 2255 Pet.                    375                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Mr. Barrett:     Yes, Your Honor.

The Court:     Do you have any questions of the Court about that?

Mr. Barrett:     No, sir.

The Court:     I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:     One more.  Does that include the verdict?

Mr. Barrett:     Yes, Your Honor.

The Court:     Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:     Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the

Amended § 2255 Pet.                    376                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems.  *See* Claim 2, *supra*.  Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive

information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's capacity to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings. *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring). Due to the

actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was

permitted to see him under the effects of steroids and without the benefit of medication deemed

medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to

obtain necessary and appropriate mental health assistance, including the assistance of a

psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while

his functioning was altered and impaired by the effects of voluntarily or involuntarily

administered or discontinued medication, and/or while his functioning was altered and impaired

by the effects of a medication regimen that was unjustified by any medical necessity. *See*

Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his

attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial. The Confrontation Clause of the Sixth

Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the

right to be present during all critical stages of the case. *Illinois v. Allen*, 397 U.S. 337 (1970).

Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by
> the judge that he will be removed if he continues his disruptive behavior, he
> nevertheless insists on conducting himself in a manner so disorderly, disruptive,
> and disrespectful of the court that his trial cannot be carried on with him in the
> courtroom.

*Id.*, 397 U.S. at 343 (emphasis added). The trial court's order – which the court initially did not

reveal on the record – that marshals remove Mr. Barrett without warning did not comport with

the requirements of law. (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding Mr. Barrett's actions was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)  Counsel unreasonably failed to consider whether an instruction that the jury should disregard the marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnessed him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the remainder of the prosecutor's argument, the court's instructions, and the reading of the penalty phase verdict violated Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights[,]" *Allen*, *supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right.  Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself from the courtroom during critical stages (closing argument, jury instructions, and the reading of the penalty phase verdict) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless.  In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him.  His presence would have contributed to the fairness of the proceeding because

Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever a defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 F.3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concurring). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.).  Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence.  Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial.  If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong.  The right to be present at one's own trial is not that weak.  *See Riggins,* 504 U.S., at 137.  "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative." *United States v. Novaton*, 271 F.3d. at 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury."  (R. 5427

[emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore."  (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent

medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error. *See* Claim 18, *infra*.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

Claim 14.    **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and

subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims.  As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."  (Exhibit 115.)  Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[64] (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death

---

[64]     Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[65] Had counsel

---

[65] Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Claim 18, *infra*.

performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a

Amended § 2255 Pet.                                   387                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors other than those required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

> "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the Government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16.   Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury.  Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to

the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process.  Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment.  Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial.  Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice.  Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.  Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17.**     **Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

Throughout his life, Mr. Barrett has struggled with severe mental illness, as well as organic brain disease and neurological and intellectual impairments. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett.  Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation.  The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . .  [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an

Amended § 2255 Pet.                        391                        *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

expansion of Eighth Amendment protection to the mentally ill. *Atkins*' and *Roper*'s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Barrett, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be

implemented.[66]   Moreover, just as in *Atkins* and *Roper*, where international law and opinion

weighed against the execution of persons with mental retardation, international law and opinion

weigh against the execution of the mentally ill.[67]

Mr. Barrett does not have, and never has had, an intact brain.  (*See* Claim 2, §

B.2.b., *supra*; Exhibit 117; Exhibit 89.)  He suffers from severe mental illness in the form of

Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is

organically damaged.  Experts who have examined Mr. Barrett have opined that Mr. Barrett's

functioning is compromised by multiple neurological and neuropsychiatric symptoms such that

---

[66]*See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor.  The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[67]The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).  Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid.  Moreover, customary international law also prohibits the execution of Mr. Barrett.  *Id.*

Amended § 2255 Pet.                              393                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.)  Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. In light of these circumstances, *Atkins* compels that Mr. Barrett's sentence violates the Eighth Amendment.

Because of both his organic brain disease and severe mental illness, there is no meaningful way to distinguish Mr. Barrett from the people protected by *Atkins*.  His execution would violate the Eighth Amendment.  The holdings of *Atkins* and *Roper* should be extended to protect Mr. Barrett from a penalty disproportionate to his culpability.

As with mental retardation, Mr. Barrett's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**Claim 18.      The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal.  *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995).  Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  *Roe v. Flores-Ortega*, 528 U.S. 470 (2000).  Here, Petitioner shows his counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues, failed to consult with Mr. Barrett regarding whether to raise meritorious issues or not, or both.

The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. To the extent the Court of Appeals prevented appellate counsel from briefing those issues, there was a failure of meaningful appellate review in violation of Mr. Barrett's rights to due process and to be free from arbitrary imposition of the death penalty.

While an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and issues framed by the trial record are ordinarily considered waived if not raised on direct appeal, *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing a procedural bar exists where appellate counsel provides ineffective assistance. *Murray v. Carrier*, 477 U.S. 478 (1986). Mr. Barrett can establish cause for any alleged failure to present a previously framed issue on appeal. Appellate counsel in this case unreasonably failed to recognize meritorious issues for appeal. (Exhibit 29.) For the reasons expressed in Claim 1; Claim 2, Parts A.1, A.5, A.11; Claim 3; Claim 4; Claim 5, Part D; Claim 6; Claim 7; Claim 9; Claim 10; Claim 11; Claim 12; Claim 13; Claim 14; Claim 15; and Claim 19, there is at least a reasonable probability that the conviction or sentence would have been reversed on appeal if these issues had been raised. The allegations of these claims are incorporated herein by specific reference.

A.    **Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**

1.    **Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

To the extent the matters raised in Claim 1 could have been raised on direct appeal, appellate counsel were ineffective which resulted in a violation of Mr. Barrett's right to Due Process under the Fifth and Fourteenth Amendments.  *See Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995).  As stated *supra*, Judge Payne specifically selected Roger Hilfiger for this case over the recommendations of the Oklahoma Federal Defenders that he appoint more experienced capital defense counsel.  Judge Payne appointed Mr. Hilfiger for the expressed purpose of boosting counsel's experience so that he could receive future capital appointments.  Judge Payne refused to compensate prior lead counsel, John Echols, at the highest prevailing rate for capital defense counsel, but immediately raised Mr. Hilfiger's compensation to that level after Mr. Echols withdrew from the case.  Judge Payne required Mr. Echols to be painstaking in his accounting for resources, but permitted Mr. Hilfiger to make requests based on his "best guestimate."  In sum, Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in Claim 1 could not be adequately litigated on appeal, because they required consideration of extra-record evidence.  (Exhibit 29.)  To the

extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  (Exhibit 29.)  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  (*Id.*)  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards.  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Claim 1 had been raised on appeal.  The record shows the trial judge interceded on behalf of the prosecution in a way that deceived defense counsel and aided the prosecutors in their effort to delay revealing the names and type of testimony that would be offered from the Government's seven most important witnesses.

**2.      Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under 438 U.S. 154 (1978).**

For the reasons stated in Claim 2, Part A.1, and Claim 4, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record.  Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record. (Exhibit 29.)  The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey, 469 U.S. 387* (1985); *Eagle v. Linahan, 279 F.3d 1283, 1301-06, 1308* (11th Cir. 2002) (counsel

ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard); *Mason v. Hanks,* 97 F.3d 887, 897 (7th Cir. 1996)(direct appeal counsel ineffective for failing to raise issue apparent from the record).

> **3.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.**

In Claim 2, Part A.5, Mr. Barrett demonstrated that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence. To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it exists. Due to trial counsel's omissions, appellate counsel was forced to raise several issues that were subject to review for clear error. The failure to raise the issue was professionally unreasonable. Had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

> **4.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.**

In Claim 2, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury. The fact that trial

counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify. Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

<div style="text-align:center">

**5.      Appellate Counsel Unreasonably Failed to Raise on
Appeal the Prosecutors' Use of Improper,
Inflammatory Argument in Violation of Mr. Barrett's
Due Process Rights**

</div>

Prosecutorial misconduct through questions and argument as described Claim 5, Part D was not raised on direct appeal. The misconduct of the prosecutors in both stages of trial was glaring. No reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Amended § 2255 Pet.                              399                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

**5.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Claim 6, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements.  This issue was clearly framed by the record.  Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence.  The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

**6.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Claim 7, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial.  The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial.  To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed the issue required extra-record development.  (Exhibit 29.)  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

**7.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Claim 9, *supra*, the trial court unconstitutionally failed to instruct the jury on the lesser included offense of voluntary manslaughter.  Appellate counsel asserts he failed to raise this issue because it was not adequately preserved for appeal by co-appellate counsel, Roger Hilfiger.  (Exhibit 29.)  Counsel's judgment was unreasonable.  Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not.  Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court.  The factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes.  (Exhibit 29.) Had this issue been raised, there is at the very least a reasonable

probability that the outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been different.

**8.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Claim 10, *supra*, the trial court violated Mr. Barrett's rights under the Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the second stage doubts regarding the raid.  It was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.) It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent and reversed the death judgment.

**9.      Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.**

The dismissal of Juror 62, as set out in detail in Claim 11, *surpa*, was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

**10.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Claim 12, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital

defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum."  *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

> **11.      Appellate Counsel Unreasonably Failed to Raise on
> Appeal the Unconstitutional Removal of Mr. Barrett
> from the Courtroom.**

As set forth in Claim 13, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver.  To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal.  It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

> **12.      Appellate Counsel Unreasonably Failed to Raise on
> Appeal the Unconstitutional Racial Bias in the
> Administration of the Federal Death Penalty.**

As set forth in Claim 14, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim. Appellate counsel did not raise on appeal the issue of the unconstitututionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue. There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate. The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 13.  Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Claim 15, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors. Appellate counsel unreasonably failed to raise this issue on

direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

### B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.

The Court of Appeals reviewed the errors in this case cumulatively.  *United States v. Barrett*, *supra*, 496 F.3d at 1121.  "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).  The review conducted on appeal was deficient due to the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would hare resulted in reversal.  Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased.  For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal.  As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, failed to seek a continuance because he believed the court would deny the request.  (Exhibit 29.)  Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact.  The jury in this case, after being denied the opportunity to convict on manslaughter, were denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt.  These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.  The judgments of conviction and sentence should be set aside.

### Claim 19.      Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.

Mr. Barrett's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV. Prayer for Relief.

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1. Recuse himself and have all proceedings regarding this Petition reassigned randomly to another judge;

2.  That Petitioner be permitted to file a Memorandum of Law in Support of this Petition in accordance with a briefing schedule established by this Court;

3.  Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4.  Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5.  Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

6.  Permit Petitioner to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Petitioner, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

7.  Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Petitioner's Response to any Affirmative Defenses raised by the Respondent. Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8.     Permit oral argument as appropriate and required;

9.     Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and

10.    Grant such further and additional relief as may be just.

DATED:   September 25, 2009

Respectfully submitted,

 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**APPENDIX A**

**PROCEDURAL HISTORY**

**I.     State Court Proceedings**

1.      On September 24, 1999, Movant was charged by Information in the District Court of Sequoyah County, Oklahoma with one count of first-degree murder and three counts of shooting with intent to kill. The Information was subsequently amended to charge Movant with one count of first-degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. (Case No. CR 99-493, Garrett, J.)

2.      The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.      Movant was re-tried on the same charges in January and February of 2004. The jury rejected the first-degree murder charge and instead found Movant guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Movant guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Movant on the two counts of discharge of a firearm with intent to kill.

4.      On April 19, 2004, Movant was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively.

5.      Movant did not appeal his convictions or sentences.

6.      At both state trials, Movant was represented by John David Echols, Esq., and the State was represented by Darrell Dowty, Asst. Dist. Atty.

1768

II.   **Federal District Court Proceedings**

7.   On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.   On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.     On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.    On February 15, 2005, the Government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.    The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12. On November 9, 2005, the second-stage proceedings began.

13. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the Government's assertion that Movant was likely to commit criminal acts of violence in the

Amended § 2255 Pet.                    413                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count). All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for his crimes.

16.     Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

17.     On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

18.     Movant filed a timely Notice of Appeal of his convictions and his death sentence to the United States Court of Appeals for the Tenth Circuit on December 28, 2005 (Case No. 06-7005).

19.     Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these proceedings. The Government was represented by Sheldon Sperling, U.S. Atty. and D. Michael Littlefield, Asst. U.S. Atty.

## III.     Federal Court of Appeals Proceedings

20.     In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

a.      The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b.    Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c.    The district court allowed admission of improper victim impact evidence.

d.    The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.    The Government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.    Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportionality review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.    Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

Amended § 2255 Pet.                         416                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

h.  The Government did not present sufficient evidence of "intent to kill."

i.  The Government failed to produce names and addresses of key witnesses.

k.  The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.  The Government failed to follow the *Petite* policy.

m.  Movant asserted cumulative error.

21.  On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22.  A timely Petition for Certiorari was filed on October 12, 2007.

23.  The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24.  Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

## APPENDIX B

## INDEX TO EXHIBITS

**NON-SEALED EXHIBITS**

Exhibit 1           Marriage Certificate for A.J. and Ada Barrett

Exhibit 2           Marriage Certificate for Abe and Minnie Dotson

Exhibit 3           Marriage Certificate for Allen and Ida Real

Exhibit 4           Marriage Certificate for David and Carolyn Joseph

Exhibit 5           Marriage Certificate for Ernest and Sylvia Gelene
                    Barrett

Exhibit 6           Declaration of Rodney Floyd

Exhibit 7           Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8           Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9          Marriage Certificate for Sam and Ida Hatter

Exhibit 10          Marriage Certificate for Sam and Bessie Hatter

Exhibit 11          Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12          Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13          Declaration of Janesse Thomas

Exhibit 14          Declaration of Dale Anderson

Exhibit 15          Divorce File for Isaac and Marilyn Barrett

Exhibit 16          *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                    December 15, 1917 (Commitment to Penitentiary)

Exhibit 17          *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                    November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18          *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault
                    with the Intent to Kill)

| | |
|---|---|
| Exhibit 19 | *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon) |
| Exhibit 20 | *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place) |
| Exhibit 21 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place) |
| Exhibit 22 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry) |
| Exhibit 23 | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense) |
| Exhibit 24 | Declaration of David Autry |
| Exhibit 25 | *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary) |
| Exhibit 26 | *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 |
| Exhibit 27 | *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918 |
| Exhibit 28 | *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital |
| Exhibit 29 | Declaration of Mark Henricksen |
| Exhibit 30 | *Ada Blount vs. Kathleen Blake*, Case Number 13026 |
| Exhibit 31 | Declaration of Leonard Post |
| Exhibit 32 | *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948 |
| Exhibit 33 | *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding |
| Exhibit 34 | Declaration of John Echols |
| Exhibit 35 | Excerpts from Kenneth Barrett's Baby Book |
| Exhibit 36 | Letter from Kenneth Barrett |

Amended § 2255 Pet.                              419                     *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 37          Declaration of Robert Thompson

Exhibit 38          Declaration of Randy Weaver

Exhibit 39          Declaration of Vickie Beaty

Exhibit 40          Declaration of Amanda Grizzle

Exhibit 41          Declaration of Ellen Stovall

Exhibit 42          Declaration of Christine Calbert

Exhibit 43          Supplemental Declaration of Leonard Post

Exhibit 44          Report of George Kirkham, Ph.D.

Exhibit 45          Declaration of Travis Crawford

Exhibit 46          *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274

Exhibit 47          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet

Exhibit 48          *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet

Exhibit 49          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet

Exhibit 50          *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet

Exhibit 51          *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet

Exhibit 52          *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet

Exhibit 53          *State of Oklahoma vs. David Littlefield*, Case No. OBAD No. 1729 and
                    SCBD No. 5338, Order dated September 14, 2009

Exhibit 54          Declaration of Susan Otto

Exhibit 55          Declaration of Bill Sharp, Ph.D.

Exhibit 56          Declaration of Jeanne Russell, Ed.D.

Exhibits 57         *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket
                    Sheet

Exhibit  58         Intentionally Left Blank, No Exhibit.

Amended § 2255 Pet.                    420                    *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 59          *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60          *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                    Docket (Cultivation of Mari)

Exhibit 61          *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                    CF-97-00086

Exhibit 62          *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                    (Disposing of Mortgaged Property)

Exhibit 63          *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                    (Manslaughter in the First Degree)

Exhibit 64          Letter from John Echols to Honorable James H. Payne, dated February 28,
                    2005

Exhibit 65          Letter from Honorable James H. Payne to John Echols, dated February 22,
                    2005

Exhibit 66          Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67          Declaration of Julia O'Connell

Exhibit 68          *United States of America vs. Karen Real*, Case Number, Case Number
                    CR-00-21-FHS

Exhibit 69          *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                    2007

Exhibit 70          *Drug Offender Receives Break*, Times Record

Exhibit 71          Letter to the Editor, *She Questions Sheriff's Department*, dated October
                    17, 1999

Exhibit 72          *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73          Photographs of Kenneth Barrett's shack

Exhibit 74          Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Amended § 2255 Pet.                            421                   *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

Exhibit 77          Declaration of Brandie Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett (resubmitted)

Exhibit 97          Declaration of Sylvia Gelene Dotson

Exhibit 98          Declaration of Mark Dotson

Exhibit 99          Declaration of Steve Barrett (resubmitted)

Exhibit 100          Declaration of Warren Barrett (resubmitted)

Exhibit 101          Declaration of Nona Reich (resubmitted)

Exhibit 102          Declaration of Carl Cook

Exhibit 103          Declaration of Abby Stites

Exhibit 104          Declaration of Richard Barrett

Exhibit 105          Declaration of Doris Barrett, March 5, 2009

Exhibit 106          New Articles from Vian American and Sequoyah County Democrat
                     Regarding Abe Dotson

Exhibit 107          Description Narrative, Written by Trooper Glen Smithson, dated
                     September 29, 1999

Exhibit 108          Excerpt from the Deposition of John Philpot

Exhibit 109          Report by Edward E. Hueske

Exhibit 110          Curriculum Vitae of Edward E. Hueske

Exhibit 111          Declaration of Steve Leedy

Exhibit 112          Declaration of Lauren Cohen Bell

Exhibit 113          2008 Declaration of Kevin McNally

Exhibit 114          Declaration of Rodney Floyd

Exhibit 115          Memo Regarding DOJ Report on the Federal Death Penalty System, dated
                     June 11, 2001

Exhibit 116          2007 Declaration of Kevin McNally

Exhibit 117          Declaration of Dr. George Woods

Exhibit 118          Declaration of Richard H. Burr

**SEALED EXHIBITS**

Exhibit 119          Birth Certificate of Kenneth Barrett

Exhibit 120          Birth Certificate of Sylvia Gelene Dotson

Exhibit 121          Birth Certificate of Richard Barrett

Exhibit 122          Birth Certificate of Toby Barrett

Exhibit 123          Birth Certificate of Stephen Barrett

Exhibit 124          Death Certificates of Allen M. Real and Allen Cleveland Real

Exhibit 125          Death Certificate of A.J. Barrett

Exhibit 126          Death Certificate of Ada Melton Barrett

Exhibit 127          Death Certificate of Albert Maxwell

Exhibit 128          Death Certificate of Billy Maxwell

Exhibit 129          Death Certificate of Hattie Dotson

Exhibit 130          Death Certificate of Hugh Dotson

Exhibit 131          Death Certificate of Ida Melton

Exhibit 132          Death Certificate of Isaac Barrett

Exhibit 133          Death Certificate of Mary Barrett

Exhibit 134          Death Certificate of Minnie Andrews

Exhibit 135          Brandon Smith Social Security Records, Itemized Statement of Earnings

Exhibit 136          Educational Records for Kenneth Barrett

Exhibit 137          Educational Records for Gwendolyn Barrett

Exhibit 138          Educational Records for Ernest Barrett

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandie Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

Exhibit 144          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

Exhibit 147          Medical Records for Kenneth Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau
                     of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2004-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
                     Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
                     *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and
                     CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Amended § 2255 Pet.                         426                *Barrett v. U.S.*, No. 6:09-cv-00105-JHP

| | |
|---|---|
| Exhibit 185 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 |
| Exhibit 186 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 |
| Exhibit 187 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 |
| Exhibit 188 | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 |
| Exhibit 189 | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 |
| Exhibit 190 | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 |
| Exhibit 191 | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 |
| Exhibit 192 | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 |
| Exhibit 193 | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 |
| Exhibit 194 | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999 |
| Exhibit 195 | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 |
| Exhibit 196 | Military Records for Travis Crawford |
| Exhibit 197 | Birth Certificate of Phyllis Dotson |
| Exhibit 198 | Birth Certificate of Travis Crawford |
| Exhibit 199 | Birth Certificate of Stephen Barrett |
| Exhibit 200 | Educational Records for Kenneth Barrett |
| Exhibit 201 | Medical Records for Gwen Crawford |
| Exhibit 202 | Medical Records for Carolyn Joseph |
| Exhibit 203 | Social Security Records for Travis Crawford |
| Exhibit 204 | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645 |

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Tivon Schardl. I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am a research and writing attorney in the Office of the Federal Defender for the Eastern District of California. In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing the amended motion on Mr. Barrett's behalf. Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I declare that the contents of the foregoing amended motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

Executed by me this 25th day of September, 2009, in Sacramento County,

California.

<div style="text-align:right">

/s/  Tivon Schardl
Tivon Schardl

</div>

**Certificate of Electronic Filing and Service**

I hereby certify that on this 25th day of September, 2009, I caused the foregoing AMENDED PETITION to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Tivon Schardl

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 1**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Exhs. § 2255 Amended Motion                                        *U.S. v. Barrett*, 6:09-cv-00105-JHP

1789

7209

## MARRIAGE RECORD

STATE OF OKLAHOMA, Sequoyah County, ss.       IN COUNTY COURT

I, A. J. Barrett, the undersigned, hereby apply for a Marriage License to be issued to

Mr. A. J. Barrett, aged 21 years

whose residence is Akins, State of Okla.

and Miss Ada May Hatter, aged 18 years

whose residence is Akins, State of Okla.,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am 21 years of age, and legally competent to take an oath, and that I reside at Akins, County of Sequoyah, State of Oklahoma.

A. J. Barrett

Subscribed and sworn to before me, this 25 day of January 193_.

By Frances Tinney Deputy     Horace Moore Court Clerk

I, the undersigned, _____ of _____ named in the application as being of the age of _____ years, do hereby consent to _____ marriage to _____

Dated at _____ Oklahoma, this _____ day of _____, 193_.

_____ Parent or Guardian

STATE OF OKLAHOMA, Sequoyah County, ss

Before me, _____

a _____ in and for said County and State, on the _____ day of _____, 193_,

personally appeared _____ to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____ executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.

Witness my hand and official seal, the day and date above written.

My commission expires _____ 193_. _____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.      IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. A. J. Barrett

of Akins, County of Sequoyah, State of Okla.

aged 21 years, and Miss Ada May Hatter

of Akins, County of Sequoyah, State of Okla.

aged 18 years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, this 2nd day of January 193_6.

My credentials are recorded in Ministers' Credentials, book _____, page _____

By Frances Tinney Deputy.     Horace Moore Court Clerk.

Recorded this 2nd day of January 193_6.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, N. B. Burrou, Minister, Baptist,
Name   Official Designation   Court or Congregation

of Maple, in Sequoyah County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the 2nd day of Jan A. D., 193_6, at Akins, in Sequoyah County, State of Oklahoma, in the presence of Tom Allen

of Akins, Okla, and Georgia Liles

of _____

N. B. Burrou
Baptist Minister Official Designation

Returned and recorded this 22d day of Jan 193_6.

Horace Moore Court Clerk

By Frances Tinney Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 2**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

1036

# MARRIAGE RECORD

STATE OF OKLAHOMA, } ss.
_Sequoyah_ County.                    IN COUNTY COURT.

I, _Abe Datson_, the undersigned, hereby apply for a
MARRIAGE LICENSE, to be issued to Mr. _Abe Datson_ _Okla_ aged _28_ years,
whose residence is _Marble City_ State of _Okla_ and
M___ _Minnie Andrews_ aged _18_ years,
whose residence is _Marble City_ State of _Okla_ and
for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places
of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering
into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _28_ years of age, and
reside at _Marble City_ County of _Sequoyah_
State of _Okla_ _Abe Datson_ Applicant.
Subscribed and sworn to before me, this _8_ day of _July_ 19_11_.
_M. D. Jones_ County Judge.
_____ Clerk County Court.

I, the undersigned, _____ of _____
named in the above application as being of the age of _____ years, do hereby
consent to _____ marriage to _____
Dated at _____, Oklahoma, this _____ day
of _____ 19_____ _____ Parent or Guardian.

STATE OF OKLAHOMA, } ss.
_____ County.

Before me, _____
in and for said County and State, on the _____ day of _____ 19_____
personally appeared _____
to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that _____
executed the same as _____ free and voluntary act and deed for the uses and purposes therein set forth.
WITNESS my hand and official seal, the day and date above written.

My commission expires _____ 19_____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, } ss.
_Sequoyah_ County.                    IN COUNTY COURT.

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—GREETING:
You are hereby authorized to join in marriage Mr. _Abe Datson_
of _Marble City_, County of _Sequoyah_, State of _Oklahoma_
aged _23_ years, and Miss _Minnie Andrews_, of _Marble City_
County of _Sequoyah_, State of _Oklahoma_ aged _18_ years.
And of this License you will make due return to my office within thirty days from this date.
Witness my hand and official seal, at _____ in said County, this _8_ day of _July_ A. D. 19_11_
_N M Littlejohn_ County Judge.
By _M D Jones_ Clerk County Court.
Recorded this _8_ day of _July_ 19_11_ _M D Jones Clerk_

STATE OF OKLAHOMA, } ss.
_Sequoyah_ County.            CERTIFICATE OF MARRIAGE

I, _R L Horn_
NAME
_Justice of the Peace_
OFFICIAL DESIGNATION.
of _McKey_ in _Sequoyah_ COURT OR CONGREGATION. County, State of Oklahoma, do hereby
certify that I joined in marriage the persons named in and authorized by this License to be married, on the _8_
day of _July_ A. D. 19_11_, at _R R Horn_ in _McKey_
County, State of Oklahoma, in the presence of _Lafayette Horn_ of _McKey_
and _Jennie Horn_ of _McKey_
_R L Horn_
_Justice of the Peace_
Returned and recorded this _11_ day of _July_ 19_11_ _M D Jones_
_Clerk County Court_

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 3**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

**This Certifies that**

_Allen C. Real_
of _Quinton, I. T._ and
_Ida Goodwin_
of _Quinton, I. T._

were by me united in

**Matrimony**

according to the ordinance of GOD and the

laws of

at _Quinton_

on the _eighteenth_ day of _Feb._

in the year of our Lord 19_07_

Witnesses
_Frank Bean_
_Alfred Goodwin_

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 4**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

KEB400570

**MARRIAGE LICENSE**

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.                                    IN COUNTY COURT

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY — GREETING:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. _David A. Joseph_ , of _Pensacola_ ,

County of _Escambia_ , State of _Florida_ , age _21_ years, and

Miss _Carolyn Watson_ , of _Sallisaw_ ,

County of _Sequoyah_ , State of _Oklahoma_ , age _18_ years; and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at Stilwell, Oklahoma, this _24th_

day of _Sept_ 19_64_ _Virginia Harper_ Court Clerk

(SEAL)                                                             By_____ Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below.

_____(1) Physician's and laboratory technician's statements required by Statute, relative to the examination and health of either or both of the parties.

___✓___(2) An order of the County Judge, with memoranda of reasons for the order dispensing with Statutory requirements relative to the examination and health of either or both of the parties.

_____(3) An order of the County Judge with accompanying memoranda of reasons for the order extending the 30 day period following the examination to 90 days or less together with papers complying with the requirements of Number (1) above.

_____(4) Affidavits of Consent to Marriage of parent or guardian, in lieu of personal appearance as provided by House Bill No. 688 of the 1959 Legislative Session.

All the above and foregoing recorded on this _24th_ day of _Sept_ A. D., 19_64_, and thereafter said License delivered according to Law.

_Virginia Harper_ Court Clerk

By_____ Deputy

---

**CERTIFICATE OF MARRIAGE**

STATE OF OKLAHOMA, COUNTY OF ADAIR, ss.

I, _E. B. Arnold_ , _Co. Judge_ , _Adair Co. Court_
(Name)                           (Official Designation)              (Court or Congregation)

of _Stilwell_ in Adair County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized

by this License to be married, on the _24th_ day of _Sept_ , A. D., 19_64_ at _Stilwell_

in Adair County, State of Oklahoma, in the presence of _Phyllis Crawford_ of _Sallisaw, Okla._

and _Ruth Harris_ of _"    "_

My credentials of authority are recorded in Minister's Credentials           _E. B. Arnold_
(Person Performing Ceremony)

_____Book_____,                                                 _Co. Judge_

at page_____of_____County, Oklahoma.                    (Official Designation)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book _20_ at page _31-1_

on this the _24th_ day of _Sept_ , 19_64_ _Virginia Harper_ Court Clerk

By_____ Deputy

I, Shawna Baird, Court Clerk, for Adair County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in the Court Clerk's Office of Adair County, Oklahoma, this _2nd_ day of _April 2001_

By: _Shawna Baird_
Clerk/Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 5**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Subscribed and sworn to before me this................................................................................................ Parent or Guardian.

(SEAL) .................................................... day of..................................................

......................................................, 19..........

.................................................................................. Court Clerk.

By ................................................................

.................................................................................. Deputy.

STATE OF OKLAHOMA, Adair County, ss.                MARRIAGE LICENSE

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:                IN COUNTY COURT

You are hereby authorized to join in marriage Mr. _Ernest E. Barrett_

of _Salisaw_ County of _Sequoyah_ State of _Oklahoma_ aged _21_ years,

and M _Sylvia A. Nelson_

of _Salisaw_ County of _Sequoyah_ State of _Oklahoma_ aged _10_ years,

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at _Stilwell_ in said County, this _8th_ day of

_July_ A. D. 19 _60_

_Jennie Harper_ Court Clerk.

By ................................................................ Deputy.

Recorded this _8th_ day of _July_

_Jennie Harper_ Court Clerk.

By ................................................................ Deputy.

STATE OF OKLAHOMA, Adair County, ss.                CERTIFICATE OF MARRIAGE

I, _E. B. Arnold_ _County Judge_ _Adair County Court_
NAME                OFFICIAL DESIGNATION        COURT OR CONGREGATION

of _Stilwell_ in _Adair_ County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the _8th_ day of

_July_ A. D. 19 _60_ at _Stilwell_ in _Adair_ County,

State of Oklahoma, in the presence of _Johnny Simmonds_ of _Salisaw Okla_

and _By weeks Mannford_ of _Salisaw Okla_

My credentials are recorded in Minister's Credentials

Book................ Page................ _E. B. Arnold,_

of....................................................... _County Judge_

......................................................... County, Oklahoma.

Returned and recorded this _8th_ day of _July_ 19 _60_

_Jennie Harper_ Court Clerk.

By ................................................................ Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

**EXHIBIT 6**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Exhs. § 2255 Amended Motion                                         *U.S. v. Barrett*, 6:09-cv-00105-JHP

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this __11__ day of __March__, 2009, in __Lincoln__ County, Oklahoma.

_Rodney Floyd_
Rodney Floyd

1800

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 7**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

532

## MARRIAGE RECORD No. 33

ввl No. 100 (1968)  MID-WEST - SAPULPA, OKLAHOMA

### APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.          IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name   Kenneth Eugene Barrett                                    , Age   18
of   Sallisaw                        , County of   Sequoyah        , State of   Oklahoma
Name   Abigail Teague                                            , Age   16
of   Sallisaw                        , County of   Sequoyah        , State of   Oklahoma

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows;

(First Party)                                    (Second Party)
and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

_Kenneth Eugene Barrett_....Applicant    _Abby Teague_....Applicant

Subscribed and sworn to before me this 28 day of April        A. D. 19 80

THEODORE STITES, Court Clerk
By  _Pamela Dyer_ Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

#### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the   mother   of   Abigail Teague   named in the above application as being of the age of   16   years, and in the presence of the issuing official, I do hereby consent to   her   marriage to   Kenneth Eugene Barrett

In the presence of        Signed this   28   day of   April   19 80   _Wyona Teague_ Signature

THEODORE STITES, Court Clerk
By  _Pamela Dyer_ Deputy

#### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ............... of ............... named in the above application as being of the age of ............... years, and in the presence of the issuing official, I do hereby consent to ............... marriage to

In the presence of        Signed this ....... day of ....... , 19 ....... Signature

THEODORE STITES, Court Clerk
By ............... Deputy

### MARRIAGE LICENSE

NO..............
STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.          IN DISTRICT COURT
TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr.   Kenneth Eugene Barrett                of   Sallisaw
County of   Sequoyah        , State of   Oklahoma        , Age   18   years, and
M   Abigail Teague                of   Sallisaw
County of   Sequoyah        , State of   Oklahoma        , Age   16   years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this 7th day of May 1980.

THEODORE STITES, Court Clerk
By  _Pamela Dyer_ Deputy

(SEAL)

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of statute indicated below.

Filed (1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.
(2) An order of the District Court with memoranda of reasons for this order dispensing with statutory requirements relative to the examination and health of either or both of the parties.
(3) An order of the District Court with accompanying memoranda of reasons for this order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.
(4) Affidavit of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.
(5) Affidavit of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.
(6) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent. 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this   28   day of   April   19 80

THEODORE STITES, Court Clerk   By  _Pamela Dyer_ Deputy

All the above and foregoing recorded on this ....... day of ............... A. D., 19 ..., and thereafter said License delivered according to Law.

By ............... Deputy        THEODORE STITES, Court Clerk

### CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I,   _Jerry Harris_ (NAME)    _Ordained Minister_ (OFFICIAL DESIGNATION)
_Deborah Watson_ (COURT OR CONGREGATION)    of   _Sallisaw_ (TOWN)

In   _Sequoyah_ County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married on the   10th   day of   May   A. D. 1980 at   _Sallisaw_ , in Sequoyah County, State of Oklahoma, in the presence of   _Angela Polasek_    of   _Carolyn Joseph_
and   _Jeff Keal_    of   _Henry Hodges_
_Jerry Harris_ (PERSON PERFORMING CEREMONY)

My credentials of authority are recorded in Minister's
Credentials ............... Book ...............        _____ (OFFICIAL DESIGNATION)
at page ............... of ............... County,
Oklahoma.

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 33 at page...........
on this the   14th   day of   May   19 80    By  _Nona Edwards_ Deputy

THEODORE STITES, Court Clerk

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 8**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**181**
920₀
1000

## MARRIAGE RECORD

THE STAR PRINTERY, INC., BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

I, _____, the undersigned, hereby apply for Marriage License, to be Issued to

Mr. _Hugh Dotson_ _____, age _21_

Color __W.__, residence _McKey_ _____ County of _Sequoyah_, State of _Okla_

and Miss _Hattie Read_ _____, age _18_

Color __W.__, residence _McKey_ _____ County of _Sequoyah_, State of _Okla_

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into the marriage relation, nor are they related to each other within the degrees prohibited by law. That I am _21_ years of age, and reside at _McKey_ _____, County of _Sequoyah_, State of _Okla_ _____, Applicant.

_Hugh Dotson_ _____, Applicant.

Subscribed and sworn to before me, this _3_ day of _July_, A. D. 19_39_.

By_____, Deputy Court Clerk.   _Lillie Rosson_, Court Clerk.

I, the undersigned, _____ of_____

named in the above application as being of the age of_____years, do hereby consent to_____

marriage to_____

Dated at_____, Oklahoma, this_____day of_____, 19____.

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____in and for said County and State,

on the_____day of_____, 19____, personally appeared _____

_____

to me known to be the identical person_____who executed the within and foregoing instrument, and acknowledged to me that_____executed the same as_____free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires_____, 19____.   _____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                    IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _Hugh Dotson_

of _McKey_ _____, County of _Sequoyah_, State of _Okla_

aged _21_ years, and Miss _Hattie Read_

of _McKey_ _____, County of _Sequoyah_, State of _Okla_

aged _18_ years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this _3_ day of _July_, 19_39_.

By_____, Deputy.   _Lillie Rosson_, Court Clerk.

Recorded this _3_ day of _July_, 19_39_.

_Lillie Rosson_, Court Clerk.

(seal)                                                           _____, Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _Rev Lewis Young_ _Minister of The Gospel_ of _Baptist Church_
   Name          Official Designation          Court or Congregation

of _Vian_ _____, in _Sequoyah_ County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be married, on the _3rd_ day of _July_, A. D. 19_39_, at _Resident_ _____, In Sequoyah County, State of Oklahoma, in the presence of _Eugene Masterson_

of _McKey Okla_, and _Margue Goodman_

of _McKey Okla_              _Rev Lewis Young_
                            _Vian Okla_ _____, Official Designation.

My credentials are recorded in Ministers' Credentials, book _1_, page _73_.

Returned and recorded this _X_ day of _July_, 19_39_.

_Lillie Rosson_, Court Clerk.

By_____, Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

**EXHIBIT 9**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

Subscribed and sworn to before me this................................................................................... day of............................................................ Parent or Guardian.

(SEAL)

........................................, 19..........

By ................................................................................................................ Court Clerk.

................................................................................................................ Deputy.

STATE OF OKLAHOMA, Adair County, ss.            MARRIAGE LICENSE

To any Person Authorized to Perform and Solemnize the Marriage Ceremony—Greeting:            IN COUNTY COURT

You are hereby authorized to join in marriage Mr. *Ernest E. Barrett*

of *Sallisaw* County of *Sequoyah* State of *Oklahoma* aged *21* years,

and M *Sylvia A. Dotson*

of *Sallisaw* County of *Sequoyah* State of *Oklahoma* aged *10* years,

And of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at *Stilwell*, in said County, this *8th* day of

*July* A. D. 19 *60*

*James Harper*, Court Clerk.

By ................................................................................. Deputy.

Recorded this *8th* day of *July*

................................, 19 *60*

*James Harper*, Court Clerk.

By ................................................................................. Deputy.

STATE OF OKLAHOMA, Adair County, ss.            CERTIFICATE OF MARRIAGE

I, *E. B. Arnold* *County Judge* *Adair County Court*
    NAME              OFFICIAL DESIGNATION          COURT OR CONGREGATION

of *Stilwell* in *Adair* County, State of Oklahoma, do hereby certify

that I joined in marriage the persons named in and authorized by this License to be married, on the *8th* day of

*July* A. D. 19 *60*, at *Stilwell* in *Adair* County,

State of Oklahoma, in the presence of *Johnny Simmgrude* of *Sallisaw Okla*

and *Hy Weeks Mansford* of *Sallisaw Okla*

My credentials are recorded in Minister's Credentials

Book............ Page............

*E. B. Arnold*

*County Judge*

of........................................ County, Oklahoma.

Returned and recorded this *8th* day of *July*

................................, 19 *60*

*James Harper*, Court Clerk.

By ................................................................................. Deputy.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 10**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

*copy, mail*
*3/18-55*

625

## MARRIAGE RECORD

9644

THE STAR PRINTERY, INC., BLANK BOOK MANUFACTURERS, MUSKOGEE, OKLAHOMA—no.

STATE OF OKLAHOMA, Sequoyah County, ss.                                   IN COUNTY COURT

I, _O_____, the undersigned, hereby apply for Marriage License, to be issued to

Mr. _Sam Hatter_

Color __W__, residence _Akins_ County of _Sequoyah_, State of _Okla_, age _41_,

and Miss _Bessie Reed_

Color __W__, residence _Akins_ County of _Sequoyah_ State of _Okla_, age _22_,

and for the purpose of procuring the same, do solemnly swear that I have personal knowledge of the facts herein stated; that the names, ages and places

of residence of said parties are truly and correctly set out above; that neither of said parties is disqualified or incapable under the law of entering into

the marriage relation, nor are they related to each other within the degree prohibited by law. That I am _41_ years of age, and

reside at _Akins_, County of _Sequoyah_, State of _Okla_, Applicant.

Subscribed and sworn to before me, this _26_ day of _Oct_, A. D. 19_40_.

By _____, Deputy Court Clerk. _Tillie Rosson_, Court Clerk.

I, the undersigned, _____ of _____

named in the above application as being of the age of _____ years, do hereby consent to _____

marriage to _____

Dated at _____, Oklahoma, this _____ day of _____, 19___

_____, Parent or Guardian.

STATE OF OKLAHOMA, Sequoyah County, ss.

BEFORE ME, _____, a _____ in and for said County and State,

on the _____ day of _____, 19___, personally appeared _____

to me known to be the identical person____ who executed the within and foregoing instrument, and acknowledged to me that_____ executed the

same as_____ free and voluntary act and deed for the uses and purposes therein set forth.

WITNESS my hand and official seal, the day and date above written.

My commission expires _____, 19___    _____

## MARRIAGE LICENSE

STATE OF OKLAHOMA, Sequoyah County, ss.                                   IN COUNTY COURT

To any Person authorized to Perform and Solemnize the Marriage Ceremony—GREETING:

You are hereby authorized to join in marriage Mr. _Sam Hatter_

of _Akins_, County of _Sequoyah_, State of _Okla_,

aged _41_ years, and Miss _Bessie Reed_

of _Akins_, County of _Sequoyah_, State of _Okla_,

aged _22_ years, and of this License you will make due return to my office within thirty days from this date.

Witness my hand and official seal, at Sallisaw, in said County, this _26_ day of _Oct_, 19_40_.

By _____, Deputy. _Tillie Rosson_, Court Clerk.

Recorded this _26_ day of _Oct_, 19_40_. _Tillie Rosson_, Court Clerk.

( seal )                                                                     _____, Deputy.

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, Sequoyah County, ss.

I, _O. W. White_, _Minister_, _Baptist_
        Name                          Official Designation          Court or Congregation

of _Short_, in _Sequoyah_ County, State of Oklahoma, do hereby

certify that I joined in marriage the persons named in and authorized by this License to be married, on the _27_ day of

_October_, A. D., 19_40_, at _Short_, in Sequoyah

County, State of Oklahoma, in the presence of _Marie Lizzie White_

of _Short Okla_, and _Mrs. Della Reed_

of _Sallisaw R/_                                        _O. W. White_

                                                        _Baptist Minister_, Official Designation.

My credentials are recorded in Ministers' Credentials, book _1_, page _46_.

Returned and recorded this _2_ day of _November_, 19_40_. _Tillie Rosson_, Court Clerk.

                                                        By _Flo Smith_, Deputy.

( seal )

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 11**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

507

MARRIAGE RECORD No. 35

## APPLICATION FOR MARRIAGE LICENSE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.                                IN DISTRICT COURT

We the undersigned, hereby apply for the issuance of a Marriage License and certify as to our ages and places of residence as follows:

Name .....Paul Dudley......................................................................., Age ..43..........

of .........Sallisaw................................................, County of ......Sequoyah..........., State of .....Oklahoma........

Name .........Sylvia Gelene Barrett................................................, Age ..42..........

of .........Sallisaw.............................................., County of ......Sequoyah........., State of .....Oklahoma....

and for the purpose of procuring same, we do solemnly swear that the names, ages and places of residence as set out above are true and correct, as evidenced by documents described in particular as follows:

(First Party) ................................................................ (Second Party) ........................................................

and that we are not disqualified or incapable under the law of entering into the marriage relation, nor are we related to each other within the degree prohibited by law.

.............................................,Applicant                .................................................Applicant

Subscribed and sworn to before me this....18..day of ....October................................A. D. 1982.

                                                                                    THEODORE STITES, Court Clerk

                                                                  By..Pamela Dyer...................................Deputy

NOTE—In event one or both of the parties to be married are under age, such application shall have been on file in the Court Clerk's office for a period of not less than seventy-two hours, prior to the issuance of the license.

### Consent Affidavit — In Person (1)

I, the undersigned, state that I am the .......................... of .............................. named in the above application as being

of the age of .............. years, and in the presence of the issuing official, I do hereby consent to ........................................ marriage to

.........................................................

In the presence of                Signed this .......    day of ...................., 19 .....  ..........................Signature

                                      THEODORE STITES, Court Clerk

By .................................................. Deputy

### Consent Affidavit — In Person (2)

I, the undersigned, state that I am the ...........    ...of .............    ......................... named in the above application as being

of the age of ........ ..... years, and in the presence of the issuing official, I do hereby consent to ........................ marriage to

.........................................................

In the presence of                Signed this ... .. .. .. day of.... ... ... ... ...., 19 ....  ..........................Signature

                                      THEODORE STITES, Court Clerk

By .................................................. Deputy

## MARRIAGE LICENSE

NO........................                                                  IN DISTRICT COURT

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

TO ANY PERSON AUTHORIZED TO PERFORM OR SOLEMNIZE THE MARRIAGE CEREMONY —— GREETINGS:

You are hereby authorized, upon delivery of this marriage license within ten days from the date of its issue to you, to join in marriage

Mr. ......Paul Dudley........................................................ of .....Sallisaw......................

County of ........Sequoyah..............................., State of ...Oklahoma..................., Age ........43..., years, and

M ......Sylvia Gelene Barrett........................................ of .....Sallisaw......................

County of .........Sequoyah..............................., State of ...Oklahoma..................., Age ....42...... years, and

by the command of the statute you shall make due return of this license to my office within five days succeeding the performance of the marriage herein authorized.

Issued under my hand and official seal, and recorded in my Marriage Record before delivery, at, Sallisaw, Oklahoma, this.....18day of......Oct......, 19.82.

                                                                        THEODORE STITES, Court Clerk

(SEAL)                                        By...Pamela Dyer.......................Deputy

ENDORSEMENT: By this endorsement to the within and foregoing Marriage License, I hereby verify, and truly certify, that the Application for said License was accompanied by proper credentials under the circumstance indicated by the word "filed" opposite one or more of the applicable provisions of Statute indicated below:

__Filed__(1) Physician's and laboratory technician's statements required by statute, relative to the examination and health of either or both of the parties.

_____(2) An order of the District Court with memoranda of reasons for the order dispensing with statutory requirements relative to the examination and health of either or both of the parties.

_____(3) An order of the District Court with accompanying memoranda of reasons for the order, extending the 30 day period following the examination to 90 days or less, together with papers complying with the requirements of number (1) above.

_____(4) Affidavits of consent to marriage of an underage person by parent or guardian, in lieu of personal appearance as provided by Statute 43 O. S. Supp. 1967, par. 3.

_____(4) Affidavits of consent to marriage of an underage person by parent or guardian, residing in another county of this State or outside the State and acknowledged as provided by Statute 43 O.S. Supp. 1967, par. 3.

_____(4) Affidavit of three persons authorizing marriage of underage person when parents are deceased or otherwise incapable of giving consent. 43 O.S. Supp. 1967, par. 3.

Witness my hand and official seal this ....18.......... day of ....October................., 1982.

                                      THEODORE STITES, Court Clerk      By .......Pamela Dyer................. Deputy

All the above and foregoing recorded on this ............. day of ............................... A. D., 19...., and thereafter said License delivered according to Law.

By .................................................. Deputy                                THEODORE STITES, Court Clerk

## CERTIFICATE OF MARRIAGE

STATE OF OKLAHOMA, COUNTY OF SEQUOYAH, ss.

I, .........Billy Ray Jackson.......................... . .............Minister.........................
                    (NAME)                                                        (OFFICIAL DESIGNATION)

.........................Baptist.............................. of ........Sallisaw.........................
              (COURT OR CONGREGATION)                                              (TOWN)

In .Sequoyah.........., County, State of Oklahoma, do hereby certify that I joined in marriage the persons named in and authorized by this License to be

married on the ...18th.. day of .......October........, A. D., 19.82, at....Sallisaw........, in ...Sequoyah... County, State of Oklahoma,

in the presence of ........Bernell Edwards... ... .... ............................ of .....Sallisaw, Okla..................

and ..................Kathy Reed................................ of .....Sallisaw, Okla..................

My credentials of authority are recorded in Minister's

Credentials .................. Book ....2......,            ..........Billy Ray Jackson............. .................
                                                                                      (PERSON PERFORMING CEREMONY)

at page ......33.. of .....Sequoyah... County,            ..........Minister...................................
Oklahoma.                                                                            (OFFICIAL DESIGNATION)

License returned, and Certificate of Marriage recorded subjoining the record of License issued and recorded in Marriage Record Book 34 at page...507....

on this the ....18th... day of ......October.........., 19..82.

        THEODORE STITES, Court Clerk            By...Kathy Reed.........................Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
      )
      *Movant,*   )
      )
v.      )     **Case No. 6:09-cv-00105-JHP**
      )
UNITED STATES OF AMERICA,   )
      )
      *Respondent.*   )

---

**EXHIBIT 12**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

236

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,

                    Plaintiff,  )
                                  )
                                  )
-vs-                             )         No. D-73-50
                                  )
                                  )     **SEQUOYAH COUNTY, OKLAHOMA**
ERNEST BARRETT,                )       **FILED**
                    Defendant.   )    **IN DISTRICT COURT**

                                           **JUN 20 1973**

                   DECREE OF DIVORCE    **THEODORE STILES,** Court Clerk

                                       By _____, Deputy

On this **20th** day of **JUNE**, 1973, the above entitled and numbered cause comes on for trial on its merits. The plaintiff, Sylvia Gelene Barrett, appears in person and by her attorney, John Robert Montgomery, of Scoufos and Montgomery, and the defendant appears not, having heretofore executed and filed sufficient Waiver of Service of Summons and Entry of Appearance, same having been filed on the 19 th day of **JUNE**, 1973.

The Court having ordered that the allegations contained in said Petition be taken as confessed, and having examined the files and records in this case and having heard the oral testimony of witnesses sworn and examined in open Court, having fully considered the evidence, and being fully advised in the premises, finds: That all material facts alleged in plaintiff's Petition are true; that the parties hereto were legally married at Stilwell, Oklahoma, on the 8th day of July, 1960, and have since that time been husband and wife though said parties have been separated since September 12, 1972; and that of said marriage three (3) children have been born, namely: Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen Barrett, age 4; that the plaintiff is now and has been for more than six (6) months next preceding the filing of plaintiff's Petition herein a bona fide resident in good faith of the State of Oklahoma, and is now and has been for more than thirty (30) days prior to the filing of plaintiff's Petition an actual resident in good faith of Sequoyah County, Oklahoma; that the plaintiff is entitled to a divorce upon the grounds of adultery in that the defendant has repeatedly engaged in unlawful voluntary sexual intercourse with persons of the opposite sex during the marriage of the parties, as alleged in plaintiff's Petition; that the plaintiff is a fit and proper perso

page two, Barrett
Decree of Divorce

237

to be awarded the exclusive care and custody of the minor children, subject to the defendant's right of reasonable visitation, and that the defendant should be required to pay reasonable child support during their minority, or until further order of the Court, in the amount of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of said children; that during said marriage of the parties hereto they have acquired no real property and have acquired certain person property, to wit:  One 1973 Pontiac automobile, household furniture and goods, including but not limited to a television, living room suit and living room rug, of which said person property the said 1973 Pontiac automobile should be awarded to the defendant as his sole and separate property and the household furniture and goods, including the television, living room set and living room rug should be awarded to the plaintiff as her sole and separate property.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that Sylvia Gelene Barrett, plaintiff herein, be and she is hereby awarded an absolute decree of divorce from the defendant, Ernest Barrett, and the bonds of matrimony heretofore existing between said parties are hereby dissolved, set aside and held for naught, and both parties are released therefrom; PROVIDED, that this part of the decree does not become absolute and final until six (6) months from the date hereof, during which time the parties are enjoined from marrying any other party.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that the plaintiff be and she is hereby granted the exclusive care and custody of the minor children, Kenneth Barrett, Richard Barrett and Stephen Barrett; and the defendant is granted rights of visitation with said children at reasonable times, and under reasonable conditions; and the defendant is ordered and directed to pay, as reasonable child support, the sum of FIFTY DOLLARS ($50.00) per week, for the care and maintenance of said children during their minority, or until further order of the Court, the initial child support payment to be made on or before the _2nd_ day of _July_, 1973, by cash, cashier's check or money order through the Clerk of the District Court of Sequoyah County, Oklahoma, and like payments on or before the _1st_ day of each week thereafter.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that the defendant be, and he is hereby, awarded the 1973 Pontiac automobile and his

238

page three, Barrett
Decree of Divorce

personal effects and belongings as his sole and separate property, free and clear of

any claims, rights, or interest whatsoever of the plaintiff, and the plaintiff be, and she

is hereby, awarded the household furniture and goods, including but not limited to a

television, living room suit and living room rug, and her personal effects and belongings

and those of the children as her sole and separate property, free and clear of any claims,

rights or interest whatsoever of the defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT

that each of the parties hereto are hereby ordered and directed forthwith to execute and

deliver to the other such assignments, bills of sale, deeds or conveyances of record

that may be necessary to carry the terms of the division of property into effect, and in

the event either of said parties fail to do so within five (5) days from this date, then this

decree shall operate as such conveyance.

BILL ED ROGERS
Associate Judge of the District Court

APPROVED:

SYLVIA GELENE BARRETT, Plaintiff

ERNEST BARRETT, Defendant

1814

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                                        Plaintiff,         )
                                                           )
                                                           )
                                                           )
-vs-                                                       )          No. D-73-50
                                                           )
                                                           )          SEQUOYAH COUNTY, OKLAHOMA
                                                           )          FILED
ERNEST BARRETT,                                            )          IN DISTRICT COURT.
                                        Defendant       )·'
                                                                     JUN 19 1973,

                                                                     THEODORE STITES, Court Clerk

ENTRY OF APPEARANCE AND WAIVER

Comes now the defendant herein, the undersigned, and acknowledges

receipt of a copy of the petition filed and on file herein, states that he has read

and understands the same, hereby waives the issuance, service, and return of

procees upon him in this action, enters a voluntary appearance in this cause, waiv-

ing all time and right to plead, answer or appear in this action, and consents that

the same may be set down for trial and heard by the Court at any time hereafter without

notice to, and in the absence of, this defendant.

                                        ERNEST BARRETT, Defendant

STATE OF WEST VIRGINIA
XXXXXXXXXXXXXXXXXXXXXXXXXXXX          )
                                      )  SS
COUNTY OF   CABELL          )

        Before me, the undersigned, a Notary Public within and for the State of
West Virginia                      June
XXXXXXXXXX, on this  6  day of XXXXXXX 1973, personally appeared the above named

defendant, Ernest Barrett, to me known to be the identical person who executed

the above and foregoing entry of appearance and waiver, and personally acknowledged

to me that he has read, understood and signed the same, and that he executed the

same as his free and voluntary act and deed for the uses and purposes therein set

forth.

        IN WITNESS WHEREOF I have hereunto affixed my signature and official

seal the date and date theretofore stated.

                                        NOTARY PUBLIC

        My commission expires the  27 day of      September      , 19 73 .

1815

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                                        Plaintiff,    )
                                                      )
                                                      )
                                                      )
-vs-                                                  )        No. **D-73-50**
                                                      )
                                                      )      SEQUOYAH COUNTY, OKLAHOMA
                                                      )          **F I L E D**
                                                      )        IN DISTRICT COURT
ERNEST BARRETT,                                       )
                                        Defendant    )          MAR 14 1973

### PETITION

THEODORE STITES, Court Clerk
By............................Deputy

The plaintiff, Sylvia Gelene Barrett, for cause of action against the defendant, Ernest Barrett, alleges and states:

I

That the plaintiff is now and has been for more than six (6) months next preceding the filing of the petition herein an actual resident, in good faith, of the State of Oklahoma, and a resident of Sequoyah County for thirty (30) days at the time her petition was filed herein.

II

That the parties hereto were married on or about the 8th day of July, 1960, at Stilwell, Adair County, Oklahoma and have been since that time, and are at the present time, husband and wife.

III

That of said marriage aforesaid three (3) children, now minors, have been born, to wit: Kenneth Barrett, age 11, Richard Barrett, age 8, and Stephen Barrett, age 4.

IV

That as grounds for divorce the plaintiff alleges that the defendant has, during the marriage of the parties, been guilty of adultery in that the defendant has repeatedly engaged in unlawful voluntary sexual intercourse with persons of the opposite sex, by reason of which the plaintiff is entitled to a decree of divorce from the defendant.

1816

page two, Barrett
Petition

V

That during the marriage of the parties hereto they have acquired no

real property and the following personal property, to wit:

One 1973 Pontiac automobile
Household furniture and goods, including but not limited to
a television, living room suit and living room rug.

VI

That the Court should award the said 1973 Pontiac automobile to the

defendant as his sole and separate property and should award the household furniture

and goods, including the television, living room set and living room rug to the

plaintiff as her sole and separate property.

VII

That the defendant is a healthy man regularly and profitably employed

with current gross earnings of approximately ONE THOUSAND FIVE HUNDRED DOL-

LARS ($1,500.00) per month, and that he should be ordered and directed to make

regular periodic payments of child support through the office of the Court Clerk of

the District Court of Sequoyah County, Oklahoma, for the maintenance and support

of the children of the parties hereto, in the amount of SEVENTY FIVE DOLLARS

($75.00) per week.

VIII

That the plaintiff is a fit and proper person to have custody of the minor

children of the parties and that custody of said children should be awarded to the

plaintiff subject to the right of the defendant to visit with said children at reasonable

times and places.

IX

That plaintiff does not have an adequate means of support and the Court

should require the defendant to pay her attorney's fee in the reasonable amount of

ONE HUNDRED FIFTY DOLLARS ($150.00) and the Court costs herein.

page three, Barrett
Petition

WHEREFORE, premises considered, the plaintiff prays that upon hearing this cause the Court grant and award the plaintiff a decree of divorce from the defendant; custody of the minor children of the parties with reasonable visitation privileges to the defendant; child support; attorney fees in the amount of ONE HUNDRED FIFTY DOLLARS ($150.00); a fair and equitable division and distribution of the property accumulated by the parties by awarding the defendant the 1973 Pontiac automobile and awarding the plaintiff the household furniture and goods, including but not limited to the television, living room rug and living room set; Court costs; and such other and further relief as to which the plaintiff may be entitled and which may be deemed just and proper by the Court.

SYLVIA GELENE BARRETT

By _____
JOHN ROBERT MONTGOMERY
SCOUFOS & MONTGOMERY
Attorneys at Law
P. O. Box 787
Sallisaw, Oklahoma 74955
Attorneys for Plaintiff

STATE OF OKLAHOMA    )
                     )  SS
COUNTY OF SEQUOYAH   )

Sylvia Gelene Barrett, being first duly sworn upon oath says: That she is the plaintiff above named, that she has read the foregoing Petition and knows the contents thereof, and that the facts therein set forth are true.

_____
SYLVIA GELENE BARRETT

Subscribed and sworn to before me this 14th day of March, 1973.

_____
NOTARY PUBLIC

My Commission Expires:

_November 1, 1976_

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

SYLVIA GELENE BARRETT,
                          Plaintiff,        )
                                            )
                                            )
                                            )
-vs-                                        )        No.    D-73-50
                                            )
                                            )        SEQUOYAH COUNTY, OKLAHOMA
                                            )        FILED
ERNEST BARRETT,                             )        IN DISTRICT COURT
                          Defendant         )
                                                     MAR 14 1973

AFFIDAVIT FORMA PAUPERIS          THEODORE STITES, Court Clerk
                                                     By Arlene Day  Deputy

I, Sylvia Gelene Barrett, petitioner, above named, do solemnly swear

that the cause of action set forth in the petition hereto prefixed is just, and I do

further swear that by reason of my poverty, I am unable to give security for costs.

                              _Sylvia Gelene Barrett_
                              SYLVIA GELENE BARRETT

Subscribed and sworn to before me this 14th day of March, 1973.

                              _Sandra Saylor_
                              NOTARY PUBLIC

My Commission Expires:

November 1, 1976

                    O. K. to file this 14th day of March,
                    1973.

                              _Bill Ed Rogers_
                    Judge of the District Court

1819

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
                                    )
              *Movant,*      )
                                    )
v.                                )       **Case No. 6:09-cv-00105-JHP**
                                    )
UNITED STATES OF AMERICA,    )
                                    )
            *Respondent*.  )

---

**EXHIBIT 13**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Exhs. § 2255 Amended Motion                            *U.S. v. Barrett*, 6:09-cv-00105-JHP

## DECLARATION OF JANESSE THOMAS

I, Janesse Thomas, declare the following:

I know Charles "Monk" Sanders. At one time, over a decade ago, I was Monk Sanders ███friend. I also know Kenny Barrett.

I was at Kenny Barrett's residence perhaps two or three times while Monk Sanders was there. Mr. Sanders and I did not got to Kenny Barrett's place together. I never went to Kenny Barrett's residence to buy drugs with Monk Sanders. I never bought drugs from Kenny Barrett on any occasion I was at his residence. I never witnessed any drug transaction between Kenny Barrett and Monk Sanders. Kenny Barrett did not like or trust Monk Sanders, and did not want him around his property.

I am aware that Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial in Muskogee. It is my understanding that Monk Sanders testified that two to three days before the trooper was killed, he and I went to Kenny Barrett's and bought drugs, and that he and I went to Mr. Barrett's property on other occasions in the summer of 1999 to buy drugs. This never happened, so if Mr. Sanders testified to these things, his testimony was false. As I said, I never bought drugs from Kenny Barrett, and I never saw Kenny Barrett sell Monk Sanders any drugs at any time, let alone two to three days before the trooper was killed.

On one occasion while I was Monk Sanders's girlfriend, he was harassing me and I got away from his place. I called Kenny Barrett to come pick me up so I could get away

1

1821

from Mr. Sanders. Mr. Barrett did pick me up, and Monk Sanders and his mother followed us for a while. He was yelling at me that I needed to go back with him, but I didn't. It appeared that Monk was mad at Kenny Barrett for picking me up and getting me away from him.

Based on my contact with Mr. Sanders, it is my personal opinion that he is completely dishonest and untrustworthy. I would not believe a word he said about anything. I am also aware that in the community, Monk Sanders's reputation for honesty and trustworthiness is about as bad as could be. Nobody trusts or believes him.

I was not contacted by any of Kenny Barrett's lawyers or anybody working for them at the time of Kenny Barrett's federal trial. If they had contacted me, I would have given them the information stated above, and would have testified to these things if asked.

I did not write this declaration. I related the above information to one of Mr. Barrett's current lawyers and an investigator working for Kenny Barrett. I have carefully read the contents of this declaration, and it accurately states what I told the lawyer and investigator.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this __12__ day of March, 2009, in ___Sequoyah___ County, Oklahoma.

2

Janesse Thomas

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 14**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF DALE ANDERSON

I, Dale Anderson, declare the following:

I am one of the investigators working on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I and another investigator, Leonard Post, interviewed Cindy Crawford. Cindy Crawford testified in both stages of Mr. Barrett's trial. During this interview, Cindy Crawford told Mr. Post and me the following:

Cindy stated that she testified as a government witness in Kenny Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Kenny Barrett. She stated that as of 1999, she had known Kenny Barrett for approximately 4 years.

Cindy Crawford told Mr. Post and I that one to 2 weeks before her initial testimony against Kenny Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She got into Mr. Philpot's car, and he drove her to Muskogee. There, she met AUSA Mike Littlefield and several men wearing guns who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

1

Cindy Crawford told us that the men wearing guns showed her several firearms that looked similar to ones that belonged to Kenny Barrett. Cindy stated that she was told by Mr. Littlefield that she needed to work with him and testify against Kenny Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a 5-year deferred sentence in a drug case. Mr. Littlefield told her that Kenny Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenny Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated that she had never seen Kenny Barrett cook methamphetamine at any time.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford told us that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Littlefield told her that in her testimony, she should make things look as violent and ominous as possible, and there was imminent danger in being around Kenny Barrett. Cindy stated during our interview that Mr. Littlefield discussed with her the possibility that she could be charged with perjury if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her

2

1826

if she did not testify against Kenny Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that she was interviewed by Mr. Littlefield and the government about Kenny Barrett's federal case separately from her husband, Travis Crawford. Cindy related that she was told by Travis that John Philpot told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. Cindy stated that she was told by Mike Littlefield, and later by John Philpot, that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Post and I that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenny

3

Barrett, she never bought drugs from him, but just used drugs with him.  She told us that when she was interviewed by Mr. Littlefield in his office, as described above, she was just coming down off a two-day meth high.  She stated that the same was true when she testified at Mr. Barrett's trial.  Cindy told us that "if you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy told us during our interview that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up.  She stated that she overreacts to stressful situations, sometimes to the point of passing out.  She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister.  Because of this experience, when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened.  Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Kenny Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, and Kenny Barrett's mood and actions at the time, due to her PTSD.  Cindy stated that other than this incident, which she very well could have exaggerated or embellished, Kenny Barrett had always been nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenny Barrett putting the gun barrel to her leg.  According to Cindy, the prosecutor or law

1828

enforcement asked her about this incident after her first stage testimony. She stated it is her belief that they must have gotten this information from Kenny Barrett's brother, Richie Barrett.

Cindy Crawford told us that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenny Barrett's place. Cindy stated they were also upset when she said she never saw Kenny Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she was not hurting Kenny Barrett enough. She stated, "They were very angry. They scared me and threatened me." Cindy related that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped them and hurt Kenny Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenny Barrett's property not too long before the shooting of the trooper to check Kenny Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Kenny Barrett and John Philpot acted like they were old buddies.

During the course of this investigation, I attempted on several occasions to interview Charles "Monk" Sanders. I was unsuccessful. On February 12, 2009, I went to the home of Evelyn Sanders, Mr. Sanders's mother. She lives in Oolagah, Oklahoma. Ms. Sanders told me that her son, Charles, had been promised things by the federal

5

prosecutors in exchange for his testimony against Mr. Barrett that he never received.  Mr.

Sanders, Mrs. Sanders and the Sanders family were upset about this.

I declare under penalty of perjury that the foregoing 6 page declaration is true and

correct.

Executed by me this 12 day of _____March_____, 2009, in

_Oklahoma___ County, Oklahoma.

_____

Dale Anderson

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,       )
                              )
                *Movant,*      )
                              )
v.                            )          **Case No. 6:09-cv-00105-JHP**
                              )
UNITED STATES OF AMERICA,      )
                              )
                *Respondent.* )

_____

**EXHIBIT 15**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

_____

SEQUOYAH COUNTY, OKLAHOMA
**F I L E D**
IN DISTRICT COURT

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY

STATE OF OKLAHOMA     JAN - 2 1992

KATHY REED, Court Clerk

By_____*Vb*_____Deputy

ISSAC C. BARRETT )
                Plaintiff, )
                           )
vs.                        )     Case No. D92-   J
                           )
MARILYN S. BARRETT         )
                Defendant. )

PETITION FOR DIVORCE

COMES NOW the Plaintiff and for his cause of action against the Defendant alleges and states as follows:

1. That prior to the filing of this Petition, the Plaintiff has been a resident in good faith of the County of Sequoyah and the State of Oklahoma for thirty (30) days and six (6) month respectively;

2. That the parties hereto were legally married on or about the 26th day of July, 1989 in Ft. Smith, Arkansas;

3. That as grounds for divorce, the Plaintiff alleges incompatibility;

4. That of the marriage, no children have been born, nor is the Defendant now pregnant;

5. That during the marriage of the parties, they have acquired certain property which should be equitably and fairly divided by the Court;

6. That during the marriage of the parties, they have incurred certain indebtedness which should be fairly and equitably divided by the Court;

LIAM K. ORENDORFF
ATTORNEY AT LAW
06 N. OAK STREET
LLISAW, OKLAHOMA
74055

1832

KEB400196

VERIFICATION

STATE OF OKLAHOMA      )
                      )    ss:
COUNTY OF SEQUOYAH     )

ISSAC C. BARRETT, of full age being first duly sworn upon his oath deposes and states:

That he is the Plaintiff in the above and foregoing instrument;  that he has read and understands the contents contained therein and further states that the same are true and correct as he verily believes.

_____
ISSAC C.  BARRETT

SUBSCRIBED AND SWORN to before me this _3/ot_ day of _December_, 199_1_.

_____
NOTARY PUBLIC

My Commission Expires:

_5/31/95_

1833

KEB400197

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, OKLAHOMA

STATE OF OKLAHOMA

FILED
IN DISTRICT COURT

JAN 29 1992

ISSAC C. BARRETT

        Plaintiff, )

KATHY REED, Court Clerk

By_____ Deputy

vs.

Case No. D92-1

MARILYN S. BARRETT

        Defendant. )

## ENTRY OF APPEARANCE AND WAIVER

COMES NOW the Defendant herein, the undersigned, a acknowledges receipt of a copy of the Petition filed and on f herein, and states that she has read and understands the sai hereby waives the issuance of service and return of process u her in this action, enters a voluntary appearance in this cau waiving all time and right to plead, answer or appear in t action, and consents that the same may be set down for trial heard by the Court at any time hereafter without notice to, in the absence of this Defendant.

The Defendant acknowledges that this Entry of Appearance Waiver has been prepared by the attorney for the Plaintiff fully understands that the attorney for the Plaintiff is un no obligation to protect and/or enforce any of the rights which the Defendant might be entitled, including the right seek the advice of counsel.

I have been presented with a (proposed) DECREE OF DIVC to be presented to the Judge who tries this case. My signat of approval has been endorsed thereon for the benefit of

JAM K. ORENDORFF
ATTORNEY AT LAW
16 N. OAK STREET
SALLISAW, OKLAHOMA
74055

1834

KEB400198

BARRETT ENTRY OF APPEARANCE AND WAIVER
Page 2

Court in acknowledgement of the proposed property settlement
these parties.

*Marilyn S. Barrett*

SUBSCRIBED AND SWORN to before me this 31st day of *December*
1991.

*[signature]*
NOTARY PUBLIC

My Commission Expires:

7/30/92

1835

KEB400199

9

#6402.divdec

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

ISSAC C. BARRETT

Plaintiff, )
)
)
)
vs. )
)
)
)
)
MARILYN S. BARRETT )
Defendant. )

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB - 3 1992

KATHY REED, Court Clerk
By_____Deputy

Case No. D-92-1

## DECREE OF DIVORCE

ON THIS 3rd day of February, 1992 the above entitled matt comes on for trial; Plaintiff appears in person and with counsel William K. Orendorff, and Defendant appears not; the Court examine the records, heard the evidence and statements of counsel, and base thereon finds:

That Defendant has executed and filed sufficient Entry c Appearance and Waiver; that the Court has jurisdiction over th parties and subject matter of this action;

That prior to the filing of the Petition herein, th Plaintiff had been a resident in good faith of the County o Sequoyah and the State of Oklahoma for thirty (30) days and six (6 months respectively;

That the parties hereto were legally married on or abou the 26th day of July, 1989, in Fort Smith, Arkansas;

That the parties hereto are entitled to a divorce on th grounds of incompatibility;

1836

KEB400200

That during the marriage the parties have acquired certain proper which should be equitably divided as specifically set for hereinafter;

That during the marriage, the parties incurred certa indebtedness which should be equitably divided as specifically s forth hereinafter;

That prior to the marriage of the parties, the Defenda acquired certain property which should be awarded to Defendant her separate property as specifically set forth hereinafter;

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Cou as follows:

That the parties are hereby granted a Decree of Divor from each other on the grounds of incompatibility, and thei marriage relationship is dissolved and both parties release therefrom; provided, neither party shall marry any other person i the State of Oklahoma for six (6) months from the date hereof;

That the Plaintiff is awarded as his sole and separat property, free and clear of any right, title, or interest of th Defendant, the following:

The appliances which are secured for the debt to Arkansas Best Federal Credit Union;

Real Estate situated in Sequoyah County, Oklahoma, to-wit:

E½ NE¼ SW¼ and SE¼ SE¼ NW¼ Section 8, Township 12 North, Range 25, Sequoyah County, Oklahoma; provided, however, that said property is subject to a lien in favor of the Defendant to secure the payment of the sum of $40,000 to the Defendant as hereinafter provided;

The Mobile Home subject to the indebtedness

2

1837

KEB400201

thereunto;

Plaintiff's personal belongings;

That the Defendant shall divest herself of any intere whatsoever in the above described real property once the lienab claim of the Defendant has been fully satisfied.

That the Defendant is awarded as her sole and separa property , free and clear of any right, title or interest of t Plaintiff, the following:

1990 GMC Pickup

Bedroom Suite

All furniture she owned prior to marriage

Stock Trailer

1983 Olds Cutlass

All real estate located in Crawford County, Arkansas, to wit;

TRACT 1

All that part of the Southeast Quarter of the Southeast Quarter of Section 18, Township 9 North, Range 32 West lying South and East of the Town of Dora, Arkansas, and South and East of the right of way of Interstate Highway 40; ALL that part of the Fractional Northeast Quarter of Section 19, Township 9 north, Range 32 West, lying South and East of the right of way of Interstate Highway 40, South and East of platted Town of Dora, Arkansas, and North of the right of way of Missouri Pacific Railroad EXCEPT a part of the Southeast Quarter of the Northeast Quarter of Section 19, Township 9 North, Range 32 West heretofore deeded for Dora Cemetery and described as follows: Commencing at the 73d mile post on Oklahoma-Arkansas line, setting in the Southwest part of said Quarter, thence North 45 degrees East 7.5 chains for a point of beginning; thence North 63 degrees East 6.44 chains; thence North 3 degrees West 6.22 chains; thence South 79 degrees West 6.5 chains;

3

1838

KEB400202

thence South 13 degrees East 4.57 chains to the point of beginning, containing 4.67 acres more or less; and, ALL that part of the West Half of the West Half of the Northwest Quarter of Section 20, Township 9 North, Range 32 West lying North of the right of way of the Missouri Pacific Railroad, being the same property described in that certain deed appearing in Book 237, page 285, Blakemore to Hogan; EXCEPT that part Commencing at the Southwesterly Corner of the Dora Cemetery which is described as an exception in that certain deed wherein Mrs. Glenn A. Blakemore was grantor and Joe Ray Hogan and Juanita Hogan, Husband and Wife, were grantees, recorded in Book 237, page 285, thence North along the Westerly line of said Dora Cemetery to the Southeasterly Corner of the Gene C. Smith property; thence Westerly along the South line of the Gene C. Smith property to the West line of the Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) of Section 19, Township 9 North, Range 32 West; thence South along the Westerly line of said Southeast Quarter (SE¼) of the Northeast Quarter (NE¼) to the Missouri Pacific right-of-way; thence in an Easterly direction to the point of beginning; EXCEPT FURTHER the two-acre tract deeded to MARCIA BARNES by her father and mother, Joe Ray Hogan and Juanita Hogan, during their lifetimes; and SUBJECT TO that certain easement granted to Bob Bordelon by Joe Ray Hogan and Juanita Hogan, which, among other things, runs along the South end of the above-described property and along the South end of the two-acre tract deeded by Joe Ray Hogan and Juanita Hogan to MARCIA BARNES; to which both MARILYN SUE REICHERT and MARCIA BARNES, their heirs, and assigns shall have joint right of use.

TRACT 2

Lots 5 and 6, Block 5, Town of Dora, Arkansas.

TRACT 3

A part of the West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of Section 20, Township 9 North, Range 32 West, more particularly described as follows: Commencing at the intersection of the East line of the said West Half (W½) of the Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of

1839

KEB400203

said Section 20, with the northerly right-of-way line of the Missouri Pacific Railroad Company, thence north along said East line of the said W½ NW¼ NW¼ aforesaid, a distance of 420 feet to a point; thence West 210 feet; thence South to the northerly right-of-way line of the Missouri Pacific Railroad Company, thence North and East along said Missouri Pacific Railroad Company northerly right-of-way line to the point of beginning, containing two acres, more or less.

That the Plaintiff shall divest himself of any interest whatsoever in the above described real property by executing a Quit Claim Deed to Defendant within ten (10) days from the date of this Decree, however, should Plaintiff fail to do so, then this Decree shall be sufficient to effect the conveyance of Plaintiff's interest in said real property to the Defendant;

That as part of the property division Plaintiff shall pay to the Defendant the sum of forty-thousand ($40,000.00) dollars as soon as he is able to secure sufficient financing and the Defendant is hereby granted a lien on the real estate hereunder awarded to the Plaintiff to secure the payment of said sum which shall be paid to the Defendant within thirty (30) days from the date hereof.

As a further part and parcel of the property settlement agreement, the Plaintiff agrees that he shall pay any and all attorney's fees and costs that may have arisen by virtue of litigation over an easement pertaining to the above described Crawford County property, and shall hold the Defendant harmless therefore.

That the Plaintiff shall pay the following indebtedness:

The debt on the Discover Card;

The note at First National Bank of Sallisaw on the Stock

1840

KEB400204

trailer and 1983 Olds Cutlass;

The indebtedness on the Mobile Home, and hold tl Defendant harmless from same.

That the Defendant shall pay the following indebtednes:

The debt to Arkansas Best Federal Credit Union on the 19¢ GMC Pickup;

The debt to Arkansas Best Federal Credit Union on the household appliances;

The Personal Note to Arkansas Best Federal Credit Union and hold Plaintiff harmless from same.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Cour as a part and parcel of the property settlement agreement betwee the parties, and as a part and parcel of the division an distribution of said property, that the parties hereto shall fil a joint income tax return for the year 1991 and they shall equall divide any refund received therefrom or shall equally pay the ta> obligation created thereby.

_____
WILLIAM K. ORENDORFF OBA #11950
Attorney for Plaintiff
P.O. Box 260
Sallisaw, Oklahoma  74955
(918) 775-4436

_____
ISSAC C. BARRETT, Plaintiff

_____
MARILYN S. BARRETT, Defendant

_____
ASSOCIATE DISTRICT JUDGE

6

KEB400205

#6402.

IN AND FOR THE DISTRICT COURT OF SEQUOYAH COUNTY,

STATE OF OKLAHOMA

ISSAC C. BARRETT

Plaintiff, )

vs.

MARILYN S. BARRETT

Defendant. )

Case No. D-92-1

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

FEB 18 1992

KATHY REED, Court Clerk
By_____Deputy

RELEASE AND SATISFACTION OF JUDGMENT

The undersigned Defendant does hereby acknowledge recei[ ]
from ISSAC C. BARRETT, Plaintiff in the above-entitled cause, th[ ]
sum of $40,000.00 dollars, the amount due upon the judgment render[ ]
in said cause on the 3rd day of February, 1992, which said sum [ ]
received and accepted in full payment and satisfaction of sa[ ]
judgment with interest and costs, and in full payment an[ ]
satisfaction of all fees, liens, and claims in said cause and in an[ ]
to the proceeds of said judgment, and the undersigned does here[ ]
release, acquit, and forever discharge the said Plaintiff, of an[ ]
from all liability to and demand of the undersigned, in respect t[ ]
said cause and judgment.

This release shall be filed in the Office of the Clerk [ ]
said Court, and the said Clerk is hereby authorized and directed t[ ]

1842

KEB400206

enter said release on the judgment docket of said Court and ｜
release the said judgment of record.

Dated this 5th day of February, 1992.

_Marilyn S. Barrett_
MARILYN S. BARRETT, Defendant

LAW OFFICES OF HARRY SCOUFOS, P.C
Attorneys at Law
P. O. Box 787
Sallisaw, OK  74955
(918) 775-5546

By: _Harry Scoufos_
HARRY SCOUFOS, O.B.A. #8031

2

1843

KEB400207

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
            )
        *Movant,*    )
            )
v.            )        **Case No. 6:09-cv-00105-JHP**
            )
UNITED STATES OF AMERICA,    )
            )
      *Respondent*.  )

---

**EXHIBIT 16**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <ins>28 U.S.C. § 2255</ins>**

---

290

MONDAY DECEMBER 10th-Continued.

And after hearing the testimony offered, by both the plaintiff and defendant, instructio
from the court as to the law governing in this cause the jury retires in care if sworn b
consider its verdict thereafter returning into open court their verdict, as follows, to w
State of Oklahoma
Sequoyah County.      IN DISTRICT COURT.

The State of Oklahoma
            vs.
Bob Burchett, Defendant

We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths f
the defendant Bob Burchett guilty of burglary in the second degree as charged in the info
herein. We fail to agree upon punishment.
                                              S.E.Winfrey,Foreman.
Their verdict is received and the jury is discharged from any further service in this ca
and the jury failing to agree as to the punishment the court sets Saturday December 15th
9 o'clock A.M. for sentence.
                    Saturday December 15th 1917.
The District Court of Sequoyah County, State of Oklahoma met in the court room at Salli
Saturday December 15th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Pres
presiding the honorable John H.Pitchford, Judge, C?E?Holder Sheriff and Joe E.Thornton,
Court is regularly opened by public proclamation and the following proceedings had to-wit
1850                        State of Oklahoma vs. Bob Burchett
The defendant having on yesterday been tried and convicted of the crime of burglar
he is now sentenced to serve a term of three years in the penitentiary ay McAlester, Okla
          :::::::::::::::::::::::::::::::
                WEDNESDAY DECEMBER 12th 1917.
          :::::::::::::::::::::::::::::::

The District court met in regular session pursuant to adjournment as of Tuesday December
present and presiding Hon. John H.Pitchford, Judge, thereof, C.E.Holder, Sheriff and Joe
Clerk.and after court being regularly and duly opened by proclamation the following proce
had and entered:
1784                        State of Oklahoma vs. Howard Henson et al.
This case coming on for trial, present in person and by their attorneys Thomas J.
Defendants Howard Henson and Robert Tabor ask permission to withdraw their plea of not gu
Court grants the permission,and defendant files a general demurrer, Demurrer is by the co
led, defendant excepts. Defendant Ed Gant is three times called and answers not and is
adjudged in default, the Clerk is ordered to draw a jury to try the cause as to Howard He
and Robert Tabor and the following named jurors are drawn and sworn to try the cause.
R.Garrison, D.L.Creekmore      Ed Cox            J.B.Shrum
S.E.Harp        Fonce Holland    S.E.Winfrey      A.P.Flowers
                R.H.Thompson    W.J.Webb          W.B.Briley
J.A.Irwin
The hearing of testimony is begun, at the conclusion of which the court instructs the ju
as to the law governing in this cause and argument of counsel being waived the jury retir
in care of a sworn bailiff to consider its verdict, thereafter returning into open court
their verdict as follows to-wit:

State of Oklahoma
Sequoyah County      IN DISTRICT COURT.

The State of Oklahoma            1784
            vs.
Howard Henson and Robert Tabor, D
We the jury drawn, empaneled and sworn in the above entitled cause do upon our oaths
find the defendants Howard Henson and Robert Tabor not guilty as charged in the informati
herein.                                      S.E.Winfrey, Foreman.
Their verdict is received and the jury is discharged from any further service in this
case. Defendants are discharged and their bondsmen exonerated.
          :::::::::::::::::::::::
                THURSDAY DECEMBER 13th 1917.
The District Court of Sequoyah County State of Oklahoma met in the Court room at Sallisa
Oklahoma Thursday December 13th 1917 at 9 o'clock A.M. pursuant to adjournment of yester
present and presiding Hon. John H.Pitchford, Judge,  there being also present C.E.Holder
Sheriff and Joe E.Thornton, Clerk. Court is regularly opened by public proclamation and
the following proceedings had to-wit:
1862                        State of Oklahoma vs. Joe Morgan
Stricken for lack of evidence on motion of the County Attorney.
          :::::::::::::::::::::::
1866                        State of Oklahoma vs. Bob Tabor and George Tabor.
Continued by agreement.
          :::::::::::::::::::::::
                FRIDAY DECEMBER 14th, 1917.
          :::::::::::::::::::::::::::::::
The District Court of Sequoyah County, Oklahoma met in the court room at Sallisaw, Oklaho
Friday December 14th 1917 at 9 o'clock A.M. pursuant to adjournment of yesterday. Present
and presiding Hon. John H.Pitchford, Judge, C.E.Holder, Sheriff and Joe E.Thornton, Clerk
Court is regularly opened by public proclamation and the following proceedings had to-wit
1660                        State of Oklahoma vs. Lafayette Horn
The court orders the mandate of the Crimnal Court of Appeals spread of record.
          :::::::::::::::::::::::
1638                        State of Oklahoma vs. Geo.Williams
The Court orders the mandate of the Crimnal Court of Appeals spread of record.
          :::::::::::::::::::::::
1672                        State of Oklahoma vs. E.L.Lemley
The court orders mandate of the Crimnal Court of appeals spread of record.
          :::::::::::::::
1727                        State of Oklahoma vs. Abe Dotson.
The court orders the mandate of the Crimnal Court of Appeals spread of record.
          :::::::::::::::
1871

KEB502745

State of Oklahoma vs. Levi Chuculate.

[...]dant present in court and waives arraignment and pleads guilty as charged. [...]ves time for sentence and is by the court sentenced to serve a term of [...] in the penitentiary at McAlester, Oklahoma and suspends sentence until [...]y of the next term of the District Court.

: : : : : 4 : : : : : : : : : : : : : : : : : :

SATURDAY DECEMBER 15th, 1917.

: : : : : : : : : : : : : : : : : : : : : : : : :

[...]ict Court of Sequoyah County, State of Oklahoma met in the court room at [...] Oklahoma Saturday December 15th 1917 at 9 o'clock A.M. pursuant to adjournment of [...] resent and presiding Hon. John H. Pitchford, Judge, C.E. Holder, Sheriff and [...], Clerk. Court is regularly opened by public proclamation and the following [...] had to-wit:

State of Oklahoma vs. Lafayette R. Horn.

[...] orders the defendant committed to the penitentiary for the term of 20 years [...]ce with the mandate of the supreme court.

: : : : : : : : : : : : : : : : : : : : : : : : :

State of Oklahoma vs. George Williams

[...] orders the defendant committed to the penitentiary for the term of five years [...]ce with the mandate of the supreme court.

: : : : : : : : : : : : : : : : : :

State of Oklahoma vs. E.L. Lemley

[...] orders the defendant committed to the penitentiary for the term of one year [...] the mandate of the supreme court.

: : : : : : : : : : : : : : : : : : : : : : : : : : :

State of Oklahoma vs. Abe Dotson.

[...] orders the defendant committed to the penitentiary for a term of one year and [...] compliance with the mandate of the supreme court.

: : : : : : : : : : : : : : : : : : : : : : : : : : : :

1846

KEB502746

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 17**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

# RECORD OF INFORMATIONS.

1703 INFORMATION.

GEO. D. BARNARD CO., ST.LOUIS

THE STATE OF OKLAHOMA
vs.
Abe Dotson, J. H. Stout
C. B. Stout,
Defendant

In the _District_ Court,
of _Sequoyah_ County, Oklahoma.

In the Name and by the Authority of the State of Oklahoma,

Now comes _J. B. Allen_ the duly qualified and acting County Attorney, in and for _Sequoyah_ County, State of Oklahoma, and gives the _District_ Court of _Sequoyah_ County, State of Oklahoma, to know and be informed that the above named defendants, Abe Dodson, J. H. Stout and C. B. Stout

did, in _Sequoyah_ County, and in the State of Oklahoma, on or about the _Twenty-eighth_ day of _June_ in the year of our Lord One Thousand Nine Hundred and _fifteen_ and anterior to the presentment hereof, commit the crime of a felony, to-wit; to-wit; an assault with intent to kill in the manner and form as follows, to-wit: That is to say the said Abe Dodson, J. H. Stout, and C. B. Stout, in the county and state aforesaid and on or about the day and date aforesaid, then and there being did then and there, with certain dangerous and deadly weapons, to-wit: an axe and a hammer, which they, the said Abe Dodson, J. H. Stout, and C. B. Stout then and there had and held in their hands intentionally, wrongfully, unlawfully, purposely, wilfully and feloniously, assault, strike, stob, cut, and wound one Henry Hart with force likewise to cause death, with the felonious intent on the part of them the said Abe Dotson, J. H. Stout and C. B. Stout, him the said Henry Hart then and there wilfully, unlawfully, intentionally, purposely, wrongfully and feloniously to kill and murder, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State.

J. B. Allen
County Attorney.

STATE OF OKLAHOMA,
_Sequoyah_ County. ss.

I, _J. B. Allen_, being duly sworn, on oath state, that I have read the above and foregoing Information and know the contents thereof and that the facts stated therein are true.

J. B. Allen,

Subscribed and sworn to before me, this _12_ day of _Nov_ 1915.
Fred Mershon
Court Clerk.

## ENDORSEMENTS.

No. _1727_

THE STATE OF OKLAHOMA
vs.
Abe Dotson. Et al.

INFORMATION.

In the _District_ Court of _Sequoyah_ County, Oklahoma.

Filed _Nov 12_ 1915
Fred Mershon
Court Clerk.

NAMES OF WITNESSES.

Henry Hart, Marble City, Okla.
Henry Sixkiller "
Natie Sixkiller "
Susie Sixkiller "
Jesse Sixkiller "
C. M. Gay, Bullisaw, Okla.
Dr. J. L. Holcomb, Marble City.

I Hereby Certify that the above and foregoing is a full, true, correct and complete copy of the original Information, together with the endorsements thereon, now on file in my office. Dated_____ 19___

By_____ Deputy.  _____ of_____ Co., Okla

1848

KEB503078

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 18**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

APPEARANCE DOCKET—CRIMINAL          No. 1227

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|
| STATE OF OKLAHOMA vs. Abe Dotson | Assault with intent to kill. | 12/7/15 Jury Trial, Guilty as to Abe Dotson. Not guilty as to J.H. & O.B. Stout. Abe Dotson, sent to Pen for 1 year & 1 day |

| | CLERK'S COSTS | SHERIFF'S COSTS | MISCELLANEOUS | DISBURSEMENTS | CREDITS |
|---|---|---|---|---|---|
| To Fil Tran 10, Comp 10, 3 Warrants 30 | 50 | | | | |
| " & Rep Appr Bond | 1 10 | | | | |
| To Dock Fee | 2 00 | | | | |
| To J P Cost | | | 8 30 | | |
| To Court Cost | | | 10 55 | | |
| To Dock Notice (Total 23 65) | 1 00 | | | | |
| To Fil & Rec Infor | 35 | | | | |
| To " Prae & " Sub | 35 | | | | |
| | 35 | | | | |
| " & Is 5 copies | 1 25 | | | | |
| Fil & Ent Sheriff's Ret | 20 | 6 15 | | | |
| To fil Chg. | 10 | | | | |
| Instruction | 10 | | | | |
| To fil Mo for New Trial | 10 | | | | |
| " " in arrest of Judgment | 10 | | | | |
| " off | 10 | | | | |
| To fil & approving Supersedeas Bond | 1 10 | | | | |
| " Taking ack. to Same | 20 | | | | |
| To Wit fee | | | 19 50 | | |
| To Appr 10 Waive 30, Plea 50, Mo 10, & Order 30 | 1 30 | | | | |
| " Swear Jurors 100, Writ 50, Order 30, Verdict 10 | 1 90 | | | | |
| " Appr 10 Order 30, Verdict 10 Order 30 | 70 | | | | |
| " Mo 10, Order 30, Mo 10, Order 30, Mo 10, Order 30 | 1 20 | | | | |
| " Mo 10, Order 30 | 40 | | | | |
| To fil Notice of Appeal | 70 | | | | |
| " & Rec Judgment & Sheriff's Ret | 1 20 | | | | |

KEB503096

Infor Rec. on Page, 483,

134
17=

# APPEARANCE DOCKET—CRIMINAL    No. 1227

PAUL DORSWORTH BOOK CO LEAVENWORTH KAN  NO 21816

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|

STATE OF OKLAHOMA

vs.

Abe Dotson

Assault with intent to kill,

12/7/15. Jury Trial, Guilty as to Abe Dotson. Not guilty as to J.F. & O.B. Statt, Abe Dotson, sent to Pen for 1 year & 1 Day

| | | | | | CLERK'S Costs | SHERIFF'S Costs | MISCELLANEOUS | DISBURSEMENTS | CREDITS |
|---|---|---|---|---|---|---|---|---|---|
| To Fil Tran 10, Comp 10, 3 Warrants 30 | | | | | 50 | | | | |
| " " & Rep Appr Bond | | | | | 1 10 | | | | |
| To Dock Fee | | | | | 2 00 | | | | |
| To J.P. Cost | | | | | | | 8.30 | | |
| Court Cost | | | | | | | 10.55 | | |
| To Dock & Notice | | | | | 10 | | | | |
| To Fil & Rec Infor (Total 23.65) | | | | | 1 10 | | | | |
| To " Prac & " Sub | | | | | 35 | | | | |
| " " " " | | | | | 35 | | | | |
| " " " " | | | | | 35 | | | | |
| " " & 5 copies | | | | | 1.25 | | | | |
| " Fil & Ent Sheriff's Ret | | | | | 20 | 6.15 | | | |
| " To fil Chas. | | | | | 10 | | | | |
| " Instruction | | | | | 10 | | | | |
| To fil Mo for New trial | | | | | 10 | | | | |
| " " " in arrest of Judgment | | | | | 10 | | | | |
| " off | | | | | 10 | | | | |
| To fil & approving Supersedes Bond | | | | | 1 10 | | | | |
| " Taking ack. to same | | | | | 20 | | | | |
| " Fee Witness | | | | | | | | 19.50 | |
| To Affr 10 Waive 30, Plea 50, Mo 10 & Order 30 | | | | | 1 30 | | | | |
| " Swear Jurors 100, Writ 50, Order 30, Verdict 10 | | | | | 1 90 | | | | |
| Appr 10 Order 30, Verdict 10 Order 30 | | | | | 70 | | | | |
| " 10, " 30, Mo 10, Order 30, Mo 10, Order 30 | | | | | 1 20 | | | | |
| " Mo 10, Order 30 | | | | | 40 | | | | |
| To Fil Notice of Appeal | | | | | 30 | | | | |
| " " " | | | | | | | | | |
| " " & Rec'd Judgment & Sheriff's Ret | | | | | 1 20 | | | | |

KEB503097

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 19**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## APPEARANCE DOCKET—Criminal

3

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|----|----------------|-----------------|-----------|
| 3. | THE STATE OF OKLAHOMA vs. Abe Dotson | Carrying Weapon | W. L. Curtis County Atty for State J. H. Jarmon for the Defendant |

| 190 7 | | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscel-laneous | Disburse-ments | Credits |
|--------|---|---|---|---|---|---|---|---|
| Nov 21 | Verifying Complaint | | 25 | | | | | |
| | Issuing Warrant | | 25 | | | | | |
| | Filing Complaint | | 5 | | | | | |
| | " Warrant | | 5 | | | | | |
| | Entering Plea guilty | | 10 | | | | | |
| | Making Entry | | 10 | | | | | |
| | Approving Stay Bond | | 25 | | | | | |
| | Entering Judgement | | 25 | | | | | |
| | Rendering " | | 25 | | | | | |
| | Continuance | | 10 | | | | | |
| | | | 165 | | | | | |
| | Sheriffs Fees | | | | | | | |
| | Serving Warrant | | | | 50 | | | |
| | Returning " | | | | 50 | | | |

Reported

27 65

SEP 30 1936
No funds in Depository
Acct in for this Case
R. L. Seaman, Deputy S. R. &c.

1853

KEB503073

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,     )
                                  )
             *Movant,*     )
                                  )
v.                              )       **Case No. 6:09-cv-00105-JHP**
                                  )
UNITED STATES OF AMERICA,     )
                                  )
         *Respondent.*   )

---

**EXHIBIT 20**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

# CRIMINAL TRIAL DOCKET.

1691.                                                                    GEO. D. BARNARD & CO., PRIN'

| No. | TITLE | ATTORNEY | PRESENT STATUS OF CASE OR PREVIOUS ORDERS |
|---|---|---|---|
| 9. | THE STATE OF OKLAHOMA, vs. Charles Nelson Defendant Charge Selling intoxicating Liquors, | W. L. Curtis County Atty. | Trial in Court. |
| 10 | THE STATE OF OKLAHOMA, vs. Abe Setson Charge Being Drunk in a public, | W. L. Curtis. | Trial in Court, |
| 11 | THE STATE OF OKLAHOMA, vs. W. P. White charge Disposing mortgaged Property & False pretense and cheats, | | |
| 12, | THE STATE OF OKLAHOMA, vs. C. F. Ivey Charge, Bartering Selling & giving away intoxicating Liquors | | |

1855

KEB503080

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 21**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## APPEARANCE DOCKET—Criminal

| TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|
| THE STATE OF OKLAHOMA vs. Abe Dotson Defendant | Being Drunk in a public Place | W. L. Curtis county atty for the State |

| | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|
| Affidavit to Complaint | | 25 | | | | | |
| Issuing Warrant | | 25 | | | | | |
| Filing Complaint 5 Entering Same 10 | | 15 | | | | | |
| Entering warrant 10 Filing warrant 5 | | 15 | | | | | |
| Docket entry of Same | | 10 | | | | | |
| Plaintiffs appearance 10 defendants appearance 10 | | 20 | | | | | |
| Statement of money paid to Justice | | 10 | | | | | |
| By whom paid Berry Dotson. | | 10 | | | | | |
| Entering plea of defendant | | 10 | | | | | |
| Defendant Stand Committed | | 10 | | | | | |
| For rendering Judgment | | 25 | | | | | |
| Filing 3 papers | | 15 | | | | | |
| For Issuing Order to bring Defend into Court | | 25 | | | | | |
| " " Commitment | | 25 | | | | | |
| | | 3.40 | | | | | |
| sheriffs fees | | 610 | | 610 | | | 610 |
| Credit by cash court cost Reported April 1908 | | | | | | | 2 40 |
| " " " " sheriffs cost | | | | | | | 6 10 |
| | | 8 50 | | | | | 8 50 |

SEP 30 1936

KEB503075

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 22**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS | |
|---|---|---|---|---|
| 5 | THE STATE OF OKLAHOMA vs. Abe Datson, Defendant. | Larceny. | W. L. Curtis County Atty. For the State, J. H. Jarman for the defendant, | ✓ |

| 190 7 | | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|---|
| 22 | Verifying Complaint | | 25 | | | | | |
| | Issuing Warrant | | 25 | | | | | |
| | Filing Complaint | | 5 | | | | | |
| | " Warrant | | 5 | | | | | |
| | Entering Plea | | 10 | | | | | |
| | Issuing Subpoena | | 25 | | | | | |
| | Rendering Judgement | | 25 | | | | | |
| | Recording | | 25 | | | | | |
| | Swearing Witnesses | | 10 | | | | | |
| | Issuing Complaint Commitment | | 25 | | | | | |
| | Approving Bond | | 25 | | | | | |
| | Making Transcript | | 25 | | | | | |
| 1909 2 | Transmitting papers | | 25 | | | | | |
| 2 | Certificate | | 25 | | | | | |
| | | | 280 | | | | | |
| | Sheriffs Fees | | | | | | | |
| | Serving Warrant | | | | 50 | | | |
| | Returning " | | | | 50 | | | |

Step on case No funds in Depository Account for this Case R. L. Seaman Deputy Sh.

KEB503074

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 23**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# APPEARANCE DOCKET—Criminal

| No | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|
| 1 | THE STATE OF OKLAHOMA vs. Abe Dodson Defendant, | Obtaining money under false pretenses and threats, Examination. | W. S. Curtis county Atty. for the State and J. H. Jarman & R. E. Jackson for the Defendant, |

| 190..7.. | | Clerk's Cost Plaintiff | Clerk's Cost Defendant | Sheriff | Miscellaneous | Disbursements | Credits |
|---|---|---|---|---|---|---|---|
| | The defendant brought before the court on the 21st day of Nov 1907 | | | | | | |
| Nov 20 | Making entry on Docket | 10 | | | | | |
| " " | Issuing information, | 25 | | | | | |
| | Issuing writ | 25 | | | | | |
| | Filing information | 5 | | | | | |
| | " writ. | 25 | | | | | |
| | Approving Bond before Trial | 25 | | | | | |
| | Swearing to Complaint | 25 | | | | | |
| | Issuing Subpoena | 25 | | | | | |
| | Swearing witness | 10 | | | | | |
| | Approving Bond after Trial | 25 | 25 | | | | |
| | Transcript of Docket 5 folios. | 50 | | | | | |
| | Transmitting Papers to District court | 25 | | | | | |
| | Entering Judgement | 25 | | | | | |
| | To Continuance | 25 | | | | | |
| | Certificate to record, | 25 | | | | | |
| | | 3 30 | | | | | |
| | Sheriffs Fees | | | | | | |
| | Serving Warrant | | | 30 | | | |
| | Returning " | | | 50 | | | |

SEP 30 1996 No funds in Depository Account for this Case R. L. _____ Deputy S.E. Dist.

KEB503072

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

_____

**EXHIBIT 24**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

_____

## DECLARATION OF DAVID AUTRY

I, David Autry, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma, the United States Court of Appeals for the Tenth Circuit, the United States District Court for the Western and Eastern Districts of Oklahoma, and the Northern District of Texas.

I am one of Kenneth Eugene Barrett's lawyers in his motion to vacate convictions and sentences pursuant to 28 U.S.C. section 2255. On February 18, 2009, I interviewed Randy Weaver, one of the witnesses who testified for the Government in the first stage of Mr. Barrett's case. Mr. Weaver gave me information that was largely consistent with his trial testimony. During my interview of Mr. Weaver, I asked him whether, in his contact with Mr. Barrett, he ever heard Mr. Barrett state that if the police came on his property, he would "go out in a blaze of glory," or anything else that would indicated he would confront the police with violence if they came on his property. Mr. Weaver informed me that Mr. Barrett never said anything like that to him or in his presence. Mr. Weaver told me that such a statement or statements would be out of character for Mr. Barrett.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this 12th day of March, 2009, in Oklahoma County, Oklahoma.

_____
David Autry

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 25**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Case 6:09-cv-00105-RAW   Document 71-15   Filed 09/25/09   Page 2 of 2

# APPEARANCE DOCKET—CRIMINAL

No. 1715

| CLERK'S Costs | SHERIFF'S Costs | MISCELLA-NEOUS | DISBURSE-MENTS | TITLE OF CAUSE | OFFENSE CHARGED | ATTORNEYS |
|---|---|---|---|---|---|---|
| | | | | STATE OF OKLAHOMA vs. Sam Maxwell et al | Burglary | 5/3.15- Court for Sentence. 13/6/15 Continued 5/1/16. Cause Continued 13-4-16 Cause Cont. 12/3-17 Cause Cont Dismissed |

| | | | | | CLERK'S Costs | SHERIFF'S Costs | MISCELLANEOUS | DISBURSEMENTS | CREDITS |
|---|---|---|---|---|---|---|---|---|---|
| | | | To fil Trans Comp Wad Commit | | 40 | | | | |
| | | | " Dock fees | | 200 | | | | |
| | | | " J.P. Costs | | | | 570 | | |
| | | | " Const " | | | | 2450 | | |
| | | | " Fil & Rec'd Impai | | | | | | |
| | | | Sum 50 Order 30 | | 110 | | | | |
| | | | Sum 50 Order 30 | | 80 | | | | |
| | | | To Fil & Rec'd app. Bond | | 110 | | | | |
| | | | Id Dock Notice (Bal 3570) | | 40 | | | | |
| | | | To Fil O.R. | | 10 | | | | |
| | | | Appro & Order 30 | | 40 | | | | |
| | | | To Docket & Notice     3630 | | 10 | | | | |
| | | | fil O.R. | | 10 | | | | |
| | | | To Docket & notice | | 10 | | | | |
| | | | To fil Pet | | 10 | | | | |
| | | | Appearance 10 " Ord 30 Cont, 20 | | 10 | | | | |
| | | | To Docket & Not | | 60 | | | | |
| | | | Paid Sam Maxwell | | 10 | | | | 1870 |
| | | | Will Dustman | | | | | | 1870 |
| | | | Report act character | | | | | | |
| | | | (Act Treasurer) | | | | | | 3740 |
| | | | To Dock & Dis | | 10 | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
        )
       *Movant,*    )
        )
v.        )      **Case No. 6:09-cv-00105-JHP**
        )
UNITED STATES OF AMERICA,    )
        )
       *Respondent.*  )

---

**EXHIBIT 26**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# RECORD OF MENTAL HEALTH PROCEEDING

119

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ........................................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Billy Dean Maxwell          No. MH-82-12

| Date Filed | | | Date Case Filed.......... Date of Hearing.......... | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | |
| 5 | 6 | 82 | Petition | | | | | | | | | | |
| " | " | " | Order for Hrg. | | | | | | | | | | |
| " | " | " | Notice of Hrg. issued (Vinita)(Craig Co.) | | | | | | | | | | |
| 5 | 11 | 82 | Order of admission ret'd | | | | | | | | | | |
| 5 | 10 | 82 | Minute: Case coming on for probable cause hearing, defendant appeared in person with attorney, Jo Adams, state represented by ?? Doctors Robbins, Herndon, + Oliver appeared. Witnesses sworn test. heard, doctors examination, finding probable cause, Court ordered defendant committed to Eastern State Hospital. ajh | 5-315 | | | | | | | | | |
| 5 | 13 | 82 | Notice Let (rec. too late) | | | | | | | | | | |
| 5 | 25 | 82 | Pd. J. O. Adams  V# 2426  $50.00 | | | | | | | | | | |
| " | " | " | Pd. Dr. Fred Oliver  V# 2432  $20.00 | | | | | | | | | | |
| " | " | " | Pd. Dr. Rick Robbins  V# 2433  $20.00 | | | | | | | | | | |
| " | " | " | Pd. Dr. Jim Herndon  V# 2436  $20.00 | | | | | | | | | | |
| | | | MH 90-29  Re: Gary Ledford | | | | | | | | | | |
| 3 | 21 | 90 | pet. | | | | | | | | | | |
| 3 | 21 | 90 | Motion to Dismiss & order 95-914 | | | | | | | | | | |
| | | | Min - Motion to dismiss of st. is sustained as per order ajh | | | | | | | | | | |
| 3 | 23 | 90 | Licensed mental health professional statement | | | | | | | | | | |

220

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ........................................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Billy Dean Maxwell } No. MH-85-17

| Date Filed | | | Date Case Filed................ Date of Hearing................ | Items Recorded | | Cost Accruals | | | | Date Paid | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Clerk's Cost | Sheriff's Cost | Other Fees | | | | |
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | | | Miscl. | On Court Order | Mo. | Da. | Yr. |
| 9 | 11 | 85 | petition | | | | | | | | | |
| ✓ | ✓ | ✓ | order for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | notice for hearing | | | | | | | | | |
| ✓ | ✓ | ✓ | order of detention issued | | | | | | | | | |
| 9 | 16 | 85 | report of ~~supp~~ symptoms | | | | | | | | | |
| ✓ | ✓ | ✓ | certificate of examine | | | | | | | | | |
| ✓ | ✓ | ✓ | issued order of admission | | | | | | | | | |
| 9 | 17 | 85 | Order of admission filed | | | | | | | | | |
| ✓ | | | Admission Notification | | | | | | | | | |
| 9 | 19 | 85 | Order of Detention filed | | | | | | | | | |
| 9 | 24 | 85 | Pd Dennis M. Sprouse V#2054 | 50 | 00 | | | | | | | |
| — | — | — | Pd Bert N. Curley MD V#2059 | 50 | 00 | | | | | | | |
| — | — | — | Pd Rich Robbin DO V#2060 | 50 | 00 | | | | | | | |
| 1 | 10 | 86 | Discharge from Hospital (letter) | | | | | | | | | |

MH-92-27 Jimmy Wright

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 26 | 92 | Petition | | | | | | | | | |
| ✓ | — | — | Order essued | | | | | | | | | |
| 5 | 27 | 92 | Temp Order filed | | | | | | | | | |
| 5 | 28 | 92 | Notice of Certification | | | | | | | | | |
| ✓ | ✓ | ✓ | Order of admission issued | | | | | | | | | |
| 6 | 29 | 92 | Letter from Eastern of Vinita | | | | | | | | | |
| 6 | 30 | 92 | Appl for Order allowing | | | | | | | | | |
| 7 | 1 | 92 | Order allowing w/Pg att. | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 27**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

State Examiner and Inspector's Form. No. 1382.                                        News-Dispatch Ptg. & Audit Co., Shawnee, O.

IN THE MATTER OF

the Sanity of

A. J. Barrett

STATE OF OKLAHOMA,

County of Sequoyah

No. 141

In The

COUNTY COURT

| PETITION | ORDER OF ADMISSION. |
|---|---|
| Date Filed Aug 12 1918 Date of Hearing _____19___ By Whom W. R. Barrett Address Maple Okla. | Date Issued _____19___ Delivered to Sheriff. _____19___ To _____Oklahoma State Hospital At _____Oklahoma Received at Hospital By Medical Superintendent _____19___ |

## PHYSICIANS.

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total Allow― |
|---|---|---|---|---|---|
| 19 | J. W. Hudson | 10 | $5.00 | $ | |
| 19 | J. A. Morrow | 10 | $5.00 | $ | |

## GUARDIAN AD LITEM.

| Date of Appointn't | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

## PLEADINGS

| Date Filed | NAME |
|---|---|
| | |

## PROCESS

| Date Issued | NAME | Date Returned | BY WHOM SERVED | Officer's |
|---|---|---|---|---|
| | | | | |

## MINUTES OF PROCEEDINGS.

KEB503066

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 28**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

IN THE MATTER OF

the Sanity of

A. J. Barrett

STATE OF OKLAHOMA

County of _Sequoyah_

No. _709_

In the

COUNTY COUI

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|

**PETITION**

Date Filed: _8-18-_ 19 _66_     Date of Hearing: _8-18-_ 19 _66_

By Whom: _Ada Mae Barrett_

Address _____

**ORDER OF ADMISSION**

Date Issued: _8-19-_ 19 _66_     Delivered to Sheriff: _8-19-_ 19_

To _Eastern_ Oklahoma State Hospital

At _Vinita_ Oklal

Received at Hospital By Medical Superintendent _____ 19_

### PHYSICIANS

| Date of Appointment | NAME | Report Filed | Fees Allowed | Expenses | Total |
|---|---|---|---|---|---|
| 19 | | 19 | $ | $ | $ |
| 19 | | 19 | $ | $ | $ |

### GUARDIAN AD LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 19 | | |

### PLEADINGS / PROCESS

| Date Filed | NAME | Date Issued | NAME | Date Returned | BY WHOM SERVED | Offi |
|---|---|---|---|---|---|---|
| | | | | | | |

### MINUTES OF PROCEEDINGS

9-20-66  Discharged with Rest. to Comp.

9-20-66  Cert of Restoration to Comp.

JOURNAL

STATE OF OKLAHOMA,

County of _Sequoyah_ } ss.

In the Matter of the Sanity of

_A. J. Barrett_

IN THE COUNTY COURT OF SAID COUNTY.

No. _709_

PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL.

To the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that _____ he is a resident of the County of _Sequoyah_ _____ and State

of _Okla._ _____ That _A. J. Barrett_ _____ is an actual bona fide resident of the

County of _Sequoyah_ _____ , State of Oklahoma, is a _____ male person of about the age

of _49_ _____ years, and is now within the said county and living with _wife_

at or near the town—city of _Sallisaw_

That your petitioner has good reason to, and does believe that the said _A. J. Barrett_

is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is

necessary that _____ he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows: _Has at_

_different times threatened his wife and children, accusing them_

_of untruths, threatens to kill wife, is belligerant, overbearing accuses_

_wife of out with other men, etc._

Your petitioner further alleges that _____ he is informed and verily believes that the following named persons, of full age, whose names and places

of residence respectively are as follows, are related to the said insane person, to-wit:

| NAME | RELATIONSHIP | POSTOFFICE | STATE |
|------|--------------|------------|-------|
|      |              |            |       |
|      |              |            |       |
|      |              |            |       |
|      |              |            |       |

Your petitioner is the _____ _wife_ _____ of the said insane person _____ or that

he is the _____ of said County and State, and by reason of such fact is authorized to institute this proceeding.

(Relationship)

(Official Title)

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the

approximate value, as follows: Real Property $_____ , Personal Property $_____ , Total Value

$_____ . Said estate is situated in _____ County, State of _____

Wherefore, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that

two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person, and that

said physicians make report of their findings, as by law required; and that said _____ be

brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the Court by proper

order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1363.

_Ada Mae Barrett_

Petitioner.

STATE OF OKLAHOMA,

County of _____ } ss.

CERTIFICATE.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompe-

tency; and upon h _____ next of kin, of full age, on account of their non-residence of the county and state, or uncertainty of location, and upon the person

with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense

with such personal service; and _____

it is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed. _____

County Judge.

Filed _____ 19 ____ _____ Court Clerk. By _____ Deputy.

Form by the Attorney General—State Examiner and Inspector's Form No. 1370.

STATE OF OKLAHOMA,

County of _Sequoyah_ } ss.

In the Matter of the Sanity of

_A. J. Barrett_

IN THE COUNTY COURT OF SAID COUNTY.

No. _709_

ORDER FOR ADMISSION TO STATE HOSPITAL.

Now, on this _19_ day of _August_ , 19 _66_ the above entitled matter came on to be heard before the County Court of

_Sequoyah_ _____ County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing

of the petition filed herein by _Ada Mae Barrett_ _____ alleging the insanity

of _A. J. Barrett_ _____ , and praying an order for h __is__ _____ admission to the State Hospital for the

Insane, has been given as required by law and as directed by the Court.

Thereupon, the court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians

appointed to examine the said _A. J. Barrett_ _____ and to report to this Court as to h __is__ _____

sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said _A. J. Barrett_

_____ _mental_ _____ is insane; and that _____ he should be admitted to a State Hospital for the Insane, there to be treated and kept as a

_____ patient.

It Is Therefore Ordered by the Court that said _A. J. Barrett_

be admitted to the _Eastern_ _____ Oklahoma _State_ _____ Hospital

at _Vinita_ _____ , Oklahoma, as a _mental_ _____ patient, there to be detained and kept until legally discharged.

It Is Further Ordered that the sheriff of said county of _Sequoyah_ _____ , be and he is hereby authorized and directed

forthwith to transport the said _A. J. Barrett_ _____ , so adjudged to be insane to the said

hospital and to deliver h __is__ _____ , together with a certified copy of this order and of the physician's final certificate herein to the medical superintendent of the

said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.

It Is Further Ordered that the said sheriff shall cause the said medical superintendent to acknowledge hereon the receipt of the above-named insane person,

and forthwith to make return hereof showing the manner in which he has executed this order.

Done in open court this the day first above written.

_Roy Frye Sr._

County Judge.

RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of _____ the insane person named in the

within order, and I hereby certify that at the time _____ he was delivered to me there was in attendance with said person _____

_____ Sheriff, with _____

and _____ guards.

Dated at _____ this _____ day of _____ 19 ____.

Medical Superintendent of _____ Oklahoma _____ Hospital.

SHERIFF'S RETURN

STATE OF OKLAHOMA, COUNTY OF _____ ss.

Received the within order on the _____ day of _____ , 19 ____,

at _____ o'clock _____ M., and in pursuance of the command thereof, executed the same

by transporting the within named _____ to the

_____ Oklahoma _____ Hospital at

_____ , Oklahoma, and there delivering h _____ on the _____ day of

_____ , 19 ____, at _____ o'clock _____ M., into the custody of

the Medical Superintendent of said institution, together with a certified copy of this order

and of the physician's final certificate.

_____ Sheriff

By _____ , Deputy—Under-sheriff.

Filed _____ , 19 ____.

SHERIFF'S FEES

EXPENSES—Receipts attached:

Executing order and making return thereof  -  $  .50

_____ miles travel  -  -  -  -  -  -  _____

TOTAL FEES  -  -  -  -  -  - $ _____

Transportation for  -  -  -  -  - $ _____

Hotel and lodging for  -  -  -  - $ _____

TOTAL EXPENSE  -  -  -  - $ _____

Court Clerk.

By _____ , Deputy.

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

## EXHIBIT 29

## TO KENNETH EUGENE BARRETT'S

## AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255

## DECLARATION OF MARK HENRICKSEN

I, Mark Henricksen, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma.  I am also licensed to practice in the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court.  I am in private practice in Oklahoma City, Oklahoma.

I was appointed to represent Kenneth Eugene Barrett as lead counsel in his direct appeal to the United States Court of Appeals for the Tenth Circuit.  Mr. Barrett's lead trial counsel, Roger Hilfiger, was also appointed on the appeal.

Based on my knowledge of the case and discussions with trial counsel, Bret Smith, Mr. Hilfiger's second chair, was put in charge of the defense penalty phase case, even though he had no experience in capital cases.  Mr. Hilfiger did not like his client, Kenny Barrett.  It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted.  There was effectively no second stage investigator for Mr. Barrett.  Mr. Hilfiger and Mr. Barrett never really got along, and Mr. Barrett wanted his former lawyer, John Echols back as his lawyer.  Overall, there was a poor attorney/client relationship between Mr. Hilfiger and Mr. Barrett.  Based on my dealings with Mr. Hilfiger, he had a blasé attitude toward the case. Mr. Hilfiger gave the distinct impression of wanting to get the case

1

behind him because he was with a small law firm and the case was consuming too much of his time.

During my work on Mr. Barrett's direct appeal, I spoke with John Echols, who had represented Mr. Barrett in state court and was originally his lead attorney in the federal prosecution. I reviewed, of course, various budgetary requests Mr. Echols made, and the manner in which the trial court dealt with them. It was evident that Judge Payne wanted remarkably detailed budget requests from Mr. Echols. Mr. Echols, in my opinion, did not have time to jump through the various administrative and budgetary hoops that had been placed in his way by Judge Payne, and work up the trial of the case, which is the reason he withdrew from representing Mr. Barrett. In contrast, it was also evident that Judge Payne was not nearly as exacting when it came to requests made by Mr. Hilfiger, although the budgets that were approved for investigators, experts and the like were extremely limited.

Mr. Echols informed me that the strictures placed on him by Judge Payne made the case virtually impossible to defend in an effective manner. By moving to withdraw, he thought he was going to call the judge's bluff, but Judge Payne rather quickly granted Mr. Echols's motion to withdraw.

When I was appointed to handle Mr. Barrett's direct appeal, Judge Payne told the Federal Defender for the Western District of Oklahoma, Susan Otto, that he wanted either Mr. Hilfiger or Mr. Smith appointed on the appeal also. This was in furtherance of Judge Payne's plan to develop a local capital defense bar in the Eastern District. It is my view that

2

this is also why Bret Smith, with no capital experience, was appointed co-counsel with Mr. Hilfiger for the trial of Mr. Barrett's case after Mr. Echols withdrew. I learned from Susan Otto that Mr. Barrett's case was to be the inaugural or "test case" for this plan.

During my representation of Mr. Barrett, I consulted on several occasions with Dick Burr, federal capital resource counsel. Mr. Burr informed me that he had consulted with Mr. Echols when Mr. Echols was lead counsel, but was not consulted after Mr. Hilfiger and Mr. Smith took over the case.

As anyone who has read the direct appeal opinion in Mr. Barrett's case can see, many of the issues raised were reviewed under the "plain error" standard because of a lack of contemporaneous objections at trial. When I asked Mr. Hilfiger about the failure to object, he said he was trying to "win" the case and did not want to "offend" the jury by making unsuccessful objections. Mr. Hilfiger also did not want to "offend" Judge Payne by making too many objections, which he felt were likely to be overruled, although not necessarily because they lacked merit.

During the trial, it was revealed that Charles "Monk" Sanders was the alleged confidential informant whose information supplied the authorities probable cause for a no-knock search warrant of Mr. Barrett's property, and for Mr. Barrett's arrest. However, during his trial testimony, Mr. Sanders testified that he never told the authorities various things that supplied the basis for the no-knock warrant. A very weak record was made on this. When I inquired of Mr. Hilfiger why he did not strenuously object and forcefully ask

<div align="center">3</div>

to re-open the search warrant issue, he stated that he was afraid of Judge Payne's reaction and did not want to "interrupt" the trial. He believed that he had little chance of success on this point with Judge Payne based on his understanding that the court wanted to get the trial underway.

As to the seven informant or "snitch" witnesses who appeared at Mr. Barrett's trial, and who were sprung on the defense during jury selection, I asked Mr. Hilfiger why he did not move for a continuance in order to investigate these witnesses. I also asked him why he acceded to an arrangement that permitted him to interview the witnesses in the presence of AUSA Mike Littlefield and law enforcement, particularly when the witnesses more or less refused to talk to him, there was no discovery of what these witnesses said to Littlefield, and there was little time to try to counteract their testimony. Mr. Hilfiger told me that he agreed to the arrangement because it meant he would at least get to interview the witnesses himself, even though this did not turn out as planned. He also said that because the trial was ongoing, he did not want to antagonize the judge by asking for a continuance, even after the witnesses more or less refused to talk to him. Mr. Hilfiger believed that since there was some time before the witnesses actually testified, some investigation could be done into them. Of course, no witnesses for the defense who could impugn the credibility of these seven witnesses were called, and the defense relied solely on cross-examination to try to attack their stories. Mr. Hilfiger said that he believed that no continuance was possible due to Judge Payne's desire to stay on schedule, and that this compromise was better than

4

nothing.

Some of the following paragraphs include propositions identified by Mr. Barret's current lawyers. I am not presently in a position to evaluate the merit of each in comparison to the propositions I chose to raise, and therefore cannot say I would have made the same decisions if I had recognized some of these issues at the time. The Tenth Circuit initially permitted the appellant's brief to be 14,000 words. I applied for an oversized brief of 24,000 words. The court ruled that the brief was limited to 20,000 words and that no further amendments to the case management order would be considered prior to submitting the appellant's brief. I had to edit it to reduce the brief to the 20,000 word threshold. Although I agree that the following issues should have been considered, every appeal involves some triage of issues.

I did not raise on direct appeal a search and seizure issue based on "Monk" Sanders' trial testimony that he had not told the police the matters that were included in the affidavit for search warrant to justify a no-knock warrant. I did not raise this issue because I believed it had not been adequately preserved by Mr. Hilfiger. I could have raised this issue, and had no legitimate strategic reason for not raising it, because the issue was, however inadequately, framed by the record. As noted, there were several issues raised on appeal for which no contemporaneous objection or record had been made at trial.

I did not raise issues relating to the lack of defense theory instructions or lesser included instructions because, again, I believed that a less than adequate job had been done

by trial counsel in arguing these issues. Again, I could have raised this issue, since some record was made. This is particularly true because self-defense was basically the defense raised at trial, and there was testimony in the record to indicate that if anything, Mr. Barrett was guilty of manslaughter or some lesser offense, not first degree murder as framed by the counts in the indictment. Of course, the jury in the state case acquitted Mr. Barrett of first degree murder and convicted him of manslaughter.

I was aware from my reading of the record that Mr. Barrett wore a "stun belt" under his clothing throughout trial. The defense objected. I discussed the stun belt with Mr. Hilfiger, who told me that while he believed the stun belt was not visible, it did detract from Mr. Barrett's communications with counsel in the courtroom. I did not recognize as a viable issue for appeal the stun belt's affect on Mr. Barrett's communication with counsel, and therefore did not reject it.

I was aware from my reading of the record that an ex parte hearing was conducted between the Government and Judge Payne regarding the Government's motion, which was originally placed under seal, to delay disclosure of the identity of the seven informant witnesses. During the ex parte hearing, Judge Payne stated that he could see a long continuance coming based on the fact that the identities of these witnesses had not been revealed and the Government wanted to delay disclosure. Mr. Hilfiger did not move for a continuance. I did not have a strategic reason for failing to raise issues surrounding this ex parte hearing. I was disappointed that trial counsel had acquiesced on this issue between the

6

time of the <u>ex parte</u> hearing and the resumption of open court. I interviewed Mr. Hilfiger repeatedly on this point. He consistently said that an application for a continuance was pointless and that he hoped to gain some useful information from this compromise. In my opinion, there was no professional basis for such a judgment. A reasonable lawyer would have demanded a continuance, and funds with which to conduct an investigation.

Although this was a lead argument in Mr. Barrett's appeal, I anticipated that trial counsel had failed to preserve the record.

In fact, the alleged compromise was meaningless in practice, and Mr. Barrett did not receive the benefit of pre-trial investigation or an adequately preserved record of this failure of due process.

I did not draft all of this declaration. The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, when he interviewed me about the case. I was also interviewed by another of Mr. Barrett's current lawyers, Tim Schardl. The information in this declaration also reflects what I told him. I have carefully reviewed this declaration, and it states accurately what I told these lawyers.

I declare, under penalty of perjury, that the foregoing 7 page declaration is true and correct.

Executed by me this _13_ day of _March_ , 2009, in Oklahoma County, Oklahoma.

_Mark Henricksen_
Mark Henricksen

7

1881

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
                                  )
                 *Movant,*   )
                                  )
v.                             )        **Case No. 6:09-cv-00105-JHP**
                                  )
UNITED STATES OF AMERICA,   )
                                  )
            *Respondent.*  )

---

**EXHIBIT 30**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                                                    Plaintiff

vs                                                            No.13026

Kathleen E.Blake, et al.                                      Defendants

### ORDER APPOINTING ATTORNEY FOR DEFENDANTS

Now on this 29th day of December ,195 8, there comes on to be heard the motion of the plaintiff to appoint an attorney of this bar to appear and represent the interests of such of the defendants, Kathleen E.Blake, Ethel J. Bourdon, Henry C. Bourdon, George R.Bourdon, William R. Bourdon, J. H. Brodie, Embra Marie Cloud, Jeanette Cox, Elizabeth Duncan, R.T.Kelleam, George A.Ralph, Sarah Louise Sprague, A.J.Stone, Hazel B.Walter, if living and or if deceased, the unknown heirs, executors, administrators, devisees, trustees and assigns, immeddate and remote of those who are deceased, the successors, assigns and trustees of Limited Oil Company and of Graves Newman Investment Company, both dissolved or defunct Corporations, the heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of Sarah Smith nee McCoy, a Fullblood Cheorkee Indian, enrolled opposite Roll No.20713, deceased and of Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No.17144, deceased, as are in or awaiting induction into the Military service of the United Statse or some allied nation in the above styled cause of action and the plaintiff appearing by his attorney, W.S.Agent, and presenting the motion to the court, being advised and sufficiently advised finds

That the defendants hereby have been served with notice by publication and have made default in appearance and pleading; that plaintiff has moved for default judgment and that an attorney should be appointed to appear and represent the interests of said defendants in this cause.

IT IS THEREFORE ORDERED AND DECREED THAT ~Fred~ ~R.~ ~Green~ Be and is hereby appointed to appear and represent the interests of said defendants and that said attorney is hereby granted leave to file answer herein for and on behalf of said defendants.

_____
DISTRICT JUDGE

SEQUOYAH COUNTY, OKLAHOMA
F I L E D
IN _____ COURT
DEC 29 1958
At ____ O'Clock ____ M. and Recorded in
Book ____ Page ____
_____ Court Clerk
Deputy

KEB503090

IN THE DISTRICT COURT IN AND FOR SEQUOYAH COUNTY, STATE OF OKLAHOMA

Ada Blount,                                                Plaintiff,

vs.                                                        NO. 13026

Kathleen E. Blake, Ethel J. Bourdon, Henry
C. Bourdon, George R. Bourdon, William R.
Bourdon, J. H. Brodie, Embra Marie Cloud,
Jeanette Cox, Elizabeth Duncan, R. T. Kelleam,
George A. Ralph, Sarah Louise Sprague, A. J.
Stone, Hazel B. Walter, if living and or if
deceased, the unknown heirs, executors,
administrators, devisees, trustees and assigns,
immediate and remote of those who are deceased,
the successors, assigns and trustees of Limited
Oil Company and of Graves Newman Investment
Company, both dissolved or defunct Corporations,
the heirs, executors, administrators, devisees,
trustees and assigns, immediate and remote of
Sarah Smith nee McCoy, a Fullblood Cherokee Indian,
enrolled opposite Roll No. 20713, deceased,
and of Jesse L. Harmon, a One-Half Degree Cherokee
Indian, enrolled opposite Roll No. 17114, deceased,
the Oklahoma Tax Commission and the Board of County
Commissioners, County Treasurer and County Assessor
of Sequoyah County, Oklahoma,                             Defendants.

SEQUOYAH COUNTY, OKLA.
FILED
IN _____

At _____ O'Clock _____ M. and in
Book _____ Page _____

JOURNAL ENTRY

This cause coming on to be heard this 29th day of December,
pursuant to special assignment on the trial docket and plaintiff
appearing by her attorney, W. S. Agent and the defendants, Board of
County Commissioners, County Treasurer and County Assessor of Sequoyah
County, Oklahoma, appearing by R. F. Campbell, Jr., County Attorney of
Sequoyah County, and the Oklahoma Tax commission having filed herein
its Disclaimer and the Superintendent of the Five Civilized Tribes
having filed his election not to remove said cause to the Federal
Courts and those defendants who are in or awaiting induction into the
military service of the United States appearing by the attorney appointed
to represent said defendants and all other defendants appearing not
in person or by counsel are adjudged to be in default.

Thereupon, the court examined the pleadings and evidence as to
the service in this cause, and finds that each and all of the defendants
have been due and legally served with notice of the pendency of this
action as prescribed by the laws of the State of Oklahoma, and that
service is good and sufficient to give the court jurisdiction to proceed
with the trial of this case.

1884

KEB503091

The Court finds after having heard the statements of counsel and examined the pleadings and evidence, all material allegations contained in Plaintiffs petition to be true and that plaintiff is the owner of and in the actual possession of the following described real estate, located in Sequoyah County, Oklahoma, to-wit:

TRACT 1

S½ NE SE SE of Section 28, Township 12 North, Range 23 East,

TRACT 2

The East 70 yards of the NE NW NE of Section 33, Township 12 North, Range 23 East,

TRACT 3

E½ W½ SW NE of Section 33, Township 12 North, Range 23 East,

TRACT 4

N½ NE NE, & SE NE NE of Section 33, Township 12 North, Range 23 East,

TRACT 5

SE SE NE Section 33, Township 12 North, Range 23 East,

TRACT 6

S½ SE SE of Section 28, Township 12 North, Range 23 East, and SE NW NE & SW NE NE & E½ SW NE & W½ SE NE, & NE SE NE of Section 33, Township 12 North, Range 23 East, and NW SW NW & W½ NW NW & NE NW NW of Section 34, Township 12 North, Range 23 East,

The court further finds, that Embra Marie Cloud, if living and if deceased, the unknown heirs, executors, administrators, devisees trustees and assigns, immediate and remote of Embra Marie Cloud is claiming some right, title, interest or estate in and to that real estate described as Tract 1, but that in truth and fact said defendant has no interest therein and plaintiff has owned and held the open, notorious and adverse possession of the same for more than 15 consecutive years immediately preceding the filing of this petition, to-wit:  Since 1919 and that plaintiff is entitled to a decree quieting her title against said defendant or defendants.

The court further finds, that the defendants, J. H. Brodie, and J. Stone, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of said defendants are claiming some right, title, interest or estate in and to that real estate described as Tract 2, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

1885

KEB503092

The court further finds that Sarah Smith nee McCoy, a fullblood Cherokee Indian enrolled opposite Roll No. 20713 died intestate on the 15 day of March, 1915 a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, the wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

The court further finds that the defendants., R. T.Kelleam, Kathleen E. Blake, George A. Ralph, Sarah Louise Sprague, Elizabeth Duncan, Ethel J. Bourdon, William R. Bourdon, George R. Bourdon, Henry C. Bourdon, Jeanette Cox and Hazel B. Walter, if living and if deceased the unknown heirs, executors, administrators, devisees, trustees and assigns, immediate and remote of those who are deceased are claiming some right, title, interest or estate in and to that real estate described as Tract 5, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting his title and possession against each and all of said defendants.

The court further finds that the Limited Oil Company is a dissolved or defunct Corporation and that the successors, assigns and trustees of said dissolved or defunct Corporation are claiming some interest in lien upon all of said real estate by virtue of that certain mortgage recorded in Book 162 at page 176 in the office of the County Clerk of Sequoyah County, Oklahoma, but that in truth and fact said mortgage has been paid and the indebtedness satisfied in full and plaintiff is entitled to a decree quieting her title against said defendants.

The court further finds that the Board of County Commissioners, County Treasurer and County Assessor of Sequoyah County, Oklahoma, are claiming some interest in or lien upon all of said real estate for taxes due and unpaid thereupon or for errors or omissions in the proceedings leading to the sale of said real estate for the non payment of taxes, but that in truth and fact said defendants have no interest therein and plaintiff is entitled to a decree from this court quieting her title against said defendants and the further order quieting her title against said defendants and the further order enjoining said defendants and successors in office from hereafter claiming any interest in or lien upon said real estate.

The court further finds that the Oklahoma Tax Commission by its own pleading claims and has no interest in said real estate or any part thereof.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED by the court that plaintiffs title and possession be and is hereby quieted and set at rest in Plaintiff against each and all of the defendants and that said defendants and all persons claiming by, through or under any defendants since the institution of this action be and are hereby enjoined from hereafter claiming or attempting to claim any right, title, interest or estate or equity of redemption in and to said real or any part thereof.

KEB503093

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that on 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident Sequoyah County, Oklahoma seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes conveyances plaintiff became the owner thereof.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that the 14th day of December, 1914, Jesse L. Harmon, a One-Half Degree Cherokee Indian, enrolled opposite Roll No. 17114 died intestate, a resident of Sequoyah County, Oklahoma, seized and possessed of that real estate described as Tract 4 and left as his sole and only heir at law, his only child, Joseph E. Harmon, who took and inherited all of said real estate, wife of said decedent having predeceased him and that thereafter the said Joseph E. Harmon sold and conveyed said real estate and by mesne processes and conveyances plaintiff became the owner thereof.

DISTRICT JUDGE

1887

KEB503094

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
           )
          *Movant,*    )
           )
v.           )        **Case No. 6:09-cv-00105-JHP**
           )
UNITED STATES OF AMERICA,    )
           )
        *Respondent*.  )

---

**EXHIBIT 31**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF LEONARD POST

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

1


1889

himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

2



Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3



Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his



parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when I asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5



Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6



possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

7



Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8



resembling it ever took place. I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house. Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry. They scared me and threatened me." Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature. After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would. Cindy stated that she would not read the declaration. She then asked me to leave. When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to. Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.

9



As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she

10



told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11



1899

I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

_____
Leonard Post

12

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 32**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

192

# LUNACY RECORD

State Examiner & Inspector's Form No. 1382 — WARDEN COMPANY, OKLAHOMA CITY

IN THE MATTER OF THE SANITY OF

Wallace Dotson

Vian R2 - McKey

STATE OF OKLAHOMA

COUNTY OF Sequoyah

No. 266

IN THE COUNTY COURT

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|
| DATE FILED | DATE OF HEARING | DATE ISSUED | DELIVERED TO SHERIFF |

May 4 _____, 1948 _____, 191___

By Whom Tom Dotson

Address Vian R#2 - Okla

_____, 191___ _____, 191___

To_____Oklahoma State Hospital

at_____Oklahoma

Received at Hospital by Medical Superintendent_____, 191___

## PHYSICIANS

| Date of Appointment | NAME | REPORT FILED | FEES ALLOWED | EXPENSES | TOTAL ALLOW |
|---|---|---|---|---|---|
| 5/4 1948 191 | Ja chul | 191 191 | $ $ | $ $ | $ $ |

## GUARDIAN AD-LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 191 | | |

| PLEADINGS | | PROCESS | | | | |
|---|---|---|---|---|---|---|
| DATE FILED | NAME | DATE ISSUED | NAME | DATE RETURNED | BY WHOM SERVED | OFFICER' |
| | Pet Order of Ref. Order appt. Report | 5-3-48 | | 5-4-48 | Chas. Hutchens under sheriff | |

## MINUTES OF PROCEEDINGS

6-4-48 Paroled by Institution

6-8-48 Discharged from records of Eastern State Hospital

KEB502739

# JOURNAL

STATE OF OKLAHOMA, COUNTY OF _Sequoyah_, ss.                    IN THE COUNTY COURT OF SAID COUNTY

IN THE MATTER OF THE SANITY OF _Wallace Dotson_                    No. _366_

### PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL

In the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that ___he is a resident of the County of _Sequoyah_ and State of _Oklahoma_

That _Tom Dotson_ ___ is an actual bona fide resident of the County of _Sequoyah_, State of Oklahoma, is a ___ male person about the age of _22_ years, and is now within the said County and is living with _his father_ ___ at or near the town—city of _Marble City_.

That your petitioner has good reason to, and does believe that the said _Wallace Dotson_ ___ is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is ___ necessary that ___ he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows:

_has some kind of spells, but now he is completely out of his mind, threw some brick at some members of the family, hasn't been asleep in 3 days and nights_

Your petitioner further alleges that ___he is informed and verily believes that the following named persons, of full age, whose names and places of residence respectfully are as follows, are related to the said insane person, to-wit:

| Name | Relationship | Post Office | State |
|---|---|---|---|
| Tom Dotson & Lucindia Dotson | father & mother | Vian R 2 | Okla |
| ___ & Charley Dotson | brothers | | |
| Holly Dotson | | Braggs | |
| Mrs. Maggy Holcomb | sister | Perry | |
| Mrs. Lillie Taylor | | Ft. Gibson | |

Your petitioner is the _father_ ___ of the said insane person—or that he is the ___ (Official Title) ___ of said County and State, and (Relationship) by reason of such fact is authorized to institute this proceeding.

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the approximate value, as follows: Real Property $_None_ Personal Property $___, Total Value $___ Said estate is situated in___ County, State of___.

WHEREFORE, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person and that said physicians make report of their findings, as by law required; and that said _Wallace Dotson_ ___ be brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the court by proper order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1368.                    _Tom L. Dotson_ ___, Petitioner.

_Witness to mark_
_Florence ___ Deputy_

### CERTIFICATE

STATE OF OKLAHOMA, COUNTY OF___, ss.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompetency; and upon h___ next of kin, of full age, on account of their non-residence of the said County and State, or uncertainty of location, and upon the person with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense with such personal service; and___

It is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed.

___, County Judge.

Filed _May 4_ ___, 1948.                    _J. T. B. Taylor_
                                                                            Court Clerk.
                                        By _Florence ___ ___, Deputy.

---

Form by the Attorney General. State Examiner & Inspector's Form No. 1370.

STATE OF OKLAHOMA, COUNTY OF _Sequoyah_, ss.                    IN THE COUNTY COURT OF SAID COUNTY

IN THE MATTER OF THE SANITY OF _Wallace Dotson_                    No. _266_

### ORDER FOR ADMISSION TO STATE HOSPITAL.

NOW, on this _4_ day of _May_ ___, 1948, the above-entitled matter came on to be heard before the County Court of _Sequoyah_ County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing of the petition filed herein by _Tom Dotson_ ___ alleging the insanity of _Wallace Dotson_ ___ and praying an order for h_is_ admission to the State Hospital for the Insane, has been given as required by law and as directed by the Court.

THEREUPON, the Court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians appointed to examine the said _Wallace Dotson_ ___ and to report to this Court as to h_is_ sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said _Wallace Dotson_ ___ is insane; and that ___ he should be admitted to a State Hospital for the Insane, there to be treated and kept as _Charity_ ___ patient.

IT IS, THEREFORE, ORDERED by the Court that said _Wallace Dotson_ be admitted to the _Eastern_ Oklahoma _State_ Hospital at _Vinita_ ___, Oklahoma, as a _Charity_ ___ patient, there to be detained and kept until legally discharged.

IT IS FURTHER ORDERED, That the sheriff of said county of _Sequoyah_ ___, be and he is hereby authorized and directed forthwith to transport the said _Wallace Dotson_ ___, so adjudged to be insane, to the said hospital, and to deliver h___, together with a certified copy of this order and of the physicians' final certificate herein to the medical superintendent of the said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.

IT IS FURTHER ORDERED, That the said sheriff shall cause said medical superintendent to acknowledge hereon the receipt of the above-named insane person, and forthwith make return hereof showing the manner in which he has executed this order.

Done in open court, this the day first above written.

_J. T. Brockman_ ___, County Judge.

### RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of _Wallace Dotson_, the insane person named in the within order, and I hereby certify that at the time ___ he was delivered to me there was in attendance with said person _Chas Hutchen_ sheriff, with _Tom Dotson_ and ___, guards.

Dated at _Vinita_ ___ this _4th_ day of _May_ ___, 1948.

_Edward K. Witcher M.D._
Medical Superintendent of ___ Oklahoma _Eastern_ Hospital

### SHERIFF'S RETURN.

STATE OF OKLAHOMA, COUNTY OF _Sequoyah_ ___, ss.

Received the within order on the _7_ day of _May_ ___, 1948, at ___ o'clock___ M., and in pursuance of the command thereof, executed the same by transporting the within named _Wallace Dotson_ to the _Eastern_ Oklahoma ___ Hospital at _Vinita_ ___, Oklahoma, and there delivering h_im_ on the _7_ day of _May_ ___, 1948, at _5_ o'clock___ M., into the custody of the medical superintendent of said institution, together with a certified copy of this order and of the physician's final certificate.

_Henry Jones_ ___, Sheriff.
By _Charley Hutchen_ Deputy—Under-sheriff.

Filed _5 — 4_ ___, 1948.                    _J. T. B. Taylor_
                                                                            Court Clerk.
                                        By ___, Deputy.

| SHERIFF'S FEES | |
|---|---|
| Executing order and making return thereof $ .50 | .50 |
| miles travel | 25.00 |
| TOTAL FEES | $25.00 |
| EXPENSES—Receipts attached: | |
| Transportation for | 25.00 |
| Hotel and lodging for | 3.10 |
| TOTAL EXPENSE | $28.10 |

KEB502740

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 33**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

RECORD OF MENTAL HEALTH PROCEEDING

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ............................................. COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Kenneth Barrett

No. MH-86-29

| Date Filed | | | Date Case Filed............ Date of Hearing............ | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | No. |
| 10 | 9 | 86 | Pet. | | | | | | | | | | |
| ✓ | ✓ | ✓ | Peace Officer's aff. | | | | | | | | | | |
| ✓ | ✓ | ✓ | Professional Statement | | | | | | | | | | |
| ✓ | ✓ | ✓ | Temp Order issued | | | | | | | | | | |
| 10 | 10 | 86 | notice of certification | | | | | | | | | | |
| ✓ | ✓ | ✓ | copy of Drs. progress notes | | | | | | | | | | |
| ✓ | ✓ | ✓ | issue order of admissions not to exceed 28 days from initial admission | | | | | | | | | | |
| 10 | 10 | 86 | Admission Notification (ESH) | | | | | | | | | | |
| 10 | 13 | 86 | Temp. order ret'd (ESH 10-10-86) | | | | | | | | | | |
| 10 | 10 | 86 | min - coming on for 72 hr. hrg., Barrett appeared in person w/atty: John Adams, State rep. by Higgins, deft. admitted to East St. Hosp. for period not to exceed 28 days from initial date of admissions - aft 11:303 | | | | | | | | | | |
| | | | MH-92-64        In Re: Johnny Johnson ✓ | | | | | | | | | | |
| 11 | 16 | 92 | Pet | | | | | | | | | | |
| ✓ | ✓ | ✓ | Aff. f a detention | | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KENNETH EUGENE BARRETT,** | ) |
| | ) |
| *Movant,* | ) |
| | ) |
| **v.** | )   **Case No. 6:09-cv-00105-JHP** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| *Respondent.* | ) |

**EXHIBIT 34**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

Exhs. § 2255 Amended Motion                         *U.S. v. Barrett*, 6:09-cv-00105-JHP

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District. I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit. I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales. Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial. Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial. During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper. We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case. Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase. In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter. He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW). On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted. Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

1

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges. When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case. The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair. I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett. Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh. Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel. In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton. It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh. Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

2

for the Eastern District, he had handled the prosecution of a client of mine in a Savings and Loan matter. That matter was resolved successfully for my client. After Mr. Hilfiger was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base. Those who access the site are identified when they visit the site. I was able to track who visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's case, Judge Payne stated that he wanted the case tried quickly and that this should be no problem, because I had handled Kenny's state case. I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial. For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done. Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings. The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

3

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship. As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting. I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case. Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne. As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

4

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category. Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks. This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted. This included time spent conferring with experts regarding the needs of the defense. These conferences were necessary for two reasons. First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and

Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare

the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the

second state court trial.  Judge Payne  initially opposed our request based in part upon his

stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to

hire an investigator to complete the investigation of mental state issues and law

enforcement practices.  The rate I was quoted for private investigative services in the area

was Fifty Dollars ($50.00) per hour.  At that rate, I would have been able to engage Dale

Eberle, who had formerly participated in the NDOK drug task force, and who was

therefore particularly qualified to conduct the drug subculture investigation which we

needed to defend the federal case. Judge Payne, however, said he would authorize a

maximum of only Thirty Dollars ($30.00) per hour for such services, because that was

the rate charged OIDS by an investigator who withdrew for health reasons prior to the

first state court trial.

Judge Payne authorized only 100 hours of investigation.  Based on the information

I received from consulting with the Federal Death Penalty Resource Counsel, which I

shared with Judge Payne, it was my understanding that the hours I requested constituted

only 3/5 of the average hours authorized by federal courts for fact investigation in capital

cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

6

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro. Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly. Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000. Judge Payne approved only 100 hours at $150 per hour, and no travel expenses. I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court. Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

analyst, and a trajectory and crime scene reconstruction expert.  Although the requested hourly rate for these experts was well within the range established by national practice at the time of compensating such qualified experts between $125 and $250 per hour, Judge Payne authorized only $100 per hour.  Judge Payne also denied most of the requests for the experts' travel and other out-of-pocket expenses.  The reduced hourly rate approved by Judge Payne and the lack of expenses again made it unworkable to obtain the services of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness and hypervigilant overreaction to perceived threats of annihilation.  My request for a total of $24,000 was well under the average authorization for a federal death penalty case at the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well below the range of hourly rates authorized by federal courts in death penalty cases for the services of a psychologist ($150-250) and psychiatrist ($250-350).  Judge Payne nevertheless approved the retention of only one mental health expert for 40 hours of work, limited compensation to a rate of $100 an hour for an expert who was a psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000.  Based on the data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge Payne, the limitation on the number of experts, hours, rate of compensation, as well as the denial of expenses, were all completely out of line with the standards of practice prevailing in federal death penalty cases, and precluded meaningful investigation of

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them. To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator. Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request. Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable. In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity. In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

9

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel.  Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research.  I did my best to comply with these requirements, and obtained pre-approved authorization from the court.  When I submitted vouchers, however, my compensation was routinely cut significantly.  I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004.  In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier.  Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses.  This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005.  As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs.  We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely.  I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center.  After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

12

D.C. for the D.O.J. meeting, as described above. At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne. Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse. I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness. Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence.  I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence.  For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial.  Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing.  Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials.  I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

14

investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug Task Force simply made up a C.I. out of whole cloth. In my opinion Charles "Monk" Sanders was not the alleged confidential informant (C.I.) used to secure the search and arrest warrants that were prepared in advance of the raid on Mr. Barrett's home. Despite our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the identity of the C.I. was not disclosed during the state trials. Prior to the second state trial, Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that was then placed in an envelope, sealed and placed in the state court file. It is my understanding that the envelope was opened just prior to the federal trial, and that the name of Charles "Monk" Sanders was written on the paper. In my opinion, Mr. Sanders was an informant, but that he did not actually fill the C.I.'s alleged role. In fact, Mr. Monk's federal trial testimony conflicted with the averments made in the affidavits supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial, the government disclosed for the first time its intention to call informant or "snitch" witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

intention to harm law enforcement officers.  The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony.  It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events.  I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me.  Based on those interviews, this declaration was drafted for my signature.  I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

16

1922

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.


/S/  _____
John David Echols

17

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,          )
                                 )
                    *Movant,*    )
                                 )
v.                               )          **Case No. 6:09-cv-00105-JHP**
                                 )
UNITED STATES OF AMERICA,        )
                                 )
                    *Respondent.*  )

---

**EXHIBIT 35**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## am I supposed to do all this ? ?

*(Mother will check if I do)*

### AT ABOUT THREE MONTHS   MORE OR LESS

Lift chest clear of surface when placed face down _(weeks)_

Straighten knees when held erect _(weeks)_

Hold head erect and steady when held to shoulders ✓

Sit on lap, hold head erect and steady with support of ribs only ✓

Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____

Smile in response to Mother's voice ✓

Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____

Manipulate object placed in hand_____ Splash in bath_____

Make stepping movements when held erect_____

Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried ✓

Sit alone on flat surface momentarily ✓

Stand firmly with help when held erect ✓

Roll from back to stomach and vice-versa on flat surface ✓

Reach and grasp for an object when in sitting position ✓

Pick up one-inch cube with fingers ✓

Scoop up ⅛-inch cube_____ Discover feet ✓

Look at object with which am playing ✓

Look at floor for fallen toy when in high-chair or lap_____

Make various vocalizations ✓

Notice difference between familiar persons and strangers ✓

Not much affected by strangers, new scenes or solitude ✓

Crow and coo actively when pleased ✓

Cry and fret when toy is taken ✓

[20]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance ✓

Crawl on stomach, making some progress ✓

Creep on hands and knees ✓

Bang table with toys or other objects ✓

Knock down block houses in play_____

Oppose thumb and forefinger in picking up one-inch cube_____

Wave "bye-bye" or play "peek-a-boo" instinctively_____

Take bottle in and out of mouth ✓

Respond to animated facial expressions_____

Bowel control_____ Respond when name is called ✓

Express vocal sounds upon recognition of familiar person or object_____

Associate outdoor clothing with being taken out_____

May react to strangers_____

Reach for objects persistently_____

Say "ma-ma" or "da-da" or equivalent_____

Make stepping movements when feet are touched to floor ✓

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture ✓

Walk with help ✓ Creep actively and rapidly ✓

Comprehend simple verbal commands and commissions ✓

May cooperate in dressing and undressing ✓

May climb steps_____ Hold and drink from cup_____

Pile one block on another when shown_____

Say two or three words indicating want_____

Play "pat-a-cake" or similar demonstrable game_____

Pick up small object with finger and thumb ✓

Show preference for one hand in reaching_____

Make rhythm movements to music ✓

Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[21]

KEB501953

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

_____

**EXHIBIT 36**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

_____

Rodger,

Maybe I seem hasty to you. But at this time. I don't know what I'm doing or going to do. Or should do. With John gone I feel like things are going to take a turn. You need to know that it's nothing against you or Bret. It could have been to other lawyers and I would have done the same. One day I feel one way and the next I feel another. I guess I have no choice now than to let you do your best. Rodger, this case was close to being beat the second time. Everything we need to be it is there. The reason I feel the way I do is because, I felt John would finally win it this time. It can be done. I don't want to go back to prison to were I'm screwed around on my levels to were It takes me twice as long to get out. Screw the politics. Just try your hardest to beat this to were I can go home. I have gave 6 years of my life for something that they caused to happen. I've got alot of things that are good for this case. So hopefully now that there is no-other means for me but to beat this, we can put this behind us and start over and do this right and win. I'll try my best to act right. I've got so much riding on this. Everything to get my life back in order is waitin. A good Job a good woman. I've got two grand kids. I've never even seen. After 6 years of this It gets old Rodger. Please understand that.

Thank you   Kenneth Barrett

1927

KEB009690

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 37**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## DECLARATION OF ROBERT THOMPSON

I, Robert Thompson, declare the following:

I am a staff sergeant in the Oklahoma Air National Guard's 138th Fighter Wing.

In 1999, I was a good friend of Toby Barrett who is Kenny Barrett's son. They called me "Bubba" back then. I often visited Toby at his father's place when Toby lived with him. Sometimes I would visit as often as once a week.

I was there for about an hour or less on the afternoon of September 23, 1999. I just hung out with Toby on the porch. Two or three people were visiting with Kenny at that time, but I didn't know or don't remember who they were. I am sure though that none of them was Monk Sanders, I never saw Monk out at Kenny's.

I don't recall whether Travis Crawford came over or if I knew Travis. But when I was there, Kenny never said anything ever about wanting to kill cops or that he would kill the first cop that came onto his property or that he wanted to go down in a "blaze of glory." I never heard Kenny talk like that, or about cops at all, let alone say anything about hurting any cops.

I left there at about 3:00 or 3:30 that afternoon. I don't recall whether the gate to Kenny's property was opened or closed when I arrived, while I was there, or when I left.

Recently, I spoke to an investigator on the phone about these things. He told me he was going to put what I told him in a declaration that would be used in

1929

Kenny Barrett's case. He brought this declaration to me. I have read it over carefully and it says exactly what I told him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this 27 day of April, 2009, in Tulsa County, Oklahoma.

Robert Thompson

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 38**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF RANDY WEAVER

I, Randy Weaver, declare the following:

I testified as a witness for the government in the first stage of Kenneth Eugene Barrett's federal trial. I have no idea how the government got my name. My guess is that some junkie on the streets gave them my name in order to trade information.

I was first approached a few weeks before Kenny Barrett's trial by the prosecutor, Mike Littlefield, and a man who appeared to be a law enforcement officer. To my recollection, they were both armed. They came to talk to me at my tattoo shop. Mr. Littlefield told me that he "knew" I had supplied the gun and ammunition that was used to kill the highway patrol trooper, and made threats about me being charged with some sort of weapons offense. Mr. Littlefield tried to intimidate me, but I wasn't too worried because I knew his accusations about me were false. Mr. Littlefield and the law enforcement officer talked to me about 20 or 30 minutes at my shop. On the day I testified in federal court, he and what appeared to be a law enforcement officer talked to me again for a short period of time at the courthouse.

I recall being interviewed by a defense attorney briefly in Muskogee. This was in the presence of Mr. Littlefield and I think a law enforcement agent. It was my impression that the defense lawyer rushed through the interview because he was uncomfortable talking to me in the presence of Mr. Littlefield and law enforcement.

When I testified at Kenny Barrett's trial, it is my impression that the prosecution

1

1932

wanted me on and off the stand as quickly as possible.

I never knew Kenny Barrett to cook methamphetamine on his property. I knew Kenny used meth, as I did back during this time. Whenever I went out to Kenny Barrett's place, I never saw a meth lab or parts of a meth lab, or anything else that would indicate Kenny had or was cooking methamphetamine on his property.

The last time I was at Kenny Barrett's place was 3 to 4 months before the trooper was shot. On that occasion, I was at Mr. Barrett's place to look at some cars he was working on.

Mr. Barrett had indicated to me that he had a court case involving a small amount of drugs. Kenny mentioned this in an off-hand way. He was not overly concerned about the case. This was just something that he mentioned in passing.

Kenny Barrett never once told me or said to anyone in my presence that if the police came to his property and tried to arrest him or search the place, that he would "go out in a blaze of glory." He never said that he would "blast" the first policeman who came on his property, or anything like that. Kenny never indicated to me in any way, at any time, that he would do violence to anyone. This is not the sort of person Kenny Barrett is. I heard a third hand rumor from somebody in the community that the police were upset because Kenny would not work for them as an informant, but I did not put much stock in the rumor. I never heard Kenny Barrett say anything about this.

It was a real shame what happened to the trooper. It was also a shame that Toby

1933

Barrett, Kenny Barrett's son, had to witness what happened. The whole raid on Mr. Barrett's place was totally unnecessary, in my opinion. If somebody had driven through my gate and onto my property without warning in the middle of the night, I would have shot, too. If they had just sent Sheriff John Philpot out to bring Kenny in, there would have been no problem. Kenny Barrett is the type of person who would have just gone with the Sheriff and done what he was told.

I did not write this declaration, but I have read it carefully. It says what I told an investigator currently working on Kenny Barrett's case, and one of his current lawyers.

I declare under penalty of perjury that the foregoing 3 page declaration is true and correct.

Executed by me this ___1___ day of ___June___, 2009 in ___09___ County, ~~Arkansas~~ Sequoyah Cook

_____
Randy Weaver

3

1934

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 39**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## DECLARATION OF VICKI BEATY

I declare the following:

1.     My name is Vicki Beaty.  I am the Clerk of the Sequoyah County Court in Sallisaw, Oklahoma.

2.     My responsibilities include maintaining records of juror summonses and records of whether citizens reported for jury service.  These records are maintained in the ordinary course of my duties as clerk of court.  The records are maintained in such a way that I can search them to determine whether jurors were called and reported for service in a given month and year.

3.     On April 21, 2009, I reviewed the records of juror summonses and reporting for January 1999.  The records reflect that no citizens were summoned for jury service in January 1999, and no jurors reported to the court during the entire month of January 1999.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing one-page declaration is true and correct.

Subscribed by me this _2 4_ day of April, 2009, in Sequoya County, Oklahoma.

_Vicki Beaty_
VICKI BEATY

Page 1 of 1

1936

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 40**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF AMANDA GRIZZLE

I, Amanda S. Grizzle, declare the following:

I am an employee, the victim-witness coordinator, of the Sequoyah County District Attorney's office.

I, Amanda S. Grizzle, did gather and package all the Kenneth E. Barrett documents in my possession and box them for pick up for DEA Special Agent Darron Lane to pick up.

I declare under penalty of perjury that the above declaration is true and correct.

Executed by me this 28th day of April, 2009, in Sequoya County, Oklahoma

_____
Amanda S. Grizzle

1

1938

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 41**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

## DECLARATION OF ELLEN STOVALL

I, Ellen Stovall, declare that I am the administrator of the Sallisaw Police Department. I first came to work for the department in 1999 at which time I was a communications and booking officer. The administrator at that time was Jan Polasek. Record-keeping then was atrocious.

Kenneth Barrett was incarcerated at the city jail for a short while sometime after September 24, 1999. I am not sure exactly what dates he was here. I do recall that he was in cell number one and that he was a complainer about the quality of the food and other conditions, always wanting something we didn't have. I recall that he was incarcerated here rather than the county jail both for his own safety and because of overcrowding at the jail. I can't recall whether he was first housed here or at the County jail. I don't recall him being here long, but he may have been housed here on more than one occasion—I'm just not sure.

I recall that we took several photos of Mr. Barrett at the time he was first incarcerated here. I recall that we had medical records, treatment records, booking sheets and additional records.

I can only rely on my recollections because we have no records of Kenneth Barrett. I and my staff have searched extensively over a period of days for records relating to him and have not found any. Those searches, including a warehouse search, were conducted upon order of the court.

An agency, either the Sequoyah County District Attorney's office or OSBI, requested these records from the police department sometime in 1999. We gave

everything we had to that agency and inexplicably did not retain copies. I don't have a clue where the records are. We have no copy of the request for these records or a receipt for these records.

An investigator working for Mr. Barrett's lawyers recently asked me for Mr. Barrett's records and I told him that we had no records and what I recalled. He told me he was going to draft a declaration and ask me to read it and sign it if it was accurate. I have read it over carefully and it says what I told him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this 30 day of April, 2009, in Sequoyah County, Oklahoma.

Ellen Stovall

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 42**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF CHRISTINE CALBERT

I declare the following:

1.      My name is Christine Calbert. I am the administrator of the Sequoyah County Criminal Justice Authority. My duties as administrator include maintaining records related to people held in the Sequoyah County Jail.

2.      I have searched the Sequoyah County Jail records for documents related to Kenneth Eugene Barrett. The records available to me show Kenneth Barrett was held at the Sequoyah County Jail from late September 1999 until approximately April 23, 2004, when he was transferred into the custody of the Oklahoma Department of Corrections.

3.      While Kenneth Barrett was still a county prisoner the responsibility for maintaining jail records was transferred from the Sequoyah County Sheriff's Office to the Criminal Justice Authority. At that time, the records for all prisoners, including Kenneth Barrett, were transferred to the Criminal Justice Authority. The Criminal Justice Authority became the custodian of all the jail records on Kenneth Barrett including those created before and after the transfer of responsibility.

4.      The Sequoyah County District Attorney's office requested and took possession of all records related to Kenneth Barrett's incarceration in the Sequoyah County Jail. The Criminal Justice Authority did not retain copies of those records. The only records regarding Kenneth Barrett that remain in the possession of the Criminal Justice Authority are summaries related to booking,

Page 1 of 2

1943

transfer and similar events that are maintained in our computer system.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing two-page declaration is true and correct.

Subscribed to by me this 22 day of April 2009 in Sequoyah County, Oklahoma.

CHRISTINE CALBERT

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 43**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## SUPPLEMENTAL DECLARATION OF LEONARD POST

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence.

As part of my investigation I attempted to locate and interview Karen Real. Previous efforts by Mr. Barrett's post-conviction attorneys and investigators to interview Ms. Real had been unsuccessful. On June 7, 2009, I was able to reach Ms. Real by telephone. Ms. Real only spoke with me for a brief period of time. She said she liked Mr. Barrett, but she believed he was under the influence of drugs in 1999 and as a result of that he had done a bad thing. I understood her to be referring to the shootout in which Trooper Rocky Eales was killed. She said bad things happen when you do drugs. Then she said, "Listen, I was told not to talk to you folks." Then she hung up. I rang her number again, but she did not answer.

During my investigation, I conducted interviews to uncover facts related to the felony child abuse charges against former assistant United States Attorney David Michael Littlefield, one of the prosecutors in Mr. Barrett's case.

On June 4' 2009, I interviewed Tim Brown in Webbers Falls, Oklahoma, where he is currently the Chief of Police. He is a former Lieutenant in the Muskogee County Sheriff's Department. At that time, he was a member of the Eastern Oklahoma Regional Child Death Review Board. He still worked at the sheriff's department when Mr. Littlefield was prosecuted for child abuse. Although he did not work directly on the case, he heard from officers who had that Mr. Littlefield had "threatened our investigators."

1946

Chief Brown stated that Mr. Littlefield had denied the charges, that he had called the charges "bullshit" and accused the sheriff's office of "trying to get him."

Chief Brown stated that Mr. Littlefield's daughter had alleged that Dawn and Mr. Littlefield smoked marijuana in front of her and her younger brother.

Chief Brown stated that the Attorney General's Office, which I understand was brought in to handle the prosecution of Mr. Littlefield, was "terrified" that the Littlefield prosecution would open "a can of worms" because Littlefield had prosecuted big drug cases.

Chief Brown stated that the attorneys in the U.S. attorney's office thought "Littlefield was a piece of shit," but that they would not tell me that.

On June 5, I interviewed former Department of Human Services child abuse investigator Melissa Todd at her home in Muskogee, Oklahoma. While she is no longer working at DHS because she was "burnt out" by being on call 24 hours a day, she was the DHS investigator on the Dawn and Mike Littlefield case. She stated that she could not speak about the case because of the confidentiality accorded DHS cases involving children unless ordered to do so by a judge.

She asked if I had spoken to Tim Brown. I said I had and asked if she could confirm what he told me, to wit; that investigators had been threatened; that there were accusations of drug use by Dawn and Mike Littlefield; and that Littlefield had lied to investigators. While she said she could not even answer that question for confidentiality reasons, she added, "I can tell you this much, when you ask Tim Brown a question, he'll tell you like it is whether you want to hear it or not," thereby attesting to Chief Brown's honesty.

On or about June 6, 2009, I attempted to interview former deputy sheriff Jan Ray at her residence in Webbers Falls.  Ms. Ray executed affidavits for search and arrest warrants for Dawn and Mike Littlefield.  She refused to speak to me or let me get out of the car.  She stated that I was lucky she had not just shot me as a trespasser, and she called the police from her cell phone and gave them my license plate number or pretended to.  In no uncertain terms and in a threatening voice she told me to get off her property when I rolled down my window and attempted to introduce myself.  I was never able even to tell her my name let alone the purpose of my visit.

During my recent trip to Oklahoma, I continued the longstanding efforts of Mr. Barrett's post-conviction counsel to obtain records related to the *Littlefield* prosecution.  On June 4, 2009, I asked the Muskogee County District Attorney's office for the name of the judge in the Mike Littlefield case and was told that they could not give me that information because the case had been expunged.

On June 4, I asked the criminal court clerk of Muskogee County for records in the Mike Littlefield case and was told that because of the expungement I could not see them without a court order.

On June 3, I interviewed John David Luton, who was the district attorney of Muskogee County when the Littlefields were prosecuted. Mr. Luton is now the first deputy district attorney of Sequoyah County, Oklahoma.  Because he and Mr. Littlefield were both assistant district attorneys in Muskogee County at the same time, Mr. Luton recused his office before he had even seen "one piece of paper in the case."  Tim Brown confirmed this to me.

<div align="center">Page 3 of 4</div>

1948

Mr. Luton was surprised and somewhat upset when I told him the child abuse case against Mike Littlefield was "sealed" (the term I used because I had not yet heard that the record was "expunged"). Mr. Luton stated that it was not the type of case—involving violence against children—which ever gets sealed for "myriad reasons," including the possibility that Mr. Littlefield might seek to adopt a child. He wanted to know who the judge was who sealed the records and who had represented the State. I have been unable to obtain that information.

I declare under penalty of perjury that the foregoing 4-page declaration is true and correct.

Executed by me this 9th day of June, 2009, in New York County, New York.

_____
Leonard Post

1949

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 44**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

**The Florida State University**
Tallahassee, Florida 32306-1127

*College of Criminology and Criminal Justice*

June 23, 2009

Mr. Tivon Schardl
Assistant Federal Defender
Federal Defender's Office
801 1 Street, 3rd Floor
Sacramento, CA 95814

RE: *United States v. Kenneth Eugene Barrett*

Dear Mr. Schardl:

Pursuant to your request, I would like at this time to submit the following report relative to the above styled matter.

Let me state at the outset that my analysis of the extensive file provided by your office concerning this case discloses extremely serious violations of well established standards and procedures of the law enforcement profession by the District 27 Task Force officers and the Oklahoma Highway Patrol Tactical Team members who planned and executed the raid on Mr. Barrett's residence which resulted in the shooting death of Oklahoma State Trooper David Eales.

It is my professional opinion as a criminologist and police standards specialist who has evaluated over three hundred law enforcement shooting incidents throughout the nation, and who has also instructed officers and authored widely used training material on police use of force and the handling of critical incidents, that the procedural violations in question resulted in a tragedy which was both foreseeable and preventable. I would like to emphasize that this conclusion remains even if one hypothetically construes all facts in a light most favorable to the officers who planned and participated in the raid which was conducted just after midnight on September 24, 1999.

The decision to rapidly approach Kenneth Barrett's house unannounced, under conditions of darkness, using unmarked vehicles in the lead was a grossly reckless action and one foreseeably likely to evoke a violent response from Barrett. *The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was being confronted by law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm.* Concern for the safety of all involved, including the arresting officers, *should have mandated making every reasonable effort to assure that Mr. Barrett realized this was a law enforcement operation prior to its initiation.*

(2)

As a law enforcement procedures specialist, I have examined many situations over the years in which police officers shot other officers simply because they didn't realize they were police (indeed, one such fatal incident occurred recently in New York city), as well as incidents where offenders discharged weapons at persons they didn't realize at the time were police officers. I have also analyzed the causation of tragic situations involving nighttime gunfire exchanges between law abiding home owners and police officers which resulted in injury or death because residents mistook police for intruders.

It is obviously imperative that law enforcement officers make their purpose and presence clearly known, unless concerns over the destruction of evidence or imminent danger to themselves or others dictate otherwise. Despite the fact that District 27 Task Force officers and members of the OHP Tactical Team were in possession of a "no-knock warrant," any concern about loss of evidence should have been eclipsed by the issue of officer safety, given what was known about Mr. Barrett's possession of firearms as well as his methamphetamine use and personal instability.

In the vast majority of arrest situations, officers know little or nothing in advance about the persons they are seeking to take into custody and usually have no real opportunity to control the circumstances surrounding the encounter. The instant case was very different in this regard. Both the District 27 Task Force officers and the OHP Tactical Team knew well in advance the following important things about Kenneth Barrett which should have resulted in a very different arrest plan than the one which was utilized:

(1) Barrett was thought by officers to be routinely armed and to have often discharged weapons "wildly" on his property during the nighttime hours. One of the firearms in his possession at the time of the raid was believed to be an AR-15 assault rifle, a formidable long range weapon which posed a foreseeable risk of potential harm to officers as well as others in the immediate area.

(2) Barrett had reportedly experienced prior conflict with law enforcement officers during which he had fled from them. There were also claims that he had verbalized threats against the police, including a determination not to be taken alive. The officers who planned and conducted the raid had information indicating that he "guarded" his residence at all times.

(3) Barrett had a known serious history of methamphetamine use. Law enforcement officers are well aware that individuals under the influence of this substance commonly exhibit paranoid ideation, sleeplessness, high anxiety and mental confusion. They are often fearful of being attacked by others, including rival drug dealers and police. Their potential for violence is accordingly high.

(4) The terrain surrounding Barrett's cabin was extremely exposed and afforded officers poor cover and concealment during an approach. The seemingly arbitrary decision to conduct this operation under conditions of darkness greatly compounded the danger involved. The known presence of Barrett's teenaged son on the property and the possible risk of harm to him was another factor which strongly contraindicated the kind of abrupt nighttime raid which was planned.

(3)

Despite knowledge of the aforementioned dangerous circumstances, and a realization that the arrest plan was inherently "high risk" in nature, District 27 Task Force officers and members of the OHP Tactical Team inexplicably orchestrated and executed what can only be characterized as a chaotic midnight raid on Barrett's armed residence. The raid was led by a white unmarked Ford Bronco containing the decedent Trooper Eales and Trooper Hamilton, who cut across a field and rapidly drove toward the cabin with their high beams on—a reckless act which elicited a hail of gunfire from Mr. Barrett's AR-15 rifle and an ensuing firefight. Given the position of those taking part in the raid coupled with the problem of nighttime visibility, a potential crossfire situation involving officers could easily have resulted.

The case record reveals *absolutely no exigent circumstance* which would have justified such an extremely reckless course of police conduct, given the availability of alternative safe methods for taking a person such as Mr. Barrett into custody. Let me represent to you that from a professional police standards and procedures standpoint, the accepted tactical sequence in this type of situation (absent imminent danger to another person) is always:  *(1) Talk them out*; (2) *Force them out* (e.g., by creating discomfort through cutting power and water to the residence, use of tear gas projectiles, etc.); (3) *Take them out*. It should be noted that entry and confrontation are regarded as a *last resort* because of the obvious danger involved and should be attempted only when negotiations to persuade the person to surrender have clearly been exhausted.

From a tactical standpoint, the arrest plan should have involved *consideration of the potential for a barricaded gunman situation arising*. This very real possibility would indicate initial establishment of a safe perimeter around the property by participating police personnel, including sniper coverage of the residence, as well as the presence of trained crisis negotiators at the scene prior to any attempt to initiate communication with Barrett. Plans should also have been made to bring to the location resource persons who could potentially be of assistance in persuading Mr. Barrett to surrender should he refuse to do so (e.g., family members, mental health counselors, clergy-- anyone whose presence might be helpful should a crisis situation develop).

In the case at hand, communication with Mr. Barrett should and could have been initiated from sufficient distance and cover to afford participating officers a reasonable degree of safety. Marked patrol cars with their overhead emergency lights operating should have been positioned outside the gate to Barrett's property in a highly visible position. Service of the warrant under daylight conditions would have afforded officers better visibility of the cabin and the area immediately surrounding it, as well as resolving any question as to Barrett's awareness of the presence of law enforcement. Given the fact that Barrett ostensibly had neither a land line nor a cell phone, a patrol car P.A. or bullhorn could have been utilized from a position of cover to announce that officers were there to execute a warrant for his arrest, and to order him to exit the cabin with his hands empty and in view. In this kind of widely employed apprehension scenario, officers would not have needlessly risked misidentification and exposed themselves to potential gunfire. All communications by police negotiators seeking to persuade Kenneth Barrett to surrender would have been conducted from a safe position. After reviewing the circumstances

(4)

surrounding this incident, one is led inexorably to ask why the involved District 27 Task Force officers and OHP Tactical Team members would not have opted to use readily available and vastly safer alternative methods of apprehension.

Caution, patience and a prioritizing of safety are essential elements in the handling of such a potentially dangerous arrest. The passage of time usually works to the advantage of officers, with most such encounters eventually being resolved without serious injury or loss of life to anyone. Unfortunately, the District 27 Task Force Officers and OHP Tactical Team members who participated in this raid, including Tactical Team Commander Kerry Pettingill, evidently lacked essential training and experience in the planning and execution of such arrests.

In conclusion, it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999.

I had no contact whatsoever with defense counsel concerning this matter prior to your retention of me, nor did I receive any documents regarding it until your office forwarded file material to me. Had defense counsel contacted me earlier, and provided me with the case file your office has, I would have expressed the professional opinions set forth in this report.

Please do not hesitate to contact me further at this time should you require any additional information or clarification of any of the points made in this report.

Very truly yours,

George L. Kirkham
Professor Emeritus

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 45**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## DECLARATION OF TRAVIS CRAWFORD

I, Travis Crawford, declare the following:

I am Kenneth Barrett's first cousin on his mother's side.  My mother, Phyllis Crawford, is the sister of Kenny Barrett's mother, Gelene Dotson.  My parents and I live next door to Gelene.

Kenny and I used to hunt and fish together and were close.  I was at Kenny's house just about every day.  Kenny would do anything in the world for me.  He liked to help people.  Kenny rarely left the property.  He ate his meals at his mother's, and sometimes friends brought him food.

I have had a long struggle with drugs and have anxiety and panic attacks. My mind does not work that well.  I will be going to get something out of the truck and I will forget what I went to get.  When I get my anxiety, I get so nervous I do whatever comes to mind.  I was like this as a kid too.  I am under a doctor's care now and am trying really hard to be healthy.  I was a long term methamphetamine user and could die if I use drugs again.  My doctor told me that if I ever shoot up again it will likely kill me on the spot.  I know that my using drugs was the result of other psychological problems that I did not understand.  Psychological problems run in my family.  I have three children, one daughter and two sons.  My oldest child is a grown young woman and has bipolar disorder.  One of my sons seems a little slow and is having a tough time of it. My other son is a straight A student, so I am hopeful he will make it alright.

I had problems in school and joined the US Army to make a go of it.  I was not able to adapt to army life and spent two months in the brig.  I could not keep up with all

-1-



the rules and was late to formation.  It felt terrible when people I trained with made fun of me when they marched by the stockade.

I testified falsely at Kenny's trial.  At the time I testified, I was living in so many places and was so strung out, I did whatever I was told to keep out of trouble.  I did methamphetamine all the time, every day.  When I testified against Kenny, I was high on speed; all of the snitches who testified against Kenny were on dope and high when we testified.  We were also high when Mr. Littlefield, the U.S. Attorney, interviewed us.

When Mr. Littlefield interviewed me about Kenny, I was terrified of losing my freedom and said whatever I thought Mr. Littlefield wanted me to say. Mr. Littlefield asked me if Kenny said he (Kenny) "was going down in a blaze of glory," and before I could answer, Mr. Littlefield told me all the bad things that would happen to me if I "lied." I was so scared I said, "Yes" that Kenny had said he would go down in a blaze of glory if the cops came. I was panicking because I was afraid.  Mr. Littlefield said he knew things about me.  I was so scared.

I never heard Kenny say he was going down in a blaze of glory. I had testified against someone once before.  I was arrested for bad checks and was afraid of going to jail.  The prosecution offered to let me work for them.  I wore a wire and made four or fives buys.  I could have been killed.  I had to testify against the person I bought the drugs from even though the police lied to me and told me I would never have to.

I knew Johnny Philpot was out at Kenny's place two weeks before the raid and had inspected Kenny's guns. Kenny told me they had a case against him for a drug charge but it was not serious.  Kenny never said anything about a warrant against him;

-2-



he only mentioned a case against him. At the time I testified, I thought having a warrant and having a case were the same thing. I now know they are very different.

Kenny put up a sign on his fence just a couple of days before the police raided Kenny's place. The sign was not directed at the police; it was directed at anybody. It was meant to scare people away from trespassing and stealing.

This declaration says what I told an investigator working on Kenny's case when he came to talk to me. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this ___3___ day of June 2009, in Sequoyah County, Oklahoma.

Travis Crawford

-3-



1958

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 46**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA

DISTRICT COURT

AUG 3 1 1979

DON E. _____   CLERK
STATE OF OKLAHOMA-TULSA COUNTY

DIANA K. BARRETT,           )
                            )
            Plaintiff,      )
                            )
-vs-                        )
                            )
ERNEST BARRETT,             )
                            )
            Defendant.      )   Case No. JFD-79-3274

## DECREE OF DIVORCE

On this _20th_ day of _August_____, 1979, the above
entitled cause comes on for trial on its merits.   Plaintiff
appears in person and by her attorney, and the Defendant appears
personally and by his attorney, Debbra J. Gottschalk.

The Court having examined the files and records in this
case and having heard the oral testimony of witnesses sworn and
examined in open Court, having fully considered the evidence,
and being fully advised in the premises, finds:

That all material facts alleged in Plaintiff Petition are
true;

That Plaintiff and Defendant are now and have been for more
than six (6) months next preceding the filing of the Petition in
this cause residents in good faith of the State of Oklahoma and
residents of Tulsa County, Oklahoma for more than thirty (30) days
next preceding the filing of the Petition herein.

That Plaintiff and Defendant were legally married on the 29th
day of February, 1976, at Hartford City, Indiana, and have since
that time been husband and wife; that of said marriage no children
have been born or conceived.

That the Plaintiff and Defendant are entitled to be granted
a divorce each from each other on the ground of mutual incompati-
bility as alleged in Plaintiff's Petition.

That the Plaintiff is to take as her share of all jointly
acquired property the following items subject to the following
conditions:  The 1977 Ford Courier Pick-up Truck Provided that
said truck be refinanced by September 7, 1979, such that it is

KEB505610

in Plaintiff's name only.  Plaintiff is to receive $1,376.00, said sum to be paid into Plaintiff's Attorney, Don Gasaway's trust account and to be held thereby until September 7, 1979. Should Plaintiff fail to achieve refinancing in her name only, said sum of $1,376.00 is to be forfeited to Defendant.  Don Gasaway is to be ordered by this Court and to be responsible to this Court for the above stated agreement.  Plaintiff is to further take as her separate property one yellow chair, her desk, the furniture for her son, Travis's bedroom furniture, the antique bedroom furniture, the charcoal grill, and her personal possessions and belongings.  Plaintiff is to further return the gun borrowed from Defendant by August 23, 1979.

Defendant is to be awarded as his sole and separate property all other jointly acquired property and his personal possessions and belongings.  That Defendant is to be liable for the sum of $250.00 as and for Plaintiff's attorneys fees for Don Gasaway, said sum has already been paid.

Each party shall take and be liable for one-half (½) of the tax liability incurred by reason of the gain from the sale of the family residence.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that Plaintiff and Defendant be, and they are hereby, granted a full, final and complete divorce each from each other on the grounds of incompatibility and the bonds of matrimony heretofore existing between Plaintiff and Defendant are set aside and held for naught; however, both parties are prohibited from marrying anyone except one another for a period of six (6) months from and after the date hereof.

IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Plaintiff is to take as her share of all jointly acquired property the following items subject to the following conditions:  The 1977 Ford Courier Pick-up Truck Provided that said truck be refinanced by September 7, 1979, such that it is in Plaintiff's name only.  Plaintiff is to receive $1,376.00, said sum to be paid into Plaintiff's Attorney, Don Gasaway's trust account and to be held thereby until September 7, 1979.  Should

KEB505611

Plaintiff fail to achieve refinancing in her name only, said sum of $1,376.00 is to be forfeited to Defendant. Plaintiff's attorney, Don E. Gasaway, is hereby ordered by this Court to comply with the above-stated agreement. Plaintiff is to further take as her separate property one yellow chair, her desk, the furniture for her son--Travis--which is in his bedroom, the antique bedroom furniture, the barbecue grill, and her personal possessions and belongings. Plaintiff is further ordered to return the gun borrowed from the Defendant by August 23, 1979.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Defendant is to be awarded as his sole and separate property all other jointly acquired property and his personal possessions and belongings. Defendant is to be further liable for the sum of $250.00 as and for Plaintiff's attorney fees; which sum has already been paid.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that each party shall take and be liable for exactly one-half (½) of any tax liability incurred by reason of the gain from the sale of the parties' family residence in 1979.

BERT C. Mc ELROY
_____
JUDGE OF THE DISTRICT COURT

APPROVED AS TO FORM:

_____
Don E. Gasaway, Attorney
for Plaintiff

_____
Debbra J. Gottschalk, Attorney
for Defendant

I, Don E. Austin, Court Clerk, for Tulsa County, Oklahoma, hereby certify that the foregoing is a true, correct and full copy of the instrument here with set out as appears of record in the Court Clerk's Office of Tulsa County, Oklahoma, this ____ day of _____ 19__

By _____ Don E. Austin
Deputy         Court Clerk

KEB505612

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 47**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Cherokee - **County Last Updated: 06/08/2009 17:00** |
| **Case:** | CF-99-00018<br>STATE OF OKLAHOMA vs. REAL, KAREN JEAN |
| **Date Filed:** | 01/26/1999 |
| **Amount Owed:** | $0.00 (as of 06/08/2009 17:00) |

## OFFENSES

TRAFFICKING IN ILLEGAL DRUGS
MANUFACTURE OF A CONTROLLED DANGEROUS SUBSTANCE
UNLAWFUL POSSESSION OF MARIJUANA WITH INTENT TO DISTRIBUTE
UNLAWFUL POSSESSION OF CONTROLLED DRUG IN THE PRESENCE OF A MINOR CHILD
USE OF WEAPON IN COMMISSION OF CRIME

### Parties

| | |
|---|---|
| Attorney | BAKER, DONN - TAHLEQUAH OK |
| Defendant | REAL, KAREN JEAN - SALLISAW OK |
| Judge | DOBBINS, MARK L. - TAHLEQUAH OK |
| Officer | JOHNSON, CLINT |
| DA | MEDEARIS, FRANK - TAHLEQUAH OK |

### Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 01/26/1999 | INFORMATION | $475.00 |
| | (Entry with fee only) | $25.00 |
| | (Entry with fee only) | $15.00 |
| | (Entry with fee only) | $35.00 |
| | (Entry with fee only) | $125.00 |
| 01/28/1999 | APPEARANCE BOND - ALLCORN | $10.00 |
| 02/01/1999 | ORDER: DEF. PLEA NOT GUILTY FELONY SOUNDING DOCKET | |
| | APRIL 5, 1999 AT 9:00AM | |
| 03/02/1999 | ORDER AS OF 1-13-99 PROBABLE CAUSE FOUND FOR W/LESS | |
| | ARREST BOND 30,000 IA 1-19-99 AT 1:00 | |
| 03/02/1999 | ORDER PASSED TO 1-26-99 AT 1:00 | |
| 04/06/1999 | ENTRY OF APPEARANCE DONN BAKER | |
| | (Entry with fee only) | $150.00 |
| 04/09/1999 | ORDER: NO LAB DEF IS ORDERED BACK JULY 6,1999 AT 9:00 | |
| | A.M. | |
| 06/30/1999 | MOTION FOR CONTINUANCE | |
| 07/08/1999 | ORDER FOR CONT. 8-11-99 AT 1:00PM | |
| 08/11/1999 | MOTION TO CONTINUE | |
| 08/11/1999 | ORDER OF CONTINUANCE | |
| 09/23/1999 | ORDER: PHSD-NOV. 1, 1999 AT 9:00AM | |
| 11/03/1999 | ORDER: DEF. IS ORDERED BACK 1-3-00 AT 9:00 | |
| 01/05/2000 | ORDER: P.H. S.D. DEF. ORDERED BACK MARCH 6, 2000 AT | |

1964

| Date | Description | Amount |
|---|---|---|
| | 9:00 A.M. | |
| 03/02/2000 | MOTION FOR CONT. | |
| 03/02/2000 | ORDER FOR CONT. | |
| 03/08/2000 | ORDER RELEASING BONDSMAN | |
| 03/09/2000 | ORDER: DEF. ORDERED BACK APRIL 5, 2000 AT 9:00 A.M. | |
| 04/08/2000 | ORDER:CASE PASSED TO 4/26/00 @9:00 AM. MLD | |
| 04/28/2000 | ORDER: CASE RESET FOR 8/7/00 @9:00 AM. FSD. MLD | |
| 08/08/2000 | ORDER: NOVEMBER FELONY SOUNDING DOCKET. DEFENDANT ORDERED BACK NOV. 6, 2000 AT 9:00 A.M. | |
| 11/08/2000 | ORDER: DEF. IS ORDERED BACK 2/5/01 AT 9:00 A.M. FOR FSD | |
| 02/15/2001 | ORDER: DEF. AWAITING SENTENCING IN FEDERAL COURT. STATE WILL DISMISS WHEN SENTENCED. DEF. IS ORDERED BACK 5/7/01 AT 9:00 A.M. MLD | |
| 05/08/2001 | ORDER: JUNE F.S.D. JUNE 4, 2001 AT 9:00 A.M. | |
| 09/04/2001 | MOTION TO DISMISS/ORDER | $-485.00 |
| | (Entry with fee only) | $-25.00 |
| | (Entry with fee only) | $-15.00 |
| | (Entry with fee only) | $-35.00 |
| | (Entry with fee only) | $-125.00 |
| | (Entry with fee only) | $-150.00 |
| **Total:** | | **$0.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 04/05/1999 | | Date Action: FEL SD-DOBBINS |
| 07/06/1999 | | Date Action: DOCKET-DOBBINS |
| 08/11/1999 | | Date Action: DOCKET-DOBBINS |
| 09/20/1999 | | Date Action: DOCKET-DOBBINS |
| 11/01/1999 | 9:00A | Date Action: FEL SD-DOBBINS |
| 01/03/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 03/06/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 04/05/2000 | 9:00A | Date Action: MISD DISP-DOBBINS |
| 04/26/2000 | | Date Action: DOCKET-DOBBINS |
| 08/07/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 11/06/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 02/05/2001 | | Date Action: FEL SD-DOBBINS |
| 05/07/2001 | | Date Action: FEL SD-DOBBINS |
| 06/04/2001 | | Date Action: FEL SD-DOBBINS |
| 09/04/2001 | | Date Action: ST DISMISSED |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

---

**EXHIBIT 48**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

# ON DEMAND COURT RECORDS

## CASE DETAIL

| County: | Cherokee - **County Last Updated: 06/08/2009 17:00** |
|---|---|
| Case: | CM-99-00040<br>STATE OF OKLAHOMA vs. REAL, KAREN JEAN |
| Date Filed: | 01/26/1999 |
| Amount Owed: | $0.00 (as of 06/08/2009 17:00) |

## OFFENSE

UNLAWFUL POSS. OF PARAPHERNALIA

### Parties

| | |
|---|---|
| Attorney | BAKER, DONN - TAHLEQUAH OK |
| Defendant | REAL, KAREN JEAN - SALLISAW OK |
| Judge | DOBBINS, MARK L. - TAHLEQUAH OK |
| Officer | JOHNSON, CLINT |
| DA | MEDEARIS, FRANK - TAHLEQUAH OK |

### Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 01/26/1999 | INFORMATION | $75.00 |
| | (Entry with fee only) | $5.00 |
| | (Entry with fee only) | $3.00 |
| | (Entry with fee only) | $7.00 |
| | (Entry with fee only) | $10.00 |
| 03/03/1999 | ORDER: PASSED TO 1-26-99 AT 1:00 | |
| 04/06/1999 | ENTRY OF APPEARANCE | |
| 06/30/1999 | MOTION FOR CONTINUANCE | |
| 07/08/1999 | ORDER FOR CONT. 08-11-99 AT 1:00PM | |
| 04/08/2000 | ORDER:CASE PASSED TO 4/26/00 @9:00 AM. MLD | |
| 04/28/2000 | ORDER: CASE RESET FOR 8/7/00 @9:00 AM. FSD. MLD | |
| 08/08/2000 | ORDER: NOVEMBER FELONY SOUNDING DOCKET. DEF. ORDERED BACK NOV. 6, 2000 AT 9:00 A.M. | |
| 11/08/2000 | ORDER: DEF. IS ORDERED BACK 2/5/01 AT 9:00 A.M. FOR FSD | |
| 02/15/2001 | ORDER: DEF. AWAITING SENTENCING IN FEDERAL COURT. STATE WILL DISMISS WHEN SENTENCED. DEF. IS ORDERED BACK 5/7/01 AT 9:00 A.M. MLD | |
| 05/08/2001 | ORDER: JUNE F.S.D. JUNE 4, 2001 AT 9:00 A.M. | |
| 09/04/2001 | MOTION TO DISMISS/ORDER | $-75.00 |
| | (Entry with fee only) | $-5.00 |
| | (Entry with fee only) | $-3.00 |
| | (Entry with fee only) | $-7.00 |
| | (Entry with fee only) | $-10.00 |
| 12/20/2001 | MOTION TO DISMISS W/ORDER OF DISMISSAL | |
| **Total:** | | **$0.00** |

| Date | Time | Calendar/Events |
|---|---|---|
| 08/11/1999 | | Date Action: DOCKET-DOBBINS |
| 03/06/2000 | | Date Action: FEL SD-DOBBINS |
| 04/05/2000 | 9:00A | Date Action: MISD DISP-DOBBINS |
| 04/26/2000 | | Date Action: DOCKET-DOBBINS |
| 08/07/2000 | | Date Action: FEL SD-DOBBINS |
| 11/06/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 02/05/2001 | | Date Action: FEL SD-DOBBINS |
| 05/07/2001 | | Date Action: FEL SD-DOBBINS |
| 06/04/2001 | | Date Action: FEL SD-DOBBINS |
| 09/04/2001 | | Date Action: ST DISMISSED |

**Date:** Case 6:09-Time:105-RAW Document 71-38 Filed 09/25 Page 3 of 3 Calendar/Events

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,            )
                                   )
                     *Movant,*     )
                                   )
v.                                 )            **Case No. 6:09-cv-00105-JHP**
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                 *Respondent.*     )

⸻

**EXHIBIT 49**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

⸻

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Sequoyah - **County Last Updated: 06/08/2009 17:00** |
| **Case:** | 🖾 CF-99-00250A<br>STATE OF OKLAHOMA vs. REAL, KAREN |
| **Date Filed:** | 06/08/1999 |
| **Amount Owed:** | $0.00 (as of 06/08/2009 17:00) |

## OFFENSES

TRAFFICKING IN METHAMPHETAMINE
UNLAWFUL POSSESSION OF MARIHUANA W/INTENT TO DISTRIBUTE
UNLAWFUL USE OF POLICE RADIO
POSSESSION OF FIREARM IN COMMISSION OF FELONY
UNLAWFUL POSSESSION OF PARAPHERNALIA

## Parties

| | |
|---|---|
| Attorney | BAKER, DONN F - TAHLEQUAH, OK |
| Defendant | 🖾 REAL, KAREN - SALLISAW OK |
| Agency | SALLISAW POLICE DEPT. - SALLISAW OK |
| Judge | SPROUSE, DENNIS M. |
| Officer | OWEN, TY |
| DA | COWAN, ROBBIE |

## Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 06/08/1999 | FILE, ENTER, RECORD INFORMATION | $103.00 |
| | (Entry with fee only) | $3.00 |
| | (Entry with fee only) | $5.00 |
| | (Entry with fee only) | $7.00 |
| | (Entry with fee only) | $25.00 |
| | BOND FEE | $10.00 |
| 06/09/1999 | CM: DMS ARR PASSED TO 6-23 FOR ATTY. 29-110 | |
| 06/16/1999 | ENTRY OF APPEARANCE | |
| 06/23/1999 | CM: DMS DEF APP W/ATTY BAKER, ENTERED A PLEA OF NOT GUILTY, LAB SET FOR 10-7. 29-120 | |
| 10/07/1999 | CM: DMS LAB PASSED TO 12-9. 30-3 | |
| 12/09/1999 | CM: DMS LAB PASSED TO 4-5. 30-45 | |
| 03/27/2000 | REQUEST AND ORDER OF BONDSPERSON TO EXONERATE BOND AFTER SURRENDER AND PRIOR TO BREACH OF UNDERTAKING | |
| 04/05/2000 | CM: DMS DISPO SET FOR 4-19. 30-126 | |
| 05/18/2004 | MOTION TO DISMISS | |
| 05/24/2004 | ORDER | |
| 05/24/2004 | CM: JCG CASE DISMISSED. 35-202 | $-113.00 |
| | (Entry with fee only) | $-3.00 |
| | (Entry with fee only) | $-5.00 |
| | (Entry with fee only) | $-7.00 |

| | | | $-25.00 |
|---|---|---|---|
| **Total:** | | | **$0.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 10/07/1999 | | Date Action: REVIEW HEARING |
| 12/09/1999 | | Date Action: HEARING DATE |
| 04/05/2000 | | Date Action: HEARING DATE Code: x |
| 04/19/2000 | | Date Action: DISPOSITION DOCKET Code: x |
| 05/24/2004 | | Date Action: ST DISMISSED/SETTLED |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 50**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Cherokee - **County Last Updated: 06/08/2009 17:00** |
| **Case:** | CF-99-00251<br>STATE OF OKLAHOMA vs. REAL, KAREN JEAN |
| **Date Filed:** | 06/28/1999 |
| **Amount Owed:** | $0.00 (as of 06/08/2009 17:00) |

## OFFENSE

UNLAWFUL POSS. OF CONTROLLED DRUG

### Parties

| | |
|---|---|
| Attorney | BAKER, DONN - TAHLEQUAH OK |
| Defendant | REAL, KAREN JEAN - SALLISAW OK |
| Judge | DOBBINS, MARK L. - TAHLEQUAH OK |
| Officer | EAVES, CARL D. |
| DA | MEDEARIS, FRANK - TAHLEQUAH OK |

### Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 06/28/1999 | INFORMATION | $95.00 |
| | (Entry with fee only) | $5.00 |
| | (Entry with fee only) | $3.00 |
| | (Entry with fee only) | $7.00 |
| | (Entry with fee only) | $25.00 |
| 06/28/1999 | AFFIDAVIT FOR PROBABLE CAUSE | |
| 06/28/1999 | WARRANT OF ARREST | $20.00 |
| 07/13/1999 | MINUTE: BOND REDUCED TO $2,000.00 | |
| 07/14/1999 | APPEARANCE BOND (ALLCORN) | $10.00 |
| 07/14/1999 | WARRANT OF ARREST RETURNED SERVED | |
| | (Entry with fee only) | $150.00 |
| 07/21/1999 | ORDER: DEF. PLEA NOT GUILTY ORDERED BACK AUG. 11, 1999 AT 9:00AM | |
| 08/11/1999 | MOTION TO CONTINUE | |
| 08/11/1999 | ORDER OF CONTINUANCE | |
| 09/23/1999 | ORDER: PHSD-NOV. 1, 1999 AT 9:00AM | |
| 11/03/1999 | ORDER: DEF. IS ORDERED BACK 1-3-00 AT 9:00 | |
| 01/05/2000 | ORDER: P.H. S.D. DEF. ORDERED BACK MARCH 6, 2000 AT 9:00 A.M. | |
| 03/02/2000 | MOTION FOR CONT. | |
| 03/02/2000 | ORDER FOR CONT. | |
| 03/09/2000 | ORDER: DEF. ORDERED BACK APRIL 5, 2000 AT 9:00 A.M. | |
| 04/08/2000 | ORDER:CASE PASSED TO 4/26/00 @9:00 AM. MLD | |
| 04/28/2000 | ORDER: CASE RESET FOR 8/7/00 @9:00 AM. FSD. MLD | |
| 08/08/2000 | ORDER: NOVEMBER FELONY SOUNDING DOCKET. DEFENDANT ORDERED BACK NOVEMBER 6, 2000 AT 9:00 A.M. | |

| | | |
|---|---|---|
| 11/08/2000 | ORDER: DEF. IS ORDERED BACK 2/5/01 AT 9:00 A.M. FOR FSD | |
| 02/15/2001 | ORDER: DEF. AWAITING SENTENCING IN FEDERAL COURT. STATE | |
| | WILL DISMISS WHEN SENTENCED. DEF. IS ORDERED BACK | |
| | 5/7/01 AT 9:00 A.M. MLD | |
| 05/08/2001 | ORDER: JUNE F.S.D. JUNE 4, 2001 AT 9:00 A.M. | |
| 09/04/2001 | MOTION TO DISMISS/ORDER | $-105.00 |
| | (Entry with fee only) | $-25.00 |
| | (Entry with fee only) | $-3.00 |
| | (Entry with fee only) | $-7.00 |
| | (Entry with fee only) | $-25.00 |
| | (Entry with fee only) | $-150.00 |
| 12/20/2001 | MOTION TO DISMISS W/ORDER OF DISMISSAL | |
| **Total:** | | **$0.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 06/28/1999 | | Date Action: WARRANT ISSUED Completed : 07/14/1999 Code: S |
| 08/11/1999 | | Date Action: DOCKET-DOBBINS |
| 09/20/1999 | | Date Action: DOCKET-DOBBINS |
| 11/01/1999 | 9:00A | Date Action: FEL SD-DOBBINS |
| 01/03/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 03/06/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 04/05/2000 | 9:00A | Date Action: MISD DISP-DOBBINS |
| 04/26/2000 | | Date Action: DOCKET-DOBBINS |
| 08/07/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 11/06/2000 | 9:00A | Date Action: FEL SD-DOBBINS |
| 02/05/2001 | | Date Action: FEL SD-DOBBINS |
| 05/07/2001 | | Date Action: FEL SD-DOBBINS |
| 06/04/2001 | | Date Action: FEL SD-DOBBINS |
| 09/04/2001 | | Date Action: ST DISMISSED |

# CLERK'S CERTIFICATE

I, PATRICK KEANEY, Clerk of the United States District Court for the Eastern District of Oklahoma, do hereby certify that the foregoing pages are copies of original pleadings, orders, papers and transcripts of the court reporter, in a case lately pending in this court, wherein

|  |  |  |
|---|---|---|
|  | ) | |
|  | ) | |
|  | ) | |
| Appellee | ) | |
|  | ) | USDC No. |
|  | ) | |
| vs. | ) | |
|  | ) | USCA No. |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| Appellant | ) | |
|  | ) | |

IN TESTIMONY to the above, I do hereunto sign my name and affix the seal of the Court at Muskogee, Oklahoma.

DATED:

PATRICK KEANEY, CLERK

By: _____
Deputy Clerk