# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: <u>6:09−cv−00105−RAW</u>

| | |
|---|---|
| Barrett v. USA | Date Filed: 03/16/2009 |
| Assigned to: Judge Ronald A. White | Date Terminated: 03/28/2019 |
| Case in other court:  10th Circuit, 12−07086 | Jury Demand: None |
| 10th Circuit, 19−07049 | Nature of Suit: 535 Death Penalty − Habeas Corpus |
| ED/OK, 6:04−cr−115 | Jurisdiction: U.S. Government Defendant |

Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence

**Petitioner**

| | | |
|---|---|---|
| **Kenneth Eugene Barrett** | represented by | **David B. Autry** |

1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: <u>dbautry77@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carrie L. Ward**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Email: <u>carrie_ward@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: <u>joan.fisher@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Karl J. Saddlemire**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: <u>karl_saddlemire@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender − Sacramento

801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*TERMINATED: 11/26/2018*

V.

**Respondent**

**USA**                     represented by   **Christopher J. Wilson**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |

| | | | |
|---|---|---|---|
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr−04−115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |

| Date | Doc | | Description |
|---|---|---|---|
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |

| | | | |
|---|---|---|---|
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | |

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |

| | | | |
|---|---|---|---|
| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: 01/13/2010) |
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBIT **159 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>125</u> | | REDACTED EXHIBITS **167, 168, 169** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>126</u> | | REDACTED EXHIBIT **159 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>127</u> | | REDACTED EXHIBITS **170, 171** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>128</u> | | REDACTED EXHIBIT **160 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>129</u> | | REDACTED EXHIBIT **160 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>130</u> | | REDACTED EXHIBITS **172, 173** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>131</u> | | REDACTED EXHIBIT **177 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>132</u> | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>133</u> | | REDACTED EXHIBIT **177 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>134</u> | | REDACTED EXHIBIT **177 Part c** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>135</u> | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBITS **179, 180, 181a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>136</u> | | REDACTED EXHIBIT **181 Part B1** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>137</u> | | REDACTED EXHIBITS **182, 183** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>138</u> | | REDACTED EXHIBIT **181 Part B2** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>139</u> | | REDACTED EXHIBIT **196 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>140</u> | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>141</u> | | REDACTED EXHIBIT **196 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>142</u> | | REDACTED EXHIBIT **196 Part c** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>143</u> | | REDACTED EXHIBIT **196 Part d** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>144</u> | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>145</u> | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | <u>146</u> | | |

| | | | |
|---|---|---|---|
| | | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas |

| | | | |
|---|---|---|---|
| | | | Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript |

| | | | |
|---|---|---|---|
| | | | may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to R&R due by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following |

| | | | |
|---|---|---|---|
| | | | documents under seal: Petitioners Motion to Vacate or Modify Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |

| | | | |
|---|---|---|---|
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |
| 03/06/2013 | 227 | | RECORD on Appeal Sent to Circuit Court (Record includes: Volume 1 – Pleadings 1, 2, 3, 4, 5, 6, 7, 45, 51, 52, 57, 58, 59, 61, 62, 66, 67, 68, 69, 70, 91, 94, 95, 96, 100, 102, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 157, 161, 170, 171, 174, 178, 179, 199, 200, 201, 206, 207, 208, 209, 210, 212, 213, 214, 216, 217, 220, 221, 222; Volume 2 – Sealed Pleadings #8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 97, 101, 162, 163, 164, 168, 175, 181, 184, 185, 186, 187, 193, 197, 198 and 215; Volume 3 – Transcripts: Show Cause Hearing held 10/6/2009 and Motion/Status Hearing held 3/31/10.) Also included from 04–cr–115–JHP – Volume 1 – Pleadings 1 – 15, 17 –19, 22, 26 – 29, 31 – 36, 38, 41 – 45, 47 – 49, 52 – 56, 58 – 60, 62, 63 – 66, 69 – 82, 85 – 87, 90, 92 – 94, 96, 97, 99, 101, 102, 104 – 106, 114, 115, 117, 120 – 122, 124, 125, 127, 128, 132 – 137, 139 – 142, 145 – 147, 152 – 155, 157, 158, 163 – 167, 169 – 175, 177, 178, 180 – 190, 192 – 194, 199, 201 – 206, 209 – 213, 215 – 218, 226, 228, 229, 231, 239, 240 – 243, 245 – 249, 252, 253, 255 – 258, 260, 263, 267, 268, 276, 279, 280, 282 – 285, 287, 288, 290, 291, 293, 302, 306 – 308, 359 – 367, 374, 382, 384, 387, 390, 391, 397, 400 – 405, 410 – 412, 415, 417 and 421; Volume 2– Sealed Pleadings 23 – 25, 50, 51, 57, 107, 113, 116, 118, 208, 214, 232, 237, 238, 264 – 266, 274, 301, 368 – 371, 375, 377, 379, 380, 383, 392, 394 – 396, 398, 399 and 416; Volume 3 – Sealed Transcripts (5): Budget Hearing held 12/09/04, Ex Parte Hearing held 01/07/05, Motion Hearing held 3/22/05, Telephone Conference held 5/12/05 and Hearing on Governments Motion held 9/13/05; Volume 4 – Sealed Presentence Report; Volume 5 – Transcripts (54): Proceedings held 10/25/04, Arraignment held 11/17/04, Status Conference held 1/07/05, Proceedings held 2/15/05, Status Conference held 3/22/05, Status Conference held 5/18/05, Telephone Conference held 6/02/05, Motion |

| | | | |
|---|---|---|---|
| | | | to Continue held 6/5/05, Status Conference held 7/15/05, Status Conference 8/12/05, Criminal Pretrial held 8/31/04, Telephone Conference held 9/06/05, Status Hearing held 9/9/05, Sealed Hearing 9/12/05, Individual Juror Qualification Stage One Proceedings held 9/12 through 9/16/05, (5 transcripts), Hearing on USA Motion for Order Delaying Production of Witness Names and Protective Order held 9/13/05 – (Vol 1 and 2), Pretrial Hearing held 9/20/05, Courts Rulings on Motions held 9/26/05, Jury Trial (27 Transcripts, Vol 1 through 27) held 9/26/05 through 11/17/05, Ex Parte Budget Hearing held 10/3/05, Partial Transcript of Proceedings dated 11/10/05, Sentencing held 12/19/05; Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. Under separate mailing 03/06/2013, certified #7009–3410–0001–4052–7584 – (Videotape – attachment to Pleading 237) and (Disk – Attachment to Pleading 265). (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) Modified on 12/1/2016 ***Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND FLOOR VAULT (See 268 LETTER from Circuit Court)*** (cjt, Deputy Clerk). Modified on 5/10/2019 ***to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK, both filed in CR–04–115–RAW, returned to 10th Circuit (See Pleading 485 LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 03/06/2013) |
| 03/06/2013 | | | ***Remark: Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 03/07/2013) |
| 03/11/2013 | | | ***Remark: Notice of receipt of Record on Appeal by 10th Circuit Court of Appeals (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 03/12/2013) |
| 02/21/2014 | 228 | | ORDER from Circuit Court (Re: 222 Notice of Appeal – Final Judgment) directing Clerk to transmit supplemental record (With attachments) (cjt, Deputy Clerk) (Entered: 02/21/2014) |
| 02/26/2014 | 229 | | SUPPLEMENTAL RECORD on Appeal Sent to Circuit Court (Record includes: Per Order of the 10th Circuit Court of Appeals entered 2/21/14 228 , supplemental record sent to 10th Circuit Court of Appeals consisting of CJA Voucher Forms with attachments (Voucher #060125000010 for period of service from 12/1/05 to 1/10/06; Voucher #051216000002 for period of service from 11/1/05 to 11/30/05; Voucher #051216000001 for period of service from 10/1/05 to 10/31/05; Voucher #051213000016 for period of service from 9/1/05 to 9/30/05; #051213000015 for period of service from 8/1/05 to 8/31/05; Voucher #050922000006 for period of service from 7/1/05 to 7/31/05; Voucher #050922000005 for period of service from 6/1/05 to 6/30/05; Voucher #050715000012 for period of service from 5/1/05 to 5/31/05; Voucher #050516000003 for period of service from 4/1/05 to 4/30/05; Voucher #050506000011 for period of service from 3/1/05 to 3/31/05; Voucher #050506000009 for period of service from 2/1/05 to 2/28/05; and Voucher #050506000008 for period of service from 10/25/04 to 1/31/05. Supplemental record transmitted to 10th Circuit Court of Appeals by Federal Express #8723–8982–6061.) (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 02/27/2014) |

| | | | |
|---|---|---|---|
| 08/19/2015 | 230 | | DECISION from Circuit Court Reverse and Remand death sentence for evidentiary hearing; Affirm in all other respects, denying motion for certificate of appealability – Decision of the District Court (awaiting mandate) (Re: 222 Notice of Appeal – Final Judgment) (With attachments) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 08/19/2015 | 231 | | JUDGMENT from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 10/26/2015 | 232 | | MANDATE letter from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/28/2015) |
| 11/30/2015 | 233 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 6/2/2016 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/30/2015) |
| 12/06/2015 | 234 | | MOTION PERMIT INSPECTION OF THE EXPANDED RECORD by USA. Responses due by 12/21/2015(Kahan, Jeffrey) (Entered: 12/06/2015) |
| 12/08/2015 | 235 | | MINUTE ORDER by District Judge James H. Payne: Directing response by 12/15/2015 (Re: 234 GOVERNMENT'S UNOPPOSED MOTION TO PERMIT INSPECTION OF THE EXPANDED RECORD) (cjt, Deputy Clerk) (Entered: 12/08/2015) |
| 12/14/2015 | 236 | | Unopposed RESPONSE to Motion (Re: 234 MOTION PERMIT INSPECTION OF THE EXPANDED RECORD ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 12/14/2015) |
| 12/17/2015 | 237 | | ORDER by District Judge James H. Payne: denying 234 Government's Unopposed Motion to Permit Inspection of the Expanded Record; striking 233 Order Setting Hearing, including Evidentiary Hearing set for 6/2/2016 at 9:30 AM and all other deadlines set in said order (cjt, Deputy Clerk) (Entered: 12/17/2015) |
| 01/11/2016 | 238 | | NOTICE OF EXTENSION OF TIME TO FILE PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/11/2016) |
| 02/16/2016 | 239 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari deadline for filing has been extended to 3/14/2016 (U.S. Supreme Court Case Number: 15A644) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 02/17/2016) |
| 03/16/2016 | 240 | | NOTICE OF FILING OF PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/16/2016) |
| 03/17/2016 | 241 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been filed on 3/14/2016 (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 03/17/2016) |
| 06/24/2016 | 242 | | ORDER from the Tenth Circuit, re: motion for authorization to file second or successive 2255 (dma, Deputy Clerk) (Entered: 06/24/2016) |
| 10/03/2016 | 243 | | |

| | | | |
|---|---|---|---|
| | | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been denied (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/03/2016) |
| 11/07/2016 | 244 | | ORDER from Circuit Court: denying authorization to file the proposed second Sec. 2255 motion (Re: 242 Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 245 | | ORDER from Circuit Court: denying authorization to file proposed second Sec. 2255 motion (Re: 242 Order, 244 USCA Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 246 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 2/16/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/10/2016 | 247 | | Unopposed MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett Responses due by 11/24/2016(Fisher, Joan) (Entered: 11/10/2016) |
| 11/15/2016 | 248 | | ORDER by District Judge James H. Payne: denying 247 Petitioner's Unopposed Motion to Modify Scheduling Order (cjt, Deputy Clerk) (Entered: 11/15/2016) |
| 11/18/2016 | 249 | | MOTION for Discovery *Leave to Conduct Civil Discovery* by Kenneth Eugene Barrett Responses due by 12/2/2016(Fisher, Joan) (Entered: 11/18/2016) |
| 11/18/2016 | 250 | | MOTION for Discovery *of Counsel's File* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 251 | | MOTION for Discovery *(Deposition of Experts)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 252 | | MOTION for Discovery *(Interrogatories)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 253 | | MOTION for Psychiatric Evaluation of Defendant by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) Modified on 11/22/2016 to edit event and text (dma, Deputy Clerk). (Entered: 11/18/2016) |
| 11/18/2016 | 254 | | MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 255 | | MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 256 | | MOTION to Unseal Document(s) (Report of Dr. Randall Price) (Re: 67 Order) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 257 | | MOTION to Unseal Document(s) (Re: 24 Sealed Document, 12 Sealed Document, 16 Sealed Document, 21 Sealed Document, 143 Exhibit(s) in Support of Document(s), 14 Sealed Document, 9 Sealed Document, 20 Sealed Document, 22 Sealed Document, 11 Sealed Document, 19 Sealed Document, 145 Exhibit(s) in Support of Document(s), 8 Sealed Document, 13 Sealed |

| | | | |
|---|---|---|---|
| | | | Document, 17 Sealed Document, 15 Sealed Document, 27 Sealed Document, 42 Sealed Document, 25 Sealed Document, 26 Sealed Document, 18 Sealed Document, 142 Exhibit(s) in Support of Document(s), 141 Exhibit(s) in Support of Document(s), 28 Sealed Document, 43 Sealed Document, 23 Sealed Document, 10 Sealed Document ) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/23/2016 | 258 | | RESPONSE to Motion (Re: 250 MOTION for Discovery *of Counsel's File* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 259 | | RESPONSE to Motion (Re: 251 MOTION for Discovery *(Deposition of Experts)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 260 | | RESPONSE to Motion (Re: 252 MOTION for Discovery *(Interrogatories)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 261 | | RESPONSE to Motion (Re: 254 MOTION for Discovery *(Subpoena Duces Tecum − Third Parties)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 262 | | RESPONSE to Motion (Re: 255 MOTION for Discovery *(Subpoena Duces Tecum − Petitioner)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 263 | | RESPONSE to Motion (Re: 256 MOTION to Unseal Document(s) *(Report of Dr. Randall Price)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 264 | | RESPONSE to Motion (Re: 257 MOTION to Unseal Document(s) ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 265 | | RESPONSE to Motion (Re: 253 MOTION ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/25/2016 | 266 | | RESPONSE to Motion (Re: 249 MOTION for Discovery *Leave to Conduct Civil Discovery* ) by USA ;(Kahan, Jeffrey) (Entered: 11/25/2016) |
| 11/28/2016 | 267 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby strikes the Evidentiary Hearing set herein on 2/16/2017 at 9:00 AM. The Court will set a new Evidentiary Hearing date as soon as all pending motions have been ruled upon. (cjt, Deputy Clerk) (Entered: 11/28/2016) |
| 11/29/2016 | 268 | | LETTER from Circuit Court with enclosed pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR−04−115−JHP (Re: 222 Notice of Appeal − Final Judgment, 227 RECORD on Appeal Sent to Circuit Court) ***STORED IN CLERK'S OFFICE 2ND FLOOR VAULT*** (cjt, Deputy Clerk) Modified on 5/10/2019 to reflect #237 and #265, with original pleadings, VIDEOTAPE AND DISK, both filed in CR−04−115−RAW, returned to Tenth Circuit (See 485 Letter to Circuit Court) (cjt, Deputy Clerk). (Entered: 11/29/2016) |
| 12/06/2016 | 269 | | ORDER re: DISCOVERY by District Judge James H. Payne: denying 249 Petitioner's Motion to Conduct Discovery; granting 250 Government's Motion to Secure Trial Counsel's Files; denying in part and granting in part 251 Government's Motion to Obtain Discovery from Defense Experts; denying 252 |

| | | | |
|---|---|---|---|
| | | | Government's Motion to Propound Interrogatories; granting 253 Government's Motion for Psychiatric Evaluation of Defendant; denying 254 Government's Motion to Serve Discovery on Third Parties; denying 255 Government's Motion to Serve Subpoenas Duces Tecum; granting 256 Government's Unopposed Motion to Permit Inspection of Expanded Record; denying in part and granting in part 257 Government's Unopposed Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/06/2016 | 270 | | SCHEDULING ORDER by District Judge James H. Payne: Evidentiary Hearing set for 3/13/2017 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/12/2016 | 271 | | MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT by Kenneth Eugene Barrett Responses due by 12/26/2016(Fisher, Joan) (Entered: 12/12/2016) |
| 12/13/2016 | 272 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 12/15/2016 (Re: 271 Petitioner's MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT) (cjt, Deputy Clerk) (Entered: 12/13/2016) |
| 12/13/2016 | 273 | | Unopposed MOTION to Continue Hearing(s) by USA (With attachments) Responses due by 12/27/2016(Kahan, Jeffrey) (Entered: 12/13/2016) |
| 12/14/2016 | 274 | | ORDER by District Judge James H. Payne: denying 273 Motion for Continuance of Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 12/14/2016) |
| 12/15/2016 | 275 | | RESPONSE in Opposition to Motion (Re: 271 MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 12/15/2016) |
| 12/15/2016 | 276 | | ORDER by District Judge James H. Payne: denying 271 Petitioner's Motion for Order of Access to Petitioner by Mental Health Expert (cjt, Deputy Clerk) (Entered: 12/15/2016) |
| 12/19/2016 | 277 | | MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* (Re: 276 Ruling on Motion for Miscellaneous Relief ) by Kenneth Eugene Barrett Responses due by 1/3/2017(Fisher, Joan) (Entered: 12/19/2016) |
| 12/20/2016 | 278 | | RESPONSE in Opposition to Motion (Re: 277 MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* ) by USA ;(Kahan, Jeffrey) (Entered: 12/20/2016) |
| 12/21/2016 | 279 | | ORDER by District Judge James H. Payne: denying 277 Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Re: 271 MOTION, 276 Order) (cjt, Deputy Clerk) (Entered: 12/21/2016) |
| 01/03/2017 | 280 | | NOTICE of Petitioner's Written Summaries of Anticipated Testimony of Experts (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 281 | | MOTION for Reconsideration *of the Court's Order Denying The Government's Unopposed Motion for Reconsideration* (Re: 274 Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 282 | | Unopposed MOTION Order to Transport Petitioner to Personally Attend Evidentiary Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/11/2017 | 283 | | ORDER by District Judge James H. Payne: granting in part 281 Petitioner's Motion for Reconsideration; Evidentiary Hearing as to Roger Hilfiger's testimony ONLY is RESET from 3/31/2017 to 3/30/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 274 Order) (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 284 | | MINUTE ORDER by District Judge James H. Payne: granting 282 Petitioner's Unopposed Motion to Transport Petitioner to Evidentiary Hearing. Government is directed to secure Petitioner's presence at said hearing commencing on 3/13/2017 at 9:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK. (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 285 | | Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. by Kenneth Eugene Barrett Responses due by 1/25/2017(Fisher, Joan) (Entered: 01/11/2017) |
| 01/12/2017 | 286 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 1/13/2017 (Re: 285 Petitioner's Opposed MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, M.D.). (cjt, Deputy Clerk) (Entered: 01/12/2017) |
| 01/13/2017 | 287 | | RESPONSE in Opposition to Motion (Re: 285 Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. ) by USA ;(Kahan, Jeffrey) (Entered: 01/13/2017) |
| 01/18/2017 | 288 | | ORDER by District Judge James H. Payne: granting 285 Petitioner's Motion for Access to Petitioner by George Woods, M.D. (cjt, Deputy Clerk) (Entered: 01/18/2017) |
| 01/30/2017 | 289 | | MOTION to Exclude Proposed Witnesses by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 01/30/2017) |
| 02/01/2017 | 290 | | MOTION to Exclude a Proposed Witness by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 291 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 289 MOTION to Exclude Proposed Witnesses, 290 MOTION to Exclude a Proposed Witness) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 292 | | MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 293 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 294 | | Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 295 | | MOTION in Limine *to Preclude Post–Hoc Rationalizations, and Supporting Brief* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 296 | | MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 297 | | Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* by Kenneth Eugene Barrett Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 298 | | Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 299 | | MOTION to Expand the Record with Exhibits 206 through 220 by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 300 | | MOTION for Order Barring Witness Collusion and Brief in Support by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 301 | | MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 302 | | MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s)) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 303 | | MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 304 | | MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 305 | | |

| | | | |
|---|---|---|---|
| | | | MOTION in Limine *to Exclude Testimony by Randall Price* by Kenneth Eugene Barrett (With attachments); Responses due by 2/8/2017(Schardl, Tivon) (Entered: 02/01/2017) |
| 02/03/2017 | 306 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited deadlines as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court*, 296 MOTION for Additional Time to File *Motion in Limine Regarding Dr. Steven Pitt*, 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony*, 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails*, 299 MOTION to Expand the Record, 300 MOTION for Order Barring Witness Collusion, 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing, 302 MOTION for Reconsideration of Order Denying Deposition of Roger Hilfiger) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/03/2017 | 307 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations*, 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony*, 305 MOTION in Limine *to Exclude Testimony by Randall Price*) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/08/2017 | 308 | | Unopposed MOTION to Seal Document *Response to Docket Entry 305* by USA (With attachments) Responses due by 2/22/2017(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 309 | | RESPONSE in Opposition to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 310 | | RESPONSE in Opposition to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 311 | | RESPONSE in Opposition to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 312 | | RESPONSE in Opposition to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 313 | | RESPONSE in Opposition to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 314 | | RESPONSE in Opposition to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 315 | | RESPONSE to Motion (Re: 296 MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* ) by USA ;(Wilson, |

| | | | |
|---|---|---|---|
| | | | Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 316 | | MINUTE ORDER by District Judge James H. Payne: granting 308 Government's Unopposed Motion to Seal Response in Opposition to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price*). (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 317 | | RESPONSE to Motion (Re: 299 MOTION to Expand the Record with Exhibits 206 through 220 ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 318 | | RESPONSE in Opposition to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 319 | | RESPONSE in Opposition to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 320 | | RESPONSE in Opposition to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 321 | | SEALED RESPONSE in Opposition to Motion (Re: 305 MOTION in Limine to Exclude Testimony by Randall Price) by USA (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 322 | | RESPONSE in Opposition to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/08/2017 | 323 | | RESPONSE in Opposition to Motion (Re: 289 MOTION to Exclude Proposed Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/15/2017 | 324 | | REPLY to Response to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 325 | | REPLY to Response to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 326 | | REPLY to Response to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 327 | | REPLY to Response to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 328 | | REPLY to Response to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 329 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/15/2017) |
| 02/15/2017 | 330 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 331 | | REPLY to Response to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 332 | | REPLY to Response to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 333 | | REPLY to Response to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 334 | | REPLY to Response to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 335 | | REPLY to Response to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/15/2017 | 336 | | REPLY to Response to Motion (Re: 289 MOTION to Exclude Proposed Witnesses , 290 MOTION to Exclude a Proposed Witness ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/16/2017 | 337 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to Extend Scheduling Order Dates for Motion in Limine regarding Dr. Steven Pitt (Dkt # 296 ) is granted as follows: Expert reports shall be exchanged by 12:00 p.m. Central Standard Time on 3/3/2017. Motions in Limine regarding Dr. Steven Pitt, D.O. and/or Dr. George Woods, M.D. shall be filed by close of business on 3/8/2017. Responses shall be filed by noon on 3/10/2017. (cjt, Deputy Clerk) (Entered: 02/16/2017) |
| 02/16/2017 | 338 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 02/16/2017) |
| 02/16/2017 | 339 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/16/2017) |
| 02/16/2017 | 340 | | STIPULATION *Joint Pre−Hearing Statement* by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/16/2017) |
| 02/21/2017 | 341 | | MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett (With attachments) Responses due by 3/7/2017(Fisher, Joan) (Entered: 02/21/2017) |
| 02/22/2017 | 342 | | Unopposed MOTION to Seal Document *Motion for Partial Summary Judgment* by USA (With attachments) Responses due by 3/8/2017(Kahan, Jeffrey) (Entered: 02/22/2017) |
| 02/23/2017 | 343 | | MINUTE ORDER by District Judge James H. Payne: granting 342 Government's Unopposed Motion to File Sealed Motion for Partial Summary |

| | | | |
|---|---|---|---|
| | | | Judgment. (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 344 | | Unopposed MOTION to Amend *Joint Statement* (Re: 340 Stipulation ) by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 345 | | Unopposed MOTION Permit Use of Computers in the Courthouse During Hearing by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 346 | | Unopposed MOTION for Authorization to Serve Subpoenas Without Tendering Fees and Mileage by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 347 | | SEALED MOTION for Partial Summary Judgment by USA (With attachments); Responses due by 3/9/2017 (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 348 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is directed to file an expedited response to Government's SEALED MOTION for Partial Summary Judgment (Re: 347 SEALED MOTION). Said Response is due by Close of Business on 2/27/2017 (dma, Deputy Clerk) (Entered: 02/23/2017) |
| 02/24/2017 | 349 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 294 Motion to Recuse and Disqualify, pursuant to 28 U.S.C. Section 455, is denied for reasons previously set out in 66 Order filed herein on 9/11/2009. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 350 | | MINUTE ORDER by District Judge James H. Payne: granting 290 Government's Motion to Exclude a Proposed Witness. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 351 | | ORDER by District Judge James H. Payne: granting 292 Government's Motion to Exclude Evidence of Unavailable Witnesses by Declaration Alone (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 352 | | MINUTE ORDER by District Judge James H. Payne: denying 295 Petitioner's Motion in Limine to Preclude Post–Hoc Rationalizations. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 353 | | MINUTE ORDER by District Judge James H. Payne: denying 297 Petitioner's Motion for Production of 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 354 | | MINUTE ORDER by District Judge James H. Payne: denying 298 Petitioner's Motion for Reconsideration of Order denying Discovery of Trial Counsel's Emails. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 355 | | MINUTE ORDER by District Judge James H. Payne: denying 299 Motion to Expand the Record with Exhibits 206 through 220 as these documents are already part of the court records in this case. See, Dkt. # 178 . If counsel desires the Court to consider these or any other documents contained within the court record, the documents must be introduced and properly admitted at the evidentiary hearing in accordance with the Federal Rules of Evidence, Rule 1101(e). (cjt, Deputy Clerk) (Entered: 02/24/2017) |

| | | | |
|---|---|---|---|
| 02/24/2017 | 356 | | MINUTE ORDER by District Judge James H. Payne: denying 300 Petitioner's Motion for Order Barring Witness Collusion. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 357 | | MINUTE ORDER by District Judge James H. Payne: 301 Petitioner's Motion to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing is moot. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 358 | | MINUTE ORDER by District Judge James H. Payne: denying 302 Petitioner's Motion for Reconsideration of Order denying the deposition of Roger Hilfiger (Dkt. # 302 ) as the Court has previously indicated it prefers to hear live testimony of counsel, see Dkt. # 246 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 359 | | MINUTE ORDER by District Judge James H. Payne: denying 303 Petitioner's Motion in Limine to Rely upon Declarations for Direct Examination Testimony. While declarations may be admissible, Petitioner will be required to seek permission to admit each declaration at the evidentiary hearing scheduled herein and the Government will be granted an opportunity to object to such admission pursuant to the Federal Rules of Evidence. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 360 | | ORDER by District Judge James H. Payne: denying 304 Petitioner's Motion in Limine to Exclude Novel Theories of Aggravation; denying 305 Petitioner's Motion in Limine to Exclude Testimony from J. Randall Price (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 361 | | ORDER by District Judge James H. Payne: granting in part 289 Government's Motion to Exclude Proposed Witnesses; Amended Joint Pre–Hearing Statement due by close of business on 3/3/2017 (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 362 | | MINUTE ORDER by District Judge James H. Payne: denying 341 Petitioner's Unopposed Motion for Extension of Time to File Expert Report. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 363 | | MINUTE ORDER by District Judge James H. Payne: denying as moot 344 Petitioner's Unopposed Motion to Amend Joint Statement. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 364 | | MINUTE ORDER by District Judge James H. Payne: granting 345 Petitioner's Unopposed Motion for Authorization to Use Computers in the Courthouse during Evidentiary Hearing. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/27/2017 | 365 | | MINUTE ORDER by District Judge James H. Payne: granting in part 346 Petitioner's Unopposed Motion for Authorization to Serve Subpoenas Without Tendering Fees and Mileage. Pursuant to 28 U.S.C. § 1825(b) and (c), the court finds witness fees for lay witnesses whose testimony has not been excluded by previous order of the court shall be paid by the United States Marshal as provided by statute. (cjt, Deputy Clerk) (Entered: 02/27/2017) |
| 02/27/2017 | 366 | | RESPONSE in Opposition to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 02/27/2017) |
| 02/28/2017 | 367 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Directing expedited reply by close of business on 3/1/2017 (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 02/28/2017 | 368 | | MOTION to Exclude Witnesses by USA; Responses due by 3/14/2017(Wilson, Christopher) (Entered: 02/28/2017) |
| 02/28/2017 | 369 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM Central Standard Time on 3/2/2017 (Re: 368 Opposed MOTION to Exclude Witnesses). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 03/01/2017 | 370 | | Unopposed MOTION to Seal Document *Reply in Support of Motion for Partial Summary Judgment* by USA Responses due by 3/15/2017(Kahan, Jeffrey) (Entered: 03/01/2017) |
| 03/01/2017 | 371 | | MINUTE ORDER by District Judge James H. Payne: granting 370 Government's Unopposed Motion to File Sealed Reply (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/01/2017 | 372 | | SEALED REPLY (Re: 347 SEALED MOTION for Partial Summary Judgment) by USA (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/02/2017 | 373 | | RESPONSE in Opposition to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 03/02/2017) |
| 03/02/2017 | 374 | | MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett (With attachments) Responses due by 3/16/2017(Schardl, Tivon) (Entered: 03/02/2017) |
| 03/02/2017 | 375 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby directs Petitioner to file a Sur–Reply to 347 Government's SEALED MOTION for Partial Summary Judgment by close of business on Monday, 3/6/2017. Said Sur–Reply shall specifically address whether or not Petitioner contests the 38 facts contained within the Government's Reply. (cjt, Deputy Clerk) (Entered: 03/02/2017) |
| 03/03/2017 | 376 | | EXPERT WITNESS REPORT *Proffered for Excluded Witnesses* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/03/2017) |
| 03/03/2017 | 377 | | NOTICE of Exchange of Rule 26 Disclosures of George W. Woods, Jr. M.D. (Re: 337 Ruling on Motion to Extend Scheduling Order Dates) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/03/2017 | 378 | | ORDER by District Judge James H. Payne: Bifurcating 3/13/2017 evidentiary hearing (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 379 | | MINUTE ORDER by District Judge James H. Payne: Counsel for Petitioner is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 376 Petitioner's |

| | | | |
|---|---|---|---|
| | | | Proffer of Expert Testimony) (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 380 | | RESPONSE in Opposition to Motion (Re: 374 Opposed MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 381 | | MINUTE ORDER by District Judge James H. Payne: denying 374 Petitioner's Motion to Supplement Response in Opposition to Government Motion for Partial Summary Judgment. (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 382 | | REPLY to Response to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 383 | | AMENDED Joint Pre–Hearing Statement (Re: 361 Ruling on Motion to Exclude) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/06/2017 | 384 | | SURREPLY to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/06/2017) |
| 03/06/2017 | 385 | | Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies (Re: 378 Order) by Kenneth Eugene Barrett; Responses due by 3/20/2017(Fisher, Joan). Added MOTION to Stay and edited text on 3/7/2017 (cjt, Deputy Clerk). (Entered: 03/06/2017) |
| 03/07/2017 | 386 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM on 3/8/2017 (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and Motion to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies). (cjt, Deputy Clerk) (Entered: 03/07/2017) |
| 03/07/2017 | 387 | | Second Amended Joint Pre–Hearing Statement (Re: 383 Stipulation) by USA (Wilson, Christopher) (Entered: 03/07/2017) |
| 03/07/2017 | 388 | | RESPONSE in Opposition to Motion (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies ) by USA ;(Kahan, Jeffrey) (Entered: 03/07/2017) |
| 03/08/2017 | 389 | | MINUTE ORDER by District Judge James H. Payne: granting 368 Government's Second Motion to Exclude Proposed Witnesses. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 390 | | MINUTE ORDER by District Judge James H. Payne: In light of the stipulation of the parties submitted on 3/7/2016, 347 Government's Motion for Partial Summary Judgment is moot. After the submission of testimony herein, the government can reurge its motion if the facts are different than what the parties anticipated at the time of the filing of their proposed findings of fact filed on 2/16/2017. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 391 | | MINUTE ORDER by District Judge James H. Payne: After consideration of 385 Petitioner's Motion to Reconsider, the motion is granted and this Court will allow the parties to submit all of their evidence in one evidentiary hearing subject to the Federal Rules of Evidence. Pursuant to 28 U.S.C. Section 636(b)(1)(B), the evidentiary hearing is referred to Magistrate Judge Steven P. Shreder for Findings and Recommendation. The evidentiary hearing is |

| | | | |
|---|---|---|---|
| | | | continued to 3/27/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/10/2017 | 392 | | Unopposed MOTION to Continue Hearing(s) *in Part* by USA Responses due by 3/24/2017(Wilson, Christopher) (Entered: 03/10/2017) |
| 03/10/2017 | 393 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Government's Motion for Partial Continuance of Evidentiary Hearing (Dkt. Entry No. 392 ) is hereby GRANTED. The evidentiary hearing scheduled on March 27, 2017 will proceed as scheduled. The Court will, however, hear testimony from the government's experts (Dr. Randall Price and Dr. Steven Pitt), beginning on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/10/2017) |
| 03/14/2017 | 394 | | NOTICE of Availability of Ruth Harris to Testify (Re: 387 Stipulation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/14/2017) |
| 03/21/2017 | 395 | | Unopposed MOTION to Unseal 10/20/05 Budgetary Hearing Transcript (Re: 67 Order) by Kenneth Eugene Barrett; Responses due by 4/4/2017(Fisher, Joan) (Entered: 03/21/2017) |
| 03/21/2017 | 396 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is requesting the court enter an order unsealing the transcript of the "second sealed" hearing on budgetary matters; however, no such transcript was ever filed with the court and, therefore, there is nothing for the court to unseal. Accordingly, 395 Petitioner's Unopposed Motion to Unseal Transcript of 10/20/2005 Hearing is denied. (cjt, Deputy Clerk) (Entered: 03/21/2017) |
| 03/24/2017 | 397 | | NOTICE of Appearance by Kenneth Eugene Barrett [NOTE: Attorney Karl J. Saddlemire added to party Kenneth Eugene Barrett(pty:pet)]. (Saddlemire, Karl) (Entered: 03/24/2017) |
| 03/27/2017 | 398 | | NOTICE of Presentation of Additional Exhibits 96–101 by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/27/2017) |
| 03/27/2017 | 399 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 3/27/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Main Document 399 replaced on 4/20/2017 to reflect Rule of Sequestration invoked 3/27/17. NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/27/2017) |
| 03/27/2017 | 400 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/28/2017 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/27/2017) |
| 03/28/2017 | 401 | | MOTION to Compel *Compliance with Discovery Order* by USA (With attachments) Responses due by 4/11/2017(Kahan, Jeffrey). (Attachments 1–8 and 10 replaced with redacted versions on 4/6/2017 per Docket Entry No. 415; NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/28/2017) |
| 03/28/2017 | 402 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 401 USA's MOTION to Compel |

| | | | |
|---|---|---|---|
| | | | *Compliance with Discovery Order.* (cjt, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 403 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day two) held on 3/28/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 404 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/29/2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 405 | | STIPULATION OF FACT. (tls, Deputy Clerk) (Entered: 03/29/2017) |
| 03/28/2017 | 406 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 401 MOTION to Compel Compliance with Discovery Order by USA. Accordingly, any documents currently in custody of Petitioner's counsel, which have not already been produced, shall be provided to the Government forthwith. All non–privileged documents acquired from attorney Jack Gordon relating to Kenneth Eugene Barrett shall be produced no later than 4/21/2017, along with a detailed privilege log pursuant to LCvR 26.2. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 407 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day three) held on 3/29/2017. (Court Reporter: Karla McWhorter) (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 408 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/30/2017 at 10:30 a.m in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 409 | | NOTICE of Filing Proffer of Testimony from Richard H. Burr by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/29/2017) |
| 03/30/2017 | 410 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day four) held on 3/30/2017. (Court Reporter: Karla McWhorter) (tls, Deputy Clerk) (Entered: 03/30/2017) |
| 04/05/2017 | 411 | | Unopposed MOTION to Seal Document *401, Exhibits 1–8 & 10* by USA Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/05/2017 | 412 | | Unopposed MOTION for Leave to File Redacted Substitute Exhibits to Doc. 401 *Exhibits 1 to 8 & 10* by USA (With attachments) Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/06/2017 | 413 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 411 Unopposed MOTION to Seal Document 401 , Exhibits 1–8 & 10 by USA. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 414 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder continuing Evidentiary Hearing on 6/12/17 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder (dma, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 415 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 412 Unopposed MOTION for Leave to File Substitute Exhibits by USA. |

| | | | |
|---|---|---|---|
| | | | Accordingly, Exhibits 1 to 8 & 10 of Docket Entry No. 401 are hereby ordered replaced with redacted versions. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/19/2017 | 416 | | Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration by USA Responses due by 5/3/2017(Wilson, Christopher) (Entered: 04/19/2017) |
| 04/20/2017 | 417 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 416 Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration. (cjt, Deputy Clerk) (Entered: 04/20/2017) |
| 04/20/2017 | 418 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 416 Unopposed Motion to Exclude Expert Witnesses from Court's Order of Sequestration by USA. (ndd, Deputy Clerk) (Entered: 04/20/2017) |
| 04/21/2017 | 419 | | NOTICE of Petitioner's Privilege Log (Re: 406 Ruling on Motion to Compel,, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 04/21/2017) |
| 05/02/2017 | 420 | | NOTICE of Petitioner's Fourth Proffer of Testimony by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 05/02/2017) |
| 05/03/2017 | 421 | | Unopposed MOTION to Seal Document *Motion for Copy of Videotape* by Kenneth Eugene Barrett (With attachments) Responses due by 5/17/2017(Schardl, Tivon) (Entered: 05/03/2017) |
| 05/04/2017 | 422 | | MINUTE ORDER by District Judge James H. Payne: granting 421 Petitioner's Unopposed Motion to File Motion and Exhibits Under Seal. (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 423 | | SEALED Unopposed MOTION for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/05/2017 | 424 | | Unopposed MOTION for Leave to Appear by Video Conference by Kenneth Eugene Barrett Responses due by 5/19/2017(Fisher, Joan) (Entered: 05/05/2017) |
| 05/09/2017 | 425 | | MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation by Kenneth Eugene Barrett Responses due by 5/23/2017(Schardl, Tivon) (Entered: 05/09/2017) |
| 05/09/2017 | 426 | | MINUTE ORDER by District Judge James H. Payne: denying 424 Petitioner's Motion to Attend Evidentiary hearing June 12–14, 2017 with Counsel by Video Conference. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 427 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 423 Motion for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 is hereby granted. The Court Clerk is directed to make copies of the videotape, attached to Dkt. # 237 in Criminal Case CR–04–115–JHP, and provide a copy of the same to counsel for both parties. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 428 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 5/15/2017 (Re: 425 Petitioner's MOTION to |

| | | | |
|---|---|---|---|
| | | | Exclude Testimony of J. Randall Price). (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/10/2017 | 429 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/27/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 1–250). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 399 Minutes of Evidentiary Hearing, ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/10/2017 | 430 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/28/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 251–514). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 403 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/11/2017 | 431 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: In light of the Court's denial of Petitioner's 424 Unopposed Motion for Leave to Appear by Video Conference, the Government is directed to secure Petitioner's presence at said Evidentiary Hearing commencing on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 05/11/2017) |
| 05/11/2017 | 432 | | MOTION to Exclude Witness Steven Pitt by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017 (Schardl, Tivon) (Additional attachment(s) added per 434 MINUTE ORDER on 5/12/2017: # 4 Sealed Exhibit A) (cjt, Deputy Clerk). (Entered: 05/11/2017) |
| 05/11/2017 | 433 | | Unopposed MOTION to Seal Document *: Exhibit A to Motion to Exclude Witness Steven Pitt* by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017(Schardl, Tivon) (Entered: 05/11/2017) |
| 05/12/2017 | 434 | | MINUTE ORDER by District Judge James H. Payne: granting 433 Petitioner's Unopposed Motion to File Exhibit Under Seal (Re: 432 MOTION to Exclude Witness Steven Pitt) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 435 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 5/19/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 436 | | RESPONSE in Opposition to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by USA ;(Wilson, Christopher) (Entered: 05/12/2017) |
| 05/12/2017 | 437 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/19/2017. (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 438 | | WAIVER of Presence at Evidentiary Hearing (Re: 431 Minute Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/12/2017) |
| 05/18/2017 | 439 | | REPLY to Response to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/18/2017) |
| 05/19/2017 | 440 | | RESPONSE in Opposition to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by USA ;(Kahan, Jeffrey) (Entered: 05/19/2017) |
| 05/19/2017 | 441 | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/26/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/19/2017) |
| 05/25/2017 | 442 | | REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/25/2017) |
| 05/25/2017 | 443 | | Corrected REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/25/2017) |
| 05/30/2017 | 444 | | MINUTE ORDER by District Judge James H. Payne: denying 425 Motion to Exclude Testimony of J. Randall Price Due to Discovery Violation. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 05/30/2017 | 445 | | MINUTE ORDER by District Judge James H. Payne: denying 432 Petitioner's Motion to Exclude Witness Steven Pitt. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 06/04/2017 | 446 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 29, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 515 – 642). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 407 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |
| 06/04/2017 | 447 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 30, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 643–762). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 410 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |

| 06/12/2017 | 448 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day five) held on 6/12/2017. (Court Reporter: Brian Neil) (tls, Deputy Clerk) (Entered: 06/12/2017) |
|---|---|---|---|
| 06/12/2017 | 449 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/13/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/12/2017) |
| 06/13/2017 | 450 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume V held on 6/12/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 763–944). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 448 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Main Document 450 replaced on 6/14/2017) (dma, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 451 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day 6) held on 6/13/2017 (Court Reporter: K.Sidwell and B. Neil) (tls, Deputy Clerk) (tls, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 452 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/26/2017 at 10:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/13/2017) |
| 06/15/2017 | 453 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VII held on 6/13/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 1084–1136). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Entered: 06/15/2017) |
| 06/15/2017 | 454 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VI held on 6/13/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 945–1083). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 06/15/2017) |
| 06/16/2017 | 455 | | MOTION Leave to Present Additional Witnesses by USA Responses due by 6/30/2017(Kahan, Jeffrey) (Entered: 06/16/2017) |

| | | | |
|---|---|---|---|
| 06/16/2017 | 456 | | MINUTE ORDER by District Judge James H. Payne directing Petitioner to file an expedited Response to Respondent's 455 MOTION to Call Additional Rebuttal Witnesses. Response is due by noon on Monday, 6/19/2017 (dma, Deputy Clerk) (Entered: 06/16/2017) |
| 06/19/2017 | 457 | | RESPONSE in Opposition to Motion (Re: 455 MOTION Leave to Present Additional Witnesses ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/19/2017) |
| 06/19/2017 | 458 | | MINUTE ORDER by District Judge James H. Payne: The Government's Motion to Call Additional Rebuttal Witnesses is referred to Magistrate Judge Steven P. Shreder as it involves matters arising out of the evidentiary hearing previously referred to him on 03/08/2017. (Re: 455 MOTION Leave to Present Additional Witnesses ) (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/19/2017 | 459 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: 455 Government's Motion to Call Additional Rebuttal Witnesses is GRANTED IN PART to the extent that the USA may call Dr. Faust Bianco as a rebuttal witness to the testimony of Dr. Miora on Monday, 6/26/2017. Motion is otherwise DENIED. (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/21/2017 | 460 | | MOTION for Disclosure , MOTION for Discovery *Report of Faust Bianco's Opinions, the Bases and Reasons Therefor* by Kenneth Eugene Barrett (With attachments) Responses due by 7/5/2017(Schardl, Tivon) (Entered: 06/21/2017) |
| 06/21/2017 | 461 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Since the Petitioner has indicated that Dr. Miora will not implicate Dr. Bianco's testimony, it appears Dr. Bianco will not testify at the hearing set for Monday, June 26, 2017, at 10:00 a.m. Consequently, Petitioner's Motion For Immediate Production Of Report From Expert Witness (Docket No. 460 ) is hereby DENIED. (tls, Deputy Clerk) (Entered: 06/21/2017) |
| 06/23/2017 | 462 | | Third Amended EXHIBIT LIST by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 06/23/2017) |
| 06/26/2017 | 463 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 6/26/2017. (Court Reporter: Karla McWhorter) (Attachments: # 1 Petitioner's Witness List, # 2 Petitioner's Exhibit List, # 3 Government's Witness List, # 4 Government's Exhibit List)(tls, Deputy Clerk) (Main Document 463 replaced on 6/30/2017 to reflect correct dates hearing held; NEF regenerated) (tls, Deputy Clerk). (Exhibit Lists replaced on 7/10/2017 to reflect admitted date; NEF regenerated) (tls, Deputy Clerk). Modified on 4/15/2019 ***Pursuant to Dkt. #482, all Exhibits from these evidentiary hearings are maintained by the Clerk and located in the Clerk's Office, 2nd Floor Vault.*** (cjt, Deputy Clerk). (Entered: 06/27/2017) |
| 07/13/2017 | 464 | | TRANSCRIPT of Proceedings (Unredacted) of Motions Hearing Volume VIII held on June 26, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1137–1366). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public |

| | | | |
|---|---|---|---|
| | | | terminal. There is no charge to view the transcript at the court public terminal. (Re: 463 Minutes of Evidentiary Hearing) (ksm, Court Reporter) (Entered: 07/13/2017) |
| 07/31/2017 | 465 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 07/31/2017) |
| 07/31/2017 | 466 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 07/31/2017) |
| 08/10/2018 | 467 | | REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder (Re: (391) Minute Order by District Judge James H. Payne referring Evidentiary Hearing to Magistrate Judge Steven P. Shreder for Findings and Recommendation). Objections to R&R due by 8/24/2018. (ndd, Deputy Clerk) (Entered: 08/10/2018) |
| 08/20/2018 | 468 | | MOTION to Extend Deadline to File Objection to Magistrate Judge's Report and Recommendation by USA Responses due by 9/4/2018(Wilson, Christopher) (Entered: 08/20/2018) |
| 08/21/2018 | 469 | | ORDER by District Judge James H. Payne: granting 468 Government's Motion for Extension of Time to Object to Magistrate's Report and Recommendation; Objections to R&R due by 10/23/2018; Responses to Objections due by 11/26/2018 (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder) (cjt, Deputy Clerk) (Entered: 08/21/2018) |
| 10/12/2018 | 470 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/12/2018) |
| 10/23/2018 | 471 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by USA (Kahan, Jeffrey) (Entered: 10/23/2018) |
| 11/26/2018 | 472 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION and 470 Objection to Report and Recommendation) by USA (Kahan, Jeffrey) Modified on 11/27/2018 to edit text and add links (dma, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 473 | | NOTICE of Substitution and Appearance of Counsel by Joan M. Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified text on 11/27/2018 (cjt, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 474 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder, 471 Objection to Report and Recommendation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 11/26/2018) |
| 12/10/2018 | 475 | | REPLY (Re: 471 Objection to Report and Recommendation ) by USA (Kahan, Jeffrey) (Entered: 12/10/2018) |
| 12/10/2018 | 476 | | REPLY (Re: 472 Response ) by Kenneth Eugene Barrett (Ward, Carrie) (Entered: 12/10/2018) |
| 01/31/2019 | 477 | | MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald |

| | | | |
|---|---|---|---|
| | | | A. White. All documents filed in this case in the future shall reflect the new case number CIV–09–105–RAW. (cjt, Deputy Clerk) (Entered: 01/31/2019) |
| 03/28/2019 | 478 | | OPINION AND ORDER by Judge Ronald A. White: affirming in part and denying in part 467 Report and Recommendation; Petitioner's 2255 motion is denied as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial; Certificate of Appealability granted. dismissing/terminating case (case terminated) (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | 479 | | JUDGMENT by Judge Ronald A. White entering judgment in favor of USA against Kenneth Eugene Barrett on his challenge to the legality of his sentence. (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 04/10/2019 | 480 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: It is ordered that each party is directed to withdraw their respective exhibits offered and admitted into evidence at the evidentiary hearings conducted on 3/27/2017, 3/28/2017, 3/29/2017, 3/30/2017, 6/12/2017, 6/13/2017 and 6/26/2017, the same to be kept and maintained for possible appeal purposes. (cjt, Deputy Clerk) Modified on 4/15/2019 ***VACATED per Dkt #482 Minute Order*** (cjt, Deputy Clerk). (Entered: 04/10/2019) |
| 04/11/2019 | 481 | | Unopposed MOTION to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals (Re: 480 Minute Order) by Kenneth Eugene Barrett; Responses due by 4/25/2019(Fisher, Joan) Modified text on 4/12/2019 (cjt, Deputy Clerk). (Entered: 04/11/2019) |
| 04/15/2019 | 482 | | MINUTE ORDER by Judge Ronald A. White: granting 481 Petitioner's Unopposed Motion to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals. The Clerk is directed to maintain the exhibits until further order of the Court. (Re: 480 Minute Order) (cjt, Deputy Clerk) (Entered: 04/15/2019) |
| 04/24/2019 | 483 | | MOTION to Alter or Amend Judgment and Brief in Support (Re: 479 Judgment, 478 Ruling on Report and Recommendation, Granting Certificate of Appealability) by Kenneth Eugene Barrett Responses due by 5/8/2019(Fisher, Joan) (Entered: 04/24/2019) |
| 05/07/2019 | 484 | | RESPONSE to Motion (Re: 483 MOTION to Alter Order/Judgment ) by USA ;(Kahan, Jeffrey) (Entered: 05/07/2019) |
| 05/09/2019 | 485 | | LETTER to 10th Circuit Court of Appeals returning pleadings, videotape and disks included in the Record on Appeal 222 Notice of Appeal and 227 Record on Appeal (With attachments)(jcb, Deputy Clerk) (Entered: 05/09/2019) |
| 05/17/2019 | 486 | | REPLY to Response to Motion (Re: 483 MOTION to Alter Order/Judgment ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/17/2019) |
| 06/11/2019 | 487 | | ORDER from Circuit Court denying authorization to file second or successive 2255 motion (See Dkt. #451 in CR–04–115–RAW and Dkt. #3 in CIV–19–152–RAW) (cjt, Deputy Clerk) (Entered: 06/13/2019) |
| 08/13/2019 | 488 | | ORDER by Judge Ronald A. White: denying 483 Petitioner's Motion to Alter or Amend Judgment, with the exception of the clarification described in the Order (cjt, Deputy Clerk) (Entered: 08/13/2019) |

| 10/07/2019 | 489 | | NOTICE OF APPEAL to Circuit Court (Re: 479 Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/07/2019) |
|---|---|---|---|
| 10/08/2019 | 490 | | Transmission of Notice of Appeal and Docket Sheet to U.S. Court of Appeals (Re: 489 Notice of Appeal – Final Judgment ) (With attachments)(jcb, Deputy Clerk) (Main Document 490 replaced on 10/10/2019) (jcb, Deputy Clerk). (Entered: 10/08/2019) |
| 10/08/2019 | 491 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 19–7049 (Re: 489 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 10/08/2019) |
| 10/21/2019 | 492 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |
| 10/21/2019 | 493 | | DESIGNATION of Record on Appeal (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
    *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
    *Respondent.*    )

**EXHIBIT 51**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Sequoyah - **County Last Updated: 06/08/2009 17:00** |
| **Case:** | CF-98-00264A<br>STATE OF OKLAHOMA vs. REAL, KAREN JEAN |
| **Date Filed:** | 07/29/1998 |
| **Amount Owed:** | $0.00 (as of 06/08/2009 17:00) |

## OFFENSES

MANUFACTURING CDS
TRAFFICKING IN METHAMPHETAMINE
UNLAWFUL USE OF POLICE RADIO
UNLAWFUL POSSESSION OF CONTROLLED DRUG
UNLAWFUL POSSESSION OF PARAPHERNALIA

## Parties

| | |
|---|---|
| Defendant | REAL, KAREN JEAN |
| Agency | SALLISAW POLICE DEPT. - SALLISAW OK |
| Judge | GARRETT, JOHN C. |
| Officer | OWEN, TY |
| DA | COWAN, ROBBIE |

## Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 07/29/1998 | FILE, ENTER, RECORD INFORMATION | $103.00 |
| | (Entry with fee only) | $3.00 |
| | (Entry with fee only) | $5.00 |
| | (Entry with fee only) | $7.00 |
| | (Entry with fee only) | $25.00 |
| | BOND FEE | $10.00 |
| 07/29/1998 | CM: DMS ARR PASSED TO 8-12 FOR ATTY. 28-94 | |
| 08/10/1998 | APPL FOR COURT APPT ATTY-PD FEE | $40.00 |
| 08/12/1998 | CM: DMS ARR PASSED TO 8-19 FOR ATTY. 28-106 | |
| 08/18/1998 | APPL FOR COURT APPT ATTY-FEE PD ABOVE | |
| 08/19/1998 | CM: DMS HUNTER APPT, DEF PLEAD NOT GUILTY, LAB SET FOR 11-5. 28-111 | |
| 11/05/1998 | CM: DMS LAB PASSED TO 1-21-99. 28-163 | |
| 01/21/1999 | CM: DMS DEF FAILING TO APP B/W B/F ALLOWED, NEW BOND DOUBLE THAT OF OLD. 29-13 | |
| 06/01/1999 | BOND-ALLLCORN-$48000 (4 SEPARATE BONDS) | |
| 06/01/1999 | ORDER OF RELEASE FROM CUSTODY | |
| 06/07/1999 | BW ISSUED | $20.00 |
| | (Entry with fee only) | $5.00 |
| 06/09/1999 | CM: DMS B/W B/F RECALLED AND SET ASIDE, DEF TO APPEAR 6-23. 29-110 | |
| 06/10/1999 | ORDER TO WITHDRAW WARRANT | |

| Date | Description | Amount |
|---|---|---|
| 07/09/1999 | BW RETURNED | |
| 05/18/2004 | MOTION TO DISMISS | |
| 05/24/2004 | ORDER | |
| 05/24/2004 | CM: JCG CASE DISMISSED. 35-202 | $-113.00 |
| | (Entry with fee only) | $-3.00 |
| | (Entry with fee only) | $-7.00 |
| | (Entry with fee only) | $-25.00 |
| | (Entry with fee only) | $-25.00 |
| | (Entry with fee only) | $-5.00 |
| **Total:** | | **$40.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 11/05/1998 | | Date Action: HEARING DATE |
| 06/07/1999 | | Date Action: ISSUE BENCH WARRANT Completed : 06/10/1999 |
| 06/10/1999 | | Date Action: ORDER TO WITHDRAW BENCH WARRANT |
| 05/24/2004 | | Date Action: ST DISMISSED/SETTLED |

| Date: | Receipts: | Amount: |
|---|---|---|
| 08/10/1998 | R1-008767 REAL, KAREN JEAN | $40.00 |

49

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 52**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# ON DEMAND COURT RECORDS

## CASE DETAIL

| | |
|---|---|
| **County:** | Sequoyah - **County Last Updated: 06/08/2009 17:00** |
| **Case:** | CF-97-00445A <br> STATE OF OKLAHOMA vs. REAL, KAREN JEAN |
| **Date Filed:** | 12/22/1997 |
| **Amount Owed:** | $0.00 (as of 06/08/2009 17:00) |

## OFFENSES

ATTEMPTED MANUFACTURE
POSSESSION OF CD W/INTENT TO DISTRIBUTE
UNLAWFUL POSSESSION OF MARIHUANA
UNLAWFUL POSSESSION OF PARAPHERNALIA
UNLAWFUL POSSESSION OF CONTROLLED DRUG
UNLAWFUL POSSESSION OF CONTROLLED DRUG
UNLAWFUL POSSESSION OF PARAPHERNALIA

## Parties

| | |
|---|---|
| Defendant | REAL, KAREN JEAN |
| Officer | RIDINGER, CINDY |
| DA | TEAGUE, FAYE |

## Case Entries

| Date: | Case Entries | Amount |
|---|---|---|
| 12/15/1997 | ORDER OF RELEASE FROM CUSTODY | |
| 12/15/1997 | BOND-DAGGS-$20000 | |
| 12/22/1997 | INFORMATION | |
| 12/22/1997 | AFFIDAVIT | |
| 12/23/1997 | CM: DMS ARR PASSED TO 1-7 FOR ATTY. 27-212 | |
| 01/07/1998 | CM: DMS DEF APP W/O COUNSEL, REMANDED TO JAIL. 27-221 | |
| 01/12/1998 | APPL FOR COURT APPT ATTY-APPROVED HUNTER | $40.00 |
| 01/14/1998 | CM: DMS HUNTER APPT, DEF PLEAD NOT GUILTY, LAB SET FOR 4-2; PREV BOND ALLOWED TO STAND, DEF RELEASED FROM CUSTODY. 27-226 | |
| 04/02/1998 | CM: DMS DISPO PASSED TO 4-16. 28-12 | |
| 04/16/1998 | CM: DMS LAB PASSED TO 5-21. 28-22 | |
| 05/21/1998 | CM: DMS DISPO SET FOR 7-1 AT 1030 AM. 28-47 | |
| 07/01/1998 | CM: DMS DEF APP W/ATTY HUNTER, WAIVED PREL, DCA SET FOR 8-13 AT 130 PM BEFORE JCG. 28-75 | |
| 07/01/1998 | WAIVER OF PREL HEARING-DCA SET FOR 8-13 AT 1:30 JCG | |
| 07/20/1998 | BOND-DAGGS-$25000 | |
| 07/20/1998 | ORDER OF RELEASE FROM CUSTODY | |
| 07/22/1998 | CM: DMS ARR PASSED TO WED. 28-91 | |
| 08/13/1998 | CM: JCG STATE BY S.BARNES DEF. W/G.HUNTER PASSED TO 11/5 FOR DCA AND/OR PLEA. 28-107 | |
| 11/23/1998 | CM: DMS PREL PASSED TO 1-19. 28-174 | |

| | | | |
|---|---|---|---|
| 03/11/1999 | CM: DMS PREL PASSED TO 4-15 AT REQ OF BAKER 09/47 | | |
| 05/18/2004 | MOTION TO DISMISS | | |
| 05/24/2004 | ORDER | | |
| 05/24/2004 | CM: JCG CASE DISMISSED. 35-202 | | $-40.00 |
| **Total:** | | | $0.00 |

| Date: | Time: | | Calendar Events: |
|---|---|---|---|
| 08/13/1998 | 1:30P | | Date Action: DISTRICT COURT ARRAIGNMENT |
| 11/05/1998 | | | Date Action: DISTRICT COURT ARRAIGNMENT |
| 01/19/1998 | | | Date Action: PRELIMINARY HEARING |
| 05/24/2004 | | | Date Action: ST DISMISSED/SETTLED |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
        *Movant,*    )
    )
v.    )     **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
        *Respondent.*  )

---

**EXHIBIT 53**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Exhs. § 2255 Amended Motion        *U.S. v. Barrett*, 6:09-cv-00105-JHP

ORIGINAL

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

FILED
SUPREME COURT BAR DOCKET
STATE OF OKLAHOMA

SEP 1 4 2009

MICHAEL S. RICHIE
CLERK

| | | |
|---|---|---|
| STATE OF OKLAHOMA ex rel. | ) | |
| Oklahoma Bar Association | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | OBAD No. 1729 |
| | ) | SCBD No. 5338 |
| DAVID M. LITTLEFIELD | ) | |
| | ) | |
| Respondent | ) | |

ORDER

On consideration of the paperwork on file, the court adopts the findings, conclusions and recommendations made by the trial panel of the Professional Responsibility Tribunal that declare respondent violated Rule 8.4(b), Oklahoma Rules of Professional Conduct, 5 O.S. § 2001, Ch. 1, App. 3-A, and Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S. § 2001, Ch. 1., App. 1-A.

Respondent has not been previously disciplined for professional misconduct. There is no evidence to suggest respondent ever followed a pattern of misconduct or of child abuse. For these reasons the parties recommend a private reprimand be imposed as disciplinary sanction.

1

*It is therefore ordered that the* respondent be privately reprimanded.  Costs in the case and all the expenses incurred herein for investigation, record and proceedings in the total sum of $925.67 stand assessed against the respondent.  He shall remit this sum in full on or before Oct. 15, 2009.   To receive the court's private reprimand respondent shall appear before the court (with counsel of record) when sitting en banc in its conference room at the State Capitol, at *10 : 00* a.m./p.m., on the 22nd day of October, 2009.

DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE THIS 14th DAY OF SEPTEMBER, 2009.

_____
CHIEF JUSTICE

Edmondson, C.J., Hargrave, Opala, Kauger, Watt, Winchester, Colbert and Reif, JJ., concur

Taylor,V.C.J., dissenting

I would impose a harsher discipline.

2

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 54**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF SUSAN OTTO

I, Susan Otto, declare the following:

I am the Federal Defender for the Western District of Oklahoma. I am admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. The Federal Public Defender Organization for the Western District of Oklahoma, through the Capital Habeas Unit, provides representation to qualified inmates on Oklahoma's death row who are seeking habeas corpus review in the Western, Northern, and Eastern Districts of Oklahoma. In accordance with our Criminal Justice Act Plan, we maintain a list of attorneys who have been approved by a selection committee and the United States District Judges as qualified to serve as counsel in capital habeas cases initiated pursuant Title 28, United States Code, Section 2254. This listed is referred to in the Plan as the Special Death Penalty Habeas Corpus Panel.

I am familiar with certain issues surrounding the appointment of counsel for the federal capital trial of Kenneth Eugene Barrett. At the time Mr. Barrett was charged in federal court, the Federal Defender for the Northern and Eastern Districts was Paul Brunton. Julia O'Connell was one of the Assistant Federal Public Defenders in Mr. Brunton's office. It was my understanding Mr. Brunton's office was not able to accept the appointment in Mr. Barrett's case because of its prior appointment in *United States v. Fields*, a federal capital prosecution initiated in the Eastern District of Oklahoma.

1

United States District Judge James H. Payne, who was presiding in Mr. Barrett's case, contacted me. Mr. Brunton referred Judge Payne to me because I had access to the list of capital habeas panel attorneys. To my knowledge, Judge Payne did not consult with the Administrative Office of the United States Courts or with federal capital resource counsel either before or after contacting me.

I told Judge Payne there were two attorneys in Oklahoma who were qualified by specific experience to serve as lead counsel in a federal capital case. My opinion was based on my personal knowledge of the attorneys' experience, the general criteria contained in Title 18, United States Code, Section 3005, and the ABA Standards for Appointment of Counsel in Capital Cases. Both of the attorneys were members of the Special Death Penalty Habeas Corpus Panel, but also had direct experience in litigating capital cases initiated under the procedures specific to federal prosecutions.

I knew Robert Nigh Jr. had been one of the attorneys in *United States v. Timothy McVeigh*, the federal capital prosecution resulting from the bombing of the Alfred P. Murrah Building in Oklahoma City. Also, Mr. Nigh represented Cody Glover in a capital case filed in Kansas. That case was resolved without a trial. *United States v. Cody D. Glover*, Dist. Kansas No. 6:98-cr-10059-MLB. Based on Mr. Nigh's experience, I considered him "learned in the law applicable to capital cases" and thus qualified to serve as lead counsel in Mr. Barrett's case. Mr. Nigh's office was located in Tulsa, Oklahoma.

2

I knew Gary Peterson had tried a federal capital case filed in Kansas. *United States v. Bountaem Chanthadara,* Dist. Kansas No. 6:94-cr-10128-MLB. Mr. Peterson successfully represented Mr. Chanthadara on appeal. *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000). *Chanthadara* was Mr. Peterson's second successful appeal in a federal capital prosecution. Mr. Peterson represented John Javilo McCullah, who was convicted and sentenced to death in Eastern District of Oklahoma Case Number CR-92-32-S. Mr. McCullah's death sentence was reversed and the case was remanded by the Tenth Circuit. Mr. Peterson continued his representation of Mr. McCullah. The case was resolved without a retrial. In addition to the federal capital prosecutions, Mr. Peterson had considerable experience in capital litigation through his representation of Oklahoma death row inmates in post conviction representation. I believed Mr. Peterson was "learned in the law applicable to capital cases" and was qualified to serve as lead counsel in Mr. Barrett's case. Mr. Peterson's office was located in Oklahoma City, Oklahoma.

I recall Judge Payne expressed his desire to appoint a lawyer or lawyers from the Eastern District. None of the attorneys on the list of qualified capital habeas panel attorneys were from the Eastern District.

I suggested to Judge Payne that he could appoint John Echols of Tulsa, Oklahoma. Mr. Echols represented Mr. Barrett in two of the state court prosecutions and would have been familiar with the case. I knew under federal law Mr. Barrett was entitled to at least two

3

attorneys. I felt it was feasible to pair Mr. Echols with an attorney experienced in federal court practice.

During my conversations with Judge Payne, he seemed reluctant to appoint Mr. Echols, but eventually he did so. Roger Hilfiger, a former United States Attorney practicing in Muskogee, Oklahoma, was appointed co-counsel. I did not suggest Mr. Hilfiger's appointment to Judge Payne. It is my understanding Mr. Echols withdrew from representing Mr. Barrett over funding issues. It is also my understanding that after Mr. Echols was permitted to withdraw, Mr. Hilfiger was elevated to first chair and a Muskogee attorney, Brett Smith, was appointed second chair. After Mr. Echols withdrew from the case, I was not consulted by Judge Payne with respect to the appointment of substitute counsel.

Another option that could have been pursued was the appointment of counsel from another Federal Public or Federal Community Defender office. Several offices had attorneys who were experienced in federal capital litigation, including the Federal Public Defender in Los Angeles and the Federal Community Defender in San Diego. In light of Judge Payne's desire to appoint counsel from the Eastern District of Oklahoma, this option was not discussed.

My next contact with Judge Payne about this case occurred when lawyers were needed to represent Mr. Barrett in his post conviction motion pursuant Title 28, United States Code, Section 2255. Judge Payne reminded me of the fact I had recommended John Echols as trial counsel, and that my suggestion did not work out. I told Judge Payne I believed two

4

experienced lawyers in capital litigation needed to be appointed. My opinion was based on the statutory language guaranteeing "one or more attorneys" to represent a capital defendant in post conviction review. 21 U.S.C. §§ 841(q)(4)(B), (q)(5), and (q)(7); *recodified as* 18 U.S.C. §§ 3599(a)(2), (c), and (d). Judge Payne broached the idea of appointing an inexperienced lawyer who practiced in the Eastern District as second chair counsel. Judge Payne expressed the idea the lawyer could "train" on Mr. Barrett's case and then be available for future capital appointments in the Eastern District.

In my discussions with Judge Payne regarding the appointment of counsel for Mr. Barrett, whether at the trial level or in subsequent litigation, he consistently expressed his desire to appoint counsel from the Eastern District of Oklahoma.

I declare under penalty of perjury that the foregoing five page declaration is true and correct.

Executed by me this 8th day of September, 2009, in Oklahoma City, Oklahoma County, Oklahoma.

Susan M. Otto
Federal Public Defender
Western District of Oklahoma

5

60

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

---

**EXHIBIT 55**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# DECLARATION OF BILL SHARP, Ph.D.

I, Bill Sharp, declare the following:

1.      I am a licensed clinical psychologist practicing in Norman, Oklahoma. An attorney representing Kenneth Barrett has asked me to give this account of my past involvement in Mr. Barrett's case, and my opinion regarding mitigation evidence that could have been presented on his behalf.

2.      In 2002, when Mr. Barrett was facing murder charges in Sequoya County, the Oklahoma Indigent Defense System ("OIDS") asked me to evaluate Mr. Barrett. I was not referred a specific question from OIDS; it was a general request to perform an assessment of Mr. Barrett. John Echols represented Mr. Barrett at the time. I conducted an assessment of Mr. Barrett in the Sallisaw Courthouse on September 28, 2002. The assessment included an interview with Mr. Barrett and the administration of psychological tests. I interviewed Mr. Barrett a second time before the second trial, and also spoke with Mr. Barrett's father in person, and another relative by telephone.

3.      Mr. Barrett first impressed me with his paranoia. I have conducted many assessments of defendants in criminal cases. In all these forensic evaluations, Mr. Barrett stands out as my most suspicious client. He would not consent to the interview until he had proof that I was there on behalf of his defense lawyers and not for some subversive reason. Mr. Barrett first asked a deputy whether he could call Mr. Echols on the telephone, then agreed to set aside his concerns and proceed when I offered to provide a copy of my contract with OIDS. Mr. Barrett was cooperative after expressing his suspicions, and became more comfortable and open on a second interview, although he remained guarded and suspicious.

4.      In response to my questions, Mr. Barrett gave me basic information about his physical condition. This included explaining that scars on his chest and back were from a self-inflicted shotgun wound, and other scars on his chest and hip were from being shot by others. Mr. Barrett also related some of his personal history such as his place of birth, age, that he had two younger brothers, and that

Decl. Bill Sharp, Ph.D.                                                               Page 1 of 6

62

his parents divorced when he was 13 years old. Mr. Barrett told me that he had been married and had one son.

5. Mr. Barrett was tentative and had difficulty recalling information about his education. He described a history of moving from state to state and changing schools in the process. He related that he repeated the eighth grade and attended special education classes in that grade. Mr. Barrett stated that he left school in the ninth grade, during which he was enrolled in school in Indiana.

6. Mr. Barrett also experienced difficulty recalling his work history. He was able to tell me that he began working as a farm hand in Indiana at age 14, that he worked on framing houses for a construction company, worked on oil pipelines and as a roughneck, and finally as a mechanic. He could not account for all the time between leaving school and his circumstances prior to his arrest.

7. Mr. Barrett's ability to recall his medical history was similarly spotty. He did relate to having been in an automobile accident, and to being prescribed the psychotropic medication Elavil for depression following his attempt at suicide.

8. Mr. Barrett related that he was facing charges of first degree murder and attempted murder. He said that his prior legal history included driving under the influence and traffic violations.

9. Mr. Barrett related that he started drinking alcohol at age 11 and had "lots of trouble" with it before giving it up in 1992. He related that alcohol contributed to problems with his former wife. Mr. Barrett also described extensive, daily use of Cannabis which began with experimentation at age 14. His drug history also was notable for differential use of "uppers and downers." His use of "downers" included Tuinal, Placidyl, and combining Valium with alcohol and other drugs. He also acknowledged using cocaine and PCP. He was a heavy smoker.

10. Mr. Barrett informed me that there was a family history of depression, substance abuse, and mental illness. He related that he had been described as "hyper" throughout his life, and, while denying paranoia, acknowledged being suspicious of the motives of others.

Decl. Bill Sharp, Ph.D.

Page 2 of 6

11.    With the exception of the memory problems to which I have referred, which were more serious, I found Mr. Barrett minimally impaired on a basic mental status examination. He was oriented to person, place, time and situation. He showed some impairment in attention, concentration, and ability to calculate. He could recall two of three items in a test of short-term memory. He had no discomfort or insight regarding his long-term memory problems.

12.    Data from Mr. Barrett's self-report form were consistent with his presentation on clinical interview. He was fearful, paranoid, had difficulty concentrating, was uneasy about others, and disordered in his thinking.

13.    My diagnostic impressions of Mr. Barrett were of a person with multiple chemical dependency problems that were in remission while he remained in a controlled environment. I found he had an unspecified learning disorder, and attention deficit/hyperactivity disorder ("ADHD"), of a predominantly hyperactive and impulsive type. He met the criteria for avoidant personality disorder and paranoid personality disorder. I assessed his global functioning at 45, indicating that in his then current state he was experiencing serious impairment in his daily functioning.

14.    During my assessment of Mr. Barrett, I observed a tremor in his hands and he complained of a buzzing in his ears that interfered with his hearing. He also showed significant difficulty with long-term memory of times and events. Based on my findings, I recommended that Mr. Barrett undergo an evaluation for organic neurological damage. I also recommended further mental health treatment.

15.    After I performed my assessment of Mr. Barrett, his attorneys asked me to work with them in the event Mr. Barrett was convicted of first degree murder and faced a trial over the imposition of the death penalty. I consulted with Mr. Echols and Jack Gordon, who also represented Mr. Barrett during his second trial. As I've mentioned, I met with Mr. Barrett one more time, spoke with his father, and another relative. My recollection is that I was asked to update my prior assessment, and that no

Decl. Bill Sharp, Ph.D.

Page 3 of 6

further work was contemplated by the lawyers.

16. After the jury acquitted Mr. Barrett of murder and convicted him of manslaughter, my involvement in the case came to an end. In 2005 someone asked me to fax my report. I had no conversations with Mr. Barrett's lawyers or any experts working with them. The next contact I had with a representative of Mr. Barrett's legal team was in 2008 when I was asked for my file on Mr. Barrett. After providing my records, in 2009, I was asked to review the declarations of Myla Young, Ph.D., and George W. Woods, M.D., and more detailed information about Mr. Barrett's family history and personal history than I had during the earlier proceedings.

17. On reviewing the social history data I was struck by the level of impairment family members saw in Mr. Barrett's mother and father. As I've indicated I had been aware that there were substance abuse problems in the family, but I did not have as complete a picture from longtime observers of the parents' functioning. The impact of alcoholism and mental illness on the parents, and therefore on Mr. Barrett during his formative years, was much worse than I knew. Alcohol use by a mother is known to impact brain development, including by leading to a lack of attention, neglect and abnormal attachment during infancy and childhood.

18. I also was struck by the prevalence of mental illness in the family, especially bipolar disorder. I had seen impulsivity in Mr. Barrett, and in his personal history. Impulsivity appears to have significantly hurt Mr. Barrett, particularly in his decision-making.

19. Dr. Young's declaration indicates she performed a thorough neuropsychological evaluation of Mr. Barrett. This evaluation is generally the type of evaluation I recommended in my report in 2002. Dr. Young's findings are consistent with my own, but also add to them. We agree that Mr. Barrett is impaired in his abilities to attend to information, take that information in, and respond appropriately. The additional data regarding the mother's drinking in combination with scores on intelligence testing, the ADHD I saw in my assessment, and bipolar disorder are features seen in the

Decl. Bill Sharp, Ph.D.                                                                 Page 4 of 6

spectrum of symptoms one associates with Fetal Alcohol Syndrome. While I do not find Mr. Barrett meets the diagnostic criteria for FAS, it is likely that his relatively poor performance on some measures of intelligence, his difficulty with attention and switching, and the features of bipolar disorder seen in his life are related to prenatal exposure to alcohol.

20. I find Dr. Young's findings regarding Mr. Barrett's frontal and limbic functioning to be significant for an understanding of his conduct. His functioning on neuropsychological tests indicates that on his best day, Mr. Barrett is a poor planner. But there were a whole constellation of factors that would make the effects that underlying organic damage much worse. Mr. Barrett is paranoid and any planning in relation to other people would be affected by this distorted, fearful view of others' motives. Mr. Barrett also engaged in dangerous substance abuse, including the use of methamphetamine which can increase unwarranted feelings of suspicion and anxiety. In addition, Mr. Barrett suffers from bipolar disorder which leads to taking on unrealistic goals, or feeling capable, when in an elevated state, of carrying out tasks one could not accomplish.

21. Mr. Barrett's isolation is significant for understanding his functioning and ability to interact with the world. Mr. Barrett had been by a law enforcement officer, Sheriff Johnny Philpot, who was a large presence in the community. Mr. Barrett could hardly go into town without running into Sheriff Philpot or one of his men.

22. I am familiar with the facts of the case being a midnight raid by Oklahoma Highway Patrol on Mr. Barrett's cabin while Mr. Barrett's teenage son and himself were present. Taking this information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be

Decl. Bill Sharp, Ph.D.                                                                 Page 5 of 6

magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

23. Dr. Woods' diagnoses fit the data on Mr. Barrett and my own observations. In any case involving possible diagnoses of bipolar disorder and methamphetamine or alcohol abuse, one has to consider the overlap of sequelae. At different times, Mr. Barrett may have satisfied the diagnostic criteria for bipolar disorder, ADHD, anxiety and depressive disorder. However, at the time I saw Mr. Barrett in 2002 and 2004, he had been incarcerated for three to four years and therefore relatively free from the affects of elicit substances. Dr. Woods and Dr. Young saw Mr. Barrett at an even greater distance from his substance abuse. The observations of family members and clinicians over time support the conclusion that Mr. Barrett's cycling through periods of elevated mood and activity interspersed with periods of depression and inactivity is due to bipolar disorder and not the affects of drugs or alcohol.

I declare, under penalty of perjury, as provided in the laws of the United States, that the foregoing six-page declaration is true and correct.

Executed by me this 21st day of September 2009 in Tulsa County, Oklahoma.

BILL SHARP, Ph.D.

Decl. Bill Sharp, Ph.D.                    Page 6 of 6

67

## DECLARATION OF DR. JEANNE RUSSELL

I, Jeanne Russell, declare the following:

I have a doctorate degree in education and counseling psychology, and am in private practice in Tulsa, Oklahoma. In the past and currently, I have consulted with counsel in capital murder cases as an expert witness, and have testified as an expert witness to my examination of capital clients in the state courts of Oklahoma.

In 2002 I was retained as an expert witness by the defense to conduct a risk assessment of Kenneth Eugene Barrett in connection with his state case in Sequoyah County, Oklahoma. A risk assessment, such as I performed on Mr. Barrett, involves a systematic review of past aggressive behavior, including the surrounding circumstances, and the use of testing instruments that are used to predict the likelihood of the subject being future danger to himself or others. That was the focus of my assessment. I did not evaluate Mr. Barrett's

1

neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment. The instruments I used were solely for the purpose of conducting this assessment.

In 2003 I evaluated Mr. Barrett and wrote a report of my findings, which was provided to the lawyers who represented Mr. Barrett in the Oklahoma state courts.   I did not have to testify in the state case because Mr. Barrett was acquitted of first degree murder, and there was no penalty phase.

In mid-August, 2005, I received a telephone call from Bret Smith who introduced himself to me as an attorney representing Mr. Barrett in a federal criminal trial arising out of the same incident that was the subject of the state trial.   He said the federal defense lawyers wanted to use me as a mitigation investigator for the federal trial.   Based on my involvement in other capital cases, I informed Mr. Smith there was not time to complete a mitigation investigation, and as a

2

doctor of education and not a mitigation investigator I was not in a position to perform that role.

Mr. Smith asked me for a copy of my report on Mr. Barrett, indicating that he did not have a copy at the time. He asked that I help with the federal case. I informed him I could not conduct a new evaluation but could provide a copy of my previous data as there was not sufficient time or financial resources available for a new report and testimony. Mr. Smith sent me a follow-up letter dated August 16, 2005, regarding our telephone conversation. I understood at the time that Mr. Barrett's trial was then less than one month away. After our initial contact, I had several brief telephone conversations with Mr. Smith, and he came to my office on one occasion and discussed the case with me.

Subsequent to our discussion, I updated the risk assessment previously conducted on Mr. Barrett in connection with his state case. The report I signed on September 15, 2005 was mostly

3

based on the records from the 2003 assessment.  In addition, I conducted some research on the effects of trauma on memory. It was my understanding that the prosecution would call an expert witness in this regard to explain gaps and inconsistencies in the testimony of law enforcement officers who participated in the raid on Mr. Barrett's house and rebuttal testimony may be required.  This was the extent of my "investigation."

I was not called to testify at the federal trial.  I am not certain why I was not called to testify, but my impression was that the defense did not want to "open the door" to rebuttal testimony from Dr. Randal Price, who did a risk assessment for the government.

It is my understanding that I was approved to conduct this evaluation primarily because I had worked on the state case, and therefore would not have to bill many hours.  Mr. Smith informed me that there would be no approval for a

4

comprehensive mitigation investigation, even if there was time to do one, and even if I was qualified to do such an investigation.   Bret Smith told me that the court provided very limited resources to the defense for the purpose of hiring experts or investigators.

From my work in the state case, I had various materials relating to Mr. Barrett's background.   Based on Mr. Smith's comments and his description of materials he had, it is my belief that the federal attorneys did not have access to much of the material, including interviews of background witnesses that had been done in connection with the state prosecution.

In my experience in capital cases mitigation investigation and evaluation includes extensive interviewing, assessment and preparation.   The mitigation investigator or investigators usually begin early in the case and gather educational, social, medical, jail, prison, psychological and other pertinent records on the client and his family.   The client's background and

5

family history are also thoroughly investigated.   This did not occur in Mr. Barrett's 2005 case for the reasons previously expressed.    As stated, I did not perform such an investigation in connection with Mr. Barrett's federal case, and was not capable of performing or qualified to perform such an investigation, even if I had been approached immediately after Mr. Barrett was charged in federal court.

I have been informed that as a result of the investigation done following Mr. Barrett's conviction in federal court, evidence has been uncovered that Mr. Barrett has been diagnosed with bipolar disorder, and on neuropsychological tests shows impairment in his prefrontal and temporal cortices. I have been told that family and friends described him as mentally ill and paranoid.

I did not write this declaration.   The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, during telephone

6

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
                                 )
                 *Movant,*     )
                                 )
v.                               )          **Case No. 6:09-cv-00105-JHP**
                               )
UNITED STATES OF AMERICA,   )
                                 )
            *Respondent.*  )

---

**EXHIBIT 56**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

conversations and an in-person interview I had with him.    I have carefully reviewed this declaration, and it says what I told Mr. Autry during our conversations.

I declare, under penalty of perjury, that the foregoing 1-page declaration is true and correct.

Executed by me this 23 day of ___September___, 2009, in __Tulsa_____ County, Oklahoma.

_____Ed.D
Dr. Jeanne Russell, Ed.D.

7

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 57**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---



# CASE DETAIL

| County: | Cherokee - **County Last Updated: 09/21/2009 14:00** |
|---|---|
| Case: | CF-98-00111     ☑ Track this case<br>STATE OF OKLAHOMA vs. SANDERS, CHARLES EDMOND |
| Date Filed: | 04/22/1998 |
| Amount Owed: | $0.00 (as of 09/21/2009 14:00) |

# OFFENSES

UTTERING A FORGED INSTRUMENT
UTTERING A FORGED INSTRUMENT
UTTERING A FORGED INSTRUMENT
UTTERING A FORGED INSTRUMENT
UTTERING A FORGED INSTRUMENT
UTTERING A FORGED INSTRUMENT

| Parties | | |
|---|---|---|
| Attorney | COWAN, ROBBIE | |
| Defendant | SANDERS, CHARLES EDMOND - OOLOGAH OK | ☑ Track this person |
| Judge | DOBBINS, MARK L. - TAHLEQUAH OK | |
| DA | MEDEARIS, FRANK - TAHLEQUAH OK | |

| Case Entries | | |
|---|---|---|
| **Date:** | **Case Entries** | **Amount** |
| 04/22/1998 | INFORMATION | $95.00 |
| | (Entry with fee only) | $5.00 |

http://www1.odcr.com/detail.php?Case=011-CF%20%209800111&County=011-  9/21/2009

| | | |
|---|---|---|
| | (Entry with fee only) | $3.00 |
| | (Entry with fee only) | $7.00 |
| | (Entry with fee only) | $25.00 |
| 04/22/1998 | AFFIDAVIT FOR PROBABLE CAUSE | |
| 04/22/1998 | WARRANT OF ARREST ISSUED | $20.00 |
| 04/29/1998 | PERSONAL RECOGNIZANCE | |
| 05/15/1998 | ORDER: DEF FTA B/F B/W $10,000 BOND | |
| 05/15/1998 | BENCH WARRANT ISSUED | $20.00 |
| | (Entry with fee only) | $5.00 |
| 05/22/1998 | WARRANT RECALL NOTICE | |
| 05/22/1998 | ORDER: DEF IS ORDERED BACK JUNE 1,1998 AT 9:00 A.M. | |
| 05/27/1998 | BENCH WARRANT RETURNED RECALLED | |
| | WARRANT OF ARREST RETURNED RECALLED | |
| 06/01/1998 | AMENDED INFORMATION | |
| 06/01/1998 | SECOND PAGE INFORMATION | |
| 06/02/1998 | ORDER: DEF ENTERS A PLEA OF NOT GUILTY, DEF IS ORDERED | |
| | BACK JULY 6,1998 AT 9:00 A.M. | |
| 07/07/1998 | ORDER: PASSED TO AUG. 3, 1998 AT 9:00AM | |
| 08/06/1998 | ORDER: HEARING RESET FOR OCT. 5, 1998 AT 9:00AM | |
| | SOUNDING DOCKET | |
| 08/20/1998 | SECOND AMENDED INFORMATION | $475.00 |
| | (Entry with fee only) | $50.00 |
| | (Entry with fee only) | $15.00 |
| | (Entry with fee only) | $35.00 |
| | (Entry with fee only) | $125.00 |
| 10/07/1998 | ORDER: DEF FTA B/F B/W $15,000 BOND | |
| 10/07/1998 | BENCH WARRANT ISSUED | $20.00 |
| | (Entry with fee only) | $5.00 |
| 02/02/1999 | BENCH WARRANT RETURNED | |
| 02/02/1999 | ORDER OF RELEASE | |
| 02/02/1999 | APPEARANCE BOND | $10.00 |
| 02/03/1999 | ORDER: BOND REDUCED ON DEF.'S MOTION COURT NOTES STATES | |
| | OBJECTION | |

| Date | Description | Fee |
|---|---|---|
| 02/25/2000 | NOTICE TO DEFT.,ATTY. OF RECORD AND BONDSMAN | |
| 03/24/2000 | CM: 3-20-00 DEFENDANT FAILED TO APPEAR, BOND FORFEITED, | |
| | BENCH WARRANT GBS | |
| 03/31/2000 | BENCH WARRANT ISSUED | $30.00 |
| | (Entry with fee only) | $5.00 |
| 04/05/2000 | ORDER AND JUDGMENT OF FORFEITURE | |
| 04/12/2000 | CERTIFICATE OF MAILING (FORFEITURE) | |
| 04/27/2000 | CERT. CARD RETURNED SIGNED R.ALLCORN | |
| | CERT. CAD RETURNED SIGNED G. LEBOEUF | |
| 07/13/2000 | ORDER: RECALL BENCH WARRANT 8-8-00 AT 1:00 | |
| 07/13/2000 | WARRANT RECALL NOTICE | |
| 08/17/2000 | ORDER: I.A. 8-29-00 AT 1:00 P.M. | |
| 10/27/2000 | BENCH WARRANT RETURNED RECALLED | |
| 05/03/2001 | ORDER RELEASING BONDSMAN | |
| 10/22/2008 | MO 10-21 $250 CASH BOND; RB 10-24-08 @ 9 MLD | |
| 10/28/2008 | MO 10-28 DEF PNG; PURSLEY FSD 11-24-08 @ 9 MLD | |
| 11/25/2008 | MO 11/24/08;BWUA DEF'S BONDSPERSON R.ALLCORN CALLED TO | |
| | INFORM THE COURT THAT DEF HAS EYE SURGERY AND COULD NOT | |
| | TRAVEL FOR 10 DAYS;DEF ORDERED TO APPEAR W/NOTE FROM DR | |
| | AND SIGN THIS MINUTE W/I 10 DAYS OF THIS MINUTE | |
| | 12-22-08 AT 9;00AM.HP | |
| 12/23/2008 | MO 12/22/08;DEF PRESENT W/O HIS ATTY ROB COWEN;CASE | |
| | RESET TO FSD 1-26-09 AT 9;00AM.HP | |
| 01/30/2009 | MO 1/26/09;DEF'S ATTY CALLED AND IN JURY TRIAL;FSD | |
| | 2-23-09 AT 9;00AM.HP | |
| 02/12/2009 | MOTION FOR CONTINUANCE | |

| | | |
|---|---|---|
| 02/12/2009 | ORDER FOR CONTINUANCE | |
| 03/24/2009 | MO 3/23/09;REVIEW RESTITUTION STATUS 5-28-09 AT | |
| | 9;00AM.HW | |
| 05/29/2009 | MO 5/28/09;PASSED AT REQUEST OF DEF ATTY ROB | |
| | COWEN;6-25-09 AT 9;00AM;MLD | |
| 06/25/2009 | MOTION FOR CONTINUANCE | |
| 06/29/2009 | ORDER FOR CONT; 7-29-09 1:30 -HW | |
| 06/29/2009 | MO 6/25/09;7-29-09 AT 1;30PM.HW | |
| 07/29/2009 | MO 7/29/09;DISMISSED ON COSTS OF $229; (REDUCED TO MISD | $-700;00 |
| | COSTS);PYMNT TO BEGIN ON 9-1-9 AT $50/M. $132.50 | |
| | RESITITUION FROM CF-09-111 DUE IN 30 DAYS. MLD | |
| **Total:** | | **$250.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 05/05/1998 | | Date Action: DOCKET-DOBBINS |
| 05/15/1998 | | Date Action: BENCH WARRANT: FAILURE TO APPEAR Completed : 05/27/1998 Code: R |
| 05/22/1998 | | Date Action: WARRANT RECALLED |
| 06/01/1998 | | Date Action: DOCKET-DOBBINS |
| 07/06/1998 | | Date Action: DOCKET-DOBBINS |
| 08/03/1998 | | Date Action: DOCKET-DOBBINS |
| 10/05/1998 | | Date Action: FEL SD-DOBBINS |
| 10/07/1998 | | Date Action: BENCH WARRANT: FAILURE TO APPEAR Completed : 02/02/1999 Code: R |
| 03/20/2000 | 10:00A | Date Action: XX-DOCKET-SEWELL |
| 03/31/2000 | | Date Action: BENCH WARRANT: FAILURE TO APPEAR Completed : 07/13/2000 Code: X |
| 08/29/2000 | | Date Action: INITIAL APPEARANCE |
| 10/24/2008 | 9:00A | Date Action: DOCKET-DOBBINS |
| 11/24/2008 | | Date Action: WELLS-FELSD |
| 12/22/2008 | | Date Action: WELLS-FELSD |
| 01/26/2009 | | Date Action: WELLS-FELSD |

| 02/23/2009 | | Date Action: WELLS-FELSD Completed : 02/12/2009 Code: X |
| --- | --- | --- |
| 03/23/2009 | | Date Action: WELLS-FELSD |
| 05/28/2009 | | Date Action: WELLS-MISD/TRAF DKT. |
| 06/25/2009 | | Date Action: WELLS-MISD/TRAF DKT. |
| 07/29/2009 | | Date Action: WELLS-1:30 PH DKT. |
| 07/29/2009 | | Date Action: REDUCED CHARGE |
| 07/29/2009 | | Date Action: ST DISMISSED |
| 07/29/2009 | | Date Action: CST;BEG$ Completed : 09/18/2009 Code: X |

| Date: | Receipts: | Amount: |
| --- | --- | --- |
| 10/22/2008 | R1-427183 SANDERS, CHARLES | $250.00 |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 59**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Exhs. § 2255 Amended Motion                                        *U.S. v. Barrett*, 6:09-cv-00105-JHP

SEQUOYAH COUNTY, OKLAHOMA

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 792 | STATE OF OKLAHOMA vs. Henry Edwards | Manslaughter | A.D.P.  J. M. McCombs |

| DATE 1925 | FILINGS, PROCEEDINGS AND RETURNS | Clerk's Costs Plaintiff | Clerk's Costs Defendant | Sheriff's Costs | Miscellaneous | Credits | Disbursements |
|---|---|---|---|---|---|---|---|
| 7 16 | To file Transcript Docket fee | 1 00 | | | | | |
| . 20 | To file Praec & Ins Summ   Reg Summ | 35 | | | 1 00 | | |
| x 7 | To file & Record Information | 95 | | | | | |
| 12 | To file & Record Verdict | 50 | | | | | |
| | | | | | Acquitted 9—11—25 | | |

SEP 30 1936

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

_____

**EXHIBIT 60**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

_____

# CRIMINAL APPEARANCE DOCKET

573

vised 1968)

| STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|
| State of Oklahoma | Cultivation of Mari | District Attorney |
| vs. Deborah Everly Marilyn Crawford | | For Defendant |

| Return Day____ 19___ Answer Day____ '19___ | ITEMS RECORDED Book \| Page | CLERK'S COSTS | SHERIFF'S COSTS | MISC. FEES | WITNESS FEES | DEPOSIT IN CASE | DISBURSED | BALANCE CASH ON HAND |
|---|---|---|---|---|---|---|---|---|
| Inf. | | | | | | | | |
| Minute- Defs. pres, St. J P Q, Refure 6 of Inf, bond set at | | | | | | | | |
| $000 each, Arraign passed to 6-1-77 at 1:30 P.M. | | | | | | | | |
| Bond (D.C.) Everly | 4 363 | | | | | | | |
| Bond (D.C.) Crawford | 34 364 | | | | | | | |
| Minute- Def. pres St J P Q, def pres w/ att. John Ayres, P.N.G, Pre. Hrg set | | | | | | | | |
| 6-17-77 at 10 A.M., bond lowered to $000 | | | | | | | | |
| Order dismissing | 4-H 77 | | | | | | | |

KEB503076

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 61**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

# ON DEMAND COURT RECORDS

## CASE DETAIL

| County: | Sequoyah - **County Last Updated: 03/13/2009 08:00** |
|---|---|
| Case: | CF-97-00086<br>STATE OF OKLAHOMA vs. BARRETT, KENNETH EUGENE |
| Date Filed: | 03/24/1997 |
| Amount Owed: | $0.00 (as of 03/13/2009 08:00) |

## OFFENSE

UNLAWFUL DELIVERY OF CONTROLLED DRUG

| Parties | |
|---|---|
| Defendant | BARRETT, KENNETH EUGENE - VIAN OK |
| Attorney | ECHOLS, JOHN DAVID - TULSA OK |
| DA | DISTRICT ATTORNEY OF SEQ. CO - SALLISAW OK |
| Officer | BLOUNT, LARRY - SALLISAW OK |
| Judge | PAYTON, JEFF |
| Agency | SALLISAW POLICE DEPT. - SALLISAW OK |

| Case Entries | | |
|---|---|---|
| **Date:** | **Case Entries** | **Amount** |
| 03/24/1997 | PRE COMPUTER | |
| 08/04/1997 | FILE IS READY FOR INSPECTION | |
| 08/27/1997 | CM: DMS DEF. APPEARS W/ATTY ROGERS, STATE REP. BY BARNES, CASE SET THIS DATE FOR PREL; WITNESSES SWORN, TESTIMONY HEARD, DEF. BOUND OVER FOR TRIAL, DCA SET FOR OCT 9, AT 1:30 P.M. BEFORE JCG. 27-84 | |
| 10/09/1997 | CM: JCG STATE APPEARS BY S BARNES, DEF WITH ATTY B. ROGERS. DEF ENTERS PLEA NOT GUILTY. SET FOR NEXT JURY DOCKET. 27-148 | |
| 10/16/1997 | TRANSCRIPT OF PROCEEDINGS PRELIMINARY HEARING HAD ON THE 27TH DAY OF AUGUST 1997 BEFORE JUDGE SPROUSE-1 ORIGINAL | |
| 06/12/1998 | LETTER FROM EASTERN STATE HOSPITAL (FILED IN WRONG CASE SHOULD BE FILED IN CF-98-86 ST VS. PAUL E. WARFORD) | |
| 09/02/1998 | LETTER FROM DA TO ATTY K.BARRETT | |
| 09/02/1998 | MOTION TO PRODUCE | |
| 09/03/1998 | SUBPOENA ISSUED BACK TO DA | |
| 09/08/1998 | MOTION FOR EX PARTE HEARING | |
| 09/11/1998 | MOTION TO WITHDRAW | |
| 09/14/1998 | ORDER FOR HEARING 9/24 AT 9AM. | |
| 12/14/1998 | APP FOR COURT APPT ATTY | $40.00 |
| 01/19/1999 | SUBP'S ISSUED-5 ST | |
| 01/27/1999 | CM: AJH; DEFENDANT FAILED TO APPEAR FOR JURY TRIAL. BENCH WARRANT. 29-17 | |
| 01/28/1999 | B/W ISSUED | $20.00 |

| | | $5.00 |
|---|---|---|
| | (Entry with fee only) | |
| 09/27/1999 | BW FILED | |
| 02/24/2000 | SUBPOENA'S ISSUED (5) ST | |
| 02/25/2000 | LETTER FROM DA TO ATTY | |
| 03/01/2000 | ENTRY OF APPEARANCE -ECHOLS | |
| 03/01/2000 | OBJECTION TO 22 O.S. | |
| 03/06/2000 | MOTION TO CONTINUE TRIAL SETTING | |
| 09/18/2000 | ORDER FOR HEARING, JURY TRIAL | |
| 04/29/2004 | NOTICE OF APPOINTMENT OF SPECIAL VOLUNTEER ASSISTANT DISTRICT ATTORNEY | |
| 05/17/2004 | ENTRY OF APPEARANCE | |
| 05/24/2004 | MOTION FOR ORDER PROHIBITING THE APPEARANCE OF PURPORTED SPECIAL PROSECUTORD AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 06/24/2004 | MOTION FOR OARDER PROHIBITING THE APPEARANCE OF PURPORTE SPECIAL PROSECUTORS AND OR SPECIAL ASSISTANT DISTRICT ATTORNEY | |
| 02/03/2005 | COURT MINUTE-ORDER | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/14/2005 | ENTRY OF APPEARANCE | |
| 02/22/2007 | CM: JP DISMISSED AS MOOT. 39-112 | |
| 03/16/2007 | DISMISSING COSTS | $-20.00 |
| | (Entry with fee only) | $-5.00 |
| **Total:** | | **$40.00** |

| Date: | Time: | Calendar Events: |
|---|---|---|
| 01/28/1999 | | Date Action: ISSUE BENCH WARRANT FAIL TO APPEAR Completed : 09/27/1999 |
| 02/03/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/18/2005 | 11:00A | Date Action: DISPOSITION DOCKET |
| 08/10/2006 | 1:30P | Date Action: DISPOSITION DOCKET |
| 02/22/2007 | 1:30P | Date Action: PAYTON HEARING CRIMINAL |
| 02/22/2007 | | Date Action: ST DISMISSED/SETTLED |

| Date: | Receipts: | Amount: |
|---|---|---|
| 12/14/1998 | R1-011914 BARRETT, KENNETH EUGENE | $40.00 |

88

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 62**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Exhs. § 2255 Amended Motion                                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

286

# CRIMINAL APPEARANCE DOCKET

SEQUOYAH COUNTY, OKLAHOMA

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 300 5 | STATE OF OKLAHOMA vs Tom Dotson | Disposing of Mortgaged Property | Ed. J. Armstrong |

| DATE 1938 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSE-MENTS |
|---|---|---|---|---|---|---|---|
| Sept 8 | Docket Fee | 2 00 | | | | | |
| - - | To file Transcript | 10 | | | 1 8 9.5 | | |
| - - | To file & record Bond | 1 10 | | | | | |
| - - | To file & record Information | 1 10 | | | | | |
| Oct 27 | case continued for the term - Book 2 page 341 | | | | | | |
| 11-21-41 | case Dismissed B.2. P. 362 | | | | | | |

KEB503071

91

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 63**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

The News-Dispatch Printing & Audit Co., Shawnee, Okla.

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|---|
| 2763 | STATE OF OKLAHOMA vs Tom Dotson & Hooley Dotson | Man-slaughter 1st degree | J. Fred Green |

| DATE 1933 | FILINGS, PROCEEDINGS AND RETURNS | CLERK'S COSTS PLAINTIFF | CLERK'S COSTS DEFENDANT | SHERIFF'S COSTS | MISCEL-LANEOUS | CREDITS | DISBURSE-MENTS |
|---|---|---|---|---|---|---|---|
| Dec 8 | Docket fee | 3 00 | | | | | |
| " " | To file transcript | 10 | | | | | |
| " " | " " record Information | 1 10 | | | | | |
| Feb. 22 | Issue alias Warrant Hooley Dotson | 50 | | | | | |
| " 28 | " file Warrant & enter sheriff's ret. | 20 | | 9 00 | | | |
| Mar. 26 | " " Motion to set aside plea of Guilty — | 10 | | | | | |
| " " | " " & record appearance Bond — | 1 10 | | | | | |

KEB503068

93

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
   )
        *Movant,*   )
   )
v.   )       **Case No. 6:09-cv-00105-JHP**
   )
UNITED STATES OF AMERICA,   )
   )
        *Respondent*.   )

---

**EXHIBIT 64**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# John David Echols                                    *Attorney at Law*

SUBMITTED *EX PARTE* AND UNDER SEAL

*VÍA HAND DELIVERY TO THE CLERK*                  Monday, February 28, 2005

Honorable James H. Payne
Chief Judge
Eastern District of Oklahoma
101 N. 5th Street
Muskogee, OK  74401

<div align="center">

In Re:  US v. Barrett
        EDOK Case No. CR-04-115-P
</div>

Your Honor:

Thank you for your letter of February 22, 2005.  For mutual convenience, I am responding to your inquires in the order in which they appear in your letter.

1.      Savings due to prior representation.

The budget which I submitted was based in part on materials which I received from Federal Death Penalty Resource Counsel, and from review of materials on the FDPRC website, capdefnet.org.  These materials indicate that the time I "budgeted" for attorneys is in line with the time and fees expended in other federal capital prosecutions.[1]

In my view, the principal advantage from my prior representation of Mr. Barrett is not that I can represent him more cheaply, but that I can represent him more effectively.  Having said that, I do believe that another attorney without my case-specific experience would need to expend a great deal of additional time and effort absorbing the unique history of the case as it played out in state court.

I found it very difficult to predict the time, particularly to break it down into categories as I was ordered to do.  It may well be that my estimates are overly pessimistic.  However, from my perspective, I believe that the proposed budget for attorney time does take into account the fact that I am not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts.  I also know that whatever the budgeted amounts, the Court will have an opportunity to review the actual time expended prior to approval.[2]

2.      Fair compensation.

The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour.  The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the

---

[1]     In addition, in my experience it is generally more expensive in time and effort to move a case quickly on all fronts, than to allow the case to proceed in a more linear way.

[2]     The entries for Mr. Hilfiger were based on projections he provided.  As noted in our Sixth and Seventh *Ex Parte* motions, I broke the attorney budget out from the experts budget so that consideration of attorney fees would not delay presentation of the experts portion to the Circuit Court of Appeals.

**Bank of America Bldg., Suite 2112**                        **Voice:  918.299.3802**
**P.O. Box 701196**                                          **Fax:  918.299.9765**
**Tulsa, OK  74170-1196**                                    **defender@pianosa.com**

KEB013596

Honorable James H. Payne
February 28, 2005
Page 2 of 6

OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.

I received approximately $72,229.00 for the first state court trial, although the bulk of this was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.

In both trials, I bore the expenses of my own secretary, and staying in Sallisaw. I also believe that the time which I recorded and submitted to OIDS was at least 20% low, particularly through the first trial.

In the first trial, OIDS hired or provided the following to assist me:[3]

- an outside investigator, Jim Allison. Mr. Allison was paid approximately $10,000. However, he became seriously ill before the first trial and was not able to participate fully, and OIDS agreed to assign two of its "in house" investigators, Steve Leedy and Jack Stringer to assist me as the case developed to trial.

- an outside mitigation investigator, Roseanne Schaye. Ms. Schaye received approximately $20,000 for her services, but she abruptly resigned prior to the first trial because she was not given an additional unlimited budget authorization. She then refused to submit a summary of her findings and/or tasks remaining unless OIDS paid her an additional $4 or $5,000 fee. Steve Leedy, listed above, retrieved the documents she had accumulated and assumed her responsibilities.

- a SWAT team tactics expert, Monroe Earl Simpson. Mr. Simpson received approximately $5,000 for his services. He was available to testify, but we elected not to present any defense witnesses. I was also very disappointed in the quality of his work, and did not request the use his services for the second trial.

- a psychologist, Faust Bianco. Mr. Bianco charged $150 per hour for testing and evaluating Mr. Barrett. I believe his compensation was under $4,000 for the first case. Mr. Bianco and Ms. Schaye disagreed completely concerning Mr. Barrett's mental well being. OIDS in house psychologist Kathy Lafortune, who is also an attorney, was then involved in the case and was prepared to testify in any second stage proceeding.

- a forensics expert, Ron Singer. Mr. Singer was retained with a $5,000 budget, but because the case took so long to bring to trial, he was compelled to withdraw before he devoted any specific time to the case. OIDS then provided the use of two of its in house

---

[3] I do not have available the hourly billing records for the outside experts, but I believe these estimates based on my recollection are reasonably accurate. The OIDS in house employees are salaried and did not submit time records through me. Also, this reflects only the OIDS staff members who were specifically assigned significant duties for the defense. Throughout the two trials, many other OIDS lawyers and employees consulted with us whenever we requested.

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK 74170-1196

Voice: 918.299.3802
Fax: 918.299.9765
defender@pianosa.com

KEB013597

Honorable James H. Payne
February 28, 2005
Page 3 of 6

forensics experts, Laura Schile for scientific issues, and Lisa Cooper for issues relating to weapons, trajectory analysis and the like. Ms. Cooper sat with me at counsel table throughout both trials.

- a jury consultant, Ernest Harper. Mr. Harper was an in house OIDS employee who specialized in the use of a computer database as an aid to jury selection. Mr. Harper worked with us for approximately two weeks, and returned to other duties after *voir dire*.

In the second trial, and at our specific request, OIDS agreed to assign the same "in house" personnel to the case.[4] In addition, OIDS contracted with Ed Hueske, in place of Mr. Singer, and Jeannie Russell, in place of Mr. Bianco. Mr. Hueske was paid approximately $4,000 for forensic testing and consultation, and he was present and ready to testify concerning weapons related issues if needed. Ms. Russell tested Mr. Barrett, consulted with me, and was prepared to testify in a second stage proceeding. She worked principally with my second chair, Jack Gordon, Jr.. I do not have a clear recollection of her total billings, but I believe they were less than $5,000.

3.     Legal research.

You are correct that we reviewed many similar legal issues in the state court trials. However, I believe that the dynamics of the state court cases differ considerably from this federal case. Judge Garrett preferred to discuss anticipated legal issues informally with the prosecution and defense. For example, in discussing issues relating to jury selection and search and seizure, he would "telegraph" his anticipated ruling based on his understanding of the law. Knowing his position in advance, on issues for which he indicated he would rule against us, we concentrated on being certain that a proper record was made to preserve the issue for any prospective appeal. While this required significant preparation, it was not what I would term "thoroughly" researched.

This was true in relation to death penalty issues as well. His position was known, based upon our discussions and his own experience in capital trials. Moreover, Judge Garrett had ruled that, in the event of a first stage verdict of guilty as charged, there would be at least a two week delay before the beginning of any second stage proceeding.[5] We deferred finalizing our position on these issues until and unless that became necessary. For example, although we prepared drafts, we never presented finalized second stage proposed instructions to Judge Garrett in either trial.

In just the past week, the FDPRC counsel have provided me with two resent opinions from other federal district courts which total almost 300 pages in length. Both opinions, *U.S. v. Sampson*[6] and *U.S. v. Johnson*,[7] emphasize the limited amount of clear precedent concerning

---

[4]     Steve Leedy, Jack Stringer, Kathy Lafortune, Laura Schile, and Lisa Cooper. By the time of the second trial, Mr. Harper was no longer with OIDS, and he was replaced in the jury selection role by another OIDS employee, Angie Cole.

[5]     This hiatus between first and second stages is, in my opinion, a sound concept, even if second stage legal issues are resolved prior to the first stage.

[6]     District Judge Mark L. Wolf, USDC Massachusetts, Cr. No. 01-10384-MLW, issued August 26, 2004.

[7]     Chief Judge Mark W. Bennett, USDC Northern District of Iowa, No. CR 01-3046-MWB, issued on February 18, 2005.

Bank of America Bldg., Suite 2112                                    Voice: 918.299.3802
P.O. Box 701196                                                      Fax:  918.299.9765
Tulsa, OK 74170-1196                                                 defender@pianosa.com

KEB013598

Honorable James H. Payne
February 28, 2005
Page 4 of 6

federal death penalty law, and the subtle distinctions between §848 provisions and the balance of federal death penalty law. We will be in large part "writing the book as we go," and in my view this is a more demanding task than locating and following [or objecting to] clear precedent. Add in possible *Apprendi*, *Blakely* and *Booker* issues, and I believe we will need to do far more than merely "update" the previous research.

4.      The use of an investigator.

When I first approached the budgeting issue, I basically thought as you have suggested. However, by the time of my first conference with Magistrate Shreder, I had begun to realize that we are not receiving the same level of cooperation from the United States Attorneys Office that we did from the state court prosecutors.[8] I also became increasingly aware that the government hopes to hang the "drug king pin" label on Mr. Barrett even though the search after his arrest revealed little other than a modest amount of precursors and trace amounts of methamphetamine.

Judge Garrett indicated early on that he considered drug abuse testimony to be troubling because of its potential for prejudicial impact. While drugs were referred to frequently, the only "druggie" whom the state called to testify, was Steven Carl Smith, who got no further than a hearing outside the presence of the jury, in which he admitted that he had committed perjury during that very hearing. Judge Garrett ordered him arrested for perjury and the state then withdrew its notice of intention to call him.[9]

The drug culture in southeastern Oklahoma is both elusive and ingrained. Throughout both state court trials we received rumors of all sorts concerning organized criminal activities and political corruption. Those rumors continue, and a thorough fact investigation could conceivably turn up evidence that Mr. Barrett was targeted not for drug activities, but in retaliation for his having angered local criminal interests.

In my opinion, we will need to be more informed generally about the drug evidence. As soon as we succeed in learning the identity of the government's intended witnesses, we will need to be thoroughly informed about those individuals and their relationship to organized criminal activities and law enforcement agencies.

With respect to the relative costs of fact investigators vs. mitigation investigators [with fact investigators less expensive], I based my opinion on my prior experiences along with anecdotal information from other attorneys. When I sought mitigation services before the first trial, most of the recognized mitigation specialists received fees in the $100 to $150 per hour range. Ms. Schaye was a "beginner" with little experience, but a good resume. She agreed to work for OIDS for $70 per hour, but as I indicated above, she was just beginning in the business and agreed to a lower than usual rate.

---

[8]      The state court prosecutors made all of their witnesses and evidence available to us at our request. In contrast, the government has refused virtually every informal discovery request, and has simply refused to reply to our request that they be responsible for summoning the law enforcement witnesses to hearings or trial.

[9]      In a typical miscarriage of justice, Mr. Smith plead guilty and was placed on an illegal suspended sentence with the concurrence of the prosecutors and the Drug Task Force. This for a man who had admitted committing perjury in a capital case!

Bank of America Bldg., Suite 2112                                    Voice: 918.299.3802
P.O. Box 701196                                                             Fax: 918.299.9765
Tulsa, OK 74170-1196                                              defender@pianosa.com

97

KEB013599

Honorable James H. Payne
February 28, 2005
Page 5 of 6

I also note that Inquisitor, Inc., the agency which I have requested, charges only $75 per hour, which is lower than I anticipated, but still higher than the rate of $50 per hour requested for Mr. Eberle. There is still a differential, but it is smaller than I anticipated.

5.      The existence of a clear plan for the defense.

I believe that my previous comments address this issue for the most part. Also, while I do think that we have a clear idea of the foundation of Mr. Barrett's first and second stage defenses, I continue to disagree that this knowledge allows me to predict, "how much time [I] plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case."

I also note that in both trials, the state court prosecutors endeavored to present a complete picture to the juries. They basically called all available witnesses. I do not expect the government to simply retry the case that has twice failed to convince a jury that Mr. Barrett intended to kill anyone. They will, in my opinion try a bare bones case that barely, if at all, touches on the statutory elements. It will therefore fall to us to give the jury the complete truth, a task which will take more time and effort than relying on cross-examination.

6.      Ex-parte proceedings.

With respect to particular experts who will be either interacting with the government [such as receiving evidence for independent testing] or certainly testifying at trial, I agree that disclosure of the name of that person *after they have been approved* will not damage Mr. Barrett. However, the disclosure of the justification advanced for each individual expert would necessarily disclose privileged attorney client information. Moreover, I think that if an expert of one sort or the other is approved, and the name and general purpose of the expert is revealed to the government, then the Court could entertain any government objection before the requested funds have been entirely expended.[10]

Generally, exposing Mr. Barrett's attorneys' plans and strategies infringes on his Sixth Amendment rights, and could irreparably harm his defense. I believe also that this is the reason the government has not objected to *ex parte* proceedings concerning the funding of his defense.

7.      Finally, I would like to respectfully express something of my own views about this process.

I am frankly concerned that Mr. Barrett cannot wait much longer to engage the requested experts if we are to be expected to meet the Court's present schedule. Recognizing your responsibility to protect the public purse, it may be that we are simply attempting to meet a schedule which is unrealistic.[11]

---

[10]    With respect to psychological or physiological experts, even the identity of the approved expert should not be revealed until we determine to give notice under Rule 12.2.

[11]    I won't expand upon this point here, because the government is not privy to this correspondence. However, Mr. Littlefield has expressed similar concerns, particularly concerning the transcript of the second trial.

---

Bank of America Bldg., Suite 2112                    Voice:  918.299.3802
P.O. Box 701196                                      Fax:    918.299.9765
Tulsa, OK  74170-1196                                defender@pianosa.com

KEB013600

Honorable James H. Payne
February 28, 2005
Page 6 of 6

I am also concerned that Your Honor may view these budgets and budgeted amounts as being set in stone, or a ceiling above which Mr. Barrett's defense should or may not go. This cuts both ways, and it may be that I have subconsciously over estimated some items out of concern that Your Honor will not take kindly to "upward departures." Then again, I have also been instructed that I am to make this case my "highest priority," which I am endeavoring to do.

I was literally sickened when informed by a reporter that the September 23, 2004, Complaint had been filed on the day the statue of limitations ran for drug offenses. From our perspective, this case should never have been filed, and zero dollars should have been needed for this defense. Nevertheless, there is a small constituency to which the government responds that insists on a third trial, and then possibly a fourth or even a fifth if this one doesn't turn out as they wish. Based on what we know now, our sincere efforts to convince the government not to file [Petite Policy] and not to seek the death penalty [Authorization by the Justice Department] amounted to a fool's errand. We anticipate that the government will continue to present one public face to the Court and the defense, while seeking every fair *and unfair* advantage.

I appreciate the opportunity to respond to your concerns. My strong preference would be that we continue to communicate our concerns to one another, and that, on Mr. Barrett's behalf, we be granted the flexibility to alter and amend our plan as the case progresses to trial.

Sincerely,

John David Echols

JDE:am
cc: Roger Hilfiger

---

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK  74170-1196

Voice:  918.299.3802
Fax:  918.299.9765
defender@pianosa.com

KEB013601

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 65**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---



# UNITED STATES DISTRICT COURT
### EASTERN AND NORTHERN DISTRICTS OF OKLAHOMA

February 22, 2005

Chambers of
JAMES HARDY PAYNE
Chief Judge
Eastern District of Oklahoma

!OI N. 5th Street, Muskogee, OK 74401
P.O. Box 2459, Muskogee, OK 74402
(918) 684-7940 (phone)
(918) 684-7941 (fax)

Mr. John David Echols
Attorney at Law
P.O. Box 701196
Tulsa, OK 74170-1196

> Re:    *United States of America* v. *Kenneth Eugene Barrett*
>        Case No. CR-04-115-P

Dear Mr. Echols:

I have reviewed a copy of the eight ex parte budget requests you have submitted in the above referenced case. After reviewing your preliminary litigation budget, I have several questions I would like you to address prior to any action being taken in this matter.

First, while I recognize this is a death penalty case, the total number of hours you estimate will be expended is more than four times the number of hours billed in the most complex criminal case that has come before this court to date. Because you have defended Mr. Barrett in two earlier state prosecutions based on the underlying facts of this indictment, it was my understanding from both you and the Public Defender there would be a substantial savings in the amount of time that would be required for you to represent the defendant. Specifically, what, if any, savings do you foresee because of the previous trials? Further, how are those savings reflected in the proposed budget now before the court?

Second, the statute requires that I establish the amount of compensation necessary to provide "fair compensation." In order to determine the amount of compensation that would be fair in this particular case, I am requesting that you advise me of the amounts paid for you to represent Mr. Barrett in each of the two previous state trials, including the number of hours that was billed to the Oklahoma Indigent Defense System for each of those trials. Additionally, I would like to know the amounts paid for experts and investigators in each of the state trials and how many hours work was required by each expert and investigator?

Third, the number of hours you have requested for legal research on items such as search and seizure, jury selection, and the death penalty appear to be issues that undoubtedly would have been researched thoroughly prior to the state court trials. Can you explain why you would need to do anything other than update your previous research? From what I understand of this case, the facts are the same. The only difference is the federal criminal statute which your client is now charged with violating. Why do you need anything other than updating your previous research?

101
KEB010540

Mr. John David Echols
February 22, 2005
Page Two

Fourth, other than service of subpoenas, for what purpose do you anticipate using an investigator? Can you not use the documents which you obtained through the state court investigators? Also, you have indicated a fact investigator will charge less than a mitigation investigator. In addition, please explain why you anticipate a higher per hourly rate for the mitigation investigator vs. the fact investigator.

It appears the Magistrate Judge has, on at least two occasions, advised you that your budget request should be specific enough for this court to determine what legal services you intend to provide. While Judge White entered an order, prior to my assignment of this case, authorizing all motions and pleadings to be filed ex parte and under seal, this court is prepared to modify that order if counsel does not disclose sufficient information to justify the budget submitted. See 18 US.c. ~ 3006A(d)(4)(D). To the extent you have dealt with what I believe to be the essential facts of this case in two state prosecutions, I assume you have developed a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case).

Finally, regarding your Sixth Motion for Funding of Expert, 21 US.C. ~ 848(q)(9) provides "[n]o ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality." As I understand the history of this matter, you have litigated the central facts of this case in two state court proceedings, using many of the experts you are now requesting authority to engage. What, if anything, is unique about the federal case that would prevent disclosure of your intent to rehire the same individuals (e.g., would such revelation divulge attorney/client privilege or work product)? See 18 US.C. _ (d)(4)(D). It appears this information might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility and perhaps allowing the court to rule on the admissibility issues prior to expenditure offunds for experts which might not be allowed to testify at trial.

I request you give this inquiry your earliest possible attention.

Sincerely,

James H. Payne

cc:     Mr. Roger Hilfiger
        Attorney at Law
        P.O. Box 791
        Muskogee, OK 74402

KEB010541

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 66**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---



INVESTIGATIVE SERVICES

364 SOUTH FRONT STREET
MEMPHIS, TN 38103
PHONE (901) 526-6576
FAX (901) 523-9281

September 24, 2008

Mr. Tivon Schardl
Asst. Federal Defender
Office of the Federal Defender
Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA  95814

<div align="center">

Re:  *United States vs. Kenneth Eugene Barrett*
CR 04-115-JHP

</div>

Dear Mr. Schardl:

After our conversation this past Friday and receipt of your letter dated September 18, 2008, we have checked our records and have no record that we ever conducted any investigative work on behalf of Kenneth Barrett. I have spoken with Glori Shettles, one of our mitigation specialists, and she recalls receiving a telephone call from an Assistant Federal Defender in Oklahoma informing her that the Assistant Federal Defender was going to recommend Ms. Shettles' services to John Echols. I also recall having a brief conversation with Mr. Echols where he also expressed a desire to use our services; however, we heard nothing further from him.

I am sorry, but at this point we have no records in our office regarding Kenneth Barrett. If I can be of further service, please do not hesitate to contact me.

Sincerely,

Ronald L. Lax

RLL:nb

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
        *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
        *Respondent.*    )

---

**EXHIBIT 67**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF JULIA O'CONNELL

I, Julia O'Connell, declare the following:

I am currently the Federal Defender for the Northern and Eastern Districts of Oklahoma. I am licensed to practice law in the State of Oklahoma, the various federal district courts in Oklahoma, and the United States Court of Appeals for the Tenth Circuit.

I am familiar with issues surrounding the appointment of counsel for Kenneth Eugene Barrett in his federal capital trial in the Eastern District of Oklahoma. At the time Mr. Barrett was charged, I was an Assistant Federal Defender. Paul Brunton was the Federal Defender for the Northern and Eastern Districts. When Mr. Barrett was initially charged, we received notice that the Court intended to appoint our office to represent him. Mr. Brunton and I met with Judge Payne regarding Mr. Barrett's representation, because we did not feel our office could effectively represent Mr. Barrett, due to the fact that our office was very small and we were already appointed in another death penalty case that we were preparing for trial. *United States v. Edward Leon Fields*, No. CR-03-73-RAW. The *Fields* case was taxing our office resources and I was the only trial lawyer in the office with death penalty trial experience. We explained to Judge Payne that we did not feel it was feasible for our office to effectively represent Mr. Barrett because I was already representing Mr. Fields in his pending capital case.

Mr. Brunton and I asked that John Echols— who represented Mr. Barrett throughout his state court prosecution and had already effectively tried the case (twice)—

1

and Rob Nigh of Tulsa-- who had federal death penalty experience in the Timothy McVeigh case-- be appointed to represent Mr. Barrett.  Both Mr. Echols and Mr. Nigh are highly qualified capital attorneys.  Based on discussions Mr. Brunton and I had with these two lawyers, we knew they were willing to represent Mr. Barrett. We asked Mr. Echols and Mr. Nigh if they would accept appointment in the Barrett case because we knew that the government would likely seek the death penalty against Mr. Barrett, and we knew our office could not accept the case because of the other pending capital case.  Thus, we wanted to get commitments from well-qualified lawyers who were willing to be appointed for Barrett's federal capital trial, so that we could assist the Court by recommending attorneys we felt the judge could rely on to try the case effectively as an alternative to the Federal Public Defender.

Judge Payne initially indicated that he wanted our office appointed, but Mr. Brunton told him that I was the only attorney in the office with capital trial experience and that I could not effectively handle two capital trials scheduled so closely to one another.  This led to a discussion of the statutory requirement to appoint "learned counsel" as first chair.  Judge Payne or his staff had evidently researched the issue, and the Judge explained that he felt "learned counsel" was not defined in the materials he had reviewed.  Judge Payne further explained that it seemed that the federal death penalty cases that were being filed in Oklahoma were being prosecuted in the Eastern District, and he expressed the idea that if counsel from the Eastern District were appointed, that

2

lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future.

My recollection is that Judge Payne did not appoint Mr. Nigh to represent Mr. Barrett. Instead, he appointed John Echols and Roger Hilfiger, the former United States Attorney for the Eastern District, as Mr. Barrett's lawyers. Mr. Echols eventually withdrew from the case. Judge Payne elevated Roger Hilfiger to first chair and appointed Bret Smith second chair. To my knowledge, Mr. Smith had no capital experience.

On June 21, 2005, I forwarded copies of orders the district court had issued in *United States v. Fell,* No. 2:01-CR-12-01 from the District of Vermont regarding fact-specific voir dire in capital cases to Mr. Hilfiger. I sent these orders to him hoping it would impress upon him the importance of mitigation in a capital case, because I suspected that the Barrett trial attorneys were not fully versed on how to investigate and utilize mitigation evidence. At the time I sent the e-mail, neither of the Barrett attorneys had consulted with me regarding the case.

Mr. Hilfiger called my office on June 30, 2005. I was away from the office, so he left me a voice message, asking if my mitigation specialist was going to be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation. Although I do not remember the exact wording of his message, I remember that it alarmed me. I got the distinct impression that Mr. Hilfiger did not know what was expected from a defense lawyer during the punishment phase of a federal capital trial.

3

The message led me to believe Mr. Hilfiger thought "mitigation" merely entailed a short meeting with my mitigation specialist (who was in no way involved in or familiar with his client's case) within a few weeks of commencement of trial. I suspected that Mr. Hilfiger did not understand the nature, value or extent of adequate, effective death penalty mitigation. I was taken aback by Mr. Hilfiger's inquiry, because Mr. Barrett's trial was imminent, and there was not sufficient time to do an adequate mitigation investigation. At a minimum, in my opinion, it would take a mitigation investigator or investigators at least six months to conduct an adequate penalty phase investigation.

I responded by e-mail on July 3, 2005, when I returned to the office and received his message. My e-mails to Mr. Hilfiger are attached to this declaration. In my July 3 e-mail response to Mr. Hilfiger, I gave him contact information for Dick Burr, one of the federal capital resource attorneys. I gave him Mr. Burr's contact information because I knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases, and knew that he was willing to help every lawyer who sought his assistance. I do not know whether Mr. Hilfiger ever contacted Mr. Burr or any other capital resource counsel regarding a mitigation specialist. In any event, as mentioned above, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage investigation if it hadn't been substantially completed on June 30, even if Mr. Hilfiger had been able to secure the services of a mitigation investigator or investigators at that late date.

<div align="center">4</div>

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this 28 day of February , 2009, in

Tulsa County, Oklahoma.

Julia O'Connell

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 68**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

FILED
EASTERN U.S. DISTRICT COURT
DISTRICT OF OKLAHOMA
06 MAR -1 PM 3: 08
WILLIAM B. GUTHRIE, CLERK
BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   Case No. CR-00-21-B S |
| | ) |
| THOMAS DOSS GANN, | ) |
| RALPH DOUGLAS GANN, | ) |
| KAREN JEAN REAL and | ) |
| IRENE MARIE GANN also known | ) |
| as Irene Baker, | ) |
| | ) |
| *Defendants.* | ) |

### MOTION FOR REDUCTION OF SENTENCE
### FOR DEFENDANT KAREN JEAN REAL
### PURSUANT TO RULE 35

COMES NOW the plaintiff, the United States of America, by and through Sheldon J.

Sperling, United States Attorney for the Eastern District of Oklahoma, and D. Michael

Littlefield, Assistant United States Attorney for the Eastern District of Oklahoma, and moves this

Honorable Court for a reduction of the sentence of Karen Jean Real pursuant to Rule 35(b),

Federal Rules of Criminal Procedure, for the following reasons:

Rule 35(b)(2) states, in pertinent part, upon the government's motion:

> made more than one year after sentencing, the court may reduce the
> sentence if the defendant's substantial assistance involved (C)
> information, the usefulness of which could not reasonably have
> been anticipated by the defendant until more than one year after
> sentencing and which was promptly provided to the government
> after its usefulness was reasonably apparent to the defendant.

Karen Real testified on behalf of the government in the case of *United States v. Kenneth Eugene Barrett*, and her testimony, in the estimation of the undersigned, constituted substantial assistance warranting a reduction of sentence.

The government filed a complaint alleging capital murder against Kenneth Eugene Barrett in September 2004. In preparation for the Indictment, the undersigned caused Karen Jean Real to be writted to the Eastern District of Oklahoma from the Federal Correctional Institution in which she was incarcerated. The undersigned was aware that Ms. Real had common associations with Barrett. It was hoped that Ms. Real had information that would be of assistance in the prosecution of Kenneth Eugene Barrett and that she would be willing to provide that information. Upon Ms. Real's return to the Eastern District of Oklahoma, the undersigned met with her and learned that Ms. Real had, in fact, associated directly with Mr. Barrett for a substantial period of time during the calendar years of 1997 and 1998. Ms. Real was willing to speak truthfully and freely about information relating to Barrett, his drug dealing activities, and his involvement with firearms. Ms. Real spoke freely, openly, and in the opinion of the undersigned, truthfully. The undersigned advised Ms. Real that there was the possibility that she would be utilized as a witness in the ultimate trial against Kenneth Eugene Barrett. She expressed a willingness to testify without hesitation or reluctance.

One of the strategies utilized by the government in the Barrett prosecution was to establish Barrett's substantial drug distribution activities as well as his extensive involvement with firearms and his willingness to utilize those firearms in the advancement of his drug distribution activities, including the utilization of those firearms against law enforcement officials. Ms. Real testified regarding Mr. Barrett's providing her with methamphetamine as well

2

as his commercial methamphetamine business operations of which she was aware. Ms. Real further testified freely at his trial regarding the firearms that Barrett had in his residence. Her testimony revealed that Barrett always carried firearms with him in relation to his drug distribution activities. Ms. Real further testified that any time a vehicle with which Barrett was unfamiliar would approach his residence, he would retrieve a firearm.

Ms. Real met on more than one occasion in preparation for trial testimony with the undersigned. During those pretrial meetings, Ms. Real was fully cooperative, answering all questions to the best of her ability, and suggesting areas about which she might be able to testify which could potentially be beneficial to the government. Especially impressive to the undersigned, Ms. Real freely advised when she was unaware of information in response to specific questions asked of her. While Ms. Real spoke freely about matters of which she was familiar and aware, it was clear that Ms. Real restricted herself to only those items about which she absolutely certain. She never "guessed" in an effort to enhance her testimony, even though it might enure to her benefit. Ms. Real was uncertain as to the exact dates of her involvement with Barrett and her observations of his commercial drug operations. She limited the time frames about which she was able to testify to periods of which she was certain, even though she knew there was the possibility that the Court could rule those time periods to be too remote to allow her testimony even though such would limit her ability to assist the government to her personal disadvantage. The undersigned has no doubt that Ms. Real's testimony was truthful and was limited to subject matters about which she was certain.

While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government.

3

The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.

While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward . She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

D. MICHAEL LITTLEFIELD, OBA # 5461
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100

## CERTIFICATE OF MAILING

I hereby certify that on this 1st day of March, 2006, a true and correct copy of the foregoing was mailed, with proper postage fully prepaid thereon, to: Michael Abel, Attorney for Karen Real, One West Third Street, Suite 1225, Tulsa, OK 74103-3532.

DML:ljh

4

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
v.                               )    No. CR-00-21-FHS
                                 )
KAREN JEAN REAL,                 )
                                 )
        Defendant.               )

## ORDER

The government has moved the court pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure for an order reducing the sentence of incarceration previously imposed upon Defendant for the following convictions: (1) conspiracy to manufacture, possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. § 846 (Count One), (2) maintaining a place for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count Three), and (3) possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count Five).  Having considered the government's motion, the court concludes a reduction of Defendant's sentence of incarceration is warranted under the facts and circumstances as outlined in the government's motion.

Defendant was originally sentenced to a term of 108 months of incarceration on Count One, a concurrent term of 60 months of incarceration on Count Three, and a consecutive term of 60 months of incarceration on Count Five.  The total sentence imposed was 168 months (fourteen years) of incarceration.  Defendant has been in federal custody since March 2000 - some six years into her fourteen-year sentence.  The government's motion under Rule 35 is

1

based upon Defendant's cooperation and testimony during the investigation and subsequent trial of Kenneth Barrett.  During the course of the prosecution of Kenneth Barrett, Defendant provided the government with significant information about Kenneth Barrett – information relevant to his drug dealing activities and his involvement with firearms.  In the court's opinion, substantial assistance was provided by Defendant in the government's successful federal court prosecution of Kenneth Barrett.  Under these circumstances, the court finds Defendant is entitled to some sentencing relief for her substantial assistance provided to the federal authorities.

Turning to the extent of the reduction, the court finds that after having considered the factors enumerated under the policy statement of United States Sentencing Guideline § 5K1.1, a reduction in Defendant's sentence to time served on each of the three counts of conviction is warranted.  Consequently, it is ordered that Defendant's sentence be reduced to time served on each of Counts One, Three, and Five, and that Defendant be released from custody forthwith.  The original terms of supervised release imposed in this case shall remain in effect.

**IT IS SO ORDERED** this 25th day of April, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma

2

117

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case Case 6:00-cr-00021-FHS Document 160 Filed in USDC ED/OK on 05/11/2006 (NOTE: Identify Changes with Asterisks(*))
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Oklahoma

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>KAREN JEAN REAL | **AMENDED JUDGMENT IN A CRIMINAL CASE** **FILED**<br><br>Case Number:    CR-00-00021-003-S<br>USM Number:    03760-063    **MAY 1 1 2006** |

**Date of Original Judgment:** February 27, 2001
(Or Date of Last Amended Judgment)

Michael A. Abel
Defendant's Attorney

~~WILLIAM B. GUTHRIE~~
Clerk, U.S. District Court
By:_____
Deputy Clerk

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
■ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or
   ☐ 18 U.S.C. § 3559(c)(7)
☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____
☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.
■ was found guilty on count(s)    1, 3, and 5 of the Superceding Indictment.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:846 | Conspiracy to Manufacture, Possess w/ Intent to Distribute, and Distribution of Methamphetamine. | March 2, 2000 | 1 |
| 21:856(a)(1) & 18:2 | Maintaining a Place for the Purpose of Manufacturing, Distributing and Using Methamphetamine. | March 2000 | 3 |
| 18:924(c) & 2 | Possession of a Firearm During and in Relation to a Drug Trafficking Offense. | January 12, 1999 | 5 |

The defendant is sentenced as provided in pages 2 _____ through 6 _____ of this judgment. The sentence is imposed pursuant to the provisions of 18 U.S.C. § 3553(a).

☐ The defendant has been found not guilty on count(s) _____

■ Count(s)   6 and 7 of the Superseding Indictment   ☐ is   ■ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 25, 2006
Date of Imposition of Judgment

_____
Signature of Judge

FRANK H. SEAY, U.S. DISTRICT JUDGE
Name and Title of Judge

EOD:   5/11/06
Date

AO 245C (Rev. 12/03) Amended Judgment in a Criminal Case    Case 6:00-cr-00021-FHS Document 160    Filed in USDC ED/OK on 05/11/2006    Page 2 of 6
Sheet 2 — Imprisonment                                                                            (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___2___ of ___6___

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of :

  * <u>Time Served on each of Counts One, Three and Five, and that the defendant be released from custody forthwith.</u>

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐   a.m.   ☐   p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C Case 6:00-cr-00021-FHS   Document 160   Filed in USDC ED/OK on 05/11/2006   Page 3 of 6
(Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release                                                (NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___6___

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of
5 years on each of Counts One and Three, and a term of 3 years on Count Five.  Said terms of supervised release shall run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement; and

14)  the defendant shall submit to urinalysis testing as directed by the probation officer.

AO 245C      (Rev. 12/03) Amended Judgment in a Criminal Case
            Sheet 3C — Supervised Release                                    (NOTE: Identify Changes with Asterisks (*))

                                                                    Judgment—Page ___4___ of ___6___

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

## SPECIAL CONDITIONS OF SUPERVISION

(1)     The defendant shall participate in a program approved by the United States Probation Office for the treatment of narcotic addiction, drug dependency, or alcohol dependency, which will include testing to determine if she has reverted to the use of drugs or alcohol.  If it is determined by the Probation Officer that the defendant is in need of a residential drug/alcohol treatment program, the defendant shall participate in such treatment as directed by the Probation Officer and remain in the treatment facility until discharged.

AO 245C   (Rev. 12/03) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties                                                            (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___5___ of ____6____

DEFENDANT:          KAREN JEAN REAL
CASE NUMBER:        CR-00-00021-003-S

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

|            | Assessment  | Fine | Restitution |
|------------|-------------|------|-------------|
| **TOTALS** | $ 300.00    | $    | $           |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---------------|-------------|---------------------|------------------------|
|               |             |                     |                        |

| **TOTALS** | $ | $ |
|------------|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C    (Rev. 12/03) Amended Judgment in a Criminal Case
           Sheet 6 — Schedule of Payments                                      (NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___6___ of _____6_____

DEFENDANT:        KAREN JEAN REAL
CASE NUMBER:      CR-00-00021-003-S

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A   ☐  Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐ F below; or

B   ■  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ■ F below); or

C   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

E   ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ■  Special instructions regarding the payment of criminal monetary penalties:

       A special assessment of $100 on each of Counts One, Three and Five, for a total of $300, is due immediately and shall be made
       payable to the U.S. Court Clerk for the Eastern District of Oklahoma, P.O. Box 607, Muskogee, OK 74402.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and
    corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

123

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 69**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

**Hugh Downs Reports:**
Artery cleaning breakthrough from Nobel Prize Winner.
Drops high blood pressure by as much as 60 points. **Bottom Line**

Sat, Feb 28 2009

# TAHLEQUAH DAILY PRESS Online NEWS



Currently
**27**
H: 31 L: 19
Click for more weather

travelocity
Choose
from over

## Resources

🖨 Print this story
✉ E-mail this story
📇 Post to del.icio.us
💬 Discuss this story

Ads by Google
· Oklahoma Teacher Jobs
· Rug Cleaning Oklahoma
· Florist Enid Oklahoma
· Flowers Moore Oklahoma

Published July 27, 2007 09:45 am - MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

## Barrett death sentence upheld

**Press staff reports**

MUSKOGEE – Sheldon J. Sperling, U.S. attorney for the Eastern District of Oklahoma, Thursday today that the U.S. Court of Appeals, Tenth Circuit, has unanimously affirmed the conviction and death sentence of Kenneth Eugene Barrett, 47, Sallisaw.

"Barrett was sentenced on Nov. 18, 2005, to death for intentionally killing a state law enforcement officer engaged in the performance of his duty," Sperling said in a press release.

Barrett was also sentenced to life imprisonment without possibility of release for both using or carrying a firearm during and in relationship to a drug trafficking crime with death resulting and using or carrying a firearm during and in relationship to a federal crime of violence, with death resulting.

**I need affordable auto insurance.**
My age is:
■ 16-19 years old
■ 20-24 years old
■ 25-29 years old
■ 30-34 years old
■ 35-39 years old
■ 40-49 years old
■ 50+ years old
**I have had my driver's license for:**
■ 1-5 years    ■ 11-15 years    ■ 21-25 years
■ 6-10 years   ■ 16-20 years
Go »
RateMarketplace

"Out of a dark, murderous tragedy, we see today a bright ray of judicial light," said Sperling. "The appellate road is long and challenging. We will continue the battle to uphold courageous jury and judicial decisions in this epic case.

"I am so thankful for a discerning judge, jury, and appellate panel. It's clearly affirmed. There is no open season on law enforcement in the Eastern District of Oklahoma.

Sperling said he is grateful to Mike Littlefield for his work as chief prosecutor in the case; and to Sequoyah County Sheriff Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

"The Oklahoma State Bureau of Investigation, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms, and Explosives, The Sequoyah County Sheriff's Office, and other agents and investigators worked together to investigate this case and see justice done so far," said Sperling.

Barrett was sentenced in 2005 for killing Oklahoma Highway Patrol Trooper David "Rocky" Eales, 49, by shooting him in the arm and chest outside Barrett's home. Eales and other law enforcement officials were conducting a raid on Barrett's home near Vian when the shooting occurred.

Barrett's lawyers have argued Barrett was defending his home and son against people he could not see in the dark; and that to prove the suspect intentionally killed a law enforcement officer, prosecutors had to prove Barrett knew the person he was shooting was a law enforcement officer, according to briefs filed in Barrett's original appeal.

Prosecutors argued that several witnesses testified Barrett "expected law enforcement officers to come upon his premises and that he intended to kill as many of them as he could rather than allowing himself to be taken into custody."

Barrett's first state trial ended in a hung jury; and during his second state trial, jurors found Barrett guilty of manslaughter in the death of Eales and felony assault and battery with a firearm for wounding another trooper.

🖨 ✉ 💬


BARDELL & BARDELL Insurance Agency
Tahlequah, OK 918-456-6129 Click here for more info
Serving All of Oklahoma


monster
**Coast to Coast. Around the Corner**
**Find your perfect car.**
Select A Make    Search


**Find a business:**
Business name or type...
**Location:**
Tahlequah, OK
Maps, Menus, Store hours, Coupons, and more...
HyperLocal SEARCH

**Popular business directory searches**

**Premium Jobs**

**Help Wanted:**
Oaks Mission- Now accepting Applications for High School Secretary. Position open until filled. Send resumes to: Wyma...>MORE

**Help Wanted:**
Restaurant Of The Cherokees now taking applications for full and part time help. No Phone Calls Please!...>MORE

**Help Wanted:**
The Salvation Army Heart O' Hills Camp and Conference Center is hiring for the summer season. We have part-time kitchen ...>MORE

**Help Wanted:**
Wanted: Front Office Medical Help plus cleaning. Call 458-9888...>MORE

**Help Wanted:**
Part-time Caregiver needed. $8.00 hour. (918)456-6290...>MORE

**Help Wanted:**
CNA/ CHHA immediate openings in Tahlequah Area. Call 351-8652...>MORE

**Help Wanted:**
The City of Tahlequah is accepting applications for a Part-time Computer Tech in the Managerial Department. Application...>MORE

See all ads
**Premium cars**

**SELL YOUR AUTO HERE**
CONTACT BRENDA OR HANNAH TO PLACE YOUR AUTO FOR SALE HERE! 918-456-8833 extension 10 or 11...>MORE

**Used Car For Sale:**
1998 Pontiac Sunfire, standard shift, good condition, good mileage. $2500 OBO 456-2707...>MORE

See all ads
**Premium Homes**

**House For Rent:**



IT'S W
TO S
BEF
YOU
CONSUMER

126

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 70**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

*By Wanda Freeman*

TIMES RECORD • WFREEMAN@SWTIMES.COM

One of two Oklahoma residents sentenced Wednesday for federal drug offenses received a sentence break because she cooperated in another case, the prosecutor announced.

Brandie Zane Price, 28, and Leslie Barnard Johnson, 40, both of Muldrow, were sentenced in connection with a methamphetamine possession case prosecuted in U.S. District Court for the Eastern District of Oklahoma in Muskogee.

Each pleaded guilty in April to one count of possession of more than 500 grams of a mixture or substance containing a detectable quantity of methamphetamine with intent to distribute.

The offenses took place between May 2006 and February 2007 in Sequoyah County. The Sequoyah County Sheriff's Office, the Fort Smith Police Department, the Cherokee Nation Marshal Service and the federal Bureau of Alcohol Tobacco, Firearms and Explosives investigated the case.

The offense is punishable by 10 years to life in prison and/or a fine of up to $4 million, plus at least five years of supervised release to follow the prison term, according to plea agreements on record with the court.

Price was sentenced to 60 months in prison plus 36 months of supervised release and ordered to pay a $100 special assessment.

Johnson was sentenced to 70 months in prison plus 36 months of supervised release and ordered to pay $100 special assessment.

Price's sentence was "significantly impacted" by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon J. Sperling stated in a news release.

"In this case, the court's sentence reaffirmed a very important principle. Truthful cooperation with law enforcement officers should be encouraged and rewarded," Sperling commented.

Barrett was sentenced to death in December 2005 for the September 1999 killing of Oklahoma State Trooper David "Rocky" Eales during a raid on his rural McKey home. The 10th U.S. Circuit Court of Appeals affirmed his conviction and sentence July 25.

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 71**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**JOYAH COUNTY TIMES**
USPS No. 490-840
NDEPENDENT Democratic NEWSpaper
MAYO     FLORENCE B. MAYO
1904-1986

Iten and edited to merit your confidence
N. Oak. St., Sallisaw, Okla. 74955-4637
Mail address: info@seqcotimes.com
ne (918) 775-4433   Fax (918) 775-3023
Published each Thursday and Sunday
By Cookson-Hills Publishers, Inc.

JIM MAYO, Publisher
ALLY MAXWELL, Managing Editor
MIKE ERWIN, Sports Editor
DRIDGE STIMMEL, County Reporter
Y MAYO, Educational Services Director
ANNA NUTTER, Advertising Manager
T TYLER, Advertising Representative
MSTRONG, Classified Advertising Representative
GAYLA EAKLE, Advertising Design
CHARD MAYO, Production Manager

MEMBER OF:
OKLAHOMA PRESS ASSOCIATION
INTERNATIONAL SOCIETY OF
WEEKLY NEWSPAPER EDITORS
IONAL NEWSPAPER ASSOCIATION

SUBSCRIPTION RATES:
Area ...................................... $18.00 Per Year
us in Okla. ............................ $35.00 Per Year
nt To Oklahoma .................... $35.00 Per Year
homs and Adjacent States ...... $45.00 Per Year

Is Postage Paid At Sallisaw, Oklahoma 74955
Send address changes to Sequoyah County Times,
Oak Street, Sallisaw, Oklahoma 74955-4637.



THE CITY OF SEMINOLE, ONCE KNOWN AS TIDMORE, IN 1926 EXPERIENCED ONE OF THE GREATEST BOOMS IN THE STATE'S HISTORY WHEN OIL WAS DISCOVERED NEARBY! THE ROCK ISLAND RAILROAD'S INCOME FROM SEMINOLE IN 6 MONTHS, MORE THAN $1,000,000, WAS SAID TO BE EXCEEDED ONLY BY CHICAGO.

A SAUK AND FOX INDIAN, JIM THORPE OF SHAWNEE, WON BOTH THE DECATHLON AND THE PENTATHLON IN THE 1912 OLYMPICS IN SWEDEN AND CAME BACK TO LEAD LITTLE CARLISLE INDIAN SCHOOL TO FOOTBALL VICTORIES OVER HARVARD AND ARMY. HE WAS VOTED THE ALL STAR ALL AMERICA ATHLETE FOR THE FIRST HALF OF THE 20TH CENTURY.

WHIRL WIND, CHEYENNE HEAD CHIEF AND ONE TIME CUSTER FOE, WHOSE DEATH FROM A HEART ATTACK REVEALED THAT HE HAD WILLED HIS PIPE AND HIS WIFE AND FOUR CHILDREN TO U.S. DEPUTY MARSHAL CHRIS MADSEN. AND THEY BROUGHT THE PIPE WITH THEM TO THE MADSEN HOME, THEN IN EL RENO, AND ALL MOVED IN!

EL RENO   SHAWNEE   SEMINOLE

# Letters to the Editor

## Cherokee Water Claim

when someone (former mayor of Sallisaw, included) rokee Nation claims all the water that falls from the n enough to run him out of town; or laugh him out. changed! I don't presume the Cherokees have at any ade such grandiose claims on Mother Nature, and in oma, so you know there must be money involved – eler, money for the Tribe, money for the politicians, collection – 40 cents added to your monthly water or that, we are a bunch of guilt-ridden taxpayers! ses undertaken by the Tribe have been well termed xpenses of personal (bad) habits, I guess 40 cents off is would fit very closely into that category. Let's see, beauty of the Cherokee Casino, in Roland, for tine little smoke shops dotting the landscape as we nute; and now that we taxpayers have established lies that have conveniently filled with their rainfall the sound of change tumbling through the slot ChaChing! ChaChing!....time again. It seems as Peoples and taxpayers we are subsidizing our own legislated by the Federal Government! I'd be better ashioned way of duking it out.
be in touch with my Congressman, as this is our s to me current Tribal events make Oklahoma look it just visually, but economically and in terms of w businesses, and those existing ones, adjusting to rce under federal, state and now Cherokee Tribal y, I think it's time to look matters squarely in the within a nation, withdraw some of these recent by the Tribes, and have the courage to say, "Now,

proud heritage, what they're becoming now is a ckpockets! Let your representatives know how n of owning water that falls from the sky, sounds to

Mary Ann Cosner
Gans

## obacco Money Wisely

ommunity hospital, I know the cost of the insurance loyees – all of them. I don't smoke and neither do s, yet over the years I have seen the cost of health eadily increase to cover the costs associated with

some relief from this unnecessary burden.
Attorney General signed on to a multi-state bacco companies to cover the billions of dollars year to cover tobacco-related health costs. The ll pay these steadily increasing costs through higher higher taxes.
ettlement provides Oklahoma with a unique ss the settlement money is used for tobacco if find itself right back in the financial hole created caring for the current generation of teen smokers

## She Questions Sheriff's Department

Dear Editor:
Everyone has been saddened by the death of the state trooper, especially the McKey community. There are many questions being asked as to how this could have happened. One of these questions is why did the local sheriff's department allow the gun and drug situation to escalate to that point. It should be known that the sheriff's department was contacted many times over the last three years and nothing was done. There were times they would drive by and simply turn around and leave. Sometimes they would not even respond to calls that were made. If the sheriff's department had done what they are paid to do this man's family would not be mourning him now.

Meredith Lawson
Sallisaw

## Comments on Cherokee Pay Raise

Dear Editor:
I worked along with my family in the past Cherokee Tribal election to try to get a chief for the Cherokee Nation who is above the rest in character and morals. While he didn't get elected, I was happy to see a few tribal councilors elected that I thought had integrity.
When I found out last week that the tribal councilors were going to vote themselves a big pay raise, I was sickened. If they feel that $16,800 a year is not enough let them resign and give the job to someone that would be thrilled with the present salary. I thought Cherokee Nation was hurting financially. We are either broke or we have money and if we have money, why not spread it around to the average Indian person just trying daily to survive.
Remember elected officials, you were voted in and you can get voted out. I'm sure all tribal members were watching you vote on Oct. 11.

Suzanne Garrett
Bunch

## Favors Cockfighting

Dear Editor:
Cockfighting and goose killing. Our elected officials, who congregate at 23rd and Lincoln Boulevard in Oklahoma City, have in the past made decisions concerning industry that have killed "the goose that laid the golden egg." Now the pressure is on the legislature to make another decision concerning an Oklahoma industry. Oklahoma is one of only three states that allow cockfighting. Do we follow the 47 states that have outlawed the sport or do we capitalize on being one of only three?
Cockfighting has been going on not just for years or decades, but for centuries. The fowl have been bred for this so long that fighting is part of their nature. Those who breed and keep game fowl take excellent care of them. By the way, this promotes Oklahoma agriculture. The purse money at many cockfights exceeds the purses at our racetracks and attracts many fans. People come from all over the world and bring their stock to participate. Motels fill to capacity and restaurants flourish in areas of our state that need the revenue generated by the sport. Why not take advantage of an opportunity that enhances the economy of some of our financially stressed counties?
What is right about allowing the populated metropolitan areas of the state to determine what is right for less populated areas where

## A Response to Peters' Comments

Dear Editor,
I was some amused by the news report of the Oct. 2 Sequoyah County Republican meeting, wherein Grand Republican Booh-Bah Joe F. Peters, Sr., did "welcome with delight into our fold the Mayo brothers."
Obviously, Joe hallucinated and thought he was present at the end of the world. Once more, Tailgunner Joe wrote like he rides--backward--in the airplane.
I'll not honor his gas attack with reiteration or dissection of my Kansas City Southern column, since any Sequoyah Countian with half an education knows what I said and what I meant. If Tailgunner Joe couldn't understand it he should enroll in night classes and, hopefully, come up to speed with the rest of the world. I would have thought they taught reading comprehension at the U.S. Air Force Academy, but maybe Joe was out tailgunning back then, too.
In today's political discussion (that's what Tailgunner Joe is trying to make of this), charges and claims can be cast with little or no regard for the truth, meaning or intent.
Tailgunner Joe is an excellent imitation of his mentor, the late U.S. Senator Joseph R. (Tailgunner Joe) McCarthy. They both cast the illusion they are "on to something," when actually they have nothing more than bad gas.
Take a Rolaid, Joe, turn around and ride with both eyes looking forward. Who knows, it might even help you shoot straight.

Dick Mayo
Sallisaw

## Thanks for Helping Tori Mills

Dear Editor:
This is to thank all that helped with the fundraiser for Tori Mills.
Thank you for your donations of food, money and time. The bake sale at the Grapes of Wrath was a great success.
This is a great community, thanks again.

Friends of Tori Mills

## Appreciate Help

Dear Editor,
First of all we want to thank our wonderful Lord and Savior for sparing our son's (Chad Sutton) life.
Special thanks to Police Chief Randy Reed, all the officers and entire staff at the Fort Smith Police Department.
Our heartfelt thanks to the many, many people who came and stood by our side. For all the visits, flowers, cards, phone calls, prayers and every act of kindness shown to us during Chad's hospital stay.
To Dr. Anderson, ambulance drivers, all the nurses and staff at Sparks Regional Medical Center.
We can never thank you enough. We love and appreciate each and every one of you.
God bless you all and keep you safe from harm.

Officer Chad Sutton and Family
Doug, Viola (Bobbie) and Dena

## Children And Divorce

Dear Editor:
People wake up! What are we doing to our children? Has anyone

KEB503252

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 72**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

*Court file Missing*

Printed: 03/10/09                         SEQUOYAH COUNTY FELONY DOCKET                         Page: 1
                                             VICKI BEATY, COURT CLERK

| Case No. | TITLE OF CAUSE | NATURE OF CHARGE | ATTORNEYS |
|---|---|---|---|
| CF-1998-00022 | STATE OF OKLAHOMA<br>VS.<br>CHARLES EDMOND (MONK) SANDERS | COUNT 1. KNOWINGLY CONCEALING STOLEN PROPERTY<br>COUNT 2. UNLAWFUL USE OF POLICE RADIO<br>COUNT 3. GRAND LARCENY<br>COUNT 4. FALSE INFORMATION TO POLICE OFFICER | |

Judge:                                   Case Information:
                                         Comments: CO-DEF=J BROWN=22A,

| Date | Entries | Book | Page | Fees | Cat. |
|---|---|---|---|---|---|
| 01-23-1998 | INFORMATION | | | | |
| 01-23-1998 | AFFIDAVIT | | | | |
| 01-23-1998 | WARRANT ISSUED-BOND $10000 | | | | |
| 01-29-1998 | MOTION TO DISMISS AND ORDER-WARRANT RECALLED PER JUDGE | | | | |
| 02-27-1998 | WARRANT CANCELLED | | | | |
| 06-11-1998 | CM: AJH;  DEFENDANT ENTERS PLEA OF NOT GUILTY. SET FOR<br>PLEA 6-26-98, AT 11AM. BEFORE JUDGE NELSON.  28-64 | | | | |
| 12-08-1999 | ORDER ACCELERATAING DEFERRED SENTENCE | | | | |

                                                              Total Fees
                                                          Total Unassigned

                                                 Amount Due:        $0.00

131

132

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**


**KENNETH EUGENE BARRETT,**     )
                               )
                    *Movant,*   )
                               )
**v.**                          )          **Case No. 6:09-cv-00105-JHP**
                               )
**UNITED STATES OF AMERICA,**   )
                               )
                *Respondent.*   )

---

**EXHIBIT 73**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---











**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 74**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**<u>Declaration of Ada Blount</u>**

I, Ada Blount, declare as follows:

I am Kenneth Barrett's maternal great aunt.  My sister is Gelene Dotson's mother.  I live with my daughter, Janice Sanders.

Kenny was a hyper little boy who could not sit still.  He grew up and built a shack next to his mother's place and tried to make a living fixing cars.  I never felt threatened by Kenny. He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise. He was living by himself and got mad at himself sometimes.  Once he shot himself.

Kenny never had much of a father, never had any guidance.  We all still love him very much.

An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1 page declaration is true and correct.

Executed by me this ___27___ day of ___Feb.___ 2009, in _____ County, Oklahoma.

_____
Ada Blount

1

137

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 75**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## Declaration of Alvin Hahn

I, Alvin Hahn, declare the following:

I am a neighbor of Kenneth Barrett and am also related to him by marriage. My wife's mother, Janice Sanders, is Ada Blount's daughter.

Kenny and I were more like neighbors than friends or bosom buddies. I went by Kenny's no more than once a month. I never saw Monk Sanders at Kenny's and I never saw Kenny make or sell drugs.

Kenny was paranoid. Kenny told me he thought there were satellites watching him. Kenny never spoke about killing cops or killing anyone, or committing suicide by cops. Kenny never told me there was a warrant out for his arrest. I never saw Kenny do anything violent.

On the night of the incident, I had been sleeping and was awakened by gunfire. I remember the sound of different guns, but I cannot remember which came first or even whether I was awakened by the first shots because I had grown somewhat used to Kenny shooting at night. By the time I looked outside, about 15 seconds after the shooting stopped, there was at least one vehicle with its police lights on.

An investigator working on Kenny's case recently asked me about Kenny and the night of the raid. Then the investigator came back to me with the information I gave him in this declaration. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that this 2-page declaration is true and correct.

Executed by me this 27 day of Feb. 2009, in Sea        A H

Page 1 of 2

139

County, Oklahoma.

_Alvin Hahn_ (signature)

Alvin Hahn

140

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 76**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

142

## DECLARATION OF BILLY POINDEXTER

I, Billy Poindexter, declare the following:

I am the uncle of Charles "Monk" Sanders. I have known Monk Sanders his entire life. He has been in trouble his whole life and you can believe him about as far as you could throw a pick-up truck. In other words, my nephew Monk Sanders is unbelievable in everything he says. I would not believe him about anything. I am aware that when my nephew Monk Sanders testified against Kenny Barrett at Mr. Barrett's federal trial, he was doing so in order to get out of his own troubles with the law. After my nephew Monk Sanders testified against Kenny Barrett, he served no jail or prison time on anything he was in trouble for.

Not only is it my personal opinion that Monk Sanders is a completely untruthful person, but I am aware that in the community, Monk Sanders' reputation for honesty and truthfulness is extremely poor.

I was not contacted by any lawyers representing Kenny Barrett on his federal case, or any investigator working for Mr. Barrett on his federal case at the time it went to trial. Had I been contacted, I would have provided the above information and would have been willing to testify for Mr. Barrett regarding my nephew Monk Sanders' lack of honesty and truthfulness.

An investigator currently working on Kenny Barrett's case asked me to provide this declaration. I did not write this declaration myself, but I have read it carefully, and it

1

143

says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing one page declaration is true and correct.

Executed by me this _1_ day of ___March___, 2009, in

_Sequoyah_____ County, Oklahoma.

_Billy Poindexter_
Billy Poindexter

143

144

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

**KENNETH EUGENE BARRETT,**    )
                              )
                   *Movant,*   )
                              )
**v.**                         )        **Case No. 6:09-cv-00105-JHP**
                              )
**UNITED STATES OF AMERICA,**   )
                              )
                 *Respondent.*  )

---

**EXHIBIT 77**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF BRANDY HILL

I, Brandy Hill, declare the following:

I am Kenneth Barrett's maternal second cousin. My grandmother, Phyllis Crawford, is a sister of Gelene Dotson, Kenny's mother. My mother is Gwen Crawford, and her mother is Phyllis Crawford. I am married to Shawn Hill, and we live with our two children in Sallisaw, Oklahoma. My youngest baby's middle name is Kenny, named after Kenny Barrett.

My family has learned first hand about bipolar disorder and depression. My mother has bipolar disorder, and I battle with depression. I was treated at Bill Willis several years ago where they prescribed anti depressants for me, but I stopped taking them. I am afraid of being a guinea pig. I had a problem with drugs, but have been clean for years. I was arrested for using methamphetamine and received a five- year suspended sentence. I completed drug court.

My mood swings make it hard on my husband. I used to attack him, kind of the way Kenny and Abby fought. Kenny told me to stop beating on Shawn because it was embarrassing. On more than one occasion, I took all of Shawn's belongings, piled them outside, and burnt them. This parallels Kenny's behavior toward Abby, both to lesser and greater degrees. My husband understands now that my mood swings control me more than I control them. He and my mother encourage me to get treatment, and I am considering it.

My husband lived with Kenny from June through October 1998. Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission. Kenny also bought and sold cars. He might buy one and flip it the same day.

I have known Travis Crawford and Cindy Crawford for years. Travis is my uncle on my

1


145

mother's side. Cindy is his wife. I know that Travis and Cindy testified against Kenny when he was on trial in Muskogee for the killing of an Oklahoma Highway Patrol Trooper.

I was at Kenny's on September 23 when Travis came over to tell Kenny about the white vehicle that had gone by that Travis thought was cops. Rick was there, as was Toby, Kenny and Bubba Thompson, little Debbie Thompson's son. Most of us were by the garage on the side right next to Gelene's fence. Travis said Grandpa said he had seen a white SUV go past the house down to the bottoms, which is a dead end, and that it had not come out. Travis said that either he or Roger thought they were likely cops; I'm not sure which one. Travis did not come onto the property at that time, but just kind of leaned over the fence and then went back home. Shawn was just pulling up at the time and I left with him soon after.

There was no talk about killing police or going down in a blaze of glory. Kenny did not act as if it were anything but normal that the police had come by. The police drove by all the time, sometimes three times a week, from around 1996 to 1999.

Cindy Crawford is completely dishonest and totally untrustworthy. In my opinion, she has no conscience whatsoever. I am also aware that she has a very bad reputation for honesty in the community. She is extremely manipulative.

Cindy has stolen from me and my family several times. She would steal to get money for drugs.

Cindy intentionally hurts other people with her lies and by trying to get them in trouble for things they never did. The only reason she would have testified against Kenny would be to get something for herself.

My uncle Travis told me he and Cindy were paid for their testimony against Kenny.

2

Uncle Travis also told me that he did two shots of dope immediately before his testimony and was under the influence of drugs when he testified.

I am aware that Cindy has long acted as a police informant, and has gotten out of trouble because of it.  For example, she was enrolled in drug court, but did not have to attend their sessions.  Most times when a person fails to abide by the conditions of drug court, they are terminated from the program and charged.  Cindy told me this didn't happen to her and she didn't have to attend drug court because "they lost her paperwork."

Around 2001 or 2002, Shawn and I were brought into ADA Robbie Cowan's office. We were asked to roll on Chip Teague, Boss Green and Diane Wynn and to tell whatever they knew about these individuals and the drug trade. We declined. Shortly after that, Cowan was out of office.

At the time of Kenny's trial in Muskogee no one working for his case talked to me about my family or what I knew about Travis and Cindy's honesty.  When an investigator working on Kenny's case asked me about these things recently, I told him the information in this declaration. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 3-page declaration is true and correct.

Executed by me this _27_ day of _Feb._____, 2009, in

_Sequoyah_____ County, Oklahoma.

_Brandy Hill_____
Brandy Hill

3

147

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent***.** | ) | |

**EXHIBIT 78**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## DECLARATION OF CAROLYN JOSEPH

I, Carolyn Joseph, declare the following:

I am the maternal aunt of Kenneth Eugene Barrett.  Kenny's mother, Gelene, is my oldest sister. I am the youngest of three daughters and am 17 years older than my only brother Mark Dotson. I live in Fort Smith, Arkansas, where I moved about a year ago to be closer to my sister Ruth. Ruth and I are Jehovah's Witnesses, and it's comforting to be close to her.

I used to live on family land but moved into town after my son Dewitt was killed in an automobile accident on November 25, 1997, when he was only 30 years old. I could not live there any more because of the memories.  Dewitt was Mark Dotson's best friend. Dewitt had a Masters degree in chemistry. I depended on him so much; he came home on weekends. I am only now beginning to come to terms with losing him.  He was a mannerly boy, just a really good son. I work at a small hospital, Booneville Community Hospital where I am the only lab tech on weekends, the only shifts I work. I went back to school at 47 to become a lab technician. I am now 62.  Prior to being a lab tech, I was a bookkeeper for Doug Stites and later for Ed Stites. Mike Stites who is married to Abby, Kenny's ex wife, is Ed Stites's nephew.  It is a small community around Sallisaw, so we all know each other.

We have had serious mental health problems in my family.  I have bipolar disorder and have bouts of depression, sometimes severe. I take Welbutrin for it every day. At one time, I had it really bad. I try now to live for the little things and not to think about the big things. I have seen a psychologist for my condition for years.  Ingram Goodwin, who was the son of my mother's sister (a Real until she married), killed his wife and then himself. His wife had just finished medical school. My daughter Stephanie has mental health issues. She is divorced. She is a nice

1

girl, but used to be flighty.  Like Kenny, she was hyper when she was little.  She is outgoing, but is very, very moody. Living with her is awful.

My daddy was not a falling down drunk and could hide how much he drank.  My mother thought he had quit drinking, and that Daddy was doing well near the end of his life.  My mother was surprised when I showed her where Daddy had been stashing vodka bottles in the barn.

I do not want to run Gelene down, because she has had a hard life, working and raising three boys alone, but she was more a drunk who would drink to being sloppy, which Daddy would not do. I think she did it because of the stress she was under.  When I got divorced after my mother passed away, Gelene wanted me to move in with her and I did for a while. She has a big heart, but she does have a drinking problem.

When I was thirteen, my mother and I went to Joliet to help Gelene when Kenny was supposed to be born, but we ended up staying five weeks, because Kenny was born a month late.  I paid Gelene and Ernie a visit again when I was 17.  Gelene was drinking up a storm. She was drinking beer and was stinky drunk and unhappy.  Kenny was four. Ernie was dating a woman named Jerry and Ernie ran around all the time. He was a good-looking guy and it went to his head. Ernie was hardly around their home.

Kenny was more than a hyper child. I think he had ADD or something; you could not pin that boy down. He was the most hyper kid I have ever seen. I remember when he was little, he was so loving. He would climb up on you and put his arm around your neck and say, "I love you." He was the sweetest little boy, and then he would change to being loud and kicking for no reason I could see.

Most of the time Kenny was in a high mood, then he would fly off the handle all at once.

2

150

Kenny had low self-esteem.  He would duck his little head a lot and act like he was not as good as those around him.  His mother put him down a lot rather than build him up and make him feel good about himself. I do not think you should condemn a child and Kenny had a lot of that. Gelene got worse toward him when he was 11 or 12, around the time of the divorce.

We all felt for Kenny.  Maybe we should have stepped in and done something about it. Kenny did not have much of a chance.  Gelene always took out on him the frustrations she had about Ernie.  Kenny was defenseless.  The damage gets done and there's not much to do about it. A child should not have to be raised like that.  It was easier for Steve because Gelene treated him better than Kenny.  She babied him when he was little, spoiled him rotten, even in high school. She took him and gave him whatever he wanted.  Richie has his problems, too.  He can be downright mean.

Kenny's divorce was hard on him and his wife, Abby.  Abby dearly loved Kenny. Abby has told me more than once she loved him.  Abby explains it as just one of those things that did not work out because Kenny would be so emotional. Kenny moved back home after he and Abby divorced, and I could never figure out why Kenny lived next door to his mother.  They did not get along.  Kenny would have done anything for Gelene, but they argued all the time. She fussed at him constantly over any little thing. It seemed like Gelene and Kenny were a whole lot alike. They argued a lot.

The whole tragedy would never have happened if Ruth had been Kenny's mother.  Ruth is a fortress.  If I have problems, I turn to her.  She's the reason I moved to Fort Smith.  I call her twice a day.  If Ruth had been Kenny's mother from infancy, he would have been taught what was correct.  What a difference that would have made for him.

3

I have never known Kenny to hurt anybody. He gets emotional, but as far as hurting anybody, he is not a dangerous person. My car broke down when I was living on the Dotson property in the little brick house. Kenny came over. He was so mannerly and he fixed my car. He never treated me disrespectfully. He could not have been nicer to me when I did see him, but I worried about him.

Kenny was going downhill, and because I have experience with bipolar disorder I recognized some symptoms in Kenny. I thought if he stopped using drugs, he could improve. Gelene and I met with Kenny in my kitchen to talk about how to get him help. We called the sheriff, asking for help but received none. I am sure that Kenny hallucinated and believed that he was constantly under surveillance. I called the authorities because I thought they could get Kenny off the drugs, that they would get him help. I wanted them to get him in a drug program. I did not want them to hurt him. They would not do anything to help. I made my last call to OSBI just days before the raid on Kenny's property, but I never got past a dispatcher.

I was not the only one to call the law enforcement. Janice Sanders often called the sheriff on Kenny with noise complaints. Janice is one of Kenny's cousins and lived across the road from Kenny. My mother's sister had married Coy Blount whose daughter, Janice, married Tom Sanders. One particular time, that got blown out of proportion at the trial, was when Kenny got miffed that Janice had called the police on him for either shooting his gun in the air or for playing the radio too loud. Kenny had yelled across his property a threat to burn down Janice's house. Neither Janice nor I thought for a moment that Kenny would carry out his threat. He was not vindictive or mean or violent. He was just mad at Janice for calling the police on him. He was just shooting off his mouth. Janice testified about this incident at the trial.

4

Kenny's trial attorney only met me for a few minutes.  He asked me about Kenny threatening to burn down Janice's house.  I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second. He never gave me a chance to tell him.  The attorney just told me my testimony would not be required. The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would. My answer would have been no. Kenny never had done anything to anyone. The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family.  I would have answered any questions the attorneys asked and I would have answered them truthfully.

My daughter, Meredith Broomfield, wrote a letter to the *Sequoyah Times* about our family's pleas for help.  At first, they would not publish it, but she insisted they do and they finally agreed if she came down to the paper and signed it.

I know Travis Crawford and Cindy Crawford.  Travis is my nephew, and he was married to Cindy.  Kenny's attorneys in the federal trial never asked me about Travis or Cindy.  If they had asked me about them, I could have testified about Travis and Cindy's honesty, not just my opinion, but their reputations.

Cindy Crawford was a heavy drug user, and I could see that her drug use affected her mentally.  She seemed to have the mind and attitude of a 12 year old.  Cindy is so deceitful and dishonest that it is pitiful.  No one I know trusts Cindy or believes anything she says.  This is not only my personal opinion.  Her reputation for honesty in the community is poor.

It is also my opinion that Travis Crawford, who was also a heavy drug user during the time of Kenny's federal case, is not an honest person.  Travis does not have a reputation in this

5

153

community as an honest person.

Every time Cindy or Travis Crawford came to my home, something turned up missing. They would steal to get money to buy drugs. Travis and Cindy were people who would say one thing and do the other. I once paid Travis $400.00 to build a well house on my property. The materials were delivered. The well house never got built, and the materials were stolen. The only people who could have stolen the materials were Travis and Cindy. No one ever paid me back the money I gave to Travis to build the well house.

On several occasions, Travis asked me for help when he and Cindy were out of money, then he'd steal things from my home and property. Travis once stole four rolls of barbed wire from my barn. The police were notified, and Travis later admitted to me that he had stolen the barbed wire. After my son DeWitt Joseph was killed in an automobile accident some years ago, Travis stole things from his property.

I have not seen or associated with Travis and Cindy Crawford since they testified at Kenny's trial. The things I'm telling about here happened before Kenny's federal trial.

Two investigators who said they were working on Kenny's federal case asked me to talk to them and one of them came back to me with this declaration, and asked me if it says what I told them. I did not write this declaration myself, but I have read it carefully, and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, as provided in the laws of the United States of America, and the State of Oklahoma, that the foregoing 7-page declaration is true and correct.

6

154

Executed by me this _15th_ day of _February_, 2009, in _Sebastian_

County, Arkansas.

_Carolyn Joseph_

Carolyn Joseph

7

155

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
        )
        *Movant,*    )
        )
v.        )        **Case No. 6:09-cv-00105-JHP**
        )
UNITED STATES OF AMERICA,    )
        )
        *Respondent.*    )

---

**EXHIBIT 79**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**DECLARATION OF DEWEY PADGETT**

I, Dewey Padgett, declare the following:

I have been a Sallisaw town barber for fifty years. I see all kinds in my business and I hear most things about everything that goes on in this town. My place of business, Padgett's Barber Shop, at 202 N Oak Street, is just down the block from the courthouse where the police, sheriff's and highway patrol have their offices.

I was Kenny Barrett's barber for many years. Kenny was always respectful to me and my other customers. When I heard about what happened up at Kenny's, of course my first thoughts were for Rocky Eales and his family. Soon the talk around town was that there was no reason for the police to do Kenny like they did. Most people think that he had a right to protect his son and his property and that there were other ways to arrest Kenny that would not have put anyone in danger.

Of course, that wasn't Rocky's fault, and as I said we all feel for him and his family. There are those in the community who think that he had a right to defend himself, but most of us felt that it was fair that Kenny got some punishment. We felt that the manslaughter conviction in state court was punishment enough. We felt that trying him again after there was a verdict was pretty much un-American and against everything we were taught in school about justice and double jeopardy.

Παγε 1 οφ 2

157

Again, I say, and the vast majority of my customers feel this way, that the police didn't have to do Kenny the way they did because they could have arrested him peaceably any time they wanted. And then to do him again like they did in the courts—people don't like that.

Of course, I have some customers who would disagree, but that's how I and most of the town feel.

An Investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told him and how I feel.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this _28_ day of _July_____, 2009, in

_Sor___ County, Oklahoma.

_____
Dewey Padgett

Παγε 2 οφ 2

158

159

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 80**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**DECLARATION OF DORIS BARRETT**

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I am Ernie Barrett's third wife. Kenny Barrett is my stepson. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, both in state and federal court. Before and during the state trials, I had frequent contact with Kenny's lawyers and investigators.

I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

I had some contact with Kenny's lead federal lawyer, Roger Hilfiger, before and during Kenny's trial, but we never discussed Kenny's family life or history. Mostly, he just outlined the day for me, told me who was going to testify that day. In fact, he only told my husband Ernie and me that we were going to testify on the day we testified in the penalty phase of Kenny's trial. He did not even tell Ernie or me what questions he was going to ask us. No investigator or investigators working for the defense in Kenny's federal case spoke with us.

I did have quite a few conversations with Mr. Hilfiger's co-counsel, Bret Smith, during Kenny's federal trial. Mr. Smith was very upset with what he considered to be Mr. Hilfiger's incompetency and lack of effort and interest on Kenny's behalf. From where I

1

sat in court I could see Mr. Smith become upset at Mr. Hilfiger's failure to object to inadmissible evidence, and at Mr. Hilfiger failing to object to the prosecutor, Mr. Sperling, referring to Kenny as "the murderer" even before the case had been submitted to the jury in the first part of the trial. Many times there would be people on the stand and Brett would say Mr. Hilfiger needed to object and Mr. Hilfiger would say, "no." Mr. Smith had a real problem with a lot about what Mr. Hilfiger did. At times, Mr. Smith complained to me in private about Mr. Hilfiger's failure to object or do other things to represent Kenny properly. While Mr. Smith and I spoke many, many times, neither he nor Mr. Hilfiger spoke to me about or interviewed me about Kenny's family life or history.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 2 page declaration is true and correct.

Executed by me this _10_ day of _February_ , 2009, in _Creek_ County, Oklahoma.

_Doris Barrett_
Doris Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

**EXHIBIT 81**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

## Declaration of Ernest Eugene Barrett

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Edward Barrett, the oldest of three sons born to me and Gelene Dotson Barrett during our marriage. At the time I married Gelene, even before we had children, I almost immediately started running around with other women. When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father. Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved. At the time, though, I had my mind set on doing whatever I wanted as long as I was working.

I always worked and was determined not to live in the kind of poverty I knew as a child growing up. I went into the glass business and worked myself up from pushing brooms to production superintendent. When I retired, I was earning about $76,000 a year and had a good life. It was a far cry from the way I lived as a youngster.

I grew up dirt poor, in a log cabin with a dirt floor, no running water and an outhouse in Akins, Oklahoma, outside of Sallisaw. We had a wood stove for heat and a wood cook stove. We all worked and barely scratched out a living for my mother, father, two brothers and two sisters. I was the oldest child who survived and was born August 8, 1938. Three other babies were born, but they died. The next oldest who survived, Margaret, was born December 26, 1941. She died from cancer in 1995. After Margaret, there was Ike, born May 31,1944, Linda, born May 30, 1946, and then came Gary, who was born January 23, 1948.

1

One of my earliest memories is being taken out of school to work in the fields alongside my parents.  As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sun up to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done. I went to school when I could during the times when my family came back to Akins from working cotton and other crops.  I went to school off and on through the eighth grade in Akins and then started high school.  High school was different for me than for most of the other students. I met Gelene in high school before I had to quit after finishing the eleventh grade.   We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country.   I made the football team but had to quit because I could not get to after school practices.  We lived far out in the country and no one could pick me up and drive me back and forth.  Lots of students came from poor families, but my family had it even tougher.  Other students made fun of me and laughed at me because of the way I dressed.  I wore my shoes and clothes until they wore out,

2

and then we had to patch them and keep wearing them. I figure I had to fight every boy in my high school class to hold any respect.

My family had some pretty serious mental problems that folks whispered about back in those days.  My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness.  My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine. My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown.  My father beat my mother and us children with his fists and with anything he could get his hands on. I tried to get between him and my mother when he attacked her.  I got beaten more than the other children and learned never to cry when my father hit me.  I figure I have a very high pain threshold because I do not remember feeling a hell of a lot. Gary was the only child to hit my father back and that happened when Gary got bigger than Dad.  My father was 5'11" and weighed 185. Gary was 5'11" and weighed 270. Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between  my father and mother to try and protect her.  My father hit me across the shoulder with a 19-inch metal file that busted my shoulder wide open. My shoulder still has a scar. I left home that day just running because I knew that if I stayed at home I

3

would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds.   My mother stayed with him all those years and put up with his abuse but I could not.  My mother, Ada, was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was.  Plus, my father was difficult to figure out because he was also a decent guy when he was sober.   He worked on a pipeline for two or three weeks and then come home, went on a bender, and just went crazy.  There was no stopping him.  He died at the age of 52, sitting on the back porch with a cup of coffee in his hand.  He just laid his head back and died. The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it. I moved to Tulsa, where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955.  In March 1957, I lost my job because of a recession and had to return home for two months.  I joined the Marines and got my first lesson in drinking and chasing women.  I was in such good physical shape that basic training was a walk in the park for me.  I had been tossing hay bales since I was 12.  I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma, where they were picking cotton.

After I came home, I saw Gelene in Sallisaw; she was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois. They had helped her get a job at Walgreens.  I had been planning to apply for a job with Oklahoma Highway Patrol, a civil service job, when I ran into her. She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon I knew she had had a lot of experience with men. I was swept away by

4

166

how beautiful she was.  Gelene called her aunt and uncle in Joliet, and they talked me into coming to Joliet.  They told me I could make a lot of money at Kerr glass, and they could get me a job.

When we got married, I was a physical supernatural.  I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep and go back to work.  I was strong as a bull and would fight anybody that wanted to fight. I did not beat them up so that they couldn't work.  Once I knocked them down I did not kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife in 1985.  I tried to keep my drinking away from the house and in bars.  I was a Canadian Club (whiskey) straight with a water chaser drinker and drank a fifth at a time. Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over any little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours shifts.  I'd rather work a straight 16 hours than listen to her.  I was a trouble-shooter at the plant and could memorize machinery blueprints.  At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up.  I preferred staying at the plant rather than facing Gelene and her drinking.

5

167

I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him.  He was colicky and cried all the time.  When he got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing. I cannot sit around either, but I am not as bad off as Kenny was.  Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished. I liked taking Kenny with me hunting.  Sometimes his little legs would give out and I had to carry him on my shoulders.  Boy, he loved that.  Kenny was fearless, but that he was a sensitive little boy too who cried if you hurt his feelings.

When I went home, I would never know which Gelene I would get, what condition she would be in.  I did not want to turn into my father and beat my wife and children.  One time Gelene cut up the front of my shirt with a knife when I was wearing it. I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985.  When I was married to Gelene I stayed away from home every few months for a night or two with other women.   Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys.  Gelene was always running back to Sallisaw where she was her daddy's number-one girl.

6

I felt bad about leaving my two boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved in to the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could, and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for a year. It was my nature and I was out of control when it came to fighting and drinking.

I called a friend in New Jersey and he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time.

Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too. Kenny was always upsetting her because he could not sit still and was always into everything. He loved my tools and he was always getting into them. I would find them all over the yard and in the woods. It made

7

me pretty mad.  Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work.  Besides, Gelene would not hear of it.  Kenny kicked and screamed to stay with me.  He was 10 or 11 years old and did not want to go with his mother back to Oklahoma.  The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game, which she returned to their wives, and left me with forty-seven cents.  I stayed single for five years before I married my second wife and then for six years before I married Doris.  I was married to Diane Kay Wilson from 1977-1979, and we lived in Dunkirk, Indiana.  I paid Gelene child support, $150.00 per child until each reached 18 and also gave Gelene extra money for the children's school clothes every fall.  I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money.  Years later, I showed Kenny canceled checks to prove I had paid because he did not believe me.  I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me.  I let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade.  Kenny resented my wife Diane and it got the best of me.  I lost control when he sassed her, and I hit him pretty hard in the chest.  He went flying slamming against the wall.  One time I overheard Kenny and some boys talking about running from a fight.  I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight."  Kenny did not show any interest in learning to

8

170

fight or any interest in fighting.  Kenny was not much of a fighter. Now his brother Steve, he was different.   He would have taken your lights out.  Kenny went back to Sallisaw after that summer and soon quit school for good.  He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma, around 1979.  I was still drinking, but no longer getting drunk or getting into fights at bars. I worked and made a decent living.  We got Kenny a job and made a down payment on a Camero for him.  Kenny did alright for two or three months but he could not stay away from Sallisaw.  Kenny quit his job and went home.  I had to take the Camero back when Kenny could not meet the payments.  It hurt Kenny that I took the car back.  Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985.  Doris and I married in Fort Smith, Arkansas, on December 28, 1990.

Kenny had bouts of depression and did things that did not make any sense.  Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.  Kenny worked hard when he worked, but he never

9

seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

My father died in 1969, and my mother died in 1977. She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor. I believe in calling a spade a spade, and I would never call myself a good father. I still kick myself over the way I lived my life and the way I treated my children, I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is. I've tried to make it up to him by standing by him since all this trouble. I went to both state trials every day. I had just started a new job when the federal trial happened so I could only go to that once or twice a week.

Kenny's trial attorney, Mr. Hilfiger, only interviewed me a few minutes before I testified. I did not know what kind of information could help my son, so I just answered questions the best I could.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when we talked.

I declare, under penalty of perjury, that the foregoing ten (10) page declaration is true and correct.

Executed by me this _10 day_ of 2009, in ___Creek___ County, Oklahoma.

Ernest Eugene Barrett

10

173

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 82**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**DECLARATION OF JACK GORDON**

I, Jack Gordon, declare the following:

I am a lawyer admitted to practice in the courts of the State of Oklahoma, the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court.

I was second chair counsel to attorney John David Echols in Kenneth Eugene Barrett's second trial in state court. I was primarily responsible for the second stage of trial, which never occurred, because Mr. Barrett was acquitted of first degree murder and was convicted of manslaughter.

Our second stage psychological expert witness was Dr. Jeanne Russell of Tulsa, Oklahoma. I had prepared her testimony and the testimony of other witnesses based on the investigation and reports that were generated by the investigators working with us on the state case, including Roseann Schaye, who had acted as a mitigation investigator for Mr. Echols before Mr. Barrett's first state trial.

I am aware that after Mr. Barrett's second state trial, he was charged in federal court. I am also aware that Mr. Echols, for a time, represented Mr. Barrett in federal court, but withdrew before the trial. I am aware that Roger Hilfiger and Bret Smith of Muskogee represented Mr. Barrett in his federal trial.

I was never contacted by either Mr. Hilfiger or Mr. Smith regarding the work I did on Mr. Barrett's state case for the penalty phase. Nor did either Mr. Hilfiger or Mr.

1

Smith, or anyone working for them, retrieve my file in Mr. Barrett's case.

I did not write this declaration. The above information was related to one of Mr. Barrett's current counsel. I have read carefully the contents of this declaration, and it accurately reflects what I told one of Mr. Barrett's current lawyers.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this 2 day of March, 2009, in _Rogers_ County, Oklahoma.

Jack Gordon

-2-

175

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 83**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF GWENDOLYN CRAWFORD

I, Gwendolyn Crawford, declare the following:

I am Kenneth Barrett's maternal cousin.  My mother, Phyllis Crawford, is Kenny's mother's sister.

My family has struggled with mental illness a lot.  I have bipolar disorder and am treated for it.  For a long time, my family had no idea what to make of my moodiness. When I was a child, I paid a terrible price because family and friends thought I could control my mood swings.  I used to smoke a lot of marijuana, before I figured out that it was the exact wrong treatment for what ails me.  I am taking prescription drugs now, and it has allowed me to control my moods much, much better.

Both my children have mental problems.  My 24-year-old son Brandon cannot speak and is clearly developmentally challenged. He is a dear boy, warm and responsive.  My daughter, Brandie Hill, also has depression, and is possibly bipolar, but she is fearful of treatment.  Her husband, Shawn Hill and I encourage her to get treatment, and we are hopeful she will make the right decision some day.

For a while, I lived in a trailer just below Kenny's shack on the other side of the ditch that OHP came though when they raided Kenny's.  Sometimes Shawn and Brandy lived with me there, too.  It would have been impossible for a Mazda to go through the two-foot deep ditch without bottoming out and destroying her transmission and oil pan as Brandie Price had testified.

—1—

177

I know Kenny, and he would not talk about killing police or going down in a blaze of glory.  That would not have been Kenny.

I have known Cindy Crawford for years.  She is married to my brother, Travis Crawford.

It is my personal opinion that Cindy Crawford is a totally dishonest person.  I am also aware that her reputation in the community for honesty and truthfulness is extremely poor.  I would describe Cindy Crawford as one of the biggest manipulators I have ever seen.  She can turn the "water works" on and off to get what she wants, and can also be charming when she needs to be to get something of advantage to herself.  Cindy Crawford has broken into my house and stolen from me on numerous occasions in order to get money to buy drugs.  She is basically a compulsive thief and a liar.  Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding my family.  It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself.

My problems with Cindy Crawford reached the point where I actually took a shot at her, and had to go to court over it.  The court case was resolved with me being put on probation.  When I was in court to resolve my case, a lady came up to me and asked if I needed her to testify for me because Cindy Crawford, on the previous day, had beaten this lady's daughter severely with a beer bottle.

–2–

178

I love my brother Travis very much, but there was no helping him when he was around Cindy and taking drugs.  Travis told me that before he testified in Kenny Barrett's trial, he did two hits of methamphetamine, and was under the influence of the drug when he testified.

I was aware that Kenny was on trial in 2005.  No defense attorney or investigator ever spoke to me about my immediate family or Kenny regarding Kenny's case until last month.  Until recently, no one working on Kenny's case asked me about Cindy Crawford's honesty, either.  If someone had asked me to testify about the things in this declaration, I would have done so.

After investigators working on Kenny's case asked me about my family and Cindy, one of them came back and showed me this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigators during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this _27_ day of _February_ 2009, in _Sequoyah_ County, Oklahoma.

_Gwendolyn Crawford_
Gwendolyn Crawford

—3—

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 84**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## Declaration of Issac Barrett

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother.

My wife, Oleta, and I lived on a nice little ranch in Akins, Oklahoma, on land that was inherited by various members of my family. We have a few horses, a few head of cattle, a good dog, and six cats that are self-taught copperhead killers. We also have cougars, coyotes, and bear around here, and we have to keep an eye out for them. I used to hunt but don't care about it anymore. Oleta and I feed deer and wild turkeys all winter, always at the same time of day. If we're late, the deer make a sound and let us know it. Our property is surrounded by woods, and lots of people would think it is pretty idyllic. My grandfather owned 1/3 of this land by himself and 2/3 of this land, twenty acres, with my Uncle John. They died intestate as did my parents. Uncle John's only child Elnora Long, my half-aunt and half cousin, got John's ten acres, which I bought from her. The remaining 20 acres was divided among my grandfather's and Uncle John's grandchildren. We each got 11/144. I bought out most of my family and paid better than the appraised value, and traded for the rest or acquired it by quiet title. Before I bought it, it had lain dormant from 1962-1980; no one lived on it or worked it.

We are able to enjoy life now because we worked hard for it; Barretts are hard working people. Busted my leg twice and my collarbone once. I drive a construction truck for a small outfit now. Before that, I was a production supervisor for 10 years at an open pit, strip surface mine, in Huntington, Arkansas. My job at the mine eventually became a union job. I spent two years in college at West Arkansas College. When I was



growing up, I worked on ranches.  When I was 15 or 16, I broke horses for $15.00 a horse.  I rode a horse every day for six weeks, and if the horse got broken in, I got paid.

From 1917 to 1943, my grandfather and namesake, Isaac Clifford Barrett, managed a 20,000-acre ranch owned by a Kansas doctor, B.B. Ralph. The ranch has since been carved up some, but much of it is a hunting preserve.

My family goes back a ways around here, and we heard interesting stories about them.  My grandfather Isaac married Mary Ellen Maxwell whose mother was Mattie Newby. Mattie married William Maxwell.  Mattie and William had nine other children besides my grandmother Mary: Hazel, Opal, Ivy Harold, Howard, Jim, a boy named Ann, Sam and Albert.  Isaac didn't like to ride in cars. He used a wagon and a team of mules. He was a walker most of all. He didn't have much to say. He chewed tobacco. We called him Papa. We always had a big garden.

Isaac was a fair man.  When I was three or four Isaac told me, "I'm going to take Mr. Rogers some green beans, radishes and new potatoes—he's been sick, bad off— he's our neighbor; we need to share with him." "Please let me go!" I asked. At first he said no because the grass was so high and he was carrying two large buckets. I begged him, "Please!" Isaac agreed and said, "All right, but you have to keep up with me," and I did.  Coming home, we passed a pear orchard and I asked if we could pick one. He said, "No, they're not our pears."  I tried to argue with him and pointed out that he just gave Mr. Rogers all that food, but he explained, "That's because we have plenty—that doesn't entitle us to these pears." That's the way he was.

Isaac sure had his burdens to carry after he married into Mary Maxell's family. She walked around the yard talking to herself.  At night, she would wake up, wash jars,

182

and think she was canning.  Mary's brother, Howard Maxwell, who worked for Douglas Aircraft in Tulsa, was Loony Tunes and his son Dean Maxwell put a gun to his head and pulled the trigger about 10 to 15 years ago.  Dean is buried in Akins Cemetery.

Papa (Isaac) committed suicide by ingesting a remedy for black leg cattle disease.  My mother told me he killed himself because he had a broken heart.  The range was open in Isaac's day. Isaac eventually assembled a small herd, and was cow rich.  His son Wilson, they called him Barney, hounded him to sell the herd and invest the money.  Finally, Isaac gave in. He sold the herd and never saw the money again after giving it to his son.  Took away Isaac's way of life.  He had nothing left.  He killed himself November 24, 1952, and is buried in Akins cemetery.  My grandmother died a little more than ten years later, on December 25, 1963.

Whatever good Isaac had in him, and there was plenty of it, did not pass down to his son, A.J., who was my father.  A. J. married my mother, Ada Mae Hatter.  I loved my father because he was my father, but as a person he was the sorriest man I ever met in my life.  I was born in Marble City, Oklahoma, and then my family moved to Akins, Oklahoma. Both are in Sequoyah County.  We lived a hard life. I had three other brothers who died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains.

The cabin we lived in had no electricity or running water. Our well water was not usable for humans, although it was all right for animals and crops. We had to haul our water.  My parents got electricity in 1957. Six years later, they got water and a drain. The entire family had to work in the fields traveling from one crop to the next.  We worked strawberry crops, and one time we went to California to pick potatoes.

–3–

183

My father was an abusive alcoholic and a bully who only cared about himself. He mortgaged cattle that he didn't own and left it to us kids, every one of us, to pay the debt off by picking cotton and green beans. His mom and dad once bought him a pair of shoes—we were so poor—he didn't like them so he threw them in the fireplace. He would destroy his own stuff. His attitude was always, "I'm bigger than you—the hell with you." My brother Ernie is a lot like my father.

If my father was in a bad mood, he hit me or the other kids with any damn thing, belt, club, board, or limb. He hit all of us and my mother. I never knew from one day to the next what was going to happen. He was drunk for two weeks at a time. I could never bring my friends around. Sometimes he was away, working pipeline or the lime quarry. Nobody wanted him to be at home because of the crazy things he did. He raped and impregnated one of my sisters, Margaret. He beat her bad if she came home from a date late, and once she said, "Beat me some more, I don't care; you've done everything else." I didn't know what she meant at the time, but now I do. My sister went to New Orleans, had the baby, and gave it up for adoption. My father went to Vinita to the state mental hospital but came back after a month. He was constantly messing around with other women, and rumors flew around that he fathered another child.

When I turned 14, I had had enough of him beating my mother and us kids. The next time he hit my mother, I hit him back with a fireplace poker that opened a five-inch gash. I knocked him out cold. When he came to, I said, "You touch my mother again and I'll kill you." I think he knew I would. He never hit her again when I was around, but he hit her plenty when I wasn't there, busting her eardrum one time when he slapped her. As I got older, I just stayed away from him.

-4-

Some of my family had some pretty serious problems as they grew up. Kids in school called my brother Emie "Loco" because of the way he acted, and he never completely straightened out. Ernie was pretty cruel and treated us kids pretty rough. When he made us cry, he thought it was funny. He would destroy what little things we might have. My sister Linda is not mentally stable and has treatment by a psychiatrist. My other sister Margaret left home, moved to Bloomington, Illinois, married Morris Cochran and had three boys with him (Kurt, Kent, and Kelly). She died from cancer in 1995. My brother Gary seems to be doing pretty well, but he struggles with a dark side he keeps hidden pretty well.

Ernie married Gelene, and I felt sorry for her. Ernie was Mr. Playboy and good for that one thing only--to use and to walk on women. He botched his marriage. He was always flashing dollars, but he didn't mind taking money from others, even our poor mother. In the Marine Corps, he got in trouble and was going to go to jail unless Mama sent him $1,000. She borrowed it. We picked cotton to pay it back. In 1969 when dad died, mama had to send Ernie money so he could come home for the funeral, but he always acted like Mr. Big.

My mother knew there was something wrong in the head with Ernie, but she covered up as best she could. Ernie would roll dad if he was drunk and passed out and dad had any money. Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him. The children were wearing worn, ragged clothes. I said, "Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful. The less Ernie wanted Kenny, the more Kenny

185

worshipped him.

Gelene had something wrong with her, too. I would come over and some new boyfriend would just be getting out of bed—you never had any idea who was going to be there in the morning.  My mother used to keep Kenny and Richie. When Gelene was at Mama's she did not drink, but when she had money, Mama would not see her again until she drank it up.  Gelene was a drunk when she was in high school.  I met a man who said that when Gelene worked in Walgreens in Joliet right after high school, before she met Ernie, she would get drunk with him, strip for him, and sleep with him. Gelene had two extremes—alcoholic and Jehovah's Witness—and she was definitely in the alcoholic mode when she begat Kenny.

Gelene's dad, Hugh Dotson, was a strange duck. He could not sit down and talk, like he was paranoid, looking around all the time.

There was a pattern in my family that went right down the line—the two suicides and Kenny's attempted suicide—mental illnesses of one kind or another that showed itself in so many ways. The dots connect. Look at Ernie, our father, grandfather and great grandfather.  Ellie Long, who is my grandmother's daughter, but is so close to our age we called her "Sis," has serious mental problems. She's a nut out. Where I'm going with this is that I think Kenny was a very paranoid person.  Something was wrong with him even when he was a little one. As he got older, Kenny's moods were all over the place.

I was aware that my nephew Kenny Barrett was tried in federal court in 2005. Before or during his trial, no lawyer or investigator working on Kenny's case contacted me.  Had I been contacted, I would have provided the information in this declaration and would have testified if asked to do so.

–6–

186

An investigator currently working on Kenny's case asked me to tell him about my family. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when he asked me.

l declare, under penalty of perjury, that the foregoing 7-page declaration is true and correct.

Executed by me this ⟨2⟩ day of March, 2009, in ⟨Sequoyah⟩ County, Oklahoma.

Issac C. Barrett

–7–



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 85**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

### Declaration of Janice Sanders

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and neighbor.  I presently live with my mother, Ada Blount, who is Gelene Dotson's mother's sister.  My husband Tom Sanders  is Monk Sanders's uncle. My husband and I are presently separated. He lives just down the road from us in the house we used to live in together.

Kenny was a hyper little boy, the most hyper child I have ever seen. Kenny could not sit still, no matter what. Kenny also had strong feelings.

I love Kenny and was never afraid of him.  That did not stop me from calling the police on Kenny on several occasions for playing the radio too loud or because I thought a bullet had accidently whizzed by my mother one afternoon when Kenny was firing his gun and she was outside. That call to the sheriff brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting Kenny's rifle to see if it was legal. I watched them there from across the road.  I saw the police drive onto Kenny's property and saw him hand the rifle to John Philpot, the Sheriff.  John looked at the rifle and gave it back, and the police left.

Carolyn Joseph told me that Kenny once threatened to burn my house down because of my calling the police on him, but neither of us took it seriously, not for a minute.  Once when I was walking by his property Kenny threatened my dog, if it ever came on to his property. I never did take it seriously. Kenny would never hurt anyone or anything.

In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more

apologetic. The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened. About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler. He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

About a week before the incident, and about two weeks after Johnny Philpot had come by and visited Kenny on his porch, I drove over to Kenny's house. The gate was open. I asked Kenny if I could give him a Bible. He took it and he could not have been any sweeter. I told him we cared about him.

I was awake at the time of the raid on September 24, 1999, and living with my husband. I had awakened to go to the bathroom and had just gone back to bed when the shooting started. I did not see any police lights when I got out of bed, although from the way my house is situated, unless I went to the kitchen or the front door I could not have seen the road. I did not go to the kitchen when I went to the bathroom.

When the first rounds were fired, I assumed it was Kenny, because Kenny often fired into the air at night. Kenny did not fire what sounded like semi-automatic or automatic weaponry when he fired into the night or when he fired during the day. It was always one or more distinctly separate shots. Soon, I no longer thought it was Kenny because of the large number of rounds fired and the rapid firing. I had no idea what was going on outside, who was shooting, and then it stopped as suddenly as it had begun. It all happened so fast. My mother called me after the shooting had stopped for a minute or two and said she saw police lights.

<center>Page 2 of 4</center>



I have always wondered if there were really a warrant out for Kenny's arrest, as I learned later after the raid. Why didn't they arrest Kenny then, when John Philpot came out a few weeks earlier or when they had his weapons and there were five police cars on his property?

At the state trial, the prosecution subpoenaed me and made me read aloud the words on the sign that Kenny had on the gate. This upset me, both because the sign was meaningless and because I had never read the sign before they showed it to me.

Mr. Littlefield came to see me. Johnny Philpot accompanied him. Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced. Mr. Littlefield said, "You want him living next door to you again?" And I said, "Why not?" I told him that I thought the state sentence was fair and that I wasn't afraid of Kenny. Mr. Littlefield was very hateful to me.

Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way.

I recently told an investigator working on Kenny's case the information I am saying in this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that this 4-page declaration is true and

correct.

Executed by me this 27 day of Feb 2009, in Sequoyah County,

Oklahoma.

Janice Sanders

Janice Sanders

192

193

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 86**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

Exhs. § 2255 Amended Motion                    *U.S. v. Barrett*, 6:09-cv-00105-JHP

## Declaration of Kathy Trotter

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin.  My parents are Ike and Ruth Barrett. Ernie Barrett is my uncle.

I grew up in Fort Smith from the second grade through the seventh, when we moved to Alma, Arkansas, where I spent my eighth and ninth grades. I moved to Sallisaw in my sophomore year where I stayed with my father. My parents divorced in 1977. I stayed in Sallisaw until the middle of my senior year in high school when I went back to Arkansas to live with my mother because I found my dad too demanding and controlling. I drove back to Sallisaw every weekend to see my friends.  My brother Glenn, who is four years younger than I am spent 20 years in the U.S. Navy, married a Japanese woman and moved to Japan upon his retirement.

You cannot pick your family, so I have learned to live with mine.  Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression.  My aunt Linda, who is my father's sister, is mentally ill, as are Ernie Barrett and Elnora Long.  My dad calls Elnora, "Sis" because they are about the same age, even though she is his grandmother's daughter. I call her Ellie. She is very emotionally unstable.  All the children loved her, but she flip-flops and her moods are unpredictable. She will say she loves you on one extreme and that you are dirt on the other. She is prone

K.T.

194

to snap, start shaking really badly, and whatever is on her mind comes flying out of her mouth. She is manic-depressive.

I have also had mental health issues. In 1985, I was an inpatient at Harbor View in Fort Smith for one week for a chemical imbalance, anxiety and depression. Two years ago, I weaned myself off medication I was prescribed in 2006 by Dr. Tom Coburn of Muskogee.

Kenny had a tough time coming up with the parents he had. His mother Gelene used to drop Kenny and his two brothers off at the home of their grandmother, Ada Mae Barrett so she could party with my Aunt Linda Riley. My parents told me Gelene was a drunk right out of high school and I never saw a reason to doubt that. I always thought Gelene was mean, that she had a mean spirit. The way she would talk to us kids was angry. I was afraid of her. Maybe because Kenny was older, Kenny did suffer more verbal abuse from her than her other two children.

Back then we called Kenny hyper. He was erratic and temperamental. He did not have a family that loved him or cared for him, and it was apparent to me that Kenny was deeply troubled. He would do irrational things, like ride bikes down a dangerously steep, extremely bumpy hill. He could be very kind and generous and he could be very agitated and mischievous. I had to be a tough girl to hang with him, but it was something I wanted to do. I love Kenny; I care about him

Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction. Ada Mae was very well thought of, and was someone who worked extremely hard. My father is a lot like she was.

Mr. Smith, one of Kenny's lawyer's, spoke to me a few minutes before I testified. When I was on the witness stand, he did not ask me any of the questions that he asked me when we spoke beforehand. He never asked me about our family's history of mental health issues, either before I testified or on the witness stand. I thought my testimony was pointless.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it says what I told him when we talked, and if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct. Executed by me this 24th day of February, 2009, in Sequoyah County, Oklahoma.

Kathy Trotter

196

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,           )
                                  )
                    *Movant,*     )
                                  )
v.                                )           **Case No. 6:09-cv-00105-JHP**
                                  )
UNITED STATES OF AMERICA,         )
                                  )
                    *Respondent.* )

---

**EXHIBIT 87**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## Declaration of Linda Riley

I, Linda Riley, declare the following:

My husband, Fred Riley is a former barber who receives disability for PTSD, a consequence of his service in Viet Nam during the war. I have twin daughters, Stephanie and Jennifer, both of whom struggle with bipolar disorder. Stephanie's seven-year-old son, Ben Thomas, has been diagnosed with Asperger's Syndrome. Jennifer's' disorder was discovered when she was training in the military during the first Gulf War, and she now receives disability from the U.S. Air Force.

Growing up was difficult because of what we had to go through. My mother was Ada Mae Hatter Barrett, who was born September 10, 1919. My father was A.J. Barrett, and he was a drunk. We all had a lot of resentment toward mom for staying with him. We loved her and respected her, but there was a part that didn't because of what we had to go through growing up with the humiliation and the shame. Wearing old clothes, clothes with holes, starting high school and not having the clothes we needed. I got along a lot better with my mom in her later years. All those bad feelings about my mom were very strong until my daddy died. After he died, I was getting more mature, I looked back, and I saw how incredible she was. She fixed her own sewing machine, cooked from scratch, and raised five children. She had two breach babies at home by herself. Women didn't have the choices to leave back then that they have now. They had nowhere to go and no one to help them.

My father had plenty of rage in him. Dad worked for St. Clair Lime in Marble City driving a truck, but his drinking caused him to lose his job. Mom started to work in

Page 1 of 8

198

1951 when my brother Gary and I were little. We stayed with Granny Bell and Papa (Isaac Clifford) when she worked. She did not work long at first but went back to work when I was 12. She worked in the Sallisaw hospital laundry from 1958 until her death, March 24, 1976. She was a hard working woman. My dad did not want her to work, but we would have starved without her income. Granny Ida knew a lady who had a field of purple hull peas. The lady said my mom could have what was left for our cattle, but we picked them and that's what we ate for two whole weeks, that and cornbread. That was in 1958.

My mother was a very unhappily married woman. Although she loved my father, she nagged him. When he had had enough, he went to town and got a bottle of whiskey. My mom did not like my grandparents and had great resentment towards her mother-in law, Granny Bell (Mary Ellen Barrett) and her sister-in law, Esther Marie Barrett Floyd.

My grandparents had plenty of nice things, and my mom thought they should have shared more with her. My grandparents were wonderful to me, and I was Aunt Esther's favorite. She told me so. Aunt Esther tried to give me her 10-acre pasture in 1991, but I had two daughters starting college and besides I could never live in Akins again because of the shame of growing up there.

I am not like my brothers. I moved away from the family right after Mom died. I did not want to be like them, fighting all the time, with no loyalty or kindness for each other. My sister Margaret felt the same way and moved to Bloomington, Illinois. I worked as a machine operator at Planter's Peanuts for some 21 years and before that I worked for two years at McDonnell Douglas in Tulsa.

Page 2 of 8

199

We think my dad was bipolar. My mom sent him to the insane asylum in Vinita. This is the same place where my father's granddad, whose name was also Andrew Jackson Barrett. died. My dad's granddad is buried at Maple Cemetery and has a military stone.

My dad used to puncture the tires on my mom's car and would threaten to cut her throat.  On the other hand, when I was pregnant with Craig, my daddy said he would buy me two pantsuits if I had a boy. When Craig was born, he took his money from digging graves and we went shopping together. He kept his promise. He was so proud.

I was not afraid of my father.  One time, my mother had been hiding from him in the woods all day and I found her. Daddy had cut the phone lines, which he often did. He could be meaner after a drunk than when he was drinking. I went to the house and called him a son of a bitch and told him I was going to the neighbor's to call the sheriff. Dad said if I walked off that hill, he would shoot me. I walked out and was going down the hill when I saw the gravel skip near my feet before I heard the shot, but I kept going.  I called E.W. Floyd, Pretty Boy's brother, the sheriff. He arrested my father, but Mom had him out by sundown. It made me resent her and that's when I decided she was on her own.

The last time I saw my dad alive, I had driven down from Broken Arrow to see my mother.  I walked into the kitchen and I could see from Mama's face that Daddy had slapped her and daddy had messed up the house like he did when he went berserk. I confronted Dad, and he told me to get my ass in my truck and go back where I came from.  Mama gave me a look and I knew if would be best for her if I left. That was the

last time I saw him alive. The next time I saw him he was on the slab and I said, "I love you daddy, but you were one mean drunk old son of a bitch."

Daddy was a cruel person at times. My sister Margaret told me in 1994 that my dad had raped my mother's younger sister, Wanda, when she was 13-years old, soon after Mama and Daddy were married. When Mama asked him why, he said because he wanted to be the first one. Granny Ida later took Wanda to Rocky Point, Oklahoma, to have a clothes-hanger abortion, so there's no telling how many times he abused Wanda. We never knew why our girl cousins couldn't come to our house, but now that questioned is answered.

I went to family therapy by myself more than once. I take Welbutrin, which is prescribed by my family doctor. I felt like I needed something. I didn't think I was depressed, but my family did. I married Fred Riley on September 30, 1980, in Poteau, Oklahoma; he is my fifth husband. I did not have children with Fred or with two of my other husbands. I married Jimmy Holden in March 1976 in Fort Smith and divorced him the same year. I married Bill Harris April 7, 1979 in Fort Smith and divorced him a few months later. I married Pat Sherrard in Inola, and divorced him in Sallisaw.

Ernie and Gelene had a volatile marriage. They got married on a dare.

They were wild. Gelene always drank. There is no doubt in my mind she drank all through her pregnancy with Kenny. To be fair, we had no knowledge back then of how bad alcohol could be for the fetus. In 1968, Richard, my first ex husband, took Craig when he was a baby and me to visit them. Gelene would get out of control. One night we drove into Chicago. We went to a supper club, ate, and had a good time until Gelene got

up on the table and started dancing. She was famous for that. She wanted attention; she was a doll, but she did not have to do that.  When Gelene had Stevie, the marriage was over.  It was a funny marriage – they both loved the children, loved to party and they were both wild.  Whatever their marriage was, it worked for them sometimes.  Ernie loved them all. He is very complex.

In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma.  It was the winter and she moved in with my mom and dad.

Mom worked and daddy would go squirrel hunting every day.  Gelene would stay in bed all day with Richie, every day.  She did not get out of bed until my mother had dinner on the table.  Kenny was three and a half.  He would cry when my mother went to work.  My mother showed Kenny so much love and tenderness.  Kenny would just wander around in the cold house alone without a wood fire to warm the place.  Gelene did not change Richie's diapers.

Gelene was depressed.  She did not drink around my parents.  She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut.  Kenny had nothing to eat.  Gelene would not even get out of bed to feed him.  I would come and he would have a box of Rice Krispies in his hand. Mom took Kenny to see Dr. Bob Mitchell because Kenny was so frail and wouldn't eat anything but those Rice Krispies. They discovered then that he had a heart murmur and Dr. Mitchell had mom put Kenny on beer to help him gain weight, but that didn't last long because my daddy would drink the beer, so Kenny

<div align="center">Page 5 of 8</div>

remained frail and thin.

Kenny never had a chance.  I remember when they were living with my parents, I found Kenny standing on one of the chairs, looking out the window. "What you doing bubby?" I asked.  "My daddy's going to come get me," he said. "He has a fast car." It was that way forever. Sometimes I would find him sitting next to his mom's bed waiting for her to wake up. I feel like I abandoned him when I moved away around this time to Broken Arrow.

Gelene, Kenny and Richie stayed at my parent's house for five months. At first, Gelene felt safe at my parents.  She could not go to her own people.  Hugh was a strange man.  Then one day A.J. told Gelene he was going into town to get condoms and that when he came home he was going to have sex with her.  Gelene moved Kenny and Richie to Aunt Ruth's before A.J. got back.  At that time, my mother did not believe Gelene, but when Mama was on her deathbed, she begged for Gelene to come. Mama told Gelene that she was so sorry she hadn't believed her.  There is no telling what Kenny saw and heard back then, when he was wandering around alone at mom and dad's house.

Kenny was the cutest boy.  He had the sweetest smile.  He loved everybody.  He didn't have anybody looking out for him after my mom died. Steve was whining and crying.  Richie was tattling. Kenny was just yelled at by Gelene.  Kenny's whole life she screamed at him.  He once told his Aunt Phyllis that he would lay awake nights because he couldn't get her voice out of his head. Kenny just wanted to be left alone by her, to avoid her, but she never gave him a break. He didn't have a moment's peace; she was incessantly nagging and screaming at him. He had to have taken himself somewhere else

emotionally and mentally to endure this.

Gelene would do anything in the world for anyone.  Nothing is any trouble for her.  What would be an inconvenience for others is not for her.  She is a Jekyll and Hyde – you never know who you're going to get. To her Kenny was always trouble, like she took Ernie out on him. He was always doing something wrong, could never do anything right. He was left to watch his brothers all the time while she partied. She wanted them not to love their daddy. She would tell them stuff you don't tell your kids, like when her child support was late.

When Gelene was in a Jehovah's Witness mode, one Christmas she brought the children out to my mother's, and would not allow the children to receive the gifts we had bought them.  Jehovah's Witnesses do not celebrate Christmas in the manner of most other Christian faiths. I took her into another room and I told her in no uncertain terms she was not going to take Christmas away from the children or my mother. If she refused, I would have taken her down like a dog.  Gelene left, and the children got their presents.

I love Kenny; I did not go to the trial but I was always praying for him.

After I spoke with an investigator working on Kenny's case, he asked me if I would provide the information I gave him to the court.  I did not write out this declaration myself but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct.

Executed by me this 28 day of February, 2009, in

Page 7 of 8

204

_____ County, Arkansas.

_____
Linda Riley

206

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　*Movant,*　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　　**Case No. 6:09-cv-00105-JHP**
　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　*Respondent*.　　　)

---

**EXHIBIT 88**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF MIKE MACKEY

I, Mike Mackey, declare the following:

I have known Cindy Crawford for several years. It is my understanding that she testified against Kenneth Eugene Barrett at his federal trial in Muskogee for the murder of an Oklahoma Highway Patrol Trooper.

Before or during Mr. Barrett's federal trial, I was not contacted by any attorneys or investigators working on his behalf. Had I been contacted, I would have given them the following information about the honesty of Cindy Crawford, and would have been willing to testify.

To put it bluntly, Cindy Crawford is the most wickedly evil person I have ever run across. She will do or say anything to get other people in trouble, if she can get something out of it and if she thinks she will benefit. She is totally dishonest, and lies constantly. This is not only my personal belief, but I am also aware that her reputation for honesty in the community is horrible. In the past, Cindy Crawford has made false referrals to the Oklahoma Department of Human Services regarding me and my step son, who is mentally handicapped, and has also used false information in an effort to get victim protective orders. For example, I once saw her walking down the road while I was driving by. I did not stop and speak to her, and did nothing to her. Within days of this non-incident, she sought a victim protective order against me. She has made false claims of wrongdoing against other members of her family. Cindy Crawford has broken into my

1

home on numerous occasions and stolen things in order to buy drugs. It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time and has managed to stay out of trouble herself because of this. She "works the system" in order to get whatever she can that will benefit her.

An investigator working on Kenny Barrett's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meeting.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

Executed by me this __1__ day of __March__, 2009, in __Sequoyah__ County, Oklahoma.

_Michal W. Mackey_

2

209

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

_____

**EXHIBIT 89**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

_____

**DECLARATION OF MYLA H. YOUNG, Ph.D.**

I, Myla H. Young, declare as follows:

1.    I am a clinical psychologist licensed to practice in the State of California, specializing in neuropsychology and neuropsychological assessments.   I am Board Certified in Neuropsychology by the American Board of Professional Neuropsychology (ABN).   I am a member in good standing of the American Psychological Association and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the National Academy of Neuropsychology; the International Neuropsychological Society; and the Society of Personality Assessment.

2.    I am currently in private practice and conduct neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients.   I have conducted neuropsychological evaluations of children, adolescents, and adults.   I am an instructor of continuing education courses in the Neuropsychological Evaluation of Criminal Offenders and Introduction to Neuropsychology at the University of California, Berkeley, and at Alliant University.

3.    I hold a doctorate in Clinical Psychology from Alliant University, formally known as the California School of Professional Psychology in San Francisco, California.   I received my Masters Degree in Experimental Psychology from Towson State University in Baltimore, Maryland, in 1977.   I earned my Bachelor of Arts Degree in 1975 with a major in Psychology from the University of Guam.

4.    From 1984 to 1985, I completed a pre-doctoral internship at Garfield Geropsychiatric Hospital in Oakland, California.   During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, or psychiatric disorders.

5.    I completed a pre-doctoral internship at the McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California, from 1985 to 1987.   While at St. Mary's Hospital I conducted neuropsychological and psychological evaluations of children, adolescents, and adults

1

who were hospitalized for psychiatric treatment, and provided treatment to these same individuals. I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurosurgery, neurological and other medical disorders.

6.     In 1989, I completed a post-doctoral fellowship in neuropsychology at San Francisco General Hospital/University of California, San Francisco. During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders. I conducted neuropsychological and psychological evaluations of children and adolescents who had been referred to the Child and Adolescent Sexual Abuse Resource Center. In addition, I participated in research that evaluated the neuropsychological, neurophysiological (evoked potential), and psychological functioning of men and women who tested positive and negative for the human immunodeficiency virus (HIV).

7.     From 1990 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility, a California State Prison, in Vacaville, California. During this period I served as a staff psychologist, providing neuropsychological and psychological assessments of individuals who had been admitted for acute and sub-acute psychiatric treatment while confined in the California Department of Corrections. I was part of an interdisciplinary treatment team and served as the clinical coordinator responsible for the development, implementation, and evaluation of a behavioral milieu treatment program. I provided staff training in neuropsychological assessment and behavioral treatment and psycho-diagnostic evaluation, and supervised pre-licensed Ph.D. candidates. I also trained and supervised pre-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children at Oakes Children's Center in San Francisco, California. I trained and supervised pre- and post-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children, adolescents and adults at the McAuley Institute of St. Mary's Hospital in San Francisco, California.

8.     From 1995 to 2000, I served as the Program Consultant for Psychology for the California Department of Mental Health facility located within the Correctional Medical Facility at

2

Vacaville, California, and served from 2000 to 2005 as the Senior Supervising Psychologist in the same prison's psychiatric treatment program. In these positions, I was the psychology consultant to the Executive Director, Medical Director, and Program Directors, was responsible for research and program evaluation, provided clinical supervision and consultation, and provided direct inmate/patient care. I was also the principal investigator for research, program evaluation, and treatment outcome measurement. I developed, accomplished accreditation of, and served as the director for an American Psychological Association accredited psychology intern training program, provided seminars in neuropsychological assessment, and provided individual and group supervision to psychology pre-doctoral interns and post-doctoral fellows.

9. From January 1990 to June 2004, I served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology where I taught courses on neuropsychological assessment. I was the dissertation chairperson for several doctoral students and served on the dissertation committees of numerous other doctoral students. The students pursued varied and wide-ranging areas of investigation involving both children and adults, psychotic and non-psychotic individuals, and persons confined in penal institutions as well as persons not so confined. I am the primary author of several studies which have appeared in peer-reviewed publications involving the prison population and the secondary author of several additional peer-reviewed publications.

10. I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology. I have been qualified as an expert witness in criminal cases in state and federal criminal courts in California, Nevada, Washington and Hawaii and in civil cases in California state courts. Further description of my education and professional experiences is included as Addendum A.

11.     I was asked by the current post-conviction attorneys for Kenneth Barrett to complete a neuropsychological evaluation of Mr. Barrett to determine if he experiences brain damage and, if brain damage exists, the nature, severity and functional impact of that brain damage.

**A.     Introduction: Brain Functioning and Neuropsychological Assessment**

12.     The science of clinical neuropsychology studies the relationship between the brain and behavior.  Because the brain is the human organ that drives behavior, any injury or insult has the potential to adversely affect a person's actions, thought processes, cognitive abilities and psychological functioning.  Conversely, observable behavioral deficits, including failure to meet developmental milestones and impaired scholastic, occupational and/or social functioning may suggest compromised brain anatomy or neurophysiology.  Consequently, historical, academic, vocational, medical/psychiatric, family, and social history information may provide reasons to suspect brain dysfunction or damage and make a comprehensive neuropsychological evaluation appropriate and/or medically indicated.

13.     A competent evaluation of neuropsychological functioning requires administration of a full battery of standardized neuropsychological tests, review of information from documents that are available, interviews or reports of interviews of those who have knowledge of the individual's history, and interviews with the individual being evaluated.  Focus of information sought includes family, medical, psychiatric, and social histories, circumstances of prenatal development, circumstances of childhood and adolescent development, educational, work, offense information, and description of current functioning.

14.     A comprehensive neuropsychological testing battery also includes measures of different aspects of brain functioning, including general mental ability (intelligence), sensory perception, motor functions, attention and concentration, verbal and visual memory and learning, expressive and receptive language, psychomotor and executive functioning (abilities to think, organize, reason, plan, inhibit impulses, think and act flexibility).  Based on knowledge of brain anatomy, brain functioning, and neurological disorders, instruments used in a neuropsychological evaluation are developed to identify and measure cognitive deficits caused by brain dysfunction,

4

and, if impairment is demonstrated, to provide an indication of the potential cognitive and behavioral consequences of disrupted brain functioning for the individual.

15. Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is supported and relied upon by contemporary neuroscientists in understanding brain function and dysfunction.

16. Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to maintain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and frontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

17. In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a predictable and unchangeable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

18. In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language

academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and frontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

19.     As the brain develops, those brain regions that are maturing the most are also those brain regions that are most vulnerable to brain damage, identified as the "vulnerability hypothesis." Consequently, the child who experiences brain trauma between the ages of approximately 8 – 12 years is most vulnerable to subsequent severe leaning disabilities. The adolescent who experiences brain injury between the ages of 12 and 16 years is most vulnerable to subsequently impaired executive functions. Additionally, brain insult(s) as a child interferes with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

### B. Risk Factors and Indications of Neuropsychological Dysfunction

20.     Social and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial indicated the existence of several risk factors and potential etiologies for congenital and/or acquired brain dysfunction. The pertinent information I reviewed included excerpts of academic records from Tommie Spear Junior High School, Sallisaw, Oklahoma and Jan County High School, Portland Indiana; Universal Cumulative Record, Plainfield Community Consolidated School District, Plainfield, Illinois; medical records from Sequoyah Memorial Hospital, Sallisaw, Oklahoma, St. Francis Hospital, Tulsa, Oklahoma, Wagoner Community Hospital, Wagoner, Oklahoma, and Bill Willis Community Mental Health Center, Sallisaw, Oklahoma; and a Disability Determination Unit Record, Sallisaw, Oklahoma. I also reviewed psychological evaluation test data obtained by Faust Bianco, Ph.D., Tulsa, Oklahoma, in August 2000 and psychological evaluation test data and a report prepared by Bill Sharp, Ph.D., Norman, Oklahoma, in October 2002. These data suggested potential insults to Mr. Barrett's brain functioning resulting from head trauma(s), both in childhood and as an adult; possible prenatal insult and brain development abnormality; and adolescent and adult abuse of alcohol and other drugs. Documented symptoms of possible

6

psychiatric disorders were also indicative of neurological brain substrate abnormality and consequent brain dysfunction.

21.    Mr. Barrett's history of potential head trauma(s) include a childhood injury, at age eight or nine years when he was struck in the head with some type of "steel ball" on the school yard. Mr. Barrett's description of the incident ("I just remember waking up and them picking me up") suggests loss of consciousness as a result of this incident, and as an adult, Mr. Barrett has a skull indentation which he attributes to this childhood injury.   At the approximate age of 22, Mr. Barrett also may have suffered a head injury, with consequent loss of consciousness, in a motorcycle accident.   He was treated at Sequoyah Memorial Hospital, Sallisaw, Oklahoma, and the Emergency Room Records describe "treatment for MVA," right periorbital area pain, edema, and possible head trauma. Immediately following his arrest in 1999 for his current commitment offense, Mr. Barrett was treated at St. Francis Hospital, Tulsa, Oklahoma, for multiple gunshot wounds and "bruising to the left eye and superficial abrasions to forehead...superficial blunt head trauma").

22.    Head traumas may cause damage to the cellular units of the brain (neurons), which transmit and store information.  The blood vessels transmitting oxygen and nutrients through the brain are also damaged.  Multiple small, and/or single large bleeds (hematomas) within the brain can occur.  The brain swells, pressing against the rigid bony skull, causing further damage to the brain.  Extensive research describing the damaging effects of head trauma as a child and head trauma as an adult is currently known and was well established in 1999.  Two sources which provide a representative description of this historical and current research are found in Kolb & Wishaw (2003) and  Silver, McAllister, & Yudofsky (2005).

23.    Mr. Barrett also may have been exposed to dysgenic disorder as the result of teratogenic effects of substance use by his mother during her pregnancy with him, as well as secondary to his mother's psychopharmacological treatment for depression during her pregnancy.  These factors are known to be associated with brain development abnormality, brain dysfunction and abnormal development of the fetal brain (Rasansen, 1999; Steissguth 1990; Tizabi, 1997; Cornelius, 2001; DiPietro; 2002, Ernst; 2001; Huizink, 2004; Weizman, 2002).  Mr. Barrett reports childhood

7

216

exposure to alcohol beginning at age seven, when his father provided alcohol to him and his brother, resulting in his severe intoxication and subsequent emesis. He indicates that he then consumed alcohol and other drugs "on a regular basis" beginning at approximately the age of 14 years, with particularly severe drug abuse between the ages of 16 and 18. Drug use was then reportedly intermittent until age 32 when it again became severe until the time of the offense for which he was incarcerated. The research describing the damaging neurocognitive effects of alcohol and drug abuse is currently known, and was well known in 1999. Two resources which provide a representative description of this past and current research include Tapert (1999) and Heimer (2003), as well as Kolb & Wishaw, 2003 and Adams, 2009.

24.    Medical records dating from several years before Mr. Barrett's arrest documented his hospitalization for a suicide attempt, as well as medically indicated need for psychopharmacological treatment with antidepressant and with antipsychotic medications. Brain abnormalities and consequent neuropsychological impairments associated with major psychiatric disorders have been known for more than a decade. There is substantial research describing the neurological bases of psychiatric disorders, particularly the neurological bases of depression, bipolar, and psychotic disorders, and there is substantial research describing the neuropsychological patterns of impairment associated with these psychiatric disorders (Heaton, 1998; McIntosh, 2005; Savitz, 2008) to site a few sources of this extensive literature.

25.    This information about Mr. Barrett's history indicated the appropriateness of conducting a comprehensive neuropsychological assessment both in 1999 and currently.

### C. Nature and Circumstances of the Neuropsychological Evaluation

26.    I conducted approximately 16 hours of neuropsychological evaluation of Kenneth Barrett over the course of three days on February 9 - 11, 2009. Mr. Barrett is a 47 year old White male. The evaluation was conducted at the United States Penitentiary, Terra Haute, Indiana in a confidential room without distraction or interruption. The examination room was reasonably quiet, reasonably private and with adequate ventilation and climate control. Mr. Barrett was not physically restrained during the evaluation and the evaluation proceeded uninterrupted. Multiple breaks in testing were taken, and Mr. Barrett was provided drink and snack. Mr. Barrett's

8

217

clinical presentation, which I observed during the evaluation, was consistent with the results of neuropsychological testing.

27.     Mr. Barrett completed 9 years of formal education, and school records for his 8th and 9th grade school experiences, as well as cumulative record from his 1st and 2nd grades were available at the time of this evaluation. It is unclear from these school records, but Mr. Barrett reports that he repeated the 8th grade of school and that he participated in special education for learning disability. He has attempted to complete a General Education Degree (GED) at several points in time, but has not been able to pass the required test. Mr. Barrett indicated that he is currently studying to take the GED examination again. He reports that he has taken several "pre-tests," but has not been able to successfully pass these pre-examinations.

28.     From the results of testing measures and from my own observations, Mr. Barrett fully cooperated with the evaluation, gave his best effort on all tests, and made no attempt to manipulate, fake or exaggerate his neurological dysfunction. Specific evaluation of Mr. Barrett's effort on and attitude toward the assessment was obtained through administration of tests that were specifically developed to determine the validity of the individual's effort on and attitude towards testing, including the 15 Item Test, the Test of Malingering Memory (TOMM), Green's Word Memory Test (WMT) and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II).    These tests have demonstrated validity and reliability in distinguishing between individuals who are known to be attempting to manipulate their test ability and those who are not, with as high as 93% accuracy (Lee, 1992; Millis, 1995; Rees, 1998) for some of these tests. Mr. Barrett's abilities on these tests indicate that he was expending his best efforts in this evaluation and was not attempting to feign or exaggerate any deficits in his abilities.

29.     Mr. Barrett's attitude towards and effort on testing was also evaluated considering the expected consistency of his test ability within each test, across different measures of the same test, and across different neuropsychological tests that are known to be measuring the same brain region and functions. Mr. Barrett's attitude and effort on testing were further evaluated considering events in his personal history, what is known about potential brain damage

9

associated with those events of his personal history, and the consistency of Mr. Barrett's history, his brain function/dysfunction, and his neuropsychological testing abilities/disabilities.

30. In addition to these validity testing measures, my own clinical observations of Mr. Barrett confirmed that he was cooperating and putting forth exceptional effort on testing. He worked consistently, attempted all tasks that were requested of him and persisted until tasks were completed or terminated. He was intent on completing the tasks asked of him and was particularly intent on trying to accomplish tasks that were difficult for him. On several occasions Mr. Barrett asked me if he could re-attempt a previously administered test which was difficult for him. These observations were consistent indications that Mr. Barrett was marshalling all of his resources to complete neuropsychological testing and was putting forth an earnest effort to perform well.

31. Consideration of all of these elements indicates that Mr. Barrett was putting forth substantial effort to complete neuropsychological testing, was cooperating with testing, and was not attempting to manipulate his abilities. This evaluation is considered to be a valid measure of Mr. Barrett's neuropsychological profile, and can be relied upon in establishing conclusions about his brain functioning.

32. Although he reported a history of what he identified as migraine headache, Mr. Barrett reported that he was not experiencing headache nor was he experiencing any other unusual pain on the days of testing. On each day of testing he indicated that his sleep and eating were no different from his usual patterns. He indicated that he did not require glasses and was able to see all information that was presented to him. He was not experiencing any peripheral numbness in his hands or fingers. Mr. Barrett reported a history of tinnitus, but indicated that he was not experiencing tinnitus on the days of testing, and that he was able to hear all information that was given to him. Although he reported several serious medical disorders (Hepitis A, Hepitis C, prostate disorder, persisting staph infection and consequent eczema, and chronic ulcers) he indicated that he was not experiencing any unusual pain or discomfort on days of testing. Mr. Barrett reported that although he has been prescribed both antidepressant and antipsychotic medications in the past that he was not currently prescribed and was not currently taking any

psychotropic medications. Although he has a history of past suicide attempt and psychiatric treatment, Mr. Barrett reported that his mood was reasonably stable, that he was not experiencing perceptual alternations such as hallucination, was not experiencing other psychotic symptoms and did not experience suicidal ideation or plan.

33. Mr. Barrett reported that he was taking an anti-inflammatory medication but did not know the name or dosage, and that he was taking Prilosec for treatment of ulcers. He reported that he had not experienced any additional medical disorders of note since his incarceration at United States Penitentiary, Terra Haute, Indiana (USP Terra Haute, Indiana) for this offense. Mr. Barrett has an extensive past drug use history. Although he acknowledged availability of drugs in incarcerations facilities, he reported that he had not used any drug or alcohol since his incarceration at USP Terra Haute, Indiana. Mr. Barrett has a history of prior tobacco use. He indicated, however, that his last tobacco use was in 2005.

34. Kenneth Barrett expressed his willingness to participate in this evaluation. He was advised of, understood and agreed to limits to his confidentiality. Although testing conditions were quite adequate, functional manifestation of Mr. Barrett's neuropsychological deficits made evaluation challenging at times. He presented as mildly hypomanic. His speech was rapid, he often started to respond to a question before the question was completed, at times was tangential, and often arbitrarily changed the focus of his discussion without warning indicating likely racing thought ("sometimes I just think too fast"). When attempting to provide information, Mr. Barrett often exhibited circumstantial speech, describing extensive, often irrelevant details. He responded to all requests, but often "talked around" the topic, rather than providing a direct response. He was not able to provide a simple "yes" or "no" response to questions that clearly called for only such a response. Although he provided many details, Mr. Barrett's thinking often was overly concrete and he often did not appear to fully understand testing instructions, often requiring test instructions to be presented several times, and in several different ways. Mr. Barrett appeared to be somewhat aware of his presentation, at times acknowledging that he sometimes "talked too much" and at times apologized for beginning to answer a question or provide a response before I had completed my question. Mr. Barrett responded positively to

11

appropriate clinical interventions, however, further assuring that all information obtained is valid and reliable.

35.     All neuropsychological tests administered have appropriate and documented standardization, reliability and validity.  All tests administered are often used and are generally accepted in the neuropsychology community.  In addition to the previously described validity tests (15 Item Test, Test of Malingering Memory (TOMM), Green Word Memory Test, CVLT II Forced Choice Subtest), the neuropsychological tests administered to Mr. Barrett included the following instruments:  Wechsler Adult Scale of Intelligence Test (WAIS IV); Wide Range Achievement Test – Third Edition (WRAT-III); Smell Identification Test, Reitan-Klove Sensory Perception Examination, Finger Tapping Test, Grooved Pegboard, Seashore Rhythm, Speech Perception Test, California Verbal Learning Test (CVLT-II), Wechsler Memory Test (WMS IV), Rey Complex Figure Test; Executive Functioning Test (EFT), Wisconsin Card Sorting Test, and Short Category Test (SCT).  Attempt was made to administer the Paced Auditory Serial Addition Test (PASAT).  Mr. Barrett was quite cooperative with his attempts to complete this test, but he was simply unable to understand the instructions.  Instructions were provided in the standardized format.  Instructions were then also repeated several times, paraphrased several different ways, and demonstrated with examples.  The PASAT was discontinued after the third trial.  The administered neuropsychological battery consists of the most sensitive and reliable standardized tests currently available for measuring neuropsychological functioning that are also compatible with the testing conditions at USP Terra Haute, Indiana.  All of these tests – or their predecessor editions – the methodology, and the research on which I based my conclusions were available and accepted in the neuropsychological community, and valid at the time of Mr. Barrett's arrest and trial in 1999.

### D.     Results of Testing

36.     Overview:  For Mr. Barrett, understanding of his brain dysfunction is particularly dependent on understanding the functions associated with the frontal cortex, temporal cortex, and interconnecting systems between these brain cortices.  The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex.  The motor cortex

provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

37. The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones and emotional meaning. The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions. Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities. Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years. Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

13

38.     The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex. The impairment of cognitive functioning produced by these deficits is manifested in a pattern of ability and disability indicating that although Mr. Barrett is generally able to reasonably access and provide information that is long-standing and that he has rehearsed and learned, his ability to actively attend to, take in, and learn and recall new information is significantly impaired. While his previously learned information remains reasonably stable and accessible, Mr. Barrett's ability to actively process and comprehend new information in the "here and now" is significantly compromised. Indicative of extensive dysfunction in Mr. Barrett's prefrontal cortex regions, his test performance was significantly impaired on executive functioning tasks which primarily required cognitive flexibility, particularly the ability to flexibly inhibit and change his thinking and actions in response to requirements of the task or situation (perseveration). Also typical of individuals with significant prefrontal cortex impairment, Mr. Barrett exhibited multiple instances of confabulation, where he unknowingly provided information that had no real relationship to the problem at hand. He presented that information in a self-assured way, seemingly not recognizing the errors—at time even absurdity —in his thinking. Mr. Barrett was not purposefully "making up" information but, as is typical in prefrontal cortex damage, he reported information that was inaccurate, at times illogical.

39.     Intellectual Functioning: Mr. Barrett's general mental ability was evaluated using the most recent revision of the Wechsler Adult Intelligence Scale (WAIS IV), which was published in January 2009. WAIS-IV consists of 15 subtests, 10 of which are required. Four Composite Indexes are developed (Verbal Comprehension Index (Vocabulary, Similarities, Information); Perceptual Reasoning Index (Block Design, Matrix Reasoning, Visual Puzzles); Working Memory Index (Digit Span Arithmetic Letter-Number Sequencing); and Processing Speed Index (Symbol Search, Coding).

40.     Mr. Barrett's abilities on this test demonstrate overall intellectual functioning in the low average range. His full scale intelligence quotient (FSIQ) is 84 (95% Confidence Index = 80 –

14

88), placing him in the 14th %ile. His acquired knowledge, verbal reasoning, and attention to verbal material is in the average range (VCI = 95, 37th %ile) (95% Confidence Index = 90 – 101). His fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration is in the low average – average range (Perceptual Reasoning Index = 92, 30th %ile) (95% Confidence Index = 86 – 99). His ability to actively receive, organize and recall information (Working Memory Index) was, however, significantly lower and in the borderline - low average range (WMI = 83, 13th %ile) (95% Confidence Index = 77 – 91). His ability to attend and concentrate, recall information, and reproduce the information that he recalls (Processing Speed Index) was even lower and in the borderline range (PS = 76, 5th %ile) (95% Confidence Index = 70 – 87).

41.     Significantly lower abilities to actively receive, attend and concentrate, organize, recall and reproduce information as measured on the WAIS-IV Working Memory and Processing Speed indexes, are particularly relevant to understanding Mr. Barrett's brain dysfunction, including the pronounced disparity between his ability to access his stable fund of knowledge and his significant inability to appreciate and make sense of new information.

42.     Compromised prefrontal, temporal, and connecting systems (Orbitofrontal Paralimbic Connection; Hippocampal Paralimbic Connection; Frontal Subcortical Connection) relaying information from the frontal cortex to all other brain regions is particularly indicated. This pattern of brain function and dysfunction provides explanation as to why Mr. Barrett's overall intellectual quotient can be in the low average range even in the face of significant current brain dysfunction. This pattern also explains why at some point in time his overall intellectual quotient may have been measured as higher.

43.     Sensory and Motor Functioning: Mr. Barrett's sensory functioning was evaluated using the Smell Identification Test (SIT) and the Reitan-Klove Sensory-Perceptual Examination (SPE). His olfactory sensory abilities on the SIT were in the normal range (4 errors, 49th %). His abilities to accurately receive bilateral simultaneous auditory, visual, and tactile stimulation were normal. His tactile-finger recognition was normal. Mr. Barrett's finger-tip number writing perception, however, was significantly bilaterally impaired. He had 10 errors for his right hand

(T = 34, mild-moderate impairment) and 8 errors for his left hand (T = 32, mild-moderate impairment). Whereas other sensory-perceptual abilities in this examination represent simple sensory perception, finger-tip number writing perception is more complex. This ability requires more concentrated attention and more communication of information from the sensory strip in the posterior area of the frontal cortex through the frontal-hippocampal-limbic connection to and from the parietal cortex. This sensory perceptual ability also requires more complex communication across the corpus callosum to and from the right and left brain hemispheres. Dysfunction of the sensory cortex and communication of the sensory cortex to other brain regions is indicated for Mr. Barrett.

44. Mr. Barrett's motor coordination and repetition were evaluated using the Finger Tapping and Grooved Pegboard tests. He experienced mild-moderate bilateral impairment on both of these measures (Finger Tapping Right T-34; L T=32; Grooved Pegboard Right SS = -1; Left SS = -1). Dysfunction within the frontal motor cortex and communication of information from the frontal motor cortex to other brain regions is indicated.

45. Attention and Concentration: Mr. Barrett's attention and concentration were evaluated using Seashore Rhythm and Speech Sounds Perception tests. As has been previously described, Mr. Barrett was not able to comprehend and carry out instructions to complete the Paced Auditory Serial Addition Test (PASAT) and this test was discontinued after the third trial.

46. There are multiple indications that Mr. Barrett experiences impaired attention and concentration. During testing he frequently had to be re-directed to the task at hand and when he was not able to sustain his attention, frequent breaks on tests which had multiple subtests were needed. Additionally, his abilities on several neuropsychological tests which are strongly weighted to the ability to attend and concentrate (WAIS IV Digit Span, Letter-Number Sequencing, Symbol Search, Coding; Executive Functioning Trail Making Tests) were particularly impaired. Attention and concentration is primarily mediated by the prefrontal cortex, subcortical reticular activating system, and communication between these two brain regions through the frontal-subcortical connecting system, indicating dysfunction of these brain structures and connections for Mr. Barrett.

16

47.     <u>Memory and Learning:</u> Multiple aspects of Mr. Barrett's memory and learning were evaluated assessing his ability to learn and recall information that was presented both verbally and visually and—in both of these modalities—assessing his immediate, delayed, free recall, interference, recognition and forced choice recall of information.   Memory and learning were evaluated using the California Verbal Learning Test (CVLT II), Wechsler Memory Scale (WMS IV), memory trials of the Rey Complex Figure Test (Rey), and Working Memory Index of the WAIS IV.   Mr. Barrett's abilities across these measures of memory and learning portray a distinct pattern of memory function and dysfunction.   On several measures his memory was within or above the normal range (Rey Complex Figure Immediate Recall T = 59, 82%; Rey Complex Figure Delayed Recall T = 59, 82%; Rey Recognition T = 51, 54%; WMS IV Auditory Memory = 95, 37th %ile; Immediate Memory = 108, 70th %ile; Delayed Memory = 100, 50th%; On CVLT II, his standard scores ranged from normal to mild-moderate impairment = +1.5 to -1.5).   On other measures of memory and learning, however, his ability was significantly impaired.     Mr. Barrett's ability to actively receive, organize and recall information (WAIS IV working memory) and his ability to concentrate, recall and reproduce information (WAIS IV processing speed) were within the borderline-low average range.   On the Wechsler Memory Scale (WMS IV) his Visual Working Memory (VWMI) was in the extremely low to borderline range (VWMI = 70, 2nd %ile), his delayed recall of word pairs was in the borderline range (WMS IV Paired Associates Delay = SS 8, 25th %ile ), his ability to store, manipulate, and ignore irrelevant or competing information was in the mildly impaired range  (Spatial Addition = SS 6, 9th%ile), and his ability to keep a mental image of a design in mind and to recall the relative spatial position of this information was in the moderately impaired range (Symbol Span SS = 4, 2nd%ile ).    Also of note, Mr. Barrett had a significant number of repetition errors indicating perseverative thinking (CVLT repetition errors = -1, mild impairment).  This same impairment of his ability to flexibly shift his thinking and acting was demonstrated across multiple tests of executive functioning, as described below.   Memory and learning is primarily mediated by the limbic system hippocampus, temporal cortex, prefrontal cortex and connecting systems among

these brain structures (Frontal-subcortical connecting system; Orbitofrontal Connecting System; Frontal-hippocampal Connecting System).

48.     Language:   Mr. Barrett's secondary language was evaluated using the Wide Range Achievement Test (WRAT3). This test measures academic achievement in three areas: Reading Word Recognition, Spelling, and Arithmetic Skills. Mr. Barrett's abilities on the WRAT3 placed him in the 25th percentile in reading recognition (high school equivalent), but in the 5th percentile (6th grade equivalent) in spelling, and the 7th percentile in arithmetic (7th grade equivalent).

49.     Executive Functioning:   As previously described, executive functioning is an umbrella construct, which encompasses abilities to think, reason, problem solve, make reasoned decisions, anticipate consequences of decisions and actions, and modify actions in response to information received from the environment. Executive functioning includes abilities to initiate, monitor and change actions depending on needs of the situation. Executive functioning also includes abilities to inhibit thinking and actions, understand and develop ways to accommodate complex situations, and inhibit thinking and actions as required by the situation. Executive functioning is mediated by the frontal cortex, predominantly by the prefrontal cortex, and through connections from the frontal cortex to all other brain regions. Intact executive functions are necessary for managing a wide range of experiences in daily living. Accommodating stressful situations, understanding complex constructs and situations, being able to plan and deliberate potential ways of solving a problem or situation, being able to describe why actions are selected or not selected for action, anticipating the consequences of those decisions, and changing decisions and actions based on understanding of the problem or situation are all examples of executive functioning abilities. Adequate executive functioning is demanded when a situation or problem is complex and/or stressful and requires the ability to understand, as well as to act thoughtfully. More specifically, executive functioning requires the individual to incorporate feedback concerning the effect of each piece of information and then consider how the new information affects subsequent actions or choices or requires the individual to modify his thinking and actions or change a course of action as needed by the problem or situation. The executive

18

functioning process is dynamic in that it requires continuous attention to, evaluation of, and incorporation of new information and inhibits thinking and actions as needed to solve the problem or situation (Delis, Kaplan & Kramer, 2001; Gioia, Isquith, Guy & Kenworthy, 1996/1998/2000). Mr. Barrett was significantly impaired across multiple tests of executive functioning, with his impairment ranging from mild to severe.

50.    The frontal cortex is the largest brain structure in the human brain, comprising 20-25% of all brain tissue. The frontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration and repetition of motor abilities. The mesial region primarily regulates emotion, motivation, drive, spontaneity, motor aspects of speech, and the ability to monitor actions. The dorsolateral lateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize information and memory, and—in combination with the mesial region—the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional lability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a particularly interactive role with the limbic system, assessing and altering emotional responsivity and inhibition of thought and actions. Knowledge of executive functioning and the role of executive functioning has been known by neuroscientists for many years, since and prior to 1996 (Benson, 1996; Casey, 1997; Constantine, 2004; Frank, 2006; Hinson, 2003; Janowsky, 1989; Kritchevsky, 1989; Lyketsos, 2004; Nagahama, 2005).

51.    Mr. Barrett's executive functioning was evaluated using tests that make up the Executive Functioning Test (EFT) (Trail Making Tests, Verbal Fluency Tests, Design Fluency Tests, Color-Word Interference Tests, Sorting Tests, Twenty Questions, and Tower Test), Wisconsin Card Sorting Test (WCST), and Short Category Test (SCT). Across EFT subtests, Mr. Barrett was able to accurately complete some tasks. He was, however, significantly impaired in his abilities on other tasks of executive functioning, with his impairment ranging from mild to

19

severe.  A distinct pattern in the nature of Mr. Barrett's impairment on EFT measures was apparent.

52.     With the exception of his ability to complete the Twenty Questions subtest of the EFT, Mr. Barrett had some significant impairment on each of the EFT subtests.   Trail Making Test is a series of four individual tests which primarily evaluate visual-scanning, attention, motor and the ability to flexibly switch thinking and actions. Mr. Barrett's ability to quickly scan the task was moderately impaired (SS = 4); his ability to sequentially process numbers was in the borderline range (SS = 8); his ability to sequentially process letters was mildly impaired (SS = 7) and his ability to flexibly shift his thinking and actions was mildly impaired (SS = 7).  Of particular note, Mr. Barrett made multiple errors of several types on Trail Making.  He had a significant number of errors where he was not able to effectively scan information, focusing on the relevant and ignoring the irrelevant (Omission Errors = 13%th, mild impairment); he had a significant number of errors correctly moving information in the expected order (Sequencing Errors = 16th ile – below average); and he had a significant number of errors where he could not order numbers and letters of the alphabet while sequentially and flexibly switching from number to letter (Set Loss Errors = 22% - below average).  Overall, the number of errors that Mr. Barrett had on Trail Making Tests was impaired (SS = 7, mild impairment).

53.     Verbal Fluency Tests evaluate the ability to initiate and report verbal information, and this was a relative strength for Mr. Barrett.  He was successfully able to retrieve and report letters and words and he was able to switch his verbal descriptions (Letter Fluency SS = 8; Category Fluency = 10; Category Switching SS = 10).  Mr. Barrett again, however, had a significant number of errors in this process (Switching Accuracy SS = 5, mild impairment; Percent Switching Accuracy SS = 4, moderate impairment).

54.     On tests which evaluate fluency of visual information, Mr. Barrett's abilities were similar to his fluency with verbal information.  Design Fluency was a relative strength for him (Filled Stimuli SS = 12; Empty Stimuli SS = 10; Design Switching SS = 10).  Mr. Barrett's accuracy in carrying out these tasks was, however, significantly impaired (Percent Switching Accuracy SS = 8, borderline impairment).

55.     A similar pattern of ability/disability was demonstrated on EFT tests of the ability to name colors and words and his ability to withhold the familiar while reporting the accurate but less familiar (Color-Word Interference Tests (Color Naming SS = 10, average range; Word naming = SS 7, mild impairment; Inhibition = SS = 9, average range; Inhibition Switching SS = 10, average range).   Again, despite his ability to simultaneously process this information was significantly impaired (Inhibition Errors = SS 6, mild impairment; Inhibition/Switching Errors SS = 7, mild impairment).

56.     On tests of concept formation and conceptual knowledge (Sorting Tests) Mr. Barrett was successfully able to develop concepts (Free Sorting SS = 8 and 9, below average - average range).   His ability to transfer his skills to understand and describe concepts presented to him, however, was significantly impaired (Recognition Description SS = 3, moderate-severe impairment).

57.     Mr. Barrett's ability to view a problem and, using his hands, to manipulate objects (Tower Test) was within the normal range (SS = 11, average range).   In the process, however, Mr. Barrett's ability to accomplish this task while inhibiting his thinking and action was severely impaired.  Mr. Barrett reports substantial work history as an automobile mechanic.  He reports with pride that he could approach a difficult automobile mechanical problem and fix it but he could not explain *how* he went about fixing the problem, *why* he did what he did to fix the problem, or to *replicate* the process at another time on another vehicle.  Completing the EFT Tower Test is somewhat similar to completing an automotive repair project.  Completion of the Tower Test has two simple rules…move one piece at a time and always put a small object on top of a larger object.  Mr. Barrett was not able to inhibit his responding and he broke the "rule" a significant number of times ((Move Accuracy Ratio SS = 3-severe, moderate impairment; Rule Violations SS = 7, mild impairment).   Persistent errors on tests of executive functioning, as well as on tests of memory and learning, represent significant perseverative thinking and acting (tendency to rigidly repeat the same thought and action even though the situation or problem has changed) and tendency towards confabulation (the recitation of inaccurate often absurd experiences to unknowingly fill in gaps of memory) for Mr. Barrett.

58.    The entire frontal cortex system is required to complete these tests on the EFT. The pattern of Mr. Barrett's success and failures across the tests, however, indicate that the greatest prefrontal cortex impairment for him is within the dorsolateral and orbitofrontal regions, with relative sparing of structures within the mesial prefrontal system.

59.    The Wisconsin Card Sorting Test (WCST) is one of the oldest, most researched, and most utilized tests of executive functioning available to neuropsychologists (Buros, 2009).  It requires the individual to place cards with different symbols, numbers of symbols printed in various colors in piles under four key cards according to a pattern that the individual must deduce from the examiner's feedback to the individual's decisions for placement of the cards.  Although the entire frontal cortex system is involved in successfully completing this test, current neuroimaging research demonstrates particular involvement of the dorsolateral prefrontal region (Nagahama, Okina, Suzuki, Nabatame & Matsuda, 2005).  Mr. Barrett's ability to complete the WCST is significantly impaired, with Mr. Barrett experiencing impairment on 67% of the WCST measures, with impairment severity ranging from mild to severe.  The total number of errors made by Mr. Barrett on the WCST places him equal to or below the 1st %ile. The number of perseverative errors made by Mr. Barrett was impaired (Perseverative Errors = 42nd%ile); and the number of nonperseverative errors was severely impaired $\leq 1^{st}$%ile).

60.    One of several abilities measured by the WCS is the ability to develop a simple concept and then to carry out that simple concept.  Mr. Barrett experienced significant difficulty developing the concept required by this test (Conceptual Level Responses = $\leq 1^{st}$ %).  Of particular concern, Mr. Barrett frequently repeated out loud the "rule" he was using to solve this problem.  Nevertheless, he was unable to carry out the "rule" he had stated (Categories Completed = 0).  When impaired, his impairment was consistently in the severe range.  Current research demonstrates a significant relationship between ability/inability to grasp and to consistently carry out the demands of the WCST and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma (Macklin, Horner, Harvey, & Stevens, 2005).

61.     Again, the WCS requires the entire prefrontal system to successfully complete. Dorsolateral and orbitolateral prefrontal regions are, however, primarily involved in completing this test (Nagahama, Okina, Suziki, Nambatome, & Matsuda, 2006).

62.     Category Test is another well-known and respected measure of functioning of the prefrontal cortex.   Category Test was developed by Halstead in 1979, and one of the first standardizations of the Category Test was in 1985 (Reitan & Wolfson,). The Short Category Test (SCT, 1989) is a current revision of the Category Test.  Using stimuli from the original Category Test, the SCT was developed as an instrument that could be more easily transported, more easily administered, and requires less time to accomplish the same goal.  SCT and Category Test are significantly related (discriminate validity = .93) and reliable (reliability co-efficient = .81).  SCT also has good sensitivity, correctly classifying 83% of individuals who do/do not experience brain damage.   This indicates that these two tests are measuring the same construct and same brain region.  Category Test and SCT are highly related (.93 to .80), providing confidence in substituting SCT for the longer, more demanding Category Test. (Buros, 2009).

63.     Similar to the WCST, the Category Test assesses an individual's ability to solve problems which require abstract concept formation, use abstract principles, and understand complex information.   Whereas neuroimaging has demonstrated the WCST to be primarily mediated by the dorsolateral region of the frontal cortex, the Category Test appears to be primarily mediated by the posterior frontal cortex, anterior parietal cortex, and connecting systems between these brain regions.

64.     Like his abilities on the WCST, Mr. Barrett's abilities on the SCT were also severely impaired.  SCT requires the individual to develop a concept to solve a problem, carry out the actions needed to accomplish the concept they developed, and flexibly change their thinking and acting in response to information that is actively provided to the individual by the neuropsychologist who is administering the test.  The test requires that the neuropsychologist to verbally respond to each choice as being "right" or "wrong" while the test is actively being taken.  The objective is for the individual to be able to develop a concept, try the concept out, and if their concept is accurate ("right") continue applying the concept, but if the concept is

23

inaccurate ("wrong") to change the concept and try out a different concept.   Out of 100 possible responses, Mr. Barrett was wrong 64% of the time, making 64 errors.   The measured significant impairment on this test means that I had to say to Mr. Barrett 64 times that he was "wrong."

65.    Mr. Barrett was not able to learn from the information he was being provided and his abilities on this test were severely impaired (T = <24, <1st%ile).   Again, Mr. Barrett often stated the concept or "rule" he had developed, but then did not carry out that rule that he had just stated. The SCT assesses an individual's capacity for abstract reasoning and complex concept formation, as well as the individual's ability to flexibly change their thinking and actions considering information that they are provided.   SCT is a measure of functioning of the entire prefrontal cortex system, evaluating abilities that are similar to those measured by the WCST.

66.    In summary, Mr. Barrett's abilities and disabilities on neuropsychological testing portray the picture of an individual who, despite reasonably adequate general mental ability, nevertheless experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices, which are necessary for the brain to effectively communicate information and function effectively.   The nature and severity of brain dysfunction would negatively impact all aspects of Mr. Barrett's daily functioning, and would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment.   His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.

67.    I hold each one of the observations, findings, and conclusions I have reached above to a reasonable degree of scientific certainty and would have advised trial counsel and testified in accordance with them if called as a witness during Mr. Barrett's trial.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on March 5, 2009.

Myla H. Young, Ph.D.

24

234

Addendum A

Myla H. Young, Ph.D., ABN

234

MYLA H. YOUNG, Ph.D., ABPN
Diplomate – American Board of Professional Neuropsychology
PSY 11916

RESUME

*Office:*
1475 North Broadway # 335
Walnut Creek, CA 94596

*Mailing:*
1630 North Main Street #357
Walnut Creek, CA 94596

(925) 952-4350
925  945-8991 (FAX)
mylayoung@sbcglobal.net

LICENSE-Psychology

California       August, 1990        PSY 11916

CERTIFICATION

Board Certification in Neuropsychology – American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

EDUCATION

Ph.D.           Alliant International University
                (Formerly California School of Professional
                Psychology)
                    San Francisco, California
                    Doctor of Philosophy/Clinical Psychology
                    January, 1988

M.A.            Towson State University
                    Baltimore, Maryland
                    Master of Arts/Experimental Psychology
                    June, 1977

B.A.            University of Guam
                    Agana, Guam
                    Bachelor of Arts/Psychology
                    June, 1975

1

235

**POST-DOCTORAL FELLOWSHIP**

University of California/San Francisco General Hospital
San Francisco, California

January 1988 – January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
San Francisco, California

July 1985 - July 1987

Garfield Geropsychiatric Hospital
Oakland, California

October 1984 - July 1985

**PROFESSIONAL WORK EXPERIENCE – Current**

| | |
|---|---|
| Private Practice | Neuropsychological Assessment Child, Adolescent and Adult Forensic, Medical, Psychiatric, Medico-Legal, Educational |

March 1992 – Present

| | |
|---|---|
| Continuing Education Faculty | Alliant International University Neuropsychological Evaluation of Criminal Offenders |

2000 - Present

| | |
|---|---|
| Continuing Education Faculty | University of California-Berkeley Neuropsychological Evaluation of Criminal Offenders Introduction to Neuropsychological Assessment |

2005 – Present

2

236

**PROFESSIONAL WORK EXPERIENCE - Prior**

Senior            California Department of Mental Health
Supervising       Correctional Medical Facility
Psychologist      Vacaville, California

                  Psychology Consultant to Executive Director,
                    Medical Director and Program Directors
                   Principal Investigator for Research Project
                   Program Evaluation, Program Development,
                     Treatment Outcome Measurement
                   Director-American Psychological Association
                    (APA) Psychology Intern Training Program
                   Director-Psychology Fellowship Training
                     Program
                    Standards of Practice/Quality Assurance
                    -Psychology Service
                    Staff Selection/Evaluation - Psychology
                     Service
                    Clinical Supervision and Consultation -
                    Psychology Service

            Staff Psychologist - January 1990 - June 1995
            Program Consultant - June 1995 - January 2000
           Senior Psychologist - January 2000 - July 2005


Adjunct           Alliant University - Berkeley/Alameda
Faculty               Instructor: Neuropsychological Assessment
                                   Cognitive Bases of Behavior

                  Dissertation Chairperson:
                          -Neuropsychological Assessment of
                             Psychotic and Non-Psychotic
                             Inmate/Patients
                          -Neuropsychiatric Description of
                             Children in Day Treatment
                          -HIV/AIDS-Affected Children:  A
                           Study Utilizing the Rorschach To
                             Identify Depression
                          -Self Mutilation:  Analysis of
                             a Psychiatric Forensic
                             Population
                           -Relationships of Rorschach and
                              MMPI2 to the PCL-R among
                              Mentally Ill Felons

3

                    Dissertation Committee:
                         -Development of Special
                             Aggression Content Scales for
                             Rorschach Test Administration
                             within a Prison Population
                         -Neuropsychological and Cognitive
                             Correlates of Academic
                             Achievement in a Child
                             Psychiatric Sample
                         -Emotional Descriptors of
                             Adolescents Who Have
                             Committed Homicide
                        -Rorschach Responses/Piagetian
                             Cognitive Development in Eight
                             to Twelve Year Old Children
                         -Understanding Malingering:
                             Theory and Treatment

                    1990 - 2005

Training,            Oaks Children's Center
Assessment,              San Francisco, California
Consultation        Training and Supervision of Pre-Doctoral
                         Psychology Intern
                    Seminars in Neuropsychological and
                     Personality Assessment of Children
                         1992 - 1995

Training,            McAuley Institute of St. Mary's Hospital
Assessment,           San Francisco, California
Consultation        Training and Supervision of Pre/Post-
                     Doctoral Psychology Interns/Fellows
                     Seminars in Neuropsychological Assessment
                         Of Children, Adolescents, Adults

                    1992 - 1995

Research            University of California-San Francisco
Training             NIDA Research Grant:  Longitudinal
                     Study of HIV Related Cognitive
                     Impairment in Groups of Gay Men and IV
                     Drug Users

                    1988 - 1990

4

| | |
|---|---|
| Child & Family Counselor | Florida United Methodist Children's Home Enterprise, Florida<br>Child & Family Counselor at a Residential Treatment Facility for Children/Adolescents<br>Individual and Group Counseling<br>Parent Education<br>Court Liaison<br>Consultation to Residential Group Home<br>Consultation to Children in Foster Care |

1978 - 1980

| | |
|---|---|
| Adjunct Faculty | University of Central Florida<br>Valencia Community College<br>Seminole Community College<br>Lake-Sumter Community College<br>Orlando, Florida<br>General Psychology<br>Developmental Psychology<br>Child & Adolescent Psychology<br>Research Methods<br>Learning Theory and Animal Behavioral Training Laboratory |

1980 - 1984

**RESEARCH EXPERIENCE**

| | |
|---|---|
| Principal Investigator | California Department of Mental Health<br>Correctional Medical Facility-Vacaville<br>Prospective description of demographic, neuropsychological and emotional functioning in psychiatrically hospitalized males |

1994 – 2005 (Project Completed)

| | |
|---|---|
| Principal Investigator | California Department of Mental Health<br>Correctional Medical Facility-Vacaville<br>Multimethod description of inmates referred for psychiatric treatment from Pelican Bay State Prison |

1994 – 1997 (Project Completed)

5

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program<br><br>1990 – 1993 (Project Completed) |
| Participant | Spine Institute of San Francisco – Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D.<br><br>1996 – 1998 (Project Completed) |
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D.<br><br>1988 – 1990 (Project Completed) |
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D.<br><br>1988 –1990 (Project Completed) |
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development: A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |
| Master's Thesis | Piagetian Moral Development: A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

240

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez, California. *When juvenile offenders become adult offenders: A prospective look* (July, 2006)

California Psychological Association Conference San Jose, California. *The sexual offender in prison psychiatric treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference Asilomar, California. *The sexual offender in prison psychiatric treatment: A multimethod description* (March, 2003)

International Organization of Psychophysiology Montreal, Canada  *Profiles of Violent Mentally Ill Incarcerated Males: Neuropsychology and Psychophysiology* (August, 2002)

California Psychological Association Conference Pasadena, California *Research in Prison Psychiatric Treatment* (May, 2002)

American Correctional Health Services Association Conference Costa Mesa, California *Profiles in Violence* (September, 2001)

Forensic Mental Health Association of California Conference Asilomar, California *Profiles in Violence* (March, 2001)

Behavioral Health Institute Conference – Los Angeles, CA. *Latinos is Forensic Psychiatric Treatment* (September, 2000)

Forensic Social Work Conference – Palm Springs, California *The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference Asilomar, California *Danger to Self and Danger to Others: A description of Inmates Who Harm Themselves or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose, California
*Neuropsychological and Psychological Evaluations in A Forensic Psychiatric Setting* (March, 2000)

7

Forensic Mental Health Association of California Conference
Asilomar, California  *The Violent Psychopath in
Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton,
California *The Violent Psychopath in Psychiatric
Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton,
California *Psychopathy in a Forensic Psychiatric
Population*(September, 1998)

Forensic Mental Health Association of California Conference
Asilomar, California *A Multimethod Approach to
Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton,
California *Violence in the Community and Assaut in
Prison:  A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference
Asilomar, California *Patterns of Violence:
Demographic, neurocognitive, diagnostic, and emotional
descriptions of inmates with high and low violence
histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican
Bay, California *Description of Inmate/Patient
Populations Demographic, Cognitive,
Neuropsychological, and Psychological Correlates with
Violence* (July, 1996)

California Department of Corrections-Preston School for
Boys – Ione, California *Demographic, Cognitive,
Neuropsychological, and Psychological Correlates with
Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet
Meeting – Sacramento, California *Description of
Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional
Warden's Meeting – Folsom State Prison *Description of
Inmate/Patient Population* (July, 1996)

8

California Department of Corrections-Warden's Meeting – CMF Vacaville, California *Description of Inmate/Patient Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference. *Development of a Forensic Psychiatric Treatment Program Based on Empirical Description of the Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference. *Opening Address – The Changing Face of Forensic Mental Health:  The Challenge Described* (October, 1994)

**PUBLICATIONS**

Young, M. H., Justice, J., & Erdberg, P. (2008). *The Rorschach Test in a prison population.* (Manuscript in press).

Young, M. H., Justice, J., & Erdberg P. (2008). *Sex offenders in prison psychiatric treatment: A biopsychosocial description.*  International Journal of Offender Therapy and Comparative Criminology. (in press).

Young, M. H., Justice J., & Erdberg, P. (2007). *A comparison of rape and molest offenders in prison psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H.  (2007). *Previously unrecognized cognitive and psychological disorders in patients with chronic neck pain due to whiplash and other forms of cervical trauma.* Pain Medicine, (Manuscript in revision).

Young, M. H.,Justice, J., & Erdberg, P. (2006).  Risk of harm:  Inmates who harm themselves while in prison psychiatric treatment.  *Journal of Forensic Sciences, 51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for assault while in Prison Psychiatric Treatment. *Journal of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002). *Managing violence in a Supermax facility:  A discussion of research findings and their application to reducing violence in supermax*

9

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 – 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000).  Neuro-psychological and personality assessment in a forensic psychiatric setting.  *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000).  A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono(Ed.) *The Clinical Forensic Assessment of Psychopathy:  A Practitioner's Guide* (pp. 313-332).  Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999).  Risk factors for violence among incarcerated male psychiatric patients:  A multimethod approach.  *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment.  *Archives of Clinical Neuropsychology, 13,* 303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P.  (1989).  Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P.  (1989).  Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men.  *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H.  (1977).  Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally.  *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

245

**PROFESSIONAL AWARDS**

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude June, 1975 |
| Towson State University | Graduation - Magna Cum Laude June, 1978 |
| California School of Professional Psychology | Superior Accomplishment Award Dissertation June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health Correctional Medical Facility | Exceptional Job Performance April, 1993 |
| State of California Department of Mental Health Correctional Medical | Superior Accomplishment Award Exceptional Job Performance April, 1995 |
| State of California Award Department of Mental Health Correctional Medical Facility | Outstanding Accomplishment Exceptional Job Performance September, 1999 |

**PROFESSIONAL ASSOCIATIONS**

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)

April, 2008

11

246

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 90**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DELCARATION OF PAUL RICKIE LUNSFORD

I, Paul Rickie Lunsford, declare the following:

I am a friend of Kenneth Barrett and had known him seven or eight years at the time the police raided his shack in 1999. I am married and have two children with my current wife and two other children by a former runner up to Miss California. I grew up in California in the Bakersfield area and lived in many place in Central California and in the Mammoth Lakes area, which is how I got my Oklahoma nickname, "California Rick."

I am a former baker and cake decorator, a trade I practiced both here in Oklahoma and in California. I baked the cakes for the grand openings of the Wal-Mart super centers in Fort Smith, Arkansas. One of the cakes was an exact replica of the store, about twelve feet long and five-feet high. Every shopper got a piece of the store. I decorated Kenny's birthday cake every year. If I ever needed him, he was always there. There are a lot of people, but few characters and Kenny's a character. Kenny was trustworthy.

I first met Kenny when I brought him my 1992 Ford Escort, a hatchback, to him to repair. I cannot recall what was wrong with it or what Kenny charged, but Kenny had a reputation in the community as an excellent mechanic who was fair. At the time, I lived about a half-mile down the road from Kenny. Kenny and I developed a friendship. Some time prior to the raid, I set up a listening device in Kenny's garage, a security monitor so that Kenny could hear in the house if someone broke in. There were never any other listening devices on the grounds. Kenny set up the motion sensor light at the back door of the house himself. These devices were not to detect police; they were like anyone's burglar alarm.

1

I was at Kenny's house from noon on September 22, 1999 through 9:00 P.M. on September 23, 1999. On 9/22/08, at about noon, I went by Kenny's to drop off a truck I was selling to Kenny. The truck was a 1964 Chevy Custom Cab. I sold it for $1500, some cash, a stereo, and a 30-30. I remained at Kenny's for the next 33 hours. I parked the truck in front of the garage.

Kenny and I stayed up for the next 33 hours; we were doing methamphetamine. During this time, there were a lot of people coming and going to Kenny's. Monk Sanders never came by during that 33-hour period. However, others, including Travis Crawford, came by to do drugs, which he often did. In the late afternoon, on September 23, 2008, Kenny, a few others, and I were standing near the fence to Kenny's property. Travis came over from his parents' place and asked Kenny if he had seen the white SUV with tinted windows that went by, which was of particular note because it had gone down a dead end road and not yet returned. Travis said he thought they were police.

Kenny did not trust Travis at all; Travis made him nervous. Travis was pretending to watch Kenny's back, but Kenny knew better. Kenny was not nervous about the police. He was nervous about Travis. Travis is a real flaky person who was a police informant. Kenny shrugged Travis off and Travis went back to his house. Once Travis had left, Kenny told us that anyone who wanted to leave could. Kenny said, "Hey, you guys might want to leave because the car that drove by was cops." Kenny was concerned the police would come by his place and that we would all get in trouble because we were all holding drugs. Kenny opened the gate to let out anyone out who wanted to go. There were three or four of us. The others left, but I remained with Kenny. Kenny re-locked the

2

248

gate and we went back to the house or the garage without our seeing the SUV again.

Kenny never said anything about going down in a blaze of glory. Kenny would not say that or want that. That was not who Kenny was.

Kenny had a case pending at the time. I knew about the case because once Kenny had borrowed my phone to call his lawyer. I knew Kenny had a case, but I never heard that there was a warrant out for Kenny.

I left about three hours before they raided Kenny's place. Toby, Kenny's son, was the only one still there besides Kenny. Toby was living there at the time.

I knew Travis Crawford and Cindy Crawford. They acted as if they would do anything if their freedom were threatened and therefore their ability to get dope.

I have never been interviewed before or during Kenny's trial by an investigator or defense attorney working on Kenny's behalf.

An investigator working on Kenny's case asked me about Kenny, our friendship, what I knew about the raid, and Travis and Cindy Crawford. After I told him what I knew, he asked if I would give a written statement. He showed me this declaration and asked me to read it carefully. I have and it says what I told the investigator during our meetings. If I had been asked to testify about the same things at Kenny's trial this declaration is what I would have said.

I declare, under penalty of perjury, that the foregoing 3 page declaration is true and correct.

Executed by me this _26_ _Feb_ day of 2009, in _Sequoyah_ County, Oklahoma.

3

249

Paul Rickie Lunsford

4

251

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
      *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
      *Respondent*.  )

---

**EXHIBIT 91**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

### Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

Page 1 of 4

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream. That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it. Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated. My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker. He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny. Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been



afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis

<div style="text-align:center">Page 3 of 4</div>



had to say about his testimony.  My husband, Roger, was here and listened to the conversation, too.  I have read the part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis.  I did not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___22___ day of 2009, in _____ County, Oklahoma.

Phyllis Crawford

Page 4 of 4

255

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 92**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

Page 1 of 6

RC

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

<div align="center">Page 2 of 6</div>



Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years

Page 3 of 6

*RC*

before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day.  Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth.  He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified. Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield.  Travis told Mr. Post that anybody who had been around drug addicts would have known that.  Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned.  Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say.  Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied." Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence.  Travis said that when he gave this answer, he was panicking because he was afraid.  Travis told Mr. Post that Mr. Littlefield told him he knew things about him.  Travis repeated that he was extremely

<div align="center">Page 4 of 6</div>



scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

Page 5 of 6

*RC*

261

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed.  Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody.  According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed.  After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post.  I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this _22_ day of _FEBRUARY_ , 2009, in _SEQUIYAH_ County, Oklahoma.

Roger Crawford



262

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 93**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## Declaration of Ruth Harris

I, Ruth Harris, declare as follows:

I am Kenneth Barrett's maternal aunt. Kenny's mother, Gelene, is my oldest sister, followed by Phyllis, then me, and then Carolyn. All the girls in the family are about two years apart. Our brother Mark is the youngest child in the family.

My husband, Jerry Harris, and I have been married for 45 years and have two grown children, both doing well. Our daughter Michelle and her husband run two family businesses, a cleaning business and an equipment rental business. Their two boys, Javan, 24, and Alex, 19, are in good health. Our son, Faron, manages a furniture store in Tulsa and has two children, Dallas, 16, and Mandy, 11. Faron was not as fortunate as Michelle in his relationships. He has been married three times. He was hurt badly by his first two wives, both of whom began associating with people outside our religion.

Jerry and I are deeply religious and are Jehovah's Witnesses. We raised our children in the faith, and they are raising their children in the congregation. Jerry and I protected our family from being around those who are not Jehovah's Witnesses so we were not around our sisters and their families very much when our children were growing up. Bad associations spoil useful habits. If we are around people who are cursing and doing bad, it influences us. Peer pressure can make children do bad things, and I tried to keep my children from that.

We made a conscious decision to be around people who are true to the Bible and have the same moral standards as we do. Jehovah's Witnesses all believe the same exact

–1–

264

way whether we are from Fort Smith or anywhere in the world.  We share the same doctrine that the only answers are in God's Kingdom and that Jesus is King.  We pay taxes, and we respect the government, but we do not vote because our allegiance is to God's Kingdom. The Bible teaches us that the only true government is the Kingdom of God. As Jehovah's Witnesses, we love everyone and do not hate the person doing wrong. We avoid talking about the bad side of people, but I make an exception for Kenny's father.

Ernie Barrett was not a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives.  I know he regrets that now. Ernie has always been for Ernie. My aunt Mary Real taught Ernie at Marble City Elementary School and said Ernie was a mean child. I do not feel good when I say bad things about people. I hope Ernie is a better person than he used to be because he was not a good father—he went his way and let Gelene take care of the kids.

My family also had problems that they have had to deal with.  My father had a drinking problem and was high-strung and quick tempered, but he tried to be a good father and he lived up to his responsibilities.  My sister Carolyn has depression, and one of her daughters also has depression.  Phyllis's son, Travis, is doing very poorly mentally, which is made worse by his use of drugs.

Gelene moved back to Oklahoma with the boys when Kenny was around nine. Kenny took the divorce very hard and probably blamed himself for it as children commonly do.  We planned for Kenny to live with me and my family to help him adjust

–2–

265

R d

better. It did not work out. He wouldn't come home with us; he wanted to go with his dad. Gelene did not have a husband to help her raise her children the way Jerry helped me. She had to raise three bronchy boys alone. She was strapped financially. She drank the way she did because that was her way of dealing with adversity. She did not set any boundaries for the boys who were allowed to do whatever they wanted

Kenny was a sweet boy as a child, but I knew there was something emotionally wrong with him. He was hyper, never sitting still, moving all the time. He was more hyper than any child I ever saw. He had a short attention span. He needed a lot of structure and support, but he did not receive any. The boys got to running around with other kids who were bad associations.

As an adult, Kenny was a sweet person, nice, and respectful. I am prejudiced because I love him. Kenny loved Abby, who was really sweet, and their son was a doll. I believe that Kenny had a family substance abuse problem that may have hidden his mental illness. After he and Abby divorced, we tried to help him. His only security was with Gelene because he did not have anybody else. My husband went to see Kenny to talk about the Bible and how he could straighten out his life. We were never afraid of him and do not believe he would intentionally hurt anyone.

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny. Kenny is a very kind person who does not want to bring harm to others. We attended Kenny' two state trials every day and his federal trial twice because we cared for him.

–3–

266

R H

After speaking with an investigator working on Kenny's case, I have made this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _15_ day of 2009, in _LeFlore_ County, Oklahoma.

_Ruth Harris_

Ruth Harris

—4—

267

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
        *Movant,*    )
    )
v.    )        **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
        *Respondent*.  )

---

**EXHIBIT 94**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF SALLY DAVIS Johnson

I, Sally Davis, declare the following:

I knew Monk Sanders for a period of several years, and last saw him in 2004. I lived with him for a period of one year. I lost track of him when he went to prison for arson and robbery of a Chinese restaurant.

On one occasion, Monk Sanders used fraud and lies to get me to go somewhere with him. During our relationship, he came to my house one day and said he needed to talk to me. I told him I could talk to him, but not for long, because I had to get back to school. At his request, I left with him in his car. After I got in his car, he drove me to Vian, Oklahoma and kidnapped and held me against my will for 8 days. During this period of time, he stabbed me and beat me on a daily basis. He kept lying to me, telling me he would take me home when my bruises healed, but since he kept beating me, the bruises would not heal. At one point when I tried to escape, Monk Sanders threw a knife at me and stabbed me in the foot. At another point, Monk Sanders cut me from my neck to my chin. This wound bled very profusely. After 5 days of being kidnapped by Monk Sanders, he finally turned himself in on another charge. I was held against my will by his mother, Evelyn Sanders, for another 2 or 3 days. At the end of this, the police finally came and got me. Evelyn Sanders tried to cover up my bruises with make-up. A police report was made regarding this incident.

Monk Sanders is an extremely dishonest person even when he is sober, but he is

1

100 times more dishonest when he is on drugs. I could never believe anything he said about any subject. He is extremely untrustworthy, and took me along on a stealing spree where he stole from practically everyone he knew in order to get money for drugs. I informed the police about this, because I wanted out of it. Monk Sanders has stolen from me before and also stole from my family in order to get drugs. He even once stole my children's toys and pawned them for drug money.

On one occasion, Monk Sanders has threatened my mother Linda Davis because she would not tell him where I was. He told her that if she did not reveal where I was, when he found me he was going to cut my tongue out.

I know Kenny Barrett. My ex-husband and I would occasionally hang out with Kenny Barrett and his wife. I never knew Monk Sanders to have any association with Kenny Barrett.

I was never contacted or interviewed by any lawyers representing Kenny Barrett during his federal trial. Had I been contacted, I would have given them the above information and would have testified if asked to do so.

An investigator working on Mr. Barrett's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully, and it says what I told the investigator during our meetings.

I declare under penalty of perjury that the foregoing 2 page declaration is true and correct.

2

270

271

Executed by me this __1__ day of __March__, 2009, in

__Sequoyah__ County, Oklahoma.

Sally Davis Johnson

3

271

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

_____

**EXHIBIT 95**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

_____

Exhs. § 2255 Amended Motion                                 *U.S. v. Barrett*, 6:09-cv-00105-JHP

## Declaration of Shawn Hill

I, Shawn Hill, declare the following:

I am related to Kenneth Barrett by marriage. My wife, Brandy Hill, is the granddaughter of Phyllis Crawford, who is Kenny's mother's sister. My wife's mother is Gwen Crawford who is Phyllis Crawford's daughter. I am a contractor and work every day to support my wife and our two children.

My wife and I both had drug problems, which we have handled and dealt with successfully. I served eighteen months, with the remainder of a 20-year prison sentence suspended upon completion of a drug program, for possession of methamphetamine.

I know Kenny pretty well. I lived with him from June through October 1998. My wife and I also lived off and on with Gwen, my wife's mother, in a trailer just below Kenny's shack on the other side of the ditch that OHP came though. It would be impossible for a Mazda to go through the two-foot deep ditch, as Brandy Price testified at trial, without tearing out its undercarriage and making the Mazda inoperable. You don't need to know much about cars to know that.

Kenny hardly left his property for several years, long before his arrest for selling any drugs. Kenny did not talk about killing police or going down in a "blaze of glory." He was not the kind of person to say something like that. The police drove by his place all the time, and they knew he would not shoot at them. Tom Sanders would sometimes call the cops over noise disturbances, and the police would drive by. Kenny was used to it. He acted as if "I'm here if you want me." What I mean by that is that his attitude was not threatening; I mean he wasn't hiding.

1

273

The sign on Kenny's gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night before and awakened him.  It had nothing to do with the police.

I was out at Kenny's frequently and know some of the people who testified against him in his federal trial.

Brandie Price is known in the community as a dope whore who would do or say anything to obtain drugs.

Monk Sanders has a reputation in this community as a thief, a liar, and a snitch.  He was never in Kenny's house because Kenny would never have let him in. We all stayed far away from Monk. I could not believe they let him on the witness stand because he had been arrested so many times.  He is well known as someone who lies to get favorable treatment.  When Monk is in jail, he gets beaten up by other inmates for the lies he tells.  Monk was addicted to pain killers.

Cindy Crawford's reputation around here is that she's dishonest, evil and worthless.

Karen Real is pretty messed up. Kenny and Karen were life-long friends. She stayed for a while in Kenny's house. She has been arrested numerous times and she informed on her boyfriend Doss Gann in exchange for favorable treatment.  Some people will take what they got coming and some will do anything to get out of it.  She is known to be the latter.

Randy Thurman is as low as you get.  He is known around here as a thief who will testify against anyone to save his own skin.

In 2001 or 2002, my wife Brandy and I were brought into ADA Robbie Cowan's office and asked to roll on Chip Teague, Boss Green and Diane Wynn.  They wanted us to say whatever we knew about these individuals and the drug trade.  We declined.  Ten days later, Cowan was no longer a D.A.  He had resigned.



I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

Had I been asked to testify at Kenny's trial about what is in this declaration, I would have.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this 26 day of February 2009, in Sequoyah County, Oklahoma.

Shawn Hill

3

275

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent*. | ) | |

---

**EXHIBIT 96**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**<u>Declaration of Toby Barrett</u>**

I, Toby Barrett, declare the following:

Kenneth Barrett is my father, and Abby Stites is my mother. I am their only child.

I was born and raised around Sallisaw. I went to Brushy Elementary School and Central High in Sallisaw. My mother had me held back in the first grade because she was not satisfied with my progress. I stayed in school throughout the 11th grade, when I withdrew. It was hard for me to focus my attention on school.

When I was 12 or 13 my parents separated for good. I lived mostly with my mom, but lived with my dad and Gelene, my grandmother, for most of a year when my parents first split up. Gelene drank beer like most of us drink water, but she drinks more moderately now. I moved back in with my dad when I was 18 for several months before the incident. He wanted me to return to school. We were working on the Camaro the night of the raid so that I could use it to go back to school. The raid changed everything, but I finally obtained a diploma from a Christian school.

Now I work on an offshore oilrig for two weeks at a time, two weeks on and two weeks off. I make pretty good money, which is important because I do not want to go in debt since I have two sons to raise. When I'm home in Sallisaw, I stay to myself mostly and with my girlfriend who just moved here, other than spending time with my sons, Toby Joe who is six and Ty Lee who is four. Their mom married a fellow who treats the boys well, so I get along with him. The boys spend more time with their stepfather than with me, which is all right because I am not a jealous person. I just want what is best for my boys.

Page 1 of 4

277

My father was too much of a mess to raise me, and I felt resentful toward him for a while, but I do not anymore.  I know he has some problems inside his head.  I always thought he had a chemical imbalance.  When I was a teenager, before the incident, I knew something was wrong with him because he had mood changes that were not normal.  Looking back over the years, I can see he was not dealing with a full deck.  My dad could be in the best of moods one minute, then the worst.

Dad was a very paranoid person.  He was also a very scared person—he always thought people were out to get over on him and, of course, the police out here were crooked.  My dad told me that Lloyd told him that if he didn't snitch, they were going to get him.  Dad stopped leaving his property and we had to bring things to him.  Even though he was scared, he was not dangerous and I was not afraid of him.  Dad did the best he could.  I have a lot of fond memories of being with Dad, going canoeing, and helping him work on cars.  He had a tender side to him.  These memories help offset the pain of having a dad with mental problems. I take medications now for my own mental health issues that I don't yet understand.

The day of the incident, soon after my friend Bubba Thompson left, I remember my dad telling me to close the gate.  He said nothing at all about cops.  We usually kept the gate locked, so him telling me to close it was nothing out of the ordinary.

I remember that when dad turned himself in there was a warrant for his arrest, and that's when he hired Bill Ed Rodgers.  I never knew of any other warrant until after the incident.  I assumed they made up the arrest warrant when they got the search warrant.  I had no idea that there was an outstanding warrant.  If my dad knew, he never mentioned it,

Page 2 of 4

and it is nothing he would have hid from me.

Just before they raided the place, the first thing I saw were taillights that went past the driveway and then a flash of light—maybe like the interior light of a car when somebody opened a door to get out. Then an SUV and a Crown Vic went up my great grandma's driveway and then the Bronco turned toward the house and I yelled "Dad." I don't recall how many times I yelled it. It all happened so fast. I thought I saw dad come onto the porch for just a second, and then the Bronco was just coming over the ditch made a boom, like it bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

If my dad went to the roll top desk to get his handgun when he saw the headlights coming, which he said he did, for sure they could have seen his silhouette through the curtain. If he went into that room, they would have seen his silhouette.

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to

Page 3 of 4

want me to testify at the trial.  He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again.

I have been interviewed by an investigator who told me he is working on my dad's case.  Later he asked me if I would give him a declaration of what I told him.  He showed me this declaration and I have read it carefully.  It says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this __23__ day of __Feb.__ 2009, in __Seq.__ County, Oklahoma.

Toby Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
         )
       *Movant,*    )
         )
v.         )       **Case No. 6:09-cv-00105-JHP**
         )
UNITED STATES OF AMERICA,    )
         )
       *Respondent.*    )

---

**EXHIBIT 97**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF SYLVIA GELENE DOTSON

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother. He is the first of three children born to me and his father, Ernest Eugene Barrett, during our marriage. To understand Kenny you have to know something about my family, how he fit into it, and how he came to live in his little shack on our family's property.

Family and hard work meant everything to my parents whose families go back generations in this part of Oklahoma. My parents and their parents always helped out each other and their children by finding jobs that let them feed their families in tough economic times, working together, and working land near each other. Through the years, my family has lived through wars, droughts, and lean economic times. We have worked our way back and forth across this country, all the way to California and up to Joliet. We had to deal with real poverty even when we worked from sunup to sundown. We dealt with mental illness and suicides, and more than our share of problems with alcohol and drugs, but we survived it as a family.

My father, Hugh Dotson, was one of six children (Hugh, Eleanor, Warren, Lela, John E. and Christine) whose great grandparents were from around Sallisaw, Oklahoma. Dad's wiife, Hattie Gertrude Real, who is my mother, was born in 1921 in rural Vian, Oklahoma. The Reals worked a piece of property north of the Dotsons. Hattie parents, Alan Real and Ida Goodwin Real, were my maternal grandparents. They were farmers like everyone else. They grew anything they could—mainly peanuts and cotton. No one had running water or

1



282

electricity until the later1940s.  They knew the value and the cost of hard labor because nothing was easy or taken for granted in those days.

Dad's younger brother, Warren, is 90 or so and lives in Kellyville, outside of Tulsa, about two and a half hours from Sallisaw.  His children are Nona, who lives with him; Linda Rogers who lives in Sapulpa; Judy who lives in Kellyville; and Karen who lives in Bunch, Oklahoma.  One of Dad's sisters, Christine Cook, lived in Sallisaw.  Dad's sister, Eleanor, married Gene Masterson, and they moved off to Joliet, Illinois, had two children, Nelda, who died recently, and Jim, who lives in Antioch, California.  Lela, another one of Dad's sisters, lived in Wichita, Kansas. The Joliet connection ended up being pretty important in my life because that's where Kenny's dad, Ernie, and I lived after we married.

Back when Dad married my mother, he did odd jobs and barely earned enough to live on.  I was born in 1940 in an old tumble down house in Vian. We moved out of that house before my sister Phyllis was born in 1942 to a house owned by my Grandpa Alan Real. That house is now gone but the land is still in the family and my cousin Mike lives on it. Not too long passed before we moved to what was known as the Granny Golden Place before my next sister Ruth was born, then back to that old tumbledown house. After that, we moved less than a mile away to another house where my youngest sister Carolyn was born. All the houses were in pretty bad shape even by standards back then. We had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking.  All that moving made Dad all the more set on owning his own land, but it took a good many more years for him to be in a position to buy

2


283

40 acres.  At the time, I just figured this was the way life was.  I did not have aspirations back then.

After Dad got out of the army, he went to classes in agriculture on the G.I. Bill in Sallisaw. Uncle Carl Cook, who was married to Dad's sister Christine, taught agriculture there. It was night classes, not college, more like a technical school. Dad learned how to run a farm, a big farm, not just a home farm.  When I was six, the family moved to the Dwight Mission School, an Indian school run by the Presbyterians. I always heard we were part Indian and think that I am 3/16 Cherokee.

Dad ran Dwight Mission's farm. The school provided a house for our family that had electricity and plumbing. There was no kindergarten in those days and I went to first and 2nd grade at Dwight Mission, and then they shut the school down.  They sent Dad, who took us along, to the Menaul School in Albuquerque, New Mexico.  It was a high school. Dad ran the cattle and vegetable farm. The kids that went to the school were the farm hands and Dad was the overseer.  I spent third grade in Albuquerque, and then we moved to Missouri when I was nine.

The fellow who had been the superintendent of Dwight Mission stayed in contact with my dad. When the Presbyterian Church started an orphanage in Farmington, Missouri, and purchased another farm, the superintendent asked Dad to run it. I loved Missouri. We had good neighbors and kids to play with. We had pigs and went sledding in the snow on the hills above the farm.  I had started the sixth grade when the superintendent lost his job and we had to move back to

3


284

Oklahoma where we lived for two or three months with Uncle Carl and Aunt Christine.  There was no work around there.  I was eleven years old and wanted to go to school in Blunt, Oklahoma, but the school was closed when we first got there because a lot of families chopped cotton in the spring and pulled cotton balls in the fall. Most of the country schools shut down because kids joined their parents in working in the fields and traveling to where the cotton needed tending.

My Uncle Jim and Aunt Rosy Newton, Rosy Real Newton, Mom's sister, had a place here in Oklahoma but they had to go to California part of every year to make money working on a ranch. I don't know why they called it a ranch, because they raised crops, but they called them ranches. We ended up going to California with them when Christmas vacation came.  We moved to Shafter, just outside of Bakersfield, California, in 1952. Aunt Valerie, my paternal grandmother's sister, was married to Monroe Bell, and they lived in Weedpatch, California. Their son-in-law was the accountant for Pelletier Farms, which owned a big farm, and he helped Dad get hired as an irrigator.  I was almost 12.

In 1952, I attended a school in Maricopa that was flattened by an earthquake so classes in the seventh, eighth and half the ninth grades were held in a Quonset hut. I made many friends. There were 30 or 40 houses on the farm, all with kids. We were not migrant workers, but people who lived there permanently.  We went from one person's house to another. The children were welcomed wherever they went. We played Kick the Can and other children's games.  It was a joyful time, and I was a happy child. My mother, Hattie, was unhappy about a whole lot of things, but she was happy when we lived at the

4


285

California farm.

My mother's unhappiness seemed mainly to be about the family not owning their own place. She was not happy after they returned to Oklahoma until she and Dad were finally able to get their own place.  Land is just something very important to us and always has been.  Out in California, Dad worked seven day weeks, 12 hour-days, and got two weeks vacation during which we came back home to Oklahoma.  He was tired from too much work but he never considered working less. He didn't take us to California to stay.  Oklahoma was home, and we always knew we went out there to make enough money to buy our own place back home.

After my brother, Mark, the youngest child, was born in 1961, Dad finally saved enough to buy 40 acres.  By that time, I had left home and was already married to Ernie. Much later, Dad gave each of his five kids 8 acres. He had lived to see his dream come true.  Kenny was living on that land when the shooting happened.

Dad was strict with his children and was not one to show favors, but Mom favored Carolyn until Mark was born.  Mom did things for Mark and his kids that she did not do for the rest of her children.  I always felt it took something away from me and my children.

I was about to turn 15 in April 1955 when, in January, we picked up stakes. I didn't want to leave. I had friends on the farm and at Maricopa High School.  I was interested in my friends more than anything else.  I was really good at English, but I didn't know enough to be interested in it. When we moved

5

286

back to Oklahoma Dad rented a place for us to live. I rode a school bus to Sallisaw High School, and a man with a station wagon picked up my sisters Phyllis, Carolyn and Ruth and drove them to McKey Grade School. In high school, I was in FHA (Future Homemakers of America), but had to drop out because Dad could not pick me up. I had to ride home on the school bus. I took a class in dramatics and the teacher said I was a natural born actress, but I couldn't be in the junior or senior plays because Dad would not come and get me. Dad wanted me to play basketball. In Maricopa, I played volleyball and I was good. We didn't lose one match. But the girls at Sallisaw High had been playing basketball since the sixth or seventh grade and I was getting too late a start to catch up to them. I regret I didn't play basketball. I had a couple of boyfriends, but nothing serious. I even dated Ernie a couple of times.

I really planned on going to college after I graduated from Sallisaw High School in 1958. I made arrangements to go to Connors College, but I didn't know what I wanted to do. Dad's sister Eleanor (Masterson) asked me to spend the summer in Joliet and helped me get a job as a waitress at Walgreen's, which had full-service restaurants back then. I still planned on going to school. I was making new friends. My teachers in high school pressed me to be an English teacher. I thought about that. I read and still do read mysteries all the time, like Jane Withers and the Hardy Boys. I was always interested in them. I am presently a member of the Mystery Guide Book Club. Back then, though, I just didn't have the initiative to go to college. One of my customers at Walgreens was an air force recruiter and I thought about going in that direction.

6


287

Right when I was trying to figure out what to do with my life, I came home to Sallisaw on vacation and ran into Ernie again. He was just back from the Marines. I was crazy about Ernie and remembered him from high school where he was ahead of me.  Ernie left high school, served in the Marines and came home kind of like a knight in shining armor. He was a handsome fellow. I was so taken by him that I didn't realize he was not the same boy I knew in high school and that he had changed, none for the better. We were not the same people we were back in high school, but I never imagined that life with Ernie could be so terrible, not just for me, but for the children we had together.

My cousins were pushing me to marry him, telling me what beautiful children we would have. I thought it would be the real American dream.  My mom and dad had worked together and stayed together to get the things they wanted, to own their own land, and to raise their children among family.  I married Ernie on July 8, 1960, and Kenny was born in Joliet on June 29, 1961.  We had a very difficult marriage right from the start but we were young and neither one of us really understood what lay ahead.  I try not to think about those years.

Ernie did not want a family or a wife, much less children.  He left me for other women right after we married. I think he had a lot of problems that made him have to have all those women to make himself feel like a man.  When I was pregnant with Kenny, he left me one night and did not come back for days. He did this all the time I was pregnant with Kenny.  Whenever he took off like that, my Aunt Eleanor would come by and bring me food, because he left me no money and he would have the pickup.  I was pretty miserable then, and Eleanor

7

288

tried to keep me company.  We would have a few beers, talk, and plan what to do next.  Eleanor and I would go looking for him—he would be out drinking.  We would go to bars and they would tell me he wasn't there.  It was a constant thing. Once I even went to a woman's apartment looking for Ernie—the woman said he wasn't there, but I heard his voice. It was humiliating and embarrassing and hurt a lot.  I was alone, pregnant, and really depressed. I wish we had known then what we know now about how having just a little beer can affect your baby— none of us would have had a drop. I couldn't believe what I had gotten myself into and wondered if there would ever be a way out of it.

I started battling with Kenny before he was born.  My pregnancy with Kenny was very difficult.  I was in constant pain above my pelvis.  He moved all the time and kicked me all the time. I could never get comfortable.

Kenny was born with a lump on top of his head, larger than a knot, which went away in a about two or three years. His days and nights were mixed up when he was a baby.  He did not sleep at night and slept in the daytime.  I was exhausted by it.  Kenny was a very difficult baby and child.  He was colicky and nothing could comfort him, not even breastfeeding him, which I did for six months.  He cried and fussed all the time. At first I thought all babies must be like this, but after I had my other two sons I realized something was wrong with Kenny.  He was very, very active and moved around without thinking about what he was doing. Still, by the time he was one he did not walk and this worried me. But by the time he was 18 months, he was walking all right.

When he was a toddler, he had to go to the hospital for several different

8

accidents. He got into everything.  He had to have his stomach pumped two different times after he managed to climb to a top cabinet. Once he ate baby aspirins and the other time he ate ex-lax.  I also had to rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting his head open and raising a big knot. He could not be still.  Any little thing could upset him, but it took a lot to calm him. I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him. This was not true with my other boys. Kenny had the measles once and ran a fever so high it scared me. I took him to the doctor and he was so concerned he prescribed a fever reducer. My other two boys got the measles' vaccine, which didn't exist before Kenny caught them.

My second son, Richard Andrew, was born June 24, 1964, in Joliet, almost three years to the day after Kenny. Soon after Richie was born, Ernie and I separated for three years.  Kenny, Richie, and I lived with another woman who had two boys of her own for a while but we had to move back to Sallisaw for two years. I could not support two boys on my own. Kenny really loved his dad and missed him a lot when we were separated.  I always wondered if that separation caused some of Kenny's problems because he never got over it. That's one reason Ernie convinced me to go back to him.  My third son, Steve was born in January 1969 in Joliet, Illinois.  Ernie still had his other women, though. There was never a time he did not have other women.

Kenny was a handful, and I did not get any help from my husband with the

9

children. Kenny had a difficult time in school and was in Special Ed classes part of the time. He failed reading and arithmetic in the first grade and had a hard time keeping up with the other kids. It was very difficult for him to read. In the second grade, when they taught phonics he never grasped it. He never did well in school and he finally gave up. I didn't know what I could do.

Ernie would not even talk to me about what was going on with me, the kids and him. It drove me crazy. I tried to talk to him about it because it is not in my nature to be a passive person. I begged, pleaded, threatened, and cried with Ernie about his women. Ernie would just tell me it was none of my business and to shut up. We split up and got back together and threatened to leave each other over and over. We always had a difficult time of it. Ernie did not drink at home but drank at bars away from home and could not hold his liquor. I was very depressed at times.

We left Joliet and moved to New Jersey to try and find a place where we could start our lives over. He said he wanted to have a fresh start, straighten himself out, but that's not what happened. Even having a job at Thatcher Glass where he worked didn't help. He started seeing another woman almost as soon as we got there. He moved out on me and the kids and lived with her, but I let him move back in. Ernie would leave and move in with other women or not come home for days on end. He gave me gonorrhea twice. We got into some pretty bad fights because I couldn't stand his not coming home nights anymore, and he gave me two black eyes and split my lip. There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not

10

291

knowing how to make us stop fighting, and then the time he hit me.

I liked Hopatcong, New Jersey; I liked the people and I liked the country; I wish I could have afforded to stay, but I finally left Ernie, told him I was leaving for good. I'm the one who left that time; all the other times it was him. He asked me to stay. He said his behavior didn't have anything to do with his love for me or the kids. He said, "Someday I'll get too old to do this and we'll have a good life." I agreed to stay, but I wanted to move into my own room and he would have to leave me alone—I mean not have sex with me anymore. He said no, that it wasn't going to be that way.

Dad had always insisted I stick it out, but now he said he wanted me to come home. Daddy paid for the ticket. My parents did not hate Ernie—they just didn't like the way he did me. Ernie went from one woman to the next before he finally settled down with Doris, his wife now.

I don't even hate Ernie; I just have no use for him, not so much for what he did to me but for what he didn't do for the kids. He was always talking about how big he was and telling the boys "'you ain't never going to be as big as me."

I came home to Oklahoma in 1972, and Ernie and I divorced June 20, 1973. I dated and had a few boyfriends before I married Paul Dudley in 1982, when Stephen was 12. Paul and I owned a bar together but he did not know how to be a husband. He was violent and attacked me, beating me black and blue. I divorced him after three years but we were in the process of getting back together when he was murdered in Las Vegas. I took my maiden name back.

When Kenny and his brothers were growing up, I had my hands full with

11


292

three boys and basically no husband. A woman is not cut out for discipline, and it is not a good role for a woman to play. I whooped my kids with a belt or a switch, the same way I was raised. Spare the rod, spoil the child. Ernie did not beat the kids because his dad beat him and Ernie hated it. I had to make up for the discipline Ernie would not give the boys. I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy. He was more than hyper. He was emotional about things that did not matter. He would cry and scream like there was no tomorrow.

Kenny never adjusted after we moved back to Sallisaw for good. He really missed his dad, but his dad did not show him any affection. His dad came every year or so to see the boys but used it as a time to show off a new car for a few minutes rather than spend any real time with the boys, although once or twice he would take them hunting, which is the only way he ever related to the boys. Kenny got pretty depressed and lost interest in school. He had to repeat the eighth grade. He went to live with Ernie and Ernie's new wife in Dunkirk, Indiana, but that didn't work out and he came back to Sallisaw as soon as he finished ninth grade. I told him he had to work, and he got a job at the local racetrack. When school started up again he went for a few days and then just quit and went to work full time.

When he was 16 or 17, Kenny was beaten up by police officer John Philpot who broke his own hand while breaking my boy's face after Kenny was arrested for squealing his tires. The FBI investigated the whole thing. Kenny always loved working on cars. They were his pride and joy. He was out driving

12


293

one of his souped-up cars and got arrested, taken to jail, and beaten all over his face. His nose was bloodied, and his jaw and collarbone broken. A highway patrolman held my son's head back by the hair while John Philpot beat him. An assistant district attorney said he just stepped out of the room and missed what happened. Everyone in law enforcement interviewed by the FBI gave a different story. You should have seen the pictures of his face, made you so mad and want to cry at the same time. I think they would have brought a case, but Kenny wanted the FBI to drop it he was so afraid. It was a big thing in Kenny's life and really traumatized and terrified him.

Kenny always worked hard and his bosses liked him. He was a good worker, strong, and able. By the time Kenny was 18, he was working on pipelines and oilrigs and traveling all over, not just in Oklahoma but to other states. He was a builder and could frame and put up apartments. He was proud of his work.

Kenny met and fell in love with Abby Stites, a wonderful girl. I love her like a daughter to this day. Kenny was 19 and Abby was 16 when they married in 1980. Kenny and Abby's marriage was always rocky, though, and they were more unhappy than happy even though they loved each other. They were too young and Kenny was far too mentally unstable. Their son, Toby, was born December 1, 1980. Toby, Kenny and Abby lived with me a lot of the time when Toby was little.

Kenny had terrible mood swings and periods of depression that lasted for days. He withdrew—anything upset him—and he was paranoid about

13



294

everything.  Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him.  She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.

He tried to kill himself in January 1986 in my front yard.  He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself.  We all ran out of the house and thought we had lost him for sure.  He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage.  Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness.  Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995.  Kenny never recovered.

Kenny was not able to live on his own.  When he and Abby would separate, Kenny always came home to me. After he and Abby broke up for good, he moved back home. He was a lost soul. Nothing in his life ever mattered but Abby and Toby. Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it. He just couldn't do it no matter how hard he tried. It was so sad, so he came home to me.

He asked his grandfather and got his blessings to build a place to live on a piece of land next to my house. This was on the part of a few acres he still owned that I knew he planned to give me, which he did before he died.

With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud. He showed it off to everybody, but it was nothing much,

14

295

pretty bare, three tiny rooms and an attic space for sleeping. It had no water, or toilet, or electricity. He put a porch on it though.

He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer. He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner.

I knew he had serious mental problems but I hoped if he lived close to me and just worked on his cars and fixed things for people, he might be able to make it. My family has seen a lot of mental illness, alcoholism and suicide so I know what depression does to people. Sometimes, Kenny was manic and thought everything was wonderful, but he became frustrated and irritable over any little thing and was depressed and withdrawn at times. His moods changed from one extreme to the other. We knew he was mentally disturbed and suffering.

As time went on, he did a little better, built a garage—more like a storage shed—and fixed cars and pickup trucks for friends and neighbors. Cars were his only other love besides Abby and Toby.

Friends brought him food and went grocery shopping for him. He ate most of his meals at my trailer, and I cooked for him. I hoped and prayed he was going to make it. At least, I believed, with him living right next door he was safe and I could keep an eye on him. We had our arguments; that's for sure. He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

15

 

The night of the shooting, I got home after working a 12-hour shift, saw Kenny and Toby working on a car by the garage, and was too tired even to say hello. I knew Kenny and Toby were already over and ate, because there had been food in the icebox for them and it was gone. I was sound asleep when I woke up to gunshots. At first, I thought it was Kenny shooting skunks, and then there was so much shooting and then it stopped like it never happened. I looked out the window and all I could see was a cloud of dust and a lot of people yelling, and the phone rang—it was Phyllis, my sister across the way, who wanted to know what was happening because she was scared to go out and she was wondering where Travis, her son, was—because he had been home just before. I told her I hadn't seen him. I walked back to my room and I saw a black and white police car in my driveway without any lights and then a black and white police car coming through Kenny's gate with just its headlights on. One thing I know is they did not have their red and blue lights on.

I never believed there would come a time when the police would come in the middle of the night to arrest him. If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all. They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble. If fact, John Philpot had been out to talk to him just a few weeks before this all happened.

Mr. Hilfiger and Mr. Smith, Kenny's lawyers, never talked to me about my

16

family's history in Oklahoma, how much our land meant to us, how we always worked for what we had, and how some of our people, including Kenny, had mental problems.  Our people go back for generations in these parts and we are close to each other even though we have our misunderstandings from time to time.  I know my family would have answered any questions they had about Kenny, his life, and his problems, but the lawyers only talked to us in a hurried way. They came to my house once, more to see where Kenny lived than to talk to me. They didn't ask me anything except about what I saw the night they came for Kenny. The day I came to testify, they didn't tell me what they wanted me to talk about in court or what they would be asking me except if I loved Kenny and would miss him if he was executed,

An investigator working on Kenny's case now asked me to give the information in this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meetings. I have looked at copies of five photographs the investigator showed me that he said would be attached to my declaration. They are pictures of the shack next to my place that Kenny built. The shack looks like it looked around 1999. I have put my initials on the copies he showed me. The investigator also showed me copies of two pages from a baby book that I had given him. The stuff not checked is stuff Kenny could not do when he was supposed to and it really worried me. Funny the things you can remember like how he couldn't follow the light when I shined a flashlight at his eyes and moved it. I have initialed the pages the investigator showed me.

17

298

I declare, under penalty of perjury, that the foregoing 18-page declaration is true and correct.  Executed by me this ___9___ day of March 2009, in _Sequoyah_ County, Oklahoma.

Sylvia Gelene Dotson

18

Case 6:09-cv-00105-RAW Document 72-46 Filed 09/25/09 Page 20 of 23

## am I supposed to do all this ? ?

(Mother will check if I do)

### AT ABOUT THREE MONTHS MORE OR LESS

Lift chest clear of surface when placed face down_____
Straighten knees when held erect_____
Hold head erect and steady when held to shoulders_____
Sit on lap, hold head erect and steady with support of ribs only_____
Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____
Smile in response to Mother's voice_____
Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____
Manipulate object placed in hand_____ Splash in bath_____
Make stepping movements when held erect_____
Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried_____
Sit alone on flat surface momentarily_____
Stand firmly with help when held erect_____
Roll from back to stomach and vice-versa on flat surface_____
Reach and grasp for an object when in sitting position_____
Pick up one-inch cube with fingers_____
Scoop up ⅛-inch cube_____ Discover feet_____
Look at object with which am playing_____
Look at floor for fallen toy when in high-chair or lap_____
Make various vocalizations_____
Notice difference between familiar persons and strangers_____
Not much affected by strangers, new scenes or solitude_____
Crow and coo actively when pleased_____
Cry and fret when toy is taken_____

[ 20 ]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance_____
Crawl on stomach, making some progress_____
Creep on hands and knees_____
Bang table with toys or other objects_____
Knock down block houses in play_____
Oppose thumb and forefinger in picking up one-inch cube_____
Wave "bye-bye" or play "peek-a-boo" instinctively_____
Take bottle in and out of mouth_____
Respond to animated facial expressions_____
Bowel control_____ Respond when name is called_____
Express vocal sounds upon recognition of familiar person or object_____
Associate outdoor clothing with being taken out_____
May react to strangers_____
Reach for objects persistently_____
Say "ma-ma" or "da-da" or equivalent_____
Make stepping movements when feet are touched to floor_____

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture_____
Walk with help_____ Creep actively and rapidly_____
Comprehend simple verbal commands and commissions_____
May cooperate in dressing and undressing_____
May climb steps_____ Hold and drink from cup_____
Pile one block on another when shown_____
Say two or three words indicating want_____
Play "pat-a-cake" or similar demonstrable game_____
Pick up small object with finger and thumb_____
Show preference for one hand in reaching_____
Make rhythm movements to music_____
Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[ 21 ]

KEB501953

















**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,   )
   )
            *Movant,*   )
   )
v.   )      **Case No. 6:09-cv-00105-JHP**
   )
UNITED STATES OF AMERICA,   )
   )
          *Respondent.*   )

---

**EXHIBIT 98**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF MARK DOTSON

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle.  Kenny's mother, Gelene Dotson, is my sister; I am 23 years younger than she is.  I am a podiatrist with a private practice in Fort Smith, Arkansas.  My wife, who is a dentist, and I have three wonderful children who are doing well.  My daughter is 20 years old and in college, and my two boys, who are 16 and 11, attend public schools.  Our home is in Vian, Oklahoma, on land passed down by my parents.

I recognize that we are fortunate to have healthy children who enjoy and appreciate their lives, do well in school, and are not disadvantaged by problems that affect my extended family.  My wife and I have not had to deal with depression, alcoholism, and attention deficits that have affected many members of the Dotson family.  My children do not appear to have been bitten by the Dotson bug.

Two of my sisters, Ruth and Phyllis, have been relatively mentally healthy, but two of them, Gelene and Carolyn, have struggled with serious impairments.  Gelene, Kenny's mother, is a heavy drinker with dramatic mood swings. Some days she is pleasant, and some days she is rough.  She is so unpredictable and unpleasant that I try to keep my distance from her.  Kenny was very hyper as a kid.  He was not a normal child.  Kenny often stayed to himself.  Most of us went to the movies or out to eat, but as far as I can recall I do not remember his ever doing those things.

All three of Gelene's sons had problems.  Richie is not quite right mentally and no longer works. He is odd. Steve was extremely hyper, the most hyper child I have ever

*MHD*

Page 1 of 4

305

seen. Grandpa used to say, "If there was a knob they would turn it." I thought Steve was retarded, but he turned out not to be and is now a principal. A difference between Kenny and Steve was that Kenny would get things and tear them up, which Steve would not.

Kenny had difficulty figuring out social situations. I used to watch the Andy Griffith show; I still enjoy it. A running gag of the show is that Andy pretends that Barney was a good deputy, although Andy knew that Barney was really bumbling and afraid. It would make me laugh, but it would frustrate and confuse Kenny that Barney believed he was good when he was incompetent. Kenny could not see the humor.

Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.

Kenny's home life was his mother drinking a lot and having men in and out. Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny. Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene.

Phyllis's children also suffered with ADD. My nephew, Travis Crawford who is Phyllis's son, had attention deficit disorder as a child that was not treated. He is nervous to an extreme. He was raised in an extremely lenient home that set no boundaries. This did not serve Travis well and nourished his problems. As a kid, we got a kick out of

*MKO*

Page 2 of 4

he had a better family life and got the help he needed, I can't help but believe things would not have turned out this way. A year before the incident, Ruth went over to speak to Kenny and tried to tell him that his lifestyle needed changing.

A lot of us had backed off from Kenny, but not Ruth. I wish now that I had talked to him. I and my family let him down. The truth is our family's failure to help Kenny begins at the core of Gelene. What I mean by that is he either lived next door to Gelene or with her, and Gelene being who she was made us want to stay away. It is not a very good excuse for the family not stepping in to help Kenny, but there you have it.

I gave this information to a man who recently came to talk to me and said he was an investigator working on Kenny's case. He asked me if I would read this declaration to see if it was an accurate account of what I told him, and if it was if I would sign it as part of Kenny's case. I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4 page declaration is true and correct.

Executed by me this _8th_ day of March 2009, in ___Sequoyah___ County, Oklahoma.

_Mark Dotson_

307

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**


KENNETH EUGENE BARRETT,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　*Movant,*　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　　**Case No. 6:09-cv-00105-JHP**
　　　　　　　　　　　　　　　　　)
UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　*Respondent*.　　　)

---

**EXHIBIT 99**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## **Declaration of Steve Barrett**

I, Steve Barrett, declare the following:

I am Kenneth Barrett's youngest brother; I was born on January 1, 1969, when Kenny was seven years old. Because of the seven-year gap in our ages, we were exposed to vastly different environments and experiences during our formative years that help explain how I was able to overcome many of the challenges I faced and how those challenges affected Kenny.

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children. Even though I love my parents very much and recognize they did not understand the damage they did to their children, I have had to come to terms with the impact of alcoholism, mental illness, and family instability on my own life.

The primary difference in our upbringing is that I was raised by a village and lived in an extended support structure, something Kenny never had. My mother moved to the country to live on family land amidst her relatives when I was an adolescent. We moved in to the same trailer in which my mother now lives, where I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him. Kenny idolized Ernie, while I barely knew him. My parents

1

divorced when I was two, and my two brothers and I stayed with our mother. I could tell when Ernie visited how much Kenny missed him, that Kenny was enamored. Kenny made sure to stay in close proximity, while I would wander off. Ernie was a god to Kenny. I have no recollections of being close to my father in childhood, although as a teenager and young adult I was able to develop a relationship with him, long after Kenny had become an adult. My father's absence in my childhood and adolescence was replaced by attentive older men and women relatives who rooted me in their love and guidance.

Finally, while I was able to succeed academically, Kenny had great difficulty with his education. Kenny failed in school, but I was one of those lucky students who was always good at school and a decent athlete. High school athletes in my small town were just about the only ones who got noticed. We got sort of pampered treatment.

School became the focal point for me. In some ways, it replaced the value system that I never got at home. I would often stay at friends' houses to avoid the high stress environment at home. My mother's ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings.

One of my first memories of Kenny doing something bizarre, was when I was about five years old. Gelene whipped Kenny for something. Kenny had built these intricate scale models of cars—Mustangs and Chevelles—that were perfect. Kenny became so upset he smashed them all.

Gelene whipped us boys with a strap, but I was able to stay out of trouble pretty much. Kenny was constantly on the go, though, and Mom was pretty harsh with him,

2

verbally and physically.  Kenny hated being whipped.  We had a German shepherd that Ernie had given Kenny.  The dog was very protective of Kenny and when Mom would try to beat him, Kenny would hide behind the dog and the dog would growl at Mom and not let her near him.  The dog was run over by a car.

Mom did not have regular discipline or rules for the house; she went from one extreme to the next.  When she lost control of herself, she whipped us, but there was no real parenting.  Sometimes she came into my room after she had been drinking, when she thought I was sleeping, and she would cry about things she had and had not done.  She went in and out of being a Jehovah's Witness, but we did not regularly attend church.  We never discussed education, how we were doing in school, or how to prepare for the future.  We mostly just raised ourselves as best we could.

After we moved to the country, I often ate breakfast with Hattie and Hugh, my maternal grandparents. They were real grandparents. Friends and relatives took an active part in my and each others' lives. Janice and Tom Sanders taught me how to play cards. I hung out with my cousins Rodger, Jr. (Podgy), Travis and my Uncle Mark.  It made all the difference in the world to have that support structure. It was a pivotal part of my life. I had positive experiences and influences that Kenny never had. Aunt Phyllis gave me girlfriend advice. Phyllis and Rodger were instrumental in helping me. Uncle Mark was like an older brother who showed me how to do stuff, who spent time with me. I fed cows and hunted and fished with Podgy and Jeff Sanders on the Real property, which was just north of the Dotson section. I went with Podgy Travis, Mark, and Hugh to get alfalfa for winter animal feed. I loved the outdoors.

My own family was always dysfunctional.  My mother was never able to have

3

311

meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys. She did everything to the extreme, whether it was drinking excessively or becoming a devout member of a religious group. I once found some diary-type notes of hers when I was young; her notes were very depressive and full of blackness and darkness. If I were to find the same kind of writing today, I would know to get that person professional mental health treatment.

Life wore my mother down. She certainly did not know how to respond to Kenny's special needs as a youngster with profound psychological problems. She was not able to meet my fairly normal needs. In my junior and senior years in high school, I started in every (varsity) football game and she only came to two. I ran track in 40 or 50 meets, in conference championships, and she saw me one time.

It seems like much of my childhood was a real blur. It was weird in some ways; I was an observer. I saw things that children should not see. My mom always drank and had men around, but when she married her second husband, Paul Dudley, her life spiraled totally out of control, and I witnessed it. Paul was an amazing alcoholic, who was around from about 1982-1986. I remember Mom having a gun put to her head by Paul, when he was drunker than Cotton Brown, until she talked him down. I remember mom in the kitchen drunk with a knife in her hand, threatening to stab Paul who ended up leaving her.

Kenny left home and tried to make it on his own, but he never succeeded. He married young, had a son, and worked hard, trying to bury his problems under constant work and activity. Sometimes Kenny and I worked together. We once packed stalls at the racetrack; it was hard labor. We had a great time. We loved it. We kicked some butt, the

4

amount of work we accomplished.  I have a genuine fondness for Kenny. Kenny and I were close; we understood each other. We were pedal to the metal kinds of kids.

As troubled as Kenny was, he worked all the time.  In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. Phyllis came over and was so freaked out she rolled in the grass. Paul wanted to drive Kenny to the hospital, but Phyllis' friend was there—a nurse—and she would not let him. She covered Kenny with a blanket and said not to give him any liquids. Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

After Kenny and his wife divorced, he moved back home, next door to Mom and built a little shack.  I visited it once when Kenny was constructing it. Kenny was showing me how he was building it. I was intrigued even though I have an inherent belief in quality. The shack was almost Waldenish in its own way. Kenny lived life with great determination; he got it down to the essential stuff.

While I benefitted from coming along later in mother's life when she was surrounded by family, I still had to overcome considerable problems. I had a rough go from ages 17 to 19.  I was involved with drugs, including crank, marijuana and psilocybin.  I had a job at the local racetrack and had been using crank for several

5

consecutive days when I overdosed and was hospitalized at Sallisaw General for two days. It was the turning point in my life.

My grandfather Hugh Dotson let me borrow his beat up car in which I could see the road through the floor and I went to the old Liberty Grade School that was by then an adult school, a general educational college of sorts, where I studied algebra. Right after that I moved away from Sallisaw in an attempt to escape the constant family drama. I moved in with my dad and his wife, Doris, and worked at Kerr Glass, where my father worked. They provided stability at that point in my life. Education was a lifesaver for me. I went to Tulsa Junior College for 18 months, while still living with my father. Ernie paid my tuition, which was about $1100 a year. I went on to Oklahoma University where I received a B.A. and a Masters in Education, majoring in physical sciences.

I have a career in education that has allowed me to help youngsters like Kenny who have multiple impediments to learning. I have taught chemistry, physics, and physical science and have coached football. I also have served as a sergeant in the National Guard for 11 years but had to withdraw when it interfered significantly with my coaching responsibilities. As an NCO I was randomly drug tested, which was a deterrent to using drugs. I am currently a principal in a junior high school, where I routinely see students in all stages of crises, many from stressful homes with alcoholic, mentally ill, and abusive parents. In our district, we consider these children emotionally disturbed (E.D.), which is a catchall phrase for distressed students who may develop prolonged or chronic mental illness the way Kenny did. We take care not to label students unless they have prolonged or chronic mental issues. I see such a parallel with some of my students and Kenny. They are students from low socio-economic backgrounds in high stress

6

environments who need appropriate diagnostic testing and intervention that takes into account their strengths as well as their weaknesses.

My professional experience and my personal history have helped me try to be the kind of father and husband that my brothers and mother never had. I am committed to remaining close to my children. My family and my job are the center of my life. My wife and I have been married 16 years and we are blessed with two very bright boys, both of whom are straight A students. My wife is my best friend. Hiking and camping are my family's hobby; it keeps us close to each other. Nothing is more important in my life than my children.

Kenny's trial attorney, Mr. Hilfiger, spoke to me briefly, maybe for five minutes, on the day I testified. I tried to tell Mr. Hilfiger my concern that the jury would likely wonder how if Kenny and I grew up in the same home I turned out so well. Mr. Hilfiger and Mr. Smith, Kenny's other attorney, just told me they were going to ask me some questions. They did not ask about our family history, about any insight I may have into why Kenny and I led such different lives, or about significant events in our lives. They never asked me about Kenny's mental and emotional problems or what steps could have been taken to avoid the tragic loss of the police officer's life that night at Kenny's. I know that if law enforcement officers were concerned about Kenny's reaction to being arrested they could have approached him, my Aunt Phyllis, or other family members and been assured he would follow the law and turn himself in peacefully. The brief conversation I had with the attorneys prior to my testimony afforded me no opportunity to talk with them about my concerns. The conversation was very perfunctory and unsettling, but I had no idea if the story of Kenny's life was relevant, and, if it was relevant, how to

7

315

get it before the jury for their consideration.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 8-page declaration is true and correct. Executed by me this ___5TH___ day of March, 2009, in _Cleveland_ County, Oklahoma.

Steve Barrett

8

316

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
)
          *Movant,*    )
)
v.          )      **Case No. 6:09-cv-00105-JHP**
)
UNITED STATES OF AMERICA,    )
)
          *Respondent.*  )

---

**EXHIBIT 100**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF WARREN DOTSON

I, Warren Dotson, declare as follows:

I am Hugh Dotson's youngest brother, which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle. An investigator for Kenny asked me to tell him about myself and the family. He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.

I am an ordained evangelical minister in the First Baptist Church in Kellyville, but I do not believe in denominations. I was saved when I was 34 years old.

I live with my daughter Nona in Kellyville, Oklahoma, about 25 miles outside of Tulsa, in a house my wife and moved into in 1965. Another daughter, Linda Rogers, lives several miles away. Linda is my only daughter to have married just once. She married Rodger Dan Rogers. The family refers to him as "Rodger Dan the Mountain Man," because" Dan is something of a recluse who likes to hunt and trap. My family is very fond of Dan. Nona has been married five times, but is single now, and after my wife died two years ago, Nona moved in with me. I have four daughters, who are all good women, but too often pick the wrong men to marry.

I have been married twice. My first marriage was to Lela Warren whose father was a U.S. Marshall. The Dotsons and Morgans are mentioned in a book, "The Outlaws of Cooks and Hill." Lela divorced me around 1939 or 1940, when I

–1–

was in the army before the war. I was in the 69th Infantry and was stationed at Camp Roberts in California. I spent most of my time in the guardhouse for hitting a lieutenant. I had been leading the company in the Rifle Prize for the best shot. I had 13 bulls' eyes, but I only fired ten shots. The soldier who stood next to me had missed his own target, but the captain counted them. However, I had tripped on the way to the range and hurt my hip. I could hardly walk. When I had to shoot from a kneeling position I could not do it. I got mad at myself. They took me to the hospital and x-rayed me. I was designated for limited service. I could never be sent overseas. It took years to heal completely.

My second wife, Ruby Elizabeth Fogle, stood by me for 61 years. She loved me and I didn't have sense enough to know it when we were first married in Muskogee in 1945. She died January 7, 2007.

The Dotsons originally came from Tennessee and were slaveholders. William Abraham Mark Dotson was off with his two oldest sons fighting for the Confederacy. Carpetbaggers came to the plantation right after the war before the men had come home. They drug Clarisse Cook Dotson, William's wife, through the creek until they killed her because she would not tell where the family money was hidden. They killed her youngest boy too, my granddad's brother.

My father was killed by gunfire in circumstances that vary depending on who is telling the story. The newspaper account reports that Dad was drunk and pulled a knife. The other man grabbed his shotgun and fired. When the first round did not kill Dad, the man pumped in a second. I way I heard it is that the

–2–

W H

sheriff had come to the house looking for stolen bridles, that Dad knew nothing about them and none was found. Dad later found them hidden in his barn and turned them in to the Feds.  Mama always thought he was killed over the bridles and that he knew more about those bridles than he told.

Dad's death left Mama with six children to raise alone.  She gave four of them to Dwight Mission School to raise: Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook.  Mama kept me and my sister Lela, but she was not able to keep us long.  I was only four years old and Lela was two.  Mama had to give me to her sister, Francis Stites who was married to Andrew Payne. They lived in Muskogee.  When I was fourteen, I went out on my own.  Lela was first given to welfare people and then to Uncle George Dotson, my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and then later to Thomas McClendon.

I was never mad at my mother.  What choice did she have? If I had to forgive her, that would be a wrong way of thinking.  It hurts to lose your family.  I remember crying when I saw her so many years later because she was a stranger.

I have worked my whole life.  I was a welder and a factory repairman and learned never to stay at a job for more than a few years. If I found a company that would pay me more, I went there.  If management insulted me, I would move on even if it was for less money. I worked as a helper for four years in Muskogee

–3–

320

for seventy-five cents an hour. I then hired on as an acetylene welder and later worked welding gas and steam lines. I also have done heavy maintenance work that involved welding. I went where I could make better—nobody paid overtime.

My brother Hugh was a shy man who liked to hunt and fish. I was at Hugh's bedside when he died.  Hugh worked all his life so he could buy land and have something to leave to his children. They live on land he left them.

Kenny, Hugh's grandson, lived out there on Hugh's land.  Kenny was a good worker, too, and was never disrespectful.  My daughters took care of him after he got out of the mental hospital.

The law did not have to go to Kenny's place in the middle of the night to arrest him. Our people live all around Kenny's place and know that he was not dangerous. It breaks my heart what happened out there that night.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _____6_____ day of March 2009, in _____Creek_____ County, Oklahoma.

_Warren Dotson_

Warren Dotson

-4-

321

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 101**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## DECLARATION OF NONA REICH

I, Nona Reich, declare as follows:

I am Kenneth Barrett's maternal second cousin.  My father, Warren Dotson, and Kenny's maternal grandfather, Hugh Dotson, were brothers.  Kenny's mother, Gelene Dotson, is my paternal aunt.

Marriages are easy to get into; they can get you a lot screwed up and they are hard to straighten out. I have been married five times, some more successful than others, but probably my best marriage was to my second husband.  I first married when I was only 16. I divorced two years later because my husband did not want children.  I had my only two children, both sons, with my second husband, and we were married for 13 years.  My youngest son, Marty, has had a difficult time with life and spent 11 years in prison for crimes related to methamphetamine. He has been out of prison two years but life as an ex convict is hard. I was married to my third husband seven years.  My fourth husband was in the penitentiary when I married him in 1988; he was an alcoholic. Our marriage lasted two years.  My fifth marriage lasted seven years.  I have been single since 1999.  When the preacher's wife wanted to introduce me to a man recently, I told her I was not interested. I must have stupid written across my forehead. Even if a man had "God sent me to you" tattooed on his forehead, I would question it.  My greatest regret is not staying with my second husband and making our marriage work.

Gelene and Ernie had a terrible marriage and she got no affection from him. Gelene was hard on Kenny. Something about him reminded her of Ernie and she took it

--1--

N 823

out on him.  Kenny never got affection from Gelene.  Gelene did not have a good relationship with her own mother, Hattie, who was never very affectionate. Gelene felt that she was the child never liked by her mother; she felt she was the black sheep in the family. I guess if you don't get affection, you don't know how to give it and so Kenny suffered from the lack of it from Gelene.

My sisters and I know something about the difficulty of raising children.  Two of my sisters each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away.

My sister Linda and I used to babysit Kenny and saw him on and off through his teens and at family reunions. He was a pretty, little boy but very hyperactive.  We kept track of him as he grew up.  Gelene had me and Linda pick Kenny up from Eastern State after they had him committed.  He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

After Kenny and Abby divorced, Kenny built his cabin next to his mother's house in Vian.  When we visited Vian, we went over to Kenny's cabin and went inside. We got along wonderfully.  The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and

–2–

said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind.  We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

I feel bad about what has happened. I have beaten myself up a hundred thousand times for letting Kenny down at a time when he was asking for help, wondering what I could have done, knowing that I should have done more. My only excuse is that my mother was dying at the time.  I feel like the whole family failed him. I know I have. I feel it in my heart. I really do love Kenny. The pity of all this is I know Kenny and he was not a violent person, troubled but not violent.

An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.

Executed by me this __5__ day of March 2009, in ____Creek____ County, Oklahoma.

_Nona Reich_

Nona Reich

—3—



**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 102**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**Declaration of Carl Cook**

I, Carl Cook, declare the following:

I married into the Dotson family on December 31, 1939, when Christine Dotson became my bride.  We were married 61 years before her death March 31, 2001.  Christine was Hugh Dotson's sister, and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle.  Through the years, I learned the Dotson family history.

The Dotson family history was passed down through the generations orally.  I was naturally interested in history so I paid attention to it.  I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history.  I should start with something of my own history, however, as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma. My mother was a Latimer, and my father was a Cook. One of my mother's ancestors was a colonel in the Revolutionary War.  Some of her family fought for the Confederacy in the Civil War. After the Civil War, they were allotted land. My father, Lewis Cook, died in 1928. He was gassed in World War I, got TB and went to Arizona to recuperate where he died. I followed the military tradition of my family and served in World War II.  I fought under General Patton in Czechoslovakia and liberated several concentration camps.  The most horrible thing I ever saw was a flat car piled high with dead bodies.  I was saved by Jesus in Le Havre, France, during the war, and credit Jesus with my long life.  I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

1

327

The Dotson family history also goes back to the Civil War. The Dotsons moved from North Carolina to Arkansas, south of Huntsville, in 1835. Their old grandma at that time claimed to have been a friend of Davey Crockett's. They loaned the town, now Huntsville, the money to incorporate. According to family lore, the Dotsons were moneyed slaveholders. The head of the Dotson clan and his two sons fought for the Confederacy, leaving the youngest boy at home with his mother. Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman. She had buried the family savings but told the scalawags she was penniless. They hung her two different times, but still she denied having any money. Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden. She relented and they took the entire Dotson fortune.

The Dotsons came to Oklahoma in 1900—I imagine they were poor. They moved to Marble City. It was wild territory back then, "still Indian." The area was riddled with bank robbers and it was a profession many took to. Even I had an uncle who did 10 years for bank robbery—Monroe Cook, from Muldrow. The Dotsons were tenant farmers. Christine and Hugh's dad, Abe, was killed in 1925. He was shot by a man in a fight over a woman they both Minnie seeing even though both of the men were married.

Abe's wife, Minnie, could not raise her six children alone. There was no welfare back then. Minnie put four of her children, including Hugh and Christine, in the Dwight Mission School, a Presbyterian School established by missionaries in 1820 in Indian Territory. I think the school went up to the eighth grade. People at the school told Minnie not to visit her children once she left them at the Mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor.

2

328

Mattie kept the other two children: Warren and a girl. Minnie never came around to the school. It turned the children against Minnie because they felt in the back of their minds that Mattie deserted them.

Eventually all the siblings connected up. I liked all of them. John E was an alcoholic, and Hugh drank quite a bit when he was young. Hugh raised his four kids; one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family, and we visited quite a bit. Hugh loved to tease and so did I. We got along good. You could depend on what he said. He told the truth, quite an attribute; now you don't know what people are thinking.

When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even the mountains. Someone told me that it was a fact that there was more corn raised in Sequoyah County in 1920 than in any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in the early 1990s.

I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it. I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them.

After I told the investigator working on Kenny's case about my family, he came back to me with this declaration. I have read this declaration over carefully and it says what I told the investigator during our meetings. I would have testified to these things in

3

Kenny's trial if anyone had asked me to,

I declare, under penalty of perjury, that this 4-page declaration is true and correct.

Executed by me this ___7___ day of March 2009, in *Sequoyah* County, Oklahoma.

_____*Carl Cook*_____

**Carl Cook**

4

330

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 103**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF ABBY STITES

I, Abby Stites, declare the following:

I was nine days short of 16 when I married Kenneth Barrett and was two months pregnant with my only child, Toby. Kenny was only 18 and married me because he felt sorry for me. My father did not speak to me throughout my pregnancy. I was one of ten, seven girls and three boys. My mom had her first baby when she was sixteen, so there was not much my mother could say.

Gelene was not a good mother to Kenny; when she wasn't working, she was partying. Kenny and I stayed with Gelene after Toby was born. I had my new baby, and Gelene brought in people from work and everyone was partying with crack and pot. Gelene made Kenny get up from bed and party with them. She was always bringing men home when the children were still living with her. Stevie was still a child. She wasn't there for her kids. She was always running around. She didn't know what her kids were doing.

Gelene was always cussing Kenny and had a terrible relationship with him. I never saw Gelene treat her other sons the way she treated Kenny. Gelene had a good side to her, even if she did not show it to Kenny much. She did not have to take me in when I was pregnant. It was just that her morals and mine were different.

Ernie, Kenny's father, was not much of a father or husband, either. He gave Kenny things and then took them back. Ernie was always running around. After the divorce, Ernie would come by the children's house to show off his new Corvette and the kids did not even have shoes, several family members told me. Ernie was for Ernie. I



think he paid Gelene some child support for all three kids but he made a lot of money. He was a big deal in the glass company where he worked.

I learned in my marriage to Kenny that Kenny had mental problems. He would do bad things and then have remorse. He did things on impulse and then regretted them. During one of his remorseful periods, I convinced him to go to Willis mental health facility in Sallisaw, and Mike Fry had him picked up by the sheriff and taken to Eastern State Hospital in Vinita, Oklahoma, an inpatient facility. They could have kept him a month and it might have done him some good, but Gelene came and got him out after two weeks when Kenny asked her to.

Kenny was like a manic depressive, hot one minute and depressed and even immobile the next. He would work hard and then sleep all the time. I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep. Kenny did not act the way normal people act. Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions. He went out with other women and then came home, expecting me to forgive him. Kenny would hit me, and I hit back.

I always thought he was mentally ill. The whole 14 years we were together, I was always trying to help Kenny. I felt like we were more like brother-sister than wife and husband because I was always bailing him out of trouble and taking care of him. He was never able to take care of me. I spent 14 years trying to keep up with his mood swings. There were times he could be good, but every time I got a new car he would tear it up; every time I got new furniture he would tear it up. He would get very upset over any little


333

thing, but then he would try so hard to be good.  He would mow the lawn and take care of things and fix things and it would last for two months.  Then he would start running around with women and be gone for two months.

I got the stay-away orders, not to just keep him from trying to come back, but to keep me from going back.  He would come back crying, begging me to take him back, so remorseful.  He could be good as he could be—he would go the extra mile, trim the tree if it meant my taking him back, but he could not keep it up.  This was from the beginning of our marriage.  He came home one time and accused me of having an affair with somebody I worked with, and cracked my nose and left bruises on me.  I had to call the police and go to the emergency room.  Kenny came back, crying, very sincere, and could not believe he had done all that.  He went out of his way to make up, to be good-hearted. I knew he had mental issues.

He was always doing crazy things on motorcycles. He never wore a helmet. Once when Toby was about eighteen-months-old we were living in Elk City, Oklahoma, where Kenny worked oilrigs. I was watching him dirt biking in a field and he didn't see the barbed-wire fence. He went smack over it and landed on his head, He was unconscious for a while. It really scared me. He had a bunch of cuts and scratches, too.

Kenny was a hard worker but it would not last long. He would get real depressed and sleep all the time.  He smoked a lot of pot, but without it he never got motivated.  He turned to drugs to make himself feel better.

I was the only stable thing he ever had in his life.  I kept him together. Without me, he could not function.  I did not care for his drugs when he started into that, but I



334

tried to keep him from falling off the deep end. Kenny needed more than I could give. I have two sisters like Kenny; that's why I tried to help him.

Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about. They did not ask me anything about his family history either. Even though I wasn't happy about testifying at the trial, I did, and I would have testified about the things in this declaration if they had asked me about it.

I recently gave this information to a man who told me he was an investigator working on Kenny's case. I did not write the declaration myself. When the investigator came back and asked me if I would provide this declaration for Kenny's case, I read it carefully. It says what I told the investigator during our meeting.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this ___9___ day of March 2009, in ___Seq.___ County, Arkansas.

_Abby Stites_
Abby Stites

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 104**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**<u>Declaration of Richard Barrett</u>**

I, Richard (Richie) Barrett, declare the following:

Kenneth (Kenny) Barrett is my older brother by a few days short of three years.

An investigator who told me that he works for lawyers representing Kenny recently asked me if I had seen my brother and Cindy Crawford in any kind of altercation. Cindy Crawford is married to our cousin Travis Crawford.

I told the investigator that I had once seen Kenny dress Cindy down. Cindy was sitting in a car at the time on my brother's property and Kenny was standing next to it. I heard him say something like, "Who the fuck do you think you are?"

The investigator then asked me if anything else took place. I had no idea what he was getting at. Then he asked me if I ever saw my brother point a gun, a shotgun or any weapon at Cindy Crawford.

I told him that I never saw my brother point any kind of weapon at her.

He then asked me if I had ever seen Kenny put a gun, shotgun or any weapon against her leg. I told him that I had never seen anything like that, that I had never seen Kenny put a gun, shotgun or anyway weapon against her leg or any part of her body, and that anybody who said that I saw that is a flat out liar.

The investigator who asked me these questions asked me to provide this declaration. I did not write the declaration myself but I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed by me this ___9___ day of March, 2009, in ___Sequoyah___ County, Oklahoma.

_Richard Barrett_
Richard Barrett

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 105**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

## Declaration of Doris Barrett

I, Doris Barrett, declare the following:

I am married to Ernie Barrett, Kenneth Eugene Barrett's father. I was married to Ernie Barrett before and at the time of Kenny's state trials in Sequoyah County, and during his federal trial in the Eastern District of Oklahoma. I followed Kenny's case closely, in both state and federal court. I went to every hearing and every day of both state trials and the federal trial, except I missed just one state hearing that was held in Stilwell.

In Kenny's federal trial, I noticed a bulge around Kenny's waist. It was there every day. I asked Kenny's lawyer what it was. He told me it was a shock belt, there to shock Kenny if he tried to escape or hurt someone. If it was obvious to me, it must have been obvious to others.

Kenny wore nothing like that in the state trials.

An investigator working on Kenny's case asked me to provide this declaration. I did not write the declaration myself, but I have read it carefully and it says what I told the investigator during our meetings.

I declare, under penalty of perjury, that the foregoing 1-page declaration is true and correct.

Executed by me this 5th day of March 2009, in Creek County, Oklahoma.

Doris Barrett
Doris Barrett

339

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 106**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Case 6:09-cv-00105-RAW Document 72-55 Filed 09/25/09 Page 2 of 5

# Sequoyah County Democrat

QUOYAH COUNTY DEMOCRAT VOL. XIX. NO. 28 — SALLISAW, OKLAHOMA, JULY 10, 1925. — STAR-GAZETTE, VOL. 31, NO. 28

## THE OFFICIAL COUNTY PAPER—THE PAPER THAT IS READ

# SEQUOYAH COUNTY LEADS AT TAHLEQUAH NORMAL

## Enrollment Records Show This County Far Ahead

Through the courtesy of J. H. Dodson, superintendent of the Roland schools and now instructor at the summer term at Northeastern State Teachers College at Tahlequah, we are to give below a list of one hundred twenty-two folks enrolled there this year study and training in their chosen sections. The list is an extended and we are advised that Sequoyah county heads the honor list in attendance this year. This speaks well in for the county and discloses a hunt on the part of those in the teaching profession to increase their knowledge and better equip themselves to place Sequoyah county so its higher rank in every detail. Prof. Dodson also enclosed an interesting note relative to the organization of the Sequoyah county colony, will be of interest to our readers. Following is the list of names:

Acton Joyce Akins, Edmund Strong, Lola Acton, Theo Brodie, Ila Barnes, Pearl Barnes, Bess Ick, J. F. K. Bass, Glena Bangs, Jean Lechard, J. V. Downing, Ver-Brackett, Mrs. Lyda Bradley, Ile Bradman, Thelma Briscoe, Hal-Brown, Leonard Bumpers, Fannie Bell, Theodore Casey, Nettye Con-Thelma Dease, A. W. Dodson, Mrs. Dodson, Maurine Dodson, J. H. Dodson, Mrs. Kate Dornan, Lois Dornan, R. E. Downing, Winnie Estep, Hazel Eichling, Ida Eppler, Max Eason, Jewell Frye, Clara Folsom, Fox, Harriett Frye, Fray Fulton, Fulton, Lola Garretson, Norma Gleason, J. W. Gilbert, Mrs. Flora Gilbert, Ida Gilbert, Stratton Goins, Hammett, Leta Harden, G. S. Hood, Mrs. G. S. Harmon, Squires, E. R. Haskins, Ruby Walton, Watkins, Marie Watkins, Sue Wilson, Mrs. Margaret Wilson, Ile Wofford, Jettie Wood, Floye Kina, Elizabeth Ratcliff, Harris, M. M. Black, Otal Wilson, J. Olson, Mae Pinkerton, Pearl Pin-Ila King, Mrs. E. R. Hastings, Margaret Hastings, Esse Helms, as Hill, Max Holcomb, John Hol-Ferrin Holcomb, R. L. Howell, Howell, James Humphrey, Humphrey, Lucille Jones, Edith Eula Keck, S. S. Kirk, Ku-Kuykendall, Mrs. Byrda Kuyken-Dra Lea, Lee J. Lewis, Mrs. Lee Sia, Mittie Lillard, Mayme Lin-Vaness Mays, Ben F. Mills, Mrs. Mills, Ruth Mize, Winnie Mize, Vida Nichols, B. F. Oliver, Ed-Oliver, Edna Pattycord, Edith Ora Lee Pinner, Gertie Read, Noel Ross, Elvis Rowland, Othel Ud., Mrs. Mary Scott, Guy R. Sharp, Wade H. Shumate, Anderson, Pansy Stewart, J. Taylor, Margie Thompson, Ruth J. H. Walhup, Mrs. J. B. Minnie Walker.

### Normal Notes

W. Gilbert principal of Liberty Sallisaw, was elected president graduating class of the Junior held return is being given to all who wish to take it. Many king advantage of this opportunity of the Sequoyah county teachers spending the week and talk the picnic.

The daughter of Mr. Floyd who is instructor in Sallisaw schools, contracted a case of whooping cough and was taken by her to Tulsa, Oklahoma, to the of Mrs. Tompkins' mother.

Humphrey of Akins was president of Sequoyah county's who are in attendance at R. S. T. C. and Floyd O. Tompkins, Sallisaw, secretary.

county stayed in for the both boys and girls basketball defeated in the finals by cherokee boys and girls.

of the Sequoyah county teachers to receive their life certificate at the close of the summer term. Receive their degree.

## TWO NEWSPAPER BOYS ARE PROUD FATHERS

Cas A. Carr, formerly connected with The Democrat but associated with the Johnson Credit company since last November is the proud father this week of a fine seven pound baby girl who arrived last Sunday. The mother and babe are doing fine and Cas wears a smile that will not come off. On Monday, July sixth, Fred Green became the proud and adoring father of a nine pound baby boy. He (Fred) joined The Democrat staff on that same date that the boy arrived but has found it hard to get his mind on has been upon his work. The mother and boy are both making splendid progress.

### JIM TAYLOR RENAMED COUNTY COMMISSIONER CHAIRMAN

When the new board of county commissioners qualified last Monday morning and proceeded to organize, J. A. (Jim) Taylor from district number three was unanimously chosen as chairman to succeed himself. He has served for two years past in this important position and the honor bestowed upon him Monday is well deserved, for no man in the county perhaps knows county affairs and the county's business as thoroughly as does Mr. Taylor. J. A. Wofford, able and qualified Commissioner from district one has served for two years past also and rendered splendid service. His work was well enough thought of by his people that he was returned to office following a most bitter fight and in a district thought by many to be Republican in politics. R. L. Horn, who replaces W. E. McConnell in district two, is the third member of the new Board and returns to official duties following a lapse of several years. He comes well equipped to render excellent service, by reason of his previous service on the Board and his wide knowledge of road affairs and county business generally. The new Board is indeed an able one and the county may expect big doings during the next two years.

The newly organized Board got down to business immediately and cleared the decks for action, Much important road and bridge work faces the three members and they expect to map out and carry into effect an extensive program. The estimates of the various county offices are to be examined soon also, preparatory to final adjustment by the county executive board. Many road overseers and seekers for official place were here on Monday also, presenting their claims and applications for reappointment. The Board met again on Tuesday to complete the work started on Monday and to consider any unfinished business that might be presented.

### FRED MERSHON ASSUMES DUTIES AS SUPT. OF SCHOOLS

Monday of this week witnessed assumption of the duties of County Superintendent of Schools by Fred Mershon, elected last November by the voters of Sequoyah county. He took over the reins of office from Lee J. Lewis who retires to enter school work in Muskogee county. Mr. Mershon is not a novice in educational work and comes to this office with a world of knowledge and experience gained in earlier years in this part of Oklahoma. He is ofttimes referred to as "the father of Sequoyah county schools" and has done more perhaps to establish and build up the school system in this county than any other man. He held the office a number of years ago, but retired from official life during 1922 and 1923 and engaged in the oil business at Eldorado, Arkansas, following the opening of that big field. He returned to Sallisaw more than a year ago and the lure of office attracted him to enter the race for county superintendent. He won the nomination over Lee J. Lewis and Dewey Patton and then won the race in November over his Republican opponent, J. M. Barton, a former school man will serve as his assistant in the office. Both of these men entered heartily upon their duties last Monday.

### COTTONWOOD

The revival meeting is getting better all the time. Houston Martin, Wade Vaughan, Hanna Turner and Jeff Shackelford were converted Saturday night.

Son Wolf and Forn Hibbs were married Wednesday night.

### MRS. CALLIE LEATHERS IS SERIOUSLY ILL

Friends of Mrs. Callie Leathers are greatly worried the past week because of the serious illness which she has been suffering since Thursday, July 8, when she became suddenly stricken immediately following the noon meal and as she had started back to her duties in the county treasurer's office. It was at first thought that the attack was acute indigestion, but this idea was soon dispelled and it became apparent that the illness came from a serious ailment at the base of the brain. She has been unconscious since the day of the attack and close family friends fear for her recovery. Attending physicians are keeping close vigil, and a trained nurse was called into service on Monday of this week. Relatives of the family have arrived throughout the week, to render whatever assistance and aid that it was possible to give. As we go to press the belief prevails that the chances of recovery are remote.

### OAK STREET TO BE OPENED AT ONCE

The city commissioners in session Tuesday evening, passed the necessary resolution ordering the opening of Oak street north across the Missouri-Pacific tracks. The news will be most welcome to those citizens who live north of the tracks and who have hoped for years that a good street might be opened to traffic. This has been impossible heretofore because of title to the land, and complications arising out of the original plot made and the way the streets and the city were laid out. The new street extends north from the First National Bank and Citizens National Bank corners, across the track, and past the R. T. Kelleam and George Daniel homes. The street will pass between those two houses and the small alleyway on the east side of the Kelleam house will be closed to traffic. Sidewalks can now be builded and a well graded street can be maintained. Many of the nicest homes in the city are located on the north side and many new homes will be builded in future, with the opening of this important street.

### HINES WINNER IN GOLF TOURNEY

Leland Hines is golf champion of the Sallisaw Country club. He won this title when he defeated Roy Frye, 5 up. Frye was at first the picked winner, but Hines worked himself up from the start and defeated everything coming his way. Leslie Hines is winner of class B, and Mrs. J. L. McDaniel is winner of the ladies title. Leslie Hines defeated Floyd Green in a close match, 1 up. Mrs. J. L. McDaniel, a champion since the organization of the club won her match easily from the very start, defeating Miss Bass Hall, 7 up in the finals.

### CHRISTIAN CHURCH TO OPEN BIG REVIVAL

Announcement was made this week by officials of the Christian church that a big revival meeting would open next Sunday, July twelfth in their church, led by Evangelist Harrison Lewin of Muskogee. This revival follows closely the recent revival of the Nazarene church. A good choir is being organized to conduct the musical service. Evangelist Lewin delivered a sermon here quite recently and impressed his hearers as being a most effective speaker, and arrangements were started at once to open a big revival meeting. He is a noted evangelist and comes very highly recommended. The meeting will be conducted for two weeks at least, and possibly for a longer period. Everyone is invited and urged to attend the nightly meetings.

### RAYMOND DRAKE NARROWLY ESCAPES SERIOUS ILLNESS

Raymond Drake, popular and efficient clerk of the court, is slowly recovering from a ten day attack of fever which was a time threatened to become serious. Attending physicians felt that for days he was in verge of an attack of typhoid fever but by careful treatment and watchful care, the attack was avoided. He was confined to his bed for more than one week but is now able to be back at work.

### BIG PIE SUPPER TO CLOSE CHAUTAUQUA

The chautauqua course has occupied the time of everyone this week, with both afternoon and night programs each day. The course ends tonight (Friday) with a splendid number—"The Musical Moores," featuring Baby Harold Chester. The Friday evening program also includes Ned Woodman, cartoonist. The week of varied entertainment started off on Monday with Woods quartet and full ringers and continued each afternoon and night with good attendance and close attention. Many complimentary remarks have been heard from those who listened to each number. The humorous lecture on Tuesday evening by Denton C. Crowl was particularly appreciated, picturing as it did the everyday problems of life and pointing the way to a solving of those problems. The ticket sales were far from what was expected and fell far short. The guarantors whose names were affixed to the contract were forced to make good the deficit.

Tonight a big pie supper and popularity contest is to be had. The doors will be thrown open free to everyone who wishes to come. The regular program will be given as usual and immediately following, the pie supper and contest for the most popular young lady and handsomest young man, will be carried on. This big pie supper is being arranged to help clear the big deficit and everyone should respond and should bring with them one or more friends. The program is well worth attending, and following the big fun will start.

### WALTER HAMPTON TO OPEN MODERN GARAGE

Walter Hampton this week closed a deal for the purchase of the large brick building immediately east of the Bonham hotel, occupied recently by the L. C. Corley garage, and is working out plans for the opening of a modern garage and filling station. His plans contemplate tearing out the present front and building a drive-in filling station. He has been connected with the Renger-Frye Motor Co. for several years past and is an experienced mechanic and garage man. The location is a splendid one and has been used for years past as a garage and auto sales room. The present occupants have made no definite plans as to a new location, and will probably not vacate the present room until next month.

### FRED GREEN OF AKINS JOINS DEMOCRAT STAFF

Fred Green, superintendent of the Akins schools this week joined the working staff of The Democrat and assumed his new duties on Monday. He served as superintendent of the Akins schools last year and had contracted to teach the summer term starting this month, but obtained a substitute when acceptance was made of the offer to enter the newspaper game. He is new in newspaper work but is entering with the intention of making it his life's work. Enjoying a wide acquaintance in the eastern part of the county, and also in the teaching fraternity, and being a graduate of Sallisaw high school equips him admirably for entrance into newspaper work in Sequoyah county. The Democrat force welcomes him and believes that the public generally will feel that a wise choice has been made. He will take over the advertising and news features of the paper just as quickly as experience can equip him for that work.

## MANY ATTEND I.O.O.F. HOMECOMING AT CHECOTAH

Several Sallisaw members and their families attended the annual Odd Fellow homecoming held at the Orphanage at Checotah last Monday July 6. More than 1600 members of the order from over the state were in attendance at the affair. A great picnic and program was held in the afternoon.

Those who attended the affair from Sallisaw were: Mr. and Mrs. Chas. W. Anderson, Mr. and Mrs. J. H. Thompson and family, Mr. and Mrs. E. S. Spears and family, Mr. and Mrs. Aulda Rosson and family, Mrs. Tucker and son John, Carnell Leach, Looney McCoy and Mr. and Mrs. William A. Timmerman.

### ROSS TAYLOR MAKES FIRST DONATION IN ORPHAN DRIVE

Ross Taylor, member of Carnie Welch post here and a sick and disabled world war veteran has the honor of being the first person in Sequoyah county to donate to the big Legion Endowment Fund drive which starts today (Friday). He is in the Government hospital at Little Rock, Arkansas, and on Tuesday of this week mailed his check to County Chairman Harry Pitchford for $10 with the wish that he could give more. He has been a government patient for three years past, suffering from illness and disability received while doing service in France and his magnanimity and big hearted desire to do his bit in this greatest drive since the war convinced, proves beyond question that the effort will succeed and that it is worthy. Ross has a wife and three small kiddies who live here in Sallisaw and who depend entirely upon his limited hospital pay for a livelihood, but he saved out a sufficient amount in start off the big drive and show his fine spirit in putting Sequoyah county over the top in the fund drive. He spent three weeks here this spring with his family and had laid his plans to be here and assist in every possible way when the drive started, but last month became so ill that he was forced to return to the hospital. If this donation by one of Sallisaw's sick and disabled vets is a criterion, then the quota for Sequoyah county will go over in great shape—and possibly with no doubted.

### POOL HALL APPLIED FOR AT MOFFETT

County Judge W. S. Moore on Wednesday of this week held a public hearing in the district court room in connection with the recent application made by L. N. Cantrell and J. W. Pressley for a permit to open a pool and billiard hall in the town of Moffett. The hearing was largely attended by citizens of Moffett who came home to testify, and offer personal views as to the advisability of granting such a permit. The Oklahoma laws vest the county judge of each county with authority to grant permits of this character. No pool or billiard halls have been permitted to run in Sequoyah county since soon after statehood and opposition has been voiced each time that individuals have taken steps to secure such a permit. The applicants in this case were represented before the county court by Judge Thos. J. Watts who presented the reasons for believing that a pool and billiard hall would not prove offensive or a nuisance. Fifteen or more citizens were questioned closely by Judge Moore concerning the effect that a pool hall would have upon the town from every conceivable angle. The application by Messrs. Cantrell and Pressley was made soon after the closing of the pool and billiard rooms in Fort Smith last month. Judge Moore continued the hearing until Wednesday, July 15, at which time additions and questions will be secured and other citizens examined and questioned concerning the advisability of granting such a permit.

Mr. and Mrs. L. T. Newton and daughter, Betty, returned home first part of the week.

## Abe Dotson, Well Known Marble City Farmer, Shot to Death

### Killed at Home of John Wallace, a Near Neighbor

Sequoyah county's long list of homicides was made longer last Wednesday of this week, when Abe Dotson well known farmer and stockman of Marble City was shot and killed five miles northwest of that town by Henry Edwards, aged 24, at the home of John Wallace, farmer.

The killing occurred about 9:00 a. m. and within one hour and a half thereafter, Sheriff John E. Johnston and County Attorney Harry Pitchford were at the scene making full investigation and securing statements from those who knew any details whatever as to causes surrounding the case.

From the meagre information at hand, it seems that Abe Dotson, Tom Dotson, Henry Edwards, Merl Edwards and John Wallace live in the same immediate community, and that Wednesday morning Abe Dotson and the Edwards boys went to the Wallace home to get some barber work done. While there a minor quarrel started which was thought nothing of and in which no one took any exception. When Dotson and the Edwards boys started away from the Wallace house, it is said that Dotson drew a butcher knife and started after Henry Edwards. Edwards ran back into the Wallace house, grabbed a double barreled 12 gauge shotgun, turned in the doorway and called to Dotson to halt. Dotson took a step forward at the gate and Edwards fired, the shot striking Dotson in the right shoulder and breast. He fell and rolled four or five steps from the gate, and according to one eye witness, Edwards fired another shot which struck Dotson in the left ear and temple. Mrs. Wallace witnessed the tragedy, but her husband was at the barn back of the house. Dotson lived fifteen or twenty minutes but was unconscious and could make no statement. The Edwards boys, who are cousins, left soon after the tragedy and rode to the home of Deputy Campbell Belior, who lives near Sycamore school house, and surrendered. Ben Crawford, deputy sheriff at Marble City, happened to be in the vicinity of the killing and rode up to the Wallace home very shortly after the killing and shortly after the departure of the Edwards boys. He heard the shots that were fired and which killed Dotson. Deputy Belior brought Henry Edwards to Sallisaw at once, and placed him in the custody of Sheriff Johnston. Merl Edwards, the cousin who witnessed the tragedy, accompanied them to Sallisaw. All of the parties made statements to Sheriff Johnston and County Attorney Pitchford. Edwards was lodged in jail pending his preliminary hearing which will be held probably next week.

Tom Dotson, a brother of Abe Dotson had some personal difficulties with John Wallace at whose home the tragedy occurred, last Saturday and was brought to Sallisaw and placed under arrest yesterday. It is not believed however that this trouble had any connection whatever with Wednesday's killing. None of the parties were drinking, as was at first reported and all were in good humor and good spirits apparently, the quarrel and the killing occurred so suddenly that it hardly seemed possible.

Abe Dotson was a brother of Berry Dotson who was killed by Constable Nicholson at Ramona, Oklahoma, about two years ago. He was also an uncle of Mack Dotson who was killed on the streets of Marble City on March 9, 1923 by Jeff Kirk. He was the third member of the family to die with his boots on within a period of two years. See Dotson, a son of Berry Dotson and nephew of Abe Dotson is a fugitive from justice at this time and has been wanted for more than a year upon bank robbing charges. He is thought to be in hiding in the Cookson country and is, it is credited with having committed this killing.

341

KEB401082

# The Vian American

VOLUME 1     VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1923.     NUMBER 3

## OB TOWRY KILLED BY TRUCK

River Falls to Observe Crossing Stop Law and Throws Five Men Off.

The entire community was shocked and grieved last Friday morning when the news was wired from Sand Springs that R. L. Towry, brother of N. H. Towry of this city had been thrown from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of man-slaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Sallisaw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where funeral services were held and the body interred in the City cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, and established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. O. C. Towry and five brothers and three sisters, viz: Brothers—J. J. and D. O. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters—Mrs. J. R. Plunkett of Charleston, Arkansas, Mrs. Ed Craven of Scranton, Arkansas and Mrs. Jas. Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock the boys working at test well Gans, Gans let the bull wheel get away which caused same to explode and tear down the rig, destroy several hundred feet of the cable and tear up many parts of the machinery.

Those who were at the scene at the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in record time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials puts an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been so referred, even a reasonable campaign of education would have resulted in the overwhelming adoption for the late legislature enacted no more constructive beneficial law. Factional policies and demagogic pretense done best fumed the attempt to make of that law something injurious to the public and its interests.

It may be the matter will yet go to represent the state in the electoral college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the Commerce of Tulsa county and who not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## ABE DOTSON KILLED
### BY HENRY EDWARDS

Home of John Wallace Scene of Tragedy Wednesday Morning

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:30 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by his wife and five children. His body was removed to his home, about four miles northwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here gave some demonstrations in this work with some of our poultry men of the county, explaining to them the method employed by the government in chasing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided in three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean strong and infertile. Standards—Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood stings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were still

take until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. D. Benher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Fee and family and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip any bit and the few mosquito bites helped each one to realize they were out on the river in a camp and act at home in a comfortable bed.

Sunday morning several of the party decided they would return home for raising School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quartettes and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished breakfast for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

Household Appliances Would Be Installed Where New Rate Would Be Effective

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with B. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents net per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 7.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the rate would be allowed in too clouds in which appliances having a capacity of at least three kilowatts per month have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification. Stockwell

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGOR FRYE MOTOR COMPANY, NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to announcement advertisement of Reagor-Frye Motor Company of Sallisaw. This new firm succeeds Max Reagor as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will have charge of the plant, while Mr. Reagor will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Merchan.

Commissioners—Bud Horn, District No. 1; A. Taylor, District No. 2; ...ford, District No. 3.



### RIDE 'IM, COWBOY

An animated tornado on four legs, 1,200 pounds of living dynamite ... is the "outlaw" breax, scores of which will provide the chief thrills at the Chicago Roundup and World's Championship Rodeo, to be held for five days, beginning August 18. Why and during ... cowboys whose facing ... injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses at the Chicago contests.

Bronche busting calls forth all the courage that is demanded in the western ranges and a great part of the $30,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay the ... When the courage of the buckaroo clashes with the ...

## Our Motto:

# "Safety First"

# Men and Money

## Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because

342

KEB401083

# The Vian American

VOLUME 1        VIAN, SEQUOYAH COUNTY, OKLAHOMA, JULY 10, 1923.        NUMBER 3

## OG TOWRY KILLED BY TRUCK

*Driver Fails to Observe Crossing Stop Law and Throws Five Men Off.*

The entire community was shocked and grieved last Friday morning when the news was wired from Sand Springs that R. L. Towry, brother of N. H. Towry of this city had been drawn from a truck and instantly killed while going to work that morning.

Mr. Towry with six other men were on a truck going out to work and in attempting to make a railroad crossing on a sharp curve, going at high speed, the driver failed to obey the crossing stop law, and as the crossing was a rough one, the truck was partly overturned to the extent that five of the men were thrown off. Mr. Towry struck the rail or a tie in such a manner as to crush the skull, from which he died instantly. One other occupant suffered a broken leg and the other three men escaped with slight bruises.

The driver of the truck, whose name we failed to get, was arrested immediately after the accident on a charge of manslaughter and was confined in the Tulsa jail.

Mr. and Mrs. E. S. Towry of Salli saw, accompanied by D. E. Towry of Stilwell and H. N. Towry of Vian, left immediately upon receipt of the tragic news, going by auto to Sand Springs, where the dead could be met with and the body interred in the city cemetery on Saturday, July 4th.

The deceased was 51 years of age and was well known to a large number of our citizens, having resided and engaged in business here several years ago, had established here, as well as at other places where he has lived, a reputation for honesty, reliability and good citizenship. He is the first death among the children of his family, and leaves to mourn his death the mother, Mrs. G. C. Towry and five brothers and three sisters, viz: Brothers—J. J. and D. E. Towry of Stilwell, J. W. Towry of Sulphur, H. N. Towry of Vian and E. S. Towry of Sallisaw. Sisters—Mrs. J. R. Plunkett of Charleston, Arkansas, Mrs. Ed Cravens of Scranton, Arkansas and Mrs. Joe Stephens of Okmulgee, Oklahoma.

The American wishes to join the many friends of this estimable family in their expressions of sympathy.

George McCoy of Muskogee was in town Wednesday of this week looking after business matters.

## ACCIDENT AT GANS WELL

Monday morning about eleven o'clock two boys working at test well on Gans got the bit wheel got away which caused same to explode and tear down the rig, destroy several cubic feet of the shale and tore up many parts of the machinery.

Those who were at the scene of the time say it was wonder that no one was hurt.

The rig fell to the ground and was practically demolished.

Contractor Robert Dooley has already begun the erection of the rig and will be back at work in a short time we understand.

## CHEERS FOR H. B. 4

The Tulsa World rejoices that the referendum on H. B. No. 4 lost.

The opinion of the attorney-general that presidential electors are state officials put an end to the demagogic attempt to refer H. B. 4 to a vote of the people. If it had been submitted, even a reasonable campaign of education would have resulted in its overwhelming adoption for the better legislature enacted no more constructive beneficial law. Factional politics and shortsighted prejudice alone bottomed the attempt to make of that law something injurious to the public and its interests.

It may be for the matter will go to return the rate in the electoral college, which exists for the purpose of electing a chief executive of the union composed of various states. And very specifically the constitution provides for the election of a chief executive by the states and not by the people directly.

As a matter of absolute fact, there are but two elective officials in the entire scheme of government that are not state officials. These are the president and vice-president. The remainder of elected officials are state officers, selected by the states for the purpose of constituting the proper state representation in the conduct of the federal government.

## FISHING ON THE ILLINOIS

C. M. Gay, George Barker and Chas. O. Frye spent the 4th on the Illinois river fishing.

By special arrangements they met a party from Tulsa composed of county and district officers of that place and Messrs Gay and Barker furnished the fish for the crowd.

Sunday, Messrs. Gay and Barker joined a Vian crowd and had a great fish fry which was enjoyed by all.

## AGE DOTSON KILLED BY HENRY EDWARDS

*Home of John Wallace Scene of Tragedy Wednesday Morning*

A wire was received at the sheriff's office Wednesday morning calling Sheriff John E. Johnston to Marble City with the information that Henry Edwards had shot and killed Abe Dotson, both of that place.

Within an hour Sheriff Johnston and County Attorney Pitchford were at the home of John Wallace, the scene of the killing, which had occurred about 9:00 o'clock, and Edwards was placed under arrest.

The full details of the tragedy could not be ascertained at the time we go to press with this issue more than that Edwards had fired two loads of "B. B." shot into Dotson using a double-barrel shotgun, one load entering the body through the right shoulder and the other going into the head and the left ear.

It seems that Ben Crawford, deputy sheriff at Marble City was within 300 yards of the Wallace home at the time of the shooting and met Edwards and another boy coming that way, but did not know of the tragedy until he arrived at the Wallace gate where he found Dotson dying.

Dotson was forty-five years of age and is survived by a wife and five children. His body was removed to his home about four miles southwest of Marble City.

Edwards was taken to Sallisaw and lodged in the county jail to await a preliminary.

## MARKETING EXPERT VISITS SEQUOYAH COUNTY

On Wednesday of this week J. Robt. Wiley of the Chamber of Commerce of Tulsa county and who is employed by this body to assist in the marketing of eggs from the Eastern Oklahoma counties and who is an expert along this line, spent the day here working with our county agent in explaining the plan of marketing the eggs, and while here put on some demonstrations in this work with some of our poultry men of the vicinity, explaining to them the methods employed by the government in classing and grading eggs and under which eggs are being marketed at this time.

For some time Oklahoma eggs have been penalized by being dumped on the Eastern market on account of not being properly classed and graded, by which this state, being one of the leading states in poultry production has lost and is losing at this time, millions of dollars each year on this account.

Mr. Wiley explained, while putting on the demonstration that the government grades of eggs were divided into three classes as follows: Extras, Standards and Trades, with the following qualifications that is required under each grade.

Extras must weigh at least 24 ounces to the dozen, be fresh, clean strong and infertile. Standards—Clear, strong, fresh, can be fertile if properly handled and must be uniform. Trades—includes culls, must be fresh, dark yolks, cracks can go in this class if not leaking, and must not show any sign of blood rings or clots.

While in the county, Mr. Wiley stressed the importance of pushing the work of swatting the rooster campaign, which has been started in this and other parts of the state so that more infertile eggs can be produced. The demand is such for this high class of eggs that is impossible, at this time, to get the supply of eggs to fill the demand which is coming in at this time, for eggs of this class.

While in Sallisaw, the egg market was investigated, and found that some of the produce men were out of the egg market on account of not

...make until they take advantage of this opportunity being afforded them in this egg marketing deal.

While here Mr. Wiley was well pleased with the poultry development he found, on his short stay in the county, and assured our County Agent he would be glad to return to this county and assist him in developing the poultry, as it should be, not only from a quality and production standpoint, but go into the marketing game and assist in the sale of eggs and poultry so that this line of farming can be placed on a more profitable basis here.

## TWO DAYS' OUTING

A two days' outing on the Illinois river was enjoyed July 4th and 5th by several families of Vian consisting of A. B. Bonher and family, Ed Whiteside and family, W. P. Davis and wife, Irwin Lay and family, Gould Moore and family, C. C. Howard and family, S. A. Foe and family and were later joined by R. W. Armstrong and family, W. T. Wilson and family.

Everyone had a most wonderful time both days, the light showers of rain not affecting the pleasure of the trip; one bit and the few mosquito bites helped each one to realize they were out on the river in a camp and not at home in a comfortable bed.

Sunday morning several of the party decided they would return home for Sunday School, but as the time drew near some one suggested that they hold Sunday School on the creek, which they did with everyone taking part.

Some of the more thoughtful took with them their Sunday School quarterlies and in one big class the lesson for the day was read and studied by all.

C. M. Gay and George Barker furnished the fish for a great fish fry which was held at the noon hour Sunday with about ten visitors from Tulsa joining in with the Vian party.

## O. G. & E. APPLIES FOR REDUCTION IN POWER RATE

*Household Appliances Would Be Installed Where New Tate Would Be Effective*

Oklahoma City, July 3.—Application for permission to apply a reduced rate on current for electrical heating and power appliances was filed today with the state corporation commission by the Oklahoma Gas & Electric company. The new rate affects sixty-two Oklahoma towns, and if granted would become effective as of July 1.

The application was filed with R. P. Stockwell, gas and electric engineer for the commission. Stockwell said he would submit it with his recommendations to the commission within the next few days.

The rate would be 3.15 cents per kilowatt hour for all current over eight kilowatts used in a household during a month, according to the application. While the primary rate for the first four kilowatts in a month varies in the different towns it averages about ten cents a kilowatt.

A charge of 5.2 cents per kilowatt would be made for the next four kilowatts used and the flat rate of 3.15 cents would apply for all additional current.

Current for all household purposes would be supplied through one meter instead of the two which would be allowed in two cases in which appliances having a capacity of at least three kilowatt, such as per month, have been installed. Electric refrigerating machines, range water heaters and all motor driven appliances of less than one horsepower are included in this classification, Stockwell said.

Ed Lee of near Gore was in Sallisaw Monday of this week where he was looking after the interest of a road which he and his neighbors want made a state highway. Ed is a very public spirited man.

## REAGER FRYE MOTOR COMPANY NEW FIRM AT SALLISAW, OKLA.

We wish to call the attention of readers of the American to announcement advertisement of Reager-Frye Motor Company of Sallisaw. This new firm succeeds Max Reager as authorized dealers of Ford products in Sallisaw. The new firm will rebuild the interior of the present plant, enlarging the floor space and add additional equipment to the garage department, that will equal any Ford agency in cities the size of Sallisaw. The owners of the plant at Sallisaw are well known to Vian people. Chas. O. Frye, the new member was formerly active head of the Sequoyah County Democrat, a newspaper at Sallisaw, during the past ten years. He is a splendid business man and will take charge of the plant, while Mr. Reager will head the sales and service department. He is considered one of the best automobile dealers in Oklahoma and is one of the oldest dealers in point of service in the state, having been the Ford dealer at Sallisaw during the past fifteen years.

## TAKES OATH OF OFFICE

Monday of this week was a very busy day at the county seat because some changes were made in the county officials on that date. Those that were elected at the last general election on last November and had not taken their oath of office did so on that date. Those who took their places as officers to act for the welfare of all concerned were:

County Superintendent—Fred Morrison.

Commissioners—Bud Horn, District No. 2; A. Taylor, District No. 3; J. A. Stafford, District No. 1.

As a matter of cold fact, there is always a large abundance of parking space about seven miles from the place you intend to stop.

---

## Our Motto:

# "Safety First"

## Men and Money

### Make This Bank Secure

There are two ways of measuring the strength and standing of a bank. In the first place money resources—capital and surplus—give it financial strength.

In the second place—and perhaps even more important—are the men, the officers and directors. They give the bank character, determine and execute its policies.

This is a strong bank, a helpful bank because...



### RIDE 'IM, COWBOY

(Copyright by R. R. Doubleday)

An animated tornado on four feet, 1,200 pounds of living dynamite—such is the "outlaw" bronk, scores of which will provide the chief thrills of the Chicago Roundup and World's Championship Rodeo, to be held for nine days, beginning August 18. Wild and daring, coolest when facing almost certain injury—such is the buckaroo, standard type of the men who will fight it out with the "bad" horses in the Chicago contests.

Broncho busting calls forth all the courage that is traditional on the western ranges and a great part of the $80,000 in prizes appropriated by the Chicago Association of Commerce, under whose auspices the rodeo will be presented, will go to the men who will fight to stay for a few seconds on the hurricane decks of the "sunfishing," "skyscraping," squealing, fighting cayuses. When the courage of the buckaroo clashes with the furious spirit of the broncho, the ride is always a sensational finish. Tex Austin, famous broncho...

343

KEB401084



**oyah County Democrat**

SEQUOYAH COUNTY DEMOCRAT

FRIDAY, JULY 10, 1925

FRIDAY, JULY 10, 92

Published every Friday at Sallisaw, Oklahoma
RAY O. WEBER, Editor and Publisher

*A Democratic Newspaper*

the postoffice at Vian, Sequoyah county, Oklahoma, under
2nd, 1897, as second class matter.
second class matter, August 21st, 1914, at the postoffice at
an, under the act of March 3rd, 1897.
unty .......... $1.50     One year out of county .......... $2.00

### GUBERNATORIAL POSSIBILITIES

### WOUNDED PRISONER BELIEVED TO BE FUGITIVE

The belief prevails with Sheriff John E. Johnston and his force of deputies that F. T. Daley who was wounded last week in a gun battle near Gans with Robert Rumell, special agent for the K. C. S. railroad, may be a fugitive from justice. His every move in the gun fight indicated such. When caught, he was wearing a shoulder scabbard but no pistol was found.

### BROTHER OF E. S. TOWRY DIES AT SAND SPRINGS

E. S. Towry of this city, accompanied by Mrs. Towry, D. E. Towry of Stilwell and H. N. Towry of Vian, were called to Sand Springs last Friday following receipt of a message that R. L. Towry, a brother, had been instantly killed in a serious auto accident on that day.

### PRESBYTERIAN CHURCH

A. E. Arnfield, pastor

Sunday school 9:45. Our closing assembly will be utilized as a Junior church service.

### CAREFUL DRIVING

### MARBLE CITY CITIZEN DIES

The many friends of the family of John Cole were shocked last Sunday when it became known, that he had been called in death on Saturday, July 4.

### COMMISSIONERS PROCEEDINGS

July 6, 1925

The board of county commissioners met pursuant to recess with all members present and transacted the following business, to-wit:

3015 Claimant Harry D. Pitchford; traveling expenses; claimed $15.25; allowed. Fund Gen.

3016 Claimant J. T. Bolling; mileage to county charge; claimed $1.50; allowed. Fund Gen.

3017 Claimant Lee J. Lewis; stamps; claimed $6.00; allowed. Fund Gen.

3018 Claimant American Natl. Bank; juror fees; claimed $9.80; allowed. Fund Gen.

**To My Patrons**

I am back at my old stand east of First National Bank and am prepared to take care of your flat tires. I vulcanize tubes. Phone 384

**Frank Weaver**

**Don't Endure Foot Troubles**

Don't let tired, aching feet, callouses, corns, bunions, weak and broken down arches mar your comfort and happiness. Come to our Foot Comfort Department today and let our Foot Comfort Expert show you how quickly and easily you can secure Foot Comfort through the proper fitting of shoes and Dr. Scholl's Foot Comfort Appliances.

No charge for this service.

**McDonald & Matthews**
"We Sell Everything"

## SOCIETY
### and Local Happenings

**We are S**

**SUPPORT**

The Legion Endowment Drive

**IT IS WORTHY**

Adv. No. 671

### CADDIES TOURNAMENT AROUSING GREAT INTEREST

A great deal of interest is being aroused by the caddies of the Sallisaw Country Club in their annual tournament now being held at the golf links west of Sallisaw.

### FINK COTTON PROSPECT

Oklahoma City, July 2—Oklahoma may exceed last year's banner crop by approximately 15,000 bales this year, according to present indications John A. Whitehurst, president of the Oklahoma state board of agriculture, said today in the first official report for the 1925 cotton season.



**THE NEW PICTORIAL REVIEW SIMPLIFIED PRINTED PATTERNS**

are perforated, notched and cut and ready for use.

**Cherry & Winter**

"We Appreciate your Business"

SALLISAW, OKLA.
—Oak Street—



The man who wakes up famous hasn't been asleep.

A BANK ACCOUNT IS A PACIFYING THING

The experience of those who keep a bank account bears testimony to this statement.

No man ever regretted anything about his account in a good bank except that the account was not larger. And when a man has an account at a good bank there is an incentive to make it grow, that he otherwise would not have.

"Ask the man who has one."



**YOUR BANK CAN HELP YOU**

**FIRST NATIONAL BANK IN SALLISAW**
1901     1925

KEB401085

345

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 107**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

ACCIDENT DESCRIPTION NARRATIVE

| MONTH | DAY | YEAR | 24 HOUR TIME | COUNTY | | | SHEET 1 OF 1 SHEETS |
|---|---|---|---|---|---|---|---|
| 9 | 29 | 99 | 1230 | SEQUOYAH | | CASE NUMBER | ADMINISTRATIVE |

ON 9.29.99 AT ABOUT 1230 HRS GARY PHILPOT, SALLISAW POLICE CHIEF & MYSELF (GLEN SMITHSON) WERE AT THE SALLISAW CITY JAIL WATCHING SHERIFF JOHNNY PHILPOT DRESS THE GUN SHOT WOUNDS ON KENNETH BARRET THE SHOOTING SUSPECT OF TROOPER ROCKY EALES. GARY MADE THE STATEMENT TO ME THAT TROOPER EALES AFTER HE WAS KILLED LEFT A LITTLE BOY & A WIFE. I SAID YES HE HAD A LITTLE 2 YR OLD BOY & A SIX YEAR OLD GIRL, & THEY WILL NEVER REMEMBER THEIR DADDY WHEN THEY GROW UP. AT THIS TIME KENNETH BARRET SPOKE UP & SAID AS I RECALL, YEA THE WRONG PERSON GOT KILLED I WISH IT HAD OF BEEN ME. I SAID TO HIM THAT YOU ARE THE ONE THAT PULLED THE TRIGGER & PICKED YOUR TARGET HE SAID YEA BUT THEY SHOT FIRST.

END OF STATEMENT

Trooper M. Smith 408

Glen Smithson

Troop C

Muskogee Ok 74401

INVESTIGATOR'S SIGNATURE & BADGE NO                DATE

ACCIDENT DESCRIPTION NARRATIVE SHOULD CONSIST OF THE FOLLOWING PARTS:
1. SYNOPSIS
2. NOTIFICATION AND ARRIVAL
3. LOCATION DESCRIPTION
4. ARRIVAL AT SCENE
5. DRIVER IDENTIFIER
6. VEHICLE IDENTIFIER
7. PASSENGER STATEMENT(S)
8. WITNESS STATEMENT(S)
9. INVESTIGATION AT SCENE
10. OFFICER'S OPINION/CONCLUSION

346

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
    )
    *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
    *Respondent.*    )

---

**EXHIBIT 108**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

5

files on our confidential informants and keep track of the money that's paid to them.

Q  How would you, for instance --

A  In the form of a receipt with a -- a signed receipt with a thumb print on it in a confidential file.

Q  Each and every payment would have such a --

A  Yes.

Q  -- receipt?  Without identifying any person by name, do you know whether or not the confidential informant that was the basis for the issuance of the search warrant used to raid Mr. Barrett's home was ever paid money through your office?

A  No.  Whoever it was was not ours, no sheriff's department informant.

Q  Do you have any knowledge of the identity of that person?

A  No, sir, I do not.  I never did.

Q  Has anyone since the time of the trial asked you if you could provide information about a particular individual, whether he be reliable or whatnot, anything of that kind?

A  In reference to this particular informant?

Q  Yes.

A  No.

Q  Now, back in our -- all of the stuff that we've received in this case, there's a reference to a time when one or more people from your office went out to Mr. Barrett's

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

00002403

KEB312947

6

home and inspected some weapons.

A   Uh-huh.

Q   Do you recall, generally, a reference to that?

A   I remember one specific incident where I went out.  After the officers had already been there, I arrived there.

Q   Fill me in on that instance.

A   I think the call was he was supposedly shooting out there; and if I remember right, a deputy by the name of Shelton Fare was the first officer there.  And when I got there I think another one had arrived and I don't remember who it was.  They had some firearms they were inspecting when I arrived.  Kenny was in the house and they were running the serial numbers and, in effect, looking at the guns.

Q   And was there a AR15-type weapon that was being looked at then?

A   Not that I remember, no.  I believe the one they had actually looking at when I got there was a -- I think it was an SKS or it looked like it.  I didn't inspect it.  I just saw it.

Q   Did you have any dealing with Mr. Barrett at that time?

A   Yes.  I walked up to the porch and talked to him.

Q   What do you recall about your conversation?

A   Mostly about -- some of it was about shooting.  I guess about shooting.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

349
00002404

KEB312948

Q    You were kind of telling him to calm down, that kind of thing?

A    Did I tell him to calm down?

Q    No, I don't mean calm down.  I mean but to tell him to behave himself a little better as a neighbor?

A    Yeah, shooting in general around a residential area.  You had to be careful and all of this stuff, and then I called his attention to a misdemeanor warrant that was outstanding on him.

Q    And what did you tell him about the misdemeanor warrant?

A    I told him there was one.  And he said he was planning on going in and appearing on that and taking care of it or doing whatever.  He promised me that he would.

Q    Did Mr. Barrett threaten you when you were out there?

A    No.

Q    Prior to the time that this search warrant was executed out at his place, did anybody ask you for advice concerning whether or not there might have been a different way of proceeding?

A    In the execution of the warrant?

Q    Yeah.  When the task force obtained this no-knock warrant and brought in the tact team, did anybody talk with you about whether it was necessary to bring in the tact team in order to deal with Mr. Barrett?

A    It was discussed at one point before the warrant -- way

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

00002405

KEB312949

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,           )
                                  )
                  *Movant,*       )
                                  )
v.                                )          **Case No. 6:09-cv-00105-JHP**
                                  )
UNITED STATES OF AMERICA,         )
                                  )
                  *Respondent.*   )

———————————————————————

**EXHIBIT 109**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

———————————————————————

# Forensic Training & Consulting, LLC

| | |
|---|---|
| 1544 Valley Creek Rd. | Ph: 940-383-8668 |
| Denton, Texas 76205 | E-mail: xprtwit@aol.com |

March 10, 2009

David Autry
1021 NW 16th Street
Oklahoma City, OK 73106

**Re** *United States of America vs. Kenneth Barrett* **(FT&C Case # 03-5767) – Review of Testimony by Terrence Higgs and Iris Dalley**

## Introduction

I was requested to review transcripts of trial testimony by Terrence Higgs and Iris Dalley in United States vs. Kenneth Barrett. I was provided both transcripts, along with a directory of court exhibits and 4 CDs containing demonstrative exhibits used by Iris Dalley, videos of the scene and images of the scale model used at trial. This is the report of my findings concerning that review.

## Higgs testimony

My review of the testimony given by Terrence Higgs revealed some issues of minor concern, but nothing of substantive concern in my opinion. The specific issues that I would categorize as being of only minor concern are as follows:

1. In his testimony concerning the number of shots that might have been fired by the officers' H&K MP5 9mm submachine gun, Mr. Higgs failed to point out that the MP5, according to H&K, should not be loaded to full magazine capacity due to the potential for jamming. Thus, basing the number of shots potentially fired on starting with a fully loaded magazine is unreliable unless it can be confirmed that the OSBI does not follow the H&K recommendation.
2. In his testimony concerning ejection characteristics for fired casings, Mr. Higgs failed to mention that, from time to time, anomalous ejection paths do result. That means a weapon that typically ejects to the right, all else being equal, may occasionally eject to the left and so on.

In his testimony concerning bullet spin, Mr. Higgs gave a flawed explanation that opined that, for a time, bullet spin overcomes the effects of gravity during its flight. In response to that, I would point to the classic ballistics question: "If a bullet is fired from a weapon held parallel to the ground and at the moment that the bullet exits the muzzle, a similar bullet is dropped to the ground from the same height the gun barrel is above the ground, which bullet would hit the ground first?" The answer, of course, is that they would hit the ground at the same time

since gravity acts on them equally and neither the horizontal velocity nor the spin stabilization of the fired bullet has any effect of the force of gravity.

4. Mr. Higgs testified that he "would expect a ricochet" for bullet impact angles of 60 degrees or less. The reality is more like 20 degrees or less.

5. Mr. Higgs expressed the opinion that many examiners have historically had in regard to the production of photographs as demonstrative exhibits in firearms examinations of fired bullet and cartridge case markings (i.e. photomicrographs). I would point out, however, that many firearms examiners do produce such photographs in court contrary to the old argument that "beauty lies in the eye of the beholder".

As already stated, I consider all these statements to be of only minor concern. The majority of Mr. Higgs' testimony is very credible and forthright. I am unable to assess the validity of any of the actual comparisons of bullets/fragments and cartridge cases on the basis of this verbal testimony alone. To do so would require my access to both the bench notes of Mr. Higgs and the photographs he states he took of his comparisons, at the least, and possibly the evidence itself.

**Dalley testimony**

Based upon my review of the testimony given by Iris Dalley, there are, in my opinion, some minor issues as well as some substantive issues of concern. My specific concerns are as follows:

Minor issues

Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components. Specifically, these are the terms that were inappropriately used:

1. The term "front quarter panel" is used to refer to the front fender.
2. The terms "left" and "right" are used when "driver side" and "passenger side" are appropriate.
3. The term "side wall", which is a term for part of the anatomy of a tire, is used several times to describe an inner body panel on the Ford Bronco.
4. The term "projectile", typically misused by non-firearms trained individuals, is applied to anything and everything presumably responsible for impacts/perforations rather than the appropriate terms "bullet", "bullet fragment", "bullet jacket", "jacket fragment", "bullet core" and "bullet core fragment".
5. Ms/ Dalley's explanation of bullet fragmentation upon impact with glass is flawed. She states that the bullet impacts the glass, perforating it and then exiting it whereupon it fragments. The reality is fragmentation begins upon impact.
6. Ms. Dalley, by her own admission, is not a firearms examiner, but states she seeks out the assistance of firearms examiners when she has a "ballistics" question. Arguably, one can reconstruct a shooting incident without being a firearms examiner, but a basic understanding of firearms and ammunition components is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

2

353

essential to being able to recognize what one is viewing at a shooting scene. This lack of understanding/familiarity was exemplified when she stated that there might be some caliber similar to a 223 that could have made some of the bullet holes in the Bronco but when asked by the defense attorney for an example she could not name one.

The use of inappropriate terminology and ambiguous statements in testimony makes it difficult for anyone to understand, but particularly so for lay individuals. This is no doubt reflective of the fact that Ms. Dalley is not a trained firearms examiner and is also apparently not very well versed in vehicle component terminology. The use of incorrect terminology constitutes only a minor concern in my opinion, however.

Substantive issues

There are, in my opinion, a number of substantive issues with regard to both Ms. Dalley's approach to shooting incident reconstruction in general and this reconstruction in particular. These concerns are as follows:

1. From her various responses to questions from both the prosecution and the defense, it appears that Ms. Dalley did not follow widely accepted protocol used in shooting incident reconstruction. This protocol includes the following:

   a. The dimensions of the Bronco were not determined. Standard protocol involves determining, at a minimum, length, width and height of vehicles involved in shootings. Similarly, there was a question as to how wide one of the Bronco's doors was open for several shots but no measurements were taken and the explanation "the door was curved so it could not be measured" was given.

   b. Prior to inserting trajectory rods into bullet holes (or otherwise altering them), one is well advised to examine the hole margins, interior surfaces and area surrounding them for trace evidence. Ms. Dalley was specifically asked about gunshot residue around some of the bullets holes at the scene but stated "she did not see any" (pg 3399). A legitimate evaluation of areas around bullet holes for trace evidence requires close inspection with a hand lens and/or making a lift for lab testing. Likewise, the presence of blood, tissue, hair, fibers, etc. should be looked for in and around bullet holes.

   c. Whenever bullet holes appear to be symmetrical and devoid of significant distortion, the length and width of the holes should be determined using a pair of dial calipers. The width can be related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates. Ms. Dalley testified that she could not determine the caliber of any of the responsible bullets striking the Bronco (pg 3298). Measurement of some of the holes, based upon the photographs included in the materials received, appears to have been something that could have been reliably carried out.

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

3

354

d.  The proper placement of trajectory rods in bullet holes in order to reliably approximate the responsible bullet trajectories requires an understanding of the characteristics of bullet penetration/perforation in a variety of substrates. This is particularly true with bullets that fragment, such as the 223 bullets in this incident. It is equally important to have sufficient experience to know when calculation of trajectories, rather than use of trajectory rods, is preferable and to know when the use of alternate means are appropriate. For trajectory rods to be a feasible method for reliably representing bullet trajectories, one needs to have a secondary impact that has not resulted from initial impact deflection and/or fragmentation. Ms. Dalley attempted to establish bullet trajectories utilizing fragment impacts into secondary targets based upon the presumption that the core (or a large fragment thereof) travels in a straight path. She correctly testified (pg 3466) that there was no way to determine the "exact path" of each bullet fragment and yet proposes that her trajectories, as represented, are "accurate".

e.  Ms. Dalley repeatedly testified that bullets passing through the "partially open" Bronco door would go "straight through" and that bullet core fragments would do likewise (it is presumed that only fragments were recovered because Ms. Dalley testified that "No, I didn't find any [fragments] consistent with being parts of a single bullet." – pg 3298). One need only recall the "magic bullet" path in the John F. Kennedy assassination to recognize the fallacy of proposing that bullets pass through intermediary target undeterred ("straight through"). The situation for bullets that fragment upon impact is even more unpredictable. In order to attempt to make her theory of bullet trajectories being unimpeded by intermediary targets fit the evidence, Ms. Dalley proposed that the door moved to various positions to account for the incongruity of the different trajectories through it (pg 3314). While such movement cannot be excluded, it is more likely that bullet deflections/fragmentation account for the trajectory variations in the door. When bullets impact surfaces with irregular contours (i.e. other than flat surfaces) deflection can and does occur with frequency.

f.  Bullet holes in vehicles and other inanimate objects and the trajectory rods placed in those bullet holes are generally referenced by two sets of coordinates (2 linear and 2 angular) in order to establish reproducible data for creating diagrams, animations, etc. that accurately represent the true trajectories (within the limits of measuring uncertainty). Ms. Dalley stated, rather amazingly, that she did not determine any of the angles because she "did not have the necessary equipment" (pg 3275). All that is required is a $30 zero base protractor and a $5 plumb bob. The primary reason for obtaining such linear and angular measurements is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident. Given her testimony that she took no such measurements and that she could not establish "exact paths" using

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

4

trajectory rods alone, it is unclear how the diagrams and animation she produced can be perceived as having any reliability.

g.  Ms. Dalley testified that the terrain at the shooting scene could be described as "hilly" but apparently did nothing to establish the exact grade or assess the potential impact any such grade might have on the perceived trajectories of bullets striking the Bronco.  At the very least, determining bullet impact angles relative to a common point of reference (plumb line) is the accepted standard.

h.  When there are holes of questionable origin, proper procedure calls for on-scene chemical testing for the presence of copper and lead to confirm that they were produced by bullets.  Ms. Dalley testified to having knowledge of that type testing but did not testify that she, in fact, conducted any of it.

i.  Ms. Dalley testified that she had "no means of sequencing any of the shots" at the scene.  The sequencing of shots, while certainly not always possible, can sometimes be accomplished through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets/fragments (glass, fibers, hair, paint, etc.).  There was no testimony that would indicate that any of this type examination/testing was ever done, either on-scene or off-scene.

j.  In an incident involving a moving vehicle, as with the Bronco in this case, a reenactment would include physically placing the Bronco in various positions and making a determination (typically projecting a laser beam from each bullet hole of interest, where possible) as to the feasibility of the each shot coming a particular position or positions.  Of particular importance in this incident are the shots that occurred after the Bronco came to a stop.  While Ms. Dalley testified that the Bronco had been moved to another position prior to her arrival, she also testified that there were tire impressions and a fluid deposit in the soil in front of the cabin that could have been used to reestablish the position before moving.

2.  Ms. Dalley's approach to establishing the trajectory of bullet holes through the cabin window glass, blinds and curtain ("towel") and the Bronco windows was inappropriate.  She testified that her results were unreliable for the cabin window part of her analysis (pg 3389).

a.  She had someone hold the trajectory rod rather than set up a tripod and place the laser on the tripod.

b.  She took no measurements of the hole locations.

Her methodology, as she testified to it, of placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation.

3.  Ms. Dalley testified that she concluded that, not "seeing" any evidence of gunshot residue on the cabin window that was shot through, that the distance of the muzzle would have been "greater than 3 feet" from the glass because that distance has been reported in forensic literature.  That testimony was an apparent reference to a general rule of thumb that varies considerably from weapon to weapon and is also dependent upon the particular ammunition used. The correct evaluation of maximum muzzle to target distance would require test firing into glass like that at

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

5

356

the scene using the incident weapon and ammunition like that used to produce the bullet holes in question.

4.  Ms. Dalley testified that she did not attempt to locate any bullets/fragments in the soil. A metal detector should have been used to attempt to locate any bullets/fragments in the soil.

5.  Ms. Dalley testified that she did not attempt to collect all of the bullets/fragments inside the Bronco. According to generally accepted protocol in shooting incident reconstruction, all shots need to be accounted for when possible. The location and recovery of bullets/fragments is an essential aspect of that endeavor.

6.  Ms. Dalley testified that she concluded that the bullet wound to Trooper Eales' right arm had to take place after he exited the Bronco because of "the absence of tissue inside the Bronco" and the fact that tissue appeared to be missing in the area of the arm wound. She did not, however, testify to finding any tissue outside the Bronco. She did not indicate that she ever attempted to locate tissue outside the Bronco. One way to test for it would have involved spraying luminol on the ground in the area around the Bronco. That apparently was not done. Furthermore, one of the cornerstones of forensic science is "Absence of evidence is not evidence of absence." That refers to the fact that not finding evidence cannot be used to conclude anything other than that no evidence was found. That statement is attributed to one of Ms. Dalley's own colleagues, well-known bloodstain pattern analyst Herbert Leon MacDonnel of Corning, New York.

In summary, Ms. Dalley's testimony indicates that she did not follow accepted protocol in the evaluations she conducted at the shooting scene. Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation. In order to confirm this apparent failure to follow appropriate protocol, it would be necessary to have access to Ms. Dalley's field notes, photographs and other supporting documents in this matter.

These opinions are based upon my 35 years experience as a firearms examiner and shooting reconstruction expert, my independent research in the area of shooting incident reconstruction and specialized training that I have received in firearms, firearms-related issues and shooting incident reconstruction as reflected in my attached curriculum vitae.

Edward E. Hueske
Consulting Forensic Scientist

*Note: The opinions expressed herein are based upon the information that was available at the time of this writing. Should new or different information be forthcoming, the right to modify these opinions accordingly is hereby reserved.*

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

6

357

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 110**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## CURRICULUM VITAE
### Edward E. Hueske

**Phone: (940) 383-8668**
**E-mail:** xprtwit@aol.com

**Fax: (940) 383-8668**
**www.edhueske.com**

Present Positions:

- Director, Forensic Training & Consulting, LLC since 1997
- Lecturer/Criminalistics Program Coordinator, University of North Texas, since 1999

Former Positions:

- Instructor of Chemistry, Blinn College, Brenham, Texas 1970-1974
- Assistant Laboratory Director, Fort Worth Police Department, 1974-1983
- Adjunct Instructor of Chemistry, Weatherford College, Weatherford, Texas 1976-1980
- Adjunct Instructor of Criminal Justice, University of Texas at Arlington, 1980-1983
- Supervising Criminalist, Arizona Department of Public Safety, 1983-1996 (retired)
- Adjunct Instructor of Police Science, Northern Arizona University, 1984-1994
- Firearms Examiner, Tulsa Police Department, Tulsa, Oklahoma 1996-1997
- Adjunct Instructor of Police Science, Tulsa Community College, 1997
- Laboratory Manager, Weckerling Scientific Laboratories, Carrollton, Texas 1997-1998
- Criminalist, Forensic Consultant Services, Fort Worth, Texas, 1998-1999

Formal Education:

- B.S., Chemistry, Sam Houston State University, 1968
- M.A., Chemistry, Sam Houston State University, 1971

Special Courses Attended:

- *DEA Forensic Chemist Seminar,* McLean, Virginia, 1975 (40 hrs)
- *FBI Glass Analysis Course,* Quantico, Virginia, 1976 (40 hrs)
- *Applied Molecular Spectroscopy,* Arizona State University, Tempe, Arizona, 1977 (40 hrs)
- *ATF Arson Residue Analysis Course,* Rockville, Maryland, 1980 (40 hrs)
- *FBI Gunshot Residue Analysis Course,* Quantico, Virginia, 1981 (40 hrs)
- *Ballistics and Handloading Course,* Trinidad State College, Trinidad, Colorado, 1982 (40 hrs)
- *Polarized Light Microscopy,* McCrone Institute, Austin, Texas, 1982 (40 hrs)
- *FBI Instrumental Analysis of Paints and Polymers Course,* Quantico, Virginia, 1983 (40 hrs)
- *FBI Symposium on Footwear and Tire Tread Examination,* Quantico, Virginia, 1984 (40 hrs)
- *X-Ray Fluorescence Class,* Tracor Corporation, Flagstaff, Arizona, 1985 (8 hrs)
- *FBI Specialized Techniques in Firearms Identification Course,* Quantico, Virginia, 1987 (40 hrs)
- *Ruger Police Armorer's Course,* Phoenix Police Academy, Phoenix, Arizona, 1987 (40 hrs)
- *Crime Scene Reconstruction Class,* Dr. Henry Lee, Scottsdale, Arizona, 1988 (8 hrs)
- *AFTE Glock Armorer's Class,* Virginia Beach, Virginia, 1989 (8 hrs)
- *AFTE Remington 1100 Service Class,* Houston, Texas, 1991 (8 hrs)
- *Photomicrography Class,* Leitz Corporation, Phoenix, Arizona, 1991 (8 hrs)
- *Crime Scene Photography,* Flagstaff, Arizona 1992 (8 hrs)
- *Wound Ballistics Class,* Dr. Martin Fackler, Glendale, Arizona, 1992 (8 hrs)
- *Blood Spatter Interpretation and Crime Scene Reconstruction,* Scottsdale, Arizona, 1993 (16 hrs)
- *FBI Footwear and Tire Tread Examination Seminar* (presenter), Quantico, Virginia, 1994 (40 hrs)
- *SWAFS Shooting Reconstruction Class,* Colorado Springs, Colorado, 1995 (8 hrs)
- *SWAFS Lamp Bulb Examination Class,* Colorado Springs, Colorado, 1995 (8 hrs)

1

- *Accident Reconstruction and Low-Speed Crash Evaluation,* Texas A&M University, 1996 (16 hrs)
- *Bloodstain Pattern Analysis in Violent Crimes,* University of North Texas, 2000 (40 hrs)
- *Recovery of Buried Remains,* University of North Texas, 2001 (16 hrs)
- *Bloodstain Pattern Analysis in Crimes of Violence – Pt. II,* University of North Texas, 2002 (40 hrs)
- *Blood Wipes, Swipes & Other Patterns,* IAI Training Seminar, Boston, MA, 2006 (2 hrs)
- *Preparation of Demonstrative Exhibits for Bloodstain Pattern Analysis,* IAI Training Seminar, Boston, MA, 2006 (10 hrs)
- *Microscopical Approach to Trace Evidence in Shootings,* AAFS, Denver, CO, 2009 (8 hrs)

Professional Affiliations:

- Fellow of the American Academy of Forensic Sciences
- Distinguished Member of the Association of Firearm and Tool Mark Examiners
- Emeritus Member of the Southwestern Association of Forensic Scientists
- Emeritus Member of the American Society of Crime Laboratory Directors
- Member of the International Association of Bloodstain Pattern Analysts

Papers Presented :

- "Developing Regional Lab-User Agency Communication," Southern and Southwestern Assns. of Forensic Scientists, Baton Rouge , Louisiana, 1986
- "Mikrosil Casting in Firearms Examinations," Assn. of Firearm and Tool Mark Examiners, Houston, Texas, 1991
- "The Jennifer Wilson Homicide: A Study in Trace Evidence," SW Assn. of Forensic Scientists, Tucson, Arizona, 1991
- "The Use of Videomicroscopy in Footwear Comparisons," Southern and Southwestern Assns. of Forensic Scientists, Shreveport, Louisiana, 1992
- "The Reconstruction of a Double Homicide near Ashfork, Arizona," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "Gunshot Residue Testing of Blood Stained Garments," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," Southern and Southwestern Assns. of Forensic Scientists, Little Rock, Arkansas, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Symposium on Footwear/Tire Tread Identification, FBI Academy, Quantico, Virginia, 1994
- "Footwear/Tire Tread Identification-The Northern Arizona Perspective," International Association for Identification, Phoenix, Arizona, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Association for Identification, Phoenix, Arizona, 1994
- "A Bizarre Homicide," SW Assn. of Forensic Scientists, Houston, Texas, 1995
- "The Portable Scopeman-A Powerful New Crime Scene Tool," SW Assn. of Forensic Scientists, Fort Worth, Texas, 1996
- "Defense Experts- The Good, The Bad, and The Ugly," Texas Criminal Defense Lawyers Assn., El Paso, Texas, 1998
- "Forensic Science for the Prosecution and the Defense," University of Texas Law School, 2000
- "The Defense of Shawn Berry," Louisiana Criminal Defense Lawyers Association, Lafayette, Louisiana, 2000
- "The Defense of Shawn Berry," University of Texas Law School, 2000
- "Private Forensic Labs – The Good, The Bad and The Ugly," International Conference of the American Society for Industrial Security, 2001
- "Bloodstain Pattern Interpretation," Oklahoma City University Law School, 2002
- "Crime Scene Deconstruction-Reconstruction," Oklahoma City University Law School, 2002
- "Re-Examination of Physical Evidence – A Defense Perspective," American Academy of Forensic Science Annual Conference, Dallas, Texas, 2004
- "Shooting Incident Reconstruction," 8[th] Annual Public Defender Retreat, Las Vegas, NV, 2008

2

Specialized Forensic Classes Taught:

(List of classes taught from 1984-1998 is available upon request)

- *Shooting Reconstruction,* El Paso Police Department, 1999 (40 hrs)
- *Shooting Reconstruction,* Prince William County Police Training Center, Nokesville, Va.,1999 (40 hrs)
- *Shooting Reconstruction,* Florida Dept. of Law Enforcement, Pensacola, Fla., 1999 (24 hrs)
- *Shooting Reconstruction,* Salt Lake Co. Sheriff's Training Center, Salt Lake City, Ut., 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-County Police Training Center, Fergus Falls, Minn., 1999 (24 hrs)
- *Clandestine Drug Lab Investigation,* Tarrant Co. (TX) Drug Task Force, Cleburne, Tx., 1999 (24 hrs)
- *Blood Spatter Interpretation,* Arlington Police Training Center, Arlington, Texas, 1999 (24 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Ankara, Turkey, 1999 (40 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Istanbul, Turkey, 1999 (40 hrs)
- *Shooting Reconstruction,* Gastonia Police Training Center, Gastonia, N.C., 1999 (24 hrs)
- *Shooting Reconstruction,* Tallahassee Police Department, Tallahassee, Florida, 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-Cities Police Academy, Richardson, Texas, 1999 (24 hrs)
- *Shooting Reconstruction,* West Palm Beach Co. Sheriff, West Palm Beach, FL, 2000 (24 hrs)
- *Crime Scene Investigation,* Office of the Attorney General , Guatemala City, Guatemala, 2000 (40 hrs)
- *Officer –Involved Shooting Incidents,* University of North Texas, Denton, Texas, 2000 (16 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2000 (24 hrs)
- *Shooting Reconstruction,* Las Vegas Metro Police Department, Las Vegas, Nevada, 2000 (24 hrs)
- *Advanced Shooting Reconstruction,* West Palm Beach Police Department, Florida, 2000 (24 hrs)
- *Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas 2000 (24 hrs)
- *Shooting Reconstruction/Adv. Shooting Reconstruction,* NYPD, New York City, New York, 2000 (48 hrs)
- *Shooting Reconstruction,* Grossmont College, San Diego, California, 2000 (24 hrs)
- *Advanced Crime Scene Investigation/Reconstruction,* University of North Texas, Denton, Texas, 2000 (40hrs)
- *Shooting Reconstruction,* Suffolk County Crime Lab, Hauppauge, New York, 2000 (40 hrs)
- *Shooting Reconstruction,* Missouri State Police Academy, Columbia, Missouri, 2001 (24 hrs)
- *Shooting Reconstruction,* Bannock County Sheriff's Office, Pocatello, Idaho, 2001 (40 hrs)
- *Shooting Reconstruction,* Syracuse Police Department, Syracuse, New York, 2001 (40 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2001 (40 hrs)
- *Shooting Reconstruction,* Washington Metropolitan Police, Washington, D.C., 2001 (24 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2001 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2001 (40 hrs)
- *Footwear/Tire Tread Evidence,* Metropolitan Police Department, Washington, D.C., 2001 (24 hrs)
- *Officer-Involved Shootings,* Baton Rouge Police Department, Baton Rouge, Louisiana, 2001 (16 hrs)
- *Officer-Involved Shootings,* East Texas Police Academy, Kilgore, Texas, 2001 (16 hrs)
- *Bio-Terrorism,* Kimberly-Clark Corporation, Dallas, Texas, 2001 (4 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2001 (24 hrs)
- *Shooting Reconstruction,* Santa Barbara County Sheriff's Office, Santa Barbara, California, 2002 (24 hrs)
- *Bio-Terrorism,* Solutions 2000, Austin, Texas, 2002 (8 hrs)
- *Gunpowder and Primer Residues,* University of North Texas, Denton, Texas, 2002 (40 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2002 (24 hrs)
- *Shooting Reconstruction,* Metropolitan Police Department, Washington, D.C., 2002 (total of 72 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2002 (40 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2002 (24 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2002 (40 hrs)
- *Shooting Reconstruction,* El Paso Police Department, El Paso, Texas 2002 (40 hrs)
- *Tool Mark Comparison,* Centre of Forensic Science, Toronto, Ontario, Canada, 2002 (40 hrs)
- *Shooting Reconstruction,* Sioux Falls Police Department, Sioux Falls, South Dakota, 2002 (40 hrs)

3

Specialized Classes Taught (continued):

- *Footwear/Tire Tread Evidence,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Crime Scene Analysis/Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Shooting Incident Analysis/Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2003 (48 hours)
- *Shooting Incident Reconstruction,* St. Louis County Police Academy, St. Louis, MO, 2003 (24 hours)
- *Crime Scene Analysis/Reconstruction,* NYPD, New York, New York, 2003 (24 hours)
- *Bloodstain Pattern Analysis in Crimes of Violence,* NYPD, New York, New York, 2003 (24 Hours)
- *Advanced Trajectory Analysis,* Special Investigations Unit, Mississauga, Ontario, Canada, 2003 (24 hours)
- *The Abuse and Sexual Assault of Children,* East Texas Police Academy, Kilgore Texas, 2003 (16 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* Denton County Sheriff's Training Center, Denton, Texas, 2003 (40 hours)
- *The Analysis/Reconstruction of Crimes of Violence,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Advanced Trajectory Analysis,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Shooting Incident Reconstruction,* Charlotte-Mecklenburg Regional Police Training Center, Charlotte, NC, 2003, (40 hours)
- *Shooting Incident Reconstruction,* Nashville Metro Police Academy, Nashville, Tennessee, 2003 (40 hours)
- *The Investigation of Officer-Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* San Diego Police Department, San Diego, CA, 2003 (40 hours)
- *Crime Scene Analysis/Reconstruction,* Florida Public Defenders Association, Ft. Lauderdale, FL, 2003 (16 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* St. Louis Cty. P.A., St. Louis, MO, 2004 (40 hrs)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Gunpowder & Primer Residues in Distance Determination,* NYPD New York, New York, 2004 (40 hours)
- *Crime Scene Photography,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Advanced Trajectory Analysis,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2004 (40 hours)
- *Shooting Reconstruction Techniques,* Texas Rangers Annual Conference, Cypress, Texas, 2004 (4 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2004 (40 hours)
- *Forensic Photography,* East Texas Police Academy, Kilgore, Texas, 2004 (24 hours)
- *Crime Scene Analysis/Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2004 (24 hours)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Sioux Falls Police Dept. , Sioux Falls, SD, 2004 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Lewis & Clark Co. S.O., Helena, MT, 2004 (40 hrs)
- *Analysis/Reconstruction of Violent Crimes,* St. Louis Co. Reg. Police Academy, St. Louis, MO, 2005 (40 hrs)
- *Investigating Officer-Involved Shootings,* Natick Police Department, Natick, MA, 2005 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Suffolk Co. Crime Lab, Hauppague, NY, 2005 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2005 (40 hours)
- *Sexually-Related Violent Crime,* Texas Rangers Annual Conference, Spring, Texas, 2005 (4 hrs)
- *Introduction to Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (24 hrs)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2005 (40 hours)
- *Introduction to Shooting Reconstruction,* Minneapolis Police Dept., Minneapolis, WI, 2005 (40 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Mississippi State Crime Lab, Jackson, MS 2005 (40 hrs)
- *Processing Violent Crime Scenes,* Federal Bureau of Investigation, Dallas, Texas, 2005 (8 hours)

4

- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (40 hrs)
- *Introduction to Shooting Reconstruction,* Charlottesville PD, Charlottesville, Virginia, 2005 (24 hrs)
- *Homicide Investigation,* Texas DPS Training Academy, Austin, Texas, 2005 (8 hours)
- *Introduction to Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2006 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Austin Police Academy, Austin, TX, 2006 (40 hrs)
- *Footwear/Tire Tread Evidence, ,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *The Analysis & Reconstruction of Violent Crimes,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *Introduction to Bloodstain Pattern Analysis,* Dallas Police Academy, Dallas, TX, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, TX, 2006 (24 hrs)
- *Special Topics in Shooting Reconstruction,* Texas Rangers In-Service Training Conference, Austin, TX, 2006 (4 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2006 (40 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Garland PD, Garland, TX, 2007 (40 hrs)
- *Special Topics in Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *The Analysis & Reconstruction of Violent Crimes,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *Shooting Incident Reconstruction,* Madison PD, Madison, WI, 2007 (24 hrs)
- *Shooting Incident Reconstruction,* Chatauqua County Sheriff's Office, Mayville, NY, 2007 (40 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2007 (40 hrs)
- *Advanced Shooting Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Vancouver P.D., Vancouver, WA, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction,* Texas Tech Univ. Inst. of Forensic Sci., 2008 (24 hrs)
- *Crime Scene Analysis & Reconstruction,* East Texas Police Academy, Kilgore TX, 2008 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2008 (40 hours)
- *Introduction to Crime Scene photography, ,* East Texas Police Academy, Kilgore TX, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* New Hampshire State Police, Concord, NH, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction, ,* New Hampshire State Police, Concord, NH, 2008 (24 hrs)
- *Shooting Incident Reconstruction,* Clackamus Co. Sheriff's Office, Oregon City OR, 2008 (40 hrs)
- *Crime Scene Analysis & Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Officer-Involved Shooting Investigation,* Minneapolis Police Dept., Minneapolis, MN, 2008 (24 hrs)

Academic classes:

I am a full time faculty member of the department of criminal justice at the University of North Texas and regularly teach the following undergraduate classes and coordinate the criminalistics certificate program at the university:

- CJUS 3330 – Introduction to Criminalistics
- CJUS 4360 – Criminal Investigation
- CJUS 4370 – Advanced Criminalistics I

5

- CJUS 4380 – Advanced Criminalistics II
- CJUS 4390 – Crime Scene Investigation

Additionally, I teach the following graduate classes on a rotating basis, each year:

- CJUS 5800 – Crime Scene Reconstruction
- CJUS 5800 – Bloodstain Pattern Analysis
- CJUS 5800 – Shooting Incident Reconstruction
- CJUS 5900 – Directed Studies (graduate research projects conducted under my supervision)

Publications:

- "Reaction of Azobenzene with Triphenylphosphine," co-authored with R.E. Humphrey, *Journal of Organic Chemistry*, 1971
- "A Procedure for the Isolation and Identification of LSD in a Single Dosage Unit (The Microdot Tablet)," *Microgram*, 1976
- "A Comparison of Decomposition Products from Selected Burned Materials with Common Arson Accelerants," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "An Examination of Selected Automobile Rubber Bumper Guards," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences*, 1977
- "Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review," *Journal of Forensic Sciences*, 1977
- "Tannic Acid as a Field Test for Caffeine," *Microgram*, 1982
- "Toy Store Bomb Paraphernalia," *AFTE Journal*, 1984
- "Forensic Aspects of Shotshell Buffers," *AFTE Journal*, 1984
- "Enhancement of Footwear Impressions on Glass," co-authored with R.A. Erfert, *SWAFS Journal*, 1985
- "Stripping of Lead Bullets in a Browning High Power Pistol," *AFTE Journal*, 1988
- "The Browning of Firearms Serial Numbering System," *AFTE Journal*, 1988
- "An Anti-Splashback Lid for Water Traps," *AFTE Journal*, 1988
- "A Preliminary Report on the Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination," *AFTE Journal*, 1990
- "Class Characteristics of Mossberg C-Lect-Choke Barrels with Factory Porting," *AFTE Journal*, 1990
- "The Examination of Goodyear Neolite Cowboy Walking Boot Heels," *SWAFS Journal*, 1992
- "The Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination- A Further Look," *AFTE Journal*, 1993
- "Calculation of Trajectory Angles Using an Inexpensive Angle Gauge," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *AFTE Journal*, 1993
- "Gunshot Residue Testing of Blood Stained Garments," *SWAFS Journal*, 1994
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with B.M. Courtney, *SWAFS Journal*, 1994
- "The Portable Scopeman- A Powerful New Crime Scene Tool," *SWAFS Journal*, 1996
- "Some Observations on Blood Back-Spatter," *SWAFS Journal*, 1997
- "A New and Economical Forensic Light Source for Crime Scene and Laboratory Use," *SWAFS Journal*, 2003
- "Recognition and Documentation of Bullet Ricochet Characteristics and Predicting Directionalities," *SWAFS Journal*, 2003
- "A Compact Laser Protractor and its Use in Shooting Reconstruction," *SWAFS Journal*, 2004
- "Estimation of Caliber for Distorted Bullets," *SWAFS Journal*, 2004
- "Determination of Lateral Angles for Bullet Holes in Windshields," *SWAFS Journal*, 2005
- "Making Knife Blade Test Impressions," *SWAFS Journal*, 2007
- "A Simplistic Approach to Demonstrative Evidence in Complex Shootings", *SWAFS Journal*, 2008
- "Pseudo-HVIS: An Empirical Study", *SWAFS Journal*, publication pending
- "A Comparison of Some Selected 00 Buckshot Pellet Patterns", *AFTE Journal*, publication pending
- "Some Thoughts on Accreditation, Certification and Bad Behavior in Crime Labs", *SWAFS Journal*, publication pending

6

Books Contributed To/Written:

- Mozyani, A. and Noziglia, C., "The Forensic Laboratory Handbook" (chapter on Firearm/Tool Mark identification), Humana Press: New Jersey, 2005 (revised 2009)
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2006
- Hueske, E.E., "Fingerprints and Firearms", Essentials of Forensic Science Series, Facts on File: New York, 2009

Training Videos Written/Produced (Through the Law Enforcement Training Network of Carrollton, Texas, 2002-03):

- "Bloodstain Pattern Analysis I"
- "Bloodstain Pattern Analysis II"
- "Blood Spatter in Shooting Incidents"
- "Bloodstain Evidence Documentation"
- "The Proper Use of Trajectory Rods"
- "Bullet Ricochet Phenomena I"
- "Bullet Ricochet Phenomena II"
- "Finding Invisible Footwear Impressions at Crime Scenes"
- "Photographing & Casting Impression Evidence"
- "Tire Tread Evidence Deductions"
- "Producing Test or Elimination Impressions"
- "The Use of Gunshot Residue in Distance Determinations"
- "Cartridge Case Ejection Pattern Testing"

Professional Offices Held:

Association of Firearm and Tool Mark Examiners:

- Reviewer for *AFTE Journal*, 1989-present

Southwestern Association of Forensic Scientists:

- Program Chairman, 1984
- Member, Board of Directors, 1986-1988
- Chair of Professional Development, 1988-1990
- *SWAFS Journal* Editor, 1988-1992
- President, 1993-1994
- Chairman, Board of Directors, 1994-1995
- Fall Meeting Workshop Chair, 1993

American Society of Crime Lab Directors:

- Member, Board of Directors, 1986-1989
- Chair, Publication Committee, 1986-1987
- Chair, Membership Committee, 1987-1989
- Laboratory Accreditation Inspector, 1987-1995
- Laboratory Accreditation Board Member, 1996
- Forensic Science Operations and Program Committee, 1988-1991
- Member, Management Committee, 1992-1994
- Chair, Crime Scene Investigation Standards Committee, 1996

7

Advisory Board Membership

- 2004 served as a member of the NYPD Laboratory Accreditation Advisory Board
- 2006-2007 served as a member of the Crime Laboratory Review Board for the Houston Police Department

Awards/Honors:

- "Distinguished Member Award," AFTE, 1988
- "James Zotter Award," SW Assn. of Forensic Scientists, 1991, ("For Outstanding Dedication and Contributions to the SW Association of Forensic Scientists and  Forensic Science.")
- "Best Technical Paper," Southern and SW Assns. of  Forensic Scientists, 1992, "The Use of Videomicroscopy in Footwear Comparisons"
- "Best Technical Paper," SW Assn. of Forensic Scientists, 1993, "The Reconstruction of a Double Homicide near Ashfork, Arizona"
- "Best Technical Paper," Southern and SW Associations of Forensic Scientists Joint Conference, 1994, "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with Max Courtney
- Awarded Emeritus status in the American Society of Crime Laboratory Directors, 1996
- Awarded Emeritus status in the Southwestern Association of Forensic Scientists, 1996
- Co-recipient of the annual MLK Award for Community service in 2007 for work done on the Houston Crime Lab project
- Co-recipient of award for "Top 10 Books for Youth" for 2009 for "Fingerprints & Firearms"

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 111**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF STEVE LEEDY

I, Steve Leedy, declare as follows:

I am an investigator with the Capital Trial Division of the Oklahoma Indigent Defense System, Sapulpa office. I was one of the investigators assigned to assist John Echols and other defense counsel in the state trials of Kenneth Eugene Barrett. I was assisted by investigator Jack Stringer, also of this office. Before Mr. Barrett's first state trial, Mr. Echols had an "outside" mitigation investigator named Roseann Schaye. It is my understanding that she did mitigation work-up, and exhausted the funds that had been made available to her by OIDS. Ms. Schaye requested additional funding to continue her investigation, but it was not approved. I retrieved her work product, which included life history documents such as school, medical, psychiatric, employment, birth, marriage, and divorce records.

Mr. Stringer and I are former law enforcement officers. I'm not a mitigation expert. Before and during Mr. Barrett's first and second state trials, his attorneys and Mr. Stringer and I investigated guilt/innocence issues. I am generally aware that a proper mitigation investigations entails compiling a complete social and background history on the defendant and his family. I reviewed documents and reports in the file Ms. Schaye provided. I conducted some interviews for the purpose of mitigation.

I am familiar with the fact that John Echols, who was lead counsel for Mr. Barrett in his state case, was appointed to represent him in federal court.

1

368

At some point, Mr. Echols withdrew. At the OIDS Sapulpa office, we possessed the investigative file that had been compiled with respect to Mr. Barrett's state case. This included, among other things, reports of interviews I did, reports of interviews Mr. Stringer conducted, the reports that had been done by mitigation investigator Roseann Schaye, as wells as records she retrieved, including from Eastern State Hospital, the Bill Willis Community Health Center, and Wagoner Community Hospital concerning Mr. Barrett. I had learned that Roger Hilfiger became lead counsel. During the time Mr. Hilfiger represented Mr. Barrett in federal court, I don't recall being contacted by him. The OIDS investigative file I referred to above remained at the OIDS office, and was not picked up by either Mr. Hilfiger or his staff who worked on Mr. Barrett's federal case. This file was retrieved in I believe 2008 by David Autry, one of Mr. Barrett's current lawyers.

OIDS Capital trial investigators are salaried employees and as a part of our employment do not work on federal trial cases and did not work on Mr. Barrett's 2005 federal trial. I don't recall statements from individuals to the effect that Mr. Barrett had stated repeatedly, or even stated, that he would "go out in a blaze of glory" if the police tried to raid his property. If that statement was made we would have confronted such witnesses at Mr. Barrett's state trial, and a thorough investigation into the records, character, background and reputations of each such witness.

2

369

The information detailed in the preceding paragraph was related by me to one of Mr. Barrett's current attorneys and an investigator currently working on Mr. Barrett's federal case. I have carefully reviewed the contents of this declaration.

I declare under penalty of perjury that the foregoing declaration is to the best of my recollection true and correct.

Executed by me this _12_ day of March, 2009, in ___CREEK_____ County, Oklahoma.

Steve Keedy

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 112**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

Declaration of LAUREN COHEN BELL, Ph.D., regarding sentencing dynamics in federal death penalty cases.

1. I am currently Associate Professor of Political Science and Associate Dean of the College at Randolph-Macon College in Ashland, Virginia, where I have been a faculty member since September 1999. Among the subjects I teach are public policy, judicial process, constitutional law, and research methodology.

2. In my research, I regularly perform quantitative analysis of data and rely on the Statistical Package for the Social Sciences (SPSS) to organize and analyze such data.  The use of quantitative analysis in social science and the use of SPSS in particular is an integral part of the research methodology course I teach.  I have authored or coauthored a total of 21 books, book chapters, and peer-reviewed articles and have presented nearly 30 academic papers at scholarly meetings.  I am a member of the editorial board of *Justice System Journal* and a regular manuscript reviewer for *American Politics Research,* Routledge Publishers, *Journal of Politics*, Congressional Quarterly Press, Longman Publishers, Cambridge University Press, *Law and Society Review, American Journal of Political Science, Justice System Journal, Judicature, Political Studies Quarterly,* and *PS: Political Science and Politics.*

3. Between August 2006 and August 2007, I served as one of four United States Supreme Court Fellows.  I was posted at the U.S. Sentencing Commission where I worked closely with the Office of Research and Data on the design and implementation of the Commission's 2007 study of the effect of minor offenses on the calculation of offenders' criminal history scores.

4. I hold Masters and Ph.D. degrees in political science from the University of Oklahoma's Carl Albert Congressional Research and Studies Center. A copy of my *curriculum vitae* is attached.

5. I have been asked to conduct an analysis of federal capital prosecutions focusing on the dynamics of death sentencing in cases involving white victims in comparison with the dynamics of death sentencing in cases not involving white victims.

6. In order to conduct these analyses, I was provided with data maintained by Kevin McNally on behalf of the Federal Death Penalty Resource Counsel Project. I used SPSS to create a database of 403 cases authorized and completed as capital prosecutions by the U.S. Department of Justice between 1989 and August 2008. For purposes of analyzing sentencing dynamics, I excluded from the analysis six cases: one in which the charged offense was treason and there were no identified victims; and five in which there were mass numbers of victims. (These were large-scale terrorist attacks: the Oklahoma City bombing, the September 11 attack, and the bombing of two U.S. embassies in Africa.) The cases were excluded because where there is either no victim or where there are mass casualties it is not possible to isolate a white victim effect on sentencing. This is consistent with the way other researchers have addressed issues of race and gender in sentencing. This left 397 authorized capital prosecutions for analysis.

7. I used statistical procedures generally applied in the analysis of quantitative data to assess whether the death penalty was imposed differently in cases involving defendants who killed white victims as opposed to victims of other races: descriptive statistics provide a "snapshot" of the characteristics of the data; crosstabulations show how two variables interact with one another; and chi-square analysis provides an indicator of whether an

2

observed relationship occurs by chance or because of a systematic interaction between the two variables.

8. My analysis, as reflected in the charts below, demonstrates that defendants who kill white victims receive the death penalty at a substantially higher rate than defendants whose victims are not white and that this correlation between white victims and death sentencing is highly statistically significant, systematic, and not the result of chance.

9. The data used in the analysis have the following characteristics:

| Condition of Interest | Number of Cases |
|---|---|
| All Authorized Cases | 403 |
| Authorized Cases Involving Victim | 402 (see paragraph 6, above) |
| Authorized Cases Excluding Mass Killings | 397 (see paragraph 6, above) |
| Death Penalty Imposed | 60 |
| Death Penalty Not Imposed | 337 |
| White Victim (WV) | 146 |
| No WV | 251 |
| Sentencing Trial Completed | 182 |
| Sentencing Trial Involving WV | 75 |
| Sentencing Trial, No WV | 107 |
| Death Penalty Imposed, WV | 37 |
| Death Penalty Imposed, No WV | 23 |

10. The results of the chi-square analysis for cases involving a white victim are as follows: Table 1 summarizes the analysis of death sentences among the set of 397 authorized federal capital cases. As explained in paragraph 6, this includes all but six authorized prosecutions. Table 1 indicates that defendants in cases involving a white victim were

3

sentenced to death 25.3 percent of the time (in 37 of 146 cases). Defendants in cases not involving a white victim were sentenced to death 9.2 percent of the time (in 23 of 251) cases. Thus, a defendant charged with killing a white victim was nearly three times (2.75) more likely to be sentenced to death than a defendant charged with killing a victim who was not white. These results are statistically significant at the p<.001 level, indicating that the probability that this relationship has been observed by chance is essentially zero.

**Table 1: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – All Authorized Cases Except Mass Casualties (N=397)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =146) with White Victim | Death-Sentenced (37) | 25.3 (37 of 146) |
|  | Non-Death Sentenced (109) | 74.7 (109 of 146) |
| Set of All Cases (N=251) with no White Victim | Death-Sentenced (23) | 9.2 (23 of 251) |
|  | Non-Death-Sentenced (228) | 90.8 (228 of 251) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
|  | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=337) Not Involving a Death Sentence | Cases with White Victim (109) | 32.3 (109 of 337) |
|  | Cases with no WV (228) | 67.7 (228 of 337) |

11. Table 2 looks at the smaller set of authorized capital cases that proceeded through to a capital sentencing trial. It indicates that among those for whom life or death decisions were made by judges or juries, defendants in cases involving a white victim received a death sentence 49.3 percent of the time (in 37 of 75 cases). Defendants in cases where there was no white victim were sentenced to death 21.5 percent of the time (in 23 of 107

4

cases). A defendant in a federal capital trial thus was almost two-and-one-third (2.29) more likely to be sentenced to death in a case involving a white victim than a defendant in a case in which there was no white victim. These results are also statistically significant at the $p<.001$ level, indicating the probability that this relationship has been observed by chance is essentially zero.

**Table 2: Relationship between the Presence of White Victim (WV) and the Imposition of a Death Sentence – Sentencing Trial Cases Only (N=182)**

| Data Source | Condition (N) | Percent (Formula) |
|---|---|---|
| Set of All Cases (N =75) with White Victim | Death-Sentenced (37) | 49.3 (37 of 75) |
| | Non-Death Sentenced (38) | 50.7 (38 of 75) |
| Set of All Cases (N=107) with no White Victim | Death-Sentenced (23) | 21.5 (23 of 107) |
| | Non-Death-Sentenced (84) | 78.5 (84 of 107) |
| Set of All Cases (N=60) Involving a Death Sentence | Cases with White Victim (37) | 61.7 (37 of 60) |
| | Cases with no White Victim (23) | 38.3 (23 of 60) |
| Set of All Cases (N=122) Not Involving a Death Sentence | Cases with White Victim (38) | 31.1 (38 of 122) |
| | Cases with no WV (84) | 68.9 (84 of 122) |

12. After reviewing the results of these analyses, it is clear that there is a robust correlation between the presence of a white victim and the imposition of a death sentence. Social scientists consider a result to be robust when changing the assumptions undergirding an analysis would be unlikely to affect its results, which is the case here. Cases in which there is white victim represent 36.7 percent of all authorized prosecutions (146 of 397) and 41.2 percent of authorized prosecutions completing a penalty phase trial (75 of 182);

5

however they represent 61.7 percent of death sentences (37 of 60). These results are highly statistically significant. The generally accepted standard for statistical significance in political science research is $p<.05$, meaning the probability that the results occurred by chance is less than five percent. In the case of these analyses, the findings are statistically significant at a higher level of $p<.001$, meaning the probability they occurred by chance is less than one-tenth of one percent, or one in one thousand. Given the robust quality of these findings, it is my opinion to a reasonable degree of scientific certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of October, 2008.

Lauren Cohen Bell

6

Appendix: SPSS Output Used to Generate the Foregoing Analysis

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 397 | 100.0% | 0 | .0% | 397 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

| | | | White Victim | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| Death Penalty Imposed | No | Count | 228 | 109 | 337 |
| | | % within Death Penalty Imposed | 67.7% | 32.3% | 100.0% |
| | | % within race2 | 90.8% | 74.7% | 84.9% |
| | Yes | Count | 23 | 37 | 60 |
| | | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
| | | % within race2 | 9.2% | 25.3% | 15.1% |
| Total | | Count | 251 | 146 | 397 |
| | | % within Death Penalty Imposed | 63.2% | 36.8% | 100.0% |
| | | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 18.834[b] | 1 | .000 | | |
| Continuity Correction[a] | 17.594 | 1 | .000 | | |
| Likelihood Ratio | 18.134 | 1 | .000 | | |
| Fisher's Exact Test | | | | .000 | .000 |
| Linear-by-Linear Association | 18.787 | 1 | .000 | | |
| N of Valid Cases | 397 | | | | |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 22.07.

7

**Case Processing Summary**

|  | Cases | | | | | |
|---|---|---|---|---|---|---|
|  | Valid | | Missing | | Total | |
|  | N | Percent | N | Percent | N | Percent |
| Death Penalty Imposed * race2 | 182 | 100.0% | 0 | .0% | 182 | 100.0% |

**Death Penalty Imposed * race2 Crosstabulation**

|  |  |  | White Victim | | Total |
|---|---|---|---|---|---|
|  |  |  | No | Yes |  |
| Death Penalty Imposed | No | Count | 84 | 38 | 122 |
|  |  | % within Death Penalty Imposed | 68.9% | 31.1% | 100.0% |
|  |  | % within race2 | 78.5% | 50.7% | 67.0% |
|  | Yes | Count | 23 | 37 | 60 |
|  |  | % within Death Penalty Imposed | 38.3% | 61.7% | 100.0% |
|  |  | % within race2 | 21.5% | 49.3% | 33.0% |
| Total |  | Count | 107 | 75 | 182 |
|  |  | % within Death Penalty Imposed | 58.8% | 41.2% | 100.0% |
|  |  | % within race2 | 100.0% | 100.0% | 100.0% |

**Chi-Square Tests**

|  | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 15.463[b] | 1 | .000 |  |  |
| Continuity Correction[a] | 14.229 | 1 | .000 |  |  |
| Likelihood Ratio | 15.422 | 1 | .000 |  |  |
| Fisher's Exact Test |  |  |  | .000 | .000 |
| Linear-by-Linear Association | 15.378 | 1 | .000 |  |  |
| N of Valid Cases | 182 |  |  |  |  |

a. Computed only for a 2x2 table

b. 0 cells (.0%) have expected count less than 5. Minimum expected count is 24.73.

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 113**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF KEVIN McNALLY REGARDING TESTIMONY
## IN *UNITED STATES V. TAYLOR* (E.D. TN No. 1:04-CR-00160-1)

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC]. I have served as a Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts. We assist court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.[1]

2. My responsibilities as Federal Death Penalty Resource Counsel include the monitoring of federal capital prosecutions throughout the United States in order to help ensure the delivery of adequate defense services to indigent capital defendants in such cases. This effort, in turn, includes the collection of data on a wide variety of topics regarding federal capital cases, including decisions by the Attorney General to seek or not seek the death penalty and decisions by juries or judges whether to impose the death penalty. This includes the factual scenario, allegations and evidence, the number of homicide victims, the race or ethnic background of the defendant and the victim(s) and the statutory and non-statutory aggravating and mitigating circumstances alleged and found by the jury.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Department of Justice allegations in these

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMEN-DATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ..." *Id.* at 50.

cases. I accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, by reviewing transcripts, reviewing media accounts of trials, reviewing DOJ press releases and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have been asked by appointed counsel for Rejon Taylor to testify before the jury regarding the federal death penalty and issues of race and fairness, including statistics regarding the race of the defendant and victim, the facts and circumstances, the allegations of statutory and non-statutory aggravating circumstances, the jury findings and the results in other federal death penalty cases.

5. Since 1988, the Attorney General has authorized a capital prosecution against 403 defendants as to whom the capital prosecution has been completed, to the extent that a decision imposing or rejecting the death penalty has been made by the Attorney General and/or a jury or a judge. FDPRC has determined the race and gender of the defendants and victims as to each of these 403 "authorized" capital defendants. Additionally, FDPRC has determined the number of homicide victims attributable to each defendant. This information is captured in a report previously filed with the Court [Docket Entry 701, Exhibit B], along with the defendant's name, the district and the indictment number. FDPRC has obtained and reviewed the Notice of Intent to seek the Death Penalty and the jury findings regarding aggravating and mitigating circumstances in these cases.

<div align="center">- 2 -</div>

6.  Each of these 403 defendants is categorized in the report by a descriptive name relating to the disposition of the case.  The categories, which FDPRC uses in our database, are as follows: "Acquittal," "Authorization withdrawn," "Awaiting resentencing or retrial," "Clemency," "Death Row," "Death Sen Vac & AW," "Dismissal after notice by judge," "Executed," "Guilty plea," "Incompetent after authorization," "Innocent," "Killed or died after authorization," "Lesser included conviction" and "Life sentence."

7.  "Acquittal" means that the jury found the defendant not guilty of the capital charge.

8.  "Authorization withdrawn" means that the Attorney General withdrew the request for the death penalty either before or during trial.

9.  "Awaiting resentencing or retrial" means that the defendant received a sentence of death, but an appellate court has ordered a retrial or resentencing which has not yet occurred.

10.  "Clemency" means that the President granted clemency to an individual who was sentenced to death.

11.  "Death Row" means that a person is under a sentence of death and is awaiting appellate or post-conviction review.

12.  "Death Sentence Vacated and Authorization Withdrawn" (Death Sen Vac & AW) means that a death sentence was reversed by an appellate court and the Attorney General withdrew the request for the death penalty.

13.  "Dismissal after notice by Judge" means that a Judge has declined to permit the government to seek the death penalty, due to a legal reason.

14.  "Executed" means that the sentence of death was carried out.

15.  "Guilty plea" means that a plea agreement involving a non-death sentence (usually life)

- 3 -

383

was approved by the Attorney General and accepted by the Court, either before or during trial.

16. "Incompetent after authorization" means that the Court found the defendant incompetent, after the Attorney General authorized a capital prosecution.

17. "Innocent" means that the government moved to dismiss the capital count and either prosecuted another individual or the prosecutor admitted he/she was unable to prove the capital charge.

18. "Killed or died after authorization" means that the individual was killed or committed suicide after the Attorney General had authorized a capital prosecution before or during a trial.

19. "Lesser included conviction" means that the jury did not find a statutorily required aggravating circumstance or the required mental state threshold.

20. "Life sentence" means that the jury, or in two cases a judge, sentenced the defendant to life in prison.

21. 110 of the 403 individuals reached a plea agreement with the government that was accepted by the Court. The Attorney General withdrew the request for the death penalty as to an additional 57 individuals for various reasons.

22. 188 of the 403 individuals were tried by a jury or judge.

23. The numerical distribution of these cases is as follows:

| | |
|---|---|
| Acquittals | 13 |
| Authorization withdrawn | 48 |
| Authorization withdrawn at trial | 9 |
| Death sentence | 61 |
| Dismissal of notice by judge | 24 |
| Guilty pleas | 110 |
| Incompetent | 2 |
| Innocent | 3 |
| Killed/Died | 3 |
| Lesser included | 3 |

– 4 –

| | |
|---|---|
| Life sentence | <u>127</u> |
| **Total** | **403** |

24. One defendant of the 403 "authorized" defendants described above was charged with espionage and there was no homicide victim.

25. Five of the 403 defendants were accused of acts of mass murder/terrorism/bombing and were tried by a jury.  These individuals were Timothy McVeigh and Terry Nichols (the Oklahoma City bombing), Mohamed Rashed Al'Owhali and Khalfan Khamis Mohamed (the African Embassy bombings) and Zacarias Moussaoui (convicted of participation in the September 11, 2001 attack on the World Trade Center in New York).

26. In cases with multiple murders, if one homicide victim is white, the case is coded as involving a white victim.

27. In the attached report, "M" means male, "F" means female, "W" means white, "H" means Hispanic, "B" means African-American, "A" means Asian, "NA" means Native American, "I" means Indian and "O" means other.

28. I provided the attached data set to Lauren Cohen Bell, Ph.D., and requested that she provide an expert opinion as to whether the race of the victim(s), in particular white victims, in federal capital cases has a statistically significant effect on the death sentencing rate.  Her analysis is attached.  It indicates that defendants who kill a white victim or victim(s) are nearly three times as likely than other capital defendants to be sentenced to death, that the race of the victim is "highly statistically significant" and that the likelihood that this occurs by chance is "essentially zero."

29. I am able to testify regarding the facts and circumstances of the following cases: *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458); *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M); *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul*

– 5 –

*Al'Owhali* (S.D. NY No. S6 98 CR 1023); *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT); *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531); *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455); *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277); *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK); *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) and *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH). I would testify that each of these individuals were sentenced by a jury to life in prison without release and that all are housed at ADX Florence, the so-called federal "Supermax" prison. This information was obtained from the Bureau of Prisons website. http://www.bop.gov/iloc2/LocateInmate.jsp (last viewed on October 3, 2008).

30. *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) involved multiple (six) killings: one in '94, four in '96, one in '97. Authorization was granted to seek the death penalty for three murders, including an allegation that Jones ordered his step-brother killed from jail because he feared he was about to become a government witness. Jones also ordered the murder, by the victim's own bodyguards, of a rival Baltimore drug dealer who had earlier attempted to arrange the murder of Mr. Jones. Numerous other homicides, attributed to Jones, were alleged in aggravation. Murder for hire was alleged as an aggravating circumstance. Jones was convicted in 1998, sentenced to life without release. Eight co-conspirators were involved in multiple murders but did not face the death penalty. Jones was sent to the "Control Unit" at "super-max," ADX in Florence, Colorado, where he is under severe communication restrictions for 10 years. The defendants and victims were black.

31. *United States v. Terry Lynn Nichols* (D. CO No. 96-CR-68-M) involved Timothy McVeigh's co-defendant in the Oklahoma City bombing case. He was sentenced in 1998 to life imprisonment in federal court and faced the death penalty in state court where he was also sentenced to life in prison. McVeigh was executed.

32. *United States v. Khalfan Khamis Mohamed and Mohamed Rashed Daoul Al'Owhali* (S.D. NY No. S6 98 CR 1023) involved foreign national accomplices of Usama bin Ladin, the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people, including 12 Americans. More than 5,000 people were injured. Al-'Owhali is a Saudi citizen who was arrested in Nairobi after the bombing. Mohamed and Al'Owhali are members of al-Qaida, an international terrorist organization, led by bin Laden, who has repeatedly issued various "fatwahs" against the United States. A co-defendant stabbed a jail guard in the eye and caused brain damage during an escape attempt.

33. *United States v. Mariano Martinez* (C.D. CA No. 99-83-(A)-DT) involved defendants in one of three related multiple murder Mexican Mafia prosecutions. "Chuy" Martinez, 41, was a "drug kingpin," the head of a narcotics organization. There were a total of four murders and 13 conspiracies to commit murder charged. Three men, one a drug dealer and two innocent bystanders, all Hispanic, were killed in a Monticello autobody shop. Martinez orchestrated the killings using a walkie-talkie. Max Torvisco, once Martinez's right hand man, obtained a plea agreement. He admitted ordering 140 murders. Wiretaps show Martinez ordering numerous murders.

34. *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531) involved an inmate killing - an evisceration stabbing of cellmate (in their cell). The aftermath of the murder was recorded on videotape. The letter "S" was written on the cell wall in the victim's blood and his organs

- 7 -

removed and held up for the guards to see. The defendants are foreign nationals, Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. William had a 20 year history of violent crime.

35. *United States v. Zacarias Moussaoui* (E.D. VA No. 01-CR-455) involved a foreign national and co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

36. *United States v. Michael* O'Driscoll (M.D. PA No. 4-CR-01-277) the stabbing and killing of an inmate at USP - Allenwood in 1997. There were half a dozen correctional officers who witnessed the end of the stabbing. Both the defendant and victim are white.

37. *United States v. Barry Byron Mills, Tyler Davis Bingham, Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK) were charged in a racketeering indictment of 40 members and associates of the Aryan Brotherhood [AB] for a string of murders and violent attacks allegedly designed to expand the power of the white racist prison gang, which was founded at San Quentin state prison in 1964. Authorities say the gang has about 100 members. In 1980, the federal faction of the AB formed a three-man "Commission" to oversee AB members in federal prisons, and, in 1993, the Federal Commission formed a "Council" to oversee the day-to-day activities of the federal faction. 17 murders were alleged. Multiple (at least six) murders occurred since 1996. Twenty-seven defendants initially were eligible for the death penalty. Mills and Bingham made all major decisions involving the criminal activities of the federal faction. Mills was

– 8 –

also charged with personally committing one murder and involvement in numerous murders. AB members who were selected to face the death penalty were: McIntosh, Knorr, Sahakian, McElhiney, Littrell, Bridgewater, Terflinger, Schwyhart, Houston, Griffin, Chance, Stinson, Mills and Bingham. Mills and Bingham were sentenced to life in prison in 2006, as were Bridgewater and Houston at a separate trial in 2007. The Attorney General dropped the remaining capital prosecutions against the Aryan Brotherhood.

38. *United States v. Kenneth McGriff* (E.D. NY No. 04-966 (ERK)) involved Kenneth "Supreme" McGriff, the leader of a notorious Queens-based drug gang, "The Supreme Team," that operated in the 1980's. He went to prison after pleading to a Continuing Criminal Enterprise and receiving a 12-year sentence. Upon his release, he resumed drug trafficking. McGriff and co-defendants were charged with two VICAR murders that took place in 2001. All involved are African-American.

39. *United States v. Ellis Mosher* (E.D. TX No. 1:06 CR 00101-TH) involved a 1998 inmate killing at Beaumont FCI.

40. I am also able to testify as to the facts and circumstances of other cases involving the murder of a government informant or witness which have resulted in a life sentence after trial. I previously listed these cases in a declaration filed of record [DE 701, Ex. A, paragraph 7]. Descriptions of the facts and circumstances of these cases have also been previously filed of record [DE 701, Ex. C].

41. I am able to produce the Notice of Intent to Seek the Death Penalty (which contains the Government's allegation of statutory and non-statutory aggravating circumstances) and the jury

– 9 –

findings of statutory and non-statutory aggravating circumstances and statutory and non-statutory mitigating circumstances in all these cases.

42. I am able to testify as to the race of all of these capital defendants and their victims, the number and nature of aggravating and mitigating circumstances and the number of homicide victims in all of these cases.

43. Rejon Taylor's date of birth is September 15, 1984 and the date of the capital offense is August 6, 2003. Therefore, Mr. Taylor was 18 years old at the time of the homicide. If the capital crime had occurred 11 months earlier, Mr. Taylor would not have been eligible for the death penalty. 18 U.S.C. §3591(a). *See Roper v. Simmons,* 543 U.S. 551 (2005).

44. No federal capital defendant who was 18 at the time of the capital offense has been sentenced to death for a single homicide.

45. No federal capital defendant has been sentenced to death in a prosecution involving a struggle for a gun leading to a shooting or a factual scenario similar to that.

46. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2008.

Kevin McNally
Federal Death Penalty Resource Counsel

- 10 -

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 114**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

Exhs. § 2255 Amended Motion                                                      *U.S. v. Barrett*, 6:09-cv-00105-JHP

## DECLARATION OF RODNEY FLOYD

I, Rodney Floyd, declare the following:

I am one of the investigators currently working for the defense in Kenneth Eugene Barrett's case. On February 21, 2008, I interviewed former Sequoyah County Sheriff John Philpot. Mr. Philpot told me that less than a month before the incident in which Oklahoma State Highway Patrol Trooper David "Rocky" Eales was shot and killed, he and three other law enforcement officers went to Mr. Barrett's residence. They did not serve an arrest warrant on Mr. Barrett, or take him into custody. They encountered no violence from Mr. Barrett, and were not harmed or assaulted.

I did not draft this declaration. The information detailed above is based on what I told one of Mr. Barrett's lawyers, David Autry, based on my investigation. I have read this declaration carefully, and it accurately states what I told Mr. Autry.

I declare under penalty of perjury that the foregoing 1 page declaration is true and correct.

Executed by me this __11__ day of ___March___, 2009, in __Lincoln__ County, Oklahoma.

_Rodney Floyd_
Rodney Floyd

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 115**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

June 11, 2001

To:     The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart
        Senate Office Building, Washington D.C. 20510-4904

From:   David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law,
        University of Iowa

Re:     DOJ report on the Federal Death Penalty System (June 6, 2001)

I have read U.S. Department of Justice, The Federal Death Penalty System:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review (June 6, 2001) ("the

report"), which supplements the DOJ report of September 12, 2000.  The following comments

explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ

report utterly fails to convince me that there is no significant risk of racial unfairness and

geographic arbitrariness in the administration of the federal death penalty.  I believe there is still

the just as much reason to be concerned about these issues as there was when the September 2000

report was issued.

        1.  The report completely overlooks the evidence of race-of-victim discrimination
documented in the September 12, 2000 report.

        A main theme of the latest report (p. 10) is that the death penalty authorization rate is

higher for whites (.38) than it is for blacks (.25) and Hispanics (.20).  These are the same figures

that appeared in the September 2000 report.  The latest report's emphasis on these statistics

appears to suggest that white defendants are actually treated more punitively than minority

defendants.

        A more plausible explanation for the higher authorization rates for the white defendants is

plainly documented in the September report – (1) white defendants are more likely to have killed

whites[1] and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-

victim cases than they are in minority-victim cases.  For example, data in the September 2000

---

[1] For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

1

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21(81/383) in minority-victim cases -- a 16 percentage point difference that is statistically significant at the .001 level.  The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system.  Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases.  Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases -- a nine percentage-point difference.[2]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*[3].  The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[2] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level.   The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level.  In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[3] 481 U.S. 279 (1987).

2

2. <u>The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.</u>

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13) Perhaps, but that is not the question. The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution. The report offers no data on that question. As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty.* (Pp. 17-18) This is extremely misleading. The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia. The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17). This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3. <u>The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.</u>

3

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19)  The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it  "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements.  This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached.  Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered?  It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases.  Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of  "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[4]

---

[4] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

4

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it. Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4. The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.

The report notes a meeting of "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11) I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the conduct of such a study would entail a "multi-year research initiative." Two years would be the likely time line. In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible. Quite the opposite. Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases." This was certainly not the consensus of the researchers at the January 10 meeting. On the contrary, the consensus was that such a study would provide the best possible evidence on the question. Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

5

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete.  It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study.  With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5.  <u>The report misconceives the nature of race discrimination in the administration of the federal death penalty.</u>

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11)  In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17)  This states the issue far too crudely.  No one with an understanding of the system suggests that it is  driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims.  The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious.  More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant.  It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists.  Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of the defendant and victim exists in the federal death penalty system, and if so, what causes it.

7

8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 116**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

**DECLARATION OF KEVIN McNALLY REGARDING THE GENDER AND
RACE OF VICTIMS IN FEDERAL CAPITAL PROSECUTIONS SINCE 2000**

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project [FDPRC], assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

3. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. FDPRC accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy whenever possible against any

---

[1] In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See* "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

1

available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.  Attorney General Gonzales reviewed 409 potential capital defendants.  In those cases, there were 19 prosecutions involving white female victims.  Of those 19 cases, 10 defendants (53%) were "authorized" or selected by the Attorney General to face the death penalty.  Of those 409 defendants, there were 67 cases involving white male victims.  Of those 67 cases, 19 defendants (28%), were chosen to face the death penalty.  Of those 409 defendants, there were 323 cases involving non-white victims.  Of those 323 cases, 52 defendants (16%) were authorized to face the death penalty.

5.  Attorney General Ashcroft reviewed 626 potential capital defendants.  However, three cases involved no homicide victims, as espionage or large scale drug trafficking was alleged.  Of those 623 cases, there were 59 cases involving white female victims.  Of those 59, 34 (58%) defendants were selected for a death penalty prosecution.  Of those 623 cases, there were 105 prosecutions involving white male victims. Of those 105 prosecutions, 18 defendants (17%) were authorized.  Of those 623 cases, there were 459 prosecutions involving non-white victims.  Of those 459 prosecutions, 86 defendants (19%) were chosen to face the death penalty.

6. Eighty-seven defendants "authorized" to face the death penalty by Attorney General Ashcroft have completed trial.  Of those 87 defendants, 25 prosecutions involved white female homicide victims.  15 of those 25 (60%) white female victim prosecutions have resulted in a death sentence.  30% (3 of 10) white male victims cases have resulted in a death sentence.  51 non-white victim prosecutions have completed trial.  Five (10%) of these 51 non-white victims have resulted in a death sentence.

7.  Thirty-one defendants "authorized" to face the death penalty by Attorney General Gonzales have

2

completed trial.  Of those, 5 prosecutions involved white female victims.  Juries have sentenced 4 of those 5 defendants to death.  Seven prosecutions have involved white male victims.  Two (29%) of those 7 defendants have been sentenced to a death sentence.  19 non-white victim cases have completed trial.  Three (16%) of those 19 defendants have been sentenced to death.

8.  The totals for Attorney General Ashcroft and Attorney General Gonzales are as follows:

Gonzales authorized - 81
52    Black, Hispanic and other victims
19    White male victims
10    White female victims

Gonzales not authorized - 328
271    Black, Hispanic and other victims
48    White male victims
9    White female victims

Ashcroft Authorized - 139
86    Black, Hispanic and other victims
18    White male victims
34    White female victims
1    No victim

Ashcroft not authorized - 487
373    Black, Hispanic and other victims
87    White male victims
25    White female victims
2    No victim

9.  I attach three graphs depicting this information.

10.  The victim gender data has not been available before.

11.  The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 5th day of December, 2007.


 /s/ Kevin McNally
Kevin McNally

3

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 117**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO <u>28 U.S.C. § 2255</u>**

---

**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1. I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2. I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

3. I am Secretary General-Elect of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees. I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

4. I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977. I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology. In 1981, I completed my psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year. During my psychiatric residency, I pursued specialized neurological

1

407

electives at Kaiser Permanente Hospital, Oakland, California.  These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

5.      In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units.  The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general.  The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.  Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency.  In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms.  Medical examinations and neurological intervention were frequently required.

6.      From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of

mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment.  Many of these patients Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

7.        From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California.  In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.  During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

8.        The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).  From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center.  The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and

psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

9.      In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

10.      In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology.  I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

11.      In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that

predated the bombings.

12.     I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents.  I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

13.     My clinical private practice is based in Oakland, California.  I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

14.     At the request of counsel currently representing Kenneth Barrett, I have performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense.   In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009.  I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites.  These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

**Clinical Presentation**

15.     Clinical observation of Mr. Barrett over the course of lengthy interviews revealed

<p style="text-align:center">5</p>

signs of significant neurologically impaired cognitive and psychosocial functioning, including severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality, hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to sustain lasting relationships secondary to his severe mental illness.

16.     Kenneth Barrett presented as an appropriately groomed White male who appeared to be his stated age of 47 years. His movements were fluid, although his gait was somewhat halting. Mr. Barrett noted he had difficulty with his legs since he had been shot multiple times during the police action that resulted in his arrest and conviction.

17.     Speech was spontaneous and coherent, although he repeated questions often, even after the questions had been answered. He evidenced pressured speech. His ability to utilize complex words or grammatical structures was limited.

18.     Mr. Barrett's thought form was extremely concrete, and his ability to abstract limited.  There was no evidence of prosody or alexithymia, poverty of thought.  On the contrary, Mr. Barrett had significant flight of ideas. He was paranoid and guarded, particularly in discussing the painful memories of separation from his father and the inattention of his mother, due to her own mental illness, during his formative years.  His thinking was also grandiose, manifesting cognitive disinhibition, reflecting neurodevelopmental and/or acquired brain dysfunction.  There was no evidence of perceptual disorders, hallucinations, or delusions.

19.     He was most animated and fluent in describing his attempts to redress perceived injustices (e.g., disrespect and unfair enforcement of rules by prison staff; the misappropriation of his property after his arrest).  His description of his responses in such situations indicated a significant lack of inhibition and age-appropriate defenses and coping skills.

20.     Mr. Barrett's mood was elevated. His affect was often inappropriate to the content of our examination. The affective content of his presentation was incongruent with self-description of his life and current situation.  Mr. Barrett is invested in appearing to be a high-functioning individual, without significant past or present impairment, and who is in control of his life.

21.     Insight and judgment were impaired by his severe mood disorder and executive functioning deficits. His conceptual dysfunction also limited his ability to develop a larger picture, further impinging his insight and judgment.

**Background and Developmental Impact**

22.     Kenneth Barrett was born on June 29, 1961, in Joliet, Illinois.  He is the oldest of three sons born to Ernie Barrett and Gelene Barrett (nee Dotson).  Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

23.     Significant risk factors for, and the symptomatic presentation of multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Barrett's antecedents.  In particular, Mr. Barrett has high genetic loading (risk) for bipolar

disorder and other affective disorders. He has multiple multigenerational and first-degree relatives with confirmed diagnoses of such mental illness. Mr. Barrett's extensive family history of bipolar and associated neuropsychiatric disorders is rare, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

24. Mr. Barrett's mother, Gelene Dotson, his maternal aunt, Carolyn Joseph, and maternal cousin, Gwendolyn Crawford, satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression and anxiety disorders. Gwendolyn's daughter, Brandy Hill, suffers with major depression punctuated by episodes of "high euphoria," and is noncompliant with her prescribed medication regimen. Gwendolyn's 26-year-old son, Brandon, suffers from developmental disabilities that prevent him from speaking or being able to live independently. Another of Mr. Barrett's first cousins, Travis Crawford, is being treated for anxiety, has a history of depression, and experiences significant cognitive impairment. Mr. Crawford's oldest daughter has been diagnosed with bipolar disorder, and one of his sons exhibits significantly impaired neurocognitive functioning. At least two other of Mr. Barrett's cousins each has a son who suffers from diagnosed bipolar disorder.

25. Medical indications of the incidence of major mood disorders, and related impairments in functioning, can be found in Mr. Barrett's maternal family back to at least the generation of his grandmother, Hattie Gertrude Dotson. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the twentieth century. Wallace Dotson, a first cousin of Mr. Barrett's maternal grandfather, was involuntarily committed to a state psychiatric hospital by

8

414

his father, Tom Dotson. The record of admission documents the senior Dotson's description of his son as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights," a neurovegetative sign of mood disorders.

26. Mr. Barrett's paternal family presents a comparable degree of genetic loading for major mood disorders and associated neurocognitive substrates. At least one paternal aunt, Linda Riley, suffers from depression, and both of her adult daughters have been diagnosed with bipolar disorder. One of Ms. Riley's grandsons has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder. Another paternal aunt, Elnora Long, currently meets diagnostic criteria for bipolar disorders and requires treatment with high doses of medication.

27. The paternal pedigree, neuropsychiatrically indicative of mental illness in Mr. Barrett's family extends back at least four generations. A Certificate of Lunacy for Mr. Barrett's great-great-grandfather, A.J. (Jack) Barrett, documents his 1918 commitment to a psychiatric hospital in Sequoyah County. Mr. Barrett's great grandfather, Isaac Clifford Barrett, despite achieving prominence in his social and professional community, manifested a loss of pleasure, called anhedonia, eventually committing suicide. His oldest son, Mr. Barrett's grandfather, Andrew Jackson Barrett, manifested severe mood imbalances and disordered thinking, which resulted in violent physical and sexual assaults against his wife and children, including the forcible rapes and consequent impregnations of one of his daughters and his 13-year-old sister-in-law; and rampages in public while under the influence of alcohol. His occupational functioning was severely impaired. Psychiatric symptoms documented in his Certificate of Lunacy, contemporaneously with his commitment to a state psychiatric hospital, include auditory hallucinations, persecutory delusions and paranoid ideation, which were, in turn, exacerbated by

neuropsychological deficits that impaired his intellectual functioning, judgment and reasoning. He suffered severe mood swings, and attempted to self-medicate his psychiatric distress with excessive amounts of alcohol.  When he was sober, his family described him as "a decent guy." When he consumed alcohol, as he did on frequent occasions, he became unpredictable and violent.

28. A.J. Barrett's disinhibition, affective dysregulation and violent behaviors, including assaults against his wife, traumatized his own son, Ernie Barrett (Kenneth Barrett's father), and impaired Ernie's neurodevelopment and cognitive functioning.  As an adolescent, Ernie Barrett exhibited signs of traumatic stress, becoming emotionally constricted, exhibiting psychic numbing and replicating his father's aggressive behaviors against his own siblings and classmates.  As an adult, Ernie Barrett exhibited a neuropsychiatrically diagnostic symptom cluster of bipolar-related behaviors, including hypersexuality, grandiosity and substance abuse.

29. Howard Maxwell, the brother of one of Mr. Barrett's paternal great grandmothers, Mary Ellen Maxwell, was colloquially described as exhibiting psychiatric symptoms, and his son, Billy Dean, had a history of Schizophrenia, and also committed suicide.

30. Kenneth Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency. Mood disorders have an incidence in the United States of approximately 8 percent of the population. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.

31. Early onset BD appears to have strong polygenetic inheritances, with strong expression in the children of affected parents, and has a higher incidence than reported in the

offspring of parents with other types of mood or affective disorders. Children with one parent

with BD have a 25% incident of inheriting BD; for children whose parents both have BD, the

incidence rises to 50% to 75%. (Faust et al, *Diagnosis and Management of Childhood Bipolar*

*Disorder in the Primary Care Setting*, Primary Pediatrics, November 2006, page 802.)

32.     Based on the research regarding the genetics of schizophrenia and bipolar

disorder, it is medically reasonable to conclude that the prevalence and severity of substance

dependency in Mr. Barrett's family is largely genetically determined.  His parents' dependency

and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's

ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate

perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically

absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered

emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents

ill equipped to develop the primary attachments or provide the basic physical and emotional

nurturing necessary for a young child's normal, healthy neurocognitive development.

33.     *From Neurons to Neighborhoods*, a study of early childhood development by the

National Research Council and the Institute of Medicine, documented sensory stimulation, and

social interactions as conditions that affect the developing brain. They also determined that

chronic stress is detrimental to the normal development of the brain. (Shonkoff and Phillips,

*From Neurons to Neighborhoods: The Science of Early Childhood Development*, National

Academy of Science Press, 2001, page 199.)

34.     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as

significant a risk factor for childhood trauma as physical abuse, and one which has some of the

longest term and most pernicious effects of all such early traumatic experiences.

35.     The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

36.     Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion.  In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

37.     Mr. Barrett was also exposed to neurological insults to his fragile central nervous system *in utero* due to his mother's alcohol use, and during his formative years from his mother's unpredictable beatings and his parents frequent domestic disputes, that were known to end in violence.  E.g., Mr. Barrett's mother describes the "pretty bad fights" she and her husband had

12

418

whenever she confronted him about his infidelity, and reports that "he gave [her] two black eyes and split [her] lip."

38.     As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.   During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.  Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not  "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

39.     Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

40.     Initial presentation of childhood or adolescent bipolar disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15

13

minutes, sadness and easy crying, inattention, and impulsiveness.  When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

41.     As he approached adolescence and continuing through young adulthood, Mr. Barrett experienced potential neurological insults outside his home that posed further risks of cognitive impairment and traumatogenic sequelae.  In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a "steel ball," with indicated loss of consciousness.  He recalls only "waking up" as he was being lifted off the ground after being struck.   At age 17, Mr. Barrett reportedly suffered an assault by one or more police officers.  Mr. Barrett reportedly declined to pursue an investigation of the officers' actions, but his mother reports that while one officer restrained Mr. Barrett, another one beat him around the face, head and neck, inflicting injuries that included a broken jaw and collar bone, facial contusions and a bloodied nose.  When he was approximately 22, and again at age 23, Mr. Barrett was involved in motorcycle accidents, again with apparent loss of consciousness.  Mr. Barrett, witness accounts and medical records confirm that at the age of 24, he apparently attempted suicide by shooting himself in the chest with a shotgun; and Mr. Barrett reports that he has made several other unsuccessful attempts to take his life by driving his car or motorcycle off the road at high speeds.   In connection with Mr. Barrett's arrest for the commitment offense, he suffered several gunshot wounds to his legs, facial contusions and abrasions, and superficial

14

blunt trauma to his head.

42.     Mr. Barrett reports that his regular use of alcohol, tobacco and other drugs, including marijuana, started around the age of eleven or twelve, a period when the development of his frontal lobes, the seat of neurological executive functioning, is first beginning.

43.     Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.( Young declaration, page 13)

44.     In an environment in which "mom drank, grandpa drank," Mr. Barrett had easy access to alcohol and soon began drinking "more regular."  In the seventh grade he regularly abused marijuana on a weekly or bi-weekly basis, and increased to more frequent use as he gained greater access to the drug once his use became more widely known among peers, and other users were willing "to turn [him] on."  From late adolescence through early adulthood he reports episodic use of Valium, Lithium, LSD, PCP, psilocybin mushrooms, methamphetamine, cocaine, Quaaludes and Placidyl; and frequent abuse of barbiturates.  By his 30's, Mr. Barrett primarily abused cocaine, methamphetamine and Tuenol.  Mr. Barrett's chemical dependency

15

history is consistent with the high incidence of substance use secondary to the increased

neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar

disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to

chemical dependency. PTSD and bipolar disorder each have a co-occurring incidence with

chemical dependence greater than 40% in the clinical literature.

45.     Mr. Barrett was unable to acquire the skills and means necessary to live

independently, and manifested significantly impaired social, relational and occupational

functioning throughout his adulthood.  He married at the age of 19, and his son, the couple's only

child, was born shortly afterward.  The union was severely strained by the effects of Mr. Barrett's

mental instability, which was apparent to lay observers.  Mr. Barrett experienced periods of

severe depression, in which he exhibited signs of catatonia, followed by mania and racing

thoughts.  Mr. Barrett was unable to maintain a consistent work schedule, and the couple

frequently had to live with Mr. Barrett's mother, Gelene Dotson.

46.     Mr. Barrett's former wife reports that during the periods they lived with Ms.

Dotson, the effects of Mr. Barrett's attempts to ameliorate symptoms by self-medicating with

illicit drugs were exacerbated by his mother's habit of making him "get up from bed and party

with crack and pot."

47.     Mr. Barrett and his wife experienced frequent separations followed by

unsuccessful attempts at reconciliation.  Mr. Barrett was unable to live independently and resided

with his mother or father when living apart from his wife.  Mr. Barrett's efforts at pursuing

gainful employment were defeated by feelings of irritability, agitation and dysthymia, and

impulsive, unconsidered abandonment of his job.

48.     Mr. Barrett reported to me that he would become so paranoid over time when interacting with others, he would be forced to leave successful attempts at working, often leaving at the point he was experiencing his direst moment. He left Fort Smith, Arkansas, working with his father, overwhelmed with racing thoughts and paranoid ideation

49.     Mr. Barrett's documented suicide attempt in 1986 was followed by psychiatric intervention and treatment with Elavil and Ascendin, antidepressants well known to exacerbate mania. Many antidepressants force a neurological "switch" to occur in bipolar disorder, inducing mania.

50.     Mr. Barrett's bipolar disorder's pattern can best be described as a "mixed phase" disorder, with depressive mood and affect combined with racing thoughts, irritability, paranoia, and disinhibition. Treated most often with antidepressants due to his depressive presentation, the medication regimen had the potential to increase Mr. Barrett's symptomatology, rather than ameliorate it.

51.     Mr. Barrett was medication noncompliant and his condition deteriorated, necessitating involuntary commitment to Eastern State Hospital in October 1986.  At admission, he presented as emotionally labile with impaired insight and judgment, and was provisionally diagnosed as suffering "depressive neurosis with suicidal potential extremely high."   Upon discharge, Mr. Barrett was again unable to live independently, and stayed with relatives.  The results of a Social Security Administration determination of eligibility found that Mr. Barrett was "moderately depressed" and periodically unable to "think clearly."  He required frequent admissions to hospital emergency rooms after reportedly falling down stairs, sustaining a contusion to his right periorbital region of his head; being involved in a motor vehicle accident,

17

423

in which he experienced rib and chest pain; and suffering a rash "all over." Mr. Barrett's disclosure, during clinical evaluation, of described suicide attempts using motor vehicles indicates that documented motorcycle and automobile accidents may have been unsuccessful suicide attempts, increasing the psychologically traumatic component of such incidents in addition to creating a risk of further neurological insults.

52.     Following a final separation from his wife after being unable to live independently in Fort Smith, Arkansas, Mr. Barrett psychiatrically decompensated and was hospitalized in January 1995. He reported to hospital staff that he was "losing [his] mind," and noted to be extremely agitated, sleep-deprived, unable to concentrate and experiencing racing thoughts. He was diagnosed with bipolar mood disorder and started on a regimen of 10mg. of Haldol, to be injected intramuscularly ("IM"). The requirement of intramuscular administration of psychotropic medication indicates that Mr. Barrett lacked the insight to recognize his medical predicament and that involuntary treatment with neuroleptics was medically necessary. However, Mr. Barrett's symptoms also called for mood stabilizing and cognitive enhancing medication, and Haldol, although an excellent antipsychotic, does neither. Again, Mr. Barrett's symptoms, although identified, were not appropriately or adequately treated, leaving him to become increasingly paranoid and cognitively impaired.

53.     When he was discharged from the psychiatric hospital, Mr. Barrett returned to his mother's property, where he constructed what family members describe as a small "shack," with approximately $150 worth of building supplies and scraps of materials. The structure lacked running water, a toilet or electricity. Mr. Barrett's mother allowed him to run an electrical cord from her house trailer to his shack, to use her bathroom and shower, and eventually to eat in her

kitchen. Mr. Barrett's family and former wife recognized that he could never "live on his own," and his mother allowed him to remain on her property, where he earned a marginal income repairing cars for friends and neighbors.

54. In the years and months preceding the commitment offense, Mr. Barrett expressed increasingly paranoid thoughts, experienced intolerable irritation at perceived surveillance and harassment by law enforcement authorities and felt threatened by illicit drug users and dealers, some of whom he suspected of being police informants. He disclosed to others his belief that he was being monitored by satellites and became increasingly withdrawn until he stopped leaving his mother's property. He relied on others to shop and run errands in the nearby town for him. At other times, he believed the unidentified aircraft "hovering" over his property were "dirigibles," similar to "the ones the U.N. uses," and reinforced with "steel plates on their bottoms." He described shooting at one and causing it to flee.

55. In the weeks or days before the commitment offense, Mr. Barrett reportedly displayed a sign on the roadway leading onto his mother's property that warned: "Keep out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." There was some dispute whether the message was directed at law enforcement, drug dealers or both.

56. Mr. Barrett's description of the events leading to his arrest indicates that he did not leave his shack before he was shot by the police. Responding to the sound of his son's voice calling his name, Mr. Barrett rushed to the front porch and observed an unidentified Ford Bronco driving toward his son. Mr. Barrett retrieved a handgun from inside the shack and placed it in the waistband of his trousers, and began to return to the porch to investigate. He was struck by a bullet he believes was fired through a window of the shack as the Bronco "hit the front of the

19

425

house."  Mr. Barrett says "I didn't know what was going on except someone was there to kill me."  At the sight of the Bronco striking his residence, Mr. Barrett "went to firing."  The next recollection he has is of a law enforcement officer ordering him to stand up.  Mr. Barrett has no memory of having fallen, but he does recall he could not stand up due to bullet injuries to his legs.

**Neuropsychological Assessment**

57.     The neuropsychological assessment performed by Dr. Myla Young measured impairments in cognitive performance associated with significant dysfunction in the dorsolateral and orbital portions of the prefrontal lobes of Mr. Barrett's brain.   The measured deficits compromise Mr. Barrett's ability to inhibit cognitive and emotional stimuli, and seriously disrupt executive function including planning (the ability to inhibit short-term goals for long-term objectives), and engaging in reasoned, purposeful, self-regulating goal-directed behavior.  The frontal lobes are also responsible for the integration of motoric and cognitive functioning, including mediation of impulses from the regions of the amygdala and hippocampus.  The amygdala is associated with primordial "fight/flight" responses, as wells as the positive/negative emotional responses of happiness and sadness.  When the amygdala sends an impulse, it is modulated by the orbital frontal lobe before activating striatal responses.  Frontal lobe integration of working memory with limbic impulses enables the brain to contextualize new information, including external stimuli, and make an appropriate response selection.

58.     The prefrontal cortex, the area of most severe damage for Mr. Barrett, is the site of executive functions.  As Dr. Young has indicated, the processes grouped under the label of executive functions can be thought of as multiple processing modules collected together to direct

20

cognitive activity, including mental functions associated with the ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior.  These modules perform functions related to overseeing the use of other cognitive processes.  As noted by Dr. Young, this array of brain functions include those that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

59.    In addition to having problems with focusing and sustained attention, manic patients have difficulties shifting attention. Manic patients resemble patients with frontal lobe

21

damage on attentional shifting task such as the Wisconsin Card Sorting Test.  Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect. (Goldberg et al, Cognitive Dysfunction in Bipolar Disorder, American Psychiatric Publishing, 2009, page 29)

60.     Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

**Malingering**

61.     The Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revised (DSM-IV-TR™) explains that "[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, or obtaining drugs."  Mr. Barrett does not "produce" or exaggerate symptoms, rather he minimizes the severity of his symptoms and attempts to present as high functioning, despite acknowledgement of signs of his mental illness.  There is no marked discrepancy between Mr. Barrett's acknowledged symptoms and the objective findings (Malingering criterion #2). Reliable, congruent clinical evidence – including lay witness observations predating Mr. Barrett's arrest, prior psychiatric diagnoses and treatment, and objective neuropsychological testing results – shows that he meets diagnostic criteria for mental illness and suffers cognitive deficits.

22

428

62.     In particular, neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

**Etiology and Onset**

63.     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

64.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

65.     Mr. Barrett's family history, the consistency of emotional dysregulation beginning

23

early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

**Clinical Impressions**

66.     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

67.     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed

behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

68.     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

**Medicolegal Findings**

69.      Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms, none of which was addressed, either legally or psychiatrically. First, Mr. Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense.

70.     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings, rendering him unable to rationally assist his attorneys. He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

431

71. Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

72. He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

73. Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

74. Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

75. Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

76. Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He

26

432

was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

77.     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

78.     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions

27

before they occurred.

79.     Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain and the reactive immunological reaction he has had to the bullet fragments in his body. Consequently, it is clinically consistent that his constellation of PTSD symptoms would continue through his trial and, to some extent, exist today.

80.     He described symptoms of racing thoughts during his trial, which prevented him from being able to effectively track the proceedings. Mr. Barrett's thoughts were also ruminative, and he was "unable to get unstuck."  He would get his mind on an issue during the trial, and not be able to move to other aspects of the trial.

81.     Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments, his PTSD, Bipolar Disorder, and Dysexecutive Syndrome; were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial.

82.     I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on March 14, 2009.

 /s/ George W. Woods
George W. Woods, Jr., M.D.

28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 118**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

*Qualifications and Experience of Declarant*

1.      I am an attorney in private practice in Houston, Texas.  My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.  I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.  I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2.      Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts.  Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases.  In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) – which was

adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id.* at 50.

3.     I have been asked by the attorneys for Kenneth Barrett to recount my contact with trial counsel for Mr. Barrett in my role as resource counsel.

4.     I first heard from John Echols, who was appointed initially as lead counsel for Mr. Barrett, on October 21, 2004. Mr. Echols and I discussed the case, which was at that point pre-indictment, and focused primarily on the Department of Justice death penalty authorization process and case budgeting. In connection with this, Mr. Echols recounted at length his previous representation of Mr. Barrett on state charges arising from the same incident and stressed that his mitigation investigation in the state case was not at all adequate. He was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully.

5.     In this first telephone call, I also learned from Mr. Echols that Roger Hilfiger had been appointed co-counsel. This was of concern to me, because my project, through the federal defender, had recommended to the Court appointment of Rob Nigh, an experienced and excellent death penalty defense attorney from Tulsa, as co-counsel with Mr. Echols. I was concerned that Mr. Hilfiger had not had much federal death experience and believed that since the circumstances of Mr. Barrett's offense created a high risk of a death sentence, both of Mr. Barrett's counsel needed to bring considerable death penalty experience and a history of quality work in such cases.[1] To my knowledge, Mr. Hilfiger did not meet those criteria.

---

[1] One of the responsibilities of Federal Death Penalty Resource Counsel is to assist federal defenders in their statutory duty under 18 U.S.C. § 3005 to recommend to the district courts appointment of counsel in federal capital prosecutions. As this responsibility has been elaborated in the Volume 7 of the *Guidelines for the Administration of the Criminal Justice Act and Related Statutes*, Chapter 6.01(B)(1), "Ordinarily, 'learned counsel' (see 18 U.S.C. § 3005) should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals or post-conviction review that, in combination with co-counsel, will assure high-quality representation."

2

6.      Following this phone call, I arranged for my project to send a letter of introduction, along with a CD of materials, to both Mr. Echols and Mr. Hilfiger.  The letter introduced me as resource counsel and explained the kind of assistance that we offered.

7.      Over the course of November, December, and January, I communicated by email or telephone with Mr. Echols several times.  The contacts were always initiated by Mr. Echols and focused on particular issues – experts or investigators that he needed, motions that he was filing, and his ongoing relationship with co-counsel, which was not developing very well in that he perceived Mr. Hilfiger to be unable or unwilling to take on his share of the work on the case.

8.      In February, March, and April, 2005, I had numerous contacts with Mr. Echols. He had set up a secure website for the case documents and provided access for me to the website.  He was interested in my views about all the work he was doing – often needing more time from me than I was able to offer.  I consulted most heavily on difficulties he was having with the Court in getting his budget requests funded adequately.  In the course of this period, I provided four declarations for Mr. Echols in support of his budget submissions to the Court concerning various aspects of attorney services, expert and investigative services, and the use of jury experts in federal capital cases.

9.      The declarations I provided to Mr. Echols in April 2005 responded to a case budgeting order the Court entered on March 18, 2005, and the report and recommendation of the Magistrate Judge that Mr. Echols should not be compensated for time spent seeking authorization for funds.  I informed the Court that Mr. Barrett's case was the only federal death penalty case in which Federal Death Penalty Resource Counsel were aware of a defense attorney being denied compensation for seeking funds.  I informed the Court that the March 18 order was contrary to the other budgeting orders the project was familiar with, and contrary to the

3

governing state and judiciary policies, in that the order infringed upon counsel's ability to exercise independent professional judgment.  I informed the Court that its cuts to Mr. Barrett's budget were unique in the experience of the project and that the Court's estimate of the time reasonably necessary for Mr. Barrett's representation was far below projections made by the Spencer Committee.  I advised the Court that the non-attorney funds Mr. Barrett had been granted were far below those courts granted other similarly situated defendants.  I also informed the Court that the Defender Services Committee had recently reaffirmed the principle that generalized concerns about the judiciary's budget should not be met by cutting back on reasonable and necessary requests for defense funding.

10.     Over this same period of time, Mr. Echols expressed increasing frustration over the difficulties he was having with securing court approval for his case budget, and with Mr. Hilfiger's continuing lack of involvement in the ongoing work on the case.  For these reasons, Mr. Echols was quite worried that he would not be able to prepare Mr. Barrett's case effectively by the then-scheduled trial date.

11.     Finally, on April 7, 2005, Mr. Echols filed a motion to withdraw as counsel, expressing to me his belief that he was not serving Mr. Barrett well since he seemed unable to secure adequate funding for investigation and experts, was getting very little help from Mr. Hilfiger, and was unable to get the substantive work done on the case that very much needed to be done.

12.     The Court granted Mr. Echols' motion to withdraw on May 11, 2005.  The Court then designated Mr. Hilfiger lead counsel and appointed Bret Allan Smith as co-counsel.

13.     Thereafter, I never heard from Mr. Hilfiger or Mr. Smith.

14.     I did have an incidental contact with Mr. Hilfiger in late August 2005.  I sent an

4

email to a federal death penalty defense list serve requesting information on turnaround time for payment of CJA 30 and CJA 31 vouchers.  On August 29, 2005, Mr. Hilfiger responded with information concerning his experience on such time.  I emailed him back asking him to bring me up to date on the case and offering my assistance.  However, I never heard back from Mr. Hilfiger.

15.     At that point in time, I had approximately 50 active federal capital cases that were assigned to me as resource counsel.  Because of this caseload, and because I also had a very heavy caseload of capital cases in which I was appointed counsel, I was unable to be as proactive as I would liked to have been.  When I did not hear back from Mr. Hilfiger, I did not continue to press him.  My experience at that time was that my work had more effect with lawyers who wanted to consult with me.  My work had little effect with lawyers who did not respond to my overtures to provide assistance.  Thus, my triage decision then was to focus on those attorneys who wanted my assistance.  Mr. Hilfiger was not one of those attorneys.

Under penalty of perjury, I declare that the representations made in the foregoing declaration are true and correct.

Richard H. Burr

Signed March 3, 2009.

5

440

Page 1

AO 243
(Rev. 10/07)

## Motion to Vacate, Set Aside, or Correct a Sentence
## By a Person in Federal Custody

### (Motion Under 28 U.S.C. § 2255)

### Instructions

1.  To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2.  You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3.  Make sure the form is typed or neatly written.

4.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6.  If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7.  In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8.  When you have completed the form, send the original and two copies to the Clerk of the United States District Court at this address:

    Clerk, United States District Court for
    Address
    City, State Zip Code

9.  **CAUTION:  You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES:  If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

Page 2

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of Oklahoma |
|---|---|---|
| Name (under which you wee convicted):<br>Kenneth Eugene Barrett | | Docket or Case No.:<br>06:09-cv-00105 JHP |
| Place of Confinement:  Terra Haute, Indiana | | Prisoner No.: 04342-063 |
| UNITED STATES OF AMERICA<br><br>v. | | Movant (include name under which you were convicted)<br>Kenneth Eugene Barrett |

MOTION

1.      (a) Name and location of court that entered the judgment of conviction you are challenging:

U.S. District Court, Eastern District of Oklahoma, Muskogee, Oklahoma.

(b) Criminal docket or case number (if you know):   04-CR-115

2.      (a) date of the judgment of conviction (if you know):  December 29, 2005

(b) Date of sentencing:  December 19, 2005

3.      Length of sentence:  Death, 2 life sentences

4.      Nature of crime (all counts):

Count I:   18 U.S.C. § 924 (c)(1)(A) and (j)

Count II:  18 U.S.C. § 924 (c)(1)(A) and (j)

Count III: 18 U.S.C. § 848 (e)(1)(B)

5.      (a) what was your plea?  (Check one)

(1)   Not guilty  ☒          (2)   Guilty  ☐          (3) Nolo contendere (no contest)   ☐

(b)  If you entered a guilty plea to one count or indictment, and a not guilty plea to another

count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.      If you went to trial, what kind of trial did you have? (Check one)     Jury ☒        Judge only ☐

442

Page 3

7.   Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☐   No ☒

8.   Did you appeal from the judgment of conviction?   Yes ☒   No ☐

9.   If you did appeal, answer the following:

(a) Name of court:   U.S. Court of Appeals for the Tenth Circuit.

(b) Docket or case number (if you know):   06-7005.

(c) Result:   Affirmed.

(d) Date of result (if you know):   July 25, 2007.

(e) Citation to the case (if you know): 496 F.3d 1079.

(f) Grounds raised:

In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

     a.     The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

     b.     Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct (firearms, drugs, and killing of the same person) and misjoinder of offenses.

     c.     The district court allowed admission of improper victim impact evidence.

d. The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e. The Government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f. Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportionality review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g. Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h. The Government did not present sufficient evidence of "intent to kill."

i. The Government failed to produce names and addresses of key witnesses.

k. The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l. The Government failed to follow the *Petite* policy.

m. Movant asserted cumulative error.

(g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☒   No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): 07-7066

(2) Result:   Denied.

(3) Date of result (if you know):   March 17, 2008

(4) Citation to the case (if you know):   128 S.Ct. 1646.

(5) Grounds raised:

GROUND ONE: Did inclusion of the "intent to kill" eligibility factor in weighing

the aggravating factors against the mitigating factors in second stage, pursuant to

the statute which required aggravating factors to substantially outweigh the

mitigating factors, result in an improper weighing scheme violating the Fifth,

Sixth and Eighth Amendments.

I.        The Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.*

II.       Capital Offenses Under 21 U.S.C. § 848

GROUND TWO: Did the trial court commit reversible error in denying the

motion to suppress the drug search warrant?

GROUND THREE: Was victim impact evidence so unduly prejudicial as to deny

petitioner of his constitutional rights under the Fifth and Eighth Amendments?

10.     Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐   No ☒

This is an amendment of Petitioner's only application for collateral relief.

11.     If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the Proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition or

application?          Yes  ☐          No  ☐

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?          Yes  ☐          No  ☐

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:     Yes  ☐          No  ☐

(2) Second petition:  Yes  ☐          No  ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly

why you did not

12.      For this motion, state every ground on which you claim that you are being held in violation of the

Constitution, laws, or treaties of the United States.  Attach additional pages if you have more

than four grounds.  State the facts supporting each ground.

**GROUND ONE**:

> **Actions of the Trial Court Violated Mr. Barrett's Rights to Due Process, to Effective Assistance of Counsel, to Cross-Examine Witnesses, to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required or routinely provided to similarly situated defendants[1]

The trial court interfered with Mr. Barrett's counsel. The trial court stated an interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and it engaged in communications with counsel that created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense.

The trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases.  The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as a class of one, intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.  Imposition of the death penalty through such a skewed process is arbitrary.

---

[1]  Mr. Barrett would present citations to authorities that serve as an aid to understanding and responding to each of his claims, as well as supporting argument in light of these authorities,  but the court has ordered him not to do so.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial.

The court was required to consider the recommendations of the Federal Defender when appointing counsel. The Federal Defender and the court should take into account the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation. Courts are encouraged to appoint counsel who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation.

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not qualified and his office could not provide competent representation to two capital defendants at the same time. (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34.)  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67.)

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Exhibit 54; Exhibit 67; Exhibit 34.). To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial. (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. (Doc. 31.) The court said,

"Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65.) Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should needed to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

Statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte*

budgeting "might actually help resolve this case more expeditiously by allowing the government

an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow

the court to rule on the admissibility issues prior to expenditure of funds for experts which might

not be allowed to testify at trial." (Exhibit 65 at 2.)  Mr. Echols objected that this proposal would

infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols  informed the court that delays in authorization

of a budget for any defense preparation were endangering counsel's ability to prepare for trial on

the court's schedule.  (Exhibit 64 at 5.)  The court did not rule on the defense's budget proposal

until March 18, 2005.  (Doc. 97.)  At that point, discovery was scheduled to close on May 11,

2005, and trial was scheduled to start on July 11, 2005.  (Scheduling Order filed 12/11/04 (Doc.

22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the

Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project

("FDPRC").  (Exhibit 118; Exhibit 34.)[2]  As Mr. Burr stated to the court at the time, the FDPRC

collects "data on the initiation and prosecution of federal capital cases, and on the defense

services provided in such cases."  (Decl. Richard Burr re attorney compensation dated 4/4/05 and

filed as Exh. B to Doc. 107.)  Mr. Barrett's counsel relied upon the data collected by the FDPRC

in making his funds requests.  (Exhibit 64.)

---

[2]  Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance
from Mr. Burr.  (Exhibit 29; Exhibit 118.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial." (Order filed 3/18/05 at 2.)

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[] It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

> projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense.  (Doc. 51; Exhibit 64.)  The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment.  (Order filed 3/18/05 at 2 n.2.)  The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  *Ibid.*  This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment.  If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Ground Three, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators.  (Order filed 5/5/05 at 3 n.1.)  In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction.  (*See* Order filed 3/18/05 at 2.)  This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC.  Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case.  The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized.  The average number of hours approved for fact investigation in authorized cases is closer to 500 hours.  The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.)  The

court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that

the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected

into the funding denial a false impression of the evidence that would be admitted at trial.  The

court denied 75 percent of the time and one hundred percent of the in-court assistance trial

counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at

7 *with* Order filed 3/18/05 at 3.)  At the same time, the court said, "Counsel should be aware that

this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order

filed 3/18/05 at 3.)  Trial counsel did not consult a crime scene reconstruction expert.  (Tr.

10/3/05 Hr'g at 8.)  The court's ruling gave counsel an unwarranted impression of the need to

consult with a crime scene reconstruction expert and left counsel with no ability to bring such an

expert to court to testify or assist in cross-examination.  Contrary to the impression given by the

court's March 18 order, the court permitted the Government to present and place heavy reliance

upon crime scene reconstruction evidence.  (*See* R. 3154-3484.)

As set forth more fully in Ground Three, *infra*, the trial court denied in full or in

majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis

for any denial or reduction related to the facts or circumstances of the case.  Based on the

FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.

Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was

"well below average," and "no federal court ha[d] failed to provide expenses for mitigation

specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.)  Where this court

denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." (*Id.*) Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert." *Id.* Trial counsel felt the court's restriction of funds was an impediment to preparing a mitigation investigation. (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Exhibit 54; Exhibit 67.) The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the

ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.)  Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.)  The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.)  Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court.  The delay also impeded or prevented defense counsel's preparation for cross-examination.  *See* Ground Two, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings.  (Order filed 3/18/05 at 6.)  This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget.  The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases.  The trial judge

in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and

available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.)  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Exhibit 118; Exhibit 34.)  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling.  (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial

Page 20

was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment.  (Doc. 113.)  Mr. Hilfiger had urged Mr. Echols not to file the motion. (Exhibit 118; Exhibit 34.)  However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw:  "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols."  (Doc. 113 at ¶ 4.)  In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)  The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols."  (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions.  (Order filed 5/5/05 at 2-3.)  The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories."  (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).)  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire

Page 21

and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  (Doc. 137.)  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state

court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case."  *Id.* at 2.  Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. (Doc. 138.)  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr.

Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the

court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the

files and records related to the case. (Doc. 50 at 4; Exhibit 64 at 1 n.1.) On March 18, 2005, the

court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to

complete these tasks. (Doc. 97 at 2.) In any event, it was impossible for Mr. Hilfiger to have

completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended

budget.

In January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's

defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc.

31.) The court admonished counsel to give the case the "highest priority." *Ibid.* In May, when

Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court

proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr.

Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities,

and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.) In September, Mr. Smith

revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation

investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.) Again, the court was not

concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him

as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and

preparation of pleadings and briefs. (Doc. 51 at 4.) On October 3, 2005, with the trial underway,

Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

After he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an

expert for two weeks of trial. (*Ibid.*) If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial. When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of diligence and inattention to the conduct of the case including obtaining resources, investigative, and expert assistance. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors. During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of

witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.) Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders. (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b). (Tr. 9/13/05 Hr'g at 25-27.) During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day. (Tr. 9/13/05 Hr'g at 4-5.) The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]." *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense. The court

Page 27

made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance.  It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and the defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it

appears to me." (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end. *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues." *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows." *Ibid.*  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position.  The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *(Id.* at 20.)  The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses.  Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to

---

[3] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts.  (Doc. 97.)

further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing. On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. (R. 840.) The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." (R. 843.)

As shown in Ground Two, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses. Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

The Government restricted defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present. The American Bar Association considers it unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present. The trial court

Page 30

permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial. (Exhibit 29.) Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, the limitations on pleading imposed by the courts, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

Relies on extra-record evidence, ineffective assistance of trial and appellate counsel.

See Grounds Two, Five and Eighteen.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

        Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

        Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND TWO**:

> **Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

        Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

        The numerous acts and omissions of Movant's trial counsel described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

A.       As set forth in Ground One, the trial court interfered with the constitutionally protected independence of trial counsel.

**1.       There is a reason the numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.**

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Ground One, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense.  This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms.

**2.       Trial counsel for Movant committed unreasonable acts and made unreasonable omissions when rearguing the motion to suppress under *Franks v. Delaware*, 438 U.S. 154 (1978), following the first stage testimony of Charles "Monk" Sanders.**

Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned

guilty verdicts. Counsel's unreasonable acts and omissions therefore undermine confidence in the trials outcome.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.) The C.I. did not testify at Mr. Barrett's two state trials. At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file. (Tr. 1/ 26/05 Hr'g. at 88-89). It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was revealed, for the first time that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant states the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they [sic] were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

> The CI went on to state that while in the above described residence they [sic] observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they [sic] had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they [sic] overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

> The C.I. also stated that while in the residence they [sic] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding

felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

(Exhibit 194.)

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

a.      That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

b.      That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

c.      In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

d (1).   After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999. The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear. *E.g.,* R. 2518-21, 2609.

Page 38

thought that either he or his nephew asked Mr. Barrett if he had any drugs available. Mr. Barrett apparently had no methamphetamine. The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin. (R. 2618-22);

        d(2). Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's. He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999. To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to a no-knock warrant, Johnson misled the court. Authorities had long been aware that like many rural dwellers, Mr. Barrett had firearms on his property. In any event, the search warrant affidavit was directed at drug activity only, not the possession of weapons. (R. 2623);

        e. Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack which, together, show he did not observe any drug transactions there. On direct examination, Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only as "Ronny," and saw Mr. Barrett hand something to "Ronny." Sanders testified that the alleged trip was for the purpose of buying drugs. At the close of cross-examination, defense counsel walked Sanders through the information Sanders had given to Clint Johnson, according to Sanders's testimony on cross-examination. Sanders agreed that when he was supposedly at Mr. Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett. Therefore, Sanders testified that based on his alleged July trips to Mr. Barrett's property he would have told Johnson *nothing* about Mr. Barrett engaging in drug activities. Sanders also testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and

"Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a mystery.  (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together.  (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search.  Of course, no "large quantity" of drugs was found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied anything was discussed except how much longer he would be on the stand.  In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates.

Sanders did not "think" Littlefield asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and

---

[5]  "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Exhibit 13.)

that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information.  Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving.  Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine.  On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen.  According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders.  The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money.  Sanders testified on cross-examination that this

did not happen.  Defense counsel pointed out they were confronted with all this by the answers

Sanders gave on cross-examination; there had been no opportunity to interview Sanders before

he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the

motion to suppress, had testified under oath what he had been told by the C.I., and what facts had

formed the basis for the search warrant affidavit.  (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the

Government to respond in writing.  The court stated that it would either hold a hearing, if such

was deemed necessary, or would rule on the pleadings.  (R. 2679.)  As pointed out by the

Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises
> from "testimony" of Charles Sanders which was elicited on cross-examination.
> Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit
> that he assumed a powder to be methamphetamine. Sanders purportedly testified
> that he did not advise Clint Johnson that Barrett represented such powder as
> methamphetamine to him purportedly denied telling Clint Johnson that he had
> observed Barrett divide and exchange a portion of white powder for quantity of
> money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders'
> testimony on direct and redirect examination.

(Doc.  231 at 1.)

The court ruled on the renewed motion to suppress by written order, without

conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original

motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the

basis for the *Franks* claim occurred during trial.  Instead, it had been alleged that the C.I. did not

really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that,

in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr.*

Page 43

*Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful." Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported." Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable." Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth." (Doc. 253 at 7.).

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been sustained. Moreover, as shown below, the court's order is seriously flawed. Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.* These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface. Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Ground Five, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence. Aside from what was stated in the re-urged motion to suppress, counsel could have argued the following:

a.      that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at his house;

b.      that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

c.      that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he "probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

d.      that Johnson knew Sanders had not informed him of methamphetamine activity as shown when Sanders testified that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs available, but there was no methamphetamine, and the three of them simply smoked marijuana;

e.      that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr.

Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr.

Barrett's during that month;

f.        that, consistent with the court's order, there was no drug activity witnessed

in August, 1999; and that, other than smoking a joint with Mr. Barrett and his

"nephew," Sanders witnessed no drug activity at Mr. Barrett's in September,

1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided

no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's

claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search

warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless

disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to

use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately. Sanders testified that Johnson, in effect,

made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed

to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on

Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically

change his testimony depending simply on which lawyer was asking him questions. Johnson

surely would have seen the same tendency in Sanders to say whatever pleased the authority figure

asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson

had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, he repeatedly asserted that Johnson had not asked about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what he supposedly observed.  This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate the entirety of the warrant affidavit.  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the renewed suppression motion would have been different.  At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

The *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable and prejudicial.  *See* Ground Eighteen, *infra*.

> **3.      Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 were that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was

---

[6]  *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  See Ground Five, *infra*.

killed while engaging in and on account of the performance of his official duties.  (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement.  (Exhibit 44.)  In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate.  Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise

the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[7] Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance. (*E.g*., ABA Guidelines 10.7, 10.10.1, and 10.11.) Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial. George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted. Dr. Woods concluded that at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning. Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

---

[7] Grounds One and Three show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense, Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Exhibit 117.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, the opinions of experts consulted during prior proceedings, as well as witness accounts that documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to Exhibit 89, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Exhibit 89 at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment." (Exhibit 89 at 24.) Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or highly stressful situations." (Exhibit 89 at 24.) Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Exhibit 89 at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Exhibit 89 at 13.) Mr. Barrett's ability to actively process and comprehend information is compromised. This includes the ability to actively to process visual information, in the "here and now," or as it unfolds. (Exhibit 89 at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Exhibit 89 at 14, 24.) Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Exhibit 89 at 20.) The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Exhibit 89 at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test

protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results. The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods

concluded:

[¶]    Mr. Barrett meets diagnostic criteria in the DSM-IV-TR for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81. He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex. Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]    Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]    Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Exhibit 117 at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]    Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated

startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]      My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Movant's trial counsel unreasonably failed to utilize whatever resources they had to discover these facts about their client's organic brain impairments.  Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue.  Trial Counsel were on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings.  Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably.  Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real-world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving

what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (*See, e.g.*, Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.) None of these witnesses, if they were interviewed at all by trial counsel, were questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so. In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. (*See* Exhibit 147.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Exhibit 117.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[8]

---

[8] As argued in Ground Nine, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers.  Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD.  Had this evidence been produced, there is a

Page 58

reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter.

   **4.**  **Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent.**

   The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

   Judges must depend to some extent on counsel to bring competence issues into focus. Defense counsel are constitutionally and professionally obligated to vindicate the right to a competence determination by bringing evidence suggesting incompetence to the attention of the court.

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel unreasonably failed to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct testing and other evaluation methods necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, chronic major mental illnesses, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD). Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the

neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

ABA Mental Health Standard 7-4-2 codifies a professional norm of criminal defense practice in which reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency.

There is a reasonable probability that Movant was incompetent at the time of his trial. The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that he is in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning. (Exibits 35, 89, 117.) Mr. Barrett's previous psychiatric  diagnosis of Bipolar Disorder, made by independent state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted, and left him unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried.  As Dr. George Woods, Jr. concluded, "Mr.

Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Exhibit 117 at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma. The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder. (Exhibit 117 at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Exhibit 117 at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

Trial counsel's unreasonable omissions were exacerbated by the court's infliction of an electric shock belt on Mr. Barrett. (*See* Ground Seven, *infra*.)

The evidence shows that trial counsel's lack of investigation created a substantial risk that their client's due process rights were violated by standing trial while incompetent, and therefore undermines confidence in the reliability of the adversarial testing process.

**5. But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Ground One discussed the trial court's improper failure to disclose the contents of the *ex parte* hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses. During this hearing, the Court criticized the Government for failing to raise the issue sooner. The Court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because no evidence was produced that any of them had been threatened or were in any sort of danger. The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified. The Court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.) However, the Court also enabled the Government to benefit by its motion by deferring ruling and withholding information.

Movant's trial counsel unreasonably acceded into an "arrangement" with the Government to "interview" these key witnesses in the presence of the Government. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine

these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand.  Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.

Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  (Exhibit 29.)  Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

A great deal of evidence was available to impeach the Government's key witnesses.  As set forth in Ground Five, *infra*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel from discovering the evidence independently.  Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.    Travis Crawford.

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin.  Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed.  Crawford claimed to have walked over to Mr. Barrett's property from his parents' house.  Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police.  Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant.  With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck."  Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions.  (R. 462-66.)  Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[9]  (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support.  He was also arrested on hot check charges many years before.  He admitted to having used a lot of drugs.  His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict.  (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony.  He acknowledged on cross-examination that he had an appointment to talk to defense counsel the

---

[9]  This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator.  Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett.  *See also* Ground Five.

preceding Friday, but claimed he did not show up because he was working and would have been fired from his job if he absented himself for the interview. He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him. (R. 468-69.) Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him. (R 469.) Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be. (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government. He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[10] (R. 470.) Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales. Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified. He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett. "Correcting" his earlier

---

[10] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. (See Ground Five *infra.*)

testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court. If Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case. (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of September 23 regarding the white SUV that had driven past Mr. Barrett's property. He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.) Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers. Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed. Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory." (R 479-80, 484.) Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.  Had counsel asked about this, and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.   (Exhibit 45, Exhibit 92.)  See also Ground Five, *infra.*

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999. Mr. Barrett is in possession of newly discovered evidence showing that Travis Crawford's trial testimony was false.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (*See* Exhibit 45; Exhibit 92; Exhibit 31; *see also* Ground Five §§ A & B.)

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted.  Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22, and stayed until around 9:00 p.m. on September 23.  Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him.  Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23, Mr. Barrett and others were standing near the fence to Mr. Barrett's property.  Travis Crawford walked over from

his parents house, which was located a couple of residences down the road, and stood at the fence line.  Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back.  Crawford stated he believed the individuals in the SUV were law enforcement officers.  Mr. Barrett did not take Crawford seriously, because he did not trust Crawford.  Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement.  Mr. Lunsford would have testified that Travis Crawford was regarded as a "real flaky person" and that he was known to have been a police informant in the past.  (Exhibit 90.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so.  Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs.  Toby Barrett and Mr. Lunsford stayed, and the others left.  Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage.  Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family.  (Exhibit 90.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory."  Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett.  Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person.  (Exhibit 90.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Exhibit 90.) Independent of Mr. Lunsford's testimony, his knowledge of Travis Crawford's conduct and record would have provided Mr. Barrett's counsel with additional grounds for impeaching Crawford on cross-examination. .

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial. Had he been contacted, he would have been willing to testify to the matters described above. (Exhibit 90.)

Brandy Hill is Travis Crawford's niece. Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999. She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle. Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back. After relaying this information, Crawford walked back home. Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home. (Exhibit 77.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory." After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by. According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999. (Exhibit 77.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Exhibit 77.) (*See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Exhibit 77.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23, Mr. Barrett

Page 71

said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Exhibit 96.)

Like Rick Lunsford, Brandy Hill and Toby Barrett, Robert "Bubba" Thompson was present at Mr. Barrett's on the afternoon of September 23, 1999. Although he cannot recall specifically whether he saw Travis Crawford there that afternoon, he is sure that while he was there, Mr. Barrett never made any statements about expecting the police to raid his house, wanting to kill law enforcement officers, or desiring to go out "in a blaze of glory." (Exhibit 37.) In fact, Mr. Thompson never heard Mr. Barrett make such statements at any time, even though he was a frequent visitor to Mr. Barrett's property in 1999 because he was close friends with Toby Barrett. (Exhibit 37.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness. Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford. (Exhibit 78.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial. It is her personal belief that Crawford is not an honest or trustworthy person. Nor does Mr. Crawford have a reputation for honesty in the community at large. (Exhibit 78.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs. Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. (Exhibit 78.)

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

   b.   **Cindy Crawford.**

Movant is in possession of evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony.

Movant is now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. See Ground Five, *infra.* Ms. Crawford gave Movant's counsel access to these records.

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18. She used the drug for nine years, and would either snort it or shoot it. She stated or implied on direct examination that she was currently drug and alcohol free. (R. 3161.) While on a "meth run," the longest she had stayed up was five days. While using methamphetamine, she would often stay up for three to four days at a time. (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time. To her, time was just a blur that played tricks on her mind. (R. 3073.) She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems. In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence

that she had an impaired mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and shown her to be unstable and amenable to pressure or influence from law enforcement.  Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks.  (Exhibit 144.)

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time.  Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested.  (Exhibit 204; Exhibit 170.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies.  Trial counsel neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial commenced.  Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees.  Significantly, the bench warrant and the application to accelerate were

hanging over Cindy Crawford's head at the time she testified against Mr. Barrett. It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation. (Exhibit 204; Exhibit 170.) The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence. The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandie Sell, the grandparents of one of Crawford's children, to District Judge John Garrett. The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital. The letter also states that drugs had become "all consuming" for Cindy Crawford. This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense. (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of

stalking, and burglary of the Mackey home and storage shed.  (Exhibit 176.)  Again, even if

extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not

have been introduced, Crawford certainly could have been cross-examined about them.

Aside from court records which would have severely impeached Cindy

Crawford's credibility, counsel failed to investigate and produce numerous available witnesses

who could have testified to her complete dishonesty and lack of believability, as well as her

history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett.  In

preparation for his second stage testimony, he was only interviewed for a matter of minutes.

Unfortunately, trial counsel neglected to interview him regarding information he had on the

credibility of Cindy Crawford.  Had Roger Crawford been properly interviewed, he could have

testified in both stages of trial that Cindy Crawford was dishonest and untrustworthy, and that her

reputation in the community for honesty was extremely poor.  Roger Crawford could have

testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug

user, contrary to what she tried to claim to the jury.  Roger Crawford also would have testified

that it was well known in the community that Cindy Crawford, far from being a disinterested

witness, had regularly acted as a police informant to escape prosecution and punishment for her

own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed

false reports about family members with the Oklahoma Department of Human Services, and also

had made false accusations when seeking victim protective orders.  Mr. Crawford was in an

excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the

community for dishonesty. He is Cindy Crawford's father in law, and has known her for years. (Exhibit 92.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that Cindy Crawford is thoroughly dishonest and untrustworthy, and her reputation in the community for honesty is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. (Exhibit 88.)

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into during cross-examination of Crawford. Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase when Crawford returned to the witness stand.

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's lack of honesty. As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial. Ms. Hill has known Cindy Crawford for many years. In her opinion, Cindy Crawford is completely dishonest and untrustworthy. Ms. Crawford's reputation for honesty in the community is extremely poor. Ms. Hill describes Cindy Crawford as manipulative. Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs. Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself. (Exhibit 77.)

Similar testimony could have been offered by Sean Hill. Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense. He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Exhibit 95.)

Carolyn Joseph has known Cindy Crawford for years. As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford. Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally. According to Ms. Joseph, Cindy Crawford has the mind and attitude of a twelve year old child. In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful." Ms. Crawford's reputation in the community for honesty is, to put it mildly, poor. No one Ms. Joseph knows would trust or believe anything

Cindy Crawford said.  Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her.  (Exhibit 78.)

Still another witness who could have testified to Cindy Crawford's bedrock reputation for dishonesty is Gwendolyn Crawford, Travis Crawford's sister.  Ms. Crawford, as with the other individuals who could have been, but were not contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years.  Gwen Crawford's experience of Cindy informed her opinion that Cindy Crawford is dishonest, and is well known in the community for her dishonesty.  Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel.  Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself.  (Exhibit 83.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to her leg and threatened to kill her, allegedly because she would not have sex with him, could have been further impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett.  Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett.  Richie Barrett was interviewed by a defense investigator in connection with the current action.  Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred.  (Exhibit 104.)

Cindy Crawford's claim that Mr. Barrett had threatened violence to law enforcement officers if they came on his property could have been impeached had defense counsel investigated and produced witnesses Rick Lunsford, Toby Barrett, Brandy Hill, and Robert "Bubba" Thompson, all of whom state that Mr. Barrett never made such statements

around them and would not have done so.  (Exhibit 90; Exhibit 96; Exhibit 77; Exhibit 37.)  This same point could have been made through Government witness Randy Weaver, had counsel simply asked the obvious.  (Exhibit 38.)

> **c.      Charles "Monk" Sanders.**
>
> > **1.      Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

Movant's trial counsel failed to investigate and present numerous grounds for impeachment of Charles "Monk" Sanders, the alleged confidential source for information contained in Clint Johnson's affidavit for a no-knock warrant.  The evidence related to impeachment is vast.  Movant presents this evidence under subheadings to facilitate understanding.

Sanders was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to the informant in his case.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available.  Trial counsel not only failed to capitalize on the entirety of Sanders's cross-examination testimony when he re-urged the motion to suppress, but counsel failed to impeach him effectively, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies including that Clint Johnson only helped with "some" of his cases, that Sanders had not gotten out of "a lot" of trouble, and his denial that he could commit crimes without fear of paying the full consequences as long as he worked as an informant.  (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions.  Counsel stated that he had looked at Sanders's D.O.C. "sheet."  This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted.  Counsel confronted Sanders with the fact that he had far more than the four priors he acknowledged on direct examination, a patent lie

that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Ground Five, *infra*.

Counsel superficially asked Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4) a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration and twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in

Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a

conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property,

second degree burglary, and second degree arson, for which Sanders received a deal similar to

that in the other Sequoyah County cases.  (R. 2524-36.)

Sanders agreed that after this many convictions, he received, on his current

sentences, a very favorable deal (to say the least), requiring him at most to serve five years in

prison, which would equate to service of only two and one-half years, even if he was not able to

enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him

with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far

more about the witness's criminal history and the virtual "get out of jail free" cards he received

repeatedly would have been revealed to the jury.  The following readily available records, from

the nineteen cases marked "a" through "s", among others, would have marked Sanders as a career

informant who would say and do anything to continue to have access to drugs and escape

incarceration:

a.       Counsel failed to point out that in Sequoyah County Case No. CF-

92-91, in which Sanders was convicted of felony drug possession in count 5, the state had

charged him with having previously been convicted in Sebastian County, Arkansas, with delivery

of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this

Sequoyah County case with the misdemeanors of attempting to elude the police, possession of

drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge. (21 O.S. 1991, section 51.) He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction. (63 O.S. section 2-402 (2).) Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge. An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge. (Exhibit 168.)

      b.     In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. (Exhibit 157.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also by failing to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather "evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

c.      In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving. Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not. On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN. The court case file itself apparently shows no disposition. Sanders was questioned on none of this by defense counsel. (Exhibit 158.)

d.      In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine. It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and

CF-90-144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

e.      In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting defendant with even one prior felony conviction from receiving a deferred sentence).[11]  Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

f.      In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, Exhibit 168; and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998.  Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by

---

[11] This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

the District Attorney's office. The sentences were also ordered to run concurrently with a conviction Sanders obtained in Creek County. Later, CF-98-128 was dismissed with costs, as is discussed below. (Exhibit 159.)

It was unreasonable for Mr. Barrett's trial counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

g. In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above. Sanders was yet again facing twenty to life. Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence. The misdemeanor charge was dismissed. At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed. (22 O.S. 1991, § 51; 22 O.S. 1991, § 991c.)[12]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he

---

[12] Again, as with the statute governing deferred sentences, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the Department of Corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in Sequoyah County Case No. CF-98-363; (d) *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

529

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (Exhibit 160.)

h.       In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314. Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections. Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed. A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered. A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, was also filed in connection with this case. On April 17, 2004, the court entered a second order revoking Sander's suspended sentence. As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (Exhibit 161.)

i. In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same

Page 92

three prior Sequoyah County felonies that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail. Yet again, Sanders faced twenty years to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1. In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright. Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9. As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case. As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years. He would revert to full probationary status upon completion of a Department of Corrections drug program. The initial revocation order for up to five years and the rest were

ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (Exhibit 162.)

j. In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged with a misdemeanor for possession of drug paraphernalia. The state alleged in page two of the information that Sanders committed the felony of larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562). (Exhibit 163; Exhibit 160; Exhibit 161; Exhibit 162, Exhibit 168.) With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint

Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (Exhibit 163.)

k.       In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case, filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly impeaching evidence.  The jury could not help but notice that Sanders was given the lightest

treatment for conduct very similar to acts the Government attributed to Mr. Barrett.  The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

l.      In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562.   The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed.  The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124.  (Exhibit 165.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received

concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

m.      In Cherokee County Case No. CF-98-111, Sanders was charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively. Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear. A bench warrant was issued on May 15, 1998. Sanders had a second failure to appear on March 24, 2000. On May 3, 2001, he was ordered released to a bondsman. On July 29, 2009, in keeping with the unbelievable sweetheart deals Sanders has received throughout his appalling and protracted criminal career, the felony charges in this case were dismissed on payment of costs of $229.00, with payment to be made beginning September 1, 2009. (Exhibit 183; Exhibit 57.)

Counsel were professionally unreasonable for failing to cross-examine Sanders about this case, which was pending at the time of Mr. Barrett's trial. Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

n.      In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively. Sanders attempted to claim that these were the same case, when they clearly were not. Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions. (Exhibit 183.)

o.      In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument. This case was dismissed years later, on September 18, 2001. Costs were assessed against the state. Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time. (Exhibit 183.)

p.      In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not. Sanders received a one year suspended sentence, fines and costs. Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004. A bench warrant was issued for his arrest on April 12, 2004. An application to revoke his suspended sentence was filed on April 14, 2004. Another bench warrant for Sanders's arrest was issued on May 20, 2004. On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed. Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless. (Exhibit 185.)

q.      In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia. On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances. During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005. He entered a not guilty

Page 98

plea, and the case was set for the jury sounding docket on October 13, 2005. On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005. On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody." On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended. (Exhibit 186.)

Mr. Barrett's trial counsel unreasonably failed to cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

r.       In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest. On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest). On March 7, 2001, a bench warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea. Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty. (Exhibit 187.)

s.       In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana. He also attempted to resist arrest. Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his

prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor.  (Exhibit 166.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals which the jury could have concluded resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions.  Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited.  (R. 2524-36.)  In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled.  The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity.  Instead, counsel merely scratched the surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time.  Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury. Impeachment of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence. These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

**2.      Counsel unreasonably failed to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate investigation into readily available evidence and witnesses who would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning

police raid on Mr. Barrett's property.  Littlefield told the jury Sanders was present around 5:00

p.m. to 6:00 p.m. on September 23, around the time the gate to Mr. Barrett's driveway was

locked.  (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct

one, they could have produced Rick Lunsford as a witness to rebut this claim.  As noted in the

discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on

September 22, 1999, and stayed until approximately 9:00 p.m. on September 23.  Mr. Lunsford

states that Sanders was never at Mr. Barrett's property on either September 22 or September 23,

1999.  Mr. Barrett's trial counsel did not contact Mr. Lunsford.  Had he been contacted, he would

have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon

and early evening of September 23.  (Exhibit 90.)

Likewise, trial counsel failed to contact and interview another witness who could

have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw

methamphetamine and a drug sale, according to his direct testimony, in September, 1999.  Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett

would not let him in.  Mr. Barrett and his real friends stayed as far away from Sanders as possible

because it was well known he was a chronic liar and a police snitch.  (Exhibit 95.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September

23, 1999.  She could have identified the people who were present during that time.  Charles

Sanders was not among them.  Ms. Hill was never contacted by defense counsel.  (Exhibit 77.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[13]  He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's, she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Exhibit 13.)

Staff Sergeant Robert "Bubba" Thompson is an eyewitness whom trial counsel could have called to impeach Sanders's and the Government's claim that Sanders was at Mr. Barrett's on the afternoon of September 23, 1999.  Trial counsel never contacted Mr. Thompson, although he was readily available and would have testified had he been asked to do so.  In 1999,

_____

[13]  Her true name is Janesse Thomas.

Mr. Thompson was a good friend of Toby Barrett's, and often visited the Barrett property. He was at Mr. Barrett's on the afternoon of September 23, hanging out with Toby Barrett on the front porch. There were two or three other people visiting with Kenneth Barrett at the time Mr. Thompson was there. Mr. Thompson is sure that Charles "Monk" Sanders was not at Mr. Barrett's on the afternoon of September 23. In fact, Mr. Thompson never saw Sanders at Mr. Barrett's, even though Thompson was a frequent visitor. Contrary to the claims of Sanders and some of the other informant witnesses, Mr. Thompson never heard Mr. Barrett state, on September 23, 1999, or at any other time, that he wanted to kill police, that he would kill any law enforcement officer who came on his property, or that he wanted to go out "in a blaze of glory." (Exhibit 37.)

Counsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury. These witnesses were known in the community, had experience with Sanders, had formed the opinion that Sanders was dishonest and completely untrustworthy, and knew that Sanders had a horrendous reputation in the community for truth and veracity. These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty. Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility. The impeachment of Sanders, alone or in

conjunction with doubts about the conduct of the Tact Team, would have provided jurors with

reason to vote for a sentence less than death.

Rick Lunsford could have testified that he knows Sanders, and had done drugs

with him in the past. Sanders was a heavy drug user, who also dealt drugs. In Mr. Lunsford's

opinion, Sanders is a dishonest person. Mr. Lunsford would not believe anything Sanders said.

Sanders was even dishonest in his drug dealings. Sanders often sold bad dope to people and

ripped them off. As reflected in court documents, he never seemed to get in trouble for his drug

dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Mr.

Lunsford could have testified to his personal opinion that Sanders is wholly dishonest, and his

knowledge that Sanders has a richly deserved reputation for dishonesty in the community. Mr.

Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr.

Barrett never threatened harm to the police, and never said he would go out in a "blaze of glory"

or anything like that. (Exhibit 90.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified to her well-

informed opinion that Sanders is dishonest and would say and do anything as long as he believed

he would obtain something of advantage to himself. Sanders's reputation for honesty in the

community is horrible. Ms. Thomas could also have given testimony showing that Sanders

resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was

still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend

for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother,

Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to

persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to

get Ms. Thomas away from Sanders.  (Exhibit 13.)  Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill, another person with experience and knowledge of Sanders, could have testified to his opinion, and the community's judgment, that Charles Sanders is a liar who was accorded no credibility whatever, and was known to trade false allegations about others for favors from law enforcement.  When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record.  In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed.  Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr. Barrett actions that routinely occurred without any connection to Mr. Barrett.  Mr. Hill would have informed the jury that when Sanders is in jail, he is routinely beaten up by other inmates because he falsely informs on others.  (Exhibit 95.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is untrustworthy.  Sanders is dishonest when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Exhibit 94.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders either in the first or second stage of trial.  This evidence would have put the lie to the prosecution's portrayal

of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her. She told him she could talk to him briefly, but had to get back to school. She left with Sanders in his car. Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days. She was beaten on a daily basis by Sanders, and was even stabbed. During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed. Instead, Sanders simply kept beating her. When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot. Sanders also used a knife to cut her from her neck to her chin. After five days of being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Exhibit 94.)[14]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Exhibit 94.)

---

[14] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders.  Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs.  The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole  Ms. Johnson's children's toys in order to pawn them for drug money.  (Exhibit 94.)

One of Mr. Sanders's own relatives could have testified, had he been contacted by the defense, that "Monk" is untrustworthy and his claims are considered uniformly unbelievable. Billy Poindexter is Sanders's uncle, and has known Sanders his entire life.  According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a pick-up truck."  Mr. Poindexter would have confirmed that Sanders has been in trouble his whole life.  Mr. Poindexter himself would not believe his nephew about anything.  Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law.  Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for.  Mr. Poindexter would have testified that Sanders has a low reputation in the community for truthfulness.  (Exhibit 76.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a persuasive

attack on the search warrant under *Franks.*  This evidence would demonstrate that no one,

including Clint Johnson, could have used Sanders as a "reliable" confidential informant.[15]

### d.   Randy Weaver.

Randall Weaver testified in the first stage of Mr. Barrett's trial.  He stated that in

1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in

the Spring and Summer of that year.  Using the death of Trooper Eales as a benchmark, Weaver

stated he had been to Mr. Barrett's earlier in 1999 looking at cars.  On that occasion, Weaver and

Mr. Barrett used methamphetamine together.  Weaver went to Mr. Barrett because he was a good

mechanic.  Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not

come out with a gun on the occasions Weaver went to the property.  Weaver testified he bought

$20.00 of methamphetamine from Mr. Barrett.  Weaver claimed Mr. Barrett told him that he (Mr.

Barrett) had missed a court date, and that he thought a warrant had been issued.  (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb

in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's

federal case by Littlefield, who came to his tattoo shop in Arkansas.  Weaver had previously

done time on an Arkansas cocaine charge.  When Littlefield came to see him at the tattoo shop,

he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it

was against federal law for Weaver to possess ammunition because of his previous conviction.

Weaver told Littlefield he never sold ammunition to Mr. Barrett.  Littlefield's statement to Mr.

---

[15]  *See also* Ground Five (Mr. Barrett's *Brady/*newly discovered evidence claim regarding the complete lack of credibility of both Sanders and Johnson).

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is closed, people should not go onto somebody else's property. It makes no sense to do such a thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to him or anyone else in his presence. In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone. (Exhibit 24; Exhibit 38.)

### e.     Brandie Zane Price.

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him. Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could." (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[16] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Exhibit 95; Exhibit 77.)

Counsel also failed to call any witnesses who could testify to their well-informed opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the defense.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Exhibit 95.  *See also* Ground Five, *infra*.)  Moreover, the witnesses who were never investigated who could have

---

[16]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with Brandie Price at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September 1999.  (R. 4117-23, 4182-83.)

impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.  (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

### f.     Karen Real.

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Ground Five, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty.  As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person.  Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency.  Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment.  Karen Real is the type of person who would do and say anything to get out of trouble.  (Exhibit 95.)  Again, witnesses who

could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

As with a number of the informant witnesses, trial counsel failed to conduct a search of available state court files to impeach Karen Real. A search of the Sequoyah and Cherokee County Court files would have shown that she had several serious state drug cases that were ultimately dismissed, some shortly before Mr. Barrett's trial. These dismissed charges would have shown Real's bias and motive in testifying against Mr. Barrett. Bias and motive are never "collateral matters" from which a witness can be shielded from cross-examination. Moreover, it is of no significance if some or all of these state charges were dismissed in lieu of Real's federal prosecution. Under the dual sovereign doctrine, Real could have, but for the dismissal of these charges, faced serious prison time in the Oklahoma Department of Corrections. After all, Mr. Barrett was convicted in both state and federal court for a single alleged criminal transaction. There was nothing to guarantee that the state charges against Real would not be revived if she failed to please the federal prosecutors with her testimony against Mr. Barrett.

In Sequoyah County Case No. CF-97-445A, Real was charged with attempted manufacture of methamphetamine, possession of CDS with intent to distribute, possession of marijuana, two counts of possession of CDS, and two counts of possession of drug paraphernalia. These charges were filed on December 22, 1997. The case was passed, or little action was taken

on it, until May 18, 2004, when a motion to dismiss was filed.  The motion to dismiss was granted by an order entered on May 24, 2004.  (Exhibit 52.)

In Sequoyah County Case No. CF-98-264A, Real was charged with manufacturing methamphetamine, trafficking in methamphetamine, unlawful use of a police radio, possession of CDS, and possession of drug paraphernalia.  The charges were filed on July 29, 1998.  A bench warrant for failure to appear was issued on June 7, 1999, and was recalled on June 9 or 10, 1999.  Nothing happened in the case until May 18, 2004, until a motion to dismiss was filed.  The motion was granted on May 24, 2004.  (Exhibit 51.)

In Sequoyah County Case No. CF-99-250A, Real was charged with trafficking methamphetamine, possession of marijuana with intent to distribute, unlawful use of a police radio, possession of a firearm in the commission of a felony, and unlawful possession of drug paraphernalia.  This case was filed on June 8, 1999, over three months before Trooper Eales was killed.  Little or no action was taken on the case before it was dismissed on May 24, 2004, based on a motion filed on May 18, 2004. (Exhibit 49.)

In Sequoyah County Case No. CF-99-251, Real was charged with unlawful possession of CDS.  The information was filed June 28, 1999.  On February 15, 2001, an order was entered that Real was awaiting sentencing in her federal case and that this state case would be dismissed after Real was sentenced in federal court.  On September 4, 2001, a motion to dismiss and an order dismissing the case were filed.  The order dismissing was apparently finalized on December 20, 2001.  (Exhibit 50.)

In Cherokee County Case No. CF-99-18,  Real was charged, on January 26, 1999, with trafficking in illegal drugs, manufacture of a controlled dangerous substance, possession of

marijuana with intent to distribute, possession of a controlled dangerous substance in the presence of a minor child, and use of a weapon in the commission of a crime. The case was passed on a number of occasions. On February 15, 2001, an order was entered that Real was awaiting sentencing in federal court, and that the case would be dismissed after she had received her federal sentence. On June 4, 2001, a motion to dismiss and an order dismissing were filed. (Exhibit 47.)

In Cherokee County Case No. CM-99-40, Real was charged with the misdemeanor of possession of drug paraphernalia. The case was filed on January 26, 1999. Little happened on the case until February 15, 2001. An order was entered noting that Real was pending sentencing in federal court, and that the case would be dismissed after Real received her federal sentence. On September 4, 2001, a motion to dismiss and an order dismissing the case were entered. (Exhibit 48.)

In Cherokee County Case No. CF-99-251, Real was charged with possession of CDS. The charge was filed on June 28, 1999. On February 15, 2001, an order was entered reflecting that Real was awaiting sentence in federal court, and that the case would be dismissed after she received her federal sentence. On September 4, 2001, a motion to dismiss the case and an order dismissing the case were entered. (Exhibit 50.)

Because counsel failed to adequately research Real's criminal record, the jury was left with the false impression that the only trouble she had been in stemmed from the federal prosecution on which she was doing time when she testified against Mr. Barrett.[17] Based on the

---

[17] Real was rewarded for her testimony against Mr. Barrett when the Government filed a Rule 35 motion to reduce her 14 year sentence to time served. See Ground Five.

dismissed state charges, counsel could have drawn her credibility into serious question by pointing out that she had previously avoided the potential of lengthy sentences in state court, which could well have run consecutively to one another and to her federal sentence, and that to prevent the possible revival of her state cases, it was certainly in her interest to cooperate with the Government in Mr. Barrett's prosecution. Each of these state cases involved separate criminal transactions, and some were apparently dismissed not necessarily in lieu of federal prosecution, but for other reasons. It certainly could have been strongly implied on cross-examination that some of these cases were dismissed because Real acted as a police informant. Mr. Barrett's trial counsel's failure to discover Real's state criminal record was professionally unreasonable, and prejudiced Mr. Barrett because her direct testimony was largely unscathed by cross-examination. Thus, the jury was wrongly left with another largely un-impeached witness who regaled it with tales of Mr. Barrett's "plan" to confront law enforcement with deadly force if his property were ever raided.

### g.   Randy Turman.

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and that he possessed a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved.

(R. 434-35.)  Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, and that he never worked as an informant or paid informant.  He declined to talk to the defense because he figured he would be questioned in court, and that would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign"

that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police

would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle;

a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which

Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion,

and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to

paint vehicles.  (R. 437-39.)

Turman testified Mr.  Barrett had expressed concern about law enforcement

coming to his property, and allegedly stated there would be a shoot-out if this occurred.

According to Turman, Mr.  Barrett expressed the hope that Sheriff Philpot or Frank Loyd would

be the first law enforcement officers through the door.  (R.  412).  Turman also testified that on

one occasion, late at night, an individual had come to the gate of Mr.  Barrett's property and said

he was running from the law and expected law enforcement to arrive at any time.  Mr.  Barrett's

response to this, according to Turman, was to go into his cabin and retrieve his Colt Sporter rifle.

(R. 414-15).

Thus, Turman was a critical witness on the underlying drug charges in the

superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was

especially important on the drug charges, since the search of Mr. Barrett's home and property

yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount

importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel were professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute; possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and possession of a firearm with an altered serial number.  The charges were based on evidence recovered during the execution of a search warrant.  Turman posted an appearance bond on September 20, 2002.  A preliminary hearing was set for April 17, 2003.  The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since the preliminary hearing was ultimately waived on November 3, 2003.  According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice."  The motion to dismiss was granted by written order the same day it was filed.  (Exhibit 195.)

Counsel were professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony. With respect to Turman's testimony regarding Mr. Barrett's supposed comments about law enforcement, counsel were also unreasonable for failing to produce testimony from available witnesses who could have testified, in direct contrast to the informant witnesses, that Mr. Barrett did not and would not threaten violence toward law enforcement. (E.g., Exhibits 37, 77, 90, 96).

Counsel were also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Exhibit 95.)

The testimony of the seven snitches was the main difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's

trial counsel failed to move for a continuance, and failed to conduct a thorough investigation in order to impeach these witnesses.  Counsel in effect agreed to a trial by ambush with respect to the seven crucial informant witnesses.  Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.

**6.      Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts**.

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[18]  The Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc. 206 at 1-3.)  The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett

---

[18]  Mr. Barrett's claim concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

could respond, the Government's filing said, "The defendant has not complained of lack of notice." (Doc. 206 at 4.)

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Fed. R. Evid. 404(b). (Tr. 8/13/05 Hr'g at 22-23.) The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule. *Ibid.* Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence. *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice. (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so. (R. 174.) Defense counsel filed a proposed limiting instruction on September 28. (Doc. 218.)

Without objection, informant Randy Turman testified that Mr. Barrett expressed concerns that the police were going to come to his property; said there would be a shootout if this happened; that he hoped Sequoyah County Sheriff John Philpot or Frank Loyd would be the first officers through the door; and that he would "take out" as many officers as he could. (R. 412-13.) Turman also testified about a supposed late-night incident where a man came to the gate of Mr. Barrett's property and said he was running from the law and expected the police to arrive. In response to this, Mr. Barrett supposedly went in his cabin and retrieved his Colt Sporter rifle. (R. 414-15.) This testimony was met with an objection, which was overruled. (R. 414.)

Turman testified that he began going to Mr. Barrett's property three to four months before the shooting of Trooper Eales. By his vague estimate, he was last there a month or two before the shooting. (R. 413.) On cross-examination, Turman stated he could not remember the dates and times on which any of the incidents he testified occurred. All Turman could really say was that they had to have occurred in the three to four months preceding the shooting of Trooper Eales that he claimed to have frequented Mr. Barrett's property. (R. 422-23.)

Without objection, Charles Sanders, on direct examination, stated Mr. Barrett told him that if the police came to his property, he would shoot the first officer who came through the door, and that he expected it to be John Philpot. No real time frame was given for this alleged statement. (R. 2515.) On cross-examination, Sanders testified that in September 1999, Clint Johnson asked if Mr. Barrett had ever made any statements about doing violence to law enforcement. Sanders stated, "I think the response was that me and Kenny Barrett had a discussion about him killing John Philpot if he came through his door." (R. 2612.) Sanders was

initially unable to put any kind of time frame on this statement; the statement was simply made "sometime," and he did not know when the alleged conversation occurred. Drifting toward an attempt at some sort of specificity, Sanders then said that while the conversation could not have occurred in 1998, it would have been before July, 1999. (R. 2612, 2614.)

Responding to a leading question by the prosecutor which set the relevant time frame at a month or two before the shooting of Trooper Eales, Cindy Crawford testified Mr. Barrett said he would "go out in a blaze of glory" if the police raided his property. This statement supposedly occurred in the context of Mr. Barrett remarking that he had a misdemeanor warrant outstanding. Crawford admitted she was a heavy drug user at the time of this alleged conversation, that she lost her sense of time when she was on drugs, and that Mr. Barrett's reference to a misdemeanor warrant could have been made long before 1999. (R. 3068, 3070, 3072-73.) No objection was made to Crawford's testimony regarding Mr. Barrett's alleged statements. (R. 3068.)

Brandie Price, who claimed she went to Mr. Barrett's cabin in August and September 1999, testified that a week to ten days before the shooting of Trooper Eales, Mr. Barrett remarked that he had an outstanding warrant and that if the police came to the property, any visitors to his residence should either grab a gun or hit the floor. Mr. Barrett supposedly stated that he would "take out as many" lawmen as he could. Price admitted that her memory was very foggy during this period of time due to her drug use. (R. 3485-86, 3492-93, 3507, 3509.) No objection was made to Price's testimony regarding Mr. Barrett's purported statements.

Karen Real testified she periodically visited Mr. Barrett at his cabin from 1997 until, by her estimation, early 1999. (R. 3082-83.) She told defense counsel it was possible the last time she had been to Mr. Barrett's property was in late 1998. (R. 3118-20.) During this time period, according to Real, Mr. Barrett expressed a negative view of law enforcement. (R. 3090.) Initially, a defense objection was sustained when the prosecutor asked Real what Mr. Barrett had specifically said about this subject. (R. 3090.) A short time later, without objection, when asked what Mr. Barrett had said about the police in late 1998 or early 1999, Real responded Mr. Barrett said he would shoot law enforcement officers who came on his property. (R. 3106.) Like the other informant witnesses, Real had been a heavy drug user. At the conclusion of Real's testimony, defense counsel moved to strike her testimony because it was remote in time. The prosecution countered that Real's testimony related to a continuing pattern of behavior on Mr. Barrett's part. The court overruled the objection. (R. 3135-36.)

The only witness to give testimony respecting alleged statements by Mr. Barrett threatening violence to law enforcement that was in any sense contemporaneous with the shooting of Trooper Eales came from Travis Crawford. Crawford testified that on September 23, 1999, the afternoon before the shooting, Mr. Barrett said if the police came on his property he would "go out in a blaze of glory." (R. 462-66.) As noted in Mr. Barrett's original petition and this amendment, Crawford has since recanted his testimony. (*See* Ground 5(A)(b), *infra*.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Fed. R. Evid. 404(b). Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the

Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b). To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government failed to show good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made. The alleged statements made weeks, several months, or many months before the offense could not reliably or relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett.

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only possible worth, not real probative value. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice.

Even assuming Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion.

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. Without the informants' inadmissible statements the prosecution's case would have been no stronger than the prosecution case presented to the two state juries. The actual results of these trials demonstrates there is at least a reasonable probability that the result of the federal trial would have been different if federal trial counsel had challenged admissibility.

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice

because it was filed untimely.  Rule 404(b) states that upon request, reasonable notice in advance

of trial of other crimes or bad act evidence must be given, absent good cause indicating notice

should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection

in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed

here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See*

Ground Eighteen, *infra*.

**7.      Due to trial counsel's unreasonable failure to engage the services of an**

**independent crime scene reconstruction expert, the jury considered and relied upon**

**unscientific, unreliable evidence.**

Trial counsel were professionally unreasonable for failing to hire an independent

crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley.

Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in

anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr.

Barrett's two state trials.  Counsel sought authorization to hire Edward Hueske of Denton, Texas.

Mr. Hueske had consulted with the defense during Mr. Barrett's state trials.  The court authorized

$4,000.00 for a crime scene reconstructionist.  After Mr. Echols left the case, trial counsel Roger

Hilfiger informed the court that het had not used available funds to hire a crime scene

reconstructionist, but instead used the funds for an investigator.  Loyd Cobb, the investigator

hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at

least some of which were introduced into evidence.  *See* Ground One, *supra*, and Ground Three,

*infra.*

As stated in Grounds One and Three, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness.  Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance.  Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and constitutional rights to expert assistance.  Counsel's failure to investigate the benefits of expert advice was deficient performance.

Iris Dalley was a key witness for the Government.  Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .233 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property.  The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle.  Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial.  Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, the defense could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction.  In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied.  Mr. Hueske, a nationally known expert whose credentials,

training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibit 109; Exhibit 110.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Exhibit 109 at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting

scene." Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle

that "could have made" some of the bullet holes in the Bronco. When asked by defense counsel

for examples, Dalley could not come up with any. (Exhibit 109 at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that

Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her

testimony difficult. Dalley's shortcomings in these areas likely reflect her lack of expertise with

firearms and vehicles. (Exhibit 109 at 3.) Hueske's analysis shows that Dalley lacked sufficient

knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate

terms of reference when reconstructing a scene to render reliable, credible opinions about a

shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a

crime scene reconstruction in this case, and with her trial testimony. Mr. Hueske's bottom line

conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident

reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for

purposes of reconstructing the events associated with the shooting under investigation." (Exhibit

109 at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

a.      Standard, accepted crime scene reconstruction protocol requires a

determination of the length, width and height of any vehicle involved in a shooting. Dalley

neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis.

There is also an unresolved question as to how wide the passenger door was open when shots

were fired. No measurements were taken. Instead, Dalley illogically explained that because the

passenger door was curved, it could not be measured.  (Exhibit 109 at 3.)

b.      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence.  Placing trajectory rods in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and stated she saw none.  (R. 3399.)  (Exhibit 109 at 3.)

c.      To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  (Exhibit 109 at 3.)

d.      The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire").  (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Exhibit 109 at 3.)

e.      Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of

bullet penetration/perforation in a variety of substrates." This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle. Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for. Trajectory rods such as Dalley utilized are a reliable tool for determining bullet trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446; Exhibit 109 at 4.)

f.      Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory

being propounded.  The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door.  Deflections occur frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces.  (Exhibit 109 at 4.)

        g.      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability."  Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident."  (Exhibit 109 report at 5.)

        h.      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Exhibit 109 at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might

have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

　　　　　i.　　　　Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Exhibit 109 at 5.)

　　　　　j.　　　　Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Exhibit 109 at 5.)

　　　　　k.　　　　Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions. It was particularly important here to determine the angle of fire after the Bronco came to a stop. However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco to where it came to rest before being moved. (Exhibit 109 at 5.)

l.      Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin. She testified that the results of her trajectory analysis for these objects were reliable. (R. 3389.) First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod. Dalley had someone assisting her hold a trajectory rod by hand. Second, Dalley failed to take measurements of the hole locations. (Exhibit 109 at 5.)

m.      Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation." *Ibid.*

n.      Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco. When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window. Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used. To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used. (Exhibit 109 at 6.)

o.      In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Exhibit 109 at 6.)

p.      In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Exhibit 109 at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Fed.R.Evid 702. Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable.  At a

minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, were outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken.

Due to the importance of Dalley's analysis to the Government's case, it was unreasonable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dally's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase. Even if the trial court had received Dalley's testimony, there is at least a

577

reasonable probability that the outcome of the trial would have been different.  If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony they would have reached any of several conclusions adverse to the prosecution from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified.

It is not only Movant who says Ms. Dalley is not the objective scientific witness she was portrayed as during trial but is a partisan advocate who dresses up her personal opinions in the guise of "science."  The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, recently reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.  Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony. Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

**8.     The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.**

The jury should have heard that methods used by the Oklahoma Highway Patrol tactical team were contrary to established law enforcement standards and practices. Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted. Even though every piece of information considered by the Task Force and Tact Team called for a daytime, talk-first approach, with prominent insignia of law enforcement and the use of distance and cover, the officers chose a nighttime, close-contact, force-first approach, with no advanced signs of law enforcement. The results of this provocative assault were foreseeable and tragic for Trooper Eales who, due to poor planning and execution, was exposed to gunfire on all sides.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert who would have revealed to the jury that the midnight raid was reckless and dangerous, as though calculated to provoke a violent response, and that it was foreseeable that these errors would result in harm to a law enforcement officer. Prior to trial, Mr. Echols sought

authorization to retain an independent expert on tact-team methods and procedures, Dr. George

Kirkham.  (Doc. 50.)  The court authorized some funds for this expert.  (Doc. 97.)  However, Mr.

Barrett's trial counsel never contacted the expert.

Trial counsel knew or should have known that it was necessary to retain an expert

to assist the defense.  In the second state trial Chuck Choney, a former FBI agent, testified for the

prosecution and, when surprised on cross-examination, provided testimony favorable to Mr.

Barrett.  However, trial counsel knew that Mr. Choney, because of his affinity with law

enforcement, was unhappy about his testimony and was unwilling to provide any further helpful

testimony for Mr. Barrett.  Based on this knowledge, trial counsel requested authorization to

retain another, independent expert, Dr. Kirkham.  (Doc. 50 at 5.)  During a hearing on March 22,

2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney.

But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as

a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

After the court authorized part of the funds trial counsel sought to retain Dr.

Kirkham, trial counsel failed to contact him.  Dr. Kirkham received no background materials and

had no contact with trial counsel about assisting in Mr. Barrett's defense.  (Exhibit 44.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-

September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by

telephone on September 13, 2005, and were told Mr. Choney would not be available until

September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no

investigation into what evidence could be presented from an independent expert authorized by

the court, and fell back on a witness who counsel knew would take any opportunity to harm Mr. Barrett's case.

Even after the trial started, trial counsel knew Mr. Choney was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense. (Tr. 10/03/05 Hr'g at 6-7.) Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify." *Id.* at 6. Yet counsel made no effort to learn what opinions Dr. Kirkham would have had if he had been informed of the facts of the case. Trial counsel could not have made a reasonable decision to forego Dr. Kirkham's assistance because they had not inquired into what that assistance would mean, and they knew they would get no assistance from Choney.

If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, Dr. Kirkham would have provided the jury with more than reasonable doubt about Mr. Barrett's alleged intent. Dr. Kirkham would have explained that the jury could assume – against the weight of evidence – that the claims made in Clint Johnson's affidavit were true, and even credit the dubious testimony of the other informants, and still conclude that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. The evidence would have shown the raid was contrary to the standards and practices of law enforcement agencies precisely because it increased the chance that the target would be unable to tell whether those attacking him and his teenage son were law enforcement officers. The Tact Team's errors conceiving the raid and carrying it out meant (a) the first vehicle visible to Mr. Barrett would have no law enforcement markings; (b) the nighttime darkness made it more difficult to identify law enforcement vehicles; (c) there would be no audible indication that law enforcement was

involved in the attack; (d) the raid would play into any paranoid fears or legitimate fears of being attacked by drug dealers or other criminals; (e) that the lead vehicle lacked necessary cover from the terrain or a sniper; (f) that the lead Bronco advanced onto the property from a tactically disadvantageous position that drew fire towards Trooper Eales; and (g) that the plan ignored a variety of tactics deemed by law enforcement experts to be less likely to result in violence. (Exhibit 44 at 3-4.)

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to the action taken, there was no compelling need to have aborted the mission.

Mr. Choney was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. Defense counsel knew Choney would be a most reluctant, if not to say

hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty. One indication of this probability is the state-court jury's acquittal of Mr. Barrett on charges of murder. Had the federal jury known that law enforcement standards and practices counseled against a raid of this type precisely because the failure to give the clearest sign of law enforcement's presence is more likely to provoke an uninformed, violent response, there is a reasonable probability that Mr. Barrett either would not have been convicted of murder, or not have been sentenced to death.

**9.  Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials.**

Grounds One and Three discuss the trial court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The Court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the Court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or

elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved to be an unreasonable assumption. At another status conference on July 15, 2005, the Court was informed that the state court reporter had completed five of the nine volumes of testimony. On August 30, 2005, trial counsel reiterated that the transcripts were necessary for the defense to prepare for trial. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the Court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett knew the police were on his property because the emergency lights on some of the vehicles were engaged and visible to him prior to the shooting. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, Mr. Barrett lost crucial opportunities for the impeachment of key prosecution witnesses in violation of his Fifth, Sixth, Eighth and

Fourteenth Amendment rights, as well as his statutory and rule-based rights to counsel, discovery, and cross-examination.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at 747.) Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed. In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on. (2nd St. Tr. Tx at 448, 461.) At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights. (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road. He was impeached with a prior statement in which he said he only saw taillights, not emergency lights. Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights. (2nd St. Tr. Tx at 25, 49, 51.) In the federal trial, Johnson said nothing on direct examination about any lighting. Trial counsel was caught flat-footed on cross-examination, when he opened the

area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco.  (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial.  Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

There obviously was a critical question as to whether Mr. Barrett or the police opened fire first.  At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  He heard shots as he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence.  (2nd St. Tr. Tx at 757, 766.)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent.  Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco.  In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approached the front of the house, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started.  This statement supported Mr. Barrett's defense argument that he only fired when

Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. Tx 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation to which any father would react.  In federal court, Hamilton stated the gunfire began earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in Mr. Barrett's cabin was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error occurred during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's

counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr.

Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial

manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr.

Barrett had threatened to kill police officers and that he was making methamphetamine at his

residence, which also creates hazards to law enforcement trying to take down a meth lab.

Buttressing the testimony not only of the despicable Charles Sanders, but six of the seven

informant witness, Johnson stated not only that several people had reported to the sheriff's office

that Mr. Barrett was constantly firing weapons across the road, but that they had received several

tips from different people within the last six months that Mr. Barrett was going to kill law

enforcement officers.[19]  This damaging answer, given only because counsel opened the door, just

hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility

of the informant witnesses by brining out testimony from Johnson regarding these "prior reports"

from "several" sources.[20]

Counsel's failures to impeach were professionally unreasonable, and not

motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in

counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

---

[19] As shown elsewhere in this Ground and in Ground Three, trial counsel's blundering cross-examination was most damaging because counsel failed to retain the expert in police tactics whose assistance the Court had authorized in part.  Without an independent source of information about the raid, the Government was able to give jurors the *false* impression that the conduct of the tactical team was appropriate under the circumstances Johnson described.

[20] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial because it tended to invest credibility in the informant witnesses – however spurious it might have been, and however false Johnson's testimony was – that these witnesses otherwise lacked.

Trial counsel's unreasonable failure to investigate what an independent expert would say about the conduct of the tactical team, and their unreasonable failure to impeach Johnson, left the jury with two false impressions: (a) that at the time of the raid Johnson and the tactical team had sources of information other than Monk Sanders; and (b) that even if the information they had was true and backed by multiple sources, the raid was reckless and carried out in a way that made it hardest for Mr. Barrett to recognize his attackers as law enforcement officers. There is a reasonable probability that jurors would have rejected first degree murder or the death sentence if counsel had impeached law enforcement witnesses with available evidence.

**10.    Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

**a.    Toby Barrett.**

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property. It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle. Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. These witnesses would have furthered Mr. Barrett's right to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior

state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and able to be prepared by trial counsel to testify in the federal trial. (Exhibit 96. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Tr. Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, the testimonies of Toby Barrett and Trooper Hamilton are consistent with each other. For example, Toby Barrett confirmed that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Tr. Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible.  (1st St. Tr. Tx at 1796.)  The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over.  (Exhibit 96.)  He denied telling the police he saw flashing lights.  (1st St. Tr. Tx at 1809.)  When Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Tr. Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  If he saw his father at all it was for perhaps a split second, after which Mr. Barrett went back inside the house.  (1st St. Tr. Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Tr. Tx at 1807.)  The entire incident happened very quickly.  (Exhibit 96.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Exhibit 96.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that the bullet that killed Trooper Eales was fired by Mr. Barrett with the intention of killing someone who was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the

Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started. (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up would have been important to defense trial counsel's closing argument. (R. 4316-17.) Instead of being able to draw the jury's attention to Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Exhibit 96.)

### b.      Alvin Hahn.

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Exhibit 75.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was

professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate

reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the

police descended on Mr. Barrett's property with nothing to indicate they were law enforcement,

and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Trial counsel's omissions of known witnesses Toby Barrett and Alvin Hahn were

unreasonable and prejudicial.  The testimony of Toby Barrett and Alvin Hahn would have

conflicted sharply with the accounts of the Government's witnesses, and provided jurors with

evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people

attacking his cabin in the middle of the night were law enforcement officers.  Viewed

individually or collectively, with all the evidence defense counsel failed to prepare and produce

in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a

different result had Toby Barrett and Alvin Hahn been called as witnesses.

**11.     Trial counsel unreasonably failed to investigate, develop and
introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware
he was subject to an active felony arrest warrant at the time of the shooting incident, was
not "hiding out" on his property in anticipation of a police raid, and was not prepared to
meet any police presence with violence.**

A key component of the Government's case was its theory that Mr. Barrett was

well aware there was a warrant out for him for failing to appear for trial in a minor felony drug

case.  *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene

Barrett.*  According to the Government, Mr. Barrett anticipated the police were going to arrest

him at any time on this warrant, and he was therefore making preparations to repel the police

with deadly force.  This theory was founded on the testimony of informant witnesses Charles

Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Randy Turman and Karen Real, who,

as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first

policeman who came on his property and would "go out in a blaze of glory."  The Government

argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the Government's

case; yet, trial counsel did virtually nothing to rebut this argument other than rely on cross-

examination.  Had counsel conducted anything approaching a reasonable, professional

investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient

attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to

suppress  (Tr. 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County

Court Clerk), the Government's theory would have evaporated, the snitches would have been

further impeached, and the Government's case for intent would have suffered mightily.

### a.      Mr. Barrett's "failure to appear".

Any reasonable investigation would have cast doubt on Mr. Barrett's alleged

failure to show up for trial and the circumstances surrounding the warrant issued for his arrest.

Had trial counsel conducted a reasonable investigation of the court files related to Mr. Barrett's

state court charges, they would have discovered that there was not going to be a trial.  No citizens

had been summoned for jury service on the date of Mr. Barrett's scheduled trial, January 25,

1999.  (Exhibit 39.)  In fact, when the Clerk of the Sequoyah County Court checked the court

records, she found that no citizens were summoned for jury service in January 1999, and no

jurors reported to the court during the entire month of January 1999. (Exhibit 39.)  This is

curious, as Ms. Edwards specifically testified at the suppression hearing that the trial scheduled for January 25, 1999 was a jury trial. (Tr. 1/ 26/05 at 25.) Accordingly, Mr. Barrett was charged with failing to appear for a trial that never was scheduled. He was not the only party who failed to appear; apparently, the entire jury failed to appear because they were never summoned.

The importance of this fact – and the importance of this fact being pointed out to a jury – goes to the defense theory of the suspect circumstances involving every single detail of the state prosecution of Mr. Barrett. The trial that never was is the first shaky detail in the whole house of cards. The first cause of the events leading to Trooper Eales death was a warrant issued for Mr. Barrett's arrest for his failure to appear for a trial that was not going to happen anyway. That warrant was "issued" in violation of state law as the state court found. The warrant was "issued" by a deputy clerk who lacked legal authority because the warrant was not sought on application by the District Attorney.

The State's "investigation" went downhill from there. The rare no-knock warrant was intended to deny Mr. Barrett notice he was going to be arrested. The warrant was based on the statements of a serial felon, informant, and liar, and a law enforcement officer who proved to be a crook himself. Evidence indicated that Mr. Barrett had cooperated with authorities in the past, and had not been violent toward law enforcement officers. The suspicious confidential informant recanted at trial the information he allegedly gave in the search warrant affidavit. The search warrant was executed with a team of "dignitaries." Once the search warrant was executed, no methamphetamine was ever discovered. Each of these facts is consistent with the conclusion that Mr. Barrett was the target of an unjustified raid that was recklessly conceived and implemented in a manner designed to conceal the fact that law enforcement officers were the

raiders. In other words, the fact that there was no jury summoned for the day Mr. Barrett was supposed to be tried supports the conclusion of the state-court jury that this was not a case of a man lying in wait for law enforcement officers. Trial counsel's lack of investigation was inexcusable and caused extreme prejudice to Mr. Barrett.

### b. Mr. Barrett's lack of knowledge of the warrant.

The Government called Ms. Bernell Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued for Mr. Barrett on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/ 26/ 05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/ 26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount

of the bond.  There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest.  The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified, with a return receipt requested.  (Tr. 1/ 26/05 at 39-43, 45.)  For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.*  The evidence was already in the record.  Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.

Mr. Rogers, the last attorney to represent Mr. Barrett in the state-court distribution case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant.  Mr. Rogers is now deceased.  In connection with this Petition, his widow, Mary Rogers, was contacted by a defense investigator.  Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case.  Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest.  Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Exhibit 31; Exhibit 182.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other facts set forth herein, including that no jury was called for the "trial," would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants, would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

### c.     Mr. Barrett's previous cooperation with the law.

Had Mr. Barrett's trial counsel conducted a reasonable investigation, there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody. Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been

contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so. See also Ground Five (suppression of evidence and newly discovered evidence).[21]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was firing a gun into the air. Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence. The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him. There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason. (Exhibit 85.)

During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett. In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently. (Exhibit 85.) On this occasion, Sheriff Philpot arrived after the other officers. When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers. One of the weapons being inspected appeared to be an SKS. Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant. Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant. Mr. Barrett never threatened

---

[21] *See also* Ground 5, (*Brady/*newly discovered evidence). Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

any of the officers, and his weapons were returned to him after they were inspected. (Exhibit 108.)

Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness. When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness. To his surprise, Mr. Hilfiger said "no." (Exhibit 85.) In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property. Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support. He had been doing this long before the "warrant" was issued. Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house. Had the police simply contacted Mr. Barrett's family, they would have brought him in. Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem. Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons. There had been no violence and no problem. (Exhibit 97.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully. (Exhibit 93.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told him if the police really wanted him, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Exhibit 91.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His view was that he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Exhibit 95.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Exhibit 77.)

Trial counsel also unreasonably failed to call in the first stage one of Mr. Barrett's neighbors, Clyde Edgmon, and bail bondsman Martin Daggs. Both these witnesses were known to trial counsel at some point, as they were called to testify in the second stage of trial. In the

penalty phase, Mr. Edgmon testified that approximately six months before the raid, two law enforcement officers, John Owens and Sandy Gerdner, came by his house when Mr. Barrett was working on a truck for him. The officers talked to Mr. Barrett for some time. There were no problems, and Mr. Barrett was friendly with the officers. Mr. Edgmon, Ms. Hill, and other witnesses contradicted the Government's theory that Mr. Barrett was "hiding out" from the law for months before the raid, priming himself for a violent confrontation. Mr. Edgmon's testimony also would have cast doubt on the claims of several of the informant witnesses that Mr. Barrett was prepared to "go out in a blaze of glory" and would react violently to any police contact.

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different. Evidence that there was no jury trial for which Mr. Barrett "failed" to appear, that the bench warrant was invalid, that he was without counsel, that he had no notice of the "trial," and that he was willing to be questioned and produce his firearms to law enforcement directly countered the prosecution's theory of the case. Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.

**12. Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress" (R. 849.) Trial counsel allowed the jury to hear Horn's testimony over a

period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their own testimony in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two tours in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)

During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing. Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.   While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that

"confidentiality doesn't extend to the courtroom, privilege does." (R. 880.) However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself. (R. 881.)

After testimony from Horn running to some forty printed pages (R. 849-889), including his narration of what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...". (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.) As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[22] confabulation (R. 906),[23] and contamination of memory through contact with others. (R. 900-901.)[24] In fact,

---

[22]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[23]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction. Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[24]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*,
(continued...)

Page 167

Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Fed.R.Evid. 702 and the fact that Horn "hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case."  (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities."  (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an
> instruction.  I started to say a special instruction.  It's not special,
> it's just – it's just a – (Pause) Not a special instruction, but just an
> instruction in regard to some testimony you have heard from Mr.

---

[24](...continued)
51 Psychology Press 2004.

Horn.  So if you would listen to this interim instruction:  Ladies
and gentlemen of the jury, when we started this trial I gave you
some preliminary instructions to guide you in your participation in
this trial.  As I advised you at that time, it is my duty to determine
the law applicable to this case and it is your duty to accept and
follow my instructions regardless of whether or not you agree with
the law.  As a matter of law, I have determined that the testimony
which you heard on Monday afternoon and Tuesday morning of
James Horn should not have been admitted into this trial.  You
should not speculate about the reasons for my ruling on this issue;
it is based solely on my interpretation of the law applicable in this
case.  Therefore, I instruct you that you should disregard Mr.
Horn's testimony in its entirety and not consider it for any purpose
in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  Inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed. R. Evid. 702.  The fact was equally clear on the basis of the two state trial transcripts.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals.  (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[25] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[26]  When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area"

---

[25]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009).

[26]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009).

and to other ill-defined criteria.[27]  For example, 30% of the necessary points required for Board Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[28]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.  For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[29]  The defense

---

[27]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain."

[28]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[29]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6,

(continued...)

also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the "Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.  Any suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were the result of inattention, not reasoned strategic judgment.

Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing.  He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

---

[29](...continued)
2009).

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was uninformed and unreasonable under prevailing professional standards.  It is hard to ascertain whether defense counsel actually viewed Horn as a witness for or against their client, but their sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by the witness denying knowledge of the authorities that counsel was seeking to have discussed, resulting in an entirely unsuccessful examination on the part of the defense.

This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  *See supra* claim of unreasonable performance regarding Chuck Choney.

The court had authorized limited funds for trial counsel to retain a psychologist to assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the raid. (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental health expert and only at below-market rates of compensation, and only for a number of hours far below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Grounds One, *supra*, and Three, *infra.*  Mr. Hilfiger, whom the court personally selected to represent Mr. Barrett as part of a plan to develop a panel for future capital cases (Exhibit 67), declined to join his former lead counsel in requesting additional funds from the court.  (Exhibit 34.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until late September, 2005, at the earliest.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him.  A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter.  Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged.  Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions.  (R. 939.)

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic

technique in trauma counseling - when describing what they said had taken place.[30]  This not only

suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more

powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been

admitted and was highly prejudicial.  It was the court that recognized Horn had nothing

legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had

a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in

futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood,

referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R.

851) and to the close relationship of SWAT team members: "it's very akin to the relationship I

still have to this day with the Marines with whom I served in Vietnam because there is a bond

when you face life-threatening situations that is formed, that is probably like no other bond." R.

861-62.  Not only did this testimony improperly bolster the prosecution witnesses, suggesting

that the inaccuracies in their testimony were of little moment, given the trauma experienced by

the grieving band of law enforcement agents, it also amounted to victim impact testimony that

should never have come in at the guilt phase.  The Court itself acknowledged this facet of the

testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is

simply an attempt by the government to bolster the credibility of its witnesses for memory lapses

of those witnesses at issue." (R. 1635.)  Moreover, it sought to explain the fact that officers might

"recall" significant facts long after an incident which they had not previously mentioned, without

---

[30]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

beginning to explore the question of whether those recovered "memories" were reliable recollections. (R. 858-59.)

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay allowed the evidence to sink into the jury's consciousness. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise not overwhelming and that the impact of Horn's testimony on the jury requires a new trial.

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial. There

was no downside to a motion for mistrial and therefore no strategic reasons for failing to make

the motion. Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

To the extent the issue could have been fully resolved on the record, direct appeal

counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance

provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or

correct that error through a stronger instruction or a mistrial. *See* Ground Nineteen, *infra*.

However, as indicated here, there is extra-record evidence in trial counsel's files showing that

they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations

of his testimony, their own expert's ability to provide questions on cross-examination, or the

general admissibility of his testimony under federal law.

**13.     The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would

have given the jury a way to give effect to the defense evidence and argument. Although trial

counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel

unreasonably failed to seek a jury instruction to the same effect. The instructions trial counsel

unreasonably failed to seek include an instruction on informant witness credibility, an instruction

on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the

defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.

These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution

in this case from the two previous state-court prosecutions.  Some of these witnesses

acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal

activities before, during, and after their testimony or the events about which they testified.  These

activities included illegal drug possession, use, and/or distribution, various civil violations,

making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek

from the trial court, such orders as may be available to assist in the presentation of the defense.

The informant witnesses also confessed to being drug addicts, either at the time of

their testimony, or at the time they allegedly perceived the "events" they described in their

testimony.  Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis

Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the

> testimony of someone who is shown to have used addictive drugs during the
> period of time about which the witness testified must always be examined and
> weighed by the jury with greater care and caution than the testimony of ordinary
> witnesses.

> [¶]  You should never convict any defendant upon the unsupported testimony of
> such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

Movant was entitled to an instruction on his theory of defense.  The defense

theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication

that the vehicle speeding toward him contained law enforcement officers (R 4314), and (b) Mr.

Barrett was not engaged in drug manufacturing or distribution when the raid took place.  As

evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement

percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**14.     The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to the following:

1.      the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90);

2.      the improper execution of search warrants by federal officers (*id.* at 1090);

3.      the violation of Fed. R. Crim. P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91);

4.      the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91);

5.      the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96);

6.      the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* at 1096-97);

7.      the improper admission of victim impact evidence (*id.* at 1097-1101);

8.      the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06);

9.      the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108);

10.     the lack of constitutionally required proportionality review (*id.* at 1108-09);

11.      the violation of *Woodson v. North Carolina,* 428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10);

12.     the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* at 1110);

13.     the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and,

14.     The Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill (*id.* at 1115-17.)

Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. Whether considered as a repeated omission, or considered cumulatively with other unreasonable acts and omissions, there is a reasonable probability that the outcome of the first or second stage of trial would have been different if trial counsel had objected.

Ground Five, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated herein but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed altogether to object. The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy. Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial. Trial counsel's omitted objections permitted the prosecution to do whatever it pleased, and abuses of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment.

## Conclusion

But for trial counsel's numerous unreasonable acts and omissions, each one a contravention of prevailing professional norms, there is at least a reasonable probability that jurors would have reached a different verdict in the first stage of trial. In summary, the deficient performance affecting the first stage verdict, second stage verdict, or both, includes the following:

Counsel late in the case recognized the need to attack the search warrant based on the trial testimony of the C.I., Charles "Monk" Sanders, but unreasonably omitted key facts and

argument from their briefing.  A competent and thorough re-urging of the motion to suppress based on *Franks v. Delaware*, 438 U.S. 154 (1978), likely would have resulted in the exclusion of much of the  Government's case.

When informed that prosecutors sought to conceal seven informant witnesses, and did conceal them until after the start of jury selection, counsel unreasonably acquiesced to a trial by ambush when they acceded to an arrangement that resulted in these crucial prosecution witnesses taking the stand with little or no time to investigate their backgrounds, criminal records, or their motives for testifying.  As a result, a wealth of impeachment evidence that could have been used to show them to be the incredible, self-serving witnesses they were was not produced.  Because counsel unreasonably failed to seek a continuance, or were induced into not seeking a continuance by prosecutorial and judicial misconduct, counsel left relatively unscathed key prosecution witnesses whose credibility would have been shattered.  With reasonable investigation the Government's case for intent, particularly with respect to Count 3 of the superseding indictment, would have been damaged beyond repair.

Trial counsel unreasonably failed to object to the seven informants' testimony to prior bad acts under Fed. R. Evid. 404(b).  When the Government failed to give notice that Karen Real would offer such testimony, in violation fo Rule 404(b), trial counsel offered no objection.  Trial counsel permitted the prosecutors to use the hearsay evidence for an improper, and highly prejudicial purpose, i.e., to show Mr. Barrett's state of mind at a time far removed from his alleged statements and under circumstances that gave the alleged statements little probative value.

Numerous witnesses were available to rebut the Government's claim that Mr. Barrett had "holed up" on his property, readying himself for an attack on law enforcement, because he feared the authorities would arrest him on an outstanding felony warrant. This spurious claim went virtually unchallenged due to a total failure of investigation although court documents and court personnel would have shown, *inter alia*, there was no trial, no jurors were summoned, the failure-to-appear warrant was invalid, and Mr. Barrett was without counsel. The two witnesses the defense did call that would have challenged this theory – Martin Daggs and Clyde Edgmon – inexplicably did not appear until the sentencing phase of trial, even though their testimony was directly relevant to the guilt/innocence stage. Several other witnesses who could have refuted the prosecution's theory were either never contacted or were interviewed only superficially. Likewise, defense counsel failed to produce readily available witnesses who could have contradicted the testimony of law enforcement regarding the lighting used on the police vehicles, and supported the defense argument that Mr. Barrett reasonably believed he and his property were being attacked by lawless intruders.

Mr. Barrett had a well-documented history of mental impairments that were highly relevant to why he stayed close to his property, what he would have perceived at the time of the raid, and on his intent at the time of the shooting, but, due to both limitations on funds for expert witnesses and counsel's failure to investigate and prepare, the jury heard about none of this. Because of counsel's failures, the Government had a clear path to falsely portraying Mr. Barrett as a deliberate killer. Along the same lines, counsel failed altogether to challenge Mr. Barrett's competency to stand trial, though a thorough investigation would have revealed his mental competency to be very much in doubt.

Trial counsel unreasonably failed to use what funds were available to prepare to impeach prosecution "expert," Iris Dalley, and her dubious "reconstruction" of the manner in which the shooting occurred.  Due to trial counsel's failure to retain an expert he asked the court to authorize, no *Daubert* challenge was made to exclude her testimony and conclusions, and the jury never heard that her methodology and testimony were seriously flawed and lacking in a reliable foundation.  In a related fashion, the version of events testified to by the members of the OHP Tactical Team, which dovetailed with Dalley's "expert testimony," was not impeached with readily available previous testimony they had given in the two state trials.  Any failures of memory on their part, or contradictions in their testimony, were allowed to be explained away by James Horn, another "expert" who held forth for the better part of two days without objection, until the court itself struck his testimony because it so plainly failed to meet the test of *Daubert* and *Kumho Tire*.  The court's curative instruction was inadequate; the bell could not be unrung.  Horn never should have been allowed to appear, but counsel's failure to object to his obviously inadmissible testimony ensured that Mr. Barrett would be prejudiced.  Whatever headway counsel did make in casting doubt on the testimony of the officers was swept away in the welter of innocent explanations for their inconsistent testimony offered by Horn.

Trial counsel recognized that it was crucial to present expert testimony to show that the raid by law enforcement was contrary to law enforcement policies and procedures, was inadvisable, ill-conceived, poorly planned, and was met by violence from Mr. Barrett only because law enforcement did not make its presence plainly known.  But trial counsel failed to contact the expert the court authorized them to retain for that purpose.  The effort to support this theory came to grief when the defense inexplicably decided to rely on the testimony of Chuck

Choney, even though the witness told trial counsel he was hostile to Mr. Barrett and would not testify for the defense. What few half-hearted criticisms he may have offered for the manner in which the raid was conducted were more than counterbalanced by his defense at almost every turn of the conduct of the OHP Tactical Team, and his ringing conclusion that they did "nothing wrong." Had counsel engaged the services of a truly independent expert, the jury would have heard an entirely different story. Dr. Kirkham, an independent, nationally recognized authority whom the Court authorized counsel to hire as the defense's SWAT expert, would have testified that the OHP raid on Mr. Barrett's property was a textbook example in almost every respect of *what not to do,* resulting in Mr. Barrett reacting in the belief that criminal trespassers were on his property.

Symptomatic of counsel's ineffectiveness were also the failure to request appropriate instructions; the failure, on many points eventually raised on direct appeal, to adequately preserve the record with timely objections and motions; and the failure to object to prosecutorial misconduct.

Based on the above evidence, the conclusion is inescapable that trial counsel rendered ineffective assistance in the first stage of trial. As the results of the state prosecution demonstrated, this was a very defensible case, even with (or perhaps especially) the eleventh hour addition of the informant witnesses. The deficiencies of counsel argued above were not grounded in sound strategy, but fell outside the wide range of reasonable professional assistance. Mr. Barrett was clearly prejudiced. Whether the Court views the errors of trial counsel individually or in the aggregate, a different outcome was reasonably likely.

**B. Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense, i.e., evidence that the jury could have relied upon to understand Mr. Barrett and offer an explanation for his conduct. Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). The evidence detailed herein shows numerous unreasonable acts and omissions of Movant's trial counsel, and further shows there is a reasonable probability that at least one juror would have struck a different balance at the second stage of trial.

**1. The evidence of deficient performance – trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death – includes the following:**

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources. As stated in Ground One, *supra*, and Ground Three, *infra*, the allegations of which are incorporated herein by specific reference, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel. (*See also* Docs. 50, 51, 57, 97, 128; Exhibit 34; Exhibit 118.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase. (ABA Guideline 4.1(A)(2).) Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel. (Exhibit 64 Letter to Honorable James H. Payne dated 2/2/8/2005; Exhibit 34.) However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors. Mental health professionals who were consulted during state proceedings found evidence of paranoia, a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"), and organic brain impairment including deficits in impulse control and processing information, especially under stress.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available. (Exhibit 111; Exhibit 34.) Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial. (Exhibit 82; Exhibit 34.) The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with Bipolar Disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation specialist. (Doc. 97.) The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline

10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005. (Docs. 46 and 50.) Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses. (Doc. 97.) *See* Grounds One, *supra*, and Three, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales." (Doc. 50.) Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed. However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. (*See*, *e.g.*, Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols. The court also appointed Bret A. Smith. Mr. Hilfiger had only worked on one prior federal death penalty case. Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial. Contrary to statutes and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender. As stated in Ground One, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial. (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.)

Mr. Hilfiger did not seek an amendment of the budget. His failure to do so was unreasonable. On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his

having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Exhibit 67.)  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Exhibit 66.)  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Exhibit 111; Exhibit 34; Exhibit 82.)  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Exhibit 118.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second-stage investigation if it had not already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Exhibit 67.)

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Exhibit 66.)

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."  *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours."  (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance to which he was

entitled.  *See* Ground Three, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Exhibit 118; Doc. 107.)  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Trial counsel obtained a copy of a preliminary report prepared by a mental health expert, Bill Sharp, Ph.D., prior to the first state trial.  (Exhibit 55 at ¶ 16.)  Dr. Sharp had identified numerous sources of mitigation, and recommended further testing and treatment.  (*Id.* at ¶¶ 9-14.)  Federal trial counsel never consulted with Dr. Sharp about his findings or how his diagnoses might be relevant to mitigating circumstances.  (*Id.* at ¶ 16.)  Dr. Sharp's report put trial counsel on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems (*id.* at ¶¶ 3, 14), facts that would have indicated a need to spend more time with Mr. Barrett and to rely on other sources for background information.  (ABA Guideline 10.7 and commentary, 31 Hofstra L. Rev. at 1023-24.)

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.  At no time prior to or during the federal trial did Mr. Hilfiger or Mr. Smith either

consult with mental health professionals who had consulted with Mr. Echols during the state-court proceedings or obtain their files.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  (Exhibit 56.)  Dr. Russell had performed an assessment of Mr. Barrett in preparation for the state trial.  In mid-August 2005, federal trial counsel did not have the report she provided to Mr. Echols in 2003.  (*Id.*)  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in 2003 in anticipation of the second state trial, and conduct some research on an unrelated matter.  (*Id.*)  At the time of her report in September 2005 she had conducted no additional interviews.

Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction.  (Exhibit 56.)   Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Fed. R. Cr. P. 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41.)

Mr. Smith asked Dr. Russell whether she would conduct a mitigation investigation.  (Exhibit 56.)  She informed him that she was not qualified to take on that assignment, and that it was too late for anyone to conduct the type of thorough background investigation she viewed as the norm in other capital cases with which she had been involved.

(*Id.*)  Mr. Smith indicated that the trial court's refusal to provide the defense with resources impaired their ability to conduct such an investigation.  (*Id.*)

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43.)  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  This hardly should have come as a surprise given (a) that Mr. Echols had informed Mr. Hilfiger and the Court that his preparation for a mitigation case was never fully formed during the state trials, (b) that Mr. Echols withdrew from the case in large part because he believed the Court's limitations on time and resources made reasonable preparation for a penalty phase impossible, and (c) that there was no penalty phase in either state trial.  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41.)  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

By September 15, 2005, when Dr. Russell submitted her "updated" report, she had not had an opportunity to conduct any additional interviews.  (Exhibit 56.)

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7.)  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41.)  Mr. Hilfiger apparently meant that Dr. Russell would

act as a mitigation investigator.  However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

As stated in § A of this Ground for relief, *supra*, trial counsel unreasonably failed to investigate, *inter alia*, (a) the circumstances of the state drug charges for which trial Mr. Barrett allegedly failed to appear; (b) the Government's evidence of how the raid occurred and the supposed "reconstruction" of the crime scene; (c) whether the conduct of the raid followed law enforcement protocols for identification and safety; and (d) the unreliability of the Government's eleventh hour informant witnesses.  Trial counsel's unreasonable omissions denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial.  Their conduct constitutes deficient performance.

**2.      The evidence demonstrating prejudice from trial counsel's deficient performance includes abundant, readily available evidence of Mr. Barrett's neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment.  This evidence includes the following:**

A thorough investigation of Mr. Barrett's background would have provided the jury with a completely different, more accurate, and exculpatory view of events, including Mr. Barrett's character and actions.  Jurors informed by this evidence would have understood that Mr. Barrett would not and did not knowingly or intentionally take the life of a law enforcement officer.  Having failed to inform themselves of the readily available evidence, trial counsel presented only a superficial penalty case.

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  (R. 4704).  The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett.  Jurors would have learned the following about Mr. Barrett, his background, and character:

      **a.**      **The family, social, and medical background of Kenny Barrett.**

### Introduction

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history.  The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *The Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California.  The Trail of Tears[31] ended at

---

[31] In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory.  The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee.  It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north

(continued...)

Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

Kenny's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Exhibits 155, 2, 131, 124.)  With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

### Family History of Mental Illness

Kenny meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  (Exhibit 117.)  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.  Although members carried genetic-based risk

---

[31](...continued)
Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people. Other family members required psychiatric institutionalization. This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community. The nature and severity of Kenny's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities. Kenny's mother's family "had to deal with mental illness for a long time." (Exhibit 91.) Kenny's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years. Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants. (Exhibit 4; Exhibit 78; Exhibit 139; Exhibit 202.) One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Exhibit 78.) Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Exhibit 98.)

One of Kenny's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication. (Exhibit 83; Exhibit 137; Exhibit 77; Exhibit 41; Exhibit 201.) Gwendolyn's two children both have significant mental

impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Exhibit 83; Exhibit 135; Exhibit 153.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d] with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens. (Exhibit 77; Exhibit 141.)

Travis Crawford, another of Kenny's first cousins (*see* Exhibit 198), also receives medication for anxiety and reports a history depression.  (Exhibit 45; Exhibit 92; Exhibit 143.) Travis has had "a long struggle with drugs and ha[s] anxiety and panic attacks" and his "mind does not work that well."  (Exhibit 45; Exhibit 92.)  He struggled and did not succeed in the Army, or in his employment.  (Exhibit 196; Exhibit 203.)  Travis understands that "psychological problems run in [his]family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it." (Exhibit 45; Exhibit 92.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Exhibit 101.)

In the maternal family, depression and mood disorders trace back to Kenny's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Exhibit 78; Exhibit 129.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a

petition brought by his father, Tom Dotson,[32] who described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Exhibit 32.)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Illness has affected Kenny's great-great-grandfather, his great grandfather, his grandfather and finally Kenny himself. (Exhibit 28; Exhibit 146; Exhibit 84.) As Kenny's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Exhibit 86.) Kenny's great-great-grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (Exhibit 27.) Kenny's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Exhibit 84, Exhibit 87, Exhibit 132.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny's grandfather (*see* Exhibit 1) , was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Exhibit 87), raped one of his daughters who became pregnant and placed the baby for adoption (Exhibit 84), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations,

---

[32]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson. (Exhibit 130.)

persecutory delusions and paranoid ideation.  (Exhibit 27.)  His family believed he "was bipolar." (Exhibit 87.)  A.J. was able to work only "sporadically."  His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce."  (Exhibit 87; Exhibit 125; Exhibit 146.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and Kenny's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (Exhibit 146), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Exhibit 84).  She "died very confused."  (Exhibit 146; Exhibit 133.)  Mary's brother, Howard, was "Looney Tunes" (Exhibit 84), and Howard's son, Billy Dean, who was a disabled veteran with a history of schizophrenia, committed suicide.  (Exhibit 26; Exhibit 128.)  Kenny's great aunt, Elnora Long, is bipolar and requires significant doses of medication.  (Exhibit 84; Exhibit 86.)  Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable."  (Exhibit 86.)  Kathy, Kenny's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings.  (Exhibit 86; Exhibit 140.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder.  (Exhibit 86; Exhibit

145.)  Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  (Exhibit 86.)

### Maternal Family History

Kenny's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose everyday life reflected the travails and successes of Indians in eastern Oklahoma.  Hugh grew up in an Indian orphanage, and became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[33] an Indian mission school started by the Presbyterian Church. Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Exhibit 100.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Exhibit 100; Exhibit 102; Exhibit 106; Exhibit 134.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[33]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[34]
(Exhibit 59; Exhibit 106.)  Records also show that Abe got into trouble with alcohol, committed
violent offenses and stole.  (Exhibits 16 through 23.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields
and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his
skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left
Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of
his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Exhibit 8), and they had five children
over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother.
(Exhibit 120.)  Hugh "barely earned enough to live on."  (Exhibit 97.)  Hugh, Hattie and their
growing family lived in "tumble down" houses that "were in pretty bad shape even by standards
back then."  (Exhibit 97.)  The family "had no running water, electricity or plumbing and used
wood stoves for heating and kerosene for cooking."  (Exhibit 97.)

World War II intervened, and Hugh served in the U.S. Army.  When he returned
home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh
"learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the
family moved to the Dwight Mission School where Hugh ran the farm.  (Exhibit 97.)  Gelene
"always heard" her family was "part Indian and that [she] was 3/16 Cherokee."  (Exhibit 97.)

---

[34]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Exhibit 97.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Exhibit 97.) After a year at Menual Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Exhibit 102.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Exhibit 97.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Exhibit 97.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Exhibit 97.) Gelene explained that "[l]and is just something very important" to her family and "always has been." (Exhibit 97.)

Hugh and his wife Hattie were dedicated to their dream of owning land.  Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never considered working less."  (Exhibit 97.)  Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home."  (Exhibit 97.)   When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California.  Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five.  Kenneth Barrett eventually built his shack for $150.00 on a spit of  his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal great-grandfather, enjoyed a fine reputation in Sequoyah County.  From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor.  Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County.  Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden.  (Exhibit 84.)  Issac "had his burdens to carry after he married" Mary.  She had a "mental breakdown" (Exhibit 146), and "walked around the yard talking to herself.  At night, she would wake up, wash jars, and think she was canning."  (Exhibit 84.)  According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was accused of burglary, and was involuntarily committed to the state mental institution four times over a ten year period before he

committed suicide by shooting himself in the head.  (Exhibit 84; Exhibit 25; Exhibit 26; Exhibit 128.)  Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November 24, 1952.  (Exhibit 84.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise.  "He had nothing left."  (Exhibit 84.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Exhibit 84.)  A.J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Exhibit 86; Exhibit 1.)  Ada's mother, Ida Melton, was an Indian (Exhibit 131) married to Sam Hatter.  (Exhibit 9.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (*See* Exhibit 10.)  Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home.  Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Exhibit 84.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Exhibit 84.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." (Exhibit 84.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." (Exhibit 146.) Unable to support his family, "[t]he entire family had to work in the fields traveling from one crop to the next." (Exhibit 84.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." (Exhibit 146.)

Life for Ernie, Kenny's father, and other children in the family was dismal. One of Ernie's "earliest memories is being taken out of school to work in the fields." (Exhibit 81.) Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma. It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Exhibit 81.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Exhibit 87.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family. His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. (Exhibit 146.) None of his children "wanted him to be at home because of the crazy things he did." (Exhibit 84.) He

suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior.  (Exhibit 146.)  Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous."  (Exhibit 146.)  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  (Exhibit 84.)  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Exhibit 84), but he "was difficult to figure out because he was also a decent guy when he was sober."  (Exhibit 81.)   A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  (Exhibit 84.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his] way."  The children left home as soon as they could.  (Exhibit 146.)  Family members reported that A.J. had "two different personalities" and "angry spells about three times a week."  (Exhibit 146.)  A.J. had "enormous moods swings from being an alright guy to being totally out of control."  (Exhibit 81.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  (Exhibit 146.)   A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him."  (Exhibit 146.)  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."  (Exhibit 146.)  A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility.  Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy.  His general intelligence seems inaverage and dull normal.  His reasoning and judgement are limited.  His insight is poor.

(Exhibit 146.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Exhibit 87; Exhibit 146), even though "nothing could stop him from attacking them."  (Exhibit 81.)  Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was."  (Exhibit 81.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  (Exhibit 81.)  Ernie tried "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown."  (Exhibit 81.)  Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children."  (Exhibit 81.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  (Exhibit 81.)  High school for Ernie was "different."  (Exhibit 81 .)  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed."  (Exhibit 81.)  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect."  (Exhibit 81.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out."  (Exhibit 84.)  Ernie's brother

described him as "pretty cruel." (Exhibit 84.) He treated his younger siblings "pretty rough," and when he made them cry, "he thought it was funny." (Exhibit 84.) Ernie's brother thought Ernie was "a lot like [his] father," A.J. (Exhibit 84.) An aunt who taught Ernie in elementary school described him as "a mean child." (Exhibit 93.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess. He was three months short of 17 the last time he stepped between his father and mother to try and protect her. His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open." He still has a scar from it. (Exhibit 81.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others. I was 6'3" and weighed 187 pounds." (Exhibit 81.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting. They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought. (Exhibit 91; Exhibit 97; Exhibit 5.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning. Although Ernie was very "determined not to live in the kind of poverty [he] knew as

a child growing up," he had little notion of family life or fatherhood.  (Exhibit 81.)

Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about

Gelene or, later on, the boys, other than working and supporting them."  (Exhibit 81.)

Ernie "almost immediately started running around with other women" (Exhibit

81) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as

long as he worked.  (Exhibit 81.)  After he finished his shift at the plant, he went to bars and got

"into as many brawls as there were" before coming home.  (Exhibit 81.)  Ernie "did pretty much

whatever [he] wanted to.  [He] would go out, drink as much as [he] wanted, and chase women," a

pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a

time."  (Exhibit 81.)  Today Ernie is deeply ashamed of his behavior towards his children and

wishes he "could take it back and do for [his] children what they needed and be the kind of

parent they deserved."  (Exhibit 81.)  At the time he and Gelene started their family, his only

measurement of success was being able to work himself  "up from pushing brooms to production

manager."  (Exhibit 81.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Exhibit 97.)

She was "a heavy drinker with dramatic mood swings."  (Exhibit 98.)   She had planned on going

to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in

shining armor."  (Exhibit 97.)  She did not realize, until after they married, that Ernie "was not

the same boy" she knew in high school and that "he had changed, none for the better."  (Exhibit

97.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for

[her], but for the children [they] had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Exhibit 97.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Exhibit 97.)  Throughout their 13-year marriage, Ernie "had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis (*see* Exhibit 197), who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Exhibit 91.)

Kenny's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Exhibit 97.)   They "split up and got back together and threatened to leave each other over and over."  (Exhibit 97.) They "always had a difficult time of it."  (Exhibit 97.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Exhibit 119.)  He was followed by his younger brother, Richard, born June 24, 1964.  (Exhibit 97; Exhibit 121.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Exhibit 81.)  Ernie admits that he "was still young and

immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could."  (Exhibit 81.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967.  (Exhibit 81.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Exhibit 81.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Exhibit 97; Exhibit 123.)  Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home."  (Exhibit 81.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." (Exhibit 81.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Exhibit 97.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Exhibit 97.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip."  (Exhibit 97.)  Gelene "was at

the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with three young boys in 1972. Ernie and Gelene divorced June 20, 1973. (Exhibit 97; Exhibit 12.)

### Infancy and Childhood Development

Kenny has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life. Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant. These deficits can be the result of his mother's ingestion of alcohol or other neurotoxins during her pregnancy with him, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes as "very difficult." (Exhibit 97.) She was in "constant pain," uncomfortable, and depressed. (Exhibit 97.) She described her pregnancy as "battling with Kenny before he was born." (Exhibit 97.) Gelene drank throughout her pregnancy with Kenny, unaware of alcohol's potentially devastating effect on a developing fetus's brain. (Exhibit 97; Decl. Linda Riley.) Gelene's in-laws commented on her early alcoholism and stated she "was a drunk right out of high school." (Exhibit 86.)

Kenny had a difficult infancy and "exhausted" his mother. (Exhibit 97.) His "days and nights were mixed up," and he "was colicky" and unable to be comforted. (Exhibit 97.) He cried and fussed "all the time," making Gelene think all babies must be like him. After she had her other two children and observed their development, she "realized something was

wrong with Kenny." (Exhibit 97.) Gelene received no help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to soothe him. He was colicky and cried all the time." (Exhibit 81.) Kenny was born with a large lump on the back of his head. (Exhibit 97.)

Kenny failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Exhibit 35.) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched." Kenny's mother nursed him. (Exhibit 35.)

At nine months, Kenny did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye" or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." (Exhibit 35.)

At one year, Kenny's delays were more obvious. His mother noted he "had trouble learning to walk." (Exhibit 97.) He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching." (Exhibit 35.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Exhibit 97.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Exhibit 97.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Exhibit 91.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Exhibit 74.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Exhibit 81.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Exhibit 85.) She also noticed that Kenny "had strong feelings" (Exhibit 85), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Exhibit 101.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Exhibit 91.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." (Exhibit 91.) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental." (Exhibit 86.) His mother reported that "any little thing could upset him, but it took a lot to calm him." (Exhibit 97.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Exhibit

81.)  When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything.  He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Exhibit 97.)  Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."  (Exhibit 97.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him.  Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still."  (Exhibit 97.)  It "almost drove [her] crazy."  (Exhibit 97.)  She thought he "was emotional about things that did not matter.  He would cry and scream like there was no tomorrow."  (Exhibit 97.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time.  She had a bad habit of saying cruel things not just to me but to the boys, too." (Exhibit 81.)  Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry."  (Exhibit 86.)  Children were "afraid of her."  (Exhibit 86.)  Kenny suffered "more verbal abuse from her than her other two children." (Exhibit 86.)  Kenny's neurologic impairments and his chaotic home life took their toll on his school work.  Gelene stated he "had a difficult time in school and was in special classes part of the time."  (Exhibit 97.)  Kenny  had difficulty almost immediately in school.  He failed reading

and arithmetic in the first grade and was barely able to keep pace with his peers.  He had difficulty learning to read.  (Exhibit 97; Exhibit 136.)

Ernie "hardly had anything to do with [Kenny] after the divorce, and everyone could see how much it hurt Kenny."  Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs.  He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear."  (Exhibit 84; Exhibit 91.)  Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have.  He was absent in their lives. Ernie has always been for Ernie."  (Exhibit 93.)  Ernie "went his way and let Gelene take care of the kids."  (Exhibit 93.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma."   (Exhibit 81.)  Kenny  "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Exhibit 81.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."  (Exhibit 91.)  Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him."  (Exhibit 91.)  Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."  (Exhibit 91.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of his room.  Phyllis and her husband went to Gelene's house and talked to Kenny.  Kenny told them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream."  (Exhibit 91.)  Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and

unpredictability.  She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings."  (Exhibit 99.)  When Gelene "lost control of herself," she whipped the boys,  but "there was no real parenting."  (Exhibit 99.)

Gelene was harsher with Kenny, "verbally and physically," than she was with her other two sons.  (Exhibit 99.)  Gelene used a strap to whip Kenny, and Kenny "hated" it.  (Exhibit 99.)  Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny.  When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him.  (Exhibit 99.)  The dog was run over by a car.

Steve, Kenny's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family.  Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny."  (Exhibit 99.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age.  (Exhibit 99.)  Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period.  Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children."  (Exhibit 99.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was

repeating eighth grade.  (Exhibit 99.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that "Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Exhibit 99.)  Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance."  (Exhibit 99.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Exhibit 99.)  School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Exhibit 99.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys."  (Exhibit 99.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Exhibit 99.)  Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Exhibit 99.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade."  (Exhibit 81.)  Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest.  He went

flying slamming against the wall." (Exhibit 81; Exhibit 149.)  After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Exhibit 97.)  She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Exhibit 97.)  Kenny "got pretty depressed and lost interest in school." (Exhibit 97.)  Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Exhibit 99.)  He could tell "how much Kenny missed [their] dad by the way he acted when Kenny was around him.  Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Exhibit 99.)  Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Exhibit 74.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Exhibit 81.)  In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw.  He was placed in special education classes in English and staff made "some adjustments to the curriculum" for him. (Exhibit 136.)  At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science).  It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Exhibit 126.)  Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14.  It was as if the only adult who ever cherished him had gone." (Exhibit 86.)  Ada Mae's death was the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Exhibit 86.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976.  His

Page 221

grades declined in three of the five subjects (general math, comm arts, and life science). (Exhibit 136.) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Exhibit 81; Exhibit 200.)

When Kenny was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Exhibit 97.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny – then a youth with manic-depressive illness, brain damage and a low I.Q. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Exhibit 117.)

**Onset of Mental Illness**

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had worked steadily since he left high school, and "his bosses liked him." He was "a good worker, strong, and able" and was "proud of his work." (Exhibit 97.) By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Exhibit 7.) Their only child, Toby,

was born December 1, 1980.  (Exhibit 122.)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Exhibit 97.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Exhibit 103.)  Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Exhibit 103.)  Gelene never treated "her other sons the way she treated Kenny." (Exhibit 103.)  She and Kenny had a "terrible relationship."  (Exhibit 103.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Exhibit 152; Exhibit 11; Exhibit 150.)

Kenny tried "to bury his problems under constant work and activity."  (Exhibit 99.)  Kenny  measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."  (Exhibit 103.)  The only antidote to his depression was drugs. His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better."  (Exhibit 103.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep."  (Exhibit 103.)

Kenny's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.)  His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Exhibit 103.)  Kenny had "racing thoughts." (Exhibit 103.)  He did things without thinking and "then regretted them." (Exhibit 103.)  Abby knew that Kenny "did not act the way normal people act" and that he "got swept away in his emotions." (Exhibit 103.)  When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Exhibit 103.)  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Exhibit 103.)

Kenny's cousin, Brandy, recognized Kenny's bipolar mood disorder created severe problems for his marriage.  Brandy compared Kenny's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Exhibit 77; Exhibit 141.)

Kenny and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of the separations, he went to his father's home where Ernie found work for him.  Ernie described his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill

himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek psychiatric treatment.  (Exhibit 103.)  Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together."  (Exhibit 103.)  She opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge."  (Exhibit 103.)  Kenny's brother reported, "[a]s troubled as Kenny was, he worked all the time."  (Exhibit 99.)  Kenny's use of drugs allowed him to keep working, despite his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple.  He needed methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.  (Exhibit 147.)  Kenny's brother Steve was home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

Page 225

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Exhibit 103.)  Elavil was extremely helpful and made a big difference in Kenny, but he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Exhibit 147; Exhibit 33.)  The admitting psychiatrist provisionally diagnosed Kenny with "depressive neurosis with suicidal potential extremely high."  (Exhibit 147.)  The nursing assessment reported that Kenny did "not recognize problems."  (Exhibit 147.)  Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."  (Exhibit 147.)

On the mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Exhibit 147.)   His insight and judgment were impaired.  Staff found Kenny to be "courteous, cooperative."  (Exhibit 147.)  Kenny acknowledged that he had "a hot temper."  (Exhibit 147.)  Kenny's highest level of functioning in the preceding year was "poor." (Exhibit 147.)  Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work."  (Exhibit 147.)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed."  (Exhibit 101.)  Nona described Kenny's preoccupation with Abby:

He stayed with me in Kellyville that first week. It was apparent how much Kenny loved Abby and he could not get his mind off her. He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Exhibit 101.)

Kenny sustained repeated head injuries from his work and from car accidents. He was preoccupied and distracted by depression and mania and unable to focus his attention. He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly." (Exhibit 147.) Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over." (Exhibit 147.)

When Kenny's marriage ended after 14 years, he "never recovered." (Exhibit 103; Kenneth Barrett, Divorce Proceedings.) He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives. By the end of their marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings." (Exhibit 103.) Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill." (Exhibit 103.) It pained Abby to leave Kenny because "[t]here were times he could be good. . . .and would try so hard to be good." (Exhibit 103.) She also knew that "he could not function without her." (Exhibit 103.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently.  He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind."  (Exhibit 147.)  Hospital staff noted he was "extremely agitated."  (Exhibit 147.)  During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days."  (Exhibit 147.)  He demonstrated "lack of concentration" and "rapid thought process."  (Exhibit 147.)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health,"  but he did not follow through.  (Exhibit 147.)   Kenny "moved back home" and "built a little shack" next door to his mother's trailer.  (Exhibit 99.)  His brother visited it and observed that the shack was "almost Waldenish in its own way."  (Exhibit 99.)  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  (Exhibit 99; Exhibit 97 and Attachment.)  Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity."  (Exhibit 97.)  Gelene prepared his meals for him, and he ate at her trailer.  Kenny's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Exhibit 96.)  Even as a teenager, Toby "knew something was wrong with him because he had mood changes that were not normal." (Exhibit 96.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person." (Exhibit 96.)

Everyone in the family and Kenny's ex-wife knew he could not "live on his own." (Exhibit 97.)  During his and Abby's frequent separations, "Kenny always came home" to his

Page 228

mother.  (Exhibit 97.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Exhibit 93.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Exhibit 96.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it." (Exhibit 97.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Exhibit 90; Exhibit 77; Exhibit 95.) Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Exhibit 75.)

As Kenny's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Exhibit 95)  His aunt Phyllis understood that he "was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Exhibit 91.)

Despite the limitations created by his mental impairments, Kenny "would give you the shirt off his back if you needed it."  (Exhibit 91.)  He "tried to stay close to home, always worked hard and took pride in his work."  (Exhibit 91.)  Kenny's family and friends uniformly

reported that Kenny was not violent or dangerous to them.  His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him."  (Exhibit 74.) Janice, his cousin, grew irritated and impatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him."  (Exhibit 85.)  Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness."  (Exhibit 93.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone."  (Exhibit 93.)  Relatives visited and talked with Kenny.  His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Exhibit 101.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is."  He agreed but asked me "Why can't we see God?"  I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

Friends and family thought at times Kenny would be alright.  A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair."  (Exhibit 90.)  A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission."  (Exhibit 77.)  Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work

on cars." (Exhibit 96.) Toby was intimate with Kenny's fears but knew that Kenny "was not

dangerous," and Toby "was not afraid of him." (Exhibit 96.) Toby thought that Kenny "did the

best he could" and saw that his father "had a tender side to him" that helped "offset the pain of

having a dad with mental problems." (Exhibit 96.)

The family hoped that Kenny could recover. His mother described their

observations:

> As time went on, he did a little better, built a garage and fixed everything from
> appliances to cars, trucks, and trailers for friends and neighbors. He stayed more
> and more to himself, though, and did not like to leave the property. Friends
> bought him food and went grocery shopping for him. He ate most of his meals at
> my trailer, and I cooked for him. I hoped and prayed he was going to make it. At
> least, I believed, with him living right next door, he was safe and I could keep an
> eye on him. We had our arguments; that's for sure. He was so paranoid and
> crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

### b. Kenny Barrett's mental illness and organic brain dysfunction.

Mr. Barrett's trial counsel had a duty to obtain this information about his family

and his own personal history. This is the story of a unique human being whom jurors never met.

If trial counsel had gathered this readily available information and provided it to a qualified

expert, as prevailing professional norms required, the jury would have understood how Mr.

Barrett's life history, while intrinsically compelling, also has profound implications for a

scientific understanding of his mind and actions. A competent mental health expert would have

seen significant risk factors in Mr. Barrett's background that would have helped explain who he

is and why he would act as he did.

> Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

(Exhibit 117 at ¶ 22.)

An expert presented with the available background data would have informed the jury that Mr. "Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency."  (Exhibit 117 at ¶ 30.)

> His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

(Exhibit 117 at ¶ 32.)

As Dr. Woods explains, research published by the National Academy of Science documents the impact of such parenting on a child's developing brain:

> *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. ***

> [¶]     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

> [¶]     The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Mr. Barrett's development.  His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.  (Exhibit 89 at ¶ 23, Exhibit 117 at ¶ 37.)  Mr. Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.  (Exhibit 89 at ¶ 23.)

> Mr. Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical

dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

(Exhibit 117 at ¶ 44.)

Jurors would want to know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenny Barrett. Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants. During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development. Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

[¶] Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade. By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

The life history information that was available to trial counsel includes evidence of other sources of trauma that placed him at risk for organic brain impairment. (Exhibit 89 at ¶ 21, Exhibit 171 at ¶ 41.) He was hit in the head with a steel ball when he was eight or nine years

old; at age 17, Johnny Philpot beat Mr. Barrett about the face and head, including a blow that broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a shotgun. *Id.*

If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Mr. Barrett's jury would have heard extensive evidence of mental illness and impaired brain functions due to organic damage. As explained by Dr. Young: "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Exhibit 89 at ¶ 28.)

The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

> More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

(Exhibit 89 at ¶ 26.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and medical records. (Exhibit 89 at ¶¶ 20-26.) The objective testing and historical study performed by Dr. Young constitutes an accepted, reliable method for assessing cognitive function. (Exhibit 89 at ¶ 62.) Based on the historical data available at the time of trial and the scientific literature, Dr. Young opines that the damage to Mr. Barrett's prefrontal cortex likely stems from abnormal prenatal development, traumatic brain injuries Mr. Barrett suffered, and drug abuse. (Exhibit 89 at ¶¶ 63-65.)

Like any other person, Mr. Barrett has areas of weakness and areas of strength in the many brain functions evaluated by a neuropsychological test battery. However, testing shows Mr. Barrett is impaired in some areas which means that he functions at a level below the average person, and sometimes far below. The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

> that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use

of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Exhibit 117 at ¶ 58.)  In less scientific terms, Mr. Barrett has brain damage that makes him less able than a normal person to process information and formulate a rational response.

Mr. Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in ways that complement (aggravate) his other impairments, as they relate to culpability in the death of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning, interpreting and processing speech and the emotional tones and meaning in speech.  The temporal cortex is also responsible for processing visual information.  Dysfunction of the temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and outbursts of aggression.  (Exhibit 89 at ¶¶ 36-77.)

Based on Dr. Young's findings and his own assessment, psychiatrist George W. Woods, Jr., M.D. concludes that Mr. Barrett experiences dysfunction in the areas of the brain that are necessary to sound reasoning, judgment and planning.  That is, "Mr. Barrett . . . suffers from a Dysexcutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™. (Exhibit 117 at ¶ 67.)  In other words, Mr. Barrett's ability to accurately and appropriately process, retain, integrate and respond to information and events as they unfold is significantly compromised.  (Exhibit 117 at ¶ 58.)

The areas in which Mr. Barrett experiences impairment make understanding his functioning a necessary part of understanding him as a unique human being trying to get along in the world, and for understanding the events of September 24, 1999.  The problems Mr. Barrett

has experienced from organic brain impairments are compounded and exacerbated by severe psychiatric illness.

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  * * *  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

(Exhibit 117 at ¶ 66.)  As Dr. Woods states it, Mr. Barrett's cognitive functioning and behavior "is severely compromised by overlapping symptoms of depression and mania ... and impairments in [the] higher cortical regions necessary for inhibition, reasoning and judgment." (Exhibit 117 at ¶ 66.)

The development of Mr. Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses.  As shown in the attached medical records and summarized *supra*, Mr. Barrett comes from a family plagued with bipolar disorder. The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors.  (Exhibit 117 at ¶¶ 63-65.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning.  "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect."  (Exhibit 117 at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types

of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Petition, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

[¶] Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

[¶] The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶] Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (Exhibit 117 at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶] Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶] Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶] Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶] He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶] Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶] Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶] Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶] Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶] Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶] My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation. If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings. (Exhibit 55 at ¶ 16.) Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods. (*Id.* at ¶ 23.)

> Taking [the social history] information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id.* at ¶ 24.)

Armed with the available information, trial counsel would have been able to persuade the jury on multiple fronts including (a) doubts about the truthfulness and motivations of the prosecution's informants; (b) doubts about the need for a no-knock warrant (including whether Mr. Barrett could have failed to appear for a trial that was not going to happen); (c) the inappropriate nature of the raid and the tactics that call into doubt whether Mr. Barrett could have seen that his attackers were law enforcement officers; (d) that the Tact Team recklessly approached a man who was hyperreactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened; (e) that Mr. Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to

see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate; (f) that apart from the conditions existing at the time of the offense, Mr. Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect; (g) that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

As elaborated in the conclusion to Mr. Barrett's second stage ineffective assistance of counsel arguments, trial counsel had a clearly defined duty to investigate, develop and present this mental health evidence in the penalty phase of trial. The mental health evidence that could have and should have been presented on Mr. Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death to one or more persons in addition to Trooper Eales, and that Mr. Barrett committed the offense after substantial planning and premeditation.

The evidence presented here shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law. There was abundant undisclosed mitigating evidence which, taken as a whole, might well have influenced the jury's appraisal of Mr. Barrett's culpability. Had the jury been able to place the evidence related to both phases of trial on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance. Accordingly, the sentence of death should be vacated.

### c.  The prosecution's exploitation of trial counsel's deficient performance.

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments.  Due to the unreasonable failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Due to trial counsel's unreasonable failure to inform the jury regarding Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Prosecutor Littlefield ran down a list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented.  Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process.  Left unsaid was what kind of father he was.  The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail.  As to Mr. Barrett's relationship with his mother, Gelene Dotson, the

prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them. Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs. As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply. Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child. Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison. Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently. This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards." Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent. (R. 5354, 5356.)

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as

simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358.)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett.  Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.  If the jurors were tempted to feel any

sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct.  Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase.  Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst."  Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim.  (R. 5417-20.)

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005.  By the beginning of July, trial counsel were searching about for a mitigation specialist.  In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history.  In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December.  The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation.  Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel.

Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation, exacerbated by the trial court's funding restrictions (*see* Ground Three), is manifest because the Government's case for death was hardly overwhelming.  The jury rejected the death sentence on Counts 1 and 2.  Even though the death sentence was imposed on

Count 3, the jury rejected the non-statutory aggravating circumstance that Mr. Barrett would constitute a continuing threat to society.  The statutory aggravating circumstances the jury did find all revolved around the circumstances of the commission of the offense (which, it should be noted, would have been viewed in an entirely different way had counsel not rendered ineffective assistance in the guilt/innocence stage).  Especially where, as here, the case for death was not overwhelming, prejudice from counsels' unprofessional performance is readily apparent.

Due to the lack of investigation, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parents' inability to sustain a life, and finally landing in Sequoyah County.  There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him.  He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage.  Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to.  The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation.  Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

Page 248

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This is a claim of ineffective assistance of trial counsel, which is properly raised for the first time in post-conviction proceedings, because it relies largely on evidence and investigation outside the trial record.  To the extent any of the individual claims of ineffective assistance of appellate counsel could have been raised on direct appeal, appellate counsel was ineffective. Claims of ineffective assistance of appellate counsel are properly raised for the first time in post-conviction proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes   ☐         No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes   ☐         No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes   ☐         No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND THREE**:

**Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§3005 & 3006A.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

        Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this petition, and all supporting exhibits, as well as all facts, allegations and

Page 250

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Grounds One and Two, *supra*.

Page 251

Mr. Barrett had a history of psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Exhibit 117; Exhibit 147.) Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Exhibit 147; Muskogee County Jail Medical Records of Kenneth Barrett; Exhibit 118.) In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore, he has a multi-generational predisposition to developing serious mental illness, including the Bipolar Disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history, indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Exhibit 118; Exhibit 89; Exhibit 117.)

Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, and other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).)

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a

mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions.   (Decl. Richard H. Burr dated 4/4/05, filed as Exh. C to Doc. 107, at 4, 8.)  To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms.  *See also* Ground Two, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Exhibit 53.)  "The standard practice in federal capital trials is to provide the services of more than one mental health expert."  (Decl. Richard H. Burr, filed as Exh. C to Doc. 107.)  Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Exhibit 118.)

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  Trial counsel informed Dr. Russell in August 2005 that the court would not fund a thorough investigation for mitigating circumstances.  (Exhibit 56.)  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence.  *See* Ground Two, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation.  (*Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97).)  Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases demand a higher level of due process, and contrary to the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District.  (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense.  (*See* Order filed 3/18/05 (Doc. 97) at 3.)  Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn.  (*See* Doc. 50 at 5-6.)  Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour.  This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases.  (Exh. C to Doc. 107, at 8.)  The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants.  (Doc. 107.)  That psychologist had been compensated in other similar cases at a rate

Page 254

of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. (*Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction.  (Doc. 50 at 8.)  Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain damage, and that he had suffered significant head injuries during his life.  (*Ibid.*)  Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation.  (Doc. 97 at 3.)  This summary denial was highly prejudicial to Mr. Barrett.  The only expert on whom trial counsel attempted to rely, Dr. Russell, had not evaluated Mr. Barrett for mental illness or organic brain dysfunction.  (Exhibit 56.)  As shown in the attached declaration of Myla Young, Ph.D. (Exhibit 89), Mr. Barrett's history of insults to his brain resulted in significant impairments in his functioning.  (*See* Ground Two, *supra*.)

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs.  Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial.  (Docs. 50, 107.)  A mitigation specialist is an essential member of the team in a capital case.  (ABA Guideline 10.7.)  Without explanation, the court

limited the mitigation investigation to 100 hours and no travel.[35]  As resource counsel informed

the court at the time,

> The number of hours requested by the defense is well below average.  The average
> number of hours worked by mitigation specialists in federal capital cases is 600
> hours.  In a number of cases, mitigation specialist services have exceeded 1000
> hours.  Investigating a client's life history thoroughly - through gathering and
> reviewing documents and interviewing scores of witnesses who are often difficult
> to find - and working with counsel and other experts to develop the themes of
> mitigation and the way in which mitigation will be presented, is extremely labor
> intensive.  The modest number of hours requested by the defense here reflects the
> hope that the mitigation investigation previously conducted, but not completed in
> the state prosecution will be of use in the current investigation.  Measured against
> the number of hours authorized for mitigation specialist services in every other
> capital case in which the death penalty has been authorized, the 100 hours
> approved by the Court is grossly inadequate.

(Exh. C to Doc. 107 at 4.)

The court's withholding of resources was highly prejudicial.  Shortly before trial,

trial counsel turned to Dr. Jeanne Russell, for whom the court had approved some funds, and

asked her to conduct a mitigation investigation.  (Exhibit 56.)  Dr. Russell was not qualified to-

perform that role, even if trial counsel had contacted her in time, which he did not.  (*Id.*)  Trial

counsel informed Dr. Russell that the defense's efforts were hampered by the court's refusal to

approve resources for a comprehensive mitigation investigation.  (*Id.*)  As shown in the social

history presented in Ground Two, Part B, and the numerous declarations cited therein, a

reasonable mitigation investigation, including travel to the various states in which Mr. Barrett

lived as a child and adult, would have produced abundant mitigation evidence.

---

[35]  The court authorized "100 hours at $150.00 per hour" apparently without realizing that the
mitigation specialist counsel had consulted quoted a rate of $75 per hour.  (*See* Doc. 107.)

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4.)  The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2.) "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours."  (Exh. C to Doc. 107 at 3.)  The Court was aware that this rate was considered reasonable by experts in relation to the practice in other federal capital cases.  Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  (Order filed 3/18/05 (Doc. 97) at 2 n.2.)  The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense System ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Exhibit 111.)

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of

an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing

up to 80 hours work, billed at a rate of $200.00 per hour, in addition to $1,000.00 for lodging,

travel and incidentals.  (Doc. 50 at 7.)  While the Government faced no limits on its ability to

marshal this type of evidence, the court, again without explanation, authorized less than one

fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably

necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3 *and with*

18 U.S.C. § 3005).  Moreover, the court did not authorize any lodging or travel expenses

whatsoever which would have made it impossible for a defense expert to observe the testimony

of the Government's expert and impossible for the defense expert to travel to Oklahoma to

testify.

　　　　After advising Mr. Barrett's counsel that "this Court has[] never allowed crime

scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr.

Barrett seventy-five percent of the time and one hundred percent of the in-court assistance

counsel needed from Mr. Hueske, the Court admitted the Government's crime scene

reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was

impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the

Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination

of the Government's "expert."  To the extent the Court's statement about its past practice

regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted

active interference in the functioning of the defense.  *See* Ground One, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial.  As set forth in Ground Two, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started.  Even if counsel had not succeeded in excluding that testimony entirely, counsel would have been far better able to rebut it.  For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

i.      Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

ii.      Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

iii.      Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

iv.      Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

v. Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

vi. Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

vii. Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

viii. Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

ix. Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

x. Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings; Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)      Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)      Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)      Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)      Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Exhibit 109.)

The trial court denied Mr. Barrett due process, equal protection, and his statutory rights to develop a defense by denying him meaningful access to an expert in law enforcement tactics.  As stated in Ground Two, *supra*, trial counsel sought funds to retain Dr. George Kirkham, a criminologist, sworn law enforcement officer, and expert in police tactics.  (Doc. 50 at 5.)  Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida.  (*Ibid.*)  The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel.  (Doc. 97 at 3.)

As stated in Ground Two, *supra*, if trial counsel had been able to retain Dr. Kirkham, or had been diligent in pursuing his services, the jury would have heard that the raid on Mr. Barrett's home (a) violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored; (b) was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence; ©) was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and (d) unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers. Dr. Kirkham would have explained how these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder. (Exhibit 44.) That is, with expert assistance, Mr. Barrett would have been able to show that he did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's claim that he had such intent. Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. *See* Ground Eighteen, *infra*. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized. *Id.* and Ground One, *supra*.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial.  Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial.  The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   □         No   □

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   □         No   □

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   □         No   □

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOUR**

> **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware*, <u>438 U.S. 154</u> (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

As shown in Ground Two, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid.  Suppressed *Brady* material and other evidence gathered in support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting

information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information. No reasonable person could put stock in anything he says. Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999. Numerous other felony charges against him were dismissed because of his work as a snitch. He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community. His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies. He has a history of promising to appear in court and then failing to appear. He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation. He is a long time drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth. Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave. All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug

usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr.

Barrett's residence during the critical time. Yet Johnson still relied on this miscreant as a

"reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to

produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from

several people in the community, including one of Sanders's uncles, who say without reservation

and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that

this is the opinion by acclamation in the community as a whole. (Exhibit 90; Exhibit 70; Exhibit

94; Exhibit 76; Exhibit 13; Exhibit 95.) Sanders claimed that he and Janesse Thomas bought

drugs at Mr. Barrett's a few days before the shooting incident. Ms. Thomas says this is

absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly

dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable

informant, about whom nothing had to be revealed to a reviewing magistrate? It simply does not

wash. Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders

for information about Mr. Barrett or anyone else, let alone presenting that information in a search

warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty.

As stated in Grounds One and Two, Mike Littlefield informed the court of a witness who failed

to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally

impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this

hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I.  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate.  Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to

escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant.  In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth.  Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  (Exhibit 29.)  *See* Ground Eighteen, *infra*.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent.  He has more than made the requisite showing.

Page 269

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐        No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

       Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

       Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

       Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FIVE**

> **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

       Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses. Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed. Threats to witnesses to get them to cooperate with the Government were not disclosed. Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, the relevance of which is explained in Ground Five, Part B.2, *infra*. Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense. (*See* Ground One, *supra*.)

Some of the evidence discussed below was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders. The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Ground One, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  The Government also sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – vacation of Mr. Barrett's convictions and sentences is required.

A.    **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

1.    **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences.**

### a.    Charles "Monk" Sanders

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.  Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the defense Sanders's complete criminal history, which could have and should have been used for impeachment purposes.  It was argued in Ground Two that trial counsel were ineffective in failing to cross-examine Sanders about all his previous criminal convictions and dismissed cases; counsel unreasonably failed to make a search of Sanders's available court files.  Above and beyond that failing, the prosecution was obligated under *Brady* to reveal Sanders's complete criminal history to the defense, since it constituted impeachment evidence.  The prosecution failed to do so, papering over Sanders's appalling criminal history on direct examination, and

leaving defense counsel to simply scratch the surface based on what counsel was able to glean from the Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant was secured..  Sanders's testimony was critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Ground Two, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346 (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine.  Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain.  Two applications to revoke Sanders's suspended sentence were filed.  Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program.  The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124.  (Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346.  Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses.

Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19.  (Exhibit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (Exhibit 162.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and

feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement.  On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board.  Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***." (Emphasis added).  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor

drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this §2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied.  Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview.  However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received.  (Exhibit 14.)  This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim.  Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.

### b.  Travis Crawford.[36]

During the investigation conducted for this §2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters.  Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the  Sequoyah County drug charge.  (Exhibit 45.)

---

[36] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post.  Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing.  (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[37]   Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Exhibit 45.)  Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble.  Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield)  would have known Crawford was high.  Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony.  (Exhibit 45.)

---

[37] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history.  Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial.  Mr. Crawford was not honorably discharged.  (Sealed military records of Travis Crawford.)   He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home.  (Exhibit 143.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony. Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement. According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*. (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial. *See* Ground Two, section A.4, *supra*. Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement. (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*. Due process and the rules of professional conduct required AUSA Littlefield to correct Travis

Page 281

Crawford's false testimony about being off drugs. The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony. Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing. Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. (Exhibit 45.) Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Ground Two. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Exhibit 6.) This

exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply assumed that having an active case meant the same thing as having an active arrest warrant. (Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft. (Exhibit 45.)[38]

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense. Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in

---

[38] At the time the original and corrected §2255 motions in Mr. Barrett's case were filed, Travis Crawford had declined to sign a declaration reflecting his statements to a defense investigator currently working for Mr. Barrett. Thus, declarations reflecting what Mr. Crawford said were filed by his parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the §2255 action, Mr. Crawford has signed his declaration.

this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory." Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c.      Cindy Crawford.

As outlined in the first stage ineffective assistance of counsel argument (Ground Two, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided. In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009. Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson. (Exhibit 31.) Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government. According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her. Philpot told her she had to go with him. Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Exhibit 31; Exhibit 14.)

Armed law enforcement officers were also present during the interview.  They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her.  Littlefield told her she need to work with him and testify against Mr. Barrett.  Otherwise, she was going to prison.  Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case.  Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[39]  While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care.  Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview.  (Exhibit 31; Exhibit 14.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony.  Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him.  Again issuing threats,

[39] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property.  She had done drugs at Mr. Barrett's residence, but did not know who supplied them.  Ms. Crawford never bought drugs from Mr. Barrett.  (Exhibit 31; Exhibit 14.)

Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Exhibit 31; Exhibit 14.)

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Exhibit 31; Exhibit 14.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Exhibit 31; Exhibit 14.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Exhibit 31; Exhibit 14.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and

Page 286

testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If you had ever crashed from a meth high, you would know that you would not be in your right mind." (Exhibit 31; Exhibit 14.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Ground Two) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[40] (Exhibit 144.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Exhibit 31; Exhibit 14.)

---

[40] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident Crawford described nor anything like it ever happened. (*See* Ground Two; Exhibit 104; Exhibit 31.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats. The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent. To quote Ms. Crawford, "They [the Government] were very angry. They scared me and threatened me." Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Exhibit 31; Exhibit 14.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford. Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect. The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony. If not, this evidence is at a minimum newly discovered. It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial. The Government's intimidation of and

Page 288

threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office. The Government's failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More significantly, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-2004-613 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the

acceleration action was filed because Crawford had finally "paid in full." (Exhibit 170.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed.

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (Exhibit 169.)

### d. Brandie Zane Price.

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females

within the Oklahoma Department of Corrections.  The balance of her sentences were suspended

upon her completion of the program.  (R. 3487.)  Responding to feeds by prosecutor Littlefield,

Price testified that the program "worked," that she was "absolutely" clean of drugs, and,

presumably, was not engaging in any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the

Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams,*

*et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to

approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment

alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from

the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per

delivery, receiving between one delivery and as many as three deliveries a week.  (Doc. 18, CR-

07-16-RAW.)  (Exhibit 174.)  Mr. Barrett's trial concluded November 17, 2005, and he was

formally sentenced on December 19, 2005, less than two weeks before the same United States

Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of

methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116,

CR-07-16-RAW) (Exhibit 174) charging that from May, 2006 to February 20, 2007, she

distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine,

or a mixture or substance containing methamphetamine.  A plea agreement, in which Price

agreed to provide all information regarding criminal activities known by her to the Government,

and in which the Government, based on its assessment of the value of her cooperation, agreed, if

appropriate, to move for a Guidelines downward departure, was entered into.  (Doc. 121, CR-07-16-RAW.)  (Exhibit 174.)

Price was ultimately sentenced to sixty months imprisonment.  (Doc. 218, CR-07-16-RAW.)  (Exhibit 174.)  She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*  Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release.  In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release."  (Exhibit 70.)  Thus,  Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[41]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing.  This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government.  Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own

---

[41]  The various sentencing memoranda and motion for downward departure are sealed.  Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

federal drug case.  The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial.  The Government's knowledge of these facts expose it once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.   Karen Real.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense.  (R. 3076-77.)  At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[42]  During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation.  Real initially answered "[n]o, sir."  Littlefield then asked, "Did I talk about anything I'd say to the court?"  Real responded, "Well, you just mentioned that, you know, what I did.  And that it would be up to the judge."  (R. 3080-81.)  On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything.  (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded.  On March 1, 2006, the Government did much more than

---

[42]  In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5).  Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3.  (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion.)  (Exhibit 68.)

Page 293

"mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.)  (Exhibit 68.)  On April 25, 2005, the sentencing court reduced Real's sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody.  (Doc. 158 in Case No. 6:00-cr-21-FHS.)  (Exhibit 68.) The Government also violated its *Brady* obligations by failing to disclose the numerous state cases, discussed in Ground Two (4)(f), that were dismissed against Real, and which could have been used as impeachment evidence.  The Government was obligated under *Brady* to disclose to the defense Real's criminal record, and failed to do so.  As with the other *Brady* violations discussed here, Mr. Barrett was prejudiced by the Government's "hide the ball" approach.  Due to its failure to follow the law, the Government was allowed to portray this witness as far more credible than she really was.

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real.  The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred.  The Government has a continuing duty to disclose exculpatory evidence under *Brady*.  The Government's true intentions were never disclosed to the defense or told to the jury.  Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial.  Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial.  Yet again, the

Page 294

Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a constitutional violation..

#### f.      Randy Turman.

It was argued in Ground Two that counsel were ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447 (Exhibit 195), and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial.  Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway.  It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch.  Otherwise, there was no reason for his case to lie dormant for two years.  The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head.  Clearly, his testimony was motivated by the fact he had a still pending felony case.  Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation.  The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

734

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal.  (Exhibit 195.)  This constitutes newly discovered evidence.

### 2.  The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders.

In Ground One, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant.

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.

> **B.**     **The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel.**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress.  The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

### 1.      Evidence of Clint Johnson's illicit activities.

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the

nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's

tragic death never would have occurred.  The Government or its agents knew that Johnson, just

like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of

areas.  To the extent the impeachment evidence discussed below was generated after Mr.

Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of

this evidence, or had a duty to become aware of it, and has once again failed to fulfill its

*continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not

only could have been used to attack the overall testimony of Johnson and Sanders, but could have

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint

Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official

investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his

official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another

critical witness in the Government's case against Mr. Barrett, colluded with and protected

Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock

search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would

have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's

numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson,

Lyons and a number of other state law enforcement officers involved in Mr.  Barrett's case had

Page 298

been involved in a series of crimes involving the misuse of their office.  On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Exhibit 181 - Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.)  On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Exhibit 181 - Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanax and Darvon. (Exhibit 181 - OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated

Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances.  He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (Exhibit 181 - *In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.)  In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him.  (Exhibit 181 - Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray).  On November 23, 2005, Sheridan noted Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation.  (Exhibit 181 - Log of events from November, 2005 to January, 2006 by Jeff Sheridan).  It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations.  In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case,

Page 300

and barred further prosecution, based on defense counsel's scathing impeachment of Clint

Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on

June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds.

(Exhibit 181 - Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,*

Cherokee County Case No. CF-2007-28, June 4, 2008.) (hereinafter "Gray RT".)  During the

cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a

child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and

that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27);

2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of

the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would

do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and

drove her car, and when government officials confronted Johnson about property he had illegally

taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did

borrow, money from counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson

illegally released funds seized from defendants to defense counsel, and then obtained kickbacks

from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his

own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from

drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson

began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's

lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned

of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case. Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's convictions. At an evidentiary hearing conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. ½6/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

Page 302

holding that only what occurred before the no-knock warrant was issued was relevant.  Counsel responded that he always believed the C.I. was not a real person, but a composite.  (Tr. 1/ 26/05, Hr'g at 83-90.)  In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004.  Of course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false.  Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences.  The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source.  The Government, which had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation."

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999.  Johnson replied, "They [meaning drugs] were probably used some, yes, sir."  Asked if the C.I. sold drugs, Johnson stated "Not that I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this §2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact

with Sanders and not recklessly disregarding the truth of his activities.  (Exhibit 90; Exhibit 95.)

Johnson's testimony was false on a material matter and prevented proper development of

evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had

every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but

stood silently by as Johnson gave false testimony.

The Government was well aware of damning evidence regarding the alleged C.I.,

Charles Sanders, but used objections to prevent counsel from eliciting this information in order

to build a record for a motion to suppress.  It was not until trial, when Sanders testified, that only

some of his criminal history, but not the many deals and the repeated lenient treatment he had

received, was revealed.  By then, the challenge to the search warrant that was mounted was

incompetent, as detailed in Ground Two.

### 2.	David Michael Littlefield's illicit activities.

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
> for his work as chief prosecutor in the case; and to Sequoyah County Sheriff
> Johnny Philpot, who was instrumental in identifying key witnesses who could
> prove Barrett acted with premeditation.

 (Exhibit 69 - Tahlequah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the

seven drug-addict informants to support the Government's case, as he stated during the *ex parte*

hearing held September 13, 2005, and discussed elsewhere in this Petition.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to

provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the

seven informant witnesses, it is likely that others were threatened as well.  Support for this claim

comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse. On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A). Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs. *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007. Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[43] (Exhibit 156 - Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*) On September 14, 2009, the Oklahoma Supreme Court determined that, based on the Bar Complaint filed against Littlefield, he should receive a private reprimand by the Court, scheduled to occur on October 22, 2009. (Exhibit 53.)

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr.

---

[43] The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea. It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Barrett's case.  (Exhibit 189 - Affidavit for search warrant, SW-07-34, filed in Muskogee County

District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in

the court record on April 23, 2007.  (Exhibit 189 - Search warrant, SW-07-34.)  Various camera

and computer equipment were seized in the search.  (Exhibit 189 - Search warrant return, SW-

07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea,

receiving a very generous sentence which has already been dismissed, with the case file

expunged.

The Bar Association action resulted in a private reprimand.  (Exhibit 53.)

Littlefield was found guilty of violations of Rule 8.4(b) of the Oklahoma Rules of Professional

Conduct, and Rule 1.3 of the Rules Governing Disciplinary Proceedings.  *Id.*  Thus, the

Oklahoma Supreme Court found Littlefield's actions reflect adversely on his honesty,

trustworthiness, or fitness as a lawyer in other respects.  *Id.*  Just as the Oklahoma Supreme Court

found that Littlefield's conduct brought "discredit upon the legal profession," this Court should

find that his conduct both in and out of court during Mr. Barrett's trial brings discredit upon the

judgment of conviction and sentence of death Littlefield engineered.

Littlefield's child abuse charges are relevant to the manner in which he handled

the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about

using his minor children as punching bags for years to work out his "temper fits" and frustrations

would have no problem threatening witnesses with all manner of dire consequences to keep them

in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence

regarding Littlefield's own deplorable and shocking criminal conduct against his own children

not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by

Littlefield to secure their testimony, and Randy Weaver's assertion that Littlefield tried to

intimidate him, but also is relevant to Mr. Barrett's claim of prosecutorial misconduct dealing

with the manner in which Littlefield handled his informant witnesses in an attempt to prevent

defense counsel from having anything close to a reasonable opportunity to investigate the

backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to

intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield
> got angry with me when I told him that I thought that Kenny's state sentence was
> fair and that it was un-American to try him again since he had been convicted and
> sentenced.

(Exhibit 85.)[44]

---

[44] Since Mr. Barrett's original Motion to Vacate was filed, there has been continuing
investigation into Littlefield's Muskogee County child abuse charges, which have been shrouded
in secrecy because the file was apparently improperly expunged even before his 2-year deferred
sentence expired.  An investigator working on Mr. Barrett's case interviewed Tim Brown, the
current chief of police in Webbers Falls, Oklahoma.  Mr. Brown was formerly a lieutenant in the
Muskogee County Sheriff's Department.  He was employed with the Muskogee County Sheriff's
Office at the time criminal charges were filed against Littlefield.  He was also a member of the
Eastern Oklahoma Regional Child Death Review Board.  According to Mr. Brown, Littlefield
threatened the sheriff's investigators working on the child abuse case.  Littlefield also dismissed
the charges as "bullshit" (a protestation of innocence belied by his later *Alford* plea), and,
adopting a victim role, claimed the Muskogee County Sheriff's Office was "trying to get him."
In addition to committing child abuse, it was alleged by Mike and Dawn Littlefield's daughter
that her parents smoked marijuana in front of her and her younger brother.
     According to Mr. Brown, the prosecutors assigned to Littlefield's criminal case from the
Oklahoma Attorney General's Office were scared that Littlefield's prosecution would "open up a
can of worms" because Littlefield, while he was employed with the Muskogee County District
Attorney's Office, had prosecuted most of the big drug cases brought in that county.  During the
                                                                              (continued...)

During the penalty trial Littlefield repeatedly questioned Mr. Barrett's ex-wife, Abby Stites, about instances of violence in their marriage. Each time Ms. Stites put these events in context – including Mr. Barrett's mental illness and her own violence towards him – Littlefield returned the jury's attention to Mr. Barrett. It is now clear that Littlefield had his own guilt to project onto Mr. Barrett during this cross-examination. Although jurors rejected the idea that Mr. Barrett was a future danger, it is likely that Littlefield's harping on the violence in the Barrett marriage had an impact on the jury's assessment of the appropriate punishment. This Court should not permit a death verdict to stand where it was influenced by the rhetoric of a prosecutor expiating his own sins of abuse on the life of the defendant.

### 3.     John Philpot.

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them. This was the repeated theme of the Government's case, based on its seven informant witnesses.

---

[44](...continued)
continuing defense investigation into this matter, former DHS child abuse investigator Melissa Todd was also interviewed. While she declined to discuss Littlefield's criminal case because of confidentiality concerns, she attested to the honesty of Tim Brown. (Exhibit 43.)

Littlefield's conduct lends additional support to Mr. Barrett's claim that Littlefield threatened the informant witnesses he cultivated for Mr. Barrett's federal prosecution. It shows that Littlefield behaved as a law unto himself, a pattern of conduct indicating he would have few qualms about concealing *Brady* material and sponsoring false testimony. Mr. Barrett will continue to seek information from the Government about these matters and amend his claims as the information becomes available to him.

Page 308

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Exhibit 6.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime, no-knock warrant, demonstrating there was no probable cause for a warrant of this type.  Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment.  This evidence would have discredited the seven snitches, some of whom claimed they were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot.  This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers.  Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony

would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses, were known and became known to the Government and its agents.  This evidence  was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome.

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever.

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony.

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

**C.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses.**

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Exhibit 92; Exhibit 31.) For example, Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. (Exhibit 43.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in

order to prevent meaningful interviews with them, including by preventing interviews with

incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and

honesty.

Prosecutors intentionally withheld the names and contact information for these

witnesses. On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense

counsel that the Government did not intend to reveal the identity of the confidential informant,

and added the "situation would change should we determine to utilize this individual as a

witness." The Government did not reveal the identities of its seven key witnesses until

September 15, 2005. In order to keep the identities secret past the deadline imposed by 18

U.S.C. § 3432, the Government filed a baseless motion for a protective order. The trial court

found the Government could have filed its motion to keep the witnesses' names from the defense

weeks earlier. (Tr. 9/13/05 Hr'g at 5). The trial court found the Government's motion did not

present any evidence to justify withholding the names and other information from the defense.

(Tr. 9/13/05 Hr'g at 4). The prosecutor admitted that the Government could have raised its

concerns about at least some of the witnesses earlier. *Id.* at 9. Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate

witnesses that you [the Government] are aware of." *Id.* at 19.[45]

During an *in camera* hearing on the Government's motion for a protective order,

AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield

was making inconsistent claims. On the one hand he was claiming that the defense attorneys had

---

[45] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b) that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the

prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Ground One, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court.  (Tr. 9/13/05 Hr'g at 10, 12.)  The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present.  *Id.* at 27.  In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense.  *See* Ground One, *supra*.  Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense.  To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Ground and Ground Two, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

### D.  Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument.

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stites' charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26,

5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.)  As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object.  The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate.  Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly,  Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.)

Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[46] "three hots and a cot" argument, Sperling repeatedly – and  falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.)  Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  (R. 5412.)  Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  (R. 5412.) In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent."  (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence."  Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?"  The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[46]  Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[47], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify. (R. 5414-15.)

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding

---

[47] This was a knowing false statement on the prosecutor's part. As discussed in Ground One, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.)

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.)

Sperling improperly aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.)

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground Two. The error stemming from

prosecutorial misconduct cannot be termed harmless. This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

A claim of prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Five:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)  **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐  No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐  No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐  No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐  No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIX**

> **Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The court wrongly excluded relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and improperly restricted the jury's consideration of the state-court verdict.

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument,

mocking the notion Mr. Barrett had any remorse at all. The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.) During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse. With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.) As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation. In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is an important mitigating factor. This is particularly true when, as in this case, the Government emphasized the lack of remorse in closing argument.

The court's error in excluding this evidence prejudiced Mr. Barrett. Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death. The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case. 21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice. Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that

expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

Appellate counsel were ineffective for failing to raise this issue, clearly framed by the record, on direct appeal.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Six:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

Page 325

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

    Yes  ☐    No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes  ☐    No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes  ☐    No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes  ☐    No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SEVEN**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**.

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr. Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist.  The belt left an unusual bulge that was visible through Mr. Barrett's clothing.  The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape.  The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use.  Mr.

Page 327

Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape.  In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating restraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal Service.  This ruling, in addition to violating the constitutional rights mentioned above,  violated Mr. Barrett's right to a fair and impartial trial judge.  *See also* Ground One.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment.  It just seems that it's a common – almost a common sense call under those circumstances."  (Tr/ 9/13/05 ex parte Hr'g at 13.)  The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in the fashion Mr. Barrett was.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury.  (Exhibit 80.) In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot.  The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and

communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial. (Exhibit 29.)

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal. *See* Ground Eighteen, *infra.*

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Seven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐     No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐     No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHT**

> **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The factual allegations set forth in more detail in Grounds Two and Thirteen, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  Mr. Barrett was

Page 332

involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information. (Exhibit 89 at ¶¶ 36-38; Exhibit 117 at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young. In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the

preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage. (Exhibit 117 at ¶ 81.) The distorting and distracting effects of the PTSD were exacerbated by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (Exhibit 117 at ¶ 79.) In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder. (Exhibit 117 at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck." (Exhibit 117, at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

As discussed more fully in Ground Thirteen, the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments. Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such

behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)        **Direct Appeal of Ground Eight:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND NINE**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

At Mr. Barrett's trial, both the prosecution and the defense requested that the trial court instruct on voluntary manslaughter.  (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. § 1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind the authority applicable to this issue, the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element.  To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove

beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute.  The crux of the whole case was knowledge and intent.  The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties.  The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired.  This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Mr. Barrett also contends, as was discussed in Ground Two, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for Counts 1 and 2.  Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined.  When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder.

As set forth in Ground Eighteen, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly insofar as the error was conceded by the

Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  (Exhibit 29.)

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Nine:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐        No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐        No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐        No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TEN**

>   **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached, to a limited and ineffective degree, on cross-examination.  As argued elsewhere in this Petition, if trial counsel had

conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented. Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue as one of guilt or innocence. Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it

might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, direct appeal counsel were professionally unreasonable for failing to raise this issue on direct appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Ten:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

Page 344

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐      No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐      No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐      No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND ELEVEN**

> **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no.  I don't believe in it."  The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life.  Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the

Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration."  Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty."  The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" (R. individual jury selection 824-25.)

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him."  Told by the prosecutor that a jury's death verdict was not just a recommendation, and that the judge could not change the verdict, the juror said, "I could not do that, huh-uh."  (R. individual jury selection 825-26.)

The court asked additional death-qualification questions of the juror:

Q.       ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your

personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.    If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.    So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.    I understand that.

Q.    And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.     I would consider it, yes.

Q.    And, of course, when you say "consider it," couched in the –  in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.    Right.

Q.    – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.    I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.      Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.      Uh-huh.

Q.      And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  (R. individual jury selection 829.)  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes."  (R. individual jury selection 829-30.)  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that

 would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose.  The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this

defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.)  Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]"– the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this.  And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it.  So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this.  But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that.  Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it.  So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad."  In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be."  (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually

vote to impose the death penalty.  Juror 62 responded reasonably that everything would depend

on the facts, but gave every indication that she could consider both penalties, despite her personal

views on capital punishment:

> Q.     All right.  Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A.     I never heard anything so heinous that I even had to think about it.  But I would have to give it a lot of thought.  But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.
>
> Q.     Okay.  Well, at the end of the day –
>
> A.     Okay.
>
> Q.     – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?
>
> A.     Like I say, it depends on what he has done and how bad I think it is.   And I'd have to weigh all of the things – I cannot say yes nor can I say no.  I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes.  But I'd have to really decide for myself – you know, I'd have to hear it.  I can't say no, I'll just go in here and sign it.  I'd have to see how bad it is.  And it would have to be really bad.

(R., individual jury selection 832-33.)

The United States Attorney then had the temerity to tell the juror that he could not

"try the case for you today," detailing the facts of the case so as to inquire whether, on those

facts, they would be "bad enough" for her to return the death penalty, even though he asked her

repeatedly to commit in advance to signing a death verdict.  (R. individual jury selection 833-34.)

Worn down by repeated questioning on whether she could not just consider both punishment

options, but could put her name to a death verdict, the juror, again very reasonably in light of the

fact she had heard no evidence, said, "Well, let me just say no, then.  Because, you know, I would have to say no right now.  I know no other thing except to say no, I could not sign it."  (R., individual jury selection 834.)

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 whether she could set her personal views aside and follow the court's sentencing instructions:

Q.      ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

A.      Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.      And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.      Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was

"substantially impaired," because a murder would have to be "really heinous" before she would

vote for death.  The court agreed with the Government that the juror was "substantially impaired"

and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-

40.)  The excusal for cause of Juror 62 was improper.

The excusal of Juror 62 was not raised on direct appeal, even though the error was

plainly apparent from the record.  There was no reasonable strategic ground for omitting this

argument.  Had the issue been raised, there is a reasonable probability that the outcome of the

appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary

circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government

or state law enforcement officials.

(b)      **Direct Appeal of Ground Eleven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal due to ineffective assistance of appellate

counsel, a  matter which is appropriately addressed in the first instance in these collateral

proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWELVE**

> **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows.  Although this court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.  The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

The instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they

are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial. *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Twelve:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐     No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

Page 356

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes    ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes    ☐         No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes    ☐         No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes    ☐         No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THIRTEEN**

**Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**.

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, and allegations made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom.  The marshals restrained him and asked the judge if Mr. Barrett should be removed.  The court said yes.  (R. 5421.)  Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument.  The court sent the jury out.  (R. 5429.)  The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room.  (R. 5430.)

The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid.* However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further

Page 360

proceedings; is that correct?

Mr. Barrett:   Yes, Your Honor.

The Court:   Do you have any questions of the Court about that?

Mr. Barrett:   No, sir.

The Court:   I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:   One more.  Does that include the verdict?

Mr. Barrett:   Yes, Your Honor.

The Court:   Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:   Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading

of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to

maintain close contact with the defendant in order to develop trust, (1 ABA Standards for

Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to

"advise the accused with complete candor concerning all aspects of the case, including a candid

estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm

is "to keep the client from making suicidal choices about the case."  (ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb.

1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the

jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be

present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation

of his background, including his mental health problems.  *See* Ground Two, *supra*.  Nevertheless,

Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted

suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder;

(c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was

not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of

steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken

steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness

of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically

decompensated  since the termination of the medications; and the nature and severity of the

functional impact of discontinuing and/or administering any medication on his ability to

communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett

was subjected was justified by medical necessity, reasonably diligent counsel would have sought

a further medical and legal determination of the degree to which the effects of such a regimen

Page 362

interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense.  Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail.  If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants

who were on trial, and impaired Mr. Barrett's capacity to control his inability to endure any

psychological or emotional distress that might be caused by the prosecutor's arguments.

Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial

counsel, the jury was permitted to see him under the effects of steroids and without the benefit of

medication deemed medically necessary to control the emotional dysregulation caused by his

bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to

obtain necessary and appropriate mental health assistance, including the assistance of a

psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while

his functioning was altered and impaired by the effects of voluntarily or involuntarily

administered or discontinued medication, and/or while his functioning was altered and impaired

by the effects of a medication regimen that was unjustified by any medical necessity.  *See*

Grounds One, Two and Three, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his

attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial.  The trial court's order – which the court

initially did not reveal on the record – that marshals remove Mr. Barrett without warning did not

comport with the requirements of law.  (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding

Mr. Barrett's actions was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As

reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give

the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnessed him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the remainder of the prosecutor's argument, the court's instructions, and the reading of the penalty phase verdict violated Mr. Barrett's constitutional rights.

Trial counsel's performance was ineffective because they allowed him to absent himself from the courtroom during critical stages (closing argument, jury instructions, and the reading of the penalty phase verdict) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have

concluded prejudicially that the marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal.  Had counsel raised the issues presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error.  *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)        **Direct Appeal of Ground Thirteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐        No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)        **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐        No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOURTEEN**

> **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits

thereto.

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency.  Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims.  As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."  (Exhibit 115.)  Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims

Page 370

were authorized, while only 16% of cases involving non-white victims were authorized.[48] (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (Exhibit 113.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.   She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.  Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."  (Exhibit 112.)

---

[48]    Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[49]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging

---

[49]  Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal.  *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue.  *See* Ground Eighteen, *infra*.

and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

(b)     **Direct Appeal of Ground Fourteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FIFTEEN**

> **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

813

In direct contravention of the constitutional principles mentioned in the heading for this Ground for Relief, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the Government claimed justified Mr. Barrett's death sentence in the indictment. This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Fifteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

     Yes   ☐       No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

     Yes   ☐       No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

     Yes   ☐       No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIXTEEN**

> **Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

(a)　　　Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

　　　　Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

　　　　Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury.  Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.  The jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his Sixth and Fourteenth Amendment rights to a fair trial and due process.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)　　**Direct Appeal of Ground Sixteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

　　　Yes　☐　　　No　☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)　　**Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

　　　Yes　☐　　　No　☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND SEVENTEEN**

> **Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended Petitions previously filed, and exhibits thereto.

Throughout his life, Mr. Barrett has struggled with severe mental illness, as well as organic brain disease and neurological and intellectual impairments. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett.  Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

Mr. Barrett does not have, and never has had, an intact brain.  (*See* Ground Two, § B.2.b., *supra*; Exhibit 117; Exhibit 89.)  He suffers from severe mental illness in the form of Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged.  Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong.  (Exhibit 117.)  Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner.  Because of both his organic brain disease and severe mental illness,

there is no meaningful way to distinguish Mr. Barrett from the mentally retarded or juvenile

murderers.

(b)      **Direct Appeal of Ground Seventeen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely

on direct appeal, because it relies on evidence and investigation outside the direct appeal record,

and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are

appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended

motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other

issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

     Yes  ☐        No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

     Yes  ☐        No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

     Yes  ☐        No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHTEEN**

> **The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process and Sixth Amendment Rights to Effective Assistance of Appellate Counsel.**

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

     Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

A.     **Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**

1.     **Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

As stated *supra*, Judge Payne specifically selected Roger Hilfiger for this case over the recommendations of the Oklahoma Federal Defenders that he appoint more experienced capital defense counsel. Judge Payne appointed Mr. Hilfiger for the expressed purpose of boosting counsel's experience so that he could receive future capital appointments. Judge Payne refused to compensate prior lead counsel, John Echols, at the highest prevailing rate for capital defense counsel, but immediately raised Mr. Hilfiger's compensation to that level after Mr. Echols withdrew from the case. Judge Payne required Mr. Echols to be painstaking in his accounting for resources, but permitted Mr. Hilfiger to make requests based on his "best guestimate." In sum, Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in Ground One could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. (*Id.*) Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground One had been raised on appeal. The record shows the trial judge interceded on behalf of the prosecution in a way that deceived defense counsel and aided the prosecutors in their effort to delay revealing the names and type of testimony that would be offered from the Government's seven most important witnesses.

**2. Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware,* 438 U.S. 154 (1978).**

For the reasons stated in Ground Two, Part A.1, and Ground Four, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record. Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record. (Exhibit 29.) The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, and Mr. Barrett was prejudiced. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

3. **Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.**

In Ground Two, Part A.5, Mr. Barrett demonstrated that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence. To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it exists. Due to trial counsel's omissions, appellate counsel was forced to raise several issues that were subject to review for clear error. The failure to raise the issue was professionally unreasonable. Had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

4. **Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.**

In Ground Two, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury. The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify. Appellate counsel could and should have raised the

issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **5.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Ground Five, Part D was not raised on direct appeal. The misconduct of the prosecutors in both stages of trial was glaring. No reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

> **6.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Ground Six, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements. This issue was clearly framed by the record. Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. There could be no reasonable strategy for neglecting to

raise this issue.  There is a reasonable probability that had it been raised, the outcome of the

appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have

had, the Court of Appeals could not conduct meaningful review of the death sentence.  The

appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was

the jury's, in favor of death.

> **7.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground Seven, *supra*, the trial court, admittedly without

constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt

during trial.  The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in

Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or

concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on

the record, as were some of its affects on the trial.  To the extent the shock belt was used without

sufficient justification, the constitutional violation was preserved for appeal, and the failure of

appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed

the issue required extra-record development.  (Exhibit 29.)  The unjustified use of visible

restraints requires reversal absent the Government showing the error was harmless beyond a

reasonable doubt.  In this case, where the issue of Mr. Barrett's alleged hostility to law

enforcement was a central issue at trial, the Government could not and cannot establish

harmlessness.  Therefore, there is a reasonable probability that Mr. Barrett would have been

granted a new trial if the issue had been raised on direct appeal.

> **8.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground Nine, *supra*, the trial court unconstitutionally failed to instruct the jury on the lesser included offense of voluntary manslaughter.  Appellate counsel asserts he failed to raise this issue because it was not adequately preserved for appeal by co-appellate counsel, Roger Hilfiger.  (Exhibit 29.)  Counsel's judgment was unreasonable.  Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not.  Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court.  The factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes.  (Exhibit 29.)  Had this issue been raised, there is at the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been different.

> **9.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground Ten, *supra*, the trial court violated Mr. Barrett's rights under the Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the second stage doubts regarding the raid.  It was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  It is at least

reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have

followed its own precedent and reversed the death judgment.

        **10.**      **Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.**

The dismissal of Juror 62, as set out in detail in Ground Eleven, *supra*, was not

raised on direct appeal, even though the error was plainly apparent from the record.  There was

no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a

reasonable probability that the outcome of the appeal would have been different.

        **11.**      **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Ground Twelve, *supra*,  the Court's failure to provide an

instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt

that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's

death sentence unconstitutional.  To the extent that the federal death penalty scheme allows

capital defendants to be sentenced to death without a finding beyond a reasonable doubt that

death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating

factors outweigh the evidence in mitigation is *the indispensable factual finding* that increases the

penalty for a crime beyond the prescribed statutory maximum.  Because the weighing instruction

given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual

finding, the weighing process in Mr. Barrett's case was constitutionally invalid. Had appellate

counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

### 12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.

As set forth in Ground Thirteen, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver. To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal. It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

### 13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.

As set forth in Ground Fourteen, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim. Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal. To the extent, if any, that trial counsel did properly raise and preserve the

question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.  There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate.  The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 14. Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Ground Fifteen, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors.  Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

**B.**    **A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively. *United States v. Barrett*, *supra*, 496 F.3d at 1121. "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). The review conducted on appeal was deficient due to the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would hare resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity

to convict on manslaughter, was denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.

(b)       **Direct Appeal of Ground Eighteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐       No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue pertains to ineffective assistance of trial and direct appeal counsel, a matter which is appropriately addressed in the first instance in these collateral proceedings.

(c)       **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐       No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

     Yes   ☐         No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

     Yes   ☐         No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

     Yes   ☐         No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND NINETEEN**

> **Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Page 395

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)        **Direct Appeal of Ground Nineteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐        No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)        **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐        No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.    Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them.

    **No.  Each ground presented here is a repetition and continuation of a claim or subclaim previously presented in the petition filed March 16, 2009, corrected on March 17, 2009, and amended on September 25, 2009.**

14.    Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for judgement you are challenging?    Yes   ☒        No   ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

**This filing is a court-ordered amendment of the same petition/motion timely filed March 16, 2009 in Eastern District of Oklahoma Case No. 09-cv-105-JHP, and corrected on March 17, 2009, and amended as of right on September 25, 2009.  Those pleadings remain pending.**

15. Give the name and address, if know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:  n/a

(b) At arraignment and plea:

John D. Echols, P.O. Box 701196, Jenks, OK 74037; Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401

(c) At trial:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A. Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(d) At sentencing:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A. Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(e) On appeal:

Mark Henrickesen, 600 N. Walker, Suite 220, Oklahoma City, OK 73102; Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401

Page 398

(f) In any post-conviction proceeding:

David B. Autry, <u>1021 N.W. 16</u>th Street, Oklahoma City, OK

73106; Tivon Schardl, Office of the Federal Defender, 801 I Street,

3rd Floor, Sacramento, CA 95814

(g) On appeal from any ruling against you in a post-conviction proceeding:

16.    Were you sentenced on more than one count of an indictment, or on more than one indictment, in

the same court and at the same time?    Yes  ☒        No  ☐

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that

you are challenging?    Yes  ☐        No  ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the

future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) have you filed, or do you plan to file, any motion, petition, or application that challenges the

judgment or sentence to be served in the future?        Yes  ☐        No  ☐

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statue of limitations as contained in 28 U.S.C. § 2255 does not bar your motion. ***************

> **This is a court-ordered amendment of a timely filed motion.**
>
> **All grounds presented herein were filed prior to the expiration of the statute of limitations.  Each part of this amendment relates back to the timely motion/petition filed March 16, 2009, corrected on March 17, 2009, and amended as of right on September 25, 2009.  To the extent any allegation in this amendment was not previously filed, it was not previously discoverable through the exercise of due diligence, or Mr. Barrett was prevented from presenting it due to the unconstitutional conduct of the government actors as to whom the allegation relates.**

---

***************The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of -

(1) the date on which the judgment of conviction became final;
(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 400

Therefore, the movant asks that the Court grant the following relief:

1.    That United States District Judge James H. Payne recuse himself and have all

      proceedings regarding this Petition reassigned randomly to another judge;

2.    That Petitioner be permitted to file a Memorandum of Law in Support of this

      Petition in accordance with a briefing schedule established by this Court;

3.    Require Respondent to file an Answer to the Petition in the form prescribed by

      Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

      District Court, identifying all proceedings conducted in Petitioner's case,

      including any which have not been recorded or transcribed, and specifically

      admitting or denying the factual allegations set forth above;

4.    Permit Petitioner to file a traverse to the Respondent's answer, responding to any

      affirmative defenses raised by the Answer;

5.    Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of

      Civil Procedure 26-37, to the extent necessary to fully develop and identify the

      facts supporting his Petition, and refute any defenses thereto raised by the

      Respondent's Answer;

6.    Permit Petitioner to Amend this Petition to include any additional claims or

      allegations not presently known to him or his counsel, which are identified or

      uncovered in the course of discovery, investigation, and litigation of this

      Petitioner, and, to allow the amendment to relate back to the date of the filing of

      his Section 2255 Motion;

7.      Conduct an evidentiary hearing to resolve any factual disputes raised by the

Respondent's Answer to this Petition, or by Petitioner's Response to any

Affirmative Defenses raised by the Respondent. Because Petitioner has alleged

facts which, if true, entitle him to relief, he is also entitled to a full evidentiary

hearing to establish the facts he alleges;

8.      Permit oral argument as appropriate and required;

9.      Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and or any other relief to which movant

may be entitled.

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

/s/ Joan M. Fisher
JOAN M. FISHER, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

Page 402

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 ~~was placed in the prison mailing system~~ **electronically filed** on  December 4, 2009.

Executed (signed) on    December 4, 2009      (date).

/s/ Joan M. Fisher
Signature of Movant
by:    Joan M. Fisher
          Assistant Federal Defender
          Counsel for Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a research and writing attorney in the Office of the Federal Defender for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those

842

matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this amended motion.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

/s/ Joan M. Fisher

**Certificate of Electronic Filing and Service**

I hereby certify that on this 4th day of December 2009, I caused the foregoing AMENDED PETITION to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan M. Fisher

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
          *Petitioner/Defendant*,          )
                                 )
v.                               )          **Case No. 6:09-cv-00105-JHP**
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          *Respondent/Plaintiff.*          )

---

**PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION**

---

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

844

**TABLE OF CONTENTS**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Events Leading Up to the Raid on the Barrett Home . . . . . . . . . . . . . . . . . . . . . . 9

        1.    Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant . . . . 9

        2.    The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  Points and Authorities Supporting Mr. Barrett's Grounds for Relief . . . . . . . . . . . . . . 18

    Ground 1    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his
            Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and
            his Right to Equal Protection of the Laws, and Federal Statutes and
            Guidelines for the Appointment and Compensation of Counsel; the Failure
            of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to
            Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 18

Judicial Interference with Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lack of Judicial Impartiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Ground 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by
            18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United
            States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.    The Test for Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.    The Test for Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        3.    The Need for an Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ground 2, Part A(1).   Defense Counsel's Unreasonable Omissions in Reurging Franks
Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ground 2, Part A(2).   Trial counsel unreasonably failed to investigate and introduce
evidence of eyewitnesses as well as mental impairment and illness
that would have rebutted the prosecution's theory of the case,
supported the defense theory, and formed the basis for conviction
of a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Ground 2, Part A(3):   Defense Counsel's Unreasonable Failure to Investigate and Present
Evidence Showing Mr. Barrett was Incompetent to Stand Trial . 53
      1.       Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      2.       Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Ground 2, Part A(4).   But for trial counsel's unreasonable omissions it is reasonably
probable that the jury would have rejected the testimony of the
Government's eleventh hour "snitch" witnesses and, like the two
juries before them, refused to convict Mr. Barrett of
 premeditated murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Ground 2, Part A (5).   Trial counsel were ineffective in failing to make appropriate and
timely objections to improper hearsay evidence of other
 bad acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Ground 2, Parts A(6) and (10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

      1.       Defense Counsel's Failure to Obtain Expert Assistance . . . . . . . . . . . . 77

Ground 2, Part A (11).            Trial counsel unreasonably failed to contest the admission
of lengthy "expert" testimony which served no legitimate
purpose, but merely excused the inaccuracies and
inconsistencies in the fact witnesses' testimony.  Counsel
also unreasonably failed to seek an adequate remedy for
this improper testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Ground 2, Part A (12).            The verdicts reached at both stages of trial are unreliable
due to trial counsel's unreasonable failure to seek
appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Ground 2, Part A (13).            The outcomes of the trial and appeal are unreliable due to
trial counsel's unreasonable failure to preserve a record of
error, resulting in numerous meritorious claims on direct
appeal being evaluated under the onerous plain
error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Ground 2, Part A (14).        Trial counsel unreasonably failed to object to numerous
                              instances of prosecutorial misconduct in closing argument
                              in the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . . . 101

Ground 2, Part B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

        1.      Deficient Performance:  Mr. Barrett's defense counsel failed to fulfill
                duties to conduct a thorough background investigation, consult with
                experts, and prepare a two-stage strategy based on readily available
                information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

        2.      Prejudice:  The readily available mitigation evidence regarding Mr.
                Barrett's background, the circumstances of the offense, impeachment of
                the Government's intent witnesses, and Mr. Barrett's mental problems
                would have changed the jury's assessment of his culpability. . . . . . . . . 115

Ground 3.       Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
                the Laws, and his Right to Transcripts, Expert and Investigative Assistance
                under 18 U.S.C. §§ 3005 & 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

        1.      The Withholding of Funds for Transcripts. . . . . . . . . . . . . . . . . . . . . 127

        2.      Mental Health Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

        3.      Mitigation Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

        4.      Fact Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

        5.      Crime Scene Reconstruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

        6.      Expert on Police Standards and Procedure. . . . . . . . . . . . . . . . . . . . . 138

        7.      Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Ground 4.       Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth
                Amendments to the United States Constitution Were Violated by the Use
                of False Information in Obtaining the No-Knock Warrant for his Arrest.
                The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was
                Invalid under Franks v. Delaware, 438 U.S. 154 (1978).  Appellate
                Counsel Were Ineffective for Failing to Raise the Issue on
                Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Ground 5.   Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

1.   The Government Suppressed Material Evidence Favorable to the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

   a.   The law relating to suppression of exculpatory evidence 149

      1.   What is "favorable to the accused"  . . . . . . . . . . 149

      2.   What is "suppression  . . . . . . . . . . . . . . . . . . . . . 151

      3.   What is "material"  . . . . . . . . . . . . . . . . . . . . . . . 152

   b.   Exculpatory Evidence Suppressed by the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

      1.   Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . 153

      2.   Travis Crawford 3.. . . . . . . . . . . . . . . . . . . . . . . . 155

      3.   Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . 155

      4.   Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 156

      5.   Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

      6.   Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 157

2.   The prosecution's reliance upon false testimony . . . . . . . . . . . 159

3.   Newly Discovered Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . 161

4.   The Need for an Evidentiary Hearing  . . . . . . . . . . . . . . . . . . . 164

5.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Ground 5, Part C  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Ground 5, Part D.      Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
                       Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 168

Ground 6.        Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to
                 the United States Constitution were Violated Due to the Court's
                 Restrictions on the Use of his Statements  . . . . . . . . . . . . . . . . . . . . . . 175

Ground 7.        Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were
                 Violated when the Trial Court Permitted the Marshals to Restrain him
                 Without Justification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Ground 8.        Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth,
                 and Eighth Amendments to the United States Constitution.  . . . . . . . . . 187

Ground 9.        Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
                 United States Constitution were Violated When the Trial Court Failed to
                 Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel
                 Were Ineffective for Failing to Raise this Issue.  . . . . . . . . . . . . . . . . . . 192

Ground 10.       Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
                 United States Constitution were Violated Due to the Trial Court's Refusal
                 to Instruct the Jury that they Could Consider Residual Doubts as a
                 Mitigation Factor.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Ground 11.       Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated
                 When the Trial Court Excused for Cause a Juror Who, While  Personally
                 Opposed to the Death Penalty, Could Nonetheless Consider it as a
                 Punishment Option.  Appellate Counsel Were Ineffective for Failing to
                 Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Ground 12.       The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights
                 under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the
                 Jury was Not Required to Find that Death was an Appropriate Punishment
                 Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were
                 Violated by Appellate Counsel's Unreasonable Failure to Raise
                 this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Ground 13.       Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth
                 Amendments were Violated Due to the Effects of Drugs he was Given in
                 Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial
                 Court's Removal of Mr. Barrett from the Courtroom in the Presence of the
                 Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical
                 Stages of the Proceedings without Valid Waiver; To the Extent Appellate
                 Counsel Failed to Raise the Issue on Appeal, Counsel were
                 Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Ground 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact. . . . . . . . . . . . . . . . . . . . . . . . . 221

Ground 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Ground 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Ground 17.    Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment . . 228

Ground 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . 232

              A.    Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . 234

                    1.    Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

                    2.    Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under Franks v. Delaware, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

                    3.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character. . . . . . . . . . . . . . 236

                    4.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn. . . . . . . 237

                    6.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements. . . . . . . . . . . . . . . . . . . . . . . 238

7.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

8.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses . . . . . . . . . . . . 240

9.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred . . . . . . . . . . . . . . 240

10.    Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence . . . . . . . . . . . . . 241

12.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

13.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . 242

14.    Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment. . . . . . . 243

B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Ground 19.   Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case. . . . . . . . . . . . 245

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adams v. Bertrand, 453 F.3d 428 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Akwal v. Mitchell, 559 F.3d 456 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Allen v. Woodford, 395 F.3d 979 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208, 209, 241

Atkins v. Virginia, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 230, 231, 232

Balfour v. Haws, 892 F.2d 556 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 152

Banks v. Reynolds, 54 F.3d 1508 (10th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 193, 196

Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bishawi v. United States, 292 F. Supp. 2d 1122 (S.D.N.Y. 2003)
    aff'd, 109 Fed. Appx. 813 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 54, 106, 189

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Bracy v. Gramley, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 32

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Brady v. Maryland, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Brecht v. Abramson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Brewer v. Aiken, 935 F.2d 850 (7th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Britt v. North Carolina, 404 U.S. 226 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 127

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Bryan v. Mullin, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 230

Bundy v. Dugger, 816 F.2d 564 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buttrum v. Black, 721 F. Supp. 1268 (N.D. Ga. 1989),
     aff'd, 908 F.2d 695 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

California v. Brown, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

California v. Trombetta, 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 175

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Chambers v. Mississippi, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Clark v. Crist, 335 F.3d 1303 (11th Cir. 2003),
     cert. denied, 540 U.S. 1155 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Clay v. Bowersox, 367 F.3d 993 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Combs v. Coyle, 205 F.3d 269 (6th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Cooks v. Ward, 165 F.3d 1283 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Cooper v, Oklahoma, 517 U.S. 348 (1996), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 188, 189

Correll v. Ryan, 539 F.3d 938 (9th Cir. 2008),
    cert. denied, 129 S. Ct. 903 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 153, 155, 156, 157

Cross v. United States, 325 F.2d 629 (D.C. Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Cunningham, 549 U.S., at 281, 127 S. Ct. 856 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 174

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . 79, 93, 95, 137

Davis v. Alaska, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176, 179

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Delaware v. Van Arsdale, 475  U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Dennis v. United States, 384 U.S. 855 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . 149, 168, 174

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . 150, 154, 156, 157

Draughton v. Dretke, 427 F.3d 286 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 90

Driscoll v Delo, 71 F.3d 701 (8th Cir. 1995),
    cert. denied, 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 82

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Drope v. Missouri, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 171, 246

Ducky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 188, 191

Duhamel v. Collins, 955 F.2d 962 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Dzurgiot v. Luther, 897 F.2d 1222 (1st Cir 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150, 175, 238

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
     cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Estock v. Lane, 842 F.2d 184 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Evittts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Felder v. Johnson, 180 F.3d 206 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 97, 174

Geders v. United States, 425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Petitioner's Merits Brief                               xi                          *Barrett v. U.S.*, 09-cv-105-JHP

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Girts v. Yanai, 501 F.3d 743 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Gonzales v. McKune, 247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Gonzalez v. Pliler, 341 F.3d 897 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Goodman v. Bertrand, 467 F.3d 1022 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 102

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Green v. United States, 972 F. Supp. 917 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
    cert. denied, 396 U.S. 865  (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 165, 166, 167

Griffin v. Warden, Maryland Correctional Adjustment Center,
    970 F.2d 1355 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Hadley v. Groose, 97 F.3d 1131 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Haliym v. Mitchell, 492 F.3d 680 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 112

Halliday v. United States, 380 F.2d 270 (1st Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hardwick v. Crosby, 320 F.3d 1127 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 109

Harris v. United States, 536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 38

Hawkins v. Camparet-Cassini, 251 F.3d 1230 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 186

Hays v. Farwell, 482 F. Supp. 2d 1180 (D. Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 236, 238

Heath v. Alabama, 474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Heath v. Jones, 941 F.2d 1126 (11th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 97

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Hill v. Mitchell, 400 F.3d 308 (6th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
    cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Holmes v. South Carolina, 547 U.S. 319 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Hooper v. Mullin, 314 F.3d 1162 (10th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Hull v. Kyler, 190 F.3d 88 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 215

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Imbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

In re Murchison, 349 U.S. 133 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

James v. Gibson, 211 F.3d 543 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002),
    cert. denied, 539 U.S. 958 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51

Jermyn v. Horn, 266 F.3d 257 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 107, 111, 115

Johnson v. Zerbst, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 178

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 225

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 79, 93

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lafferty v. Cook, 949 F.2d 1546 (10th Cir. 1991),
       cert. denied, 504 U.S. 911 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Lambright v. Schriro, 490 F.3d 1103 (9th Cir. 2007),
       cert. denied, 128 S. Ct. 882 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Leonard v. Michigan, 256 F. Supp. 2d 723 (W.D. Mich. 2003) . . . . . . . . . . . . . . . . . . . . 84, 85

Lindstadt  v. Keane, 239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lockhart v. Fretwell, 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lockhart v. McCree, 476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200, 204

Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Marshall v. Hendricks, 307 F.3d 36 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 75, 81, 97, 100

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Mason v. Mitchell, 543 F.3d 766 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Massaro v. United States, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Mattox v. United States, 146 U.S. 140 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227, 228

Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

McCleskey v. Kemp, 482 U.S. 920 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

In re McDonald, 514 F.3d 539 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984) . . . . . . . . . . . . . . . . 227

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 187

Media v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Mejia v. City of New York, 119 F. Supp. 2d 232 (EDNY 2000) . . . . . . . . . . . . . . . . . . . . . . 147

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Miles v. Stainer, 108 F.3d 1109 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 551109

Miller v. Anderson, 255 F.3d 455 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 37, 84, 85, 86

Miller v. Anderson, 268 F.3d 485 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Miller v. Senkowsky, 268 F. Supp. 2d 296 (E.D. N.Y. 2003) . . . . . . . . . . . . . . . . . . . . 84, 85, 86

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Mooney v. Holohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38, 109

Moore v. United States, 432 F.2d 730 (CA3 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Morgan v. Illinois, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 159, 164, 246

Norhrup v. Trippett, 265 F.3d 372 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

O'Bryan v. Estelle, 714 F.2d 365 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

O'Neal, 513 U.S. at 437. [,O'Neal v. McAninch, 513 U.S. 432 (1995).] . . . . . . . . . . . . . . . . . 131

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Outten v. Kearney, 464 F.3d 401 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 111

Owens v. United States, 387 F.3d 607 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 86, 106

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 173

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

Pennsylvania v. Ritchie, 480 U.S. 39 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Penry v. Johnson, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 173, 199

Phaneuf v. Fraiken, 448 F.3d 591 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

Phillips v. Woodford, 267 F.2d 966 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Porter v. McCollum, ___ U.S. ___, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Petitioner's Merits Brief                        xvi                        *Barrett v. U.S.*, 09-cv-105-JHP

Powell v. Collins, 332 F.3d 376 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 130, 131

Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Ramonez v. Berghuis, 490 F.3d 482 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Remmer v. United States, 347 U.S. 227 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Reynolds v. Bagley, 498 F.3d 549 (6th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Richards v. Quarterman, 566 F.3d 553 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 214, 219

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208, 210, 225

Roche v. Davis, 291 F.3d 473 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185, 239

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Rodriguez v. Hoke, 928 F.2d 534 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Romano v. Gibson, 239 F.3d 1156 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Rompilla v. Beard, 545 U.S. 374 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Roper v. Simmons, 543 U.S. 304 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 231, 232

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 200

Sassounian v. Roe, 230 F.3d 1097 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 76

Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998),
    cert. denied, 525 U.S. 1093 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Silva v. Woodford, 279 F.3d 825 (9th Cir.),
    cert. denied, 537 U.S. 942 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 238

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Smith v. Phillips, 455 U.S. 209 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 82, 97

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Steinkuhler v. Meschner, 176 F.3d 441 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Stewart v. Wolfenbarger, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . 51, 61, 69, 90

Stouffer v. Reynolds, 214 F.3d 1231 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Greene, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 151, 160

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Taylor v. Kentucky, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Taylor v. Workman, 554 F.3d 879 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 196

Tennard v. Dretke, 524 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Tennard v. Dretke, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 55

Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 173, 246

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Turner v. Duncan, 158 F.3d 449 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
    cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Agurs, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 159

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 152

United States v. Baker, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 183

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 177, 243

United States v. Beeks, 224 F.3d 741 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Benally, 146 F.3d 1232 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Bernal-Obeso, 989 F.2d 331 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Biswell, 700 F.2d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Blakely, 14 F.3d 1557 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . 98

United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Broomfield, 201 F.3d 1270 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

United States v. Burrows, 872  F.2d 915 (9th Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 109

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 194, 205

United States v. Cherry, 433 F.3d 698 (10th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Cheska, 202 F.3d 947 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Cook, 45 F.3d 388 (10th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233, 234

United States v. Correas, 419 F.3d 151 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Cronic, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 53

United States v. Davenport, 753 F.3d 1460 (9th 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . . 199

United States v. Davis, 766 F.2d 1452 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Davis, 960 F.3d 820 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Dawkins, 17 F.3d 399 (D.C. Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

United States v. Durham, 287 F.3d 1297 (11th Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . 182, 186

United States v. Ferra, 900 F.2d 1057 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Foree, 43 F.3d 1572 (11th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Fulcher, 250 F.3d 244 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Fuller, 938 F. Supp. 731 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

United  States v. Garcia-Guizer, 160 F.3d 511 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Ghane, 490 F.3d 1036 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

United States v. Giovanelli, 945 F.2d 479 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

United States v. Hall, 113 F.3d 157 (9th Cir. 1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Haney, 318 F.3d 1161 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Henandez, 975 F.2d 1035 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

United States v. Hernandez-Rodriguez, 443 F.3d 138 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . 163

United States v. Hill, 799 F. Supp. 86 (D. Kan. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Hogue, 827 F.2d 660 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 199

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 98, 193

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Jones, 336 F.3d 245 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

United States v. Kauffman, 109 F.3d 186 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

United States v. Kennedy, 64 F.3d 1465 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 126, 133

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

United States v. Kreutzer, 61 M.J. 293 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 134

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

United States v. Manning, 23 F.3d 570 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Miller, 753 F.2d 1475 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 71

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Pinto, 755 F.2d 150 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 152, 162

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Reddick, 90 F.3d 1276 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Resko, , 3 F.3d 684 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226, 228

United States v. Rich, 580 F.2d 929 (9th Cir.),
        cert. denied, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 167

United States v. Rivera, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 219

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Scheer, 168 F.3d 445 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 156

United States v. Serawop, 410 F.3d 656 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. Siddiqi, 959 F.2d 1167 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

United States v. Sorrells, 714 F.2d 1522 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Temple, 862 F.2d 821 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74

United States v. Thomas, No. CCB-03-0150,
        2006 U.S. Dist. LEXIS 3266 (D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Toles, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 246

United States v. Torres, 569 F.3d 1277 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Velarde, 485 F.3d 553 (10th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Wardell, 591 F.3d 1279 (10th Cir. 2009)  . . . . . . . . . . . . . . . 182, 183, 184, 186

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

United States v. Wood, 207 F.3d 1222 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Viereck v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Ward v. Village of Monroe, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Watts v. Singletary, 87 F.3d 1282 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Williams v. Quarterman, 551 F.3d 352 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okl. 1995) . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 200, 204

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 141

Woodson v. North Carolina, 428 U.S. 280 (1976)  . . . . . . . . . . . . . . . . . . . . . 104, 199, 200, 210

## STATE CASES

Anderson v. State, 992 P.2d 409 (Ok. Crim. App. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . 112, 115

Burnside v. State, 858 N.E.2d 232 (Ind. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

Commonwealth v. Alvarez, 740 N.E.2d 610 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 172

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan.31, 2000)  . . . . . . . . . . . . . . . . . . . . . . . . 69

Jennings v. State, 744 P.2d 212 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Mitchell v. State, 379 S.E.2d 123 (S.C.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Patton v. State, 784 So. 2d 380 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

State v. Garner, 36 P.3d 346 (Mont. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

State v. Saunders, 958 P.2d 364 (Wash. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 237

State v. Talley, 702 P.2d 353 (N.M. Ct. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 199

United States v. Rodham, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) . . . . . . . . . . . . . . . . . . . 56

Williams v. State, 669 N.E.2d 1372 (Ind. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 133

Wood v. Endell, 702 P.2d 248 (Alaska App. 1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wrinkles v. State, 749 N.E.2d 1179 (Ind. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

## DOCKETED CASES

Boyd v. Allen, __F.3d__, No. 07-14908 (11th Cir. Jan. 8, 2010) . . . . . . . . . . . . . . . . . . . . . . 176

Stun-Technology, Inc. v. RACC Industries, Inc., Case No. 95-268 . . . . . . . . . . . . . . . . . . . . 184

United States v. Kenneth Eugene Barrett, Case No. 6:04-CR-00115-JHP-SPS . . . . . . . . . . . . . . 3

## FEDERAL STATUTES

18 U.S.C.
    § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
    § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33, 125
    § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33
    § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 166
    § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
    § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
    § 3592(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 151
    § 3593(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 208, 225
    § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

21 U.S.C. § 848(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Federal Rules of Civil Procedure 26(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Federal Rules of Criminal Procedure
    16 ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
    31( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
    33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Federal Rules of Evidence
    403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74
    404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
    608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 64
    615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
    702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 137
    803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## MISCELLANEOUS

ABA Guideline 10.8 and Commentary, 31 Hofstra L. Rev. 913, 1028
        (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Barlow, David H. , Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-
        Step Treatment Manual, 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Blume John H. & Johnson, Sheri Lynn , Competent Capital Representation: the Necessity
        of Knowing and Heeding what Capital Jurors Tell us about Mitigation, 36 Hofstra L.
        Rev.1035 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Garvey, Stephen P., Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,
        98 Colum. L. Rev. 1538, 1563 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Goodpaster, Gary The Trial for Life: Effective Assistance of Counsel in Death Penalty
        Cases, 58 N.Y.U. L. Rev. 299 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

The ABA Model Code of Professional Responsibility EC 5-23 (1980),
        quoted in Wood, 450 U.S. at 270 n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| **Petitioner/Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent/Plaintiff.** | ) | |

---

**PETITIONER'S BRIEF IN SUPPORT OF**
**SECOND AMENDED § 2255 MOTION**
**AND IN SUPPORT OF**
**PETITIONER'S MOTION FOR EVIDENTIARY HEARING**
**AND MOTION FOR RECORD EXPANSION**

---

## I.      Introduction

### A.      Statement Regarding Form

This brief is being filed pursuant to the Court's order filed October 7, 2009 (Doc. 81).  In keeping with the Court's description of the reasons for requiring Mr. Barrett to file a second amended petition on the form created for petitioners filing *pro se* this brief provides the legal support for the grounds set forth in that amended petition.  As stated in Mr. Barrett's prior filing (Doc. 94), pursuant to the Court's statements at the hearing held October 6, 2009, Mr. Barrett's First Amended § 2255 Motion is a valid pleading.  (Doc. 70.)  Mr. Barrett does not waive or abandon any basis for relief set forth in his First Amended § 2255 Motion.  However, as the Court has indicated it may not look further at the First Amended § 2255 Motion, Mr. Barrett repeats in this brief the introductory summary of argument from that pleading.  In other respects,

this brief supplements the legal grounds for relief set forth in the Second Amended § 2255 Motion.  (Doc. 95.)

As shown in Mr. Barrett's previous objections (Doc. 94), the procedure being used in this case is not the norm for cases in the Eastern District or elsewhere.  Mr. Barrett and his counsel have made every effort to ensure this brief meets the Court's expectations and requirements.  However, those requirements and expectations remain unclear.  In preparing this brief based on the October 7 Order and the hearing transcript, counsel understand that the Court intends for them to rely upon the facts set forth in the Second Amended § 2255 Motion (Doc. 95), upon the unsealed exhibits filed with the First Amended § 2255 Motion, and upon the redacted exhibits being filed contemporaneously with this brief.  Therefore, this brief assumes the reader is familiar with those facts, and the record and exhibits documenting them, and the absence of a fact or reference to a fact from this brief should not be construed as a waiver or forfeiture of any previously asserted basis for relief.

The arguments set forth in this brief are incomplete.  On January 12, 2010, the Court issued an order that enjoins Mr. Barrett's counsel from speaking publicly about certain evidence that supports Mr. Barrett's claims.  That evidence was disclosed, in whole or in part, to Mr. Barrett's counsel on January 28, 2010.  On February 11, 2010, Mr. Barrett filed a motion seeking to continue the briefing schedule so that he could seek relief from that injunction, investigate the newly discovered evidence, and amend his claims accordingly.  The Court has set the motion for hearing on a date after this brief is due.  The outcome of that hearing will affect the supplemental and additional merits briefing to be filed in support of Petitioner's claims.

In addition, Mr. Barrett respectfully submits this brief in support of his motion for an evidentiary hearing pursuant to 28 U.S.C. § 2255(b) and to expand the record pursuant to Rule 7 of the Rules Governing § 2255 Proceedings.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g at *xxx*;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number for *United States v. Kenneth Eugene Barrett*, Case No. 6:04-CR-00115-JHP-SPS:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to the First Amended § 2255 Motion:  Exhibit *xx* (an index to the exhibits appears in Appendix B to that Motion);

- All other references are self-explanatory or based on the Blue Book.

**B.     Summary of Argument**

Kenneth Eugene Barrett would not and did not intentionally kill Trooper David "Rocky" Eales.  Mr. Barrett defended himself from an unannounced attack on his home and his teenage son by individuals who failed to announce that they were law enforcement officers.  In recognition of these facts – although without the benefit of the evidence presented through this Petition – a jury of Oklahoma citizens acquitted Mr. Barrett of the murder for which he now sits on death row.  This Petition shows the Government succeeded in overturning that result through an unfair trial in this Court, a trial characterized by judicial misconduct, ineffective defense

representation (a product both of a failure to perform according to prevailing professional norms and judicial interference), the withholding of truthful information that would have impeached the Government's key witnesses, and other forms of misconduct by prosecutors and law enforcement officers.  Mr. Barrett is a mentally ill, traumatized man under sentence of death for a death that, though tragic, was not murder.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the prosecution with much needed and inadmissible "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he threatened to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Trooper Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose has been reprimanded by the Oklahoma Supreme Court as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial.  The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's

search warrant for Mr. Barrett's residence, which set this entire tragedy in train.  Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony.  Karen Real, who, at the time of her testimony was serving a fourteen-year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death.  Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy.  In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced.  Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when, in fact, it had not.  The Government surely knew Turman was lying, but sat silently and allowed him to perjure himself, in derogation of its duty to correct false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent or forestall any effective investigation by the defense,

Petitioner's Merits Brief                              5                    *Barrett v. U.S.*, 09-cv-105-JHP

the Government contrived to keep the identity of these witnesses secret for as long as possible. As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses. An improper *ex parte* hearing was conducted by the Court on the motion. As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger. Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial had already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses. The Cout recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation. In passing, AUSA Littlefield revealed to the Court, but not defense counsel, that he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the Court nor the Government informed the defense of what had gone on behind closed doors. What had occurred was misrepresented to defense counsel. There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with. Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a *fait accompli*, the ability of defense counsel to investigate and impeach these witnesses and to marshal independent evidence contradicting them went up in smoke. Mr. Barrett shows by his motion and this brief

that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the Cout as well.

From the inception of the case, the Cout demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The Cout only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The Cout's furtherance of these interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the Cout required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in his motion and this brief that trial counsel, due to a combination of interference from the Cout and their own unprofessional errors and omissions, rendered ineffective assistance at the guilt/innocence stage

Petitioner's Merits Brief                              7                         *Barrett v. U.S.*, 09-cv-105-JHP

of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses, whose qualifications and methods the Cout recognized as lacking.

Trial counsel, in part deceived by the Cout and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in his motion and this brief, Kenneth Barrett has struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life.  This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional

and, at times, physical abuse, and infidelity.  Kenneth Barrett's upbringing was anything but normal.  As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents.  The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.      Statement of the Case

### A.      Events Leading Up to the Raid on the Barrett Home

#### 1.      Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant

In March, 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent.  In the court proceedings for that case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case.  There is no record of a ruling on Mr. Rogers' motion.  The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the Court ever did so.  There was no other activity in the case until January 19, 1999, when the docket states that "subp's issued."

The court docket indicates that on January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999.  This was the only notation in the criminal docket regarding the trial for which Mr. Barrett allegedly failed to appear.  The only other information about this alleged trial date was elicited at the hearing on Mr. Barrett's Motion to Suppress Evidence on January 26, 2005, prior to his federal trial.  At that hearing, Sequoyah

Petitioner's Merits Brief                          9                    *Barrett v. U.S.*, 09-cv-105-JHP

County Court Clerk Bernell Edwards testified that Mr. Barrett's state trial for the drug case had been scheduled for January 25, 1999. However, juror records examined by Sequoyah County Court Clerk Vickie Beaty show that no citizens were summoned for jury duty on January 25, 1999 or, indeed, for the entire month of January, 1999. Accordingly, the bench warrant issued for Mr. Barrett's arrest arose from his failure to appear for a trial for which no jurors had ever been summoned.

There was never any evidence that Mr. Barrett was aware of the bench warrant. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2. *The Search Warrant.*

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence. The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and, that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night. (At the federal trial in 2005, law enforcement for the first time identified the confidential informant as Charles "Monk" Sanders. Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Judge signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant.  Johnson met with Tact Team members to discuss the execution of the warrant.  It was determined that the Tact Team would enter and secure the area first, and that the Task Force and would then perform the actual search of Barrett's residence.  The Tact Team and Task Force were accompanied by an entourage of local dignitaries.  The Tact Team allegedly decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos that were unmarked and had extra antennae removed and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.      *September 24, 1999*.

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro which Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles

headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private drive to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, to which were attached two full and one partially full magazines of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began

moving towards the rear of the vehicle.  Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.  Hamilton then moved towards the rear of his vehicle.  As he did so, he was struck by a bullet in the back of the left shoulder.  When he reached the back of the vehicle, Hamilton observed Eales face down on the ground with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body.  Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot.  Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him.  Mr. Barrett had been shot at least four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead.  A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B.    Three Trials

#### 1.    *State Trials*.

Mr. Barrett was tried in Oklahoma state court, twice, as set out more fully in the Procedural History (Appendix A hereto).  In the first state trial, the jury was deadlocked and

could not reach a verdict. The second state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon. The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill. Mr. Barrett did not appeal his convictions or sentences.

### 2. *Federal Trial.*

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase the most notable difference was the testimony of seven informants, who did not testify in either of the state trials. The identity of these snitches was not made known to the defense until after the beginning of jury selection. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1. Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2. Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.      Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.      Charles "Monk" Sanders testified that he was present when a female friend of Mr. Barrett's received a telephone call from Mr. Barrett while he was in jail.  According to Sanders's second-stage testimony, he overheard Mr. Barrett, whose voice he recognized, tell the female friend they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint.  Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way.  Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife.  Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother.  Ms. Stalcup stated that Trooper

Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.       Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.       Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.       Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered.  Mrs. Eales also read into the record statements her children had written about the loss of their father.

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.       Maudeen Vann, First Deputy Court Clerk, Sequoyah County, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.       Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.       Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his

state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.      Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame.

5.      Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.      Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge.  Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time.  This was a very friendly exchange that took place three to six months before the raid.

7.      Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.      Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.      Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case.  Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.      Steve Barrett, Mr. Barrett's brother, who testified superficially about his

Petitioner's Merits Brief                               17                         *Barrett v. U.S.*, 09-cv-105-JHP

and Mr. Barrett's childhood.

11.     Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr.

Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's

youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.    Points and Authorities Supporting Mr. Barrett's Grounds for Relief**

**Ground 1     Actions of the Trial Court Violated Mr. Barrett's Right to Due
Process, his Sixth Amendment Right to Counsel and to Cross-
Examine Witnesses, and his Right to Equal Protection of the Laws,
and Federal Statutes and Guidelines for the Appointment and
Compensation of Counsel; the Failure of Counsel to Raise this Issue
on Appeal Violated Mr. Barrett's Right to Effective Assistance of
Appellate Counsel**.

In Ground 1of the Amended § 2255 Motions, Mr. Barrett describes the factual bases for

this Court to vacate his conviction or death sentence for violations of several constitutional and

statutory rules.  The facts presented therein show actions of the trial court denied Mr. Barrett a

fair trial under conditions required or routinely provided to similarly situated defendants pursuant

to 18 U.S.C. §§ 3005, 3006A, and 3599, the Judicial Conference's Guidelines for

implementation of the Criminal Justice Act, prevailing professional norms of criminal defense

practice, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. As he will throughout this Brief, Mr. Barrett relies upon the factual averments of

the Amended § 2255 Motions and the exhibits thereto.

At the outset, Mr. Barrett reiterates his multiple objections to the Honorable James H. Payne deciding this claim.  First, Ground 1 alleges on-the-record and off-the-record actions by Judge Payne.  It is improper for a trial judge to decide a claim where he is at least a potential witness to extra-record matters.  Judge Payne has made himself a witness by disputing on the basis of his personal knowledge the accounts of other witnesses.  Resp. Pet. Mandamus by Hon. James H. Payne, Tenth Cir. Case No. 09-7096.  Second, Ground 1 contains more than mere allegations of legal error; it presents evidence on which an impartial tribunal could find interference with defense counsel and the withholding of a ruling so that the prosecution could gain a strategic advantage.  These actions were undisputed in the mandamus proceedings before the Court of Appeals.  Even if these actions were taken in the well-intentioned, but mistaken belief that they were proper, the Due Process Clause recognizes that judges, like all other human beings, are susceptible to cognitive biases that render unreliable decisions reflecting on their own interests.

### Judicial Interference with Defense Counsel

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment.  *Geders v. United States*, 425 U.S. 80, 91(1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853, 863, 865 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570, 596 (1961) (where state rule made defendant incompetent to give sworn testimony,

Constitution required that counsel be permitted to guide unsworn statement).  Where such interference is shown, the "[Supreme] Court has uniformly found constitutional error without any showing of prejudice . . . ."  *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984).[1]

The facts set out in Ground 1 show the trial court acting in contravention of guidelines for the administration of the Criminal Justice Act.  Those guidelines were developed by judges and personnel from the Administrative Office of the United States Court for the purpose of implementing the statutory requirements of the Criminal Justice Act while preserving the independence of criminal defense counsel that is protected by the Fifth and Sixth Amendments.

The Supreme Court granted certiorari in *Geders v. United States* in order to resolve a split in the circuits regarding whether a defendant had to show prejudice in order to prevail on a claim that the trial court interfered with his Sixth Amendment right to counsel by preventing counsel from conferring with the defendant during a recess that coincided with the defendant's testimony.  425 U.S. at 86. The Supreme Court in *Geders* recognized the broad powers of a trial judge to control the proceedings and make discretionary rulings in the course of a trial.  425 U.S. at 86.  The Court held that where these important tools of the trial court conflict with a defendant's rights, "the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel.  *Brooks v. Tennessee*,  406 U.S. 605 (1972)."  425 U.S. at 91.  The Court in *Geders* distinguished the common practice of sequestering disinterested witnesses, which the Court described with approval, from the special case of keeping a defendant from speaking with his attorney.  425 U.S. at 87.  The difference, the Court emphasized, is that an attorney must be able to gather information from the defendant and discuss the trial with him

---

[1]  Although Mr. Barrett need not show prejudice before the Court would be required to vacate his conviction based on Ground 1, Mr. Barrett can show prejudice and does so through the facts and law addressed here, and in Grounds 2, 3, and 4.

Petitioner's Merits Brief                              20                    *Barrett v. U.S.*, 09-cv-105-JHP

because, during even a time as brief as the seventeen hours at issue, there are "tactical decisions to be made and strategies to be reviewed." 425 U.S. at 88. The key issue is whether the trial court's action denies the defendant, even temporarily, the "'guiding hand of counsel at every step in the proceedings'" that is at the core of the Sixth Amendment right. 425 U.S. at 89, quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932).

In *Herring v. New York*, the Supreme Court considered a state law giving the trial judge discretion to dispense with closing arguments in bench trials. *Herring*, 422 U.S. at 853-54. In holding that this grant of judicial discretion violated the Sixth Amendment, the Court referred to two factors. First, was the historical role of closing argument in criminal cases. 422 U.S. at 860-61. Second, the Court focused on the core function of counsel for the defense:

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.*, 422 U.S. at 862. In the present case, the trial court's discretionary, administrative rulings infringed upon the core defense functions of marshaling evidence and making informed strategic and tactical decisions.

The trial court here communicated to defense counsel (a) that counsel had been selected to represent Mr. Barrett over more qualified alternatives so that he could be appointed to future capital cases; (b) that the Court disapproved of investigative expenditures such as the use of experts to assist the defense in preparing various parts of the defense, even where those resources were routinely provided to other capital defendants; (c) that the Court would involve itself in defense decision-making to an unprecedented extent by requiring the defense to justify all investigative expenditures and proposing to allow prosecutors to challenge defense experts at the

Petitioner's Merits Brief                    21                    *Barrett v. U.S.*, 09-cv-105-JHP

point where they were first requested; (d) that the Court preferred Mr. Hilfiger to Mr. Echols, and that the Court would show that preference by compensating Mr. Hilfiger at a higher rate. Mr. Hilfiger demonstrated through words and deeds that he recognized the trial court's displeasure with defense expenditures, and responded by refusing to join Mr. Echols' efforts to obtain resources for Mr. Barrett's defense. After Mr. Hilfiger was elevated to lead counsel, he acknowledged that he had not been familiar with the work done in preparation for the prior trials. Mr. Hilfiger also decided to forego use of expert and investigative resources the trial court had authorized, resources of which Mr. Hilfiger thought the trial court disapproved. The consequence of these circumstances was that Mr. Barrett's defense counsel failed to employ resources that would have supported his defense and the marshaling of mitigation evidence, and that defense counsel made innumerable tactical moves in ignorance.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the Court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *See Wood v. Georgia*, 450 U.S. 261 (1981).

In *Wood*, the solicitor for the State of Georgia brought to the attention of the trial court and Supreme Court that the attorney for the petitioners was burdened by a conflict between his own interests and the interests of his clients. The conflict stemmed from the attorney's fee arrangement. He was being paid by the former employer of the petitioners. When the petitioners had been employed by the lawyer's principal, they were arrested for distributing indecent materials. The petitioners were convicted and ordered to pay fines. They were ordered as a condition of their probation to make installment payments, and when they failed to make those payments, there was a parole revocation hearing. The attorney retained by the former employer

represented the petitioners at that hearing.  The petitioners told the judge they were unable to pay and had been lead to believe their former employer, their attorney's principal, would pay the fines.  Rather than advocate that the petitioners should not be jailed, or that the conditions of their parole should be modified, the attorney challenged the constitutionality of the fines.  *Wood*, 450 U.S. at 266-67.

In *Wood* the Supreme Court acknowledged that it was unclear whether the arrangement between the petitioners' attorney and their former employer created an actual conflict.  The Court did not need to find that the former employer was withholding payment of the petitioners' fines in order to create a test case.  It was sufficient for the incentive to create such a test case to exist.  at 267-68.  Similarly, in the present case, it is not necessary for Mr. Barrett to establish that the trial court was withholding funds from the defense for any particular purpose, or that Mr. Hilfiger refused to use the few funds that were available because the trial judge disapproved and Mr. Hilfiger's appointment was to be the first of many in capital cases.  The incentive structure was clear and, as discussed more *infra*, it had an actual, negative impact on Mr. Barrett's defense.

The Supreme Court in *Wood* found that the attorney's loyalty to his employer created an incentive for the attorney not to seek all remedies available from the trial court including leniency.  *Id.* at 268 n.14  In addition, the Court found "a danger that petitioners' lawyer was influenced in his strategic decisions by . . . improper considerations" stemming from the attorney's employment.  The Court noted the widespread condemnation of payment arrangements for defense counsel where "the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed."  Id. at 270.

Here, Judge Payne had a long-range plan that included establishing a panel of local attorneys to handle capital cases, and establishing precedent, or not permitting capital-case considerations to override precedent, for lower rates of compensation. Judge Payne expressed in his orders and letter to counsel that he wanted to limit compensation in this capital case to rates paid for non-capital cases, despite clear authority in statute and the CJA Guidelines as well as a national practice of paying higher rates in cases where the Government seeks the defendant's execution. Mr. Hilfiger was aware that he was personally selected for appointment to this case due to Judge Payne's first long-range plan. His communications with co-counsel Echols reflect he also was aware of Judge Payne's long-range plan to keep costs low, and not to establish a precedent for the future panel of the higher costs established by precedent in other capital cases.

Judge Payne illustrated the benefits of furthering his long-range agenda. At the point where disagreements between Mr. Echols and Judge Payne came to a head, that is when Judge Payne denied funds for investigative and expert assistance that had been granted to all other similarly situated capital defendants, Mr. Hilfiger refused to join his co-counsel in advocating for resources. Mr. Echols withdrew from the case over the denial of what he considered necessary resources. Shortly before this dispute, Judge Payne had refused to compensate Mr. Echols at the highest rate offered lead counsel in a capital trial. Immediately after Mr. Hilfiger refused to support Mr. Echols' request for funds and Mr. Echols withdrew, Judge Payne increased Mr. Hilfiger's compensation to the highest rate.

Federal Death Penalty Resource Counsel, Richard Burr had provided evidence that the funds sought for Mr. Barrett's defense were well within the range of funding for other federal death penalty cases. After he was made lead counsel, Mr. Hilfiger refused to communicate with Mr. Burr. As the trial date drew near, Mr. Hilfiger requested advice from Assistant Federal

Petitioner's Merits Brief    24    *Barrett v. U.S.*, 09-cv-105-JHP

Defender Julia O'Connell about a mitigation specialist. This was one of the investigative resources Mr. Echols sought in a request with which Mr. Hilfiger had refused to join. When Ms. O'Connell advised Mr. Hilfiger to contact Resource Counsel, Mr. Hilfiger did not follow through. The record of hearings in August and September, and the recollection of Jeanne Russell shows Mr. Hilfiger's reluctance to retain a mitigation specialist was not based on knowledge of the facts. Dr. Russell relates that co-counsel Bret Smith was philosophical about her inability to serve as a mitigation specialist, saying the trial court would not fund a thorough investigation anyway. Despite invitations from the trial court, defense counsel never sought to amend the budget. These circumstances show Mr. Barrett's counsel were not exercising independent professional judgment on what was in their client's interests.

As the ABA has long recognized,

> Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.

The ABA Model Code of Professional Responsibility EC 5-23 (1980), quoted in *Wood*, 450 U.S. at 270 n.17. The Supreme Court has explicitly applied this principal to the work of publicly funded criminal defense counsel:

> [A] public defender is not amenable to administrative direction in the same sense as other employees of the State. Administrative and legislative decisions undoubtedly influence the way a public defender does his work. State decisions may determine the quality of his law library or the size of his caseload. But a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, see *Moore v. United States*, 432 F.2d 730 (CA3 1970), a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client. "A lawyer shall not permit a person who recommends, employs, or pays him to render legal

services for another to direct or regulate his professional judgment in rendering such legal services." DR 5-107(B), ABA Code of Professional Responsibility (1976).

*Polk County v. Dodson*, 454 U.S. 312, 321 (1981).

This is not merely a matter of professional ethics. The administrative actions of the trial court in this case, however well-intentioned they may have been, created incentives and disincentives that, according to participants in the defense, influenced the actions of defense counsel in ways that harmed Mr. Barrett's ability to marshal a defense based on a reasonable investigation and expert assistance. These unique circumstances violated "the constitutional obligation of the [trial court] to respect the professional independence of the public defenders whom it engages." *Polk County*, 454 U.S. at 321-22. "Implicit in the concept of a 'guiding hand' is the assumption that counsel will be free of state control. There can be no fair trial unless the accused receives the services of an effective and independent advocate." *Id.*, 454 U.S. at 322. Due to the administrative actions of the trial court, and the disincentives it created, defense counsel in this case were not informed, for example, of available grounds for cross-examination of prosecution "expert" Iris Dalley, of grounds for presenting a mental-state defense, of evidence that Mr. Barrett was incompetent to stand trial, and of a wealth of lay and expert mitigation evidence.

The trial court's express limitations on investigation, including the requirement, contrary to CJA Guidelines, that all investigative expenditures be justified after the fact, interfered with the defense's exercise of independent professional judgment by influencing the factual bases upon which defense counsel could make judgments. The Supreme Court and Tenth Circuit have repeatedly recognized that counsel cannot make reasonable, independent judgments in the absence of information that can only be obtained through inquiry and investigation. *Rompilla v. Beard*, 545 U.S. 374, 390 (2004) (counsel could not have made reasonable decision regarding

penalty phase having failed to examine record of prior conviction); *Wiggins v. Smith*, <u>539 U.S. 510, 532-33</u> (2003) (counsel could not have made reasonable decision regarding mitigation after having failed to investigate evidence of sexual abuse); *Williams v. Taylor*, <u>529 U.S. 362, 395-96</u> (2000) (counsel could not have made reasonable decision about penalty phase closing argument after having failed to investigate defendant's background); *Kimmelman v. Morrison*, <u>477 U.S. 365, 387</u> (1986) (counsel could not have made reasonable decision regarding suppression after failing to inquire into prosecutor's duty to produce evidence absent a discovery motion); *Strickland v. Washington*, <u>466 U.S. 668, 691</u> (1984) (choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

The evidence shows Judge Payne expressed deep skepticism about the need for any additional investigation after the two state-court trials. Exh. 65. The disagreement between Mr. Echols and Judge Payne over the need for further investigation was one ground on which Mr. Echols withdrew. Mr. Hilfiger stated in his fee budget prior to Mr. Echols's withdrawal, and in his motion for a continuance after the withdrawal, that he was unfamiliar with the prior record and with the extent of the investigation that had been done during the state court proceedings. The record and extra-record evidence also shows that Mr. Hilfiger and Mr. Smith did not even attempt to review whatever mitigation evidence had been developed for the state trials until the federal trial was underway.

Mr. Barrett does not rely solely upon the *potential* impact on defense counsel's actions from the trial court's incentive and disincentive structure. *See Mickens v. Taylor*, <u>535 U.S. 162</u> (2002). Defense counsel's actions (including the conversation with Dr. Russell) show counsel was conscious of the limitations imposed by the budget, but that counsel proceeded without

seeking additional funds even to the extent that counsel presented a witness who had promised to damage Mr. Barrett's case if he could rather than consult an court-funded expert.  Regardless of the trial court's intentions, the message communicated to defense counsel was that the court would look favorably on less spending, and this message had an actual impact on counsel's performance.  For example, although the trial court authorized defense counsel to retain George Kirkham, Ph.D., an expert in police procedures, based on prior counsel's explanation that former FBI agent Chuck Choney, a friend of the victim, was hostile to the defense, trial counsel never contacted Dr. Kirkham.  See Exh. 44.  During a hearing in October 2005, defense counsel dismissed the court's questions about the budget by stating that he had not used the funds authorized for Kirkham and other experts, and said he would rely upon Choney, instead.  As he had indicated, Choney reversed his prior position on aspects of the raid and provided more evidence favorable to the prosecution than it was favorable to Mr. Barrett.  It is difficult to imagine a more concrete adverse impact than presenting a witness who had an announced bias against the defendant rather than spend CJA funds on an independent expert.[2]

The evidence presented in the Amended § 2255 Motions demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases.  The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

---

[2] Mr. Barrett's defense counsel never contacted Dr. Kirklham.  Therefore the decision to rely upon the biased Choney could not have been based on an informed judgment about their relative strengths or weaknesses.

Petitioner's Merits Brief                                    28                          *Barrett v. U.S.*, 09-cv-105-JHP

Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth Amendment's prohibition on cruel and unusual punishment.

### Lack of Judicial Impartiality

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe,* 409 U.S. 57, 62 (1972). This right includes a factfinder without either actual bias or the appearance of bias. *In re Murchison,* 349 U.S. 133, 136 (1959). This constitutional guarantee is sufficiently important that its denial is not subject to the harmless error rule. *See, e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir. 2002).

The trial court took actions and withheld action in violation of the Code of Judicial Conduct and that demonstrated the judge was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's rights under the Fifth and Fourteenth Amendments.

In order to establish a due process violation based on judicial bias, Mr. Barrett must show the trial judge took actions adverse to his interest that were not based on legitimate concerns. *See Bracy v. Gramley*, 520 U.S. 899 (1997). In *Bracy*, the judge who presided over the petitioner's trial was convicted of taking bribes to fix the trials of other criminal defendants. Bracy alleged that the judge's misconduct on behalf of those defendants who did bribe him "induced a sort of

Petitioner's Merits Brief                                    29                      *Barrett v. U.S.*, 09-cv-105-JHP

compensatory bias" against those who did not so the authorities would not suspect the judge of being soft on all defendants. *Bracy*, 520 U.S. 905. This compensatory bias was manifest in numerous discretionary rulings the judge made. *Ibid.* The Supreme Court found, "difficulties of proof aside, there is no question that, if it could be proved, such compensatory, camouflaging bias on [the judge's] part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Ibid.*

In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court invalidated the judgment rendered against a man convicted of violating a prohibition law. *Tumey* is generally cited for the proposition that due process is violated when the judge presiding over a cause has a personal pecuniary interest in the outcome. However, the Supreme Court held "the pecuniary interest of the mayor in the result of his judgment is not the only reason for holding that due process of law is denied to the defendant here." *Tumey*, 273 U.S. at 532. The Court held Tumey's due process rights also were violated due to the mayor's fiduciary interest in protecting and providing for the *public* fisc by convicting defendants. *Id.* at 532-33.

In Mr. Barrett's case, the facts show at least two ways in which the trial court demonstrated a lack of impartiality and made administrative or discretionary rulings, or withheld such rulings to Mr. Barrett's disadvantage and without a legitimate legal basis. As shown in the Amended § 2255 Motions, the trial court ignored, knowingly violated, or threatened to ignore numerous aspects of the Criminal Justice Act ("CJA"), the Judicial Council's Guidelines for administering the CJA, federal judicial practice in administering the CJA, and 18 U.S.C. § 3599. Mr. Echols, the local Federal Defender, and trial counsel Smith all have commented upon the extraordinary extent to which the trial judge's concern over the public fisc impeded the defense.

The CJA and CJA Guidelines were constructed to prevent concern over the fisc from crossing the line into interference with the defense's ability to function as the prosecution's adversary.

As argued *supra*, the trial judge's deviations from the CJA Guidelines and standard practice in federal death penalty cases also communicated to defense counsel that resources were not available and that the court would show favor towards defense counsel if he did not use those resources that were made available. But the trial judge manifested a lack of impartiality in other, more direct ways.

The record shows the trial judge participated in an *ex parte* hearing with prosecutors then misrepresented to defense counsel what occurred during the hearing. Thereafter, the trial judge took actions, and withheld judicial action in ways that the judge knew inured to the benefit of the prosecution and to the disadvantage of Mr. Barrett's dissent. Although the trial judge, during the *ex parte* hearing found the government presented insufficient grounds for delaying the release of witness names as required by 18 U.S.C. § 3432, the judge withheld judgment on the government's motion for a protective order while prosecutor's secured concessions from the defense. Although the judge stated during the *ex parte* hearing that the defense would have cause for a continuance based on the number of witnesses and their importance to the prosecution's case, the judge never communicated that information to the defense. In the post-conviction process, defense counsel has stated that he believed the trial judge would not grant a continuance. Additionally, although the trial judge recognized in the government's *ex parte* proffer that the withheld witnesses would testify to alleged prior bad acts of the defendant, the judge (a) permitted the prosecutor to make *ex parte* arguments against disclosure of that testimony, (b) misrepresented the content of the hearing by omitting reference to that discussion, and (c) stood

by while the prosecution delayed disclosures and the defense failed to object at trial to the testimony.

The trial judge's withholding from defense counsel of all the matters discussed in the *ex parte* hearing violated clearly established norms of judicial conduct.  Similar to the American Bar Association's Model Code of Judicial Conduct ("Model Rules"), the Code of Conduct for United States Judges ("Code of Conduct") provides:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.  Except as set out below, a judge should not initiate, permit, or consider ex parte communications, or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

Canon 3 Rule 4(a)(b);  *Cf.* Model Rules, Canon 2, Rule 2.9.[3]  The trial judge's failure to disclose all the matters discussed in the September 13, 2005 *ex parte* hearing violated  this rule.

As in *Bracy*, there can be no question that the trial judge's withholding of rulings and statements required by the Code of Judicial Conduct violated Mr. Barrett's right to due process of law.  This case is distinguishable, however, in that there is abundant evidence of the violation.  At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled

---

[3]  Petitioner cited this Rule in his Motion to Disqualify and it is this Rule that Judge Payne addressed in his opinion.  For purposes of Judge Payne's disqualification, the Code of Conduct controls but is in all relevant ways effectively the same as the Model Rules.

to no relief.  Therefore, this Court should order an evidentiary hearing on sufficient notice so that Mr. Barrett's counsel may make use of discovery and subpoenas to marshal all available evidence.  R. Gov. § 2255 Proc. 8(c).  The trial judge should recuse himself from that hearing. *Dzurgiot v. Luther*, 897 F. 2d 1222, 1227 (1st Cir 1990) (judge who presided at trial may determine if evidentiary hearing is necessary but different judge should conduct evidentiary hearing); *Halliday v. United States*, 380 F. 2d 270, 274 (1st Cir. 1967) (pre-section 2255 Rules decision mandating assignment of section 2255 motion to judge other than trial judge, except when difficult to do so because, for example, there is only one judge in district).  Following the hearing, this Court should vacate the judgment against Mr. Barrett and order a new trial before a different judge.

> **Ground 2.     Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Review of Ground 2 is governed by the familiar two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny: deficient performance and prejudice.

### *1.     The Test for Deficient Performance.*

"The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685.  In general terms the Supreme Court has said that "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), quoting *Strickland*, 466 U.S. at 688.  Defense counsel may fail to perform according to Sixth

Amendment standards when they "undermine[] the proper functioning of the adversarial process." *Strickland*, at 686.

Beyond these general terms the Supreme Court has consistently relied upon codified and judicially recognized duties of counsel as guides to judging the reasonableness of attorneys' performance "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 688. The evidence proffered with Mr. Barrett's petitions shows that the attorneys who represented him at trial failed to follow these norms in numerous ways. At a minimum, an evidentiary hearing is required because the proffered evidence and the files and records of the case do not conclusively show that Mr. Barrett is entitled to no relief under *Strickland*'s standards.

*Strickland* requires that "a court deciding and actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Courts, including the Supreme Court, have repeatedly recognized that *Strickland*'s focus means that "[j]ust as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).[4]

---

[4] The Supreme Court has rejected efforts to portray a trial attorney's conduct as the product of a strategic decision because, when considered in light of the surrounding circumstances, the alleged strategy "resemble[d] more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations." *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003). Other courts have long been in accord. *See*, *e.g.*, *United States v. Burrows*, 872

Because the focus of the Sixth Amendment claim is on the functioning of the adversarial process, *Strickland*, 466 U.S. at 686, reviewing courts should make "every effort to view the facts as a *defense* lawyer would have at the time." *Rompilla v. Beard*, 545 U.S. 374, 386 (2005) (emphasis added).

The Supreme Court has explained that a reviewing court generally should "assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1985) (internal quotations from, and citations to, *Strickland* omitted). This includes an examination of counsel's performance both "before and at trial." *Ibid.* It is not necessary for Mr. Barrett to show that his counsel completely failed to act as the prosecution's adversary; even a single objectively unreasonable act or omission may establish grounds for relief. *Fisher v. Gibson*, 282 F.3d 1283, 1306-07 (10th Cir. 2002).

The Supreme Court has cautioned against any "checklist" or "detailed rules for counsel's conduct" because they would "interfere with the constitutionally protected independence of counsel," and "distract counsel from the overarching mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-689. At the same time, the Supreme Court has

F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

Petitioner's Merits Brief                    35                    *Barrett v. U.S.*, 09-cv-105-JHP

identified certain basic duties that must be met in every case.  First is "the duty of loyalty, perhaps the most basic of counsel's duties," *id.* at 692, which includes "a duty to avoid conflicts of interest."  *Id.* at 688.  Additionally, counsel have

> ...the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

*Id.* at 688.  Criminal defense counsel have a "duty to investigate," *id.* at 690, and capital defense counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 523, quoting *(Terry) Williams*, 529 U.S. at 396.  This investigation must precede and inform counsel's actions, and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  Included in the duty to investigate is the common-sense "notion that defense counsel must obtain information that the [prosecution] has and will use against the defendant," and investigate that information. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

### 2.      *The test for prejudice.*

Mr. Barrett "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is less than a preponderance.  *Strickland*'s standard does not require to Mr. Barrett to "show that counsel's deficient conduct more likely than not altered the outcome in the case."  *Id.* at 693.  Claims such as Mr. Barrett's do not implicate the prejudice standard of *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993).  *(Terry) Williams*, 529 U.S. at 393.

> The question is not whether counsel's ineffectiveness must be demonstrated by showing the trial would have resulted in a defense verdict, but whether the omitted evidence "creates a reasonable doubt that did not otherwise exist." *See United States v. Agurs*, 427 U.S. 97, 112 (1976). Upon such a showing, constitutional error has been committed. *Id.* In this case, it cannot be fairly said that the omissions and failures of trial counsel, while argumentatively explainable, do not raise a reasonable doubt in the guilty verdict.

*Stouffer v. Reynolds*, 214 F.3d 1231, 1234-35 (10th Cir. 2000) (parallel citations and footnote omitted). *See also Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("we think the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance, and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial") (citing *Strickland*, 466 U.S. at 694, and other authorities).

*Strickland*'s prejudice test requires the Court to consider the effects of all of trial counsels' unprofessional errors in light of "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397. This Court must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695-696.

Determinations of prejudice require a cumulative assessment of counsels' errors: "Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696; *Fisher v. Gibson*, 282 F.3d 1283, 1307-11 (10th Cir. 2002).[5]

---

[5] Accord *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009); *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002).; *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001); *Lindstadt*

In making that determination, the Supreme Court looks not only at the evidence trial counsel failed to uncover, but what further effort by reasonable attorneys in their role as advocates would have produced with the evidence. *Rompilla*, 545 U.S. at 391-92 (describing chain of evidence a defense lawyer at the time could have developed following reasonable investigation). *See also Kyles v. Whitley*, 514 U.S. 419, 438, 441 (1995) (reasonable-probability standard looks at cumulative effect of "disclosure of suppressed evidence to competent counsel").[6]

Lastly, the Court must "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to convict of a particular offense, or impose a sentence of death. *Id.* at 695.

### 3. *The Need for an Evidentiary Hearing*.

This Court is required to conduct an evidentiary hearing on Mr. Barrett's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). Because the record of the trial will rarely contain sufficient information for the Court to make a determination under the *Strickland* standard, it is generally necessary to consider extra-record evidence. *Massaro v. United States*, 538 U.S. 500, 05 (2003). "The evidence introduced at trial . . . will be devoted to issues of guilt or innocence, and the

---

*v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *Berryman v. Morton*, 100 F.3d 1089, 1101-02 (3d Cir. 1996); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991).

[6]The same prejudice test is applied in ineffective-assistance cases and cases of suppressed evidence. *Stouffer*, *supra*, 214 F.3d at 1235 n.4 ("In a constitutional context, we see no principled distinction between whether that omission results from the acts of the prosecution or an ill-prepared defense counsel.").

Petitioner's Merits Brief                    38                    *Barrett v. U.S.*, 09-cv-105-JHP

resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Ibid.* "Particularly where, as here, it is the pretrial . . . performance of counsel as well as the performance during trial that is specifically alleged to have been inadequate, it is not sufficient that the trial judge found counsel's performance as observed in the course of trial to be adequate." *Wood v. Endell*, 702 P.2d 248, 249 (Alaska App. 1985).[7]  At a minimum, the record of the trial cannot be said to conclusively refute the evidence proffered with the Amended § 2255 Motion and the argument presented herein.  Accordingly, this Court should enter an order providing Mr. Barrett adequate notice of a hearing so that his counsel may marshal all available evidence including through the use of discovery and this Court's subpoena power. R. Gov. § 2255 Proc. 8(c).

> **Ground 2, Part A(1).**      **Defense Counsel's Unreasonable Omissions in Reurging *Franks* Issue**

Trial counsel were professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978) following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this respect undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a night-time, no knock

---

[7] *See also Clark v. Crist*, 335 F.3d 1303, 1311-1312 (11th Cir. 2003), *cert. denied*, 540 U.S. 1155 (2004) (where petitioner raised two distinct appellate ineffective-assistance claims, and state court held hearing on the second claim but not the first, it was improper for district court to rely on counsel's testimony regarding the second claim as a basis for finding reasonable performance on the first claim); *Marshall v. Hendricks*, 307 F.3d 36, 109-10 (3rd Cir. 2002) (resolution of *Strickland* claim unreasonable because based on "generalized assumptions" from trial record); *Bryan v. Mullin*, 335 F.3d 1207, 1216 n.7 (10th Cir. 2003) (no deference due state-court rejection of *Strickland* claim where state court refused to determine facts through evidentiary hearing).

warrant[8] were false, or were made in reckless disregard for the truth, and for other reasons, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. *See* Ground IV. The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial. Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

On cross-examination, Charles Sanders, the alleged "C.I." who supplied information to secure the search warrant, repudiated virtually all the claims attributed to him by District 27 Task Force Officer Clint Johnson in the warrant affidavit. ( R. 2518-21, 2596-2601, 2608-10, 2618-23, 2625-28) Sanders's wildly conflicting testimony, the content of which seemed to depend on which lawyer happened to be questioning him at the time ( R. 2531-38), not only served to disavow the "facts" supporting probable cause, let alone probable cause for a nighttime, no-knock warrant, but showed Sanders, due to his criminal record, including criminal acts of dishonesty (or that portion of his vast criminal record was revealed at trial, *see* Ground II A (4)(c)), the deals he had received in the past (to the extent that was explored incompletely and incompetently at trial, *see* Ground II A (4)(c)), his ongoing drug use even while working as an informant, and his reputation for honesty in the community (*See* Ground II A (4)(c)) made him so thoroughly disreputable that no police officer, in good conscience, could have relied on him to secure a search warrant of any kind, against anybody. In dealing with Sanders, Clint Johnson, who himself was thoroughly corrupt (*See* Ground V B (1)), either sponsored false information or acted in reckless disregard of the truth.

---

[8] Exhibit 194.

Petitioner's Merits Brief                                        40                          *Barrett v. U.S.*, 09-cv-105-JHP

The usefulness of an informant witness such as Sanders depends "in large measure on the degree to which he both is and can be presented to the fact-finder as a reliable person." *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993).  But for counsel's failings, Sanders could have presented as thoroughly untrustworthy, thus collapsing the foundation for the search warrant.  There was nothing in the search warrant affidavit to show that Johnson, or anyone else, had corroborated the information purportedly received from the C.I. (Sanders).  *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (where an informant's tips are concerned, the task turns in large part on the independent police work corroborating – or failing to corroborate – the details of the informant's claims).  For all that was revealed by the search warrant affidavit, Sanders simply could have been making the information up.  *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006).

Instead of arguing the vast array of reasons provided by Sanders's testimony, his background and history (which were not disclosed in the search warrant affidavit), and the circumstances surrounding his supposed involvement in the case as grounds to suppress the fruits of the search under *Franks,* the defense, as the Government was quick to point out, argued only one discrepancy in his testimony, involving Sanders's alleged sighting of a white powder he believed to be methamphetamine during one of his "visits" to Mr. Barrett's cabin.  (Doc. 231.) With the argument in this posture, the trial court was quick to deny the renewed motion to suppress without a *Franks* hearing, holding not only that the ground urged by the defense was inadequate, but improperly also relying upon the testimony of the other snitch witnesses, who only surfaced years after the warrant was executed, to "corroborate" Sanders. (Doc. 235.)

Had defense counsel urged all of the many grounds for suppressing the fruits of the search warrant under *Franks*, there is no question that Mr. Barrett would have been entitled to an

Petitioner's Merits Brief                                        41                                *Barrett v. U.S.*, 09-cv-105-JHP

evidentiary hearing. *United States v. Ferra,* 900 F.2d 1057, 1058-59 (7th Cir. 1990) (where testimony of one officer at trial appeared to contradict the essential testimony of another officer as to when the search warrant was obtained, trial court should have conducted an evidentiary hearing on a renewed motion to suppress). Here, had counsel advanced all the reasons the search warrant was defective under *Franks,* the court would have been compelled to hold a hearing, which was avoided because of counsel's unprofessional re-urging the motion to suppress.

It is also abundantly clear that had defense counsel properly argued all the grounds for suppression under *Franks,* stemming not only from Sanders's contradictory testimony, but from the facts that had been omitted from the search warrant affidavit about Sanders's criminal history, deals, and ongoing drug use[9], which Clint Johnson deliberately blinded himself to, a

---

[9] The courts have held that search warrants are ripe for a *Franks* attack where, as here, the affiant omits crucial information bearing on an informant's credibility, leaving the magistrate in the dark in appropriately evaluating the information upon which a search warrant affidavit relies. *E.g., United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (in context of *Franks* challenge, police withheld information on the confidential informant's prior convictions, as well as the fact the informant had previously falsely reported a crime); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983) ("We do not however recommend or endorse omissions in the affidavit of the confidential informant's credibility or reliability."). Likewise, just as counsel failed to mount a *Franks* attack on the warrant based on Sanders's extensive criminal history, acts of dishonesty, and the numerous deals he had received due to his work as an informant, counsel failed to challenge the unadorned statement in the search warrant affidavit that Sanders had provided "reliable" information on "at least" five prior occasions, a bald statement that is entitled to little if any weight in evaluating the sufficiency of the probable cause showing. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation that C.I. had provided reliable information in the past entitled to little weight); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (assertion that C.I. had provided reliable information in the past was entitled to only "slight weight," since such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to one or more police investigations).

*Franks* challenge would have been sustained.  No legitimate strategy excuses counsel's failure in this regard.  As noted, Mr. Barrett was grievously prejudiced by counsel's omissions.  Had the evidence obtained from the search warrant been suppressed, as it should have been upon a proper, competently argued renewed motion to suppress under *Franks*, the Government would have been left with virtually no case.  *Kimmelman v. Morrison,* 477 U.S. 365, 383-91 (1985) (counsel was professionally unreasonable for failing to litigate valid Fourth Amendment claim, which may be raised under the rubric of ineffective assistance of counsel in collateral proceedings, and remand was ordered to determine prejudice); *Owens v. United States,* 387 F.3d 607, 609-11 (7th Cir. 2004) (failure to make a proper Fourth Amendment objection to the admission of evidence can support later challenge to counsel's effectiveness); *Norhrup v. Trippett,* 265 F.3d 372, 382-85 (6th Cir. 2001) (counsel ineffective for failing to pursue meritorious motion to suppress).  Here, the prejudice from counsel's failures is clear.  Counsel was ineffective for failing to professionally and thoroughly re-urge a motion to suppress based on Sanders's trial testimony and other factors bearing on his credibility.

The *Franks* issue, and counsels' failure to effectively argue it, were at least partially framed by the record.  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable and prejudicial.  *See* Ground 18.

Petitioner's Merits Brief 43 *Barrett v. U.S.*, 09-cv-105-JHP

913

**Ground 2, Part A(2).**      **Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

> Where, as here, a defendant claiming lack of criminal responsibility has a significant medical history that appears to have contributed to the underlying mental disease or defect, competent counsel would certainly investigate the full extent of that contributing medical history.  The possibility that a defendant's mental illness could be explained and confirmed by reference to some demonstrable physical illness or injury would be of such obvious value to the defense that one would expect counsel to explore it both promptly and thoroughly.  The opportunity to present the jury with a medical explanation for the defendant's mental illness, an explanation that could both corroborate the existence of the mental disease and portray the defendant's mental illness in a sympathetic light, should not have been squandered.

*Commonwealth v. Alvarez*, 740 N.E.2d 610, 616 (Mass. 2000).

Mr. Barrett's defense counsel were on notice of at least three things that triggered a duty to investigate his mental health prior to trial.  First,  based on the prior trials and discovery, defense counsel knew the Government's theory of the case would be that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  Count 3 of the superseding indictment put defense counsel on notice that the Government would attempt to prove Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  Conviction on Count 3 could, and did result in Mr. Barrett being sentenced to death.  Docs. 258, 285.  Jury instructions on Count 3 would require findings that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  Doc. 240; R. 4262-64, 4266-67.

Second, medical records, statements from Mr. Barrett's family and ex-wife, and prior mental health examinations available to defense counsel from the time of their appointment

showed Mr. Barrett had a history of mental health problems.  Mr. Barrett's family and friends informed prior counsel that he had attempted suicide by shooting himself in the chest, and had progressively become more paranoid and isolated in the years prior to the raid.  Medical records corroborated the account, showed Mr. Barrett had been diagnosed at different times with Major Depression and Bipolar Disorder, and showed he had been involuntarily medicated with antipsychotic drugs, and was prescribed them for the future.  A prior forensic examination had found him to be the most paranoid criminal defendant the examiner had ever seen.  That expert also reported that Mr. Barrett showed signs of organic brain damage that should be investigated by a specialist.  Accordingly, counsel sought funds for a neuropsychological evaluation.  Doc. 50 at 8.  Defense counsel had information from various sources, including the affidavit supporting the no-knock warrant, records from Mr. Barrett's incarceration, and witness accounts, that Mr. Barrett had been a long-time drug user, including the use of methamphetamine.[10]

Third, long established case law and professional norms of criminal practice, particularly in capital cases, informed Mr. Barrett's attorneys that they should investigate these matters and secure expert assistance.  ABA Guidelines 10.7, 10.10.1, and 10.11.  Defense counsel actually informed the trial court prior to trial expert testimony on "the psychology of individual responses to sudden life or death situations * * * is essential to Mr. Barrett's capital defense, which hinges on an understanding the human mind's response * * * [and] will negate the government's allegations of premeditation and malice aforethought relating to capital punishment."  Doc. 46 at 5.  *See also* Doc. 50 at 5-6, 8.

---

[10]  The evidentiary hearing support for these facts is documented in the Amended § 2255 Motions and the exhibits thereto.  As he has elsewhere in this Brief, Mr. Barrett relies upon and incorporates by specific reference those averments and exhibits.

Despite the recognition that mental health evidence could aid the defense at both stages of trial, defense counsel failed to retain any mental health expert to review Mr. Barrett's history or examine him prior to trial.  Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), for example, the Supreme Court found constitutional error where defense counsel's statements prior to and during trial reflected a contemporaneous intention to present evidence of sexual abuse, but counsel failed to investigate available documents showing the defendant had been a victim of such abuse.  *Wiggins*, 539 U.S. at 526-27.

Similarly, in *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003), the court held the result of the trial was unreliable due to defense counsel's failure to investigate and present evidence that would have established a mental state defense.  *Jennings*, 290 F.3d at 1014-19.  Defense counsel's failure to investigate and explore expert advice regarding a mental state defense was found to be objectively unreasonable under *Strickland* where counsel knew the defendant had been a long-time methamphetamine user, the defendant's ex-wife would have reported prior diagnoses of mental illness, the defendant had been sent for a psychiatric examination by a court, and had exhibited other mental impairments.  *Id.*, 290 at 1014.

The duty of capital defense counsel to conduct a prompt and thorough investigation of the defendant's background, to provide relevant personal history records to mental health experts, and to have the defendant evaluated by mental health experts is discussed more fully in the section of this brief addressing Part B of Ground 2, *infra*.

In assessing the prejudice from counsel's deficient performance, this Court must consider

Petitioner's Merits Brief                          46                          *Barrett v. U.S.*, 09-cv-105-JHP

the cumulative effect of all acts and omissions of counsel found to be deficient, and the favorable evidence presented at trial. *Rompilla*, 545 U.S. at 391-92; *Stouffer v. Reynolds*, 214 F.3d at 1235 & n.4. The results of an accurate and reliable mental health evaluation – summarized in the Amended § 2255 Motions and cited exhibits – demonstrate that trial counsel's failings were prejudicial. A reasonable investigation would have revealed the following:

- Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted;

- at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning;

- significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats (*see generally* Exh. 117 at ¶¶ 66-78);

- Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment," and these disabilities are exacerbated under "conditions of complexity and/or highly stressful situations" (Exh. 89 at 24);

- Mr. Barrett has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts (Exh. 89 at 13.)

Petitioner's Merits Brief                    47                    *Barrett v. U.S.*, 09-cv-105-JHP

•       family witnesses would have described an individual who had been mentally and

emotionally troubled from childhood on; who was subject to inexplicable and wild mood

swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep

and prolonged episodes of depression; who reacted without thinking or correctly

perceiving what was going on around him; who handled stress poorly and who reacted

under stress; and who retreated to a safe place when he felt threatened.  (*See, e.g.*, Exhibit

103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99;

Exhibit 74; 101; Exhibit 79.)

Had Mr. Barrett's defense counsel retained and provided background information to the

mental health professionals they recognized a need for, jurors would have heard a psychiatrist

testify that

> Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation
> augmented his affective dysregulation, hyperreactivity, and exaggerated startle
> response, setting the stage for his brain, with little executive functioning ability, to
> misprocess everything that was going on, to limit his ability to understand the
> input from each of these symptoms, and, eventually, to be shot himself multiple
> times and kill an officer.  It is my professional belief that Mr. Barrett, as a
> function of a mental disorder, believed his actions were right at the time of the
> police action on his property.  This distorted belief was further augmented by the
> symptoms of his bipolar disorder, his profound depression, isolation, impaired
> judgment, irritable mood, and paranoid ideation.  His belief that he was also doing
> the right thing was shaped by his hyperreactivity, a known stressor that was life
> threatening but unidentified, an exaggerated startle response and, again, extreme
> paranoia.
>
> [¶]      My belief that Mr. Barrett, at the time of his offense, could not understand
> the difference between right and wrong is also based on, and bolstered by,
> consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his
> perseveration which amplifies his rumination, the disinhibition which magnifies
> the impulsivity, the impaired sequencing which complicates the scanning of the
> environment.  The severe impairment of Mr. Barrett's higher cortical functioning,
> which prevents mediation of limbic-based responses to perceived threats,

neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

Exh. 117 at ¶¶ 76-78.

This evidence – particularly when viewed in conjunction with the available evidence impeaching the prosecution's informant witnesses, the expert evidence impeaching the prosecution's "reconstruction" of events, eyewitness accounts, and expert evidence of the raid's fatal flaws – would have supported the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably. Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of Count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The available evidence would have created reasonable doubt as to the intent element of Count 3, and would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[11]

---

[11]    As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

Petitioner's Merits Brief                    49                    *Barrett v. U.S.*, 09-cv-105-JHP

.  Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), § 2.  Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion.  Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life.  Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.  *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether.  E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985) ("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005) (citing *Lofton*'s holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control

he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

As in *Jennings v. Woodford, supra*, Mr. Barrett was prejudiced by his counsel's failure to conduct a reasonable investigation and preparation of a defense that counsel themselves viewed as viable.  290 F.3d at 1015-19 (concluding undiscovered evidence would have aided defense that accused lacked the capacity to form the intent to commit first degree murder; defendant was a long-term methamphetamine addict, had previously attempted suicide and was committed to a mental hospital, otherwise had a history of self-injury, and had been diagnosed as a schizophrenic); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999) (counsel ineffective for failing to investigate and produce evidence of defendant's mental problems, including PTSD, which would have served to negate malice and support self-defense claim); *Williamson v. Ward,* 110 F.3d 1508, 1518-21 (10th Cir. 1997) (counsel ineffective for failing to investigate and present evidence of defendant's extensive mental health problems, which would have assisted a claim of incompetency to stand trial and aided in a first stage mental health defense); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel ineffective for failing to call witnesses in support of defense theory (alibi)).

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement.  (Exhibit 44.)  In addition to

these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case at both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events.  Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[12]

---

[12]     Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

**Ground 2, Part A(3):**     **Defense Counsel's Unreasonable Failure to Investigate and Present Evidence Showing Mr. Barrett was Incompetent to Stand Trial**

In Part A(3) of Ground 1, Mr. Barrett pleaded the factual basis for finding that his trial counsel unreasonably failed to investigate and present evidence establishing a bona fide doubt as to his competence to stand trial.  Such omissions lead to circumstances in which no attorney could be expected to perform competently.[13]  The failure to ensure competence presents a structural defect in the trial process because an incompetent defendant is unable to assist in his own defense.  As the Supreme Court has said,

> [c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.[[14]]

Thus, the failure of Mr. Barrett's trial counsel to gather and present evidence that he experienced neuropsychological dysfunction that impaired his ability to track the proceedings exacerbated by Bipolar mania, paranoia, and the effects of Post Traumatic Stress Disorder violated Mr. Barrett's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 1.     *Deficient Performance*.

One of defense counsel's unreasonable omissions prior to trial, was the failure to use funds the trial court had authorized for a background investigation and mental health evaluation. The duty of capital defense counsel to conduct a thorough investigation of the defendant's background, and to do so well in advance of trial, is well established in law and codified norms of capital defense practice, and is described in detail in the argument supporting Ground 2, Part

---

[13] *See United States v. Cronic*, 466 U.S. 648 (1984).

[14] *Cooper v, Oklahoma*, 517 U.S. 348, 354 (1996), *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

B, of this brief, *infra*.[15]  It is equally well-established that capital defense counsel should, in every case, consider having the defendant evaluated by a qualified mental health professional.[16]  In Mr. Barrett's case the duties triggered by these conventions were also triggered by the information available to, or known by, defense counsel.

Exhibits submitted with Mr.Barrett's initial and amended § 2255 motions show defense counsel had, or should have had in their possession documents establishing that Mr. Barrett was paranoid and unstable, that he was prone to deep depression, had attempted suicide, was diagnosed with the major mental illness, Bipolar Disorder, and was prescribed antipsychotic medication.[17]  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."[18]  Mr. Barrett's defense counsel were aware that he had been evaluated in state court by Dr. Bill Sharp. Had counsel contacted Dr. Sharp they would have known that he found Mr. Barrett the most

---

[15]  The Supreme Court found defense counsel ineffective for omissions related to their background investigation in *Rompilla v. Beard*, 545 U.S. 374, 388-89 (2005) (failure to review file of defendant's prior conviction that prosecution intended to introduce in aggravation and which contained evidence of mental health problems); *Wiggins v. Smith*, 539 U.S. 510, 531-32 (2002) (defense counsel ineffective for failing to pursue evidence defendant had been victim of sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (defense counsel ineffective for failing to undertake numerous tasks associated with background investigation).  The prevailing norm in capital defense practice at the time of Mr. Barrett's trial was to gather background information in the form of family history, school records, medical records, and employment records, *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (citing ABA Guideline 10.7 commentary), and to do so early so that the information could be supplied to mental health experts, and used to devise a consistent strategy for both phases of trial.  *Id.*, 476 F.3d at 1143.

[16]  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).  *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase); ABA Guidelines 10.7, 10.10.1, and 10.11.

[17]  See Exhs. 147 and 55.

[18]  *Williamson v. Ward*, 110 F.3d 1508, 1518-19 (10th Cir. 1997) (quoting *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990)).

paranoid criminal defendant he had ever evaluated.[19]  Defense counsel also knew, or should have

known, that Mr. Barrett had been involuntarily committed for psychiatric treatment, once

following a suicide attempt.[20]  Records of such a hospitalization would have been obtained by

any reasonably diligent attorney.[21]  Those records show Mr. Barrett was diagnosed with Bipolar

Disorder and that he was prescribed antipsychotic medication.[22]  A history of paranoia,

psychiatric hospitalization, and a need for psychotropic medication provides more than what an

objectively reasonable attorney would need before employing the already-authorized services of a

mental health expert to evaluate the defendant.  "'An attorney has expanded duties when

representing a client whose condition prevents him from exercising proper judgment.'"[23]

Numerous courts have recognized that a defendant's need for medication is relevant to

whether he is competent.[24]  The defendants in *Pate v. Robinson* and *Drope v. Missouri*,[25] and like

Mr. Barrett, had attempted suicide, and that was one factor the Supreme Court considered in

---

[19]  Exh. 55 at ¶ 33.

[20]  Exh. 34 (Decl of John Echols) at p. 13.

[21]  ABA Guideline 10.7 Commentary; *Anderson*, *supra*, 476 F.3d at 1142.

[22]  Exh. 147.

[23]  *Williamson*, *supra*, 110 F.3d at 1518 (quoting *Thompson v. Wainwright*, 787 F.2d 1447, 1451-52 (11th Cir. 1986)).  *See also Hull v. Kyler*, 190 F.3d 88, 112 (3rd Cir. 1999) ("Defense counsel's special role arises not only from the typical attorney-client relationship, but from the very fact that the defendant may be unable to appreciate the proceedings or to assist his attorney (or to make an intelligent decision on challenging his competency)").

[24]  See *Williamson*, *supra*, 110 F.3d at 1515-16 (defendant had been diagnosed with severe bipolar disorder and medicated, perhaps to excess); *McGregor v. Gibson*, 248 F.3d 946, 956 (10th Cir. 2001) (defendant could only maintain competence when medicated); *Miles v. Stainer*, *supra*, 108 F.3d at 1112; *State v. Garner*, 36 P.3d 346, 352 (Mont. 2001) (collecting cases); *United States v. Jones*, 336 F.3d 245, 260 (3d Cir. 2003); *Watts v. Singletary*, 87 F.3d 1282, 1287-1288 (11th Cir. 1996) ("The fact that a defendant is taking drugs (whether proscribed or prescribed) during trial should alert the court to a potential competency issue, but need not, in itself, necessitate a competency hearing.").

[25]  383 U.S. 375 (1966); 420 U.S. 162 (1975).

Petitioner's Merits Brief                    55                    *Barrett v. U.S.*, 09-cv-105-JHP

finding sufficient cause to question their competence.[26]  Due to the requirement that the defendant have the present ability to work with counsel in a rational manner,[27] paranoia, particularly when directed toward defense counsel, can be a sign of incompetence.[28]

Despite these duties, defense counsel advised the trial court in September and October 2005 that they had not consulted any mental health professionals, or had Mr. Barrett evaluated by a psychologist or psychiatrist.  Due to defense counsel's failure to undertake these rudimentary investigative tasks, counsel lacked information necessary to make informed decisions about Mr. Barrett's mental condition.

The relevant ABA Standards clearly required defense counsel to secure an independent assessment of Mr. Barrett's competence from the first time they had reason to doubt it.[29] Because, in part, "judges must depend to some extent on counsel to bring [competence] issues into focus,"[30] prevailing professional norms require that defense counsel bring evidence suggesting incompetence to the attention of the court.[31]

---

[26]  *Pate*, 383 U.S. at 381; *Drope*, 420 U.S. at 170.

[27]  *Ducky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. at 172.

[28]  *See*, *e.g.*, *Jones*, *supra*, 336 F.3d at 258; *United States v. Rodham*, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) (unpublished) (finding of incompetence upheld despite defendant's ability to understand proceedings where paranoid delusions and bipolar symptoms rendered defendant incompetent to assist in own defense); *Williamson*, *op. cit.*; *Lafferty v. Cook*, 949 F.2d 1546, 1552 (10th Cir. 1991), *cert. denied*, 504 U.S. 911 (1992) ("while Lafferty physically knew the nature of the proceedings against him, and their possible consequences, he was unable as a result of his paranoid delusional system to interpret them in a realistic way"); *Estock v. Lane*, 842 F.2d 184 (7th Cir. 1988) (per curiam) (defendant incompetent at time of trial due in part to paranoia, attempt to kill himself shortly before trial).

[29]  ABA Criminal Justice Standards, ? 4-3.6 and commentary; ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

[30]  *Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).

[31]  *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).

### 2.    *Prejudice.*

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial.[32] In making that determination, the Court must consider in aggregate all the information available. This is a requirement both of *Strickland*,[33] and the substantive standards governing competence to stand trial.[34]

"[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial."[35]  As he understands the Court's instructions, Mr. Barrett relies upon the detailed description of the facts in, and the exhibits appended to, the initial and amended § 2255 motions to apprise the Court of the facts.  He summarizes some of the relevant facts here for the purpose of relating them to the case law previously cited.

- A reasonable investigation of Mr. Barrett's family history would have shown extensive evidence of Bipolar Disorder in his family;

- Interviews with witnesses known to defense counsel, such as Gelene Dotson (defendant's mother) and Abby Stites (defendant's ex-wife) would have produced

---

[32]  *Williamson*, *supra,* 110 F.3d at 1519; *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)).

[33]  *Williams v. Taylor*, *supra*, 529 U.S. at 497.

[34]  *See Drope*, *supra*, 420 U.S. at 179-80 ("in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia"); *Jermyn v. Horn*, 266 F.3d 257, 292 (3d Cir. 2001) (*Drope* requires reviewing court to consider probative force of "indicia of incompetence . . . in the aggregate"); *Balfour v. Haws*, 892 F.2d 556, 560-61 (1989) (analyzing under *Drope* the "cumulative information in the record"); *Bundy v. Dugger*, 816 F.2d 564, 567 (11th Cir. 1987).

[35]  *Williamson*, *supra*, 110 F.3d,  at 1519.

Petitioner's Merits Brief                    57                    *Barrett v. U.S.*, 09-cv-105-JHP

extensive reports of his elevated (manic) episodes and depressive episodes including how they interfered with his daily functioning;

• Had defense counsel gathered the medical records normally obtained in capital cases, they would have found diagnoses of paranoia and Bipolar Disorder, and prescriptions for antipsychotic medications, and known that Mr. Barrett was unmedicated;

• Mr. Barrett showed marked distrust of his lead counsel, Roger Hilfiger, such that the Court had to encourage Mr. Barrett to communicate with counsel;

• Mr.Barrett had been attacked by the Government's case agent, was fearful of law enforcement, and was fearful of being electrocuted by law enforcement officers who controlled an electric shock belt strapped to his back or side throughout the trial;

• A qualified psychiatrist, duly advised of Mr. Barrett's performance on neuropsychological tests, would have advised defense counsel and the court of the following:

> • That Mr. Barrett showed functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights;

> • That Mr. Barrett was impaired by the cognitive effects of his paranoia and Bipolar Disorder;

- That Mr. Barrett was further impaired by the effects of Post Traumatic Stress Disorder;

- That PTSD and paranoia exacerbated the interference with Mr. Barrett's participation in his defense caused by the electric shock device and the fear it was designed to induce.[36]

At a minimum, the files and records of the case do not conclusively refute the evidence that Mr. Barrett's defense counsel unreasonably failed to investigate his mental health prior to trial. Therefore, this Court either should find that this "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process,"[37] or vacate the conviction and order a new trial.[38] If the Court deems an evidentiary hearing necessary, it should schedule the hearing at a time when Mr Barrett will have had sufficient notice to conduct discovery and subpoena witnesses, R. Gov. § 2255 Proc. 8(c), and thereafter vacate the judgment of conviction and sentence of death.

**Ground 2, Part A(4).** **But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

The Government's case for the intent element of Count 3 and for the penalty phase "gateway" intent factors overwhelmingly rested on the shoulders of the seven informant witnesses. The same could also be said for the drug charges underlying Counts 1 and 2, in light

---

[36] *See* Exh. 117 (Decl. George W. Woods, M.D.) at ¶¶ 80-81

[37] *Williamson v. Ward*, 110 F.3d, at 1519.

[38] *Ibid.*

Petitioner's Merits Brief                               59                    *Barrett v. U.S.*, 09-cv-105-JHP

of the paucity of drug evidence found in the search of Mr. Barrett's cabin and property after Trooper Eales was shot and killed.

These witnesses were absent from the two state trials.  It was crucial to the defense case that they be impeached and discredited.  However, through a combination of 1) the machinations attending the improper *ex parte* conference, where the court recognized that a lengthy continuance would be necessary for the defense to prepare adequately for these witnesses, particularly in light of the fact that the Government's motion for a protective order was baseless (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27) (*See* Ground I); 2) deliberate obfuscation and delay on the part of the Government in revealing the identity of these witnesses and the substance of their testimony; 3) defense counsel's acquiescence in an arrangement (and the consequent time constraints) that doomed any effective investigation into these witnesses; and 4) the failure of the defense to move for the continuance the court itself recognized would be appropriate in light of the Government's conduct[39], the informant witnesses escaped the type of withering impeachment they would have faced had counsel conducted – or been allowed sufficient time to conduct – a professionally reasonable investigation into these witnesses and their stories.[40]

Counsels' failure to secure the time needed to competently investigate these witnesses, or to mount an investigation in the time permitted, was professionally unreasonable.  This is especially true due to the centrality of these witnesses to the Government's case in both stages of

---

[39]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the direct appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  (Exhibit 29.)  Of course, as noted, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[40]  Any defense efforts to effectively attack the informant witnesses were also blunted by the Government's *Brady* violations, which are discussed in Ground V.

trial. *Rompilla v. Beard,* 545 U.S. 374, 387 (2005) (as noted in the introduction to this ground for relief, defense counsel are obligated to obtain the evidence the prosecution is going to use and to investigate it); *Strickland v. Washington,* 466 U.S. 668, 690 (1984) (counsel's overarching duty is to conduct a competent, reasonable investigation, and where such is not undertaken and no strategy exists for foregoing it, counsel's conduct is professionally unreasonable); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel was professionally unreasonable for failing to investigate and produce witnesses who would have supported the accused's defense); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

In his previous filings, Mr. Barrett has shown that abundant evidence which would have rendered these witnesses incredible could have been produced with a professionally reasonable investigation. In summary, this evidence consists of the following:

1.      Because Charles Sanders's criminal history was not adequately investigated, the defense omitted to bring out numerous other convictions suffered by Sanders, as well as a litany of dismissed charges and sweetheart deals. Put in context, this information showed not only that Sanders's criminal history, including acts of dishonesty, was far more extensive than revealed at trial, but that local law enforcement was complicit in simply allowing him to commit crime after crime with little consequence, so long as he was getting other people in trouble by informing on them. Had all of this information been imparted to the jury, not only Sanders's credibility, but that of his cynical sponsors in law enforcement, would have all but vanished. (*E.g.,* Exhibits 57, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 168, 183, 185, 186, 187.)

Likewise, counsel failed to investigate and produce evidence of a laundry list of bad and dishonest acts Sanders could have been confronted with on cross-examination. *United States v. Torres,* 569 F.3d 1277, 1282-83 (10th Cir. 2009); *United States v. Velarde,* 485 F.3d 553, 563

(10ᵗʰ Cir. 2007); Fed.R.Evid. 608(b).  Defense counsel failed to present witnesses, including one

of Sanders's own relatives, who could have attested to Sanders's total lack of believability, both

to them personally and in the wider community.  Fed.R.Evid. 404(a).  (Exhibit 13, Decl. of

Janesse Thomas; Exhibit 76, Decl. of Billy Poindexter; Exhibit 90, Decl. of Rick Lunsford;

Exhibit 94, Decl. of Sally Davis Johnson; Exhibit 95, Decl. of Sean Hill.)  Witnesses were also

available to contest Sanders's seeming claim – latched onto by the Government in closing

argument (R. 4299.) – that Sanders had been at Mr. Barrett's residence on the afternoon of

September 23, 1999.  (Exhibit 37, Decl. of Robert Thompson; Exhibit 77, Decl. of Brandy Hill;

Decl. 90, Decl. of Rick Lunsford.)  A witness was available to contradict specific portions of

Sanders's testimony regarding his alleged drug-related visits to Mr. Barrett's property in the

summer and early fall of 1999.[41]  (Exhibit 13, Decl. of Janesse Thomas.)

Not only would all this overlooked information, testimony, and evidence have impeached

Sanders's trial testimony, it would have aided immeasurably in a competent *Franks* attack on the

search warrant.  (*See* Ground II A (1).)

2.      The absence of a professionally reasonable investigation and preparation resulted

in the omission of numerous impeaching facts and witnesses to discredit Travis Crawford.[42]

Among the informant witnesses, only Mr. Crawford testified to an alleged contemporaneous

statement by Mr. Barrett threatening law enforcement.  There were readily available witnesses

who could have contradicted Crawford's account of the events on the afternoon and early

evening of September 23, 1999, but the lack of a competent investigation, and/or the time to

---

[41] The court and the Government are aware of other information reflecting adversely on Sanders's credibility from this particular witness.  (Docs. 100-02.)

[42] As discussed in Ground V A (1)(b), Travis Crawford has recanted his testimony. (Exhibit 31, Decl. of Leonard Post; Exhibit 45, Decl. of Travis Crawford.)

Petitioner's Merits Brief                              62                      *Barrett v. U.S.*, 09-cv-105-JHP

perform one, meant that the jury never heard them.  (Exhibit 77, Decl. of Brandy Hill; Exhibit 90, Decl. of Rick Lunsford.)

The jury never heard evidence regarding Mr. Crawford's history as an informant and an informant witness.  (Exhibit 45, Decl. of Travis Crawfod; Exhibit 92, Decl. of Roger Crawford; Exhibit 90, Decl. of Rick Lunsford.)  Crawford's mental health history and his criminal record in the military were not explored.  (Exhibit 45, Decl. of Travis Crawford; Exhibit 143, sealed medical records of Travis Crawford; Exhibit 196, sealed military records of Travis Crawford.)  Crawford could have been cross-examined at some length about past acts of dishonesty and other bad acts relevant to his overall credibility, but, because a reasonable investigation was not or could not be undertaken, he was able to skirt scrutiny in these areas.  *United States v. Torres, supra*; *United States v. Valarde, supra.*; Fed.R.Evid. 608(b).  (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.)  Omitted also were witnesses who could have testified that in their personal opinions, and in the community at large, Crawford was known for his self-serving dishonesty. Fed.R.Evid. 404(a).  (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.)  The jury also never heard from available witnesses that, contrary to his testimony, Crawford's drug problems were ongoing at the time of his testimony against Mr. Barrett.  (Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph.)  It should also be noted that since the time of his testimony, Mr. Crawford has stated that he was rewarded for appearing as a witness against Mr. Barrett.  (Exhibit 77, Decl. of Brandy Hill.)

3.      Much the same is true of Travis Crawford's wife, Cindy Crawford.[43]  Failure to competently and reasonably investigate her criminal record led to her not being impeached, for example, with the fact that she could have been charged with felonies instead of misdemeanors in her previous criminal cases and that she was, at the time of her testimony against Mr. Barrett, in violation of the terms of her Sequoyah County deferred sentence, which gave her a motive to tailor her testimony to the Government's liking.  (Exhibits 170, 204.)

Although, as if by accident, Cindy Crawford's mental health history was alluded to briefly in the penalty phase, where she made a return appearance to the witness stand, it was not brought up at all in the guilt phase, when the need to employ every means to discredit her was especially acute.  (Exhibit 144, sealed medical records of Cindy Crawford.)

As with Sanders and Travis Crawford, counsel, due to a lack of investigation, not only failed to cross-examine Ms. Crawford on numerous bad and dishonest acts that would have chipped away at her credibility, *United States v. Torres, supra*; *United States v. Valarde, supra,* Fed.R.Evid. 608(b), but failed to investigate and present a host of witnesses who could have testified to her history as an informant and her bad reputation for honesty in the community, as well as her continued drug use at the time of Mr. Barrett's trial.  Fed.R.Evid. 404(a).  (File in Sequoyah County Case No. P-03-458; Exhibit 176; Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph; Exhibit 83, Decl. of Gwendolyn Crawford; Exhibit 88, Decl. of Mike Mackey; Exhibit 92, Decl. of Roger Crawford; Exhibit 95, Decl. of Sean Hill.)  Likewise,

---

[43]  Like her husband Travis, Cindy Crawford recanted her testimony to defense investigators.  Unlike Travis, she refused to sign a declaration attesting to her recantation.  *See* Ground V A (1)( c).  *See also,* Exhibit 14, Decl. of Dale Anderson; Exhibit 31, Decl. of Leonard Post.

Petitioner's Merits Brief                              64                              *Barrett v. U.S.*, 09-cv-105-JHP

counsel neglected to develop a witness who could have completely discredited Ms. Crawford's second stage testimony.  (Exhibit 104, Decl.of Richie Barrett.)

4.      Randy Turman was not only a key Government witness in connection with supposed threats Mr. Barrett hurled at law enforcement, but was the most important of the informant witnesses on the alleged drug crimes which underlay Counts 1 and 2.  Turman testified that Mr. Barrett had manufactured methamphetamine.

Turman was allowed, without correction by the Government, to perjure himself about his 6-count Sequoyah County drug case, which he falsely informed the jury had "done been taken care of."  In fact, it was still pending, and was to languish in the system for two more years before being dismissed by the Sequoyah County District Attorney's Office "in the interests of justice."  With nothing apparently hanging over his head, Turman testified that he had nothing to fear from the Government, and had not worked as an informant.  (Exhibit 195.)

Because defense counsel neglected to check Turman's court records in Sequoyah County, they were unable to expose his perjury about his then-pending felony case, the fact that little or no action had been taken on it in years, which strongly suggested he had been working as an informant, and that with these serious pending charges, he had a powerful motive to please the Government with his testimony in the hopes that he would be rewarded – as he ultimately was – with a favorable resolution of his case.  Had Turman's perjury and his motives for testifying been revealed, his credibility as a whole would have been brought into serious question by any reasonable trier of fact.  Moreover, Sean Hill was available as a witness who could and would have testified to Turman's poor reputation in the community for honesty, but he was not developed as a witness.  (Exhibit 95, Decl. of Sean Hill.)

5.      As with the failure to impeach the other informant witnesses through cross-examination, independent evidence, or both, defense counsel failed to effectively attack the testimonies of Karen Real and Brandy Price.

Again due to the failure to investigate the relevant court records, counsel failed to confront Real with the fact that a number of state drug cases against her had been dismissed. Real had a motive to please the Government in order to maintain the status quo on her dismissed state drug charges.  (Exhibits 47, 48, 49, 50, 51, 52.)

Counsel failed to delve beyond a surface level into what Real wanted and expected to receive by way of benefit on her 14 year federal sentence, allowing Real to escape into expressing vague and ethereal hopes for a break she really did not expect to materialize.  Nothing beyond her statement that the prosecutor would "talk to" the sentencing judge in her case was testified to.  In fact, Real later received, pursuant to a Rule 35 motion filed by the Government, a sentence reduction to time served as the direct result of her testimony against Mr. Barrett.[44]

Defense counsel, due to the failure to take reasonable investigative steps, also omitted to call witnesses who could have testified to Real's poor reputation in the community for honesty. Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)

The last statement is true also of Brandie Zane Price.  Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)  In addition, counsel failed to call independent witnesses who could have testified that Price's automobile could not have navigated the terrain east of Mr. Barrett's cabin,

---

[44]  *See* Ground V A (e).

Petitioner's Merits Brief                     66                     *Barrett v. U.S.*, 09-cv-105-JHP

as she claimed she did when she allegedly drove out to visit Mr. Barrett.[45] (Exhibit 77, Decl. of Brandy Hill; Exhibit 95, Decl. of Sean Hill.)

6. Due to the omission of a professionally reasonable investigation, trial counsel failed to convert Randy Weaver into a defense witness, which could have been done with one question. Weaver was the only one of the informant witnesses to have consented to an interview with the defense (albeit in the presence of Government agents, per the ill-fated "arrangement" with defense counsel). Had he been asked, Weaver would have testified that Mr. Barrett never threatened to harm law enforcement if they came to his property in response to is pending drug delivery case, and that such comments would have been completely out of character for Mr. Barrett. (Exhibit 38, Decl. of Randy Weaver.)

The failure to explore this subject with Mr. Weaver was mirrored in defense counsels' failure to launch a professionally reasonable investigation to discover other readily available witnesses who could and would have testified, in complete contrast to six of the seven informant witnesses, that Mr. Barrett never threatened law enforcement, in relation to his pending drug case or under any other circumstances, and that, in fact, law enforcement patrols were a regular occurrence in his neighborhood, with no acts of violence from Mr. Barrett. (Exhibit 37, Decl. of Robert Thompson; Exhibit 77, Decl. of Brandie Hill; Exhibit 90, Decl. of Rick Lunsford; Exhibit 96, Decl. of Toby Barrett.)

Just as there can be no question that defense counsel were professionally unreasonable for failing to investigate and introduce all of the impeachment evidence outlined above, and explicated in detail in Mr. Barrett's previous filings (in part, but not exclusively, because a

---

[45] As with Karen Real, Price later received a huge break from the Government in a federal drug case in which she was charged shortly after Mr. Barrett's trial concluded. *See* Ground V A (d).

reasonable and necessary continuance was not sought), it is crystal clear that counsel's failings, for which no strategic basis existed, were prejudicial to the outcome of both stages of trial.

It cannot be over-emphasized that the sole difference between the state prosecution against Mr. Barrett, in which he was acquitted of murder, and the federal case, in which he was sentenced to death, was the presence of the late-coming informant witnesses. Effective investigation, cross-examination, and independent evidence would have neutralized them completely. Despite the obvious importance of these witnesses to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges, counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (counsel ineffective for, among other reasons, failing to insist on adequate time to prepare for trial).

In Mr. Barrett's case, counsel in effect agreed to a trial by ambush with respect to the seven critical informant witnesses. Because of the crucial importance of these witnesses, whose credibility could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsels' indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

Mr. Barrett's case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The evidence, there and in Mr. Barrett's case, would have shown that the witnesses had a motive to fabricate

Petitioner's Merits Brief          68          *Barrett v. U.S.*, 09-cv-105-JHP

and had colluded in their stories.  *See also, Stewart v. Wolfenbarger,* 468 F.3d at 357, 361 (failure to investigate and develop witnesses who would have contradicted prosecution case and supported the defense theory of alibi); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003) (counsel ineffective in part for failing to impeach immunized witness, and for failing to call available witnesses to contradict testimony of prosecution witnesses and prosecution's theory as to how the homicides occurred); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999) (counsel ineffective for failing to use available evidence to impeach witnesses).

In Mr. Barrett's case, among other failings addressed here and in Mr. Barrett's previous filings, counsel failed to adequately investigate the criminal histories of the informant witnesses, particularly Sanders and Turman, and failed to research their court files, which would have produced devastating impeachment and demonstrated that they had motives to lie.  *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996) (counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan.31, 2000) (unpublished) (counsel ineffective for failing to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate in the offense; the prosecution's witnesses told inconsistent stories, and the prosecutor emphasized that defendant's version of events was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the state's chief witnesses were collaborating with each other and had motives to fabricate); *Hadley v. Groose,* 97 F.3d 1131 (8th Cir. 1996) (counsel's handling of police witness's testimony, which conflicted with his police report, constituted ineffective assistance; here, there was not just a single failure to impeach with a single document, but a wholesale failure to reasonably investigate and effectively confront a number of crucial prosecution witnesses).

Petitioner's Merits Brief                              69                              *Barrett v. U.S.*, 09-cv-105-JHP

**Ground 2, Part A (5).**   **Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts.**

Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the  prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The Federal Rules of Evidence generally preclude the use of evidence of crimes or wrongs unrelated to the conduct at issue if that evidence is offered to prove a propensity to behave in a particular manner."  *Tanberg v. Sholtis,* 401 F.3d 1151, 1168 (10th Cir. 2005).  For evidence of other crimes or bad acts to be admissible under Rule 404(b), four factors must be satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction. *United States v. Cherry,* 433 F.3d 698, 700-02 (10th Cir. 2005).  *See also*, *United States v. Brooks,* 161 F.3d 1240, 1243 (10th Cir. 1998), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).  In offering 404(b) evidence, the Government carries the burden of showing how the proffered evidence is relevant to one or more issues in the case; it must specifically articulate the evidentiary hypotheses by which a fact of consequence may be inferred from the other acts evidence.  *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983).  There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.  *Id.* at 1317-18.

Before prior bad acts evidence is admissible, the trial court must find the evidence: (1) tends to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) is related to the charge in that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) has real probative value, not just possible worth; and (4) is close in time to the crime charged.  If the trial court determines that the prior acts are admissible under 404(b), it must still conduct a separate balancing of the probative value of the evidence and its prejudicial impact under Fed.R.Evid. 403.  *United States v. Temple,* 862 F.2d 821, 823-24 (10th Cir. 1988), *relying on United States v. Morales-Quinones,* 812 F.2d 604, 612 (10th Cir. 1987); *United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987).

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[46]  The Government argued these alleged statements were relevant to show Mr. Barrett's intent.  (Doc. 206 at 1-3.) The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett could respond, the Government's filing said, "The defendant has not complained of lack of notice."  (Doc. 206 at 4.)

---

[46]  Mr. Barrett's argument concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Rule 404(b).  (Tr. 8/13/05 Hr'g at 22-23.)  The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule.  *Ibid.*  Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence.  *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice.  (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so.  (R. 174.)  Defense counsel filed a proposed limiting instruction on September 28.  (Doc. 218.)

With virtually no objections or requests for appropriate limiting instructions, the informant witnesses (aside from Travis Crawford ( R. 462-66), who later recanted his testimony) were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous to the offenses charged in the

superseding indictment.  ( R. 412-15, 422-23, testimony of Randy Turman; R. 2515, 2612, 2614, testimony of Charles Sanders; R. 3068, 3070, 30732-73, testimony of Cindy Crawford; R. 3485-86, 3492-93, 3507, 3509, testimony of Brandie Zane Price; R. 3082-83, 3118-20, 3090, 3106, 3135-36, testimony of Karen Real.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Rule 404(b).  Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.  *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1985) (counsel's failure to seek suppression of evidence unreasonable where counsel also failed to seek pretrial discovery).

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b).  To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government had not shown good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made.  The alleged statements made weeks, several months, or many months before the offense could not reliably or

relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett. *United States v. Temple, supra*; *United States v. Henandez,* 975 F.2d 1035, 1040 (4th Cir. 1992) (other crimes testimony that defendant told witness about special recipe for cooking crack, that the defendant used crack and used to sell it was inadmissible to show intent in conspiracy case; the testimony was not relevant to the defendant's conduct or mental state during the course and at the time of the alleged conspiracy).

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only "possible worth," not real probative value. *Temple,* 862 F.2d at 823-24. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

Even assuming for the sake of argument that Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion. With respect to Karen Real, no notice was given by the Government in its 404(b) filing that she would attribute any threatening statements to Mr. Barrett. *United States v. Temple, supra* (defendant was prejudiced by improper admission of other crimes or bad act evidence which did not show a common scheme or plan and was

otherwise inadmissible, and commenting that care should be taken to protect the accused as far as possible from being convicted simply because of past conduct rather than the crime for which he is being tried).

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. *United States v. Davis,* 766 F.2d 1452, 1458 (10th Cir. 1985) (failure to lodge contemporaneous objections fatal to claim raised on appeal). Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984); *Martin v. Grosshans,* 424 F.3d 588, 591-92 (7th Cir. 2005); *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996); *Crowe v. Sanders,* 864 F.2d 430 (6th Cir. 1989) (counsel deemed ineffective for failing to properly object or seek proper curative measures, including moving for a mistrial).

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice because it was filed untimely. Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice

should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See* Ground 18, *infra*.

**Ground 2, Parts A(6) and (10)**

In Parts A(6) through (10) of Ground 2, Mr. Barrett sets forth the factual basis for finding that the judgment of conviction is unreliable due to the defense attorneys' failure to pursue mutually reinforcing evidence undermining the prosecution's theory of intent.  As these omissions are related, and must be considered cumulatively, *see Scott v. Mullin*, 303 F.3d 1222, 1230-31 (10th Cir. 2002); *Strouffer v. Reynolds*, 214 F.3d 1231, 1235 n.4 (10th Cir. 2000), they will be addressed together here.

In Ground 2, Parts A(6) and (7), Mr. Barrett describes the evidence showing that his trial counsel failed to consult with or present evidence from expert witnesses Edward Hueske and George Kirkham, whom this Court had found were reasonably necessary to the defense.  In Part A(8) of Ground 2, Mr. Barrett shows that his defense counsel unreasonably failed to show the jury that Tact Team members had made numerous inconsistent statements that called into question their account of the raid, especially the signs that they were law enforcement.  In Part A(9) of Ground 2, Mr. Barrett describes the eyewitness evidence that was available to dispute the accounts of law enforcement officers regarding the visibility of signs that the attack on Mr. Barrett's cabin came from law enforcement officers.  In Part A(10), Mr. Barrett sets out the evidence contradicting the theory that he was on notice that he faced arrest.  Together, these errors gave the jury an unchallenged and unreliable record upon which to decide the crucial

question whether the evidence showed beyond a reasonable doubt that Mr. Barrett had sufficient knowledge that he was under assault from law enforcement officers that the jury could infer he had an intent to kill.

### 1.      Defense Counsel's Failure to Obtain Expert Assistance

"A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007).  In *Richey*, the court held that the outcome of the trial was unreliable because defense counsel failed to make use of an expert to challenge gaps in the prosecution's theory of how the crime (arson) occurred.  498 F.3d at 363.  In *Adams v. Bertrand*, 453 F.3d 428 (7th Cir. 2006), the court held the state court had unreasonably applied *Strickland* by finding no deficient performance although the defense attorney "committed to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness." 453 F.3d at 437.  The same occurred in Mr. Barrett's case, where defense counsel committed to strategy at trial without consulting two experts who could have undermined key aspects of the prosecution's case.

Iris Dalley's crime scene reconstruction testimony, complete with animations and a power point presentation, was the key component of the prosecution's claim that the physical evidence demonstrated Mr. Barrett was not only firing from a vantage point that made it supposedly apparent that he was shooting at law enforcement officers, but that Trooper Eales had stepped out of the Bronco driven by Trooper Hamilton at the time Eales was shot.  The inference was that, based on the way Trooper Eales was dressed, Mr. Barrett would have recognized him as a law enforcement officer.  Thus, Dalley's testimony was important to the Government's case for the

intent factors in Counts 1 and 2, the specific intent requirement of Count 3, as well as the intent "gateway" factors in the sentencing stage.

Perhaps lulled into inaction by the trial court's earlier comment, in limiting the funding for a defense crime scene expert, that the court had never permitted crime scene reconstruction evidence in previous trials, counsel failed to utilize what resources had been made available to engage the services of their own crime scene analyst to critique and counter Dalley's testimony and presentation.  Instead of seeking expert assistance to rebut Dalley's findings, counsel relied exclusively on cross-examination, which did virtually nothing to dent Dalley's testimony.[47]

Due to the importance of Dalley's testimony to the Government's case in both stages of trial, counsel were professionally unreasonable for failing to retain Mr. Hueske, who had previously worked on the case at the state level and had been contacted by Mr. Echols to assist in Mr. Barrett's defense in federal court.  Trial counsels' unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense,

---

[47] The manner in which trial counsel handled expert witnesses as a whole raises troubling questions indicative of deficient performance and resulting prejudice.  Although Dalley's testimony was ripe for attack by another, far more qualified expert in Mr. Hueske, such an attack was never mounted.  The one expert the defense did call – Chuck Choney – was, as shown here, an ill-advised move from the beginning.  Choney could only hurt the defense, and he did. Defense counsel were on notice that Choney would be a hostile witness.

Yet again symptomatic of counsel's deficient performance with expert witnesses was counsel's failure to object at the outset to the plainly inadmissible testimony of James Horn, which the court ultimately struck *sua sponte*, although not until the damage was done, taking measures inadequate to excise the prejudice flowing from Horn's testimony.  Ground 2, Part A (11).

The one expert the defense retained for the second stage, Dr. Jeanne Russell, who has a PhD. in education, was approached on the eve of trial, in part to serve as a mitigation specialist, even though she was unqualified to undertake this task and had no time to work up a professionally reasonable mitigation case, even if she were qualified to do so.  (Exhibit 56)

Finally, despite a wealth of evidence indicating that Mr. Barrett had serious psychological and psychiatric impairments, counsel failed altogether to secure the assistance of *appropriate* mental health professionals, whose testimony would have been critical in both stages of trial. Grounds 2, Part A (2)(3), Part B (1)(2), Ground 8.

it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her Power Point presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibits 109, 110.)

Had trial counsel obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable. At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire.*

It is not just Mr. Barrett's current lawyers who say Ms. Dalley is far from being an objective scientific witness, but is a partisan advocate who dresses up her personal opinions in the guise of "science."  The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer-generated animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computerized animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.  Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.[48]

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dalley's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle.  If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired the weapon, and

---

[48]  In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, it was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

Petitioner's Merits Brief                    80                    *Barrett v. U.S.*, 09-cv-105-JHP

was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All of this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase.  Even if the trial court had received Dalley's testimony, there is at least a reasonable probability that the outcome of the trial would have been different.  If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony, they would have reached any of several conclusions adverse to the prosecution, from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by that knowledge.  Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the Tact Team members who testified.

Thus, the prejudice under *Strickland* flowing from counsels' failure to effectively contest Dalley's testimony with expert assistance is readily apparent.  The failure to prepare a reliable reconstruction of the crime scene, or to challenge an unreliable reconstruction, is ineffective assistance where the reconstruction is an important issue at trial.  *See Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(trial counsel ineffective for failing to present evidence on how fatal shooting occurred, which would have supported defense claims); *Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005)(counsel ineffective in part for failing to object to the inadmissible

Petitioner's Merits Brief                          81                          *Barrett v. U.S.*, 09-cv-105-JHP

testimony of two key prosecution witnesses); *Snowden v. Singleterry,* <u>135 F.3d 732, 738</u> (11th

Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert

testimony); *Driscoll v. Delo,* <u>71 F.3d 701, 708</u> (8th Cir. 1995)(counsel professionally

unreasonable and ineffective for failing to impeach serology evidence); *Jennings v. State,* <u>744</u>

<u>P.2d 212</u> (Okl. Cr. 1987)(counsel ineffective for failing to secure opinion from accident

reconstruction expert who would have corroborated eyewitness testimony that defendant was not

driving the vehicle involved in a fatal accident).  As in *Jennings,* defense counsels' unreasonable

omission here lay in part in the failure to retain an expert, and in part in the failure to make use of

lay testimony.  As set forth in Part A(9) of Ground 2, defense counsel failed to call Toby Barrett

and Alvin Hahn, the only two percipient witnesses to the scene other than the law enforcement

officers whose conduct was under review.

Defense counsel had requested authorization to retain the assistance of Dr. George

Kirkham, a criminologist, sworn police officer, and expert in SWAT standards, methods, and

procedures.  (Doc. 50.)  Counsel explained to the trial court in March 2005 that a former FBI

agent, Chuck Choney, had given testimony favorable to Mr. Barrett during the second state trial,

but had made it clear that he had been a friend of Trooper Eales and would not testify favorably

for the defense.  *See* Tr. 3/22/05 Hr'g at 14-15.  Mr. Choney confirmed this in September and

October 2005 by not returning calls from defense counsel and telling them he was, at best,

reluctant to testify.  Tr. 10/3/05 Hr'g at 6-7.  Defense counsel did not speak with Dr. Kirkham

before the trial started, and had only minimal contact with Mr. Choney.

In the prevailing professional norms of capital defense practice, counsel do not simply

assume the accuracy of the prosecution's expert's findings, or rely upon their lay knowledge of a

subject to get them through cross-examination.  Counsel acting in that manner fails to provide the

Petitioner's Merits Brief                            82                         *Barrett v. U.S.*, 09-cv-105-JHP

defendant with the "ample opportunity to meet the case of the prosecution" to which he is entitled, and undermines "the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (internal quotation marks and citations omitted).  Rather, "[w]ith the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence."  ABA Guideline 10.7 Commentary.  *See also* ABA Standard 4-4.1 Commentary ("resources of scientific laboratories may be required to evaluate certain kinds of evidence . . . Neglect of any of these steps may preclude the presentation of an effective defense").  Thus, the Supreme Court in *Kimmelman* found defense counsel's performance constitutionally deficient where counsel failed to conduct discovery and perform scientific testing on a bed sheet.  *Kimmelman*, *supra*, 477 U.S. at 385-86.

Similarly, in *Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000), the court upheld the district court's grant of habeas corpus relief based, in part, on the district court's finding that defense counsel performed deficiently because they failed to consult with forensic experts prior to cross-examining the prosecution's experts.  Defense counsel had "failed to file an application for funds to hire experts to examine the opinions of the State's expert witnesses.  The district court found the result was an inability to 'develop the defense theory through cross-examination of the State's witnesses [which] was not strategic, but [a] total lack of preparation.'"  *Id.*, 214 F.3d at 1234.  As noted, the same could be said for Mr. Barrett's defense counsel's failure to have Mr. Hueske review Iris Dalley's prior testimony.

Petitioner's Merits Brief                         83                    *Barrett v. U.S.*, 09-cv-105-JHP

In *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001),[49] the court held the Indiana Supreme Court had unreasonably rejected the petitioner's ineffective-assistance claim where defense counsel had failed to retain experts to challenge key aspects of the prosecution's case. Judge Posner wrote that "it was irresponsible of the [defense] lawyer not to consult experts" in a case where so much turned on the prosecution's experts' testimony and there was little trial counsel could do to substantiate the defense without experts. 255 F.3d at 459. As in this case, experts in different fields were available to substantiate the defense. In *Miller*, the defense was that the defendant was not present at the crime scene, and a DNA expert, as well as a treadmark and footprint expert, would have testified there was no objective evidence he had been present. *Ibid.*

In this case, there was no objective evidence that Mr. Barrett could have seen lights or other signs that the people attacking him were law enforcement officers. Iris Dalley's testimony about the relative positions of the lead Bronco and Mr. Barrett were the product of unreliable methods and exaggeration. Testimony from Dr. Kirkham would have informed the jury that the methods used by the Tact Team were so far outside the norms of safe police methods that they seemed calculated to make it impossible for Mr. Barrett to recognize them as law enforcement officers until the last possible moment. Testimony from Mr. Hueske, and an informed cross-examination of Ms. Dalley, would have exposed her opinions as mere speculation.

In *Leonard v. Michigan*, 256 F.Supp. 2d 723 (W.D. Mich. 2003), defense counsel's performance was held ineffective where the case turned largely on weight to be given the prosecution's DNA evidence. Defense counsel failed to secure the services of an expert prior to a suppression hearing, and the expert would have revealed many flaws in the testimony of the

---

[49] The order granting habeas corpus relief, but not the opinion itself, was withdrawn after the parties settled the case. *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

prosecution expert.  There, as here, the failure to retain an expert prior to the suppression hearing, then conceding admissibility of the prosecution expert's testimony without the information the defense expert could have provided to bring that testimony into doubt, was unreasonable because the decision was based on incomplete investigation.  256 F. Supp. 2d at 731.

The *Leonard* court also found trial counsel acted unreasonably by failing to secure an expert to assist with cross-examination during the testimony of the prosecution's expert.  *Id.* at 733.  "How defense counsel could have proceeded to trial, knowing the critical piece of evidence against his client was DNA evidence, without first reviewing the experts' reports, protocol, and analysis is almost incomprehensible and certainly unreasonable."  *Ibid.*  One could say the same here.  Although Mr. Barrett's defense counsel had reviewed Ms. Dalley's prior testimony, they simply threw away the opportunity to have their cross-examination informed by an expert in the field.

In other cases where defense counsel failed to make use of expert assistance the courts made available, their performance was found to be deficient.  The court in *Miller* raised *sua sponte* the question whether trial counsel could have found the experts offered by post-conviction counsel, and the question whether the trial court would have provided funds for those experts. 255 F.3d at 457.  Here, the record answers those questions.  Defense counsel knew about Mr. Hueske and Dr. Kirkham, and the court authorized them to assist the defense.  Similarly, in *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (*en banc*), the court found it significant that defense counsel "spent less than half the defense investigation budget authorized" to prepare for trial.  270 F.3d at 927.  This was one factor reflecting counsel's lack of preparation.

Defense counsel's conduct in this case is similar to that of counsel in  *Miller v. Senkowsky*, 268 F. Supp. 2d 296 (E.D. N.Y. 2003).  There as here, defense counsel signaled that

he was aware there was a strategic need to retain the services of experts to challenge the prosecution's theory of liability.  There as here, the trial court authorized counsel to retain experts to assist the defense, but defense counsel failed to retain the experts.  268 F. Supp. 2d at 311.  There as here, defense counsel cross-examined the prosecution's expert about questionable matters in the expert's testimony.  *Ibid.*  But, there as here, defense counsel's failure to retain available experts denied the defense the opportunity to present the jury with an independent expert's opinion that contradicted that of the prosecution.  *Id.* at 311-12.  Relying on *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001), and earlier decisions from the Seventh Circuit, the court concluded it was unreasonable for defense counsel not to seek an independent expert's opinion.  *Id.* at 312.

Another theme echoed by courts in other cases is that defense counsel is professionally unreasonable for calling expert witnesses they know or should know will be hostile to the defense position and/or will give damaging testimony.  This was certainly the case with Mr. Choney.  In *Miller*, for example the Seventh Circuit found defense counsel had made a tactical decision to call a psychologist to testify that Miller "was incapable of the kind of violence that had been perpetrated against the victim."  255 F.3d at 458.  There was no "coherent reason" for the tactic "given the inevitability of the destruction of the psychologist and of Miller himself if the jury was told about the prior convictions," which occurred during cross-examination.  *Ibid.* This Court should similarly find there was no coherent reason for Mr. Barrett's defense counsel to call Chuck Choney to the stand given the inevitability that he would change his testimony to harm the defense.  Whatever counsel hoped to accomplish, the risk to Mr. Barrett was too great given that it was entirely avoidable, and an independent expert who could have offered favorable testimony had already been approved by the court.

Similarly in *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), the court found defense counsel acted unreasonably when he decided to recall a mental health expert at a second trial after the expert's testimony at the first trial had been "rambling, confusing, and, at times, incoherent to the point of being comical." 235 F.3d at 264. The court found defense counsel acted unreasonably in part because, like Mr. Barrett's counsel, they waited until "the eleventh hour" to prepare for the second penalty trial. *Id.* at 270. The court continued, "Counsel's decision to call [the expert] at the retrial of the penalty phase, despite their belief that [his] testimony could realistically be more harmful than helpful, simply because counsel believed it would not be worth their time to request additional money from the court, cannot be deemed to have been a reasonable exercise of professional judgment." *Id.* at 270. In Mr. Barrett's case, the issue is not the competence of the witness *per se* but the witness's telling defense counsel that he would, if he could, harm the defense case. Here, defense counsel lacked even the unreasonable excuse proffered in *Skaggs,* because the trial court had authorized counsel to retain another expert. *See also Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008) (ineffective assistance found for allowing pro-prosecution witness to testify where a defense witness was standing by).

> Defense attorneys, we recognize, are not obligated to shop for "the 'best' experts" who will testify in the most advantageous way possible. *Reynolds v. Bagley*, 498 F.3d 549, 557 (6th Cir.2007). But it is unreasonable, after an incomplete investigation, to put an expert on the stand who will "directly contradict[ ] the sole defense theory" and "render worthless" other helpful testimony. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir.2000).

*Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008). *See also, Akwal v. Mitchell,* 559 F.3d 456, 464-68 (6th Cir. 2009)(where accused's defense was insanity, counsel ineffective for calling expert who testified defendant was sane at the time of the commission of the offense); *id.* at 466 ("presenting an expert witness whose testimony plainly contradicts and utterly destroys an individual's sole defense constitutes deficient performance by counsel"); *Combs v. Coyle,* 205

F.3d 269, 288 (6th Cir. 2000)(counsel ineffective for relying on expert witness who undermined defense).

> ### 2.      *The Failure to Impeach and Present Percipient Witness Testimony*

The failure to secure expert testimony to contradict the Government's theory was compounded by trial counsel's failure to impeach the version of events given by Government witnesses with the prior state trial testimonies of the Government witnesses and the testimony of reliable  eyewitnesses whose testimony rebutting the Government's recent version of events was readily available.  *See* Claims 2A.9 (Doc 95 at 143-149);  2A.10 (Doc 95 at 149-154).  The extensive record details of the factual bases for the claims is incorporated as if fully set forth herein.  In general, prior to the federal trial, there had been two state trials in which witnesses had testified.  Government witnesses had testified significantly differently at the state trials on the critical issues of (1) Mr. Barrett's knowledge that the onslaught of aggressive activity in the middle of the night was a police action and (2) who actually initiated the gunfire.  Had trial counsel insisted on securing the prior transcripts and compared the testimonies of the Government witnesses, including  Trooper Poe, Greninger and Hamilton and most importantly Clint Johnson, the Government's version of events would have been shown to be what it was – a concoction fabricated to avoid the same result as the state court trial.

Even more inexplicably, trial counsel did not call two eyewitnesses, Toby Barrett and Alvin Hahn, to rebut the law enforcement accounts of the raid.  *See* Doc. 95 at 149-154.  Toby Barrett, a witness relied upon by the State, raised reasonable doubts at the state court trial about the Government's version of events regarding the raid, including the prosecutor's argument that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started.  (R. 4299-4302.)  Similarly, counsel failed to call Mr. Barrett's

neighbor, Alvin Hahn, to support the defense theory that the police assault occurred without indication that they were law enforcement, giving Mr. Barrett reason to believe he was being attacked by unknown trespassers.  (Exhibit 75.)

Trial counsel's omissions of these known witnesses were unreasonable and prejudicial. In *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007), the court held the result of the trial was unreliable because the defense attorneys had failed to interview and present testimony from percipient witnesses who would have corroborated the defendant's account of events and supported acquittal.

In *Goodman v. Bertrand*, 467 F.3d 1022 (6th Cir. 2006), the court vacated the petitioner's conviction based on the cumulative effect of a few deficiencies in counsel's performance.  Of significance here, defense counsel failed to call as a witness an individual who had testified in a previous trial on the same charge.  In the prior trial, the witness failed to identify the defendant as the perpetrator.  That trial ended in a hung jury.  467 F.3d at 1024.  The court found it was unreasonable for the defense not to call the witness, although defense counsel defended the decision not to subpoena her because he believed the government would call her.  Similarly here, the prosecution had called Toby Barrett and Alvin Hahn in the state trials.  "There is little tactical wisdom in counsel resting on his hands and assuming the government would help make the defense case for him."  467 F.3d at 1029.

The testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and provided jurors with evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement officers.  Viewed individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter

Petitioner's Merits Brief                                   89                          *Barrett v. U.S.*, 09-cv-105-JHP

the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call available witnesses who would have supported defense claim, specifically, in that case, an alibi defense); *Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(counsel ineffective for failing to produce evidence supporting defense theory and in contrast to prosecution testimony on how shooting occurred); *Cargle v. Mullin,* 317 F.3d 1196, 1120-22 (10th Cir. 2003)(counsel found ineffective, among other reasons, for failing to call available witnesses to contradict testimony of prosecution witnesses, and prosecution's theory as to how homicides were committed).

### 3.   The Failure to Attack the Inference that Mr. Barrett was Aware of a Warrant

In Part A(11) of Ground 2, Mr. Barrett describes the abundant evidence defense counsel could have presented showing that he lacked knowledge of a bench warrant for failing to appear for trial. Defense counsel's presentation of the bail bondsman at the penalty phase demonstrates that counsel were aware that doubts could be raised about the issue of notice. Their failure to investigate is materially indistinguishable from the circumstances of *Rompilla v. Beard*, *supra*. The Court found one "obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance" was that counsel was aware the prior would be used in aggravation. 545 U.S. at 383. "It [was] also undisputed that the prior conviction file was a public document" available at the local courthouse. *Id.* at 384.

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.

*Id.* at 385.

In Mr. Barrett's case the obviousness of the need to investigate was even greater. The alleged failure to appear was the *sine qua non* of the entire case. Yet defense counsel (a) failed to review the court records for January 25, 1999, the day of the supposed trial, and (b) failed to recognize that the warrant had been "issued" by a deputy clerk in violation of state law.

The available evidence defense counsel unreasonably failed to investigate shows the following, *inter alia*:

- Court records showed reason to believe Mr. Barrett had no reason to go to court in January 25 because the trial was not scheduled to occur, no jurors were summoned, and he was without counsel;

- The state court had found the District Attorney had not sought an arrest warrant, and the warrant had "issued" illegally under state law for that reason and because it was signed only by a deputy clerk;

- That Mr. Barrett's counsel on the charge had obtained an offer for him to plead guilty and receive no jail time;

- There was no official evidence of notice of the failure to appear and no record, such as a certified mail receipt, that notice had been received;

- That Mr. Barrett's attorney in that case had been upset with him and had cut off communication.

*See generally* Exhs. 31 and 182, and transcripts cited on pages 155-58 of the Second Amended § 2255 Motion.

In addition, defense counsel failed call a neighbor of Mr. Barrett's who would have testified that approximately three weeks before the raid, law enforcement officers visited Mr. Barrett's cabin, inspected his weapon, and left without either arresting him or mentioning a

warrant. ( Exh. 85.)  Sheriff Phipot also has told Mr. Barrett's investigator that he was present in late 1998 for a similar incident on the property.  (Exh. 108.)  Had defense counsel interviewed Mr. Barrett's family they would have testified, consistent with Dr. Kirkham, that the raid was foolish and unnecessary as Mr. Barrett could have been arrested without confrontation or violence.  (Exhs. 91, 93, 97.)

Cumulatively or individually, the evidence available but unpresented would have given jurors at least reasonable doubt about the Government's circumstantial theory, of notice and intent.  Defense counsel's failure to subject that theory to the available means of adversarial testing was a failure to function as counsel guaranteed by the Sixth Amendment.

At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.  Other jurors, presented with impeachment of the Government's theory acquitted Mr. Barrett of intentional murder.  This Court must either vacate the judgments of conviction and sentence, or schedule an evidentiary hearing at such time that counsel may complete their investigation.  R. Gov. § 2255 Proc. 8(c).

> **Ground 2, Part A (11).**       **Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress."  (R. 849.)   Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.  The facts

Petitioner's Merits Brief                          92                    *Barrett v. U.S.*, 09-cv-105-JHP

supporting the claim are set out extensively in the Amended Petition and fully incorporated herein. (Doc. 95 at 163-176.)

Horn testified extensively before the jury without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and permitted Horn to establish that his work was not "interested in critiquing and facts, but in helping [officers] resolve their emotional response to these incidents." Though the Court eventually struck the testimony (R. 1636), and instructed the jury not to consider the extensive testimony (R. 1740), it was too little too late. Trial counsel's failure to aggressively seek an affirmative order striking the testimony and/or a mistrial was constitutionally indefensible. Absent this error Petitioner probably would not have been convicted or, at a minimum, sentenced to death.

Horn's testimony was inadmissible under Fed. R. Evid. 702. The fact was equally clear on the basis of the two state trial transcripts. The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id.* at 592. Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were also ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony despite ample opportunity to prepare for a challenge to Mr. Horn. Defense counsel were also ineffective for failing to challenge Horn's testimony because it

Petitioner's Merits Brief 93 *Barrett v. U.S.*, 09-cv-105-JHP

was not helpful to the trier of fact. The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (internal citation omitted) (counsel ineffective for failure to review readily available court file concerning previous conviction). Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, and reconsidered only when the court ruled the testimony inadmissible and suggested moving to strike it.

Defense counsel's apparent acceptance without question of a privileged relationship between Horn and the officers he was debriefing was insupportable. While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996) (recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[50] Thus, counsel's ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive

---

[50]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds. To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses. Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

Petitioner's Merits Brief                              94                      *Barrett v. U.S.*, 09-cv-105-JHP

violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance

what other officers would say and, consciously or unconsciously, adopt other officers'

perspectives on the incident.  Defense counsel also did not question the narrative technique

adopted by some of the officers, of speaking in the present tense - a recognized therapeutic

technique in trauma counseling - when describing what they said had taken place.[51]  This not only

suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more

powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted

and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer,

hence the fact that his testimony was stricken.  This testimony must have had a tremendous

impact on the jury, and the court's instruction to disregard it was an exercise in futility.

Horn's connection with the FBI alone would have been perceived by the jury as lending

weight to what he said.  Another court, in holding that the testimony of a member of the FBI's

Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable

authority and even mystique in which these experts are cloaked due to their status within the FBI,

it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No.

CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006) (criticizing

unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would

have been easily cured.  It is normally presumed "that a jury will follow an instruction to

disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be

---

[51] *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71, Guilford Press (2001).

Petitioner's Merits Brief                          95                          *Barrett v. U.S.*, 09-cv-105-JHP

unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) (internal quotation marks and citations omitted) (emphasis added); *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005) (single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small. Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993), an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction." Consequently, reversal was not required. In this case, the nonchalant instruction downplayed its own importance and cannot be said to have effectively admonished the jury.

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990) (new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

As alleged in the Amended Petition, Doc. 95 at 176, there was no disadvantage to requesting mistrial and therefore no strategic reasons for failing to make the motion. Counsel's

failure to move for a mistrial clearly demonstrated deficient performance.  In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already invoked his rights, a trial court suppressed the statement.  However, only a cautionary instruction was given and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C.  2004).  Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh."  *Id*. at 37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005) (trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996) (counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989) (counsel ineffective for failing to seek mistrial after court gave improper parole instructions); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998) (counsel ineffective for failing to object to bogus "expert" testimony).

**Ground 2, Part A (12).**   **The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**.

Trial counsel's task in representing a criminal defendant is to giveg the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349, 360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument. The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions. Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified. These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'" *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000). *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978). Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony.

Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. One such instruction reads:

> "You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) that Mr. Barrett was not engaged in drug manufacturing or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction. *Richards v. Quarterman,* 566 F.3d 553, 568-70 (5th Cir. 2009) (defense counsel was ineffective not only for failing to introduce available exculpatory evidence, but also failing to request appropriate instructions, specifically on lesser included offenses.

**Ground 2, Part A (13).**     **The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

In Ground 2, Part A(13), Mr. Barrett sets forth the factual basis for finding his defense counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal in violation of his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment. Trial counsel's failure to timely preserve complete objections are fully set out in the Amended § 2255 Motions and in the direct appeal decision in this case *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007).

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cf. Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005); *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996). Analogously, in these cases, counsel were found ineffective, in whole or in part, for simply failing to object to prosecutorial misconduct. In Mr. Barrett's case, trial counsel's failures to lodge appropriate objections and to adequately preserve the record for appeal were numerous, were not a function of legitimate trial strategy, and prejudiced Mr. Barrett because the onerous "plain error" standard was applied to judging myriad meritorious issues.   Under prevailing professional norms, trial counsel had a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim." ABA Guideline 10.8 and Commentary, 31 *Hofstra L.Rev.* 913, 1028 (2003). Trial counsel must bear in mind "the importance of protecting the client's

Petitioner's Merits Brief                         100                         *Barrett v. U.S.*, 09-cv-105-JHP

rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.*  Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims that trial counsel failed to preserve had merit. Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review. Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

The constitutional violations set forth above warrant the granting of § 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993).  Furthermore, these constitutional violations, individually or cumulatively, so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**Ground 2, Part A (14).**     **Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.**

Ground V, section C, details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase.  The specific instances will not be repeated but are incorporated herein by specific reference.  Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment.  *E.g., Girts v. Yanai,* 501 F.3d 743, 755-58 (6th Cir. 2007); *Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996) (finding counsel ineffective for failing to object to misconduct in closing arguments).

### Ground 2, Part B

> *1.    Deficient Performance:  Mr. Barrett's defense counsel failed to fulfill duties to conduct a thorough background investigation, consult with experts, and prepare a two-stage strategy based on readily available information.*

In general, the standard for evaluating an ineffective-assistance claim related to the penalty phase of a capital trial is the same as that applied to the liability phase.[52]  However, reviewing courts

> are particularly vigilant in guarding this right when the defendant faces a sentence
>
> of death. See *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir.1997) ("In
>
> assessing counsel's conduct, we are mindful of the Supreme Court's observation
>
> that '[o]ur duty to search for constitutional error with painstaking care is never
>
> more exacting than it is in a capital case.'") (quoting *Burger v. Kemp*, 483 U.S.
>
> 776, 785 (1987)).[53]

---

[52]  *Strickland*, 466 U.S. at 695; *Smith v. Mullin*, 379 F.3d 919, 938 (10th Cir. 2004).

[53]  *Smith*, 379 F.3d at 938-39 (parallel citations omitted).

Petitioner's Merits Brief                      102                      *Barrett v. U.S.*, 09-cv-105-JHP

The differences between first and second-stage claims relate to the different tasks trial counsel must perform in a capital case, and the law related to a capital sentencing decision.[54]  Of course, the tasks counsel must perform in order to prepare for a capital trial are, in large part, driven by the rules governing these unique proceedings.  The Court of Appeals for the Tenth Circuit has summarized these duties:

> "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir.2001). To perform adequately in a capital case, trial counsel must undertake "'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 1989 Guidelines] ); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A) (2003) [hereinafter 2003 Guidelines]. Counsel should consider, inter alia, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7, Commentary.[55]

---

[54]  *Strickland*, 466 U.S. at 694-95 (determination of prejudice must be based on assumption that jurors will follow the law applicable to decision); *Smith*, at 939 (citing ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) ("Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.")).

[55]  *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007).

Petitioner's Merits Brief                           103                     *Barrett v. U.S.*, 09-cv-105-JHP

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense.[56]  In order to guarantee enforcement of that right, trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Criminal Justice Standards ("ABA Standards") and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").[57]

Eighth Amendment law has long recognized that mitigation evidence exists in many forms.  The Supreme Court has "spoken in the most expansive terms" when describing the scope of mitigation evidence.[58]  "[M]itigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."[59]  In order to identify evidence from the defendant's background or the circumstances of the crime that a juror could find has mitigating value, trial counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'"[60]

---

[56] *Williams v. Taylor*, 529 U.S. 362, 393 (2000); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).

[57] *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams*, 529 U.S. at 396; *Smith*, 379 F.3d at 942.  References to the 2003 Revised Edition of the ABA Guidelines are to 31 Hofstra L. Rev. 913 (2003) and are referenced as "ABA Guidelines" unless the 1989 Guidelines are intended.

[58] *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

[59] *Ibid.* (internal quotation marks omitted).  *See also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (decision whether to impose death sentence must be informed by "compassionate or mitigating factors stemming from the diverse frailties of humankind").

[60] *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 452-53 (2009), quoting *Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 522 (same).  *See also* ABA Guideline 10.7 (Investigation); ABA Guidelines, 31 Hofstra L. Rev. at 925 ("providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation").

Petitioner's Merits Brief                            104                     *Barrett v. U.S.*, 09-cv-105-JHP

A central goal for this investigation is finding evidence that humanizes the defendant and provides an explanation for the crime.[61]  Both court decisions and codified norms of capital defense practice recognize the need for defense counsel to begin the mitigation investigation early.[62]  The ABA Guidelines, for example, recognize the importance of gaining sufficient trust with the defendant and his family that they will understand and cooperate with an investigation that presupposes the possibility of a conviction, and that is likely to involve highly personal and painful parts of the family's history.[63]

Prevailing professional norms called upon Mr. Barrett's defense counsel to speak with

> [w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.[64]

Because the entire process of investigation will take time, codified norms of capital defense practice have long recognized the need for counsel to start early and be persistent.[65]

Strategic concerns also recommend prompt investigation due to the need for counsel to have sufficient information far enough in advance of trial to develop a consistent strategy for the

---

[61]  *Smith*, 379 F.3d at 943.

[62]  *Anderson, supra*, 476 F.3d at 1143 (defense counsel's performance deficient where "penalty phase investigator[] spent only twenty-three hours in substantive investigation, all of which was undertaken in the month before trial"; citing ABA Guideline 10.7 and commentary); *Allen v. Woodford*, 395 F.3d 979, 1001-02 (9th Cir. 2005) (finding deficient performance based on defense counsel's delay in investigating potential mitigation until after guilt phase and finding "legal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase"); ABA Guidelines, 31 Hofstra L. Rev. at 925.

[63]  ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1024 ("Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss.").

[64]  ABA Guideline 10.11(F)(1).

[65]  *Ibid*.; *id.*, 31 Hofstra L. Rev. at 925-26.

first and second stages.[66]  In order to complete a thorough background investigation it is routine

for defense counsel to retain a mitigation specialist, an investigator with knowledge of the types

of information considered mitigating and with the training or experience needed to gather this

sometimes difficult information.[67]  The team, including the mitigation specialist, should be

assembled "[a]s soon as possible."[68]

In Mr. Barrett's case, the observations of witnesses and even the trial record shows trial

defense counsel unreasonably delayed an investigation of Mr. Barrett's background, never

conducted a thorough investigation, and never learned enough about the available mitigation

evidence to have made reasonable decisions about strategy.[69]  The evidence proffered with the

Amended Motions shows the following with regard to counsel's duty to conduct a prompt and

thorough background investigation:

---

[66]  ABA Guideline 10.10.1 ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."); 31 Hofstra L. Rev. at 926; Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L.Rev. 299, 320, 324 (1983).

[67]  ABA Guidelines 4.1(A)(2) and 10.7.

[68]  ABA Guideline 10.4(C).

[69]  It is well-established that defense counsel cannot make reasonable strategic decisions without first conducting an investigation into strategic alternatives.  *Wiggins*, 539 U.S. at 523 (where alleged deficiency relates to investigation court will "focus on whether the investigation . . . *was itself reasonable*") (emphasis in original); *see also*, *Strickland*, 466 U.S. at 691; *Anderson*, 476 F. 3d at 1145-46 (citing *Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir.2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from sentence of death); *Pavel v. Hollins*, 261 F.3d 210, 218 n. 11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of relevant facts and law cannot be characterized as strategic under *Strickland*); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (noting that the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of ... ineffective investigatory steps")).

- According to computer records and a motion to continue the trial, during the time lead trial counsel Roger Hilfiger was co-counsel with John Echols, he did not access the records of the state court trials or the files of the defense investigation of those files (Exh. 34 at p. 3);

- In court filings in February 2005, Mr. Echols advised that a prior effort to develop mitigation evidence was cut short after being conducted by a novice mitigation investigator who refused to prepare a report, and that the materials gathered by the investigator were in the possession of Steve Leedy (Exh. 64 at p. 2, 4; Doc. 113);

- In March 2005 the trial court found the services of a mitigation specialist were reasonably necessary to the defense and authorized trial counsel to use the services of Inquisitor, Inc. (Doc. 97);

- In late May 2005, after being made lead counsel, trial counsel informed the court that he was unfamiliar with the records accumulated by prior counsel during the state-court proceedings, and that he was obtaining them;

- By the end of June 2005 with the trial approximately six weeks away, trial counsel was only searching for a mitigation specialist (Exh. 67 at p. 3);

- In mid-August 2005 trial counsel asked Dr. Jeanne Russell to serve as a mitigation investigator, but she declined in part due to the lateness of the request (Exh. 56 at p. 2-3,);

- On September 9, 2005, trial counsel advised the court that they had contacted Mr. Barrett's prior counsel because they had been able to find "very little mitigation" in the materials they had received from state-court counsel (Tr. 9/9/05 Hr'g at 43,);[70]

---

[70] In *Johnson v. Bagley*, <u>544 F.3d at 600</u>, the Sixth Circuit found trial counsel had been ineffective in part because they, like counsel here, had relied exclusively on inexperienced mitigation investigators who did an incomplete job.

Petitioner's Merits Brief                                        107                          *Barrett v. U.S.*, 09-cv-105-JHP

- Trial counsel never retrieved the files of the mitigation investigator that were in the possession of Steve Leedy (Exh. 111 at p. 2), and did not confer with the attorney who had responsibility for presenting any second-stage evidence at the second state court trial (Exh. 82.);

- Trial counsel never contacted Inquisitor, Inc., the mitigation specialist the court authorized him to retain (Exh. 66.);

- Although trial counsel were aware that many family members and friends of Mr. Barrett lived nearby, no one from the defense interviewed them regarding Mr. Barrett's background or other mitigating factors (*see*, *e.g.*, Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.)

It is not simply that a lawyer should conduct a mitigation investigation because prevailing professional norms say he should, or because the Supreme Court had reiterated this requirement three times shortly before Mr. Barrett's trial.[71]  Nor is it merely that the Supreme Court, for nearly two decades before this trial, had reminded defense counsel that mitigation is important due to the "'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'"[72]  Nor was it necessary for Mr. Barrett's counsel to conduct a thorough background investigation solely because empirical evidence available to counsel and broadly cited and relied upon by courts and practitioners put trial counsel on notice that evidence of family dysfunction and mental illness were cited by jurors in

---

[71] *Rompilla*, *supra* (June 2005); *Wiggins*, *supra* (2002); *Williams*, *supra* (2000).

[72] *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

studies as reasons to vote for a sentence less than death.[73]  While the presence of each of these factors is sufficient to compel a finding of deficient performance in this case, the evidence shows trial counsel were aware that mitigation evidence was obtainable upon reasonable investigation, and that the trial court found such an investigation was reasonably necessary.

This Court must "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time."[74]  The trial record reflects counsel saw that mitigation evidence from Mr. Barrett's family would be valuable.[75]  The records and reports of prior investigators available to trial counsel showed that Mr. Barrett came from a broken home, that he had attempted suicide, that he had been diagnosed with and involuntarily treated for Bipolar Disorder, that a prior forensic evaluation and statements of witnesses cited evidence of paranoia and a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"),

---

[73] *See Smith*, *supra*, 379 F.3d at 942; *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir.1991) (Easterbrook, J., concurring).

[74] *Strickland*, 466 U.S. at 689.  This requirement means both that the Court may not impose unreasonable expectations based on hindsight, *ibid.*, and that it is inappropriate to consider post-hoc rationalizations for counsel's challenged conduct.  *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).  *See Wiggins*, *supra*, 539 U.S. at 526-27 (rejecting theory proffered by government because it "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604  (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

[75]  Trial counsel's opening statement at the penalty phase promised the jury "some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  Vol. 24 at 4704.

and other mental health problems affecting information processing and impulse control, especially under stress.  Yet, as shown in the evidence summarized *supra*, defense counsel delayed for approximately nine months any investigation, then only made half-hearted efforts to obtain records of a previous investigation that they were on notice was incomplete.  When defense counsel realized their predicament, they indicated to an Assistant Federal Defender and a psychologist that they wanted to conduct a mitigation investigation, only to learn it was too late. It was unreasonable for Mr. Barrett's defense counsel not to follow the leads that were available to them.[76]

A simple comparison between the personal history of Mr. Barrett presented at trial and that presented through records and witness declarations in the Amended Petition, plus the witnesses' statements that they were not contacted by trial counsel, or were only superficially interviewed, shows trial counsel's preparation for the penalty phase was objectively unreasonable.[77]  Trial counsel presented testimony from  seven members of Mr. Barrett's family: Kathy Trotter (cousin), Abby Stites (ex-wife), Steven Barrett (brother), Roger Crawford (uncle by marriage), Gelene Dotson (mother), Ernest Barrett (father), and Doris Barrett (step mother).

---

[76] *See Wiggins*, 539 U.S. at 526-27 (finding trial counsel unreasonably failed to follow lead related to defendant suffering childhood sexual abuse despite extent of other mitigation investigation); *Johnson v. Bagley*, 544 F.3d 592,605-606 (6th Cir. 2008) (trial counsel failed to conduct reasonable family background investigation despite interviewing and presenting at least one family member); *Mason v. Mitchell*, 543 F.3d 766, 768 (6th Cir. 2008) (trial counsel ineffective where conducted only limited background investigation).

[77] *See Outten v. Kearney*, 464 F.3d 401, 415-416, 418-419 (3rd Cir. 2006) (defense counsel ineffective for conducting superficial investigation and presenting six family members and friends to testify defendant was a good guy). *Compare*, *e.g.*, Vol. 24 at 4783-93 (testimony of Kathy Trotter) *with* Exh. 86; Vol. 24 at 4878-93 (direct examination of Abby Stites) *with* Exh. 103; Vol. 25 at 5030-51 (testimony of Steven Barrett) *with* Exh. 99; Vol. 25 at 5052-70 (testimony of Roger Crawford) *with* Exh. 92 at 1-2; Vol. 25 at 5071-5104 (testimony of Gelene Dotson) *with* Exh. 97); Vol. 25 at 5105-18 (testimony of Ernest Barrett) *with* Exh. 81; Vol. 25 at 5119-25 (testimony of Doris Barrett) *with* Exh. 80.

Ms. Trotter, Steve Barrett, Gelene Dotson, Ernest Barrett, and Doris Barrett report that the only work trial counsel did with them regarding the penalty phase was to speak with them for a few minutes shortly before they were called to testify.  Exh. 86 at 3; Exh. 99 at 7; Exh. 97 at 16-17; Exh. 81 at 10; Exh. 80 at 1-2.  Trial counsel did not even give Ernie Barrett or his wife a preview of the questions they would ask.  Exh. 81 at 10; Exh. 80 at 2.  Ms. Dotson and Ms. Barrett attended the trial and were available to be interviewed on many occasions.[78]  Exh. 97 at 16-17; Exh. 80 at 1.  Trial counsel on only one occasion visited Ms. Dotson's home, but failed to interview her about Kenny Barrett's background.  Exh. 97 at 16-17.  Ms. Stites reports that trial counsel did not interview her about Mr. Barrett's family history or mental health problems.  Exh. 103 at 4.  Mr. Crawford notes that although trial counsel questioned him on the witness stand about his daughter-in-law, Cindy Crawford, counsel never asked about Ms. Crawford's honesty or her troubles with the law.  Exh. 92 at 1-2.  Steven Barrett predicted that there would be questions about how he turned out different than Kenny, and even attempted to talk with trial counsel about the reasons for these differences, but trial counsel would only say they would ask him some questions.[79]  Exh. 99 at 7.

The difference the commonplace of witness interviews would have made is set forth in the section of the Amended Petition and this brief addressing the prejudice prong of *Strickland*.

[78]  It is objectively unreasonable for capital defense counsel to fail to interview the defendant's mother regarding potential mitigation when she is available and has information to disclose.  *See Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) (finding "[n]o reasonable professional judgment could have supported a decision not to interview [defendant's mother]") (internal quotations and citation omitted).

[79]  The prosecution exploited trial counsel's unreasonable omission at great length, thereby furthering the misleading and incomplete image of Mr. Barrett that trial counsel presented to the jury.  *See* Vol. 25 at 5042-51.  Where defense counsel's failure to prepare witnesses for penalty phase leaves prosecution open to undermine mitigation, there is deficient performance.  *See Outten*, *supra*, 464 F.3d at 421-423 (defense counsel's failure to interview mitigation witnesses lead to prosecutor eliciting statements about defendant assaulting them).

But there is much more to trial counsel's lack of preparation.  Reasonable defense counsel would have known that a thorough investigation of the capital defendant's background, including collecting records regarding his education, medical treatment, psychiatric treatment, work history, and any criminal history is necessary for a competent assessment of mitigation by mental health experts.[80]

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."[81]  With regard to defense counsel's lack of investigation into mental health issues the evidence from record and extra-record sources shows the following:

- • Prior counsel and a psychologist had identified potential areas of mental health mitigation including Mr. Barrett's prior diagnoses of paranoia, a mood disorder, ADHD,

---

[80]  The failure to pursue obvious, readily available leads regarding aggravating and mitigating evidence has often been found to constitute deficient performance.  *See*, *e.g.*, *Rompilla*, 545 U.S. at 383-84 (failure to investigate file on prior conviction that was maintained in courthouse was deficient); *Williams*, 529 U.S. at 396 (deficient performance found in part because "[c]ounsel failed even to return the phone call" of a potential mitigation witness"); *Anderson*, 476 F.3d at 1143 (defense counsel's performance deficient in part for failing to gather documents related to defendant's social history, citing ABA Guideline 10.7 and commentary).

[81]  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).  *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase).

The trial under review in *Hall* occurred in the mid-1980's, *Hall*, 106 F.3d at 744 (citing direct appeal opinion decided in 1986), and the trial in *Anderson* occurred in 1997, *see Anderson v. State*, 992 P.2d 409, 412 (Ok. Crim. App. 1999).  All of the trials under review in cases cited in this section of the present brief occurred long before Mr. Barrett's trial.  While it is true that the purpose of Sixth Amendment review is not to improve the standards of defense counsel, *see Strickland*, 466 U.S. at 688, it is a reflection of how far below prevailing professional norms trial counsel's performance was that they failed to undertake the most rudimentary tasks decades after their importance was so well established in practice and in law.

and organic brain impairments, and trial counsel were on notice of those results (*see*, *e.g.*, Exh. 55);

• Trial counsel were aware that evidence of brain impairment could be helpful in both stages of trial due to the circumstances of the raid, and that Mr. Barrett had "used drugs and suffered significant head injuries during his life" (Doc. 50);

• In March 2005 the trial court found the services of a psychiatrist or psychologist were reasonably necessary to the preparation of a defense (Doc. 97), but trial counsel never retained a mental health expert to evaluate Mr. Barrett;

• In mid-August 2005 trial counsel contacted Dr. Jeanne Russell, who had performed a "risk assessment" of Mr. Barrett in 2003 (Exh. 56);

• Trial counsel obtained the report of Dr. Bill Sharp, but did not speak with him (Exh. 55);

• On September 9, 2005, with the start of jury selection less than one week away, the court described the defense's preparation as "still [a] work in progress" (Tr. 9/9/05 Hr'g at 42.);

Trial counsel's failure to have Mr. Barrett evaluated by a mental health expert fell below prevailing professional norms. As the United States Attorney himself observed at the time, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation (Tr. 9/9/05 Hr'g at 38). The facts of the case, and additional information about Mr. Barrett's background were the bases for defense counsel's request to retain mental health experts to prepare for trial. Trial counsel knew, or should have known, that Mr. Barrett had come from a dysfunctional family, had sustained head injuries, used drugs known to have a negative impact on brain functions, was considered

paranoid, had attempted suicide by shooting himself in the chest with a shotgun, was involuntarily hospitalized and treated with antipsychotic medicine, was diagnosed with Bipolar Disorder and ADHD, and that the shooting occurred during a surprise attack on Mr. Barrett's property in the middle of the night with his teenage son present. Like the United States Attorney, courts viewing less compelling cases have found deficient performance where trial counsel failed to obtain a thorough mental health assessment.[82]

Defense counsel's last-minute attempt to make use of Dr. Russell's prior assessment was unreasonable. Defense counsel themselves maintained that Dr. Russell's risk assessment was not a mental health examination, and Dr. Russell confirms that she did not see Mr. Barrett in connection with the federal trial. Exh. 56 at 4. Dr. Russell did not evaluate Mr. Barrett's neuropsychological functioning or explore the presence of other psychological conditions. *Id.* at 1-2. Merely contacting a doctor of education, or even having an examination performed, may not be reasonable where evidence suggests more work will produce more persuasive mitigation.[83]

> ## 2. *Prejudice: The readily available mitigation evidence regarding Mr. Barrett's background, the circumstances of the offense, impeachment of the Government's intent witnesses, and Mr.*

---

[82] *See, e.g., Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 903 (2009) (defense counsel's performance deficient where counsel knew defendant "came from a dysfunctional family, sustained a serious head injury, was committed to various psychiatric facilities, and that he was addicted to drugs; yet defense counsel did not obtain the records nor did he interview witnesses concerning these matters"); *Haliym v. Mitchell*, 492 F.3d 680, 716 (6th Cir. 2007) (defense counsel's knowledge that defendant attempted suicide by shooting himself in the temple "should have strongly suggested the need to investigate whether Petitioner had a mental defect"); *Lambright v. Schriro*, 490 F.3d 1103, 713 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 882 (2008) (finding deficient performance where defense counsel failed to conduct mental health investigation despite knowing that defendant had twice attempted suicide, been hospitalized, traumatized in Vietnam War, and used drugs).

[83] *See, e.g. Rompilla*, 545 U.S. at 391 (defense counsel ineffective despite initial unhelpful assessment from mental health experts because reasonable investigation would have revealed mental health problems); *Haliym*, *supra*, 492 F.3d at 715 (trial counsel acted unreasonably by allowing only for one and one half hour evaluation of defendant by psychiatrist).

Petitioner's Merits Brief                    114                    *Barrett v. U.S.*, 09-cv-105-JHP

*Barrett's mental problems would have changed the jury's assessment of his culpability*.

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant.  In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" between aggravating and mitigating evidence at the second stage of trial.[84]  Prejudice is established where "[c]ompetent counsel could have put on evidence that 'differ[ed] in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing.'"[85]  Stated differently, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant's "unique personal circumstances"[86] and offer an explanation for his conduct.[87]

The test is not whether "a jury could have heard it all and still have decided on the death penalty." *Rompilla*, 545 U.S. at 393.  It is whether the totality of the mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability." *Williams*, 529 U.S. at 398.

As the Tenth Circuit stated in *Anderson*, *supra*, defense counsel are expected to recognize the importance of the penalty phase, and prepare accordingly.  The verdict from the second state court trial – which specifically rejected a finding that Mr. Barrett had an intent to kill – put Mr. Barrett's counsel on notice that rebutting evidence of intent was possible.  As shown in the

---

[84] *Wiggins*, 539 U.S. at 537.

[85] *Johnson v. Bagley*, 544 F.3d at 603 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.2005)) .

[86] *Williams*, 529 U.S. at 415-416.

[87] *Smith v. Mullin*, 379 F.3d at 929, 943.

Petitioner's Merits Brief                               115                          *Barrett v. U.S.*, 09-cv-105-JHP

preceding sections of this Brief, Mr. Barrett's defense counsel unreasonably failed to investigate and present readily available evidence to rebut the Government's theory of intent in the following ways:

- Court records and witness statements showing the seven key witnesses the government relied upon to establish intent could have been impeached because they (a) were liars; (b) were career criminals; (c) were testifying in exchange for implied or explicit promises of compensation or threats of retaliation; (d) were actively using narcotics either at the time they allegedly perceived the events described in their testimony, or at the time of their testimony, or both; (e) testified falsely, and/or (f) were discouraged from communicating with Mr. Barrett's counsel, or refused to be questioned before their testimony;[88]

- Expert testimony and cross-examination would have shown that the government's "expert" reconstructionist used unreliable methods and could not have provided any reliable opinion regarding Mr. Barrett's view of events;[89]

- Expert testimony and cross-examination of government witnesses showing that the raiding team used unorthodox methods and failed to follow standard practices in ways that made it extremely unlikely Mr. Barrett would recognize his attackers as law enforcement officers;[90]

---

[88] *See* evidence described in Ground 2, Part A(4) and the exhibits thereto.

[89] *See* evidence described in Ground 2, Part A(6) and the exhibits thereto, especially Exhibit 109, the report of Edward E. Heuske who, like other experts was found to be reasonably necessary to the defense, but was not retained until post-conviction.

[90] *See* evidence described in Ground 2, Part A(7) and the exhibits thereto, especially Exhibit 44, the report of George Kirkham, Ph.D., another expert the court found was reasonably necessary to the defense, but who was not retained until post-conviction.

Petitioner's Merits Brief                    116                    *Barrett v. U.S.*, 09-cv-105-JHP

- The prior inconsistent statements of members of the raiding team showing further reason to doubt that Mr. Barrett recognized his attackers were law enforcement officers;[91]

- Testimony of percipient witnesses Toby Barrett, Bubba Thompson, and Alvin Hahn who would have testified (a) that the sign on Mr. Barrett's gate had nothing to do with law enforcement; (b) that Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; (c) that there were no police lights visible at the start of the shooting; (d) that Toby's cry of alarm was the first indication Mr. Barrett had of the raid; (e) that Mr. Barrett only had a split second view of the scene before he went inside; (f) and that there was only one car with its lights on visible within 15 seconds of the shooting;[92]

- Court records, the files of Mr. Barrett's attorney on the state drugs charge, and witness statements were available to show (a) that there was no trial scheduled for the day Mr. Barrett supposedly failed to appear, (b) that there is neither an official record nor any evidence in counsel's file that Mr. Barrett either knew of the court date or the warrant, (c) that Mr. Barrett had been offered a plea settlement that would have given him no rational reason to avoid court, (d) and that law enforcement officers had recently been to Mr. Barrett's home to inspect his weapons and left without incident.[93]

That the jury rejected the "future dangerousness" aggravating circumstance when the government offered the evidence impeached in the foregoing points demonstrates that even with

---

[91] *See* evidence described in Ground 2, Part A(8).

[92] *See* evidence described in Ground 2, Part A(9), and the exhibits thereto including the declarations of Toby Barrett (Exh. 96), Robert Thompson (Exh. 37), and Alvin Hahn (Exh. 75).

[93] *See* evidence described in Ground 2, Part A(10), and the exhibits thereto including Exhs. 39, 31, and 182. The record shows defense counsel believed it was important to present evidence that Mr. Barrett at least lacked notice of the trial and warrant as they presented witnesses on this issue.

Petitioner's Merits Brief                    117                    *Barrett v. U.S.*, 09-cv-105-JHP

the seven snitches, the question of intent was a close call.  It is at least reasonably probable that if defense counsel had marshaled this readily available evidence the jury would have had sufficient doubts about Mr. Barrett's intentions to vote for a sentence less than death.[94]

If Mr. Barrett's defense counsel had conducted the "requisite, diligent investigation into his client's troubling background and unique personal circumstances,"[95] the jury would have heard extensive mitigation evidence that, at a minimum, creates a reasonable probability of changing the balance for at least one juror.  The available evidence, described in detail on pages 195 through 230 of the Second Amended § 2255 Motion, and the exhibits cited therein, shows the following:

- Mr. Barrett lived, and was attacked on, land given him by his grandfather;

- The land was precious to the family as it represented the greatest wealth they had in the world;

- Mr. Barrett's family presents an extraordinary history of and hereditary predisposition for Bipolar Disorder extending over multiple generations, in addition to other relatives with severe mental illness;

- Mr. Barrett is a descendant of Cherokees; his grandfather, who gave him the property, acquired it after a life of hard work he began after leaving an Indian orphanage to which he was sent when his own father was killed in a gunfight;

- Mr. Barrett's mother Gelene grew up in poverty, and worked hard in the fields as a child; she sometimes missed out on school, but eventually graduated high school;

---

[94] *See Anderson*, *supra*, 476 F.3d at 1146 (finding ineffective-assistance where aggravating evidence included that defendant said he wanted to "take care of" prosecution witnesses).

[95] *Williams*, 529 U.S. at 415 (O'Connor, J. concurring).

Petitioner's Merits Brief                    118                    *Barrett v. U.S.*, 09-cv-105-JHP

- Mr. Barrett's paternal grandfather was mentally ill and an alcoholic; he and Mr. Barrett's grandmother also lived a hard-working life in extreme poverty;

- One of Mr. Barrett's father's earliest memories is of being taken out of school to work in the fields;

- Ernie Barrett feared his father and the erratic, angry outbursts his mental illness brought on;

- Ernie, Mr. Barrett's father, responded to these feelings of powerlessness by becoming emotionally numb, and as a boy he got into many fights, even treating his younger siblings cruelly;

- Ernie once attempted to prevent his father from beating his mother and himself sustained a large scar from a blow with a metal file;

- Ernie joined the Marines, but dealt with his memories of home by drinking to excess;

- Ernie and Gelene had a stormy marriage characterized by Ernie's emotional and physical absence, excessive drinking ("a fifth at a time"), and incessant philandering;

- Mr. Barrett's mother Gelene was miserable and suffered from alcoholism;

- From the time she was pregnant with Mr. Barrett, Gelene was humiliated and embarrassed by her circumstances and dealt with it by drinking "from the moment she woke up until she went to bed";

- Unsurprisingly, Mr. Barrett's early childhood development was marked by some significant delays including attending to someone speaking or observing their hands, playing peek-a-boo, and making associations between objects and events;

- He had trouble learning to walk, drink from a cup and play pat-a-cake;

Petitioner's Merits Brief                    119                    *Barrett v. U.S.*, 09-cv-105-JHP

- He exhibited early signs that he might develop Bipolar Disorder, including appearing "hyperactive," crying easily, and being "emotional about things that did not matter";

- Ernie and Gelene beat Mr. Barrett with a belt and Gelene in particular verbally abused him with habitually cruel or degrading speech;

- Mr. Barrett struggled in school and attended special education classes some of the time;

- Mr. Barrett's parents separated and got back together many times, at one point separating for three years;

- On at least one occasion, Ernie assaulted Gelene;

- Ernie "[h]ardly had anything to do with [Kenny] after the divorce" and Mr. Barrett suffered tremendously from the separation from the father he idolized;

- Mr. Barrett moved from Joliet, Illinois, to New Jersey, to Oklahoma and Indiana before settling in the Sallisaw area as a teenager;

- At age 14 Kenny Barrett lost his beloved grandmother, one of the few adults who visited nothing by love on him;

- At age 17, Mr. Barrett was assaulted by Sheriff John Philpot who broke his jaw;

- By this time, family and friends noticed Mr. Barrett's paranoia and "terrible mood swings" including periods of depression that lasted for days;

- His mother taught him to self-medicate with drugs and alcohol;

- Still, he earned the affection of his co-workers and neighbors, and the love of Abby, his wife;

• Abby and Kenny's marriage was stormy and involved violence on both sides and, like his parents' marriage, involved frequent separations and reconciliations;

• During the marriage, Ernie, Abby and Mr. Barrett's cousin Brandy observed Mr. Barrett's bouts of depression and sudden changes to being "manic, always on the go and upbeat," he would work all the time;

• Abby tried to get Mr. Barrett to seek psychiatric treatment;

• Abby felt that Mr. Barrett was unable to take care of himself;

• Then Mr. Barrett tried to kill himself by shooting himself in the chest with a shotgun;

• After the suicide attempt, he saw a psychiatrist who prescribed Elavil and Ascendin, but his mood swings continued;

• In October 1986 Mr. Barrett was involuntarily committed to Eastern State Hospital "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created an immediate risk of harm to himself or others;

• After his release from the hospital nine days later Mr. Barrett was observed to be paranoid;

• In addition to the shotgun blast to the chest, Mr. Barrett experienced numerous head injuries;

• In January 1995 Mr. Barrett was again hospitalized, and this time he was diagnosed with Bipolar Disorder and placed on Haldol; hospital staff described him as "extremely agitated," and showing a "lack of concentration" and "rapid though process" characteristic of the disorder;

- His son Toby observed that Mr. Barrett was very paranoid and scared and "could be in the best of moods one minute, then the worst";

- Gelene hoped that if Mr. Barrett lived close to her "and just worked on his cars and fixed things for people, he might be able to make it";

- But Mr. Barrett became more paranoid and more dependent on his family;

- Still, as the jury heard somewhat at trial, Mr. Barrett was a beloved family member and neighbor, known for his mechanical skills and generosity, and who never caused anyone to fear him.

If this history had been given to mental health experts, as was expected practice under prevailing professional norms, they would have identified numerous risk factors for the development of mental illness and impairment in Mr. Barrett's life. These include multi-generational neurological impairments and affective mood disorders, as well a patterns of substance abuse, parental neglect, lack of appropriate boundaries, domestic discord, and inter-parental violence and abuse. (Exh. 117 at ¶ 22.) In addition to family members' moving descriptions of Mr. Barrett's struggles, experts would have explained that "neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences." *Id.* at ¶ 33.

As the state-court expert, Dr. Sharp had observed, Mr. Barrett shows symptoms of organic impairments due to his mother's alcohol abuse during pregnancy. (Exh. 55; Exh. 89 at ¶ 23; Exh. 117 at ¶ 37, ¶ 44.) From these early insults to his developing brain, Mr. Barrett moved on to head injuries at age eight or nine, being punched hard enough to break his jaw, a motorcycle accident in his early twenties, and the trauma of the shotgun blast to his chest.

Petitioner's Merits Brief                   122                   *Barrett v. U.S.*, 09-cv-105-JHP

This history, when considered by a competent mental health professional with appropriate testing and clinical evaluation, shows Mr. Barrett was, in September 1999, severely impaired by a combination of functional problems diagnostically described as Dysexecutive Syndrome, Bipolar Disorder, and Post Traumatic Stress Disorder.  Taking into account these clinical assessments, the psychologist originally retained for the second state trial would have found that

> one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out.  I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock.  In general, someone in those circumstances will experience some disorientation and difficulty understanding events.  For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over.  For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

Exh. 55 at ¶ 24.

In making its prejudice determination, this Court also must consider the ways in which the prosecution was able to exploit defense counsel's lack of preparation for the penalty phase. As set forth in pages 243 through 247 of the Second Amended § 2255 Motion, defense counsel's inattention to developing a second stage case permitted the prosecution to portray Mr. Barrett in a false light.  Now disgraced prosecutor Michael Littlefield mocked Mr. Barrett's parents for not seeing him enough and not knowing the difference between him being "hyper" and "hyped up." He exploited the fact that Mr. Barrett's son had not even testified regarding the impact an execution would have on him.  He made much of the differences between Steven and Kenny Barrett, because defense counsel failed to heed Steven's concern about explaining the differences in their childhoods.

The Court also must consider the effect the undiscovered mitigation evidence would have had on the aggravating evidence.  The jury rejected the idea that Mr. Barrett would present a

continuing threat to society.  The aggravating circumstances they found all related to the

circumstances of the offense.  The evidence discussed from Part A of Ground 2 would have

created serious doubts about the Government's portrayal of those circumstances.  And the mental

health evidence, summarized here by Dr. Woods, would have negated the aggravating

circumstances:

> Mr. Barrett's chronic PTSD had . . . become acute, faced with a new stressor.
> Acute symptoms of increased startle response, hyperreactivity, fight or flight,
> impaired judgment, and ruminative thinking, and affective dysregulation all came
> into play; and were compounded by his psychiatric disorder.
>
> [¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most
> extreme.  He was profoundly depressed, and had been in a particularly steep
> downward spiral since his divorce.  Mr. Barrett had become increasingly
> withdrawn, by everyone's account.  He reported to me that the years from his
> divorce and the raid on his home were the darkest of his life.  He was self
> medicating more heavily than ever before.
>
> [¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid
> ideation augmented his affective dysregulation, hyperreactivity, and exaggerated
> startle response, setting the stage for his brain, with little executive functioning
> ability, to misprocess everything that was going on, to limit his ability to
> understand the input from each of these symptoms, and, eventually, to be shot
> himself multiple times and kill an officer.  It is my professional belief that Mr.
> Barrett, as a function of a mental disorder, believed his actions were right at the
> time of the police action on his property.  This distorted belief was further
> augmented by the symptoms of his bipolar disorder, his profound depression,
> isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief
> that he was also doing the right thing was shaped by his hyperreactivity, a known
> stressor that was life threatening but unidentified, an exaggerated startle response
> and, again, extreme paranoia.

Exh. 117 at ¶¶ 75-77.

In sum, the mitigation evidence readily available to Mr. Barrett's defense counsel is of the

type and quantity that courts in the cases cited *supra* have consistently found to establish a

reasonable probability of jurors making a different decision at the second stage of trial.  At a

minimum, "the undiscovered mitigating evidence, taken as a whole, might well have influenced

Petitioner's Merits Brief                    124                    *Barrett v. U.S.*, 09-cv-105-JHP

the jury's appraisal of [this defendant's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (internal quotation marks and citations omitted).

> **Ground 3.   Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A**

In Ground 3 of his initial and Amended § 2255 Motions, Mr. Barrett seeks a new trial based on the failure of the trial court to provide him expert assistance necessary to his defense at both phases of trial. As set forth more fully in the amended petition, the record evidence shows the trial court denied in full, delayed, or denied to such a great part as to make use ineffectual, transcripts, investigative assistance, and expert assistance that are routinely provided to defendants in federal death penalty cases. Although the trial court found these resources were reasonably necessary to Mr. Barrett's defense, the court withheld funds necessary to make those resources useful to preparing the defense.

Due process guarantees a criminal defendant "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Holmes v. South Carolina*, 547 U.S. 319 (2006). Where the government proceeds against an indigent defendant, due process requires that a defendant be provided "the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985); *see also Britt v. North Carolina*, 404 U.S. 226, 227 (1971). As the Supreme Court noted in *Ake*, Congress attempted to guarantee to due process to defendants in federal criminal cases through "subsection (e) of the Criminal Justice Act, 18 U.S.C. § 3006A," which "provide[s] that indigent defendants shall receive the assistance of all experts 'necessary for an adequate defense.'" *Ake*, 470 U.S. at 79-80. Reflecting the higher due process requirements of capital cases, Congress provided in 18 U.S.C.

Petitioner's Merits Brief                                        125                            *Barrett v. U.S.*, 09-cv-105-JHP

§ 3005 that a capital "defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses," and in § 3599 for funds for "investigative, expert, or other services [that] are reasonably necessary for the representation of the defendant."

In deciding whether the denial of investigative or expert assistance violated due process, the Court of Appeals for the Tenth Circuit follows the three-part test the Supreme Court applied in *Ake*:  (1) the effect on Mr. Barrett's private interest in the accuracy of the trial if the requested service is not provided;  (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.  *United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995).

In the sections that follow, we will address the second and third of these factors as to each deprivation with the exception of the transcripts which the Supreme Court has held are presumptively necessary to preparing a defense, particularly where prosecution witnesses' prior testimony will be offered.  As to each deprivation, however, the private interest at stake is the same.  As the Supreme Court said in *Ake* itself, "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling."  470 U.S. at 78.  Mr. Barrett's interest in the outcome of the trial – his very life – "is obvious and weighs heavily in our analysis."  *Ibid.  See also Williamson v. Reynolds*, 904 F. Supp. 1529, 1561-62 (E.D. Okl. 1995), *aff'd on other grounds by*,  *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997).

As to the third factor – the probable value to the defense of the expert assistance – this Court should conduct a cumulative assessment of the error.  This case presents unique circumstances because the trial court did not simply deny Mr. Barrett the assistance of an investigator or expert.  It cut funding for each and every type of assistance counsel identified as

necessary to the development of the defense, including all funds for travel that would have permitted an investigator, or in some instances an expert, to interview witnesses, observe the crime scene, meet with counsel, testify, or observe the government's experts in order to assist with cross-examination.  This across-the-board restriction was devastating to the defense and allowed key aspects of the prosecution's case to go unchallenged.  The effect of these restrictions under the third part of the *Ake* test must be considered cumulatively.  However, each individual denial will be discussed separately.

### 1.      *The Withholding of Funds for Transcripts*.

By the time of *Britt v. North Carolina*, 404 U.S. 226 (1971), the Supreme Court's cases left "no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt*, 404 U.S. at 227.  *Britt* itself involved a retrial after the initial three-day trial ended in a mistrial.  *Ibid.*  The Court majority agreed with the dissent that the Court's

> cases have consistently recognized the value to a defendant of a transcript of prior proceedings, *without requiring a showing of need tailored to the facts of the particular case*.  [E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

*Id.*, 404 U.S. at 228 (emphasis added).  Thus, the majority "agree[d] with the dissenters that there would be serious doubts about the decision below if it rested on petitioner's failure to specify how the transcript might have been useful to him."[96]  *Ibid.*

---

[96] The Supreme Court found no due process violation in *Britt* because the state court had *not* required a showing of need, but had instead rested its denial of a transcript "on the second factor in the determination of need, that is, the availability of adequate alternatives to a transcript. The second trial was before the same judge, with the same counsel and the same court reporter, and the two trials were only a month apart. In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript." *Britt*, 404 U.S. at 228.

Despite this precedent, the trial court initially denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial, because they could not make a showing of special need sufficient to satisfy the court.  Order filed 3/18/05 (Doc. 97) at 6-7.  Although the trial court ultimately relented and allowed Mr. Barrett's counsel access to transcripts of the second state-court trial, the delay was prejudicial.  Lead trial counsel had explained to the court in February that he would need 160 hours to assemble and review the files and records of the case.  Doc. 51 at 4.  After Mr. Hilfiger was elevated to lead counsel, he reported to the court that he had not yet reviewed those transcripts.  As weeks and months went by, the lack of progress in obtaining the transcripts was a frequent topic of conversation between defense counsel and the court.  As shown in Ground 1 and Ground 2 section A(8), defense counsel failed to obtain and use the transcripts in a timely or effective manner.

### 2. *Mental Health Assistance*.

As stated *infra*, Mr. Barrett's interest in confronting the government's case was the most compelling imaginable – his life was at stake.  The importance of mental health testimony in a capital trial was stated in *Ake*, 470 U.S. at 80-82.  As to the third factor in the *Ake* analysis, the importance of mental health testimony, particularly in the penalty phase of a capital trial, is too well established in law and empirical research to be in dispute.  Numerous cases discussing the importance of mental health testimony in a capital sentencing proceeding are discussed in the part of this brief on Ground 2, *supra*.  *See also Powell v. Collins*, 332 F.3d 376, 395-96 (6th Cir. 2003).

Nevertheless, as to the third factor in the *Ake* analysis, defense counsel presented the court with sufficient grounds to find mental health assistance was reasonably necessary to the

defense.  Doc. 97 at 3.  The trial record reflects that the principal matter in dispute was Mr. Barrett's mental state at the time his home was attacked.  Trial counsel requested the assistance of a mental health expert in part based on the need to explain to the jury how his mind reacted to the sudden assault.  Doc. 50.  Trial counsel also informed the court that Mr. Barrett had "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel stated that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."  *Ibid.*

In addition to these statements, as documented in the exhibits cited in support of Grounds 2 and 3, trial counsel had available evidence that Mr. Barrett had attempted suicide, was diagnosed with Bipolar Disorder, and had been involuntarily treated with psychotropic medications.  *See* Doc. 208, Exhs. 118 & 147.  As to the penalty phase at least, it is undisputed that Mr. Barrett's "mental condition [was] relevant to his criminal culpability and to the punishment he might suffer."  *Ake*, 470 U.S. at 80.  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  It should be undisputed, therefore, that "the assistance of a psychiatrist may well [have been] crucial to the defendant's ability to marshal his defense."  *Ake*, 470 U.S. at 80.  The declarations of Dr. Myla Young (Exh. 89), Dr. George Woods (Exh. 117), and Dr. Bill Sharp (Exh. 55) show that with adequate funding -- both for a background investigation and for proper testing and clinical evaluation -- the defense could have developed both a mental state defense to Count 3 and extensive mitigation evidence.

However, the trial court would not permit this evidence to be developed. First, the court denied most of the funds needed to conduct a routine background investigation, and denied all travel expenses. In that defense counsel had identified a mitigation specialist from Tennessee to perform that work, the denial of travel expenses effectively negated the utility of the reduced amount available for hourly work. Second, although Dr. Sharp had specifically recommended neuropsychological testing, which is performed by a psychologist, and defense counsel demonstrated a need for a medical doctor based on Mr. Barrett's prior treatment with antipsychotic medications, the trial court would permit counsel to retain "either a psychiatrist or a psychologist" but not both. Doc. 97 at 3. *Ake* requires the court, "at a minimum, assure the defendant access to a *competent* psychiatrist who will conduct an *appropriate* examination and assist in evaluation, preparation and presentation of the defense." *Ake*, 470 U.S. at 83 (emphasis added). *See also Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1995); *Buttrum v. Black*, 721 F.Supp. 1268, 1312 (N.D. Ga. 1989), *aff'd*, 908 F.2d 695 (11th Cir. 1990) (expert "failed to provide the scope of psychiatric assistance contemplated by *Ake*"). As a psychiatrist was not competent to do the testing Dr. Sharp identified as important, and a psychologist was not competent to assist the defense in presenting the significance of Mr. Barrett's medication, the court's provision for only one expert failed to satisfy due process.

Similarly, in *Powell*, *supra*, the court held the petitioner was entitled to a new capital sentencing trial due to the trial court's refusal to appoint an expert the defense needed to diagnose the petitioner's organic brain impairments. Upon consideration of the evidence proffered from Drs. Young, Woods, and Sharp, this Court should reach the same conclusion *mutatis mutandis* as the Sixth Circuit said in *Powell*:

> the testimony of an independent psychiatrist – particularly one who was qualified
> to conduct the appropriate testing of which Dr. [Sharp] spoke – may have

Petitioner's Merits Brief                    130                    *Barrett v. U.S.*, 09-cv-105-JHP

provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing. We therefore believe that the lack of the expert assistance which Petitioner sought, and [to] which he was entitled under *Ake*, "had a substantial and injurious effect or influence in determining the jury's" decision at sentencing, *see Brecht*, 507 U.S. at 637,[97] such that we are left in "grave doubt" as to the harmlessness of this error, thereby requiring that relief be granted to Petitioner on this issue. *See O'Neal*, 513 U.S. at 437.[98]

332 F.3d at 395-96.

As to the second *Ake* factor – the burden on the Government of providing the services – this case is unique in showing that the cost to the Government of providing the assistance counsel requested was wholly in line with costs the Government absorbed in other capital cases. Of course, *Ake* itself held that the burden of providing appropriate, competent mental health assistance in a capital case is minimal compared to the risks of an erroneous outcome. But defense counsel also presented the court with declarations of Federal Death Penalty Resource Counsel, Richard Burr, who was able to place the funding in a national context. Mr. Burr advised the trial court that Congress had allocated funds specifically for the purpose of defense preparation such as that sought for Mr. Barrett's defense, and that the "standard practice in federal capital trials is to provide the services of more than one mental health expert." Exh. C to Doc. 107. Mr. Burr also advised the trial court that the rates it was willing to pay were far below those authorized in other cases. *Id.*

The record and extra-record evidence demonstrates that Mr. Barrett was denied due process due to the trial court's unique limitation on his counsel's access to expert assistance. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief. Whether considered alone, or together with the other deprivations, this Court either

---

[97]     *Brecht v. Abrahamson*, 507 U.S. 619 (1993).
[98]     *O'Neal v. McAninch*, 513 U.S. 432 (1995).

Petitioner's Merits Brief                     131                     *Barrett v. U.S.*, 09-cv-105-JHP

should vacate Mr. Barrett's conviction and sentence, or set this matter for an evidentiary hearing after affording counsel time to complete their investigation.  R. Gov. § 2255 Proc. 8(c).

### 3.      *Mitigation Investigation.*

As set forth more fully in relation to Part B of Ground 2, *supra*, the Supreme Court's capital sentencing jurisprudence, empirical evidence of what jurors value in mitigation, and the standards of capital defense practice make the assistance of a skilled mitigation investigator essential to developing a strategy for the penalty phase.  *See generally* ABA Guideline 10.4, § C(2), and Guideline 1.1 Commentary, 31 Hofstra L. Rev. at 925.  The ABA Guidelines' emphasis on mitigation investigation, and that of the Supreme Court in *Rompilla*, *Wiggins*, and *Williams*, *supra*, amply demonstrate that the first and third *Ake* factors weigh heavily in Mr. Barrett's favor.  Thus, the Court of Appeals for the Armed Forces has held, relying in part on *Wiggins*, that the denial of a mitigation specialist for the defense in a capital case violates due process and the defendant's right to compulsory process as secured by the Sixth Amendment. *United States v. Kreutzer*, 61 M.J. 293, 298 & n.7 (2004).

As to the second factor, again, the record shows the cost to the Government was minimal compared to the importance of conducting the "requisite, diligent investigation into [the defendant's] troubling background and unique personal circumstances."  *Williams*, 529 U.S. at 415 (O'Connor, J., concurring).  Defense counsel consulted with Inquisitor, Inc., a firm in Tennessee that could provide specialized mitigation investigative services.  Per Judicial Council Guidelines, Inquisitor's services were recommended by an experienced Assistant Federal Public Defender who had used the firm in another case in the Eastern District of Oklahoma.  Doc. 50 at 4.  Defense counsel also consulted with Resource Counsel Burr about the different needs of federal versus state trials.  Defense counsel also planned to rely upon the incomplete, preliminary

investigation that had been done years earlier, prior to the first state court trial.  Doc. 50 at 5 n.3.  Based on this work, defense counsel requested 300 hours of time, and $5,000.00 for travel.

Resource counsel advised the trial court that the time sought was well below the average of 600 hours worked by mitigation specialists in federal death penalty cases.  Exh. C to Doc. 107 at 4.  Nevertheless, the trial court would authorize only 100 hours, less than three weeks' work.  Doc. 97 at 3.  That was approximately one tenth the funds provided in other federal death penalty cases.  Exh. C to Doc. 107 at 4.  However, as indicated *supra*, even this insufficient amount was at best a symbolic gesture because the court denied all funds for travel.  Under those circumstances, the mitigation investigator could not even be compensated for mileage driving to various family members' homes.  *See Williams v. State*, 669 N.E.2d 1372 (Ind. 1996) (trial court's limitation of mitigation expert services to 25 hours per week was arbitrary and an abuse of discretion; however, error was harmless because sufficient mitigating evidence was presented at sentencing and jury deadlocked on punishment).

This case must be contrasted with *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995), in which the court found no abuse of discretion under the CJA where the trial court authorized the defense expert to fly from California to Denver in order to inspect documents there and prepare for trial.  64 F.3d at 1471-72.  In this case, the denial of similar travel expenses prevented Mr. Barrett's counsel from bringing to court the mitigation specialist who would assist with the witnesses, if not testify to the social history she gathered.

Assuming *arguendo* the denial of a mitigation investigator is subject to a harmless-error analysis, the personal, medical, and social history available to be developed, and its consequences for an accurate mental health diagnosis, as set forth in pages 195 through 242 of the Second Amended § 2255 Motion, had a substantial and injurious effect on the verdict.  The

record and declarations of Mr. Barrett's family members show defense counsel failed to conduct any interviews aimed at developing mitigation evidence. In cases cited in the argument supporting Ground 2, *supra*, courts have often found similar social history evidence to satisfy the more burdensome reasonable-probability standard of *Strickland*.

This case is analogous to *United States v. Kreutzer*, 61 M.J. 293, 298 (2005), in which the Court of Appeals held that the trial court's denial of funds for a mitigation specialist was not harmless in light of the abundant mitigation evidence that was available, but that went undiscovered due to the absence of a qualified investigator.

At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense. This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 4. *Fact Investigation*.

As the Supreme Court had repeatedly iterated in the years preceding Mr. Barrett's trial, *see cases cited supra*, fact investigation is the foundation for reasonable professional decision-making. The centrality of investigation to defense preparation also is reflected in ABA Criminal Justice Standard 4-4.1 and ABA Guidelines 1.1 and 10.7.

Mr. Barrett's counsel sought 300 hours of investigative assistance at a rate of $50.00 per hour, which was the rate quoted for capital trial investigation. Resource Counsel advised the Court that the "average number of hours approved for fact investigation in [death-penalty] authorized cases is closer to 500 hours." Exh. C to Doc. 107 at 3. The trial court authorized only 100 hours at $30.00 per hour, the rate paid to state-subsidized investigators working with the

Petitioner's Merits Brief                    134                    *Barrett v. U.S.*, 09-cv-105-JHP

Oklahoma Indigent Defense System (Doc. 128 at 3 & n.1), although those investigators were prohibited from working on a federal death penalty case. Exh. 111.

Moreover, the trial court announced that it would not follow Judicial Conference Guidelines and pay for previously authorized labor, but would condition payment on *ex post* "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." Doc. 97 at 2 n.2. This meant any investigation that did not produce significant admissible evidence would be uncompensated. The Court's refusal to pay market rates, provision for 20 percent of the investigative time common to capital cases, and threat not to compensate the investigator for any work later deemed insignificant or inadmissible, created unprecedented disincentives for defense counsel to explore potential defenses and ways to test the prosecution's evidence.

The prejudice from the trial court's restrictions was compounded by defense counsel's decision, stated at the October 3, 2005 hearing, to forego the use of experts and instead rely upon a lay investigator. This decision was likely influenced by the trial court's expressed desire to have the defense spend minimal amounts on expert assistance.

The prejudice from the trial court's withholding of investigative resources is seen most starkly in Parts A(4), A(6), and A(10) to Ground 2 of the Amended § 2255 Motions. The evidence proffered there shows the failure to investigate had a substantial injurious effect on the trial in that nearly all key prosecution witnesses necessary to convict Mr. Barrett of first-degree murder could have been either excluded or impeached.

At a minimum, the files and records do not demonstrate that Mr. Barrett is entitled to no relief. Therefore, this Court must either vacate his conviction or schedule an evidentiary hearing

after permitting counsel sufficient time to complete their investigation. R. Gov. § 2255 Proc.

8(c).

### 5. *Crime Scene Reconstruction.*

As this Court has previously held,

> when forensic evidence and expert testimony are critical parts of the criminal prosecution of an indigent defendant, due process requires the State to provide an expert who is not beholden to the prosecution. The fact that forensic evidence and expert testimony are crucial to the prosecution is in and of itself a sufficient showing of the need for expert assistance and that the defendant would be prejudiced without it.

*Williamson v. Reynolds*, 904 F. Supp. 1529, 1562 (E.D. Okl. 1995), *aff'd on other grounds by*,

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997). At trial, as the State had in the prior trials,

the Government relied upon purported "expert" Iris Dalley's "reconstruction" of events as

evidence that Mr. Barrett would have been aware that his attackers were law enforcement

officers.

Mr. Barrett's defense counsel requested authorization to retain Edward E. Hueske to assist

counsel in preparing to submit Dalley's testimony to the adversarial testing that due process and

the Sixth Amendment require. The defense sought 80 hours of labor from Mr. Hueske and

$1,000.00 in travel expenses. Doc. 50 at 7. While Dalley had years to prepare and refine her

testimony, and unlimited resources to view the crime scene and the vehicles, the trial court

authorized for Mr. Barrett's defense 20 hours work and no travel expenses. Doc. 97 at 3.

As this Court said *Williamson* was no different than *Ake*, so too Mr. Barrett's case is no

different.

> "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." *Ake*, 470 U.S. at 78. The State's interest in the financial burden of providing expert assistance for Petitioner and its interest in prevailing at trial are clearly outweighed by the

interest of the "fair and accurate adjudication of criminal cases." *Ake*, 470 U.S. at 79.

*Williamson*, 904 F. Supp. at 1561.

Also as this Court said in *Williamson*,

Unless the defendant's attorney is learned in the expert's field, cross-examination will hardly suffice. Expert witnesses can stray outside the boundaries of their expertise, but a defendant's attorney may not be able to recognize misrepresentations or errors in methodology.  Only the defendant's own expert can assure the indigent accused an adequate defense in cases where expert testimony plays a key role in the prosecution.

904 F. Supp. at 1562 (footnotes omitted).  Due to the prohibition on travel, Mr. Barrett could not rely upon Mr. Hueske at trial when Dalley's testimony showed, *inter alia*,

•       that she failed in many ways to follow accepted methods for conducting a reconstruction such that her testimony was inadmissible under Fed. R. Evid. 702 and *Daubert*, *supra*;

•       that she falsely testified to having been unable to determine the caliber of bullets that struck the lead Bronco;

•       that she exceeded the bounds of accepted methodology when testifying that the trajectories she described were "accurate";

•       that she misrepresented both science and the evidence when she claimed there was "no means of sequencing any of the shots";

•       that she exaggerated her ability to estimate the distance of a firearm from the cabin;

- that her conclusion regarding the location of Trooper Eales' arm when it was struck was unreliable due to her failure to examine the surrounding area for tissue or blood.

(Exh. 109.)

In short, Dalley's testimony was wholly unreliable, but, due to the defense's lack of access to an expert, the jury was permitted to consider it as the only forensic "science" to support a finding of intent. Due to this failure of the adversarial testing process, the jury was permitted to reach an unwarranted conclusion. The prosecution demonstrated at trial – through its use of Dalley and Horn and the seven informants – that it had serious doubts about its ability to obtain a conviction for murder based on the conflicting and unreliable accounts of the Tact Team members. The results of the two state trials show those fears were justified as the case against Mr. Barrett for intentional murder was weak at best.

Assuming *arguendo* that the impact of the denial of expert assistance on the adversarial testing process in violation of due process could be subject to harmless-error analysis, the report of Mr. Hueske appended to Mr. Barrett's Motion as Exhibit 109 demonstrates his absence from the trial had a substantial injurious effect on the verdict. At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense. This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 6. *Expert on Police Standards and Procedure*.

Based on success in the state trial that could not be repeated with the same witness, Mr. Barrett's defense counsel sought authorization to retain Dr. George Kirkham, a criminologist,

sworn law enforcement officer, and expert in police tactics. Doc. 50 at 5. Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida. *Ibid.* The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. Doc. 97 at 3.

It was clearly error for the trial court tacitly to determine that saving the United States Government a few thousand dollars outweighed both Mr. Barrett's interest and society's interest in avoiding an erroneous assessment of the Tact Team's methods, including whether they afforded Mr. Barrett an opportunity to identify law enforcement officers. *See Williamson*, 904 F. Supp. at 1561, quoting *Ake*, 470 U.S. at 78, 79. Count 3, and the statutory aggravating factors found by the jury, required the jury to find, contrary to the state-court jury, that Mr. Barrett intended to kill law enforcement officers.

If the trial court had permitted Dr. Kirkham to testify, rather than excluding him through the use of purse strings, the jury would have learned, *inter alia*,

- that the raid was contrary to law enforcement standards and procedures in that it relied first and foremost on force and aggression, provoking force and aggression in return without attempting a peaceful resolution;

- that the Tact Team violated standards of law enforcement practice that are designed to protect officers by minimizing opportunities for Mr. Barrett to identify them as law enforcement officers; and

- that the Tact Team recklessly and unnecessarily exposed Troopers Hamilton and Eales to gunfire both from the cabin and fellow officers.

Exh. 44.  Dr. Kirkham would have explained that everything about the information the Tact Team had made the raid exactly the wrong thing to do, and that the standards the team ignored were based on extensive experience of mistakes that lead to shootings that otherwise would not have occurred.

Assuming *arguendo* the denial of an adversarial testing through defense evidence attacking intent can be subject to harmless-error analysis, the withholding of funds for Dr. Kirkham's review of law enforcement officers' testimony and his own testimony had a substantial injurious effect on the verdict.  Jurors informed of the facts would have rejected a finding of intent.  At a minimum, they would have had sufficient doubts in the penalty phase to find Mr. Barrett was insufficiently culpable to be sentenced to death.

The files and records do not conclusively show that Dr. Kirkham's testimony would have had no effect.  Therefore, if this Court does not vacate the judgments of conviction and sentence based on the extant or an expanded record, it should order an evidentiary hearing following an opportunity for further investigation and discovery.  R. Gov. § 2255 Proc. 8(c).

### 7.    *Cumulative Effect.*

As discussed herein and in relation to Ground 1 and Ground 2 of the Amended § 2255 Motions, the verdict in the criminal case was not the product of the adversarial testing process contemplated by the Fifth, Sixth, Eighth and Fourteenth Amendments.  The trial court's refusal to authorize defense resources such as transcripts and time and travel for mitigation and other fact investigation – resources long deemed minimally necessary by Supreme Court precedent and routinely granted similarly situated defendants – undercut the adversarial testing process in at least two ways.  First, the Court's demonstrated preference for minimal spending by the defense and its demonstrated willingness to provide future appointments and higher compensation to

counsel who worked within those limitations, and to dismiss counsel unwilling to work within them, created a conflict between Mr. Barrett's interests and counsel's interests. *See* discussion *supra* of *Wood v. Georgia*, 450 U.S. 261 (1981). From defense counsel's defeatist statement to Jeanne Russell only a few weeks before the trial started – that it was alright that it was too late to conduct a mitigation investigation because the Court would not fund it anyway (Exh. 56 at 2-3) – it is clear that counsel acutely felt the impact of these impediments.

Second, and independent of the disincentives created by the trial court's preferences, the Court imposed unprecedented limitations on defense resources that prevented Mr. Barrett from bringing witnesses to court, unless he subpoenaed various professionals and compelled them to appear for free. As a result, Mr. Barrett's defense were unable fully to challenge, *inter alia*, the testimony of law enforcement officers regarding the conduct of the raid, the testimony of seven informant witnesses about whom vast amounts of impeachment evidence was either suppressed or undiscovered by the defense, and the only forensic "science" evidence adduced to demonstrate intent. In addition, the defense was prevented from conducting the mitigation investigation, and mental health investigation the Supreme Court and Courts of Appeals have consistently held is essential to a fair and reliable capital sentencing proceeding. The across-the-board impact of the trial court's denial of routine expenses cannot be said to have been harmless under any standard.

**Ground 4.**   **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* <u>438 U.S. 154</u> (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

As shown in Ground II, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* <u>438 U.S. 154</u> (1978).  Suppressed *Brady* material and other evidence gathered in support of Mr. Barrett's §2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* <u>462 U.S. 213</u> (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability, and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

The unsupported statement in the search warrant affidavit that Sanders had given "reliable" information in the past, without more, does not establish the credibility of the

Petitioner's Merits Brief                 142                 *Barrett v. U.S.*, 09-cv-105-JHP

information contained in the affidavit and does not assist in establishing probable cause, since there is nothing in the affidavit to show that any of this information was corroborated by anyone else, let alone an independent law enforcement investigation. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation in affidavit that informant had provided reliable information in the past is to be accorded little weight in the probable cause calculus); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (statement in affidavit that C.I. had provided reliable information previously was entitled to only "slight weight"; such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to other law enforcement investigations).  The total absence of any corroborating facts for the C.I.'s claims indicates that Sanders, with Clint Johnson's approval, could simply be fabricating the information. *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (in evaluating whether an informant's tip furnishes probable cause for a warrant, magistrate must look to whether independent investigation has corroborated or failed to corroborate the informant's claims).

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes

with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention an extensive list of other felonies. He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict.  Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.   All this was known about Sanders in 1999, and it has only gotten worse.   Johnson's affidavit was deliberately and egregiously misleading because all this information bearing directly on Sanders's credibility was omitted from the search warrant affidavit.  *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (police withheld information on the confidential informant's prior convictions and the fact that the informant had previously falsely reported a crime).

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr.

Barrett's residence during the critical time.  Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.  (Exhibit 13.)

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty.  As stated in Grounds I and II, Mike Littlefield informed the court of a witness who failed to corroborate Sanders.  This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense.  The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts,

deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the " C.I".  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false statements and considering such material omissions, the corrected affidavit does not supply probable cause to search.  *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Correas,* 419 F.3d 151, 152, 155 (2nd Cir. 2005) (two federal courts, after conducting *Franks* hearings, found affiant made numerous assertions that were knowingly and recklessly false; after setting aside the false statements, probable cause was not established); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable.  Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate.  Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.  *Mejia v. City of New York,* 119 F.Supp.2d 232, 273, n. 38 (EDNY 2000) (like a prosecutor's knowing use of false evidence to obtain a tainted conviction, the use of false or reckless information in a search warrant affidavit works an "unacceptable corruption" of the truth seeking function).

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant.  In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth.  Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  (Exhibit 29.)  *See* Ground XVIII, *infra*.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in his §2255 motion, and specifically requests a *Franks* hearing, or its equivalent.  He has made more than the requisite showing.

**Ground 5.     Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

**Introduction**

Ground 5 of the Amended § 2255 Motion describes evidence of constitutional and statutory violations  under a variety of rules.  In Parts A and B, Mr. Barrett describes evidence establishing violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and *Mooney v. Holohan*, 294 U.S. 103 (1935), and its progeny, including *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).  Parts A and B of Ground 5 also describe newly discovered evidence of criminal and other misconduct committed by the three law enforcement officials who were chiefly responsible for the investigation and prosecution of this case.  In Part C, Mr. Barrett describes evidence demonstrating a violation of due process under *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (Wright, J.), *cert. denied*, 396 U.S. 865

(1969).  In Part D, Mr. Barrett sets forth the bases for finding prosecutorial misconduct rendered the trial unfair under the standard of *Donnelly v. DeChristoforo*, 416 U.S. 1974).

As he has throughout this brief, Mr. Barett relies upon the facts set out in the Amended Motion and the exhibits thereto.

### 1.    The Government Suppressed Material Evidence Favorable to the Defense.

### a.    The law relating to suppression of exculpatory evidence.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### 1.    What is "favorable to the accused".

The scope of favorable evidence includes everything that is "material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1967).  *Brady*, 373 U.S. at 87.  Evidence must be disclosed if it is favorable to the defense, *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995), and evidence is favorable "either because it is exculpatory, or because it is impeaching." *Strickler*, 527 U.S. at 281-82; *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006).

The case at bar presents an extraordinary amount of impeachment material of the type that has been found to be subject to disclosure requirements.  For example, in *Banks v. Dretke*, 540 U.S. 668 (2004), the Court held the petitioner was entitled to a new capital sentencing trial because the prosecution withheld information showing that a key witness presented to show the

defendant would be a future danger was an informant.  *See also United States v. Torres*, <u>569 F.3d 1277</u> (10th Cir 2009) (vacating conviction where government disclosed some but not all impeachment evidence related to informant witness).  In particular, the Government was required to disclose any and all deals either the prosecutor or any of the law enforcement officers working on the case had made with a witness whether "explicit or tacit." *Douglas v. Workman*, <u>560 F.3d 1156, 1186</u> (10th Cir. 2009).

The scope of what could be considered favorable evidence for the defense is a function of the law applicable to the two potential phases of trial, liability and punishment.  As to the issue of punishment, *Brady* requires the disclosure of evidence that could be used by the defense as mitigation evidence to be weighed against a possible death sentence.  Indeed, *Brady* itself was a death penalty case in which the suppressed evidence related to Brady's relative culpability, not his liability for the murder.  *Id.* at 88-89.  *See also Cone v. Bell*, ___ U.S. ___, <u>129 S. Ct. 1769, 1786</u> (2009) (remanding capital habeas case to district court for hearing on suppression of evidence favorable to capital defendant at sentencing).  When the Supreme Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms." *Tennard v. Dretke*, <u>542 U.S. 274, 284</u> (2004).  *See*, *e.g.*, *Eddings v. Oklahoma*, <u>455 U.S. 104, 114</u> (1982) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances").  Congress codified this conception of mitigation evidence in <u>18 U.S.C. §§ 3592(a)(8)</u> and <u>3593©</u>).  A "defendant may present any information relevant to a mitigating factor . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ." <u>18 U.S.C. § 3593(c)</u>.  Mitigating factors are broadly defined to include any "factors in the

defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

<div align="center">

**2.      What is "suppression"**

</div>

Suppression is defined as the failure to produce favorable evidence.  Prosecutors have an "affirmative duty to disclose evidence favorable to the defense." *Kyles*, 514 U.S. at 432.  The prosecutor's "constitutional duty is triggered by the potential impact of favorable but undisclosed evidence . . . ." *Kyles*, 514 U.S. at 434.  Because it is the prosecutor's affirmative duty to seek out *Brady* material and produce it to the defense, the failure to produce evidence constitutes "suppression" "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  When the government possesses favorable evidence that is "material," the evidence must be produced to the defense.  Evidence is material when, "considered cumulatively, not item by item," *Kyles*, 514 U.S. at 436, it would create a "reasonable probability" of a favorable result for the defendant.  *Id.*, 514 U.S. at 434, quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Because knowledge of all evidence in the possession of the government, and any state agency working with the prosecution, is attributed to the prosecutor, *United States v. Giglio*, 405 U.S. 150, 154 (1972), "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.  Thus, "the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 438).  *See also United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979) (facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.").

This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999) (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992) (prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25 (1976) (under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

### 3.    What is "material"

Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial or sentencing would have been different.  *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985).  To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different.  *Kyles*, 514 U.S. at 435-36.  Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a

different result reasonably probable." *Id.*, at 441. That is, the court must consider the evidence "not item by item," *Kyles*, <u>514 U.S. at 436</u>, and not in the abstract or based on the evidence's own inherent value, but "the cumulative impact of the withheld evidence; its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Banks v. Reynolds*, <u>54 F.3d 1508, 1518</u> (10th Cir.1995).

In establishing a *Brady* violation, Mr. Barrett need not refute every piece of evidence in the prosecution's case. "*Bagley* materiality . . . is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, at 434-35. Mr. Barrett is entitled to relief if he can show that in the hands of competent defense counsel the suppressed "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

### b.      *Exculpatory Evidence Suppressed by the Government.*

### 1. *Charles Sanders.*

The Government suppressed a wealth of exculpatory evidence which would have impeached Charles Sanders. This evidence includes:

• Evidence of Sanders's complete criminal history, including his many felony convictions, arrests, and dismissed charges. On direct examination, the Government permitted Sanders to testify falsely that he had only four prior felony convictions, when, in fact, he has at least eighteen. Sanders also had numerous charges dismissed in exchange for his work as an informant. This was not revealed to the defense. *Crivens v. Roth,* <u>172 F.3d 991, 995-96</u> (7th Cir. 1999) (prosecution's failure to provide defendant with criminal records of its witnesses violated *Brady*); *United States v. Hill,* <u>799 F.Supp. 86, 89-90</u> (D. Kan. 1992) (for purposes of

Petitioner's Merits Brief                                     153                          *Barrett v. U.S.*, 09-cv-105-JHP

impeachment, a defendant is entitled to discovery of the adult criminal records of Government witnesses; in addition, the Government is required to disclose all promises or consideration given to a witness, and any threats made to a witness).

• Evidence of the breadth of Sanders's work as an informant, including the many favorable deals he received over his lengthy criminal career, all of which was relevant to his overall credibility and his motives for testifying against Mr. Barrett.  *E.g., Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *Crivins v. Roth, supra*; *United States v. Hill, supra.*

• Evidence of the nature of the deals Sanders's would receive directly as a result of his testimony against Mr. Barrett.  The prosecution misled the jury by getting Sanders to agree that the prosecution would simply "talk to" state authorities in Sequoyah County in the several cases on which he was currently doing time, and would "talk to" authorities in Tulsa County in connection with a pending case Sanders had there.  At and shortly after the conclusion of Mr. Barrett's trial, the sentences in Sanders's Sequoyah County cases were converted to straight suspended sentences with no supervision by the Oklahoma Department of Corrections.  All this was done pursuant to a "plea agreement with feds."  Later, Sanders's obligation to pay costs and fines in these cases was lifted.  Sanders received straight probation on his Tulsa County case, despite his appalling criminal history.  Sanders had another pending case in Cherokee County for which he later received favorable treatment.  *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Douglas v. Workman,* 560 F.3d at 1186; and the other cases cited above.

• Based on what was revealed by AUSA Littlefield at the improper *ex parte* conference with the court on September 13, 2005, the Government was aware of a witness, whose identity has still not been disclosed, who would impeach Sanders's second stage testimony.  *See generally, Kyles v. Whitley,* 514 U.S. at 433-34; *Brady v. Maryland,* 373 U.S. at 87.

### 2.    *Travis Crawford*

The Government suppressed the following exculpatory evidence with respect to Travis Crawford:

• The Government knew or should have known that, contrary to his trial testimony, Crawford was still an active drug user and was under the influence of drugs when he testified.

• Evidence of Crawford's criminal record in the military.  *Crivens v. Roth, supra*; *United States v. Hill, supra.*

• Evidence that AUSA threatened Crawford and coached or suggested what his testimony would be in connection with supposed threats Mr. Barrett had made to law enforcement on the afternoon before the shooting.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999) (reversal required due to Government's failure to reveal prosecution's intimidation of a key witness); *United States v. Hill, supra* (among other exculpatory evidence required to be disclosed to the defense is any threats to witnesses by the Government or its agents).                    •  Evidence of Crawford's history as an informant and an informant witness, which was relevant to Crawford's overall credibility and his motives for testifying against Mr. Barrett.

### 3.  *Cindy Crawford.*

The Government suppressed the following exculpatory evidence with respect to Cindy Crawford:

• That she had been threatened when interviewed by AUSA Mike Littlefield before trial, that the interview was otherwise conducted in an intimidating atmosphere, and that she had been coached to make Mr. Barrett appear more violent than he actually was.  Cindy Crawford was also threatened between her first and second stage testimony, because the prosecution was displeased that she had not provided evidence on alleged drug manufacturing by Mr. Barrett in her first

stage testimony. The prosecution also discouraged her from talking to the defense. *United States v. Scheer, supra*; *United States v. Hill, supra.*

• That, contrary to her trial testimony, Ms. Crawford was still an active drug user and was either high or "coming down" from a high when she was interviewed by the Government and testified against Mr. Barrett.

• That Ms. Crawford suffered from mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate.

• That Ms. Crawford had regularly worked as an informant in the past, and had received a break on a Sequoyah County drug case in which she could have been charged with a felony; that, at the time of her testimony against Mr. Barrett, she was in violation of her Sequoyah County five year deferred sentence, which gave her a motive to please the Government with her testimony; and that the probation violation was resolved favorably to her after her testimony against Mr. Barrett. *Giglio v. United States, supra*; *Douglas v. Workman, supra.*

### 4. Brandie Zane Price

• In light of the fact that shortly after Mr. Barrett's trial, Brandie Price was charged in a federal drug conspiracy, the Government suppressed evidence it knew or should have known respecting Price's drug-related activities, including drug usage, at the time of her testimony at Mr. Barrett's trial. Much was made during Price's direct testimony that she had rehabilitated herself and was "clean" of drugs.

### 5. Karen Real

• The Government suppressed evidence of Real's complete criminal record, including the dismissal of numerous state drug charges in Sequoyah and Cherokee Counties. *Crivens v. Roth,*

*supra*; *United States v. Hill, supra.* Evidence regarding the dismissed state charges was relevant to Real's overall credibility and her motives for testifying.

• As with Charles Sanders, the Government soft-peddled the deal it had in the works for Real's testimony. It was suggested at trial that the prosecutor would simply "talk to" her sentencing judge, and Real testified that while she may be hopeful for a break on her fourteen year federal sentence, she really was not expecting one. Shortly after Mr. Barrett's trial, Real, courtesy of a Rule 35 motion filed by the Government, was rewarded for her testimony with credit for time served and immediate release from prison. *Giglio v. United States, supra*; *Douglas v. Workman, supra.*

### 6.   *Randy Turman*

• The Government suppressed evidence regarding Turman's six-count Sequoyah County felony drug case which, contrary to Turman's trial testimony that the case had "done been taken care of," was still an open case, and had been pending resolution for some years. With this case hanging over his head, Turman had a powerful motive to tailor his testimony to the Government's liking. This evidence flatly contradicted Turman's testimony that he had nothing to fear from the authorities. *Crivens v. Roth, supra*; *United States v. Hill, supra.*

### 7.   *Law Enforcement Witnesses*

The Government suppressed material exculpatory evidence with respect to law enforcement witnesses Clint Johnson, Vicki Lyons and Sequoyah County Sheriff John Philpot. These witnesses – and the Government's theory of the case – could have been impeached into oblivion but for the suppression of this evidence.

Clint Johnson, with his financial irresponsibility, hot check writing, kickbacks to select defense counsel, theft of drugs and drug money, likely drug use, mishandling of informants, and

overall abuse and misuse of his office, was the quintessential dirty cop.  This information was obviously known to the Government and its agents at the time of Mr. Barrett's trial, and defense counsel was entitled to it.  *Cf. United States v. Henthorn,* 931 F.2d 29, 30-31 (9th Cir. 1991).  Shortly after Mr. Barrett's trial concluded, Johnson was fired from his law enforcement job.  Johnson's corrupt and criminal behavior not only thoroughly discredited him, but, by clear implication, discredited Charles Sanders as well as the validity of the search warrant.  Johnson's recklessness, incompetence and corruption set this entire tragedy in motion.

OSBI Agent Vicki Lyons, Johnson's girlfriend, used her position of authority to help shield him from scrutiny of his illegal activities.  The Government knew or should have known this.  Had this evidence been placed before the jury, Lyons credibility would have been severely damaged, perhaps beyond repair.

Sequoyah County Sheriff John Philpot – and the Government – concealed the fact that approximately one month before the raid on Mr. Barrett's cabin, he had been to Mr. Barrett's property and encountered no problems.  Philpot's recent admission of this fact corroborates the accounts of other witnesses who were available to testify on this point, but were not called by the defense.  This fact alone fatally undercuts the Government's intent case against Mr. Barrett, not to mention the necessity for a no-knock, nighttime search warrant.

Consistent with the authority cited herein, there can be no doubt that the Government wilfully suppressed exculpatory evidence and that, but for the suppression of this evidence, there is a reasonable probability that the outcome of trial would have been different.  As the Government itself has acknowledged, the sole difference between the state proceedings, in which Mr. Barrett was acquitted of murder and convicted of manslaughter, was the late-coming appearance of the seven informant witnesses.  Their credibility, and the Government's case for

intent in both stages of trial, as well as its case for the underlying drug charges, would have been destroyed absent the Government's illegal conduct in shielding these witnesses from effective impeachment. The integrity of the investigation and the Government's theory of the case would have been shown to be entirely lacking had exculpatory evidence relating to Clint Johnson, Vicki Lyons, and John Philpot been revealed. The exculpatory evidence suppressed by the prosecution also would have shown that the search warrant was invalid and that all evidence seized in its execution should have been suppressed.

### 2.     *The prosecution's reliance upon false testimony*

> Prosecutors may not knowingly present perjured testimony. Thus, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269 (internal citations omitted).

As in other classes of cases, the law imputes to the individual prosecutor knowledge of the falsity of the witnesses' statements. In *Giglio*, the Court imputed to one Assistant United States Attorney knowledge of a promise offered to a witness by another Assistant United States Attorney, even though the trial prosecutor denied knowledge of the promise. *Giglio*, 405 U.S. at 154. Thus, prosecutors in the perjured-testimony context have the same duty to learn information showing the falsity of a witness's testimony that they have to discover exculpatory or impeachment evidence.

However, when, as here, the prosecution relied upon perjured testimony, the prejudice standard is different than for a *Brady* claim. In such cases, a "new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154, quoting *Napue*, 360 U.S. at 271; *see also United States v. Agurs*, 427

U.S. 97, 103 (1976).  The Supreme Court has "treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus ha[s] equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." *Strickler*, 527 U.S. at 299 (Souter, J., dissenting) (collecting cases).

Some of these falsehoods the prosecution presented at trial were substantive.  Others went to the witnesses' credibility.  Either way, the prosecutors violated Mr. Barrett's right to due process of law:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Ibid.*

Some of the *Brady* evidence discussed above, and the newly discovered evidence addressed below, is also relevant to Mr. Barrett's argument that the Government knowingly sponsored false evidence.  The false evidence foisted on the jury by the Government includes: 1) failing to correct Charles Sanders's testimony on direct examination that he only had four felony convictions, *Giles v. Maryland,* 386 U.S. 66 (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); 2) failing to correct Charles Sanders's testimony that he only received a few favors from Clint Johnson and others in law enforcement over the course of his criminal career; 3) failing to correct Randy Turman's perjury that his six-count Sequoyah County drug case had "done been taken care of"; 4) sponsoring Charles Sanders as a second stage witness, even though the Government was aware of a witness who said Sanders's claims were false; 5) eliciting testimony from Sanders that he had been to Mr. Barrett's cabin on the afternoon preceding the shooting, and three days before the shooting to consummate a drug deal; 6) eliciting or failing to correct testimony from

Petitioner's Merits Brief                           160                        *Barrett v. U.S.*, 09-cv-105-JHP

Clint Johnson at the pretrial suppression hearing which falsely portrayed the confidential informant's (Sanders's) drug activities and prior record; 7) fostering the false impression that the Government would simply "talk to" state authorities about Sanders's cooperation, and would "talk to" Karen Real's sentencing judge on her behalf, while leaving the false impression that these witnesses may well receive nothing in consideration of their testimony; 8) sponsoring false testimony from the Crawfords and Brandie Price regarding their ongoing drug use; and 9) giving an overall false picture of the informant witnesses' records and motives for testifying.

Consistent with the authority cited here, and especially when the Government's knowing use of false testimony is considered in the aggregate with the suppression of exculpatory evidence and newly discovered evidence, there can be no serious debate that Mr. Barrett was prejudiced and that relief is required.  Had the jury been given an accurate picture of the prosecution's witnesses, the Government's case would have been on shaky ground indeed.

### 3.    *Newly Discovered Evidence*

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under § 2255. *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996) (rejecting newly discovered evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different

outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

Travis Crawford's recantation is newly discovered evidence, and could not have been uncovered prior to or during trial with the exercise of due diligence, because the Government sprung Crawford as a witness at the eleventh hour to forestall any effective investigation, and Crawford refused to speak with trial counsel about his testimony.  Because he was the only witness to claim Mr. Barrett threatened law enforcement roughly contemporaneously to the shooting of Trooper Eales, his testimony was critical to the Government's intent case.  Much the same is true of Cindy Crawford's revelation of improper Government conduct in connection with her testimony and the numerous impeaching facts she related to investigators currently working for Mr. Barrett.  Crawford has also all but recanted her second stage testimony against Mr. Barrett.  The newly discovered evidence respecting the Crawfords, either alone or in combination with the other newly discovered evidence addressed here, warrants relief under the standard of *Peltier v. Booker, supra.  E.g., In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (post-trial recantation of key witness's trial testimony could not have been discovered previously with the exercise of due diligence and, if recantation was credible, defendant's constitutional rights would have been violated; defendant was permitted to file a second habeas challenge to his conviction); *Ferrara v. United States,* 456 F.3d 278, 290-98 (1st Cir. 2006) (defendant allowed to withdraw

plea ten years after the fact because informant witness recanted, and government concealed evidence of the recantation).

Other *Brady* evidence already discussed here also constitutes newly discovered evidence under the standards outlined above.  This evidence includes: 1) Charles Sanders's deals in exchange for his testimony against Mr. Barrett, which had to have been in the works all along but were only consummated at or shortly after the conclusion of Mr. Barrett's trial; 2) the deals, in state and federal court, respectively, accorded to Karen Real, Brandie Price, Randy Turman, and Cindy Crawford; and 3) Clint Johnson's firing shortly after Mr. Barrett's trial, and the revelations further damaging Johnson's credibility that surfaced at the trial of former Sequoyah County District Attorney Richard Gray, wherein Mr. Gray was acquitted on a directed verdict following Johnson's appearance as a prosecution witness.

Newly discovered evidence corroborating Travis and Cindy Crawford's claims that they were threatened and intimidated by then-AUSA Mike Littlefield has come to light with Littlefield's *Alford* plea to child abuse charges and the Oklahoma Supreme Court's private reprimand of his criminal conduct.  A child-abusing bully would hardly be above threatening witnesses, or engaging in the suppression of exculpatory evidence and the other forms of prosecutorial misconduct addressed throughout Mr. Barrett's pleadings.

All of this newly discovered evidence meets the *Peltier* factors and raises the reasonable probability of a different trial outcome had it been presented to the jury.  *United States v. Hernandez-Rodriguez,* 443 F.3d 138, 144-48 (1st Cir. 2006) (new trial ordered before a different judge where trial court abused its discretion in failing to assess the full impact of newly discovered evidence on the trial outcome; in Mr. Barrett's case, the combined effect of the newly discovered evidence, as well as the *Brady* violations and other related prosecutorial misconduct,

Petitioner's Merits Brief                                  163                          *Barrett v. U.S.*, 09-cv-105-JHP

plainly mandates relief); *United States v. Fulcher,* 250 F.3d 244, 249-93 (4th Cir. 2001) To the

extent that some – but most assuredly not all – of this newly discovered evidence could be called

impeaching in character, it should be remembered that in some situations, such as in Mr.

Barrett's case, newly discovered impeachment evidence could be so powerful that it renders the

trial testimony of one or more witnesses incredible.  *United States v. Davis,* 960 F.3d 820, 835

(9th Cir. 1992).

### 4.       *The Need for an Evidentiary Hearing*

As argued regarding Ground 2, *supra*, the governing law regarding *Brady*, *Giglio*, and

*Napue* claims generally requires the Court to evaluate the cumulative effect of extra-record

evidence.  For that reason, hearings are generally required, and the prerequisite for denying such

claims without a hearing, 28 U.S.C. § 2255(b), is less likely to exist.  *United States v. Siddiqi,*

959 F.2d 1167, 1172-74 (2nd Cir. 1992) (remand to determine if defendant's submission of new

evidence entitled him to a new trial).

### 5.       *Conclusion*

Considered together, the Government's wholesale suppression of exculpatory evidence, its

knowing reliance on false evidence, and the new evidence Mr. Barrett has been able to discover

during the course of these collateral proceedings demonstrates without question that Mr. Barrett's

constitutional rights were violated and that he received a fatally flawed trial before this court.

*United States v. Torres,* 569 F.3d 1277 (10th Cir. 2009: *Douglas v. Workman,* 560 F.3d 1156,

1186 (10th Cir. 2009); *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002) (habeas relief granted

in §2254 case where exculpatory evidence, even if it could only be used for impeachment

purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir.

2001) (vacating state death sentence for failure to reveal exculpatory results of testing of physical

evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000) (habeas relief granted where prosecution failed to disclose material evidence impeaching key prosecution witness).  This evidence was relevant not only to the guilt-innocence determination, but to punishment as well, because it reveals mitigating facts about the circumstances of the homicide.

**Ground 5, Part C**

"In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact.  Exceptions to this are justifiable only by the clearest and most compelling considerations." *Dennis v. United States*, 384 U.S. 855, 873 (1966) (footnote omitted).  "'No right of a defendant is violated when a potential witness freely chooses not to talk....'  *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981), *cert. denied*, 456 U.S. 980 (1982). However, the prosecution may not interfere with the free choice of a witness to speak with the defense absent justification 'by the clearest and most compelling considerations.'  *Id.*"  *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985). "[W]hen the free choice of a potential witness to talk to defense counsel is constrained by the prosecution without justification, this constitutes improper interference with a defendant's right of access to the witness. Justification on the part of the prosecution to interfere with that right can be shown only by the clearest and most compelling considerations." *Kines*, 669 F.2d at 9.

In *United States v. Gregory*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969), the court, per Judge Skelly Wright, found the defendant's due process rights were violated when the "prosecutor embarrassed and confounded the accused in the preparation of his defense by advising the witnesses . . . not to speak to anyone unless he were present."  369 F.2d at 187.  The prosecutor said he had "instructed all the witnesses that they were free to speak to anyone they like. However, it was my advice that they not speak to anyone about the case unless I

was present." *Ibid.*  The statements of the court in *Gregory* apply to this case, although the

misconduct here was more serious:

> The purpose of 18 U.S.C. § 3432 requiring that in capital cases the defendant be
> furnished a list of the names and addresses of the witnesses to be called by the
> Government is to assist defense counsel in preparing the defense by interviewing
> the witnesses. Witnesses, particularly eye witnesses, to a crime are the property of
> neither the prosecution nor the defense. Both sides have an equal right, and should
> have an equal opportunity, to interview them. Here the defendant was denied that
> opportunity which, not only the statute, but elemental fairness and due process
> required that he have. It is true that the prosecutor stated he did not instruct the
> witnesses not to talk to defense counsel. He did admit that he advised the
> witnesses not to talk to anyone unless he, the prosecutor, were present.

*Gregory*, 369 F.2d at 187-88.

The *Gregory* court noted that the then-current canons of professional conduct provided

that each party should have equal access to witnesses. *Id.* at 188.  Today, professional standards

provide that it is unprofessional conduct for prosecutors to impede defense counsel's access to

prosecution witnesses.  ABA Standard 3-3.1(c).  "It is imperative that prosecutors and other

officials maintain a posture of strict neutrality when advising witnesses of their duties and

rights."  *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978).

Courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging

witnesses from cooperating with the counsel of an accused."  *Ibid.*  Thus, "counsel may not make

his or her presence a condition of the interview" between the defense lawyer and a witness.  ABA

Standard 3-3.1(c) Commentary.

The court in *Gregory* held the prosecutor's conduct was as pernicious as the suppression

of evidence in violation of *Brady*.  The court observed that there was not

> any direct suppression of evidence. But there was unquestionably a suppression of
> the means by which the defense could obtain evidence. The defense could not
> know what the eye witnesses to the events in suit were to testify to or how firm
> they were in their testimony unless defense counsel was provided a fair

opportunity for interview. In our judgment the prosecutor's advice to these eye witnesses frustrated that effort and denied appellant a fair trial.

*Id.* at 189.

In this case, the Government first sought through an *ex parte* motion for a protective order to prevent the defense from receiving the identifying information required by § 3432. During the *ex parte* hearing on that motion, the trial court made it clear that the Government failed to present anything close to the clearest and most compelling circumstances necessary to forestall compliance with the statute. (Tr. 9/13/05 Hr'g at 4-5, 9, 19.) Nevertheless, the Court withheld adjudication of the motion for a protective order. This enabled the prosecutors to rely upon the possibility of the protective order being granted when "negotiating" an "arrangement" with the defense. In the end, the prosecutors would secure, with the Court's tacit assistance, an arrangement more detrimental to the search for truth than the one the court condemned in *Gregory*, i.e., some witnesses would be interviewed but only after a delay and only in the presence of the prosecutor.

There were also more egregious violations of the defense's right to investigate. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. ( Exh. 92; Exh. 31.) Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. ( Exh. 43.)

As stated in the Amended § 2255 Motions, the performance of Mr. Barrett's defense counsel in relation to these witnesses also fell below prevailing professional norms. To the extent they acquiesced in the limitations on their access to information about the witnesses based on ignorance of *Gregory* and cases following it, their conduct was unprofessional. *Williams*, 529 U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman*,

Petitioner's Merits Brief                     167                  *Barrett v. U.S.*, 09-cv-105-JHP

477 U.S. at 385 (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").  The evidence described in Ground 2, Part A(4) and in Ground 5, Part A, shows that if defense counsel had sought a continuance and investigated the informants, and if the prosecution had complied with its duty to disclose impeachment evidence, the informant witnesses' credibility would have been totally undermined.

At a minimum, in light of the evidence presented in the Amended Motion, and the legal arguments presented here, the files and records do not conclusively show Mr. Barrett is entitled to no relief.  This Court should order an evidentiary hearing on sufficient notice for Mr. Barrett to obtain discovery and make use of this Court's subpoena power to marshal the abundant evidence.  Thereafter, this Court should vacate the conviction.

### Ground 5, Part D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument.

Throughout the guilt and penalty phases of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  (*See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

As shown in Mr. Barrett's previous filings, the Government engaged in the following forms of improper questioning of witnesses: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witness, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's

Petitioner's Merits Brief                               168                    *Barrett v. U.S.*, 09-cv-105-JHP

exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.

Each of these categories of questioning was improper. *United States v. Beeks,* 224 F.3d 741, 746 (8th Cir. 2000)(analyzing in detail and condemning repeated questioning by prosecutor for which no good faith basis existed); *United States v. Davenport,* 753 F.3d 1460, 1462 (9th 1985)(improper to make commentary or ask questions for which no good faith basis exists to "waft an unwarranted innuendo into the jury box"),  Just as it is improper to engage in commentary in closing argument that is outside the record evidence, *e.g., United States v. Cheska,* 202 F.3d 947 (7th Cir. 2000); *United States v. Manning,* 23 F.3d 570 (1st Cir. 1994); *United States v. Blakely,* 14 F.3d 1557 (11th Cir. 1994), it is likewise improper, through the questioning of witnesses, to imply the existence of certain facts or evidence the witness has not testified to.  In effect vouching for the testimony of witnesses, or treating their testimony as established fact in commentary or questioning of other witnesses, is equally beyond the pale. *United States v. Young,* 470 U.S. 1, 18-19 (1985)(vouching for witnesses vests them with the imprimatur of the government, and may induce the jury to trust the government's judgment rather than its own view of the evidence); *United States v. Martinez-Medina,* 279 F.3d 105 (1st Cir. 2002)(improper vouching for credibility of informant witness by implying that if informant were lying to curry favor with the government, he would have come up with more powerful testimony); *United States v. Broomfield,* 201 F.3d 1270, 1276 (10th Cir. 2000)(court condemned increased willingness of prosecutors to "push the envelope" with improper vouching); *United*

*States v. Garcia-Guizer,* 160 F.3d 511, 520 (9th Cir. 1998)(noting that the court had frequently observed that the government may not vouch for the credibility of its witnesses, either through putting the prosecutor's own prestige behind the witness's testimony, or indicating that extrinsic information not presented in court supports the witness's testimony).

The Government's conduct in the penalty phase closing arguments was even more egregious. In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical

question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness." (R. 5408.)

Trotting out a variation on the old Bob Macy[99] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and  falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[99] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Petitioner's Merits Brief                              171                    *Barrett v. U.S.*, 09-cv-105-JHP

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[100], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough," to testify. (R. 5414-15.) *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding Mr. Barrett's

---

[100] This was a knowing false statement on the prosecutor's part. As discussed in Ground 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  (R. 5420-21.)  There were additional comments on Mr. Barrett's supposed lack of remorse.  (R. 5419-20, 5421-22.)  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment.  *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir. 2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in

Petitioner's Merits Brief                    173                    *Barrett v. U.S.*, 09-cv-105-JHP

prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.)  This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.  *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections.  *See* Ground II.  *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.*  This was not a runaway case for the death penalty.  The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006).  The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason.  *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal.  Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).  *See* Ground XVIII, *infra.*

**Ground 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements and Other Evidence.**

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales.  The trial court also improperly restricted evidence regarding the previous state court trials and verdict.

The court's exclusion Mr. Barrett's statements expressing remorse for Trooper Eales's death during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Tennard v. Dretke,* 524 U.S. 274, 285 (2004); *Penry v. Johnson,* 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1 (1976); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his case.  *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986); *California v. Trombetta,* 467 U.S. 479, 485 (1984).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475

U.S. 673, 678 (1986); *Davis v. Alaska,* 415 U.S. 308, 318 (1974).  Finally, the trial court's

rulings fatally infected the proceedings and violated Mr. Barrett's due process rights.  *Estelle v.*

*McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, counsel sought to admit a number of statements

made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper

Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen

Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person

got killed.  I wished it had been me."  (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded

them.  It goes without saying that remorse is a proper mitigating factor, and that any evidence

bearing on it, particularly in light of the relaxed standards for the admissibility of evidence in a

federal capital trial, is admissible under the Eighth Amendment.  The courts routinely note that

evidence of remorse, whether testified to by a defendant himself, or a defendant's expressions of

remorse to third parties, are appropriate considerations for a jury in a death penalty case.  *Boyd v.*

*Allen,* ___F.3d___, No. 07-14908 (11th Cir. Jan. 8, 2010) (noting that a witness testified in the

penalty phase that the defendant had expressed remorse to her and told her that he never "meant

for it to happen"); *Smith v. Mullin,* 379 F.3d 919, 936 (10th Cir. 2004); *James v. Gibson,* 211 F.3d

543, 549 (10th Cir. 2000); *Cooks v. Ward,* 165 F.3d 1283, 1294 (10th Cir. 1998) (jury instructed

that, as a mitigating factor, defendant had repeatedly expressed remorse and shame for his

offense); *Duvall v. Reynolds,* 139 F.3d 768, 779 (10th Cir. 1998) (rejecting ineffective assistance

argument for failure to introduce evidence of remorse, when evidence of defendant's remorse

was in the trial record, including defendant crying during his statement to the police).  Here, the

court instructed the jury on remorse as a mitigating factor, but excluded the evidence supporting

a finding of remorse.  With evidence of remorse improperly excluded, the jury was left to believe that the opposite was true: that Mr. Barrett had no remorse for his crimes, and that this was a reason to sentence him to death.  *United States v. Barrett,* 496 F.3d 1079, 1088 n. 4 (10th Cir. 2007) (noting that while all or some of the jurors found a number of mitigating factors, the jury *unanimously* rejected remorse as a mitigating factor).

The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield  stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.)  During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer."  (R. 5423.)

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

Petitioner's Merits Brief                               177                    *Barrett v. U.S.*, 09-cv-105-JHP

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all."

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a reasonable probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  Title 21 U.S.C. §848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of relief without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional

Petitioner's Merits Brief                      178                      *Barrett v. U.S.*, 09-cv-105-JHP

violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The trial court also violated Mr. Barrett's Fifth Amendment due process rights to a fair trial, and his Sixth Amendment rights to present a defense and to confront witnesses against him by excluding altogether, in the *first stage* of trial, evidence of the prior state court trials and verdict.   *Crane v. Kentucky,* 476 U.S. at 690; *Delaware v. Van Arsdall,* 475 U.S. at 678-79; *Davis v. Alaska,* 415 U.S. at 318; *Chambers v. Mississippi,* 410 U.S. at 294.  Although counsel did cross-examine some of the informant witnesses about why they only came forward shortly before the federal trial, the cross-examination lacked proper context.  The credibility of these witnesses would have been severely damaged, and their motives for coming forward only years after the fact would have been exposed, had counsel been able to point out in cross-examination that Mr. Barrett had actually been tried for Trooper Eales's death not once, but twice in state court in 2002 and 2004, and that these "important" witnesses were nowhere to be found, even though they were in the community and the same state law enforcement officers (most particularly, Clint Johnson and Sheriff Philpot) who were assisting in the federal case had worked the state case.  Evidence that these witnesses were totally silent at the time of the two previous state court trials also would have put the lie to Clint Johnson's testimony, elicited on cross-examination, that several individuals had reported threats from Mr. Barrett to law enforcement, and that this "fact" made execution of the warrant "high risk."  (*See also,* Ground II A (8))

In *United States v. Giovanelli,* 945 F.2d 479, 486-490 (2nd Cir. 1991), the defendants were charged in a racketeering case. Some of the predicate acts for the racketeering charge were an attempted murder and two murders for which some of the accused had either been acquitted or which had resulted in hung juries in state court. Just as the trial court did here in the guilt phase, the trial judge in *Giovanelli* excluded all previous mention of the fact that there had been previous trials, and the outcome of those trials.

On appeal, the defendants argued that the information regarding the prior state trials was vital to the ability to cross-examine and impeach witnesses with the fact that their testimony had evolved since the state court prosecutions. It was held that while evidence regarding the outcome of the previous state prosecutions could perhaps have been excluded as being more prejudicial (to the Government's case) than probative, the defendant's rights to put on a defense and confront witnesses was violated by the trial court's ruling that any mention of the previous state court prosecutions was *verboten*. The appellate court held that before evidence of the state proceedings was introduced, the trial court could have and should have instructed the jury that under the dual sovereign doctrine, *Heath v. Alabama,* 474 U.S. 82 (1985), it was permissible for the Federal government to charge an individual for the same offense that had previously been prosecuted at the state level, and that the jury would hear references to testimony given in the prior state trials. Defense counsel should have been permitted to refer to the previous trials, but not their outcome. Because the trial court did not follow this course, the jury's findings of the predicate acts relating to the previous state prosecutions were vacated.

At the very least, counsel for Mr. Barrett should have been able to bring out, on cross-examination of the informants, that there had been previous state court trials and that these witnesses were suspiciously absent from them, raising the inference that their testimony had been

tailored and fabricated for the late-coming federal prosecution in order to "fill the gap" in the Government's proof.  Counsel also should have been permitted to refer to the previous state court trials in cross-examination of the law enforcement witnesses to raise the inference that their testimony had evolved after two jury trials.  As noted, information regarding the state court trials also would have been invaluable in impeaching Clint Johnson's false testimony that execution of the warrant was "high risk" because several individuals had reported threats by Mr. Barrett to law enforcement.  If that were the case, where were these witnesses in state court?

Mr. Barrett submits that not only the fact of the state court trials, but their outcome, should have been permitted in the guilt stage.  Evidence that one jury had deadlocked on the state murder charge, and that a second jury had acquitted Mr. Barrett of murder, convicting him instead of manslaughter, was highly probative to his defense at the federal trial, and would have exposed the impure motives of the Government for bringing a federal case simply because it did not like the outcome of the state prosecution.  The only "prejudice" the Government would have suffered had the result of the state court proceedings been placed before the jury was the exposure of its cynicism and the unfairness in launching a federal prosecution to begin with.

Appellate counsel were ineffective for failing to raise the issues addressed here, which were clearly framed by the record..  There could be no reasonable strategy for neglecting to raise these claims on direct appeal.  There is a reasonable probability that had the issues been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).  *See* Ground XVIII, *infra*.

**Ground 7**.    **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification.**

In Ground 7 of the Amended § 2255 Motion, Mr. Barrett sets out the evidence demonstrating that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place on Mr. Barrett a bulging electric shock apparatus and required him to wear the shock device during the trial without a finding that Mr. Barrett was or would be a security risk.  Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist.  The belt left an unusual bulge that was visible through Mr. Barrett's clothing.  The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible or fear-inducing restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment.  *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970). "'The use of stun belts, depending somewhat on their method of deployment, raises all of the traditional concerns about the imposition of physical restraints.'" *United States v. Wardell*, 591 F.3d 1279, 1294 (10th Cir. 2009), quoting *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003), and citing *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (applying Supreme Court's restrictions to "stun belts").

The Tenth Circuit has "recognized the district court's legal obligation to consider *individualized* factors in determining whether to deviate from the general rule prohibiting physical restraints." *Wardell*, 591 F.3d at 1293 (emphasis added). *See also Deck*, at 633 ("determination must be case specific; that is to say, it should reflect particular concerns , say special security needs or escape risks, related to the defendant on trial"). In order to place Mr. Barrett in the electric shock device the trial court had to find it "serve[d] an 'essential' interest 'specific' to [the] particular case. Security needs or escape risks 'related to the defendant on trial' constitute such an interest." *Ibid.*, quoting *Deck*, 544 U.S. at 628, 633. The record shows there was no basis for finding Mr. Barrett posed any risk of escape, and the trial court made no such individualized finding. On the contrary, the trial judge stated that the decision to place Mr. Barrett in the electric shock device was *not* based on defendant-specific concern that he would pose a danger in court, but on generalized security concerns. Tr. 9/13/05 ex parte Hr'g at 13. *Cf. United States v. Baker*, 432 F.3d 1189, 1244 (11th Cir. 2005) ("the decision to use shackles to restrain a defendant at trial should rarely be employed as a security device"). "[B]ecause of the various constitutional concerns that flow from such a decision, it triggers 'close judicial scrutiny.'" *Wardell*, at 1293, quoting *Estelle*, 425 U.S. at 504. Here, during the September 9, 2005 hearing on the use of the device, the trial court failed to apply the required scrutiny when it expressly deferred to the judgment of the marshals.

Prejudice is presumed from the use of a shock restraint unless two conditions are met: "(1) the court makes a defendant-specific determination of necessity resulting from security concerns; and (2) it minimizes the risk of prejudice by, for instance, concealing the stun belt from the jury." *Wardell*, at 1294. As already shown, the trial court did not make any defendant-

specific finding and there was no basis in the record for one.  Thus, prejudice is to be presumed.

But there is evidence that the second precondition to requiring a prejudice showing also fails.

The electric shock device created a visible bulge in Mr. Barrett's clothing that was observable by the jury.  Exh. 80.  Indeed, the manufacturer of the device has distinguished its product from others because it is an "obvious" restraint.  Pet. Writ Cert. in *Stun-Tech, Inc. v. RACC Industries, Inc.*, Case No. 95-268, available at 1995 WL 17048059.

In addition, this is not the "ordinary" case posited in *Wardell*.  As the jury found, Mr. Barrett was known by the Government and trial court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  The Government and trial court also were aware that Mr. Barrett had been beaten, denied medical treatment, and threatened by law enforcement officers for his role in the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would be shocked by the marshals on the slightest perceived provocation, and as this issue was raised by defense counsel, the trial court was aware that the shock device would inhibit Mr. Barrett's movements and communications with counsel in court.  Since the trial, defense counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.  (Exh. 29.)

> That experience is hardly surprising given what was known about the use of this device: Two nine-volt batteries connected to prongs that are attached to the wearer over the left kidney region power the belt. The belt may be activated from as far away as 300 feet and once activated it delivers an eight-second, 50,000 volt shock that cannot be stopped. This high-pulsed electrical current travels through the body along blood channels and nerve pathways. The belt's electrical emission knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes. Activation may also cause immediate and uncontrollable defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation may cause some wearers to suffer heartbeat irregularities or seizures.

> *Manufacturers of the stun belt emphasize that the belt relies on the continuous fear of what might happen if the belt is activated for its effectiveness.*

*Wrinkles v. State*, 749 N.E.2d 1179, 1193-94 (Ind. 2001) (emphasis added).

Defense counsel's performance fell below prevailing professional norms when they failed to bring these issues to the attention of the trial court during the trial.  Defense counsel have a duty to develop a relationship of trust with the defendant and to take affirmative steps "at all stages of the case [to] engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case."  ABA Guideline 10.5.C.  In order to facilitate communication during trial, and to avoid impediments to Mr. Barrett's ability rationally to assist in his own defense, and to preserve the record, defense counsel were obligated to bring to the trial court's attention the bulge in Mr. Barrett's clothing, and the discomfort and fear it produced.  ABA Guideline 10.8.A.  Counsel's omissions constitute deficient performance.

In *Roche v. Davis*, 291 F.3d 473 (7th Cir. 2002), the court held the outcome of the capital sentencing proceedings was unreliable due to defense counsel's failure to object to the petitioner's shackling and the failure to ensure that the jury could not see the shackles.  The state court decision was unreasonable because the court only considered counsel's efforts to reveal the shackles during his testimony but not when seated at the defense table when the record revealed the shackles were visible to the jurors.  The court held there was prejudice – even though the final determination about the appropriate sentence rested with the trial judge – because there was considerable mitigation available and the jury deliberated for eight hours and was unable to recommend the death penalty.  In the present case, this Court must consider the abundant mitigation evidence presented in Part B of Ground 2.  Upon such consideration, defense

Petitioner's Merits Brief                                   185                        *Barrett v. U.S.*, 09-cv-105-JHP

1055

counsel's failure in this case to prevent Mr. Barrett from being restrained with an obvious and terrifying device undermines confidence in the verdict.

To the extent this Court finds the claim should have been raised on direct appeal, Mr. Barrett suffered prejudice from counsel's errors. Appellate counsel states that he did not believe the issue was preserved. Exh. 29. Mr. Barrett was prejudiced from prior counsel's omissions in that if the facts had been presented, prejudice would have been presumed, and Mr. Barrett would been entitled to a new trial.

As with the obviousness of the device, the element of fear cannot be denied as "the psychological toll exacted by such constant fear is one of the selling points made by the manufacturer of the belt." *Hawkins v. Camparet-Cassini*, 251 F.3d 1230, 1239 (9th Cir. 2001) (referring to Stun-Tech literature promoting "'total psychological supremacy [over] troublesome prisoners'"). Mr. Barrett's defense counsel informed the court that Mr. Barrett feared the device because he was at special risk from electrocution due to conductive steel wire in his chest and abdomen area. Tr. 9/9/05 Hr'g at 27. As courts have observed

> "[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel.
>
> "... Wearing a stun belt is [also] a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt."

*Wardell*, at 1296-97, quoting *Durham*, 287 F.3d at 1305-06.

The use of an obvious, fear-inducing device that gave marshals psychological dominance over Mr. Barrett during the trial requires that the conviction be vacated and a new trial held. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.

Accordingly this Court should give adequate notice of an evidentiary hearing so that Mr. Barrett may use discovery and this Court's subpoena power to prove either the denial of due process, the denial of effective assistance of counsel, or both.  28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(c).  Thereafter, the conviction should be vacated and a new trial should be ordered.

> **Ground 8.**    **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

In Ground 8 of the Amended § 2255 Motions, Mr. Barrett sets out the factual basis for the Court to find that the judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.  The facts supporting the claim are set out in the Amended Motion and will not be repeated here.

It is "well-settled that the 'criminal trial of an incompetent defendant violates due process.'"  *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc), quoting *Media v. California*, 505 U.S. 437, 453 (1992).  The Fifth and Fourteenth Amendment right not to be tried while incompetent includes the right to be present and rationally to participate in the proceedings.  *Medina v. California*, 505 U.S. at 453; *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966).

Due process requires that when a trial court is aware of evidence sufficient to create a bona fide doubt about the defendant's competence, a hearing is necessary.  *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975).  Because competence can wax and wan over the course of the

Petitioner's Merits Brief                    187                    *Barrett v. U.S.*, 09-cv-105-JHP

proceedings, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181; *see also United States v. Ghane*, 490 F.3d 1036, 1041 (8th Cir. 2007) ("competency finding is not static").  Thus the Court reversed in *Drope* because "the record reveal[ed] a failure [on the part of the trial court] to give proper weight to the information suggesting incompetence which came to light during trial." *Drope*, 420 U.S. at 179.

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.

*Cooper*, *supra*, 517 U.S. at 354, *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

In *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court ruled that the test for determining whether a criminal defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." In *Drope v. Missouri*, 420 U.S. 162 (1975), the Court further explained that a "person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S. at 171.

*Drope* and *Dusky* establish a two-part test.  "The first prong of the competency test requires the district court to determine if the defendant has 'a rational as well as factual understanding of the proceedings against him.'" *Ghane*, 490 F.3d at 1040, quoting *Dusky*, *supra*. This first prong also has two components, and unless each is satisfied, the trial cannot proceed.

Petitioner's Merits Brief                              188                        *Barrett v. U.S.*, 09-cv-105-JHP

If the defendant has a factual understanding but lacks a rational understanding, for example, due to irrational beliefs about to personnel involved, he is not competent to stand trial. *Ibid.* (finding defendant was incompetent due to paranoid conspiracy beliefs although he had a factual understanding of the proceedings).

"The second prong of the competency test requires the district court to determine whether the defendant is able to assist properly in his defense." *Ibid.* If the defendant understands the proceedings, but, due to a mental disease or defect, cannot properly assist in his defense, the trial cannot proceed. 18 U.S.C. § 4241.

Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Grounds 2, 7, and 13, and incorporated by this reference as though fully set fort, and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition, irrefutably demonstrates that

Petitioner's Merits Brief                    189                    *Barrett v. U.S.*, 09-cv-105-JHP

Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.  At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997).

The evidence submitted with the Amended § 2255 Motions, in summary, establishes the following:

- Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication;

- in the months before his arrest, Mr. Barrett's disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft;

- Mr. Barrett experiences brain dysfunction due to organic brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

- damage to Mr. Barrett's brain compromises his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58);

- Mr. Barrett was suffering the effects of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD) (Exh. 117 at ¶ 81);

Petitioner's Merits Brief                              190                    *Barrett v. U.S.*, 09-cv-105-JHP

- Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder (*cf. Williamson v. Ward*, <u>110 F.3</u>d, at 1519; Exh. 117 at ¶ 80);

- these conditions were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck" (Exh. 117, at ¶ 80), which caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings (*id.* at ¶¶ 59, 80).

The record reflects times when Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*,

362 U.S. 402 (1960).  The error deprived Mr. Barrett of a fair and reliable determination of guilt

and penalty.  *Pate v. Robinson*, 383 U.S., at 386.

At a minimum, the files and records do not conclusively refute Mr. Barrett's grounds for

relief.  Therefore, this Court must schedule an evidentiary hearing after permitting sufficient time

for his counsel to complete their investigation, including through the use of discovery.  28 U.S.C.

§ 2255(b); R. Gov. § 2255 Proc. 8(c).  Thereafter, this Court should vacate the judgments of

conviction and sentence and order that a new trial be held.

> **Ground 9.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

In a capital case, where the evidence supports it, a court must instruct the jury on a

lesser- included homicide offense.  This "third option" between first degree murder and acquittal

helps ensure the reliability of any death verdict if the defendant is convicted of first degree

murder.  *Beck v. Alabama,* 447 U.S. 625 (1980).  As the Supreme Court explained in *Beck*:

> [W]hen the evidence unquestionably establishes that the defendant is guilty
> of a serious, violent offense – but leaves some doubt with respect to an
> element that would justify conviction of a capital offense – the failure to
> give the jury the "third option" of convicting on a lesser included offense
> would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life
> is at stake.

*Beck,* 447 U.S. at 637.  *See also, Taylor v. Workman,* 554 F.3d 879, 885-894 (10th Cir. 2009);

*Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106

(2005); *Hogan v. Gibson,* 197 F.3d 1297, 1305 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332

(2000) (in *Turrentine* and *Hogan*, the Tenth Circuit found *Beck* error for failing to instruct on

lesser forms of homicide that were supported by some evidence; in *Taylor*, *Beck* was not satisfied

because the second degree murder instructions that were given were flawed and prevented the jury from accurately assessing whether the defendant was guilty of second degree rather than first degree murder).

In more general terms, a defendant is entitled to instructions on his theory of defense where the law and some evidence support them. *United States v. Haney,* 318 F.3d 1161, 1163 (10th Cir. 2003); *United States v. Benally,* 146 F.3d 1232, 1235-36 (10th Cir. 1998) (error for failing to instruct on involuntary manslaughter as a lesser-included offense of voluntary manslaughter). In *United States v. Bruce,* 458 F.3d 1157, 1162-66 (10th Cir. 2006), the Court noted that Fed.R.Crim.P. 31( c) provides "[a] defendant may be found guilty of ... an offense necessarily included in the offense charged[,]" and that this rule is mandatory "in the sense that if there is evidence to support a lesser included offense and the defendant requests such a charge, the court has no discretion to refuse such an instruction." *See also, United States v. Humphrey,* 208 F.3d 1190, 1206-07 (10th Cir. 2000).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. §1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter. Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser-included offense instruction be given. The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of

Petitioner's Merits Brief                                        193                          *Barrett v. U.S.*, 09-cv-105-JHP

count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case. As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination, as well as his rights under federal law to be instructed on his theory of defense.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life.  "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force.  Voluntary heat of passion manslaughter is "murder without malice."  (Tenth Circuit Pattern Jury Instruction 2.54.)  *See also, e.g., United States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required (as opposed to simply the intent to commit an underlying felony) are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties.  (Doc. 240; R. 4262-63.)

Petitioner's Merits Brief                    195                    *Barrett v. U.S.*, 09-cv-105-JHP

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial*.

Because all four of the elements for determining when a lesser-included offense instruction must be given were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. at 637 (1980); *Taylor v. Workman,* 554 F.3d at 885-

894; *Turrentine v. Mullin,* 390 F.3d at 1192-94; *Hogan v. Gibson,* 197 F.3d at 1305.  The court also committed error, under the federal criminal cases cited above and under Fed.R.Crim.P. 31 (c), in refusing to instruct on this lesser offense, consistent with the evidence and Mr. Barrett's theory of defense.

Mr. Barrett also contends, as was discussed in Ground II, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2.  Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined.  When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder.  *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

As set forth in Ground 18, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly because as the error was conceded by the Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court.  (Exhibit 29.)  Had this issue been raised, there is at least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 10.   Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

In Ground 10 of the Amended § 2255 Motion, Mr. Barrett describes the record and extra-record factual basis for concluding he was denied effective assistance of counsel, due process, and a reliable capital sentencing proceeding because his defense counsel failed to present, and the

Petitioner's Merits Brief                          197                          *Barrett v. U.S.*, 09-cv-105-JHP

trial court failed to give an instruction on, evidence casting a doubt on the manner in which the death of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction. (R. 5288.) Mr. Hilfiger stated that he did not object. (R. 5289.) This failure to object was professionally unreasonable.

Evidence from studying how jurors decide whether to impose a death sentence has shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008). Defense counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in its sentencing deliberations the doubt that first-stage cross-examination had cast upon the informants' testimony.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue

as one of guilt or innocence.  Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Capital sentencing instructions must "provide [the jury] with a vehicle for expressing its 'reasoned moral response'" to the defendant's background and character, and the circumstances of the crime.  *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  That response is supposed to express the "conscience of the community."  *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), prohibited mandatory death penalty statutes on grounds that they prevented the jury from making, and denied the defendant the right to,an individualized sentencing determination.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), held that a jury instruction that fails to require the jury to give consideration to the circumstances of the offense violates the Eighth Amendment.  "*Woodson* and *Lockett* meant to ensure that the sentencing jury would function as a 'link between contemporary community values and the penal system.'" *Morgan v. Illinois*, 504 U.S. 719, 745 (1992) (Scalia, J. dissenting), quoting *Witherspoon*, 391 U.S. at 519 n. 15.  Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation.  *United States v. Davis*, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005).  Mr. Barrett's defense counsel knew, or should have

known, about these cases.  Their existence was discoverable without the need of independent research.  Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case.  *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002) (reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001) (counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999) (citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986), and recognizing that residual doubt strategy can be extremely effective in a capital case).

The trial court's preclusion of  evidence and argument that would have cast doubt upon the Government's contention that Mr. Barrett acted out of a pre-established intention to shoot at law enforcement officers, and the court's refusal to instruct that jury that residual doubts about these circumstances could be considered in mitigation, was contrary to *Woodson*, *Lockett*, and *Witherspoon*, was contrary to the law observed in other federal death penalty cases, and was contrary to the law of the Tenth Circuit.  The error was compounded by the bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

Due to these errors, the Government was permitted to rely upon, and the jury was instructed to give effect to, the prosecution evidence adduced through the seven informant witnesses, while Mr. Barrett was prohibited from relying upon evidence presented in the first stage or trial that cast doubt upon that evidence, and from showing that in the absence of these eleventh-hour prosecutorial saviors, two previous juries declined to convict Mr. Barrett of murder.

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. ABA Guideline 10.15.1. It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent. *See* Ground 20.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment. The death sentence should be vacated. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief. Therefore, this Court must conduct an evidentiary hearing on trial counsel's unreasonable failure to seek a residual-doubt instruction and appellate counsel's failure to raise the issue on appeal. 28 U.S.C. § 2255(b). That hearing should be scheduled for a time after Mr. Barrett's counsel have had an opportunity complete their investigation through discovery and other means. R. Gov. § 2255 Proc. 8(c). Thereafter, this Court should vacate the death sentence.

**Ground 11.     Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

In Ground 11 of the Amended § 2255 Motion, Mr. Barrett sets forth evidence in the record to establish that his constitutional rights were violated when the trial court excused Juror 62 for cause because she was personally opposed to the death penalty, rather than because she would be prevented or substantially impaired from considering it.

When initially questioned by the Government, Juror 62 answered, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)  Upon further questioning by the Court, however, Juror 62 answered as follows:

Q.     ...If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.     If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually -- the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not -- I would live --

Q.     So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.     I understand that.

Q.     And -- but if you were selected -- otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.     I would consider it, yes.

Q.     And, of course, when you say "consider it," couched in the -- history of how you've answered these questions, it prompts me to say: Would you consider it fairly? I mean, in this case, the first thing that would have to happen before we got to even a sentencing stage, is there would have to be a finding --

A.     Right.

Q.     --that justified-- I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law, justified either death or imprisonment for life without the possibility of release. So, under these circumstances, the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on what's called mitigating factors. And, as a juror, you'd be obligated to not exactly balance them, but give them serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty. So, do you think you could do that?

A.     I think I could. It would be very hard for me to do that, but if it was my duty.

Q.     Well, I think when you say it would be -- it encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean,

the people who end up sitting as jurors in any case, but particularly in this case,

it's going to be very hard.

A.      Un-huh.

Q.      And it should be very hard.

(R. individual jury selection 826-28).

After further questioning by the Government defense counsel and the court, the Government moved to excuse Juror 62 for cause stating that she only answered "three or four questions in the right direction, under significant pressure." (R. individual jury selection 838). The court granted the Government's motion over objection by defense counsel, finding that Juror 62 was "substantially impaired." (R. individual jury selection 838-40).

The *Witherspoon* doctrine limits a trial court's power to dismiss prospective jurors based on their views about capital punishment. *Witherspoon v. Illinois*, 391 U.S.510, 519 (1968). "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Unless a potential juror's opposition to capital punishment is so deeply entrenched that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath," the prospective juror is qualified. *Wainwright v. Witt*, 469 U.S. 412, 420-21 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A prospective juror's views "prevent or substantially impair the performance of duties" when they "create an obstacle" to impartial consideration of law or facts. *See Witt*, 469 U.S. at 434. The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." *Dutton v. Brown,* 788 F.2d 669, 675 (10th Cir. 1986). "Where the court

Petitioner's Merits Brief                204                *Barrett v. U.S.*, 09-cv-105-JHP

finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.' " *Fuller v. Johnson*, <u>114 F.3d 491, 500</u> (5th Cir.1997) (quoting *Gray v. Mississippi*, <u>481 U.S. 648, 668</u> (1987)).

In *United States v. Chanthadara,* <u>230 F.3d 1237</u> (10th Cir. 2000), the 10th Circuit overturned a death sentence when it found that a district court erred by removing a juror for cause based on her questionnaire answers.[101] *See id.* at 1271. The potential juror indicated, "I believe the death penalty is proper in some cases although I don't think I would be able to vote for the death penalty in a case." *Id.* She clarified that this was because she didn't feel she would "ever be 100% sure that [death] was the proper verdict." *Id.* The juror also stated, "I feel the death penalty is proper in some cases but I don't feel I could ever think there was enough evidence to come to that conclusion even though I might feel the person has been proven guilty." *Id.* The 10th Circuit found that the juror's answers were ambiguous but not sufficient to determine that she should be removed for cause; thus, she was not substantially impaired. *Id.* The court noted that perhaps upon questioning it would have been determined that she was not fit to be a death penalty juror, but the court failed to make any such determination. *See id.* at 1272.

Similar to the prospective juror in *Chanthadara,* Juror 62 in Mr. Barrett's case was only ambiguous in her answers. She was improperly excused for cause solely because of her moral

---

[101]    It should be noted that the *Chanthadara* court did not base its holding on the fact that the juror's answers were on a questionnaire without an opportunity for voir dire. ("[W]e reserve for another day the question of whether a trial court has an obligation to voir dire prospective jurors before removing them for cause based on their views on the death penalty.  . . . even if we assume the district court was not required to conduct voir dire before removing her, [the juror's] answers on the questionnaire do not support removing her for cause under the [*Witherspoon*] standard[.]" *Chanthadara,* <u>230 F. 3d at 1269</u>.) Because there was no voir dire, however, the *Chanthadara* court used a de novo standard of review rather than abuse of discretion, based on the fact that the trial court did not make any credibility determinations with respect to this juror.

Petitioner's Merits Brief                                      205                              *Barrett v. U.S.*, 09-cv-105-JHP

objections to the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might be difficult or harmful to her conscience.  This wrongful dismissal for cause violated Mr. Barrett's rights under the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987).

Based on this error, Mr. Barrett's death sentence must be reversed. *See Gray,* 481 U.S. at 668 (holding that the erroneous removal of potential juror based on her views on the death penalty was reversible constitutional error); *see also O'Bryan v. Estelle,* 714 F. 2d 365, 371 (5th Cir. 1983) ("The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in *Witherspoon.*") (citing *Davis v. Georgia,* 429 U.S. 122 (1976)).

It was unreasonable of appellate counsel to fail to raise this issue on appeal. Had this issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 12.  The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt standard governed the

ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are set out in the Amended Motion to Vacate filed pursuant to court order on December 4, 2009. Doc 95 at 354-355. Simply put, Mr. Barrett's jury was not instructed to find and did not find beyond a reasonable doubt whether the aggravating factors sufficiently outweigh the mitigating factors – a fact necessary to elevate the punishment available from life to death.

In *Ring v. Arizona*, the Supreme Court held that the fundamental constitutional principle it had made clear three years earlier, in *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999), applies to capital cases like all others. *Ring*, 536 U.S. at 600. That constitutional principle is this: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id., quoting Jones* 527 U.S. at 243 n.6. The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principle applies to fact findings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. 18 U.S.C. §§ 3591, *et seq.;* 21 U.S.C. § 848(g) (repealed). In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. 18 U.S.C.§ 3591-3592; 3593; 21 U.S.C. § 848 (i),(j), (k),

Petitioner's Merits Brief                    207                    *Barrett v. U.S.*, 09-cv-105-JHP

(n).    These findings include a finding that the aggravating factors sufficiently outweigh any mitigating factors to justify the imposition of a sentence of death.  18 U.S.C. § 3593(e); 21 U.S.C. § 848(k).

Because additional factual findings are absolutely required in order to impose an increased punishment, under *Apprendi,* the additional facts must be proven beyond a reasonable doubt.  530 U.S. at 478.  In *Oregon v. Ice,*  __U.S.__, 129 S.Ct. 711, 717 (2009), the Supreme Court clarified its application of *Apprendi* to particular situations as follows:

> Our application of *Apprendi*'s rule must honor the "longstanding common-law practice" in which the rule is rooted. *Cunningham,* 549 U.S., at 281, 127 S.Ct. 856. The rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense. See *Apprendi,* 530 U.S., at 477, 120 S.Ct. 2348. Guided by that principle, our opinions make clear that the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain. See *id.,* at 497, 120 S.Ct. 2348. We accordingly considered whether the finding of a particular fact was understood as within "the domain of the jury ... by those who framed the Bill of Rights." *Harris v. United States,* 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion).

*Id.*  The Sixth Amendment principle of a "jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well-established," by the time the Bill of Rights was established.  *Ring,* 536 U.S. at 599 (quoting *Walton v. Arizona*, 497 U.S. 639, 710 (1990) (Stephens, J., dissenting).  Under the *Apprendi* rationale, then, Mr. Barrett was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find beyond a reasonable doubt that the aggravating  factors sufficiently outweighed the mitigating factors to justify a sentence of death.  *See* 18 U.S.C. §3593(e). [102]

Just as the finding of an aggravating circumstance is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating circumstances

---

[102] Or if no mitigating factors are found, that the aggravating factors are sufficient to justify a death sentence.  18 U.S.C. § 3593(e).

outweigh mitigating circumstances is a factual one.  Indeed, under the federal death penalty statutes applicable to Mr. Barrett's trial, the weighing process leads to the *ultimate* factual finding without which the death penalty may not be imposed.  Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum."  *Apprendi,* 530 U.S. at 490.  In other words, while the finding of one or more aggravating circumstances is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed.  Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating circumstances outweigh the mitigating circumstances.  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid.

This conclusion is supported by the Tenth Circuit's holding in *Rojem v. Gibson,* 245 F.3d 1130, 1135-38 (10th Cir. 2001), where the Court vacated an Oklahoma death row inmate's capital sentence because the trial court failed to give a weighing instruction altogether.  If the weighing process is simply "icing on the cake" and does not require both a *necessary and sufficient* factual finding before a death sentence can be rendered, then the absence of a weighing instruction would be of little significance.  If, as in *Rojem*, it is constitutional error to forgo a weighing instruction altogether, then the flawed weighing instruction given in Mr. Barrett's case, which did not properly allocate the burden of proof, is equally erroneous.

By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is

appropriate beyond a reasonable doubt.  Put another way, the trial court's weighing instruction permitted the jury to make the ultimate factual finding without which a death sentence cannot be returned by a preponderance of the evidence only.  This plainly violates the Supreme Court's *Apprendi* line of cases.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

This Court's failure to instruct the jury to find the necessary fact of sufficient weight beyond a reasonable doubt renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  Ring, *supra*; Jones, *supra*.  The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function."  *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993).  It is, therefore, reversible per se.  *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668. 686 (1984).  Their performance fell far below the standards expected of competent counsel in capital cases.  Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death.

Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.  *See* Claim 18, *infra*.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  These constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

> **Ground 13.   Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective.**

In Ground 13, Mr. Barrett sets forth evidence in support of his claim that his removal from the courtroom without hearing, warning or just cause violated his constitutional rights. The trial court further violated Mr. Barrett's rights by failing to determine whether he was competent to knowingly and willingly waive his constitutional right to be present at trial and instruct him about that right. Mr. Barrett sets forth evidence of further constitutional violations arising from the effects of the medication regime he was subjected to in jail, including the administration of contraindicated drugs and the discontinuation of necessary medication, all of which substantially exacerbated his neurological impairments and affected his judgment, self-control and behavior in front of the jury. Mr. Barrett's trial counsel's actions and omissions in response to these events were unreasonable and caused unfair prejudice to Mr. Barrett.

During the Government's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. This behavior was arguably due to the fact that Mr. Barrett was not being given medication for his psychological conditions and he was suffering from the effects of steroids. The marshals restrained him and asked the judge whether Mr. Barrett should be removed from the courtroom. The judge said yes. (R. 5421). After the Government finished its closing argument, the court held a hearing without Mr. Barrett present regarding whether the jury should be instructed regarding Mr. Barrett's removal. (R. 5430). Defense counsel requested no instruction and stated, "I don't really care one way or the other. I don't object, I don't approve," in response to the court's proposed instruction. (R. 5434-35). Trial counsel did not confer privately with Mr. Barrett about this matter; instead, they spoke to him in the presence of a deputy marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.) Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> Mr. Barrett:   Yes, Your Honor.
>
> The Court:   Do you have any questions of the Court about that?
>
> Mr. Barrett:   No, sir. I'll ask the marshal to return – (Interrupted)
>
> The Court:   One more. Does that include the verdict?

Mr. Barrett:   Yes, Your Honor.

The Court:   Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:   Yes, sir.

(R. 5439).

Mr. Barrett was escorted out, and the jury escorted in. (R. 5439.)

The court then read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict.

(R. 5440).

As a result of these events, the trial court violated Mr. Barrett's constitutional rights by (a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr. Barrett to unnecessarily wear additional restraints;  (c) failing to advise Mr. Barrett of his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett had in fact  knowingly and voluntarily waived that right; and (e) failing to give the jury a curative instruction. Mr. Barrett's trial counsel acted unreasonably (a) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise

Petitioner's Merits Brief                           213                    *Barrett v. U.S.*, 09-cv-105-JHP

him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Among the most prejudicial inferences likely affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. The defendant's courtroom demeanor is always a relevant and important issue - fair game for either side. In *Riggins v. Nevada,* 504 U.S. 127 (1992), Justice Kennedy in his concurring opinion noted:

> It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause.

*Id.* at 142.

At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. *See Riggins,* 504 U.S. at 142*; see also Williams v. Calderon,* 52 F.3d 1465, 1483 (9th Cir. 1995) ("Williams' trial demeanor was evidence the jury and judge could both consider."); *Kubat v. Thieret,* 867 F.2d 351, 373, n. 19 (7th Cir. 1989) ("We note again that mitigating factors are not necessarily limited to those adduced from specific evidence offered at the sentencing hearing . . . such as character testimony . . . . A juror might be disposed to grant mercy based on other factors, such as a humane perception of the defendant developed during trial.").

The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the right to be present during all critical stages of the case. *Illinois v. Allen,* 397 U.S. 337 (1970). Under controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues the disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

*Id.* (emphasis added). The trial court's order that the marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34). The trial court plainly ignored the requirement the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights[,] *Allen,* 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints beside the electric shock device he already wore on his belt, and (b) permitted him to be absent without informing him that his presence was a constitutional right and of the risks of giving up that right. Moreover, Mr. Barrett did not knowingly and intelligently waive his right to be present.

First, Mr. Barrett was not overly disruptive such that his removal was necessary. Any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the marshals perhaps acted in response to some threatening behavior of Mr. Barrett toward someone in the courtroom or an attempt to escape. This prejudice was only exacerbated by the court's order of the placement of additional restraints on Mr. Barrett.

Second, the court did not fulfill its duty to instruct Mr. Barrett that he was foregoing a constitutional right by being absent from the courtroom, and it did not assure that Mr. Barrett made a knowing and voluntary waiver of that right.  Although the court asked Mr. Barrett whether he wanted to be present, it did not instruct him that he was waiving a constitutional

Petitioner's Merits Brief                            215                    *Barrett v. U.S.*, 09-cv-105-JHP

right. Further, it made no inquiry of his mental status or competency to make that decision. *See Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993).

Federal Rule of Criminal Procedure 43(a)(2) requires the presence of the defendant at "every trial stage, including . . . the return of the verdict." Although this requirement can be waived, "'[i]t has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' * * * This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.'" *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), quoted in *Carnley v. Cochran,* 369 U.S. 506, 514-515 (1962). This means that when the defendant is available, "the serious and weighty responsibility of determining whether he wants to waive a constitutional right requires that he be brought before the court, advised of that right, and then permitted to make 'an intelligent and competent waiver.'" *Cross v. United States,* 325 F.2d 629, 631 (D.C. Cir. 1963). The trial court did not carry out its "serious and weighty" responsibility in this case.

Mr. Barrett's trial counsel was wholly inadequate in this entire matter and acted unreasonably in two fundamental ways:  first, by failing to accurately assess Mr. Barrett's mental health and medication needs; and second, by failing to adequately advise their client, object to the trial court's actions including the ordering of additional restraints, and seek a proper curative instruction.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Ground 2, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder;

(c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise or waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted

Petitioner's Merits Brief                    217                    *Barrett v. U.S.*, 09-cv-105-JHP

inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Trial counsel acted unreasonable in their failure to properly advise or convey to Mr. Barrett the repercussions of his absence from critical stages of his trial. Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Trial counsel's performance was ineffective because they willingly allowed Mr. Barrett to be absent from the courtroom during critical stages of the trial -- closing argument, jury instructions and the reading of the penalty phase verdict. They did so without ensuring that Mr. Barrett was making a knowing, informed decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshals to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions,

prejudice has been found wherever a defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. *See, e.g. United States v. Rosales-Rodriguez,* 289 F.3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. ("I really don't care one way or the other." (R. 5435.)  Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

> The fact that Mr. Barrett's counsel was present did not remedy the situation:
>
> Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative." *United States v. Novaton*, 271 F.3d. at 1000.

Petitioner's Merits Brief                    219                    *Barrett v. U.S.*, 09-cv-105-JHP

Trial counsel also acted unreasonably by failing to seek an instruction necessary to avoid harm to the jury's deliberations. Trial counsel stated that he could not think of an instruction to give the jury.  Unable to decide, he said, "I don't really care one way or the other." (R. 5434).

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the problem. In fact, the instruction given constituted prejudicial error. It was as if the court instructed everyone to ignore the elephant in the room -- the defendant's absence from the proceedings. Nonetheless, the court's instruction permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although trial counsel was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. It is beyond reason that trial counsel failed to seek a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

Any of these individual factors would warrant reversal of Mr. Barrett's death sentence; the cumulative effect of this error substantially influenced the jury's verdict and, as a result, this Court should vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues

presented in this claim it is reasonably probable that the court would have found the numerous

violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error.

**Ground 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

In Ground 14 of the Amended Petition, Mr. Barrett challenges the constitutionality of the

federal death penalty, as administered, because it is disproportionately applied according to the

race of the victim. Some twenty years ago, the federal death penalty was reintroduced; since then

it has been used as a tool of federal law enforcement with escalating frequency. Statistics

maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate

the effective defense of federal capital cases demonstrate that the authorization process by which

the Department of Justice (DOJ) selects those defendants who will face the death penalty, and

subsequent Government decision-making regarding whether to accept pleas to sentences less

than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection

Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth

Amendment.

A significantly higher percentage of cases involving white victims are authorized for

death than cases involving non-white victims. As Professor David Baldus reported in 2001 to

Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and

July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167)

in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point

difference that is statistically significant at the .001 level." (Exhibit 115.) Continuing the pattern,

during the administration of Attorney General Ashcroft, 32% of cases involving white victims

Petitioner's Merits Brief                                221                        *Barrett v. U.S.*, 09-cv-105-JHP

which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[103]  (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

---

[103]    Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

Given these statistics regarding the application of the federal death penalty, it is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. The Supreme Court has held that a court may not infer from broad statistical studies involving different decision-makers (*i.e.*, prosecutors, judges, or juries across an entire state) that the decision to seek or impose the death penalty in a particular case was based on a racially discriminatory motive. *McCleskey v. Kemp,* 482 U.S. 920 (1987). However, *McCleskey* can be distinguished from the situation presented here. A single decision-maker - the Attorney General of the United States - is responsible for each and every decision to seek the death penalty in a court of the United States. This distinction alone renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the government's charging and plea practices are influenced by the race homicide victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

Although a portion of the statistics cited above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[104] Had counsel

---

[104]    Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Ground 18, *infra.*

Petitioner's Merits Brief                    223                    *Barrett v. U.S.*, 09-cv-105-JHP

performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

> **Ground 15.   Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Court-ordered Amended Petition [Doc 95 at 373-75] and the exhibits filed herewith.

Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no

mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

The indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death.   United States Constitution, Fifth, Sixth, and Fourteenth Amendments; 18 U.S.C. §3593 (compelling Notice only a reasonable time before trial or acceptance of a guilty plea rather than in the indictment), *Ring v. Arizona, supra;  Jones v. United States*, 526 U.S. 227 (1999).

As the Supreme Court has made clear in a line of cases:

[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to allege in the indictment  any non-statutory aggravating factors which the Government relied upon to urge death or that the aggravating circumstances proved were sufficient to justify a sentence of death. *See* 18 U.S.C. §3593.  By the Government's failure to allege that death was justified and identify non-statutory aggravating factors which the Government alleged were sufficient to justify a sentence of death, the jury was not appropriately instructed on the facts necessary before a death sentence could be imposed.  *See generally*, Claim 12, *infra*.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

Petitioner's Merits Brief                             225                      *Barrett v. U.S.*, 09-cv-105-JHP

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

**Ground 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In Ground 16, Mr. Barrett sets forth claims that various forms of juror misconduct violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

As set forth in the Amended § 2255 Motion, the juror misconduct that took place in Mr. Barrett's trial included improper consideration of matters extraneous to trial; improper exposure to publicity and community sentiment; improper exposure to witnesses and others who claimed to have knowledge about Mr. Barrett and the case; false or misleading responses of jurors on voir dire; improper biases which infected jury deliberations; improper exposure to the prejudicial opinions of third parties; improper communications with third parties and/or the trial judge; and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial. In addition, the jury in this case was not sequestered in such a way as to avoid contact with prejudicial publicity.

The most serious cases of juror misconduct involve extraneous influences on the jury, such as jurors becoming privy to prejudicial information not introduced into evidence or having improper contacts with parties, witnesses, or third parties. *See United States v. Resko*,

Petitioner's Merits Brief                      226                      *Barrett v. U.S.*, 09-cv-105-JHP

3 F.3d 684, 690 (3d Cir. 1993) (finding improper intra-jury misconduct warranted new trial in this instance). The Sixth Amendment includes an impartial jury clause, such that "[p]rivate communications, possibly prejudicial, between jurors and third persons, ... are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961) (internal quotation marks omitted). This rule resulted in what is colloquially called the *Remmer I* presumption:

> [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229 (1954).

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. The Supreme Court has defined "an impartial trier of fact" as "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). When jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). "It is vital in capital cases that the jury should pass upon the case free from

Petitioner's Merits Brief                    227                    *Barrett v. U.S.*, 09-cv-105-JHP

external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox*, *supra*, 146 U.S. at 149. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. *See, e.g., Resko,* 3 F.3d at 690. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Defense and appellate counsel had a duty to preserve Mr. Barrett's rights by asserting and preserving the record as to all potentially viable bases for relief. ABA Guideline 10.8. Due to the low standard for reversal in cases of extra-judicial influence on jurors, there can be no valid reason for prior counsel not to have raised this issue except to the extent it relies upon extra-record evidence not previously available. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled to no relief. Accordingly, this Court should set this matter for hearing after affording his counsel adequate time to engage in discovery and other investigation, and to use this Court's subpoena power to marshal all available evidence. R. Gov. § 2255 Proc. 8(c).

**Ground 17.   Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment**

In Ground 17, Mr. Barrett argues that the Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett. Similar to people with mental

retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins*' and *Roper*'s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Barrett, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and

Petitioner's Merits Brief                    229                    *Barrett v. U.S.*, 09-cv-105-JHP

deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability Law Rpt'r 668, 670 (2006).

This was specifically recognized by Judge Robert Henry of the 10th Circuit, who cited to the *Atkins* ruling and concluded that the imposition of the death penalty against a mentally ill individual likewise "contributes nothing" to the goals of retribution and deterrence and "also is not constitutional." *See Bryan v. Mullin,* 335 F.3d 1207, 1228 (10th Cir. 2003) (Henry, J., dissenting). In his dissent, which was joined by three other judges, Judge Henry stated:

> The Supreme Court has held that the deficiencies borne by the mentally retarded "do not warrant an exemption from criminal sanctions, but diminish their personal culpability." *Atkins,* 536 U.S. at 320, 122 S.Ct. 2242. The Court's logic applies no less to those in Mr. Bryan's shoes who suffer from severe mental deficiencies. *See Hardwick v. Crosby,* 320 F.3d at 1164 (2003) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.") (internal quotation marks omitted).

*Id.* at 1237.

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A,

Petitioner's Merits Brief                                    230                                    *Barrett v. U.S.*, 09-cv-105-JHP

unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.[105] Moreover, just as in *Atkins* and *Roper*, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion weigh against the execution of the mentally ill.[106]

Mr. Barrett does not have, and never has had, an intact brain. (*See* Ground 2, § B.2.b., *supra*; Exhibit 117; Exhibit 89.) He suffers from severe mental illness in the form of Bipolar

---

[105]    *See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness.*

[106]    The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993). Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid. Moreover, customary international law also prohibits the execution of Mr. Barrett. *Id.*

Petitioner's Merits Brief                                231                        *Barrett v. U.S.*, 09-cv-105-JHP

Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged. Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.) Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. In light of these circumstances, *Atkins* compels that Mr. Barrett's sentence violates the Eighth Amendment.

Because of both his organic brain disease and severe mental illness, there is no meaningful way to distinguish Mr. Barrett from the people protected by *Atkins*. His execution would violate the Eighth Amendment. The holdings of *Atkins* and *Roper* should be extended to protect Mr. Barrett and those like him from a penalty disproportionate to his culpability.

As with mental retardation, Mr. Barrett's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**Ground 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Amended § 2255 Motions and the exhibits thereto and filed herewith.

As noted throughout there are numerous constitutional claims alleged in the Amended § 2255 Motions which were not raised on appeal that arguably could have been briefed and argued on the trial record.  To the extent a claim raised herein could have been and should have been raised on appeal, the failure of appellate counsel, one of whom was trial counsel as well (Mr. Hilfiger) to raise significant, substantive claims which probably would have resulted in a reversal

and remand on appeal violated Mr. Barrett's right to the effective assistance of counsel on appeal as guaranteed by the Due Process Clause of the Fifth Amendment.

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). To make out this claim, Mr. Barrett must and can demonstrate that appellate counsel's performance fell below an objective standard of reasonableness and but for counsel's actions, the omitted issue would have a reasonable probability of success on appeal. *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir.1992); *Heath v. Jones,* 941 F.2d 1126, 1132 (11th Cir.1991).

Here, Petitioner's counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues, failed to consult with Mr. Barrett regarding whether to raise meritorious issues or not, or both. The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. To the extent the Court of Appeals prevented appellate counsel from

briefing those issues, there was a failure of meaningful appellate review in violation of Mr. Barrett's rights to due process and to be free from arbitrary imposition of the death penalty.

While an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and issues framed by the trial record are ordinarily considered waived if not raised on direct appeal, *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing a procedural bar exists where appellate counsel provides ineffective assistance. *Murray v. Carrier*, 477 U.S. 478 (1986). Mr. Barrett can establish cause for any alleged failure to present a previously framed issue on appeal. Appellate counsel in this case unreasonably failed to recognize meritorious issues for appeal. (Exhibit 29.)

For the reasons briefed here in support of Ground 1; Ground 2, Parts A.1, A.5, A.11; Ground 3; Ground 4; Ground 5, Part D; Ground 6; Ground 7; Ground 9; Ground 10; Ground 11; Ground 12; Ground 13; Ground 14; Ground 15; and Ground 19, there is at least a reasonable probability that the conviction or sentence would have been reversed on appeal if these issues had been raised. The allegations related to these claims in the Amended § 2255 Motions, as well as the legal arguments in this Brief offered in support of the claims, are incorporated herein by specific reference.

> **A.** **Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**
>
> **1.** **Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

To the extent the matters raised in Ground 1 could have been raised on direct appeal, appellate counsel were ineffective which resulted in a violation of Mr. Barrett's right to Due Process under the Fifth and Fourteenth Amendments. *See Evitts,* 469 U.S. at 396; *Cook*, 45 F.3d

at 392.  As set out in the Amended § 2255 Motions Judge Payne's disparate treatment of original lead counsel, John Echols, who had successfully defended Mr. Barrett in two state trials and Mr. Hilfiger, like Judge Payne, a former U.S. Attorney, which resulted in the ultimate withdrawal of Mr. Echols, was a matter of record which could reasonably have been presented on appeal.  *See* Doc. 95 at 382-83.  Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  His client did not.  Despite the clear issues of partiality and issues surrounding the same, Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  As a result, Mr. Hilfiger suffered from a conflict of interest.

Appointed counsel Henricksen believed that the issues related to the court's treatment of counsel required consideration of extra-record evidence.  Exhibit 29.  To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  ABA Guidelines, *supra*, Guideline 10.15.1.  If counsel Henricksen is incorrect in his analysis that the issue can be later raised, his failure to raise it is not strategic but constitutionally defective.  *See generally, Bishawi v. United States*, 292 F. Supp. 2d 1122, 1127 (S.D.N.Y. 2003) *aff'd*, 109 Fed. Appx. 813 (7th Cir. 2004) (holding failure to file a consolidated appeal raising all issues after denial of a Motion for New Trial was not a strategic decision because counsel incorrectly believed petitioner could later challenge his conviction and sentence on direct appeal.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  Exhibit 29.  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below

Petitioner's Merits Brief                              235                    *Barrett v. U.S.*, 09-cv-105-JHP

prevailing standards.  *See Hays v. Farwell,* 482 F. Supp 2d 1180, 1200 (D. Nev. 2007)(Failure to raise meritorious prosecutorial misconduct including improper argument was ineffective assistance of counsel on appeal.)  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground 1 had been raised on appeal.

<div style="text-align:center">

**2.**      **Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware*, 438 U.S. 154 (1978).**

</div>

For the reasons stated in Ground 2, Part A.1, and Ground 4, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record.  Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record.  (Exhibit 29.)  The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts, supra*; *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002) (counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard); *Mason v. Hanks,* 97 F.3d 887, 897 (7th Cir. 1996)(direct appeal counsel ineffective for failing to raise issue apparent from the record).

<div style="text-align:center">

**3.**      **Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.**

</div>

In Ground 2, Part A.5, Mr. Barrett argued that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence

to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence.  To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See Argument under Ground 2(A)(5), hereinabove.*

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it from the appeal exists.  *See, e.g., State v. Saunders*, 958 P.2d 364, 366-67 (Wash. Ct. App. 1998);  *Mitchell v. State*, 379 S.E.2d 123, 125 (S.C.1989). The failure to raise the issue was professionally unreasonable.  For the reasons briefed in relation to the substantive issues *supra*, had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

### 4.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.

In Ground 2, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury.  The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial

rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

**5.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Ground 5, Part D was not raised on direct appeal.  The misconduct of the prosecutors in both stages of trial was glaring *See Hays v. Farwell*, 482 F. Supp. 2d at 1200-1201.   No reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

**6.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Ground 6, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements.  This issue was clearly framed by the record. Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455

Petitioner's Merits Brief                                    238                          *Barrett v. U.S.*, 09-cv-105-JHP

U.S. 104 (1982); *Lockett v. Ohio*, <u>438 U.S. 586</u> (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence.  The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

> **7.     Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground 7, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial. The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial.  To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed the issue required extra-record development. Exhibit 29.  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  *Roche v. Davis,* <u>291 F. 3d 473</u> (7th Cir. 2002).   In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could

not and cannot establish harmlessness.  Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal.

> **8.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground 9, *supra*, the trial court unconstitutionally failed to instruct the jury

on the lesser included offense of voluntary manslaughter.  The failure to argue on appeal that the

trial court had a responsibility to include an instruction on lesser included offense was ineffective

assistance of counsel.  *See e.g., Burnside v. State*, 858 N.E.2d 232, 238 (Ind. App. 2006).  In light

of the very clear circumstances set out in the Amended § 2255 Motions [Doc 70 at 350-54; Doc

95 at 387] and under Ground 9 above, *no* reasonable strategy excuses the failure to raise this

issue.  Had this issue been raised, there is at the very least a reasonable probability that the

outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been

different.

> **9.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground 10, *supra*, the trial court violated Mr. Barrett's rights under the

Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the

second stage doubts regarding the raid.  It was unreasonable for appellate counsel to fail to raise

the trial court's denial of a residual doubt instruction on appeal.  ABA Guideline 10.15.1.  It is at

least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would

have followed its own precedent and reversed the death judgment.

> **10.     Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.**

The dismissal of Juror 62, as set out in detail in Ground 11, *supra*, was not raised on direct appeal, even though the error was plainly apparent from the record.  Because the petitioner's claim of the trial court's unconstitutional dismissal of Juror 62 was plainly apparent on the trial record, had a high probability of success, and was not foregone on the basis of a tactical decision, the failure to raise it on appeal fell below the objective standards of reasonableness required under *Strickland. See, e.g., United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir. 1997); *see also*, *Green v. United States*, 972 F. Supp. 917, 919 (E.D. Pa. 1997) (defense compelled to use strike on juror who should have been removed for cause).  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

**11.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Ground 12, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was

constitutionally invalid. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

**12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.**

As set forth in Ground 13, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver. To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal. It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

**13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.**

As set forth in Ground 14, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim. Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.

There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate. The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 14.    Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Ground 15, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors.  Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

### B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.

The Court of Appeals reviewed the errors in this case cumulatively.  *United States v. Barrett*, *supra*, 496 F.3d at 1121.  "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).  The review conducted on appeal was deficient due to

the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would have resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, defense trial counsel failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity to convict on manslaughter, were denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations. While the errors alleged may not have been prejudicial, standing alone, they must be considered cumulatively, each of which "was one more thread with which to tie the knot of ineffective assistance of counsel." *State v. Talley*, 702 P.2d 353, 358 (N.M. Ct. App. 1985).

Prejudice at the very least is present when considering the "cumulative effect" of the errors.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments. The judgments of conviction and sentence should be set aside.

At a minimum, the files and records of the case do not conclusively demonstrate that Mr. Barrett is entitled to no relief. Therefore, this Court either should vacate the judgments or schedule an evidentiary hearing after providing sufficient notice and time for Mr. Barrett's counsel to complete their investigation and marshal all available evidence. R. Gov. § 2255 Proc. 8(c).

### Ground 19.    Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.

Mr. Barrett's convictions and sentences were unlawfully and unconstitutionally imposed, in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *E.g., Taylor v. Kentucky,* 436 U.S. 478, 487, and n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.")

Mr. Barrett has amply demonstrated that numerous prejudicial errors of constitutional dimension, or otherwise, require vacation of his convictions and sentences.

Petitioner's Merits Brief                    245                    *Barrett v. U.S.*, 09-cv-105-JHP

However, should it be deemed that, individually, none of the errors asserted require relief, their combined impact clearly necessitates a new trial or, at a minimum, a new sentencing trial.

A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of trial is such that, collectively, they can no longer be determined to be harmless. *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002); *United States v. Rivera,* 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc).  Put a slightly different way, cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002), *quoting Rivera*, 900 F.3d at 1469.  In the Tenth Circuit, a cumulative-error analysis is applied to review the impact of legally diverse claims. *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1207 (10th Cir. 2003); *United States v. Wood,* 207 F.3d 1222, 1237-38 (10th Cir. 2000) (conviction reversed due to cumulative effect of mid-trial denial of acquittal on first and second degree murder and evidentiary error).  In death penalty cases, the courts review whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case[,]" *Thornburg v. Mullin,* 422 F.3d 1113, 1137 (10th Cir. 2005), unless the errors involve violations of specific constitutional rights, in which case "the principles governing those rights control." *Cargle,* 317 F.3d at 1207.

Mr. Barrett has demonstrated that, due to numerous errors and omissions, he was denied his rights to effective assistance of counsel in both stages of trial, and that the prosecution violated its *Brady, Giglio* and *Napue* obligations virtually wholesale.  Prosecutorial misconduct was rampant in this case.  These significant constitutional errors were aided and abetted by

Petitioner's Merits Brief                   246                   *Barrett v. U.S.*, 09-cv-105-JHP

judicial misconduct which permitted the Government to lay behind the log and conduct a trial by ambush.  The "materiality" standards of the tests for ineffective assistance of counsel and *Brady* violations are identical: to prevail, a defendant must show that but for counsel's errors or omissions, or but for the suppression of evidence and similar misconduct, there is a reasonable probability that the outcome of trial would have been different, *i.e.,* that confidence in the outcome of trial is undermined.  *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).  *E.g., Felder v. Johnson,* 180 F.3d 206, 214 (5th Cir. 1999); *Benn v. Lambert,* 283 F.3d 1040, 1053 (9th Cir. 2002); *Clay v. Bowersox,* 367 F.3d 993, 1000 (8th Cir. 2004).

Thus, in a cumulative-error analysis of *Strickland* and *Brady* violations, a court must first analyze the *Strickland* violations collectively to determine if the errors are "material."  If the claimed errors of trial counsel are not in combination found to meet the materiality standard of reasonable probability of a different outcome, the court must combine all *Strickland* and *Brady* violations collectively to determine whether the combination of errors meets the "reasonable probability" standard.  *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) (remanding to district court for *de novo* consideration of *Strickland* claim and of the cumulative prejudice of *Strickland* and *Brady* claims); *Gonzales  v. McKune,* 247 F.3d 1066, 1078 (10th Cir. 2001) (court found that the outcome of trial "would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief."); *Phillips v. Woodford,* 267 F.2d 966, 975-76 (9th Cir. 2001)(court cumulated prejudice as a result of ineffective assistance of counsel with the materiality resulting from *Napue* violation where prosecution allowed its witness to falsely testify that he had no deals).

Petitioner's Merits Brief                         247                         *Barrett v. U.S.*, 09-cv-105-JHP

There can be no serious question that, even if the ineffective assistance claim and the *Brady* and similar errors which infected Mr. Barrett's trial are not judged individually to warrant relief, their combined effect warrants relief. This is particularly true because, as noted, judicial misconduct contributed to both constitutional errors. Moreover, additional constitutional and other serious errors marred Mr. Barrett's trial, as reflected in this brief and Movant's previous filings. The combined effect of all errors, if not determined to warrant relief individually, compels the granting of relief when viewed in the aggregate.

## CONCLUSION

For the foregoing reasons, as well as those stated in the Amended § 2255 Motions and all exhibits thereto, this Court should grant the following relief:

1. Recuse himself and have all proceedings regarding Mr. Barrett's application for post-conviction relief randomly reassigned to another judge;

2. Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing § 2255 Proceedings, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3. Permit Mr. Barrett to file a traverse to the Respondent's answer, at such time as to provide an adequate opportunity to respond to any affirmative defenses raised by the Answer;

4. Permit Mr. Barrett to amend his motion with recently discovered evidence and any further evidence or grounds for relief that may arise through investigation of that evidence, discovery, or an evidentiary hearing;

5.      Grant Mr. Barrett's motion to expand the record;

6.      Grant Mr. Barrett's motion for evidentiary hearing to resolve any factual disputes

raised by the Respondent's Answer to this Petition, or by Petitioner's Reply to any

affirmative defenses raised by the Respondent;

7.      Permit oral argument as appropriate and required;

8.      Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just.


DATED:   March 1, 2010

Respectfully submitted,
*/s/ David B. Autry*
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

*/s/ Joan M. Fisher*
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

*/s/ Tivon Schardl*
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1st day of March 2010 I caused the foregoing Petitioner's Brief

in Support of Second Amended § 2255 Motion and in Support of Petitioner's Motion for

Evidentiary Hearing and Motion for Record Expansion to be filed with the Clerk of the Court

using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson,

AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of

Justice, 1331 F Street, NW, Washington, DC 20530.


/s/ Tivon Schardl

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

**APPENDIX A**
**TO PETITIONER'S BRIEF IN SUPPORT OF**
**SECOND AMENDED § 2255 MOTION**
**AND IN SUPPORT OF**
**PETITIONER'S MOTION FOR EVIDENTIARY HEARING**
**AND MOTION FOR RECORD EXPANSION**

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**INDEX**

**NON-SEALED EXHIBITS**
**PREVIOUSLY SUBMITTED IN SUPPORT OF**
**(FIRST) AMENDED MOTION TO VACATE, DOCKET NUMBER 70**

**VOLUME I**

Exhibit 1          Marriage Certificate for A.J. and Ada Barrett

Exhibit 2          Marriage Certificate for Abe and Minnie Dotson

Exhibit 3          Marriage Certificate for Allen and Ida Real

Exhibit 4          Marriage Certificate for David and Carolyn Joseph

Exhibit 5          Marriage Certificate for Ernest and Sylvia Gelene
                   Barrett

Exhibit 6          Declaration of Rodney Floyd

Exhibit 7          Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8          Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9         Marriage Certificate for Sam and Ida Hatter

Exhibit 10         Marriage Certificate for Sam and Bessie Hatter

Exhibit 11         Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12         Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13         Declaration of Janesse Thomas

Exhibit 14         Declaration of Dale Anderson

Exhibit 15         Divorce File for Isaac and Marilyn Barrett

Exhibit 16         *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                   December 15, 1917 (Commitment to Penitentiary)

Exhibit 17         *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                   November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18          *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19          *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20          *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23          *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24          Declaration of David Autry

Exhibit 25          *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26          *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27          *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28          *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29          Declaration of Mark Henricksen

Exhibit 30          *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31          Declaration of Leonard Post

Exhibit 32          *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33          *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34          Declaration of John Echols

Exhibit 35          Excerpts from Kenneth Barrett's Baby Book

Exhibit 36          Letter from Kenneth Barrett

Appendix A to Petitioner's Merits Brief                    ii                    *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 37        Declaration of Robert Thompson

Exhibit 38        Declaration of Randy Weaver

Exhibit 39        Declaration of Vickie Beaty

Exhibit 40        Declaration of Amanda Grizzle

Exhibit 41        Declaration of Ellen Stovall

Exhibit 42        Declaration of Christine Calbert

Exhibit 43        Supplemental Declaration of Leonard Post

Exhibit 44        Report of George Kirkham, Ph.D.

Exhibit 45        Declaration of Travis Crawford

Exhibit 46        *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274

Exhibit 47        *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet

Exhibit 48        *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet

Exhibit 49        *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet

Exhibit 50        *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet

Exhibit 51        *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet

Exhibit 52        *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet

Exhibit 53        *State of Oklahoma vs. David Littlefield*, Case No. OBAD No. 1729 and
                  SCBD No. 5338, Order dated September 14, 2009

Exhibit 54        Declaration of Susan Otto

Exhibit 55        Declaration of Bill Sharp, Ph.D.

Exhibit 56        Declaration of Jeanne Russell, Ed.D.

Exhibits 57       *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket
                  Sheet

Exhibit  58       Intentionally Left Blank, No Exhibit.

Appendix A to Petitioner's Merits Brief            iii            *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 59          *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60          *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal
                    Docket (Cultivation of Mari)

Exhibit 61          *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number
                    CF-97-00086

Exhibit 62          *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket
                    (Disposing of Mortgaged Property)

Exhibit 63          *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket
                    (Manslaughter in the First Degree)

Exhibit 64          Letter from John Echols to Honorable James H. Payne, dated February 28,
                    2005

Exhibit 65          Letter from Honorable James H. Payne to John Echols, dated February 22,
                    2005

Exhibit 66          Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67          Declaration of Julia O'Connell

Exhibit 68          *United States of America vs. Karen Real*, Case Number, Case Number
                    CR-00-21-FHS

Exhibit 69          *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27,
                    2007

Exhibit 70          *Drug Offender Receives Break*, Times Record

Exhibit 71          Letter to the Editor, *She Questions Sheriff's Department*, dated October
                    17, 1999

Exhibit 72          *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73          Photographs of Kenneth Barrett's shack

Exhibit 74          Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Appendix A to Petitioner's Merits Brief          iv          *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 77          Declaration of Brandie Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley


**VOLUME II**

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett (resubmitted)

Exhibit 97          Declaration of Sylvia Gelene Dotson

Exhibit 98          Declaration of Mark Dotson

Appendix A to Petitioner's Merits Brief                v                *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 99            Declaration of Steve Barrett (resubmitted)

Exhibit 100           Declaration of Warren Barrett (resubmitted)

Exhibit 101           Declaration of Nona Reich (resubmitted)

Exhibit 102           Declaration of Carl Cook

Exhibit 103           Declaration of Abby Stites

Exhibit 104           Declaration of Richard Barrett

Exhibit 105           Declaration of Doris Barrett, March 5, 2009

Exhibit 106           New Articles from Vian American and Sequoyah County Democrat
                      Regarding Abe Dotson

Exhibit 107           Description Narrative, Written by Trooper Glen Smithson, dated
                      September 29, 1999

Exhibit 108           Excerpt from the Deposition of John Philpot

Exhibit 109           Report by Edward E. Hueske

Exhibit 110           Curriculum Vitae of Edward E. Hueske

Exhibit 111           Declaration of Steve Leedy

Exhibit 112           Declaration of Lauren Cohen Bell

Exhibit 113           2008 Declaration of Kevin McNally

Exhibit 114           Declaration of Rodney Floyd

Exhibit 115           Memo Regarding DOJ Report on the Federal Death Penalty System, dated
                      June 11, 2001

Exhibit 116           2007 Declaration of Kevin McNally

Exhibit 117           Declaration of Dr. George Woods

Exhibit 118           Declaration of Richard H. Burr

**INDEX**

**REDACTED EXHIBITS
IN SUPPORT OF PETITIONER'S
(SECOND) AMENDED MOTION TO VACATE SET ASIDE,
OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY
(MOTION UNDER 28 U.S.C. § 2255), DOCKET NUMBER 95
FILED AT DOCKET NUMBERS 114 THROUGH 145**

**VOLUME I**

Exhibit 119          Birth Certificate of Kenneth Barrett

Exhibit 120          Birth Certificate of Sylvia Gelene Dotson

Exhibit 121          Birth Certificate of Richard Barrett

Exhibit 122          Birth Certificate of Toby Barrett

Exhibit 123          Birth Certificate of Stephen Barrett

Exhibit 124          Death Certificates of Allen M. Real and Allen
                     Cleveland Real

Exhibit 125          Death Certificate of A.J. Barrett

Exhibit 126          Death Certificate of Ada Melton Barrett

Exhibit 127          Death Certificate of Albert Maxwell

Exhibit 128          Death Certificate of Billy Maxwell

Exhibit 129          Death Certificate of Hattie Dotson

Exhibit 130          Death Certificate of Hugh Dotson

Exhibit 131          Death Certificate of Ida Melton

Exhibit 132          Death Certificate of Isaac Barrett

Exhibit 133          Death Certificate of Mary Barrett

Exhibit 134          Death Certificate of Minnie Andrews

Exhibit 135          Brandon Smith Social Security Records, Itemized Statement of Earnings

Appendix A to Petitioner's Merits Brief          vii          *Barrett v. U.S.*, 09-cv-105-JHP

Exhibit 136            Educational Records for Kenneth Barrett

Exhibit 137            Educational Records for Gwendolyn Barrett

Exhibit 138            Educational Records for Ernest Barrett

Exhibit 148            Report of Interview with Kenneth Barrett by the Oklahoma State Bureau
                       of Investigation, dated October 11, 1999

Exhibit 149            Marriage Certificate for Ernest and Diana Barrett

Exhibit 150            Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151            Divorce File for Kenneth and Abigail Barrett

Exhibit 152            *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153            *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154            *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155            Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156            *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338


**VOLUME II**

Exhibit 157            *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158            *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159            *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160            *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

**VOLUME III**

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444


**VOLUME IV**

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2004-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390


Appendix A to Petitioner's Merits Brief          ix          *Barrett v. U.S.*, 09-cv-105-JHP

**VOLUME V**

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett


**VOLUME VI**

Exhibit 181 A        Background Materials on Clint Johnson:  Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 181 B        Background Materials on Clint Johnson:  Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits (Continuation of Exhibit 181A)

**VOLUME VII**

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Exhibit 185          *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603

Exhibit 186          *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187

**VOLUME VIII**

Exhibit 187          *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389

Exhibit 188          *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186

Exhibit 189          *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369

Exhibit 190          *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774

Exhibit 191          *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244

Exhibit 192          *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572

Exhibit 193          *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988

Exhibit 194          Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999

Exhibit 195          *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477


**VOLUME IX**

Exhibit 196          Military Records for Travis Crawford


**VOLUME X**

Exhibit 197          Birth Certificate of Phyllis Dotson

Exhibit 198          Birth Certificate of Travis Crawford

Exhibit 199          Birth Certificate of Stephen Barrett

Exhibit 200          Educational Records for Kenneth Barrett

Exhibit 203          Social Security Records for Travis Crawford

Exhibit 204          *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645

Exhibit 205          *Cindy Crawford v. Jeffrey and Stacy Mattox, and Larry and Brenda Shelly*, Case Number JFP-09-458


Appendix A to Petitioner's Merits Brief                    xi                    *Barrett v. U.S.*, 09-cv-105-JHP

**INDEX**

**UNREDACTED VERSION PURSUANT TO LOCAL RULE: FILE UNDER SEAL**

**SEALED EXHIBITS
IN SUPPORT OF PETITIONER'S
(SECOND) AMENDED MOTION TO VACATE,  DOCKET NUMBER 95
AND RELATED TO PETITIONER'S UNOPPOSED
MOTION TO FILE EXHIBITS UNDER SEAL, DOCKET NUMBER 110
LODGED WITH THE COURT ON FEBRUARY 18, 2010**

**VOLUME I**

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandie Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

**VOLUME II**

Exhibit 144A          Medical Records for Cynthia Crawford

Exhibit 144B          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

**VOLUME III**

Exhibit 147 A          Medical Records for Kenneth Barrett

Exhibit 147 B          Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 C          Medical Records for Kenneth Barrett (Continuation)

**VOLUME IV**

Exhibit 147 D           Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 E           Medical Records for Kenneth Barrett (Continuation)

Exhibit 147 F           Medical Records for Kenneth Barrett (Continuation)


**VOLUME V**

Exhibit 147 G           Medical Records for Kenneth Barrett (Continuation)

Exhibit 201             Medical Records for Gwen Crawford

Exhibit 202             Medical Records for Carolyn Joseph

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Movant/Defendant,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

## MOVANT'S REPLY TO UNITED STATES' RESPONSE TO SECOND AMENDED § 2255 MOTION

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUND 2:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH
            STAGES OF THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.   Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           1.   Trial counsel operated under a conflict of interest. . . . . . . . . . . . . . . . . . 9

           2.   Counsel were professionally unreasonable and ineffective in failing to
                properly re-urge the motion to suppress under Franks v. Delaware, 438
                U.S. 154 (1978).  Appellate counsel were ineffective for failing to raise
                the issue, to the extent it was framed by the record, on direct appeal. . . . 11

           3.   Counsel were professionally unreasonable and ineffective for failing to
                investigate and introduce evidence of Mr. Barrett's diminished mental
                capacity in the guilt/innocence stage of trial. . . . . . . . . . . . . . . . . . . . . . . 15

                a.   Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                b.   Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           4.   Failure to raise competency issue was constitutionally ineffective
                assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

           5.   Counsel were ineffective for failing to move for a continuance and for
                failing to conduct a professionally reasonable investigation which
                would have led to abundant impeachment evidence of the prosecution's
                informant witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                a.   Failure to move for a continuance. . . . . . . . . . . . . . . . . . . . . . . . . 25

                b.   Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                c.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

           6.   Counsel were ineffective in failing to make appropriate and timely
                objections to other bad acts testimony by the informant witnesses. . . . . 40

i

a.      Mr. Barrett's claim relates back and is, therefore, not
        time barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

b.      Trial counsel's failure to object constituted ineffective assistance of
        counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

7.   Trial counsel were professionally unreasonable for failing to engage the
     services of an independent crime scene reconstruction expert. . . . . . . . . 45

8.   Trial counsel were ineffective in their failure to secure an independent
     expert on police tactics who would have demonstrated that the midnight
     raid on Mr. Barrett's house was reckless and dangerous. . . . . . . . . . . . . 47

9.   Failure to adequately cross-examine law enforcement witnesses was
     ineffective assistance of trial counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . 50

10.  Trial counsel were ineffective in failing to call Toby Barrett
     and Alvin Hahn, percipient witnesses, who could impeach
     government testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

     a.      Toby Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     b.      Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

11.  To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable
     investigation into evidence that he was not aware of the arrest warrant,
     could have been taken into custody without incident, and had not reacted
     violently to the police when they had been to his home shortly before the
     raid and on other occasions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

12.  Trial Counsel were ineffective for failing to adequately contest "expert"
     Horn testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

13.  The verdicts reached at both stages of trial are unreliable due to trial
     counsel's unreasonable failure to seek appropriate jury instructions. . . . 63

     a.      Credibility instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     b.      Instructions on self-defense and theories of defense . . . . . . . . . . 65

15.  Trial counsel ineffectively omitted objections to prosecutorial
     misconduct in penalty phase closing arguments. . . . . . . . . . . . . . . . . . . . 68

ii

B. Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    1. Introduction and summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . 69

    2. Undisputed facts and law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    3. The declarations of trial counsel support findings of deficient performance and prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

        a. Internal inconsistencies and adoptive admissions. . . . . . . . . . . . 78

        b. Inconsistencies between Government's theory and other witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        c. Inconsistencies between the trial record and the Government's theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        d. Inconsistencies between the Government's theory and the law of effective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . 89

    4. The government's legal arguments have no merit. . . . . . . . . . . . . . . . . . 97

        a. Neither case law nor the record supports the Government's theory on deficient performance. . . . . . . . . . . . . . . . . . . . . . . . 97

        b. *Neither case law nor the evidence supports the Government's theory on prejudice.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

GROUND 3: THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES. . . . . . . . . . . . . . . . 112

A. The Issue Is Not Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

B. The Court Abused its Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

C. The Experts Requested Were Necessary and Relevant . . . . . . . . . . . . . . . . . . . 114

    1. Mental health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

iii

2.      Crime scene reconstruction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

3.      Expert on police standards and procedure  . . . . . . . . . . . . . . . . . . . . . . . 117

4.      Mitigation specialist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

GROUND 4:   THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER
            *FRANKS V. DELAWARE,*438 U.S. 154 (1978).  . . . . . . . . . . . . . . . . . . . . . . . 118

GROUND 5(A) and (B):THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY
            EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY.
            NEWLY DISCOVERED EVIDENCE ALSO
            WARRANTS § 2255 RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

1.      Charles Sanders -- *Brady,* newly discovered evidence, and
        false evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

2.      Travis Crawford -- *Brady*, newly discovered evidence, and use of false
        evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

3.      Cindy Crawford -- *Brady*, newly discovered evidence and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

4.      Brandie Zane Price -- *Brady*, newly discovered evidence, and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

5.      Karen Real -- *Brady,* newly discovered evidence, and false evidence . . 136

6.      Randy Turman -- *Brady,* newly discovered evidence, and false
        evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

7.      Law enforcement witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

8.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

C.      The Prosecution Interfered with the Defense's Right to Interview
        Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

D.      Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial.  . . . 142

1.      Mr. Barrett's claim is subject to collateral review  . . . . . . . . . . . . . . . . . 143

2.      The prosecutors improperly questioned the witnesses. . . . . . . . . . . . . . 143

iv

3.      The prosecutors were especially egregious  . . . . . . . . . . . . . . . . . . . . . . 145

GROUND 7:  THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD
CAUSE WAS ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

A.      The September 13th Finding Made Clear the Court Permitted the Electric
Shock Device Because it Was a Capital Case. . . . . . . . . . . . . . . . . . . . . . . . . . 148

B.      The Order Permitting Use of the Device Did Not Comply with Due
Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

1.      The hearing on the issue did not support the court's conclusion.  . . . . . 149

2.      The electric shock device was not "preferable" to other security
measures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

3.      The September 6th Order does not comply with *Deck v. Missouri*  . . . . 153

C.      Compelling Mr. Barrett to Wear the Electric Shock Device Was
Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

1.      The electric shock device was visible and undermined the
presumption of innocence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

2.      The Court did not consider the impact on Movant's ability to assist
his counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

3.      Mr. Barrett renewed his objection on September 9, 2005.  . . . . . . . . . . 154

D.      The Claim is Properly Reviewed in Collateral Proceedings. . . . . . . . . . . . . . 155

GROUND 8:  MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED
WHILE INCOMPETENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

A.      This Court must Hold an Evidentiary Hearing on the Issue of
Incompetency.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

B.      The Expert Opinions Relied upon by Mr. Barrett Are Not
Speculative.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

C.      Trial Counsel's Opinions Are Not Controlling  . . . . . . . . . . . . . . . . . . . . . . . 162

v

GROUND 9:   MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY
THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY
MANSLAUGHTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

GROUND 10:  THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE
JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS
A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE
AND ARGUMENT ON RESIDUAL DOUBT.  . . . . . . . . . . . . . . . . . . . . . . . 175

GROUND 12: THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF PROOF
REQUIRED FOR WEIGHING THE AGGRAVATING FACTORS
VIOLATED MR. BARRETTS CONSTITUTIONAL RIGHTS.  . . . . . . . . . . . 179

A.      The Issue Was Not Raised or Adequately Resolved on Appeal. . . . . . . . . . . . . 179

1.      The *Ring* issue was inadequately raised and argued on
direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

2.      Trial counsel failed to raise the issue properly on appeal. . . . . . . . . . . 180

B.      The Constitutional Principle upon Which Ground 12 Relies Has
Been Wrongly Rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

1.      The (Edward) Fields Decision wrongly relied on
*United States v. Barrett*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

2.      The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the
application of *Ring* to the "weighing" element. . . . . . . . . . . . . . . . . . . 183

3.      The 5th, 6th and 8th Amendments require a jury finding beyond
a reasonable doubt.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

C.      Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 17: THE EIGHTH AMENDMENT'S PROHIBITION OF THE
EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED
COGNIZABLE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 18:  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.  . . . . . . . . . . . 189

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

vi

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Ake v. Oklahoma*, <u>470 U.S. 68</u> (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 162

*Alcorta v. Texas*, <u>355 U.S. 28</u> (1957)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Anderson v. Johnson*, <u>338 F.3d 382</u> (5th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . 32, 39, 178

*Anderson v. Sirmons*, <u>476 F.3d 1131</u> (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . passim

*Apprendi v. New Jersey*, <u>530 U.S. 466</u> (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180, 184

*Atkins v. Virginia*, <u>536 U.S. 304</u> (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Banks v. Reynolds*, <u>54 F.3d 1508</u> (10th Cir.1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Battenfield v. Gibson*, <u>236 F.3d 1215</u> (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . 97

*Battle v. United States*, <u>419 F.3d 1292</u> (11th Cir 2005)... . . . . . . . . . . . . . . . . . . . . . . 158, 159

*Beck v. Alabama*, <u>447 U.S. 625</u> (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Becker v. Kroll*, <u>494 F.3d 904</u> (10th Cir.2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

*Bell v. Bell*, <u>512 F.3d 223</u> (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131, 132

*Blackledge v. Allison*, <u>431 U.S. 63</u>, <u>97 S. Ct. 1621</u>, <u>52 L. Ed. 2d 136</u> (1976)... . . . . . . . . . . . . 160

*Blakely v. Washington*, <u>124 S. Ct. 2531</u> (2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

*Blystone v. Pennsylvania*, <u>494 U.S. 299</u> (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Boyde v. California*, <u>494 U.S. 370</u> (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Boyle v. McCune*, <u>544 F.3d 1132</u> (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Burger v. Kemp*, <u>483 U.S. 776</u> (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*Caldwell v. Mississippi*, <u>472 U.S. 320</u> (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . 113, 147, 185

*Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . 147, 148

*Casey v. Frank*, 346 F. Supp. 2d 1000 (E.D. Wis. 2004)... . . . . . . . . . . . . . . . . . . . . . . . . 33, 39

*Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States,*
585 F.2d 254 (7th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Cunningham v. Zent*, 928 F.2d 1006 (11th Cir. 1991)... . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Darden v. Wainwright*, 477 U.S. 168 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . 2, 3, 177

*Deck v. Missouri*, 544 U.S. 622 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . 131

*Drope v. Missouri*, 420 U.S. 162 (1975)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

*Duckett v. Mullin*, F.3d 982 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*English v. Romanowski*, 589 F. Supp. 2d 873 (E.D. Mich. 2008)... . . . . . . . . . . . . . . . . . . 178

*Evittts v. Lucey*, 469 U.S. 387 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Fero v. Kerby*, 39 F.3d 1462 (10th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Fontaine v. United States*, 411 U.S. 213 (1973)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Foster v. Ward*, 182 F.3d 1177 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Franklin v. Lynaugh*, 487 U.S. 164 (1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

*Franks v. Delaware*, 438 U.S. 154 (1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . 123

*Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836 (10th Cir. 2005)... . . . . . . . . . . . . 181

*Giglio v. United States*, 405 U.S. 150 (1972)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 137

*Giles v. Maryland*, 386 U.S. 66 (1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Graham v. Florida, --*, U.S. -- 230 S. Ct. 2011 (2010)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Greer v. Miller*, 483 U.S. 756 (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*Gregg v. Georgia*, 428 U.S. 153 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Greico v. Meachum*, 553 F.2d 713 (1st Cir. 1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . 30, 91, 103

*Herrera-Castillo v. Holder*, 573 F.3d 1004 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . 181

*Hill v. Bank of Colorado*, 648 F.2d 1282 (10th Cir. 1981)... . . . . . . . . . . . . . . . . . . . . . . . . . 183

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . 164, 173, 174

*Holbrook v. Flynn*, 475 U.S. 560 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Hopkins v. Reeves*, 524 U.S. 88 (1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 170

*Hopper v. Evans*, 456 U.S. 605 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Jacobs v. Horn*, 395 F.3d 92 (3rd Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Jones v. Barnes*, 463 U.S. 745 (1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 191

*Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 107, 123

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kyles v. Whitley*, 514 U.S. 419 (1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 128, 140

*Le v. Mullin*, F.3d 1002 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003).... . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Massaro v. United States*, 538 U.S. 500 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . 141, 156, 157

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Mayle v. Felix*, 545 U.S. 644 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*McGahee  v. United States*, 520 F. Supp. 2d 723 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . passim

*Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Napue v. Illinois*, 360 U.S. 254 (1959)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248 (10th Cir.2001)... . . . . . . . . . . . . . . . . . . . . . . . 182

*Oregon v. Guzek*, 546 U.S. 517 (2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

*Osborn v. Shillinger*, 861 F.2d 612 (10th Cir. 1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

x

*Panetti v. Quarterman*, 551 U.S. 930 (2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Parker v. Dugger*, 498 U.S. 308 (1991)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 182

*Peltier v. Booker*, 348 F.3d 888 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Penry v. Johnson*, 532 U.S. 782 (2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Penry v. Lynaugh*, 492 U.S. 302 (1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 185

*Phaneuf v. Franklin*, 448 F.3d 591 (2nd Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*Phillips v. Workman,* ___F.3d___, No. 08-7043 (10th Cir. May 12, 2010)
(slip op. at 29-30)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Pillette v. Berghois*, 630 F. Supp. 2d 791 (E.D. Mich. 2009)... . . . . . . . . . . . . . . . 29, 32, 39, 178

*Porter v. McCollum*, 130 S. Ct. 447 (2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Rhoades v. Arave,* 2007 WL 1550441 (D. Id. May 24, 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Richards v. Quarterman*, 578 F. Supp. 2d 849 (N.D. Tex. 2008),
*aff'd* 566 F.3d 553 (5th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 99

*Ring v. Arizona*, 536 U.S. 584 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Romano v. Oklahoma*, 512 U.S. 1, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994)... . . . . . . . . . . . . . 147

*Rompilla v. Beard*, 545 U.S. 374 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Roper v. Simmons*, 534 U.S. 304 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*Saranchek v. Beard*, 538 F. Supp. 2d 847 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Shabazz v. Artuz*, 336 F.3d 154 (2nd Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 137

*Simmons v. South Carolina*, 512 U.S. 154 (1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Skipper v. South Carolina*, 476 U.S. 1 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Smith v. Massey*, 235 F.3d 1259 (10th Cir.2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 105, 112

*Smith v. Murray*, 477 U.S. 527 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 191

*Smith v. Robbins*, 528 U.S. 259 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Soffar v. Dretke*, 368 F.3d 441 *amended,* 391 F.3d 703 (5th Cir. 2004)... . . . . . . . . . . . . . 20, 100

*Solesbee v. Balkcom*, 339 U.S. 9, 70 S. Ct. 457, 94 L. Ed. 604 (1950)... . . . . . . . . . . . . . . . . 162

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Stone v. Powell*, 428 U.S. 165 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 122, 123, 124

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Strickland v. Washington*, 466 U.S. 668 (1984)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Strickler v. Greene*, 527 U.S. 263 (1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Stringer v. Black*, 503 U.S. 222 (1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

*Town v. Smith*, 395 F.3d 251 (6th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Thomas v. Horn*, 570 F.3d 105 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)... . . . . . . . . . . . . . . . . . . . . . . . . 122, 128

xii

*United States v. Bagley*, 473 U.S. 667 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*United States v. Banks*, 451 F.3d 721 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*United States v. Barrett*, 496 F.2d 1079 (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Beckford*, 916 F. Supp. 1415 (E.D. Va. 1997)... . . . . . . . . . . . . . . . . . . . passim

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Bolden*, 335 F.2d 453 (7th Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Bowie*, 392 F.3d 1494 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . 45, 140

*United States v. Challoner, *, 583 F.3d 745 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Chandler*, 218 F.3d 1305 (11th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000)... . . . . . . . . . . . 165, 166, 170, 173

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . 8, 62, 63, 191

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . . 123, 191, 192

*United States v. Davis*, 132 F. Supp. 2d 955 (E.D. La. 2001)... . . . . . . . . . . . . . . . . . . . . 176, 177

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Dawkins*, 17 F.3d 399 (D.C. Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. (Edward) Fields*, 516 F.3d 923 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . 183, 185

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . 36, 40, 56

xiii

*United States v. Evans*, 224 F.3d 670 (7th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Foree*, 43 F.2d 1572 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Frady*, 456 U.S.152 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. French*, 556 F.3d 1091 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Fuller*, 938 F. Supp. 731 (D. Kan. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Hill*, 799 F. Supp. 86 (D. Kan. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . 130, 133

*United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004)... . . . . . . . . . . . . . . . 176, 177

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . 175, 176, 177

*United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005)... . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Lafayette*, 983 F.2d 1102 (D.C. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. McVeigh*, 153 F.3d 1166 (10th  Cir. 1998)... . . . . . . . . . . . . . . . . . 164, 170, 171

*United States v. Miller*, 753 F.2d 1475 (9th Cir. 1985)... . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Miller*, 907 F.2d 994 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Nicholson*, 983 F.2d 983 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Oliver*, 278 F.3d 1035 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Owens*, 882 F.2d 1493 (10th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Quintinella*, 193 F.3d 1139 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . 128

xiv

*United States v. Reddick*, 90 F.3d 1276 (7th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . 60

*United States v. Scafe*, 822 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*United States v. Scheer*, 168 F.3d 445 (11th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*United States v. Serawop*, 410 F.3d 656 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . 172, 173

*United States v. (Sherman) Fields*, 483 F.3d 313 (5th Cir. 2007)... . . . . . . . . . . . . . . 183, 184, 185

*United States v. Sinclair*, 109 F.3d 1527 (10th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*United States v. Smith*, 692 F.2d 658 (10th Cir. 1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Sorrells*, 714 F.2d 1522 (11th Cir. 1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Soundingsides*, 820 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . 167

*United States v. Thomas*, 221 F.3d 430 (3rd Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 56

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 167

*United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Vigeant,* 176 F.3d 565 (1st Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Visinaiz*, 428 F.3d 1300 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . 66, 68

*United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Durham*, 287 F.3d 1297 (11th Cir 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Gutierrez*, 839 F.2d 648 (10th Cir 1988)... . . . . . . . . . . . . . . . . . . . . . . . . 159, 160

*United States v. Rivas*, 862 F. Supp. 208 (N.D. Ill 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Walker v. Gibson*, 228 F.3d 1217 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . 160, 161, 191

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Weems v. United States*, 217 U.S. 349 (1910)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Wiggins v. Smith*, 539 U.S. 510 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Williams v. Taylor*, 529 U.S. 362 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wood v. Georgia*, 450 U.S. 261 (1981)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Woodward v. Williams*, 263 F.3d 1135 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . 20, 29, 178, 29

*Young v. Sirmons*, 551 F.3d 942 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**STATE CASES**

*Frederick v. State*, 902 P.2d 1092 (Okl. Cr. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 188

*State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woldt v. People*, 64 P.3d 256 (Colo. 2003)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woodruff v. State*, 825 P.2d 273 (Okl. Cr. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**DOCKETED CASES**

*State of Oklahoma v. John Joseph Romano and David Wayne Woodruff*, Oklahoma County
Case No. CRF-86-3920... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**FEDERAL STATUTES**

21 U.S.C. § 848(e)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21 U.S.C. § 848... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

18 U.S.C. § 1111... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165, 166

18 U.S.C. § 1112... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167, 196

18 U.S.C. § 1114... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

28 U.S.C. § 2255(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 76, 159, 160

18 U.S.C. § 2332... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

18 U.S.C. § 3432... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 25, 141

18 U.S.C. § 3592(a)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

18 U.S.C. § 924(c)(1)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 165, 167

Fed R. Civ. P. 15(c)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Crim. P. 33... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Fed. R. Evid. 403... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Fed. R. Evid. 404(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 140

Fed. R. Evid. 608(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 702... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 801(2)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 81, 169

U.S. Const. amend. V... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**MISCELLANEOUS**

*Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,*
98 Colum. L. Rev. 1538 (1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Pursuant to Rule 5(d) of the Rules Governing Section 2255 Proceedings, Kenneth Barrett files this, his Reply to the Government's Response to his Motion to Vacate His Conviction and Sentence.

## I.   INTRODUCTION

As noted above, Mr. Barrett's Reply is filed pursuant to Rule 5 of the Rules Governing § 2255 Proceedings, which provides "[t]he moving party may submit a reply to the respondent's answer or other pleading within a time fixed by the judge." Rule 5(d), Rules Governing § 2255 Proceedings. The rule uses the word "reply" rather than "terms such as 'traverse[.]'" Commentary, Rule 5, 2004 Amendments. The Committee Notes further explain that "[t] here is nothing in § 2255 which corresponds to the § 2248 requirement of a traverse to the answer." *Id.* As also set out in the Notes, "numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held." Rule 5, Advisory Committee Notes (citations omitted).

Mr. Barrett's § 2255 Motion raises numerous disputed issues of fact, many of which are made more apparent by the Government's response. He is entitled to a hearing on all of the grounds alleged. Any failure to specifically reply concerning a ground raised in Mr. Barrett's Motion and supporting brief [1], or any fact or argument within any ground in this reply, is not intended, nor shall it be construed, as an admission of any argument or assertion by the

---

[1]Mr. Barrett specifically stands on his Motion and supporting brief without further reply concerning the following grounds: Ground 2(A)(14) (Doc 95 at 178; Doc 149 at 100 ["Ground 2, Part A (13)]); Ground 6 (Doc 95 at 322, Doc 149 at 175); Ground 11 (Doc 95 at 345; Doc 149 at 202); Ground 13 (Doc 95 at 211; Doc 149 at 357); Ground 14 (Doc 95 at 357; Doc 149 at 211); Ground 15 (Doc 95 at 373; Doc 149 at 224); Ground 16 (Doc 95 at 376; Doc 149 at 226); Ground 19 (Doc 95 at 394; Doc 149 at 245).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    1                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

Government or an abandonment of any ground of error set out in the Motion to Vacate and Supporting Brief or argument or fact therein.

## II.     ARGUMENT

### GROUND 1:  THE TRIAL COURT UNCONSTITUTIONALLY INTERFERED WITH MR. BARRETT'S DEFENSE AND ENGAGED IN IMPROPER *EX PARTE* CONTACT WITH THE GOVERNMENT.

Ground 1 of the Second Amended Motion and the supporting brief set out factual and legal bases for the Court to hold that the trial court unconstitutionally interfered with the defense. The interference occurred through a variety of actions including (a) misuse of the Court's administrative responsibilities under the Criminal Justice Act to discourage expert assistance and reward a willingness to forego assistance; (b) ignoring evidence that lead counsel – hand picked by the trial judge – was neglecting work on the case, then giving that lawyer a raise; (c) engaging in improper *ex parte* communications with prosecutors; (d) misrepresenting the nature and content of those *ex parte* communications; and (e) withholding ruling on a meritless Government motion knowing that prosecutors were using the outstanding motion to gain leverage against the defense.

The Government contends issues related to CJA funds are not cognizable, even on appeal, citing *United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992).  Doc 175 at 17-18.  This is a gross misrepresentation of the law and Mr. Barrett's claim.  *Davis* and the other cases cited in the Response stated that "[f]ee determinations by the district judge pursuant to the Criminal Justice Act are administrative in character and *do not constitute final appealable orders* within

the meaning of 28 U.S.C. § 1291."[2]  *Davis*, 953 F.3d at 1497 n.21 (emphasis added).  As Mr.

Barrett is not seeking review of the trial court's funding decisions as such, *Davis* and the other

cases the Government relies upon are inapposite.

The Government's claim that Mr. Barrett makes no attempt to show he was denied

resources necessary to the defense is false.  Mr. Barrett makes that showing in Ground 3, and

refers thereto in Ground 1.  2nd Amend. § Mot. (Doc 95) at 7, 14-15.  Moreover, the facts here

are not disputed by trial counsel.  For example, in Ground 1, Mr. Barrett specifically relied upon

the declaration of Dr. Jeanne Russell in which she states that trial counsel Bret Smith told her the

defense would not be able to conduct a comprehensive mitigation investigation because the

Court would not fund it.  *See* Discussion in Merits Brief (Doc 149) at 27-28.  The declarations of

Mr. Hilfiger and Mr. Smith that are attached to the Response specifically state that trial counsel

have reviewed Dr. Russell's declaration.  Resp. Exh. 11 at ¶¶ 8-9; Resp. Exh. 12 at ¶¶ 10-11.

They do not dispute her account of counsel's thinking at the time.

The Government wholly ignores the constitutional law underlying Mr. Barrett's claim.

The sleight of hand at work in the Government's citations to *Davis* is significant for what the

Response does not say.  Rule 5 of the Rules Governing Section 2255 Proceedings provides that

an "answer *must* address the allegations in the motion."  (Emphasis added.)  Ground 1 alleges the

trial court abused its administrative role under the Criminal Justice Act to interfere with the

constitutionally protected independence of counsel.  Contrary to the Government's assertion that

Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses lead

---

[2]  As the Court of Appeals later said, this quotation from *Davis* was dicta.  It was adopted as law in *United States v. French*, 556 F.3d 1091, 1094 (10th Cir. 2009).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    3                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized, unreasonably limited as they were.

The Government fails to respond to the facts and the law.  Mr. Hilfiger specifically addresses his failure to retain the reconstruction expert authorized by the Court, Resp. Exh. 12 at ¶ 13, which is another example Mr. Barrett gave of interference.  Doc 149 at 26.  Yet neither counsel dispute Mr. Barrett's contention that the Court misused its administrative authority to create a disincentive for defense counsel to retain experts and investigators.  Trial counsel's silence on these issues, in declarations prepared and filed by the Government, should be treated as adoptive admissions.  Fed. R. Evid. 801(2).  Surely, if Mr. Hilfiger or Mr. Smith did not perceive the trial judge's actions as creating a disincentive to expend resources they would have said so, particularly as they are quoted in declarations saying the opposite.

While the Government cites the trial judge's projection regarding whether his misrepresentation of the *ex parte* hearing, and his withholding ruling on the prosecution's motion for a protective order, influenced defense counsel, (Doc 175 at 23-24), the Government fails to submit any corroboration from defense counsel themselves.  On the contrary, Mr. Hilfiger states that the Government's "method of investigation thwarted the defense investigation of the truthfulness of [the snitches] at trial."  Resp. Exh. 12 at ¶ 14.  Mr. Hilfiger "believed that the witnesses could be effectively impeached with evidence of their prior convictions and agreements with the Government for leniency."  *Ibid.*

Mr. Hilfiger previously told appellate counsel Mark Henricksen that his ability to investigate the snitches' prior convictions and offers of leniency was curtailed by the short time

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                4                *Barrett v. U.S.*, 6:09-cv-00105-JHP

before trial.  Exh. 29 at 4, Amended Motion.  Mr. Hilfiger said he did not seek a continuance in part because "he did not want to antagonize the judge," and in part because "he believed that no continuance was possible due to Judge Payne's desire to stay on schedule." *Ibid.*  Mr. Hilfiger also told Mr. Henricksen that he compromised on the snitches because he believed that was better than nothing.  *Id.* at 4-5.  The matter Judge Payne failed to reveal to Mr. Hilfiger on September 13, 2005 included his belief that a request for a continuance would have merit, and the prosecution's motion – the source of Mr. Hilfiger's concern that he had to compromise or get "nothing" – had no merit.

Under these circumstances, if the Government could respond to these allegations, as Rule 5 requires, it would have done so.  The Government's failure to proffer any refutation of the evidence, particularly after this Court granted Mr. Barrett's request to expand the record with Mr. Henricksen's declaration, should be taken as an adoptive admission.  The only factual basis now before the Court as grounds for denying relief on Ground 1 is the self-serving factual averment of the very judge who, it is conceded, was acting in his administrative capacity, and who caused the constitutional violation.

The facts show that the manner in which the Court administered funding in this case is virtually unprecedented in the annals of federal capital prosecutions.  These funding decisions prejudicially impacted the quality of Mr. Barrett's defense in the retention of necessary experts and other tools required for an adequate defense.  The Court's active and repeated interference in the defense constitutes structural error even without a showing of prejudice, but even if this were not so, Mr. Barrett has demonstrated prejudice.

The Government fares no better with its defense of the Court's *ex parte* hearing with the prosecutors on September 13, 2005.  Doc 175 at 21-24.  The Government states that the Court had no alternative but to hold an *ex parte* hearing when the prosecutors brought to its attention that they feared for witnesses safety.  However, because the Court found at the hearing that: 1) the prosecution's motion could have been filed much earlier and was dilatory; and 2) that the prosecution had produced no evidence to support its concerns, only naked speculation that the witnesses might have had some general, inchoate, and unsupported "fear," there was no reason to take the matter "under advisement" and shield what had been discussed from the defense.  Tr. Hr'g 9/13/05 at 2-4, 7, 12, 19-20, 21.

In other words, there was no basis for a sealing order, and the matters discussed *ex parte* should have been revealed to the defense.  Since the matter improperly remained sealed and there was no basis to take it "under advisement," the defense was never made privy -- as it should have been -- to the Court's concern that the trial had already started for purposes of 18 U.S.C. § 3432, that there was no showing of danger to witnesses, and, in light of the importance of the informant witnesses to the prosecution's case, a continuance would likely be reasonable and necessary for the defense to properly investigate.  Failing to reveal these matters permitted the prosecution to thrust on the defense the untenable "arrangement" for witness "interviews" that never took place, except in one instance, and that was under supervision of the Government.  As shown in Ground 2(5), the improper failure to unseal the earlier portion of the September 13 hearing so the defense could have learned that the security concerns were groundless and the Court itself believed a continuance was appropriate contributed directly to counsel's ineffectiveness in investigating and challenging the informant witnesses.  While the Government contends that Mr. Barrett merely

recites "aspirational" ABA standards showing the Court's conduct was improper (Doc 175 at 22), this is simply not true. There can be no question that the *ex parte* hearing in this case was improper, prejudiced the defense, and permitted the Government to secure an unfair tactical advantage. *E.g., Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States,* 585 F.2d 254, 263 (7th Cir. 1978); *Greico v. Meachum,* 553 F.2d 713, 719 (1st Cir. 1976) (*ex parte* hearing was prejudicial to one of the parties).

In addition to its procedural bar argument, the Government contends that this issue is foreclosed from consideration in these proceedings because the Tenth Circuit ruled that the prosecutors had complied with the 3-day notice requirement of 18 U.S.C. § 3432. *United States v. Barrett,* 496 F.3d 1079, 1115-16 (10th Cir. 2007). But the appellate court had no opportunity to consider this issue in its proper context, because appellate counsel was ineffective in failing to raise the issue. The Government is correct that since the issue is framed by the record that was available to counsel on direct appeal, it would ordinarily be forfeited in collateral proceedings. However, as lead appellate counsel candidly admits, he negligently overlooked this meritorious issue, and had no strategic reason for doing so. Exhibit 29, Amended Motion. Had the issue of the improper *ex parte* hearing and its prejudicial impact been drawn to the attention of the Court on direct appeal, there is a reasonable probability, sufficient to undermine confidence in the outcome of the appeal, that the result would have been different. *E.g., Strickland v. Washington,* 688 U.S. 668, 684, 696-97 (1984); *Neill v. Gibson,* 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001) ("reasonable probability" standard governing assessment of prejudice under *Strickland* standard applies to evaluation of ineffective assistance of appellate counsel claims; *Neill* specifically disavowed the "dead bang winner" standard erroneously invoked in *United States v. Challoner,*

583 F.3d 745, 749 (10th Cir. 2009), which the Government cites at various points of its Response; *Challoner* relied on *United States v. Cook,* 45 F.3d 388, 395 (10th Cir. 1995), which the *Neill* Court specifically discussed and disavowed). *See also,* reply to Ground 18.

**GROUND 2: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH STAGES OF THE TRIAL.**

### A.      Introduction.

Before addressing specifically the Government's arguments with respect to each sub-claim of ineffective assistance of trial counsel, it is important to note at the outset that Respondent filters its contentions through flawed and improper frameworks.

The Government incorrectly analyzes the claim as a whole by arguing that in order to prevail, Mr. Barrett must show prejudice under *Strickland v. Washington,* 466 U.S. 668, 684-88 (1984) with respect to each sub-claim of ineffective assistance. This is manifestly incorrect. Where a number of claims of ineffective assistance are raised, a reviewing Court must determine prejudice collectively, or in the aggregate. *Fisher v. Gibson,* 282 F.3d 1283, 1289 (10th Cir. 2002); *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999); *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir. 1988). While it is certainly true that a single professionally unreasonable error or omission on the part of counsel could in and of itself warrant a finding of ineffectiveness, where, as here, numerous sub-claims of ineffective assistance are raised, their combined impact, or combined prejudice, must be examined. And, Mr. Barrett has shown that several individual errors on the part of counsel by themselves warrant relief.

Throughout, the Government repeatedly invokes the phrase "reasonable likelihood" of a different outcome as a substitute for *Strickland's* prejudice test. It is also claimed that in

assessing prejudice, the test is more strict than that for judging whether a constitutional error is harmless. The *Chapman* harmless error test requires a reviewing Court to determine whether an error of constitutional dimension is harmless beyond a reasonable doubt. But, properly stated and understood, the prejudice prong of *Strickland* is not as onerous as the incorrect "reasonable likelihood" standard cited by the Government, and is in fact no more exacting than the *Chapman* harmless error test. A defendant claiming ineffective assistance of counsel must show that, but for counsel's unprofessional errors or omissions, there is a "reasonable probability" that the trial outcome would have been different. A reasonable probability of a different outcome does not mean "more probable or likely than not," as the Government's misleading invocation of the non-existent "reasonable likelihood" standard implies. A "reasonable probability" of a different outcome is one that simply undermines confidence in the trial verdict, and is less than a preponderance of the evidence. *Strickland,* 466 U.S. at 693-94; *Stouffer v. Reynolds,* 214 F.3d 1231, 1234-35 (10th Cir. 2000) (*Stoffer II)*; *Miller v. Anderson,* 255 F.3d 455, 459 (7th Cir. 2001).

### 1.    Trial counsel operated under a conflict of interest.

The Government argues Mr. Barrett makes a conclusory and undeveloped claim that trial counsel operated under a conflict of interest detrimental to Mr. Barrett's defense because of the trial court's funding decisions, and counsel's evident unwillingness to "rock the boat" by seeking necessary and proper funding for defense services according to prevailing professional norms. It is argued that Mr. Barrett fails to establish a nexus between the Court's funding decisions and counsel's actions, or inaction, and that Movant has failed to show how counsel's actions with respect to funding prejudiced him. Similarly, the Government urges that the Court's funding

decisions did not create an incentive for trial counsel to save the Court money at the expense of Mr. Barrett's defense.  No such conflicting loyalties existed because, according to Respondent, the Court encouraged counsel to seek additional funding if they deemed it necessary.  Doc 175 at 25-27.

In Ground 1 and throughout Ground 2, Mr. Barrett showed that the Court's funding decisions indeed did create a conflict between counsel and Mr. Barrett, which resulted in prejudice to Mr. Barrett; the claim is not undeveloped.  Mr. Echols aggressively pursued sufficient funding to retain needed experts and investigators, and got little more than trouble and rock-bottom approvals for funding for his efforts.  Exh. 34, Declaration of John Echols; Exh. 64, letter from the Court to Mr. Echols; Exh. 65, response letter from Mr. Echols to the Court, Exh. 118, Declaration of Richard Burr, Amended Motion. Once Mr. Echols was off the case, counsel never challenged the inadequate funding that had been approved, never sought more funding, and, with respect to a crime scene reconstructionist, a mitigation specialist, and assistance from an *appropriate* mental health professional or professionals, did virtually nothing.  Counsel simply acquiesced in the unreasonable conditions imposed by the Court for Mr. Barrett's representation.  The Court wanted to use Mr. Barrett's case as a test case for a capital bar in the Eastern District (Exhs. 54, Declaration of Susan Otto; Exh. 67, Declaration of Julia O'Connell) rather than seeking the most suitable counsel for Mr. Barrett, and trial counsel were evidently part of this experiment.  Mr. Hilfiger received a raise after he was elevated to lead counsel.  All this demonstrates, contrary to the Government's argument, that there were indeed financial and other incentives for counsel to do it the Court's way, rather than seeking the resources to properly and zealously represent Mr. Barrett. *Cuyler v. Sullivan,* 446 U.S. 335, 349 (1980); *Wood v.*

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    10                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

*Georgia,* 450 U.S. 261, 271 (1981); *United States v. Bowie,* 392 F.3d 1494, 1500 (10th Cir.

1990).

> **2.** **Counsel were professionally unreasonable and ineffective in failing to properly re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate counsel were ineffective for failing to raise the issue, to the extent it was framed by the record, on direct appeal.**

Respondent argues trial counsel were not ineffective due to the manner in which

they raised a mid-trial motion to suppress the evidence seized in the search of Mr. Barrett's home

and property under *Franks v. Delaware,* 438 U.S. 154 (1978).  According to the Government,

even if trial counsel had raised all the arguments in support of the motion based on Charles

Sanders's trial testimony, which, as Movant has shown, conflicted sharply with virtually all the

information he supposedly supplied Clint Johnson in support of the warrant affidavit, it would

have made no difference.  In denying the motion, the Court properly focused on the honesty of

the affiant (Johnson), not the honesty or credibility of the informant (Sanders).  The Government

argues that simply because Johnson stated in the search warrant affidavit that Sanders had given

"reliable" information in the past, Johnson had a "good faith" basis for crediting this information,

and that Johnson's "good faith reliance" on Sanders is unassailable under *Franks*.  Doc 175 at

27-28, 30.

If this were the law, *Franks* would collapse on itself.  Essentially, the Government  argues

that so long as the affiant simply states he has a good-faith belief in the source's information

based on a naked statement that the informant has provided reliable information in the past, a

warrant is immune to attack under *Franks*.  According to the Government, this is true regardless

of whether the surrounding facts actually support such a belief, and regardless of what is actually

contained in or omitted from a warrant affidavit.  It is also true regardless of the honesty of the informant.  In support of its argument that the Court here rightly focused on the truthfulness of the affiant rather than the informant, the Government cites *United States v. Tisdale,* 248 F.3d 964, 973-74 (10th Cir. 2001), but this case nowhere supports the broad claim made by the Government, which is unsupported by the law in any event.  Doc 175 at 27.  In *Tisdale*, the Court was not even dealing with information from a confidential informant to provide the basis for probable cause, but a citizen witness who was at the scene of a fatal shooting and the defendant himself, who had been shot.  Any alleged omission of facts in the warrant affidavit was inadvertent and immaterial, and based on what the affiant learned at the scene of the shooting, it was reasonable to conclude that probable cause had been established for the search of an automobile.  *Tisdale* does not state that an informant's reliability, and information concerning the informant's reliability (if any) communicated to the magistrate is "irrelevant" under *Franks*.  There was no such issue in the case.

The Government simply ignores the cases cited by Mr. Barrett which show that in assessing probable cause, the believability of a confidential informant, and the extent to which the information has been corroborated, is critical.  *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994); *Phaneuf v. Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006).  Likewise, the Government ignores that information bearing on a confidential informant's believability -- such as motive (escaping their own troubles with the law), criminal record, drug use, and continuing criminal activities --  if deliberately or recklessly misstated or omitted from a warrant affidavit, which is exactly what happened here with Johnson's affidavit -- supports a *Franks* motion.  *United States v. Vigeant,*

176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983).  An unsupported conclusion that the informant has given reliable information in the past, such as occurred here, not only fails to shield a warrant from an attack under *Franks*, but is virtually meaningless.  *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Foree,* 43 F.2d 1572, 1575-76 (11th Cir. 1995); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985).

Not only were trial counsel ineffective for failing to raise all the many contradictions between Sanders's trial testimony and the information contained in the warrant affidavit as a basis for the *Franks* motion, they were also ineffective for failing to argue that Johnson deliberately or recklessly omitted from the warrant affidavit any and all information bearing on Sanders's motives and credibility as a whole -- the many favors he had received for his informant work, his lengthy and continuing criminal history, including crimes of dishonesty, and his ongoing drug use.  Similarly, counsel failed to argue that in this context, Johnson's statement that the C.I. was "reliable" carried no weight and that it was dishonestly and recklessly made. Counsel also failed to point out, because they had not sufficiently researched Sanders's criminal history, that Johnson gave false testimony before the magistrate judge as to whether Sanders's had a prior record for drug distribution or delivery.  The totality of the facts and circumstances establishes that Johnson in no sense could place "good-faith" reliance on Sanders.

The Government argues in the alternative that "even if" Sanders's honesty or believability could form the basis for a *Franks* challenge, the contradictions and denials of the information contained in the warrant affidavit established by Sanders's trial testimony were insignificant, and could be chalked up to a faded memory.  Regardless, according to the Government, nothing in

Sanders's trial testimony showed that Johnson had any reason to doubt his supposed information at the time the warrant was secured. Doc 175 at 28-30.

These arguments fail. The Government glosses over the numerous material contradictions between Sanders's testimony and the information contained in the search warrant affidavit, which were unreasonably overlooked by defense counsel in making the mid-trial *Franks* challenge. Doc 175 at 29-30. There is no need to repeat here the laundry list of contradictions, which were outlined in Mr. Barrett's Amended Motion. Doc 96 at 34-47; Doc 149 at 39-43. Suffice it to say, the contradictions which emerged between the information alleged in the warrant affidavit and Sanders's trial testimony undermined the entire factual basis for the affidavit, showing both that Sanders was a thoroughly unreliable source who would lie at the drop of a hat for his own self-serving purposes, and that any honest and reasonable law enforcement officer would have no reason to use anything he had to say as the foundation for a search warrant. The numerous and material contradictions between the information contained in the warrant affidavit and Sanders's testimony speak not to a "faded memory," but show he is a pathological liar who has not even a passing acquaintance with the truth. On this record, it is absurd to assert that Sanders's trial testimony does nothing to "undermine" Johnson's belief in him. In his trial testimony, Sanders repudiated virtually the entire factual basis for the warrant affidavit.

Finally, the Government dismisses as unimportant "dicta" the trial court's ruling that the inadequately urged *Franks* motion was without merit because, some six years after the fact, the Government's other informant witnesses "corroborated" Sanders. Doc 175 at 30. Contrary to

the Government's claim, Movant is not "speculating" that this was a basis for the Court's ruling; it is stated in the order itself as one reason for denying the motion.

Respondent argues that appellate counsel were not ineffective for failing to raise the *Franks* issue, to the extent it was framed by the record, because the issue lacks merit. But the record shows that it is reasonably probable the outcome of the appeal would have been different had the issue been raised, even based on what was apparent on the record. At the very least, it is reasonably probable that the matter would have been remanded for a proper *Franks* hearing. *Strickland v. Washington,* 466 U.S. 668, 684, 696-97 (1984); *See* Ground 18 and reply to Government's arguments respecting Ground 18.

> **3.      Counsel were professionally unreasonable and ineffective for failing to investigate and introduce evidence of Mr. Barrett's diminished mental capacity in the guilt/innocence stage of trial.**

The Government argues that trial counsel did not render deficient performance to Mr. Barrett's prejudice when they failed to investigate and present evidence of Mr. Barrett's mental illnesses in support of a diminished capacity defense, *i.e.,* that Movant lacked the intent to commit the offenses charged, or in support of a lesser included offense instruction. Doc 175 at 32. It is alleged that counsel had no reasonable duty to investigate, because they were unaware of Mr. Barrett's mental problems and had no reason to be aware of them. Doc 175 at 32-33; Resp. Exhs. 11, 12. The Government also argues that anything that could have been discovered about Mr. Barrett's mental state would have been irrelevant to the intent elements of the charges in the

superseding indictment.  Doc 175 at 35-36.  Being unsupported by both the facts and the law, these arguments should be rejected.[3]

### a.      Deficient performance.

Just as it does in connection with counsel's duties to investigate mitigating evidence, the Government badly misstates counsel's responsibilities to investigate Mr. Barrett's mental state in aid of the first stage defense.  As it does throughout its response, the Government falsely asserts that counsel's investigative duties extend only to the information provided by the client, and their observations of him.  The Government argues that because Mr. Barrett appeared to counsel not to have mental problems, there was no duty to delve into this area.

There is no support for this argument.  For one, as is also discussed in the reply to the Government's arguments on penalty phase ineffectiveness, competent counsel in a capital case would never simply rely on what the client tells them, or their observations of the client, to assess the defendant's mental health.  *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008); ABA Guidelines, 10.7, 10.10.1, and 10.11.  As it also does in its discussion of second stage ineffectiveness, the Government invokes Dr. Woods's observation that at first blush, Mr. Barrett evinces no obvious outward signs of mental illness.  Doc 175 at 35.  This simply underscores Mr.

---

[3] The Government's argument that there were no lesser included offenses to the charges in the superseding indictment will be deferred to Mr. Barrett's reply to the Government's arguments against Ground 9.  Mr. Barrett showed in Ground 9, and shows below, that constitutional error was committed when the Court failed to instruct on voluntary manslaughter as a lesser offense to each of the three charges faced by Mr. Barrett.  That being the case, the failure to investigate and present evidence of Movant's mental state to negate the intent requirements for the crimes charged, in connection with the request (made both by the prosecution and the defense) for a voluntary manslaughter instruction, was both professionally unreasonable and prejudicial under *Strickland* and its progeny.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                16                *Barrett v. U.S.*, 6:09-cv-00105-JHP

Barrett's point: appearances mean nothing and counsel must *investigate*.  *McGahee v. United States,* 570 F.Supp.2d 723 (E.D. Pa. 2008) (to investigate means to delve into areas at present unknown).

As Mr. Barrett reiterates later in his discussion of penalty phase ineffectiveness, the claim that counsel were unaware of a need to investigate Mr. Barrett's mental health is flatly belied by the record.  The Government baldly ignores the facts.

Mr. Echols and Mr. Hilfiger requested expert psychiatric and psychological assistance, stating it was necessary to investigate the effects on Mr. Barrett of a life and death situation to support the defense that Mr. Barrett was unaware the police were on his property when he fired the shots ("the psychology of individual responses to sudden life or death situations ...is essential to Mr. Barrett's capital defense, which hinges on an understanding of the human mind's response...[and] will negate the Government's allegations of premeditation and malice aforethought relating to capital punishment."  Messrs. Echols and Hilfiger also requested the assistance of a neuropsychologist.  Doc 46 at 5; Doc 50 at 5-6, 8.  Mr. Hilfiger, based on the requests for expert assistance, has thus already acknowledged that this type of investigation and assistance was required to counter the Government's theory of the case -- that Mr. Barrett was expecting a police raid and was ready to repel it with deadly force.  This alone disproves the Government's claim that counsel were defensibly ignorant.

As it does in its second stage ineffectiveness argument, the Government dismisses Mr. Barrett's medical records as showing only that he was an ill-tempered drug addict Doc 175 at 34.  The facts are otherwise.  These records, which were in counsel's actual or constructive possession,  put counsel on full notice that Mr. Barrett suffered from mental illness.  Given the

facts of the case and the planned defense, an investigation and the development of evidence of mental impairments was crucial. Even Mr. Barrett's use of methamphetamine put counsel on notice of mental or emotional problems, due to the well-known effects of the drug on the brain. The fact that Movant had attempted suicide by shooting himself in the chest with a shotgun and was, after recovery in the hospital, committed to the state mental facility in Vinita was more than a red flag. Counsel were certainly aware of this or were on notice of it, since the records had been acquired by previous defense counsel. The medical records show Mr. Barrett had been diagnosed variously with Major Depression, Bipolar Disorder, and had been medicated with anti-psychotic drugs, which were prescribed for future use. Exh. 147 A-F, Amended Motion. It is simply absurd to argue that counsel were legitimately ignorant of Mr. Barrett's mental problems, and had no reason to investigate.

Counsel were also aware of a prior diagnosis highly relevant to the overall defense theory of the case. In their declarations accompanying the Government's response, counsel state that they recall nothing about Dr. Sharp and his report. Resp. Exhs. 11, 12. Dr. Sharp states otherwise. Exh. 55, Amended Motion. Dr. Sharp had examined Mr. Barrett for the defense in connection with the state proceedings. He found Mr. Barrett suffered from serious mental illness Dr. Sharp describes Mr. Barrett as the most paranoid person he had ever examined and concluded there were signs of organic brain damage that a specialist should further investigate. Dr. Sharp's diagnosis of extreme paranoia would have been extremely important to the defense that was offered at trial, as it would tend to negate knowledge and intent for the reasons described in the brief supporting Mr. Barrett's Amended Motion, and briefly below in the discussion of prejudice. Doc 149 at 49, 52. Based on this alone, since Dr. Sharp had examined

Mr. Barrett in relation to the same event that was being prosecuted in federal court, defense counsel were certainly aware or on notice of him and his report.

But there is more.  Counsel were actually aware of Dr. Sharp.  At various points in its response, the Government takes pains to argue that counsel had retained and consulted with Dr. Russell, and that this constituted a sufficient investigation of Mr. Barrett's mental state.[4]  *E.g.*, Doc 175 at 34.  Defense counsel knew about Dr. Sharp because the report written for them by their own expert, Dr. Russell, referenced Dr. Sharp's report explicitly and enumerated the testing instruments he employed.  *See* Docs. 208, 210; Mot. Exh. 56 at 3-4.  Dr. Sharp's diagnosis, particularly combined with all the other facts mentioned above, undoubtedly imposed on defense counsel a duty to investigate.

Defense counsel also failed to investigate Mr. Barrett's mental state with Movant's family members.  Not only would this be a natural first step in any investigation, but it gave "real world" corroboration to medical findings in the records and Dr. Sharp's diagnosis, both of which counsel unreasonably ignored.  The Government, skimming the surface of the family members's declarations, broadly claims that Mr. Barrett's family simply related old information that was irrelevant to his mental state at the time of the offense.  Doc 175 at 33, 34.  This is simply not true.  Even a cursory reading of the declarations, particularly taken together, reveals the history of bizarre and paranoid behavior on Mr. Barrett's part, leading up to and including the time of the fatal incident.  Exhs. 74, 78, 80-81, 85-87, 91, 93, 96-99, 101, 103, Amended Motion.  Yet,

---

[4]  This contention itself lacks persuasive force.  As shown in Mr. Barrett's reply on the issue of second stage ineffectiveness, Dr. Russell, who simply updated the risk assessment she did in state court, and was neither a psychologist nor a neuropsychologist, was not an "appropriate expert" to diagnose the mental problems Mr. Barrett suffers from.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    19                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

counsel never discussed these matters with the witnesses, a number of whom were called in the penalty phase. Exhs. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218.

No legitimate strategy animated counsel's decision not to investigate, since this evidence dovetailed and strengthened the planned defense. In the absence of a competent investigation, no reasoned and informed tactical choice can be made. *E.g., Soffar v. Dretke,* 368 F.3d 441, 474, *amended,* 391 F.3d 703 (5th Cir. 2004); *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir. 1992).

### b.    Prejudice.

Although in assessing prejudice, the Court must accumulate the individual allegations of ineffective assistance, *e.g., Rompilla v. Beard,* 545 U.S. 374, 391-92 (2005); *Stouffer v. Reynolds,* 214 F.3d 1231, 1235 (10th Cir. 1999), it is clear that counsel's failure to investigate and present mental health evidence prejudiced Mr. Barrett in the first stage of trial.

Citing *United States v. Brown,* 326 F.3d 1143, 1147 (10th Cir. 2003), the Government argues that even if counsel performed a professionally inadequate investigation, the omission of the mental health evidence created no *Strickland* prejudice because it would not have negated the intent elements of the offenses, which the Government seemingly analogizes -- incorrectly -- to strict liability offenses. Doc 175 at 35-36. *Brown,* which was not a murder case, excluded psychiatric evidence because there was no "nexus" between the diagnoses of post-traumatic stress disorder and chemical dependence and the intent element of conspiracy to distribute methamphetamine. Instead of being relevant, the evidence proffered in *Brown* would only present a confusing defense more akin to justification than go to negating the intent element of the charged offense (which is completely unlike the intent elements in Mr. Barrett's case).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    20                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

That is not the case here.  Although with respect to count 3 of the superseding indictment (charging violation of 21 U.S.C. § 848(e)(1)(B)) the Government tries to downplay the intent element, emphasizing Mr. Barrett only "should have known" that the persons he was firing on were police officers, the intent required is actually quite specific.  The Government had to prove beyond a reasonable doubt that Mr. Barrett had the specific intent to kill Trooper Eales, knowing or having reason to know that he was a law enforcement officer, and that the killing was committed on account of or during the performance of his official duties.  In other words, Mr. Barrett was alleged to have intended to kill Trooper Eales because he was a law enforcement officer.  Count 2 (charging violation of 18 U.S.C. §924(c)(1)(A) and (j)) also required a specific intent to kill a law enforcement officer.  To be found guilty of count 2, which charged Mr. Barrett with using and carrying a firearm during and in relation to a crime of violence, the Government had to prove beyond a reasonable doubt the underlying crime of violence, *i.e.,* that he intentionally killed "any state or local law enforcement officer engaged in, or on account of such official duties."  Thus, the intent elements of counts 2 and 3 are the same.  To convict, the Government had to prove not only an intentional killing, but that the homicide was deliberately (knew or should have known) committed against a law enforcement officer in the performance of his official duties, or on account of those duties.  *United States v. Barrett,* 496 F.3d 1097, 1112-13 (10th Cir. 2007).  The Government's argument that the intent elements did not turn on Mr. Barrett's knowledge that he was shooting at the police conflicts with the law applicable to his case.

The defense in this case was that when he fired his rifle, Mr. Barrett was unaware that he was shooting at law enforcement, and that the Government could not prove that Mr. Barrett

harbored the intent required.  The defense relied on the circumstances of the police raid -- *e.g.,* the Tact Team entered the property late at night; the fact that the lead vehicle to all appearances was a civilian automobile which the physical evidence showed had run into Mr. Barrett's cabin; questions surrounding the lighting of the other police vehicles; Mr. Barrett's son yelling out a warning -- to argue that Mr. Barrett thought he was being invaded by trespassers rather than the police.  If sufficient doubt could be thrown on the specific intent elements of counts 2 and 3, which hinged on Mr. Barrett's knowledge that the people who had driven onto his property were the police, the Government would not be able to secure convictions.

Contrary to the Government's argument, there is a clear nexus between the intent elements of counts 2 and 3 and the omitted mental illness evidence.  Mr. Barrett's extreme paranoia, flight of ideas, sometimes delusional thinking, and inability to accurately process external stimuli and recognize what is going on around him, all manifestations of his mental illnesses, *went directly to the specific intent elements of counts 2 and 3, which required knowledge and intent to kill not just someone, but a police officer because he was a police officer.*  This evidence would have powerfully supported the defense that was offered at trial, had it been properly investigated and developed.  The upshot of Dr. Woods's diagnoses is that Mr. Barrett's mental illnesses prevented him from recognizing that he was firing at the police rather than in justifiable self-defense, and that he lacked the requisite intent.  Exh. 117, Amended Motion.  Even if it could be said, as the Government suggests, that an expert could not deliver such an opinion because it would invade the province of the jury -- a dubious proposition in any case, in light of FRE 704 -- an expert could testify to his or her diagnoses, their basis, and how Mr. Barrett's mental illnesses affected his perceptions.  Counsel would then be free in closing

argument to draw the inference from this and other testimony that Mr. Barrett lacked the required intent.[5]

This evidence was also relevant to the defense of count 1, which charged Mr. Barrett with violating 18 U.S.C. § 924(c)(1)(A) and (j) by using and carrying a firearm during and in relation to a drug trafficking crime, resulting in death. *United States v. Barrett,* 496 F.3d at 1112-13. To prove Mr. Barrett guilty of this offense, the Government had to establish a nexus between the drug offense and the shooting of Trooper Eales. It is not enough to say that coincidentally or temporally, drug offenses were being committed at the time Trooper Eales was killed. The use of the firearm had to be *in relation to* the drug trafficking crime. This is shown by a case cited by the Government itself in its response to Ground 9 discusses *Beck* error. *United States v. Beckford,* 966 F.Supp. 1415, 1418 (E.D. Va. 1997), *relying on United States v. Tipton,* 90 F.3d 861, 887 (4th Cir. 1996) (proof of temporal connection between homicide and underlying drug trafficking crime will not support conviction under 21 U.S.C. § 848(e)(1)(A), the CCE statute; a substantive connection between the offenses must be shown). If Mr. Barrett fired thinking he was acting in self-defense or defense of his son from illegal intruders, and not the police, his act would have no substantive connection to any drug trafficking crime.

---

[5] The Government elsewhere criticizes the findings of Drs. Woods and Young as being irrelevant to Mr. Barrett's mental state at the time of the shooting. Doc 175 at 121. This argument has no merit. A court determining a post-conviction ineffective assistance claim must take into account evidence developed in the post-conviction proceedings. The diagnoses of Drs. Woods and Young relate back to the time of the offenses. Mr. Barrett cannot be penalized for bringing this evidence forward now, because trial counsel were ineffective for failing to investigate and develop it at the time of trial. *Gray v. Branker,* 529 F.3d at 236-37.

Counsel were ineffective for failing to investigate Mr. Barrett's mental illnesses, which were directly relevant to his trial defense. No reasonable strategy excuses the failure to investigate, and Movant was prejudiced. Ineffective assistance has been found in similar cases involving the failure to investigate mental illnesses similar to those suffered by Mr. Barrett, which aided in establishing a diminished capacity or lack of intent defense. *Jacobs v. Horn,* 395 F.3d 92, 102-07 (3rd Cir. 2005); *Jennings v. Woodford,* 290 F.3d 1006, 1014-19 (9th Cir. 2002), *cert. denied,* 539 U.S. 958 (2003); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999); *Saranchek v. Beard,* 538 F.Supp.2d 847, 863-78 (E.D. Pa. 2008).

The prejudice from counsel's failure to investigate is compounded with other errors and omissions in investigating and developing evidence that would have been supportive of the defense theory, including evidence to impeach the informants, the testimony of eyewitnesses Toby Barrett and Alvin Hahn, and the failure secure proper expert assistance in SWAT tactics and crime scene analysis, all of which, taken together, would have refuted or tended to refute the Government's theory of the case.

### 4. Failure to raise competency issue was constitutionally ineffective assistance of counsel.

The Government's contention that because Mr. Barrett lacked noticeable psychiatric issues his counsel had no notice of his incompetency does not relieve counsel of their duty to know. Doc 175 at 37. When placed in context, the evolving communication actually supports counsel's responsibility to further investigate and litigate Barrett's mental health issues, including the impact that mental health would have on their client's ability to rationally assist in his defense. The mental health history which was known to trial counsel demanded further

inquiry. Beyond that, as noted below, counsel did know that the Court-ordered stun belt which could send electric shock through their previously abused client was likely to interfere in his ability to assist. *See* CR 04-115-P at 6; Tr Hrg at 8/31/05 at 95-96; *see also,* Ground 7 hereinbelow.

The Government's reliance on *Foster v. Ward,* 182 F. 3d 1177, 1186 (10th Cir. 1999) should be noted. In *Foster*, the defendant had a pre-trial competency determination and actually testified at trial, which the Court found was "logical and coherent." 182 F. 3d at 1191. There is nothing in the case which relieves counsel of the obligation to be alert to the mental health concerns of the client but simply finds counsel were not ineffective for failing to request a post-hearing competency exam because the substantive claim to the exam was non-meritorious. *Id.* at 1186. Similarly, in *U.S. v. Rivas*, 862 F. Supp. 208, 212 (N.D. Ill 1994), the Court found only that there was "no evidence that his attorney had reason to question his competence." *Id.* Neither undermines the strength of the claim here.

> **5.   Counsel were ineffective for failing to move for a continuance and for failing to conduct a professionally reasonable investigation which would have led to abundant impeachment evidence of the prosecution's informant witnesses.**

> *a.    Failure to move for a continuance.*

The Government asserts that counsel were not ineffective for failing to move for a continuance after the seven informant witnesses, for which there was no discovery, were sprung on the defense shortly before the commencement of the trial proper. It is maintained there were no grounds for a continuance because the prosecution technically complied with the 3-day notice requirement of 18 U.S.C. § 3432 as determined by the Tenth Circuit on direct appeal; that the

defense reached a reasonable agreement with the prosecution for interviewing the informant witnesses; that any continuance to permit investigation into the informants would have constituted an undeserved windfall for the defense, resulting in mere delay; and that any continuance would not have produced substantial evidence favorable to Mr. Barrett. *E.g.,* Doc 175 at 40, 41. None of these arguments has legal or factual support.[6]

The fact the Tenth Circuit ruled the prosecution complied with the 3-day notice requirement has nothing to do with whether a continuance should have been requested, would have been granted, or whether more time was necessary in order for counsel to conduct a reasonably professional investigation into the informant witnesses. There is no law stating a continuance is unavailable or would be unreasonable simply because the prosecution has complied with the 3-day notice requirement, and the Government cites none. The Tenth Circuit's ruling dealt with a matter of relatively straightforward statutory construction, *Untied States v Barrett,* 496 F.3d at 1115-17; the Court obviously had no opportunity to pass on evidence and arguments showing that notwithstanding compliance with the notice statute, counsel were professionally unreasonable for failing to secure additional time to properly investigate these crucial witnesses. At certain points in its response, the Government argues that these witnesses were not central to the Government's case, or at any rate, their individual credibility was not important (see below) (Doc 175 at 44), but this late-coming assertion conflicts with the statement of the United States Attorney himself, who credited the informants, and AUSA's Littlefield's

---

[6] Movant deals with the prejudice stemming from defense counsel's failure to move for a continuance and failure to investigate and present impeaching cross-examination and evidence relating to the informant witnesses below.

work in cultivating them, as the key to the conviction.  These witnesses were unquestionably the difference between the state trial, where Mr. Barrett was convicted of manslaughter, and the federal case.  Exh. 69, Amended Motion.  This constitutes an admission by a party opponent.  FRE 801(d)(2).

The Government's argument that no grounds for a continuance existed is in stark contradiction to the trial court's own statement -- to which the prosecutors did not disagree -- at the *ex parte* hearing that the motion for a protective order was dilatory and that, based on the importance placed on these witnesses by the Government, the prosecutors were setting the case up for a "long continuance."  Tr. Hr'g 9/13/05 at 3-5, 7, 12, 19-20.  The Court recognized the obvious -- it was far too late in the day for the defense to adequately investigate and prepare to cross-examine these witnesses at trial, given their pivotal role in the Government's case.  Although the Court ruled during the *ex parte* hearing that the prosecution's motion for protective order was not only late, but without merit, the Court strung the matter along by taking under "advisement" a motion it  already deemed lacked factual and legal support, thereby giving the Government the green light to manipulate defense counsel into a situation that would all but ensure the absence of a proper investigation due to a lack of time and the conditions for "interviewing" the witnesses under the prosecution's watchful eye.

The Government claims that defense counsel's acquiescence in this arrangement was reasonable (Doc 175 at 40), completely overlooking that nothing in the way of investigation was accomplished with it.  All but one of the informant witnesses refused to be interviewed, and the one interview that did take place, of Randy Weaver, occurred under close Government watch.  No reasonable defense lawyer would agree to such an arrangement, which was designed to

frustrate, and did frustrate, any *independent* attempt to speak with these witnesses or investigate them further.

The Government is partially correct, so far as it goes, in stating that notwithstanding the *ex parte* hearing, the defense did not have to agree to the one-sided "arrangement," and could have moved for a continuance. Doc 175 at 40-41. But the effect of the *ex parte* conference and its aftermath on what counsel believed they could do is significant. The fact counsel did not move for a continuance underscores Movant's ineffectiveness claim, rather than defeats it. As shown in the Amended Motion, brief in support, and here, counsel's failure to move for a continuance or otherwise appropriately investigate the informant witnesses assured that the *substance* of their testimony would emerge largely intact, and that the impeachment would be "around the edges," concentrating (and even then in an incomplete fashion) only on previous convictions, drug use, and motive. *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (among other reasons counsel found ineffective was failing to insist on adequate time to prepare for trial).

### b. *Deficient performance.*

Based in part on the declaration of Mr. Hilfiger, the Government argues counsel made a reasoned "strategic choice" to concentrate on impeaching the informant witnesses with their drug use, prior criminal records, and, with respect to some, their hopes of receiving leniency based on their testimony against Mr. Barrett. Resp. Exhs. 12 ¶ 14; Doc 175 at 42. But this ignores that, due to the failure to move for a continuance and in no small part the machinations of the Court and prosecution, this was all counsel believed they were left with. Mr. Hilfiger unreasonably acceded to the arrangement due to his belief, according to the declaration of lead appellate

counsel Mark Henricksen (Exh. 29, Amended Motion) that it was better than nothing, and that nothing else could be done.  "Better than nothing" is obviously not consistent with a reasonable investigation and reasoned strategic choices.  Mr. Hilfiger states that he believed his ability to investigate the informant witnesses was frustrated by what can only be described as the prosecution's obstructionist tactics.  Resp. Exh. 12, ¶ 14.

The Government's argument on this score not only ignores what is apparent from the declarations of trial counsel, but the record itself and the applicable law.  A reasoned strategic choice under *Strickland* requires a knowing choice made after adequate investigation, not a *fait accompli* made in an investigative vacuum because counsel was painted into a corner that rendered effective investigation an impossibility.  In the face of these obstacles, counsel still failed to utilize the time they had to launch an investigation or move for a continuance.  Mr. Barrett has proved, and the Government cannot really contest, that no professionally reasonable investigation was conducted into the informant witnesses.  The failure to investigate cannot be excused by after-the-fact rationalizations dismissing the importance of evidence that was never known.  The specific claim made here -- that counsel made a "tactical choice" to proceed with the impeachment they had, believing it to be adequate -- is unavailing.  *E.g., Wiggins v. Smith,* 539 U.S. 510, 526-27 (2003); *Workman v. Tate,* 957 F.3d 1339, 1345 (6th Cir. 1992); *Richards v. Quarterman,* 578 F.Supp.2d 849 (N.D. Tex. 2008), *aff'd* 566 F.3d 553 (5th Cir. 2009); *Pillette v. Berghois,* 630 F.Supp.2d 791 (E.D. Mich. 2009).

The Government contends, as it does in response to the second stage ineffectiveness claim, that because the witnesses who could have impeached the informants, and/or provided impeaching evidence to use on cross-examination, were friends and relatives of Mr. Barrett's,

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

<div align="center">29</div>

*Barrett v. U.S.*, 6:09-cv-00105-JHP

counsel's duties to investigate went no further than what Mr. Barrett told them.  Doc 175 at 43.  If Mr. Barrett did not detail the witnesses to contact, counsel had no duty to independently investigate.  As is also discussed in Mr. Barrett's reply to the Government's second stage ineffectiveness argument, this is not the law.  Counsel had an independent duty to investigate, regardless of what they were told or not told by Mr. Barrett.  Independent investigation must be undertaken even when the client is uncooperative or even obstructive.  *E.g., Porter v. McCollum,* 130 S.Ct. 447, 453 (2009); *Rompilla v. Beard,* 545 U.S. 374, 381 (2005); *Hamilton v. Ayers,* 583 U.S. 1100, 1117-18 (9th Cir. 2009).  The Government makes the same argument in connection with its claim that, with Mr. Barrett as a source (in the Government's wrongheaded formulation, the only source necessary) for information about these witnesses, counsel could not have made a meritorious motion for continuance.  Doc 175 at 40-41.  For the same reason stated immediately above and for the reasons stated in subpart 1 of this reply, the "no grounds for a continuance" claim fails.

Without a trace of irony, Respondent alleges that counsel did not render deficient performance (and that Mr. Barrett did not suffer prejudice) because, in the main, the independent fact witnesses who could have given helpful testimony on Movant's demeanor, absence of threats to law enforcement, and who could have contradicted the accounts of Charles Sanders and Travis Crawford as to what was said and what transpired on the afternoon before the shooting, would have had credibility problems because of drug use, prior criminal records (as with Sean Hill), or bias toward Mr. Barrett and against some of the informant witnesses (*i.e.,* Sean Hill, Brandy Hill, and Gwendolyn Crawford with respect to Cindy Crawford).  Doc 175 at 43, 47, 57, 61.  The same argument is made with respect to those witnesses (some of them the same), who could have

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                       30                          *Barrett v. U.S.,* 6:09-cv-00105-JHP

testified that the Government's informants were personally known to them to be dishonest, and had shabby records in the community for dishonesty, as well as witnesses who could have provided counsel with information about past bad acts of the informants which reflected on their dishonesty.[7]  Doc 175 at 43, 47, 57, 61..

Apparently the Government's informant witnesses, who had even more impeaching evidence in their criminal backgrounds than the witnesses omitted here; "came forward" six years after the fact; and in some cases (Sanders, Turman and Real, most prominently) had a powerful motive to please the prosecutors with the (ultimately realized) hopes of quick release from prison or dismissed charges, are above reproach from charges of bias, while Mr. Barrett's witnesses, because they were friends and family, are automatically suspect.  This classic pot-kettle argument cannot be accepted.

Even granting that some of Mr. Barrett's witnesses could have been attacked for bias, drug use[8], and the like, this in no way diminishes the ineffectiveness claim.  These witnesses

---

[7]  Setting up a strawman, the Government responds to an argument Mr. Barrett never made.  The Government states that witnesses who could have provided counsel with fodder for cross-examination on the informants' past bad acts exhibiting dishonesty could not themselves have testified to these facts.  Such would constitute the use of extrinsic evidence to impeach the witnesses on a collateral matter.  Doc 175 at 45.  Fed.R.Evid. 608(b).  The Government is correct.  That is why Mr. Barrett only argued that counsel were ineffective for not discovering this impeachment evidence for use on cross-examination of the witnesses only, a matter which lies in the discretion of the Court.  Doc149 at 61, 62, 64.

[8]  The Government argues that witnesses present at Mr. Barrett's property on the afternoon and evening of September 23 would have undermined Mr. Barrett's defense because they were using drugs there, which would have supported the prosecution's largely drug-based charges.  Doc 175 at 44.  But Mr. Barrett has never denied he was a drug user, or associated with drug users.  The question was whether he was manufacturing or trafficking drugs, and whether there was a substantial connection between the alleged drug crimes and the shooting of Trooper

(continued...)

were unquestionably helpful to the defense, both to impeach the informants' honesty and substantive testimony, as well as support the defense of lack of intent and knowledge. Questions of credibility are to be resolved by a jury, not the Government. *Anderson v. Johnson,* 338 F.3d 382 (5th Cir. 2003) (failure to call eyewitness who would have supported defense theory could not be excused because counsel believed witness would not be credible, and holding that with respect to an ineffectiveness claim grounded in a failure to interview a witness, the potential persuasiveness of the omitted witness is largely immaterial); *Pillette v. Berghois, supra* (deficient performance and prejudice found where counsel failed to interview four witnesses who would have contradicted prosecution witnesses and would have corroborated defendant's testimony, at least in part; prejudice was also established, because even though the jury could have possibly discounted the witnesses due to bias and inconsistencies in accounts, there remained a reasonable probability that the jury would not have rejected their testimony); *McGahee v. United States,* 570 F.Supp.2d 723 (E.D. Pa. 2008) (failure to investigate alibi witnesses could not be justified by after-the-fact rationale, since counsel cannot downplay or dismiss evidence for which no reasonable investigation was made; prejudice shown even though witnesses had their own

---

[8](...continued)
Eales. With respect to Janesse Thomas, the Government argues that her testimony would have been "toxic" to Mr. Barrett's defense (Doc 175 at 58, Resp. Exh. 3), because she had "apparently" been to Mr. Barrett's residence on occasions when drugs were sold, and Ms. Thomas had, according to Resp. Exh. 3, bought drugs from Mr. Barrett in the past. However, her latest declaration in no way diminishes her contradiction of Charles Sanders's accounts of being with her at Mr. Barrett's residence during the critical time period, and her alleged purchase of drugs from Mr. Barrett occurred approximately one year before the raid. On balance, her testimony was helpful to Mr. Barrett, because it would have specifically impeached Charles Sanders. It should be kept in mind that the Government had to show a substantive connection between the underlying drug charges and the shooting of Trooper Eales, at the time of the fatal act.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion
32
*Barrett v. U.S.*, 6:09-cv-00105-JHP

credibility problems and even contradicted one another to an extent; the credibility of these nonetheless helpful witnesses was for a jury to resolve); *Casey v. Frank,* 346 F.Supp.2d 1000, (E.D. Wis. 2004) (deficient performance and prejudice found where counsel failed to discover or utilize statements in previous counsel's file that undercut witness credibility, where credibility was the key issue in the case).

The bias and interest of the Government's own witnesses and the state of the law aside, the Government's "bias" argument is misplaced. Contrary to the Government's claim, a number of the impeaching witnesses had no bias for Mr. Barrett, or had "cross-biases" (if any) that canceled one another other out. For example, one of the witnesses who could have testified to Charles Sanders's totally lack of honesty was his uncle, Billy Poindexter. Exh. 76, Amended Motion. Sally Davis Johnson had no apparent allegiance to Mr. Barrett. Exh. 95, Amended Motion. Janesse Thomas was a friend of Charles Sanders's and Movant's. Exh. 13, Amended Motion. Witnesses who could have testified to impeaching information, or provided counsel with impeaching facts for cross-examination with respect to several of the witnesses (such as Travis Crawford and his wife, Cindy), were not only related to Mr. Barrett, but to the Crawfords as well. Exhs.77, 78, 83, 88, 92, 95, Amended Motion. As already shown, whether the Government could have impeached the omitted witnesses for bias or drug use does not show that counsel rendered constitutionally adequate performance, because there was a total failure to investigate. The informant witnesses certainly had their own biases and interests, and it would be up to a jury to resolve a credibility contest.

Questioning the informants superficially about their drug use, prior convictions, and hopes for leniency was not sufficient impeachment, based on all the other impeaching evidence

that was out there but never investigated.  The Government claims that the "strategy" employed by defense counsel was to impeach the informant witnesses with their prior criminal histories, drug use, and, on the part of some, hopes for leniency.  But the Government's survey of what these witnesses were asked in these areas, and what was left out, demonstrate that counsel even did an inadequate job in these impeachment efforts.  A few examples suffice.

The Government claims that Sanders was impeached with "all" his criminal convictions, but, the Government's arguments to the contrary, it is clear that only ten of Sanders's eighteen previous felony convictions were explored on cross-examination.  Doc 175 at 53-54.  *E.g.,* Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion.   The Government claims the numbers make no difference, but this is inaccurate on its face and underlines the fact that counsel did not adequately examine the witness in an area that counsel "strategically decided" to focus upon in impeachment.

The Government states that counsel adequately cross-examined Sanders about the deals he received in previous cases, but then contradicts itself, quoting a portion of Sanders's cross-examination where the witness gave Mr. Hilfiger "great resistence," denying that he had actually received many favors at all.  Had counsel adequately researched Sanders's record, he could have confronted the witness with the many dismissed counts and cases that common sense shows could only have occurred due to Sanders's work as an informant.  Otherwise, he was usually looking at a minimum of 20 years and up to life imprisonment.  Exhs. 57, 72, 157-68, 175, 183-87.  The Government also claims the potential deal Sanders was to receive in this case was the only important one, but common sense dictates that if it could be conclusively demonstrated – as it could have been here – that the witness did practically nothing during his adult life but commit

crimes and get out of trouble because he was a snitch, a jury would see his testimony against Mr. Barrett was just one more sorry chapter in his career as an informant, and that nothing he said could be trusted in the slightest.

Likewise, the Government argues counsel was not ineffective for failing to question Travis Crawford about his prior work as a testifying informant and his mental problems, even aside from the effects of drug use, because counsel "had no reason to know about these things." Doc 175 at 46-47. The reason counsel did not know was because they conducted no investigation. The failure to inquire into these areas shows yet again that counsel did not even reasonably investigate the impeachment areas they purportedly decided to concentrate on. The same is true of the fact that Cindy Crawford had worked as an informant before, faced acceleration of a deferred sentence in a state drug case at the time of her testimony, could have been charged with a felony rather than a misdemeanor in a marijuana possession case, and had mental problems. The fact that she faced acceleration on her state drug case at the time she testified gave her an obvious motive to please the Government. Doc 175 at 52.

The Government claims that defense counsel effectively cross-examined Randy Turman on whether his multi-count Sequoyah County drug case had been "taken care of." When Turman denied it, all counsel did was state that he had the paperwork with him, but he let Turman slide with the answer that he would not "understand it," instead of confronting the witness directly with the documents and making him read them on the stand, or calling someone from the Sequoyah County Court Clerk's Office to impeach Turman. Contrary to the Government's argument, this would not have run afoul of FRE 608(b). The matter was not "collateral," but went to Turman's bias and motive for testifying: by pleasing the Government, he was hoping to

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    35                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

get the charges dismissed, which is ultimately what happened.  Doc 175 at 63-64.  Evidence of bias and motive is never collateral.  *E.g., Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986).

Trial counsel also failed to impeach Karen Real with a number of dismissed state drug cases.  The Government argues that this aspect of Mr. Barrett's claim is time-barred, because it was first raised in the amendment filed in September, 2009, after the 1-year period of limitations expired.  The Government also cites 21 O.S. 2001, § 11 for the claim that because of her federal drug conviction, Real could not also have been prosecuted in state Court.  Doc 175 at 162.  Both arguments fail.  Reference to Real's dismissed state charges was not barred by the period of limitation, as it did not constitute a "new claim," only additional evidence supporting an existing claim that was timely.  *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 501, 503-04 (10th Cir. 2000); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000).  Section 11 of Title 21 of the Oklahoma statutes bars multiple punishments in *state prosecutions only.*  The Government also overlooks the dual sovereign doctrine, which permitted Mr. Barrett to be charged in federal court after he had already been acquitted of murder but convicted of manslaughter in state court.

### c.      *Prejudice.*

To the extent that the Government's "bias" argument is part of its assertion that Mr. Barrett suffered no prejudice because the witnesses would have been subject to impeachment by the prosecution, the above demonstrates this contention is legally untenable.

The Government cites a single case, from 1989, to the effect that where witnesses have been impeached by other means, counsel was not ineffective for failing to call "anti-character"

Movant's Reply to USA' Response
to Second Amended § 2255 Motion
36
*Barrett v. U.S.*, 6:09-cv-00105-JHP

1189

witnesses[9], particularly where they could be perceived as having a bias toward the defendant. Doc 175 at 42. *Kubat v. Thieret,* 867 F.2d 351, 364 (7th Cir. 1989). *Kubat* lacks persuasive force for several reasons. First, as shown above, the Government's "bias" argument misses the mark. Second, the far more recent authority cited above shows that even when defense witnesses are subject to impeachment for bias, or even occasional contradictory testimony, their helpful testimony or information outweighs whatever is lost through possible impeachment; it is for the jury to make credibility determinations. Third, *Kubat* does not describe the situation here. Taken as a whole, the impeaching evidence that was unreasonably omitted from Mr. Barrett's trial went not just to impeaching the credibility of the informant witnesses *per se* by showing they were dishonest people, but raised significant doubts about the *substance* of their testimony regarding threats to law enforcement and Mr. Barrett's statements and attitude on the afternoon before the shooting. Fourth, the "other means" used by counsel in an effort to impeach the informants have been shown inadequate and based on no reasonable strategy. Fifth, any impeachment the anti-character witnesses could have provided in *Kubat* was cumulative to trial impeachment that the prosecution witness in question had a perjury case. This type of direct evidence of dishonesty on the part of a prosecution witness or witnesses was absent from the impeachment offered by counsel at Mr. Barrett's trial. Again, the impeachment that was attempted was inferential only.

It is urged that the individual credibility of the witnesses was of no moment; the witness's accounts of Mr. Barrett's hyper-vigilance and threats to the police were consistent, and Mr.

---

[9] See Exhs.13, 76, 77, 78, 83, 88, 90, 92, 94, 95, Amended Motion.

Barrett's lifestyle bespoke a volatile recluse just itching for the opportunity to shoot a law enforcement officer.  Doc 175 at 44.  Whether the witnesses "corroborated" each other or not does not make them impervious to scrutiny through impeachment of their honesty, and impeachment of their accounts of Mr. Barrett's alleged statements and attitude.  Yet again, the Government wants to sit in the jury box.

Mr. Barrett's lifestyle does not point unerringly, or even approximately, to the fact that he was at the ready to shoot it out with the police and was constantly on guard.  It just as reasonably shows that Mr. Barrett liked the privacy of his small, rural community and kept to himself.  The Government dismisses as insignificant the omitted testimony of Sean Hill and Toby Barrett explaining the purpose and origin of the "warning sign" attached to Mr. Barrett's gate (Exhs.88, 96 Amended Motion), stating that this was just one piece of evidence showing Mr. Barrett's violent propensity toward intruders (particularly, by implication, the police), but it was an important piece of evidence to the Government at trial.  According to the prosecutors, the sign crystallized in microcosm Mr. Barrett's alleged violent propensities, to the public in general and the police in particular.  There can be no question that the benign explanation for the sign that could have been offered by these two omitted witnesses would have undercut the prosecution's theory of the case.

The omitted witnesses were also "cross-corroborating": they described an individual much different from that sketched by the six-years-late-in-coming informants, a man who was not threatening toward the police or spoiling for a confrontation, and who was unconcerned with police presence in his isolated, rural neighborhood.  *E.g.,* Exhs., 37, 77, 90, Amended Motion. The Government contends that just because these witnesses would say that Mr. Barrett was not

threatening or aggressive toward the police, that does not necessarily impeach the account of the informant witnesses, but this simply is not so.  Doc 175 at 45, 48, 53.  This is certainly not the case with the witnesses who could have impeached the accounts of September 23 offered by Travis Crawford about Mr. Barrett's supposed threats toward law enforcement and concern for an imminent raid, and Charles Sanders's claim -- repeated by the prosecution in closing argument -- that he was at Mr. Barrett's that afternoon.  Exhs. 37, 77, 90, 96, Amended Motion.  Nor is it true for the witnesses who could have testified that Mr. Barrett as, a matter of personality, demeanor and word, was not threatening toward the police.  Exhs. 37, 77, 90, 96 Amended Motion.  This testimony would have called into serious question the informants' claim that Mr. Barrett had this attitude or ever made such statements..

Mr. Barrett was clearly prejudiced by counsel's professionally unreasonable failure to investigate and present witnesses who could have impeached the Government's informants, and in failing to develop impeaching evidence during the cross-examination of these witnesses.  Contrary to the Government's claim, this evidence was not simply "cumulative" to the surface impeachment that was undertaken.  This was "substantially favorable" evidence that went to the heart of the Government's case.  *United States v. Miller,* 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera,* 900 F.2d 1462, 1472-74 (10th Cir. 1990) (en banc)  The omitted impeachment witnesses and evidence went to the very substance of the informants' testimony.  There is a reasonable likelihood that had these witnesses been called and had further impeaching cross-examination been undertaken, the result of the guilt phase would have been different.  *E.g., Anderson v. Johnson, supra*; *Pillette v. Berghois, supra*; *McGahee v. United States, supra*; *Casey v. Frank, supra.*  Accordingly, Mr. Barrett should be granted § 2255 relief.

**6.      Counsel were ineffective in failing to make appropriate and timely objections to other bad acts testimony by the informant witnesses.**

The Government attempts to dispute Mr. Barrett's argument regarding trial and appellate counsel's ineffectiveness in failing to properly challenge testimony by informants regarding Mr. Barrett's alleged animosity towards law enforcement officers and his desire to harm them if they came on his property.  The Government argues that:  1) Mr. Barrett's claim is untimely; and 2) the underlying testimony was admissible.  The Government is wrong.

**a.      *Mr. Barrett's claim relates back and is, therefore, not time barred.***

The Government argues that Mr. Barrett first raised this claim in his Amended § 2255 Motion filed on September 25, 2009 and, as a result, the claim is time barred because Mr. Barrett's one-year period of limitations expired on March 17, 2009.  The Government further contends that the claim does not relate back to Mr. Barrett's timely-filed motion because:

> [t]he claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-Saenz*, [235 F.3d 501, 505 (10th Cir. 2000)].  In short, the claim arises from different facts than those ineffective assistance claims set forth in the Corrected Motion (Doc 2) and therefore does not relate back to that pleading.

Doc 175 at 65.

Not only is the Government missing the point, its support for its argument is based on a case that pre-dates *Mayle v. Felix*, 545 U.S. 644 (2005), the United States Supreme Court case that definitively defines "relation back" in the habeas context.  *Id*. at 664.

Under Federal Rule of Civil Procedure 15, a party may properly raise a new claim or defense that would have been barred by the statute of limitations if the claim or defense "arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original

pleading." Fed R. Civ. P. 15(c)(1)(B); *see also Mayle*, 545 U.S at 656. *Mayle* defined "conduct, transaction or occurrence," holding that "[s]o long as the original and amended petitions state claims that are tied to a *common core of operative facts*, relation back will be in order." *Id.* at 664 (Emphasis added.)

In *Mayle*, the Court gave examples of claims that constitute a common core of operative facts in which relation back was appropriate. *See id.* at 664, n.7. For example, the Court noted an Eighth Circuit case in which the original petition alleged *Brady* violations and the amended petition alleged the Government's failure to disclose a particular document. *See id. (citing Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003)). Additionally, the Court pointed out a situation in which the original petition challenged the admission of recanted statements, while the amended petition challenged the Court's refusal to allow the defendant to show that the statements had been recanted. *See id. (citing Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001); *see also United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009) (post-*Mayle* case in which an ineffective assistance of counsel claim was found to relate back to a right to appeal claim because both claims dealt with erroneous advice movant received from counsel regarding the right to file an appeal).

In this claim, Mr. Barrett is challenging his counsel's failure to make timely and appropriate objections to the testimony of the informant witnesses, who alleged that in the months before the shooting, Mr. Barrett engaged in drug activity and made inflammatory comments about law enforcement. Prior to trial, the Government filed a notice that it intended to use this type of evidence and contended that it was not prior bad act evidence under Fed. R. Evid. 404(b). Mr. Barrett's counsel objected, and the Court ruled that the admissibility would be

determined on an as-needed basis.  However, as the evidence came out, Mr. Barrett's counsel failed to object or request appropriate limiting instructions.  The informant witnesses were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous with the offenses charged.

The Government contends that this claim does not relate back to Mr. Barrett's previously-stated ineffective assistance of counsel claims.  Doc 175 at 65.  The Government's conclusory statement is wrong.  There is a common core of operative facts between this claim and Mr. Barrett's prior claims of ineffectiveness regarding the informant testimony.  In his timely-filed Corrected Motion (Doc 2), Mr. Barrett went into great detail setting forth his attorneys' ineffectiveness in dealing with the informant testimony.  For example, Mr. Barrett stated that "the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand." Doc 2 at 78.  Mr. Barrett then discussed each of the informant witnesses individually and enumerated ways in which his counsel failed to adequately investigate, discredit or impeach them.  *See* Doc 2 at 77-129. Mr. Barrett's "new" claim is simply an expansion of his previous claims regarding his counsel's utter failure to mount any sort of defense against these very same witnesses.  Or put differently, Mr. Barrett's claim regarding counsel's failure to timely object to the informant testimony constitutes a common core of operative facts with his earlier claims of counsel's complete ineffectiveness in handling the informant witness testimony.

This situation is analogous to the example set forth in *Mayle*.  In that Eighth Circuit case, a cumulative *Brady* claim related back to movant's original *Brady* claim.  *See Mayle*, 545 U.S. at

664 n.7 (*citing Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003)). Here, likewise, Mr. Barrett's cumulative challenge to his counsel's ineffectiveness in dealing with the informant testimony relates back to his original claims regarding the informant testimony. Moreover, the issue of objections based on Fed. R. Evid. 404(b) is an obvious one, as pointed out by the Court in an *ex parte* hearing: "there is 404(b) material obviously in the proposed motion, it appears to me." Tr. 9/13/05 Hr'g at 22. In fact, Mr. Barrett raised the 404(b) issue in his Corrected Motion in his claim regarding the *ex parte* hearing. Doc 2 at 38.

Accordingly, this Court should find that Mr. Barrett's claim relates back to the date of his Corrected Motion.

### b. Trial counsel's failure to object constituted ineffective assistance of counsel.

The Government argues that even if the Court considers the claim, "none of the foregone objections had any merit, and trial counsel had no obligation to raise a futile objection." Doc 175 at 66. Again, the Government's conclusory statement is wrong.

After Mr. Barrett's trial started, on September 22, 2005, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.[10] Doc 206. This was after the Government described the testimony to the Court in an *ex parte* hearing and the Court noted that the testimony would include 404(b) evidence. Tr. 9/13/05 Hr'g at 22-23. Mr. Barrett filed a response to the 404(b) Notice and the Court ruled that it would not make a determination at that time but wait until it actually heard the evidence or the effort to present the evidence, noting that, "[o]f course, I would

---

[10] The Notice filed by the Government did not include information regarding informant Karen Real. Mr. Barrett's counsel were ineffective for failing to object to that lack of notice.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    43                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

caution counsel for the Government to approach the bench for conference when that evidence --

when an effort to introduce that evidence is appropriate."  R at174.

The Government first argues that Rule 404(b) does not even apply, because the other acts

evidence complained of was not other acts, but "intrinsic" to the offenses charged, relying on

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) and *United States v. Viefhaus*, 168 F.3d

392 (10th Cir. 1999).  The Government is attempting to profess that somehow the statements

made by the informants at unknown points in time were intertwined with the charged offense.

Because the Government at least realizes the problem with the timing of the statements, it

attempts to link them to the time Mr. Barrett "failed to appear for his state trial, resulting in the

issuance of a warrant for his arrest." Doc 175 at 68.  This is not a straight-faced argument.

*Parker* is completely distinguishable.  In that case, the defendant was accused of a

conspiracy involving the selling of defective airplane engines.  *See Parker*, 553 F. 3d at 1313.

The challenged 404(b) evidence was several sales that occurred within the conspiracy time frame

but were not charged as overt acts, and several sales that occurred before the conspiracy time

frame.  *See id.* at 1314.  The Tenth Circuit found that the sales that occurred within the

conspiracy time frame were not other bad acts because they were intrinsic to the offense charged;

however, the sales that occurred prior to the conspiracy time frame were subject to a 404(b)

analysis.  *See id*. at 1314-15.  This is a completely different situation from Mr. Barrett's, in which

the Government is trying to assert that his alleged statements that were made months previous to

the offense were somehow intrinsic to the offense charged.

The Government's reliance on *Viefhaus* is equally unimpressive.  That case only referred

to the "intrinsic" argument in dicta; it did not hold that the evidence in that case was intrinsic to

the offense charged such that a 404(b) analysis was unnecessary. *See* 168 F.3d at 397. Instead, the Court performed a 404(b) analysis and held that the evidence does not offend Rule 404(b). *See* 168 F.3d at 398.

The Government then argues that even if the statements are considered other acts and analyzed under 404(b), "their admissibility would be patent." Doc 175 at 68. This is hardly the case. Evidence is admissible under Rule 404(b) if it is offered for a proper purpose, relevant, not unduly prejudicial and accompanied by a proper limiting instruction if requested. *See United States v. Caldwell*, 560 F.3d 1202, 1211-12 (10th Cir. 2009). Here, a proper 404(b) analysis was never conducted because of counsel's ineffectiveness. It is beyond question that there were problems with the evidence involving hearsay, propensity and prejudice. Moreover, any time frame placed on the statements by the informants was completely unreliable. The relevance of the statements is further called into doubt by the situation -- if Mr. Barrett had in fact made the inflammatory statements about law enforcement, those statements had nothing to do with law enforcement showing up, unannounced, in unmarked vehicles in the dark of night. Trial counsel were professionally unreasonable by their unmitigated failure to object to any of these issues or, at a minimum, request a limiting instruction. This failure caused prejudice to Mr. Barrett.

To the extent that trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

### 7. Trial counsel were professionally unreasonable for failing to engage the services of an independent crime scene reconstruction expert.

Trial counsel sought $17,000 for an expert to conduct crime scene reconstruction, in anticipation that the Government would hire Iris Dalley, who appeared as a witness in both of

Mr. Barrett's state court trials.  The Court authorized $4000.  Trial counsel did not use those funds for a crime scene reconstruction expert; instead, counsel used the funds for an investigator who took photographs.  Had trial counsel hired expert Edward Hueske, he would have testified that Dalley's testimony was completely unreliable and not worth of belief.  *See* Exh. 109, 110, Motion.

The Government argues that trial counsel were not ineffective because Dalley's testimony was not damaging to Mr. Barrett.  In fact, reading the Government's argument, one would believe that Dalley testified in Mr. Barrett's favor.  Nothing is farther from the truth.

Dalley's testimony more than supported the Government's position, as evidenced by the Government's closing argument:

> And you'll remember where those trajectories were.  They were directly -- at the drive.  And when someone comes in and you're trying to stop them, when you're trying to stop the law, you take out the lead vehicle.  And how do you do it? You take out the driver.  And that's where all those shots were until it got parked right in front, 15 feet away.  And he changed his focus because Buddy didn't go down between the seats.  He changed his focus to the person trying to get out of the vehicle and he shot and killed Rocky at that point.  The pattern of shots tells you his intention.  It will show somebody who was thinking.
>
> &ast; &ast; &ast;
>
> Remember Iris Dalley.  I believe -- I can't remember which shot, but there was one shot that passed through and hit the inside door molding on the driver's door and she testified that door had to be open when that shot was fired because the inside of the door covers the molding, covers that rubber molding when it's closed.  He shot through that door as Buddy was exiting.

R at 4305-06.  Moreover, as admitted by the Government, Dalley firmly concluded that Mr. Barrett could not have fired all the shots in a prone position from inside his house and that Trooper Eales' elbow and flank wounds occurred after he exited the vehicle.  This was detrimental to Mr. Barrett's case.

The Government's assertion that trial counsel exercised reasonable strategy by turning Dalley's testimony to Mr. Barrett's advantage is ludicrous. As set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support, trial counsel were constitutionally ineffective for denying Mr. Barrett his constitutional and statutory right to expert assistance to rebut Government witnesses. This was a critical error; Dalley's testimony was arguably the most important factor in establishing the intent elements of the offenses charged. As a result, Mr. Barrett can establish that he was prejudiced by counsel's failure.

> **8.    Trial counsel were ineffective in their failure to secure an independent expert on police tactics who would have demonstrated that the midnight raid on Mr. Barrett's house was reckless and dangerous.**

In Mr. Barrett's second state trial, Chuck Choney, a former FBI agent, testified for the prosecution and when effectively cross-examined, provided favorable testimony to Mr. Barrett regarding the recklessness of the police tactics that were used when Mr. Barrett's house was raided. Choney was upset about this outcome and had absolutely no desire to testify for Mr. Barrett at the federal trial, a fact of which trial counsel were well aware. Nonetheless, trial counsel conducted no investigation into what evidence could be presented by an independent expert and instead called as their expert the very reluctant Choney, who was harmful to Mr. Barrett's case. If trial counsel had engaged Dr. George Kirkham, Dr. Kirkham would have testified that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. Exh. 44, Motion (Doc 70). However, the Government contends that Dr. Kirkham "fails to show that those the [sic] choice of tactics had any bearing on Barrett's intent or

that alternative tactics were reasonably available to the police." Doc 175 at 74. This statement is an outright lie or, perhaps, the Government did not read Dr. Kirkham's report.

Dr. Kirkham's report clearly and emphatically concludes that "it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999." Exh. 44 at 1, Motion (Doc 70). Dr. Kirkham's report sets forth in great detail the alternative tactics that the Tact Team should have utilized, including establishing a safe perimeter, communicating with Mr. Barrett from a safe distance, the use of marked patrol cars with overhead flashing lights, the presence of negotiators and/or friends or family members who could talk to Mr. Barrett in the event he refused to surrender, just to name a few. Exh. 44 at 3, Motion (Doc 70). In fact, Dr. Kirkham states, "After reviewing the circumstances surrounding the incident, one is led inexorably to ask why the involved District 27 Task Force officers and OHP Tactical Team members would not have opted to use readily and available and vastly safer alternative methods of apprehension." Exh. 44 at 4, Motion (Doc 70). Certainly, Dr. Kirkham concluded that alternative techniques were available to the police. As for Mr. Barrett's intent, Dr. Kirkham's findings most assuredly would have cast reasonable doubt on whether Mr. Barrett knew that he was being raided by police officers. Dr. Kirkham concluded, "The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was being confronted by law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm." Exh. 44 at 1, Motion (Doc 70).

The Government further brushes off Mr. Barrett's claim, by stating that trial counsel's strategic choice of witnesses is virtually unchallengable, citing *Boyle v. McCune*, 544 F.3d 1132 (10th Cir. 2008) and *Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). The Government misses the point.  Both cases cited by the Government stand for the proposition that counsel's adequately informed strategic choices are accorded a presumption of reasonableness.  Trial counsel cannot exercise strategy in calling witnesses when they fail to perform adequate research and investigation.  Moreover, the cases cited by the Government are easily distinguishable.

In *Boyle*, the Movant argued that counsel was ineffective for failing to call medical experts in a rape case where nurses testified.  *See* 544 F.3d at 1138.  However, the issue at trial was whether the victims consented and the nurses bolstered the victims' testimony.  *See id.* Movant did not set forth any evidence indicating that other medical experts would have disagreed with the nurses; thus, additional medical testimony could have hurt his case.  *See id.* at 1139. This is a far different situation than Mr. Barrett's, in which he has produced an expert who has set forth an opinion favorable to Mr. Barrett.

Likewise, *Bowersox* is distinguishable.  In that case, the Movant claimed ineffective assistance for his counsel's failure to call two witnesses whom counsel had said he was going to call in his opening statement.  *See* 340 F.3d at 670.  After counsel investigated the witnesses further, he made the strategic decision to not call them.  *See id.* at 670-71.  In finding that counsel was not ineffective, the Court placed much emphasis on the fact that counsel investigated the witnesses before making that strategic decision.  *See id.* at 672.  Again, this is a different situation than Mr. Barrett's, in which trial counsel did not investigate the potential benefit of an independent expert on police tactics.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                     49                     *Barrett v. U.S.*, 6:09-cv-00105-JHP

The Government also argues that it was a "strategic" decision for trial counsel to call Choney because he would be difficult to impeach.  That is not "strategy"; that is cutting your nose off to spite your face.  It is not within the bounds of reason for counsel to call a  hostile witness rather than to even investigate the possibility of a favorable, respected expert witness, just because a hostile witness might be difficult to impeach.

The Government also takes conclusory pot shots at Dr. Kirkham's expert opinion and states that Dr. Kirkham cannot offer an opinion regarding Mr. Barrett's mental state.  Doc 175 at 77.  Dr. Kirkham's report does not offer an opinion regarding Mr. Barrett's mental state; instead, it offers an expert opinion about the reckless manner in which the raid was conducted.  Dr. Kirkham believes that because of the reckless manner in which the raid was conducted, it's impossible to know, let alone prove, whether Mr. Barrett knew that it was law enforcement officers who were entering his property.  This fact was more than critical to Mr. Barrett's case, in which the jury had to find, beyond a reasonable doubt, that Mr. Barrett had the requisite intent to kill a law enforcement officer in the performance of his official duties.  Accordingly, trial counsel were wholly and prejudicially ineffective in their failure to retain an independent expert on police tactics.

### 9.    Failure to adequately cross-examine law enforcement witnesses was ineffective assistance of trial counsel.

Despite later strenuously arguing that the Court's denial of timely production of the state trial transcripts was not error, (Doc 175 at 145), the Government here relieves trial counsel of its responsibility to adequately cross-examine critical witnesses *because* he did not have the transcripts.  Doc 175 at 78.  Nor does the fact that it was "a long and complex trial" lessen the

likely prejudice to Mr. Barrett. Doc 175 at 78. The guilt here is not overwhelming. The Government's evidence was susceptible to disbelief, and if disbelieved could have led the jury to a very different understanding of the events which led to the death of the trooper, and ultimately a very different verdict. Failure to adequately cross-examine and impeach state drug task force member Clint Johnson, who put the entire sequence of events into action, cannot be considered minor, no matter the length or complexity of the events which followed.

The Government's argument that the matter of emergency lighting, while important to the defense, "was understandably less important to, and therefore more easily forgotten by, members of the Tact Team," makes clear what the Government's argument would have been, had there been effective cross-examination. It does not, however, relieve trial counsel of his responsibility to secure critical testimony in support of his defense. The Government's admission that "such facts were of great significance to Barrett's trial defense," (Doc 175 at 80), effectively ends the inquiry, establishing both the deficient performance and the prejudice which resulted.

In *Moore v. Marr*, 254 F. 3d 1235, 1241 (10th Cir. 2001), a case relied upon by the Government, the Tenth Circuit notes that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls "outside the wide range of professionally competent assistance[.]" *Id., quoting Strickland,* 466 U.S. at 690. Rejecting a finding of prejudice, the Court says:

> Our review of the trial transcript, shows an overwhelming evidence against Moore was presented at trial, even absent Goudie's testimony. . . .Accordingly, even if Goudie had been impeached we cannot conclude that the outcome would have been different.

*Id.* Ignoring the failure of the Court to cite the correct *Strickland* standard of prejudice[11], here the evidence is not overwhelming, especially without the testimony of the state troopers who were present. Impeachment of the law enforcement was critical to Mr. Barrett's defense. The failure to impeach was constitutionally deficient and reasonably likely to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694.

> **10. Trial counsel were ineffective in failing to call Toby Barrett and Alvin Hahn, percipient witnesses, who could impeach government testimony.**

Toby Barrett and Alvin Hahn were vital witnesses who would have testified that: 1) the sign on Mr. Barrett's gate had nothing to do with law enforcement; 2) Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; 3) there were no police lights visible at the start of the shooting; 4) Toby's cry of alarm was the first indication that Mr. Barrett had of the raid; 5) Mr. Barrett only had a split second view of the scene before he went inside; and 6) there was only one car with its lights on visible within 15 seconds of the shooting. This evidence would have been critical to impeach the Government's contention that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started. The Government argues that neither Toby Barrett nor Alvin Hahn would have meaningfully undermined the Government's case and the decision not to call them as witnesses was a proper exercise of counsel's trial strategy. Doc 175 at 87.

---

[11] "That there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

52

*Barrett v. U.S.,* 6:09-cv-00105-JHP

### a.      Toby Barrett.

Although the Government concedes that Toby Barrett was an eye-witness, the Government argues that Toby's recollection is limited. Doc 175 at 89. In support of this statement, the Government cites to Toby's declaration in a piecemeal manner to make it appear that Toby's knowledge of the raid was vague. The Government concludes that this weighs in favor of trial counsel's "strategy" in failing to call Toby Barrett as a witness.

There are two problems with the Government's theory.  First, before counsel decides to not call a witness, counsel must perform sufficient investigation to make a strategical call. *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007).  In *Ramonez*, the Court found ineffective assistance of counsel because the defense attorneys failed to interview percipient witnesses who could have corroborated defendant's account of the events.  *See id.*  The Court stated that "the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Id.; see also, Town v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.")

Here, the Government cannot assert that trial counsel made a strategic choice because counsel never properly interviewed Toby Barrett. Toby has stated:

> I spoke to Mr. Hilfiger once, I don't know where, and asked him if he was going to want me to testify at the trial. He said he was weighing whether it would be helpful or not, but expected I would. He never asked me about my father's problems, my home life or about me or my mom. I never spoke to him again.

Exh. 96 at 3-4, Motion (Doc 70). Thus, trial counsel had one brief conversation with Toby -- the only eyewitness to the beginning of the raid other than law enforcement -- before counsel made the determination that he was not going to call Toby as a witness at trial.

Second, Toby testified in the two prior state trials that resulted in a much more favorable manner to Mr. Barrett. That should have alerted counsel to the potential advantage of Toby's testimony. In *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007), the Court vacated a conviction based on the cumulative effect of counsel's errors. *See id.* at 1031. One of these errors was counsel's failure to call a witness who had testified in defendant's trial on the same charge. *See id.* at 1024. That trial ended in a hung jury. *See id.*

### b. Alvin Hahn.

Likewise, the Government contends that Alvin Hahn had nothing of value to add to the evidence so that it was not ineffective assistance to fail to call him as a witness. Again, trial counsel failed to conduct a proper investigation to even determine whether Mr. Hahn would be an appropriate witness. *See Bertrand*, 467 F.3d at 1024.

The testimony of Toby Barrett and Alvin Hahn would have conflicted with the accounts provided by the Government witnesses and provide jurors with evidence that Mr. Barrett did not know that the raid conducted on his home was being performed by law enforcement officers. There is a reasonable likelihood that the trial would have ended differently had both Toby Barrett and Alvin Hahn testified.

**11.   To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable investigation into evidence that he was not aware of the arrest warrant, could have been taken into custody without incident, and had not reacted violently to the police when they had been to his home shortly before the raid and on other occasions.**

The Government's theory was that Mr. Barrett, aware of a felony arrest warrant, was anticipating a police raid on his property and was ever-vigilant to meet it with lethal resistence. If the defense could show that Mr. Barrett was either unaware of the warrant, that it was improperly issued, or that he was not worried about it and was simply going about his business, the credibility of the Government's theory, founded as it was on the seven informant witnesses, would have been thrown into substantial doubt.[12]  Likewise**,** had the jury heard evidence that Mr. Barrett had not reacted violently when he was sought by the police on an earlier occasion, the Government's theory would have taken another hit.

A competent investigation would have produced this evidence, but counsel unreasonably failed to look into these matters, which would have involved nothing more than checking the Court file, talking to family and friends of Mr. Barrett, and contacting his former lawyer and bail bondsman on the state drug delivery case.  Because there was no investigation, no "strategic choice" can excuse counsel's failings.  Trial counsel had "no reason to be aware" of the evidence because they never investigated it.  The Government claims that certain aspects of this evidence, such as Sheriff Philpot's visit to his cabin approximately a month before the raid, would have been known to Mr. Barrett, and counsel cannot be faulted if Movant did not tell them about it.  Doc 175, 96, 97.  Mr. Barrett has shown that counsel's duty to investigate is not limited to

---

[12]  As noted, this evidence was also important to moving effectively for suppression of the evidence under *Franks v. Delaware,* 438 U.S. 154 (1978).

information gleaned from the client.  Mr. Philpot's recent declaration claiming that this event did not occur should be taken with a grain of salt.  His reversal of what he previously told a defense investigator (Exh. 6, Amended Motion) is simply an attempt to save the Government's theory of the case.  The declaration of defense investigator Rodney Floyd is a proper part of these proceedings and this record, "hearsay" or not.  Declarations are used to make a factual record, the facts are in dispute, and an evidentiary hearing is warranted.

The Government asserts that Mr. Barrett's arguments respecting the failure to even summon a jury on the day of his purported trial, which led to an arrest warrant being issued for him, was raised outside the one-year limitations period, as is the argument that this invalid arrest warrant to attend a trial that was never scheduled affected the validity of the no-knock search warrant.  Doc 175 at 192.  This does not represent a "new claim," but simply additional facts supporting a claim already made which clarify and amplify the argument.  *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 503, 504 (10th Cir. 2000); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000).

It is maintained that there was no significance to the fact that the notice of jury trial/arrest warrant was not sent certified mail, because it is "presumed" that a letter properly posted and deposited with the mail service reached the intended recipient.  Doc 175 at 94.  Regardless of this legal presumption, the fact that standard procedure was not followed supports the argument that Mr. Barrett never received the letter, and there is no real proof that he did receive it.

Respondent states that trial counsel did not render deficient performance in failing to present evidence that Mr. Barrett had nothing to worry about with respect to his drug delivery case, because his former attorney, Bill Ed Rogers, had secured a plea agreement that called for no

jail or prison time.  Doc 175 at 95.  The Government contends Mr. Rogers's wife, Mary Rogers, could not have testified to this or sponsored her husband's file, because any testimony she would offer would be "hearsay."  This ignores that Mr. Barrett had to rely in the current proceedings on Ms. Rogers to supply this information, because Mr. Rogers died in 2008.  He was alive at the time of Mr. Barrett's federal trial, and could have testified to this information himself.  Yet again, the Government argues that there was no reason for Mr. Barrett's lawyers to have been aware of this information, presumably because Mr. Barrett did not tell them.  This argument ignores what has already been established here and in Movant's earlier filings: that counsel have a duty to investigate beyond whatever they learn from the client.  Surely, counsel should have acquainted themselves with the facts surrounding the issuance of an arrest warrant for their client on a state drug charge that was one of the links in the chain that the Government argued led to Trooper Eales being killed.

In a similar vein, the Government argues that counsel did not perform deficiently for failing to call Mr. Barrett's bail bondsman on the state drug case, Martin Daggs, in the first stage of trial.  Doc 175 at 95-96.  Daggs testified in the penalty phase that he never alerted Mr. Barrett to the existence of the arrest warrant, because he knew where to find Movant if he needed him.  The Government speculates that even if Mr. Daggs had not informed Mr. Barrett of the existence of the arrest warrant, this does not mean that Mr. Barrett could not have learned of it from another source or by other means.  This ignores that Daggs's testimony would have been one more piece of circumstantial evidence showing that the Government's theory of the case was off the mark.  It is argued that, in any event, Mr. Daggs's testimony would have made no difference, because jury found in the second stage that the offenses were committed after substantial

planning and premeditation.  This circular argument skirts the fact that had counsel effectively investigated this case and brought to bear all the omitted evidence conflicting with the Government's theory, a reasonable probability of a different result would have existed.

The Government claims that testimony from Mr. Barrett's relatives that there would have been no need for the type of raid that occurred, if only the authorities had simply contacted the family and asked that Movant be brought in, would be inadmissible hearsay.  Doc 175 at 98.  But the family certainly could have testified to their observations of Mr. Barrett.  This is particularly true of Phyllis Crawford, to whom Mr. Barrett ran on an earlier occasion when he learned the police were after him.  Exh. 91, Amended Motion.  Ms. Crawford could have testified to Mr. Barrett's actions and demeanor on that occasion.  Such is not hearsay.

Finally, the Government argues that counsel did not perform deficiently for failing to introduce evidence from witnesses who could have testified that police patrols were routine in his isolated neighborhood, without any reaction from Mr. Barrett, that the police had visited him before when he was working on a car without incident, and that the sign posted on the gate to his property did not have the intent attributed to it by the Government, and was placed there because drug-using trespassers had been on the property a short time before the raid.  Doc 175 at 98-100.  Exhibits 45, 77, 95, Amended Motion; second stage testimony of Clyde Edgmon.  The Government claims this evidence would have been irrelevant because it did not deal with how Mr. Barrett would react if his home was raided by police, and actually would have strengthened the testimony of Travis Crawford.  Again, this omitted evidence would have circumstantially shown that Mr. Barrett did not have the vigilant and hateful attitude toward the police as claimed by the Government, and would not have buttressed Travis Crawford's testimony in the slightest.

Counsel's failure to marshal the omitted evidence which is the subject of this sub-proposition is symptomatic and indicative of counsel's inadequate investigation as a whole, and the prejudice that inured to Mr. Barrett as a result, consistent with the authority cited in this reply brief and Mr. Barrett's opening brief.

### 12.   Trial Counsel were ineffective for failing to adequately contest "expert" Horn testimony.

Respondent's briefing concerning defense counsel's handling of the testimony of its so-called "traumatic stress" expert reveals the Government trying to have its cake at trial and to eat it in habeas proceedings:  At trial, the Government called James Horn as its own witness and elicited testimony replete with colorful references to his own, and others', military and law enforcement experiences and to the powerful emotional bonds created by such public service. This Court correctly pinpointed the fact that none of Mr. Horn's testimony was actually relevant to the facts of this case, and ultimately struck the evidence in its entirety when finally prompted to do so by defense counsel.  Now, in §2255 proceedings, in order to protect its unjustly obtained verdict, the Government asks this Court simply to ignore Mr. Horn's repeated references to military and law enforcement camaraderie in combat situations  (*see, e.g.,* R at 843-848, 852-4, 858-860; Doc 175, p. 105) arguing that Mr. Horn's spouting of "generalities" (R at923-27) was both "innocuous and non-controversial" (Doc 175 at 103) and indeed actually helpful to the defense (Doc 175 at 105-06).  Therefore, the Government argues, no mistrial needed to be declared.

This approach is disingenuous.  Even if Mr. Horn's testimony had indeed been limited to the "innocuous and non-controversial," it would still have failed the basic test of admissibility:

Purported to be an expert, Horn did not in fact offer any expertise that met <u>Fed. R. Evid. 702</u>[13]

<u>All</u> he had to offer in terms of actual content, as the Government concedes, was "common sense

observations" and "intuitive and anecdotal observations about the nature of human memory".

Doc 175 at 103-04.  To dress up these platitudes as being somehow in the same category as

standard jury instructions (Doc 175 at 104), or like expert testimony in eyewitness identification

cases, where in some "*narrow* circumstances ... subject to the trial court's *careful supervision*,

*properly conceived* expert testimony may be admissible", assuming *Daubert* criteria are satisfied,

borders on the absurd.  *See United States v. Rodriguez-Felix*, <u>450 F.3d 1117, 1124-26</u> (10th Cir.

2006) (emphasis added).

Also straining the boundaries of logic is the assertion that Horn's testimony was

positively helpful to the defense and that defense counsel must have chosen for tactical reasons

not to challenge it.  Doc 175 at 105-106.  If that were so, defense counsel were truly irrational to

move, as they did, to strike evidence that was, according to the Government, "potentially very

helpful" to the defense.  Doc 175 at 106.  The fact is that defense counsel did move to strike the

evidence, recognizing the validity of the Court's opinion of the evidence's intrinsic

worthlessness.  Defense counsel's error was not in seeking to eliminate from the jury's

consideration Mr. Horn's testimony, but in failing to even attempt to fully wipe that slate clean.

*See Greer v. Miller,*  <u>483 U.S. 756, 766</u>  (1987) (trial counsel bears primary responsibility for

---

[13]**Rule 702   Testimony by Experts**: If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

seeing that error is cured in the manner most advantageous to the client).  Trial counsel's failure to move for a mistrial, when there was nothing to lose by such a motion, and much to gain, demonstrates an remarkable absence of strategic thinking on their client's behalf.

It is perfectly true that generally a jury is presumed to follow its instructions, but that presumption is rebuttable.  For example, in *Penry v. Johnson*, 532 U.S. 782, 799-800 (2001), cited here by the Government, the jury could not "logically and ethically" follow the internally inconsistent instructions it was given.  Similarly the Supreme Court of the United States has long recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994), *quoting Bruton v. United States*, 391 U.S. 123 (1968).  Here, the jury had heard Mr. Horn's testimony over a two-day period and, far from being "innocuous", it had provided a ringing endorsement of the fortitude of law enforcement, and what was in effect an apologia for deficiencies in law enforcement testimony after a traumatic event, complete with overtones of victim impact testimony.  Trial counsel, having failed to probe the specific facts in Horn's possession because of their misapprehension that his discussions with the prosecution witnesses were privileged, (R at 881, Doc 95 at 165-66), also failed to secure a swift instruction to disregard -- the instruction given came three days later -- or to press for a more resounding instruction than the Court's statement that the instruction given was "not special" but "just an instruction in regard to some testimony that you have heard ..."  R at 1739.  This was not, therefore, a case like *Greer*, 482 U.S. at 766, where an immediate objection to a single question, followed by two curative instructions sufficed to prevent violation of due process

rights.  These facts created the overwhelming probability that the jury could not follow the instruction given, and that the effect of Horn's testimony was calamitous to Mr. Barrett's case. *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (mistrial appropriate when probability that instruction will not be followed is overwhelming and there is strong likelihood that effect of the evidence will be devastating).  This was made all the more probable by the government's invitation to the jury to recall the testimony when it referred to the witnesses as "soldiers of the law telling you what they remembered, honestly recalling the circumstances of September 24th . . . Yes, many law enforcement officers responded, a soldier of the law had been murdered." R at  4379.  *See e.g.,* R at 844-45, 864-65 (testimony of James Horn discussing his military experience); 912 (testimony of Mr. Horn comparing ability of Vietnam veterans abilities to recall events).

Finally, the Government attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice.   This reads too much into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates reversal can prove sufficient prejudice.  To limit appellate ineffectiveness claims solely to those cases where an issue is "obvious from the record, and must have leaped out upon even a casual reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995) (internal quotation omitted) runs contrary to the law in this area: effective appellate counsel must, of course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) - and exercise reasonable professional judgment in

deciding what issues to raise and how to argue them. However, the traditional *Strickland* analysis of performance and prejudice applies, 466 U.S. 668, 690 (1984); *see also Smith v. Murray*, 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed with simply because an issue requires consideration going further than a knee-jerk response. *See* Ground 18 hereinbelow.

**13.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate jury instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek appropriate instructions regarding informant witness credibility, drug-addict witness credibility, self-defense, theories of defense and lesser-included offenses. The Government attempts to refute this claim by stating that adequate instructions were given or counsel made proper requests or the omitted instructions were contrary to law and evidence. Doc 175 at 106.

*a.      Credibility instructions.*

There is no question in this case regarding the importance of the testimony of the informant witnesses. Their testimony was the distinguishing factor in this trial as opposed to the two state court trials, which turned out much more favorably for Mr. Barrett. It was crucial that the Court adequately instruct the jury regarding the testimony of these witnesses so that the jury could properly evaluate this testimony. Trial counsel unreasonably failed to seek an informant witness-credibility instruction and a drug-addict credibility instruction, both of which were necessary for proper evaluation of the informant witness testimony.

The Government first states that the Court did, in fact, give an informant witness credibility instruction, citing to Instruction 27 given by the trial court, "Witness -- Personal

Advantage." That instruction says, in pertinent part, that greater care or scrutiny must be given to the testimony of a witness who provides evidence against the defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement.  Doc 240, Inst. 27.  Contrary to the Government's assertion, that was not an informant instruction.  An example of an informant instruction is as follows:

> An informant is someone who provides evidence against someone else for a personal reason or advantage.  The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence.  You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness.  You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.

Tenth Circuit Pattern Criminal Jury Instr., 1.14 (2005).  This is the type of instruction the jury should have received to specifically alert it to pay special attention to the testimony of the informants.  The general instruction given by the Court did not accomplish this.

Trial counsel also unreasonably failed to seek a drug-addict credibility instruction.  The Government concedes that such a request should be given upon request when supported by the record.  Here, there is no doubt that such an instruction was supported by the record.  The evidence clearly established that Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford and Brandie Price were drug addicts at the time of their testimony or at the time of the events to which they testified.  There is no excuse for counsel's failure to request an addict instruction in light of the evidence presented.

The Government argues that the absence of a drug addict credibility charge in this case was harmless because the Court gave other credibility instructions and testimony about the

informants' drug use came out in trial, relying on *United States v. Smith*, <u>692 F.2d 658, 660-661</u> (10th Cir. 1982) and *United States v. Nicholson*, <u>983 F.2d 983, 991</u> (10th Cir. 1993).  The Government is missing the point.  The *Smith* court approved the use of an addict instruction and held that the determination of when such an instruction is required turns on the particular facts of the case.  *See* <u>692 F.2d at 661</u>.  In *Smith*, the Court found that the defendant was not prejudiced by the failure to give an addict instruction in that case because of the extensive testimony on drug usage and the fact that the Court gave credibility instructions on "accomplice, immune informant, and felon testimony, along with the general credibility instruction," which were sufficient to alert the jury.  *Id*.; *see also Nicholson*, <u>983 F.2d at 991</u> (same).

Thus, the Government's cited authority instructs us that whether an addict credibility instruction is required turns on the particular facts of the case.  In Mr. Barrett's case, an addict credibility instruction was required because of the paramount importance of the testimony of the informants and the fact that the trial court gave no special instruction to caution the jury about their testimony.  The only instructions that the Court gave were general credibility instructions.  Those instructions were not sufficient to alert the jury that the informants' testimony must be considered with special care.  Counsel was unprofessionally deficient in failing to seek appropriate instructions; this failure prejudiced Mr. Barrett such that there is a reasonable likelihood that the outcome of his trial was unreliable.

### b.      *Instructions on self-defense and theories of defense*.

The Government further contends that trial counsel were not ineffective for failing to request  instructions on self-defense and theories of defense because the record did not support the giving of such instructions.  Doc 175 at 108-09.  The Government mis-reads the record.

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, <u>428 F.3d 1300, 1308</u> (10th Cir. 2005).  In this case, there was ample support for Mr. Barrett's theory of self-defense to warrant a jury instruction on the issue.[14]  The record supports the following facts: an unmarked Bronco, without lights, came through Mr. Barrett's yard at 12:30 A.M. and hit or came right up against Mr. Barrett's porch.  *See United States v. Barrett*, <u>496 F.3d 1079, 1084</u> (10th Cir. 2007).  Mr. Barrett's son, Toby, was in the yard and screamed, "Dad!" *Id.*  Mr. Barrett fired shots at the approaching vehicle and was seen at one point in the interior of his doorway.  *See id.* at 1084-85.  Mr. Barrett was shot through the window when he was inside the house.  *See id.* at 1085.  There is nothing that establishes that Mr. Barrett knew that it was law enforcement approaching his house.  Thus, it was reasonable that Mr. Barrett was in fear for his life and the life of his son, after hearing his son scream and seeing an unmarked car, without lights, come barreling through his yard very late at night.  There is no doubt that a self-defense instruction should have been requested and given in those circumstances.

---

[14] Such a charge would have informed the jury:

A person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself.

To find the defendant guilty of the crime charged in the indictment, you must be convinced that the government has proved beyond a reasonable doubt:

Either, the defendant did not act in self-defense,

Or, it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat.

Tenth Circuit Pattern Criminal Jury Instr., 1.28 (2005).

The Government argues that even if Mr. Barrett had been in fear for his safety when the Tact Team members raided his home, a self-defense instruction was not warranted because "as the Tenth Circuit noted, the evidence indicated that Barrett shot Eales three times as the victim sought cover behind a vehicle," and that Mr. Barrett "had clearly become the aggressor when he shot a fleeing man three times in the back and could not have demonstrated that he was using reasonable force under the circumstances." Doc 175 at 108.  The Government is grossly distorting the facts.  The Tenth Circuit opinion stated that Eales "opened the passenger door, got out of the vehicle and began moving towards the rear of the vehicle.  At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots," and that Eales' injuries "appeared to have occurred" while Eales was facing away from Barrett.  *Barrett*, 496 F.3d at 1084-85.

There is absolutely nothing in the Tenth Circuit opinion, nor in any of the evidence in this case, stating that Eales was either "seeking cover" or "fleeing" from Mr. Barrett.  This is pure extrapolation,  speculation and fantasy on the part of the Government.  Moreover, the Government fails to point out that it has never been ascertained where Mr. Barrett was standing when the shots were fired.  If Mr. Barrett was inside his home, blindly exchanging gunfire when the Tact Team vehicle came up to his porch in the dead of night, it's very difficult, if not impossible, to assert that Mr. Barrett became the "aggressor" in the raid on his home, especially since law enforcement shot Mr. Barrett four times.  And, as stated, it is very possible that Mr. Barrett had no idea that it was law enforcement raiding his home when the shooting began.  The Government has said nothing that would indicate that a self-defense instruction was not warranted.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                  67                  *Barrett v. U.S.*, 6:09-cv-00105-JHP

Along the same lines, Mr. Barrett was entitled to instructions on his other theories of defense. The Government argues that any instructions of this sort would have been covered in the regular jury charge, which instructed the jury that it must acquit on the basis of reasonable doubt as to any element of any offense charged. Doc 175 at 109. Again, the Government misses the point. Mr. Barrett is entitled to instructions on his theories of defense provided there is support in the record. *See Visinaiz*, 428 F.3d at 1308. The jury should have been instructed that as a defense, Mr. Barrett was asserting that he had no idea that the vehicles contained law enforcement officers. There was evidence in the record to support Mr. Barrett's contention (*i.e.*, the lead vehicle was unmarked, the vehicle was unlit, it was dark outside, there was no indication that law enforcement announced their presence) and, as such, counsel should have requested such an instruction and was unreasonable not to do so. Counsel also should have requested an instruction that Mr. Barrett was asserting as a defense that he was not engaged in drug manufacturing or distribution when the raid took place. There was evidence in the record to support this contention, most obviously, the fact that no drugs were found at Mr. Barrett's home or on Mr. Barrett's person during the raid -- the search revealed only so-called "precursor" items. Counsel were unreasonably ineffective in their failure to request these instructions.

In addition, counsel were ineffective by failing to request a lesser-included offense instruction as discussed more fully, *infra*, in Ground 10.

### 15.   Trial counsel ineffectively omitted objections to prosecutorial misconduct in penalty phase closing arguments.

The Government alleges this particular claim should be rejected because it is stated in a conclusory fashion, and therefore fails to state a ground for relief. Doc 175 at 115. This is

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    68                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

incorrect. Rather than repeat the same factual basis for this and the prosecutorial misconduct claim twice, Movant specifically incorporated by reference the facts and arguments stated in Ground 5(C), demonstrating that the prosecutors engaged in misconduct in closing argument. Mr. Barrett's supporting brief cited specific authority showing that the failure to object was professionally unreasonable and prejudicial. Doc 95 at 180; Doc 149 at 101-02.

**B. Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing.**

**1. Introduction and summary of argument.**

Part B of Ground 2 of the Second Amended § 2255 Motion and supporting brief set forth factual and legal bases for this Court to find the death verdict is unreliable due to defense counsel's failure to investigate and present evidence of Mr. Barrett's unique personal background and character, and the mental impairments he suffers. Evidence substantiating the allegations is already before this Court following record expansion. The Government disputes none of the material facts related to counsel's deficient performance, and none of the historical facts related to Mr. Barrett's background, his family history, social history, development, educational history, work history, suicide attempt, or neurocognitive impairments. Nevertheless, the Government argues the death judgment should be sustained on the following theories:

(1) Defense counsel's presentation at the penalty phase was a concession to Mr. Barrett's alleged desire that they not "beg for his life," permit "the outcome of the case to hinge on personal sympathy for him," "dwell on his childhood," or involve his family in presenting a mitigation case;

(2)  Defense counsel had no reason to be aware that Mr. Barrett and his family exhibited a long history mental illness;

(3)  Counsel "wisely chose" a "strategy" designed simply to show Mr. Barrett's good qualities, and this "strategy" was partially successful because the jury found a number of mitigating factors and rejected the non-statutory "future dangerousness" aggravator;

 (4)  The mitigation evidence proffered in these § 2255 proceedings would have conflicted with and detracted from the evidence showing Mr. Barrett was a non-violent, loved and valued member of his family, and counsel reasonably chose to avoid evidence of Mr. Barrett's past drug use;

(5)  Even if counsel failed to conduct a reasonable investigation, there is no reasonable probability of a different outcome because the omitted mitigation evidence would have undermined the mitigation case that was presented.  Doc 175 at 116-125.

In this Reply, Mr. Barrett shows none of the Government's arguments has factual support either in the trial record or the expanded post-conviction record, or the slightest legal merit under the relevant case law.  The Government's factual theory is based on conjecture or inferences that are contradicted by the trial record.  The Government's legal theory wholly ignores Supreme Court cases contrary to the older cases from lower Courts, none more recent than 2001, on which it relies.[15]

---

[15]  The Government studiously ignores cases such as *Wilson v. Sirmons*, 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008) (noting that Supreme Court, beginning with *Williams v. Taylor*, 529 U.S. 362 (2000), has placed increased emphasis on counsel's obligation to investigate and present mitigating evidence, often on basis of family upbringing and mental health; due to crucial mitigating impact that evidence of deprived upbringing and mental illness can have in penalty phase of a capital case, counsel *must* pursue this area with due diligence).

As the expanded record amply demonstrates a violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, and the Response fails to set forth a factual dispute that could sustain the judgment, this Court should hold that Mr. Barrett has demonstrated his entitlement to relief.  At a minimum, this Court should order an evidentiary hearing to resolve any material factual disputes.  28 U.S.C. § 2255(b).

### 2.      Undisputed facts and law.

On the issue of deficient performance, the Second Amended Motion and the exhibits contained in the expanded record set out a detailed chronology of events related to defense counsel's lack of investigation and preparation for the penalty phase.  2nd Amend. Pet. (Doc 95) at 185-194; Merits Brief (Doc 149) at 106-14.  The Government has filed declarations from defense counsel Bret Smith (Resp. Exh. 11) and Roger Hilfiger (Resp. Exh. 12).  The following facts are not disputed by any evidence cited in the Government's Response or the attached exhibits:

- defense counsel's ability to investigate mitigation evidence was curtailed by the trial court's funding orders which provided far less resources than was routine in federal death penalty cases (Mot. Exh. 56 at 4-5);

- prior counsel John Echols advised Mr. Hilfiger and this Court that the mitigation investigation conducted prior to the state-Court trials was done by a novice who did not complete her work, and did not produce a report (Mot. Exh. 64 at 2, 4);

- this Court found the services of a mitigation specialist were reasonably necessary and authorized counsel to employ one for 100 hours (Doc 97 at 3);

- defense counsel inquired about a mitigation investigator in late June 2005, and in mid-August 2005 asked Dr. Jeanne Russell to perform that service, but counsel never actually retained anyone to investigate a mitigation case;[16]

- defense counsel never interviewed Mr. Barrett's family members about his personal history, the family history, or other matters related in their post-conviction declarations;[17]

- defense counsel possessed medical records showing Mr. Barrett had been diagnosed with and treated for head injuries, depression, bipolar disorder, and attempting suicide by shooting himself in the chest with a shotgun, and they possessed the report of Dr. Russell referring to the state-Court evaluation conducted by Dr. Bill Sharp, Ph.D.;[18]

- defense counsel retained Dr. Russell in August 2005 to update her risk assessment, but Dr. Russell did not perform any other type of mental health evaluation, and counsel otherwise did not consult any mental health expert in preparation for the penalty phase;

---

[16] Mr. Hilfiger and Mr. Smith state that they read Movant's Exhibit 56, the declaration of Dr. Jeanne Russell. Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10. Dr. Russell states that Mr. Smith asked her in mid-August 2005 to conduct mitigation investigation. Pet. Exh. 56 at 2. When she declined, it is undisputed that Mr. Smith told Dr. Russell the Court would not approve a comprehensive mitigation investigation, even if there were time to conduct one. *Id.* at 4-5.

[17] Mr. Hilfiger and Mr. Smith confirm in their declarations that they spoke with members of Mr. Barrett's family, but do not dispute the accounts of family members regarding the timing or content of those conversations. *Compare* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, *with* Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.

[18] The Government has filed portions of those records, which it acknowledges were cherry-picked to illustrate a point, Govt Resp. at 122 n.15, to argue that doctors changed some of their diagnoses, or disagreed with each other. Govt. Resp. at 122-23. However, the Government has not presented any competent evidence disputing the opinions of Dr. George Woods or Dr. Myla Young, who reviewed the documents.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

72

*Barrett v. U.S.*, 6:09-cv-00105-JHP

- on September 9, 2005, defense counsel advised the Court that they were contacting prior counsel "because we have been able to find very little on mitigation" in the files of the state trials, and this and other discussion led this Court to describe the defense's preparation as "still a work in progress;" [19]

- due to defense counsel's failures to investigate Mr. Barrett's life history and have him evaluated by a psychologist or psychologist counsel prior to trial counsel neither could have advised Mr. Barrett about the available options for the penalty phase nor could they have made a strategic choice between options of which they were ignorant;[20]

- the performance of counsel described here is below the prevailing professional norms of capital defense practice that are codified in the 2003 revised ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.[21]

---

[19] Although the Government does not, and could not, dispute the chronology set forth in the trial record and expanded record in these proceedings, including that defense counsel never retained the mitigation expert authorized by this Court, the Government argues defense counsel could have done more "'with the luxury of time.'" Govt. Resp. at 119, quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). That is Mr. Barrett's point. If defense counsel had acted according to prevailing professional norms and begun work on the penalty phase before August 2005, and made use of resources the Court made available, they could have adduced vastly more mitigation evidence than they did.

[20] The Government argues that defense counsel "elected" to present certain evidence from Mr. Barrett's family and friends, "[i]n view of the circumstances confronting defense counsel," but fails to present any evidence that this alleged election was an informed choice. On the contrary, neither Mr. Hilfiger nor Mr. Smith state in their declarations that they either knew about the mitigation evidence proffered in these proceedings or, if they knew the facts, that they elected not to present them. Consequently, the Government has failed to create a disputed issue of material fact on this issue.

[21] The Response contains no references to any evidence or legal authority regarding the professional norms of capital defense practice that were prevailing at the time of trial. The Government cites only one case decided after 2001, and that is on the issue of prejudice, not deficient performance. Doc 175 at 125 n.15, citing *Rhoades v. Arave*, No. CV 93-0155-S-EJL,

(continued...)

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    73                 *Barrett v. U.S.*, 6:09-cv-00105-JHP

For the reasons stated in the Merits Brief (Doc 149) and herein, these facts are sufficient to establish that defense counsel's preparation for the penalty phase fell below an objective standard of reasonableness. This Court should hold Mr. Barrett satisfied the first prong of *Strickland*.

As to the prejudice prong of *Strickland*, the Government does not dispute any of the historical facts set forth on pages 195 to 230 of the Second Amended Motion. Although these facts are drawn from the accounts of family members, and their releases of personal information to support Mr. Barrett, the Government argues these facts would have undercut the jury's finding that Mr. Barrett was loved by his family. Govt. Resp. at 125. This is a matter of pure conjecture that runs contrary to the declarations before this Court which express love for and devotion to Mr. Barrett, and it is contrary to the holdings of numerous Supreme Court decisions that were cited in Mr. Barrett's supporting brief and completely ignored by the Government. *See Porter v. McCullum*, 130 S. Ct. 447, 455 (2009) (holding it was unreasonable for state Court applying *Strickland* to entirely discount mental health mitigation presented post conviction merely because "State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them" and to discount childhood abuse and military record because they included negative information about defendant); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (prejudice established "although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty" because "that is not the test"); *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (rejecting alleged strategic excuse for omitting mitigation

---

[21](...continued)
2007 WL 1550441 (D. Id. May 24, 2007).

evidence and finding prejudice where historical facts were not disputed because "there is a reasonable probability that at least one juror would have struck a different balance"); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (unreasonable for state Court to discount mitigation evidence from defendant's background and lay mental health evidence even though "not all of the additional evidence was favorable to Williams").  Consequently, there is no genuine dispute as to any material fact regarding Mr. Barrett's life history.

As to mental health issues, the Government admits that its disputation of the facts consists solely of cherry-picked excerpts from Mr. Barrett's medical records that are subject only to the interpretation of the Government's lawyers.  Govt. Resp. at 122 n.15.  The Government opines that evidence of Mr. Barrett's mental health problems would not have been mitigating because "his entire mental health history was inextricably tied to his use of illegal drugs."  Govt. Resp. at 124.  However, the Government does not dispute the evidence that Mr. Barrett's parents and grandparents modeled alcohol and drug abuse, *see* Exh. 117 at ¶¶ 42 & 44, Motion (Doc 70) or Dr. Woods' scientific conclusion that Bipolar Disorder and Post Traumatic Stress Disorder *predisposed* Mr. Barrett to develop chemical dependency problems, *id.* at ¶ 44, or his conclusion that Mr. Barrett was, particularly at the time before the raid, self-medicated for pre-existing problems, *id.* at ¶¶ 46 & 76.  The Government ignores this evidence placing Mr. Barrett's drug use in a mitigating, not aggravating, framework.  In this respect, too, the Government's defense is essentially identical to the unreasonable error found in *Porter v. McCullum*, *supra*, i.e. there could be no prejudice because the prosecution opines the mental health mitigation is weak.  It is

reasonably probable the undisputed evidence is sufficient to have persuaded at least one juror to spare Mr. Barrett's life.[22]

The Government also does not dispute Mr. Barrett's showing that the available mitigation evidence – both that adduced in support of Part A of Ground2, and the undisputed facts adduced in support of Part B – would have undercut the statutory aggravating circumstances and the jury's finding that Mr. Barrett intended to kill Trooper Eales.  Likewise, the Government does not dispute the record evidence that the prosecution was able to exploit defense counsel's lack of preparation and investigation by eliciting damaging testimony from family members that would have been avoided or rendered harmless if counsel had conducted the most cursory of investigations or made reasonable use of the facts from the skeletal state mitigation investigation.[23]

Taking into account the jury's rejection of the future-dangerous aggravating factor, and "the totality of the evidence" adduced at trial and in post-conviction proceedings, *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397, this Court should find the evidence  "might well have influenced the jury's appraisal of [the defendant's] culpability," *Williams*, 529 U.S. at 398, and vacate the death sentence.

To say the least, the Government has failed to show the trial record conclusively refutes Mr. Barrett's allegations and the expanded record substantiating those allegations.  28 U.S.C. §

---

[22]  The Government never acknowledges (or disputes) this is the standard for prejudice in a federal death penalty case.

[23]  The Government's two-sentence characterization of Steven Barrett's testimony pales in comparison with the pages of cross-examination that could have been avoided if defense counsel had listened to him prior to trial.  *Compare* Doc 175 at 117 *with* Mot. Exh. 99 *and* Merits Brief (Doc 149) at 111 & n.79.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                76                 *Barrett v. U.S.*, 6:09-cv-00105-JHP

2255(b).  The Government's primary defense asserts that Mr. Barrett's counsel either "elected" not to present evidence of Mr. Barrett's background, or that they lacked information to trigger an investigation of mental health issues.  Govt. Resp. at 116.  However, as indicated *supra* and discussed at greater length *infra*, the Government's evidence fails to support its contentions and fails to establish a legally viable defense.  Therefore, if the Court does not vacate the death judgment and order a new penalty trial, it must at least conduct an evidentiary hearing.

> **3.      The declarations of trial counsel support findings of deficient performance and prejudice.**

The Government places great emphasis on the declarations of Mr. Hilfiger and Mr. Smith, citing them ten times in the ten pages of the Response devoted to Part B of Ground 2.  Doc 175 at 116-25.  The Government argues that defense counsel knowingly chose not to present evidence like that proffered with the § 2255 Motion because "Kenneth Barrett did not want to present a case in mitigation that centered on sympathy for him or dwelled on his family."  Doc 175 at 116.  (We say "like" because the Government never identifies any particular witness or document to which trial counsel or Mr. Barrett objected.)

For at least five reasons addressed in detail *infra*, the Government's theory is distinguishable from the post-hoc rationalization the Supreme Court rejected in *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), only insofar as the theory in this case constitutes additional evidence of deficient performance.  First, the declarations of counsel are internally inconsistent, at least if given the meaning the Government imputes to them.  Second, neither declaration specifically endorses, or even refers to, the theory the Government advances.  Third, the declarations (as interpreted by the Government) are inconsistent with the statements of numerous

other witnesses whose accounts Mr. Hilfiger and Mr. Smith do not dispute.  Fourth, the

declarations are contradicted by the trial record, including statements of trial counsel.  Fifth,

assuming the declarations mean what the Government argues, they are independent evidence that

Mr. Hilfiger and Mr. Smith did not understand mitigation, and unreasonably failed to carry out

routine responsibilities of capital defense counsel.

### a.      *Internal inconsistencies and adoptive admissions*.

The Government relies upon argument that embellishes and distorts the statements of

defense counsel.  The paragraphs of each declaration to which the Government seems to refer are

verbatim identical.  They say the following:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase
> of the trial.  He did not want the outcome of the case to hinge on personal
> sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood.  He also
> wanted to minimize the amount of testimony elicited from his relatives,
> particularly his son, mother and ex-wife, though he understood that decision could
> work to his detriment.

> * * *

> I did not want to premise our case in mitigation on Mr. Barrett's drug use because
> I did not believe that the jury would be sympathetic to such a strategy.

Resp. Exh. 11 at ¶¶ 11, 12, 14; Resp. Exh. 12 at ¶¶ 15, 16, 18.  Each attorney also states that he

was not familiar with Dr. William Sharp's evaluation of Mr. Barrett prior to the second state

trial.  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.

From these statements, the Government argues, implicitly at least, that defense counsel

were under no duty to investigate Mr. Barrett's background because he "solemnly and adamantly

wished to avoid presenting a mitigation case based on personal sympathy for him," and "as a

point of pride, he wanted to minimize reliance on his relatives to avoid bringing them unnecessary embarrassment." Doc 175 at 120. The unspoken premise in the Government's argument is that defense counsel wanted to conduct a background investigation, and could have done so prior to trial, but Mr. Barrett precluded them from doing so. The declarations contradict that inference in several ways.

First, neither Mr. Hilfiger nor Mr. Smith relate the alleged statements of Mr. Barrett to any tactical or strategic decisions they actually made in the case. Trial counsel simply do not assert that their failure to investigate Movant's background was influenced by any statement Mr. Barrett made to them. The declarations show Government counsel provided defense counsel with exhibits proffered with the § 2255 Motion, Resp. Exh. 11 at ¶¶ 8-10; Resp. Exh. 12 at ¶¶ 10-12, but neither defense attorney says he could not have investigated or presented a single witness or fact based on the alleged statements from Mr. Barrett.

In fact, the declarations contradict the Government's inference that Mr. Barrett interfered with his counsel. Mr. Smith states, "Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had." Resp. Exh. 11 at ¶ 3. Mr. Smith and Mr. Hilfiger "did not find Mr. Barrett disruptive in any way." *Id.* at ¶ 13; Resp. Exh. 12 at ¶ 17 (using same language). Whereas the Government argues that Mr. Barrett's outburst during the penalty argument of Mr. Sperling shows "he was manifestly disinterested in relying on mitigation evidence premised on any alleged dysfunction in his upbringing," and cites trial counsel for this proposition, Doc 175 at 120, according to Mr. Hilfiger, "Mr. Barrett's outburst . . . was a very unusual and *unanticipated* event." Resp. Exh. 12 at ¶ 17 (emphasis added).

Nor do trial counsel state the evidence they actually presented was influenced by Mr. Barrett's alleged statements.  Neither trial attorney asserts that he knew the facts of Mr. Barrett's background and elected not to present them.  Each counsel asserts that he was unaware of the evidence of mental impairments developed by Dr. Sharp prior to the second state trial.  Consequently, counsel could not have made any decision regarding those facts.  And while the Government claims the mitigating evidence presented in these § 2255 proceedings would have contradicted the case that was presented at trial (Doc 175 at 121), neither Mr. Hilfiger nor Mr. Smith endorse that view.

The Government cites the declarations of counsel for the proposition that they would not have presented mental health mitigation because "records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs."  Doc 175 at 124.  Again the declarations are inconsistent with the Government's theory.  Mr. Hilfiger and Mr. Smith state that they read Dr. Sharp's report prior to giving their declarations.  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.  Neither attorney so much as suggests he would not have presented Dr. Sharp's testimony.  Similarly, it appears defense counsel were provided with the reports of Dr. Woods and Dr. Young before they signed their declarations.  As noted *supra*, Dr. Woods finds that Mr. Barrett, like many individuals discussed in the scientific literature, was predisposed to develop chemical dependency problems due to his underlying Bipolar Disorder and PTSD.  Mot. Exh. 117 at ¶ 44.  Yet neither attorney says the opinions expressed in those declarations would have been excluded by their desire not to premise mitigation on drug use.

On the contrary, counsel's statement that they "did not want to *premise* our case in mitigation on Mr. Barrett's drug use" (emphasis added), suggests they would have welcomed

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    80                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

evidence that premised his drug use on underlying mental illnesses. Given that the jury would already have convicted Mr. Barrett of a drug offense prior to the penalty phase, and likely credited the informants' testimony about his drug use, the only rational course for counsel would be to explain the drug use as something other than pleasure-seeking or bare defiance of the law.

To the extent defense counsel were apprised of the allegations in the Amended § 2255 Motion, and the supporting exhibits, and either did not dispute them, or failed to endorse the Government's theories, the Court should view the omissions as adoptive admissions by silence.[24] *See* Fed. R. Evid. 801(d)(2)(B) (discussing adoptive admissions: "a statement of which the party has manifested an adoption or belief in its truth"); 5 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* (2d ed. 2009) (noting that "[a] party can adopt another's statement by responding to it with silence," and that Courts must look to the circumstances including whether the party "understand[s] the statement" and is able or "unable ... to reply to it"). The identical language used in the two declarations shows either collusion between the witnesses, or more likely, that the Government's lawyers prepared the declarations. If the Government had been able to substantiate its theories in counsel's declarations, it would have done so.

### b. *Inconsistencies between Government's theory and other witnesses.*

The Government's expansive interpretation of trial counsel's declarations to suggest Mr. Barrett's alleged statements influenced defense counsel's decision whether to investigate

---

[24] There is no reason for Mr. Barrett to admit or deny the statements attributed to him by Mr. Hilfiger and Mr. Smith because the declarations of counsel support Mr. Barrett's grounds for relief. For the reasons stated herein, any such statements either did not influence counsel's conduct, or counsel responded to any such statements in a manner that constitutes ineffective assistance.

conflicts with the testimony from at least two disinterested witnesses.  Dr. Jeanne Russell has given this Court a declaration recounting that in mid-August 2005, Mr. Smith contacted her and asked her to perform a mitigation investigation.  She states that she told Mr. Smith she was not qualified to perform that role, and in any event, with the trial only one month away, it was too late.  She states that Mr. Smith told her the Court would not fund a comprehensive mitigation investigation.  Exh. 56 at 2, 4-5, Motion.

Mr. Smith and Mr. Hilfiger state that they have reviewed Dr. Russell's declaration. While they dispute her recollection regarding the presentation of the risk assessment she performed,[25] neither Mr. Hilfiger nor Mr. Smith disputes Dr. Russell's statements about the lack of mitigation investigation.  Resp. Exh. 11 at ¶ 9, Resp. Exh. 12 at ¶ 11.  If Mr. Barrett had indicated to counsel that they should not, or need not, investigate his background, there was no reason for counsel to ask Dr. Russell to do just that one month before the trial.  Similarly, there could be no reason for Mr. Smith to complain about the lack of funding for a mitigation investigation if, per Mr. Barrett's wishes, one was unnecessary.

Similarly, Mr. Hilfiger's declaration does not dispute the declaration of Federal Defender Julia O'Connell in which she states that Mr. Hilfiger left her a voicemail message on June 30, 2005, in which he asked whether he could meet with a mitigation specialist she had used.  Mot. Exh. 67 at 3-4.  Neither does Mr. Hilfiger dispute that Ms. O'Connell advised him by e-mail on July 3, 2005 to contact resource counsel, Richard Burr.  *Id.* at 4.  Mr. Hilfiger does not dispute

---

[25]  This dispute is not material.  Mr. Barrett does not allege it was unreasonable for defense counsel not to present Dr. Russell.  As she states, the sole purpose of her evaluation was to combat evidence of future-dangerousness.  Mot. Exh. 56, at 1-2.  As the jury rejected that non-statutory aggravating factor, there could be no prejudice.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    82                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

Mr. Burr's declaration stating that he had only one contact with Mr. Hilfiger after Mr. Echols left the case, and that was not on a substantive matter. Mot. Exh. 118 at ¶¶ 13-15.

Dr. Russell and Federal Defender O'Connell are disinterested percipient witnesses who can document their contacts with defense counsel in contemporaneous records. Dr. Russell's undisputed account is corroborated by the contemporaneous trial record, discussed in the next section of this Reply. These witnesses contradict the Government's post-hoc claims by showing that throughout the summer of 2005 defense counsel were acting as though they wanted to conduct a thorough mitigation investigation but were hampered only by their own neglect and the Court's funding decisions.

Mr. Hilfiger and Mr. Smith state that they met with various members of Mr. Barrett's family "including (but not limited to)" his mother, father, step-mother, uncle Roger, and son Toby. Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9. These same family members, and many more, have provided this Court with declarations in which they describe the timing and content of their conversations with defense counsel, if any. Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96. As set forth on pages 110 to 111 of Mr. Barrett's merits brief (Doc 149), in those instances where defense counsel interviewed family members at all (in the sense of asking questions rather than telling them the questions that would be asked on the stand), defense counsel either did not ask about Mr. Barrett's family history, mental health history, or they actively dissuaded family members from providing such information. Only Gelene Dotson was interviewed prior to the trial. Defense counsel's declarations are silent on the timing and content of their conversations with Mr. Barrett's family under circumstances where they would be

expected either to deny their accounts, or explain them in terms of Mr. Barrett's alleged statements.

Still more evidence conflicts with the Government's claim that Mr. Barrett resisted a mitigation case based on dysfunction, abuse and mental illness.  State court counsel began interviewing Mr. Barrett's family members and obtaining releases in order to present evidence about Mr. Barrett's background.  John Echols and Jack Gordon, Mr. Barrett's state lawyers, received no direction that certain areas of mitigating evidence were not to be investigated or presented.  Mr. Echols has informed this Court that

> Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

Mot. Exh. 34 at 14.

### c.     *Inconsistencies between the trial record and the Government's theory*.

There is a glaring inconsistency between the Government's theory and reality:  defense counsel's penalty phase case actually dwelled upon testimony from the very family members whom the Government contends Mr. Barrett did not want to testify.  *See* Doc 175 at 116-19.

To the extent the Government argues defense counsel knew the facts about Mr. Barrett's family and personal history adduced in these proceedings and "elected" not to present those facts but to present other facts through the same witnesses, the record refutes the argument.  After counsel's contacts with Ms. O'Connell and Dr. Russell, on September 9, 2005, Mr. Smith

advised the Court that he was contacting "Mr. Echols[] because we have been able to find very little on mitigation" in the files from the past trials. Tr. 9/9/05 Hr'g at 43. This Court generously described the state of the defense's preparation for the penalty phase as a "work in progress," at that time, and that characterization was confirmed less than one month later when counsel advised the Court they were still attempting to develop mitigation evidence. Tr. 10/3/05 Hr'g at 7. These statements and the other evidence before this Court overwhelmingly demonstrate that Mr. Hilfiger and Mr. Smith could not have chosen to exclude facts from their presentation, because they had not investigated the facts.

The Government contends it was reasonable for defense counsel not to conduct any mental health investigation because "Barrett has not shown that the results of [Dr. Russell's] contemporaneous evaluation merited further exploration." Doc 175 at 121-22. Defense counsel's current reliance upon Dr. Russell to give them an indication whether "Mr. Barrett suffered from a significant mental health condition," Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10, is contradicted by the statements they made at the time of trial regarding the purpose for which they retained Dr. Russell. On September 9, 2005, Mr. Smith advised the Court that the defense was not relying upon Dr. Russell as a mental health expert. Tr. 9/9/05 Hr'g at 41. On October 3, 2005, defense counsel advised the Court that they had not consulted with a psychiatrist or psychologist. Tr. 10/3/05 Hr'g at 7.

The contemporaneous statements of defense counsel are consistent with Dr. Russell's declaration in which she states, "I did not evaluate Mr. Barrett's neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment.

The instruments I used were solely for the purpose of this assessment."[26]  Mot. Exh. 56 at 1-2.

The implications of counsel's post-conviction declarations, except to the extent that they do not

dispute Dr. Russell's account, are inconsistent with their trial-time statements.  To the extent

defense counsel relied upon Dr. Russell to guide them regarding Mr. Barrett's competence to

stand trial or mitigation evidence unrelated to future-dangerousness, their decision-making

reflects an unprofessional lack of understanding of the issues.  *See Haliym v. Mitchell*, 492 F.3d

680, 715-16 (6th Cir. 2007) (counsel ineffective for relying solely upon one and one-half our

evaluation of defendant by psychiatrist); *cf. Starr v. Lockhart,* 23 F.3d 1280, 1289-1290 (8th Cir.

1994) (competency evaluation did not satisfy due process right to assistance for defense as it was

inappropriate to purpose of developing mitigation case based on defendant's functional deficits);

*Frederick v. State,* 902 P.2d 1092, 1098 (Okl. Cr. 1995) (prejudicial error in capital case to deny

a continuance where expert appointed under *Ake* lacked the competence to diagnose and assess

the disorder defendant apparently suffered from).

Dr. Russell states that when Mr. Smith contacted her in mid-August 2005 he did not have

a copy of her 2003 report, Mot. Exh. 56 at 2, and throughout their interactions he gave the

impression that he lacked knowledge of Mr. Barrett's background and the investigation of it that

was done prior to the second state trial.  *Id.* at 5.  Although defense counsel do not dispute her

account, it is worth noting that the trial record substantiates it.  Three weeks after their initial

discussions, Mr. Smith indicated that he did not know that Dr. Russell had examined Mr. Barrett,

but he believed she had "reviewed records and what have you."  Tr. 9/9/05 Hr'g at 41.

---

[26]  This statement conclusively refutes the Government's contention that Dr. Russell's visit with Mr. Barrett constituted a mental health mitigation investigation.  Doc 175 at 121 and Resp. Exh. 5.

Counsel's statements in a later hearing corroborate Dr. Russell's statement that Mr. Smith wanted her to be a mitigation expert.  During a hearing held that day, Mr. Hilfiger referred to the $15,000.00 the Court had authorized for a mitigation specialist, and said "when he [Mr. Smith] talked to *her* about doing it," he did not think they were "*going to get* to $10,000.00."  Tr. 10/3/05 Hr'g at 6:17-21 (emphasis added).  *See also id.* at 7:15-21 (referring to female expert who is also a psychologist who "has provided us extensive questions for their psychologist, Mr. Horn").[27]  Counsel's statements conclusively show that, contrary to long established standards of practice, they had not investigated a mitigation strategy prior to trial.  *See authorities cited in* Doc 149 at 105-06 & nn. 62-69.

The September 9, 2005 hearing also places in context defense counsel's current statements about when they gathered information from the state cases.  Mr. Hilfiger's declaration confirms the trial record insofar as he states that he first collected files from Mr. Echols and OIDS in May 2005, after he was elevated to lead counsel.  *See* Doc 138.  He does not dispute Mr. Echols contemporaneous records showing Mr. Hilfiger had not consulted the online database of state-Court files Mr. Echols had made available.   Mot. Exh. 34 at 13.  While Mr. Hilfiger says he had believed he received all the materials in May 2005, the record shows that in September 2005, Mr. Smith was not sure and was contacting Mr. Echols.  Tr. 9/9/05 Hr'g at 43.  Counsel did not follow this Court's order to give the case the "highest priority."  Doc 31

---

[27]  In *Wiggins v. Smith*, the Supreme Court found "counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background."  *Wiggins*, 539 U.S. at 531.  In this case, counsel's decision to hire Dr. Russell illuminates the issue and reveals that prior to August 2005 counsel had done nothing to investigate Mr. Barrett's background, and when Dr. Russell declined to perform that role, counsel did nothing afterward, either.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    87                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

The trial record also refutes the Government's contention that counsel were not on notice of a need to investigate Mr. Barrett's mental health problems because Mr. Hilfiger and Mr. Smith say they were "not familiar with Dr. [William] Sharp."  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.  Mr. Hilfiger states, "I was not aware that there was any . . . contact between Dr. Sharp and Kenneth Barrett" such as a mental health evaluation.  Resp. Exh. 12 at ¶ 12.  Mr. Smith, who worked most closely with Dr. Russell, Resp. Exh. 12 at ¶ 10, says he "did not ask Dr. Sharp to provide me with a report in 2005, nor did I direct anyone else to do so."  Resp. Exh. 11 at ¶ 10.  The Government contends these statements show there were no "documents in the defense file that would have suggested the need to investigate the possibility of serious mental illness."  Doc 175 at 121.

However, in the risk assessment obtained by defense counsel on September 15, 2005, and filed on September 23, 2010, Dr. Russell specifically states on page 3 that she reviewed the "Psychological Evaluation completed by psychologist, William Sharp, dated September 28, 2002."  *See* Docs. 208, 210.  Dr. Russell goes on to list the "Assessment Tools used" by Dr. Sharp.  Most of Dr. Russell's 2005 report, including the reference to Dr. Sharp's evaluation, is identical to her 2003 report which Mr. Smith obtained in August 2005.  *See* Mot. Exh. 56 at 3-4.  If defense counsel never heard of Dr. Sharp and never requested his report, it is because they were not paying attention to the very person whom Mr. Hilfiger described as the defense mitigation expert.  Tr. 10/3/05 Hr'g at 6.

To the extent the Government argues that the statements counsel attribute to Mr. Barrett contradict defense counsel's statements that he was cooperative, the trial record also contradicts the Government's claims.  On June 2, 2005, Mr. Hilfiger advised this Court that Mr. Smith had

been speaking with Mr. Barrett and "he indicated that everything's okay; he's on board."  Tr. 6/2/2005 Hr'g at 7:2-6.  On June 6, 2005, this Court confirmed through a colloquy with Mr. Barrett that issues between himself and defense counsel had been resolved.  Tr. 6/6/05 Hr'g at 2:19 - 3:14.  That Mr. Barrett was cooperative with counsel also is confirmed in Exh. 36, Motion (Doc 70), a letter Mr. Barrett wrote to Mr. Hilfiger around the time of these hearings in which he promised to work with and support his counsel.  If counsel had acceded to any desire of Mr. Barrett's that they believed was "to his detriment," they had every reason and opportunity to put that issue on the record, but they gave exactly the opposite representation.

In sum, the record shows trial counsel informing this Court in June 2005 that Mr. Barrett was cooperating with counsel, and Mr. Barrett confirmed that in the presence of counsel without being contradicted.  In September and October 2005 counsel informed this Court that their mitigation investigation was ongoing, and although they identified another impediment (the prior files), they did not suggest Mr. Barrett objected to any form or area of investigation.  Disinterested percipient witnesses also confirm that trial counsel expressed no concerns about the scope of investigation at the time of trial, and counsel's current declarations do not dispute those accounts.

### d.    *Inconsistencies between the Government's theory and the law of effective assistance of counsel.*

The record shows that whatever statements Mr. Barrett may have made to defense counsel, their unreasonably delayed and fleeting effort to gather mitigation evidence, and the evidence they actually presented, was not influenced by those statements.  As the Supreme Court has repeatedly held, counsel cannot make a strategic (or client-directed) decision about what

evidence to present, if they failed to learn through investigation what the evidence would show. *Wiggins*, *supra*, 539 U.S. at 526 (record shows mitigation presented at trial was not strategic choice but "resulted from inattention"); *id.* at 536 ("counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable").  Nevertheless, as the Government has raised the defense, we will assume for the sake of this Reply the statements were made, and address whether the evidence indicates defense counsel acted reasonably under *Strickland* and its progeny.

The test is familiar: "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 690.  Due to the lack of explanation in the declarations regarding what, if anything, Mr. Barrett's alleged statements meant to defense counsel, it is necessary to proceed hypothetically.

While the Government treats counsel's declarations as a shibboleth that precludes a finding of deficient performance, Supreme Court and circuit precedent shows that under a variety of circumstances, statements like those attributed to Mr. Barrett do not obviate the duty to investigate.  *Porter*, *supra*, 130 S. Ct. at 453.  In *Porter*, the Court found ineffective assistance for failing to investigate and present mitigation evidence although "counsel described Porter as fatalistic and uncooperative.  But he acknowledged that although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview."  130 S. Ct. at 453.  The Court assumed what counsel said about Porter was true, and held counsel's "decision not to investigate did not reflect reasonable professional judgment."  *Ibid.*  Similarly, in *Rompilla v. Beard*, *supra*, the Supreme Court found

ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive" of counsel's efforts, 545 U.S. at 381.  The Court also found counsel ineffective because a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93.  *See also Hamilton v. Ayers,* 583 F.3d 1100, 1117-18 (9th Cir. 2009); *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008) (retained counsel not excused from developing and introducing mental health evidence because the client said he did not want to spend the money for an expert).[28]  In this case, it is undisputed that counsel were free to speak with any member of Mr. Barrett's family about anything they chose, *see* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, that they possessed "Mr. Barrett's medical, educational and mental health records," Resp. Exh. 12 at ¶ 4, and that they failed to ask about family history, or seek a mental health evaluation.

Assuming Mr. Hilfiger and Mr. Smith understood Mr. Barrett's statements to mean they should not investigate evidence of his family's history of mental illness, alcoholism, infidelity, broken marriage, separations, violence, and abuse, because that would be begging or seeking sympathy, counsel exhibited a lack of understanding of mitigation.[29]  *See Anderson v. Sirmons,* 476 F.3d 1131, 1144-45 (10th Cir. 2007); *Smith v. Mullin,* 379 F.3d 919, 943 (10th Cir. 2004); *Mayes v. Gibson,* 210 F.3d 1284, 1298 (10th Cir. 2000) (mitigating evidence provides the

---

[28]  Indeed, it has been held that even where a client forecloses certain avenues of mitigation, it is arguably more incumbent on counsel to seek out alternative sources of mitigating information.  *Hamilton, supra.*; *Karis v. Calderon,* 283 F.3d 1117, 1136 (9th Cir. 2002).

[29]  Mr. Hilfiger and Mr. Smith both place the phrase "beg for his life" in ironic quotation marks.  That counsel are dubious about the meaning of this phrase suggests, in addition to other evidence, that this alleged statement was not perceived as a direct impediment to any specific area of investigation or mitigation evidence.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                91                *Barrett v. U.S.*, 6:09-cv-00105-JHP

opportunity to humanize the defendant and explain the offense in the context of the defendant's life).  Decisions based on an erroneous understanding of an issue constitute deficient performance.  *See*, *e.g.*,  *Williams*, 529 U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").

Mr. Barrett has already cited numerous cases explaining the object and purpose of mitigation evidence in a capital trial.  *See* Merits Brief  (Doc 149) at 104-05.  As resource counsel Richard Burr states in his supplemental declaration,

> Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy.  Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. [30] * * *
>
> * * * Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction.  Mitigation also involves offering the jury an explanation for the defendant's actions.  Nearly every initially-reluctant capital defendant allows this evidence to be presented.
>
> It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy.  Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life.  Both the experience of capital trial attorneys and scientific studies of how capital jurors decide whether to vote for life or death show that mitigation

---

[30]  Citing *Williams v. Taylor,* 529 U.S. 362, 369 n.2, 397-98 (O'Connor, J., concurring).

succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm.  *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases:  What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story.  The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding.  Dwelling on a defendant's childhood could be seen as a plea for sympathy.  That kind of one dimensional penalty phase case is not the norm in federal death penalty cases.  Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms.  That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

Exh. 219 at ¶¶ 13-16.

As already noted, the declarations of defense counsel do not support the expansive arguments the Government bases on them.  Assuming *arguendo* counsel understood Mr. Barrett's alleged statements to be a barrier to investigation, their response, like that of counsel in *Porter* and *Rompilla* was unreasonable.  As Mr. Burr states in his supplemental declaration, this sort of occurrence is "death penalty defense 101," and the 2003 ABA Guidelines provided counsel with a variety of responses, none of which they pursued.  The 2003 Commentary on ABA Guideline 10.5 (Relationship with the Client) provides the following:

Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. *It is ineffective assistance for counsel to simply acquiesce to such wishes*, which usually reflect overwhelming feelings of guilt or despair rather than a rational

decision.  Counsel should initially try to identify the source of the client's hopelessness.  Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates.  Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time.  One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

(Emphasis added).  These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett.  Even so, it does not appear that Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

Neither Mr. Hilfiger nor Mr. Smith indicates that he made any effort to identify the source of their client's alleged concern.  Mr. Barrett's family were very close to him and supportive during the trial.  They have been reinterviewed to ascertain whether Mr. Hilfiger or Mr. Smith ever told them Mr. Barrett did not want mitigation evidence presented.  The evidence shows defense counsel never sought assistance from Mr. Barrett's family.  Indeed, they never mentioned the issue.  Exh. 217 at 1, 3 (federal trial counsel never contacted her ahead of trial; Mr. Barrett stated he only disagreed with counsel's failure to call certain witnesses); Exhs. 216, 212; Exh. 207 at 3; Exh. 206 at 2-3; Exhs. 208, 214.  These declarations, like those submitted with the initial and amended § 2255 Motions show Mr. Barrett's family were extraordinarily supportive of him and his defense, that they were meeting with him regularly prior to the federal trial, and, if an issue arose, could have assisted defense counsel in helping Mr. Barrett understand the nature and importance of his story.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                           94                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

The record shows this Court authorized counsel to retain a mitigation specialist, a person who "possess clinical and information-gathering skills and training that most lawyers simply do not have.  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed." Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services).  It was standard for a competent defense counsel at the time of this trial to rely upon a mitigation specialist's skills and training to develop mitigation evidence.  Exh. 219 at ¶¶ 17-20.  Although the Court authorized the use of a mitigation specialist and counsel knew how to find one, they did not make use of this resource to address the alleged problem with Mr. Barrett.

Although recommended by the ABA Guidelines, the prior and supplemental declarations of Richard Burr show defense counsel failed to heed the contemporaneous advice of Julia O'Connell and seek the assistance of more experienced capital trial counsel.  Exh. 219 at ¶ 22. According to defense counsel's declarations any lack of cooperation from Mr. Barrett would have been unusual.  Yet the trial and expanded records show defense counsel never sought the assistance of a mental health professional regarding Mr. Barrett's alleged concerns, or any other matter.

Assuming (contrary to all evidence) that defense counsel in this case, like counsel in *Porter* unreasonably took the alleged statements of Mr. Barrett as an excuse for failing to investigate, their performance was unreasonable for additional reasons.  As Mr. Burr explains, if defense counsel had investigated, they could have pursued a variety of means of presenting evidence about Mr. Barrett's family history without "dwelling" on the testimony of family members themselves.  Exh. 219 at ¶¶ 10, 23.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    95                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

Defense counsel state that Mr. Barrett was aware that limiting testimony of his family members "could work to his detriment."  Resp. Exh. 11 at ¶ 12; Resp. Exh. 12 at ¶ 16.  Counsel's advice on this issue could not have been reasonable.  Long before the ABA Guidelines, the ABA Criminal Justice Standards codified the norm of investigating first so that any advice to the defendant about the risks of pursuing a particular strategy.  Standard 4-5.1(a) (counsel should advise client "[a]fter informing himself or herself fully on the facts and the law.").  The trial record and undisputed post-conviction evidence overwhelmingly shows defense counsel could not have investigated prior to advising Mr. Barrett because they were still attempting to locate an investigator as the trial was beginning, the person they turned to (Dr. Russell) turned them down, family members were not interviewed or consulted, counsel were unfamiliar with past mental health evaluations, and counsel consulted no mental health experts.

Moreover, counsel do not pretend they strictly adhered to Mr. Barrett's other ideas about the case, and it is clear that decisions such as which witnesses will testify are consigned to counsel's judgment.  ABA Criminal Justice Standard 4-5.2.  While counsel state that Mr. Barrett made suggestions, they do not say they followed them.  Res. Exh. 11 at ¶¶ 3-4; Res. Exh. 12 at ¶ 5.  Indeed, counsel do not dispute the account of Doris Barrett who observed Mr. Hilfiger on several occasions refuse to make objections urged by Mr. Smith.  Mot. Exh. 80 at 2.

The Commentary to ABA Guideline 10.5 establishes that at the time of this trial the phenomenon of defendants expressing resistance to mitigation evidence was well known, and effective strategies were also known and available to address the problem.  Taking these codified norms as guides to whether defense counsel acted reasonably, *Wiggins*, 539 U.S. at 523, this

Court must find that the declarations of trial counsel do not refute Mr. Barrett's showing of deficient performance; they corroborate and enhance that showing.

### 4. The government's legal arguments have no merit.

#### a. Neither case law nor the record supports the Government's theory on deficient performance.

The Government relies on *Wallace v. Ward*, 191 F.3d 1235, 1246-49 (10th Cir. 1999), as a case analogous to its theory of what occurred in this case. Doc 175 at 120. *Wallace* is readily distinguishable on its facts, and in particular the trial record in this case. In *Wallace,* the defendant waived jury trial and entered a blind plea of guilty. At the sentencing hearing, he objected to his counsel cross-examining state's witnesses, and affirmatively stated to the Court he wanted no mitigating evidence put forth. Wallace himself insisted on testifying, however, and stated that if free he would continue to commit crimes. Wallace not only affirmatively waived the presentation of mitigating evidence, but practically begged for the death penalty.

Assuming counsel's assertions are consistent with the Government's theory, this case is more closely analogous to those in which Courts found deficient performance. *See*, *e.g.*, *Young v. Sirmons,* 551 F.3d 942, 957-68 (10th Cir. 2008) (due to counsel's deficient performance in investigating and preparing a mitigation case, defendant could not be held to decision to forego live testimony in favor of stipulated facts, although no prejudice could be shown; this was not a case where the defendant adamantly refused to permit mitigation evidence at trial); *Battenfield v. Gibson,* 236 F.3d 1215, 1226-35 (10th Cir. 2001) (case remanded for resentencing where counsel was found to have performed deficiently, to defendant's prejudice, by failing to investigate and present mitigating evidence; counsel stated after the fact that client had instructed him not to

present anything in mitigation, but this could not be credited absent knowing and voluntary waiver of right to put on a mitigation case; purported "waiver" entered by defendant before the trial court was not knowing and voluntary, in part because there was a failure to investigate); *Thomas v. Horn,* 570 F.3d 105, 121-25 (3rd Cir. 2009) ("waiver" of right to present mitigating evidence was invalid; it could not be said that defendant would have blocked any attempts by counsel to put on mental health evidence; defendant only told Court that he waived right to testify personally).

The Government also relies on *Romano v. Gibson,* 239 F.3d 1156, 1174-82 (10th Cir. 2001), but it too is distinguishable. Doc 175 at 120. In *Roman*o, co-appellee Woodruff claimed that counsel was ineffective for failing to introduce evidence that he had been abandoned and abused by his birth mother before being adopted as an infant, and that counsel neglected to introduce evidence that he had the judgment of a teenager and was a follower rather than a leader. According to trial counsel, Woodruff did not want family and friends called as mitigation witnesses, but despite that, counsel put on a mitigation case anyway, consisting of Woodruff's adoptive mother, friends, and the defendant himself. Counsel conducted a reasonable investigation. He investigated Woodruff's background, but was told he had a normal upbringing. Post-conviction evidence did not show that Woodruff suffered from any mental illness, and a previous competency examination had failed to disclose any evidence of mental impairments.[31]

---

[31] *Romano* is interesting for what the Court did not say. Mr. Woodruff and his co-defendant, Romano, were convicted of two murders in separate trials and sentenced to death in both. Woodruff's conviction on one of these murders was reversed for new trial. *Woodruff v. State,* 825 P.2d 273 (Okl. Cr. 1992); *State of Oklahoma v. John Joseph Romano and David Wayne Woodruff,* Oklahoma County Case No. CRF-86-3920. Current lead counsel for Mr. Barrett and another lawyer represented Woodruff at the retrial. Woodruff was sentenced to life

(continued...)

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    98                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

At most, the Government's argument that trial counsel shied away from presenting unidentified aspects of the available mitigation evidence presents a post-hoc excuse that carries no legal weight. As in *Wiggins,* this argument is simply a belated rationalization to explain away the absence of a competent investigation by lawyers who still apparently do not understand the function of mitigating evidence in a capital case. *See also, Richards v. Quarterman,* 578 F.Supp.2d 849 (N.D. Tex. 2008), *aff'd.* 566 F.3d 553 (5th Cir. 2009) (counsel's alleged strategic choice deemed afterthought based on false premise and disputed by other portions of record), cases cited in Merit Brief (Doc 149) at 34-35 & n.4.

As an alternative to the claim that counsel were merely following the instructions of their client, the Government argues that counsel made a reasonable tactical choice in presenting the second stage case they did. The evidence and the case law show that trial counsel's alleged "strategic decision" to concentrate on a skeletal presentation of scattered "good guy" evidence, rather than present evidence of dysfunction, abuse and mental illness, in combination with what actually was presented, was unreasonable *ab initio* for the reasons already discussed and the following.

---

[31](...continued)
without parole at the retrial after counsel presented the evidence he complained on habeas review had been omitted from the second stage of the other murder case. After hearing this evidence, the jury rejected death, even though it heard evidence of the other murder Woodruff had been convicted of committing, as well as evidence that Woodruff had a previous conviction for solicitation to commit murder involving a plot to blow up a coin shop and kill the proprietors and any customers who happened to be on the premises. While all cases must be judged on their own merits, the result in the Woodruff retrial demonstrates the powerful effect evidence of past abuse and dysfunction can have on a jury's punishment decision, even where, unlike Mr. Barrett's case, the defendant is a multiple murderer with other convictions for crimes of violence.

In a capital case, counsel's investigative duties are both broad and deep with respect to a defendant's family history and personal background, including mental, emotional and physical impairments.  Counsel is required to investigate, prepare and present all relevant mitigating evidence.  *Porter*, 130 S.Ct. at 453-54; *Rompilla* 545 U.S. at 387-89; *Wiggins*, 539 U.S. at 522-23; *Williams*, 529 U.S. at 329; *Wilson v. Sirmons,* 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008), *aff'd on rehearing en banc, Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009); *Anderson v. Sirmons,* 476 F.3d 1131, 1141-48 (10th Cir. 2007).   Counsel's investigative duties are not "client-centric."  To "investigate" means to look for and uncover evidence as yet unknown.  *McGahee v. United States,* 570 F. Supp.2d 723, (E.D. Pa. 2008).  An actual failure to investigate such as occurred here "cannot be excused by a hypothetical decision not to use its unknown results."  *Soffar v. Dretke,* 368 F.3d 441, 474 (5rh Cir. 2004), *amended,* 391 F.3d 703 (5th Cir. 2004).

Counsel's failure to undertake a professionally reasonable second stage investigation is deficient performance.  There can be no reasoned "strategic choice" in the absence of a competent investigation that would permit a reasoned tactical choice to be made.  A strategic decision requires a conscious and knowing choice between one or more alternatives.  Such a decision must be borne of deliberation, not happenstance.  A cursory investigation does not automatically justify a tactical decision with respect to sentencing strategy.  *Wiggins v. Smith,* 539 U.S. at 526 (counsel's failure to investigate stemmed from inattention, not a reasoned strategic judgment).  *See also* cases cited in Merits Brief (Doc 149) at 106 n.69 *and* 110-11 nn. 76-79.  Counsel cannot abandon a mitigation investigation after gaining only rudimentary

knowledge about a client's background, which the evidence shows is what counsel did here. *Wiggins,* 539 U.S. at 524.

As with the lack of anything approaching an adequate investigation into Mr. Barrett's personal and family background, the Government argues that counsel had no reason to be aware of any mental illness on Mr. Barrett's part because he was helpful and engaged in the defense, and did not present himself as someone who was clearly laboring under the weight of mental and emotional impairments. Doc 175 at 116, 119. But no competent death penalty defense counsel simply relies on their observations and interaction with the client to gauge whether he has a mental illness. *Gray v. Branker,* 529 F.3d at 231. Equally specious is the Government's reliance on Dr. Wood's statement in his report that at first blush, Mr. Barrett presents himself as a competent, "in control" person with no mental illness. Doc 175 at 121. It obviously takes appropriate expert assistance to get beyond surface appearances to discover a person's true mental state. Despite this surface and misleading appearance, there is no question that Mr. Barrett suffers from a constellation of debilitating mental illnesses, and the Government's criticism of what it terms a late-coming "post-conviction" set of diagnoses carries no weight. Doc 175 121. As shown in the declaration of Dr. Sharp (Mot. Exh. 55), and the declarations of Dr. Young and Dr. Woods, these diagnoses were available at the time of trial and are based on documents that counsel either admit they had, or that they could have had on reasonable investigation.

> **b.** **Neither case law nor the evidence supports the Government's theory on prejudice.**

Contrary to the Government's argument that the mental health records in existence at the time of trial simply showed Mr. Barrett to be a "violent drug addict," the current diagnoses of Mr.

Barrett are fully consistent with his history.  As shown *supra*, the Government's theory fails as a matter of law for the same reason the same arguments failed in *Porter*, *Wiggins*, and *Williams*: under the reasonably probability standard, a post-conviction prosecutor's ability to poke tiny holes in a mental health mitigation case is insufficient to rebut or dispel prejudice.  *See also Gray v. Branker,* 529 F.3d at 236-27 (holding that state habeas Court unreasonably rejected any real consideration of diagnoses of mental illness proffered in collateral proceedings; defendant was forced to rely on such a diagnosis because his counsel were ineffective for failing to investigate and present mental health evidence at time of trial; rejecting out of hand post-trial reports on a defendant's mental state would contravene "uncontroversial" requirement that Court must assess an ineffective assistance claim based on evidence developed in post-conviction proceedings, citing *Williams v. Taylor,* 529 U.S. at 398).

The Government's contention that defense counsel had no reason to be aware of Mr. Barrett's mental problems is specious as a matter of law and refuted by the record.  As shown *supra*, the only expert trial counsel consulted, Dr. Russell, specifically referred to Dr. Sharp's 2002 evaluation in both her 2003 and 2005 reports which were provided to counsel.  The issue was simply never discussed with Mr. Barrett's family, who could have provided insight into Mr. Barrett's erratic, delusional and paranoid behavior.  Mr. Barrett's documented history of a serious suicide attempt, which led to him being committed to the state mental hospital in Vinita, as well as his other contact with mental health facilities, were more than "red flags" demanding additional investigation and expert assistance.

The Government argues that Mr. Barrett's medical records simply showed he was a violent drug addict.  Doc 175 at 119-121.  The assertion is incorrect on its face and the

Government's argument is devoid of any competent evidentiary basis. At one time or another, Mr. Barrett had been diagnosed as suffering from Bipolar Disorder, organicity, and depression, and had been placed on anti-psychotic drugs. Mot. Exh. 174. The declarations of Dr. Sharp, Dr. Woods, and Dr. Young show that Mr. Barrett's medical records contain abundant support for expert testimony. Defense counsel at trial simply never presented those documents to an expert. If the Government had its experts review these medical and mental health reports, they have apparently been unable to obtain an opinion to substantiate their claims, or they surely would have referenced it.

Viewed in the context of case law and the ABA Guidelines (ignored by the Government), the evidence defense counsel possessed was more than sufficient to trigger consultation with mental health experts. *See* cases cited in Merits Brief (Doc 149) at 51, 54-55, 114. Where counsel were aware or should have been aware of a client's mental problems, counsel have been found to have rendered deficient performance for failing to engage the services of appropriate experts and in failing to conduct further, reasonable investigation. *Wilson v. Sirmons,* 536 F.3d at 1085-87 (counsel ineffective for failing to engage services of mental health expert in timely fashion and to provide him with sufficient time and background materials to effect proper diagnosis); *Hamilton v. Ayers,* 583 F.3d at 117-18 (counsel failed to properly investigate defendant's mental health, where client had documented psychological problems and had attempted suicide in jail); *Gray v. Branker,* 529 F.3d at 229-30 (counsel were confronted repeatedly with fact that defendant had mental problems and had an expert who had offered her assistance, but needed additional time and information to make competent diagnosis).

As the Courts – including the Supreme Court – have recognized, long experience and empirical study show that the type of truncated and misleading case that was presented here (focusing exclusively on the defendant's "good qualities") is almost invariably doomed to failure. *See*, *e.g.*, *Rompilla*, 545 U.S. at 38 (unreasonable not to investigate defendant's prior crimes because investigation may produce abundant mitigation evidence); *Williams*, 529 U.S. at 397-98 (unreasonable not investigate prison records and juvenile records that contained mitigating evidence and evidence of past offenses); *Johnson v. Mitchell*, 585 F.3d 923, 942 (6th Cir. 2009) ("Obviously, confining investigation in the defense of a capital case to only the 'good things' that could be said about the client cannot be considered a reasonable investigation.").

The *most compelling mitigating evidence to which juries respond in deciding to spare a defendant's life is precisely the type of evidence that went un-investigated and un-produced here: evidence of an abusive and dysfunctional background and mental illness.* This is so because of "the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional or mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California,* 494 U.S. 370, 382 (1990); *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989). *See particularly, Wilson v. Sirmons,* 536 F.3d at 1085 (Courts have repeatedly found evidence of mental problems and an abusive background to be "powerful" mitigating evidence; counsel's performance was deficient where counsel relied on superficial evidence of defendant's "good qualities" and limited testimony from an expert who did not have the time or background materials to reach a definitive diagnosis); *Anderson v. Sirmons,* 476 F.3d at 1141-48 (counsel's performance was deficient where he put on a skeletal second stage limited to vague evidence about the defendant's "good qualities" and omitted evidence, due to an inadequate

investigation, of defendant's abusive background, mental illness, and use of methamphetamine, which exacerbated the defendant's mental problems; the omitted evidence was exactly the sort of evidence that garners the most sympathy from the jury, because it humanizes the defendant and explains and puts in context a defendant's behavior and actions that the jury would otherwise view as simply the product of a lack of caring or "meanness"); *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir. 2004) (it was "patently unreasonable" for counsel to fail to investigate and present evidence of defendant's borderline retardation, organic brain damage, and troubled childhood; this is the type of evidence juries respond to in deciding to spare a defendant's life).

The Government argues that Mr. Barrett was not prejudiced because the omitted mitigating evidence would have "utterly negated" the case that was presented, which was aimed at showing Mr. Barrett was a loved and valued family member.  According to the Government, a mitigation case that included testimony about Mr. Barrett's mental illness and neurocognitive impairment also would have by necessity focused on his drug problem and episodes of violence. Doc 175 121-125.  No evidence or case law is offered to support the novel contention that neither family members nor jurors could find a reason to spare a man who resorted to illegal drugs when he was not being treated for a major mental illness.  The declarations of Mr. Barrett's family members, especially those who testified at trial, show both that they were aware of his cycling from depression to mania and back, and his drug use, and that they loved and cared for him as any family would.

It is equally nonsensical to contend that jurors would have found *Mr. Barrett* was not a good person, and was a future danger, because *his parents* were alcoholics whose marriage fell apart and who neglected and abused him.  At trial, the Government heavily stressed the

sometimes mutually abusive relationship between Mr. Barrett and his ex-wife Abby Stites. Evidence of Mr. Barrett's serious mental impairments would have explained his sometimes volatile, suspicious conduct, particularly because Ms. Stites herself viewed his behavior in that context.  Mot. Exh. 103 at 2-3.  In other words, the Government has it backwards:  It was the defense case itself that permitted the jury to view Mr. Barrett as a violent drug user, (a) by ignoring the pleas of family members like Steve Barrett and Abby Stites who wanted to explain Mr. Barrett's background and illness, and (b) by failing even to read the report of Dr. Sharp much less consult with a mental health expert.  The defense left Mr. Barrett's drug use and bouts of domestic violence unexplained, and ripe for prosecutorial argument that Mr. Barrett was simply an unrepentant drug addict with virtually no redeeming qualities.

The Government's argument – unsupported by evidence – confuses cause and effect.  Dr. Woods, like Abby Stites, and any informed person familiar with Mr. Barrett's history, explains that Mr. Barrett's mental illness was not "premised" on his drug use, his drug use was premised on having untreated mental illnesses.  Mot. Exh. 117 at ¶¶ 42-46 & 76.

Before the penalty phase began, the jury was already well aware Mr. Barrett had been involved with drugs; his convictions were predicated on drug crimes.  The defense omitted a mitigation case that would have explained, in a manner that reduced Mr. Barrett's degree of moral culpability, his involvement in drugs.

The Government argues that counsel adopted a "reasonable strategy" -- a conclusion that has no substance in light of the obvious lack of a proper investigation -- in focusing on Mr. Barrett's "good qualities," and points to jury findings to say the mitigation case was partially successful. Doc 175 at 118.  The Supreme Court rejected the Government's line of argument in

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).  Morrison challenged his conviction for raping a 15-year-old girl on grounds that his trial attorney unreasonably failed "to file a timely motion to suppress evidence allegedly obtained in violation of the Fourth Amendment."  *Kimmelman*, 477 U.S. at 368.  The State responded, notwithstanding the failure to move to suppress, "defense counsel's vigorous cross-examination attempts to discredit witnesses, and effort to establish a different version of the facts lift[ed] counsel's performance back into the realm of professional acceptability."  477 U.S. at 385-86.  The Supreme Court rejected the argument saying, "Counsel's performance at trial, while generally creditable enough, suggests no better explanation for []his apparent and pervasive failure" to investigate a possible suppression motion.  477 U.S. at 386.

Since at least 1986 it has been clear that an ineffectiveness claim is analyzed on what counsel failed to do, not what they did.  *See also Wilson v. Sirmons,* 536 F.3d at 1084-85 (trio of Supreme Court cases -- *Williams, Wiggins,* and *Rompilla* – focus not on what was presented at trial, but on the adequacy of the penalty phase investigation; "the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident.") (emphasis in original).  Consequently, the Government cites absolutely no authority for the proposition that so long as a jury finds some mitigating circumstances and rejects one or more aggravating factors, counsel's performance is immune to an ineffectiveness challenge.[32]  This dovetails with what Mr. Barrett showed in his Amended Motion: that counsel's wholly ineffective penalty phase presentation permitted the Government, in arguing for death,  to

---

[32]  The Government pulls the rug out from under its own argument by later maintaining, in connection with Movant's claim that the prosecutors committed misconduct in second stage closing argument, that the prosecutors rightly ridiculed the weak mitigation case that had been put forward.  A respondent cannot have it both ways.  Either the mitigation case was "effective" or it was ripe for the type of disdain that was heaped on it in the prosecutors' closings.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    107                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

run roughshod over the anemic, skeletal mitigation case that was put forward. 2nd Amend. § 2255 Mot. (Doc 95) at 243-47.

The Government cannot and does not explain how any fact presented in mitigation now would have caused otherwise rational jurors to find "utterly negated" the "partial success" of the mitigation case that was presented. It beggars the imagination to say that the *addition* of what the Courts recognize as the most persuasive type of mitigating evidence would have harmed Mr. Barrett, particularly because it would have been consonant with what was presented. Despite his many problems, Mr. Barrett had "good qualities" and did the best he could.

Not only would the omitted mitigating evidence have not conflicted with the evidence that was presented, but it would have supported the defense argument that Mr. Barrett was unfairly treated by the Government. Doc 175 at 116. He was all the more susceptible to such unfair treatment due to his mental illness.

In aid of its "no prejudice" claim, the Government makes a series of boilerplate arguments that have no relation to the facts. Citing *Burger v. Kemp,* 483 U.S. 776, 794 (1987),[33] among other inapplicable cases, the Government contends that Movant has done no more than show that a more thorough investigation "might have borne fruit," and that "unlimited time" to investigate "might have" turned up more under "ideal conditions." The adequacy of counsel's investigation and the evidence presented as a result should not be judged under a standard of "perfection." Doc 175 at 120.

---

[33] *Burger* is inapposite. In that case, counsel conducted a reasonable investigation but ran into the brick wall of one potential witness after the next having harmful things to say about the defendant. In Mr. Barrett's case, the omitted evidence would have put an entirely different light on the case in a humanizing, mitigating light.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                108                *Barrett v. U.S.*, 6:09-cv-00105-JHP

The Government's theory is most often raised, and recognized when "additional" investigation would only yield cumulative evidence to what the jury actually heard, which was the case in *Burger*.  But here the Government itself argues the mitigation case that was not presented conflicted with the mitigation that was presented.  Neither contention is correct.  The evidence available to trial counsel would have supported the showing that Mr. Barrett is a beloved member of his family and community, and would have dramatically increased the value of that evidence by showing how he and his family struggled to overcome generations of mental illness, alcoholism, poverty, violence, and deprivation.

The Government's claim that defense counsel were not acting under ideal conditions rings particularly hollow given that the undisputed record shows they failed to begin preparation for the penalty phase until the month before trial, and failed to obtain the expert assistance this Court authorized.

Among the many cases cited in Mr. Barrett's brief in support of his Amended Motion and here showing that he was prejudiced by trial counsel's professionally unreasonable errors and omissions, two cases from the Tenth Circuit stand out.

In *Anderson v. Sirmons,* 476 F.3d at 1141-48, the defendant was convicted of *three* brutal murders during what can only be described as an exceedingly violent rampage.  In addition to the murders, Anderson also shot or participated in the shooting of another individual who managed to survive, was involved in a kidnapping, and was involved in burning down a dwelling.  Just as in Mr. Barrett's case, counsel in *Anderson* relied on a superficial "good guy" mitigation case.  The mitigation case consisted of evidence that although Anderson had drug and alcohol problems, he worked and provided for his family; that he was the son of a "good woman" and had a family that

loved him; and that his daughter loved him and he could still be of help to her while he was incarcerated.

The mitigating evidence omitted in *Anderson* is almost a mirror image of what was left unsaid in Mr. Barrett's case. Because the mitigation investigation in *Anderson*, such as it was, was inadequate, the jury never learned that Anderson had a "borderline" I.Q. and organic brain damage stemming from multiple causes, including heavy drug use from a young age and head injuries. Like Mr. Barrett's mental impairments, Anderson's brain damage affected his reasoning, problem solving, and judgment. The Court noted that while these problems could be perceived by laymen as "meanness" or anti-social behavior, with expert evaluation, they were properly explained as deriving from disruptions and impairments to the nervous system. Anderson's mental impairments, like Mr. Barrett's, were exacerbated by his use of methamphetamine. Attempts to get off the drug were unsuccessful, and Anderson was involved in a co-dependent relationship with his wife, who was a drug user herself. The jury in *Anderson*, as in Mr. Barrett's case, never learned that his family history was replete with abuse and neglect. Both parents were alcoholics, and the mother was abusive both to her husband and her children. The children in *Anderson* were whipped with extension cords and struck with hammers. Anderson's mother and stepfather engaged in drunken brawls in front of the children, and the mother carried on extramarital affairs in the home. The Tenth Circuit stated all this was "just the kind of mitigating evidence that trial counsel is obligated to investigate and develop as part of building an effective mitigation case." *Anderson v. Sirmons,* 476 F.3d at 1144.

The Court's determination that Anderson was prejudiced by counsel's deficient performance despite his conviction for multiple murders and a host of other violent crimes –

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    110                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

offenses far more aggravated than Mr. Barrett's – applies *exactly* to the assessment of prejudice here:

> [R]ather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy.
>
> * * *
>
> Against this backdrop, trial counsel mounted an extraordinarily limited case in mitigation. As noted above, trial counsel adduced the testimony of Anderson's family and co-workers to support the theory that Anderson was a kind, hard-working, normal man who could be of some help to his daughter if his life were spared. Unfortunately, the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an "evil" man. The prosecution seized on Anderson's case in mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a good family and was never abused as a child. Thus, relying on the exceedingly limited nature of trial counsel's case in mitigation, the prosecution was able to argue convincingly to the jury that there was nothing in the case to diminish Anderson's moral culpability for the murders.
>
> * * *
>
> In this particular case, the absence of this readily available mitigating evidence left the jury with no explanation for the murders other than the assertion that Anderson was "evil." Although the case against Anderson was strong, and the murders in this case were horrific, Courts have not hesitated to grant relief in similar circumstances where the absence of available mitigating evidence left the jury with a "pitifully incomplete" picture of the defendant. [Citation omitted] Had the jury been presented with a complete picture of Anderson's background and history, there is a reasonable probability at least one juror would have struck a different balance between the aggravating and mitigating factors. [Citation omitted'

*Anderson v. Sirmons,* 476 F.3d at 1144, 1147, 1148.

In light of the fact that sentencing relief was given in *Anderson*, on facts far more aggravated than those here, can it be said that Mr. Barrett – who was spared the death penalty on two counts, and whose jury rejected the proposition that he would be a continuing danger – was

not prejudiced by trial counsel's all but identical failures to present all but identical evidence?

The answer has to be "no."

In *Smith v. Mullin,* 379 F.3d at 938-44, the defendant was convicted of five murders.

Four of the victims were children.  The case for death was obviously strong.  However, he was

granted sentencing relief because trial counsel presented a skeletal mitigation case bereft of any

evidence of his borderline retardation, organic brain damage, and troubled upbringing.  It cannot

reasonably be said that the omission of analogous evidence in Mr. Barrett's far less aggravated

case – a case for which he acquitted of murder conviction in state Court – caused no prejudice.

### 5.      Conclusion.

The facts, argument, authority and exhibits presented in Mr. Barrett's Amended Motion,

brief in support, and here demonstrate that counsel's penalty phase performance was both

professionally unreasonable and prejudicial.  The Government's arguments fall wide of the mark,

lacking both factual and legal support.  Mr. Barrett's death sentence must be vacated.

### GROUND 3:  THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES.

### A      The Issue Is Not Procedurally Defaulted.

Contrary to the Government's assertions, the issue is not defaulted.  Movant has alleged

and set out supporting facts that the failure to raise the issue on appeal was caused by the

ineffective assistance of appellate counsel, one of whom was trial counsel, whose conduct, if the

Government's position has any legitimacy, is responsible for failing to provide the Court with the

demanded "detailed" substantive showing.  Doc 95 at 127-39; Doc 149 at 104-115.  It was again

fully argued in the opening Motion and Brief.   Doc 95 at 249-263; Doc 149 at 125-141 and

supporting documentation.  *See also,* Ground 2(A)(7), (8) and 2(B), hereinabove.

Movant has further fully laid out the prejudice to Movant by the Court's denial of the

funding to provide a minimal defense to the capital charges pending against him.  The Court

abused its discretion in denying the funding and used its position and control of the

administration of the CJA funding to bludgeon the defense into submission and control by the

Court, the result of which was a denial of a fair trial and the right to present a defense.[34]  While

the Government, like the Court, seeks to nitpick the detail with which trial counsel supported its

requests for funding, the record is clear that the Government's case demanded expert response

and the Court refused to give Mr. Barrett the ability to do it.  While *Caldwell v. Mississippi*, <u>472

U.S. 320</u> (1985) at 323-24 n.1, requires a defendant to make a threshold showing for expert

assistance, the Court here demanded a full and complete substantive presentation.  Cr 04-115

Doc 38 at 2.  Even then the Court's unreasonable reduction of fees and denial of travel

effectively denied Mr. Barrett the right to present a defense.  Movant provided the trial court with

the necessary particularized facts sufficient to trigger *Ake's* requirement of assistance.  *Powell v.

Collins,* <u>332 F. 3d 376</u> (6th Cir. 2003).   Even the Government's Response sets out the satisfactory

threshold for mental health experts requested.  *See, e.g.,* Doc 175 at 129-130.

---

[34] As noted in Ground 1(A) hereinabove,  Movant alleges the trial court abused its administrative role under the Criminal Justice Act to interfere with the constitutionally protected independence of counsel.  Contrary to the Government's assertion that Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses led John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized.  The facts and arguments set out in Movant's Motion to Vacate (Doc 95 at 7-25), Brief (Doc 149 at 46-56) and hereinabove under Ground 1, are relevant to the denial of expert assistance and as such are incorporated herein as if fully set out herein.

**B.**     **The Court Abused its Discretion.**

The Court's demands for detailed showings to justify CJA experts were an abuse of discretion, an unconstitutional interference with the defense, and a blatant attempt to bludgeon the defense into submission, an effort that was ultimately successful.  The evidence presented amounts to more than an mere abuse of discretion, it amounts to judicial interference with Mr. Barrett's right to present a defense and the use of the "purse" to effect it.  *See* Exh. 34, Motion (Doc 70).  Not only did the Court demand unreasonable justification for expert and investigative assistance but refused to pay counsel for preparing the justification.  Exh. 34 at 5, Motion (Doc 70).  ("In April 2005 the Court held that [Mr. Echols] would not be compensated for any of the time [he] spent preparing the detailed budgets on which Judge Payne insisted.")

Contrary to the Government's assertions otherwise, Movant has sufficiently alleged and supported its allegations of prejudice.

**C.**     **The Experts Requested Were Necessary and Relevant.**

**1.**     **Mental health.**

On the issue of mental health, the Governments baldly asserts that "Barrett relies on a mistaken assumption in claiming that the allegedly erroneous denial of mental health evidence affected the guilt phase-verdict because it prevented him from rebutting the Government's evidence of malice aforethought."  Doc 175 at 132.  The Government does not refer to any cite in the Motion to Vacate or the Brief upon which it draws the conclusion stated above.  Review of Movant's pleadings show that Movant asserts the prejudice from lack of appropriate mental health experts to rebut the prosecutions' theory of malice aforethought *and intent*."  Doc 95 at 252.  (Emphasis added).  The convenient omission of the prejudice to Movant's ability to negate

the "intent" element illustrates the weakness of the Government's argument.  In its Brief in support of the Motion to Vacate, Movant again argued prejudice from the Court's arbitrary denial of funds for appropriate mental health experts by it adverse impact on Mr. Barrett's ability to "develop a mental health defense."  Doc 149 at 129.  Indeed, the Government's argument that because Counts 1 and 2 require only an underlying felony to establish "malice aforethought," and "common law malice" was not an element of Count 3, "the absence of mental health evidence had no impact on the guilt phase verdict," Doc 175 at 132,  can only be true if Mr. Barrett has been convicted of strict liability offenses.  Though the Government now asserts no element of "malice aforethought" was necessary, it argued otherwise before the jury.  *See, e.g.,* CT vol 20 at 4375 ("We've become used to coming here day after day and seeing a man that I respectfully suggest the evidence proved beyond a reasonable doubt not only committed all three of the crimes with which he is charged but is a *cold-blooded malice aforethought premeditated murderer*.") (Emphasis added.)  Mental health evidence is relevant to any element of intent, and certainly here, where a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  *See also* Argument Ground 2(A)(3) hereinabove and Ground 9, hereinbelow, both of which are incorporated herein as if fully set forth herein.

Similarly, Movant incorporates the relevant arguments concerning ineffective assistance of trial counsel hereinabove to specifically deny the Government's unsubstantiated assertion that "counsel ultimately made a strategic decision not to present any mental health evidence, apparently out of concern for the strength of the Government's potential rebuttal evidence."  Doc 175 at  133 (relying on Mot. Ex 56 at 4; Resp. Exhs. 11 & 12.)  There is nothing in Exhibit 56

(Declaration of Jeanne Russell) or the trial attorneys' declarations, (Resp. Exhs. 11 and 12), which indicate a strategic decision not to pursue a mental health defense.  At best, it can be said counsel elected not to pursue the "risk assessment" which had been made much earlier without the necessary social, medical and family history required for a full mental health evaluation and related only to "future dangerousness."

> **2.**      **Crime scene reconstruction**.

To avoid the prejudice finding as a result of the Court's abusive denial of funds for a crime scene reconstruction, the Government downplays the significance of the evidence upon which it relied for a conviction presented through witness Dalley.  Doc 175 at 136.  ("Dalley provided limited opinions, largely corroborative of existing evidence or conclusions the jury would have naturally drawn from it.")  The testimony of a witness presented as an expert to "corroborate" eyewitnesses, whose testimony was at best inconsistent, lends credibility to the witnesses themselves.  If it was irrelevant and unnecessary, as the Government now contents, Mr. Barrett's expert could have succeeded in keeping it out.  The record is clear that Ms. Dalley testified at length upon a critical issue and the Government pointed to her testimony in both opening and closing arguments urging the jury's reliance on it in its deliberation.  R at 207-208 (Testimony will show that officer was shot when the vehicle stopped in front of the house and he turned to exit out the passenger door); R 20 at 4377 ("Well, no way would that account for the testimony of the trajectory analyst,"); s*ee also,* R at 4306-06 (argument quoted at length in Claim 2(A)(7) hereinabove).  Ms. Dalley's testimony attempted to piece the sketchy, frequently unclear eyewitness testimony into a scientific package of intentional killing.  *See* Argument, Ground 2(A)(7) hereinabove, incorporated fully herein.  The Government's attempt to minimize the

impact of her testimony invades the jury's role. *United States v. Oliver*, 278 F. 3d. 1035, 1043 (10th Cir. 2001) (noting that "it is solely within the province of the jury ...to weigh... expert testimony.")  The inability of Mr. Barrett to counter that evidence with his own expert who could have debunked her entire testimony was prejudicial and had a substantial injurious effect on the verdict.

### 3.   Expert on police standards and procedure.

Similarly, denial of funds and the ability to produce for trial an expert who would have made clear law enforcement's serious missteps in planning and executing the raid, which effectively created a lethal situation, cannot be dismissed as irrelevant.  Contrary to the Government's argument otherwise, Doc 175 at 140, the jury finding that Barrett acted with substantial planning and premeditation, which illustrates Barrett's knowledge that the attack was an attack by law enforcement, does not undermine the importance of the defense testimony.  It is precisely that jury finding which illustrates the harm caused by denying Mr. Barrett an opportunity to show Mr. Barrett's state of mind as it was impacted by poor judgments made by law enforcement.  The jury had a right to hear from an expert for the defense before it was charged with determining Mr. Barrett's state of mind.  Presented with a more accurate picture of the events which transpired on the date of the shooting would have likely compelled a different finding of *mens rea* and verdict.  *See* Argument 2(A)(8) hereinabove and incorporated fully herein.

### 4.   Mitigation specialist.

The Government's argument that Mr. Barrett's claim that he was entitled to a mitigation expert should fail because he has not shown "what information was actually obtained by the

defense, and what was forgone as a result of the funds provided," Doc 175 at 143, is undermined by the Government's own exhibits in which neither of trial counsel's declarations filed on behalf of the Government support its position. Resp. Exh. 11, 12. Beyond that, the declaration of Jeanne Russell illustrate trial counsel's inability to conduct the necessary sentencing investigation. Exh. 56. The evidence now before the Court on the family, social and medical history of Mr. Barrett amply illustrates the harm to Mr. Barrett by the Court's denial of adequate funding for mitigation. Nor does the fact that trial counsel may have done some mitigation investigation deprive Mr. Barrett of the right to a professional who would have conducted an adequate investigation and presentation. *See Sears v. Upton*, 561 U.S. --, *6 (S.Ct. No. 09-8854, June 29, 2010) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.) *See also,* Argument 2(B) hereinabove and incorporated fully herein.

**GROUND 4: THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER *FRANKS V. DELAWARE*, 438 U.S. 154 (1978).**

*Stone v. Powell,* 428 U.S. 165 (1976) does not preclude Mr. Barrett from raising the Fourth Amendment *Franks* issue in these collateral proceedings. Doc 175 at 147-48. Respondent concedes that if exculpatory evidence regarding Clint Johnson's honesty was suppressed by the Government, Mr. Barrett could raise a *Brady* claim, but that it does not permit a frontal Fourth Amendment attack on the no-knock warrant under *Franks*. This is incorrect. The suppression of exculpatory evidence regarding Johnson's honesty as a law enforcement officer shows that Mr. Barrett was denied a full and fair opportunity to litigate the issue at trial.

*Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222, 227 (1992).  This is particularly true in light of the Government's argument (incorrect though it is), raised in response to the ineffective assistance of counsel claim respecting the *Franks* issue, that it was Johnson's honesty, not Charles Sanders's, that is the focus of the *Franks* inquiry.  Doc 175 at 147.  Thus, *Stone's* bar against raising a Fourth Amendment argument does not apply; material evidence bearing on Johnson's honesty, as Movant has shown, was suppressed [35].

Rather than defer discussion of the Government's *Brady* violation with regard to Johnson to the reply to the Respondent's arguments on Ground 5, Mr. Barrett addresses it now, because it is pertinent to his *Franks* claim.  In its response to Ground 5, the Government argues in essence that Johnson was victimized by a crooked District Attorney (Richard Gray) with a vendetta against him.  The Government claims that Johnson may have been bad with money or a poor manager, but that he was not corrupt.  For this baseless claim, the Government relies on a

---

[35]  The Government contends that the exculpatory evidence regarding Johnson's improper and illicit activities does not constitute *Brady* material because much of it was developed following Mr. Barrett's trial, and thus could not have been used to attack Johnson's credibility and the search warrant.  The Government cites *United States v. Lafayette,* 983 F.2d 1102, 1105 (D.C. 1993) and *United States v. Bolden,* 335 F.2d 453, 461 (7th Cir. 1966) for this proposition. Both are distinguishable.  In *Lafayette*, the evidence pressed by the defendant related to events that were purely post-trial and long after the fact.  Here, the investigation into Johnson's corruption pre-dated the conclusion of Mr. Barrett's trial, and he was terminated less than two months after trial.  Exhs. 181 A, 181 B, Amended Motion.  In *Bolden,* the defendant claimed newly discovered evidence of a witness's counterfeiting conviction was material evidence that would have impeached the witness's testimony.  The Court rejected this claim not only because the conviction occurred after the defendant's trial,  but also because, even if the conviction was in existence at the time of trial, it was merely cumulative to the impeachment that was accomplished with the witness.  He was cross-examined at length about the counterfeiting case, for which he had been indicted at the time of the defendant's trial. In Mr. Barrett's case, the ongoing investigation into Johnson was never revealed.

declaration from Joel-Lyn McCormick (Resp. Exh. 2), the Oklahoma Assistant Attorney General who prosecuted Mr. Gray in Cherokee County on corruption charges. Her view of Johnson's honesty, whether based on an internal investigation she was involved in or not, is entitled to no weight. McCormick lost the case against Mr. Gray in spectacular fashion. Clint Johnson was her star witness, and his testimony was so impeached and riddled with improbabilities that the trial judge took the rare step of directing an acquittal. In these circumstances, McCormick's vouching for Johnson's honesty has the totally hollow ring of a *post-hoc* attempt to salvage some small measure of integrity out of a failed prosecution based on a disreputable witness. The old saying holds: McCormick and Johnson got run out of town, and they act like they're leading a parade.

The evidence submitted by Mr. Barrett shows the Government's claim that Johnson is simply a sloppy administrator and poor money manager is simply untrue. He was fired from the District 27 Task Force mere weeks after Mr. Barrett's trial concluded not because he was a well-meaning but poor manager, but because he was corrupt. He placed no proper control over his informants, a fact particularly relevant here. Money went missing. He passed hot checks, the Government's contention that these were simply "oversights" notwithstanding. Drug evidence and funds were not properly accounted for. He used state property for personal reasons. Johnson lied to his superiors. He did not account for drug evidence properly; at the time he was fired, he was riding around with drugs and drug paraphernalia, purported "evidence" that had not been sealed. Most serious of all, there was evidence uncovered in District Attorney Gray's investigation that Johnson was running a kickback scheme among favored individuals, some of them attorneys. Exhs. 181 A, 181 B, Amended Motion. All this transpired before, during and

shortly after Mr. Barrett's trial; Johnson was fired in January, 2006. This is not "after the fact" information, as the Government claims.

It has also been shown that the Government suppressed evidence regarding Charles Sanders's motives for testifying against Mr. Barrett (the deal he ultimately received, Ground 5(A)(1), Amended Motion at 273-78) and the numerous favors he had received from state law enforcement and prosecutors for his work as an informant, which Sanders's falsely denied during cross-examination. All this was relevant to a *Franks* determination.

In its response to Grounds 5, the Government attempts to overrule *Brady* and its progeny. Without a shred of support in the law, Respondent contends it could adopt a "see no evil" attitude toward Johnson (and everything else) because the DEA, and not local law enforcement, was the "case agency." *E.g.,* Doc 175 at 149. The Government cannot unilaterally limit the prosecutions' *Brady* duties, which extend to information held by all its agents in law enforcement, regardless of what agency they work for. That is especially true here, because this case was investigated not by the DEA or some other federal law enforcement agency, but state law enforcement -- the District 27 Drug Task Force, the Sequoyah County Sheriff's Office, and the Oklahoma Highway Patrol. Against what the Government claims now, the prosecutors designated Sequoyah County Sheriff John Philpot as the case agent at trial. The informant witnesses were developed by Sheriff Philpot, assisted by AUSA Littlefield. The case was originally prosecuted in state Court. State law enforcement and their informants provided the overwhelming bulk of the evidence against Mr. Barrett. The search warrant that led to this tragedy was secured by Johnson himself. The state dog was wagging the federal tail.

The DEA ruse will not fly.  The DEA did virtually nothing in this case, except conduct the search of Mr. Barrett's property after Trooper Eales was killed.  For *Brady* purposes, the Government was on notice of evidence in possession of state law enforcement.  *Kyles v. Whitley,* 514 U.S. 919, 937 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979) (facts known to state law enforcement imputed to federal prosecutors, particularly in a case where they pooled resources and acted in concert).

Because evidence regarding Johnson's dishonesty was known or should have been known by the Government before or at the time of Movant's trial, and was directly relevant to the *Franks* claim, Mr. Barrett was denied the opportunity for a full and fair hearing on the issue, and is not precluded from raising the issue in these proceedings.  Again, the Government concedes that if exculpatory evidence regarding Johnson's honesty was suppressed, the *Stone v. Powell* bar would not apply, but contends the issue "sounds under *Brady,*" not the Fourth Amendment.  (Doc 175 at 148)  However, the case cited by the Government demonstrates that a *Brady* violation is relevant to a motion to suppress under *Franks*.  *Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222, 227 (1992) (holding *Brady* claim that evidence relevant to *Franks* issue had been suppressed was not "foreclosed by *Stone*," and proceeding to determine whether non-disclosure of *Brady* material affected outcome of suppression hearing).

The opportunity for a full and fair hearing was denied for other reasons as well.  The Government points out that the magistrate judge held a suppression hearing at which Clint Johnson testified, and where he was questioned about the C.I. who supplied information for the warrant affidavit.  Doc 175 at 147.  But at this time, the identity of the C.I. was still unknown,

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

122

*Barrett v. U.S.*, 6:09-cv-00105-JHP

and Mr. Echols's attempts to discover his identity, his complete criminal record, and whether he was continuing to commit crimes, went nowhere when the Government objected. Johnson testified falsely that the C.I. had not been involved in dealing drugs; Sanders had a previous conviction for distribution or delivery. When a *Franks* claim was raised during trial at the conclusion of Sanders's testimony, no hearing was held, and counsel were ineffective for failing to marshal all facts bearing on Sanders's credibility. *Gamble v. State of Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978) (full and fair opportunity to raise Fourth Amendment issue includes a full and fair evidentiary hearing, where warranted).

The Government contends the *Franks* issue has now been waived because a number of Fourth Amendment issues were raised. Doc 175 at 147-48. However, the case cited by the Government for this argument actually supports Movant. In *United States v. Cook,* 997 F.2d 1312, 1317 (10th Cir. 1993), aside from making the uncontroversial statement that *Stone v. Powell* bars re-litigation of a Fourth Amendment claim where a full and fair hearing has been conducted, the Court remanded the case to the district Court to determine whether appellate counsel was ineffective for failing to raise certain Fourth Amendment arguments.

Obviously, *Stone v. Powell, supra* does not bar a *Franks* issue from being raised in a § 2255 motion where it is argued counsel was ineffective for failing to properly raise it in the trial court. *E.g., Kimmelman v. Morrison,* 477 U.S. 365, 38391 (1985); *United States v. Owens,* 882 F.2d 1493, 1498-1500 (10th Cir. 1989). In order to prevail on such a claim, a movant must first show that the underlying Fourth Amendment claim is meritorious. That is what Mr. Barrett has done in Ground 4.

Based on the above and what Movant has previously shown, there was no full and fair opportunity to raise the *Franks* issue at trial.  The suppressed evidence and counsel's ineffectiveness in raising all grounds for *Franks* suppression that were available based on Sanders's trial testimony precluded both the procedural opportunity to raise the claim, and a full and fair evidentiary hearing.

In the alternative to its *Stone v. Powell* argument, the Government contends Mr. Barrett cannot show, and has made "no effort" to show  by a preponderance of the evidence, that Johnson intentionally or recklessly included materially false information, or intentionally or recklessly omitted material information from the warrant affidavit necessary to the magistrate making an informed decision.  Doc 175 at 149.

The Government simply ignores Mr. Barrett's showing in this regard, which obviously meets the preponderance of the evidence standard.  The Government again parrots its claim that Sanders's credibility was not at issue, ignoring that Johnson, at a minimum, intentionally omitted material information on Sanders's lengthy criminal record, including crimes of dishonesty and continuing criminal acts, not to mention the many favors he had received from law enforcement and local prosecutors for his work as an informant.  Johnson also deliberately or recklessly omitted any information -- because there was none -- that would have corroborated Sanders. *E.g., Phaneuf v. Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993); *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997).  The unadorned conclusory statement that Johnson had found the informant "reliable" on past occasions is meaningless. *E.g., United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Miller,*

753 F.2d 1475, 1480 (9th Cir. 1985). As argued in the ineffective assistance of trial counsel claim, the Government is simply wrong when it states that the credibility of the informant is irrelevant to a *Franks* question.

The magistrate thus could not make a neutral and detached finding of probable cause because all evidence respecting the awful credibility of the informant was omitted, and there was nothing to show the informant's account had been corroborated in any way. As shown elsewhere in Movant's arguments, Johnson at the very least acted with reckless disregard for the truth because and knowingly supplied false information regarding the substantive basis for the warrant since, against the Government's arguments in response to Ground 2, Part A (1), Sanders's repudiated in his trial testimony the information Johnson relied upon to secure the warrant in the first place.

The Government argues the *Franks* claim is not affected by omission of the fact that Sheriff Philpot visited Mr. Barrett without incident approximately a month before the fatal raid. The Government claims Philpot was never there at that time; otherwise, counsel would have been so informed by Mr. Barrett. Doc 175 at 150. This is pure speculation and is irrelevant to Mr. Barrett's claim. The issue is not what Mr. Barrett knew, but whether, in September, 1999, Johnson made material omissions in the search warrant affidavit for the no-knock, nighttime warrant. Had this information been supplied to the magistrate, there would be absolutely no need for a no-knock, middle-of-the-night warrant.

The Government claims Sheriff Philpot was not at Mr. Barrett's residence a month before the raid, and that family members who attested to this are mistaken. Doc 175 at 151. The Government now offers a declaration from Sheriff Philpot stating that the only time he was at

Movant's cabin to inspect his weapons was in 1998.  Resp. Exh. 1.  However, Janice Sanders's and Gelene Dotson's accounts (Exhs. 85, 97, Amended Motion) are supported by Sheriff Philpot himself, according to the declaration of Rodney Floyd, who interviewed Sheriff Philpot about this subject.  Exh. 6, Amended Motion.  The Government dismisses this declaration as "hearsay," but it is Sheriff Philpot's about-face in his declaration that is suspect.  It can be inferred easily that when he spoke to Mr. Floyd, Philpot did not recognize the significance of what he was saying.  Mr. Philpot's latest statement occurred only when the significance of his statement to Mr. Floyd was brought to his attention by the Government.

Hedging its bets, the Government contends in the alternative that "even if" Sheriff Philpot visited Mr. Barrett's cabin a month before the raid, there is no reason to suppose that Johnson would have known this at the time he sought the warrant.  There was no reason for him to not know, since, as the Government states, he consulted with Sheriff Philpot about the warrant and the need to bring in the OHP Tact Team, and did not agree, at least initially, with the approach being taken by Johnson.  Doc 175 at. 151.  The Government then goes a step further, arguing that even if the month-before incident occurred, and even if Philpot informed Johnson of it, Johnson was still "sincere" in his belief that a no-knock, nighttime warrant spearheaded by the OHP SWAT team was necessary.  Johnson's alleged "sincerity" is irrelevant.  The issue is whether Johnson made false statements or omitted material information in seeking the warrant.  Again, it is clear that if the magistrate were supplied with information that a month before Johnson sought the search warrant, law enforcement had been to Mr. Barrett's property without incident, the "case" for a no-knock search warrant to be served at night due to the "danger" posed to officers by Mr. Barrett would have collapsed.

Finally, the Government argues that appellate counsel was not ineffective for failing to raise the *Franks* issue on appeal because the issue is "meritless." Doc 175 at 151. The Government's arguments respecting this claim's alleged lack of merit have been conclusively refuted here and in Mr. Barrett's Amended Motion and brief in support. It is also urged that appellate counsel could not be ineffective for failing to raise arguments in support of a *Franks* claim based on extra-record evidence. This is certainly true, but Mr. Barrett never made that argument. He argues that *to the extent the issue was framed by the record*, appellate counsel were ineffective for failing to raise the issue. Brief in Support of Amended Motion at 147. At the very least, based on what was contained in the trial record, an appeal of the Court's *Franks* ruling should have been raised, coupled with a request to remand for a proper evidentiary hearing. There is a reasonable probability that had the issue been raised, the result of the appeal would have been different. *Strickland v. Washington,* 466 U.S. 668, 697 (1984). The entirety of the physical evidence which supported the charges stemmed from an illegal warrant.

Accordingly, the Government's arguments should be rejected, a proper *Franks* hearing should be conducted, and Mr. Barrett should be granted § 2255 relief.

**GROUND 5(A) and (B):** **THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY. NEWLY DISCOVERED EVIDENCE ALSO WARRANTS § 2255 RELIEF.**

As stated in the reply to Ground 4, the Government responds to Mr. Barrett's *Brady* claim through a false framework. In direct conflict with the applicable law, the Government seeks to unilaterally limit its *Brady* duties by arguing it had no obligation to be aware of exculpatory evidence known to or in the possession of state and local law enforcement because the DEA was

the only law enforcement agency on the prosecution's "team." *E.g.,* Doc 175 at 160, Resp. Exh. 4 (unilateral declaration by United States Attorney's Office that DEA was the only member of the prosecutor's "investigative team").  Not only is this assertion empty as a matter of law, *Strickler v. Greene,* 527 U.S. 263, 280-81 (1999); *Kyles v. Whitley,* 514 U.S. 419, 438 (1995); *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979), but it is untrue in fact.  As noted in the reply to Ground 4, this case was investigated almost entirely by state and local law enforcement and the prosecution relied on local agencies heavily, extending even to its designated case agent at trial, Sheriff Philpot.  Evidence known to or in the possession of state or local law enforcement is imputed to the federal government in this case, and to argue otherwise is wholly disingenuous.

In attempting to counter Mr. Barrett's newly discovered evidence claims, the Government states that he cannot rely on Fed.R.Crim.P. 33, since at the time the issue was presented in these collateral proceedings, the period for filing a Rule 33 motion had expired.  Doc 175 at 153.  The Government also states that the standard for granting relief under Rule 33 is lower than that in a § 2255 proceeding.  Doc 175 at 153.  A newly discovered evidence claim is cognizable in a § 2255 proceeding.  *United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996). *See also, Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003) (discussing previous § 2255 petition filed by Peltier premised in part on newly discovered evidence).   It is a legal basis for seeking collateral relief, and affects the due process fairness of the underlying trial.  U.S. Const. amend. V. Additionally, the interconnectedness of the *Brady* and newly discovered evidence claims raises a Fifth Amendment due process claim, not simply a claim of "factual injustice."  Doc 175 at 153. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  To the extent Tenth Circuit authority recognizes the viability of newly discovered evidence issues in § 2255

proceedings, the Seventh Circuit case cited by Respondent is inapplicable. *United States v. Evans,* 224 F.3d 670, 674 (7th Cir. 2000).

### 1.   Charles Sanders -- *Brady,* newly discovered evidence, and false evidence.

The Government's claim that the prosecution did not suppress Sanders's criminal history -- including records of all convictions, the numerous deals he had obviously received one time after the next preceding Mr. Barrett's trial, and his record of dismissed charges, which were obviously related to his work as an informant (despite the Government's attempt to argue this is "speculation") ignores the facts.  Doc 175 at 154-55.  Respondent fails to address the fact that the prosecutors permitted Sanders to testify falsely on direct examination that he had a mere four convictions, and failed to correct his false testimony on cross-examination as to the actual number of his convictions and his false denial of a Muskogee County conviction.  The Department of Corrections sheet filed as an exhibit by the Government (Resp. Exh. 6) is apparently the one used by defense counsel to cross-examine Sanders, and Movant has demonstrated conclusively that it does not represent his true number of convictions, let alone his many dismissed charges and deals.  Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion.

Respondent maintains that the Government had no duty to disclose any of this, because it was "public record," and that Mr. Barrett, through counsel, also had access to it.  This could be said of practically any witness's criminal records, but it is well-recognized that the prosecution has an affirmative duty to disclose a witnesses criminal record and other impeaching information associated with it.  Relatedly, the Government has an affirmative duty to reveal the full extent of leniency a witness has received, not only in the case at bar, but in the past.  A history of receiving

favorable treatment in exchange for information or testimony would tend to impeach the witness. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir. 1999); *Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *United States v. Hill,* 799 F. Supp. 86, 89-90 (D. Kan. 1992).

The case primarily relied upon by the Government for its argument, *United States v. Erickson,* 561 F.3d 1150, 1164-65 (10th Cir. 2009), does not support its claim. The alleged suppressed *Brady* material in *Erickson* consisted of an audit report of the company (a private concern) that the prosecution never had, either actually or constructively under *Brady*, and another financial document that was actually made available to the defense through the prosecution's "open file" policy. The criminal records involved here are classic *Brady* impeachment material within the control of the prosecution and its agents. Mr. Barrett's argument that the prosecution sponsored false testimony and failed to correct false testimony given by Sanders respecting his criminal record stands unrefuted. *Giles v. Maryland,* 386 U.S. 66, (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); *Napue v. Illinois,* 360 U.S. 254, 269 (1959).

The Government argues that it fulfilled its *Brady* duties by disclosing the only deal it had made with *Sanders*, namely, that the prosecutor would "speak to" state authorities about his cooperation, implying that there was no specific *quid pro quo* that would actually result in favorable treatment. Doc 175 at 155-57. The fact that Sanders received deliverance from prison, conversion of sentences to straight probation without supervision, and the rest was something that just happened at a future time, but was not set in stone or even broadly hinted at, according to the Government. Movant submits that there was much more to the arrangement between Sanders and the Government. Despite its semantic contortions, the Government cannot escape the fact that the favors Sanders received in Sequoyah County carried the imprimatur "per plea

agreement with feds," which, contrary to the Government's speculation, should be taken to mean what it says: that Sanders got his get out of prison card, "paperless," painless probation, and freedom from financial obligation on his cases due to an agreement, whether explicit or tacit, that preceded or was contemporaneous with his testimony. The statement that the Government was only going to "speak with" state authorities, both in Sequoyah County and Tulsa County suggested in a misleading fashion much less than what actually transpired. Movant asserts, and the evidence shows, this was deliberate. *United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009); *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009). Mr. Barrett is certainly entitled to an evidentiary hearing to test his claims.

The cases cited by the Government in alleged support of its argument that no *Brady/Giglio* error occurred in the manner Sanders's deal was handled are readily distinguishable. Doc 175 at 156. In *Bell v. Bell,* 512 F.3d 223, 224-25 (6th Cir. 2008), the incarcerated witness, on his own initiative, called the prosecutor asking for favors in exchange for his testimony. The prosecutor declined, and there were no explicit or even tacit agreements entered into for any leniency whatever. After the defendant's trial, the prosecutor wrote a letter on behalf of the witness to the parole board, which did the witness "no good" at all. Although the witness's cooperation in the case against the defendant was mentioned, the primary reason for the letter seemed to be that because of his informant status, the witness was in danger of retaliation from other inmates and should be protected. The witness had a separate pending criminal case, and received a beneficial plea bargain, but the disposition of that case was totally independent of the witness's involvement in Bell's case. Thus, there was never any agreement at all, of any sort, that the witness would receive any favor for his cooperation against Bell.

*Shabazz v. Artuz,* <u>336 F.3d 154, 164-66</u> (2nd Cir. 2003) is likewise distinguishable. The prosecution completely and forthrightly revealed the plea bargain it had entered into with one of the cooperating witnesses, which called for a certain sentence. When the witness was sentenced, he received a lower sentence than that specified in the plea agreement. However, this was not due to any side agreement between the witness and the prosecutor, or at the urging of the prosecutor. The sentencing judge made a unilateral decision to impose a lower sentence than that called for by the plea agreement. Two other witnesses were told by the prosecution there would be no promises, explicit or tacit, for their cooperation. Because they decided to cooperate anyway, their lawyers continued their sentencing dates until after their testimony against the defendant, so the fact of their cooperation could be brought to the attention of the sentencing judge. The witnesses were ultimately rewarded with breaks on their sentences due to their cooperation, but there was no preceding agreement of any sort that such would be the case. In addition, the prosecutor had opposed an "own recognizance" release for one of these witnesses, but the judge authorized it anyway.

In contrast to *Bell* and *Shabazz*, the evidence shows that the prosecution here made an agreement with Sanders for leniency well beyond what was revealed to the jury -- that the prosecutor would simply "talk to" state authorities. The Government also delayed disposition of Sanders's Tulsa County case until he testified against Mr.Barrett so his cooperation could be made known to the Court there. This benefit was likewise not revealed to the jury. *Shabazz, supra* (noting that delaying a witness's sentencing until after his cooperation against a defendant is a form of favor or leniency).

The Government states the prosecution did not suppress evidence of the existence of a witness who would impeach Sanders (Doc 175 at 174-75), but the transcript of the *ex parte* hearing of September 13, 2010, shows the prosecutors clearly discussing a female witness they or their agents had interviewed who denied that Mr. Barrett had threatened law enforcement.  Tr. Hr'g 9/13/05 at 11-12.  This would not only impeach Sanders, but the informant witnesses as a whole.  This impeachment evidence was clearly *Brady* material, but the identity of this witness is still unknown.

### 2. Travis Crawford -- *Brady*, newly discovered evidence, and use of false evidence.

Respondent disputes that any *Brady* evidence existed with respect to Travis Crawford. The Government alleges that Mr. Crawford's recantation (Exh. 45, Amended Motion) does not show that he was threatened and intimidated by AUSA Littlefield, but was simply told "bad things" would happen to him unless he told the truth.  Doc 175 at 162.  A fair reading of Mr. Crawford's declaration[36] shows the opposite.  Mr. Crawford was basically given a road map of what to say, backed up by threats if he decided not to play ball.  Threats against witnesses by prosecutors or Government agents constitute *Brady* material.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999); *United States v. Hill, supra.*  This *Brady* evidence was certainly known to the Government, since it stemmed from the conduct of one of the prosecutors.  Additionally, the fact that Crawford had previously acted as an informant, which itself is *Brady*

---

[36] The Government routinely dismisses the witness declarations relevant to Mr. Barrett's *Brady*, false evidence and newly discovered evidence claims as unsworn hearsay which should be given little consideration.  But declarations of the sort used by Movant are recognized as appropriate vehicles for bringing matters to the Courts attention in § 2255 proceedings.  These declarations are now a matter of record, as the record has been expanded on this Court's order.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    133                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

material was in constructive possession of the Government, because this fact was known to its agents in state law enforcement, who were unquestionably part of the prosecution team.

The Government dismisses Mr. Crawford's "unsworn" recantation as newly discovered evidence, but, again, declarations of this type are appropriate in these proceedings, and raise questions of fact which should be resolved at an evidentiary hearing.  As discussed in Mr. Barrett's opening brief, Crawford's recantation meets the legal standards for newly discovered evidence.  *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).  Doc 95 at 161-62. Contrary to the Government's arguments that the statements in Mr. Crawford's declaration do not really constitute a recantation, the declaration shows that in many of its particulars and in its tone, Crawford repudiated his testimony with respect to his trial description of Mr. Barrett's demeanor, attitude, and statements on the afternoon of September 23, 1999.  *In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (credible recantation of key prosecution witness would show defendant's constitutional rights to a fair trial were violated).  The Government argues there was no reason for it to know that Crawford gave false testimony, but this is belied by the fact that he was intimidated into giving his story by AUSA Littlefield.

### 3.      Cindy Crawford -- *Brady*, newly discovered evidence and false evidence.

Although Ms. Crawford refused to sign a declaration attesting to the statements she made to defense investigators, the declarations of the investigators themselves put the factual matters recited there in issue, requiring an evidentiary hearing.  Crawford told the investigators she had been intimidated and threatened by AUSA Littlefield, both before trial and during her trial testimony, and that this intimidation affected and colored her testimony against Mr. Barrett.

Exhs. 14, 31, and 43, Amended Motion. In accordance with the authority cited above, Littlefield's threats were *Brady* material that was required to be disclosed to the defense. This is also a species of newly discovered evidence and use of false evidence, because, again, Littlefield's threats shaped Ms. Crawford's testimony and they were not revealed at trial.

Again based on its specious argument that the prosecutors could turn a blind eye to anything known by state and local law enforcement about their witnesses, the Government argues there was no need to inform the defense of Cindy Crawford's history as an informant. Doc 175 at 167. This argument, for the reasons and authorities already stated, should be rejected. Equally without merit is claim that the prosecution had no duty to disclose Crawford's informant history because, according to various declarants, it was "well known" that Crawford had acted in such a capacity. Doc 175 at 167. This does not diminish the Government's *Brady* obligations.

The Government suppressed impeaching evidence that at the time of Mr. Barrett's trial, Cindy Crawford was in violation of a deferred sentence and thus had a motive to curry favor with Government authorities, particularly prosecutors. A sufficient factual question has also been raised as to whether she received favor as a result of her testimony, since her problems with the deferred sentence disappeared after Mr. Barrett's trial.

> **4. Brandie Zane Price -- *Brady*, newly discovered evidence, and false evidence.**

The Government contends Mr. Barrett engages in speculation when he argues the prosecution knew or should have known that Price was engaged in drug activities at the time of Mr. Barrett's trial. Doc 175 at 168-69. The fact she was charged in a federal drug indictment involving acts occurring, at the latest, shortly after Mr. Barrett's trial raises the inference of

earlier drug activity and knowledge on the part of the Government that, contrary to her trial testimony, she was involved in drug activities at the time of Mr. Barrett's trial.  In her federal drug case, she received a significant sentencing break not due to the facts of that case, including any cooperation she might have given, but due to her testimony in Mr. Barrett's totally unrelated case.

### 5.      Karen Real -- *Brady,* newly discovered evidence, and false evidence.

As with its argument respecting the leniency Charles Sanders received following his testimony, the Government argues the prosecutors fully revealed Karen Real's expectations of leniency, but this is incorrect.  Doc 175 at 169-72.  The prosecutors soft-peddled the lengths they were willing to go in exchange for her testimony against Mr. Barrett by allowing Real to state that the only thing she had been promised was that the prosecutor would tell her judge she cooperated, that it would be up to the Court as to whether she would actually receive any leniency for her cooperation, and that she was not really expecting to get anything.  The Government comes close to conceding, but does not, that this exchange misrepresented the true nature of the consideration she was being given in exchange for her testimony against Movant.  Doc 175 at 170-71.  The Government should concede the point.  The prosecutors did not just "talk to" Real's sentencing judge, they filed a Rule 35 motion and strongly recommended that she be given a *substantial* reduction in sentence.  Thus, the Government's claim that "no ... particular reduction" was recommended by the Government is untrue.  The "substantial reduction" affirmatively sought by the Government  materialized when Real's sentence was reduced to time served.   The prosecutors clearly concealed the deal they had with Karen Real, and cannot hide behind the claim that so long as a vague assurance is made, acted on only after trial, no *Brady* or

*Giglio* violation occurred.  The misleading spin placed on what the prosecutors were prepared to do for Real also constituted the sponsorship of materially false evidence.  Real's deal is also newly discovered evidence, because it was consummated after Mr. Barrett's trial.  For the reasons stated in the above discussion of the undisclosed deal given to Charles Sanders, the Government's reliance on *Bell v. Bell, supra* and *Shabazz v. Artuz, supra* to turn back a *Brady/Giglio* attack with respect to Karen Real fails.

The prosecution also suppressed *Brady* evidence when it failed to disclose that a number of state drug charges had been dismissed against Real.  Doc 175 at 172.  Exh. 47-52, Amended Motion.  Mr. Barrett showed in his reply to Ground 2(5) that issues concerning Real's dismissed state charges do not constitute time-barred "new issues," but merely amplify or clarify issues already raised.  The Government's argument that an Oklahoma state statute absolutely barred her prosecution in state Court because she had been charged in federal court was also shown to be without merit.  The dismissed state charges gave Real a motive to please the federal prosecutors in Mr. Barrett's case lest they possibly be revived if she displeased the Government.  The authority cited above in relation to the suppression of Charles Sanders's criminal records applies equally here.  The Government's argument that there was no reason for the prosecution to know about these charges due the supposed "Chinese wall" between federal and state authorities has no merit for reasons already stated, and is especially unconvincing because Real was prosecuted federally in the Eastern District.  The prosecutors were obviously aware of her state charges.

**6.    Randy Turman -- *Brady,* newly discovered evidence, and false evidence.**

The Government argues that the prosecution committed no violations with respect to Randy Turman's pending Sequoyah County drug case because defense counsel were aware of that case and cross-examined Turman about it. Doc 175 at 173. The evidence indicates Turman was working as an informant, which is the only reasonable explanation for why his case lay fallow for years. Turman's informant status was not revealed to the defense. When Turman falsely denied that his multi-count felony drug case was still ongoing, despite counsel's ineffective attempt to establish this, the Government sat idly by, allowing Turman to perjure himself.

Newly discovered evidence raises the factual issue of whether Turman was acting as an informant and was given an explicit or tacit assurance that his testimony against Mr. Barrett would lead to favorable resolution of the witness's case, which is what occurred since it was dismissed outright after no action for a significant period of time. As reflected in comments made by the prosecutors during the September 13 *ex parte* hearing, the Government was especially solicitous of Turman's plight. The Government told the Court that Turman feared physical retaliation from drug dealers due to his cooperation, one of whom was involved in the Karen Real federal drug case and was currently imprisoned. Tr. Hr'g 9/13/05 at 13-14.

**7.    Law enforcement witnesses.**

In his reply to Ground 4, Mr. Barrett discussed the suppression of *Brady* evidence relating to Clint Johnson. That analysis and argument applies equally here. It is clear that since Johnson was an important prosecution witness and part of the Government's team, the prosecution knew or should have known of the ongoing corruption investigation into him. The self-serving

declaration of the Oklahoma Assistant Attorney General who utilized Johnson as the star witness in the failed prosecution of Richard Gray is entitled to little, if any credence. The Government's argument that much of the evidence relied upon by Mr. Barrett to show Johnson's corruption in office was developed after Mr. Barrett's trial does it no good, because the investigation leading to Johnson's firing from the District 27 Drug Task Force, which occurred shortly after the conclusion of Mr. Barrett's trial, was ongoing. Any post-trial evidence bearing on Johnson's honesty, which is critical in assessing the credibility of his trial testimony and, particularly, the validity of the no-knock search warrant, constitutes newly discovered evidence under the authority cited in Movant's opening brief and above.

The Government argues Johnson testified truthfully at Mr. Barrett's suppression hearing regarding the then-anonymous C.I.'s involvement with drugs, but the record disputes this. Doc 175 at 179. Johnson denied the C.I. was a drug dealer or had been involved in dealing drugs, stating only there was evidence of "some" drug use on the C.I.'s part. Tr. Hr'g 1/26/05 at 92. The prosecution suppressed evidence to the contrary, and permitted Johnson to testify falsely.

A disputed factual issue has been raised respecting Sheriff Philpot's uneventful visit to Mr. Barrett's property approximately a month before the raid. As noted elsewhere in this reply, Sheriff Philpot's current denial that such an incident occurred is entitled to little credence because it is made in the context of an earlier admission that the event in fact took place, and he is now forced to backtrack only because the significance of his earlier admission has been brought to his attention by the Government. Even aside from Mr. Barrett's *Brady* claim respecting this evidence, it is readily apparent that the Government sponsored false testimony, since this event

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    139                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

itself disproves the theory that Mr. Barrett was a danger to law enforcement, and had to be approached in the way he was in the early morning hours of September 24, 1999.

Former AUSA Mike Littlefield's child abuse case, and the facts surrounding it, constitutes both *Brady* material and newly discovered evidence. Littlefield's abuse of his children was ongoing at the time of Mr. Barrett's trial, as indicated by the search warrant affidavit for his residence. Exh. 189, Amended Motion. Littlefield's abusive conduct is plainly relevant to Mr. Barrett's claim that he used his authority to bully and intimidate witnesses. The Government argues that this evidence would have been inadmissible at trial under Fed.R.Evid. 404(b), but this is not correct. Evidence of Littlefield's pattern of intimidation was relevant to show his motive, intent, and "common scheme and plan" toward those over whom he had authority. *E.g., United States v. Caldwell,* 560 F.3d 1214, 1217, 1220 (10th Cir. 2009). Although, to be sure, the evidence would have been prejudicial to the Government's case, it would not have been *unfairly* prejudicial. Fed.R.Evid. 403.

### 8. Conclusion.

In assessing *Brady* error, the Court must consider the effect of the suppressed evidence cumulatively, not item by item. *Kyles,* 514 U.S. at 436. The prosecution's repeated suppression of exculpatory evidence, use of false evidence, and the newly discovered evidence bearing on both entitle Mr. Barrett to relief from his convictions and sentences. Because the suppressed evidence, false evidence and newly discovered evidence would have undercut the entire basis for the prosecution's theory of the case, there is at the very least a reasonable probability that the outcome of trial would have been different absent to prosecution's constitutional violations. *See*

*United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), and the other cases cited in Mr. Barrett's opening brief.  Doc 95 at 149-65.

> **C.     The Prosecution Interfered with the Defense's Right to Interview Witnesses.**

The Government's claim that this issue was decided on appeal, misapprehends which issue is actually before the Court.  Admittedly, a claim that the late disclosure by the Government of the identities of seven "snitch" witnesses violated the statutory requirement for disclosure and was prosecutorial misconduct was raised.  *See* Appellant's Brief on Appeal at 65-89; Further, the issue of the timeliness of that disclosure under 18 U.S.C. §3432 was resolved on appeal. *United States v. Barrett*, 496 F.3d at 1116.

The issue now before the Court, however, is not the timeliness of the disclosure.  The factual background of that interference does indeed include the untimely disclosure, but the error in question is the Government's interference with, and misrepresentation to, the witnesses that they could not talk with the defense or that any contact by the defense had to occur under the watchful eye of the prosecution.  *See* Doc 95 at 310-314; Doc 149 at 165-168.  The claim rests on extra-record, newly discovered evidence which could not have been raised on appeal and is appropriately brought under Section 2255.  *Massaro v. United States*, 538 U.S. 500, 505 (2003).

The conduct by the prosecutor in insisting that the witnesses be interviewed at his office was an unreasonable interference with the defense.  *See e.g.,* Exh. 91, (Doc 70) (Declaration of Roger Crawford regarding statements made by Travis Crawford that his testimony was the result of fear and intimidation of Government agents); Exh. 31 (Doc 70) (Declaration of Investigator regarding statements made by Travis Crawford that he felt fear and intimidation through Philpot and Littlefield); Exh. 43 (Declaration of Investigator that Karen Real was told not to speak to the

defense.)  *See also* section B hereinabove; Ground 2(A)(15) above.  Without addressing the direct statement by Ms. Real that she was expressly told not to speak to the defense, the Government does concede Ms. Crawford's belief that she could not speak to them which the Government downplays as being the witness' "subjective interpretation."  Doc 175 at 188.  By that concession alone (and the lack of any denial regarding Ms. Real), Mr. Barrett is entitled to further discovery and an evidentiary hearing.  The discovery process including the right to depose the critical witnesses and an evidentiary hearing which should be held will undoubtedly lead to additional evidence to support this claim.

The Government's argument that "simply put, Barrett fails to show that any foregone interview with Cindy Crawford would likely led to his acquittal,"  Doc 175 at 189, again misstates the prejudice requirement.  Here Mr. Barrett was denied a fair opportunity to interview the witnesses which "elemental fairness and due process require that he have." *Gregory v. United States,* 369 F. 2d 185, 188 (D.C. Cir. 1966).  Mr. Barrett is entitled to a new trial or, at a minimum, the right to full discovery and an evidentiary hearing on the issue.

### D.    Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial.

During both the guilt and penalty phases of the trial, the prosecutors blatantly interposed improper questions designed to imply falsehoods or bolster the credibility of witnesses.  Additionally, the prosecutors made egregious, inflammatory statements during closing arguments.  The overall effect of these questions and comments so infected that trial that Mr. Barrett was denied due process of law.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The Government argues that Mr. Barrett procedurally defaulted this claim and beyond that, the

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    142                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

Government valiantly attempts to twist the prosecutors' inflammatory behavior into some semblance of reasonableness.

### 1.    Mr. Barrett's claim is subject to collateral review.

Prosecutorial misconduct was not raised on direct appeal.  However, Mr. Barrett can establish constitutionally-cognizable ineffectiveness based on the fact that the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused their failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evittts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  This claim has not been procedurally defaulted.

### 2.    The prosecutors improperly questioned the witnesses.

There are numerous examples of the prosecutors' improper questioning of witnesses, as set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support.  These include: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witnesses, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.  For each of the examples in each of these categories, the

Government goes to great lengths in an attempt to explain the prosecutors' supposedly legitimate reasons for the challenged questioning. The Government's convoluted explanations fall woefully short.

For example, Mr. Barrett challenges the prosecutors' line of questioning regarding his right to go to trial. In questioning Deputy Court Clerk Maudeen Vann, Prosecutor Littlefield engaged in the following:

> Q. In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?
>
> A. No, sir.
>
> Q. Put the government to the task of proving its case, didn't he?
>
> A. Yes, sir.
>
> Q. And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?
>
> A. Yes, sir.

(Tr. 4765.)

The Government contends that the point of this questioning was somehow tied to later testimony indicating that Mr. Barrett's state manslaughter conviction was based on different evidence than that presented by the Government in this case. Doc 175 at 198. This argument defies logic. There is no connection between Mr. Barrett's plea of not guilty and the evidence presented in his state trial. The Government is reaching -- albeit feebly -- to explain its inappropriate questioning. Prosecutors commit misconduct if they imply that the defendant somehow abuses the legal system by exercising his Sixth Amendment right to trial. *See*

*Cunningham v. Zent*, <u>928 F.2d 1006, 1019</u> (11th Cir. 1991).  That's exactly what the prosecutor was attempting to do here.

> **3.**     **The prosecutors were especially egregious in arguing that the jury should impose a death sentence.**

The examples of prosecutorial misconduct in the penalty phase closing argument are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support.  Again, the Government unsuccessfully tries to find justification for the prosecutors' outrageous statements.

The prosecutors made unsubstantiated and inflammatory statements about Mr. Barrett's alleged lack of remorse, such as "There's no proof that Defendant lost one wink of sleep over what he did.  It's almost like nothing happened . . . You know it's almost a oops." Tr. 5419.  This is complete speculation on the part of the prosecutors, only meant to inflame the jury.  The prosecutors continually pushed the bounds of reasonableness, arguing that it was only the "hand of God" that prevented Mr. Barrett from being a multiple murderer and that this was "way over the capital murder line."  R at 5402-03.  Amazingly, the prosecutors told the jury that Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  R at 5408.  It only gets worse.  Prosecutors told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  R at 5412.  Speculating outside the record simply to prejudice the jury, prosecutors said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  R at 5412.  Inflammatory phrases without any evidentiary support were continually used, such as "executioner of the innocent," how unjust was it that Mr. Barrett wanted to "choose his

sentence," Mr. Barrett wanted "the thrill of the kill," (R at 5412-13), and Mr. Barrett "slaughtered an innocent soldier of the law." R at 5423.

And yet again, the Government tries to rationalize this hyperbole. For example, in support of its statement to not let Mr. Barrett be made a "hero" to his fellow inmates, the Government argues that there was "substantial evidence adduced upon which the jurors could have made the inferential leap suggested by the prosecutor." Doc 175 at 206. This substantial evidence pointed out by the Government included the fact that Mr. Barrett allegedly exerted control over other inmates, that he allegedly threatened a guard and, "as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement." Doc 175 at 206. First, the Government exaggerates the "substantial evidence." Mr. Barrett's alleged control over other inmates was actually the fact that he had been incarcerated in that particular location the longest. R at 5234. The alleged threat Mr. Barrett made to a guard was hearsay evidence that Mr. Barrett used some "cuss words" when a television set was removed from his cell and told a guard "he would get him when he got out." R at 5252. Accepting even these exaggerated facts, this is much more than the inferential leap the Government suggests; it's an intergalactic flight to get from those facts to the inference that "prison inmates would look with favor upon someone who murdered a police officer," and "jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement." Doc 175 at 206. This "inference" is so ludicrous it does not even warrant a response. It simply goes without saying that the prosecutor's statement most assuredly did not rely on facts adduced in the record. *See Duckett v. Mullin*, F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin*, F.3d 1002, 1014-15 (10th Cir. 2002).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                  146                  *Barrett v. U.S.*, 6:09-cv-00105-JHP

The prosecutors further improperly aligned themselves with the jury by the use of first person pronouns during their argument. The Government admits that "the prosecutor's use of the first-person was ill-advised," but contends that the argument did not confuse the jury so Mr. Barrett was not prejudiced. The Government attempts to distinguish *Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), in support of its argument but in so doing, misstates the holding of *Cargyle*. The Government contends that in *Cargyle*, the prosecutor offended the defendant's rights because "it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution. As such, it implied that the jury bore some duty, or at least allegiance to the government." Doc 175 at 214-15. In *Cargyle*, the offending language contained some of the sentiment the Government cites. However, Cargyle held:

> We agree with the district court that "[t]his is an extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." The Supreme Court has stressed repeatedly "that the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (following *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Young*, 470 U.S. at 18, 105 S.Ct. 1038 (holding prosecutor's effort "to exhort the jury 'to do its job' ... has no place in the administration of justice").

317 F.3d at 1223. Thus, *Cargyle* stands for the proposition that it is prejudicial for a prosecutor to suggest that jurors are part of the prosecution team.

That is exactly what happened in Mr. Barrett's case. The prosecutor stated:

> Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

> But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

Tr. 5421-22.  The prosecutor was attempting to make the jurors feel a part of the prosecution team, i.e., "our job, " "put us all here," "our duty," and "we can't make the victim's ... whole." Mr. Barrett's case is directly on point with *Cargyle*.

**GROUND 7:   THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD CAUSE WAS ERROR.**

**A.       The September 13th Finding Made Clear the Court Permitted the Electric Shock Device Because it Was a Capital Case.**

The Government complains that Mr. Barrett "attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling."  Doc 175 at 222.  On September 13, 2005, the Government sought to do precisely what it is now trying to do: to bootstrap the grant of leave by the Court to the U.S. Marshal to use an electric shock device or  "stun belt" during the trial into a finding by the Court that Mr. Barrett was "dangerous."  Thus, on the 13th of September the Government argued that the Court's order regarding the "stun belt" supported the Government's request to be relieved of its duty to timely disclose six previously unidentified witnesses and one previously unused witness.  The Court advised the Government that "probably in any capital case where [he] was the presiding judge a stun belt would be used just because of the nature of the potential punishment." Tr Hrg at 9/13/05 at 13.  That finding by the Court was a specific affirmation of the prior finding and rejection of the premise of the Government's argument here.

**B.      The Order Permitting Use of the Device Did Not Comply with Due Process.**

The Government's assertion that the claim "ignores the Court's reasoning as articulated

in the Order" is simply not accurate.  Doc 175 at 222.  The Court's September 13[th] conclusion

that the use of a "stun belt" in a capital case was just "common sense" was a cogent summary of

the Court's September 6th Order.  Tr Hrg 9/13/05 at 13.

**1.      The hearing on the issue did not support the court's conclusion.**

It is true that the Court held a hearing and entered an Order regarding the use of the

electric shock device during the trial.  Tr Hrg at 8/31/05; Order at 9/6/05.  It is not true, however,

despite the Government's insistence otherwise, that the Court found that "the belt was employed

to thwart a potential security risk, rather than mere disruptions,"  or that "its use reflects an

entirely appropriate exercise of the Court's discretion."  Doc 175 at 222.  *See* Order, 9/6/05.  The

Court's order was not an exercise of discretion, but rather an abdication of its responsibility to

exercise discretion; a matter made clear by both the Order itself, and the Court's clear articulation

of the basis at the September 13th hearing.

While the Court Order notes the testimony of the deputy U.S. Marshal, it made no

findings regarding credibility or the conclusions regarding the facts.  For instance, as the

Government notes, Deputy U.S. Marshal Louisia Murrow testified that she saw Mr. Barrett

attempting to tamper with his handcuffs, turning his back on the security camera at one point.

The deputy also testifies, however, that she believes the electric shock device is necessary

because it is a death penalty case and she thinks they should be used in every death penalty case.

Tr Hrg 8/31/05 at 39 *ll* ll-12.  Murrow also testified, however, that handcuffs can cause irritation

if too tight, and then acknowledged that Mr. Barrett's wrists showed signs of redness and

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    149                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

irritation. Tr Hrg 8/31/05 at 43, *ll* 1-20.  She also acknowledged that Mr. Barrett was locked in a cell block at the time she observed him "tampering" with the handcuffs and that she had no information that he was an escape risk.  Tr Hrg 8/31/05 at 44 *ll* 5-17.  Nor in the eleven months in which the U.S. Marshal's Office had custody of Mr. Barrett and transported him past numerous "avenues" of escape had she observed Mr. Barrett make any action suggesting an escape.  Tr Hrg 8/31/05 at 48, *ll* 8-10.  Murrow admitted she was not aware of any violent actions by Mr. Barrett in either of his two state trials, both of which had been capital trials.  Tr Hrg 8/31/05 at 45 *ll* 16-21.  Beyond that Murrow testified that there was already increased security in the presence of two additional deputy marshals in the courtroom, making a total of four simply because it was a death penalty case.  Tr Hrg 8/31/05 at 44.  Indeed, the testimony showed a lack of concern for security specific to Mr. Barrett by permitting the Sheriff's deputies to take him to the doctor at which time he was unhandcuffed and unshackled.  Tr Hrg 8/31/05 at 49.  Though the deputy marshal speculated that Mr. Barrett "is thinking in his mind possibly of escaping somewhere else," she confirmed that there was nothing to show that he "tried to do anything to escape from a courtroom."  Tr Hrg 8/31/05 at 52 *ll* 10-12, 13-16.  Murrow testified that the three reasons to put restraints on Mr. Barrett were that it's a death penalty case, "that he looked around the sallyport" and "that he fiddled with his handcuffs."  Tr Hrg 8/31/05 at 53.

The Court's "statement of facts" identifies the testimony and argument received but makes no specific fact-finding based on the testimony.  Order,  9/6/05.  Indeed, the Court notes the defendant's argument as well.  *See* Order, 9/6/05 at 5-6.

> On August 30, 2005, the defendant through counsel, filed a brief objecting to the **use of any type of restraint** during the upcoming trial (docket No. 173).  The defendant argues he has not previously attempted to escape or exhibited any non-compliant behavior while

in custody of the United States Marshal. Additionally, the defendant argues there has been no violence exhibited by the defendant, either in front of the Court or defense counsel. Finally, the defendant argues, despite the facts recited above and the allegations currently lodged against him, because he was not restrained by Sequoyah County deputies during his state proceedings, he does not pose an increased risk of danger before this Court such that he needs to be restrained in any way in his upcoming trial herein.

Order, 9/6/05 (emphasis in original). Nothing in the factual recitations which preceded or followed or the Court's ultimate conclusions refuted those statements. *See* Order, 9/6/05 at 15.

### 2. The electric shock device was not "preferable" to other security measures.

While the Court finds that the "use of the stun belt preferable to the use of other security measures, "including additional Marshals within the courtroom, leg irons, leg shackles, or the use of weapons other than the stun belt to subdue the defendant in the event of behavior posing a risk to courtroom security" (Order, 9/6/05 at 19), it makes no finding that any additional security is actually *necessary* at all. Other than the fact of the capital charges pending against Mr. Barrett, there is nothing in the Court's findings which suggest additional security is necessary. Indeed, the Court specifically finds "if the stun belt" is not used, additional Marshals would have to be present and the Court "***might*** entertain the possibility of using leg irons on the defendant, at a minimum while being transported to and from the courtroom". Order 9/5/05 at 18. (Emphasis added.) If the Court could not say that leg irons would be required if there were no electric shock device, there was no actual finding of a security risk. The Court's finding that the electric shock device was "preferable" to additional marshals does not support the finding that the use of an electric shock device was appropriate since additional marshals were already employed. Tr Hrg 8/31/10 at 44 *ll* 18-22.

Beyond that, the Court's finding that the electric shock device was "preferable" to additional personnel is simply not supported in law. 9/6/05 Order at 19. In *Holbrook v. Flynn*, 475 U.S. 560, 568-69(1986), Justice Thurgood Marshal speaking for a unanimous Supreme Court found that the "conspicuous or at least noticeable deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that, like shackling should be permitted only where justified by an essential state interest specific to each trial." Similarly, the Tenth Circuit has found that the electric shock device raises the same concerns as shackling or other physical restraints. *United States v. Wardell,* 591 F. 3d 1279, 1294 (10th Cir. 2009) (finding no violation of due process in the use of the stun belt where the Court made a defendant-specific determination of necessity including two prior convictions for escape-related crimes). The Court's finding here that the electric shock device was *less* intrusive than additional security personnel or shackling was legally incorrect.

The Court failed to appreciate that the electric shock device, is in fact, more intrusive and "far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own defense." *U.S. v. Durham*, 287 F. 3d 1297, 1306 (11th Cir 2002). In this case, defense counsel explained that the prejudice from the interference with the ability to participate in the proceedings was greater than in the ordinary case. Tr Hrg 8/31/05 at 95 ("[A]ny kind of inhibition that is placed on Mr. Barrett to freely be able to converse and talk to us is very crucial because again, while this is so different -- Mr. Barrett knows more about this case, knows more about the testimony in this case than anybody here because he has been involved in two trials.") The anxiety induced by the belt recognized in *Durham* is substantially compounded by Mr. Barrett's prior beatings by law enforcement and his

fear that the metal in his chest from a prior attempted suicide would create a lethal force through use of the shock device.

### 3. The September 6th Order does not comply with *Deck v. Missouri*.

The September 6th Court Order following the August 31st hearing made no finding that Mr. Barrett was dangerous, an escape risk, threatening or likely to cause any security problems. Order, 9/6/05 at 1-12. The Order, therefore, does not comply with *Deck v. Missouri,* 544 U.S. 622, 632 (2005). The Court's reliance on the fact that the U.S. Marshal used the electric shock device in two prior capital cases in the district supports the Court's later statement that it was just "common sense" to order it in a capital case, Tr Hrg 9/13/05 at 13, and illustrates the lack of defendant-specific findings. The failure to address the specific issues raised by the defense including the interference with Mr. Barrett's ability to fully participate in the defense and communicate with counsel, as well as, the numerous courtroom appearances, in both state and federal court, without disruption illustrates the lack of individualized determination required in *Deck*, 544 U.S. at 642.

### C. Compelling Mr. Barrett to Wear the Electric Shock Device Was Prejudicial.

As argued in the opening brief, because of the deficiencies in the Court's Order, prejudice is presumed. Beyond the presumption, the evidence on this record shows clear prejudice to Mr. Barrett.

### 1. The electric shock device was visible and undermined the presumption of innocence.

The Order further relies on a finding that the electric shock device will preserve the "presumption of innocence" based on a ***belief*** that it was ***not likely*** jury will not see the electric

shock device.  Order, 16, 19 (emphasis added).  The Court's obligation was to require the Government to *prove* that the jury would not be able to see the belt.  Absent a ***finding*** by the Court that the jury could not see the two inch bulge the belt caused, the "presumption of innocence" was not preserved.  Mr. Barrett has shown that the Court's belief was not well founded by Doris Barrett's declaration that she could see the bulge from the gallery.  Contrary to the Government's claim that the visibility from the gallery is irrelevant, the record establishes the likelihood that the jury observed the bulge.  If seen, the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *U.S. v. Durham*, 287 F. 3d 1297, 1305 (11ᵗʰ Cir. 2002) *quoting State v. Flieger,* 955 P.2d 872, 874 (Wash. 1988).  Had the Court not recognized the visibility of the bulge and the prejudice it would cause, it would not have ordered Mr. Barrett be escorted in and out of the courtroom outside the presence of the jurors "in an effort to minimize the prejudice to the defendant." Order at17. (Emphasis added.)

### 2.       The Court did not consider the impact on Movant's ability to assist his counsel.

Defense counsel specifically argued that the electric shock device would adversely affect Mr. Barrett's ability to communicate and assist counsel was essential to his defense.  Tr Hrg 8/31/05 at 95-96.  The Court makes no mention in its findings of the defense-interference the device could create.

### 3.       Mr. Barrett renewed his objection on September 9, 2005.

The Government misstates the record when it argues that Barrett only aired the concerns with use of the electric shock device as a result of "metal implanted in his torso" "not by way of

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                 154                 *Barrett v. U.S.*, 6:09-cv-00105-JHP

objection, but by a post-ruling question." Doc 175 at 223.  Mr. Barrett's counsel specifically renewed the objection to the use of the electric shock device as a result of the free-floating metal implants.  Tr hrg 9/9/05 at 27.  ("We are – you know--*renew our objection* to the stun– use of the stun belt.") (Emphasis added.)  The specific objection was that Mr. Hilfiger understood "[t]hat there would be an examination to determine if there was any medical problems that the stun belt may effect him on."  The Government's response was that it was confident that the marshal's service can address this area of concern.  The Court directed the marshal to "address it and report to [the court], a copy of which [he would] provide to counsel."  Tr hrg 9/9/05 at 28.  No such report was made available to Court or counsel.  The failure to rule on the renewed objection to the use of the electric shock device in light of Mr. Barrett's specific physical and psychological health was error.  While the failure to pursue the ruling was ineffectiveness of trial counsel, it was error for the Court not to insist that his orders be followed and the ensuing reports made available to him for consideration of the objection.

### D.    The Claim is Properly Reviewed in Collateral Proceedings.

The Government contends that the issue has been procedurally defaulted relying on the general rule that claims not raised on direct appeal may not be raised on collateral review unless the movant shows cause and prejudice.  *United States v. Frady*, 456 U.S.152, 167-68 (1982).  Doc 175 at 219.  Mr. Barrett's medical history including the floating bullet fragments and Mr. Barrett's mental illnesses, as well as at least two prior physical beatings by law enforcement, the factual basis of which were not developed at the hearing, raise special concerns regarding the Court's deferral to the United States Marshal's office in the decision to compel Mr. Barrett to wear a electric shock device.  *See* Exhs. 89 ¶66 at 24 ("His disabilities would be further

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    155                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

exacerbated under conditions of [] highly stressful situations."); 117 ¶74 at 26 (Persons,  like Mr. Barrett, suffering from Post Traumatic Stress Disorder, are more likely to experience a more severe acute emotional reaction," including emotions such as fear, anxiety"); ¶79 at 27 ("Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain[.]).  Notwithstanding the Court's finding that there was no substantial risk of accidental discharge, the record is clear that there was a risk, a risk which, because of his physical condition and prior experience with law enforcement officials, would necessarily induce significant fear and agitation in Mr. Barrett and negatively affect his ability to freely confer with counsel and participate in his defense.

Unconstitutional restraints during trial are generally considered an issue which should be brought on direct appeal.  Given the significant development of the issue in this case, it was ineffective assistance of appellate counsel not to raise the issue on appeal.  Nonetheless, additional extra-record evidence was reasonably necessary to fully understand the impact of the electric shock device on this particular defendant makes consideration of the substantive constitutional issues in collateral proceedings appropriate.  *See Massaro v. U.S.,* 538 U.S. 500, (2003) (failure to raise trial counsel's failure to take offer of continuance on late disclosure which rested *in toto* on record evidence was not procedurally defaulted and could be properly presented in a § 2255 motion.)  "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments."  *Massaro v. U.S.,* 538 U.S. at 506.    In this case, however, requiring Mr. Barrett to bring the constitutional claims related to the Court's permission to the Government to utilize a "weapon" of their choice to satisfy the

speculative and unsubstantiated concerns regarding Mr. Barrett's behavior on direct appeal, where additional extra-record evidence significantly strengthens the claim, does not promote these objectives. Mr. Barrett's electric-shock-device-related claims should be permitted in a collateral proceeding under §2255, whether or not he could have raised the due process and eighth amendment claims on direct appeal. *See Massaro v. U.S.,* 538 U.S. at 506.

In this case, without additional factual development including the visibility and, more importantly, the impact of the electric shock device on Mr. Barrett as a result of his psychological and mental health exacerbated by a history of abuse by law enforcement, the appellate court may not have been able "to ascertain whether the alleged error was prejudicial." *Id.* Presentation of the claim on appeal would have resulted in a duplication of time and a waste of resources and ultimately been an inefficient way to present the issues, ...unnecessarily burden[ing] both the parties and the court . . .". *United States v. Galloway*, 56 F. 3d 1239, 1241(10th Cir. 1955).

The substantive due process issue arising from the electric shock device is properly before the Court on collateral review.

In any event, the issue is properly before the Court as substantive constitutional violations caused by the ineffective assistance of counsel at trial and on appeal. *Massaro v. U.S.,* 538 U.S. at 506. Even if the Court finds the question of the electric shock device as an unnecessary security measure should have been brought on appeal, Mr. Barrett alleges the failure of its presence on appeal as ineffective assistance of counsel at both trial and appeal. To the extent that the record supports a finding of a due process violation, the failure to raise it on appeal fell below the prevailing professional norms and was objectively unreasonable under *Strickland,*, 466 U.S.

at 687.  These ineffectiveness claims establish cause and prejudice for the due process claim as well as serving as independent claims for relief.  *See also,* Ground 18 hereinbelow.

There was no adequate security reason to permit the U.S. Marshal to restrain Mr. Barrett with the threat of electric shock in a manner visible to the jury and destructive of Mr. Barrett's ability to communicate with his counsel and participate in his defense.  He is entitled to a new trial.

**GROUND 8:  MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED WHILE INCOMPETENT.**

The Government overstates its evidentiary support of its three arguments in opposition to Mr. Barrett's substantive due process claim that he was incompetent during trial:  1.) The Motion to Vacate does not present "clear and convincing evidence" of incompetency; 2.)  That the opinions of Mr. Barrett's mental health experts are speculative and do not constitute clear and convincing evidence of incompetence; and, 3.)  Mr. Barrett's trial counsel's declarations contradict and defeat the claim.  The Government overstates its evidentiary support for each argument.  While the Government's concerns are relevant to the ultimate determination of the claim on the merits, they are neither controlling nor grounds for summary  dismissal.

**A.**      **This Court must Hold an Evidentiary Hearing on the Issue of Incompetency.**

The Government relies on the standard of proof set out in *Battle v. United States,* 419 F. 3d 1292, 1298-99 (11th Cir 2005).  Doc 175 at 224.  Its reliance is misplaced.  As set out by the Government, the Court of Appeals for the Eleventh Circuit in *Battle* held that to prevail on a claim of having been tried while incompetent, the defendant must present by clear and convincing evidence a real, substantial and legitimate doubt regarding his competence to stand

trial. 419 F. 3d at 1298-99. See Doc 175 at 225. The *Battle* opinion, however, rested on a complete record developed in an extensive pre-trial hearing in which the Court was faced with "diametrically opposite expert testimony." 419 F. 3d at 1299.

Nothing in the Government's response refutes the fact that at the very least, Mr. Barrett is entitled to a hearing on the issue. Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the Court *shall* . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. §2255 (emphasis added). *See e.g., Fontaine v. United States,* 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for hearing because "motion and the files and records of the case [did not] conclusively show that the petitioner is entitled to no relief"). In *U.S. v. Gutierrez*, 839 F. 2d 648, 653 (10th Cir 1988) the Tenth Circuit Court of Appeals remanded the issue of competency for an evidentiary hearing under 28 U.S.C. §2255 "where the record did not conclusively show that defendant [was] entitled to no relief." In *Gutierrez,* the petitioner claimed "he was suffering from the symptoms of withdrawal from heroin addiction at the time of his plea and hence was incompetent to enter a knowing and voluntary plea. *Id.* at 649. In remanding for an evidentiary hearing the Tenth Circuit relied on *Sanders v. United States,* 373 U.S. 1, 64820 (1963), where the Supreme Court had ordered an evidentiary hearing under similar factual circumstances. *Guttierez,* 839 F.2d at 652.

> In *Sanders,* the petitioner alleged that he was mentally incompetent at the time of his guilty plea due to the administration of narcotic drugs during his incarceration. "However regular the proceedings at which [petitioner] ... pleaded guilty might appear from the transcript, it still might be the case that petitioner did not make an intelligent and understanding waiver of his constitutional rights. (Citations omitted)

For the facts on which petitioner's claim in his second application is predicated are outside the record." *Id.* at 20, 83 S. Ct. At 1079; *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S. Ct. 1621, 1629, 52 L.Ed. 2d 136 (1976) ("the barrier of the plea of sentencing proceeding record, although imposing, is not invariably insurmountable").

*Gutierrez,* 839 F. 2d at 652. Here, too, the facts upon which Mr. Barrett's claim is predicated are outside the record and were unknown to Court and counsel at the time of trial. An evidentiary hearing is warranted.

Mr. Barrett has produced an expert medical opinion that Mr. Barrett was "unable to rationally assist his attorneys" before and during trial because he is a brain-damaged individual who during the trial was suffering from "a triad of neuropsychiatric impairments, including "acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder" and "Dysexecutive Syndrome." Exh. 119 at 24, 26, 27. That information was not known to trial counsel or the Court, though it presumably *should* have been known to counsel. Beyond that, as pointed out in Claim 7, the added stress caused by the U.S. Marshal's insistence that he wear an electronic shock device throughout the trial inhibited his ability to participate in the proceedings, an impact specifically argued by his trial counsel. *See Objection to Use of Restraint and Brief in Support,* CR 04-115-P at 6; Tr Hrg 8/31/05 at 95-96. The record and files simply do not conclusively show that Mr. Barrett is entitled to no relief in light of the evidence now before the Court.

**B.      The Expert Opinions Relied upon by Mr. Barrett Are Not Speculative.**

Relying on *Walker v. Gibson,* 228 F. 3d 1217, 1229 (10th Cir. 2000), *abrogated on other grounds*, *Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001), to defeat the otherwise unrefuted medical opinion of Mr. Barrett's trial-time incompetence, the Government dismisses the expert

opinion as a "retrospective, speculative post-conviction evaluation which does not meet the clear and convincing evidence standard." Doc 175 at 26. In *Walker,* the Court of Appeals determined the opinions of experts, conducted over seven years after trial, did "not establish by clear and convincing evidence a real, substantial, and legitimate doubt as to Mr. Walker's competency at the time of trial" because one of two post-trial experts offering an opinion on competency "had no medical records regarding Mr. Walker's response to treatment and thus, [] merely speculated any symptoms of somnolence and ataxic gait were side effects of medication and because the other expert's opinion was patently speculative."[37] 228 F. 3d at 1230.

Here, the Government itself speculates that Dr. Woods "appears to have ignored" prior medical records which found Barrett was "oriented in all three spheres." Doc 175 at 225 (without record citation). Dr. Woods unambiguously states that he reviewed *and considered* "significant institutional records, to include available academic, medical and custodial records; declarations and/or social records of various family members." Exh. 117 at 5 ¶14 . The expert opinion here is not speculative but based upon specific findings which the expert psychiatrist attests he finds to a reasonable medical certainty.   Exh. 117 at 28 ¶¶81, 82.

Dr. Woods' consideration and review of the extensive medical and social records and history in reaching his expert opinion may be fodder for cross-examination but it does not change the fact that no trial-time competency evaluation was undertaken in Mr. Barrett's case. Dr. Woods has stated to a reasonable medical certainty that Mr. Barrett's mental health conditions, uninvestigated by and thus unknown to trial counsel, precluded Mr. Barrett's rational assistance

---

[37]The expert's opinion stated the he" *believed* the use of the medications *'appear[ed]* to raise issues of competency[,]'" *Walker v. Gibson*, 228 F. 3d at * (emphasis added).

in his defense.  Evidence of mental health is relevant to a competency claim.  *Drope v. Missouri,* 420 U.S. 162, 179 (1975).  Dr. Woods' declaration raises serious concerns about Mr. Barrett's mental illness and its effect on Mr. Barrett at the time he was tried.   As the United States Supreme Court observed in *Ake v. Oklahoma,*  470 U.S. 68, 80-81(1985):

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12, 70 S.Ct. 457, 458, 94 L.Ed. 604 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Id.*   An expert's evaluation, even post-trial, is no less relevant or critical to the question of competency.  Dr. Woods' medical opinion, based on comprehensive review of relevant historic records, complete neuropsychological testing and evaluation and his own psychiatric evaluation that Mr. Barrett was incompetent to be tried, at the very least, entitles Mr. Barrett to a hearing.

### C.     Trial Counsel's Opinions Are Not Controlling.

The Government would have this Court wholly disregard Dr. Woods' opinion because it "appears" to contradict the Government's assessment of Mr. Barrett's courtroom demeanor

(while wearing an electric shock belt) and trial counsel's declarations (also made years after the fact and subsequent to Mr. Barrett's allegations of ineffectiveness).  Doc 175 at 227.  In support of its argument, the Government attaches declarations by both trial counsel each of which states:

> In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

Doc 175, Exh. 11 at 1 ¶6 (Smith); Exh. 12 at 1 ¶7 (Hilfiger).  Mr. Barrett's motion makes clear trial counsel were wholly unaware of their client's mental health.  *See e.g.,* Amended Motion to Vacate at 48-56; Ground 2(A)(3) hereinabove.  Trial counsel's opinions or observations regarding competency are undoubtedly relevant.  *See Drope v. Missouri, supra*.  They are, however, not dispositive.  Lawyers are not experts when it comes to medical or psychological diagnoses.  *See Panetti v. Quarterman*, 551 U.S. 930, 970 (2007) (Thomas, J. dissenting); *see also*, *Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978) (rejected incompetency claim where "slender evidence" of the "*lay* testimony of [the petitioner's] attorney was not a sufficient predicate on which to make a decision that" "would be anything more than speculation." (Emphasis added.)).  Here the fact that trial counsel face serious well-documented  allegations of ineffectiveness including a substantial record of their absymal failure to develop the mental health issues of their client, necessarily weaken the reliability of their confidence in their client's competence.  *See, e.g., Williamson v. Ward,* 110 F. 3d 1508, 1517 (10th Cir 1997).  The "proclamation of competence" by Messrs. Hilfiger and Smith merits close scrutiny and certainly does not dispose of the issue.  At issue is not whether trial counsel harbored a doubt concerning their client's mental competence but whether Mr. Barrett was, in fact, incompetent.  Dr. Woods' opinion, when considered with the mental health records and diagnoses now before the Court, as

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                 163                 *Barrett v. U.S.*, 6:09-cv-00105-JHP

well as trial counsel's own concern about the inhibition of Mr. Barrett's participation in the trial

and communication with counsel if the U.S. Marshal's were permitted to use the "stun belt,"

defeats the Government's effort to conclusively show that the prisoner is entitled to no relief.

Mr. Barrett is entitled to a hearing on the issue.

## GROUND 9:  MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY MANSLAUGHTER.

Quick work can be made of two of the Government's arguments.  The Government

maintains that if there is *Beck*[38] error, it can be deemed harmless.  Doc 175 at 231, 233.

Respondent recognizes this is not the law in the Tenth Circuit.  *Beck* error is automatically

deemed prejudicial.  *Hogan v. Gibson,* 197 F.3d 1297, 1312 and n. 13 (10th Cir. 1999); *Hooks v.*

*Ward,* 184 F.3d 1206, 1227 (10th Cir. 1999).  The Tenth Circuit recently reaffirmed this

principle.  *Phillips v. Workman,* ___F.3d___, No. 08-7043 (10th Cir. May 12, 2010) (slip op. at

29-30).  This is not only the law in the Tenth Circuit; the Supreme Court has so decreed.  *Hopper*

*v. Evans,* 456 U.S. 605, 610 (1982).

It is argued that *Beck* does not apply to the federal death penalty scheme because the jury

was not confronted with an "all or nothing" choice between acquittal and a conviction

automatically leading to the death penalty.  Before Mr. Barrett could be death-eligible upon

conviction, the jury first had to find one or more of the "gateway" intent factors and at least one

statutory aggravating circumstance.  Doc 175 at 232-33.  Again, the Government recognizes this

is not the law of the circuit.  *Hooks v. Ward,* 184 F.3d at 1126-27 (explicitly disapproving as

against circuit precedent the reasoning of *United States v. McVeigh,* 153 F.3d 1166, 1197 (10th

---

[38]  *Beck v. Alabama,* 447 U.S. 625 (1980).

Cir. 1998), which tracks the argument the Government makes here, and noting that *Beck* extends to capital schemes, such as Oklahoma's (and, by implication, all similar statutory schemes), where the defendant is not automatically eligible for or subject to the death penalty on conviction, because aggravating circumstances must first be found in the penalty phase).

The Government asserts lesser degrees of homicide could not apply to count 2 (which charged violation of 18 U.S.C. § 924(c)(1)(A) and (j)), because the crime has no intent elements independent of the underlying felony.  Doc 175 at 228-29.  For this, the Government cites *United States v. Chanthadara,* 230 F.3d 1237, 1257-59 (10th Cir. 2000).  Chanthadara was convicted under 18 U.S.C. § 924 (j) for using a firearm during and in relation to a crime of violence (in his case, a Hobbs Act armed robbery), resulting in death to the victim (which amounted to first degree murder under 18 U.S.C. § 1111).  The elements of the offense were: 1) the armed robbery of a restaurant as charged in the first count of the indictment; 2) knowingly using or carrying a firearm during and in relation to the robbery; 3) during the robbery, the defendant directly caused the victim's death by use of the firearm; and 4) the killing was murder with malice aforethought. *Id.*

On appeal, Chanthadara contended he was entitled to a second degree murder instruction, but the Court ruled that based on the charges and the facts of his case, second degree murder was not a lesser included offense of the first degree murder alleged under § 924(j). The "malice" required for first and second degree murder in *Chanthadara* were different in kind, rather than degree.  Thus, the elements of second degree murder were not a "subset" or subsumed within the top charge; one could commit the higher offense without necessarily committing the lesser.  The commission of the underlying felony -- armed robbery -- supplied the "malice" for the first

degree murder charge.  There was no independent intent requirement other than that required for the commission of the robbery.  In other words, in proving first degree murder, the prosecution needed only to show the commission of the felony of armed robbery (felony murder).  On the other hand, the "malice" for second degree murder goes to the intent or *mens rea* with which the killing itself is done.  *Id.*

*Chanthadara* did not foreclose a voluntary manslaughter instruction on count 2 of Mr. Barrett's superseding indictment.  While no specific intent or *mens rea* in association with the killing was required to prove first degree murder in *Chanthadara,* because the commission of the robbery supplied the necessary malice, this was not so with respect to count 2.  As stated in Mr. Barrett's reply to Ground 2(3), in order to convict Mr. Barrett of count 2, the jury had to find that he committed the "crime of violence" in count 3, which was a specific intent murder with knowledge that the victim was a law enforcement officer in the performance of his official duties, or on account of those duties.  *United States v. Barrett,* 496 F.2d 1087, 1112-13 (10th Cir. 2007).

Thus, count 2 was not the type of felony murder committed in *Chanthadara.*  In Mr. Barrett's case a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  (See below.)  Killing in the heat of passion, and without knowledge that the person or persons being fired upon were law enforcement officers (which was the defense) would diminish or negate the intent element of count 2, which relates to the killing itself, not an underlying felony.  Heat of passion is different in degree, but not in kind, from the specific intent to kill required to establish the *mens rea* of count 2.  A heat of passion negates a the malice of a specific intent murder.  It is murder without malice.  *United States v. Scafe,* 822

F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987); Tenth Circuit Pattern Instruction 2.54.  Though not dispositive (see below), 18 U.S.C. § 924(j)(1)(2) provides for both murder and the lesser offense of manslaughter, as defined by 18 U.S.C. §§ 1111, 1112.

Voluntary manslaughter was also a lesser offense of the crime charged in count 1, which alleged that Mr. Barrett used or carried a firearm during and in relation to a drug trafficking crime, resulting in death.  18 U.S.C. § 924(c)(1)(A) and (j).  *Barrett, supra.*  While the intent or "malice" required for this offense was supplied by commission of the drug trafficking crime, the offense requires, as noted in the reply to Ground 2(3), a nexus between the drug trafficking crime and using a firearm, resulting in death.  *E.g., United States v. McCullah,* 76 F.3d 1087, 1102 (10th Cir. 1996) (discussing requirement of a nexus between the homicide and the continuing criminal enterprise); *United States v. Tipton,* 90 F.3d 861, 867 (4th Cir. 1996).  Mere temporal coincidence is not sufficient; the firearm must be used *in relation to* the drug trafficking crime.  Evidence severing the substantive connection between "use of a firearm" and "during and in relation to" a drug trafficking offense, *i.e.,* Mr. Barrett's acting in a heat of passion because he did not believe the individuals on his property were police, or in the United States Attorney's formulation at trial, was acting in imperfect self-defense and defense of his son, should reduce the crime to voluntary manslaughter.  Again, while not conclusive, § 924 (j) provides for a manslaughter conviction.

The Government cites the non-binding and unpersuasive district Court opinion in *United States v. Beckford,* 916 F.Supp. 1415, 1424-33 (E.D. Va. 1997)[39] as support for its argument that no error occurred in refusing to give a voluntary manslaughter instruction as a lesser included offense of count 3.  Construing the CCE statute (21 U.S.C. § 848(e)(1)(A); intentional killing during and in relation to a drug trafficking crime), and not the § 848(e)(1)(B) offense charged against Movant, the district Court held that because Congress had not provided for lesser homicide offenses in the statute, there was no lesser included offense as a matter of law.  *See also, Hopkins v. Reeves*, 524 U.S. 88, 90-91(1998) (where defendant was convicted of felony murder, with rape being the underlying felony and supplying the"intent," and the Nebraska Supreme Court had ruled for the last hundred years that there were no lesser included offenses of this species of felony murder, there was no *Beck* error in refusing to instruct on second degree murder and manslaughter; by state law, they were not lesser offenses of the main charge).

*Beckford* does not apply here.  First, unlike Mr. Barrett's case, where the jury had no "third option" between conviction and sending the case into the penalty phase, a third option did exist in *Beckford*.  The jury could have rejected the CCE charge and convicted the defendants of drug conspiracy, which did not carry the death penalty.  Second, the *Beckford* Court ruled, against Tenth Circuit law, *Hooks v. Ward, supra*, that the federal death penalty scheme did not present the type of "all or nothing" choice the Supreme Court confronted in *Beck*, since conviction would not automatically make the defendant eligible for the death penalty or would

---

[39]  Moreover, there was no appeals Court opinion on the district Court's ruling in *Beckford*.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    168                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

not automatically lead to a death sentence. The jury was required to find one or more intent factors and a statutory aggravating circumstance before the defendant became death-eligible.

Third, as alluded to, the Court, reading the CCE provision of § 848 strictly, held that Congress provided for no lesser included offenses in the statute. Therefore, none existed as a matter of law. Additionally, the *Beckford* Court also held that other federal homicide statutes, such as second degree murder and voluntary manslaughter, 18 U.S.C. §§ 1111, 1112, could not serve as lesser included offenses because these offenses "must be committed within the maritime or territorial jurisdiction of the United States to be federally prosecuted." *Beckford,* 966 F.Supp. at 1418. These rationales find no support in Tenth Circuit law.

Before addressing the inapplicability of the last two mentioned portions of *Beckford* to the law of the circuit, and Mr. Barrett's case, it should be pointed out that the Government's current position conflicts with the United States Attorney's position at trial. The prosecution, along with the defense affirmatively requested, in connection at least with count 3, a voluntary manslaughter instruction, as there was evidence in the record to negate the specific intent required in count 3 -- in essence, intentionally killing a police officer because he is a police officer. R at 4212-13, 4215, 4218-19, 18 U.S.C. § 1112. This constitutes an admission by a party opponent that forecloses the Government's current argument. Fed.R.Evid. 801(d)(2)(A)-(D). In any sense, it is a concession that Mr. Barrett was entitled to a voluntary manslaughter instruction.

The *Beckford* "statutory language provides for no lessers" and "no federal territory and maritime nexus, no § 1112 instruction" arguments have evidently found no takers in the Tenth Circuit, and in fact conflict with circuit precedent. Taking the latter point first, invocation of the

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    169                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

federal murder statutes is not dependent on a homicide being committed on federal land or within federal maritime jurisdiction. For instance, in *Chanthadara*, the charge alleged that the offense constituted murder under § 1111, which obviously could not be the case if the federal murder statutes are applicable only on federal land. The murder in Chanthadara was committed during a Hobbs Act robbery, which was charged in count 1, but federal jurisdiction was also proper under § 924 because a firearm was involved. In Mr. Barrett's case, federal jurisdiction for the murder charged in count 3 was predicated on the commission of a federal drug offense. (Doc 52)

The fact that lesser included offenses are not specifically mentioned in § 848(e)(1)(B) does not mean they do not exist, and Respondent can point only to a lone, thirteen-year old district Court opinion to support its argument. This is not a situation like *Hopkins v. Reeves, supra.*, where there was a century of unbroken authority from the highest Court in the state holding there were no lesser included offenses to the rape-murder charged against the defendant.

The Tenth Circuit implicitly rejected the conclusion the Government draws from *Beckford* in *United States v. McVeigh,* 153 F.3d at 1192-98. McVeigh argued that *Beck* error occurred where the Court refused to instruct on second degree murder with respect to both the use of a weapon of mass destruction charge in violation of 18 U.S.C. § 2332a and federal first degree murder charges under 18 U.S.C. § 1114. While *Hopkins v. Reeves, supra* was cited, the denial of lesser included offense instructions on the weapon of mass destruction charge did not turn on a finding that the statute precluded any lesser included offenses, even though, as in *Beckford*, the statute being construed did not provide in its text for any lesser included offenses. Rather, the Court rejected McVeigh's argument that there were number of gradations of the offense based on differing levels of intent. McVeigh argued that conviction on this count

required an intent to kill or specific intent to kill.  The statute was silent on the required intent, so the Court read into it a "knowingly" mental state based on the language of the statute as a whole.  Because no intent or specific intent to kill was required, there were no gradations of intent respecting the commission of the fatal act.  Therefore, as there were no different degrees of mental state based on the level of intent, there were no intent-based lesser offenses.

The clear implication from *McVeigh* is that had the weapon of mass destruction statute contained a specific intent provision, there would be lesser included homicide offenses in cases where such intent was lessened or negated (but still criminal), regardless of whether the language of the statute itself provided for lesser included offenses.  Mr. Barrett's case is unlike *McVeigh* because the statute under which Movant was charged required a specific intent to kill a person or persons he knew or had reason to know was a law enforcement officer engaged in or on account of his duties.  The Government's argument that this was not a specific intent crime (Doc 175 at 231) is belied by the statutory language, the Government's arguments at trial, and the Court's instructions.  The Courts generally reject the argument that a lesser offense of homicide has been committed when the charge is felony murder or something like it, and there is no specific intent to kill required, thus making the mental state with which the killing was done irrelevant. *Hopkins, Chanthadara* and *McVeigh* all stand for this proposition.  Where, as with count 3, specific intent is required -- which necessarily implies gradations of *mens rea* and criminal

responsibility -- § 848(e)(1)(B) would be unconstitutional as applied in violation of *Beck*[40] if it were held the statute provided for no lesser included offenses.

The Government seemingly comes close to conceding as much, stating that if the statute had employed a common-law term like malice, gradations of intent, and therefore lesser included offenses, could be discerned in the statute despite its silence. Doc 175 at 230. This is merely playing with semantics. The Tenth Circuit looks to common law terms like "malice" in determining the intent elements of federal homicide statutes. *United States v. Serawop,* 410 F.3d 656, 658, 661 (10th Cir. 2005). Section 848(e)(1)(B) is a federal homicide statute. Though the word "malice" is not used in the statute, that is what its intent element amounts to. The type of homicide proscribed by the statute is not just one committed with an intentional (as charged here) or reckless mental state, but one done without justification, excuse, or mitigation. *Id.* (defining malice in these terms). The homicide committed under § 848(e)(1)(B) clearly is one, as charged, which is done both intentionally and without justification or excuse. Otherwise, it wouldn't amount to the equivalent of first degree murder. For all intents and purposes, a § 848(e)(1)(B) killing is done with specific intent malice, and therefore admits to gradations of the offense based on the quality of the offender's intent or mental state.

Accordingly, with respect to count 3, Mr. Barrett was entitled to an instruction on voluntary manslaughter as an alternative to the specific intent murder charged. As the Government agreed at trial, there was sufficient evidence in the record that Mr. Barrett was

---

[40] *Beckford* is also distinguishable from Mr. Barrett's case because the intent required for the commission of a § 848(e)(1)(B) homicide is more specific than that required for a CCE murder -- an intentional killing. The mental state required here was not simply an intentional killing, but one tied to knowledge and intent with respect to the victim's status as a law officer.

unaware or could have been unaware that he was firing at the police, though not in self-defense, to warrant the manslaughter instruction. Of course, the case for *conviction* of manslaughter or acquittal, sufficient to undermine confidence in the outcome of trial, would have been made much stronger had counsel conducted a proper investigation and brought to bear the wide array of evidence, discussed specifically elsewhere in Mr. Barrett's opening brief and here, that challenged the Government's theory of the case. But that is not the point here. There was sufficient evidence in the record, as the prosecution conceded, to warrant a manslaughter instruction.

The Government is simply wrong when it argues that the elements of heat of passion manslaughter consists of some, but not all, of the elements of the charged offense. Doc 175 at 228. *Chanthadara,* 230 F.3d at 1257. Heat of passion manslaughter clearly negates a specific intent to kill. Heat of passion is shown where there is a general intent to kill (or knowledge that the likely result of the act will be the death of another), the intent to do serious bodily injury, or depraved heart recklessness. In other words, there must be a heat of passion coupled with an intentional or reckless mental state. *Serawop,* 410 F.3d at 658. There was a dispute at trial as to Mr. Barrett's mental state and intent. Voluntary manslaughter is "actually" a lesser included offense of § 848(e)(1)(B). *Hogan,* 197 F.3d at 1306.

The Government claims that if error in the failure to give a lesser included offense instruction could ever be harmless, it was harmless here because the jury, relying on guilt phase evidence, found in the second stage that the murder was committed with substantial planning and premeditation. Doc 175 at 232. This argument does the Government no good because it has conceded that in the Tenth Circuit, *Beck* error is never harmless. Additionally, based on the request for a lesser included instruction by the prosecution at trial, the Government has in fact

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

173

*Barrett v. U.S.*, 6:09-cv-00105-JHP

conceded what the trial evidence showed -- that a jury could rationally have convicted Mr. Barrett of the lesser offense and acquitted him of the main charge or charges. *Taylor v. Workman,* 554 F.3d 879, 888 (10th Cir. 2009). The fact that, as the Government argues, the shooting might be characterized as heinous, in that it involved multiple gunshots from a high-powered rifle, fails to show the jury could not still conclude that the shooting was a response to what Mr. Barrett perceived as adequate provocation, and that he fired the weapon in a heat of passion as the result of fear and terror. *Hogan,* 197 F.3d at 1310 (fact that victim received approximately 25 stab wounds did not foreclose a rational decision to convict of manslaughter).

Of course, the Government argues that this issue is procedurally defaulted because it was not raised on direct appeal, even though it was established by the record, and that the issue is meritless in any case. Doc 175 at 228. Cause and prejudice exist for excusing any procedural bar, because counsel were clearly ineffective for failing to raise this record-bound claim. It was obviously meritorious; both parties agreed the instruction should be given, and the evidence unquestionably supported it. As shown conclusively above, voluntary manslaughter is a lesser offense of a § 848(e)(1)(B) murder. No legitimate strategy explains the omission of this preserved issue, particularly in light of the fact that numerous issues were raised on appeal that had to be reviewed under a plain error standard. Counsel's unprofessional omission clearly prejudiced Mr. Barrett. As the Government acknowledges, *Beck* error can never be harmless. *E.g., Strickland v. Washington,* 466 U.S. 668, 694, 696-97 (1984). *See also,* reply to Ground 18.

The Government's arguments should be rejected, and Mr. Barrett should be granted § 2255 relief from his convictions. The failure to give the proper lesser included offense instructions

clearly enhanced the risk of unwarranted convictions on the charged offenses, particularly, but not exclusively, with respect to count 3. *Beck,* 447 U.S. at 637.

**GROUND 10:** **THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE AND ARGUMENT ON RESIDUAL DOUBT.**

The Government claims no constitutional error occurred when the Court ruled before trial that Mr. Barrett could not rely on the result of the state case as a mitigating circumstance and, relatedly, could not rely on residual doubt as a mitigating circumstance. The Government's primary argument is that a defendant in a capital case has no right to rely on residual doubt to argue against the death penalty, citing *Franklin v. Lynaugh,* 487 U.S. 164, 174 (1988), *Oregon v. Guzek,* 546 U.S. 517, 523-27 (2006) and *United States v. Jackson,* 549 F.3d 963, 981 and n. 24 (5th Cir. 2008). Doc 175 at. 234.

These cases do not stand for what the Government claims. The Supreme Court has never held that a defendant in a capital case is barred from introducing residual doubt evidence and/or argument. The plurality opinion in *Franklin* has been read to mean that there is no constitutional basis for a residual doubt *instruction*, but it did not rule that residual doubt could not be used as a mitigating factor. In fact, the Court in *Franklin* pointed out that the defendant could have suffered no prejudice from the absence of a residual doubt instruction, because he was allowed to introduce residual doubt evidence and argue it without limitation.

*Guzek* likewise affords the Government no help. The issue there was not whether the defendant could introduce residual doubt or argue it as a basis for rejecting a death sentence, since Oregon law permits the defendant in the penalty phase to introduce any evidence and make any

argument that the defendant is in fact innocent, or that doubts about guilt remain.  The issue in *Guzek* was whether, on *resentencing*, the defendant could introduce "new" alibi evidence that had not been heard in the previous guilt/innocence stage of trial.  Guzek was permitted to rely on transcripts of alibi evidence that were already a matter of record.  *Guzek,* like *Franklin,* passed on ruling whether there was a constitutional right to present evidence and argument of residual doubt.

*United States v. Jackson, supra.,* supports the Government's argument not at all.  Though ruling, in line with *Franklin*, that there was no constitutional right to a residual doubt instruction, the *Jackson* Court held the defendant, like the defendant in *Franklin*, suffered no prejudice from the lack of a specific instruction because he was not obstructed in the slightest from arguing residual doubt as a reason to reject the death penalty.  In footnote 24 to the opinion, the Fifth Circuit noted Jackson had cited numerous cases holding that a jury can consider residual doubt in determining sentence; there simply is no constitutional right to an instruction.

Here, not only did the Court's pretrial ruling preclude evidence and argument of residual doubt (Tr. 0/26/05 Hr'g at 10-11), the Court affirmatively instructed the jury that residual doubt could not be considered a mitigating circumstance.  Doc 257, Inst. 19, R at 5320-21.  This goes well beyond what the Supreme Court and other Courts have sanctioned.  Mr. Barrett submits he not only  had an Eighth Amendment right to introduce evidence and make argument on residual doubt, *cf. Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982), but that such was sanctioned by the applicable federal statutes, 18 U.S.C. § 3592(a) and 21 U.S.C. § 848(m).  *United States v. Honken,* 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); *United States v. Davis*, 132 F.Supp.2d 955, 456-67 (E.D. La. 2001).  The trial court's instruction, in violation of the Eighth Amendment as construed in the *Lockett* line of cases, prevented the jury

from considering a relevant mitigating circumstance.  This alone requires vacation of Mr. Barrett's death sentence.

The Government dismisses the Tenth Circuit state habeas cases cited by Movant which held, against ineffective assistance of trial counsel attacks, that counsel were effective for concentrating on a residual doubt penalty phase strategy, which is often highly effective. *E.g., Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002).  The Government states this just reflects that the practice is permitted in Oklahoma.  Doc 175 at 235.  But there is no Oklahoma state law respecting residual doubt evidence and argument, one way or the other.  Numerous Courts have held that a defendant has a right to raise residual doubt, through both evidence and argument.  *E.g., United States v. Honken, supra.* (§ 848 case); *United States v. Davis, supra*; *United States v. Jackson, supra*; *United States v. Johnson,* 403 F. Supp.2d 721, 782 (N.D. Iowa 2005) (§ 848 case); *United States v. Chandler,* 218 F.3d 1305 (11th Cir. 2000) (§ 848 case).  The *Davis* Court (collecting cases) noted that both the Fifth and Eleventh Circuits (as does the Tenth Circuit) had routinely approved or commented on residual doubt evidence and argument introduced in state capital cases.  The Government cites no case where a Court has affirmatively prevented residual doubt evidence and argument by way of instruction.

The Government states that trial counsel failed to challenge the Court's ruling or introduce evidence supporting a residual doubt argument (Doc 175 at 233), but this is not altogether correct. The Court ruled before trial that such evidence and argument were off-limits, and in defending appellate counsel's failure to raise the issue, the Government, contradicting its earlier argument, says counsel were bound to obey the Court's order.  Doc 175 at  237.  Evidence that Mr. Barrett

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

177

*Barrett v. U.S.*, 6:09-cv-00105-JHP

had been convicted of manslaughter in state Court was introduced, but the Court's ruling prevented a residual doubt argument in connection with it.

Moreover, as Mr. Barrett has argued, counsel were ineffective for conducting a professionally unreasonable investigation to unearth evidence that would have impeached the informant witnesses, as well as mental health evidence and testimony from percipient witnesses (Toby Barrett and Alvin Hahn) who could have supported the defense that Mr. Barrett fired without realizing law enforcement officers were on his property. Counsel also failed to secure the services of expert witnesses who could have cast doubt on the prosecution's theory of the case, and failed to lodge appropriate objections to the instructions. So, in large measure, any failure to introduce evidence supporting a residual doubt theory was due to ineffective assistance, even aside from the fact that the Court's pretrial order affirmatively prevented counsel from doing so.

Counsel's failures undermine the Government's circular argument that any error was harmless because the evidence was "strong," the jury found the "gateway" intent factors, and also found the substantial planning and premeditation aggravating circumstance. Doc 175 at 236. Due to counsel's failures, the jury never heard a great deal of countervailing evidence that would have conflicted with the Government's case. Elsewhere, the Government dismisses evidence that could have been used to impeach the informant witnesses, arguing the informant's were "cross-corroborating," and that Mr. Barrett's witnesses would have been subject to impeachment for bias. As Movant has argued, it is not up to the Government to resolve the question of credibility, which is the lone province of the jury. *E.g., Anderson v. Johnson,* 338 F.3d 382, 393 (5th Cir. 2003); *Workman v. Tate,* 957 F.2d 1339, 1346 (6th Cir. 1992); *Pillette v. Berghuis,* 630 F.Supp.2d 791 (E.D. Mich. 2009); *English v. Romanowski,* 589 F.Supp.2d 873, 902 (E.D. Mich. 2008); *McGahee*

*v. United States,* 520 F.Supp.2d 723 (E.D. Pa. 2008).   Movant need only show a reasonable probability that only a single juror would have rejected the death penalty.  *Wiggins v. Smith,* 529 U.S. 510, 537 (2003).

The Government asserts that in any event, consideration of this issue is procedurally barred because it was defined by the record and not raised on direct appeal (Doc 175 at 234), and that appellate counsel were not ineffective for failing to raise the issue, because it was meritless. Doc 175 at 236.  Movant has shown that the issue was meritorious, particularly in light of a fact the Government ignores -- the trial court affirmatively instructed the jury that it could not consider residual doubt as a mitigating factor, a state of affairs that is all but unprecedented in federal death penalty law.  Since the issue was framed by the record, counsel had no excuse for failing to raise it.  Because of the significance of this Eighth Amendment and statutory error, there is a reasonable probability the result of the appeal would have been different.  *Strickland v. Washington,* 688 U.S. 668, 696-97 (1984).

The Government's arguments should be rejected.  Relief should be granted from Mr. Barrett's death sentence.

**GROUND 12:       THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF PROOF REQUIRED FOR WEIGHING THE AGGRAVATING FACTORS VIOLATED MR. BARRETTS CONSTITUTIONAL RIGHTS.**

**A.       The Issue Was Not Raised or Adequately Resolved on Appeal.**

**1.       The *Ring* issue was inadequately raised and argued on direct appeal.**

The Government here attempts to dismiss the claim by asserting that "[o]n appeal, Barrett made essentially the same claim, which the Tenth Circuit rejected on the merits."  Response, at

1332

243.  On appeal, Mr. Barrett's counsel, one of whom was trial counsel, asserted "The District Court Erred by Failing to Declare the Federal Death Penalty Act Unconstitutional."  Appellant's Opening Brief, 2006 WL 3099220 at 32 (Proposition VI).  The first of six arguments concerning the statute's unconstitutionality alleged:

> The Federal Death Penalty Act is unconstitutional and violated Mr. Barrett's right to due process; his 6th Amendment right to a jury trial as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington,* 124 S. Ct. 2531 (2004); and violates the 8th Amendment prohibition against cruel and unusual punishment.  Barrett filed a pretrial motion seeking to have the federal death penalty statute declared unconstitutional, but the motion was denied.  Doc 78, 147, 153.

*Id.*  That is the entire issue and argument on appeal relating to ground 12.

### 2.    Trial counsel failed to raise the issue properly on appeal.

As explained in Mr. Barrett's Motion and Brief, the failure to adequately raise this issue was ineffective assistance of appellate counsel.  *See* Movant's Motion to Vacate, Claim 12 (b) at 355.  Movant's Brief on the Merits, Doc 149 at 206.   Despite the lack of any specific argument on direct appeal the Tenth Circuit Court of Appeals addressed the catch-all argument made by appellate counsel *de bene esse*.  The Court of Appeals noted,

> In his appellate brief, Barrett cites to *Ring* and generally alleges that the federal death penalty scheme is violative of the Sixth Amendment, but does not otherwise flesh out his argument.  Because, however, he submitted a more detailed argument on this point to the district court, we have proceeded to analyze that argument on the merits.

496 F. 3d at 1107-08 n.12.  Though appellate counsel had cited the motion made below, counsel cited no argument or constitutional principles or even reference pages supporting the argument made therein.  Cr-04-115, Doc 78.  Indeed, as the Court noted, Mr. Barrett was not actually convicted or convicted under the Federal Death Penalty Act.  *Barrett,* 496 F. 3d at 1106

("Obviously [Barrett] lacks standing to challenge the FDPA because he was not sentenced to death under that Act.").

Nonetheless, the Court chose to address the claim "out of an abundance of caution" and "because Barrett challenged the constitutionality of both the FDPA and §848 in the district court[.]" 496 F. 3d at 1107.  The Court assumed for purposes of appeal that [Barrett] intended to attack the constitutionality of the relevant death penalty statute in 21 U.S.C. §§848 (g)-(p).  *Id.*  The Court then took up the issue of "Section 848's scheme for weighing of aggravating and mitigating factors."  *Id.*  496 F. 3d at 1107 n.12.[41]

Due to counsel's deficient performance, the issue was not properly before the Court, and ought not to have been decided without full and adequate briefing.  See F.R.A.P. Rule 28 (9).  The Tenth Circuit has recognized, even in the case of *pro se* litigants, that it cannot "fill the void by crafting argument and performing necessary research."  *Garrett v. Selby, Connor, Maddux & Janer*, 425 F. 3d 836, 841 (10th Cir. 2005).  An issue may be waived where, as was the case here, an appellant's statement in support of the issue "consist [] of mere conclusory allegations with no citations to the record or any legal authority . . . ."  *Id.  See also United States v. Banks,* 451 F. 3d 721, 728 (10th Cir. 2006) (declining to address issue for which the appellant provided no supporting legal authority), *cert. denied,* 129 S. Ct. 952 (2009).  Likewise, in *Herrera-Castillo v. Holder*, 573 F. 3d 1004, 1010, the Court of Appeals found that where the brief lacked an

---

[41]  Trial counsel's briefing on the argument was particularly deficient for its failure to recognize and emphasize the distinction between the fact of whether the "aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death" and the ultimate discretionary decision of life or death.  *See* Doc 78 at 8-9.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    181                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

argument and did not "articulate [the] specific contentions" the issue was deemed waived.   The

Court said:

> We have previously declined "[to] make arguments for [the appellant] that it did not make
> in its briefs," *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1257 n. 1 (10th Cir.2001),
> and decline to do so here as well. Herrera has therefore waived his equal protection
> argument. *See Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir.2007) (an issue
> "insufficiently raised in the opening brief is deemed waived").

*Id.*

In this case, the Court's attempt to address an un-briefed and unspecified argument did not

satisfy Mr. Barrett's right to have the claim adequately raised by competent counsel before it was

considered by the Court.  The Tenth Circuit's decision in itself illustrates the deficiency in

performance by appellate counsel.  *Id.*  Counsel's actions in raising the issue without briefing the

same was ineffective and therefore led the Tenth Circuit to devise and reject its own issue and

argument.  Mr. Barrett ought to be able to have the issue considered after full briefing.  The failure

to do so denies him his right to meaningful appellate review required in capital cases under the

Due Process Clause of the Fifth Amendment and the right to be free of cruel and unusual

punishment guaranteed by the Eighth Amendment.  *See Parker v. Dugger*, 498 U.S. 308, 321

(1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in

ensuring that the death penalty is not imposed arbitrarily or irrationally.").

> **B.      The Constitutional Principle upon Which Ground 12 Relies Has Been
> Wrongly Rejected.**
>
> **1.      The (Edward) Fields Decision wrongly relied on *United States v.
> Barrett*.**

The Government argues that the "Tenth Circuit recently reaffirmed its rejection of

Barrett's argument about the application of reasonable doubt to the death penalty selection

process, rejecting precisely the claim that Barrett attempts to raise in this §2255 litigation."  Doc 175 at 243, citing *United States v. (Edward) Fields,* 516 F. 3d 923, 950 (10th Cir. 2008).[42]  That reaffirmation, however, was not based upon consideration and adjudication of the arguments supporting the jury fact-finding requirement but instead, a superficial deference to the previously decided case.  516 F. 3d at 950 ("The issue is controlled by our decision in *Barrett*, which followed the Fifth Circuit in holding that a reasonable doubt standard is not required in the weighing process.")  The snowball effect of a court's failure to consider an important constitutional issue which has not been properly raised and argued cannot bootstrap that ruling into a decision worthy of stare decisis.  *Hill v. Bank of Colorado,* 648 F.2d 1282 (10th Cir. 1981) ("The rule of stare decisis does not require any Court to follow a judicial rule which is erroneous.")

### 2. The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the application of *Ring* to the "weighing" element.

Because it had no actual briefing or argument before it, the Court of Appeals looked to a Fifth Circuit case and adopted the reasoning therein to reject the jury fact-finding requirement on the weighing procedure in this case.  *United States v. Barrett,* 496 F. 3d at 1108, adopting *United States v. (Sherman) Fields,* 483 F. 3d 313, 346 (5th Cir.2007) ("Although not binding on us, we find this decision highly persuasive.  Accordingly, we reject Barrett's argument for the same reasons stated by the Fifth Circuit in *Fields*.)  The *(Sherman) Fields* analysis, however, was fatally flawed in ways which were not brought to the Tenth Circuit's attention because the Tenth Circuit was acting on its own and not pursuant to any specific argument.

---

[42]Since two different decisions, both styled *Fields v. United States*, are discussed here, the first names of the appellants are given to avoid confusion.

In *(Sherman) Fields,* the Court of Appeals held, "[s]ince the Constitution does not require a jury to do the weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt." 483 F. 3d at 346. It is true that the Constitution does not require a jury to make a separate decision of life or death after the weighing process. *Blystone v. Pennsylvania,* 494 U.S. 299, 301(1990) (finding constitutional a Pennsylvania's death penalty statute which required a sentence of death if a jury unanimously found at least one aggravating circumstance and no mitigating circumstances or one or more aggravating circumstances that outweigh any mitigating ones). In that case, the Supreme Court found that "[t]he fact that other States have enacted different forms of death penalty statutes which also satisfy constitutional requirements casts no doubt on Pennsylvania's choice." *Id.* at 309. Similarly, here it is the statute which controls and 21 U.S.C. Section 848 made clear that the weighing of aggravating factors against mitigating facts was required *before* consideration of the life or death decision could be made. Under 848k a jury was required to make the finding of fact that the aggravating factors sufficiently outweighed any mitigation found to justify a death sentence before it could, if it decided to, impose the death penalty.

> If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, *shall then consider* whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

21 U.S.C. §848(k) (emphasis added). *Apprendi* and *Ring* do not control what fact finding is constitutionally required, but once a statutory scheme does require specific fact finding which elevates the potential punishment, that fact-finding must be made by a jury. *Apprendi v. New*

*Jersey*, <u>530 U.S. 466, 491</u> (2000);  *Ring v. Arizona,* <u>436 U.S. 584, 589</u> (2002)(extending the

*Apprendi* holding to capital defendants).  As Justice Scalia stated,

> [All] facts essential to imposition of the level of punishment that the defendant
> receives – whether the statute calls them elements of the offense, sentencing
> factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, <u>436 U.S. at 610</u> (Scalia, J., concurring).  Because it was not dealing with §848,  *Fields* did

not address the statute's clear provision that death does not automatically follow the weighing

process.  The Tenth Circuit's failure to appreciate the difference, or to fully apprehend the effect

of 848k's mandate of full discretion following the weighing renders its hasty embrace of the

*(Sherman) Fields* decision erroneous.

> The Fifth Circuit Court of Appeals also erred when it found,

> Moreover, the *Apprendi*/*Ring* rule should not apply here because the jury's decision
> that the aggravating factors outweigh the mitigating factors is not a finding of fact.
> Instead, it is a "highly subjective," "largely moral judgment" "regarding the
> punishment that a particular person deserves ...." *Caldwell v. Mississippi,* <u>472 U.S.
> 320, 340</u> n. 7, <u>105 S.Ct. 2633</u>, <u>86 L.Ed.2d 231</u> (1985). In death cases, "the sentence
> imposed at the penalty stage ... reflect[s] a reasoned *moral* response to the
> defendant's background, character, and crime." *Penry v. Lynaugh,* <u>492 U.S. 302</u>,
> 319, <u>109 S.Ct. 2934</u>, <u>106 L.Ed.2d 256</u> (1989) (emphasis in original). The
> *Apprendi*/ *Ring* rule applies by its terms only to findings of fact, not to moral
> judgments. *See Ring,* <u>536 U.S. at 602</u>, <u>122 S.Ct. 2428</u>.

<u>483 F. 3d at 346</u>.  As noted below, the "weighing process" is a fact necessary before a jury can

make the "highly subjective," "largely moral judgment" "regarding the punishment that a

particular person deserves ...."  The jury must first determine whether the aggravating factors

outweigh the mitigating factors sufficiently to justify the death penalty.  If and only if the jury

finds that they do, it must then make that moral judgment for which the constitution does not

impose a standard of proof. The fact of weight, however, must be decided prior to the discretionary exercise of the highly subjective life or death decision. 21 U.S.C. §848k.

### 3.   The 5th, 6th and 8th Amendments require a jury finding beyond a reasonable doubt.

It is the weighing process which leads the jury to decide whether or not the sentence should be death. In *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), the Supreme Court stated, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* The death penalty statute under which Mr. Barrett was sentenced to death clearly separated the weight finding and the ultimate punishment decided. 21 U.S. C. §848 (k)(repealed). Immediately following the directive on the jury's obligation to consider the weight of the aggravating factors outweigh the mitigating factors, if any, sufficiently to justify a death sentence, the statute provides:

> The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

*Id.* The elements of capital murder include decisions right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. In truth, the "selection" decision is not made until the jury reaches the final decision-point of determining whether the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a death sentence of death . . . ." 21 U.S.C. §848k (now repealed); *see and compare,* 18 U.S.C.

§3593(e))(emphasis added).  A simple outweighing is not enough.  It is not difficult to imagine a conscientious juror finding that, although the aggravating circumstances do tip the balance in favor of death, the degree to which that balance tips is not *sufficient* to *justify* imposition of a sentence of death.  It is not until the actual finding is made that the defendant's potential punishment increases to death.

Ultimately, the question presented must be decided by the United States Supreme Court.[43] A number of states have already determined the Constitution does indeed require a jury finding on the weighing question.  *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003) (finding step where, as in 848, the jury has full discretion *after* the required weighing to impose or not impose the death penalty, the weighing is a fact-finding necessarily to be made by a jury); *Woldt v. People*, 64 P. 3d 256, 265-66 (Colo. 2003) (finding Colorado's statute unconstitutional under *Ring* because it permitted a three-judge panel to engage in the fact finding including determining whether "[t]here are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved." 6 C.R.S. §11-103(2)(b)(II)(A)-(B) (2000)); *Johnson v. State,* 118 Nev. 787, 802-03, 59 P. 3d 450 (2002) ("[A]s applied to Nevada law, *Ring* . . . requires [a] jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact finder to further find whether mitigating circumstances are sufficient to outweigh the aggravating circumstances.)  848 makes clear that the death penalty scheme establishes the same 4-step process, the first three of which,

---

[43]The fact that this issue is not yet decided by the United States Supreme Court does not prevent its consideration by this Court, since the issue was raised at Mr. Barrett's trial which occurred three years after the *Ring* decision, which was issued in 2002.  Consequently no problems of retroactivity are raised, the issue having been presented to the Court before Mr. Barrett's case became "final".  *See United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)(Court does not generally apply new constitutional rules of criminal procedure to cases on collateral review).

Movant's Reply to USA' Response
to Second Amended § 2255 Motion          187          *Barrett v. U.S.*, 6:09-cv-00105-JHP

including the weighing, are fact finding and the last of which is the exercise of discretion on the ultimate decision.

The Court's failure to instruct the jury on all fact-finding requirements of capital murder, including the weighing, means the conviction of "death" must be set aside.

### C.     Conclusion.

As a result of the deficient performance of appellate counsel, the decision of the Court of Appeals on direct appeal was not based on adequate briefing and argument.  The issue can and should now be considered, and Mr. Barrett's death sentence vacated as a result.

**GROUND 17:          THE EIGHTH AMENDMENT'S PROHIBITION OF THE EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED COGNIZABLE CLAIM.**

The Government asserts that the ground of error which asserts that Mr. Barrett's execution is barred by the Eighth Amendment because he is severely mentally and suffers from organic brain impairments is "otherwise indistinguishable from a contention that he lacks the capacity to be executed" and that such claims of incompetence are not ripe until execution is imminent.  Doc 175 at 270.  Because execution in this case is not yet imminent, the Government asserts the claim is not ripe.  *Id.*  Secondly, the Government argues the claim is not cognizable because it lacks a basis in existing law.  Doc 170 at 271.

The claim, however, is rooted in the Eighth Amendment's preclusion from the death penalty of certain classes of individuals for whom execution is prohibited, including the mentally retarded, *Atkins v. Virginia*, <u>536 U.S. 304</u> (2002) and persons whose crimes were committed before their eighteenth birthday, *Roper v. Simmons,* <u>534 U.S. 304</u> (2005).  *See*  Doc 95 at 379; Doc 149 at 228-29.  In neither *Atkins* nor *Simmons* did the United States Supreme Court find the

issue untimely because execution was not imminent nor that the claim was non-cognizable, but addressed the claims under the constitutional precept that "punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, -- U.S. --, 230 S. Ct. 2011, 2021 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).  The claim at issue here arises specifically under the need to continuously review the Eighth Amendment's "evolving standards of decency" which in this case extend to Mr. Barrett a "status" based on "categorical rules" that define Eighth Amendment standards and which preclude his execution.  *Graham*, 130 S. Ct at 2022 (identifying two subsets of rules precluding execution: those concerning the nature of the offense and those considering the characteristics of the offender) .  The classification upon which this claim rests turns on a characteristic of Mr. Barrett, that he is a severely mentally ill and organically brain-damaged individual.

The claim is timely and cognizable.  Because the Eighth Amendment precludes Mr. Barrett's execution, the sentence of death must be vacated and Mr. Barrett, sentenced anew in conformance with the Eighth Amendment's "evolving standards of decency."

**GROUND 18:          INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

The Government argues that Mr. Barrett's claim that the cumulative impact of appellate counsel's errors and omissions violated his constitutional right to the effective assistance of counsel is untimely because it was not asserted until he filed his Amended §2255 Motion.  The argument is without merit.  Whether asserted affirmatively or not, the standard for prejudice in an ineffective assistance of counsel claim is determined by sum total of the errors of counsel.  The standard for determining prejudice in an ineffectiveness claim is a cumulative weighing of the deficient performance and its impact on the reliability of the verdict and/or result on appeal.

*Strickland v. Washington*, <u>466 U.S. 694</u> (Claimant must show "there is a reasonable probability that, but for counsel's *errors*, the result would have been different") (Emphasis added.)   Where a number of claims of ineffective assistance are raised, a reviewing court must determine prejudice collectively, or in the aggregate.  *Fisher v. Gibson,* <u>282 F.3d 1283, 1289</u> (10th Cir. 2002); *Stouffer v. Reynolds,* <u>168 F.3d 1155, 1164</u> (10th Cir. 1999); *Osborn v. Shillinger,* <u>861 F.2d 612, 625</u> (10th Cir. 1988).

Beyond that Mr. Barrett asserted the claim in his first 2255 Motion.  While the organization of the Amended Motion included the separate claim of Ineffective Assistance of Counsel on Appeal, the original Motion expressly asserted:

> Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution, because the *cumulative effect* of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, *due process*, *effective assistance of counsel,* presentation of a defense, and a reliable determination of guilt and penalty and fundamental fairness.

> \* \* \* \*

> If none of the claim [sic] presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Doc 2 at 376.  At worst, the cumulative error claim under the failure to provide the effective assistance of appellate counsel is a known subset of the original claim.

Finally, the Government throughout it's Response relies on the wrong standard of the prejudice which must be shown to proceed on an ineffective assistance of appellate counsel claim. It attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice.   This reads too much

into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates reversal can prove sufficient prejudice.  To limit appellate ineffectiveness claims solely to those cases where an issue is "obvious from the record, and must have leaped out upon even a casual reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995)(internal quotation omitted) runs contrary to the law in this area.  Effective appellate counsel must, of course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) - and exercise reasonable professional judgment in deciding what issues to raise and how to argue them.   However, the traditional *Strickland* analysis of performance and prejudice applies, 466 U.S. 668, 690 (1984).  *See Smith v. Robbins,* 528 U.S. 259, 285-286(2000) (applying *Strickland* when considering claim of ineffective assistance of appellate counsel claims); *see also Smith v. Murray,* 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed with simply because an issue requires consideration going further than a knee-jerk response.

Notwithstanding the inclination of *Challoner*, to revert to the old, unconstitutional standard, *Strickland* is the standard in the Tenth Circuit as stated in *Neill v. Gibson*, 278 F. 3d 1044, 1062 (10th Cir 2001) (relying on *Smith v. Robbins*, *supra* and applying *Strickland* standard to claims of ineffective assistance of appellate counsel).  In *Neill*, the en banc court specifically addressed the standard of the "dead-bang winner" expressed in *Cook*.

> This court has expressed this test in terms of appellate counsel's omitting a "dead-bang winner," often defined in part as a claim that "would have resulted in a reversal on appeal." *United States v. Cook,* 45 F.3d 388, 395 (10th Cir.1995). To the extent this language can be read as requiring the defendant to establish that the omitted claim would have resulted in his obtaining relief on appeal, *see, e.g., Smith v. Massey,* 235 F.3d 1259, 1274 (10th Cir.2000), *cert. denied,* 534 U.S. 904, 122 S.Ct. 235, 151 L.Ed.2d 169 (2001) (No. 01-5117); *Walker v. Gibson,* 228 F.3d

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    191                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

1217, 1237 (10th Cir.2000), *cert. denied,* 533 U.S. 933, 121 S.Ct. 2560, 150 L.Ed.2d 725 (2001), rather than there being only a reasonable probability the omitted claim would have resulted in relief, *see Banks v. Reynolds,* 54 F.3d 1508, 1515 n. 13 (10th Cir.1995), this language conflicts with *Strickland. See* 466 U.S. at 694, 104 S.Ct. 2052. The en banc court, therefore, **expressly disavows** the use of the "dead-bang winner" language *to imply requiring a showing more onerous than a reasonable probability* that the omitted claim would have resulted in a reversal on appeal.

*Neill,* 278 F. 3d at 1057 n. 5 (emphasis added).  In light of the express repudiation of the standard cited in *Cook*, the reliance on *Cook* by a panel of the 10th Circuit in *United States v. Challoner,* 583 F. 3d at 749, and reiteration there of the "dead-bang winner" is inexplicable.  To the extent the Government relies on *Challoner* as a revival of the old standard, it is "dead-bang" wrong.

Moreover, here, the errors and omissions of Mr. Barrett's appellate counsel were pervasive and included the omission of issues in which trial counsel properly objected to clear constitutional violations (*see e.g.,* Claims 7, 12) as well as numerous constitutional errors which were plainly apparent on the record, and yet appellate counsel still did not find these issues important enough to brief.  Instead, appellate counsel chose to assert evidentiary challenges or statutory challenges that had no likelihood of success or which were briefed so poorly, they failed to preserve Mr. Barrett's right to a meaningful appeal (*see e.g.,* Claim 12).  Appellate counsel's failure to raise the issues which - whether raised alone or together - presented a reasonable probability that Mr. Barrett would have prevailed on appeal, *see Neill v. Gibson*, 278 F. 3d at 1062, renders counsel's assistance constitutionally ineffective.

## II.    CONCLUSION

For the foregoing reasons, together with those alleged in Mr. Barrett's Motion To Vacate Under 28 U.S.C. Section 2255 (Doc 95) and the Original, Corrected and Amended Motions filed

previously thereto (Docs 1, 2 and 70) and the Brief filed in Support of his Motion (Doc 145), this

Court should grant Mr. Barrett relief in the manner requested in his Motion (Doc 95 at 400-401)

and Supporting Brief (Doc 149 at 248-249) including but not limited to:

1.   That United States District Judge James H. Payne recuse himself and have all proceedings regarding the Motion to Vacate randomly reassigned to another judge;

2.   Permit Mr. Barrett to amend his motion with any newly discovered evidence or grounds for relief which may arise through investigation of that evidence, discovery  or an evidentiary hearing;

3.   Permit Mr. Barrett to utilize the processes of discovery set forth in the Federal Rules of Civil Procedure Rules 26-37, to the extent necessary to fully develop and identify the facts that support his Motion and refute any defenses raised by the Government's Response;

4.   Permit Mr. Barrett to expand the record, if necessary and appropriate;

5.   Grant Mr. Barrett's motion for evidentiary hearing to resolve any and all of the factual disputes raised by the Government's Response to the Motion and this Reply;

6.   Permit oral argument as appropriate and/or required;

7.   Vacate Mr. Barrett's convictions and sentences and order that appropriate retrial and/or resentencing hearing be conducted; and,

8.   Any such further and additional relief as may be just.

1346

DATED:   July 1, 2010

Respectfully submitted,
*/s/ David B. Autry*
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
*/s/ Joan M. Fisher*
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

*/s/ Tivon Schardl*
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**INDEX OF EXHIBITS**

**VOLUME I**

Exhibit 206          Supplemental Declaration of Ernie Barrett

Exhibit 207          Supplemental Declaration of Doris Barrett

Exhibit 208          Supplemental Declaration of Issac Barrett

Exhibit 209          Supplemental Declaration of Phyllis Crawford

Exhibit 210          Supplemental Declaration of Gelene Dotson

Exhibit 211          Supplemental Declaration of Mark Dotson

Exhibit 212          Supplemental Declaration of Ruth Harris

Exhibit 213          Supplemental Declaration of Carolyn Joseph

Exhibit 214          Supplemental Declaration of Linda Riley

Exhibit 215          Supplemental Declaration of Janice Sanders

Exhibit 216          Supplemental Declaration of Abbie Stites

Exhibit 217          Supplemental Declaration of Kathy Trotter

Exhibit 218          Supplemental Declaration of Leonard Post re Supplemental

                     Declaration of Toby Barrett

Exhibit 219          Supplemental Declaration of Richard Burr

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1st day of July 2010 I caused the foregoing Movant's Reply to

United States' Response to Second Amended § 2255 Motion to be filed with the Clerk of the

Court using the ECF System for filing.  A copy will be served electronically to Christopher J.

Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S.

Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ *Joan M. Fisher*
Joan M. fisher

# EXHIBIT  206

1350

## Supplemental Declaration of Ernest Eugene Barrett

I, ERNEST EUGENE BARRETT, declare as follows:

I am the father of Kenneth Eugene Barrett.

The investigator who worked with me to get my first declaration done called me on the phone to ask some more questions. I am half deaf, likely more, so he talked to my wife Doris Barrett who relayed the questions to me. Then she repeated my answers, but I spoke loudly so he could likely hear, too. When he called back and read it out loud, he read it to her and she repeated back to me slowly, like I was taking an oath. Anyway, I read this over and he got it right.

I met with Roseann Shaye before the first state trial at my home. She wanted to get information to help Kenny. I had no idea how it would be used. I just assumed she was cooperating with John Echols. That was good enough for me. If she told me why she was asking those questions, I don't remember.

No one else ever asked me about raising Kenny, not one lawyer, state or federal. Sperling asked me more than anyone about it when I testified.

Nobody ever talked to me about how they would try to save Kenny's life if he was convicted, what kind of evidence was important for the jury to hear, nothing like that.

The only the strategy the lawyers ever talked to me about was after the prosecution put on their first state case, John Echols asked me and Doris and Kenny—Doris says a woman was there too, Joan Brown—whether we thought he needed to call any witnesses. We questioned that, but John said that he didn't think the state had presented enough evidence to convict. John never did call any witnesses in either trial.

I saw Kenny every other weekend after he was arrested until they sent him to

EEB

Page 1 of 3

1351

McAlester after he was convicted.  That was while he was in Sallisaw *and* Muskogee.  Doris came with me, but I saw Kenny alone except for the last time.  Doris came in so she could say goodbye.

Kenny never once said he didn't want us to testify about mental health subjects or family history.  He didn't say the lawyers wanted him to, and that he didn't, nothing like that.

Hilfiger and Smith talked to me about nothing except to be careful with Sperling, to answer questions "yes" or "no," because an open-ended answer could open a can of worms.  He didn't tell me what the "can of worms" was.  I had no idea.

Hilfiger and Smith did not tell me what they were going to ask me.  They didn't even tell me why they were calling me.  Sperling knew more about me than they did.  Sperling knew where I worked, how long I had been there, how many people I had under me, and that people at work liked me.  Hilfiger hardly asked me anything and Sperling went on and on.

When Sperling asked me how come my youngest son Steve and me were able to make it and Kenny wasn't, I really didn't know what to say.  Kenny's lawyers never discussed that question with me.  They didn't talk to me about nothing.

When we were driving to court the day I testified, Doris and I were talking about how ugly it might get for me on the witness stand.  I was willing to talk about the family history of mental problems, about myself, my marriage to Gelene, and Kenny and me up until the day I testified, so the jury could understand the role I played in Kenny's life.  I said what a sorry father I was in my first declaration and how sorry I was for it.  I didn't care how I looked.  I mean I cared, who wouldn't, but I was willing.  When I say I was willing, what I mean by that is that is I wanted to.  Doris and I assumed that was why they

EEB

Page 2 of  3

called me to testify, but it wasn't.  I guess I'll never know what Kenny lawyer's had in

mind when they called me.

The investigator said he was going to send this to me and that I should read it over

carefully, and only to sign it if every word was truthful.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and

correct.

Executed by me this /7 day of June 2010, in Creek County, Oklahoma.

Ernest Eugene Barrett

EEB

# EXHIBIT   207

## Supplemental Declaration of Doris Barrett

I, Doris Barrett, declare the following:

I am married to Kenny's father Ernie Barrett. While Kenny is not blood kin and I didn't raise him, I think of Kenny as one of my children.

This is my third declaration in Kenny's case. The same investigator who interviewed me to prepare the first two called me again recently to talk some more about the case. We talked about some things we talked about before, but a lot of new things too.

As I said in my first declaration, I attended both of Kenny's state trials and his federal trial, including all the hearings before the trials except one that was held in Stilwell. I missed one hour of one day in state court and a half a day in federal court, but I was there every day except that one. I got to know the lawyers and I made sure they got to know me.

Ernie visited Kenny in jail during the trials every other week, sometimes every week if Gelene, Kenny's mother, couldn't take her turn. I waited outside so that Kenny could have this private time with his dad. Every other night, Kenny would call the house and talk to one or both of us. You should have seen our phone bills. In state court, they let me sit right up next to Kenny and we would talk sometimes and share looks. Kenny and me got really close during the state trials. In the federal trial, they wouldn't let me near him in court, but we still talked most every other night.

Roseann Shaye interviewed both my husband and me before the state trial. It was at our house. She spent about an hour an a half just with me. It was the summer before the first state trial. She told me she was interviewing family because she wanted to make a plea of insanity. Yes, she used the word "insanity," I'm sure. I thought she was weird. She said it was Kenny's

𝔇.𝔅.
DB

best bet based on what she had learned about his growing up. When I talked to John Echols about it, he said he wasn't going there.

John told me that if the jury convicted Kenny, it was important for the jury to see what kind of life Kenny had growing up because many jurors were sympathetic to people who had a rough childhood, that some of them might have been in the same shoes as Kenny. That was how John planned to save Kenny's life if he got convicted of murder, but he never really thought that would happen and it didn't.

That was a big difference between John and Roger Hilfiger. John had a strategy for winning the trial and he had a plan in case we didn't. Roger didn't have a plan that I could see and certainly none that he told me about. When I would tell him that prosecution witnesses, mainly cops and OHP, had testified different in state court, he would ignore me and tell me not to tell him what to do.

At least Bret Smith listened and told me he would bring it to Roger's attention whenever I told him a witness had said something different in state court. I don't know if Bret did tell Roger or not.

Neither Roger or Bret ever asked about what I had heard about Kenny's life growing up, or asked me anything about his family. I don't think they asked anyone, not Kenny's father for sure. They never talked to me about the importance of the jury getting to know Kenny and where he came from. They just asked me if I would miss him if he was executed.

When they sentenced Kenny to death, Roger didn't even turn around to say he was sorry or to say that he would keep fighting or anything like that. Maybe that's just on TV, but he never said one word to us—we left the courthouse thinking this was the end.

DB

Roger never told us that Kenny didn't want the family involved in his case, never. He did ask me if I would help him get Kenny to testify. That's the only thing he ever told me that him and Kenny disagreed about, Kenny testifying. I told him that I wouldn't help him do that, that I didn't want to be responsible for killing Kenny.

Kenny never told me he didn't want my help. He did say once that we shouldn't stress out over him, but never that he didn't want our help. In fact, he knew I was going to testify and he never said not to testify or not to talk about family, nothing like that. Of course, I had no idea what I was going to testify about because the lawyers never told me—I was so nervous, to this day I can't remember what he asked me or what I said.

Kenny also told me that Roger wouldn't call some witnesses he wanted him to, but for the life of me I can't remember who.

The investigator who called said he would write up what I said the way we did the last times, but this time he would call and read it to me. He did and it said what I had told him. He then told me he was going to FedEx it for me, to go over it and sign if it was accurate. He said he was going to send a prepaid return label to send it back to him.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this _17_ day of June 2010, in Creek County, Oklahoma.

<br>

_Doris J. Barrett_
Doris Barrett

<br>

_D.B._
DB

# EXHIBIT   208

## Supplemental Declaration of Issac Barrett

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother. I signed a declaration sometime in the early part of 2009 after meeting many times with an investigator. That investigator called me on June 4, 2010 to ask me some additional questions and to ask if I would be willing sign another declaration. I said that I would.

He asked me if I had ever talked to Roger Hilfiger, Bret Smith, John Echols or Jack Gordon about my nephew Kenny. I told him that I hadn't. He then asked me if I had spoken to Rosanne Schaye. I recalled speaking to a woman named Roseanne in regard to Kenny's state case, and the last name kind of rang a bell when he mentioned it. It was many years ago that I met her at Leslie's Café, which is no longer in business. I recall that we talked for a considerable amount of time. We met about 9:00 A.M. and I spent about three hours talking about my family with her. I don't know exactly when that was, but I think it was before Kenny's state trials. I'm just not positive.

I answered all her questions. She said she would call me again, but never did.

I had no idea why she was asking me about the family. I didn't know if she worked in Mr. Echols office or what her role was. If she explained it to me, I didn't comprehend it. I had no idea how she intended to use the information I gave her or why she was assembling information about the family. At that time, I didn't know how it could help Kenny, but I wanted to.

*ICB*

ICB

Page 1 of 2

I also met Steve Leedy, an investigator for Mr. Echols.  We met in Sallisaw in the back parking lot of the Dinner Bell Restaurant that is now out of business.  He came to see me before Kenny's first trial to talk to me about the circumstances of the way things are in Sallisaw.  By that I mean who pulled the strings, who was the money behind the sheriff and the D.A, who the major players were in the drug business in town, none of whom were Kenny, that's for sure.  I told him all I knew, which is common knowledge in this town.  You'd have to be deaf and blind not to know.  He didn't ask me anything about Kenny or our family that I can recall.

I saw Kenny when I attended his trial in state court.  When they brought him in I said "hi." He welcomed whatever family came to the trial.   He seemed grateful for the little we did.

No one ever told me that Kenny didn't want to get his family involved in his case or that he didn't want our help.  No one ever told me he ever felt that way, not Mr. Leedy, not Ms. Schaye.  None of the lawyers ever asked me to help.  I would have if I knew how.   Like I said, none of the lawyers ever talked to me.

The investigator called me again the following week and read this declaration to me. What he read is what I told him in our conversation, what is written here.  He said he would FedEx it to me with a prepaid label to send it back to him.  I have read this declaration carefully and it accurately says what I told him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _28_ day of June 2010, in Sequoyah County, Oklahoma.

_Issac C. Barrett_
Issac C. Barrett

ICB

Page 2 of 2

1360

# EXHIBIT  209

## Supplemental Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt. On June 4th, I received a phone call from an investigator who I had met with many times before I signed my previous declaration. He asked me several questions. In response, I told him that other than him and family, nobody had ever come out here to my house to talk to me about Kenny or about anything having to do with Kenny's state trials or his federal trial. Then he asked me specifically about Roger Hilfiger, John Echols, a man named Smith, a man named Gordon and a woman named Schaye. I told him again that nobody had come out here and that I didn't remember anyone calling.

Since it has been 10 years, I checked with my husband Roger to see if he remembered anyone calling or coming to our house. He said no, that no one had come out here or called to talk about Kenny.

I did go over to my sister Gelene's shortly before Kenny's federal trial. My sister Carolyn and my cousin Janice were there with Mr. Hilfiger and Mr. Smith, I think that was his name, a short heavy guy. Mr. Hilfiger sat on the couch and Mr. Smith sat in a chair. That's about all I can remember.

I didn't see Kenny when he was in jail. I did see him when we went to court, but there was no chance to talk. He never called to tell me, or ever told me, that he didn't want me or the family involved in his case. I live next door to his mother. She never told me that Kenny told her that he didn't want the family involved in his trial or that he didn't want our help or her help.

I recently got a really nice letter from Kenny and wrote him back.

PC

Page 1 of 2

1362

This time the investigator interviewed me entirely over the telephone. He then wrote up what I said and called me again to read it to me. I told him what he read is what I had told him and that I would sign it. He mailed it to me and I read it. It says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _____ day of June 2010, in Sequoyah County, Oklahoma.

Phyllis Crawford

PC

# EXHIBIT  210

**Supplemental Declaration of Gelene Dotson**

I, SYLVIA GELENE DOTSON, declare the following:

I am Kenneth Eugene Barrett's mother.

The investigator who met with me many times when drafting my last declaration in Kenny's case called me to ask me additional questions about my contact with various members of my son's legal teams.

The first one I met with was John Echols, his state lawyer. He came out to the house twice, I think. The first time he came out with Joan, who worked with him, and Traci Swearingen, a friend of Kenny's. John went over with me what happened that night, the night they came for Kenny and the shooting happened.

The second time John came over was mostly to go over to Kenny's place and look around. He really cared about Kenny. I feel like he did a good job. He sent over an investigator too. His name was Jim Allison. Jim talked to me about what happened the night of the incident. Mr. Echols also sent another investigator, Lisa, who spent time over at Kenny's place.

John also sent Roseann Schaye to see me. I saw her quite a few times, at least five. She asked me questions about Kenny, me, my marriage to Ernie and my family. That was before Kenny's first trial. I signed lots of forms, releases. She even tried to get my elementary school records from Albuquerque, but the school was gone. She went to Joliet, Illinois, where we lived when Kenny was a kid. She talked to my cousin Nelda and some of my friends.

Ms. Schaye was doing this to check out Kenny's background in case they needed to do the second phase of the trial. She explained it all to me. The last time I heard from her is when

SGD

Page 1 of 4

1365

she sent me copies of some newspaper articles about my grandfather when he was murdered. Anyway, there was no second phase in the state trials.

If I met Jack Gordon, I don't remember. His name sounds familiar. I went to some pre-trial hearings, but I was excluded from the trial because John Echols said he might call me as a witness.

Roger Hilfiger came to my house with Bret Smith once, and a second time with an investigator that used to be an agent with ATF. I can't remember when the first time was, but the second time was just before the trial. They talked about the incident, nothing else. Nobody ever talked to me about anything but the incident except for Roseann Schaye.

Roger Hilfiger did not impress me as someone who cared about Kenny. He and Mr. Smith called me to testify in the penalty phase of the trial. They didn't tell me why, but I knew from my dealings with Rosanne Schaye what was likely. When I got to Muskogee, they told me what they thought the prosecutor would ask me. Then they asked me if I loved Kenny and if I would miss him if he was executed, the same questions they asked me when I testified. They didn't ask about the things Ms. Schaye and I talked about.

After Kenny was arrested, I saw him once a week in the jail in Sallisaw and every other week when he was in jail in Muskogee. Kenny never told me he wanted to minimize the family's involvement in the case or that I shouldn't be discussing his mental health or anything like that. He would never tell us that. We're family. We stick together.

Kenny wasn't satisfied with Mr. Hilfiger and it wasn't just that he wasn't John Echols. It's because they wouldn't do what he wanted. Lots of things, but I can only remember one

SGD

Page 2 of 4

specific example. For a jailer, Mr. Hilfiger called Robert Good, someone who didn't like Kenny much. Kenny had asked them to call a different jailer, Buck Locust or Christenberry. They both liked Kenny. Buck has already told me that he wanted to testify for Kenny and that he would do all for Kenny that he could.

Kenny really missed John Echols, but he wouldn't have missed him as much if he thought Hilfiger was doing right by him. Kenny liked Bret Smith, although I can't remember why exactly—I think Kenny liked the way Mr. Smith related to him, but Mr. Hilfiger made all the decisions as far as Kenny and me knew. Kenny just wasn't satisfied with Roger Hilfiger. None of us were.

Mr. Hilfiger and Mr. Smith never asked for my help in getting Kenny to do anything for them. I didn't know that there was anything they wanted Kenny to do that he wasn't doing. They never talked to me about what they hoped the second phase of the trial would be if there was one. If they had a plan, they didn't tell me or anyone that I know. They never talked to me about Kenny's family history of mental illness and alcoholism on both sides, or about Kenny's upbringing, or why he might live in a shack without water, electricity or even a drain, or why he might have shot himself in the chest with a shotgun—nothing like that. I would have shared all that to save my son's life.

No, Kenny's lawyers never told me that Kenny didn't want them to beg for his life or anything like that. I wonder who is saying that. I would have begged for his life.

The investigator who interviewed me for this declaration called me back and read it to me. It says what I told him. He said he would send it, and that I should read it over carefully to

SGD

Page 3 of 4

make sure it was accurate in every way.  I did that and now I'll sign it like he asked and send it back to him.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true and correct.

Executed by me this *2 3* day of June 2010, in Sequoyah County, Oklahoma.

Sylvia Gelene Dotson

SGD

Page 4 of 4

1368

# EXHIBIT   211

## Declaration of Mark Dotson

I, Mark Dotson, declare the following:

I am Kenneth Barrett's maternal uncle.

I signed a declaration for Kenny's case more than a year ago after speaking with an investigator. That same investigator called me on June 6, 2010 to review a couple of things, which he recalled accurately, that were not included in my first declaration. He also asked me a few new questions and asked if he could include my answers in a new declaration. I said that would be fine.

I told him again that I had never been contacted by anyone about Kenny's state or federal cases. Then he specifically asked if I had been contacted by Roger Hilfiger, Brett Smith, John Echols, Jack Gordon or Roseann Schaye. I have heard the name John Echols—one of Kenny's lawyers I think— but none of them or anybody working for them ever contacted me.

I also told him that Kenny had never told me he didn't want to trouble the family by having them involved in his case. I never heard from Kenny or anyone that Kenny didn't want the family's involvement for whatever reason. If any one of his lawyers had asked for my help, if they had showed me how I could help, I would have done my honest best.

The investigator called back and read this declaration to me after we talked. It says what we talked about. He sent it to me to read, sign if it was truthful, and send it back to him.

I have read it carefully and it says what I told him on the phone and what he read to me. I declare, under penalty of perjury, that this 2- page declaration is true and correct.

Executed by me this 21st day of June 2010, in Sequoyah County, Oklahoma.

_____ 6-21-10
Mark Dotson

_____
MD

Page 1 of 1

1370

# EXHIBIT  212

**<u>Supplemental Declaration of Ruth Harris</u>**

I, Ruth Harris, declare as follows:

I am one of Kenneth Barrett's maternal aunts.

The investigator who I gave the information to for my first declaration called me on June 7, 2010, to ask me a few more questions. I felt bad because I didn't know anything about what he was asking even though I went to both state trials. I don't remember missing one day.

I met John Echols several times. He was an excellent lawyer. I had very high hopes. He cared about Kenny.

I didn't go to the federal trial and never met those lawyers or anybody working with them. They never tried to contact me. Where was the fairness when they took John Echols away from Kenny? It was like the government wanted to take control when they didn't like what happened in state court, so they even took Kenny's lawyer away.

Not even John Echols talked to me about how family testimony could be important. I didn't even know that there could be two parts of the trial. I thought if they convicted him of murder that was it. I don't know about those kinds of things.

The investigator who called me is the only one who ever talked to me about the need for a jury to understand Kenny's upbringing and his family's history. I never talked to Roseann Schaye or Bret Smith or Roger Hilfiger or Jack Gordon about anything.

I couldn't get very near Kenny at the trials, just near enough to tell him we love him. I know Kenny wanted us there because he sent word through his mother when his federal trial was going on, wondering where we were. It must have hurt him that we didn't go.

*R. H*

RH

Page 1 of 2

I never heard Kenny didn't want the family to participate in his trial.  Nothing like that. Kenny never said that.  Neither did the lawyers.  If the lawyers had asked me, I would have done all that I could to help the jury understand Kenny and care for him like I do.

The investigator read this declaration over the phone and said he would send it for me to sign, but that I should read it over before I did.  I have read it carefully and it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 2- page declaration is true and correct.

Executed by me this _17 th_ day of June 2010, in Le Flore County, Oklahoma.

_Ruth Harris_
Ruth Harris

RH

# EXHIBIT   213

## Supplemental Declaration of Carolyn Joseph

I, Carolyn Joseph, declare the following:

I am a maternal aunt of Kenneth Barrett.

I signed a declaration in Kenny's case a while back.  The investigator who questioned me for it called me a few days ago and asked me some more questions.  He wanted some details of things we already talked about.

He started out by reading the following, which he said was in my first declaration:

Kenny's trial attorney only met me for a few minutes.  He asked me about Kenny threatening to burn down Janice's house.  I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second.  He never gave me a chance to tell him.  The attorney just told me my testimony would not be required.  The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would.  My answer would have been no.  Kenny never had done anything to anyone.  The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family.  I would have answered any questions the attorneys asked and I would have answered them truthfully.

I told the investigator that was exactly right.  He asked me when that conversation happened.  I couldn't remember, but I remembered where it was.  Gelene called to ask me to come over to her house, said Kenny's lawyers wanted to talk to me.  It was me and Janice and Gelene, and I think Phyllis was there too, and the two lawyers.  One was named Hilfiger, I think. I don't know the other lawyer's name.

They asked me what they asked me in front of everybody, wasn't even five minutes that they talked to me, and then never said another word to me.  But I could hear what they asked my sisters and my cousin Janice.  They asked Janice the same thing they asked me about.  They talked to Gelene and Phyllis about the night of the raid on Kenny's, that's all.  The lawyers never



CJ

Page 1 of 2

asked any of us about our family's history of mental illness or about Kenny's upbringing. The lawyers treated us cold.

The lawyers didn't say that Kenny told them he didn't want our help. I know the lawyers didn't want my help because they told me so, because I told the truth. I would have been willing to do anything for Kenny except lie. I still would do anything I could for him.

I never met Kenny's state lawyers. They sent a woman by to see me not too long after Kenny was arrested. I barely remember her. I don't recall her name, what she looked like, what she asked or what I told her. I couldn't even tell you why she came.

The investigator told me he was going to call and read this declaration to me, and that we could make changes if he got something wrong. It was exactly like I told him. He said he would send it, and that I should read it over carefully before I signed it, which I did.

I declare, under penalty of perjury, as provided in the laws of the United States of America, and the State of Oklahoma, that the foregoing 2-page declaration is true and correct.

Executed by me this /9th day of June 2010, in Sequoyah County, Oklahoma.

*Carolyn Joseph*
Carolyn Joseph

CJ

1376

# EXHIBIT   214

## Supplemental Declaration of Linda Riley

I, Linda B. Riley, declare the following:

I am Kenny Barrett's surviving paternal aunt. I provided a declaration in Kenny's case more than a year ago after long talks with an investigator. That same investigator called me last week. He said the government had responded to Kenny's legal papers and that he was calling on family members again to ask some questions.

No lawyer ever talked to me about Kenny or his case. Not ever. Roseann Schaye, who I talked to once, and the investigator who asked me to do these declarations are the only ones, outside of the family, that ever talked to me about Kenny's case.

Ms. Schaye just wanted to know things. I remember I told her about when Gelene, Kenny and Richie lived with my mom and dad.

I think I saw Ms. Schaye when Kenny was still in jail in Sallisaw, that's all I can remember about when. It was a long time ago. She came to the house. She didn't stay that long. She never told me how it could help Kenny; just collecting facts. She said she would come back again, but never did. I never saw her again.

Once before the first trial, my brother Ernie, Kenny's father, asked me if my husband Fred would cut Kenny's hair in jail—Fred was a barber. After Fred did it, he told me that he and Kenny had talked about cars and all kinds of things. Kenny never told him that he didn't want the family's help with his case. I'm sure Fred would have told me that.

The investigator I spoke to called me again and read this to me. It says what he read to me. He said he would send it to me to read over to make sure it was accurate. If it was, he

_LBR_

Page 1 of 2

asked me date, sign and it send it back to him.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this 15 day of June 2010 in Sebastian County, Arkansas.

Linda Riley

LBR

# EXHIBIT   215

1380

## Supplemental Declaration of Janice Sanders

I, Janice Sanders, declare as follows:

I am Kenneth Barrett's maternal cousin and was his neighbor.

This will be my second declaration in Kenny's case. The same investigator who helped me with my first one called me on June 13, 2010 and asked me some more questions for this one.

He first asked about whether I had met Kenny's state lawyers and investigators. Soon after Kenny got a lawyer appointed, Mr. Echols came around to my house—I think that's where I saw him—and asked questions about the gunshots I heard and some other questions about the raid on Kenny's. The first person who came was someone from OSBI and the second was John Echols. Then the prosecutors from the state case came out. Nobody had questions about our family history or about Kenny's life.

No one else came out until Kenny's lawyers from Muskogee came. I met them at Gelene's house. After I told the investigator this, he read me the following statement, which he said was in my first declaration:

> "Mr. Hilfiger came to my house with a heavyset younger man whose name I do not know. I told him everything I am stating in this declaration except the part about Kenny being hyper. Mr. Hilfiger did not ask anything about Kenny's childhood or background. The man with Mr. Hilfiger said, "Aren't you going to put her on the stand?" He was referring to me. Mr. Hilfiger said, "No." The man with Mr. Hilfiger acted like he could not understand why Mr. Hilfiger felt that way."


JS

Page 1 of 2

The investigator asked me if that were true. I was mistaken when I said they came to my house. I met Kenny's lawyers from his third trial at Gelene's house. Carolyn and Phyllis were there too, along with Gelene. It was probably about two weeks before the trial started. The rest of what the investigator read me from my first declaration is exactly true.

None of Kenny lawyers ever talked to me about our family, or that they had disagreements with Kenny, or asked me for help with Kenny, or discussed plans they had for saving Kenny's life if he was convicted. I would have helped anyway I could if they had asked. Nobody in the family ever told me that they had heard that Kenny didn't want us to help save his life. The term "mental illness" never came up, or anything like it.

The investigator told me he was going to call and read this to me, and that we could make corrections if need be. He called me back and read this to me. It says what I told him. He said he was going to send it to me and that I should read it carefully to make sure that everything that was in it was true before I signed it. I did that and will send it back FedEx in a prepaid envelope.

I declare, under penalty of perjury, that this 2-page declaration is true and correct. Executed by me this _26_ day of June 2010, in Sequoyah County, Oklahoma.

*Janice Sanders*
Janice Sanders

JS

# EXHIBIT  216

## Supplemental Declaration of Abby Stites

I, Abby Stites, declare the following:

I was married to Kenneth Barrett. Toby Barrett is my son.

I was interviewed by an investigator several times more than a year ago. After that, I signed a declaration. That same investigator called me to ask me some more questions.

Becky Teague, a friend of mine called to tell me that Mr. Littlefield was going to subpoena me to testify against Kenny. She knew from her daughter Mandy who worked with those folks. That was about three weeks before I did testify. Soon after that, Mr. Littlefield came to my house and served me the papers himself. Mandy brought him to show him where I lived. I took his paper, but I didn't talk to him.

To the best of my recollection, maybe a week after that Roger Hilfiger phoned and told me that he wanted to call me as a witness. I told him that I had already been served a subpoena by Mr. Littlefield. He was mad the prosecution got to me first, but there was nothing he could do, he said. He didn't tell me why the government was calling me or why he had wanted to.

I told Mr. Hilfiger that I wasn't going to testify, that I didn't want any part of it, that I was not going to help them kill Kenny. Mr. Hilfiger said I didn't have a choice, but to testify.

The next time I spoke to Mr. Hilfiger was the day I testified. There might have been another lawyer there too, but I'm not sure. He prepared me by telling me not to be nervous, to tell the truth and if I didn't remember to say so. I knew the prosecution didn't call me to talk about Kenny's problems. I knew they only wanted to talk about the restraining orders.

AS

Page 1 of 2

That was all Mr. Hilfiger wanted to talk about too. I wanted to talk to him about Kenny's problems, but he said he didn't want to hear about it. I thought Kenny's problems were important to the case and I tried to tell him. I tried to bring up Vinita, the mental hospital which I had pick up Kenny once because the doctor at Bill Willis thought Kenny might hurt himself. They kept Kenny two weeks and would have kept him longer, but his mother came and got him. If she had let him stay, he might have gotten better. He was doing real good.

When I was testifying Mr. Sperling got so nasty the judge had to step in to protect me from him. Mr. Sperling didn't like my answers to his questions.

I don't know the name Roseann Schaye, but I remember going to a motel to talk to a woman who worked on Kenny's side. She was mostly asking me questions about my relationship with Kenny. I don't remember that she said why. I just answered her questions. It was before Kenny's first state trial, that's all I can say for sure about when I saw her.

I never talked to Kenny's state lawyers or to Kenny. No one told me that Kenny didn't want people to testify about how he was messed up in the head.

The investigator called me back and read this declaration to me. I told him that it said what I said. He said someone would send it to me and that I should read it again carefully before I signed it to make sure.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct. Executed by me this _17_ day of June 2010, in Sequoyah County, Oklahoma.

_____
Abby Stites

_A.S._
AS

Page 2 of 2

# EXHIBIT   217

## Supplemental Declaration of Kathy Trotter

I, Kathy Trotter, declare as follows:

I am Kenneth Barrett's paternal first cousin.  My father is Ike Barrett.  Kenny's father is my uncle.

The investigator who helped me prepare my first declaration recently called me to ask some additional questions.

I put my heart into Kenny's state cases and offered to help out the federal lawyers too, but they never took me up on it.  I spent a lot of time with John Echols.  I've even been to his house in Jenks, outside of Tulsa, where we went through juror questionnaires together.  I also spent time with John's investigators from OIDS, Steve Leedy and Jack Stringer.  I helped them find witnesses.  I went to Arkansas with them to locate Tara Barrett, for example.

I never met Roseann Schaye or had much contact with Jack Gordon.  I didn't meet Bret Smith until the day I testified.  Roger Hilfiger never contacted me.  I would guess they asked me to testify because Kenny gave them my name, but I don't know.  They never told me what they wanted me to testify about.

Not one of the lawyers, including John Echols, ever talked to me about how important it was for the jury to get to know Kenny.  Roseann Schaye, a psychologist, I think, interviewed my father and my Aunt Elnora.  Elnora told me that Roseann told her it was to gather family history so that a jury would learn why Kenny was the way he was, understand his mental health and spare his life.  When I asked John about that, I recall he just said that

KT

Page 1 of 3

1387

we could talk about that once it got to that point.  Of course, it never did when he was on the case.  I don't think my dad understood why Roseann wanted to know the things she did, but he talked to her anyway because he knew he was helping Kenny.

On several occasions, when I was with John or the investigators, I would comment about how hard Kenny's childhood was.  I remember Steve Leedy once said to me, so he had a bad childhood, whatever.  No one ever asked me for details or to talk about the family more.  They would just kind of shrug.  It was not the kind of thing that interested them.

Bret called me a few days before I testified, I think, anyway in enough time to make arrangements for someone to take care of my child.  He didn't tell me to bring anything, family things, pictures, nothing.  He didn't tell me what to think about, but of course I thought about what I could say that would help Kenny.  I thought I would testify about how things were, so the jury could see a side of our family that wasn't as bad as the prosecution tried to make us look.

Bret asked me just a few questions when I got to Muskogee; we talked 10 or 15 minutes, tops.  I can't remember what he asked me, but I was shocked when he asked me completely different questions when I was on the witness stand and none of the same ones he asked me before.  The questions he asked didn't seem important; it was nothing to help the jury understand Kenny.  I said in my first declaration that I thought my testimony was pointless.  I'll say it again.

At the time of the trial, the lawyers never said that Kenny didn't want the family's help or for us not to testify about our lives and what we knew about our family history.  If they had told me that, it wouldn't have been true.  I talked to Kenny all the time.  He wanted help from his family and friends.  In a way, this was the closest our family had ever been—we would have

KT

Page 2 of 3

done anything to save Kenny's life, but nobody asked us to.   None of the lawyers ever asked for family records or for help in getting them, which I'm very good at because of my job serving process and because I know everyone over at the courthouse.

The only thing I know that Kenny and his attorneys disagreed about was some of the witnesses Kenny wanted to call and some he didn't that they did.  I know this from Kenny.  He asked me to try and get the lawyers to listen.  John Echols didn't want to hear it and neither did Bret Smith, who I must have told when he called me to testify.  Also, maybe during the guilt phase I had called him for Kenny, but he didn't listen.  And as I said, I called and offered to help before the trial began.  I can't remember who I talked to, but they never called me to ask me if I knew something or to do anything.

After my recent phone interview, the investigator called me back and read a draft of this declaration.  We fixed a couple of things on the phone and then he mailed it to me.  He asked me to read it carefully to make sure it is accurate.  I have and it is.

I declare, under penalty of perjury, that the foregoing 3-page declaration is true and correct.  Executed by me this _17th_ day of June 2010, in Sequoyah County, Oklahoma.

_Kathy Trotter_
Kathy Trotter

KT

Page 3 of 3

# EXHIBIT  218

**Supplemental Declaration of Leonard Post
re Supplemental Declaration of Toby Barrett**

I, Leonard Post, do declare:

I conducted a telephonic interview with Toby Barrett before drafting his supplemental declaration. I then called Mr. Barrett and slowly read the draft back, making minor edits suggested by him as we went along.

I then had the Federal Defender's office send Mr. Barrett his declaration via US Postal Service, Priority Mail, Postage Prepaid along with a prepaid self addressed Federal Express return envelope. Unfortunately, the declaration reached Mr. Barrett on the day he had already left for his bi-weekly shift on an oil rig in the Gulf of Mexico. He will be returning to his home in Sallisaw, Oklahoma, on July 1, 2010.

I have attached an unsigned copy of his declaration to mine. It is a true and correct copy of the one sent Mr. Barrett and the one he has agreed to sign on July 1st because it is truthful rendition of what we discussed and what was read to him.

I declare, under penalty of perjury, that this 1-page declaration is true and correct. Executed by me, this 29 day of June 2010 in New York County, New York.

_____
Leonard Post
NYS Investigator's License #11000145413

1391

## Supplemental Declaration of Toby Barrett

I, Toby Barrett, declare the following:

I am Kenny Barrett's son, his only child.

I signed a declaration early last year. The investigator who interviewed me many times to gather the information for that declaration called me on June 5, 2010 and told me he had a few more questions for me.

He asked me if Mr. Hilfiger spoke to me about my family history. I told him that Mr. Hilfiger spoke to me once, for a very short time, but it wasn't about my family. Mr. Hilfiger told me he wasn't sure if he was going to call me to testify.

The investigator then read me the following paragraph, which he said was from my previous declaration and asked me if it was accurate. I said that it was.

"I spoke to Mr. Hilfiger once, I'm not sure where, and asked him if he was going to want me to testify at the trial. He said he was weighing whether it would be helpful for my dad or not, but that he expected I would. He never asked me about my father's mental problems, my home life or about me or my mom. I never spoke to him again."

Mr. Hilfiger never talked to me about his plans for defending my dad or for saving my dad's life. I can't remember where we spoke or put a time to it except that it was sometime before my dad's federal trial.

I spoke to Mr. Echols, my father's state lawyer, once for a very short time. It was before my dad's first trial. It might have been in court. It might have been somewhere else. I don't remember it being arranged, but it could have been. I can't remember one thing we talked about. It could have been just small talk. We never talked about my family. To the best of my

TB                                                                     Page 1 of 2

recollection, nobody ever talked to me about my family in regards to my father's case until the investigator who gathered the information for these declarations did.

The investigator asked me if I had spoken to Bret Smith, Roseanne Schaye or Jack Gordon. If I did I don't recall it. I felt bad that I couldn't remember talking to them so I asked the investigator if they were saying that they had talked to me and he said no, that he hadn't heard that they were saying that. I felt better.

I have talked to my dad many times since he was arrested. He never once said he didn't want my help or for the family not to get involved in the case. None of the lawyers ever told me he said that. I have never heard him say he didn't want the family to get involved in his defense or in saving his life. My grandma, my dad's mother, never told me that he didn't want her involved either. I always felt just the opposite, that he wanted our help. I didn't know how to help him. I don't think anybody in the family did.

The investigator called me again a few days after this last interview and read this to me. I told him it was accurate. Then he sent it to me to read over. I have read it carefully and it says what I said to the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this _____ day of July 2010, in Sequoyah County, Oklahoma.

_____
Toby Barrett

TB

Page 2 of 2

1393

# EXHIBIT  219

### DECLARATION OF RICHARD H. BURR

Richard H. Burr, under penalty of perjury, declares the following:

#### *Qualifications and Experience of Declarant*

1. I am an attorney in private practice in Houston, Texas. My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979. I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time. Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No. 96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work. I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2. Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts. Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases. In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) (hereinafter

"Judicial Conference Recommendations") – which was adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id.* at 50.

3.     I have submitted several other declarations to the Court regarding Mr. Barrett's case.  In the declaration dated March 3, 2009, I recounted my contact with trial counsel for Mr. Barrett in my role as resource counsel.

### *Referral Questions and Response*

4.     Mr. Barrett's current attorneys have asked me to address the government's assertion that defense counsel in this case were not under a duty to investigate or present mitigation evidence.  Mr. Barrett's current counsel informed me that Roger Hilfiger and Bret Smith have made the following statements in relation to the penalty phase of the trial:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase of the trial.  He did not want the outcome of the case to hinge on personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood.  He also wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife, though he understood that decision could work to his detriment.

Mr. Barrett's current counsel have asked me whether I was aware of Mr. Barrett's counsel ever having similar concerns at the time of trial, and how I would have advised trial counsel if they had asked me for assistance regarding this alleged position of Mr. Barrett.

5.     As I stated in my previous declaration in this case, I spoke with John D. Echols about this case beginning in October 2004.  At the time Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully.  I communicated on the phone and through e-mail with Mr. Echols on several occasions from

2

October 2004 through April 2005.  The topics of those discussions included the need to investigate Mr. Barrett's background and mental health issues.  Mr. Echols never indicated that Mr. Barrett disapproved of any form of mitigation investigation.

6.      As I said in my previous declaration, neither Mr. Hilfiger nor Mr. Smith ever approached me for assistance as resource counsel in Mr. Barrett's case.  My only contact with Mr. Hilfiger after Mr. Echols was relieved was in late August 2005.  I sent an email to a federal death penalty defense list serve requesting information on turnaround time for payment of CJA 30 and CJA 31 vouchers.  On August 29, 2005, Mr. Hilfiger responded with information concerning his experience on such time.  I emailed him back asking him to bring me up to date on the case and offering my assistance.  However, I never heard back from Mr. Hilfiger.

7.      If Mr. Hilfiger or Mr. Smith had contacted me and made the statements quoted above, I would have told them clients often express concerns like that at some point in time, and they most often get over it.  While the statements attributed to Mr. Barrett would have confirmed my concerns that Mr. Hilfiger and Mr. Smith lacked the death penalty experience and history of quality work that is called for in federal death penalty trials, reaching out to me for help in working with Mr. Barrett would have been a sign of dedication.  However, in the context of what occurred earlier in the case, and later, the quoted statements tend to confirm the concerns Mr. Echols expressed to me regarding Mr. Hilfiger's lack of involvement in the work on the case that was ongoing prior to his withdrawal.

8.      If Mr. Hilfiger or Mr. Smith had contacted me regarding the statements in their declarations, I would have advised them, if the statements were made prior to or during the investigation, that Mr. Barrett should be advised that the first step is to learn what his family knows about his history.  After we learn from them, a decision can be made about who should

3

testify.  It may be unnecessary for specific family members to testify.  Such an explanation often satisfies the client's concerns sufficiently to enable the investigation to move forward.  In this case, it appears from Mr. Hilfiger's declaration that he had the cooperation of Mr. Barrett's family, and he had "Mr. Barrett's medical, educational and mental health records."  That is, Mr. Hilfiger appeared to have the ability to conduct an investigation that would allow him to explore various options for trial and explain those options to Mr. Barrett so that he could make an informed decision.  If Mr. Hilfiger had responded to my offer of assistance, I would have advised him that he should follow the leads he had.  I also would have noted that early in 2005, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive," 545 U.S. at 381, but a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93.

9.     If Mr. Barrett's trial counsel had informed me that Mr. Barrett's statements were made after the investigation, and before the presentation of evidence, I would have asked them what other avenues they explored for presenting Mr. Barrett's life history, such as the use of a mitigation specialist with qualifications to testify as an expert or the use of a mental health professional.  I also would have asked whether the attorneys had presented these possibilities to Mr. Barrett.  The declarations of trial counsel do not suggest they took any of these steps.

10.     When Mr. Barrett's current counsel informed me about the statements of trial counsel, my initial reaction was, "that's death penalty defense 101."  By this I meant that every experienced capital defense attorney knows defendants sometimes express feelings like those attributed to Mr. Barrett. The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases that were revised in 2003 specifically refer to the phenomenon suggested

4

in the statements counsel attribute to Mr. Barrett.  The Commentary on Guideline 10.5 offers a variety of responses to such concerns.  I will address those responses in later paragraphs.  At the outset, it is essential that counsel must assure his client that his views count, and will be considered, but that the first priority is to investigate, to learn what the story is, and later to decide who will testify and what the mitigation case will be.

11.     This common-sense practice is codified in Defense Standard 4-5.1(a) of the ABA Criminal Justice Standards which provides that a defense attorney should discuss the risks of different strategies only "[a]fter informing himself or herself fully on the facts and the law." Standard 4-5.2 explains that decisions about what evidence should be presented are for the attorney to make.

12.     While reports of capital defendants not wanting certain types of mitigation to be investigated or presented are not uncommon, it is uncommon for an experienced or skilled capital defense attorney to feel the scope of his work must be limited by statements like those attributed to Mr. Barrett.  As the commentary to ABA Guideline 10.5 says, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present.  Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation." I do not mean to imply that Mr. Barrett was a "difficult" client.  Nothing from my experience working with Mr. Echols suggested Mr. Barrett was difficult, and the statements attributed to him by Mr. Hilfiger and Mr. Smith do not suggest he was difficult to work with.  On the contrary, both Mr. Hilfiger and Mr. Smith stated in their declarations that Mr. Barrett "was very involved in his defense," and cooperated with them.

13.     The statements attributed to Mr. Barrett are more indicative of a problem with

5

counsel than a defendant who is opposed to mitigation evidence.  Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy.  Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel.  *See Williams v. Taylor*, 529 U.S. 362, 369 n.2, 397-98 (2000) (majority opinion quoting closing argument and mitigation evidence not presented); *id.* at 415 (O'Connor, J., concurring) ("The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life").

14.     The *Williams* decision reflects a capital defendant's common misunderstanding of mitigation evidence that can be, and routinely is, dispelled by investigation, thereafter allowing counsel to present the evidence, even in cases where a defendant expresses reluctance to "beg" for "sympathy" or rely upon his family to get sympathy from jurors.  Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction.  Mitigation also involves offering the jury an explanation for the defendant's actions.  Nearly every initially-reluctant capital defendant allows this evidence to be presented.

15.     It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy.  Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life.  Both the experience of capital trial attorneys and

6

scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases:  What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

16.    Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story.  The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding.  Dwelling on a defendant's childhood could be seen as a plea for sympathy.  That kind of one dimensional penalty phase case is not the norm in federal death penalty cases.  Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms.  That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

17.    The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial.  The process of developing a trial strategy includes

taking into account the client's concerns.  However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

18.     Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information, interpreting it, and presenting it to jurors.  Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett.  In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist.  The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal."  (Judicial Conference Recommendations.)

19.     Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records.  The Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services) adds the following:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have.  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.  [¶]  Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

8

20. "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.) I am aware that Mr. Echols requested funding for a mitigation specialist in this case, and Judge Payne authorized some funds. If Mr. Hilfiger and Mr. Smith did not make use of those funds, they missed an opportunity to avoid the problem they seem to be attributing to Mr. Barrett.

21. Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence. The Commentary on Guideline 10.5 (Relationship with the Client) provides the following advice:

> Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett. Even so, it does not appear that

9

Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

22.     As I have already indicated, neither Mr. Hilfiger nor Mr. Smith contacted me to seek assistance with the problem they are alleging in their declarations.  Assuming their statements are true, and inferring that the statements they attribute to Mr. Barrett influenced their investigation or trial strategy, their decision not to seek assistance confirms the sense I had in 2005 that Mr. Hilfiger was not interested in obtaining assistance from resource counsel.

23.     I am aware that Mr. Echols received some funding for a psychiatrist or psychologist to be employed as part of the mitigation investigation.  Mr. Hilfiger's declaration suggests that he did not retain a mental health professional either to talk with Mr. Barrett about the penalty phase, or to testify in mitigation.  Mental health professionals, like those I recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions.  Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

24.     Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case.  *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994).  Mr. Hilfiger's declaration indicates that he had access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or

10

explained to Mr. Barrett that expert testimony was available.

25.     I also read in the declarations of Mr. Hilfiger and Mr. Smith that they felt they had a good rapport with Mr. Barrett, and that they met with several members of Mr. Barrett's family.  The declarations do not indicate that Mr. Hilfiger or Mr. Smith spoke with Mr. Barrett or his family about the penalty phase, or any concerns they had that Mr. Barrett's views would be detrimental to their efforts.  As the commentary above states, an attorney who feels his client is reluctant to allow mitigation evidence to be investigated or presented should speak with family members about the problem.

26.     In conclusion, if Mr. Barrett told his attorneys not to present his background to the jury because it would involve begging, dwelling on his childhood, placing his family in a vulnerable position, or an appeal to sympathy, that suggests Mr. Hilfiger and Mr. Smith either did not understand the nature or purpose of mitigation evidence, or the various methods of presenting it, or they allowed Mr. Barrett to harbor an inaccurate understanding of the penalty phase.  The declarations from Mr. Hilfiger and Mr. Smith indicate that they took none of the actions commonly taken in similar situations.  They did not speak with more experienced counsel, a mitigation specialist, a mental health professional, the court, family members, or anyone else who could have explained the process of developing mitigation evidence in a way that diffused the alleged concerns.  The declarations also do not offer any reason for failing to take the steps outlined in the ABA Guidelines including those that were available under the court's March 2005 funding order.

Under penalty of perjury, I declare on June 27, 2010, that the representations made in the foregoing declaration are true and correct.

11

1405

Richard H. Burr

12

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT,              )
                                     )
              Movant/Defendant,      )      **DEATH PENALTY CASE**
       vs.                           )
                                     )
UNITED STATES OF AMERICA             )      NO.  6:09-cv-00105-JHP
                                     )
              Respondent/Plaintiff.  )

_____

**NOTICE OF FILING OF DECLARATION OF PAUL D. GORDON**
_____

NOTICE IS HEREBY GIVEN that Kenneth Eugene Barrett, Movant herein files herein

and herewith the Declaration of Paul D. Gordon.  Said Declaration is filed  in support of

Amended Section 2255 Motion to Vacate, Set Aside or Correct (Doc 95) , Motion to Supplement

Amended Section 2255 Motion to Vacate (Doc 95) and Supplemental Section 2255 Motion to

Vacate, Set Aside or Correct Judgment/Order and Sentence.

DATED:   March 16, 2012

Notice of Filing of
Declaration of Paul D. Gordon                    1                    Barrett v. USA
                                                                      OKED Case No. 6:09-cv-00105-JHP

1407

Respectfully submitted,


        /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600


DANIEL J. BRODERICK
Federal Defender


        /s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666


Attorneys for Defendant
KENNETH EUGENE BARRETT

Notice of Filing of
Declaration of Paul D. Gordon                2                Barrett v. USA
                                                             OKED Case No. 6:09-cv-00105-JHP

1408

## **CERTIFICATE OF SERVICE**

I declare that this Notice under 28 U.S.C. § 2255 was electronically filed on March 16,

2012 and served on:

**Christopher J. Wilson**
**United States Attorney**
**1200 W. Okmulgee**
**Muskogee, OK 74401**

**Jeffrey B. Kahan**
**U.S. Department of Justice**
**1331 F Street, N.W., Room 345**
**Washington, D.C. 20530**


    /s/ Joan M. Fisher
Signature of Movant's Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

## DECLARATION OF PAUL D. GORDON

---

## DECLARATION OF PAUL D. GORDON

Paul D. Gordon, a person over eighteen (18) years of the age and competent to testify and mindful of the penalties of perjury, deposes and says as follows:

1.      I am currently a Senior Instructor at SOR Training Center, and conduct CLEET re-certification and certification training for security officers and investigators.

2.      I am retired from the Oklahoma Highway Patrol ["OHP"].  I was assigned to the OHP Internal Affairs Division on April 1, 1999.  On September 24, 1999, I was the on-call lead investigator and was assigned to investigate the shooting incident which resulted in Trooper Rocky Eales's death and charges of murder against Kenneth Barrett.

3.      At the time of the call to the shooting event, I lived in the Wellston area, which is approximately 25 miles northeast of Oklahoma City on I-44, or the Turner Turnpike.

4.      My experience and qualifications to conduct investigations for Oklahoma Highway Patrol Internal Affairs Division in September of 1999 are set out in my resume, which is attached hereto, Exhibit 1, and includes but is not limited to the following:

   a.      I was employed with the Oklahoma Highway Patrol from February 1, 1984 until my retirement in 2000.  My primary duties in that employ included Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a fifty (50) hour basic protection school and advanced protective efforts by solo officers.

   b.      Vocational Training during my tenure with the Oklahoma Highway Patrol

DECLARATION OF PAUL D. GORDON -1                    PDG

included:  the Oklahoma Highway Patrol Academy; Booby Trap Devices Recognition; Semi-Automatic Pistol Transition Course; Advanced Shooting Skills; Instructors Orientation Course; Hazardous Materials Awareness Training;  CLEET Security Instructor Certification; Criminal Investigation Academy; Police Survival Course; CLEET Firearms Instructor School; Protective Security Operations Training Program; Bomb Threat Management; Narco-Terrorism Executive Protection Course; Incident Management Training; Defensive Tactics Instructor Training; C.E.R.T. Training, TTT, Sniper School; Hazardous Material Awareness; Advanced Material Awareness; Hazardous Materials- Operations; Hazardous Materials - Incident Commander; Physical Security Specialist Training Program; Fugitive Investigator Training Program.

5.      On the morning of the shooting on September 24, 1999, I took the call for 1st Lt. George Randolph, also of Internal Affairs. At approximately 0130, I received a call from the DPS Com Center in Oklahoma City. The Com Center dispatcher advised that there were two troopers down in a shooting incident in Sequoyah County.  Both troopers were members of the Tactical (or Tact) Team, but it was unknown why they were at the location of the incident.

6.      At approximately 02:00, while driving to the location, Bob Ricks, the Highway Patrol Commissioner, called and told me that the Tact Team had been set up and he wanted me to go over the entire scene and find out exactly what happened.

7.      Upon arrival to the location I conducted several on-scene interviews that were

**DECLARATION OF PAUL D. GORDON -2**                    _PDG_

limited in nature and observed the scene as it was at the time of the event, as well as, much of the physical evidence that would later be collected.

8.      When I arrived on the scene, I initially spoke to Lt. Kerry Pettingill, who was responsible for the mission.  Pettingill advised me that when everything started he thought it was his men who started shooting at the Barrett cabin as they rolled up on it.

9.      At the scene that morning, I was the fourth trooper to enter the Barrett cabin after the event and made a videotape recording of the scene and the interior of Mr. Barrett's cabin with my personal video camera because the OHP camera did not work.  I have reviewed that videotape to refresh my recollection.

10.      During the course of my investigation of this incident, three things were made clear to me:  (1) that the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2)  that neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation ["OSBI"] desired or pursued a thorough objective investigation of the incident and events following the incident; and, (3) my efforts to conduct a thorough objective investigation resulted in attempts by the State of Oklahoma to undermine that investigation and my ability to credibly conduct and report the same.

The facts supporting these conclusions are set out below.

11.      There were a number of things that happened in my investigation which were not the usual Internal Affairs's investigatory practices.

**DECLARATION OF PAUL D. GORDON -3**

a.      First, I was not permitted to attend Rocky Eales's funeral by order of my captain. Captain Burris advised me that my attitude concerning the Eales's shooting investigation had caused bad feelings so I needed to stay in Oklahoma City and watch the office.

b.      Secondly, I was not allowed to talk to any of the Tact Team members involved for ten (10) days, even though the usual practice was 72 hours. This directive came from the top of the Highway Patrol per Captain Burris. By the time I was able to talk to the troopers involved, they had already met with a "counselor" and had legal counsel, Gary James, the Trooper's Association counsel.

c.      OHP brought the Troopers' Association legal counsel, Gary James, to the shooting scene.

d.      On the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting. The troopers ultimately had to be ordered to comply and surrender their weapons for analysis.

12.     I did not interview Mr. Barrett; I was advised, however, that 1st Lt. Randolph did interview Mr. Barrett at St. Francis Hospital in Tulsa, Oklahoma where Mr. Barrett was taken after the shooting for gunshot wounds and apparent injuries sustained in a beating by later-identified law enforcement officers at the scene. In the course of my investigation, I asked Lt. Randolph for the Barrett interview tapes and any notes he might have taken during the interview but Lt. Randolph ignored my request. I was never given the information, recordings or notes.

**DECLARATION OF PAUL D. GORDON -4**                    PDG

Recording interviews and taking notes is called "locking them into their statement," and was standard practice for Internal Affairs.

13.     When I arrived at the scene on the morning of the shooting, I interviewed or attempted to interview DA Diane Barker-Harold, who was among the group of dignitaries or observers that tagged along with the Tact Team. I asked her who the informant on the warrant was to which she replied that "we" know the identity of the informant, but she was not going to disclose this to me. I did not expressly inform DA Barker-Harold that I was tape recording the interview; however, as I spoke to her, I was holding the tape recording device in my hand without trying to hide it.

14.     I routinely used a recorder in all of my investigations with the full knowledge and approval of my supervisors. Despite that fact, I was advised by my superior, Captain Burris that Ms. Barker-Harold had filed a complaint against me for recording her and that I should not have used the recorder. Captain Burris told me to give him the tape recording of Barker-Harold. I refused, stating the recorder was an accepted investigation tool and that it was part of my investigation. Burris forbade me from any further contact with Dianne Barker-Harold or other local law enforcement who filed complaints against me because no contact is to be attempted by the trooper to the complaining party until the complaint was resolved. I never saw any written complaint and I was never advised to address the complaint in writing which would have been the first step in the complaint process. The original of the tape recording of Dianne Barker-Harrold and tapes of interviews of other parties involved in the Barrett shooting were given to Lt. George Randolph when I retired from the patrol under pressure in 2000.

**DECLARATION OF PAUL D. GORDON -5**

PDG

15.     At the shooting site on September 24, 1999, I asked Lt. Pettingill and others on the scene who was responsible for the planning of the mission. I was admittedly vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk Fugitive warrant. As a result, I was advised by Captain Burris and several others there that I was not a "team player" and that I should adjust my attitude.

16.     Despite the fact that as the primary investigator I was responsible for the investigation, I was denied any access to the state troopers on the morning of the shooting. The troopers had written statements which were collected by the Troopers Association attorney Gary James. I was never given access to those statements from me throughout my investigation.

17.     I was not given any access to the troopers for a number of weeks. When I was given access to them, I was permitted to ask only questions which were pre-screened and approved by Lt. George Randolph. Those questions are reflected in the recorded statements which I provided to Mr. Barrett's counsel identified below.

18.     In interviewing the troopers who were involved in the shooting incident, I was prevented from asking questions which would have been routine in any officer-involved shooting incident, specifically a drug or fugitive warrant service like the Barrett raid. Those questions are set out below and are questions which I specifically remember wanting to ask and others which are found in the 1988 U.S. DEPARTMENT OF JUSTICE DRUG ENFORCEMENT HANDBOOK that I had received in a class prior to the shooting incident and which I would normally have consulted in preparation for the interviews.

     a.  Number of suspects confirmed by real time eyes on surveillance
     b.  The group makeup of persons involved (male or female)

**DECLARATION OF PAUL D. GORDON -6**

c. Were children at the arrest site?
d. What were the approximate ages of the occupants?
e. Did you have current photographs of your target?
f. Number of suspects at the targeted location at any given time.
g. The full name and background of the target.
h. The capabilities of the suspect, considering the following:
   i. What type of criminal violations had Barrett committed?
   ii. What target classification did the OHP Tact team assign to Barrett?
   iii. What was Barrett's previous police record involving physical violence?
   iv. Likelihood of resistance by Barrett;
   v. Physical and mental condition of Barrett;
   vi. Was Barrett a user of drugs?
   vii. Was Barrett suffering from mental problems?
   viii. Was Barrett known to assault police?
   ix. Did Barrett have a record of resisting arrest or using firearms against law enforcement?
   x. Was Barrett usually armed at all times and if so, with what kind of weapon
   xi. Did Barrett have a military background?
   xii. Was Barrett knowledgeable about explosives?
   xiii. What was Barrett's mode of transportation?
i. What type of safety equipment were you provided with?
j. What was the exact geographical location of the Barrett Cabin?
k. Who provided the interior layout of Barrett's cabin?
l. Please provide me with a picture of the cabin or sketch of the property?
m. How were the doors and windows of the cabin secured?
n. Please provide me with an aerial map with the Barrett cabin marked on it?
o. What was your primary and secondary approach and escape routes to and from Barrett's cabin?
p. What type of material is Barrett's cabin constructed of?
q. What type of alarm systems were present?
r. What type of guard animals were on the property?
s. What type of utilities were at the Barrett cabin?
t. What were the written rules of engagement?
u. What was the mission abort signal?

19.     The trooper interviews which were ultimately permitted took place in late October to early November of 1999 in my office. They were recorded and followed the script which was required and pre-approved by Captain Burris. Even then, if any trooper had a complaint about

**DECLARATION OF PAUL D. GORDON -7**

the manner in which I handled the investigation, he could go directly to my superior, Captain Burris and file a complaint. I am unaware of any complaints.

20.     One of the routine steps I took in this investigation was to try to acquire the procedural handbook for the East and West Tact Teams. When I asked for the handbook from Lt. Kerry Pettingill at his office, he told me it was not available. I told him if it needed to be printed I would come back and pick it up. He then told me "you'll never see this book." At that time, I went to my supervisor Captain Burris and advised him of Lt. Pettingill's statement. Burris told me he would get a copy of the Tact Team manual or handbook for me. About twenty minutes later, Burris refused to get me a copy of the manual, telling me it was a restricted document. About an hour later, Asst. Chief Jerry Cason walked into my office and asked me why I wanted the Tact Team book. I told him it was investigative protocol to obtain whatever manual was being used by the officer or unit at the time of the event. Cason told me I would never see the book as it was a restricted document. The lack of cooperation within the OHP upper ranks made the Internal Affairs investigation difficult, to say the least.

21.     Within a few days of the refusal to give me the manual, however, when I went to my office, IASI secretary Carol Rawlings told me that there was a bunch of papers lying on the floor inside my office. When I went into my office, I found the papers and among them was the Tact Team handbook that Pettingill had refused to give me. I asked Carol who had been in my office. She said she did not know; that the papers were there when she put a message on my desk.

**DECLARATION OF PAUL D. GORDON -8**                    PDG

1418

22.     The manual recited that when a raid was being conducted on a suspected drug house, the Tact Team was not to conduct the raid without clearly identifying themselves as law enforcement officers.  Otherwise, the suspected drug dealer would think that he was being "ripped off," setting the stage for a violent confrontation.  The copy of the Tact Team Manual which appeared mysteriously in my office was left with Lt. Randolph when I retired.

23.     My investigation made clear that the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard:  the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police.  When I arrived at the shooting scene on September 24th, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader.  When I talked to Trooper Hamilton later, I asked him specifically about the lights.  At first, Hamilton said the emergency lights were down.  I told him that the flip lights would have been shot up if they had been down.  After the recording had been turned off, Hamilton admitted to me that did not activate the lights; in fact, that they did not have any lights on at all.   Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement.

24.     Among other things, my investigation also revealed the following:

a.     On the night of the shooting, there was good visibility because there was a full moon with no clouds of any kind.

b.     Mr. Barrett's residence was a homemade cabin with no electricity and no running water, undermining any fear of destruction of evidence by announcing law

**DECLARATION OF PAUL D. GORDON -9**                    PDX

enforcement's presence. Mr. Barrett did run an electric cord from his mother's residence which was next door to both his garage and cabin.

    c.  There had been a "drive by" earlier in the day, with four troopers participating. The troopers used one of their unmarked tactical vehicles. The tell-tale antennas, which could identify the vehicles as law enforcement vehicles, had been removed.

    d.  At the time of the drive-by, Mr. Barrett and an unknown individual were standing in the yard and reportedly witnessed by the drive-by troopers. Because the road fronting Mr. Barrett's property dead-ended to the east, the vehicles had to turn around and drive back past the property. There was nothing about the vehicles to convey to Mr. Barrett or anyone else present that the vehicle was law enforcement.

    e.  There had been a fly-over of the property, which only lasted 15-20 seconds the day before the execution of the warrant.

    f.  No real time surveillance had been conducted up to the start of the raid to ensure intelligence integrity of the mission.

    g.  The gate to Mr. Barrett's property was open at the time of the drive-by but on the night of the raid, the gate was closed and locked.

    h.  Earlier in the night before the raid, Mr. Barrett and his son, Toby, had reportedly been working on a vehicle in the garage on the property. In my professional opinion, if proper real time surveillance had been conducted, Mr. Barrett could have been approached and taken by surprise at that time and taken into custody without incident.

    i.  The information relayed to the troopers prior to the execution of the

**DECLARATION OF PAUL D. GORDON -10**            _PDG_

warrant regarding Mr. Barrett's dangerousness was that Mr. Barrett's likely response to law enforcement was to run away. Among other things, this was supported by Trooper Manion's interview, Mr. Hise's interview and the placement of OHP manpower at the two adjoining residences to prevent Mr. Barrett's safe escape to either residence.

25.     Based on my observations at the Barrett residence the night of the incident, review of the physical evidence, and interviews with the surviving troopers and other people present or in the area, it was clear that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially because of the full moon.

26.     The task force investigator, identified to me at the scene as Frank Lloyd, who was in the lead vehicle of the caravan of state agents, which was supposed to arrive after the state troopers secured the scene, stated that as they approached the scene, Lloyd could see the Tact Team's brake lights when they turned into the Barrett drive. Mr. Lloyd did not mention to me at the scene that morning seeing overheads, rear deck lights or any emergency lighting as they came on the scene which was over by the time they arrived.

27.     The physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on. For example, Hamilton's unmarked Bronco's windshield was damaged by bullets but the emergency lights, which if in use would have been in the line of fire were undamaged.

28.     Though Trooper John "Buddy" Hamilton, who was driving the lead vehicle, initially advised me that his emergency lights were on, when confronted with the physical

**DECLARATION OF PAUL D. GORDON -11**                    _PDX_

1421

evidence, he admitted to me that he was not running his lights. Though the admission came after I turned the tape recorder off, it would most likely be reflected in my notes of the interview. Those notes were left with Lt. Randolph.

29.     Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on, but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. I have a clear recollection of Trooper Hash's admission regarding the emergency lighting to me, which came after I turned the tape recorder off and Trooper Hash continued to talk. The statement is likely reflected in my notes of the interview which were left with Lt. Randolph when I retired.

30.     Lt. Pettingill's lights, which if activated would have been obvious to Barrett if he looked in that direction, were, in my professional opinion, in the up position because the flipped down lights would have impaired Assistant Team Leader McBride's vision for observation of the raid from their vantage point in the yard next door, which was Kenny Barrett's mother's home.

31.     Mr. Barrett would not have seen the other vehicles approaching from the side in any case, because even when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help. Troopers Darst and Hise had tackled the son in the yard by the garage after they came across the gate in the dark.

32.     The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

**DECLARATION OF PAUL D. GORDON -12**                                    *PDG*

33. When Trooper Hamilton was driving up to the cabin after turning off the main road, he bottomed out hard in a depression on the east side of the cabin, an incident which would have made considerable noise and made him slow down and then gun the vehicle to get out of the deep depression.

34. The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running. Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

35. With appropriate expert testing, this transmission fluid may still be detectable on the Barrett property and able to establish the precise location of the lead Bronco during the shooting incident.

36. According to Lt. Pettingill, the Hamilton vehicle was backed out away from the house to be used to transport Trooper Eales. Because the vehicle would not drive forward due to transmission fluid loss, another vehicle was selected for the transport.

37. As a result, on the evening of September 24th, OSBI with the assistance of OHP Vernon Phillips, inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

38. I advised my supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle. They both advised me this was an OSBI

**DECLARATION OF PAUL D. GORDON -13**

1423

investigation and to stay out of it. I filmed the process showing where the processing effort took place for further review.

39.     My recollection of these events are substantiated by the statements of the surviving troopers that when Trooper Eales exited his vehicle with the ballistic shield he turned towards Barrett and then turned and walked to the rear of the vehicle where he collapsed. The troopers retrieved the trauma kit by knocking out the rear window of the vehicle and cared for Eales at the rear of the vehicle where he had collapsed. The troopers and others then loaded Eales into the vehicle and moved the vehicle back to where OSBI later processed it.

40.     The video clearly shows that the Hamilton vehicle is behind the ballistic shield and trauma kit, indicating an obvious movement.

41.     When I first arrived on the scene in the early morning hours of September 24, 1999, 1st Lt. Pettingill told me that everything was laying where it was dropped during the event including the transmission fluid in front of the porch.

42.     Trooper Hamilton claimed to me that his brakes failed, but when I had the brakes tested at the DPS garage, they were found to be in good operating order and that nothing was lodged under them.

43.     Since the vehicle was unmarked and no other vehicles were running their lights, and without any announcement that law enforcement was on the property, Mr. Barrett, or any person like Mr. Barrett, who was paranoid as a result of his-off-the-grid lifestyle, would reasonably have believed that he was shooting at criminal intruders.

44.     Most of the rounds fired by Mr. Barrett were fired from inside the house which are

**DECLARATION OF PAUL D. GORDON -14**

also visible in the video I made that morning. Trooper Manion shot Mr. Barrett in the legs in the residence.

45. When the shooting stopped, Mr. Barrett was handcuffed behind his back in the house and dragged out onto the porch by Trooper Hamilton and searched by Trooper Manion for weapons. Mr. Barrett was searched at least a total of two times while at the scene, once by Trooper Manion and again when taken into custody by the Sheriff. His clothing would have been thoroughly searched at that time. Neither Trooper Manion nor the sheriff reported that anything other than the S&W semi-automatic handgun was found on Mr. Barrett's person found by Trooper Manion.

46. I know that Sheriff Philpot and his deputies searched Barrett before they beat him as a result of my interview with the sheriff. I observed the sheriff walking across the Barrett yard on the morning of the 24th. I asked him who he was and he told me that he was the sheriff. I asked him if he had any contact with Barrett and he advised me that he and his deputies searched Barrett when they took custody of him. I asked the sheriff specifically at that time if they found any guns or anything else dangerous on Barrett and he said no.

47. Every trooper, and certainly drug task force members, would have answered the question of whether anything dangerous had been found would have responded "yes" if Barrett had red phosphorus on his person because of the inherent dangers of inhalation, absorption and ingestion associated with red phosphorous, not to mention flammability problems.

48. At the time of our conversation, outside of my OHP vehicle, I asked the sheriff if he would let me conduct a formal interview while we were there at the scene and he consented.

**DECLARATION OF PAUL D. GORDON -15**

During this tape-recorded interview inside my OHP vehicle on September 24, 1999, Sheriff Philpot admitted to me on tape that he and his deputies beat Barrett badly, saying they had done all they could and would have done more if there had not been so many people around. Sheriff Philpot never mentioned red phosphorus to me at that time or I would have notified all of the troopers involved to take necessary decontamination procedures. Anyone with any understanding of red phosphorous who found anything which had come into contact with red phosphorous would immediately have reported it because of the danger of contact transfer from hands to your face within 5 minutes and in your eyes requiring immediate medical attention. Sheriff Philpot did not mention either the pill bottle or the baggie in the pill bottle with red phosphorous residue in it.

49.     The tape of this interview was kept with all of my investigative tapes related to this matter and turned over to Lt. Randolph when I retired.

50.     OHP divides the state into Western and Eastern Tact Teams; the raid on Mr. Barrett's property was undertaken by the East Tact Team. Assistant Team Leader Lt. McBride, who was assigned to the West Tact Team, was temporally assigned to the East Tact Team. I interviewed Lt. McBride. After the formal approved questions had been asked and answered and the tape recorder turned off, Mr. McBride became very emotional and told me that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by

**DECLARATION OF PAUL D. GORDON -16**

the end of the interview. Though the recording does not reflect this portion of the conversation, my notes would most likely reflect it. Those notes were given to Lt. Randolph when I retired.

51. Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin. There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.

52. I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.*, he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.

53. There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.

54. Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was also an OHP Tact Team member and Explosive Ordinate Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.

55. I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots. Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied respirator. I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its

**DECLARATION OF PAUL D. GORDON -17**

three forms: boxed; set-up not functional; or, set up functional cooking.

56. The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken. I have provided these videotapes to Mr. Barrett's counsel and can attest that they were available to the East Tact Team for training prior to the execution of the warrant at Mr. Barrett's residence on September 24, 1999. Exhibit 2 (DEA Dangers of Drug Labs), Exhibit 3 (The Meth Lab), Exhibit 4 (Kitchens of Death). In 1989, three sections of Exhibit 4 "Kitchens of Death" were required viewing by the OHP.

57. As my investigation continued, I was advised by at least two state troopers to watch my back and that the Highway Patrol was after me.

58. At one point in my investigation, Lt. Randolph, Captain Burris, and Jerry Cason came into my office with others, whose identity I do not recall, and aggressively accused me of putting the wrong serial number for Rocky Eales' gun in my report. I was told that the Widow Eales had noticed it and brought it to their attention while she was reading my un-released report. I told them that I had taken the number from the OSBI report and pulled that report out to show them that OSBI had recorded the number incorrectly. I corrected the serial number on the report. More importantly, I inquired, why anyone from outside the division had access to my on-going investigation. I was advised that they wanted to nominate Rocky for a medal of honor and had sent the report to Dallas and that they had let Mrs. Eales review the report. I again pointed out

**DECLARATION OF PAUL D. GORDON -18**

that the investigation summary report was taken from my computer without my permission, authorization or even notification. I told them that my office had been locked on a weekend when no one was present to allow access to the report. They told me I needed to relax; that we all needed to be on the same team.  At that point, I became very concerned about what was happening in the Internal Affairs Division and began to make copies of some of the recordings I had made.  I did not have access to all of my recordings at that time.

59.     Because I believed the work environment to be hostile, in February of 2000, I began the employment process with Dyn Corps, a private overseas contractor, with the intent to vest my retirement and get away from the problems which I felt were only going to worse.  I was contacted in March by DYN Corps and advised that I was good to go for a mission in Bosnia with processing classes forming in May and June. I advised them I needed to talk with my wife and give them a firm answer by May.

60.     In April, 2000, I attended a High Risk Fugitive training course given by the U.S. Marshals' Service at FLETC in Georgia.  While there, I discussed the manner in which the Barrett raid had been conducted and was advised that it was everything that shouldn't happen.

61.     When I returned from the training, I decided to go ahead and vest my retirement from the Highway Patrol rather than to continue in the openly hostile work environment.  I knew that as soon as I took the stand in the Barrett case, I would be in a position adverse to the Highway Patrol and thus, decided to retire from the Patrol and wait to see what happened in the Barrett case.

**DECLARATION OF PAUL D. GORDON -19**

*PDG*

62.     In June of 2000, I took a position with DYN Corps, an International Police Task Force, as CO-locator and patrol officer in small villages in and around Sarajevo, Bosnia, where my assignment was expanded to assist in Haz Mat training and evaluating Tactical Teams in controlled use of force in training situations.

63.     While in Bosnia, my wife, Susan Gordon received subpoenas for records from the Oklahoma Attorney General's Office.  I was investigated for, and later charged with, what amounted to misappropriation of state funds and property for taking "unapproved" comp time and for using a state telephone while working on the side as a private investigator.

64.     I was advised by the Attorney General's Office that if I did not return to face the charges, they would come and get me.

65.     The comp time and use of the state phone and other equipment had been explicitly approved by my superiors, Lt. Randolph and Captain Burris when I was assigned to the Internal Affairs Unit.  While I was assigned to the Internal Affairs Division, there existed a "hidden 32-hour comp time" policy which applied to everyone assigned to Internal Affairs.  If you were on-call, you automatically got 32 hours comp time, whether or not you were called out.  A person was on-call for two weekends and thus was supposed to claim sixteen hours comp time for each weekend.

66.     In the investigation of the charges against me, which were primarily the abuse and/or misuse of government property, services and compensation investigation, Burris and Randolph gave false statements to the Attorney General's office investigator, Larry Andrews,

**DECLARATION OF PAUL D. GORDON -20**

when they told him that they did not get comp time as a result of their job responsibilities which included being "on call." They also gave false statements to the grand jury.

67.     While the charges were pending against me, I was advised by Lt. John Matlock that he had been requested to perform an internal audit by Commissioner Bob A. Ricks, as suggested by the Grand Jury, and the audit revealed that the policies regarding comp time and use of state property for personal business were not clearly set out and that it was clear that Captain Burris and Lt. Randolph had misrepresented the fact that they, too, claimed comp time for weekend on-call time.

68.     Lt. Matlock told me that he advised both OHP Commissioner Bob Ricks and his Captain Jerry Simpson of the audit teams findings and  that he had heard recorded telephone conversations with me and agency personnel, including Assistant OHP Chief Jerry Cason, who complained about the leadership of the agency, and defended use of the 32 hours on-call comp time as a standard practice.  Cason confirmed to Matlock that I was entitled to the comp time like everybody else and that he expected subordinates to drive their units all the time to enable immediate response to investigations.  Cason stated he would testify for me. I also allowed Matlock to hear tapes of Captain Burris stating that recording on-call time as comp time had been approved and was standard practice. Burris gave me permission on many occasions to leave DPS because I had "lots of comp time" coming.  On those occasions, I was expected to drive my unit and was assured by Burris that I shouldn't worry because he "had my back."

69.     According to Lt. John Matlock, one of the OHP troopers assigned to conduct an audit of comp time policies in Internal Affairs, Diana McKnight, the Deputy Attorney General

**DECLARATION OF PAUL D. GORDON -21**

who prosecuted my case, became aware in the course of the investigation that Randolph and Burris committed perjury in the grand jury proceeding and advised OHP auditors that both Burris and Randolph compromised themselves in the grand jury. John Matlock also told me that Deputy AG McKnight advised Lt. Don Stockton, a member of the OHP audit team, that I was the only trooper to be prosecuted. When Ms. McKnight discovered that Lt. Stockton kept notes of the meeting with McKnight, she requested that he give her all of the notes concerning the grand jury testimony.

70.    Deputy AG McKnight nonetheless vigorously pursued the prosecution in my case after being told about Burris and Randolph and the hidden illegal 32 hours of comp time by OHP auditors.

71.    In my criminal case, I was represented by attorney Miles Zimmerman. Deputy AG McKnight did not notify Mr. Zimmerman that Burris and Randolph committed perjury in the grand jury. She did not advise him of the results of the audit which showed that the accumulation of comp time in the manner for which I was being prosecuted was an approved method used by all Internal Affairs personnel or that I was the only person being prosecuted for it.

72.    Mr. Zimmerman worked out a plea deal where I could keep my retirement. I was allowed to enter a plea of *nolo contendere* to misuse of a state telephone, and received a five (5) year deferred sentence which has now been expunged after successful completion of the sentence. After the agreement to permit a *nolo* plea had been made, Ms. McKnight advised Mr. Zimmerman that they would only accept a guilty plea. Mr. Zimmerman asked to talk with

**DECLARATION OF PAUL D. GORDON -22**

someone else, and Mrs. Goodspeed, who was McKnight's supervisor, approved the original agreement for a *nolo* plea which preserved my retirement.

73.     I entered the plea on August 16, 2001 because I was tired and extremely paranoid of the prosecution which was occurring.  I was out of money and every effort to subpoena material witnesses was being quashed.  I knew that the Commissioner of the Department Of Public Safety, Bob Ricks, was advised by the audit team about the conspiracy but had decided not to intervene or take any action against any of my superiors other than to transfer them to other units.  He did not refer their conduct to the AG's office for review even though both Burris and Randolph committed a felony when they blatantly lied to the Attorney General investigator, Larry Andrews.  Both officers then attempted to keep the investigation on me in the Internal Affairs unit so attention was not called upon them.

74.     The audit, the results of which were not disclosed to me prior to my plea, shows that I did not engage in any act which had not been specifically authorized by my superiors and which was not common practice in the division.

75.     Despite having entered a specific plea agreement, the terms of my probation were constantly changed by the prosecuting deputy attorney general, Diana McKnight, in significant ways, changing the conditions of my probation and making it more and more difficult to comply with those conditions. Additionally my police certification was revoked by the Council on Law Enforcement Education and Training despite the plea agreement to suspend the certification for the deferred sentence and not to contest my re-certification as a peace officer once my deferment was set aside.

**DECLARATION OF PAUL D. GORDON -23**

76.     After the plea, and while I was on probation pursuant to a deferred adjudication, I received from Lt. John Matlock a copy of the Report on the Multi-County Grand Jury, Partial Report SC-99-56 prepared for Commissioner Bob A. Ricks, dated September, 2001.  A true and correct copy of the Internal Audit including the Response to the Chief's Inquiry which I received from Lt. John Matlock is attached hereto and marked Exhibit 5.

77.     In that report, findings included a response to the Chief's Inquiry which had downplayed the significance of the audit requested by the Grand Jury.

78.     Included in the Internal Audit completed by OHP Auditors John Matlock, Jerry Simpson and Don Stockton is a section entitled "Audit's Response to Chief's Inquiry Re: OIA-01-04."  The audit team attempted to resolve "some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2d Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry."  That response points out that when the investigation resulting in the felony charges against me were referred to the Attorney General's Office, "no mention was made of the application or accrual of comp time or the fact that [I] was or may have been authorized comp time when [I] was alleged to have been working for the State Insurance Fund."  The report concluded that had that fact or an internal memo or other notice of the accrual of comp time and its use inside IASI been made, "it is highly likely this incident would have never escalated beyond that point.  Failing to do so casts a dim light on the motivation to omit that information by the management of IASI."  Exhibit 5.

79.     Additionally the Response found that the DPS and IASI management "violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious

**DECLARATION OF PAUL D. GORDON -24**

wrongdoing by an employee within that division, a decision which casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators." Exhibit 5.

80. After addressing other matters including the calculations of comp time taken by both Burris and Randolph, the Response concluded that the circumstances . . .

> . . . imply that conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney General's Office. The individuals continued the practice even after a fellow trooper resigned [footnote omitted] and was subsequently indicted by a multi-county grand jury. There were no indications they would have stopped until the practice was revealed by an audit."

Exhibit 5.

81. Shortly after I entered the plea *nolo contendere* and received the 5-year deferred sentence, I was contacted at my residence by Lt. John Matlock. He asked me if I had read the newspaper articles about the testimony being given by the state troopers against Mr. Barrett in his state trial which, if reported correctly, was a lie. I contacted Mr. Barrett's state trial counsel, John Echols by telephone and voiced my concern. I answered all of the questions he had about the ill-fated execution of the warrant on Mr. Barrett and the investigation of it.

82. The felony charges against me were career-ending and I was emotionally distraught and suffering from a high degree of anxiety as a result of the prosecution against me. Though subpoenaed for both state trials and willing (though nervous) to honor those subpoenas, I did not testify for either the state or the defense.

**DECLARATION OF PAUL D. GORDON -25**

*PDJ*

83. At some point, while the Barrett state court proceedings were ongoing, a second copy of the Tact Team manual was anonymously hand-delivered to me through the mail slot at my school in Moore, Oklahoma. The first copy had been left with Randolph and reportedly was no longer in existence. I contacted by telephone Oklahoma Indigent Defense Services ("OIDS") investigator Jack Stringer and informed him that I had received another copy of the Manual. I was asked to bring the manual to Judge Garrett's chambers. I met with Judge Garrett, Mr. Echols, the prosecutor, and representatives of OSBI. When Judge Garrett asked me what was important about the manual, I related the critical passage about the Tact Team protocol when serving a drug search/arrest warrant requiring positive identification as law enforcement to avoid the suspect from believing he was being ripped off, procedures which were not followed in this case. I gave the manual delivered to me to Judge Garrett and did not make a copy for myself.

84. I was subpoenaed by both the Government and the Defense for the federal trial. One of the federal prosecutors, who I believe is Mr. Littlefield, called me and was very aggressive, threatening and intimidating. He basically told me that he was going to tear me up on the witness stand over the deferred sentence I received and challenged my credentials because I was not a SWAT officer and was in no position to second-guess the Tact Team. I told my wife about the conversation and she reminded me that I had been trained by the U.S. Marshalls's Service on how to execute high risk warrants. I called the prosecutor back and left a message about this training because I did not want him to think I was sandbagging him. The prosecutor called my residence the next morning and left a message with my wife, Susan, that I did not need to come to Muskogee to testify at the federal trial.



**DECLARATION OF PAUL D. GORDON -26**

Case 6:09-cv-00105-RAW Document 199-1 Filed 03/16/12 Page 28 of 33

85. I talked to defense counsel in the federal case, who I believe to be Roger Hilfiger, only once on the telephone for a very short period of time in a call initiated by me because I had been subpoenaed and wanted to know the questions he was going to ask. I believe an investigator from the defense did make a short visit before that but I do not specifically recall the details of the conversation other than that the investigator did not ask me any substantive questions. Defense counsel told me that it was his understanding that I had a relationship with Mr. Barrett. I advised him that there was no such relationship and told him that if called to testify, I would simply tell the truth. I emphasized a couple of times during the interview that I had no affection for Mr. Barrett because he killed a state trooper but that if he asked me the questions, I would give him the answers. I told him that it depended on the questions he asked whether or not my testimony would help Mr. Barrett. Hilfiger did not ask me any questions and I was not called to testify. If called and asked the questions, I would have testified to everything to which I attest herein.

86. I was interviewed on this matter by Mr. Barrett's present counsel, Assistant Federal Defender Joan Fisher, Attorney David Autry and the Federal Defender's investigator, Paul Mann on November 3, 2011. Since that time, I have cooperated with them, answering any questions posed and attempting to provide whatever documentation or recordings I have been able to locate to support the truth of this Declaration.

87. After my discussion with the attorneys and investigator for Mr. Barrett, I remembered that once I became aware of the removal of my report from my computer and was worried for my professional security, I began making copies of interviews that were then

**DECLARATION OF PAUL D. GORDON -27**                PDG

available to me. I put the copies in a box and took them to my mother-in-law's residence where they remained until she died. Prior to my mother-in-law's death, I was responsible for cleaning her house and removing her property so the house could be sold. While removing the property, I came across the box of tapes which was then put in storage at my school in Moore, Oklahoma. After talking with Barrett's defense team, I searched for them and gave copies of those tapes that I have been able to find to Ms. Fisher and Mr. Autrey on December 8, 2011.

88.     I did not advise either Mr. Echols or Mr. Hilfiger that I had these recordings because I did not remember that I had them and nothing in the my conversations with them reminded me of them.

89.     I also had copies of training videos which I later copied and sent to Ms. Fisher.

90.     Among the documents upon which I have relied to refresh my recollection and to support my assertions which I have provided to counsel are the following:

a.     Memorandum for 27th District Attorney Richard Gray regarding the Subpoena;

b.     The Subpoena issued by the prosecutor;

c.     Release from the subpoena dated September 19, 2002;

d.     May 7, 2001 Request by John Matlock "for monthly time sheets for the last three years or while assigned to IASI of Captain Rodney Burris, Captain Rick Adams, 1 Lt. Eddie Davenport, 1 Lt. George Randolph, 2 Lt. Paul Gordon, 2 Lt. Leanne Spears, 2 Lt. Deryckere;"

e.     State of Oklahoma Office of Attorney General Grand Jury Investigation

**DECLARATION OF PAUL D. GORDON -28**

PDJ

Unit, June 9, 2000 report by Larry W. Andrews regarding interviews with Captain Rodney Burris and Lt. George Randolph;

f.  October 16, 2001 statement by 1 Lt. John Matlock #44 regarding an April 17, 2001 meeting with 1 Lt. Don Stockton, Capt. Jerry Simpson #18, Asst. Atty. Gen. Diana McKnight and B. J. Schmidt wherein McKnight stated that 1 Lt. Randolph and Capt. Burris of Internal Affairs compromised themselves testifying in front of the Grand Jury to events regarding Paul Gordon;

g.  Correspondence between Miles C. Zimmerman to Diana McKnight, Assistant Attorney General, dated April 21, 2001;

h.  Report on Multi-County Grand Jury Partial Report SC-99-56 (September 2001), including comparative comp days claimed, taken and calculated cost by Burris and Randolph in 1999;

i.  October 21, 2001 leave Request by 1 Lt. Matlock to Captain Jerry Simpson resulting from treatment in response to his efforts in conducting the Internal Audit "[a]long with [his] knowledge of Atty General Behavior and DPS involvement".

j.  OSCN copy of the Docket Sheet in State of Oklahoma vs. Paul D. Gordon, Oklahoma County No. CF 2001-2226

k.  Application for Clarification of Terms and Conditions of Probation, State v. Gordon, Case No. CF 2001-2226;

**DECLARATION OF PAUL D. GORDON -29**                      PDG

l. Order of Expungement and Vacation of Previously Entered Plea dated 13th day of October 2006, filed October 18, 2006 in State v. Gordon, Case No CF-2001-2226

m. Current Resume of Paul Donahue Gordon (Exhibit 1)

91. Among the recorded statements upon which I have relied to refresh my recollection and to support my assertions which I have provided to Mr. Barrett's counsel are the following:

a. Tape by Paul Gordon - 09/24/1999

b. TRP Eales Shooting - 09/24/1999

c. Danny Oliver [mislabeled Scott Jenkins]- 09/24/1999

d. Gene Hise - 11/08/1999

e. Rick Manion - 11/09/1999

f. John Matlock  - 07/21/2001

g. Matlock - 08/01/2001

h. Terry Morris- 06-24-03

i. Steve Hash - November 19, 1999

j Training Videos

  i. DEA- DANGERS OF DRUG LABS (EXHIBIT 2).

  ii. THE METH LAB (EXHIBIT 3)

  iii. COPS SURVEILLANCE "DRUGS"

  iv. KITCHENS OF DEATH  (EXHIBIT 4)

**DECLARATION OF PAUL D. GORDON -30**

PDG

v..    RAID PLANNING

92.    After I spoke with Mr. Barrett's counsel and before signing this Declaration, Ms. Fisher provided me with copies of the typewritten transcripts of the interviews I conducted with Troopers Darst (Exhibit 6), Greninger (Exhibit 7), Hamilton (Exhibit 8), Hash (Exhibit 9), Hise (Exhibit 10), McBride (Exhibit 11), Manion (Exhibit 12), and Poe (Exhibit 13), as well as, Lt. Pettingill (Exhibit 14) and DEA Liaison Danny Oliver (Exhibit 15). I reviewed those transcripts and they confirmed my recollection of the those interviews.

93.    Prior to and during the federal capital trial of Kenneth Barrett, I was able and willing to testify under oath to all of the matters discussed in this Declaration including the statements made to me in all of the interviews indicated above as well as to the conversations with the interviewees which occurred after I completed the scripted interviews and turned the recorder off. I am willing to testify to same now.

94.    I declare under penalty of perjury that, to the best of my recollection as refreshed in part by my review of the documents identified above, the foregoing twenty-nine (31) page declaration is true and correct.

Executed by me this _14_ day of March, 2012 in _LiNCoLN_ County, Oklahoma.

_____
Paul D. Gordon

**DECLARATION OF PAUL D. GORDON -31**                    _____

**Declaration of Paul D. Gordon**
**EXHIBIT INDEX**

**Exhibit #**                                                                                    **Tab #**

1.    Paul Gordon Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    DEA Dangers of Drug Labs - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.    The Meth Lab - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4.    Kitchens of Death - Training Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5.    Multi- County Grand Jury, Partial Report SC-99-56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Transcripts**

6.    Transcript of Interview with Robert Darst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7.    Transcript of Interview with Raymond Greninger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8.    Transcript of Interview with John Hamilton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9.    Transcript of Interview with Steve Hash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10.   Transcript of  Interview with Gene Hise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11.   Transcript of Interview with Jim McBride  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12.   Transcript of Interview with Rick Manion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13.   Transcript of Interview with Billie C. Poe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14.   Transcript of Interview with Kerry Pettingill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

15.   Transcript of Interview with Danny Oliver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# EXHIBIT 1

RESUME

PAUL DONAHUE GORDON
402 W. Highway 66
Wellston, Oklahoma  74881
Cell:  (405)306-9872
Bus:  (405)793-0869

EDUCATION

| | | |
|---|---|---|
| G.E.D.- | | McAlester Public Schools<br>McAlester, Oklahoma<br>November 16, 1974 |
| College | - | Tulsa Junior College,  Tulsa, Oklahoma<br>January 1981 to May 1983<br>Course of Study:     Law Enforcement<br>Degree Earned:      Associate of Arts |
| | - | Central State University, Edmond, Oklahoma<br>July 1984 to May 1987<br>Course of Study:     Criminal Justice<br>Degree Earned:      Bachelor of Arts |

MILITARY EXPERIENCE

United States Marine Corps        February 4, 1973 to November 9, 1979
Rank:                                          Staff  Sergeant, E-6
Discharge:                                  Honorable
Duties: Primary Marksmanship Instructor in the U.S.M.C. Marksmanship Program. This
included heavy classroom contact and extensive practice with the M-16, M-14, and  .45
Semi-automatic pistol.

EMPLOYMENT

01/01/93 to Present   SECURITY OFFICER Re-QUALIFICATION
2339 N. Moore Ave., Bldg B
Moore, Oklahoma  73160

Senior instructor of a private security training school licensed by the State of
Oklahoma Board of Private Vocational Schools and the Council on
Law Enforcement  Education and Training (CLEET) for the State of Oklahoma.

1444

06-01-2000 to 05-01-2001  **DYN CORPS**
**International Police Task Force**
**Sarajevo, Bosnia**

**Primarily assigned as CO-locator and patrol officer in small villages, however Assignment was expanded to training and evaluation of tactical teams in Controlled force situations. Additional duties included hazardous material Response and training of national police officers in the Sarajevo Law Enforcement Academy.**

02/01/84 to 2000  **OKLAHOMA HIGHWAY PATROL, 2nd Lieutenant**
**3600  Martin Luther King Boulevard**
**Oklahoma City, Oklahoma  73111**

**Primary duties include Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a 50 hour basic protection school and advanced protective efforts by solo officers.**

01/01/90 to 12/01/91  **PLATT COLLEGE**
**6105 West Reno**
**Oklahoma City, Oklahoma  73127**

**Duties included instruction of students in the field of private security and law enforcement.**

06/30/83 to 02/01/84  **OKLAHOMA CAPITOL PATROL**
**Oklahoma Department of Public Safety**
**3600 Martin Luther King Boulevard**
**Oklahoma City, Oklahoma  73111**

**Duties consisted of security related tasks with an emphasis of assisting the public  on state property.**

## VOCATIONAL SCHOOLS

**Security Training Institute**
**Tulsa, Oklahoma**
**07/01/80 to 08/01/80**

**State of Oklahoma, Basic Police School**
**Broken Arrow, Oklahoma**
**03/01/82 to 04/09/82**

**Street Survival School**
**Norman, Oklahoma**
**12/04/82 to 12/05/82**

**Uniform Crime Reporting School**
**Coweta, Oklahoma**
**03/23/83**

**Armed Robbery Investigation School**
**Seminole, Oklahoma**
**04/28/83 to 04/29/83**

**Oklahoma Highway Patrol academy**
**Oklahoma City, Oklahoma**
**02/10/84 to 06/30/84**

**Booby Trap Devices Recognition**
**Oklahoma County Sheriff's Department**
**06/27/85**
**Oklahoma City, Oklahoma**

**Semi-Automatic Pistol Transition Course**
**Oklahoma Highway Patrol**
**08/21/89 to 08/23/89**
**Oklahoma City, Oklahoma**

**Standard Field Sobriety Testing**
**Oklahoma Highway Patrol**
**02/25/90 to 02/16/90**
**Oklahoma City, Oklahoma**

**Advanced Shooting Skills**
**Indian Meridian Vo-Tech**
**06/05/90**
**Stillwater, Oklahoma**

**Instructors Orientation Course**
**3600 North Martin Luther King Boulevard**
**10/15/90 to 10/19/90**
**Oklahoma City, Oklahoma**

**Hazardous Materials Awareness Training**
**Department of Public Safety**
**08/16/91**
**Oklahoma City, Oklahoma**

**Latent Fingerprint Development**
**Oklahoma State Bureau of Investigation**
**09/10/91**
**Oklahoma City, Oklahoma**

**Domestic Disturbance Seminar**
**Council on Law Enforcement Education & Training**
**11/19/91**
**Oklahoma City, Oklahoma**

CLEET Security Instructor Certification
Oklahoma Department of Vocational &
10/25/92
Technical Education
Oklahoma City, Oklahoma

NRA Police Firearms Instructor Development School
Mesa Police and Mesa PPC
03/01/92 to 03/06/92
Mesa, Arizona

Monadnock PR-24 Police Baton Instructors Course
Oklahoma Highway Patrol
03/15/92 to 03/17/92
Oklahoma City, Oklahoma

Criminal Investigation Academy
Council on Law Enforcement Education & Training
05/03/92 to 05/22/92
Oklahoma City, Oklahoma

Police Survival Course
Chapman Academy
10/11/92 to 10/16/92
Columbia, Missouri

Aerosol Subject Restraint Instructor's Course
Police Training Consultants
02/24/93
Midlothian, Texas

ASP - Tactical Baton Instructor's Course
Oklahoma Highway Patrol
04/10/93 to 10/13/93
Oklahoma City, Oklahoma

CLEET Firearms Instructor School
Council on Law Enforcement Education & Training
07/10/92 to 03/29/93
Oklahoma City, Oklahoma

Protective Security Operations Training Program
Federal Law Enforcement Training Center
08/05/94 to 08/19/94
Glynco, Georgia

Bomb Threat Management
Oklahoma Highway Patrol
10/27/94
Oklahoma City, Oklahoma

**Executive Protection and Security**
**Vance International**
**06/23/95 to 06/27/95**
**West Virginia**

**Street Survival '95 Tactical Edge Seminar**
**Oklahoma County Sheriff's Department**
**10/23/95 to 10/24/95**
**Oklahoma City, Oklahoma**

**Hostage Negotiation Training**
**Oklahoma Highway Patrol**
**05/13/96 to 05/17/96**
**Oklahoma City, Oklahoma**

**Executive and Dignitary Protection**
**Texas A&M Law Enforcement & Security**
**05/27/96 to 05/31/96**
**Training Division**
**College Station, Texas**

**Interviews and Interrogations Training, Reid Technique**
**Council on Law Enforcement Education & Training**
**06/24/96 to 06/28/96**
**Oklahoma City, Oklahoma**

**Narco-Terrorism Executive Protection Course**
**USA Army - Military Police School**
**01/06/97 to 01/10/97**
**Fort Mc-Clellan, Alabama**

**Incident Management Training**
**FEMA**
**04/28/98 to 04/29/98**
**Port of Catoosa, Oklahoma**

**Defensive Tactics Instructor Training**
**PPCT Defensive Tactics School**
**06/14/98 to 06/19/98**
**McKenny, Texas**

**C.E.R.T.  Training TTT**
**Oklahoma City FEMA**
**06/30/98 to 07/01/98**
**Oklahoma City, Oklahoma**

**Sniper School**
**07/21/99 to 07/23/99**
**McKenny, Texas**

**Basic Terrorism Awareness**
**08/10/98 to 08/11/98**
**Oklahoma City, Oklahoma**

**Terrorism  Awareness - Train the Trainer**
**08/23/98 to 08/14/98**
**Oklahoma City, Oklahoma**

**Hazardous Material Awareness**
**08/26/98**
**Oklahoma City, Oklahoma**

**Hazardous Material Awareness - Train the Trainer**
**08/27/98**
**Oklahoma City, Oklahoma**

**Advanced Hazardous  Materials -**
**09/15/98 to 09/18/98**
**Incident Commander**
**San Antonio, Texas**

**Hazardous Materials - Operations**
**09/21/98 to 09/25/98**
**Oklahoma City, Oklahoma**

**Electronic Counter Measures I**
**10/12/98 to 10/16/98**
**Jarvis International**
**Tulsa, Oklahoma**

**Electronic Counter Measures II**
**10/19/98 to 10/23/98**
**Jarvis International**
**Tulsa, Oklahoma**

**Hazardous Materials - Incident Commander**
**11/16/98 to 11/21/98**
**Oklahoma City, Oklahoma**

**Physical Security Specialist Training Program**
**Federal Law Enforcement Training Center**
**02/01/99 to 02/12/99**
**Glynco, Georgia**

**Fugitive Investigator Training Program**
**05-05-2000 to 05-15-2000**
**Federal Law Enforcement Training Center**
**Glynco, Georgia**

**Introduction to Search and Rescue**
**10-15-2005 to 11-20-05**
**National Assoc. of Search and Rescue**
**Houston, Texas**

**Search and Rescue Technician Two**
**11-15-2005 to  01-22-2006**
**National Assoc. of Search and Rescue**
**Houston Texas**

**Asp  Handcuff Instructor School**
**06- 09- 2006**
**St. Louis Police Department**
**St. Louis, Missouri**

**DUI Detection and Standardized Field Sobriety Testing (NHTSA)**
**06-24 thru 26-2010**
**Atlanta, Georgia**

**DUI Detection and Standardized Field Sobriety Testing Instructor**
**09-23 thru 26-2010**
**Atlanta, Georgia**

**Understanding, Attacking, and Winning DUI Cases**
**September, 2011**
**Wichita, Kansas**

1450

# EXHIBIT 2

(DEA Dangers of Drug Labs)

DVD- ROM labeled " DEA Dangers of Drug Labs" submitted under
separate cover for conventional filing

# EXHIBIT 3

(The Meth Lab)

DVD- ROM labeled "The Meth Lab" submitted under
separate cover for conventional filing

# EXHIBIT 4

(Kitchens of Death)

DVD-ROM labeled "Kitchens of Death" submitted under
Separate cover for conventional filing

# EXHIBIT 5

# Report on Multi-County Grand Jury Partial Report SC-99-56

*OIA-01-04*



September 2001

Prepared for Commissioner Bob A. Ricks
By Department of Public Safety
Office of Internal Audits

Filename: c:\docs\audits\oia-01-04\finalreport_v1

# Oklahoma Department of Public Safety

OFFICE of INTERNAL AUDITS
Review of Management Practices
Preliminary Report OIA 01-04
June 3, 2001

The DPS Office of Internal Audits was directed by Commissioner Bob A. Ricks to conduct a review of DPS management practices on April 4, 2001, in response to recommendations made by a Multi-County Grand Jury Partial Report. This review is not yet complete; however, a preliminary report was requested by the administration to enable it to take action on certain critical areas in a timely manner.

**FINDING #1:**       *Misinterpretation and application of the state's "official duty" status.*

The audit found the misunderstanding of "official duty" to be the common thread in all of the findings. "Official Duty" is the term used by the state to describe job duties and latitudes of activities for employees responsibilities. It is a guide as to how we expend the resources provided by our state. DPS created, but has not sufficiently defined, the terms of "subject to call," "on call," and "on standby" and employees do not share a common understanding of these terms and applications. This misunderstanding crosses all ranks and divisions. These terms impact the appropriate use of state equipment and the expectation of compensation in some cases, under the Fair Labor Standards Act.

RECOMMENDATION:

Define "subject to call," "on-call," and "on standby" in respect to official duty status. DPS should conduct a review emphasizing the progression of each call status with regard to employees being restricted, receiving compensation and the use of state resources. The review should consider the Fair Labor Standards Act, Merit Rules for Employment, retraining issues and revisions to the DPS Operations Manual.

DPS should develop pro-active initiatives to minimize future such instances by reinforcing core values and ethics in the mind set and daily activities of all personnel. The critical component of this adjustment is for all employees to understand risk in the existing practice and understand that a general practice does not supercede the law.

**FINDING #2:**       *Poor management and a lack of supervisory oversight.*

Many of the problems found by this audit result from some managers failing to do their jobs with a high level of consistency. The likelihood of anyone discovering inaccuracies and indiscretions was practically nil. This is not to say that every document was riddled with errors. However, it is important that the quality of any report should be scrutinized by staff and command personnel whose job it is to oversee their commands and ensure that things are being done correctly. That simply did not happen.

RECOMMENDATION:

Review DPS Operations Manual Sub-chapter 2: Conduct. Assure that all patrol members are familiar with these guidelines and understand that consequences exist for failure to obey and uphold this standard.

**FINDING #3:**          *Erratic submission and retention of Outside Employment Request forms.*

Current DPS policy appears to be sound, however, in application, internal controls at the Troop level to assure compliance are absent.

RECOMMENDATION:

Provide an addition to the annual Performance Management Process form of each employee, requiring supervisory personnel to ask and record whether the employee is currently employed outside the agency. If so, the supervisor should assure that an Outside Employment Request Form is submitted at that time or is currently on file in the employee's personnel files.

DPS Administration should revisit the issue of outside employment for those members who are self-employed or business owners, and clarify requirements for reporting purposes.

**FINDING #4:**          *Inconsistent personnel file content and integrity.*

DPS Operations Manual 1.1.8 states that the DPS will maintain two "201" (personnel) files on each member of the Oklahoma Highway Patrol. The official 201 file is to be housed in the Personnel Division and the permanent 201 File is maintained at Troop level.

A third 201 file is housed in the Major's Office, possessing data not available elsewhere. The auditors found varied interpretations of instructions for file maintenance leading to non-standard entries, mishandling of date-sensitive materials, constant handling of files, and duplication of effort.

RECOMMENDATIONS:

Merge the 201 file currently being kept at the Major's office with the official file in the Personnel Office.

Provide training to supervisory and secretarial personnel regarding the appropriate maintenance of 201 files.

A digital imaging solution should be pursued whereby personnel data is scanned and stored in one digital file and accessed through a relational database complete with security levels and computer-triggered edits.

**FINDING #5:**          *Inconsistent standards for reporting and recording time worked and work assignments for employees.*

Obscure standards and weak controls have compromised the appropriate recording and reimbursement of time as promulgated by the Fair Labor Standards Act. Some exempt employees may be incorrectly classified.

Ongoing changes in the Fair Labor Standards Act are not being sufficiently researched and implemented by DPS to stay abreast with current opinions and rulings.

The absence of formalized training has left newly promoted personnel to their own devices in formulating and administering time accountability issues. Written instructions for the proper completion of time reports have been lost or forgotten over time.

RECOMMENDATIONS:

A thorough review by the DPS Personnel Division of the Fair Labor Standards Act and Merit Rules to establish the Department's position with regard to:
1.   Correct classification of non-exempt and exempt employees
2.   Reporting and recording of all employee time elements
3.   The lawful range of the Departments ability to restrict employees with "call" definitions

Explore the possibility and feasibility of integrating the Department's computerized time records program with the Office of Personnel Management payroll system currently used by DPS.

Devise a comprehensive time accountability retraining curriculum for all employees and a method to reinforce the lessons throughout employees' careers.

Develop a training program to assure that employees who move from a non-exempt to an exempt status are trained in reporting and recording their time correctly.

Conduct periodic audits of division and individual time reports to assure that rules and procedures are being followed.

**FINDING #6:**        *Inadequate guidelines for the use of state equipment.*

DPS lacks specific rules and guidelines to assure lawful compliance with state statutes governing the use of state resources. These resources include, but are not limited to: fuel credit cards, mobile telephones, turnpike "PikePasses," telecommunication terminals, and state vehicles.

RECOMMENDATION:

While state law is clear regarding the use of state equipment, its actual application is not as simple. DPS should establish written guidelines and audit controls to assure compliance with state statutes.

## CONCLUSION

It is important to remember that the vast majority of our personnel are hardworking, honest and responsible individuals who come to work every day with a sincere desire to serve the State of Oklahoma. However, as an organization we must recognize that a failure to carefully review reports, a failure to examine events closely to identify patterns, and a failure to provide effective oversight and auditing creates the opportunity for inappropriate behavior. DPS can do much better in providing employees with written policies and guidelines to minimize confusion and encourage proper work ethics. At the same

time, management control by superiors is essential to ensure that employees do not stray into unlawful or unethical areas.

With a very tight time frame, certain areas of this review are incomplete. We feel this work should be continued to ensure that a full and complete analysis has been conducted, and to ensure that there are no additional problems left unaddressed.

# DEPARTMENT OF PUBLIC SAFETY

*"Don't Say It - Write It"*

TO          Commissioner Bob A. Ricks                    DATE July 13, 2001

FROM        LTC Jerry N. Cason #4

SUBJECT     Internal Audit Directive

On June 11, 2001 this office was directed to put a committee together to review areas of deficiency in the agency brought about by an internal audit. Committee members were:

| | |
|---|---|
| LTC Jerry Cason | 1LT John Matlock |
| 1LT Don Stockton | 1LT George Green |
| Bill Hollars | Gene Thaxton (Telecommunications) |
| John Lindsey | Brad Long (OLETS) |
| Major Garry Thomas | Captain Gerald Davidson |
| Judi Burton | Donna Hardridge (Chief's Office) |

The following areas were addressed:

IX.     **Description #1**: PikePass Policy & Procedures
        **Criteria**: *What should exist?* A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

X.      **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.
        **Criteria**: *What should exist?* A criteria that defines the difference and a clearly stated policy for members to follow.

XI.     **Description #5**: Use of State Vehicles
        **Criteria**: *What should exist?* Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

XII.    **Description #6**: Outside Employment Requests
        **Criteria**: *What should exist?* Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

XIII.   **Description #7**: 201 Files Content & Integrity
        **Criteria**: *What should exist?* File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

XIV.    **Description #8**: Time sheet vs. Assignment reconciliation
        **Criteria**: *What should exist?* A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

Commissioner Bob A. Ricks
Internal Audit Directive
July 13, 2001

Page 2


XV.    **Description #9**: Policy & Procedure for Mobile Phone Usage
       **Criteria**: *What should exist?*  A policy whereby all employees who are assigned a
       mobile phone has a clear understanding of the proper use of state equipment and
       resources.

XVI.   **Description #10**: Restate OLETS Policy
       **Criteria**: *What should exist?*  Every member of DPS with access to the OLETS system
       should possess a clear understanding of the law and department policy with respect
       to the use of the system.

JNC/dh

INTERNAL AUDIT RECOMMENDATIONS
July 13, 2001

I.   **Description #1**: PikePass Policy & Procedures

**Criteria**: *What should exist?* A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

The Oklahoma Transportation Authority (OTA) policy states that any Oklahoma law enforcement officer, while in the performance of their official duties, are not subject to paying associated tolls when utilizing and properly displaying a law enforcement PIKEPASS tag. Applicable toll charges incurred by the use of a law enforcement PIKEPASS for purposes not associated with official business shall be reimbursed by the agency. Personal use of law enforcement PIKEPASS tags is strictly prohibited. Re-education of all personnel will be conducted as to the regulations via an Informational Bulletin. The agency and/or OTA will conduct random audits to ensure strict compliance with the policy. A change to the operations manual has been prepared under "Use of State Equipment" to note compliance with established OTA guidelines.

II.  **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.

**Criteria**: *What should exist?* A criteria that defines the difference and a clearly stated policy for members to follow.

The *Department of Public Safety Patrol Divisions Operation Manual* currently states in the minimum qualifications for troopers, "...a willingness to be on call 24 hours per day..." This statement clearly conveys to employees, who have accepted the responsibilities of being a member of the Patrol, they will be "subject to call." A change should be made to the wording to indicate, "...a willingness to be **subject to call** 24 hours per day..."

"On call" and "On standby" are already defined in the *Definition of Terms* section of the manual. Historically in the agency, "on call" has been less restrictive for employees than "on standby."

A change in the wording of the Operations Manual should show:

Current wording: On call - the time before or after a scheduled work shift, when a member is required to be available for a specified time to respond to calls and notify his troop office where he can be contacted by telephone.

New wording: On call - time the member is somewhat restricted in his/her movement and should be ready to be respond to call should the need arise. The members are not necessarily restricted to a specific location, but must provide information as to how to be contacted. This time is not considered as compensatory time.

1462

Internal Audit Recommendations
July 13, 2001

Page 2

Current wording: On standby – the time when a member is off duty but required to be available to go on duty quickly and to notify his troop office where he can be contacted.

New wording: On standby - **time that is more restrictive than "On call" time, wherein a member must be ready to be respond at a moments notice.  The member's movement is restricted and this time is considered as compensatory time.**

III.  **Description #5**: Use of State Vehicles

**Criteria**: *What should exist?*  Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

Title 47 §156.1.B.2 provides any DPS commissioned employee be permitted use of a state-owned vehicle from his residence to place of employment, or places other than employment when in the scope of their assignment.  It is the interpretation of Legal that this statute provides sufficient legal authority for members on call to use their vehicle as necessary to remain available to the agency.  A review should be conducted of any civilian employee who has use of a state vehicle to their residence to ensure they meet compliance with Title 47 §156.1.B.1.  Individual approvals should be granted by the Commissioner's Office on a case-by-case basis as recommended by division directors.

IV.  **Description #6**: Outside Employment Requests

**Criteria**: *What should exist?*  Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

A draft policy has been prepared which clearly defines the agency's position on outside employment and places the responsibility of our employees to comply with the provisions thereof.  An informational bulletin will be distributed to educate all employees to the new provisions of the policy.

V.  **Description #7**: 201 Files Content & Integrity

**Criteria**: *What should exist?*  File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

It has been determined that an employee's permanent 201 file will be maintained in the agency's Personnel Division and a working file may be maintained at the individual troop headquarters.  The only release for records will come from our Personnel Division.  All divisions have been

1463

Internal Audit Recommendations
July 13, 2001

Page 3

instructed to ensure all documents maintained in their files are forwarded to Personnel in a timely basis.  We will continue to make an effort to ensure no documents are maintained locally which are not on file in the permanent, official personnel file.  It is not practical to eliminate all files throughout the agency.  But, better effort will be made to ensure consistency between the files.

VI.     **Description #8**: Time sheet vs. Assignment reconciliation

**Criteria**: *What should exist?*  A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

The time recording method for exempt employees currently in place meets the standards of FLSA.  What is probably a more accurately identified problem is the proper completion of the *Individual Daily Time Report* by exempt employees.  The form and instructions were developed in 1986. Through time and lack of instruction, employees are not aware of the correct procedure to follow when completing the report.  This can be remedied through training of the procedures and forms.

Also recommended is a change in exempt status for all First Lieutenants and Second Lieutenants to a non-exempt status.  This would allow for better accountability at the troop level.

It has been determined that the TIME program on our mainframe can be modified to show actual hours and non-scheduled hours work by exempt employees.  However, it will not accurately calculate the hours.

VII.    **Description #9**: Policy & Procedure for Mobile Phone Usage

**Criteria**: *What should exist?*  A policy whereby all employees who are assigned a mobile phone has a clear understanding of the proper use of state equipment and resources.

The Department of Public Safety (DPS) has determined that its functions and responsibilities require certain employees to be accessible by telephone from remote locations and at hours other than normal business hours. Certain employees are required to have access to telephones from locations other than their normal workstations and at hours other than normal business hours in order to adequately and efficiently perform their duties.

Employees who are assigned DPS mobile phones shall reimburse DPS for the following: (1) all non-governmental long distance charges, roaming charges, directory assistance charges and taxes attribute thereto and (2)

1464

Internal Audit Recommendations
July 13, 2001

Page 4

charges for all personal local calls in excess of the "flat rate" if the employee's use of local calling exceeds the 'flat rate' amount of local calling permitted by the particular plan to which the employee is assigned.

The Telecommunication Division, will review the mobile telephone bill and shall notify any employee who is required to reimburse DPS for any of the charges set forth in the preceding paragraph. The Telecommunication Division shall also notify any employee of an unexplained call(s) and request an explanation for the call(s). The employee shall reimburse DPS for personal calls or calls which cannot be verified as relating to the employee's duties within 30 days of receipt of the request from the Telecommunication Division. Falsification of statements concerning mobile telephone usage or failure to provide reimbursement may result in disciplinary action up to and including termination.

VIII.    **Description #10**: Restate OLETS Policy

**Criteria**: *What should exist?* Every member of DPS with access to the OLETS system should possess a clear understanding of the law and department policy with respect to the use of the system.

Appropriate OLETS Rules and Regulations governing the access and dissemination of OLETS information should be reviewed yearly as part of the PMP evaluation process for all DPS sworn and non-sworn employees having access to the OLETS system.

The OHP Training Bulletin Number 92-13, though dated November 20, 1992, is still appropriate. It is proposed that this policy be updated and distributed to all personnel with OLETS access.

The investigation of our Internal Affairs and Special Investigations Division is being handled by Captain Bill Hughes and 1LT Todd Blish, and will be addressed under a separate report.

# TIME ACCOUNTABILITY INQUIRY RESULTS

The following issues were addressed in a Chief's Inquiry conducted by Capt. Bill Hughes #17 and 1Lt. Todd Blish #41 concerning personnel of the IASI Unit. The findings and recommendations are as follows:

**ISSUE #1:  Time reporting improprieties by personnel of IASI**

**FINDINGS: This inquiry has determined that previous high ranking officials of the Oklahoma Highway Patrol approved a practice,  sometime between 1989 and 1996, which allowed IASI personnel to claim weekends while "on-call" as days worked. This practice was established because the assignment in IASI was determined to be highly restrictive and for longer than normal periods of time creating a substantial interference on the employee's ability to use the time for personal purposes.  It is the opinion of the personnel conducting this inquiry that no malicious intent to defraud this agency or the people of the State of Oklahoma of time or other compensation has occurred in the IASI Unit.**

**RECOMMENDATION: The agency should clearly define terms such as "on-call", "subject-to-call", and "on-standby", and create internal written policies which clarify an employee's status for each assignment for reporting purposes.**

**ISSUE#2: Perjury by members of the IASI Unit before the Grand Jury**

**FINDINGS: This inquiry was unable to resolve this issue due to the Attorney Generals Office denying DPS Legal Division's request to access the sealed testimony.**

**RECOMMENDATION: At the conclusion of the current litigation involving the testimony in question DPS should again request copies of said testimony to rectify this issue.**

I.      Intelligence phase

The initial portion of the Chief's inquiry focused on the Audits and Inspection Unit where 1LT Don Stockton and 1LT John Matlock were interviewed. Both Members were involved in an audit of time accountability records where discrepancies developed in the Internal Affairs Division. There were indications of possible bias in the initial briefing they gave us regarding audit of time records from IASI. 1LT Stockton, when interviewed by 1LT Blish, indicated that this particular issue was his opportunity to prove himself to the current administration. This, as well as 1LT Matlock's indication of his friendship with former 2LT Paul Gordon, indicates the possibility of personal bias being involved in the interpretation of the findings of the internal audit of IASI time records. Despite these indicators the appearance of improprieties does exist in regard to time accountability practices within IASI. These practices include showing "on-call" time as time worked, then using the accrued time as leave on a later date.

We recovered time accountability reports from both current and past Members assigned to the Internal Affairs Division as well as a partial report from the Multi-County Grand Jury of Oklahoma County (SC-99-56). The Grand Jury wished to address the supervisory and internal audit mechanisms within the Department of Public Safety as well as the existing management practices as it applies to oversight of work assignments.

The Internal Audit personnel also indicated possible perjury before the Grand Jury on the part of CPT Rodney Burris and 2LT George Randolph. DPS Legal Division was contacted in an effort to obtain copies of Grand Jury testimony as it related to our inquiry. The Office of Attorney General refused to supply copies of testimony related to the case because of ongoing litigation.

Base questions were developed which addressed time accountability questions within the Division. Those questions focused on the use and completion of monthly time accountability records and any Troop policies regarding the accrual and use of compensated time. The following represents a sample of baseline questions presented during each Member's interview with minor variances;

| 1. | (Qualifying questions related to time in grade, current and past assignments, Supervisor's name, etc.) |
| 2. | When you were initially assigned to the Internal Affairs/Special Investigations Division were you instructed in the completion and use of the monthly time accountability report? (If so) By whom?, (If not) Knowing you were not instructed, how did you complete the report? |
| 3. | What instructions have you received in showing "on-call" time while in other assignments? |
| 4. | (Presented with time report if available) Is this an accurate copy of a time sheet completed by you on _____? Is this your signature? |
| 5. | Was it the accepted practice to show a "W" (representing a day worked) on the weekend days that you were scheduled to be "on-call" whether called out or not? |
| 6. | What explanation was provided for this? (Question 5) |

| 7. | The nature of your position in Internal Affairs requires specialized training and skills. What type of training have you received as it relates to internal affairs? (how, why) Are these skills unique to the function of IASI versus other Divisions? |
|---|---|
| 8. | What is the Troop "Z" policy concerning restrictions while "on-call"? Is this policy written or verbally passed from one member to another? |
| 9. | What, if anything, is the difference between being "on-call" in your IASI assignment versus a traffic related assignment? |
| 10. | Have you ever signed another member's time accountability report, as a supervisor, when they may have shown "on-call" time as a "W" indicating time worked? |
| 11. | Is this practice a violation of Department policy or State law? Can you see where it may be construed as such? |

## II.    Identification phase

We identified four (4) current members of IASI and up to five (5) previous members of the division that may have an internal knowledge of the time accountability practices within IASI.

CPT Hughes interviewed current IASI personnel CPT Rodney Burris, 1LT George Randolph, and former IASI investigator 1LT Rick Fagan. 1LT Blish interviewed current IASI Members 2LT Doug Deryckere, 2LT Leanne Spears, and previous member 2LT Donnie Robins. Attempts were made to contact retired IASI Investigator Larry Punneo who did not return phone messages. Retired IASI Troop Commander Larry Rutherford was contacted and interviewed by 1LT Blish as to time management practices during his assignment to the division. Current 1LT Jeff Griffith, a former IASI investigator, was on vacation at the time of the interviews.

Because of the general issues which we were instructed to address and the limited time frame, not every past member of this unit was contacted nor were specifics as detailed as the Internal Auditors presented to us noted. The information passed to us along with tapes of the interviews we conducted are included for review in this file.

## III.    Interview phase

### A.    2LT Donnie Robins #111

LT Blish conducted an interview with 2LT Donnie Robins #111 in his office at 1143 hours on July 4th. 2LT Robins was transferred to the Internal Affairs and Special Investigations Division (IASI) from Troop "A" in late 1999 and remained approximately 18 months.

2LT Robins states that he was instructed jointly by 1LT George Randolph and Captain Rodney Burris in the completion of his monthly time accountability report. 2LT Robins continued by stating that persons assigned to IASI were on call for a period of two (2) weeks at a time. The "on-call" IASI Investigator was subject to call after business hours including 24 hour responsibility on weekends.

2LT Robins was instructed jointly by 1LT Randolph and Captain Burris to take "make up" days off to replace the weekends lost while "on-call". It was an accepted practice while assigned to IASI to use the "make up" days as time off on a routine basis.

2LT Robins confirmed that "on-call" time was managed differently in other Divisions he had worked. LT Blish inquired of him to explain the difference in being on call in a traffic assignment as opposed to Internal Affairs. Robins stated that he was told to show the weekend "on-call" days as "worked" due to their being subject to call for a complete 48 hour period on a statewide basis. Robins stated it was verbally understood he would be subject to travel anywhere in the State of Oklahoma at any given moment. He states that IASI policy required him to carry a cellular telephone and pager on weekends. 2LT Robins furthered his explanation that IASI investigators routinely worked more than 40 hours during the week and that the nature of the assignment required a quick response when called. He felt compelled by the nature of the assignment to be readily available for deployment on weekends.

2LT Robins did not maintain any subordinates while assigned to IASI; thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

When asked if he ever witnessed the IASI Secretary, Carolyn Rawlings, make changes to time accountability reports, Robins replied, "Not to my knowledge".

### B. 2LT Doug Deryckere #103

LT Blish conducted an interview with 2LT Doug Deryckere #103 on July 5th, at 1330 hours, in the Captain's conference room. 2LT Deryckere was transferred from Troop "S" into IASI in July of 2000. 2LT Deryckere stated he was never instructed in the completion of the time accountability report while in Troop "S" but was instructed upon his transfer into IASI by the Secretary, Carolyn Rawlings. 2LT Deryckere confirmed 2LT Robins statement that IASI Investigators were on call for a period of two weeks at a time where they were subject to all calls after business hours including a full 48 hours on weekends. He was instructed by Mrs. Rawlings to show the "on call" weekends as time worked.

2LT Deryckere noted that the current time accountability report provides space for indicating time taken not time "accrued". <u>This portion of the issue is invalid as there is a "remarks" section available for indicating accrued time.</u>

2LT Deryckere indicated that the Troop "Z" policy concerning "on-call" time was verbally expressed to him by his superiors. The general policy of the Division, however un-written, indicated that Investigators were to be restricted during their "on-call" periods to being available for travel statewide at any given moment. He stated that he was verbally instructed to refrain from the consumption of alcoholic beverages during his on-call period and required to carry both a telephone and pager at all times. He felt that he was unduly restricted during these "on-call" periods.

2LT Deryckere did not maintain any subordinates while assigned to IASI, thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

C.     2LT Leanne Spears #116

LT Blish conducted an interview with 2LT Leanne Spears #116 on July 5th, at 1617 hours in the Captain's conference room. 2LT Spears has been assigned to IASI for approximately five (5) months. She stated that she was verbally instructed by 1LT Randolph to inscribe a "W" on her time report for weekend days of which she was on call. 2LT Spears stated she was on call for two weeks at a time. LT Blish inquired whether she showed comp time for time spent on call during her previous assignments. She stated no. LT Blish asked Spears to clarify the call out system in the Internal Affairs Division, she stated that she did not clearly understand some of the time policies being used as she only had limited experience in the division.

2LT Spears states that she was instructed to be "10-8" in time to make it to the office by 0800 and remain until 1645 hours each day, with total time spent 10-8 to be a 10 hour shift. Her impression was these hours equated to a 50 hour work week which would encompass the two make up days used for time spent "on-call". She confirmed that it was accepted practice within IASI to reflect a "W" for weekend days (Saturday & Sunday) spent on call, whether called or not.

2LT Spears stated that the Troop "Z" policy changed around May 1, 2001 (She was unsure of the exact date). She was verbally instructed not to use her Department issued vehicle for local-personal trips when "on-call", despite the assumption that members of the division were required to travel at any given moment. She confirms that the nature of the position caused her to feel highly restricted when off duty and "on-call".

When asked to define "on-call" time versus "on-stand by" time, 2LT Spears defined "on-call" as being subject to work within a reasonable time while "on-stand by" as being uniformed or dressed for an event, fueled, and awaiting an imminent call. 2LT Spears was also instructed to carry her Department pager and phone when off-duty.

2LT Spears did not maintain any subordinates while assigned to IASI; thus she was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

D.     Larry Rutherford (Ret.)

LT Blish interviewed *Retired* 1LT Larry Rutherford who was assigned as Troop Commander in IASI between 1989 and 1997. Rutherford stated that during his term as Troop Commander he was directly responsible to either Colonel Kenneth Vanhoy (then LT. Colonel), or LT COL Bob Shaw. Rutherford recalled a meeting with Shaw but could not recall the exact date. The meeting focused on responsibilities of IASI members as it relates to call-out time and reporting procedures. It was decided that IASI members would be restricted to the OKC area while on call in order to facilitate travel to any portion of the State without delay. The centralized location of the OKC area was ideal for response given any incident that may occur in any other portion of the State. He also added that Captains during this period of time also showed time spent at "duty officer" as time worked as well. The rationale behind their decision was based on the fact that when "on-call" they were subject to travel at any given time and restricted to the OKC area. Members were also to report their location at all times to the Communications Center and remain "on alert" for incidents that may arise during their assigned call-out period. Rutherford recalls Colonel Vanhoy conducting classes in the completion of the time accountability report and management of time within IASI. The practice of showing "on-call" time as time worked began under the command of Larry

<u>Rutherford, as well as using the time as "make up" days off under the direction of LT Col.
Bob Show (Ret.)</u>

### E.      1LT Rick Fagan #25

Capt. Bill Hughes interviewed 1LT Rick Fagan #25 on July 9th at DPS Headquarters. LT Fagan
was assigned to IASI from Troop J  January of 1998 and served in that capacity until June of
1998. Also assigned to IASI at that time were Capt. Rodney Burris, 1LT Eddie Davenport, and 1LT
Jeff Griffith. LT Fagan advised that after he submitted his first time sheet report it was returned
to him. He was unable to remember if it was CPT Burris or LT Davenport who instructed him to
show the on-call weekends as days worked. He stated this was the standard practice in IASI at
that time. LT Fagan could not recall the reason given to him to report his time this way. He
indicated  he was instructed to wear civilian clothes by CPT Burris. He felt the verbal instructions
he received relating to on-call time were more restrictive than other assignments he has had with
on-call requirements.
1LT Fagan did not maintain any subordinates while assigned to IASI; thus he was not responsible
for signing time accountability reports where a subordinate may have shown "on-call" time as time
worked.

### F.      1LT George Randolph #22

1LT George Randolph was interviewed by Capt. Hughes on July 13th at DPS. LT Randolph is
currently assigned to IASI as Office Manager. He has been in IASI for approximately three years
and one month after transferring from the Training Division. CPT Burris was in command over IASI
at that time as he currently is. LT Randolph advised that he was not instructed on how to complete
his time sheet in IASI until after he had turned in his first one. He stated CPT Burris  instructed him
after he had turned it in to count weekends on-call as days worked. He told CPT Burris he had not
done that on his first one and CPT Burris told him he had fixed his previous one. LT Randolph told
CPT Hughes that this did not seem to be any type of violation of policy or law because this on-call
time seemed highly restricted. It was his impression that his travel from his residence and other
activities during this time were extremely limited knowing that the on-call person was expected to
respond anywhere in the state at a moments notice. He advised that this reporting practice had
ceased in May 2001 when he was told his status was subject-to-call by LT COL Jerry Cason. He
further  stated he was told at that time, for the first time, that the restrictions under which they had
all operated  under did not exist. He was told that restrictions such as limited travel from his
residence and consumption of alcoholic beverages are not in place during subject-to-call time. LT
Randolph said he operated until May by the instructions he was given when he arrived in IASI. LT
Randolph stated that he felt written directives should be issued to clarify this situation.
1LT Randolph does maintain subordinates while assigned to IASI; thus he was responsible for
signing time accountability reports where a subordinate may have shown "on-call" time as time
worked.

### G.      CPT Rodney Burris #16

CPT Burris was interviewed July 12, 2001, by CPT Hughes at DPS. CPT Burris has been
assigned to the IASI Unit for approximately seven (7) years. At the time of receiving his
assignment from the Training Division to that unit CPT Burris reported directly to 1LT Larry

Rutherford. LT Rutherford reported directly to LT COL Bob Shaw. CPT Burris could not remember specifically if it was LT Rutherford or LT COL Shaw who instructed him to wear civilian clothing for this assignment. CPT Burris initially did not receive any instructions regarding the time sheet because it was the same one he had used at Training. CPT Burris stated 1LT Rutherford came back later and told him to show the weekend days he was on-call as days worked. He said he did not question his orders. He did not recall an explanation for the different reporting method. He elaborated that whoever was on call had to respond instantly and was considered the lead investigator on the case. Typically, all IASI personnel respond to a call. CPT Burris felt strongly that there was a difference for IASI personnel and their restrictiveness due to the timely response and the types of calls they receive. CPT Burris went on to explain that the practice of reporting the on-call weekends continued until he received word of this inquiry. He stated he did not at any time feel they were violating a policy or law the way they were reporting their time or he would have stopped. He did indicate he had several meetings with LT Rutherford and LT COL Shaw over shift differential and clothing allowance issues which he thought were justified because of what the IASI personnel are expected to do.

CPT Burris does maintain subordinates while assigned to IASI; thus he was responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

## IV.    Summary

### ISSUE #1 - TIME REPORTING

While the initial auditors (Matlock, Stockton) discovered improprieties in the management of time accountability, it is important to acknowledge that the accepted practice before May 2001 was established prior to the assignment of any current Members to the division.

Current and past members of the division confirm they were instructed by Members of a superior rank to show their time accountability as indicated in the audit. This was explained on several different avenues within our investigation. One explanation, which is prevalent among current IASI Members, is they feel highly restricted by the nature of their assignment. The "on-call" investigator must be prepared to travel statewide at any given time in the event of an internal crisis. Current and past members of the division were under the impression they were restricted in their ability to perform certain personal activities or travel far from home while in "on-call" status.

Another avenue of explanation for the practice centers around regular work hours during the week. The desire that members of the division be in the office by 0800 and remain until 1645, unless out of the office on official business, was interpreted by 2LT Deryckere to be a fifty hour work week. Because of his lengthy travel time he interpreted that the time would be compensated through the "on-call" weekends.

The DPS Operations Manual does not give a solid definition of "on-call" or "on-standby" duty status. Additionally,  the current time accountability report use by exempt members of the Department does not provide a clear definition of how to reflect overtime work. This is a source of confusion for some, despite the provision of a "remarks" section.

There were no obvious indications of any malicious intent to deceive in this case. Despite the appearance of abuse, time accountability practices within the Internal Affairs Division were acceptable through several different commanders.

The issue is obviously in need of direct attention in order to clarify "on-call" or "subject-to-call" policies within the Internal Affairs Division. Initially the definition of "on-call" or "subject-to-call" versus "on-standby" should be clarified within the DPS Patrol Divisions Operations Manual or in the form of a memorandum from the Chief's Office. Subsequently it is highly recommended that time accountability practices, including an "on-call" policy, a shift coverage policy, and scheduling policy be clearly defined in writing and distributed to the members of the division.

It should also be noted that the current Captain's time sheets were reviewed by the Internal Auditors. They reported CPT Burris and CPT Rick Adams were the only two current Captains who have shown weekends as worked while in "Duty Officer" status. CPT Adams was assigned under CPT Burris while he was a lieutenant in the CID Unit.

There were numerous times in the IASI Division when two members claimed the same weekend days as days worked. Some of this occurred when CPT Burris was Duty Officer and an additional IASI member was "on-call". Clarification in this area would be recommended.

## ISSUE #2 - PERJURY

As previously noted the Internal Auditors made note of possible perjury on the part of CPT Burris and 1LT Randolph. This investigation was unable to either prove or disprove these allegations due to the fact that the Attorney General's Office denied the request by DPS Legal Division for copies of the Grand Jury testimony. This issue can be resolved at the time that testimony is released.

AUDIT RESPONSE TO
CHIEF'S INQUIRY
RE: OIA-01-04

The audit team would like to resolve some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry.

The Department of Public Safety Operations Manual's Implementation Order states, "Any provision within this Manual contrary to law is void, and if any provision herein is declared invalid by a court of competent jurisdiction, such holding shall not affect remaining valid provisions."

Fact: When the letter referring the Gordon matter for further investigation to the Attorney General was sent, no mention is made of the application or accrual of comp. time, or the fact that Gordon was or may have been on authorized comp. time when he was alleged to have been working for the State Insurance Fund.

Fact: There are no internal memo's or other notice's given regarding the application or accrual of comp. time in the Gordon matter, or it's use inside I.A.S.I. until the Office of Internal Audits exposed the practice.

Conclusion: Had either of these simple facts been conveyed to the Commissioner or Attorney General it is highly likely this incident would have never escalated beyond that point. Failing to do so casts a dim light on the motivation to omit that information by the management of I.A.S.I. Statements made by current and former I.A.S.I. personnel did affirm that the practice was perpetuated by unwritten rules and verbal instructions.

---

Fact: DPS and I.A.S.I. management violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious wrongdoing by an employee within that division.

Conclusion: Again, this decision casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators.

---

Fact: The I.A.S.I. investigation of 2Lt. Gordon centered around his working a part-time job while indicating on duty with DPS. His superiors are required to approve accrual and application of comp. time (DPS Operations Manual 1.1.6.A.4d) as well as, assuring that the off-duty job does not interfere with DPS activities. (DPS Operations Manual 1.1.10.10) I.A.S.I. managers cannot absolve themselves from these responsibilities. (DPS Operations Manual 2.1.3.B)

Conclusion: I.A.S.I. managers were directly responsible for 2Lt. Gordon's daily activities. Their

Audit Response
August 9, 2001

2

omission of the fact that they approved the accrual and application of Gordon's significant amount of comp. time, appear to be an attempt to deny the Commissioner that information which ultimately led to the order to send the informational letter to the Attorney General. Should they deny knowledge of Gordon's activities they would be forced to admit gross dereliction in their duties to properly supervise a subordinate. (DPS Operations Manual 2.1.3.B)

---

Fact: The I.A.S.I. captain, troop commander, and other similarly ranked personnel, who were directly responsible for Gordon's activities, signed his time sheets as accurate and correct. This indicates that I.A.S.I. managers either were extremely negligent in overseeing his daily activities or had approved his application for, and use of, comp. time and the method he was using to report it.

Conclusion: It appears that 2Lt. Gordon may have been misinstructed in the proper method to report comp. time used. Many other members have reported similar instructions regarding the application of comp. time. No mention of this is made in the I.A.S.I. official investigation or the Chief's Inquiry, nor has any notation been found that 2Lt. Gordon's time sheets were ever returned or corrected by I.A.S.I. managers.

---

Fact: When 2Lt. Gordon's excess time, such as annual, sick leave and comp. time was settled upon his departure from the agency, no record is found of I.A.S.I. managers mentioning or reporting any comp. time accrued by 2Lt. Gordon as required in DPS Operations Manual 1.1.6.A.4f

Conclusion: Troop commanders are required to complete "Notice of Personnel Action" forms that inform the Personnel Division when members resign. Included on these forms are the resigning members remaining annual, sick and overtime data which is used to determine the official departure date and any additional payment due the member. Lt. Randolph did not record or mention any accrued comp. time for 2Lt. Gordon, yet according to records compiled by Internal Audits from 1/18/99 to 4/23/2000 Gordon had accumulated 288 hours of "on call" comp. time and taken 24 hours. This leaves a balance of 264 hours, or 6.6 weeks, which was not reported by Lt. Randolph. An explanation should have been reported by the Chief's Inquiry.

---

Fact: Lt. Randolph's time records reflect a number of "U's" indicating that they have been updated since originally input. It is curious why this has occurred as 2Lt. Gordon's time records do not show similar frequency of updates.

Conclusion: Lt. Randolph's time records indicate that it was a common practice to adjust or

Audit Response
August 9, 2001

3

correct time records after they were input. It is curious why Gordon was not given the same courtesy?

---

**Fact:** Information was provided to the Chief's Inquiry team of the possible existence of a taped statement by Captain Burris to a meeting of the O.S.T.A. in which he denied the practice of providing compensatory time to I.A.S.I. employees while they were on an "on call" status. This information, critical to a complete investigation, does not appear to have been pursued by the Chief's Inquiry or mentioned in their final report.

**Conclusion:** The failure of the Chief's Inquiry to pursue this lead casts doubt on the value and completeness of the report. It also places them in favor with the possible conspiracy to mitigate the effects of the fraudulent behavior by justifying the act and discrediting the internal auditors with unsubstantiated, out of context comments of bias. Unwittingly, the Chief's Inquiry has now proven, without doubt, that the I.A.S.I. division has been violating state law by allowing members to claim time worked when in fact they were only "on call" which has been determined a non-pay status. The report also reveals that subordinates within I.A.S.I. are not thoroughly informed regarding the reporting of time and left to their own to justify why they are suddenly able to claim an additional eight hours for every day they show "on call." (RE: Interviews of 2Lt.s Spears and Deryckere) This begs the question why did they stop at eight hours and not claim the entire 48 hour weekend? Obviously, this practice would have required them to take so much comp. time as to never be at work during the week, thus causing the fraud to be understood by superiors who would, and did, stop the practice once it was exposed by the internal audit.

---

**Fact:** The Chief's Inquiry reported unwritten rules and verbal instructions by I.A.S.I. managers regarding the accrual of "on call" comp. time. Some I.A.S.I. members admitted being confused by the unusual practice and offered a variety of explanations to justify it. They also expressed a feeling of being restricted but in every instance admitted to being issued a Department mobile phone and pager to further reduce the restriction beyond what it was when the practice was begun in the early 1990's.

**Conclusion:** Neither state statutes nor DPS Operations guidelines afford members the ability to accrue comp. time while in an "on call" status. The Department has long held that members be on call to quickly respond to situations. The Commissioner, Assistant Commissioner, Chief, Assistant Chief, Duty Officers, Public Information Officers and other administrators are held to the same standard. Even field troopers who are required to respond to emergency life or death situations have traditionally been held to this standard. The advent of pagers and mobile phones have afforded an even greater flexibility to the restrictions placed on members who must serve in these capacities.

Audit Response
August 9, 2001

4

---

Fact:        The Chief's Inquiry reports having interviewed a previous commander of I.A.S.I. who related a verbal decision by either Lt. Col. Vanhoy or Lt. Col. Shaw to allow the accrual of comp. time while on call for the I.A.S.I. division. The Inquiry does not indicate that the statement or decision was ever confirmed by interviewing Vanhoy or Shaw.

Conclusion:    A prudent and complete investigation should have included such an interview and the Chief's Inquiry is remiss in its duties for not obtaining this information.

The fact remains that 2Lt. Gordon was investigated by his immediate supervisor regarding charges of obtaining funds by false pretense and the fact that the supervisor omitted crucial information regarding Gordon's ability to accrue and apply comp. time. At best, this displays a conflict of interest since the supervisor too was accruing a great deal of comp. time. However, the fact that the supervisor and his commanding officer failed to properly inform their superiors and report the possibility that 2Lt. Gordon may have been using comp. time while he was alleged to be working off duty is incomprehensible, cowardly and prima-facie evidence of a conspiracy.

These circumstances imply that a conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney Generals Office. The individuals continued the practice even after a fellow trooper resigned and was subsequently indicted by a multi-county grand jury. There is no indication they would have stopped until the practice was revealed by an audit.

**BURRIS 1999**
**$28.81**

| DATES | CALL MAKEUP DAYS CLAIMED | DATES | CALL MAKEUP DAYS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01–09 | 8 | 01-15 | 8 | 96 | $2,765.76 |
| 02–06 DO | 8 | 02-12 | 8 | | |
| 02–07 DO | 8 | 03-18 | 8 | | |
| 03–27 DO | 8 | 03-19 | 8 | | |
| 03–28 DO | 8 | 04-16 | 8 | | |
| 04–25 VINITA | 8 | 05-13 | 8 | | |
| 05–22 DO | 8 | 05-14 | 8 | | |
| 05–23 DO | 8 | 06-29 | 8 | | |
| 06–12 VINITA | 8 | 06-30 | 8 | | |
| 07–10 DO | 8 | 07-02 | 8 | | |
| 07–11 DO | 8 | 10-21 | 8 | | |
| 08–21 DO | 8 | 10-22 | 8 | | |
| 08–22 DO | 8 | | | | |
| 09–25 EALES | 8 | | | | |
| 11–06 DO | 8 | | | | |
| 11–07 DO | 8 | | | | |
| 11–13 SHTING | 8 | | | | |

**BURRIS 2000**
**$28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 Y2K | 8 | 02-11 | 8 | 144 | $4,148.64 |
| 01-17 MLK | 8 | 03-13 | 8 | | |
| 01-22 52ND ACAD | 8 | 03-14 | 8 | | |
| 01-23 52ND ACAD | 8 | 03-15 | 8 | | |
| 02-05 DO | 8 | 03-16 | 8 | | |
| 02-06 DO | 8 | 03-17 FOR 01-01 | 8 | | |
| 04-01 DO | 8 | 04-18 | 8 | | |
| 04-02 DO | 8 | 05-05 | 8 | | |
| 05-13 | 8 | 06-13 | 8 | | |
| 05-20 DO | 8 | 06-19 | 8 | | |
| 05-21 DO | 8 | 08-25 | 8 | | |
| 08-12 DO | 8 | 09-15 | 8 | | |
| 08-13 DO | 8 | 09-29 MUDO | 8 | | |
| 08-25 SHTING TISH | 8 | 11-05 IRVING TX | 8 | | |
| 09-17 CHICAGO | 8 | 11-17 | 8 | | |
| 09-23 DO | 8 | 12-15 LAS VEGAS | 8 | | |
| 09-24 DO | 8 | 12-28 | 8 | | |
| 10-21 LANSTON | 8 | 12-29 | 8 | | |
| 11-10 VET DAY | 8 | | | | |
| 11-11 DO | 8 | | | | |
| 11-12 DO | 8 | | | | |
| 12-10 LAS VEGAS | 8 | | | | |
| 12-23 DO | 8 | | | | |
| 12-24 DO | 8 | | | | |
| 12-25 DO CHRISTMAS | 8 | | | | |
| | 8 | | | | |

**BURRIS   01   $28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-27 DO | 8 | 03-16 | 8 | 16 | $460.96 |
| 01-28 DO | 8 | 04-06 | 8 | | |
| 02-03 ACLU FT WORTH | 8 | | | | |
| 03-10 DO | 8 | | | | |
| 03-11DO | 8 | | | | |
| 04-14 DO | 8 | | | | |
| 04-15 DO | 8 | | | | |
| 04-21 GUTHRIE 89ER PARADE | 8 | | | | |

1480

RANDOLPH  98  $26.51

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 06-20 OC | 8 | 09-23 MUD | 8 | 88 | $2,332.88 |
| 06-21 OC | 8 | 09-24 MUD | 8 | | |
| 06-27 OC | 8 | 09-25 MUD | 8 | | |
| 06-28 OC | 8 | 11-20 MUD | 8 | | |
| 09-05 OC | 8 | 11-23 MUD | 8 | | |
| 09-06 OC | 8 | 11-24 MUD | 8 | | |
| 09-07 OC LABOR DAY | 8 | 12-21 HOL | 8 | | |
| 09-12 OC | 8 | 12-22 HOL | 8 | | |
| 09-13 OC | 8 | 12-23 HOL | 8 | | |
| 10-31 | 8 | 12-28 HOL | 8 | | |
| 11-01 OC | 8 | 12-29 HOL | 8 | | |
| 11-07 OC | 8 | | | | |
| 11-08 OC | 8 | | | | |
| 11-27 THANKS. FRIDAY | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 11-29 OC | 8 | | | | |
| 12-12 OC | 8 | | | | |
| 12-13 OC | 8 | | | | |

RANDOLPH 99   $26.51

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-24 OC | 8 | 05-21 MUDO | 8 | 232 | $6,150.32 |
| 01-30 OC | 8 | 06-14 MUDO | 8 | | |
| 01-31 OC | 8 | 06-15 MUDO | 8 | | |
| 03-06 OC | 8 | 06-16 MUDO | 8 | | |
| 03-07 OC | 8 | 06-17 MUDO | 8 | | |
| 03-13 OC | 8 | 07-02 MUDO | 8 | | |
| 03-14 OC | 8 | 07-05 INDEP. DAY | 8 | | |
| 04-03 OC | 8 | 07-06 MUDO | 8 | | |
| 04-04 OC | 8 | 07-07 MUDO | 8 | | |
| 04-10 OC | 8 | 07-08 MUDO | 8 | | |
| 04-11 OC | 8 | 07-09 MUDO | 8 | | |
| 05-08 OC | 8 | 07-12 MUDO | 8 | | |
| 05-09 OC | 8 | 07-13 MUDO | 8 | | |
| 05-15 OC | 8 | 07-14 MUDO | 8 | | |
| 05-16 OC | 8 | 07-15 MUDO | 8 | | |
| 06-19 OC | 8 | 07-16 MUDO | 8 | | |
| 06-20 OC | 8 | 07-21 MUDO | 8 | | |
| 06-26 OC | 8 | 07-28 MUDO | 8 | | |
| 06-27 OC | 8 | 11-15 MUDO | 8 | | |
| 07-31 OC | 8 | 11-16 MUDO | 8 | | |
| 08-01 OC | 8 | 11-17 MUDO | 8 | | |
| 08-07 OC | 8 | 11-18 MUDO | 8 | | |
| 8-08 OC | 8 | 11-19 MUDO | 8 | | |
| 09-04 OC | 8 | 11-22 MUDO | 8 | | |
| 09-05 OC | 8 | 11-23 MUDO | 8 | | |
| 09-06 OC LAB( | 8 | 11-24 MUDO | 8 | | |
| 09-11 OC | 8 | 11-25 THANKS. DAY MUI | 8 | | |
| 09-12 OC | 8 | 12-21 MUD | 8 | | |
| 09-25 EALES S | 8 | 12-22 MUD | 8 | | |
| 10-16 OC | 8 | | | | |
| 10-17 OC | 8 | | | | |
| 10-23 OC | 8 | | | | |
| 10-24 OC | 8 | | | | |
| 11-13 EDMONI | 8 | | | | |
| 11-26 THANKS | 8 | | | | |
| 11-27 OC | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 12-24 CHRISTI | 8 | | | | |
| 12-25 OC | 8 | | | | |
| 12-26 OC | 8 | | | | |

1482

**RANDOLPH 2000  $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 OC Y2K | 8 | 01-13 MUDO | 8 | 264 | $6,998.64 |
| 01-02 OC | 8 | 01-14 MUDO | 8 | | |
| 02-05 OC | 8 | 04-07 MUDO | 8 | | |
| 02-26 OC | 8 | 05-19 MUDO | 8 | | |
| 02-12 OC | 8 | 06-26 MUDO | 8 | | |
| 02-13 OC | 8 | 06-27 MUDO | 8 | | |
| 03-18 OC | 8 | 06-28 MUDO | 8 | | |
| 03-19 OC | 8 | 06-29 MUDO | 8 | | |
| 03-25 OC | 8 | 06-30-MUDO | 8 | | |
| 03-26 OC | 8 | 07-03 MUDO | 8 | | |
| 04-16 OC | 8 | 07-04 MUDO INDEP DAY | 8 | | |
| 04-22 OC | 8 | 07-05 MUDO | 8 | | |
| 04-23 OC | 8 | 07-06 MUDO | 8 | | |
| 05-06 OC | 8 | 07-07 MUDO | 8 | | |
| 05-07 OC | 8 | 08-04 MUDO | 8 | | |
| 05-13 OC | 8 | 08-07 MUDO | 8 | | |
| 05-14 OC | 8 | 08-08 MUDO | 8 | | |
| 06-10 OC | 8 | 08-09 MUDO | 8 | | |
| 06-11 OC | 8 | 08-10 MUDO | 8 | | |
| 06-17 OC | 8 | 08-11 MUDO | 8 | | |
| 06-18 OC | 8 | 08-14 MUDO | 8 | | |
| 07-15 OC | 8 | 08-15 MUDO | 8 | | |
| 7-16 OC | 8 | 08-16 MUDO | 8 | | |
| 07-22 OC | 8 | 08-17 MUDO | 8 | | |
| 07-23 OC | 8 | 08-18 MUDO | 8 | | |
| 08-20 JOHNSTON CO. | 8 | 09-08 MUDO | 8 | | |
| 08-26 OC | 8 | 10-20 MUDO | 8 | | |
| 08-27 OC | 8 | 12-01 MUDO | 8 | | |
| 09-02 OC | 8 | 12-19 HOLIDAY MUDO | 8 | | |
| 09-03 OC | 8 | 12-20 HOLIDAY MUDO | 8 | | |
| 09-04 OC | 8 | 12-21 HOLIDAY MUDO | 8 | | |
| 10-07 OC | 8 | 12-22 HOLIDAY MUDO | 8 | | |
| 10-08 OC | 8 | 12-27 MUDO | 8 | | |
| 10-14 OC | 8 | | | | |
| 10-15 OC | 8 | | | | |
| 11-11 OC | 8 | | | | |
| 11-12 OC | 8 | | | | |
| 11-23 OC THANKS HOLIDAY | 8 | | | | |
| 11-24 OC THANKS HOLIDAY | 8 | | | | |
| 11-25 OC | 8 | | | | |
| 11-26 OC | 8 | | | | |
| 12-28 OC | 8 | | | | |
| 12-29 OC | 8 | | | | |
| 12-30 OC | 8 | | | | |
| 12-31 OC | 8 | | | | |

**RANDOLPH 2001     $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 NEW YEARS DAY OC | 8 | 01-16 MUDO FROM 2000 | 8 | 72 | $1,908.72 |
| 01-06 OC | 8 | 01-17 MUDO FROM 2000 | 8 | | |
| 01-07 OC | 8 | 01-18 MUDO FROM 2000 | 8 | | |
| 01-27 OC | 8 | 01-19 MUDO FROM 2000 | 8 | | |
| 01-28 OC | 8 | 01-22 MUDO FROM 2000 | 8 | | |
| 02-03 OC | 8 | 01-23 MUDO FROM 2000 | 8 | | |
| 02-04 OC | 8 | 01-24 MUDO FROM 2000 | 8 | | |
| 02-10 OC | 8 | 03-09 MUDO | 8 | | |
| 02-11 OC | 8 | 03-14 MUDO | 8 | | |
| 03-24 OC | 8 | | | | |
| 03-25 OC | 8 | | | | |
| 03-31 OC | 8 | | | | |
| 04-01 OC | 8 | | | | |

# EXHIBIT 6

## DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_____
Signature of Affected Employee

STATE OF OKLAHOMA )
 )
COUNTY OF _Oklahoma_ )

Witnessed before me this _24_ day of _Sept_____, 19 _99_

_____
NOTARY PUBLIC

My commission expires:

_12/18/2001_



DEFENDANT'S EXHIBIT 16

1 1 1

00000917
00000917
1486
KEB204618

STATE OF OKLAHOMA       )
                        )SS.
COUNTY OF OKLAHOMA      )

I, Robert Darst, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
ROBERT DARST

SUBSCRIBED AND SWORN  to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1487
KEB204619

STATE OF OKLAHOMA    )                    ROBERT DARST
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-9-1999. The time is 10:25. I am at 3600 Martin Luther King, at the Internal Affairs Office of the Department of Public Safety. Present in the room with me is Trooper

DARST:    Darst

GORDON:   What's your first name?

DARST:    Robert.

GORDON:   Robert Darst #474. Trooper, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

DARST:    Yes I am.

GORDON:   Sir, is this recording being made with your permission?

DARST:    Yes.

GORDON:   Sir, I have handed you a Disciplinary Interview Advice of Rights which you have read and signed. You understand what that Disciplinary Interview say sir?

1

1488
KEB204620

STATE OF OKLAHOMA     )                    ROBERT DARST
                      )SS                  TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

DARST:     Yes.

GORDON:    All right sir, so you are giving this interview freely.

DARST:     Yes.

GORDON:    All right sir, I need to cover a few basic questions with you, could you please state your complete name?

DARST:     Trooper Robert C Darst.

GORDON:    Could you spell your last name for me?

DARST:     D A R S T

GORDON:    What is your date of birth sir?

DARST:     ███████

GORDON:    And your social security number?

DARST:     ███████

GORDON:    How long you been on the patrol sir?

DARST:     Approximately five years.

2

1489
KEB204621

STATE OF OKLAHOMA   )
                )SS
COUNTY OF OKLAHOMA   )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

GORDON:    Where are you currently assigned?

DARST:    Hugo, Choctaw County detachment.

GORDON:    What is your ah, are you a regular road Trooper?

DARST:    Yes.

GORDON:    Are you on the TAC Team?

DARST:    Yes sir.

GORDON:    Which team are you on, east or west?

DARST:    East.

GORDON:    What is your assigned position sir?

DARST:    Ah, we don't normally have assigned positions, I'm assigned to the tracking team, ah, but it varies with assignments what your job will be.

GORDON:    Sir, did you participate in the events that occurred at ah, 0038 Hrs on September 24, 1999, near Sallisaw, Oklahoma sir?

DARST:    Yes.

3

1490
KEB204622

STATE OF OKLAHOMA    )                          ROBERT DARST
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

GORDON:   Could you please tell me what happened from the time that you got off I-40 and were in route to Dwight Mission Road to include the events that took place at the residence.

DARST:   Ah, Trooper Gene Hise was driving the vehicle I was riding in, I was the front seat passenger, ah, Trooper Billy Poe was the rear seat passenger, ah, we were in a convoy of five vehicles, we were the fourth vehicle ah, we were in route to serve a search warrant, felony arrest misdemeanor arrest warrant at a location that was determined by the Attorney Task Force in that area ah, we had, I had seen the warrants, they looked like good warrants to me, we had done some planning earlier in the day in order to effect these warrants in service and ah turned northbound of of Interstate 40 on to Dwight Mission Road approximately four miles west of Sallisaw, and approximately a half a mile north of the interstate we came to a crossing, I'm not sure what the highway number is, I believe it's Highway 64, ah, intersection then just north of that intersection we met members of the Drug Task Force for that district. We stopped for a few moments, no one got out of our vehicle, there's some OHP personnel that were on the team that met with some of the people that were there, outside the vehicle, I'm not sure who those people were. Not sure who it was that talked with them. After a few minutes we proceeded northbound in route to the location which was about three miles, approximately three miles north of where we had stopped and then back a mile east. Ah, we were, like I said we were the fourth vehicle in the

4

1491
KEB204623

STATE OF OKLAHOMA   )
                              )SS
COUNTY OF OKLAHOMA  )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

convoy, ah, Lt's Pettingill and McBride were in the fifth vehicle which was behind us, ah, the three vehicles in front of us were to enter a driveway just past the residence that we were serving the warrant on and approach it from that driveway. We were to stop in front of the residence, the suspects residence in our vehicle and Trooper Hise and I were to ah scale the fence at the gate and proceed northbound from the county road ah to a point just west of the suspect residence in order that we might be the chase team so that if we had some suspects flee the residence that we might be able to take them into custody. Ah, we made a little distance, we slowed down a little bit, made a little distance between our unit, Trooper Hise made a little bit of distance between our unit and the third unit in the convoy so that they might be able to get in position without us ah, being there too soon, maybe tipping off the people in the residence. As we, as we pulled up and stopped in front of the gate, it seems that the third vehicle was approaching the gate where they were entering which was a few, oh possibly two hundred yards down the road from where we stopped. Ah, Trooper Hise and I got out of the patrol vehicle and went over the gate, I'm not sure if he went over in front of me or behind me, I don't really remember, ah, I went over the gate, I started running northbound across the yards, kind of in a driveway area and I made probably 30 or 40 feet, approximately that much ah, north of the gate in the yard area and I saw a person directly in front of me, north of my location, ah, almost in the area of where I was running to, and standing in the yard ah, looking back toward the residence

5

1492
KEB204624

STATE OF OKLAHOMA     )                    ROBERT DARST
                      ) SS                 TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

it was like he's moving away from the residence, but he's looking back walking backwards maybe. I didn't see any weapons on that subject ah, I could see red and blue lights flashing on that subjects from the units that were coming in from the other side of the yard, which would of been Trooper Hamilton, Trooper Grinenger and Trooper Hash's units and ah, I drew my sidearm because that was all the weapon I had on my person, due to my assignment, and started ordering that person that I saw in the yard, to the ground and I'm not positive, but it was something to the effect of "police, get on the ground" and ah, I think I said it twice, but that person never responded to me, never even looked at me, like he hadn't even heard what I said and about the time I said those commands, I had stopped and dropped to one knee and was directing my weapon in the direction of this person I saw and about the time I got those commands out, I heard gunfire that sounded like automatic gunfire to my right in the area of the residence that we were serving the warrants on, and as I turned to my right to address that I was looking for a target on the porch, I could see the porch was real well lit because I could see ah, white Bronco that I later I knew was Trooper Hamilton's Bronco approaching the residence, moving almost straight towards it, ah, and his headlights were lighting up the porch area and I could see a lot of smoke right in front of the front door, but I couldn't see anyone on the ground or anyone, I could not see any, any target, any person, ah, I saw the glass coming off the windshield of Trooper Hamilton's vehicle ah, I kept looking for a target and I couldn't,

6

1493
KEB204625

STATE OF OKLAHOMA )
                  ) SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

I couldn't see anyone, so I moved on up to the position where I was supposed to be it was a vehicle parked kind of, oh, approximately 20 yards west of the residence and just in front of it maybe five yards, in front of the residence and it was like a '63 Chevrolet Pickup, blue in color, '60's model Chevrolet pickup, and I moved up on the drivers side of it, keeping it between me and the residence, maintaining cover on the residence, and as I moved up on the driver's side of it, I saw that Trooper Hise had a subject on the ground that looked to be the subject that I had seen as I crossed the fence and stopped in the yard and I know now that that was who it was and he was handcuffing that subject. So I moved between Trooper Hise and the residence maintaining cover on residence as he handcuffed that subject. Ah, after he had advised he had him secured, had the subject secured so he and I both moved back behind the fender, front fender of this pickup that was sitting there and approximately at that time, there was still shots being fired, sounded like automatic gunfire to me, ah, I could see, I could see someone on the ground on the other side of the Bronco, cause it appeared silhouetted with the lights from the other patrol vehicles that were on the other side of the residence. Ah, I kept looking through a window, or looking at a window there on the west edge, er west side of the residence and looking at the back of the residence what I could see of the back of the residence ah looking for a target, and I couldn't find a target and about that time was when the ah we heard someone come over our radio, our TAC radio, and said they needed some help, we had a man down, they needed a

7

1494
KEB204626

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

vehicle, Trooper Hise said at that point and time, "I'm gonna crash the gate with my car and get my car in there and get them out". So he left and I maintained cover in that position as I was assigned to do and I grabbed the individual that had been handcuffed, he was laying prone on the ground, ah, I grabbed him by the foot and drug him back, I grabbed him by his right foot, I drug him back to where I could maintain cover behind the front fender of the pickup and still maintain control of him and I stood on his right lower leg so he couldn't move and I maintained cover at that point until ah, I hadn't heard any shots for a few moments, I don't know how long of time it was and I called out directly not over radio, I called out directly to ah, the other members that I could see in front of the residence, and ask if the residence was secured, one of them advised, and I don't know who that was, called back to me directly and said "no, the residence had not been secured" so I maintained my position, at some point in there Lt Pettingill ah came through that area en route to where that person was on the ground, he ask me if I was okay and I said "yes sir" he went on and ah, few moments later after some of our team members had entered the residence and they exited again, I ask them again directly if the residence had been secured and one of them, I don't know again who it was, advised that "yes, the residence was secured" there were no other people in there other than the one they had already taken out. And at that point, I ah, escorted this prisoner that I was in custody of to a gate that Trooper Hise had crashed with his unit and turned him over to some of the drug task force, or Sheriff's

8

1495
KEB204627

STATE OF OKLAHOMA )          ROBERT DARST
                )SS       TROOPER
COUNTY OF OKLAHOMA )      OHP

## AFFIDAVIT

office people that were waiting outside (inaudible) and then I returned back to the scene to assist however I needed.

GORDON: Okay. Did you fire any rounds?

DARST: No sir, I didn't.

GORDON: Do you know if Buddy Hamilton fired any rounds?

DARST: I don't know.

GORDON: Did you assist in the taking of the suspect Kenneth Barrett into custody.

DARST: No, I did not.

GORDON: Did you know what the suspect looked like before the forced entry was attempted?

DARST: I had a verbal description of the suspect.

GORDON: Do you remember what the verbal description was?

DARST: I don't remember exact heights, somewhere around 5'7" - 5'8", something like that, slight built, skinny, with long stringy blondish hair.

9

1496
KEB204628

STATE OF OKLAHOMA   )
                    ) SS
COUNTY OF OKLAHOMA  )

ROBERT DARST
TROOPER
OHP

### AFFIDAVIT

GORDON: The individual that you took into custody, you and Hise,

DARST: Yes sir.

GORDON: Would he of fit that description?

DARST: Ah, no they also gave us an age, they did have an age on this suspect of Kenneth Barrett of being approximately 38 years old, if I remember correctly, I don't know right off hand how old he was.

And I don't remember if I ever did know exactly how old he was, but it was in that area, and the subject that we took into custody was obviously or less, approximately 20 years old.

GORDON: But physically would he of looked the same?

DARST: He could have, yes sir.

GORDON: Did you know how many weapon and, how many and what type weapons that were inside the house?

DARST: Ah, we had some intelligence that there might possibly be an automatic weapon in the house and that this subject, Kenneth Barrett, was known to carry a handgun on his person at all times.

GORDON: Did ah, was his criminal history and his ah, threats

10

STATE OF OKLAHOMA ) ROBERT DARST
)SS TROOPER
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

against law enforcement related to you?

DARST:   Excuse me?

GORDON:   Ah, was his criminal history and his threats against law enforcement related to the TAC Team?

DARST:   Yes sir, in the earlier briefing ah, we had been told that at some point prior to this ah, he had been in a stand-off with some law enforcement officers, I believe they were local law enforcement, and ah, he had attempted suicide by shooting himself in the abdomen with a long gun, I believe.

GORDON:   Do you know who provided the intelligence for this mission?

DARST:   Ahem, there were two drug task force agents ah, I'm not sure what their names are.   I've heard their names a number of times but I just can't recall them right off hand.

GORDON:   Were you all told about the sensormatic listening device on the back of the house?

DARST:   I wasn't aware of it, no.   I don't know if anyone else on the team was.

11

1498
KEB204630

STATE OF OKLAHOMA     )
                      ) SS      ROBERT DARST
COUNTY OF OKLAHOMA    )         TROOPER
                                OHP

AFFIDAVIT

GORDON:   Did you think the intelligence was okay for this mission?

DARST:   Ah, for my part of the mission, I had, I had ah, I personally had enough knowledge to perform the job that I was assigned.

GORDON:   You think it was, it was adequate for the overall mission?

DARST:   I'm not for sure about that, ah, it would be ah, I, I don't feel like I have the ability to judge that since I was not on the entry team on this particular ah, operation, ah, and I'm not sure if the, I'm sure there people that might say there was enough intelligence, ah, looking back, maybe we did need to know a little bit more, I don't know.  I don't know if there could of been more intelligence.

GORDON:   You know how the TAC Team conducted surveillance for the mission?

DARST:   Yes sir.  I, I was told by some members that did some surveillance on the mission as to what they did, but that's all I have, I don't have any direct knowledge of it.

GORDON:   What did they tell you they did?

12

1499
KEB204631

STATE OF OKLAHOMA  )
                ) SS
COUNTY OF OKLAHOMA  )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

DARST: Ah, I believe Trooper Hamilton and Trooper Grinenger and ah, Trooper Manion did a drive by earlier in the evening in Trooper Hamilton's white Bronco. I believe that's the Bronco they used earlier in the evening ah, so that they might put eyes on this particular residence so that they might know a little bit more about it, rather than just the ah ariel photographs that we had, ariel video tape

GORDON: Okay.

DARST: and officers descriptions that had been their prior.

GORDON: Do you ah, you think of anything else, ah, one last question do you know how you all arrived at 0030 to hit the hours as far as time frame?

DARST: We discussed it as a team ah, we didn't want to go too early, we had a no knock day or night search warrant which I'm sure your aware of is a good thing to have gives you a lot of options that you don't normally have on a daytime search warrant and ah, I do believe that in many of the members mind and I know in my mind that I felt like it was better to do it at some point during regular sleeping hours since we were unable to, it was decided by the team and that we were unable to put forward snipers for (inaudible) ah, (inaudible) that we felt more comfortable going at a time that would be an abnormal time for people to be out of bed

13

1500
KEB204632

STATE OF OKLAHOMA  )
                   )SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

when ah, one might expect that ah, even in my mind I would think you'd be more likely to have a ah, a drug dealer or drug user would be more likely to be in bed and not as as alert somewhere after 12:00, between 12:00 and 4:00 or 5:00 in the morning.  Ah, I know that was part of what I was thinking, I can't say what anybody else was thinking.

GORDON:  When you all rolled up did you see lights on in the house?

DARST:  I wasn't looking to see if there were lights on in the house, I had a particular mission ah, like I say Trooper Hise and I were assigned to the chase team and we had a particular area that we wanted to get to, a particular location that would provide us with some cover, it would also put us in the proper location so that anybody jetted out of the back of the house or out of the front of the house we would be able to take them in custody with the least amount of effort on our part because we weren't as familiar with the area and what not, the dangers in that there was a lot of vehicles and ah scrap iron, there was a lot of trip hazards and things that might get you injured in the dark, in a dark chase if you weren't aware of them so we wanted to put ourselves in the best location we could, so I wasn't really concentrating that closely on the house and wouldn't have at all had the shots not opened up, had there not been gunfire prior to me even reaching my post.

14

1501
KEB204633

STATE OF OKLAHOMA ) ROBERT DARST
)SS TROOPER
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

GORDON: Sure.

DARST: Ah, but I can't say if there were lights on in the house or not the lights I saw were the lights, what I see in my mind I believe were the lights of Trooper Hamilton's Bronco reflecting off the front porch and it was it was well on it because as I say, Trooper Hamilton's Bronco was pointed was right towards the front of the house and even rolled up very close to the house

GORDON: How far did he get, do you know. How far did Hamilton's vehicle get to the house.

DARST: I'm not sure it didn't touch the front porch.

GORDON: I mean was it like six feet, ten feet,

DARST: At some point I think it touched the front porch.

GORDON: Okay.

DARST: I think it rolled up in front of the actual flooring on the porch (inaudible). Ah, at some point while I was maintaining control of this prisoner that Trooper Hise and I had ah, affected the arrest on (inaudible) some point after Trooper Hise left me and, and I walked that prisoner out, there were some attempts being made by some of our team members to ah, load Trooper Eales into a

15

1502
KEB204634

STATE OF OKLAHOMA    )                    ROBERT DARST
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

vehicle and they, they tried to use Trooper Hamilton's vehicle for that and I believe it was actually pushed backward approximately 10 or 15 feet away from the residence so that when your people and the OSBI got there to do the investigation that that's not an actual representation of where that vehicle stopped.

GORDON:    Okay. Who pushed the vehicle back?

DARST:    I'm not sure, some of our team members I think.

GORDON:    Okay.

DARST:    But I'm not sure who did it, and I'm not even sure if they know who did it. Ah, but I believe that vehicle was pushed backward and it never was put into park

GORDON:    Okay.

DARST:    until maybe after it was pushed backward.

GORDON:    Okay. Can you think of anything else Trooper that might help me conclude my investigation on the events that occurred in Sallisaw on September 24, 1999?

DARST:    Ah, I don't know of anything else, (inaudible).

16

1503
KEB204635

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

ROBERT DARST
TROOPER
OHP

AFFIDAVIT

GORDON: Sir, with your permission, I'm gonna turn off the tape recorder at this time.

17

1504
KEB204636

# EXHIBIT 7

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Raymond Greninger, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
RAYMOND GRENINGER

SUBSCRIBED AND SWORN to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1506
KEB203352

STATE OF OKLAHOMA )              RAYMOND GRENINGER
                     )SS                  TROOPER
COUNTY OF OKLAHOMA )            OHP

**AFFIDAVIT**

GORDON:      This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-99. The time is 1:07. I am in the Internal Affairs office in Oklahoma City at 3600 Martin Luther King. Present in the room with me is Trooper Raymond Greninger.

GORDON:      Trooper Greninger, is you would, I'm handing you the Disciplinary Interview Advice of Right, could you please read that out loud for me sir?

GRENINGER:      I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I

1

1507
KEB203353

STATE OF OKLAHOMA )         RAYMOND GRENINGER
               ) SS         TROOPER
COUNTY OF OKLAHOMA )         OHP

### AFFIDAVIT

understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:      Okay sir, would you please sign where it says signature of affected employee and date it please. Could you please state your complete name?

GRENINGER:      Raymond C Greninger, Jr.

GORDON:      Sir, could you spell your last name for me?

GRENINGER:      G R E N I N G E R

2

1508
KEB203354

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

*COPY*

AFFIDAVIT

GORDON:        Could you state your date of birth?

Greninger:     ███████

GORDON:        Your social security number?

Greninger:     ███████████

GORDON:        How long have you been on the patrol?

Greninger:     Ah, since March of 1984.

GORDON:        Where are you currently assigned at?

Greninger:     Ah, I'm assigned to the Bomb Squad Division out of Pryor area.

GORDON:        Ah, sir, are you on the Tac Team?

Greninger:     Yes sir.

GORDON:        What is your assigned position on the Tac Team?

Greninger:     Ah, building entry.

GORDON:        Can   you   please   tell   me   what   happened   at

3

1509
KEB203355

STATE OF OKLAHOMA     )                    RAYMOND GRENINGER
                      ) SS                 TROOPER
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

approximately 0038 on September 24, 1999?

Greninger:     Okay, you just want to start when it happened, you want the background as to what we did up til this

GORDON:     If you could start with, specifically in reference to what happened in that event from the time you got off the Interstate.

GRENINGER:     Okay, we were going to execute a search warrant and a felony arrest warrant and we also had a misdemeanor warrant for an individual for named Kenneth Barrett, ah, we exited Interstate 40 on to ah I believe it's Dwight Mission Road was the name of it, when we exited the Interstate we were to link up with a task force group of Sequoyah Personnel, ah which was supposed to consist of ah, two investigators, ah, and a small group to actually take care of the, the scene once we secured the residence with a search warrant. Ah, when we pulled off the Interstate and turned north ah there was a large group of people ah, probably rough guess and I don't really know how many was there, maybe 15 or 20 people which consisted of the D.A., ah a Sheriff from another county ah, and other people that I'm not familiar with who it was.  We paused there for a minute, ah, advised them that we were en route and they were told wait, to give us two minutes and ah they could follow the procession, follow in behind us but to give us two minutes which we felt was more than enough time to get in and take care of the

4

1510
KEB203356

STATE OF OKLAHOMA       )
                        )SS
COUNTY OF OKLAHOMA      )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

situation that we had, our part of the situation.  We left there and went northbound which consisted of Trooper Hamilton's unit was in front, my unit, ah, Trooper Hise's unit, ah, Trooper Hash's unit and Lt Pettingill's unit, we had five units, we continued north to the intersecting road that turned us east to go to the residence that we were going to execute the search warrant on.  As we crossed the final intersection ah to go to the house, there was another 200 or 300, 400 yards to ah the residence which had a gate which from the Intel that we had done the prior two days and we knew that the gate was was locked and having double strand of log chain around it and two padlocks.  The plan was is for Trooper Hamilton's unit, my unit and Trooper Hash's unit to continue on a very short distance 20 - 30 yards on up, there was another road that went to another residence that ah, was not, that did not have a gate and there was, from the aerial photos, and from the drive by there was another road that we could turn into to make entry into the house to get there as quickly as possible.  As we turned into the other road, Trooper Hise's was going to peel off and stop at the gate which consisted of three people, their objective was to ah provide cover for us, also to ah, get to the site of the residence, we had information that the guy would run and try to make it to his mother's house which was next door, and also Lt Pettingill and Lt McBride ah pulled into the mother's residence and that was also their job there to take down anybody that would come.  The other three units led by Trooper Hamilton's unit, my unit was second and Trooper Hash's unit was third, was to enter the next road ah, make

5

1511
KEB203357

STATE OF OKLAHOMA   )                              RAYMOND GRENINGER
                    )SS                            TROOPER
COUNTY OF OKLAHOMA  )                              OHP

## AFFIDAVIT

an approach to the house and make entry into the house and secure the residence. As we turned into the road, and turned off of that road into the little lane that would take us into it, there ah, I, as Trooper Hamilton's unit dropped down in it, there was a ditch that was quite a bit deeper than we anticipated, I can remember seeing Trooper Hamilton's unit, the rear end of it, his bumper rear bumper bottoming out in that ditch, there was no pause though it was just a continuous motion and as I knew that I had to hit the gas, I hit the gas and we went through the ditch and we started our approach and I have drawn a blank from the time I hit the ditch up until we actually came up, I can actually hear rounds going off as we're pulling up to stop, I can see Buddy's car still moving but the distance in there I don't exactly know where in relation to where we were when we started hearing the rounds. As we pulled up to stop, I could see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of ah Trooper Hamilton's vehicle and I'm thinking, I initially my thoughts are, it's dirt, why are we shooting in the ground and ah, I can see ah, ah debris coming up, I'm sure what I was seeing was the windshield off his vehicle, fragments of glass going up in the air from the bullets, it took a few seconds to ah determine if the shots were coming from them, if the shots where coming from there and as we stopped Trooper Manion, I was driving, Trooper Manion was my passenger, ah, we stopped our vehicle in the area of where ah in relation to Trooper Hamilton, we both exited the vehicle as Trooper Manion came around first as I

6

1512
KEB203358

STATE OF OKLAHOMA   )
                   ) SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

**AFFIDAVIT**

was still putting it in park, getting it stopped and as I come out we met Trooper Eales who had made it to the rear of the Trooper Hamilton's Bronco and he dropped face down on the ground. Trooper Manion dropped and was asking "Rocky, are you okay, are you okay", and I ran back to my unit and grabbed the mike and yelled "Officer down, need help, man down" and we were gonna make entry with a hand gun, my rifle was laying right there, I grabbed my rifle and came back around the front of the car and Trooper Manion had, while he was looking Rocky, had seen movement inside the house and the guy stepped across into a window on the east side and Trooper Manion was going around to that side, I continued around the front of the car to go with him and as he got to the window, he seen the individual ah inside the room, or movement or whatever he seen and he fired a burst from an MP5 into the window, ah, as I'm coming around I can see Trooper Hamilton stepping up on the porch and I'm thinking, I can hear him yelling something at somebody, has his pistol pointed towards the door and I can hear him saying something, he's stepping up to the door, and I start yelling at Rick "Buddy's going in, Buddy's going in" ah, my intent was so Rick wouldn't fire anymore rounds because I didn't want him to, to shoot our own person. Rick heard me, he, he did not fire anymore, Buddy steps in the door, I go to Buddy and as Buddy, as I get to Buddy he's got the individual, he's drug him out and he's placed on the ah, he's placed there on the ground ah, Trooper Manion's made it back there to us then, he takes him and they place the handcuffs on him and our focus immediately, at that point, ah turns to Trooper

7

1513
KEB203359

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

Eales to what we can do for him.  Trooper Poe had made it up to the vehicle, he has the house, he has a, his A2K rifle and he has, he is holding ah, he's maintaining cover on the residence so we can do what we need to do to get Trooper Eales out of there, ah, Trooper Hise has also made it there, Trooper Hise and Trooper Hamilton and Trooper Manion are, have, we've all got to Rocky, they start working on Rocky, I look up and see that Lt Pettingill's vehicle has made it into the yard, I run down to him and tell him we need an ambulance, we need something and he tells me to get him in to one of the Broncos and get him out of there.  I run back to Trooper Hamilton's Bronco which I ah, tried to roll the back glass down from the inside, the driver's door was still open, it wouldn't go down, I ran behind it, I took my rifle I beat the back glass out of it to try to get the tailgate down and it dawns on me that the vehicle is disabled, that we can't do it, so I yell at them to get him to my vehicle, I get the tailgate down, I get everything ready, we get Rocky over, put him into the back of my vehicle and Trooper Hise get's in it and he drives it ah and takes it out, the Sheriff of, of, of Cherokee County, I can't remember her name off the top of my head and she's an RN, and a D.A.'s investigator, Clint Johnson, ah, she had gotten in, she is a registered Nurse, she's gotten in the back and she's working on Rocky and Clint Johnson's helping her and Trooper Hise and we get them out of there and they leave.  We immediately focus back on the job that we have to do and that is to secure the residence because at that point and time we don't know whether we have the shooter or the only shooter, or or

8

1514
KEB203360

STATE OF OKLAHOMA )     RAYMOND GRENINGER
         )SS      TROOPER
COUNTY OF OKLAHOMA )     OHP

COPY

## AFFIDAVIT

whether there's more, so we go back to the residence, ah Trooper, myself and Trooper Poe and Trooper Manion and Danny Oliver, who is a retired Trooper, and I don't remember if, Trooper Hash was there somewhere, I don't remember, I know the four of us made entry into the residence, secured the residence and when we got to the area that we knew had an upstairs, a small room, we needed a mirror to look up there to see if anybody was there, we yelled for a mirror and Trooper Hamilton brought the mirror in, which I took from him, handed to Trooper Manion who actually did the deal, and at that time I noticed blood on Trooper Hamilton and I could see ah, some debris in his eye, I can see some blood under his eye, and I, he was still holding his pistol and I, I ask him "Buddy, are you okay" and I reached down and touched him on the shoulder and he flinched, and when he did I felt blood and noticed here was blood on his shoulder and I did a quick physical scan of him to see if there was, I could see any other injuries to him and he says "no, I think that's all there is" I took his Sig from him, placed it in my waistband and told him "com on, I'm gonna get you to the hospital" and I took him out as I went by Lt Pettingill I told him what I was doing and I took him back out to the fence that was on the road and there was a Sheriff's deputy, I don't recall his name, I put him inside his Ram Charger and told him to get him to the hospital in Sallisaw as fast as he could get him there. I came back up to Lt Pettingill and told him that I had got Buddy out of there and got him headed toward a hospital, told him that I had Buddy's service weapon, which was his Sig, and ask him what he wanted me to do with

9

1515
KEB203361

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

it and he told me to place it ah, on the porch of the residence and to advise whoever showed up to do the investigation, that that's what had been done, that that weapon, how that weapon come to be on the porch. Ah, at that time we backed out of it, placed the crime scene around it and waited for the appropriate people to get there to process the crime scene.

GORDON: You fire any rounds during the confrontation?

GRENINGER: No sir.

GORDON: Did you assist in taking the suspect Kenneth Barrett into custody, in any way, did you touch him in any way?

GRENINGER: I never physically touch him.

GORDON: Did you see anybody else touch him or do anything mean to him?

GRENINGER: No sir, I did not.

GORDON: Basically just our Troopers touched, did we keep control of him or did we pass him off to

GRENINGER: No sir, at some point and time into the process of of, getting Trooper Eales out and securing the residence and that

10

1516
KEB203362

STATE OF OKLAHOMA    )
                      )SS
COUNTY OF OKLAHOMA  )

RAYMOND GRENINGER
TROOPER
OHP

**AFFIDAVIT**

from the proximity of where he was laying in front of it, there was also a residence, which I stated was his Mom's, at some point and time the deputies for Sallisaw ah, obtained custody of him and moved him around to the east side of the house.  When that happened or who moved him, or what I have no idea, I was not there, I didn't see anything, I don't know the time frame that it was, we were still in the process of finishing what we were sent there to do and that was to secure the residence and, and I have no idea when he was moved.

GORDON:        Okay.  And you know what the suspect looked like, you know the suspects name?

GRENINGER:    Ah, I do now, the suspects name is Kenneth Barrett.

GORDON:        Okay, did you know what he looked like prior to the entry being attempted.

GRENINGER:    No sir.

GORDON:        Did you have any kind of physical description or anything of him.

GRENINGER:    They gave us a rough physical description, but it didn't really match and right off the top of my head right now, I

11

1517
KEB203363

STATE OF OKLAHOMA      )                    RAYMOND GRENINGER
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                     OHP

AFFIDAVIT

drew a blank as to what it was, it seemed like they told us he was 5'6" or 5'7" and weighed around 150 or 160 lbs which is not, the first time that I actually seen him to look him in the face was at his arraignment in Sallisaw.  We ah, something off the question that you ask, we ask for pictures we were told that there was no pictures of Kenneth Barrett off the other arrests or or the things that he had been in trouble because they had always found a way to slide him out before the actual booking and the arrest photos could be made.  We were under the impression that there were no arrest photos of Kenneth Barrett from any other times dealing with law enforcement personnel.

GORDON:      You know how many suspects were in the house or on the property prior to being there?


GRENINGER:      Prior to


GORDON:      Prior to your getting to the house er, or prior to your making entry to the house.


GRENINGER:      There was, the only thing that was told during our, I'm gonna have to back up a couple of days now, okay, we started from the deal, Trooper Hamilton and I, three days, two days prior, did a, we met with the District Attorney, er the D.A.'s Task Force which was Clint Johnson and Frank ah, I can't remember Frank's last name right now, we met with them at the Sallisaw Airport on

12

1518
KEB203364

STATE OF OKLAHOMA )
                  )SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

instructions from Lt Pettingill to do a fly over of the area and take some aerial photos and also a video of, during that time Trooper Hamilton and I ah, we did the fly over, out pilot was Kenneth Stafford, we did the fly over, took some aerial photographs and still photos and used a video camera which was my personal video camera and and took a video of the area to attempt to formulate some sort of a plan, to look at the area to see what would be our best option to be able to maintain the element of surprise off this deal. At that time the questions that was ask, is, you know, is he there, who lives with him, ah, all this information, we were led to believe under the assumption that he was a real recluse, he never left the property, he lived by himself, and that ah, to distribute his drugs that the people came to him, that there was nobody that lived there with him. Ah, that was two days, in the afternoon before we executed the raid after midnight that night, Trooper Hamilton, Trooper Manion and myself did a drive by of the residence to ah, to look at it a little closer just to maintain that all the information that we had was accurate and true and that we had that we had the best plan, we had met when we arrived that morning and formulated a plan and we just wanted, we always attempt to do a drive by to make sure what we're looking at from the air is actually what we're looking at from the ground. Ah, our initial plan was to deploy snipers across the road, they were gonna come up and cut the gate for us, but after we did the drive by the area was so tight there's so many houses, so many dogs and everybody is there, that there was no place to deploy

13

1519
KEB203365

STATE OF OKLAHOMA )                              RAYMOND GRENINGER
                  )SS                            TROOPER
COUNTY OF OKLAHOMA )                             OHP

AFFIDAVIT

those people without taking an extremely high risk of compromising them and ah causing us problems other than that. Ah, at that time when we did the drive by, at the residence, there was two male individuals in the outside of the residence. There was a bunch of cars out front and there was two male individuals out there, we still didn't know because we did not have a photograph, all we had was a physical description of the individual, whether one of them was Kenneth Barrett or not at that time, ahem, so to answer your question, we at that point and time, we took under the assumption that there was possibly gonna be more because we had seen people, that we were led to believe by the people that we were actually executing the warrant for that he was a recluse that lived by himself, and there would probably be nobody else there.

GORDON:      You know how many and what type of weapons were inside the house?

GRENINGER:      The only type of weapons that I can, there was a, when we made entry into the residence to secure it after he had been brought out, course he had a handgun on him, there was a, in the, as you go into the door there's, ah, this is an extremely, extremely small place, there's a living room type area or whatever in the front and there a, immediately to the right there's a, a little nother type room, I mean it's too little to be, my closet in my house is bigger than that, but it's a real small room, in the floor of that residence when we did make entry the stairway to go

14

1520
KEB203366

STATE OF OKLAHOMA    )                          RAYMOND GRENINGER
                     )SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

                         AFFIDAVIT

up was right there, there was a M-16/AR15 type rifle laying on the, in that floor, there was a sawed off double barrel shotgun laying in that floor that was not picked up and not disturbed in any way by any of the people that we had there so what they were, caliber or anything like that I don't know, but there was two weapons laying there and that is the only weapons that I seen inside the house.

GORDON:        Okay.  Were you all advised of the criminal history of the suspect?

GRENINGER:     Ah, yes, we were advised that, off the warrants were advised that he'd made, we'd been advised that he'd been making statements that he wouldn't be taken alive, we knew that the ah, the felony arrest warrant that we had ah, was a felony arrest warrant for ah, unlawful delivery or something of ah, of a controlled substance and that the misdemeanor warrants were, had occurred then they attempted to arrest him on that deal and he had pulled weapons, we were familiar about this criminal history, yes.

GORDON:        Do you know who provided intelligence for this mission to the patrol tactical team?

GRENINGER:     Ah, yeah, I believe it would be the people that I stated earlier, it was Clint Johnson, and Frank, I can't remember

15

STATE OF OKLAHOMA       )                    RAYMOND GRENINGER
                        )SS                  TROOPER
COUNTY OF OKLAHOMA      )                     OHP

AFFIDAVIT

Franks last name right now, they are the D.A.'s Task Force for Sequoyah/Cherokee County, that type, that area.

GORDON:        Do you think that the intelligence that they provided the TAC team was okay?

GRENINGER:        Well, that's ah, that's a rough question, ahem, I think, I think, Franks last name I think is Lloyd, I'm not sure, but I think that's what it is, but the information that we were given, I think that there was other information that we didn't receive ah, and the only reason I say that is because after the fact information has surfaced and I don't know whether that information is accurate or whether or whether it's people talking. At that particular time when we did the warrant, we believe that we had the most up to date and accurate information that we could go off of, ah, so not knowing whether all the speculation and the talk and the rumors and all of that are true, I would have to say from doing the actual warrant that day, I felt that we had the most up to date information and not knowing whether everything else is true or not  and you know, it's hard for me to answer that question.

GORDON:        Okay.  Do you know what type of vehicles were used to conduct surveillance on the residence, either by the patrol or the D. A.'s Task Force?

GRENINGER:        The only vehicle on the patrol side that was used to

16

1522
KEB203368

STATE OF OKLAHOMA  )                                RAYMOND GRENINGER
                   )SS                              TROOPER
COUNTY OF OKLAHOMA )                                OHP

## AFFIDAVIT

do surveillance on it was a white 1985 Ford Bronco which was Trooper Hamilton's Bronco, it was totally unmarked, it does have antennas on the top but we stopped and removed all the antennas off the vehicle before we made the drive by. Ah, there was no markings, it has a plain tag on it, that was the only vehicle that we used, used by patrol personnel that I am aware of other than the aircraft to do any surveillance on it.

GORDON:        Did you say '85 or '95?

GRENINGER:     I mean ah, I'm sorry it's '95, drives like an '85.



GORDON:        Do you know, do you know why the interior lights were not deactivated, on Hamilton's vehicle?

GRENINGER:     Well, I'll tell you Lieutenant, I've, the interior light on that vehicle had no bearing on what happened there in my opinion. I've been a firearm instructor a long time and I've done that and I walked into the (inaudible) and he had a pet peave for me I walked into the garage and Darrell at the garage, when I pulled my vehicle with Trooper Hamilton in it, I'm sorry, it was Trooper Hise, when we come up he walks out there and I'm trying to get something worked on on mine and he looks into mine, when the door opens on it and he looks in there and says "that light right there it's working in here, that's what killed Trooper Eales". I'm

17

1523
KEB203369

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

sorry, that's not what killed Trooper Eales, that light had no bearing whatsoever, they were taking fire a long time before that, you can look at the patterns on the windshield and when that, when that door opened, the man was already shooting, the pattern was aiming at the center of the windshield coming that way, I'm sure he seen the door open, I don't believe there was enough light off of that that it made a difference. Why it was not deactivated, I do not know, why is not every passenger dome light on ever patrol car we have across the state deactivated, but they work, and that's an individual preference, up to the Trooper. I do not believe that that light had any bearing over what happened.

GORDON: Okay. Can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw on September 24, 1999.

GRENINGER: No.

GORDON: Trooper Greninger, are you aware that our conversation has been recorded and may be reduced to a typed sworn affidavit for your signature at a later date sir?

GRENINGER: Yes sir.

GORDON: Sir, with your permission, I'm gonna turn off the tape recorder at this time.

18

1524
KEB203370

STATE OF OKLAHOMA    )
                          )SS
COUNTY OF OKLAHOMA    )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

COPY

COPY

19

1525
KEB203371

# EXHIBIT 8

STATE OF OKLAHOMA     )
                      )SS.
COUNTY OF OKLAHOMA    )

I, John Hamilton, Jr, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
JOHN HAMILTON, JR


SUBSCRIBED AND SWORN  to before me, a Notary Public, this

_____ day of _____, 1999.


_____
Notary Public

My Commission expires:


_____

1527
KEB201816

STATE OF OKLAHOMA   )
                        )SS
COUNTY OF OKLAHOMA   )

            JOHN HAMILTON
            TROOPER
            OHP

**AFFIDAVIT**

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-1999. The time is approximately 2:04. I am present in the Internal Affairs office, 3600 Martin Luther King, Oklahoma City. Present in the room with me is Buddy Hamilton.

GORDON: Trooper Hamilton, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

HAMILTON: Yes.

GORDON: Is it being done with your permission sir?

HAMILTON: Yes.

GORDON: Sir, I have handed you the Disciplinary Interview Affidavit, could you please read that out loud for me?

HAMILTON: I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also

1

1528
KEB201817

STATE OF OKLAHOMA    )
                        ) SS
COUNTY OF OKLAHOMA  )

JOHN HAMILTON
TROOPER
OHP

**AFFIDAVIT**

understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of the state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:   Okay, sir if you will please sign right there where it says signature of affected employee.

HAMILTON: (writing noise)

GORDON:   Thank you sir.   Sir can you please state your complete name for me?

2

1529
KEB201818

STATE OF OKLAHOMA    )
                     ) SS
COUNTY OF OKLAHOMA   )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

HAMILTON: John Mark Hamilton, Jr.

GORDON: Could you spell your last name?

HAMILTON: H A M I L T O N

GORDON: Could you give me your date of birth sir?

HAMILTON: █████████

GORDON: And your social security number?

HAMILTON: █████████

GORDON: Sir, how long have you been on the patrol?

HAMILTON: Approximately 15 years.

GORDON: Where are you currently assigned?

HAMILTON: Bomb Squad.

GORDON: Are you on the Tac Team sir?

HAMILTON: Yes.

3

1530
KEB201819

STATE OF OKLAHOMA    )
                     )SS        JOHN HAMILTON
COUNTY OF OKLAHOMA   )          TROOPER
                                OHP

AFFIDAVIT

GORDON:    What is your assigned position on the Tac Team?

HAMILTON: I'm assistant team leader.

GORDON:    What does assistant team leader do?

HAMILTON: Help coordinate with the team leader planning activities, training, missions.

GORDON:    Sir, can you tell me what happened at 0038 on September 24, 1999 and I would like you to start from ah, the time that you got off the Interstate.

HAMILTON: Got off, exited the Interstate at Dwight Mission Road and I-40, turned northbound on Dwight Mission Road, we met (inaudible) task force unit, consisting of about 10, well maybe as many as 15 people ah, we had a short meeting there in which we discussed we would go in and take the subject down (inaudible) Kenny Barrett and then they would give us a two minute interval then they would come in with the rest of the team to process the scene, subsequent to a search warrant, and they already had a misdemeanor and one felony search warrant. We left from that meeting and I was the lead unit and there was five units total, I think 11 people in all the units all together. As we approached ah subject's house, saw someone standing close to it, either the house or in the yard, (inaudible) we had a physical description of this guy, he had scraggly hair,

4

1531
KEB201820

STATE OF OKLAHOMA   )
                       )SS
COUNTY OF OKLAHOMA   )

JOHN HAMILTON
TROOPER
OHP

### AFFIDAVIT

and he was small build and this seemed to match our description. We couldn't go in the main gate at the house because it had ah ah, aluminum gate with heavy chains around it, so we went to the next drive to the east of the residence and (inaudible), as we turned in and went north on this, just a little ways then veered off to the left toward the subjects house which there was a big ditch, when we hit the ditch, we came up out of it the person was still standing there in the yard, and some time between the time that we turned off the road and the time we hit the ditch I heard someone yelling, (inaudible) around the house, I couldn't tell what they were saying, I just (inaudible) after we crossed the ditch and shortly thereafter, the shooting started, bullets started hitting the Bronco, (inaudible) and Trooper Eales (inaudible) I kept driving towards the subject that had been standing in front of the house. The vehicle stopped, bullets were still coming, we were still under fire, the vehicle came to a stop and maybe even before it stopped ahem, I just stopped the vehicle and I laid down between the seats and I had a stun (?) or flash bang in my hand that we were gonna use on the entry to the house and I throwed it outside the vehicle and it detonated, and when it detonated I exited the vehicle and went to the back of the Bronco and there where I saw Trooper Eales (inaudible) on the ground and Trooper Manion was kneeling next to him then I turned and went back toward the front, I didn't know it was Trooper Manion at the time, I just knew it was one of our people, I went back to the front of the Bronco and we had a five man entry team which Rocky and I, Raymond, Rick, and Steve Hash

5

1532
KEB201821

STATE OF OKLAHOMA )        JOHN HAMILTON
                )SS        TROOPER
COUNTY OF OKLAHOMA )        OHP

AFFIDAVIT

were a part of it, and we were (inaudible). I looked inside the house door, the house was open, I couldn't see anything then I saw movement in the house, ah, just some hands and a (inaudible) I had been shot near the left eye and I, I, didn't know who was in the house, I didn't know if it was some of our people or or if it was the suspect or who. Shortly thereafter I heard some shots from an MP5, the guy fell through the door, and I could see it wasn't one of our people, then I went in the house and grabbed him and drug him out by his hair (inaudible) once I got him outside I released him and I believe it was Trooper Hash took him from there, or Trooper Manion, I don't know which one. One of them searched him real quick, cause once I got him out I released him, and I went back to Rocky, they found a handgun in his waistband that I didn't see, I saw that he had a rifle in the house, Trooper Hash (inaudible) Ricky, myself, Gene Hise (inaudible) cut the shirt off and vest off of him, (inaudible) with the shirt off of him I looked for bullet hole wounds, I saw a small hole on his left side, and somebody said they needed something that I had in my medical kit, that's when Gene and Rick stayed there and Gene lifted him to (inaudible), I went to get my medical kit from the Bronco, came back, they had hollered for another vehicle to come up, another vehicle came up, which was Raymond Bronco, loaded Rocky in the back of it, I had Rocky by his feet and Rick had him around the arm and loaded him in the Bronco and they took Rocky. The rest of the house wasn't cleared so ah, (inaudible) I'm not sure about that and that's when Raymond saw that I was bleeding around the face and

6

1533
KEB201822

STATE OF OKLAHOMA    )                      JOHN HAMILTON
                     )SS                    TROOPER
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

(inaudible) the Deputy ( inaudible) and went to the hospital, I left the scene at that time.

GORDON:    Did you fire any rounds during the confrontation?

HAMILTON: (inaudible)

GORDON:    Did you know what the suspect looked like prior to the forced entry?

HAMILTON: Just (inaudible) we had no picture, no photograph to look at (inaudible) they just gave a description of him, long blond hair, and small build.

GORDON:    Was there any explanation given why they didn't have a photograph of Kenneth Barrett?

HAMILTON: Said he had never been arrested, he had been arrested but he had never been booked into the County jail, (inaudible).

GORDON:    Did you know how many suspects were in the house on the property prior to the forced entry.

HAMILTON: We were told he lived by hisself and (inaudible) supposed to be a distribution point for a lot of the area,

7

1534
KEB201823

STATE OF OKLAHOMA   )
                    )SS
COUNTY OF OKLAHOMA  )

JOHN HAMILTON
TROOPER
OHP

AFFIDAVIT

GORDON: So basically you did not know how many people were in the house at the time.

HAMILTON: We were (inaudible)

GORDON: Did you know how many and what type of weapons were in the house?

HAMILTON: There was information given to us from the Task Force Agents, (inaudible) rumor had it he was (inaudible), from information there was automatic weapons, (inaudible) as far as (inaudible) he had backed a Deputy down and shoot hisself, that was one of the things that (inaudible).

GORDON: Were you advised of the suspects threats against law enforcement and his criminal history, did they give you a complete run down about him?

HAMILTON: They, they did a bio segment. He had made threats to law enforcement, (inaudible)

GORDON: Do you know who provided intelligence for the mission to the Tac Team?

HAMILTON: I know two people told, myself and Trooper Greninger prior to the execution of this, I don't know who

8

1535
KEB201824

STATE OF OKLAHOMA    )                      JOHN HAMILTON
                        )SS                   TROOPER
COUNTY OF OKLAHOMA   )                      OHP

**AFFIDAVIT**

GORDON:    You think that the intelligence was acceptable for this mission?

HAMILTON: At the time yes, but now, no.

GORDON:   Did the Tac Team conduct surveillance for this mission?

HAMILTON: Yes,

GORDON:    What type of surveillance did the Tac Team conduct?

HAMILTON: We drove by the residence (inaudible) and observed it just to get a (inaudible) of the lay out, see what was going on, that's where we observed the chain on the gate, the size of the house, (inaudible), houses, animals, that might give us up (inaudible). The people that lived around this subject were either sympathetic or family member. (Inaudible).

GORDON:   There was a sensor device on the back door, tell about that?

HAMILTON: No.

GORDON:   You know what type of vehicle they used to conduct surveillance,

1536
KEB201825

STATE OF OKLAHOMA )        JOHN HAMILTON
               ) SS     TROOPER
COUNTY OF OKLAHOMA )      OHP

AFFIDAVIT

HAMILTON: we used a white Bronco, we removed all the antennas, his windows were tinted, we went by with street clothes, myself, Trooper Greninger and Trooper Manion. We drove by went down the dead end road and there's a man baling hay, we acted like we were (inaudible), one way in and one way out

GORDON: See anybody at any time?

HAMILTON: Yeah, the person now we know is the son was standing right there and I believe he was talking to some man (inaudible)

GORDON: Do you know why the lights, interior lights of your unit were still activated?

HAMILTON: my interior lights?

GORDON: yes sir, on your Bronco.

HAMILTON: (inaudible)

GORDON: Did you make the request at any time for the lights to be turned off, or deactivated?

HAMILTON: (inaudible)

GORDON: Buddy can you think of anything else that might help me

10

1537
KEB201826

STATE OF OKLAHOMA     )                          JOHN HAMILTON
                      )SS                        TROOPER
COUNTY OF OKLAHOMA    )                          OHP

1538

AFFIDAVIT

conclude my investigation of the events that occurred in Sallisaw on September 24th?

HAMILTON: As far as the interior light, I don't know (inaudible)

GORDON:   Inaudible.

HAMILTON: Headlights on, (inaudible) interior lights on, I've heard (inaudible), I don't know, maybe that's possible, but we had a plan, everybody (inaudible) and this went bad, looking back now we could of done some things different, but (inaudible).  The guy was either ready by way of being informed on the, yard and he saw several vehicles coming up the road, and you thought they might be the (inaudible) units behind him which one of them is a marked black and white unit, had overheads on as they turned off the county road, so he knew who we were, (inaudible), so, I guess the reason the lights were not on when we hit that ditch, it was such a jar, I, I, (inaudible) shortly there after that when (inaudible) started.

GORDON:   Buddy the time is approximately 19 minutes after 2:00 and I'll turn off the tape recorder.

11

1538
KEB201827

# EXHIBIT 9

*DISCIPLINARY INTERVIEW ADVICE OF RIGHTS*

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_____
Signature of Affected Employee

STATE OF OKLAHOMA            )

COUNTY OF OKLAHOMA           )

Witnessed before me this 24 day of Sep , 19 99

_____
NOTARY PUBLIC

My commission expires:

Sept 15, 2002

108

DEFENDANT'S EXHIBIT 14

00000915

00000915

KEB204433

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Steve Hash, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
STEVE HASH

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1541
KEB204434

STATE OF OKLAHOMA    )                          STEVE HASH.
                     )SS                         TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety. I am conducting a personal interview with Trooper Steve Hash, #720 at the Internal Affairs and Special Investigations office located at 3600 Martin Luther King.  Present in the room with me are Trooper Steve Hash and myself.

GORDON:   Trooper Hash, are you aware that our conversation is being recorded and may be  reduced to a typed sworn affidavit for your signature at a later date?

HASH:     Yes.

GORDON:   Trooper Hash, is this being done with your permission?

HASH:     Yes it is.

GORDON:   Trooper Hash, at this time I'm going to hand you a Disciplinary Interview Advice of Rights form and I need for you to read it out loud for me sir.

HASH:     I understand that I am being questioned as
          part of an official investigation of the
          Oklahoma Department of Public Safety and will
          be asked questions specifically directed and
          narrowly related to the performance of my

1

1542
KEB204435

STATE OF OKLAHOMA )    STEVE HASH
        )SS      TROOPER
COUNTY OF OKLAHOMA )    OHP

AFFIDAVIT

official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON: Okay, will you please sign that for me and date it. Okay, today's date if Friday, November 19th, the ah time is approximately 20 minutes until 2:00. Trooper Hash, I have a few questions here for you sir. Could you please state your complete name

2

1543
KEB204436

STATE OF OKLAHOMA   )               STEVE HASH
                        )SS              TROOPER
COUNTY OF OKLAHOMA   )               OHP

**AFFIDAVIT**

HASH:     Steven Eugene Hash.

GORDON:   Can you spell your last name sir?

HASH:     H A S H

GORDON:   Could you give me your date of birth?

HASH:     █████████

GORDON:   And your social security number sir.

HASH:     █████████

GORDON:   Sir, how long have you been with the patrol?

HASH:     15 years this month.

GORDON:   Where are you currently assigned?

HASH:     Troop C, Wagoner detachment.

GORDON:   What is your current position at that assignment?

HASH:     Road Trooper.

3

1544
KEB204437

STATE OF OKLAHOMA   )                     STEVE HASH
                    )SS                    TROOPER
COUNTY OF OKLAHOMA  )                     OHP

AFFIDAVIT

GORDON:   Road Trooper.   Sir, are you on the Tac Team?

HASH:   Yes I am.

GORDON:   Ah, I understand that the Tac Team is divided ah, by I-35 being East and West Team, which team are you on?

HASH:   I'm on the East Team.

GORDON:   East Team.   What is your assigned position on the team sir?

HASH:   I'm tracking member.

GORDON:   Can you tell me, sir were you present in Sallisaw, Oklahoma on September 24, 1999?

HASH:   Yes I was.

GORDON:   Can you tell me what happened at approximately 0038, September 24, 1999, from the time that you left the Interstate, which would be I-40 and Dwight Mission Road.

HASH:   From the time we left there?

GORDON:   Yes sir.

4

1545
KEB204438

STATE OF OKLAHOMA )                         STEVE HASH
                  )SS                       TROOPER
COUNTY OF OKLAHOMA )                         OHP

AFFIDAVIT

HASH:    We had met with the D.A.'s investigators, Sheriff Department members by I-40, drove off going to serve a search warrant, arrest warrant. I was the third unit back, I was the ram man, I had the door ram, I was the third unit back ah, on the entry team that day. Traveled, followed Buddy Hamilton, Buddy had already been by the house that we were going to and knew the location. Buddy and Rocky were in their truck, I was behind Raymond Greninger, Ricky Manion, they were directly in front of me, followed them on the black top road off on a county road, there's a driveway, made a left turn into a driveway, just as soon as we made the left hand into the driveway I knew from our briefing that's the house we were gonna hit right by that area, had a ah marked car with overhead lights, I turned my overhead lights on followed them in the driveway, got to a ditch, had to cross a ditch, came out of the ditch Buddy was in front of me and Rick Manion, Raymond were in front of me also, just as soon as crossed the ditch, I could hear pops ah, looked toward the front of the house to see gunshots coming from the front of the house, ah, saw something fly off the front of Buddy's truck over the top of it, had Agent, retired Trooper, Danny Oliver with me, I told Danny "we've got shots fired" Raymond Greninger's break lights came on, I locked my car down and stopped, ah, started exiting the car, I was the ram man, had my hands tied up with the ram, had a shotgun strapped my back, got out of my car, kicked the ram off one side, got the shotgun off my back, trying to find where the shots were coming from, had been coming from, there was on Bronco, which I

5

STATE OF OKLAHOMA    )                      STEVE HASH
                     )SS                    TROOPER
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

find out is Buddy's, it close to the front of the house, still see some shots being fired, there's flames coming off, took a run on the house trying to find a target, ah, Rick Manion crossed in front of me he went to a window on the side of the house and went to the window on the side of the house, just as I got to Rick he raised up and fired through the window, saw a shadow fall, the only think I saw was a shadow that fell ah, (inaudible) fast it went, it was about that fast.  Shadow falls, I heard somebody holler, "Buddy" er I heard Buddy hollering at somebody, I could tell that he had somebody spotted and he was hollering at them to "come out, come out", and he had somebody spotted, and somebody else hollering, said ah, "Buddy's going in" hot footed around in front of the house, Buddy's going in the house, went in the house, Buddy had his hands on one suspect, we drug him out, drug him off the porch got him out in the yard, handcuffed him, Rick Manion and I handcuffed him, had slight resistance, had him hands underneath him, had that prisoner, like we was cuffing him up some of the other members went inside cleared the house, Raymond Greninger talked to Buddy, was telling Buddy, you know, "your hit" telling Buddy that he was hit, took his gun away from, I saw that, laid it on the porch, somebody else, somebody said Rocky'd been hit, come back out to move the suspect I could see Rocky laying in the back of the Bronco, went on over towards where Rocky was at, Ricky Manion and somebody else started working on Rocky, they were talking to him, not gettin much response out of him, come back over to where the suspect was, he moved over, he started rolling on one side and I stay with the

6

STATE OF OKLAHOMA    )                 STEVE HASH
                     )SS          TROOPER
COUNTY OF OKLAHOMA  )                 OHP

**AFFIDAVIT**

suspect until the Sheriff Deputy or Sheriff, I believe it was the Sheriff that showed up, Sheriff showed up and said that we should move him around to the side of the building, (inaudible) we moved him around the side if ask him if he'd take control of him, he did, and I went back to where they were loading Rocky up, got Rocky out of there, got Buddy loaded up, got Buddy out of there about that the all (inaudible) showed up,

GORDON: When you went through the gate, you said you guys went down and turned into a drive way, did you all have your emergency lights on at that time?

HASH: I did not. Someplace (inaudible) county road, before I, about the time I turned in when is turned the lights on.

GORDON: Did Buddy Hamilton or Raymond Greninger either one turn their lights on?

HASH: They've got front lights, I was behind them I couldn't tell.

GORDON: Did you see any (inaudible) guys pull in behind any back lights (inaudible)

HASH: No, (inaudible)

7

1548
KEB204441

STATE OF OKLAHOMA )         STEVE HASH
                )SS        TROOPER
COUNTY OF OKLAHOMA )        OHP

### AFFIDAVIT

GORDON: Ahem, when you guys made the turn, you got Buddy Hamilton, Rocky Eales, Raymond Greninger and ah

HASH: Rick Manion

GORDON: Rick Manion, yourself and Danny Oliver, was your caravan?

HASH: Right.

GORDON: Okay, when you all are going into that, when you say you hit this ditch, did you pause any there in the ditch?

HASH: No, nobody did.

GORDON: Okay, so you just hit it and ran

HASH: That all, soon as I saw Buddy hit, I saw where he had (inaudible) and I saw Rick and Raymond hit it and I knew it was rough, I kind of just made it across.

GORDON: You kind of made it across. How long did it take them to get in and out of it, do you think?

HASH: Ah, we were moving at a good clip, just a few seconds between cars.

8

1549
KEB204442

STATE OF OKLAHOMA )     STEVE HASH
        )SS     TROOPER
COUNTY OF OKLAHOMA )     OHP

<div align="center">AFFIDAVIT</div>

GORDON: Okay, you said you heard shooting and you saw muzzle flashes, could you see where Buddy's vehicle was in reference to the muzzle, was it already up close to the house, was it at the ditch, where was it

HASH: It had cleared the ditch, I was the last unit in, whenever I cleared the ditch, about the time I cleared the ditch, that's whenever I heard the shots and I glanced up and seen the flashes coming out, Buddy was (inaudible) it would be two car lengths in front of me, he had his still moving.

GORDON: Okay, so, could you see the suspect standing at the end of the porch?

HASH: No. I never saw anybody on the porch, the only flashes I could see were coming out of the doorway. I never saw anybody on the porch.

GORDON: Okay.

HASH: I did see ah, you know, during all this time I could see somebody straight across from the house going over to his momma's house, (inaudible) but I was concentrating on the muzzle flash.

GORDON: Okay, so, so you didn't see anybody on the porch, you saw the muzzle flash from inside the door?

<div align="center">9</div>

STATE OF OKLAHOMA )
                  )SS
COUNTY OF OKLAHOMA )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

HASH:    It was inside the door.

GORDON:   Okay.  And then Buddy's vehicle was coming up, your saying he's taking hits?

HASH:    Yeah, Buddy when he started in the curve (inaudible) he was out of my vision, but he was right in front of me a little bit (inaudible) then he curved back in and I could see something coming off the front of the car, I thought, I didn't know what it was, I know now.

GORDON:   So Buddy continued to drive up to the car even though he was taking hits?

HASH:    Driving up towards the house?

GORDON:   Yeah.  Did you fire any rounds during the confrontation?

HASH:    Did not.

GORDON:   Did you have a chance to or not an available target?

HASH:    No target.

GORDON:   You said that when you looked at the window ah, you saw a shadow, what, what only allowed you to see a shadow in that

10

1551
KEB204444

STATE OF OKLAHOMA ) STEVE HASH
)SS TROOPER
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

window?

HASH: Curtain. (Inaudible) what I figured would be the front room

GORDON: Okay.

HASH: (inaudible) I could see the curtain moving whenever Rick fired, so I knew he had a target (inaudible)

GORDON: Could you, so your saying you could absolutely make out Kenneth Barrett or couldn't

HASH: I couldn't.

GORDON: Is that the reason you held your fire, you couldn't make out

HASH: Oh, I'd see something fall, I didn't know what was falling,

GORDON: But you didn't know if it was Kenneth Barrett or not?

HASH: I did not.

GORDON: Did you know what the suspect looked like before the

11

1552
KEB204445

STATE OF OKLAHOMA )       STEVE HASH
        ) SS        TROOPER
COUNTY OF OKLAHOMA )       OHP

<div align="center">AFFIDAVIT</div>

forced entry was attempted?

HASH: Ah, I knew he was lean, blond headed, shaggy blondish-brown hair, (inaudible)

GORDON: How, how did you get that information (inaudible)

HASH: Ah, (inaudible) in the briefing before they were talking about a white male, blond headed.

GORDON: Now was that the briefing that was held at Camp Gruber?

HASH: Yes. I think they gave an approximate age on him, but (inaudible).

GORDON: Did you know how many suspects were in the house, or on the property at the time of the forced entry?

HASH: No.

GORDON: Did you have an approximate?

HASH: Are you talking about before we got there,

GORDON: Right, before you got there, from information in the briefing

<div align="center">12</div>

STATE OF OKLAHOMA    )              STEVE HASH
                    )SS         TROOPER
COUNTY OF OKLAHOMA  )              OHP

                          AFFIDAVIT

HASH:    We figured at 12:30 there would probably one or two, (inaudible)

GORDON:    You how many and what type of weapons were in the house?

HASH:    No.

GORDON:    Had any of that been covered in the briefing?

HASH:    Ah, they said he had a handgun all the time, there was no information about his rifles, shotguns, anything like that (inaudible).

GORDON:    There was a sensomatic listening device on the back of the house, was that related at the briefing?

HASH:    No.

GORDON:    Any kind of security measures that Mr Barrett might of taken if he thought that he was going to be taken, if he thought he was going to be arrested by the police or anything like that?

HASH:    (inaudible) D.A.'s office the Task Force members, he had barricaded himself in the house before and he had a habit of running to his mothers house.

                              13

1554
KEB204447

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

GORDON: Did anybody say anything about any devices that he might of used.

HASH: No.

GORDON: You know what kind of criminal history he had? Was it violent, not violent.

HASH: Ah, (inaudible) in the house once before and he had shot himself once before.

GORDON: Had he ever used any violence toward any police officers or anybody, did they say?

HASH: Ah, I really don't recall, (inaudible)

GORDON: Did ah, do you know who provided the intelligence to the patrol tactical team?

HASH: (inaudible)

GORDON: You also had a confidential informant that had been inside the house and had some diagrams?

HASH: He might of been, he had a mock of the house, (inaudible)

14

1555
KEB204448

STATE OF OKLAHOMA   )
                    )SS
COUNTY OF OKLAHOMA  )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

GORDON:   Was it accurate?

HASH:   I never made to, past the front door, (inaudible) I could see pretty much everything from the front door there was (inaudible)

GORDON:   You think the intelligence was okay for this mission?

HASH:   I think it was except for (inaudible)

GORDON:   Why did you all, the tac team elect to do this assault at 12:30 AM?

HASH:   Well, trying to give him enough time to where he would be at the house and even have some people there, (inaudible).

GORDON:   (inaudible) concerned about the security possibly an informant.  Do you know why that concern was there, was it just information, what.

HASH:   I don't think so.

GORDON:   Okay ah,

HASH:   (inaudible)

15

1556
KEB204449

STATE OF OKLAHOMA    )                    STEVE HASH
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

GORDON:   Any of them did you have reason to believe somebody was leaking information back to the suspect?

HASH:     No (inaudible)

GORDON:   As far as you knew, intelligence for this particular mission, was it secure or

HASH:     (inaudible)

GORDON:   You know what type of vehicles were used to conduct surveillance on the residence?

HASH:     (inaudible) they drove the Bronco's (inaudible) I don't know what the D. A.'s office used.

GORDON:   Ahem, back to the entrance, you had your lights going, okay did you turn your lights on just as quick as you turned into the gate or after you came out of the ditch?

HASH:     No, probably before the got off the road, just about the time (inaudible)

GORDON:   Did you ah, while you were out there you know who (inaudible)

1557
KEB204450

STATE OF OKLAHOMA  )
                   )SS
COUNTY OF OKLAHOMA )

STEVE HASH
TROOPER
OHP

AFFIDAVIT

HASH:    (inaudible)

GORDON:  Did you see their lights, did they have their lights activated?

HASH:    I don't know.

GORDON:  How about Lt Pettingill and Lt McBride, did they have their lights on?

HASH:    Now they peeled off and went in the driveway before, (inaudible) if they had em on, (inaudible) whenever they went in (inaudible)

GORDON:  Somewhere Hise's vehicle was there at the gate, to the house do you know how far that was?

HASH:    (inaudible)

GORDON:  Sir, can you think of anything else that might help me complete my investigation of the Sallisaw incident?

HASH:    No.

GORDON:  Okay, at this time I'm gonna turn off the tape recorder.

17

1558
KEB204451

STATE OF OKLAHOMA   )                STEVE HASH
                    )SS               TROOPER
COUNTY OF OKLAHOMA  )                OHP

AFFIDAVIT

18

1559
KEB204452

# EXHIBIT 10

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Gene Hise, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
GENE HISE

SUBSCRIBED AND SWORN  to before me, a Notary Public, this

_____ day of _____ , 1999.

_____
Notary Public

My Commission expires:

_____

1561
KEB201703

STATE OF OKLAHOMA   )
                      )SS
COUNTY OF OKLAHOMA  )

GENE HISE
TROOPER
OHP

**AFFIDAVIT**

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 8, 1999. The time is 4:00. I am present in the Internal Affairs Office at 3600 Martin Luther King. Present in the room is Trooper Gene Hise.

GORDON: Trooper, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

HISE: Yes.

GORDON: Is this conversation being recorded with your permission?

HISE: Yes sir.

GORDON: Okay Gene, I've got some questions that I need to ask you sir, and we'll start out with ah, can you please state your complete name?

HISE: Gene Andrew Hise, Jr.

GORDON: Can you spell your last name for me.

HISE: H I S E

1

1562
KEB201704

STATE OF OKLAHOMA    )                      GENE HISE
                     )SS                    TROOPER
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

GORDON:   Ah, can you please give me your date of birth?

HISE:     ███████████████

GORDON:   And your social security number?

HISE:     ████████████

GORDON:   How long have you been on the patrol?

HISE:     Approximately nine years.

GORDON:   Where are you currently assigned sir?

HISE:     Ah, Will Rogers Turnpike, Troop XA, Northeast Oklahoma.

GORDON:   Are you on the Tac Team?

HISE:     Yes sir, I am.

GORDON:   What is your position on the Tac Team?

HISE:     Entry team.

GORDON:   Entry team.  How long have you been on the Tac Team?

2

STATE OF OKLAHOMA   )
                      )SS
COUNTY OF OKLAHOMA  )

GENE HISE
TROOPER
OHP

AFFIDAVIT

HISE:    Ah, approximately 2 years come February of 2000.

GORDON:   Okay, can you tell me what happened on September 24th, at 0038 and start from when you got off of the, of I-40.

HISE:    East Divisional Tactical Team was serving a warrant at a known location on ah Dwight Mission Road from Interstate 40. Approximate time was ah, 0035 or 38 hours when we arrived at the location. My assignment this date was ah security, to provide to keep the suspect or suspects from entering the Mother's residence which is directly west of his place of residence. Subject was a Kenny Barrett. Myself and Doc Darst and Billy Poe were in my unit ah, we would of been the fourth unit in the ah, you can call it a motorcade en route the ah residence. At the time I mentioned a while ago, I pulled up to the ah gate which was my assignment ah, exited my vehicle, went over the fence that was chained ah, started up through the front yard ah between two pickups ahem, a gentleman appeared right in front of me, I didn't know who it was at that time, ah, my weapon was drawn, I told him to get on the ground. At that time as I came between two pickups, and this person appeared there and like I say have anything in their hands yelling them to get on the ground, see no weapon, no threat, the person out there yelling, two or three times yelling, finally went to the ground ah, a barrage of gunfire broke out, I was trying to cover this person and duck, I yelled at ah, Doc to cover me, Doc was behind me, leaned over a pickup truck to support him and after approximately

3

1564
KEB201706

STATE OF OKLAHOMA )  
)SS  
COUNTY OF OKLAHOMA )  

GENE HISE  
TROOPER  
OHP  

AFFIDAVIT

what I feel was about 11 to 12 second ah gun battle, sounded like automatic gunfire and I heard a shift in fire, remember a flash bang going off and there was a light ah, got the last cuff on I ran, well before I took off running ah, I remember looking straight would be back to the east and I remember someone yelling "man down", it sounded like Ricky Manion, I looked over saw someone face down at the rear of a Blazer, er, I'm sorry, a Bronco, I ah, immediately went to ah train vehicle extraction, knew that we needed a vehicle to remove man down. I ran to my unit, jumped the fence, I drove through the, busted through the gate, drove through the gate ah, pulled my vehicle tactically in front, unaware if we still had another suspect or if we were still gonna be in a long drawn out gun battle or what we're gonna be. I come out of my unit, went over saw that, at the same time I heard Manion yelling Rocky's name, Rocky Eales, they rolled Rocky over and ah, started to remove Rocky's clothes, vests as quickly as possible to, to assess the damage and ah, cause he was shot, ah, remember being yelled at to get a trauma kit so I went to my car, I ran back to my car popped the trunk lid and grabbed my tactical gear and got my trauma, my trauma dressings out, pulled a trauma dressing out, by that time ah, he was free of his shirt and his vest, I'm talking about Rocky ah, there was blood coming from his sides and from ah Rocky's mouth and ah, he was trying to breath and ah, Ricky was losing pulse and ah, Ricky started to, he said "we have to start CPR", I agreed. Trooper Manion started compressions and I started breathing for Rocky, understand it's hard for me and ah, between

4

1565  
KEB201707

STATE OF OKLAHOMA    )                                    GENE HISE
                     )SS                                  TROOPER
COUNTY OF OKLAHOMA   )                                    OHP

AFFIDAVIT

the spitting up blood and breathing for Rock, compressions we done that for, it seemed like a while, it wasn't very long, ah, we got ah, I guess Trooper Greninger's vehicle, ah, we got the tailgate down on the Bronco, we got Rocky loaded up on the Bronco and ah, at that time I drove while a deputy and a registered nurse was on the back and they were taking turns, I drove out to, I left the scene immediately through the gate, Dwight Mission Road to Interstate 40, told Muskogee "man shot", had a man down, which I think they, from later I think they already knew, Lt Pettingill, Lt McBride had already contacted them, but at that time I didn't know, ah, got out to Interstate 40 and ah I told them to get a bird in the air and got to Interstate 40 immediately went to the rear where they were and ah, for ah, oh, five, ten, fifteen minutes we took turns ah, doing CPR for Rocky, took turns breathing, check compressions ah, never could get, never could get a pulse.  (Inaudible) later an ambulance come in from Sallisaw and ah, took over, we ah, got Rocky on a gurney and ah, got him to the back of the ambulance, putting him in the ambulance and moving the equipment around Rocky, his eyes were still open, I choked and I closed Rocky's eyes, I thought it was too bad at that point, I, from the wound I saw on the back of the Bronco tailgate, ah, I ran interference in front of the ambulance into the Sallisaw City Hospital, I looked at my watch at it was 0105 Hrs, when we pulled into the emergency room, they got Rocky inside ah, trauma team waiting standby immediately went to work on Rocky ah, I go through the doors and looked over and I saw Buddy Hamilton sitting on the gurney and ah, he had, he was

5

1566
KEB201708

STATE OF OKLAHOMA )            GENE HISE
                   )SS         TROOPER
COUNTY OF OKLAHOMA )           OHP

## AFFIDAVIT

bleeding from his head and shoulder, obviously he'd been shot, ah, I didn't know, I didn't even know Buddy had been shot. I stayed there with Buddy, they worked on Rocky in the next room over until ah, 0138 hours, they pronounced Rocky, by then the Lifeflight had made it in from Tulsa, I ah, I went with ah Buddy, I stayed with Buddy and we flew to Tulsa and ah, I'd say I was, from the time my unit arrived to execute the warrant and the time I left the scene, couldn't of been two minutes, minute and a half to two minutes.

GORDON: Did you fire any rounds during the confrontation?

HISE: No sir, I didn't.

GORDON: Did you assist in taking the suspect Kenneth Barrett into custody?

HISE: No sir, I did not.

GORDON: Did you know what the suspect looked like before the forced entry was attempted?

HISE: No sir.

GORDON: Did they give you a physical description?

HISE: Yes sir.

6

1567
KEB201709

STATE OF OKLAHOMA ) GENE HISE
)SS TROOPER
COUNTY OF OKLAHOMA ) OHP

AFFIDAVIT

GORDON:   Have you had an opportunity to see Kenneth Barrett later?

HISE:     Yes sir, I did.

GORDON:   Was the physical description they gave you good enough to identify Kenneth Barrett?

HISE:     Yes sir.

GORDON:   The reason I ask that is this CI, confidential informant, all I'm trying to determine is if they gave you guys good information or not, if it was good enough you know, because they kind of threw you into it there, when I say "they" I'm talking about the confidential informant, was his information good enough to assist the Tac Team once you got in there.

HISE:     I would say with the knowledge that we had of the ah, the intel from the Task Force because he had been arrested before and that was part of the intel we did know, he had been arrested before but there was no photograph taken of him when he was arrested, I guess he had turned himself in with his attorney and they came in to the courthouse, but was never officially booked in where they took a photograph, so we had to go on a physical description.

GORDON:   You know how many suspects were in the house or on the property at the time of the forced entry?

7

1568
KEB201710

STATE OF OKLAHOMA    )  
                     )SS  
COUNTY OF OKLAHOMA   )  

GENE HISE  
TROOPER  
OHP  

AFFIDAVIT

HISE:    Ah, what I found out after the person that I handcuffed and took to the ground was apparently the son because I remember him yelling in the barrage of gunfire I remember him yelling "Dad, Dad" so I took it as I was cuffing, that this must be the son.

GORDON:    Did you know that he was in the house before you attempted the entry or the team got there?

HISE:    No sir, I did not.

GORDON:    Okay. Ah, did you know if anybody else was in there besides Kenneth Barrett at all, girl friend?

HISE:    No sir, I did not.

GORDON:    Ah, do you know, or did they discuss how many and what type of weapons were in the house?    Did anybody during the briefing (inaudible) did anybody pass any kind of information through the CI or any anything else as to what type of weapons Kenneth Barrett may of had on his person or in the house.

HISE:    I don't recall that sir.

GORDON:    Did ah, they go into the criminal history of Kenneth Barrett when you all were briefed?

8

1569  
KEB201711

STATE OF OKLAHOMA    )                    GENE HISE
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

HISE:     Ah, yes sir, I believe they did.

GORDON:   Okay, did they tell you about his threats against law enforcement officials?

HISE:     Ah, there was something mentioned about that and you know we hear those types of statements made before in the past and several other warrants we've done, and you know people say, you know, that's hearsay I'm saying but you know "I won't be taken alive" and things like that, ah, I don't remember any exact statement that this guy may of made or anything like that.

GORDON:   Did ah, okay there was a sensormatic listening device on the back of the house, okay.  Did the confidential informant advise the team of that, was the team ever advised that there was any kind of listening devices in or around the house?

HISE:     I heard about it a later date, after everything had taken place, I didn't know that before.

GORDON:   Okay, prior to the event itself, you did not know that?

HISE:     No sir, did not.

GORDON:   Do you know who provided the intelligence for the mission for the Tac Team?

9

1570
KEB201712

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

### AFFIDAVIT

HISE:     Prior to executing the warrant?

GORDON:   Yes sir.

HISE:     Ah, I do know that ah two of our Troopers, Trooper Greninger and Trooper Hamilton had flow in an OHP aircraft, they done aerial photos, aerial video tapes of the residence to provide some intel of the location and ah, of the surroundings, any residences that may be around, any hazzards that we may have, ah, I don't recall, I'm sure there was, I don't recall anything from ah, the Task Force, I do remember them saying this person stayed at home, never left, pretty much as a hermit, you know, just stayed right there at the residence, he was very seldom ever seen out.

GORDON:   You know how the Tac Team did, you said, you mentioned the air plane, you know if the Tac Team did any other surveillance in preparation for the mission?

HISE:     Ah, yes sir, there was a drive by of the residence done, ah, yes sir, there was a drive by of the residence done.

GORDON:   Do you know who did it?

HISE:     I want to say it was Trooper Hamilton, Trooper Manion and Trooper Greninger. I believe that was the three.

10

1571
KEB201713

STATE OF OKLAHOMA  )                        GENE HISE
                   ) SS                     TROOPER
COUNTY OF OKLAHOMA )                        OHP

AFFIDAVIT

GORDON:   Did they say

HISE:     I'm not quite for sure, but I believe that was the three?

GORDON:   Did they say anything about, did you, were you able to hear later about what their surveillance ah

HISE:     They said there was ah, remember them saying something, there was someone standing in the front yard, there was two people standing in the front yard, but unsure if it was the suspect or not.

GORDON:   You know what type of vehicles were used to conduct the surveillance drive by?

HISE:     I believe it was one of the Ford Broncos from the Bomb, one of the Bomb Tech's on the team.

GORDON:   Looking back on it now, and of course it's easy to Monday night quarterback, it's easy to second guess, do you think the intelligence was adequate for the mission?

HISE:     I feel it was for what we had, it would of probably been nice to have a photograph of the person, ah, looking back on it, had to do it over again with the intel that we had, I would of, we would of done it the same way, I feel I would of done it the same

11

1572
KEB201714

| STATE OF OKLAHOMA | ) | | GENE HISE |
|---|---|---|---|
| | )SS | | TROOPER |
| COUNTY OF OKLAHOMA | ) | | OHP |

AFFIDAVIT

way, I would of done my assignment that evening the same way, I wouldn't of deviated different from it, ah, far as changing some things, I would like to change some things, knowing what I know now, Lieutenant, but

GORDON:  You know how the Tac Team arrived at the time of 12:30 to conduct the entrance?

HISE:     That was ah, the time that the team had chosen to execute the warrant, ah, Lieutenant Pettingill and the team, it's a time that we all arrived with and agreed with that that would be the time that we would execute the ah, warrant.

GORDON:  Did you see any lights on in the house when you all rolled up?

HISE:     Ah, yes sir, there was lights coming from in the house, in the target residence

GORDON:  Now at the residence, did you, you got this guy out in the yard, did you see him when you rolled up?

HISE:     No sir, I didn't, I ah, I was going up like I said when I went over the fence I was going up between the vehicles, next thing I know (hands hit together) there's someone standing in front of me and I knew that was not a team member because I only had one

12

1573
KEB201715

STATE OF OKLAHOMA  )
                   )SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

other man go with me and there isn't no way he beat me over the fence.

GORDON: Do you know how long, and this is an estimation, and this is an estimation 30 days after the fact, do you have any idea how long it was from the time that you got there, stopped, went over the fence, met up with this individual where you had to take him into custody, before the shooting started.

HISE: I could of been 10 to 12 seconds

GORDON: Just out, boom, it's going.

HISE: Yeah.

GORDON: Trooper Hise can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw on September 24, 1999?

HISE: No sir, I just, like to ask you a question if I could?

GORDON: Sure,

HISE: When this was going down and you could hear the gunfire, nobody could tell exactly where it was coming from, (inaudible) coming from the front of the house but, with the shooter standing

13

1574
KEB201716

STATE OF OKLAHOMA )                      GENE HISE
                 ) SS                    TROOPER
COUNTY OF OKLAHOMA )                      OHP

AFFIDAVIT

back in the doorway, has that ever been determined yet?

GORDON:  We believe from the cases, he came out on the front porch, but quickly retreated back into the house,

HISE:  For cover,

GORDON:  we know that there was approximately, he had three 30 round magazines taped together, there was one magazine, OSBI has been able to account for all 30 rounds that was in that magazine.

HISE:  I'm still having a little bit of a problem with, you know, I was, I was right there and never saw a target to engage and could see glass blowing off the Bronco and you know, at the same time I'm doing this and looking, so he, if he shot from outside on the porch he must of busted a (inaudible) and went back into the doorway, cause I never had a target

GORDON:  Yeah, and that's what we're getting ah, through everything so far, and OSBI believes that he came out on the front porch, fired a few rounds and then went back inside the house where most of his, and probably you may of been able to see his, ah, maybe the powder coming off the, you know, from the muzzle flash, but we believe he was that far back inside the house shooting.

HISE:  I distinctly remember after cuffing, I guess it was his

14

1575
KEB201717

STATE OF OKLAHOMA  )
                 ) SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

son, and retreating back to my car the smell of gunfire was heavy.

GORDON: Do you know if

HISE: Cause that cloud was coming over toward

GORDON: Sure.

HISE: the way the wind was that evening, out of the north.

GORDON: You know if Trooper Buddy Hamilton fired his weapon? You don't know or he

HISE: No he didn't fire his weapon, he told me he didn't fire his weapon

GORDON: Okay, that is

HISE: After talking, after the team talking the only person that fired their weapon would of been Trooper Manion.

GORDON: That's, you know, like I said we can account for approximately 18 rounds going through the cab of the vehicle. You know, OSBI with their wooden dowels?

HISE: Um hum.

15

1576
KEB201718

STATE OF OKLAHOMA )
                   )SS
COUNTY OF OKLAHOMA )

GENE HISE
TROOPER
OHP

AFFIDAVIT

GORDON: on the trajectory of the rounds that we could account for all 30 rounds and ah, so we do know that Kenneth Barrett was standing up when he was firing his rounds

HISE: (inaudible) kneeling, he would of

GORDON: Based on what OSBI is telling us about the trajectory of the rounds, the way, this guy standing up, he had, he had to of been in an elevated position to get the rounds to go where he was wanting them to go, ah, which, what that does it affects the idea that ah, one of his defenses is that he was shot by the Tac Team and the Tac Team rolled up and this guy, he's now laying on the ground fighting for his life, OSBI says that in fact is not at all what happened, he was standing up shooting into the cab of the vehicle. So,

HISE: I'm just, somewhat grateful, I'm very grateful that ah, Trooper Hamilton got off the flash bang because it seems liked when the flash bang went I don't remember hearing but one to two rounds after that and he had fire superiority and the element of surprise for us tactically was lost. It was overcome with the flash bang and he, I guess, retreated deeper into the house, I don't know, and ah, that I think glad he didn't get another magazine in,

GORDON: Yeah, because he was definitely loaded up. Well Trooper, I'm gonna turn off the tape recorder with your permission sir.

16

1577
KEB201719

STATE OF OKLAHOMA    )                           GENE HISE
                     )SS                         TROOPER
COUNTY OF OKLAHOMA   )                           OHP

<p style="text-align:center">AFFIDAVIT</p>

HISE:    Yeah.

<p style="text-align:center">17</p>

1578
KEB201720

# EXHIBIT 11

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Jim McBride, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
JIM McBRIDE


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 2000.


_____
Notary Public

My Commission expires:


_____

1580
KEB017465

STATE OF OKLAHOMA ) 
)SS 
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 1, 1999. The time is approximately 1:15 PM. I am present in the Internal Affairs Office in Oklahoma City. Present in the room with me is 2LT Jim McBride.

GORDON: Lt McBride, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

McBRIDE: Yes I am.

GORDON: Sir, is this recording being made with your permission?

McBRIDE: Yes it is.

GORDON: Sir, if you could would you please state your complete name and spell your last for me.

McBRIDE: Jim L McBride, #109, last name is M c B R I D E.

GORDON: Could you give me your date of birth sir?

McBRIDE: ███████

1

1581
KEB017464

STATE OF OKLAHOMA  )                    JIM MCBRIDE
                   ) SS                 2LT
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

GORDON:   Could you give me your social security number?

McBRIDE:

GORDON:   Sir, how long have you been on the patrol?

McBRIDE:  Ah, almost, it will be 22 years in January, 22 years and two months.

GORDON:   Which Academy did you come out of?

McBRIDE:  37th.

GORDON:   Where are you currently assigned at?

McBRIDE:  Ah, Special Operations as a, currently serving as the Acting Troop Commander in Special Operations, but my normal position is supervisor over criminal interdiction.

GORDON:   What all does Special Operations entail?

McBRIDE:  It had Criminal Interdiction Troopers, ah, Asset Forfeiture and Auto and Marine Theft Troopers.

GORDON:   Okay.  Are you a member of the Tac Team?

2

1582
KEB017467

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

McBRIDE:  Yes I am.

GORDON:   Ah, which Tac Team, and know it's divided into two separate Tac Teams, can you elaborate on the Tac Team division.

McBRIDE:  Yeah, the Tac Team is divided into two, somewhat geographic divisions, East and West, primarily divided by I-35.

GORDON:   Which team are you assigned to sir?

McBRIDE:  Neither, I'm the Assistant Tac Team Commander, Lt Pettingill's assistant and respond with either team ah, as directed by Lt Pettingill.

GORDON:   Okay, in that position is there ever a time that you would possibly have to direct the Tac Team yourself, on a mission.

McBRIDE:  In Lt Pettingill's absence ah, step into the role as the Tac Team Commander.

GORDON:   Okay.  How long have you been in your assigned position with the Tac Team?

McBRIDE:  In my assigned position?

GORDON:   Yes sir, as the ah

3

1583
KEB017468

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

McBRIDE: Nine months, maybe.

GORDON: Nine months, before that were you just a regular Tac Team member or how did that work?

McBRIDE: I was the team leader for the west Tac Team.

GORDON: Okay, as the team leader ah, what were your responsibilities there sir?

McBRIDE: Ah, the team leader ah, does the ah, if the patrol had a Sergeant, that would be the Sergeant, he's the one that runs the respective Tac Team, Tac Team has ten members assigned and then the team leader makes up the eleventh, ah, so he's the overseer of training, ah, put the plan in motion and, and is the one that the Tac Team Commander gives the orders to, to be carried out.

GORDON: How often does the Tac Team train sir?

McBRIDE: Two days every month, and then two - one week periods each year usually in April and September.

GORDON: Can you tell me what happened of September 24, 1999.

McBRIDE: Ah, yes.

4

1584
KEB017469

STATE OF OKLAHOMA          )
                           )SS               JIM MCBRIDE
COUNTY OF OKLAHOMA         )                 2LT
                                             OHP

AFFIDAVIT

GORDON:   Can you elaborate on that please.

McBRIDE:   Ah, Lt Pettingill, how much detail do you want, from the time we were notified, the time we arrived

GORDON:   From the time that you left I-40

McBRIDE:   And executing the mission?

GORDON:   Yes sir.

McBRIDE:   We were given a mission, prior to leaving I-40 we made a plan for the mission and we were in the processing executing the mission, ah, we exited off of I-40 on to a memorial road that I don't remember the name of en route to execute a high risk, no knock, day or night, search warrant and arrest warrant to be served. I was ah, the passenger in Lt Pettingill's vehicle, ah, as he exited, goes under I-40, the first thing out of the ordinary was the number of people that were gathered there, ah, we had been told in our briefing that there was only three people, an investigator from the D.A.'s office, the Sheriff and a Task Force member, I believe and I don't know the positions of, I do know the Sheriff investigator and there was someone else, there were only three people that knew about this, however when we arrived there was a large number of people there, I would estimate a minimum of 15 people there on the north side of I-40 where we met em, we stopped

5

1585
KEB017470

STATE OF OKLAHOMA     )                    JIM MCBRIDE
                      ) SS                  2LT
COUNTY OF OKLAHOMA    )                    OHP

AFFIDAVIT

there ah, didn't deviate from our plan, briefed them very briefly on what our plan was, I heard Lt Pettingill tell them as he topped the hill crest wait a period of time, and, and I believe it's two minutes, I'm not sure on the amount of time, but I think it's two minutes he said, we were the last vehicle in the group, ah, when our tail lights went below the hill there, they were to wait a period of time then they would come in, then by that time we would have, planned on having the search warrant executed, people in custody, turn the searching for the narcotics and other contraband over to the investigators. Ah, we left that location, and preceded in a group of five vehicles ah, (inaudible) the rear, Lt Pettingill and myself being at the rear, in his Suburban, first four vehicles ah, proceeded uneventfully to the location, ah, I saw one of the four vehicles stop at the entrance to the location as to the plan while the other three vehicles went down the road make a left turn they were then out of my sight, we pulled in to the west of the residence into the trailer house that we described as mother's trailer house, our mission, Lt Pettingill and my mission was to head off somebody if they ran over there, if we could do it easily, but we weren't to chase people, that the Troopers at the gate were the chase personnel. Our main function was if someone ran from the house, (inaudible) search warrant for the trailer houses, was to observe them go in the trailer and then set up a hasty perimeter around the trailer house to preclude them from exiting. Obviously if we have a felony arrest warrant we can say the persons inside the trailer house were (inaudible) without a search warrant. In

6

1586
KEB017471

STATE OF OKLAHOMA )      JIM MCBRIDE
               )ss        2LT
COUNTY OF OKLAHOMA )       OHP

AFFIDAVIT

our briefing we had been told that in prior cases when they tried to arrest him that he'd take off to his mother's trailer house, they believe that's what happened, however since they didn't see him physically go in there couldn't enter it and she wouldn't allow them in. That was our mission to kind of observe if he went in there and set up a hasty perimeter to preclude him from coming out bring the team over and then go in there and arrest him on the felony warrant. We got into position, ah, well actually before we got in position, we were rolling to a stop because someone on the west side of the residence running to the west of the, (inaudible) the chase team ah, stopped by the road coming up at about the same time that I heard, well, I believed at the time and still believe that it was full automatic M-16 rifle fire, I looked to the, to my right, faced kind of to the north over to the east and saw flames, muzzle flash, flames coming from the front porch area of the residence ahem, I was hoping in my mind, I knew that Danny Oliver who was a Task Force member over there had a M-16, I had no doubt in my mind it was an M-16 fired, hoping it was Danny that was firing ah, then it became confusing, over the radio it said "we have a man down", we tried to verify if the man down was one of us or one of them ah, there was another shots fired at about the same time that the radio call, when the radio call first came out someone else got on the radio, not (inaudible) and said "who's down" and they said "we don't know", again, we don't know whether it's a good guy or bad guy when they say "we have a man down" ah, there was some confusion (inaudible) a little while, I don't know

7

1587
KEB017472

STATE OF OKLAHOMA    )                          JIM MCBRIDE
                     ) SS                        2LT
COUNTY OF OKLAHOMA   )                          OHP

COPY

AFFIDAVIT

how long, second, could of been as much as a minute, but I don't think so, to identify that we did have a Trooper down, I got on the radio, called Muskogee and had emergency traffic, that we need an ambulance and Med-Evac started, our directions, told them the Sheriff's office would be setting up a landing strip location at I-40, Lt Pettingill came back, told me it was Rocky that was down, ahem, they, that's the same time I was calling on the radio, the marked unit that was providing security at the gate, busted through the gate and drove up there, they opened the trunk of it and then moved Rocky into a second Bronco, ah, the one Bronco that was up there that appeared to be real close to the porch, Rocky was behind it, they loaded him into the second bronco and I saw Rocky laying on the back with two people that were not with us. Ah, it was the Sheriff Department people ah, back there working on Rocky as they exited. Ah, kind of brief and sketchy, two or three point I probably need to make for sure, is the first time that I saw the muzzle flash coming off the porch, when I looked over there I do not know where Steve Hash's unit was, but I could see ah, lights off of the rotating light, not flashing light, but a rotating light across the porch area, the way a rotating light does you hit one side of the porch then go across it and then (inaudible). I do not ever, I'm not saying they weren't on, I did not look, I don't recall seeing any emergency lights flashing on the white Bronco.

GORDON:    Either white Bronco or just the that was there.

1588
KEB017473

STATE OF OKLAHOMA      )                         JIM MCBRIDE
                       )SS                       2LT
COUNTY OF OKLAHOMA     )                          OHP

AFFIDAVIT

McBRIDE: Either, either white Bronco. But by the same token I didn't, until I looked, Steve Hash's car was also blocked from my view, but in my mind I believe it was his lights that I was seeing reflecting and going across the front porch, it could of been flashing lights, but if they would of had a Kojak light on the back of the Bronco it could of been that type of light, it appeared to me to be brighter than that. The first time I heard the shot and saw that, the lights were going across. (Inaudible) the lights came on exactly the same split second the first round was fired or they were on before the round was fired, I believe they were on before the round was fired, but I didn't specifically look in that direction and I heard a shot and looked that way and seen the muzzle flash, light, lights washing across the

GORDON: You said (inaudible) you saw the three vehicles go down the road and turn to the left, were there any emergency lights on then?

McBRIDE: No there was not. Ah,

GORDON: You referred to him in you statement sir, do you know who he was, who the suspect was?

McBRIDE: Ah, the person that shot Rocky, the older guy, ah, another (inaudible) that obvious before this, and I don't recall his name, he was the father and the person we had the arrest

9

1589
KEB017474

STATE OF OKLAHOMA )
) SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

warrant for.

GORDON: Would his name be Kenneth Barrett?

McBRIDE: Kenneth Barrett is it, yes.

GORDON: Ah, in your ah, any of the information received prior to this event, did you have a picture of Kenneth Barrett?

McBRIDE: No, we did not.

GORDON: Okay, you did not know, or to your knowledge nobody on the team knew exactly what Kenneth Barrett looked like.

McBRIDE: We had a physical description of him, I think they described him as 5'8", skinny, shoulder length hair and he had a big scar on his stomach where he shot himself in the stomach.

GORDON: Okay. Did ah, did the Tac Team have any information in reference to what type of weapons that Kenneth Barrett might be armed with?

McBRIDE: Yes, ah, I don't to say it was routine, but, but, the typical stuff on these, somebody said that somebody else said that somebody said that he had a machine gun, and that he always carried the gun on his person and that he's got guns all over the house.

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

Now, looking back on it, that sounds pretty ah, traumatic and pretty severe statement, but those same statements are probably made on 90% of the people we arrest and we execute (inaudible) if that scenario of information wasn't given we probably wouldn't of been there, I mean, or we normally try to reserve our commitment to high risk type stuff and had they just said this guy is just a pussy cat, all you got to do is walk up there and he'll stick his wrist out and you can handcuff him, we probably wouldn't of been there.  Yes we did hear that the rumor is that he has a machine gun, rumor is he always has a gun on him, rumor is he's not gonna be taken alive and and those things were heard, but their also heard in 90% of the ones I've been on.

GORDON:  Ah, could the vehicle that was assigned to the gate for security (inaudible), you said they had to crash through the gate, why did they have to crash through the gate, do you recall?

McBRIDE:  Yeah, the gate had a heavy chain and heavy lock on it, that's why we didn't make an entrance at that point, they elected to go further east, turn in to a neighbors yard and then drive through a path that was visible from the air, from the neighbors trailer house up to Barrett's house and that was the plan, rather than, we had bolt cutters but ah, it was determined that there was a possibility, as big as the chain was that our bolt cutter may not even cut it.  Had they cut it we would certainly of drawn attention to the (inaudible).

11

1591
KEB017476

STATE OF OKLAHOMA )
        )SS
COUNTY OF OKLAHOMA )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

GORDON: Did the Troopers have, at the gate did they have the bolt cutters?

McBRIDE: I don't know.  Ah, the bolt cutters were present at the briefing, they identified where they were ah, the assigned, they, Buddy Lambert was the acting team leader for the operation, I mean Buddy Hamilton was the acting team leader for this and they assigned the equipment to include the bolt cutters.  I don't have any first hand knowledge that they were there, I would assume that they were there, but I do not know.

GORDON: Did you fire any rounds during the confrontation?

McBRIDE: No I didn't.

GORDON: You know who did fire rounds?

McBRIDE: I know who told me they fired rounds.

GORDON: Who said they fired rounds.

McBRIDE: Rick Manion said he did, and I've been told that that's been substantiated by ah, ballistic test, but I did not see him fire a round.

GORDON: Okay.  You know if Buddy Hamilton fired a round?

12

1592
KEB017477

STATE OF OKLAHOMA   )
                    ) SS
COUNTY OF OKLAHOMA  )

JIM MCBRIDE
2LT
OHP

AFFIDAVIT

MCBRIDE:  Ah, no, I don't think he did, but I don't know that.

GORDON:  Do you have any idea, and this is just, just, you, ahem, in your opinion, you have any idea why the internal lights of the Bronco, why they were left operational?

MCBRIDE:  Ah, when I came on the patrol, it was unheard of to have internal light operation, my first patrol car, first thing they do, on my newest patrol car they say they can't wire over those and all kinds of stuff, til I pulled the bulb out of my new ford that was issued to me, has a dome light that not only comes on but slowly goes off, I think the patrol for some reason does not look at that the same as they did 20 years ago and I see a lot of Troopers that the dome light come on when they get out of the car ah, I don't believe, and it's my opinion, the reconstruction I did in my mind, and that's all it is, I don't think the dome light had anything to do with it, I believe that Rocky and Buddy were fired upon long before Rocky opened the door.

GORDON:  Okay.  Did you assist in the actual taking of ah, Kenneth Barrett into custody?

MCBRIDE:  No I didn't.

GORDON:  Do you know which Troopers did take Kenneth Barrett into custody?

13

1593
KEB017478

STATE OF OKLAHOMA      )                    JIM MCBRIDE
                       ) SS                  2LT
COUNTY OF OKLAHOMA     )                     OHP

AFFIDAVIT

McBRIDE: Ah, (inaudible) Buddy went in and got him, Raymond Greninger assisted in it and I know Ricky Manion, I know for a fact Buddy and Rick were there and I think Raymond Greninger was, ah kept him on the ground, handcuffed him then turned him over to the Sheriff's office when they arrived from (inaudible)

GORDON: Lieutenant can you think of anything else that I would need to know in this statement ah, in retrospect to what you thought about with the situation, ah, that I could use to complete my investigation, sir.

McBRIDE: I can't think of (inaudible), I can't think of anything.

GORDON: Okay sir, the time approximately 1:38. I'm gonna turn off the tape recorder with your permission.

McBRIDE: Okay.

14

1594
KEB017479

# EXHIBIT 12

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA    )

I, Ricky Manion, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
RICKY MANION

SUBSCRIBED AND SWORN to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1596
KEB202098

STATE OF OKLAHOMA    )                              RICK MANION
                     )SS                            TROOPER
COUNTY OF OKLAHOMA   )                              OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is November 9, 1999. The time is approximately 9:25. I am at the Internal Affairs office located at 3600 Martin Luther King. Present in the room with me Trooper Rick Manion.

GORDON:   Trooper Manion, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

MANION:   Yes I am.

GORDON:   Sir, is this conversation being recorded with your permission?

MANION:   Yes.

GORDON:   Sir, at this time I'm going to hand you a Disciplinary Interview Advice of Rights also known as the Garrity Form, if you would please read it out loud for me sir.

MANION:   I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and

1

1597
KEB202099

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RICK MANION
TROOPER
OHP

AFFIDAVIT

narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United State, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON: Okay sir, can you please sign that for me?

MANION: (writing sounds)

GORDON: Thank you sir. All right sir, I've got some questions I

2

1598
KEB202100

STATE OF OKLAHOMA     )
                      )SS
COUNTY OF OKLAHOMA    )

RICK MANION
TROOPER
OHP

AFFIDAVIT

need to ask you in reference ah to the events that took place in Sallisaw on September 24th at approximately 0038.  Ah, but we need to start out with just some basic questions, sir, could you please state your full name for me.

MANION:   Ricky Manion.

GORDON:   Could you ah spell your last name?

MANION:   M A N I O N

GORDON:   Could you please give me your date of birth?

MANION:   ███████████

GORDON:   And your social security number sir.

MANION:   ███████████

GORDON:   Sir ah, what is your current position?

MANION:   State Trooper of the Oklahoma Department of Public Safety, Oklahoma Highway Patrol stationed in Troop E, Madill.

GORDON:   How long have you been on the patrol sir?

3

1599
KEB202101

STATE OF OKLAHOMA     )                          RICK MANION
                      )SS                        TROOPER
COUNTY OF OKLAHOMA    )                           OHP

AFFIDAVIT

MANION:   Seventeen and a half years.

GORDON:   Are you ah currently on the Tac Team?

MANION:   Yes.

GORDON:   Which Tac Team are you on sir?

MANION:   I'm on the east side Tac Team.

GORDON:   What is your designated position?

MANION:   I'm currently designated as a sniper.

GORDON:   Okay.  Ah, sir, did you participate in the activities that occurred on September 24, 1999, at approximately 0038 in the morning.

MANION:   Yes I did.

GORDON:   Sir, could you please relate to me what happened at that time on that date starting with when you got off the Interstate at I-40 and Dwight Mission Road.

MANION:   I was riding as a passenger with Trooper Ray Greninger in his state issue Bronco, we exited off the Interstate and met with

4

1600
KEB202102

STATE OF OKLAHOMA )
                ) SS
COUNTY OF OKLAHOMA )

RICK MANION
TROOPER
OHP

## AFFIDAVIT

the ah, drug task force people there at that location ah, I did not personally talk to any of the drug task force people, I stayed mostly over by the unit, got back in the unit after ah, team leaders and Lieutenants talked to the drug task force people and then we proceeded on to the target house that we had the warrant for. We were to second car in line. When we turned east on ah, the county road off a blacktop road and proceeded on down, I think it's just over a mile when ah, we drove by the residence on the county road we could see that the lights was on at the house ah, we drove by it and entered at the east driveway. As we entered the east driveway I could hear gunfire, directed at the first unit that was in front of us, another Bronco, driver by Trooper John Hamilton and ah, Trooper Rocky Eales as a passenger. I also heard someone on the radio, which turned out to be Lt Pettingill say "there's someone in the yard" or "out in the yard", something to effect. I'm looking for the subject in the yard, also hear the gunshots and see that Buddy and Rocky was taking fire ah, as we had turned into the yard, I had turned the lights on, Greninger's vehicle has red and blue lights, ah, as we come up behind em, Hamilton and Eales, I had my door open and getting ready to exit the vehicle ah, I could see smoke coming out of the house and a large amount of gunfire directed into the windshield and front area of Trooper Hamilton's vehicle. As I was getting out, I never saw anybody on the ground, any suspects ah, at all, never saw anyone on the ground, as I got out I was Rocky get out of his vehicle and start back to the rear of the Bronco, ah, I could tell by the way he was

5

1601
KEB202103

COPY

STATE OF OKLAHOMA     )                    RICK MANION
                     ) SS                  TROOPER
COUNTY OF OKLAHOMA   )                     OHP

AFFIDAVIT

moving that he was injured, I went directly to Rocky, as I got to the back of the Bronco, that's where Rocky was, I met him about the same time he got to the back I got to the back, ah, Rocky went to his knees and I grabbed him by the back of the shirt and he went all the way to the ground, face down. I ask Rocky, "are you hit, are you hurt", he says "I'm hit bad" ah, same time I heard a flash bang go off that ah, Trooper Hamilton had thrown ah, it was about this same time period I looked to my left, I heard a commotion, I looked to my left I could see that some of the other team members had a white male down on the ground handcuffing just a few yards from us, but we're still taking gunfire so I know that someone is still in the house. Buddy comes to the back of the vehicle, all at the same time this is going on, I can see blood on Buddy's face, I can see blood and where his shirt is kind of puffed up where it hit the shoulder and I said "Buddy, you been hit" he say "hit twice, but I'm okay, I'm all right" or something to that effect. Ah, there was some shots coming out of the house directed toward us and I looked around the back of the Bronco, peep around it, I see a white male carrying a rifle step from, step in a sideways motion ah what would be the living room area to a room on the east end of this small house. I've already yelled "Rocky's down, get us some help, Rocky's hit" ah, (inaudible) is on the radio trying to get us some help, I see the man step into the east room, I leave the rear of the Bronco and go to the east side of the house and there's an old blue pickup sitting there close to the house, there's also a window there with blinds on it, ah, took a position of cover behind

6

1602
KEB202104

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

RICK MANION
TROOPER
OHP

AFFIDAVIT

this pickup, I don't know if he looked out the window or if his movement just caused the blinds to move or what, but I saw some movement in the blinds, I fired ah two short bursts, state issue MP5, ah, I heard, I thought I fired about six rounds, (inaudible) so, I fire, immediately fire again, take the window out and Greninger yelled at me, well first of all I heard the man yell in the house, don't know what he yelled, I just heard him yell, ah, then Greninger yells at me "Rick don't shoot, Buddy's going in the house" so I leave my position and I run around to the front of the house, Trooper Hamilton is pulling the subject out of the house ah, he's yelling that his legs are hurt, and shot, he dropped kind of on his knees I guess, pulls him off the porch and there's someone else standing there, another Trooper, but I'm not sure, I think it was Steve Hash, ah, I grab the guy, we handcuff him and I take a weapon and sniff, semiautomatic pistol from ah, his shirt was out it wasn't tucked in, his raised his shirt up and he had a pistol directly in front of his stomach tucked into his pants, I took it away, laid it off on the ground finished searching him, Steve is maintaining cover on the house, ah, I ask the guy who he was and he tells me he's Kenny Barrett and ah, I ask him if there was anybody else in the house and he said "no, there's no one else in there" so I immediately leave him and go to Rocky ah, I yelled to get a vehicle, I yelled sometime during this period that we needed a vehicle, ah, I roll Rocky over, rip his shirt open, take out my pocket knife, cut his vest off of him, he wore two vests, regular second chance vest and ceramic (inaudible) vest. I cut those off

7

1603
KEB202105

STATE OF OKLAHOMA  )
         )SS
COUNTY OF OKLAHOMA  )

RICK MANION
TROOPER
OHP

AFFIDAVIT

of him and removed his ah, protective helmet ah, trying to get him to talk to me, he's not responding, feel for a pulse at that time he had a pulse, I lost it, myself and Gene Hise start giving him CPR ah, continue that for just a second or two feel again, Rocky has a pulse, he's breathing and then he stops again, we're still giving CPR and ah, Lt Pettingill tells us "let's load him up, get him out of here" so we grab him and load him up in the back of Greninger's Bronco, I go to get in and ah, the Sheriff of Cherokee County, she's there by them, Task Force and she is an RN so she jumps in the back with another member of the Task Force, EMT or Paramedic, they continue giving CPR and Gene Hise drives and leaves. At that time we ah, go in and secure the house, ah, myself and Greninger, Danny Oliver DEA Task Force and maybe one or two more. I clear the upstairs, what would be the loft area where he sleeps, I cleared that, didn't find anybody, came out then we secured the residence, Lt Pettingill and Lt McBride taped it off and we stayed out of it, I didn't enter it again until the next day and we was asked to go out and help recreate some things for the OSBI and Internal Affairs investigation.

GORDON: Ah, you said you fired approximately six rounds?

MANION: I thought at the time I did.

GORDON: Did your weapon malfunction?

8

1604
KEB202106

STATE OF OKLAHOMA    )                    RICK MANION
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

MANION:   Not that I'm aware of.

GORDON:   Okay.  The reason I ask that is because in the trunk of the car your weapon had (inaudible) when we looked at it in the car it was just laying in the car, course we didn't touch it because we didn't want to taint anything but Ron Jones over at OSBI had made a notation that your weapon had malfunctioned, that it had double loaded off the magazine, so

MANION:   I wasn't aware, it would of had to of done it with the last shot, because I fired, I intentionally fired two bursts and as I was getting ready to take the window completely out ah Raymond hollered at me "Rick don't shoot, Buddy's goin in the house" so I didn't want to shoot while Buddy was in there.

GORDON:   Okay.  You say when you looked into the house you could see him moving, you could see Barrett?

MANION:   Yes, I saw him facing, he was inside the house facing out, ah, he stepped in a sideways motion into the east room and he had a rifle in his hand.

GORDON:   And you fired through the window could you absolutely identify Kenneth Barrett?

MANION:   At that time, no.

9

1605
KEB202107

STATE OF OKLAHOMA   )           RICK MANION
                    )SS    TROOPER
COUNTY OF OKLAHOMA  )          OHP

<div align="center">AFFIDAVIT</div>

GORDON: Okay. Why did you fire, if you could not identify Barrett and not somebody else, what I'm getting out, could you identify him as the aggressor, whoever it was?

MANION: Oh, yes, I, I, he had a rifle that I took to be an AR15,

GORDON: I mean, when your looking through the window, when your on the side of the house

MANION: When I looked through the window, no I did not, I knew that the person that was doing the shooting had stepped into that room. My initial thought was I knew Rocky was hit bad and I knew he could not survive if we had a sustained fire fight there. That was the first thing went through my mind, we got to stop this cause Rocky can't survive this.

GORDON: Ah, you said that you actively participated in the arrest of Kenneth Barrett, getting him in cuffs and everything.

MANION: Yes,.

GORDON: You know if Buddy Hamilton fired any rounds?

MANION: I'm not aware that he did.

GORDON: You didn't see him shoot any.

<div align="center">10</div>

1606
KEB202108

STATE OF OKLAHOMA      )                    RICK MANION
                       ) SS                 TROOPER
COUNTY OF OKLAHOMA     )                    OHP

COPY

AFFIDAVIT

MANION:   I didn't see him shoot, the only thing ah, that I knew for sure that he had thrown a flash bang.

GORDON:   Ah, did you all have any idea, did any member of the Tac Team know what Kenneth Barrett looked like before you got there, did you have pictures of him?

MANION:   We did not have pictures, we had a general description, you know, white male, tall, somewhat slender and told that he weighed a lot less then he appeared to be, long scraggly blond hair

GORDON:   Did that ah, ah, did the confidential informant advise you all or did anybody advise you as to the type of weapons that Kenneth Barrett was armed with?

MANION:   The only thing I can remember is he said that, we was told that at one time he had had some ah, ah, he always had guns in the house and he may of had some automatic weapons.  But the Sheriff's office had taken some of his bullets and some automatic gunfire out there sometime in the past.

GORDON:   Had you all been advised of ah, his threats against law enforcement?

MANION:   Yes.

11

1607
KEB202109

STATE OF OKLAHOMA    )                    RICK MANION
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

GORDON:   You remember what those threats were?

MANION:   That, that he would ah, that he would mainly run from law enforcement and also that nearly everybody in the community ah, and even the people in the drug community was scared of him.  They didn't like to go out there, that he would shoot you if you came on to his property and he didn't know you.

GORDON:   Okay, you said that earlier, that when you turned into the driveway on the east side of the house, when you all turned in, you were taking fire at that time.

MANION:   When we turned into the driveway and started, the driveway goes up to the other house, we turned off that driveway on to his property, crossed a small ditch there ah, we started taking fire.

GORDON:   Now was that when you heard the fire

MANION:   That's when I heard the fire.

GORDON:   How far were you behind Buddy's Bronco

MANION:   Directly behind him.

GORDON:   Ah, you know what kind of surveillance was conducted in

12

1608
KEB202110

STATE OF OKLAHOMA      )                          RICK MANION
                      )SS                         TROOPER
COUNTY OF OKLAHOMA     )                          OHP

                            AFFIDAVIT

preparation for the assault?

MANION:   As far as the Task Force or

GORDON:   County, OHP, anybody.

MANION:   I know that Raymond Greninger and Buddy Hamilton along with one of our aircrafts taking pictures from the air and video, we had those in our initial planning ah, as far as the surveillance on the residence ah, before and up to the raid there was none.  It was our initial plan to sit the two snipers, myself and Billy Poe, ah out just across the road by the gate, we knew he always kept his gate locked or usually kept his gate locked ah, the chain, the initial plan was he and I would go in ahead of time and as surveillance, approximately hour and a half and we would, just before the raid that I would cross the road with bolt cutters, cut the locks and chains, ah off the gate and open the gate so the raid team could drive through, we did do a drive by in an unmarked vehicle, ah, the small little neighborhood that's there, houses ah, and due to the gate being very close to Barrett's Mother's house very close to his house, ah, and the fact that houses were a lot closer than they appeared from the aerial photographs and there was a lot of loose animals, dog running in that neighborhood, ah we felt that a sniper would be compromised and that that wasn't a feasible plan, we'd do a vehicle assault.   As far as setting up surveillance at that time, that's what we usually do, the snipers

13

1609
KEB202111

STATE OF OKLAHOMA  )                    RICK MANION
                   )SS                  TROOPER
COUNTY OF OKLAHOMA )                    OHP

AFFIDAVIT

will go in a couple of hours ahead of time and set up surveillance and watch for movement such as that, but ah, we didn't do that because the houses were so close, the animals and we felt like we would compromise it.

GORDON: Based on your skills as a sni, how long you been a sniper?

MANION: Three years

GORDON: Okay, based on your still, have you done very many creeps?

MANION: Yes.

GORDON: Based on your skills as a sniper and having done creeps before do you think you could of got inside that ah grass line which had the trees and stuff like that along the fence, could you have got there and established a surveillance post yourself?

MANION: I could of, I could of got in there but I think it would of been compromised by the amount of dogs that were running loose around there, it's always a problem. Ah, the reason, one of the other reasons we didn't, anytime you put people on the ground you have to have a reaction team, say you want to get them out in case things go wrong, or they need backup (inaudible) more than likely

14

1610
KEB202112

STATE OF OKLAHOMA     )                           RICK MANION
                      )SS                          TROOPER
COUNTY OF OKLAHOMA    )                           OHP

                              AFFIDAVIT

the radio communications if nothing else.  That would of put another strange car in what we consider a hostile environment because we was told that everyone that's down there was dopers, and related or friends with Barrett, so that would put a strange vehicle in a very small neighborhood, hour and a half or two hours would raise suspicion.  Always feel like I can get into most places but it's not always feasible simply due to the fact that you never know if you've been compromised or not, ah, due to animals, traffic stuff like that.   I don't know that ah, I'm sure we could of got into the south side ah, I feel, but I don't think that snipers would of been effective surveillance there due to the fact (inaudible)

GORDON:  Based on your previous experience as a sniper and the fact your a sniper now, do you think if you would of been on the glass at the time that the vehicular assault took place, if Barrett had of came to the door with his rifle, do you think you could of surgically removed him?

MANION:   If I would of been on the

GORDON:   If you'd been on the rifle, on the scope

MANION:   If I had been on the north side of the road, our plan was to be on the south side cause that offered the best cover, there's a small rise there

15

1611
KEB202113

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RICK MANION
TROOPER
OHP

AFFIDAVIT

GORDON: So a sniper wouldn't of made a difference in the final outcome?

MANION: No.

GORDON: Can you think of anything else that would help me conclude my investigation?

MANION: That's everything I know.

GORDON: Sir, with your permission I'm gonna turn off the tape recorder.

MANION: Fine.

16

1612
KEB202114

# EXHIBIT 13

*DISCIPLINARY INTERVIEW ADVICE OF RIGHTS*

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

_TRP. BCFORD #830_
Signature of Affected Employee

STATE OF OKLAHOMA      )
                       )
COUNTY OF OKLAHOMA     )

Witnessed before me this 24 day of SEPT , 19 99

_GD Ram_
NOTARY PUBLIC

My commission expires:

SEPT 15, 1999 2002



110

00000919
00000919
KEB201600

STATE OF OKLAHOMA ) )SS. COUNTY OF OKLAHOMA )

I, Billy C Poe, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
BILLY C POE

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

```
STATE OF OKLAHOMA      )                    BILLY C POE
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                     OHP
```

                         AFFIDAVIT

GORDON:   This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-09-1999. The time is 10:02 AM. I am present at 3600 Martin Luther King, at the Internal Affairs Office. Present in the room with me is Trooper Billy Poe.

GORDON:   Trooper Poe, are you aware that our conversation is being recorded and may be reduced to a typed sworn affidavit for your signature at a later date?

POE:      I do.

GORDON:   Ah, sir are you aware, is this recording being made with your permission?

POE:      Yes.

GORDON:   Okay sir, can you please state your complete name for me?

POE:      It's Billy Carrol Poe

GORDON:   Could you spell your last name?

POE:      P O E

GORDON:   Sir, what is your social security number?

1

1616
KEB201602

STATE OF OKLAHOMA )          BILLY C POE
                  )SS        TROOPER
COUNTY OF OKLAHOMA )          OHP

AFFIDAVIT

POE: ███████████

GORDON: And your date of birth sir.

POE: ████████

GORDON: How long have you been on the patrol?

POE: Ah, about 13½ years.

GORDON: Where you currently assigned?

POE: Ah, Pushmataha County, Troop S

GORDON: Are you currently on the Tac Team?

POE: Yes.

GORDON: What is your designated position on the Tac Team?

POE: I'm a counter sniper.

GORDON: How long you been a sniper sir?

POE: Around, going on two years I guess.

2

1617
KEB201603

STATE OF OKLAHOMA   )
                    ) SS
COUNTY OF OKLAHOMA  )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

GORDON:   Sir, can you tell me what happened, did you participate in the events that occurred in Sallisaw?

POE:   Yes.

GORDON:   Can you please relate to me what happened at Sallisaw from the time that you got off the Interstate, off of I-40 and drove onto Dwight Mission Road.

POE:   Okay, you want the whole trip down the road or just from the time we drove up to the residence (inaudible)

GORDON:   Ah, that's fine, from the time you rolled up to the residence.

POE:   Okay.  Ah, I was in a car with Trooper Darst, Trooper Hise.  I was in the backseat on the right hand side of the car.  We pulled up to the gate in front of the house along the road, Trooper Darst, Trooper Hise were going to act as chase men, in case somebody left the residence, I was supposed to act as a cover man while the team was assembling to make entry.  As we pulled up, we get out of the car, I let Trooper Darst get out get a start, then I get out.  As I'm approaching, there's a big fence post there by the gate, the gates (inaudible) I guess, ah I intended to get a better position, I hear gunfire.  To my knowledge we're the only two at this point (inaudible) so I thought maybe the fire was

3

1618
KEB201604

STATE OF OKLAHOMA  )                BILLY C POE
                   )SS              TROOPER
COUNTY OF OKLAHOMA )                OHP

AFFIDAVIT

coming in our direction so I got down low, got behind my cover and come up to see if I could find a target, as I get along the post ah, I see ah, Trooper Hamilton's Bronco come into the picture, (inaudible) they can shoot at which, so I go around and go through the fence so I can stay low and I run up to Trooper Hamilton take the cover position up, I can see inside the residence, Trooper Hamilton's up on the porch ah, hollering at a subject that's laying in the floor inside the house, plainly see his head ah, sticking out of the doorway.  Trooper Hamilton told him to come out ah, I'd seen that we got a man down as I was approaching, ah, (inaudible) was taking cover position,  Buddy's hollering at the guy "come out, come out"  and the guy tells Buddy to the effect that he can't walk because he's been shot in the legs.  Buddy entered the residence pulled the guy out, they pulled him off the porch, I maintain my position because I don't know if there's anybody in the house or not so I just stay over near the Bronco, ah, I can hear them working on Rocky, ah, load him up, I maintain my position, soon as they get him loaded up, I go up on the porch with Ray Grinenger, we make entry, clear the lower part of the house, it don't take, small as the house was it don't take long and ah, I clear the back room and I look around and ah, Rick Manion, Danny Oliver, and ah, Buddy Hamilton was also there, but Rick had went up the stairway to the loft, inside the room I observed this when we was clearing it was ah, AR15, M16 style rifle laying and then over by the window was a double barrel shotgun.  Rick had climbed up on the ladder to the loft and Danny Oliver and I were (inaudible) I was doing it,

4

1619
KEB201605

STATE OF OKLAHOMA      )
                      )SS
COUNTY OF OKLAHOMA     )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

maintained a cover position on the ceiling.  Rick said he needed a mirror, and I said, told them that Rick needs a mirror and ah, Buddy went out, Hamilton went out to the vehicle and got a mirror, come back in, er Raymond said Buddy had been hit, or were you hit, that's when I glanced at Buddy to see if he'd been hit, so Raymond takes Buddy back out, Rick does the mirror, him and Danny go up and clear the top, we back out, seal it off and that's about it.

GORDON:    Did you fire any rounds during the confrontation?

POE:    No.

GORDON:    Did you assist in taking the suspect, Kenneth Barrett, in custody, did you ever lay your hands on him?

POE:    No sir.  I maintained just a cover position on the house, I didn't know if he was the only one, I didn't know if he was the one that did the shooting, I didn't, at this point I didn't know, so I just maintained my, I knew that was being taken care of and I felt the best thing I could do was cover the house.

GORDON:    Did you know how many suspects were in the house or on the property?

POE:    No.

5

1620
KEB201606

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

BILLY C POE
TROOPER
OHP

AFFIDAVIT

GORDON:   Could I get you to sign that please.  Thank you.  Ah, so you didn't know how many suspects were in the house at all, was there a briefing, did they ever brief you guys?

POE:   Well, they said, you know, there was a possibility of, well the bad guy of course, and then possibly his son, but in these dope deals you never know how many people's gonna be in the house or anything like that, so I felt that that was an area, still a threat area that hadn't been cleared that needed to be covered, so that's why I just maintained cover.

GORDON:   Did they tell you what kind of weapons Kenneth Barrett was carrying or may have in his possession?

POE:   I don't recall, ah, firearms were mentioned, I can't remember as to the type they told us, exact types or anything to that effect.

GORDON:   Did they tell you anything about his threats against law enforcement?

POE:   Yes.

GORDON:   What did they say about that?

POE:   Ah, they said he'd always scared off the deputies, you

6

KEB201607

STATE OF OKLAHOMA        )                    BILLY C POE
                         )SS                  TROOPER
COUNTY OF OKLAHOMA       )                    OHP

AFFIDAVIT

know, he was just a real bad guy everybody is scared of him, that's what we was told in the briefing.

GORDON:    You know who provided the intelligence for this mission?

POE:    No, not really.  I just know ah, I can assume but I don't know, don't recall who they told us brought the information.

GORDON:    Did they tell you about the listening device on the back of the house?

POE:    No.  I didn't find out about that until way later, ah, I guess Lt Pettingill told us or something the next few days or something.

GORDON:    You think the intelligence was okay for this mission?

POE:    It could of been better, I guess, I don't you know, it's just, sometimes you go with what you got and it's hard to second guess.

GORDON:    Did you all have a picture of Barrett?

POE:    Nope.

GORDON:    Okay.

7

1622
KEB201608

STATE OF OKLAHOMA    )                    BILLY C POE

                         )SS               TROOPER

COUNTY OF OKLAHOMA   )                   OHP

**AFFIDAVIT**

POE: They told us er, ah, we were told to, we had a sketch description of what he looked like, that's all, they said they didn't have a picture of him.

GORDON: Ah, do you know how surveillance was conducted?

POE: No.

GORDON: You said you been on the Tac Team for two years, er you been a sniper for two years?

POE: Yes.

GORDON: Have you ever done any creeps?

POE: Yes.

GORDON: Based on your experience as both a counter sniper and you ability to do creeps, do you think you could of got close to the house and conducted surveillance on it?

POE: Well, I think we could of got in, there's so many dog in the area, we originally planned, me and Rick Manion as we go in to (inaudible) along the ditch line or across the road from the house, but they did a drive by on the residence, Rick and ah Raymond, Buddy I believe and there was I don't know how many dogs, small

8

1623
KEB201609

STATE OF OKLAHOMA  )                          BILLY C POE
                   ) SS                        TROOPER
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

dogs running loose and plus the close proximity of the residence, which I think, if it wasn't for the dog factor we could of got in, around the residence we was afraid we would be compromised by the dogs coming to us.

GORDON:   This ah, assault went at 12:30 at night,

POE:   Approximately

GORDON:   0038, why was that time picked?

POE:   It was a, any time a warrant and I'm not for certain why we come up with this time, I mean, it, say we'll do it at 12:30 or whatever, originally we planned on getting there at 1:30 with me and Rick laying on surveillance for a while, but, but we've done several deals over there and they all been daylight only warrants, you know, we always hit them just a little after 6:00, so we thought we'd change it up some and instead of being like our routine the time we always hit, (inaudible) anytime warrant to go ahead and hit them early in the morning instead of in daylight.

GORDON:   Based on your previous experience with drug houses cause obviously you've hit a few, do you think 12:30 at night is a pretty good time to hit a drug persons house.

POE:   It's just as good as any other time.

9

1624
KEB201610

STATE OF OKLAHOMA      )                    BILLY C POE
                       )SS                  TROOPER
COUNTY OF OKLAHOMA     )                    OHP

AFFIDAVIT

GORDON:   Ah, did you all see any lights on in the house, when you, as you rolled up?

POE:   I think, I think I remember seeing lights when we pulled up.

GORDON:   You know what type of vehicles they used to conduct surveillance.

POE:   No.   The only surveillance I know ah that was, know how it was conducted was ah, ah, I guess Buddy and Raymond maybe, one or the other or both in the airplane, (inaudible) pictures and that's what we were shown, this (inaudible).

GORDON:   You know if Buddy Hamilton ever fired any rounds?

POE:   No, not that I know of.

GORDON:   You ever see his gun in his hands?

POE:   Yes.   He had his gun in his hand when I went on the porch, then Raymond when he was taking him out, Buddy still had his gun, Raymond took his gun from him, took him out.

GORDON:   Trooper Poe, can you think of anything else that might help me conclude my investigation of the events in Sallisaw on

10

1625
KEB201611

STATE OF OKLAHOMA    )                 BILLY C POE
                        )SS              TROOPER
COUNTY OF OKLAHOMA   )                 OHP

**AFFIDAVIT**

       September 24th?

POE:      No.  Not right off hand.

GORDON:   Sir, with your permission, we'll turn off the tape.

11

1626
KEB201612

# EXHIBIT 14

## DISCIPLINARY INTERVIEW ADVICE OF RIGHTS

I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

Signature of Affected Employee

STATE OF OKLAHOMA )
)
COUNTY OF _Oklahoma_ )

Witnessed before me this __ day of _Sept_____, 19 99

NOTARY PUBLIC

My commission expires:

_12/18/2001_

105



DEFENDANT'S EXHIBIT

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Kerry Pettingill, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
KERRY PETTINGILL

SUBSCRIBED AND SWORN  to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1629
KEB203642

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol.  Today's date is 11-02-1999.  The time is 2:55.  I am at the Internal Affairs office, 3600 Martin Luther King at the Department of Public Safety.  Present in the room with me is 1LT Kerry Pettingill.

GORDON:      Lt Pettingill, are you aware that our conversation is being recorded and may be  reduced to a typed sworn affidavit for your signature at a later date?

PETTINGILL:   Yes I am.

GORDON:      Is this conversation being recorded with your permission?

PETTINGILL:   Yes it is.

GORDON:      Sir, I have handed you the Disciplinary Interview Advice of Rights, ah, could you please read that out loud for me?

PETTINGILL:   I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or

1

1630
KEB203643

STATE OF OKLAHOMA   )
                    )SS
COUNTY OF OKLAHOMA  )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

fitness for office.  I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself.  In addition, I understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety.  If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding.  However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:      Okay sir, would you please sign where it says signature of affected employee and date it for me sir. Thank you sir.  Sir, can you please state your complete name?

PETTINGILL:   Kerry Lee Pettingill.

GORDON:      Can you please spell you last name for me.

2

1631
KEB203644

STATE OF OKLAHOMA      )                        KERRY PETTINGILL
                       )SS                      1LT
COUNTY OF OKLAHOMA     )                        OHP

AFFIDAVIT

PETTINGILL:    P E T T I N G I L L

GORDON:        Can you give me your date of birth sir?

PETTINGILL:    ████████

GORDON:        And your social security number?

PETTINGILL:    ████████

GORDON:        How long you been on the patrol?

PETTINGILL:    Ah, 17 ½ years.

GORDON:        Where are you currently assigned?

PETTINGILL:    Ah, I'm currently commander of tactical teams and bomb squad.

GORDON:        Ah, is that here in Oklahoma City sir?

PETTINGILL:    Yes it is.

GORDON:        Are you on the Tac Team itself sir?

PETTINGILL:    I'm commander of the team, yes.

3

1632
KEB203645

STATE OF OKLAHOMA )                          KERRY PETTINGILL
                  )SS                        1LT
COUNTY OF OKLAHOMA )                          OHP

AFFIDAVIT

GORDON:     And so your assigned position would be the Commander and can you tell me what the Commanders duties are.

PETTINGILL:     Overseeing any and all operations or potential operations to ah, decide, assist the Chief's office in deciding whether or not activation should take place. To oversee training, and make sure training takes place as well as procuring equipment and ah, other items that may be necessary for the tactical units to carry out their duties.

GORDON:     You have anybody that assists you with that?

PETTINGILL:     Ah, in addition to the Commander there are two assistant commanders.

GORDON:     And who are they?

PETTINGILL:     2LT Jim McBride and 2LT Mike Holloway.

GORDON:     Okay now, any one of the assistant commanders in your absence could they step into your position?

PETTINGILL:     Yes.

GORDON:     Can you tell me what happened at 0038 on September 24, 1999, from the time that you got off the Interstate.

4

1633
KEB203646

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

PETTINGILL:      Ahem, we got off the Interstate at Dwight Mission Road, went probably quarter to half a mile north of the Interstate and met with several members of the Task Force, DEA's Task Force and also the District Attorney's, District 27 ah Drug Task Force. Ah, I met specifically with Clint Johnson and ah, Frank Lloyd with D.A.'s Task Force and Diane Barker-Harrold, who is the District Attorney for District 27.  They ask how they wanted, how I wanted them to proceed in following us to the residence of Kenneth Barrett who we had a day or night no knock search warrant that we were there to execute.  Because there were so many people there, I anticipated probably half a dozen, no more than eight individuals ahem when I got off the Interstate, I counted as I drove by 12 individuals and that was just as I was driving by, what I could count, I didn't get a full head count as far as who all was there, but because there was so many people and so many different vehicles I told them that I would prefer for the Tactical Team to go ahead and for them to delay in following us for two minutes.  Ah, my thoughts on that were in the past we ah, we served many of these warrants ah, search warrants, usually we don't have arrest warrants but we go ahead and secure everybody in the residence for our safety and theirs and the longest that it's ever taken us was 20 seconds to clear a house and secure everyone inside and ah, my thoughts were we'd have everybody secured and ah in the front yard by the time they got there, and we could turn those people over to them and we could be on with our business, so I ask for a two minute delay.   Ah, we got back in our vehicles and ah started

5

1634
KEB203647

STATE OF OKLAHOMA    )                      KERRY PETTINGILL
                     )SS                    1LT
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

toward the house, they agreed to that, that that's what they would do. We ah, the way we were approaching was ah Trooper Hamilton, who is an assistant team leader, I had designated him as the team leader for this operation due to the fact that the East Team leader, Trooper Roger Lee, was out of state on vacation. And because it was Buddy's area and he had been doing some preliminary on this deal for us, ah, I told him he'd be the team leader so he was in the lead vehicle with Trooper Eales, followed by second vehicle, Trooper Greninger and Trooper Manion and then the third vehicle was ah Trooper Hash, who had a DEA Task Force officer ah, Danny Oliver with him and then ah, Trooper Hise was in his vehicle and he had ah, Trooper Poe and Trooper Darst in the vehicle with him and them I was the fifth vehicle with ah, 2LT McBride in the vehicle with me. As we made our approach to the residence, ahem, the gate to the ah house that we were going to execute the warrant on, we knew that it was double chained so we wouldn't be able to take time to cut it so the plan was for the front three vehicles to go past that residence and ah go through a wash-out, we thought it was a wash-out, ah, and then over to the side of the residence where they would exit their vehicles and make the entry. The fourth vehicle was to stop at the gate ah, and I was to pull into the driveway at the house immediately to the ah, west of Barrett's residence so that if, if he were to run from the residence to his Mother's house, which was the first house ah, west, we would either one, be able to intercept him or we knew that we had a ah, felony arrest warrant for him and if we could identify him going into the

6

1635
KEB203648

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

residence then we could pursue him into that residence and apprehend him. As, so there was a separation between the first three vehicles, the fourth vehicle and my vehicle so that we would all arrive at the same time, having vehicles parking in the front as the other vehicles were still on their approach. So as the other vehicles started across the creek area, which I called it a wash-out earlier, it turned into be more of a creek but as they were crossing it we were arriving at the gate and the driveway. The vehicle directly in front of me, Trooper Hise stopped at the gate, I pulled into the driveway, as I was pulling into the driveway ah, Lt McBride was, strobe lights on the visor, he was initiating those and I was supposed to hit the panel to turn the other hidden lights on my vehicle on, however I saw someone walking across the yard. On the west side of the house, ahem, there were some lights on in the house so I saw their head as they walked by on the exterior. So, I was driving with my left hand instead of hitting the light, I grabbed, I have a lapel mike for my tac radio, I ah keyed it up with my right hand and started calling out to the units that there was, there was movement in the yard, that I have a suspect in the yard. Ahem, probably before I ever got off the air shots were being fired, ahem I exited my vehicle and went to the front of it and by the time I got there I was, ah Trooper Greninger was on the air saying that we had a Trooper down, I went to a line of cars that was on the west side where I saw a Trooper and it turned out to be Trooper Darst, I went to him because there was somebody down on the ground in front of him, it turned out to

7

1636
KEB203649

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

be the person that was in the yard, which was later identified as Toby Barrett. Ahem, so I left him and went to the back of the vehicles where I saw one of the Trooper laying down, face down on the ground, went to him and ah, tried to identify who it was and ah, recognized that it was Trooper Eales and he had considerable amount of bright red frothy blood and it looked like other particles were in it probably lung and ah, he was having difficulty breathing, I rolled him on his side and attempted to clear his mouth, I was unable to do that ahem, I wanted to make sure that Troo, ah, 2LT McBride was on the air calling for assistance so I made my way, someone else, I think it was Trooper Greninger showed up at the back of the vehicle and then I went ahead and left cause there was somebody there with Rocky, I went ahead and went back toward my vehicle ah, McBride was on the air, on the radio talking to Muskogee Headquarters advising them that we did have a Trooper down and requesting net 10-63 to us and ah, also requesting a Mediflight Helicopter. I, for whatever reason, I ah, got in on the driver's side of my vehicle and drove it around because I saw Trooper Hise crash the gate, so I drove my car through and the, my thought process at the time was I knew I was gonna be over there and not in that yard and I did not want to leave that vehicle unattended. And that the other residences around, the house where I was parked was a Barrett and the house directly west of it was a Barrett and I just didn't want to leave the vehicle there unattended I had other weapons and things in the vehicle that I just couldn't feel safe leaving it there. So I went ahead and

8

1637
KEB203650

STATE OF OKLAHOMA    )                    KERRY PETTINGILL
                     )SS                  1LT
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

moved the vehicle around into the driveway of Kenny Barrett's where the gate had been opened by ah Trooper Hise driving his vehicle through it. Ah, at ah, some point and time, I got back over to where Rocky was and this is the second time, I have to go back, prior to going back to my vehicle I had told ah, Greninger to get Rocky loaded. We have a (inaudible) officer down rescue plan that we use one of the vehicles and we had two Broncos there and they had both been designated as ah rescue vehicles, so if somebody was down we would load them in it and go with them. Ahem, told him to go ahead, told him to load em, get him out of there, by the time I got back, he was still there, they were still working on him and I told them again to get a vehicle over here and get him loaded and get him out of here ah, that's when I noticed that the deputies and the task force people were arriving and there were numerous vehicles and they were blocking the road, so I ran out to the road and told them to clear the road because we had an officer down. I went back to where Rocky was and ah Clint Johnson, who's an EMT and ah, Sheriff Doss from ah Cherokee County, she's a registered nurse and both of them arrived with me right about the same time back up to where Rocky was. Then Gene Hise, Manion, Sheriff Doss, and Clint Johnson grabbed Rocky and got him in the back of Trooper Greninger's vehicle, Trooper Hise got in the front and started driving off. Ahem as they were leaving, Troopers Greninger, Manion and Poe, Poe had moved up from the gate area whenever they moved the vehicle up and he was, he was covering the front of the house while we were at the back of this vehicle. Once Greninger's

9

1638
KEB203651

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

vehicle left, I believe this is how it happened, once the vehicle with Rocky left then Manion, and Greninger, Poe and ah, task force officer Oliver went into the residence to clear the residence and secure it and to be sure that there was no one else inside.  I started back to my vehicle to ah, to start making, I think was going back over there to make a phone call to ensure that the duty officer was being notified and that Captain Harris was being notified, my Captain.  Ahem, that's, before I got back over to my vehicle Greninger called on the radio again and said that Trooper Hamilton had been shot, so I turned and went to them and met them as they were coming off the porch, Trooper Hamilton had blood on his face and on his around his left eye and shoulder, left shoulder area and ah, Trooper Greninger had Trooper Hamilton's weapon in his hand, his handgun in his hand, he said "this is his gun, what do you want me to do with it", I said "just lay it on the porch", I said "has it been fired", "I don't know", said "just lay it on the porch, leave it there" and of by this time the other guys had come out of the house and said it was secure, that's how come I said to go ahead and leave the gun on the porch.  Ah, we started back toward the vehicles and ah they were out in the roadway with Buddy and I told Raymond, somebody said something about an ambulance, I said "forget the ambulance" I probably didn't say those words, but I said "forget the ambulance", I said "just get him in a car and get him out of here and so he was, Raymond took him, Greninger took him to one of the Sheriff's deputies cars and loaded him and the deputy transported him to the hospital.  By this time I was again

10

1639
KEB203652

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

on my way back to my vehicle when I noticed somebody started to pick something up in the yard, cause everything was really had settled down quite a bit at that time. At that moment it was very quiet for whatever reason and I noticed somebody bent over starting to pick something up I called out to them not to pick anything up, not to load any magazines, to secure all their weapons to leave everything where it was at, went to my vehicle retrieved some crime scene tape and Lt McBride and I, McBride actually took the crime scene tape from my hand and went over and tied it over on the porch and he and I walked together as he lied out the line and then as we made it back to our vehicle the ah, McBride got a sheet of paper and signed off on the crime screen saying what time he had roped it off and signed off on it. Kenneth Barrett was on the east side of the house, two deputies and the Sheriff were with him maintaining him, ah, there had been an ambulance called already, actually one was already responding decision was made that they would go ahead and have it come to the scene to ah, transport him. Ah, I made my notification to Captain Harris, and that's about it, I mean, there's a lot in there and I think, I start thinking back there's probably a lot I left out and as, like as we were pulling up I saw the guy in the yard and before I got off the radio there was gunfire and ah, it sounded like to me automatic gunfire because it was so rapid, but I recall looking at towards where the gunfire was coming from, it was coming from the front of the house and there was a porch area there, but I couldn't see anybody, there was just a great deal of smoke and ah, I could see muzzle flashes ah coming

11

1640
KEB203653

STATE OF OKLAHOMA    )                        KERRY PETTINGILL
                     )SS                       1LT
COUNTY OF OKLAHOMA   )                         OHP

AFFIDAVIT

from, first I thought the fire was coming from out people, but then I saw the muzzle flash and could see that it was coming from the residence or porch area and then occasionally I could see either glass or brass, I don't know what it was that was flying and ah that was as I was making my way towards ah where Trooper Darst was and I can't tell you when the weapons fire stopped.

GORDON:      On the ah, where the suspect Kenny Barrett was at, was he elevated up above the vehicle?

PETTINGILL:   Yes.

GORDON:      So, do you know if he was standing or laying down?

PETTINGILL:   I never saw Kenneth Barrett until he was secured.

GORDON:      You never actually saw the person shooting

PETTINGILL:   There was so much smoke, I couldn't even see a silhouette of a person.

GORDON:      Did you fire any rounds during the confrontation yourself?

PETTINGILL:   I did not.

12

1641
KEB203654

STATE OF OKLAHOMA     )                              KERRY PETTINGILL
                      )SS                            1LT
COUNTY OF OKLAHOMA    )                              OHP

AFFIDAVIT

GORDON:     Did you assist in taking the suspect Kenny Barrett into custody?

PETTINGILL:    No.

GORDON:     Okay, so that was out Troopers

PETTINGILL:    Physically, Trooper, once he was shot in the house Trooper Hamilton saw him fall to the, to the floor, Trooper Hamilton ran up on the porch and into the residence and grabbed Barrett and drug him onto the porch from the inside of the residence, that's when two of three other Troopers grabbed, grabbed him and drug him into the yard, ah, they handcuffed him there and ah, did a pat down search and Trooper Manion found a handgun in Barrett's waistband and pulled it from his waistband and just kind of threw it away from his body and we left it laying in the yard, ah, I mean, our guys physically took him into custody but once the other deputies and everybody started arriving, the deputies, the Sheriff and two deputies took over maintaining control of Kenneth Barrett, Trooper Darst maintained control over Toby Barrett, ah until we had people there and I think he actually took him to the road area where he turned Toby Barrett over to a deputy. Ahem, I, I don't know, I, I, I believe in my mind that the Sheriff and them were there taking custody of Kenneth Barrett just prior to the team members going into the residence to secure it and ensure nobody else was there, and then he was drug from that area by the

13

1642
KEB203655

STATE OF OKLAHOMA )
COUNTY OF OKLAHOMA )SS
)

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

Sheriff's deputies, I think, cause he was in the front, just in front of the vehi, not in front of the vehicle, but to the, between the porch area and the first Bronco, which was the Bronco they out at, he was between the porch and that Bronco lying face down on the ground, handcuffed and ah, and then the next time I saw him he was on the east side of the house, that's when 2LT McBride and I were laying out the crime scene tape and the Sheriff and two deputies were with him at that time.

GORDON:      Did you know what the suspect looked like prior to the forced entry.

PETTINGILL:      No.

GORDON:      Did they not have any pictures of him?

PETTINGILL:      Nope.  Ahem, Kenneth Barrett had been arrested prior to this, we checked with Sequoyah County, they had no photographs even though he had been arrested and was ah, had a felony warrant for failure to appear for a jury trial, or ah, unlawful distribution or unlawful deliver of a controlled dangerous substance, ah, they had no photographs and we received a story that ah it was a different  Sheriff back when that occurred and it was a backdoor type deal he was brought in, his lawyer came up and got him out before he was ever really processed into the jail, I can't verify that, that's just the story that was related to me.

14

1643
KEB203656

STATE OF OKLAHOMA )                             KERRY PETTINGILL
                  )SS                          1LT
COUNTY OF OKLAHOMA )                            OHP

AFFIDAVIT

GORDON:     Did you know how many suspects were in the house or on the property at the time of the forced entry?

PETTINGILL:     Well, we really never did a forced entry ahem, as the vehicles were rolling up they started receiving the gunfire.

GORDON:     Right, I mean, okay, prior to the attempt

PETTINGILL:     and the front door was open, we didn't kick a door, we didn't do, there was no forceful, so, I mean, we never know how many people is gonna be in a house, we always go on the assumption there could be ah, one or there could be twenty,

GORDON:     Right, I mean was there any intelligence indicating how many there was?

PETTINGILL:     No.   We we told occasionally his son is there, ah, we were told that Barrett was a recluse and never left the residence, ahem that he would probably be there, there were times when other dopers would show up cause he was supposed to be a distributor of drugs, he wasn't supposed to be a cooker, ahem, it was more like he had, everybody was afraid of Barrett so, they would take their, they would cook the dope and take it to him and he'd sell it because nobody would go up there and mess with him and ah, so we didn't know at the time that we hit the house whether Barrett would be alone or whether a carload of people had brought

15

1644
KEB203657

STATE OF OKLAHOMA      )
                       )SS
COUNTY OF OKLAHOMA     )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

some stuff over, I mean anything was possible.

GORDON:        Did you know how many and what type of weapons were in the house?

PETTINGILL:    No, just, actual I don't, I don't know. Ah, we were told prior to this that Ken Barrett had numerous handguns, that he had a handgun in almost every room and he generally had a handgun on him. Ah, there had been talk about ah, a rifle but the CI that was working with the Task Force ah, said he had not seen one, so all we were going on was there was a possibility of more, we, we understood there were handguns there according to the confidential informant, but ah, the actual types or how many we didn't have a sure number.

GORDON:        Did you ever get an opportunity to talk with the CI?

PETTINGILL:    No.

GORDON:        Were you advised of the suspects threats against law enforcement officials?

PETTINGILL:    Yeah, I'd been told that he was ah, a bad ass and that he had threatened to kill law enforcement officers before, that there was an incident a few years back, or several years back where ah, he had an incident where he was ah, ended up barricading

16

1645
KEB203658

STATE OF OKLAHOMA )
)SS              KERRY PETTINGILL
COUNTY OF OKLAHOMA )           1LT
                           OHP

## AFFIDAVIT

himself or something and ended up shooting himself. Ah, so, you know, deals like that you have to weigh it from, you know, from past actions, he was a big talker, had an opportunity at that time, ended up shooting himself, so his past actions were that, maybe he would shoot, but who's he gonna shoot, is he gonna shoot at us or is he gonna shoot himself, or what's he gonna do, so it was one of those situation where we knew there was a strong potential for some kind of violence.

GORDON: Did you know who provided the intelligence for the mission to the Tac Team?

PETTINGILL: Yes, ah, Clint Johnson and ah, Floyd,

GORDON: Frank Floyd

PETTINGILL: Yeah, whatever his name is, that ah, task force, supposed to be the District Attorney's Task Force, supposed to be District Attorney's Task Force officer. We'd worked with them on numerous occasions ah serving warrants and most times they provide reliable information ah, this time, it was just very limited information.

GORDON: Did you think the intelligence was okay for this mission?

17

1646
KEB203659

STATE OF OKLAHOMA   )
                    )SS
COUNTY OF OKLAHOMA  )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

PETTINGILL:   Yes.  We knew that he was a bad guy and ah, they had a ah, no knock, day or night search warrant for the residence, there was a potential for the drugs to be at the residence and they had to be, they had secured the warrant on Monday, we had ah, done a fly over on Wednesday, we arrived on Thursday hitting early Friday morning ah, I felt that ah, with the information we had yeah, I mean, we didn't have the information that he ah, had been out a couple of weeks before driving around and gotten in a chase, we didn't have that information, still the same, we've done it the same way just for the fact that it was we weren't there after Kenny Barrett, we were there to execute a search warrant, and if Kenny Barrett was there we could arrest him because we had an arrest warrant for him, if he wasn't there, no big deal, we were there to serve a search warrant.

GORDON:   Ah, did the Tac Team conduct surveillance?

PETTINGILL:   No, well, I say no, yeah we did.  We did a fly over, aerial reconnaissance on ah, Wednesday and Thursday, I sent ah, Hamilton, Greninger and Manion into the area in an unmarked vehicle to see if they could tell anything from the ground, what type of differences, aerial stuff is a lot different from actually being on the ground and ah, they came back and said it was nothing like the aerial photographs, what we were thinking it was, that ah, the ah, we had talked at first about putting ah an observation, listening type team on the ground, ah, and serving them and putting them in

18

1647
KEB203660

STATE OF OKLAHOMA      )                     KERRY PETTINGILL
                       ) SS                  1LT
COUNTY OF OKLAHOMA     )                     OHP

AFFIDAVIT

a couple of hours before our arrival ah, but once they did their drive around in the area, they came back and said there's no way they were gonna be able to put them in, it's just gonna be too dangerous with the number of people that live in the area. The intelligence that we received was that all the people in that immediate area are either related to Kenneth Barrett or they are friendly with Kenneth Barrett and ah, if we put two people on the ground we were gonna have to stay in the area, we'd have to have another vehicle in the area and to have a strange vehicle in that small of an area with that many people living there, for a two hour time period would draw too much attention to us and ah, we just felt that it was, it was more of a risk to put them in than it would be for us not to have the people in place for that time period.

GORDON:        You know what type of vehicles were used to conduct surveillance on the residence, wither by the Tac Team or by the County?

PETTINGILL:    I don't know what the County used if they did any, as far as whenever they were in there in that immediate area, ah, the vehicle that we used was a, '95 Ford Bronco and ah, solid white, tinted windows and ah, they took the antennas off of it whenever they went through so it wouldn't draw attention to the antennas.

19

1648
KEB203661

STATE OF OKLAHOMA    )
                       )SS
COUNTY OF OKLAHOMA   )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

GORDON:       Do you know if when they ran surveillance did they in fact see anybody in or around the

PETTINGILL:     They saw two people, if I remember correctly, but because we didn't have any information or a picture of Barrett, they didn't know if it was Barrett or not.

GORDON:       Ah, do you know why, on Hamilton's vehicle, why the interior lights we activated or not deactivated?

PETTINGILL:     No.   I mean, see he started shooting at em as he was coming through on the approach, so he'd of had headlights facing him and only time the lights would of been on would of been when they were getting out of the vehicle and that was after, Hamilton had a flash bang in his left hand as they were on their approach and cause as he was getting out he was gonna do this, be the distraction while the other team members got on the porch, ah, he found a moment in time to pull the pin throw it out of the vehicle towards the residence, it went off and that's when he was able to exit the vehicle, ahem, and it wouldn't of been until one of the doors opened that the light inside the vehicle would of come on, but ah, I mean I don't know, that's not our deal, you know I guess the garage does that or whatever, I don't know.

GORDON:       Can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw

20

1649
KEB203662

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

KERRY PETTINGILL
1LT
OHP

AFFIDAVIT

on September 24, 1999?

PETTINGILL: I can't think of anything, I know I'm probably leaving some things out, you know, it not, it's just that so many things happened in a short amount of time, I couldn't tell you how long the whole thing transpired, ah, I, I think I covered a lot of specific points but there could be small things that you know, I'm not recalling right now, but ah, like I said a lot of things happened in a very short amount of time and I think we covered most of it, our planning as far as the ah, the raid was concerned, we had a ah, we had a small makeshift models that one of the task force agents had made of the residence and ah, we spent two to three house at Camp Gruber in a building over there, we had the floor plan laid out, walls built with tables and chairs, those type of things, practicing entry where everybody was gonna go, and what everybody was gonna do, it got to the point we weren't able to execute our plan because he started shooting before we ever got there,

GORDON: Sir, it's approximately 3:33, with your permission, I'll turn off the tape sir.

21

1650
KEB203663

# EXHIBIT 15

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Danny Oliver, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
DANNY OLIVER

SUBSCRIBED AND SWORN  to before me, a Notary Public, this

_____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

1652
KEB203541

STATE OF OKLAHOMA       )
                        )SS          DANNY OLIVER
COUNTY OF OKLAHOMA      )            DEA

AFFIDAVIT

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol.  Today's date is 11-08-1999.  The time is 10:45 AM.  I am at the Internal Affairs Office at 3600 Martin Luther King.  Present in the room with me is Mr Danny Oliver with the DEA.

GORDON:   Mr Oliver, are you aware that our conversation is being recorded and may be  reduced to a typed sworn affidavit for your signature at a later date?

OLIVER:   Yes sir, I am.

GORDON:   Is it being recorded with your permission sir?

OLIVER:   Yes sir, it is.

GORDON:   Thank you.  Ah, Mr Oliver could you please state your complete name for me.

OLIVER:   Danny L. Oliver.

GORDON:   Sir, could you ah, spell your last name?

OLIVER:   O L I V E R

1

1653
KEB203542

STATE OF OKLAHOMA    )                                    DANNY OLIVER
                     )SS                                  DEA
COUNTY OF OKLAHOMA   )

                              AFFIDAVIT

GORDON:    Could you give me your date of birth?

OLIVER:    ███████

GORDON:    And your social security number.

OLIVER:    ███████

GORDON:    Sir, what is your current job, where are you currently employed at?

OLIVER:    I work out of the DEA office out of McAlester.

GORDON:    Now do you work directly for the DEA or are you on a Task Force sir?

OLIVER:    I'm a DEA Task Force Officer,

GORDON:    Okay

OLIVER:    employed through the Cherokee County Sheriff's office.

GORDON:    Cherokee, and then the DEA pays your salary?

OLIVER:    Partial.

2

1654
KEB203543

STATE OF OKLAHOMA    )                    DANNY OLIVER
                     )SS                  DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

GORDON:   What are your specific duties associated with the Task Force?

OLIVER:   I'm a Drug Task Force Officer, I work mainly drugs in the McAlester District, 20 plus counties and ah, mostly it's drug interdiction cases ah, and warrants.

GORDON:   And warrants, ah, have you ever had an opportunity to work with the ah East Tac Team sir, of the Oklahoma Highway Patrol?

OLIVER:   Yes sir, I have.

GORDON:   You used to be on the Oklahoma Highway Patrol, weren't you sir?

OLIVER:   Yes sir, retired April of '99.

GORDON:   How many years did you spend on the Patrol sir?

OLIVER:   Twenty-eight.

GORDON:   Twenty-eight years.  Did you have any association with the Tactical Team at that time?

OLIVER:   Yes sir, I was a Tactical Team member for a period of 15 years.

3

1655
KEB203544

STATE OF OKLAHOMA   )                   DANNY OLIVER
                    )SS             DEA
COUNTY OF OKLAHOMA  )

<div align="center">AFFIDAVIT</div>

GORDON:    Which team were you on sir?

OLIVER:    East Team.

GORDON:    East Team.  Ah, sir since you've retired from the Patrol have you had any association with the East Tac Team?

OLIVER:    Yes sir, I have.

GORDON:    How about, I should say, official contact with the East Tac Team?

OLIVER:    Yes sir.

GORDON:    Okay, can you tell me what kind of contact that was?

OLIVER:    Ah, yes I ah, in different times I've assisted with training  at one time I assisted in the running of a felony drug warrant.

GORDON:    Would that of occurred on September 24th, at approximately 0038  in the morning sir?

OLIVER:    Yes sir.

GORDON:    Could you please tell me what happened ah at 0038 on

<div align="center">4</div>

1656
KEB203545

STATE OF OKLAHOMA   )                        DANNY OLIVER
                    )SS                      DEA
COUNTY OF OKLAHOMA  )

AFFIDAVIT

September 24, 1999 and where it was at, where this took place at.

OLIVER:   Yes, ah, going back just a few hours before the issuance or execution of a warrant I arrived at Camp Gruber, Braggs, Oklahoma, with the East Tac Team, ah, we was at that point and that's where they were actually staying, the staging point for this for this mission.  I hooked up with them there, I had been tied up the three days before teaching a rifle, long range rifle school for Adair County.  I had known about the, a warrant was going to be served I was called Sunday night prior to that late by ah, Task Force Officer Johnson out of ah LeFlore County and ask to assist in ah tactical operation in issue of this drug warrant.  I told him at the time I couldn't because I was already obligated on this three day rifle school, me and Trooper Barry Clay, teaching it.  And I ah, one person couldn't teach it so I had to help him, which I did, I arrived at Gruber approximately 1600 hrs on that Thursday, the 23rd, I believe it was.  When I arrived ah, part of the Tac Team was there, course I talked to them, part of them were doing their drive by surveillance on the target we were gonna hit, they got back we all went to eat, ah most of us, I think a few of them didn't go eat, we went over to a cafe close there, south end (inaudible) come back caught the at 1930 hrs had a briefing ah, I listened to the briefing of about what was to take place, listened to the operations order ah, listened to, (inaudible) residence we were taking, listen to information got by recon.  Trooper Buddy Hamilton

5

STATE OF OKLAHOMA )                          DANNY OLIVER
                  ) SS                       DEA
COUNTY OF OKLAHOMA )

AFFIDAVIT

was ah as team leader, he was assistant, is an assistant team leader on East Tactical Team, Trooper Roger Lee was ah, not present for that mission so Trooper Hamilton was acting team leader at that time, and he was doing the briefing. Ah tactics were discussed ah, I overheard the whole conversation being familiar with tactics and tactical, seeing the experience I had I didn't ah circumstances the best tactic were discussed, planned and we were going to be put forth in an operation that were available at that time. Ah, few of them laid down ah, got a little rest, most of us just stayed up and talked, talked about old times and what was going on and how everybody was doing. We left Camp Gruber area approximately 12:00. Trooper Hamilton had called Officer Johnson, think Johnson was Task Force, DA's Task Force him and the Sheriff's Department, Sequoyah County Sheriff's Department were to meet us under the ah bridge overpass bridge at I-40 and Dwight Mission Road at 12, or at 0030 on the 24th; we were to meet there and from that location we would go forth and ah, do the warrant. We pulled off the interstate, I looked at my watch it was approximately ah, 0020, first thought to hit my mind was you know, we're early and I'm, I'm worried about sitting there waiting on someone (inaudible) marked unit in that area, all of Sequoyah County has a lot of drug traffic, and I didn't know, one of my biggest worries sitting there in that marked unit was somebody come by maybe know this person, go up and have a leak there. Fortunately when we pulled in everybody was there, District Attorney's office was there ah, Sheriff was there, Sequoyah County, Cherokee County Sheriff was there, bunch of

6

1658
KEB203547

STATE OF OKLAHOMA )        DANNY OLIVER
                 )SS           DEA
COUNTY OF OKLAHOMA )

## AFFIDAVIT

deputies, ah, was there from Sequoyah County also, I don't know how many but there was quite a few people there. We pulled up and stopped and waited for approximately, got out and talked approximately 30 seconds to a minute, ah, there were going to, that group of people was going to give us two minute lead time and then they were gonna come as backup. The lead vehicle, the first one was Trooper Hamilton and Trooper Eales in a white Bronco, full size Bronco; second vehicle was Trooper Manion, Trooper Greninger in a white full size Bronco; and third vehicle was myself and Trooper Steve Hash. We were gonna be the entry team and ah I don't remember how the other vehicles lines up, but the rest of the team including Lt Pettingill ah was behind the first three vehicles and their job was outside (inaudible). Ahem, from that location approximately two miles to the target, the house we were gonna hit, we left out, didn't have not problems en route as far as any vehicle problems or traffic problems, dark of course at that time of night ah, I don't believe it was overcast, it was not raining, it was dry, temperature was probably 60 degrees. We got close to the residence, I'd never been there, I hadn't even done a drive by recon, and I live in Sequoyah County but I've never been up that far off Dwight Mission Road, the only thing I knew was what the house looked like on, you know, the photos that had been taken. But we come up ah, I don't remember the direction but we come up, the house I believe is facing, if I'm not mistaken, facing east ah, we come up basically going north, I could be completely wrong in these directions, to the side of the house which would be the right

7

1659
KEB203548

STATE OF OKLAHOMA    )                    DANNY OLIVER
                     )SS                  DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

side if your looking out of the front door and the entrance to the house or the driveway to the house is, was discussed in the briefing, had a steel gate across it, it had a chain wrapped around the gate and a lock.  Because of the dogs in the vicinity and so closeness of the residences around it ah, they had decided not to cut the lock, unwrap the chain (inaudible) go in there because they would be detected.  We turned left in front of the house which was a little driveway type road and as soon as we got where we could see the house, I saw that the lights was on.  Ah, we turned left, 10 or 15 yards turned left again across an entrance we had been driving across, across (inaudible) gate.  When the first vehicle cross I seen it have a little bit of problem cause I think the right rear bumper guard (inaudible) ditch which was fairly deep, course we were in a marked Ford patrol unit and I told Steve, I said "we're gonna have to gun it good, give it a lot of gas to get across there or we're gonna be stuck in that ditch.  Approximately the time the first vehicle went through the ditch I started hearing gunfire, semi-automatic, ah, rifle fire, the second one come across the ditch, I'm still hearing rifle fire and about the time we were coming across the ditch it turned to semi-automatic, I'm sorry fully automatic fire.  The first vehicle pulled up approximately to the left, if your looking out the front door to the left of the front door, the second vehicle pulled up to the ah driver's side to the right of that one and we pulled up to the right of the second vehicle, pointing to the side of the house.  We exited the car at this time, the gunfire was real heavy, first thing that hit my mind

8

1660
KEB203549

STATE OF OKLAHOMA    )                          DANNY OLIVER
                     )SS                        DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

at this point was someone in these front two vehicles was shooting with automatic fire instead (inaudible).  I go out by the right front fender of the patrol car and I'm looking at the porch, smoke everywhere and it suddenly dawns on me the gunfire is coming out of the doorway, the smoke is still coming out.  Whoever was shooting was shooting three to five round bursts, fully automatic ah, as we drove in the yard, I seen a male approximately six foot tall, I don't know what age, what color of hair, I could tell by the stature it was a male not a female, run from the, into the house which would be the right if your looking out the front door or off into the yard.  Understand later it was Barrett's son (inaudible).  Ah, I saw him as soon as, before we crossed the ditch, I didn't see any weapons in his hand, I didn't see anybody outside the house other than that (inaudible) before the capture.  Getting back, after I exited the patrol car I seen the gunfire coming out of the house, I dove to the second vehicle as you come in, got cover on the back left corner just (inaudible) I look over to the next vehicle, which were just a few yards apart and I see a camouflage body to the right rear corner of the vehicle on the ground, face down.  Ah, had camouflage on (inaudible), gunfire was still going heavy.  I'd seen it was one of the Tac Team member, I didn't know who at the time.  I run to him, and I seen it was Trooper Eales, Rocky wore two vests, we always (inaudible) Tac Team policy was to issue, body armor were issued and he also had a ah, I don't know where he got it, he purchased it I'm sure hisself, I know he got it some while back, probably from a arms surplus, I don't know where

9

1661
KEB203550

STATE OF OKLAHOMA    )                          DANNY OLIVER
                     ) SS                       DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

he got it from, it was a green (inaudible) vest and he always zipped it up twice.  And when I was, (inaudible) I seen Rocky (inaudible) I looked down, I leaned over him, I grabbed him by the right shoulder cause I was gonna turn him face up, he was on his elbows, hands out in front of him, I couldn't see any blood at the time, I grabbed him and he let out a painful scream, and I said "Buddy, help's on the way, hang on", the gunfire stopped somewhat now, I turned around Trooper Hash and I believe, I'm not positive on this, Greninger was dragging Mr Barrett outside, had him by the arms, about the time I had turned around and got a good look, Trooper Hash was ah, was in a semi, handcuffing the victim (inaudible).  At this time Trooper Manion had run over to Rocky, had run over to me and Trooper Hash was still on Mr Barrett and ah, he run over to me and was talking to Rocky and telling him to hold on.  Trooper Greninger had went inside the Bronco and was hollering for help and I was, I was screaming, "get us some help, Rocky's down, Rocky's down" ah, seemed like it was forever , we didn't hear any response back on the radio, so I jumped out of the vehicle and I was hollering as loud as I can, "get some help, we got a man down, get some help".  I got out of the vehicle, I was out of the vehicle and I turned around Greninger and Manion were working on Rocky giving him CPR and had ah, his vest back and his shirt pulled back to where his chest was visible and Rocky had blood all over is (inaudible) top of his chest and I went over to him and I cupped my hand, I wiped the blood away looking for a hole.  I couldn't see any holes, I looked his head and neck over, cause I knew the blood

10

STATE OF OKLAHOMA ) DANNY OLIVER
)SS DEA
COUNTY OF OKLAHOMA )

AFFIDAVIT

was coming from somewhere, but I didn't think about him being shot anywhere else because he had two vests on, I figured you know, I'm looking for holes cause I know he's all right because he's got two vests on, can't be hurt with vests protecting him. I, you couldn't see no holes, about this time ah, Trooper Greninger was trying to get the back tailgate down from the first vehicle, he knocked the window out trying to open it and it wouldn't open. Ah, then he got into the second vehicle and got the tailgate down and we laid Rocky up on the tailgate, about this time ah, (inaudible) she's the Cherokee County Sheriff and she was an RN before she became Sheriff, many years as a RN in the emergency room, so she just jumped up on top of Rocky on the tailgate and started giving him CPR, Raymond told me that to drive him to the hospital, I go around and Clint Johnson, who's a Task Force Officer is in the driver's seat and by this time Trooper Hise comes around and jerks Johnson out and gets in, says he knows where the hospital is. Johnson then climbs in the back and I'm yelling at them, please don't fall off that tailgate, cause they ain't got nothing to hold. They take off, in the mean time, prior to this, ah, Trooper Hise has his patrol car run through the gate, you could tell it was a patrol car because of the lights, I turn back around Barrett, Hash is still on top of Barrett, I told Raymond and Manion, I said "we need to clear this house, don't know many people been in it" so me and him, us three go inside and clear the house. We clear the bottom floor, inside the house, you go in and it's a very small building, (inaudible) to your right as you go in there a little room and use

11

STATE OF OKLAHOMA      )                    DANNY OLIVER
                       )SS                  DEA
COUNTY OF OKLAHOMA     )

AFFIDAVIT

the doorway to the right.  Inside this doorway was a 405 full length barrel ah, Colt, looked like a Colt, could of been another brand, AR15 looking weapon.  Three magazines, one in the weapon, two taped down in the weapon, and either on top, I don't remember, or underneath, they were kind of crossed, there was a 12-gauge double barrel shotgun.  Ah, as I went by Barrett, there was a Smith and Wesson pistol thrown over on the ground that I understand he had in his belt, I didn't see, but I understand it.  We clear the house, the bottom floor and I hollered to Raymond, I said "we need a mirror, there's an upstairs" I said "we need a mirror" so Buddy Hamilton comes in with a mirror, Buddy's bloody, his left eye, (inaudible) hanging out, there's blood all over his face and all over his left shoulder and some on his right shoulder, I didn't, first time I'd saw Buddy, you know, since we left down at Dwight Mission Road and I told Raymond, I said "get him some help, get him to the doctor now", Raymond took him out and I was standing as they put him in the car, sent him to the hospital.  At this time me and Manion cleared the, the top floor, which there's nobody in it and that time we didn't see any guns up there.  Once the house was clear we come back out, course by this time the Sheriff's Department, everybody was there at the house.  The Sheriff's at that time took custody of this Barrett and ah, moved him from the house to the side of the house, your looking out the front door it would be the left side of the house, over by our (inaudible) course at that time ah, we got, we had gotten all the injured out and started taping off the crime scene, telling everybody, everybody

12

1664
KEB203553

STATE OF OKLAHOMA    )                    DANNY OLIVER
                     )SS                  DEA
COUNTY OF OKLAHOMA   )

**AFFIDAVIT**

was telling everybody else "don't touch nothing in the crime scene, don't go back in the house, it's all clear" and then the Tactical Team kind of gathered over there in the corner and they, I don't know, probably, seemed like a long time, probably 30 minutes after the shooting they called back and said Rocky was dead and ah, we ah, we kind of hung there together till the D.A. got there and ah, I don't know how long a time it was, but they took us to ah, I think the Child Support Office there at the Sallisaw D.A.'s office and at that point in time we stayed until the next morning, we went back out to the scene and that's basically what happened.

GORDON:    Did you fire any rounds during the confrontation?

OLIVER:    No sir.

GORDON:    Ah, did you ever actually touch Kenneth Barrett during the taking when you were taking him into custody or was it just the other Troopers that were doing it?

OLIVER:    I bent down I think one and put my hand on his back.

GORDON:    Did you all know what the suspect looked like, did you have a picture of him before the forced entry was attempted?

OLIVER:    I never did see one, no.

13

1665
KEB203554

STATE OF OKLAHOMA        )                    DANNY OLIVER
                         ) SS                 DEA
COUNTY OF OKLAHOMA       )

AFFIDAVIT

GORDON:   Okay. You know how many suspects were in the house, or on the property prior to you arriving at the house?

OLIVER:   Prior information I got in briefing was one, Mr Barrett.

GORDON:   Okay, was that hard intelligence or was that just

OLIVER:   That information I got, the information (inaudible) briefing, this comes from an informant and the informant had been in there recently, and said that Mr Barrett had lived alone, and was usually there by himself, or there could of possibly been several other people there at different times. On the drive by, surveillance, I believe the Trooper said there were two people out in the yard.

GORDON:   Did the ah, informant advise you how many and what type of weapons were in the house?

OLIVER:   Course I never did talk to the informant and the informant never did talk to us, never did talk to the Tactical Team is my understanding from information they got, but the informant talked to the D.A.'s Task Force, ah, the information that come to us from D.A.'s Task Force was that this man always had weapons.

GORDON:   Did, did they advise you about his criminal history?

14

1666
KEB203555

STATE OF OKLAHOMA    )
                     ) SS
COUNTY OF OKLAHOMA   )

DANNY OLIVER
DEA

AFFIDAVIT

OLIVER:    Yes.

GORDON:    And about his threats against law enforcement?

OLIVER:    Yes.

GORDON:    Did they ever, I know you said the CI, but did they ever take and say ah, anything about the CI, his credibility?

OLIVER:    The only thing, ah, they said they had run several warrants off this CI and (inaudible)

GORDON:    There was an alarm, a sensormatic alarm on the back of the house, you know if the informant er did that pass during the ah ah, briefing about the alarm on the back of the house.

OLIVER:    I did not hear if it was.

GORDON:    You think the intelligence was okay for this mission?

OLIVER:    As far as intelligence (inaudible) Trooper job, ah, and the warrants that we usually do, ah, I think we, I think the Troopers, the team acted on all the intelligence they had, I don't think the intelligence was correct,.

GORDON:    Okay. During the, you were driving down the road with a

15

1667
KEB203556

STATE OF OKLAHOMA )            DANNY OLIVER
                  )SS         DEA
COUNTY OF OKLAHOMA )

                        AFFIDAVIT

set of lights on, is, do you, how was the decision reached that this take place at 12:30 instead of, at night, instead of early in the morning.

OLIVER:   I don't know, that was my understanding that intelligence was left, was made ah through the Tactical Team and the Task Force.

GORDON:   Did you hear anybody voice an opinion one way or the other when they said they were gonna do it at 12:30, good or bad.

OLIVER:   Rocky said "well, let's just do it now".

GORDON:   You mean as far as "just go out and do it at 12:30".

OLIVER:   No, it was 7:30 when we did the briefing.

GORDON:   Okay, he said "just go ahead and do it"

OLIVER:   "Let's just go ahead and do it now and get it over with".

GORDON:   You know how the Tac Team conducted surveillance for this mission?

OLIVER:   My understanding they did a drive by with an unmarked vehicle, (inaudible) would be the Bronco, it may of been another vehicle, I know we had already gone to eat and they come met us, I

16

1668
KEB203557

STATE OF OKLAHOMA   )                   DANNY OLIVER
                     )SS               DEA
COUNTY OF OKLAHOMA  )

AFFIDAVIT

don't know exactly what, if they had ah vehicle from the Task Force or, that's something that I really don't know.

GORDON:   Based on your experience, you know being on the Tac Team 15 years obviously you've been on some deals, you think the surveillance was adequate for this particular mission?

OLIVER:   Yes.

GORDON:   Okay. Ah, you think you all should of had a picture of Barrett?

OLIVER:   Yes.

GORDON:   Ah, been my understanding, I've never been on the Tac Team, but it's been my understanding that ordinarily the Tac Team will run surveillance for an hour or two prior to an event occurring.

OLIVER:   Yes.

GORDON:   Ah, is there any reason why that did not occur at this time?

OLIVER:   Yes, that was ah, Mr Barrett's house, you've been there cause I saw you there, Mr Barrett's house is so closely surrounded

17

1669
KEB203558

STATE OF OKLAHOMA    )                          DANNY OLIVER
                     )SS                        DEA
COUNTY OF OKLAHOMA   )

AFFIDAVIT

by residences that are kin to him, very close, his mother's house (inaudible), ah, in the Tactical Teams opinion ah, that a surveillance team couldn't (inaudible),

GORDON:   Do you hold that same opinion?

OLIVER:   Yes I do.

GORDON:   Can you think of anything else that might help me to conclude my investigation of the events that occurred in Sallisaw on September 24, 1999?

OLIVER:   No.

GORDON:   Sir, with your permission I'm gonna turn the tape recorder off at this time.

OLIVER:   Yes sir.

18

1670
KEB203559

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

_____

### NOTICE OF FILING OF DECLARATION OF LEONARD POST
_____

NOTICE IS HEREBY GIVEN that Kenneth Eugene Barrett, Movant herein files herein and herewith the Declaration of Leonard Post.  Said Declaration is filed  in support of Amended Section 2255 Motion to Vacate, Set Aside or Correct (Doc 95), Motion to Supplement Amended Section 2255 Motion to Vacate (Doc 95) and Supplemental Section 2255 Motion to Vacate, Set Aside or Correct Judgment/Order and Sentence.

DATED:  March 16, 2012

Respectfully submitted,

       /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

       /s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## <u>CERTIFICATE OF SERVICE</u>

I declare that this Motion under <u>28 U.S.C. § 2255</u> was electronically filed on March 16,

2012 and served on:

**Christopher J. Wilson**
**United States Attorney**
**1200 W. Okmulgee**
**Muskogee, OK 74401**

**Jeffrey B. Kahan**
**U.S. Department of Justice**
**1331 F Street, N.W., Room 345**
**Washington, D.C. 20530**

           /s/ Joan M. Fisher

Signature of Movant's Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,        )
                               )     **DEATH PENALTY CASE**
         Movant,               )
                               )
v.                             )     Case No. 09-CIV-105-JHP
                               )
UNITED STATES OF AMERICA,      )
                               )
         Respondent.           )
_____)

---

### DECLARATION OF LEONARD POST IN SUPPORT OF SUPPLEMENTAL SECTION 2255 MOTION TO VACATE

---

I, Leonard Post, a person over the age of eighteen (18) and competent to testify and mindful of the penalties of perjury, declares as follows:

1.      I am an investigator retained by the Federal Defenders Office of the Eastern District of California to assist in the postconviction investigation in the above-numbered and styled matter.

2.      David Autry, counsel for Kenneth Eugene Barrett and I interviewed the Hon. John Garrett at the Adair County courthouse in Courtroom One, which was otherwise unoccupied, on July 1, 2011.

3. The following is a true and correct accounting of Judge Garrett's statements to us.

A.      Re Judge Garrett:

      1.      Judge Garrett presided over two state trials brought by the state of Oklahoma against Kenneth Barrett for capital

DECLARATION OF LEONARD POST IN SUPPORT OF
SUPPLEMENTAL SECTION 2255 MOTION TO VACATE -1

murder in the shooting death of Trooper Rocky Eales.

2. Publicly available information shows Judge John Garrett to now be seventy (70) years of age.

2. Judge Garrett retired approximately five years ago.

B. Re: Monk Sanders

1. Judge Garrett told Clint Johnson he did not want to know who the Confidential Informant [CI] for the warrant was. At the time of the interview, Judge Garrett still didn't know who the CI was.

2. When Judge Garrett was advised that the CI was Monk Sanders, he said, "Hell you say." When asked if he knew Monk, he said that he did and that "No, I would not believe anything he told me."

C. Re: Clint Johnson

1. Judge Garrett said that Clint Johnson "was not a truthful guy and not to be trusted. We have an Oklahoma expression for someone like him. 'He'd slap you on the back and piss in your boots at the same time.' He did lots of shaky things....slime around and finagle a lot of stuff....various and sundry things...people were afraid of him, because of what he had the power to do—I like to think I wasn't—the black gown will always prevail—but other people were afraid of him and had reason to because of what he held over your head....I was always suspect of him."

2. "Johnny Philpot had been out there [Kenny's] the week before [the raid] and talked to him [Kenny]." Judge Garrett believes that Philpot testified to that. "The warrant was already good at that time.

C. Re: OHP:

1. "I wouldn't let them bring their firearms into the courtroom. They would argue that that it offered the court protection. I told them that I had two armed deputies...." He finally had to tell them "You're not going to wear your . . . guns."

2.   OHP officers "filled the courtroom. They were trying to intimidate a lot of people. I think they thought they were going to intimidate me."

D.   Re Kenneth Barrett:

1.   Judge Garrett advised that while presiding over the trial, he never thought Mr. Barrett was a danger. "We'd have lots of hearings. He was never anything but a gentleman in all respects. He showed me the greatest of respect[.]"

2.   Judge Garrett also said that Mr. Barrett had treated his secretary, Audrey, with the same degree of respect.

E.   Re: Echols:  Judge Garrett thinks that John Echols is the best lawyer who ever tried a case in front of him.

I declared under penalty of perjury that this three page declaration is true and correct.

Executed by me on this *15th* day of March, 2012 in New Yourk County, New York.

Leonard Post
NYS Investigator's License
#110001455413

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### PETITIONER'S MOTION FOR LEAVE TO SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. SECTION 2255

Petitioner's Motion for Leave to Supplement Amended Motion                      Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence          OKED Case No. 6:09-cv-00105-JHP

1677

**TABLE OF CONTENTS**

I.      Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Introduction and Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      This Court Should Grant Petitioner Leave to File the Motion to Supplement
                the Pending 2255 Motion to Vacate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Petitioner's Motion for Leave to Supplement Amended Motion                              Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence        i               OKED Case No. 6:09-cv-00105-JHP

1678

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Buder v. Merrill Lynch*, 644 F.2d 690 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Conley v. Gibson*, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Foman v. Davis*, 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Gillette v. Tansy*, 17 F.3d 308 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Mayle v. Felix*, 545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Riley v. Taylor*, 62 F.3d 86 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Woodford v. Williams*, 263 F.3d 1135 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### FEDERAL STATUTES

Fed.R.Civ.P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     ii

Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1679

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S MOTION FOR LEAVE TO SUPPLEMENT
THE PENDING AMENDED MOTION TO VACATE, SET ASIDE
OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE
UNDER 28 U.S.C. SECTION 2255**

**I.      Motion**

Petitioner, Kenneth Eugene Barrett, by and through his undersigned counsel, hereby moves this Court for leave to amend and/or supplement his pending second amended Motion to Vacate, Set Aside Or Correct a Judgment, Order and/or Sentence, Under 28 U.S.C. Section 2255. (Doc. 95)

Mr. Barrett respectfully submits this Court should grant the motion because leave is to be freely given and it would be an abuse of discretion to withhold leave under the circumstances of this case.  Since filing the Second Amended Motion (Doc 95), substantive, relevant and material information has been discovered which relates back to Movant's claims.  The interests of justice, as well as the Fifth, Sixth and Eighth Amendments, require that this motion be granted.

1680

## II.      Introduction and Summary of Argument

Since the filing of the Second Amended Motion, Mr. Barrett has, as he said he would, continued the investigation into the conduct of both the Government, its agents and appointed defense counsel which led directly to the unjust verdict and sentences sought to be vacated. Interviews of a number of witnesses have produced additional evidence to support the claims pending in Mr. Barrett's §2255 Motion (Doc 95).

The most critical of the newly produced witnesses is Paul D. Gordon, a retired OHP Internal Affairs Investigator originally responsible for the investigation of the September 24, 1999 shooting.  Mr. Gordon's investigative efforts were blocked, hampered, and ultimately stopped because the investigation revealed the OHP was covering up the mistakes of the fatal raid on Mr. Barrett's residence.  Based on the facts recited in Mr. Gordon's declaration, much of the evidence presented in this Court resulting in Mr. Barrett's convictions and sentences is untrue.  In order to render Mr. Gordon either incredible or intimidated, either of which prevented the truth from emerging, the State of Oklahoma, primarily the same actors and agents who assisted the federal government in the current prosecution, went so far as to prosecute Mr. Gordon for acts of accepted policy within OHP despite knowing that perjury had been committed to secure his prosecution.  The Government failed to disclose to the defense matters regarding Mr. Gordon's investigation which were unquestionably exculpatory and material both substantively and as impeachment of the Government's law enforcement witnesses.  Mr. Gordon's proffered testimony is set out in significant detail and filed separately in support of this Supplemental §2255 Motion to Vacate, as well as Mr. Barrett's pending §2255 Motion to Vacate (Doc 95).  It is this testimony that provides the substantial portion of additional evidence in

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence        2

Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

support of Mr. Barrett's claims of prosecutorial misconduct and ineffective assistance of counsel, as well as the related substantive claims of the unconstitutional use of restraints and judicial interference with the defense

Another witness who was interviewed is retired Sequoyah County District Judge John Garrett, who presided at Mr. Barrett's state trials. Because of his status as a retired judge, the evidence which Judge Garrett could offer is proffered by the Declaration of Leonard Post, an investigator retained by Mr. Barrett's counsel who, along with counsel David Autry, interviewed him. Judge Garrett's evidence goes to the good conduct of Mr. Barrett in the state trials. Judge Garrett's characterization of the conduct of Mr. Barrett as at all times respectful undermines this Court's acquiescence to the U.S. Marshal in unconstitutionally restraining Mr. Barrett with a visible stun belt, an unnecessary encumbrance which interfered with Mr. Barrett's communications with his counsel and prejudicially detracted from the presumption of innocence.

Kenneth Barrett's conviction and the resulting sentences of Life without Parole and Death are based on a web of lies and deceit, fabrication and prevarication, all of which was designed to spare the troopers of the East Tact Team of the Oklahoma Highway Patrol the embarrassment, humiliation and burden of having contributed to the death of their friend and fellow trooper, Rocky Eales. The Tact Team deliberately, intentionally and inexplicably ignored OHP policies and procedures in planning and executing the raid, thus ensuring that Kenneth Barrett's response to the Tact Team's presence could be nothing other than it was to defend his family, his home and his life against what he perceived to be an illegal intrusion and confrontational attack by persons unknown.

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence    3    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1682

Since filing his original Section 2255 Motion to Vacate his convictions and sentences (Doc 1), the correction thereof (Doc 2) and the First and Second Amended Motions, (Docs.74, 95), previously undiscovered information has come into Movant's possession which demonstrates the United States Government, by and through its agents, including the State of Oklahoma and the Oklahoma State Highway Patrol, engaged in a continuous course of conduct to obscure, misrepresent, deceive and preclude discovery and/or presentation of matters which, when considered individually, cumulatively and/or together with the facts and claims currently pending, make clear that violations of Mr. Barrett's constitutional rights as guaranteed by the Fifth, Sixth, and Eighth amendments to the United States Constitution compel relief from both his convictions and sentences.

In the course of the continuing investigation in this matter, counsel for Mr. Barrett located and interviewed Paul Gordon, retired Oklahoma State Trooper, a former investigator for the Internal Affairs Division of the Oklahoma Highway Patrol. Mr. Gordon was the primary and lead investigator assigned to the shooting at the Barrett residence. Mr. Gordon recently disclosed matters previously known to the prosecution but which were not disclosed to the defense before and during the federal trial, in violation of the Government's obligation to produce exculpatory evidence. Independent of this constitutional violation, trial counsel were ineffective for failing to reasonably investigate, to Mr. Barrett's prejudice, evidence gleaned from Mr. Gordon's investigation. See Declaration of Paul Gordon (Doc. 199-1).

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence    4                Barrett v. USA
                                                                                    OKED Case No. 6:09-cv-00105-JHP

1683

**A.** **This Court Should Grant Petitioner Leave to File the Motion to Supplement the Pending 2255 Motion to Vacate.**

This Court should permit the filing of the supplemental amendments to the pending Motion to Vacate, and should fully consider them in the interests of justice. Where an amendment is filed following the service of a responsive pleading, a court should "freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). This is particularly true where, as here, no new claims are raised in the amendments to the petition, and therefore there is no violation of the statute of limitations and no prejudice to the opposing party.

In the following section, Petitioner presents grounds for allowing his amendment.

The phrase "freely given" in Rule 15(a)(2) is a limit on a district court's discretion. *Gillette v. Tansy,* 17 F.3d 308, 313 (10th Cir. 1994); *Riley v. Taylor,* 62 F.3d 86, 90, 92 (3rd Cir. 1995) (denial of leave to amend was reversible error; "the district court's order denying Riley leave to amend his petition for a writ of habeas corpus is inconsistent with the exercise of sound discretion in light of Rule 15(a)'s command that amendments should be freely allowed when justice so requires.")

Refusal to allow amendment of a §2255 motion in a capital case, where the cost to Petitioner may be his life, and where the Government can claim no prejudice, would be a particularly extreme abuse of discretion, and contrary to the Supreme Court's statement in the seminal Rule 15(a) case that "the purpose of pleading is to facilitate a proper decision on the merits." *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (quoting *Conley v. Gibson,* 355 U.S. 41, 48 (1957)); *see also, Moore v. Balkcom,* 716 F.2d 1511 (11th Cir. 1983) (affirming denial of leave to amend on "futility" grounds, but noting that "[c]ertainly in a capital case, the district court

should be particularly favorably disposed toward a petitioner's motion to amend"). Refusal to allow a habeas litigant to amend his petition in order to expand or clarify claims already made would constitute an abuse of discretion. *Gillette v. Tansy, supra.*

Declining leave to amend must be justified. *Foman v. Davis,* 371 U.S. at 182; *Riley,* 62 F.3d at 90. Permissible justification for refusing to allow amendment include: 1) undue delay; 2) bad faith or dilatory motive; 3) undue prejudice to the opposition; 4) repeated failures to correct deficiencies with previous amendments; and 5) futility of the amendment. *Foman,* 371 U.S. 182; *Riley,* 62 F.3d at 90. None of these potential justifications for denying an amendment is present here.

The Supplemental Motion to Vacate sought to be filed  does not create "undue delay" because Mr. Barrett has already timely moved for relief under § 2255. The Court has yet to make any findings, preliminary or otherwise. Any delay in this case has been occasioned by the circumstances cited in Mr. Barrett's motion to toll the statute of limitations, the Government's untimely disclosure of information previously undisclosed, and the need to conduct further investigation or difficulties in obtaining additional evidence; and, the Court's failure to rule on pending motions to vacate the protective order and permit discovery on newly disclosed information. No undue delay is created by the amendments, which merely supplement, elaborate, clarify, and expand upon arguments already made.

The amendments for which leave to file is sought by Mr. Barrett do not evince "bad faith" or "dilatory motive." Mr. Barrett has not lain behind the log, springing new arguments that do not relate back to the timely filing. Rather, while the Court is still formulating its initial review, Mr. Barrett's counsel and those assisting them have continued to investigate and work on his

Petitioner's Motion for Leave to Supplement Amended Motion                                         Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence        6                OKED Case No. 6:09-cv-00105-JHP

1685

case.  Beyond that, any delay in the amendments or supplementation sought here is the direct result of the misconduct of the Government in its deliberate intent to hide the evidence now known, in part by intimidation, perjury, selective bad faith prosecution of the witness whose testimony is the primary basis of the pending amendments, and destruction of corroboration for that evidence.

There has been only one actual previous amendment to Mr. Barrett's §2255 motion, namely, the amendment timely and properly filed on September 25, 2009 under Rule 15(a)(1)(A), which by Court Order was transferred to a District Court's Indigent Prisoner §2255 form.  (Docs. 74, 81).  That properly amended motion was then transferred onto the Indigent Prisoner form at the direction of the Court.  (Doc 95).

The amendment  for which leave is sought is not "futile."  Amendments are futile if "they assert clearly frivolous claims." *Riley,* 62 F.3d at 91 ("[t]hough we cannot say Riley will prevail on any of the [proposed amendments], we are equally unable to say the amendments he proposed are so unlikely to affect the outcome that they would be futile."); *Buder v. Merrill Lynch,* 644 F.2d 690, 695 (8th Cir. 1981).  In the supplemental amendment, Mr. Barrett does not advance new claims that would be barred by the limitation period, and thus futile, as in *Mayle v. Felix,* 545 U.S. 644 (2005).  The amendment elucidates, expands or clarifies matters already raised which relate back to the timely filed motion based on counsel's continuing investigation and research. The amendment simply asserts claims arising out of the "conduct, transaction or occurrence" set out before.  *See Woodford v. Williams*, 263 F.3d 1135 (10th Cir. 2001); *United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000); *cf. Felix*, *supra*, 545 U.S. at 664. Unlike the situation in *Felix* and similar cases, Mr. Barrett's proposed supplemental amendments "relate

Petitioner's Motion for Leave to Supplement Amended Motion                                    Barrett v. USA
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence       7            OKED Case No. 6:09-cv-00105-JHP

1686

back" to the date of his timely filed motion under Rule 15( c)(1)(B), because they contain no new ground or grounds for relief supported by facts that differ both in time and type from those previously set forth. The claims raised by Mr. Barrett are substantial, not frivolous.[1]

The Supplemental Motion sets out under each supplemented ground for relief the specific ground for relief to which it relates back.

The grounds which Movant requests supplementation all relate to the proffered testimony of Paul Gordon, a retired OHP internal affairs investigator, and an interview with Hon. John Garrett, the presiding judge in the two state trials in which Movant faced a capital charge. The evidence pertains primarily to the previously alleged and currently pending claims of prosecutorial misconduct (Doc 95 Ground 5) and ineffective assistance of counsel (Doc 95 Ground 2) and to a lesser extent the claims of denial of due process and the presumption of innocence by the Court's order compelling Mr. Barrett to wear a visible stun belt during the proceedings (Doc 95 Ground 7), as well as judicial interference with the defense (Doc 95 Ground 1).

For reasons already alluded to, the amendment does not cause undue prejudice to the Government. The amendment elaborates upon or clarifies claims already made in March, 2009. Counsel for Mr. Barrett did not "wait" to file the proposed amendment; they continued to collect

---

[1] It is impossible for Mr. Barrett to say more regarding the relation-back doctrine because he has no notice whether this Court or the Government contests the timeliness of any part of the amended Petition. Whether an amended claim relates back to an earlier filed claim is contingent both upon a comparison between two sets of facts alleged, and the substantive law governing the claim or claims. *See Felix, supra,* 545 U.S. at 664 & n.7.

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence       8       Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

evidence, and filed when that evidence could be incorporated into the existing claims as supplements to the pending Motion to Vacate and the exhibits previously filed.

All the above demonstrates the court would abuse its discretion in not allowing the amendment.

## IV.    Conclusion

Based on the foregoing arguments and authorities, Mr. Barrett respectfully requests that this motion be granted.

DATED March 16, 2012

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER
Idaho Bar No. 2854
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656 [fax]

Attorney for Petitioner,
Kenneth Eugene Barrett

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence     9

Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1688

**Certificate of Service**

      I hereby certify that on this 16TH day of March, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401 and Jeffrey B. Kahan, U.S. Department of Justice, 1331 F Street, N.W., Washington, D.C. 20530.

/s/ Joan M. Fisher

Petitioner's Motion for Leave to Supplement Amended Motion
to Vacate, Set Aside or Correct Judgment, Order and/or Sentence   10        Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1689

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

---

**TABLE OF CONTENTS**

TWENTIETH GROUND.
    THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD
    HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND
    SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT
    KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE
    EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE
    DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A
    FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE
    SENTENCING DETERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.      Facts supporting the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TWENTY-FIRST GROUND.
    APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE
    THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE
    OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND
    TO CALL HIM AS A WITNESS TO  TESTIFY TO THE FALSE VERSION OF
    EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND
    DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY
    GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED
    AND COMPETENT ATTORNEYS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    1.      Availability of Mr. Gordon to Testify. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    2.      Summary of Paul Gordon's Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    3.      Specific Acts of Prejudicial Deficient Performance by Trial Counsel. . . . . . . . . 16

            a.      Mr. Barrett's Counsel unreasonably failed to investigate and
                    present the testimony of Paul Gordon to refute the affidavit
                    supporting the Search warrant to support the *Franks v. Delaware*
                    reconsideration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            b.      Trial counsel failed to investigate, interview, and present
                    testimony of a critical material witness,  Mr. Paul Gordon, retired
                    OHP Internal Affairs Investigator, that would have rebutted the
                    prosecution's theory of the case, supported the defense theory,
                    and formed the basis for acquittal or conviction of
                    a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Supplemental Motion to Vacate, Set Aside                                             Barrett v. USA
or Correct Judgment, Order and/or Sentence            -i-                  OKED Case No. 6:09-cv-00105-JHP

1691

i.      The Mission Should Have Been Aborted. . . . . . . . . . . . . . . . . . 19

ii.     There was No Emergency Lighting Activated Identifying Law
        Enforcement   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii.    There is credible substantive and impeaching evidence
        through Paul Gordon's Interviews and Investigation that a
        member of the OHP East Tact Team, not Mr. Barrett. initiated
        the gunfire.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iv.     Information known to OHP indicated Mr. Barrett would run
        from  to law enforcement.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

v.      Credible evidence undeveloped by trial counsel would have
        shown that Mr. Barrett did not have a pill bottle with red
        phosphorous residue in his pocket.  . . . . . . . . . . . . . . . . . . . . . . 24

vi.     After arrest, Mr. Barrett was beaten by the Sheriff and two of
        his deputies. Denials that a beating was administered
        were false.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

c.      Trial Counsel was constitutionally ineffective for failing to call Mr.
        Gordon to refute the legitimacy of the experiment of Iris Dally
        both as a fact witness and expert witness.  . . . . . . . . . . . . . . . . . . . . . 27

d.      Trial Counsel's failure to interview, prepare and present the
        testimony of Mr. Gordon regarding the OHP witnesses and the
         lack of adherence to any reasonable protocol, including their own,
        in the execution of the High Risk Warrant which created Mr.
        Barrett's reasonable belief that he was being attacked by unknown
        criminals and the OHP witnesses's continuous efforts to avoid
        disclosing the same fell far below prevailing norms and wholly
        undermined the reliability of the verdicts and sentence
        in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TWENTY-SECOND GROUND.
        MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND
        PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO
        COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY
        OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE REASONABLY
        LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE. . . . . . . . . . . . . . . . . 29

Supplemental Motion to Vacate, Set Aside                                    Barrett v. USA
or Correct Judgment, Order and/or Sentence          -ii-          OKED Case No. 6:09-cv-00105-JHP

1692

TWENTY -THREE GROUND.

THE COURT'S FAILURE TO CONSIDER  SIGNIFICANT AND READILY AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A  STUN BELT WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . 30

TWENTY-FOURTH GROUND.

MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER GORDON. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TWENTY- FIVE GROUND.

MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence

-iii-

Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1693

## APPENDICES INDEX

Appendix A
      Audio Tape at Crime Scene by Paul Gordon on September 24, 1999 . . . . . . . . . . . . . A-1

Appendix B
      Crime Scene Videotape by Paul Gordon on September 24, 1999   . . . . . . . . . . . . . . B-1

Supplemental Motion to Vacate, Set Aside           -iv-           Barrett v. USA
or Correct Judgment, Order and/or Sentence          OKED Case No. 6:09-cv-00105-JHP

1694

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, ) | |
| ) | |
| Movant/Defendant, ) | **DEATH PENALTY CASE** |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA ) | NO.  6:09-cv-00105-JHP |
| ) | |
| Respondent/Plaintiff. ) | |

_____

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**
_____

COMES NOW, Movant, KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence based on the Grounds previously alleged in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order/Sentence (Doc 95) supplemented by the Grounds alleged herein which specifically relate back to the Grounds raised in the § 2255 Motion to Vacate (Doc 95) now pending.

Mr. Barrett states for relief requested the following supplemental grounds:

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence      1      Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1695

**TWENTIETH GROUND**

**THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION.**

**1.  Introduction**

The Government's theory of the case, based on the testimony of the OHP Tact Team members, was that Mr. Barrett knew full well that the individuals who entered his property on the night of September 24, 1999 were law enforcement officers, because the emergency lights on at least some of the vehicles were engaged from the very inception of the raid.  Therefore, Mr. Barrett shot Trooper Eales knowing or having reason to know that he was a law enforcement officer, and killed him based on this knowledge while Trooper Eales was engaged in his official duties.   Several of the informant witnesses, who testified that Mr. Barrett had threatened to shoot or kill any law enforcement officer or officers who came on his property, lent support to this theory.  Taking these witnesses together, the Government argued that Mr. Barrett made good on his alleged threats because he knew, at the time he fired his weapon and shot and killed Trooper Eales, that he was firing at law enforcement officers.  The Government also relied on the testimony of Charles Choney, an expert on SWAT tactics who was inexplicably called by the defense.  Choney testified that the raid was properly conducted and that the members of the OHP Tact Team "did nothing wrong."

Charges of manufacturing and/or attempting to manufacture methamphetamine provided jurisdiction for this federal prosecution.  One of the key pieces of evidence for the underlying

drug charges was that a quantity of red phosphorous, an ingredient in the manufacturing of methamphetamine, was found on Mr. Barrett's person by local law enforcement when he was searched following the shooting.

The defense argued that due to the manner in which the raid was conducted, Mr. Barrett was unaware that law enforcement was on his property, and that he reasonably believed he was acting in defense of himself and his son, Toby Barrett. With respect to the underlying drug charges, the defense argued that the evidence was insufficient to support them because no working lab was found on the property and only trace amounts of methamphetamine were found.

These arguments foundered because critical exculpatory evidence which would have supported them and thoroughly discredited the Government's version of events was not disclosed by the prosecution. The exculpatory evidence suppressed by the Government, which went to the manner in which the raid on Mr. Barrett's property was actually conducted, would have shown that Mr. Barrett reasonably believed that trespassers, not law enforcement, were on his property, and that he justifiably used lethal force to repel them. Along with discrediting the "official" version of events, this exculpatory evidence would have rendered irrelevant the testimony from the informant witnesses that Mr. Barrett had threatened to shoot or kill any law enforcement officer who came on his property.

**2.  Facts supporting the claim**

Paul Gordon was the OHP internal affairs investigator who responded to Mr. Barrett's property at the direction of his superiors on the night of the shooting. Mr. Gordon has extensive experience both with OHP and other law enforcement. (Declaration of Paul D. Gordon in Support of §2255 Motion to Vacate (Doc 95) and Supplemental 2255 Motion herein ("Gordon Dec") at 1-2 ¶ 4)  He was responsible for investigating the shooting and reconstructing the crime

scene.  The Government failed to disclose exculpatory facts and conclusions from his investigation, and, along with agents of State government relied upon in the Government's case, acted improperly to prevent Gordon from being a credible witness.  The exculpatory facts and conclusions the Government failed to disclose include:

• Contrary to the testimony of the OHP Tact Team witnesses, including Trooper Kerry Pettingill, Pettingill told Mr. Gordon that he believed members of the Tact Team *fired weapons* when they "rolled up" on Mr. Barrett's property.  (Gordon Dec at 3 ¶ 8)  This would obviously support Mr. Barrett's claim of self-defense.  The prosecution knowingly introduced false evidence from the OHP witnesses which portrayed any shooting by the OHP Tact Team as purely defensive in character.

• Contrary to the testimony of the OHP Tact Team witnesses (and defense witness Chuck Choney, who was quickly converted into a prosecution witness both on direct and cross-examination), the raid was poorly planned, lacked adequate intelligence and surveillance, and directly violated OHP policies and procedures for an arrest of an alleged "high risk" fugitive. Tact Team vehicles entered Mr. Barrett's property without warning that law enforcement was on the premises.  This violated OHP policy that an announcement should be made for the safety of all concerned.  Otherwise, just as occurred in this case, the target might believe trespassers (for example, rivals from the drug world) are invading his property and react violently in apparent self-defense.  (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶¶ 10, 15, 22-24, 43, 50, 56)  Mr. Barrett's belief that trespassers had roared onto his property was heightened by the fact the OHP "drive by" on the afternoon preceding the raid was made in what appeared to be a civilian vehicle. (Gordon Dec at 11 ¶ 24)

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                     4                     Barrett v. USA
                                                                                              OKED Case No. 6:09-cv-00105-JHP

1698

In brief, Mr. Gordon concluded "[t]he Manual and Training Videos available to the East Tact Team at the time make it clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken."  (Gordon Dec at 19 ¶ 56)

This conclusion from Mr. Gordon's investigation clearly conflicted with the prosecution theory and testimony, and supported Mr. Barrett's defense that he acted in self-defense while thinking criminal trespassers had invaded his property.  To the extent OHP witnesses testified that the raid was properly planned, was based on adequate intelligence and surveillance, and was executed "by the book," the prosecution knowingly sponsored false testimony.

The problems with the planning, intelligence and surveillance in connection with this raid were so pronounced that OHP Lieutenant McBride, who was delegated from his usual position on the West Tact Team to the East Tact Team for this particular operation, advised that the raid be aborted.  Lieutenant McBride was told to go back to the West Tact Team if he disagreed with the way the raid was going to be conducted.  Lieutenant McBride was extremely upset and emotional when he related this to Mr. Gordon.  (Gordon Dec at 17 ¶ 50)

It is Mr. Gordon's view that had the OHP conducted adequate, real-time surveillance as directed by policy, Mr. Barrett could have been arrested, likely without incident, while he and his son Toby were working on a vehicle the day of the raid.  (Gordon Dec at 11 ¶ 24)  Based on the limited intelligence that was available, Mr. Barrett's likely reaction to law enforcement presence on his property would be to attempt to flee on foot.  This was supported not only by the fact that OHP personnel were stationed at adjoining residences at the time of the raid, but by statements made to Mr. Gordon by Troopers Manion and Hise.  (Gordon Dec at 11-12 ¶ 24)  Therefore, a

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                     5                     Barrett v. USA
                                                                                   OKED Case No. 6:09-cv-00105-JHP

1699

sudden confrontation without warning involving numerous vehicles charging onto the property in the middle of the night was an ill-advised and improper tactic, aside from the fact that it violated OHP protocol to begin with.  (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶ 10, 15, 22-24, 43, 50, 56, )

• Against the testimony of the OHP Tact Team witnesses, the members of the Tact Team *did not* engage their emergency lights during the raid.  Indeed, no vehicle lights were engaged. The Tact Team "rolled in dark."  (Gordon Dec at 10, 12 ¶¶ 23, 25)  The Government knowingly sponsored false testimony to the effect that Mr. Barrett was "warned" of the law enforcement presence because emergency lights were activated on some of the vehicles from the inception of the raid.

Trooper Hamilton, who drove the lead Ford Bronco in which Trooper Eales was a passenger, initially told Mr. Gordon that the "flip lights" on the vehicle's visor had been engaged, but later admitted he did not engage these or any other emergency lights.  The physical evidence itself showed that the "flip lights" had not been activated.  Had the visors been lowered and the "flip lights" engaged, they would have been shot out by the rounds fired by Mr. Barrett through the windshield of the Bronco, but this did not happen.  (Gordon Dec at 10, 12 ¶¶ 23, 27-28 )

Task Force Agent Frank Lloyd, who arrived on the scene in the immediate aftermath of the shooting, told Mr. Gordon that he could see the tail lights of the OHP vehicles when they turned onto Mr. Barrett's drive, but mentioned nothing about seeing any emergency lights. (Gordon Dec at 12 ¶ 26)

One of the key "facts" elicited and argued by the prosecution at trial for the proposition that Mr. Barrett "knew" law enforcement officers rather than trespassers were on his property was that Trooper Hash, who was in a marked unit, drove onto the property with his lights and flashing bar on.  This is what Trooper Hash initially told Mr. Gordon, and what he testified to at

trial, but Hash ultimately admitted to Mr. Gordon that "somebody just flipped the lights on after the shooting to give needed light during the wounded trooper's evacuation." (Gordon Dec at 13 ¶ 26)

Likewise, Mr. Gordon's investigation revealed that no emergency lights on Lieutenant Pettingill's vehicle were engaged. Had emergency lights on Pettingill's vehicle been activated, they would have been seen by Mr. Barrett had he looked in that direction. However, when Mr. Gordon examined Pettingill's vehicle, the flip lights were in the "up" position. These lights would not have been engaged because they would have impaired the view Trooper McBride, the assistant team leader, who was stationed near Mr. Barrett's mother's residence. (Gordon Dec at 13 ¶ 30)

• Mr. Gordon's evaluation of the physical evidence, coupled with interviews of the troopers, supports Mr. Barrett's claim that he was unaware law enforcement was on his property because he was not at a vantage point to see the vehicles, including the lead Bronco driven by Trooper Hamilton, which entered from the east. Most of the shots fired by Mr. Barrett were fired from inside the cabin. For the brief period of time he was on the porch, his attention was directed to the west where his son was crying for help. Mr. Barrett first fired his weapon after Trooper Hamilton struck his cabin with the lead Bronco. (Gordon Dec at 13, 15-16 ¶¶ 31-32, 44)

• Mr. Gordon's analysis of the crime scene confirmed what the defense attempted to argue at trial – that Hamilton's vehicle indeed struck the cabin, and was later moved back. Lieutenant Pettingill confirmed this to Mr. Gordon, as did the location of various items of physical evidence. Government testimony to the effect that Trooper Hamilton's Bronco did not strike Mr. Barrett's cabin was knowingly false. The after-the-fact placement of the Bronco away from Mr. Barrett's cabin compromised, and rendered false, the crime scene reconstruction and

trajectory analysis done by the OSBI's Iris Dalley, as well as the processing of the vehicle itself done by the OHP's Vernon Phillips. When Mr. Gordon tried to advise his supervisors, Lieutenant George Randolph and Captain Rodney Burris, that "the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle(s)," he was brushed off and told to stay out of it, because it was the OSBI's investigation. (Gordon Dec at 14-15 ¶¶ 33- 40)

• The conclusions drawn by Mr. Gordon in his investigation also would have critically undermined the drug charges against Mr. Barrett. Even taken in their most flattering light, the drug charges were weak. There was no working lab on the property. Only a trace amount of methamphetamine was found, and this was located in the trailer used by Mr. Barrett's son, Toby. The overwhelming majority of the instrumentalities the Government claimed could be used for a meth lab were ordinary household goods or mechanical implements.

As alluded to above, Sequoyah County Sheriff John Philpot testified at trial that during a search of Mr. Barrett's person conducted by his officers after he was removed from the cabin by OHP officers, a quantity of red phosphorous, an ingredient in the manufacture of methamphetamine, was found in his pants pocket. However, when Sheriff Philpot was interviewed by Mr. Gordon on the night of the raid and was asked whether he or his officers found anything dangerous on Mr. Barrett, he replied "no," even though it is well-recognized by any experienced law enforcement officer that red phosphorous is a highly toxic, dangerous substance. Had Philpot stated red phosphorous was found on Mr. Barrett, Mr. Gordon would have immediately alerted the troopers to this fact and advised them to begin decontamination procedures. Philpot admitted to Mr. Gordon that he and his deputies severely beat Mr. Barrett after he was removed from the cabin, and would have done more had there not been other people

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                8                Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1702

around.   Significantly, the "red phosphorous" *was not found* when Mr. Barrett was searched by Trooper Manion after he was removed from the cabin by Trooper Hamilton.  (Gordon Dec at 16-17 ¶¶ 45-49)

According to Mr. Gordon, the manner in which the scene was searched and processed completely belied the Government's later claim that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine.  None of the precautionary measures used by law enforcement for taking down a meth lab or a suspected meth lab were undertaken.  (Gordon Dec at 18-19 ¶¶ 57- 55)

   • The conduct of the powers that be at the Oklahoma Highway Patrol toward Mr. Gordon and his internal affairs investigation was also exculpatory evidence suppressed by the Government.  As stated in Mr. Gordon's declaration, his efforts to conduct an objective investigation, going wherever the facts led him, were blocked at virtually every turn by his superiors at OHP.   OHP administration in effect embarked on a cover-up of the actual events of September 24, 1999.

Against policy, Mr. Gordon was denied timely access to the Tact Team members for formal interviews.  He had to wait ten or more days after the incident to interview them.  While Mr. Gordon was prevented from doing timely interviews, the members of the Tact Team "lawyered up" with OHP outside counsel Gary James.  (Gordon Dec at 4, 6 ¶¶ 11, 16)  In violation of standard policy for internal affairs investigations involving a shooting, the Tact Team members initially refused to turn over their weapons for forensic testing.  (Gordon Dec at 4 ¶ 11)  When Mr. Gordon was finally permitted to interview the Tact Team members, questions he would ordinarily ask in any investigation involving a law enforcement raid which resulted in a shooting were ruled out of bounds by his superiors, and he was limited to asking a set of

questions "pre-approved" by Lieutenant George Randolph, which were designed to obscure the truth rather than reveal it. (Gordon Dec at 6-9 ¶¶ 17-19) If Tact Team members did not like any question asked by Mr. Gordon, they were not required to answer. (Gordon Dec 8-9 ¶ 19) Mr. Gordon tape recorded the interviews he was eventually able to conduct with the Tact Team (Gordon Dec 8-9 ¶ 19), but these tapes were apparently not turned over to the defense by the Government. Mr. Gordon was constantly exhorted to be a "team player," and his attempt to conduct an objective investigation was met with hostility and roadblocks within OHP. (Gordon Dec at 3, 6, 19-20 ¶¶ 10, 15, 57-58,) At one point, a summary of Mr. Gordon's report was taken from his office computer without permission. (Gordon Dec at 19 ¶ 58) Mr. Gordon was at a loss to explain this resistance if, as was claimed, the Tact Team had done nothing wrong when it attempted to serve the warrant on Mr. Barrett. (Gordon Dec at 4 ¶ 11) Because Mr. Gordon attempted to conduct a thorough, objective investigation and was perceived as not being a "team player," he was even told that he could not attend Trooper Eales' funeral. (Gordon Dec at 4 ¶ 11)

Mr. Gordon was also admonished for tape recording his interview of Sequoyah County prosecutor Diane Barker-Harrold, one of the "dignitaries" who tagged along with the Tact Team to observe the raid, even though the use of tape recorders in interviews was standard procedure. When asked by Mr. Gordon about the informant who supplied information for the warrant, Barker-Harrold stated "we" were aware of the informant's identity, but she refused to reveal it. Barker-Harrold complained about her interview being tape recorded to OHP, and OHP Captain Rodney Burris told Mr. Gordon he was to have no further contact with her. (Gordon Dec at 5-6 ¶¶ 13-14)

Significantly, OHP administration even refused to provide Mr. Gordon with the policy manual for the East Tact Team, a document which was, to say the least, highly relevant if Mr.

Gordon were to conduct a competent investigation into whether the Tact Team had acted appropriately or against training and policy.   Kerry Pettingill told Mr. Gordon that the Tact Team manual was "not available" and that he would "never see this book."  A few days later, the policy manual or handbook mysteriously appeared in Mr. Gordon's office among debris and trash that had been placed on the floor.  Mr. Gordon's review of the handbook showed that the Tact Team had failed to adhere to policy in its raid on Mr. Barrett's home.  Against policy, the Ford Broncos used in the raid were unmarked, no warning that law enforcement was on the premises was given, and emergency lighting was not engaged on the vehicles.  (Gordon Dec at 9-10 ¶¶ 20-23)

Due to the fact that Mr. Gordon tried to conduct an objective, fact-based investigation into the circumstances which led to Trooper Eales' death, he was constantly harassed by his superiors at OHP and ultimately decided to retire.  In further retaliation for his efforts, the State of Oklahoma manufactured bogus criminal charges against Mr. Gordon for misappropriation of state funds for taking unapproved "comp time" and misuse of a state telephone, even though the comp time taken by Mr. Gordon and his use of a state telephone had been approved by his superiors and was authorized by informal policy within OHP.  An internal audit later revealed that two of the witnesses against Mr. Gordon, Lieutenant Gordon and Captain Burris, had given false testimony before the grand jury investigating Mr. Gordon.  In order to bring his ordeal to an end, Mr. Gordon ultimately entered a no contest plea to the charges in exchange for a five year deferred sentence, which has since been expunged.  (Gordon Dec at 20-26 ¶¶ 59-82)

The politically motivated criminal charges against Mr. Gordon were brought in retaliation for his internal affairs investigation of Trooper Eales's shooting and to adversely affect his credibility as a witness in any trials involving Mr. Barrett.  State authorities thus sought to prevent Mr. Barrett from having exculpatory evidence in aid of his defense.  Mr. Gordon did not

testify in Mr. Barrett's state trials, although he shared at least some of the information he gleaned from his investigation with state trial counsel John Echols and Judge John Garrett, who presided at the trials. (Gordon Dec at 25-26 ¶ 81-84)

Former Assistant United States Attorney Mike Littlefield also acted to suppress Mr. Gordon's exculpatory evidence by threatening him in connection with the federal trial. In a telephone conversation, Littlefield sought to intimidate Mr. Gordon, telling him that because of his deferred sentence, Littlefield was going to tear Mr. Gordon up on the stand and that Mr. Gordon did not know what he was talking about because he was not a trained in SWAT tactics and procedures. After being berated by Littlefield in this initial phone call, Mr. Gordon later called him back and informed him that he had received training in these areas by the United States Marshal's service. After being told this, Littlefield told Mr. Gordon that he did not need to worry about having to testify in the federal trial. (Gordon Dec at 27 ¶ 85)

The above facts, and the facts recited in Mr. Gordon's declaration, show that the prosecution suppressed material exculpatory evidence. There is a reasonable probability that had this evidence been heard by Mr. Barrett's jury, the outcome of the guilt-innocence stage of trial would have been different. At a minimum, this evidence also undermines the reliability of Mr. Barrett's death sentence.

This supplemental ground for relief relates back to Ground 5 of Mr. Barrett's amended § 2255 motion. (Doc. 95) There, it was alleged that in numerous respects, the Government suppressed exculpatory evidence and sponsored false testimony, including with respect to law enforcement officers.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    12                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1706

**TWENTY-FIRST GROUND.**

**APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND TO CALL HIM AS A WITNESS TO  TESTIFY TO THE FALSE VERSION OF EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED AND COMPETENT ATTORNEYS.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by his trial counsel's failure to competently and reasonably investigate, engage, interview, prepare, corroborate and present the testimony of Retired OHP Internal Affairs Investigator Paul D. Gordon, now submitted and proffered to the Court by Notice of Filing the same in support of Mr. Barrett's pending Sec. 2255 Amended Motion to Vacate (Doc 95), his Motion to Supplement the Pending Sec. 2255 Amended Motion to Vacate and this document, his Supplemental Motion to Vacate, to be lodged with the Court pending his Motion to Supplement. Had trial counsel interviewed Mr. Gordon in any meaningful way, they would have known that Mr. Gordon's testimony would credibly and materially support Mr. Barrett's substantive defense that Mr. Barrett did not know the trespassing vehicles carried law enforcement officials.  Counsel would have acquired significant corroborating evidence from Mr. Gordon to show that, from the time of Trooper Eales' death and throughout the federal trial, OHP engaged in unethical and illegal conduct to hide the truth of the planning and execution of the raid.

The testimony of Mr. Gordon would have irreparably undermined the Government's case substantively and through the impeachment of its law enforcement witnesses to such an extent

that there is a reasonable probability that Mr. Barrett would now not stand convicted of capital murder and the charges which resulted in sentences of death and life without parole. Had this evidence been reasonably investigated and produced at trial, there is a reasonable probability that Mr. Barrett would have been acquitted or, at a minimum, been convicted of lesser charges. Alternatively, counsels' failure to reasonably investigate and introduce this evidence led to an unreliable death sentence.

This claim relates back to Mr. Barrett's Ground Two, which raises numerous acts of constitutionally ineffective assistance of counsel. Doc 95 at 33 *et seq.*

## 1.     Availability of Mr. Gordon to Testify.

The record is clear that Mr. Gordon was available to testify at Mr. Barrett's trial in this case. (Gordon Dec at 31 ¶ 93) Defense counsel was aware of Mr. Gordon, listed him as a defense witness and subpoenaed him. According to Mr. Gordon, he was contacted by an investigator for the defense, who asked no substantive questions. (Gordon Dec at 27 ¶ 85) When he received a subpoena from the defense, it was Mr. Gordon who called Mr. Hilfiger, not the other way around. *Id.* The conversation was extremely short and insubstantial and was prematurely aborted by Mr. Hilfiger's dismissive remark about Mr. Gordon's "relationship" with Barrett. (Gordon Dec at 27 ¶ 85) Had trial counsel made even minimal effort in his defense of Mr. Barrett, he would have been aware that Mr. Gordon's knowledge of the events resulting in Trooper Eales' death had served Mr. Barrett well in his state trials through Mr. Gordon's non-testimonial cooperation with Mr. Echols.

Mr. Gordon was available to testify for Mr. Barrett at the federal trial. (Gordon Dec at 27 ¶ 93) He had relevant, material information which he would have presented to the jury if called to testify. That testimony would have revealed a continuing conspiracy on the part of law

enforcement to misrepresent their actions and avoid responsibility for the death of Trooper Eales.

Defense counsel were woefully uninformed by inadequate preparation and resources and failed to

understand the facts and circumstances leading to Mr. Barrett's deadly predicament. By not

calling Mr. Gordon as a witness, the defense lost their best opportunity to persuade the jury that

Mr. Barrett's actions were in defense of himself and his son under the circumstances. Mr. Barrett

had only a very few seconds to comprehend the nature of the attack on his home in the middle of

the night by unknown and unidentified persons wielding automatic weapons.

**2.      Summary of Paul Gordon's Testimony**

If called and questioned accordingly, Mr. Gordon shown would have testified that the

planned execution of the no-knock nighttime warrant was based on insufficient intelligence and

realtime surveillance and thus, should not have taken place at all. (Gordon Dec at 10 ¶ 24 (f))  As

outlined above in Ground Twenty, and contrary to testimony presented at Mr. Barrett's trial, the

information known to the troopers when they intruded onto Mr. Barrett's property was that Mr.

Barrett was likely to run away individuals he knew to be law enforcement, not respond with

violence.

Beyond supporting Mr. Barretts claim that no emergency lighting was activated and there

was no meth lab on Mr. Barrett's property (Gordon Dec at 17 ¶¶ 51-55) , Gordon's interviews of

the troopers confirm the very real possibility that the gunfire was initiated by OHP and not Mr.

Barrett.  According to Jim McBride and Danny Oliver, the initial gunfire heard was from an

automatic weapon. ("Gordon Dec" Exh 11 at p. 7 (McBride interview); Exh 15 at 8 (Oliver

Interview))  Mr. Barrett had no automatic weapons.  When Lt. Pettingill spoke to Mr. Gordon on

the scene shortly after the shooting, he specifically said that he thought it was his people firing.

Exhibit A, referenced in Gordon Dec at  30 ¶ 93 (a) (a hard copy of which will be submitted to

the Court).

**3.  Specific Acts of Prejudicial Deficient Performance by Trial Counsel.**

      a.      **Mr. Barrett's Counsel unreasonably failed to investigate and present the testimony of Paul Gordon to refute the affidavit supporting the Search warrant to support the *Franks v. Delaware* reconsideration.**

The failure to competently investigate and reargue the *Franks v. Delaware* motion after it was disclosed that Monk Sanders was the alleged informant, and after Sanders testified, as alleged in the Amended § 2255 Motion to Vacate (Doc 95) is particularly egregious based on the testimony that would have been available to counsel had they simply taken the opportunity to talk to Mr. Gordon, a named defense witness.  Mr. Gordon's observations of the entry into Mr. Barrett's home and buildings made clear that the law enforcement on the scene had no reason to believe that Mr. Barrett was manufacturing meth on the premises.  *See* Gordon Dec at 17 §§51-55.

Mr. Gordon would have testified:

> Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin.  There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.
> I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.
> There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.
> Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was an OHP tactical team member and Explosive Ordinance Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.
> I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots.  Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence      16      Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1710

respirator.   I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its three forms: boxed; set-up not functional; or, set up functional cooking.

The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.

(Gordon Dec at 17-18 ¶¶ 51-56); *see also*, Gordon Dec Exh Nos. 2, 3, 4.

Mr. Barrett was seriously prejudiced by the constitutional shortcomings of his appointed counsel by their failure to challenge the alleged drug evidence in a *Franks v. Delaware* hearing. Had trial counsel properly prepared and reasonably interviewed Mr. Gordon, together with the available testimony and documentation set out in Mr. Barrett's Motion to Vacate (Doc 95 at 33-47) and the available testimony of Judge Garrett, set out below in Claim 23, there is a reasonable probability that upon reconsideration, the Motion to Suppress would have been granted, the result of which would have been either a likely refusal of further federal prosecution, or an acquittal of the same.

This subclaim relates back to sub-claim 2(A)(2), *i.e.*,  Failure to Competently Reargue *Franks v. Delaware* Claim (Doc 95 at 34) and if merged in the pending Second Amended §2255 Motion to Vacate, would be inserted prior to the first full paragraph at page 46 of Doc 95.

**b.      Trial counsel failed to investigate, interview, and present testimony of a critical material witness,  Mr. Paul Gordon, retired OHP Internal Affairs Investigator, that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for acquittal or conviction of a lesser offense.**

In the transcripts and records of Mr. Gordon's interviews and investigation lies a treasure trove of impeachment untapped by trial counsel.  Portions of the interview transcripts were very effectively used by state trial counsel, John Echols, to impeach law enforcement witnesses in the state trial.  They were not used ineffectively, or not at all, by defense counsel in Mr. Barrett's

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    17                    Barrett v. USA
                                                                                   OKED Case No. 6:09-cv-00105-JHP

1711

federal trial.  Counsel's failure to effectively present the contents of the interviews, including and beyond the content of the transcripts themselves, to impeach the law enforcement witnesses through the testimony of Paul Gordon is indefensible and far below the minimum standards of prevailing professional norms.  The factual issues raised at trial, which could have been resolved in Mr. Barrett's favor by reasonable lawyering include: whether the no-knock nighttime warrant was justified based on the information conveyed to the troopers; when, if at all, the emergency lighting was activated during the warrant execution; who initiated the gunfire; where did the lead OHP Bronco eventually stop and why it was moved prior to the trajectory analysis experiment; and once moved, was the Iris Dalley dowel rod scientific experiment reliable or accurate; and, whether Mr. Barrett was severely beaten at the time of his arrest, with "red phosphorous" planted on him.

Trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from then 2d Lt. Gordon that would have seriously undermined and rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Gordon's proffered testimony also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that the use of unprofessional procedures that minimized the chances of being recognized as law enforcement was reckless and cost Trooper Eales his life.

Trial counsel failed to reasonably investigate and present credible evidence, including the testimony of Mr. Paul Gordon and the witnesses and documents to which his testimony or information would have led, that would have substantively supported Mr. Barrett's defense and credibly refuted the testimony of law enforcement regarding the controverted issues.

### i. The Mission Should Have Been Aborted.

If appointed defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected the theory of the defense and a working knowledge of the Government's case, counsel would have discovered that Lt. McBride told Mr. Gordon and others that the mission should have been aborted due to insufficient intelligence and surveillance.  Mr. Gordon would also have testified that after the formal interview,

> McBride became very emotional and told [Gordon] that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken.  McBride was advised by the East Team to go back to the West Team if he did not want to participate.  McBride was so upset over what happened that he began crying by the end of the interview.

Gordon Dec at 16 ¶ 50.

Had the statements of Mr. McBride been presented to the jury either through admissions extracted from McBride, or ultimately through Mr. Gordon and others, the jury would have realized that it was not simply the "trauma" of the event which caused the lapses in memory and inconsistencies with the troopers' testimony but the cover-up of tactical errors known before the mission was ever begun. The cowboy-like insistence in executing a warrant with insufficient intelligence and/or real-time surveillance could reasonably benefit Mr. Barrett's on every other fact issue raised in the trial, creating a reasonable probability that the jury would not have convicted Mr. Barrett.

### ii. There was No Emergency Lighting Activated Identifying Law Enforcement

If defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected an informed theory of defense and a working knowledge of the Government's case, counsel would have discovered that Mr. Gordon could and would have testified that his investigation revealed that the troopers "rolled in dark" and did not activate any emergency

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                  19                  Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1713

lighting until after the shooting was over, when Trooper Hash's overhead lights were activated to help illuminate the scene. (Gordon Dec at 9 - 12, ¶¶ 23 -28)  Specifically Mr. Gordon would have testified that in an interview with Trooper Hamilton, Hamilton at first insisted that he had activated his emergency lights.  Like the question of whether he fired his weapon, when confronted with physical evidence disproving his version of events, Hamilton admitted to Gordon that he had not activated the lights. (Gordon Dec at 9 ¶ 23, 11 ¶ 28)  Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his emergency overhead bar activated but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. (Gordon Dec at 12 ¶ 30)

Mr. Gordon would have testified that "[t]he physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on." ("Gordon Dec" at 11 ¶ 27; *see also* Gordon Dec at 9 ¶ 23, 11 ¶ 27, 12 ¶ 30)  Even Frank Lloyd's brief encounter with Mr. Gordon shortly after the shooting confirms the lack of emergency lights.

Sheriff John Philpot's testimony that he saw the emergency overhead bar flashing and illuminating the area (Tr 8:1797 *ll* 14-15), though elicited by Prosecutor Littlefield in a manner intended to misrepresent the facts, is consistent with Frank Lloyd's statement that they came over the hill when the shooting was over and saw taillights.  Appendix A.  Tr v. 8 at 1797 *ll* 5-7.  The question by Littlefield about the emergency lights refers to a later time when Philpot is in the yard, a time at which Hash admitted the shooting was over.  (Gordon Dec at 12 §12)

It is undisputed that the question of the activation of emergency lights was critical to the Government's case.  Mr. Gordon's testimony, at the very least, would have been admissible to impeach by prior inconsistent statements the testimony of the troopers and other law enforcement officers.  *See e.g*., (Gordon Dec at 12 ¶ 29 Exh 7) (Greninger makes no mention in his interview

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    20                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1714

of any lighting); (Gordon Dec  Exh 15) (Oliver, who is the car with Greninger, also makes no mention of activating or observing activated lights.).

Had trial counsel reasonably investigated the case and interviewed Mr. Gordon in a substantive way, he could have presented credible evidence that the OHP troopers did not activate their lights during the approach or shootout, and that they were lying, or at the very least, intentionally misleading the jury, when they testified that they did. The importance and impact of credible evidence showing that Mr. Barrett did not know the vehicles invading his property and charging his front porch were law enforcement is incalculable.  There is a reasonable probability that this testimony alone, or together with the corroborating physical evidence and adequate expert testimony on that physical evidence, would have resulted in a directed verdict, an outright acquittal or, at the very least, consistent with the state verdict, a conviction for manslaughter.

Mr. Gordon's testimony of his investigation and the troopers' clear admissions that they had not had their emergency lights on would have corroborated and cemented the truth of the testimony of Toby Barrett and Alfred Hahn.  See Doc 95 Ground 2(A)(10).  If the jury believed Gordon, Barrett and Hahn, that there was no indication that the charging vehicles were law enforcement, there is little doubt the jury's verdict would have been different.  In light of Mr. Gordon's status as an OHP Trooper trained in and trusted with the most sensitive investigations, there is little doubt the jury would have placed significant stock in his testimony.

> iii.     *There is credible substantive and impeaching evidence through Paul Gordon's Interviews and Investigation that a member of the OHP East Tact Team, not Mr. Barrett. initiated the gunfire.*

Had counsel actually interviewed Gordon, he would have been able to impeach or raise serious questions of the veracity the testimony and inferences throughout the trial that Mr. Barrett initiated the gunfight.  Mr. Gordon's testimony could also have shown that even the OHP

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    21                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1715

troopers, including the team leader, believed their people started the firefight.

Trooper Hise in his interview with Mr. Gordon describes that what he hears is automatic gunfire. (Gordon Dec Exh 10 at 4) And as recorded by Mr. Gordon, the team leader, Kerry Pettingill, said he initially thought it was "our folks" who fired. Appendix A. And later in his interview with Paul Gordon, Pettingill says "it sounded to me like automatic gunfire." ("Gordon Dec" Exh 14 at 11) As noted in the Amended Motion, at the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house. (2nd St. Tr. Tx at 757, 766.) Greninger's description comes the closest to admitting that the gunfire was begun presumably by Hamilton.

> As we pulled up to stop, I cold see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of Trooper Hamilton's vehicle and I'm thinking, I- initially my thoughts are, it's dirt, why are they shooting in the ground, it took a few seconds to ah determine if the shots were coming from them.

("Gordon Dec" Exh 7 at 6) None of this was brought out on cross-examination at Mr. Barrett's federal trial. The Government's decision not to call Jim McBride as a witness in the federal trial is telling, since McBride was certain he heard automatic gunfire. (Gordon Dec Exh 11 at 7) The failure of the defense to call McBride is inexplicable. With credible testimony that the gunfight was begun by automatic gunfire and thus was necessarily commenced by the trooper(s) and not Barrett, there is a reasonable probability that a different result would have occurred, *i.e.*, a not guilty verdict or at the very least, a conviction on the lesser included offense.

This section supplements Claim 2(A)(9), Doc 95 at 146, again by the testimony of an available witness, Mr. Gordon. As noted in the Amended Motion, "[t]here obviously was a critical question as to whether Mr. Barrett or the police opened fire first."

> iv.    *Information known to OHP indicated Mr. Barrett would run from to law enforcement.*

The most consistent of all the responses to Mr. Gordon's pre-scripted questions was about the intelligence the East Tact Team had on Kenneth Barrett's level of dangerousness. Steve Hash said the only criminal history of which he was aware was that Mr. Barrett had barricaded himself in his house and he had shot *himself* once before. (Gordon Dec Exh 9 at 14) Hash could not recall any use of violence against any police officers or anybody else. *Id.* Similarly Robert Darst recalled the "standoff" with local law enforcement and the attempted suicide. (Gordon Dec Exh 6 at 11) Gene Hise was aware that Mr. Barrett had been arrested before and "turned himself in." (Gordon Dec 10 at 7) Asked by Gordon if they had been told about any threats against law enforcement, Hise did not remember any statement Mr. Barrett may have made. *Id.* at 9. Oliver told Gordon they had been given information about threats but offered none that he had been given. (Gordon Dec Exh 15 at 15) Hash recalled no information regarding violence against law enforcement, though recalled that Mr. Barrett had barricaded himself in the house and had a "habit of running to mom." (Gordon Dec Exh 9 at 14) Pettingill noted the barricading and attempted suicide as well, and then noted that "he was a big talker[.]" (Gordon Dec Exh 14 at 17) McBride noted that the information they received that "those statements are probably the same statements made on 90% of the people we arrest." and indicated the scenario is generally given to secure the Tact Team's involvement. (Gordon Dec 11 at 11) Greninger told Gordon that the information they had was that "the guy would run and try to make it to his mother's house which was next door[.]" (Gordon Dec Exh 7 at 5) Ricky Manion characterized the threats by Barrett as: "That, that he would ah, that he would mainly run from law enforcement.." (Gordon Dec Exh 12 at 12) Mr. Gordon's testimony or impeachment of the troopers would have made known to the jury that the OHP acted contrary to the known

Supplemental Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence          23          Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1717

intelligence in the manner the Tact Team executed the warrant. Trial counsel's failure to develop the testimony was constitutionally inexcusable.

> v. *Credible evidence undeveloped by trial counsel would have shown that Mr. Barrett did not have a pill bottle with red phosphorous residue in his pocket.*

The testimony that Mr. Barrett had red phosphorous in his right front pocket is highly suspect in light of prior searches by OHP without any mention in the Gordon interviews of having found or felt the pill bottle. The saga of the supposed seizure of a pill bottle from the pocket of Mr. Barrett's jeans is rife with inconsistencies and outright perjury. At trial, Hash testified that he and Manion searched Mr. Barrett and he felt the pill bottle but did nothing with it. Sheriff Johnny Philpot testified that he searched Mr. Barrett afterwards and pulled the bottle out of Mr. Barrett's front pocket, looked inside and saw a baggie with red powder, held it up for Stanley Philpot to see, and then put the pill bottle with the baggie back into Mr. Barrett's pocket.

If called to testify, Mr. Gordon would have stated that Ricky Manion and Steven Hash both searched Mr. Barrett before turning him over to the custody of the local sheriff. Both mentioned the handgun and neither mentioned a pill bottle. Mr. Gordon is familiar with the standard OHP searches at the time a suspect is arrested, especially after a firefight. If there was a pill bottle on Mr. Barrett's person, the OHP search would have uncovered it.

The likelihood that Mr. Barrett was nonchalantly walking around with red phosphorous in his pocket is patently incredible. The two prior searches by OHP troopers, the dangerous nature of red phosphorous, the failure of Hash to mention the pill bottle in his interview with Lt. Gordon, the incredible testimony of Stanley and John Philpot and the information and belief that Mr. Barrett was a middle man, not a drug manufacturer, when considered with the prior other evidence produced regarding the purported discovery, confiscation and chain of custody of the

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence
24
Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1718

pill bottle, would have led a reasonable juror to totally discredit the testimony regarding the red phosphorous.

Mr. Gordon would also have testified that he is trained in the execution of high risk warrants and the appropriate protocol for clearing and searching a building in which the manufacture of methamphetamine is suspected. Included in that training is an understanding of the dangers of red phosphorous. The very real and substantial danger attached to handling or mishandling red phosphorous renders the events described by Hash and the Philpots in relation to the manner in which they handled the pill bottle inherently incredible. No red phosphorous, no meth. No meth, no conviction.

With competent and reasonably well-prepared counsel, any testimony regarding the red phosphorous would have been either suppressed or rendered incredible, leaving the jury with the incredible and thoroughly self-serving testimony of the seven snitches. The drug trafficking was the purported basis for the federal prosecution. Without it, the prosecution itself is suspect and raises double jeopardy concerns for vindictive prosecution of a capital crime which has no elements not present in the state prosecution. There is a reasonable possibility no federal prosecution would have or could have occurred but for the fabricated "red phosphorous" story by Trooper Hash that he felt the pill bottle but did nothing with it. There is a very reasonable probability that the jury would have returned an acquittal or at worst convicted on a lesser included offense.

> vi.   *After arrest, Mr. Barrett was beaten by the Sheriff and two of his deputies. Denials that a beating was administered were false.*

At trial, Sheriff Philpot denied having observed any physical action taken toward Mr. Barrett while he was in custody. However, if Mr. Gordon had been called as a witness, he would have testified that on September 24, 1999, he interviewed Sheriff Philpot in Mr. Gordon's

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    25                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1719

vehicle and Philpot admitted that he and his men had beaten Mr. Barrett and would have caused greater injuries but for the number of people around.  In short, Sheriff Philpot lied to the jury. Had defense counsel showed the sheriff to be a liar, as well as to have violated the Mr. Barrett's rights, it would have undermined all of the Philpots' testimony, including, most importantly, the pill bottle tale.

Sheriff Philpot's interview with Mr. Gordon was recorded and the recording placed with the investigation results, which he left in the custody of Lt. George Randolph when he retired from the OHP in May, 2000 as a result of the extreme pressures placed upon him by members of the Oklahoma Highway Patrol as a result of his  investigation.  The failure of trial counsel to discover the existence of that recording and demand disclosure of the same was consistent with trial counsel's continual constitutionally substandard representation.

As set out in the Amended Motion to Vacate, Doc 95 at 58, this evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and refuted any evidence of actual drug trafficking required in Counts 1 and 2, compelling a dismissal of the same, or resulting in outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter. This subclaim relates back to Claim 2(A)(3), of the § 2255 Motion (Doc 95) which asserts failure to present testimony of witnesses Toby Barrett and Alfred Hahn that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense, and Claim 2(A) (9) which asserts that Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials. Doc 95 at 143.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence          26          Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1720

**c.**      **Trial Counsel was constitutionally ineffective for failing to call Mr. Gordon to refute the legitimacy of the experiment of Iris Dally both as a fact witness and expert witness.**

As alleged in the §2255 Motion to Vacate (Doc 95), trial counsel were professionally unreasonable for failing to hire an independent crime scene analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley.  Trial counsel's failure to interview, prepare and present the testimony of Mr. Gordon as both a fact and expert witness to undermine the reliability of Ms. Dalley's experiment fell far below prevailing professional norms.

Had trial counsel acted in a professionally reasonable manner, Mr. Gordon would have testified to the unreliable manner and necessarily inaccurate results of Ms. Dalley's trajectory dowel-rod experiment.  Mr. Gordon would have testified that the Bronco which Ms. Dally used to determine and demonstrate the projectile paths of the various shots directed at it had been moved from the position it had been in when Mr. Barrett shot at it.  Indeed, Mr. Gordon would have testified that he warned OHP of the inaccuracy.  Mr. Gordon would also have produced and authenticated the videotape which he took the evening of September 24 when the experiment was being concocted, which showed Dalley's actions were obviously unreliable and unscientific.  (Appendix B)   (Dowel-Rod Experiment videotape, a copy of which will be delivered to the Court for filing.)

This claim is filed in conjunction with and to supplement, Claim 2(A)(7) of Mr. Barrett's §2255 Motion to Vacate which alleges "[d]ue to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence."   Doc 95 at 127.  Specifically, Mr. Gordon's testimony would support the allegations of Mr. Barrett set out in Claim 7 (k).  If a single amended Motion were filed, this claim would be inserted at Doc 95 at 135 immediately following and within

Supplemental Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence                    27                    Barrett v. USA OKED Case No. 6:09-cv-00105-JHP

1721

subsection k.

> **d.      Trial Counsel's failure to interview, prepare and present the testimony of Mr. Gordon regarding the OHP witnesses and the lack of adherence to any reasonable protocol, including their own, in the execution of the High Risk Warrant which created Mr. Barrett's reasonable belief that he was being attacked by unknown criminals and the OHP witnesses's continuous efforts to avoid disclosing the same fell far below prevailing norms and wholly undermined the reliability of the verdicts and sentence in this case.**

Mr. Gordon was well-qualified to investigate the events of September 24, 1999.  (Gordon Dec 1-2 ¶ 4; *see also,* Exh 1)  He had the qualifications, experience and was professionally familiar with Mr. Barrett's residence and the events leading up Rocky Eales death.  At a minimum, a reasonable defense in a case of this seriousness, particularly in light of the limitations the court placed on defense resources, would have mandated interviewing Mr. Gordon.  It is not only in hindsight that it becomes apparent Mr. Gordon would have provided trial counsel far more to support the defense than Mr. Choney, who was in effect a prosecution witness.

This claim is intended to and does supplement the factual basis for Movant's subclaim 2(A)(8) which alleges that "[t]he outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.  Doc 95 at 139.

### TWENTY-SECOND GROUND .

**MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE HAVE REASONABLY LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To compliment and corroborate the compelling and detailed testimony of Mr. Gordon, which would have been available to refute the "meth" evidence, there was also available to defense counsel the Hon. John Garrett, the state judge who presided at the state capital trials of Mr. Barrett.  Judge Garrett  could have, and presumably would have, testified that he was familiar with both Mr. Monk Sanders and Mr. Clint Johnson and neither of them were credible persons.  (Declaration of Leonard Post ("Post Dec"), filed herewith in support hereof and in support of Mr. Barrett's §2255 Motion to Vacate (Doc 95))  Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by the trial counsels' failure to competently and reasonably investigate, prepare, corroborate and present the testimony of the Hon. John Garrett to impugn the credibility of Clint Johnson, affiant on the critical nighttime no-knock search warrant, and Charles "Monk" Sanders, purported confidential informant, upon whose information the affidavit in support of the search warrant relies.

Had Judge Garrett been called to testify on the lack of trustworthiness of both Johnson and Sanders, there is a reasonable probability that the Court would have granted Mr. Barrett's *Franks v. Delaware* motion and/or that the jury would have disbelieved the drug-related evidence, as well as the numerous law enforcement officers and drug informants testifying to drug related evidence, and returned a verdict of not guilty or guilty of a lesser included offense.

Trial Counsel was remiss in failing to interview Judge Garrett concerning his knowledge of the truth and veracity of Mr. Sanders, be it by reputation or specific acts.  Judge Garrett would have testified that Mr. Sanders was a totally incredible person.  It is indisputable that the testimony of the judge who presided over the two state cases that he wouldn't believe Monk Sanders farther than he could throw him would have impacted the jury's assessment of Mr. Sanders' credibility.  (Post Dec)

This claim expands, explains, supplements and relates back to Claim 2(A)(1) (Doc 95), described above. In his Amended §2255 Motion, Doc 95 at page 103, Mr. Barrett alleges '[c]ounsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury."

## TWENTY -THREE GROUND.

**THE COURT'S FAILURE TO CONSIDER  SIGNIFICANT AND READILY AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A  STUN BELT WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Judge John Garrett presided over the two state trials in which Mr. Barrett faced essentially the same capital murder charge.  Had Judge Garrett been called to testify to Mr. Barrett's good behavior in the courtroom despite facing the death penalty, there is a reasonable probability that this Court would not have acceded to the U.S. Marshal's unreasonable request that Mr. Barrett be restrained by the use of a visible stun belt, which unconstitutionally

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence
30
Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1724

undermined Mr. Barrett's presumption of innocence.

The Court was well aware that Mr. Barrett had been tried twice before for the same capital murder in state court. Easily available to the court was Judge Garrett, to whom this Court needed only make an administrative inquiry as to the conduct of Mr. Barrett and the likely necessity of restraint. Judge Garrett would have advised the Court that Mr. Barrett was at all times respectful and submissive to court procedures and security. Judge Garrett would also have advised the Court that Mr. Barrett was extraordinarily polite and helpful to both the judge and his secretary during the proceedings. (Post Dec)

This Claim supplements Mr. Barrett's Section 2255 Motion to Vacate, seventh ground in which he alleges that his "[r]ights under the Fifth, Sixth, and Eighth Amendments were [v]iolated when the Trial Court Permitted the Marshals to [r]estrain him [w]ithout [j]ustification." Doc 95 at 326. To the extent that an affirmative showing of the evidence of Mr. Barrett's behavior in Judge Garrett's courtroom should have been presented by trial counsel, the failure to present the testimony of Judge Garrett, or even to interview or inquire of him, fell below prevailing professional norms, and prejudiced Mr. Barrett by denying or adversely affecting the presumption of innocence and Due Process, in violation of the Sixth Amendment right to the effective assistance of counsel. This claim relates back to Claim 7 of the Amended §2255 Motion to Vacate which is supplemented by the same. Doc 95 at 329.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    31                    Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1725

## TWENTY-FOURTH GROUND.

**MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER GORDON.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The result of the Court's interference with and unreasonable imposition upon original lead counsel Mr. John Echols, who had represented Mr. Barrett in two prior unsuccessful prosecutions for capital murder in state court, was a denial of a likely verdict of acquittal or conviction on a lesser included offense, or, at the very least, a sentence less than death.

During the course of the first trial, Mr. Echols was contacted by Mr. Paul Gordon, Because of matters which Mr. Gordon read in the paper summarizing testimony by the troopers which Mr. Gordon knew to be untrue, he contacted Mr. Echols.  Mr. Echols used some of what Mr. Gordon reported to him about the troopers activities  in his cross-examination of the troopers and other witnesses in the state trials.  Indeed, during the first state trial, Mr. Gordon ultimately produced for Judge Garrett the East Tact Team Manual, which Lt. Pettingill insisted did not exist.  Had Mr. Echols remained as lead counsel, he would have known he had available to him a source who knew that the testimony of the troopers given in federal court was false in the many significant respects discussed above. Mr. Echols' previous use of information from Mr. Gordon and his cooperative relationship with him would have alerted Mr. Echols to search Mr. Gordon out when faced with drug evidence which had not been an element of the charges or admitted in state court.

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                 32                 Barrett v. USA
OKED Case No. 6:09-cv-00105-JHP

1726

If the Court had not interfered with Mr. Echols' defense of Mr. Barrett to such a degree that Mr. Echols felt compelled to withdraw, the defense would likely have produced Mr. Gordon as a fact and expert witness – and justice would have prevailed.  There is a reasonable probability that Mr. Gordon's testimony, as set out in his declaration, would have resulted in a verdict of not guilty on all three counts as alleged in the indictment, or a conviction of lesser offenses, and unquestionably would not have resulted in a sentence of death or even in life without parole.

This Claim expands, explains, supplements and relates back to Mr. Barrett's Claim 1, i.e., "Mr. Barrett was Prejudiced by the Trial Court's Actions and Interference and Ultimate Deprivation of Prior Qualified Counsel, John Echols, in violation of Mr. Barrett's Right to Due Process, his Sixth Amendment Right. . ."

## TWENTY- FIVE GROUND.

**MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To the extent the Claims and subclaims set out above add considerable weight to the constitutional errors leading to the convictions and sentences of Kenneth Barrett, the cumulative impact of the errors now alleged for purposes of supplementing the claims set forth in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order and Sentences (Doc 95) compels the reversal of Mr. Barrett's convictions and sentences and dismissal of the same, or alternatively, an order granting a new trial on each and every count charged, or vacation of each and every sentence imposed and an order for new sentencing proceedings.

This ground of error relates back to Ground Nineteen of Doc 95.

**PRAYER FOR RELIEF**

Therefore, Kenneth Barrett asks that the Court grant the relief requested in his pending

Amended Sec. 2255 Motion to Vacate (Doc 95 at 400) including but not limited to:

Vacate Movant's convictions and sentences and order that appropriate retrial and/or

sentencing hearings be conducted; and or any other relief to which Movant may be entitled.

DATED:   March 16, 2012

                                             Respectfully submitted,

                                             ___/s/ David B. Autry___
                                             DAVID B. AUTRY, OBA #11600
                                             Attorney at law
                                             1021 N.W. 16th Street
                                             Oklahoma City, Oklahoma 73106-6405
                                             Telephone:  405-521-9600

                                             DANIEL J. BRODERICK
                                             Federal Defender

                                             /s/ Joan M. Fisher
                                             JOAN M. FISHER, Idaho Bar No. 2854
                                             Assistant Federal Defender
                                             801 I Street, 3rd Floor
                                             Sacramento, California 95814
                                             Telephone:  916-498-6666

                                             Attorneys for Defendant
                                             KENNETH EUGENE BARRETT

Supplemental Motion to Vacate, Set Aside                    Barrett v. USA
or Correct Judgment, Order and/or Sentence          34          OKED Case No. 6:09-cv-00105-JHP

1728

**CERTIFICATE OF SERVICE**

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was electronically filed on March 16, 2012 . This document will be served electronically to all counsel in this case.

             /s/ Joan M. Fisher
             Signature of Movant's Attorney

**VERIFICATION**

I am an attorney licensed to practice law by the State of Idaho, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am an Assistant Federal  in the Office of the Federal Defender for the Eastern District of California.  Pursuant to the appointment of the Federal Defenders of the Eastern District of California to represent Mr. Barrett in this proceeding, I filed a Notice of Appearance as co-counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                    35                    Barrett v. USA
                                                                                                                    OKED Case No. 6:09-cv-00105-JHP

1729

lawyers, investigators and/or experts connected with the preparation of this amended motion.  I

make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings

because these matters are more within my knowledge than Mr. Barrett's knowledge.

Dated this 16th day of March, 2012.

                                           /s/ Joan M. Fisher
                                          Joan M. Fisher

Supplemental Motion to Vacate, Set Aside
or Correct Judgment, Order and/or Sentence                   36                   Barrett v. USA
                                                                                  OKED Case No. 6:09-cv-00105-JHP

1730

# Appendix A

(Audio Tape at Crime Scene by Paul Gordon on September 24, 1999)

CD-ROM labeled "Audio Tape at Crime Scene by Paul Gordon on September 24, 1999"
submitted under separate cover for conventional filing.

# Appendix B

(Crime Scene Videotape by Paul Gordon on September 24, 1999)

DVD- ROM labeled "Crime Scene Videotape by Paul Gordon on September 24, 1999 "
submitted under separate cover for conventional filing

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT        )
                              )
              *Movant*,       )
                              )
v.                            )          Case No. 09-CV-00105-JHP
                              )
UNITED STATES OF AMERICA      )
                              )
              *Respondent*.   )

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR LEAVE TO
SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE, SET ASIDE OR
CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

**COMES NOW** the United States of America by and through undersigned counsel and
files this response in opposition to Barrett's Motion for Leave to Supplement the Pending
Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence Under 28
U.S.C. § 2255 (Doc. 201).  The Court should deny the Motion because the defendant has failed
to establish that justice requires leave for filing his untimely supplement.

**PROCEDURAL HISTORY**

On November 4, 2005, a jury empanelled by this Court convicted Barrett of three
offenses charged by indictment: firearm murder in relation to drug trafficking crimes (18 U.S.C.
§ 924(c) & (j)); firearm murder in relation to a crime of violence (18 U.S.C. § 924(c) & (j)); and
intentionally killing a state law enforcement officer during the commission of a drug trafficking
crime (21 U.S.C. § 848(e)(1)(B)).  Trl. Doc. 241.  On November 17, 2005, at the conclusion of a
penalty phase trial, the jury recommended a death sentence for Count Three (Trl. Doc. 257),
which this Court imposed on December 19, 2005.  The Tenth Circuit Court of Appeals affirmed
the judgment.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

1

On March 16, 2009 (364 days after the Supreme Court denied certiorari from the Tenth Circuit's judgment), Barrett filed a 17-claim motion for relief under 28 U.S.C. § 2255.  Doc. 1. On March 17, 2009, he filed a corrected § 2255 motion, again asserting 17 claims.  Doc. 2.  On September 25, 2009, he filed an amended motion for collateral relief, asserting 19 claims.  Doc. 70.  This Court then ordered Barrett to file a second-amended motion that complied with the Rules Governing § 2255 Proceedings, and also permitted him to file a brief in support.  Doc. 81. On December 5, 2009, Barrett filed a second-amended § 2255 motion, asserting 19 claims (Doc. 95), and on March 1, 2010, he filed a supporting brief (Doc. 149).  On May 17, 2010, the government filed an Answer.  Doc. 174.

Barrett now moves for leave to supplement his second-amended § 2255 motion, raising five new claims and a restated assertion of cumulative error.  Doc. 201.  This Response in Opposition follows.

**BARRETT HAS NOT ESTABLISHED GOOD CAUSE FOR FILING AN UNTIMELY SUPPLEMENT TO HIS § 2255 MOTION**

Barrett argues that this Court should permit him to supplement his second-amended § 2255 motion because his new claims relate to existing contentions.  He asserts that any denial of his request would be an abuse of discretion under Federal Rule of Civil Procedure 15.  Doc. 201 at 5-9.  Barrett's supplemental claims, filed years after the deadline for timely inclusion in a § 2255 action, do not relate back to an existing issue because they are premised on new factual allegations.  Barrett has made no effort to identify circumstances outside of his control that prevented him from timely raising these claims.  Accordingly, the government urges this Court to deny the Motion to Supplement.

After the following of an answer, a § 2255 movant may amend his motion only with the government's written consent or with leave of court, which should be freely given when justice

requires.  Fed. R. Civ. Proc. 15(a)(2); *see United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006) (concerning the applicability of the rule to § 2255 proceedings).  The courts' discretion to provide such leave is limited by the Antiterrorism and Effective Death Penalty Act of 1996, which imposes a one-year period of limitations in which federal prisoners may seek collateral relief from criminal judgments.  28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).  The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from a direct appeal.  *Willis*, 202 F.3d at 1280-81.  The limitation period bars untimely amendments that add new claims to an initial § 2255 motion.  *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).

The limitation period is not an absolute bar: Section 2255 movants may make untimely amendments that relate back to existing claims.  *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000).  Arguments premised on new facts do not, however, relate back to earlier contentions just because they both rely on the same constitutional principle.  *See id.*  An untimely amendment that "clarifies or amplifies" an existing claim relates back to the original motion.  *United States v. Weeks*, 653 F.3d 1188, 1206 n.12 (10th Cir. 2011) (quoting *Espinoza–Saenz*, 235 F.3d at 505); *see also Mayle v. Felix*, 545 U.S. 644, 655 (2005) ("Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings arise out of the same conduct, transaction, or occurrence").  Thus, a proposed amendment may not introduce a new theory based on facts different from those underlying existing issues.  *See Dean v. United States*, 278 F.3d 1218, 1221 (11th Cir. 2002) ("Congress did not intend Rule 15(c) to be so broad as to allow an amended pleading to add an entirely new claim based on a different set of facts").  Section 2255 movants may justify otherwise inexcusably untimely pleadings by showing a need for equitable tolling based on

extraordinary circumstances beyond their control.  *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008); *see generally Holland v. Florida*, ___ U.S. ___, 130 S. Ct. 2549, 2562 (2010) (holding equitable tolling applicable to § 2254 cases when the petitioner diligently pursued his rights but an extraordinary circumstance prevented timely filing).

Barrett's proposed supplement,[1] for which he never sought the government's consent, raises five new claims of relief and one restated assertion of cumulative error.  Each new claim is a factual departure from the contentions raised in his prior Motions for § 2255 relief.  The supplement raises the following issues: the government suppressed exculpatory information about the investigation of Oklahoma Highway Patrol Internal Affairs investigator Paul Gordon (Doc. 201-1 at 2-12); trial counsel ineffectively failed to investigate and present information and opinions possessed by Paul Gordon (*id*. at 13-28); trial counsel ineffectively failed to investigate and present information and opinions possessed by Oklahoma State Court Judge John Garrett (*id*. at 29-30); this Court failed to consider significant testimony (available through Judge Garrett) that the use of a stun belt was unnecessary to restrain the defendant (*id*. at 30-31); this Court interfered with the defense by compelling the withdrawal of John Echols who had previously relied on information from Paul Gordon (*id*. at 32-33).

Barrett makes no pretense that the novel claims are facially timely, nor could he.  Over four years have passed since the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's opinion affirming the judgment in this case.  The supplement clearly falls outside of the one-year period of limitations applicable to § 2255 motions.  *See* 28 U.S.C. §2255(f).

---

[1] The government observes that "supplement" is a misnomer in this instance.  A "supplement," under Rule 15(d), sets out events that occur after an initial pleading, while Barrett's new claims concern events that occurred at or around the time of trial.  To avoid confusion, however, the government maintains reference to the new claims as a "supplement."

Barrett argues in conclusory terms that his new claims relate back to issues in his second-amended motion.[2]  Doc. 201 at 7-8.  He contends that he cannot address the relation-back doctrine absent notice that the government will contest the timeliness of his supplement.  Doc. 201 at 8 n.1.  Barrett misapprehends his burden: he must establish that he satisfied the relation back doctrine under Rule 15, rather than simply rebut arguments concerning a presumption of timeliness.  *See King v. Ryan*, 564 F.3d 1133, 1142-43 (9th Cir. 2009) (placing burden on § 2254 petitioner); *In re Alstom S.A.*, 406 F. Supp. 2d 402, 430 (S.D.N.Y. 2005) (noting the plaintiff's burden to establish relation back under Rule 15).  Not only does Barrett avoid the effort of showing that his new arguments expand or clarify existing issues, he could not do so because his supplementary contentions arise from novel factual premises.  In truth, the only relationship between his new and old claims lies in generally-stated legal doctrines, such as the rights to due process and competent counsel.

Barrett's new claims rely, centrally, if not exclusively on information from Paul Gordon and Judge John Garrett, who go essentially unmentioned in the earlier § 2255 motions.  Barrett's most recent § 2255 Motion, filed in 2010, does not mention Gordon and refers to Judge Garrett once in the context of an unrelated case.  *See* Doc. 95 at 76 (concerning a letter Judge Garrett received while presiding over a domestic matter).  The Brief filed in support of the § 2255 Motion does not mention Gordon or Judge Garrett.  *See* Doc. 149.  Barrett's original two motions also lack references to Mr. Gordon and Judge Garrett that would suggest either man possessed information that might give rise to relief.  *See* Docs. 1 & 2.  While the proposed supplement asserts claims that are broadly reminiscent of existing contentions – ineffective assistance of counsel, prosecutorial misconduct and judicial interference – the new arguments do

---

[2] The government asserts that portions of that Motion are, themselves, untimely.  *See, e.g.*, Doc. 147 at 19, 62, 64-66, 92-93, 153, 169, 171-72, 217, 246, 269, 271, 273.

1737

not relate back because they rely on factual allegations without any relationship to the earlier pleadings. *Espinoza-Saenz*, 235 F.3d at 504-05.

Barrett makes no attempt to excuse the lateness of his new claims by attributing his delay to extraordinary circumstances beyond his control, which might provide a basis for equitable tolling.   Surely, current counsel knew or could easily have determined within days of appointment that Judge Garrett presided over the Barrett's state court trials and that he might, as a result, have made observations or formed opinions that bore on the present litigation.  As to Paul Gordon, current counsel cannot assert that they were previously unaware of him, as his investigation was frequent referenced during trial.  *See e.g.*, Tr. 3:630, 632; 4:686, 812, 816; 5:1071, 1075, 1119-20, 1129, 1142-43; 6:1204, 1291-94, 1297-98, 1325, 1329-30; 7:1549, 1559; 17:4040-41, 4047-51.   Despite obvious notice about the roles of Gordon and Judge Garrett, Barrett provides no hint why he required more than four years to identify them or their observations as bases of potential § 2255 claims.

Barrett may attempt to justify his tardiness by relying on his allegation that the government did not disclose exculpatory information about Paul Gordon, at least in regard to the new claims concerning that witness. Doc. 201-1 at 2-12.  However, Barrett clearly knew of Gordon in 2005, having listed him as a trial witness. *See id*. at 14.  Indeed, Barrett recognizes that Gordon made overtures to the defense before trial.  *Id*.  On these facts, it does not appear that Barrett could show that any discovery violation by the government created extraordinary circumstances beyond Barrett's control that prevented him from timely raising the supplementary claims. *Cf. United States v. Gabaldon*, 522 F.3d at 1124.

6

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges the Court to deny Barrett's Motion for Leave to Supplement the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence under 28 U.S.C. § 2255.

Dated: April 27, 2012

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,       )
                              )
          Movant,             )
                              )
v.                            )          Case No. 6:09-cv-00105-JHP
                              )
UNITED STATES OF AMERICA,     )
                              )
          Respondent.         )

**REPLY TO RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR
LEAVE TO SUPPLEMENT THE PENDING AMENDED MOTION TO VACATE,
SET ASIDE, OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE
UNDER 28 U.S.C. § 2255**

The Government asserts Mr. Barrett's supplemental arguments should not be considered by the Court because the issues, and the facts supporting them, were raised well after the one-year period of limitations expired.  28 U.S.C. §2244(d).  The Government declares bluntly that the issues raised in the supplement do not "relate back" to arguments raised in Mr. Barrett's timely filed § 2255 motion and the previous amendment(s) to it, because he is raising entirely new issues predicated on facts different from those alleged before, and that Petitioner has not demonstrated how the claims raised in the supplement relate back to previously stated claims. (Doc. 206, pp. 1-6)  The Government's arguments should be rejected.

Rule 15 ( c)(1)(B) of the Federal Rules of Civil Procedure states that "a party may properly raise a new claim or defense that would have been barred by the statute of limitations if the claim or defense 'arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.'" *Hodge v. United States,* 554 F.3d 372, 377 (3rd Cir. 2009).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence

1

*Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1740

In *Mayle v. Felix,* 545 U.S. 644, 664 (2005), the Supreme Court applied the "relation back" provision of Rule 15 in the context of a § 2254 action.  Rule 15 and *Mayle* unquestionably apply also in § 2255 proceedings, as the Government concedes in its response.  *United States v. Jordan,* ___F.3d___, No. 11-1108 (10th Cir. Feb. 15, 2012 (slip op.); *United States v. Weeks,* 653 F.3d 1188, 1206 n. 12 (10th Cir. 2011).  The Supreme Court defined in *Mayle* the phrase "conduct, transaction, or occurrence" in the habeas context, holding that "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix,* 545 U.S. at 664; *Hodge v. United States,* 554 F.3d. at 378.  Put a slightly different way, in order for a claim or claims in an amended or supplemental motion to "relate back" to the timely filed motion, they must be of the same "time and type" as those in the original motion, such that they arise from the same set or core of operative facts.  *United States v. Weeks, supra.*  Where the claims differ in time and type, amendment or supplementation will not be allowed.  *United States v. Jordan, supra.*  An untimely amendment to a timely filed petition which, *by way of additional facts,* clarifies or *amplifies or expands* a claim or theory advanced in the timely motion may, in the district court's discretion, relate back.  *United States v. Weeks, supra*; *Espinoza v. Saenz,* 235 F.3d 501, 505 (10th Cir. 2000).  An amendment or supplement that serves to *expand facts* or cure deficiencies in an original claim or claims relates back to the original claim.[1]  *Dean v. United States,* 278 F.3d 1218, 1223 (11th Cir. 2002)(per curiam).  On the

---

[1] In essence, the Government argues that any amendment or supplement purporting to relate back to an original, timely filing cannot be predicated on facts that were not pled before (Doc. 206 at p. 5), but this is incorrect.  If the Government were right, there would be literally no occasion to invoke the "relation back" provision of Rule 15, since by definition such amendments rely on or may rely on facts not previously addressed or presented.

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                        *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence                    2               OKED Case No. 6:09-cv-00105-JHP

1741

other hand, an *entirely new* claim or theory of relief will not relate back. *Hodge v. United States,* 554 F.3d at 377, *citing United States v. Thomas,* 221 F.3d 430, 436 n. 4 (3rd Cir. 2000). The rationale behind the "relation back" provision of Rule 15 is that a party who has been notified of litigation concerning a particular type of conduct, transaction, or occurrence has been given all the notice the statute of limitations was intended to provide. *United States v. Mandacina,* 328 F.3d 995, 1100 (8th Cir. 2005).

Ground Twenty in Mr. Barrett's proposed supplement (Doc. 201-1, pp. 2-13), alleging that the Government suppressed exculpatory evidence from Paul Gordon's Internal Affairs investigation of the raid, information regarding what appears to be the red phosphorous that was planted on Mr. Barrett, that Mr. Gordon was pressured into retirement when he attempted to conduct an objective investigation, that agents of the government tried to silence him with bogus criminal charges, and that Gordon was intimidated by AUSA Littlefield during Mr. Barrett's federal trial, relates back to Ground Five of the original and amended § 2255 motions, in which Mr. Barrett claims that the Government knowingly relied on false evidence and suppressed exculpatory evidence. (Doc. 95, pp. 270-310)

The suppression of exculpatory evidence stemming from Mr. Gordon's investigation and its aftermath relates to a common core of facts of the same time and type previously raised, and of which the Government was on notice. *Valdovinos v. McGrath,* 598 F.3d 568, 574-75 (9th Cir. 2010)(where original petition alleged that Valdovinos was denied due process and a fair trial by the prosecution's withholding exculpatory evidence of prior photo lineups, evidence of drugs and guns found in a Government witness's possession, and the favorable treatment the witness

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                                    *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence              3                     OKED Case No. 6:09-cv-00105-JHP

1742

received for her testimony, amended claim that the prosecution suppressed *other and additional* exculpatory evidence in the form of anonymous letters and a photograph related back to the original petition; the claimed suppression of exculpatory evidence raised in the original and the amended petitions were both of the same time and type, since all the suppressed evidence was exculpatory information the government had in its file and of which it was aware); *Mandacina v. United States,* 328 F.3d 995, 1000 (8ᵗʰ Cir. 2003)(where original petition alleged the Government suppressed exculpatory evidence and the petitioner sought to amend his habeas petition to include the "Borland Report," which also contained alleged exculpatory evidence but was totally unmentioned in the original petition, relation back was appropriate because the report was "evidence of other suspects" obtained by the police during its investigation into the murder for which the petitioner was convicted).

There can be little question, in relation to the Twenty-First Ground in Petitioner's supplement (Doc. 201-1, pp. 13-30), that the Paul Gordon evidence relates back to, and amplifies and expands with additional facts, a number of ineffective assistance of counsel arguments already made by Mr. Barrett in his original and amended § 2255 motions. It has been argued that:

- Counsel were ineffective for failing to investigate and introduce expert and other evidence attacking the Government's evidence that the raid was properly planned, conducted according to accepted tactical operation protocol, and that Mr. Barrett had notice that law enforcement was on his property due to the display of emergency lights.  Had counsel conducted a professionally reasonable investigation, this evidence would have undermined Government testimony on these points and supported the defense theory that the Tact Team entered Mr. Barrett's property in a manner that led him to reasonably believe that trespassers, rather than law enforcement, were present. (*E.g.,* Doc. 95, Ground Two, parts A(3), (8), (10) at  pp. 47-58, 139-43, 149-54)

- Counsel failed to competently challenge and impeach the accounts of the raid and its aftermath given by the Tact Team witnesses and other law enforcement personnel with respect to

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                                          *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence                  4                  OKED Case No. 6:09-cv-00105-JHP

1743

how the raid was conducted and how Mr. Barrett was taken into custody.  (*E.g.,* Doc. 95, Ground Two, part  9 at pp. 143-49)

      • Counsel failed to reasonably investigate and prepare to challenge the crime scene reconstruction testimony and trajectory analysis of Iris Dalley, which was intended to support the Government's theory that Mr. Barrett "ambushed" the Tact Team and had fair warning of the presence of law enforcement.  Counsel was professionally unreasonable for failing to call as a witness crime scene reconstruction expert Ed Hueske to rebut Dalley's methodology and conclusions.  (*E.g.,* Doc. 95, Ground Two, part A(7) at pp. 127-39)

      • Counsel unreasonably failed to object to the "expert" testimony of James Horn, which was intended to legitimize the conduct of the Tact Team and excuse their incomplete and conflicting accounts of what actually transpired during the raid.  (Doc. 95, Ground Two, part A (12) at pp. 163-76)

      • Counsel unreasonably failed to introduce evidence that had law enforcement approached Mr. Barrett in a non-confrontational manner and properly identified themselves, Mr. Barrett would not have reacted with violence, but either would have tried to run way or surrendered peacefully.  Counsel unreasonably failed to investigate and introduce evidence (and the Government failed to disclose) that a short time before the raid, Sheriff Philpot had gone to Mr. Barrett's residence without incident.  (*E.g.,* Doc. 95, Ground Two, part A(11), pp. 159-63; Ground Five, part B(3) at pp. 307-08)

      • Counsel unreasonably failed to investigate and introduce evidence which would have impeached the legal basis and supporting evidence for the no-knock, nighttime warrant, and shown that the warrant was issued in violation of *Franks v. Delaware,* 438 U.S. 154 (1978).  (Doc. 95, Ground Two, part A( 2) at pp. 34-47, Ground Five, parts B(1) and B(3) at pp. 296-303, 307-08)

Because Mr. Gordon's evidence amplifies and expands with additional facts arguments already made or attempted to be made, of which the Government was and is on notice through the original and amended § 2255 motions, relation back is appropriate.  The supplemental ineffective assistance claim arising from Mr. Gordon's evidence stems from the same attorney conduct as set forth previously, is tied to a common core of operative facts, and is of the same time and type as a variety of previously raised ineffectiveness arguments, all of which addressed counsels' professionally unreasonable failures to investigate and present evidence which would

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                     *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence      5      OKED Case No. 6:09-cv-00105-JHP

have refuted evidence supporting the search warrant, shown that the raid was poorly planned in violation of protocol, and that the raid itself violated law enforcement standards and unnecessarily created a situation fraught with danger to both the officers and Mr. Barrett, who was unaware police were on his property.  The exact same form of attorney misfeasance, going to the same factual issues, is present vis a vis Mr. Gordon's evidence and what was previously raised.  *E.g., Davenport v. United States,* 217 F.3d 1344, 1346 (11th Cir. 2000).

This is not an instance where a petitioner is asserting for the first time wholly new, distinct and separate grounds for relief on new legal theories which fail to tie back to ineffective assistance claims already made.  *Compare, United States v. Jordan, supra* (failure to present evidence vs. failure to object to the rejection of a proffer which would have resulted in a different standard of review on appeal; no relation back); *United States v. Gonzalez,* 592 F.3d 675, 679-80 (5th Cir. 2010)(attorney error during sentencing phase and error in advising defendant to proceed to trial in the face of overwhelming evidence vs. failure to file notice of appeal; no relation back); *United States v. Hernandez,* 436 F.3d 851, 858 (8th Cir. 2006)(claims relating to attorney's failure to cross-examine two witnesses and those relating to failure to object to evidence were "not similar enough to satisfy the 'time and type test' of *Felix*"); *United States v. Ciampi,* 419 F.3d 20, 24 (1st Cir. 2005)(attorney's alleged failure to discuss with the defendant his appellate rights did not relate back to original claim dealing with attorney's advice to accept plea bargain); *Hodge v. United States, supra* (claim that counsel was ineffective for failing to file notice of appeal related back to denial of right to appeal claim).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,                     *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence              6                  OKED Case No. 6:09-cv-00105-JHP

1745

Judge Garrett's evidence attacking the credibility of Charles "Monk" Sanders and Task Force Officer Clint Johnson[2] unquestionably relates back to the claim that counsel were ineffective for failing to marshal evidence which would have undermined the testimony of Sanders and Johnson with respect to the *Franks* issue, and generally.  In Mr. Barrett's timely original and amended § 2255 motions, he argued at length that counsel was ineffective for failing to impeach Sanders' credibility with the full nature and number of his previous convictions and bad acts, as well as with witnesses who could attest that Sanders, by reputation and based on their personal opinions, was a dishonest, untruthful person.  It was argued also that counsel failed to investigate and introduce evidence of bad acts and dishonest conduct which reflected adversely on the credibility of Clint Johnson.  Judge Garrett's evidence on these scores simply amplifies, by way of additional facts, arguments previously made, or a theory or claim previously addressed.  Judge Garrett's evidence is tied to a common core of operative facts which are of the same or similar time and type – counsels' ineffectiveness in failing to investigate evidence which would have impeached Sanders and Johnson.  No new or entirely new claim for which the Government lacked notice is made.  (Doc. 95, Ground Two, parts 2, 5, pp. 34-47, 61-120)

The same analysis applies to Ground Twenty-Three in the supplement.  (Doc. 201-1, pp. 30-32)  Mr. Barrett argued previously (Ground Seven in the original and amended motions to vacate, *e.g.,* Doc. 95, pp. 326-30) that his constitutional rights were violated when the Court ordered that he would wear a "stun belt" during trial, because no factual or legal necessity was shown for the Court's order. Again, the evidence that could have been obtained from Judge

---

[2]  Twenty-Second Ground in supplemental motion, Doc. 201-1, pp. 29-30.

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,          *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence          7          OKED Case No. 6:09-cv-00105-JHP

1746

Garrett to the effect that Mr. Barrett was not a dangerous or disruptive presence at the state trials, and, in the alternative, that counsel was ineffective for failing to produce evidence that would have demonstrated use of a stun belt was completely unnecessary and impinged on Petitioner's constitutional rights, relates back to an argument already made, relates to the same core of operative facts addressed previously, and is of the same time and type as arguments already advanced and of which the Government was and is on notice.

The Twenty-Fourth Ground for relief in Mr. Barrett's supplement relates back to Ground One of the original and amended motions to vacate, in which it is argued that the trial court unconstitutionally interfered with and denied Mr. Barrett's Sixth Amendment rights by forcing John Echols off the case with unreasonable funding and other limitations.  The trial court's actions, which have already been addressed and of which the Government is well aware, prevented Mr. Barrett from having a full, competent and complete defense in the ways argued previously, and in addition prevented competent counsel from using the Paul Gordon evidence, which would have devastated the Government's theory of the case.  The Gordon evidence simply expands or amplifies with additional evidence a claim already made, is related to the same core of operative facts of the same or similar time and type, and therefore relates back to Ground One of the original and amended § 2255 petitions based on the authority cited above.  (Doc. 95, pp. 7-33)

Likewise, with respect to the Twenty-Fifth Ground raised in Mr. Barrett's proposed supplement (Doc. 201-1, pp. 33), the Paul Gordon evidence and the evidence that could have been provided by Judge Garrett amplify and expand with additional evidence the cumulative

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,            *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence            8            OKED Case No. 6:09-cv-00105-JHP

1747

effect of the constitutional errors committed at Petitioner's trial. Relation back to Ground Nineteen in the original and amended motions to vacate is appropriate, since it has been shown that the evidence outlined in the supplement clearly relates back to other issues previously raised. (Doc. 95, pp. 394-96)

As a final matter, the Government in its response argues that Mr. Barrett cannot excuse the lateness of his proposed supplemental claims "by attributing his delay to extraordinary circumstances beyond his control, which might provide the basis for equitable tolling," because Paul Gordon's investigation was referenced during trial and habeas counsel were clearly aware that Judge Garrett presided over Mr. Barrett's state trials. (Doc. 206 at p. 6) The Government's argument misses the mark. First, because the claims raised in the proposed supplement clearly, as shown above, relate back to grounds for relief previously raised or attempted to be raised and of which the Government was on notice, there is no necessity for Mr. Barrett to rely on an equitable tolling argument. Second, and in the alternative, equitable tolling would be appropriate in this case because the intimidation of Paul Gordon by both agents of the state and federal government (former AUSA Mike Littlefield) and the filing of baseless criminal charges against Mr. Gordon to render him an "impeachable" and "discredited" witness lulled petitioner into inaction based on reliance on that conduct (or, more appropriately, misconduct), and constituted extraordinary circumstances created by the Government which were beyond Mr. Barrett's control. *E.g., Maghee v. Ault,* 410 F.3d 473, 476 (8th Cir. 2005); *United States v. Martin,* 408 F.3d 1089, 1093 (8th Cir. 2005).

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,
or Correct a Judgement, Order and/or Sentence

9

*Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

1748

Accordingly, based on the above argument and authority, the Government's arguments should be rejected, and the Court should consider fully Mr. Barrett's supplemental motion, and all facts and arguments raised therein.

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, Third Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,       *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence    10    OKED Case No. 6:09-cv-00105-JHP

1749

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 7th day of May, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing.  This document will be served electronically to all counsel in this case.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher

Reply to Response in Opposition to Petitioner's Motion for
Leave to Supplement Amended Motion to Vacate, Set Aside,            *Barrett v. USA*
or Correct a Judgement, Order and/or Sentence          11          OKED Case No. 6:09-cv-00105-JHP

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA, MUSKOGEE

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | DEATH PENALTY CASE |
| | ) | |
| Petitioner, | ) | |
| | ) | No.  6:09-CIV-00105-JHP |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |
| | ) | |

### MOTION TO PRESERVE TESTIMONY  OF
### JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY

Petitioner Kenneth Eugene Barrett, through his counsel, respectfully requests that the Court enter an Order and allow the testimony of a material witness, namely, the Hon. John J. Garrett to be taken by deposition as soon as practicable to preserve the testimony thereof.  The perpetuation of that testimony will "prevent a failure or delay of justice."  Fed. R. Civ. P. 27(a)(3).

In support of this Motion, Mr. Barrett shows the Court the following:

1. The testimony of the witness is critical, material and relevant to the claims pending before the Court;

2. The testimony of the witness is at risk of being lost or unavailable as a result of the advanced age of the witness and the lengthy delay between the events and matters to which the witness will testify and the hearing in this matter.

**Motion to Take Testimony of Hon. Judge John Garrett,**           *Barrett v. United States*
**Retired, Outside of Court without Further Delay**           1           Case No. 6:09-CIV-00105-JHP

1751

3.     On June 11, 2012, the undersigned counsel, Joan M. Fisher, contacted opposing counsel, Messrs. Chris Wilson and Jeffrey Kahan, requesting of each their position on the instant motion by telephone and email communications.  That same day, counsel received an email from Mr. Wilson advising counsel of the Goverment's opposition to the Motion.

Wherefore, Mr. Barrett respectfully requests an Order Granting  permission  to take and preserve the testimony of Hon. John Garrett, out of court as soon as practicable for consideration herein.

This Motion is based on the pleadings and files herein and the Brief in Support hereof, filed herewith.

Dated this 18th day of June, 2012.

Respectfully submitted,

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL, Fla. Bar No. 73016
Trial and Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for KENNETH EUGENE BARRETT

**Motion to Take Testimony of Hon. Judge John Garrett,**          *Barrett v. United States*
**Retired, Outside of Court without Further Delay**      **2**      **Case No. 6:09-CIV-00105-JHP**

**Certificate of Electronic Filing and Service**

I hereby certify that on this  18th day of June,  2012, I caused the foregoing Motion for Extension of Time to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher Wilson: Chris.Wilson@usdoj.gov

/s/ *Joan M. Fisher*
Joan M. Fisher

**Motion to Take Testimony of Hon. Judge John Garrett,**          *Barrett v. United States*
**Retired, Outside of Court without Further Delay          3**          **Case No. 6:09-CIV-00105-JHP**

1753

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA, MUSKOGEE

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| **Movant,** | ) | **DEATH PENALTY CASE** |
| | ) | |
| **vs.** | ) | |
| | ) | **No.  6:09-CIV-00105-JHP** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

---

### BRIEF IN SUPPORT OF MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY

---

Kenneth Barrett, through counsel, files this Brief in support of his Motion to Preserve Testimony of Judge John Garrett, Retired,  Outside of Court Without Further Delay.

**1.        Background**

Pending before this Court is an Amended Motion to Vacate (Docs 70, 95) upon which Petitioner seeks an evidentiary hearing.  *See* Doc 95 at 268,354,357,371, 401; Doc 150 (Motion for Evidentiary Hearing)[1].  The Amended Motion to vacate has been pending for over two and one-half years (filed  Dec. 4, 2009) and fully briefed for over a year and a half (Doc 178, Reply filed as of July 1, 2010).  Also pending before the Court is a Sealed Motion for Leave to File

---

1. The Motion was denied as premature and because Court would review pleadings and if appropriate order an evidentiary hearing.  Doc 157.

**Brief in Support of Motion to Preserve Testimony of**          *Barrett v. United States*
**Hon. John Garrett, Retire, Without Further Delay**          **1**          Case No. 6:09-CIV-00105-JHP*

1754

Discovery (Doc No 186, filed Feb. 11, 2011) and a Sealed Motion to Vacate Protective Order (Doc No. 184).  Both are fully briefed and have been pending without further argument or disposition for well over a year.  Further and additional discovery motions are anticipated.

**2.      Judge John Garrett's Testimony is Relevant and Necessary to the 2255 Motion.**

One of Mr. Barrett's principal witnesses concerning claims raised in his Amended Motion to Vacate, including judicial interference with the defense; prosecutorial misconduct; the deficient performance of his trial counsel; and the denial of a fair trial by compulsion to wear a stun belt during trial (Doc 95 at 326) is the Honorable Judge John Garrett, Retired.  Doc 95 at 25, 34, 100, 180, 264, 270, 271,273, 296, 297, 326 [Claims 1, 2(A)(2), 2(A)(4)(c)(2), 4, 5(A)(1), 5(B)(1), 7].  Judge Garrett presided over Mr. Barrett's two state trials for capital murder arising out of the very same events upon which Mr. Barrett currently stands convicted and sentenced to death.  A recent interview of Judge Garrett by undersigned counsel and an investigator discloses the lack of credibility of former Task Force Officer Clint Johnson and his purported "confidential informant" Monk Sanders, as well as Judge Garrett's observations and findings regarding Mr. Barrett's conduct and the lack of necessity of any extraordinary restraint.  *See* Appendix 1 (Declaration of Leonard Post, investigator).[2]

By consulting a commercial public records database, a paralegal working on behalf of undersigned counsel has determined that Hon. John Garrett was born September 18, 1941, making him over 70 years of age.

---

2.  For the Court's convenience and in support hereof, the declaration is attached hereto.

**3.     Unless Permitted to Depose Judge Garrett, His Testimony May Be Lost.**

The length of time Movant's Motion to Vacate and ancillary motions have been pending without any action by this Court, and the critical nature of the testimony sought and the importance of a fair and full adjudication of Mr. Barrett's constitutional claims, compel the conclusion that Judge Garrett's testimony should be taken sooner rather than later.  There is an arguable and unnecessary risk that the witness will not be available to either party if his testimony must await the scheduling of an in-court hearing, especially in light of the pace this case is being adjudicated.

This Motion is not made lightly and is unlikely to be the only Motion of its kind.  A number of witnesses relied upon by Mr. Barrett, whose testimony is critical to the claims raised in his §2255 Motion, are over the age of 70 and at significant risk of being unavailable to testify, especially in light of the lack of any demonstrable movement in this case. [3]

**a. The Testimony of the Witness is Necessary, Material and Relevant.**

Judge Garrett's importance to Mr. Barrett's case is demonstrated by the extensive summary of his proposed testimony in Mr. Barrett's Supplemental and/or Amended Motion to Vacate and the supporting declaration of Leonard Post.  Docs. 201, 200, 200-1.  In brief, Judge Garrett presided over the two state trials arising out of the same conduct for which Mr. Barrett stands convicted in this Court.  Judge Garrett is well familiar with the factual allegations originally asserted and with the conduct and good behavior of Mr. Barrett during the capital state

---

[3]. Counsel for Mr. Barrett notes for the Court the very recent death of Kenneth Barrett's father, Mr. Ernie Barrett, on June 4, 2012, who was (and is by Declaration) a material and relevant witness to Mr. Barrett's ineffective assistance of counsel claims at sentencing.

trials commencing with state capital murder charges in 1999 through the subsequent trials held in 2003 and 2004.  As District Judge of Sequoyah County for many years, Judge Garrett is also well familiar with the credibility and reliability of the informant purportedly relied upon by the affiant, Monk Sanders, and Drug Task Force investigator, Clint Johnson.  Judge Garrett had a unique vantage point of Mr. Barrett's lack of any threatening or hostile conduct, such as would necessitate extraordinary precautions like the compelled wearing of a stun belt.  Judge Garrett also has knowledge of Mr. Johnson's and Mr. Sanders' credibility, which directly impacts questions surrounding the issuance of the search warrant and the likelihood that Mr. Barrett's behavior demanded or even supported the issuance and execution of a no-knock, nighttime warrant.  *See* Claim 2(A)(1) (Doc 95). In his Amended §2255 Motion, Doc 95 at page 103, Mr. Barrett alleges '[c]ounsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury." Judge Garrett is one of those "other witnesses."  He is a material witness to that claim.

Judge Garrett is also  a critical, material witness on the unnecessary use of restraints, which effectively denied Mr. Barrett his constitutional right to the presumption of innocence and to assist his counsel at trial in violation of the Sixth Amendment to the United States Constitution.  Had appropriate judicial inquiry been made and/or had trial counsel presented the testimony of Judge Garrett in support of his Motion in opposition to the U.S. Marshall's request to restrain Mr. Barrett during trial, Judge Garrett  would have advised the Court that Mr. Barrett was at all times respectful and submissive to court procedures and security, notwithstanding the capital charge for which he was standing trial.  Judge Garrett would also have advised the Court

**Brief in Support of Motion to Preserve Testimony of**          **Barrett v. United States**
**Hon. John Garrett, Retire, Without Further Delay**          **4**          **Case No. 6:09-CIV-00105-JHP**

1757

that Mr. Barrett was extraordinarily polite and helpful to both the judge and his secretary during the proceedings.  Appendix A.

The testimony which was available at the time of the federal trial illustrates counsel's failure to perform the necessary pretrial investigation which would have resulted in exculpatory and mitigating evidence.  His testimony relates directly to Mr. Barrett's §2255 claims of ineffective assistance of counsel in the investigation and litigation of issues including denial of his Fourth Amendment rights under *Franks v. Delaware* motion.  Additionally, had Judge Garrett's testimony been presented, there is a reasonable probability the jury would have disbelieved the drug-related evidence, as well as the numerous law enforcement officers and drug informants, and returned a verdict of not guilty or guilty of a lesser included offense.  Doc 95 at 103.  Judge Garrett's testimony would also have been relevant to counsel's failure to adequately contest the necessity of Mr. Barrett being compelled to wear a stun belt during trial. Doc 95 at 326-329.

Mr. Barrett's ability to prove the allegations raised in his §2255 Motion will be significantly prejudiced if Judge Garrett is unable to testify due to loss of the testimony by the increasing risk of death and/or lack of recall, made significantly more likely by age and the passage of time.  If Judge Garrett's testimony is not preserved and he becomes unavailable, Respondent would likely argue that Judge Garrett's statements to the investigator and Mr. Barrett's current counsel are inadmissible, or that the value of Judge Garrett's statements is diminished because of Respondent's inability to cross-examine him.

**Brief in Support of Motion to Preserve Testimony of**                    *Barrett v. United States*
**Hon. John Garrett, Retire, Without Further Delay**          **5**          **Case No. 6:09-CIV-00105-JHP**

1758

**b.  The Law Supporting Preservation of the Testimony.**

This Court may order the taking of a deposition pursuant to Rule 27 if it is "satisfied that perpetuating the testimony may prevent a failure or delay of justice." Fed.R.Civ.P. 27(a)(3). Under Rule 27(b) the court "may" allow the perpetuation of testimony pending appeal where it is "proper to avoid a failure or delay of justice."  Here, with an aging witness whose material and relevant testimony in a capital case relates to events transpiring eight to thirteen years ago, the circumstances clearly favor permitting the Movant to perpetuate that testimony as soon as practicable.  *Ash v. Cort,* 512 F.2d 909, 913 (3d Cir.1975) (cited in *In re Eisenberg,* 654 F.2d 1107, 1111 (5th Cir.1981) (Unit B)); *see also Rose v. McNamara,* 375 F.2d 924, 925 & n. 2 (D.C.Cir.), *cert. denied,* 389 U.S. 856, 88 S.Ct. 70, 19 L.Ed.2d 121 (1967).

Because advanced age certainly carries an increased risk that the witness will be unavailable by the time of trial or hearing, it is well-recognized as a ground for perpetuation of testimony under Rule 27.  *See, e.g.*,  *Penn Mutual Life Ins. Co. v. United States*, 68 F.3d 1371 (D.C. Cir. 1995) (court erred by denying Rule 27 motion without considering that witness was 81 years old); *Texaco, Inc. v. Borda*, 383 F.2d 607 (3d Cir. 1967) (abuse of discretion to deny permission to take testimony of a 71-year-old witness in a case otherwise stayed); *DeWagenknecht v. Stinnes*, 250 F.2d 414 (D.C. Cir. 1957) (Rule 27 used to take testimony of 74-year-old witness); *cf. Ash v. Cort*, 512 F.2d 909, 913 (3d Cir. 1975) (allegation that "it is probable that" witnesses "are over fifty years of age" is insufficient to invoke Rule 27).  *See also, In re McBean,* __ F.Supp__, (D.Colo. No. 12-cv-00579, March 8, 2012), 2012 WL 769521 (citing with approval age-related reasons for permitting deposition).  *A fortiori*, at age 70+, age alone justifies taking Judge Garrett's testimony out of court at this time.

**Brief in Support of Motion to Preserve Testimony of**    **Barrett v. United States**
**Hon. John Garrett, Retire, Without Further Delay**   **6**   **Case No. 6:09-CIV-00105-JHP**

1759

**4.** **Conclusion**

For the reasons stated, Mr. Barrett's Motion to preserve Judge John Garrett's testimony and permit it to be taken outside the courtroom without further delay, with video recording if respondent wishes, should be granted.

DATED this 18th day of June, 2012.

Respectfully submitted,

    /s/ David B. Autry

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Joan M. Fisher

JOAN M. FISHER, ID Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL, Fla. Bar No. 73016
Trial and Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Movant
KENNETH EUGENE BARRETT

**Brief in Support of Motion to Preserve Testimony of**                *Barrett v. United States*
**Hon. John Garrett, Retire, Without Further Delay**    **7**        **Case No. 6:09-CIV-00105-JHP**

1760

**Certificate of Electronic Filing and Service**

I hereby certify that on this 18th day of June,  2012, I caused the foregoing Motion for Extension of Time to be filed with the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher Wilson: Chris.Wilson@usdoj.gov

/s/   *Joan M. Fisher*
Joan M. Fisher

**Brief in Support of Motion to Preserve Testimony of**                                   *Barrett v. United States*
**Hon. John Garrett, Retire, Without Further Delay          8          Case No. 6:09-CIV-00105-JHP**

1761

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **DEATH PENALTY CASE** |
| Movant, | ) | |
| v. | ) | Case No. 09-CIV-105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |

## DECLARATION OF LEONARD POST IN SUPPORT OF
## SUPPLEMENTAL SECTION 2255 MOTION TO VACATE

I, Leonard Post, a person over the age of eighteen (18) and competent to testify and mindful of the penalties of perjury, declares as follows:

1.      I am an investigator retained by the Federal Defenders Office of the Eastern District of California to assist in the postconviction investigation in the above-numbered and styled matter.

2.      David Autry, counsel for Kenneth Eugene Barrett and I interviewed the Hon. John Garrett at the Adair County courthouse in Courtroom One, which was otherwise unoccupied, on July 1, 2011.

3. The following is a true and correct accounting of Judge Garrett's statements to us.

A.      Re Judge Garrett:

        1.      Judge Garrett presided over two state trials brought by the state of Oklahoma against Kenneth Barrett for capital

DECLARATION OF LEONARD POST IN SUPPORT OF
SUPPLEMENTAL SECTION 2255 MOTION TO VACATE -1

1763

murder in the shooting death of Trooper Rocky Eales.

2. Publicly available information shows Judge John Garrett to now be seventy (70) years of age.

2. Judge Garrett retired approximately five years ago.

B. Re: Monk Sanders

1. Judge Garrett told Clint Johnson he did not want to know who the Confidential Informant [CI] for the warrant was. At the time of the interview, Judge Garrett still didn't know who the CI was.

2. When Judge Garrett was advised that the CI was Monk Sanders, he said, "Hell you say." When asked if he knew Monk, he said that he did and that "No, I would not believe anything he told me."

C. Re: Clint Johnson

1. Judge Garrett said that Clint Johnson "was not a truthful guy and not to be trusted. We have an Oklahoma expression for someone like him. 'He'd slap you on the back and piss in your boots at the same time.' He did lots of shaky things....slime around and finagle a lot of stuff....various and sundry things...people were afraid of him, because of what he had the power to do—I like to think I wasn't—the black gown will always prevail—but other people were afraid of him and had reason to because of what he held over your head....I was always suspect of him."

2. "Johnny Philpot had been out there [Kenny's] the week before [the raid] and talked to him [Kenny]." Judge Garrett believes that Philpot testified to that. "The warrant was already good at that time.

C. Re: OHP:

1. "I wouldn't let them bring their firearms into the courtroom. They would argue that that it offered the court protection. I told them that I had two armed deputies...." He finally had to tell them "You're not going to wear your . . . guns."

2. OHP officers "filled the courtroom. They were trying to intimidate a lot of people. I think they thought they were going to intimidate me."

D. Re Kenneth Barrett:

1. Judge Garrett advised that while presiding over the trial, he never thought Mr. Barrett was a danger. "We'd have lots of hearings. He was never anything but a gentleman in all respects. He showed me the greatest of respect[.]"

2. Judge Garrett also said that Mr. Barrett had treated his secretary, Audrey, with the same degree of respect.

E. Re: Echols: Judge Garrett thinks that John Echols is the best lawyer who ever tried a case in front of him.

I declared under penalty of perjury that this three page declaration is true and correct.

Executed by me on this 15th day of March, 2012 in New Yourk County, New York.

Leonard Post
NYS Investigator's License
#110001455413

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-09-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## ORDER

This matter comes on for decision on petitioner's motion for leave to supplement the pending amended motion to vacate, set aside, or correct a judgment, order and/or sentence under 28 U.S.C. § 2255 (Doc. # 201). The government has responded (Doc. # 206) and petitioner has filed a reply (Doc. # 207). For the reasons set forth herein, plaintiff's motion is denied.

Fed.R.Civ.P. 15 authorizes amendment or supplementation of a pleading subject to certain restrictions. Rule 15(c)(2) provides, in pertinent part, as follows:

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading; . . . .

Pursuant to this rule, an amendment is intended to clarify or amplify a claim or theory raised

1765

in the original pleading.  Under Rule 15(a), a petitioner may amend his pleading once as a matter of course at any time before a responsive pleading is served.  Once, however, a responsive pleading is served, a party may only amend a pleading if the opposing side consents in writing or the court grants leave to amend.  Fed.R.Civ.P. 15(a)(2).  "[L]eave to amend should be freely granted unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment or futility of amendment."  *United States v. Thomas*, 221 F.3d 430, 435 (3rd Cir. 2000).

> Whereas, Rule 15(d) of the Federal Rules of Civil Procedure provides
>
> . . . .the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that **happened after the date of the pleading to be supplemented**.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense.  (Emphasis added).

A supplemental pleading is not amendatory in effect.  Rather, a supplemental pleading deals with events or issues that arise *after* the filing of the original pleading.  Looking at the pleading petitioner proposes to file, there is no doubt in this Court's mind that none of the events set forth in the proposed supplement happened after September 25, 2009, the date of the filing of the Amended Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence, and for a New Trial.  Doc. 70.  Furthermore, based upon the fact that the petitioner has waited more than three years after the statute of limitations has expired to seek leave to add six propositions of error, all of which were discoverable by counsel at the time of their

appointment herein, this court finds the proposed amendments would be futile.  Accordingly, this Court hereby denies the Motion for Leave to Supplement (Doc. 201) the pending amended motion to vacate.

It is so ordered on this 20th day of June, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## OPINION AND ORDER

This is a proceeding initiated by the above-named petitioner by filing a Motion for

Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial. The motion

to vacate conviction and sentence is brought pursuant to 28 U.S.C. § 2255. The government

has filed a response by and through the United States Department of Justice and the United

States Attorney for the Eastern District of Oklahoma. On July 1, 2010, the petitioner filed

his reply.

Petitioner has expanded the record in this case to voluminous proportions. He has

filed multiple amendments to the motion and exhibits in support thereof. Additionally, on

March 16, 2012, three years after the statute of limitations expired herein, the petitioner

sought leave to supplement his motion filing in excess of 500 more pages of pleadings. On

June 20, 2012 this court denied the petitioner's motion to supplement. *See*, Doc. # 210. This

court has, however, reviewed the relevant trial court records associated with Case No. CR-

04-115-JHP, including pleadings, pretrial and trial transcripts as well as all of the pleadings

and exhibits filed by the petitioner and the government herein.  The records reflect the petitioner was named in a three-count indictment on November 9, 2004 and a three-count superseding indictment on February 9, 2005.  The superseding indictment charged the petitioner with Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B).  On February 15, 2005, the government gave notice of its intention to seek the death penalty on all three counts of the superseding indictment.[1]

On September 12-16, 2005, the court conducted individual juror death qualification proceedings.  Thereafter, on September 26, 2005, the jury trial was commenced.  Following presentation of evidence during the first stage of trial, on November 4, 2005, the jury returned verdicts finding the defendant guilty on all three counts.  On November 9, 2005, the second stage of trial commenced.  On November 17, 2005, the jury returned verdicts of Life in prison without the possibility of release on Counts I and II and a death sentence on Count

---

[1]Doc. Nos. 59 and 60 filed in Case No. 04-CR-115-JHP.  All further references to documents filed in the criminal case shall be referred to as "Cr. Doc."  References to documents contained in the civil case shall be referred to as "Doc."  All page number references to documents contained within the civil case are to the page numbers assigned by CM/ECF as opposed to the page number printed at the bottom of the documents.

III.  On December 19, 2005, the defendant was sentenced in accordance with the jury verdicts.  The court ordered the sentences to run consecutively.  Additionally, the defendant was ordered to pay a special assessment of $100 on each count for a total assessment of $300.

Following his conviction, the defendant filed a direct appeal.  The following issues were raised on appeal:

1.  The district court committed error in denying the motion to suppress because the warrant: a) did not satisfy Oklahoma standards for a nighttime warrant; b) did not satisfy Oklahoma standards regarding executing officers; c) did not comply with Fed.R.Crim.P. 41; and, d) should have been suppressed on double jeopardy grounds.

2.  The indictment was insufficient for failure to set forth elements of predicate offenses; improperly charged multiple crimes; and improperly joined defenses.

3.  The district court erred in admitting improper victim impact evidence.

4.  Juror misconduct occurring during the trial resulted in the deprivation of the defendant's Fifth, Sixth, and Eighth Amendment rights.

5.  The government violated *Batson*.

6.  The federal death penalty scheme is unconstitutional and violated the defendant's rights to due process, 6th Amendment right to a jury trial; and  the 8th Amendment prohibition against cruel and unusual punishment.

7.  The "intent to kill" aggravating factor was unconstitutional.

8.  There was insufficient evidence of an intent to kill.

9.  The government failed to timely disclose the names of its witnesses.

10.  The district court erred in failing to dismiss the indictment based on double jeopardy, collateral estoppel and the statute of limitations.

11.  The district court erred in failing to follow the "Petite policy."

12.  Cumulative errors occurring at trial deprived the defendant of a fair trial.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed the defendant's conviction.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).[2]

## I.  Procedural History of this Action

On March 19, 2008, two days after the United States Supreme Court denied *certiorari* from his direct appeal, the defendant filed a Motion for Appointment of Counsel to Pursue Post-Conviction Remedies, and Memorandum of Law in Support in the underlying criminal action, which this court construed as a Motion for Substitution of Counsel.[3]  Thereafter, on March 27, 2008, this court appointed David B. Autry as lead counsel and the Federal Defender for the Eastern District of California, Capital Habeas Unit as co-counsel for the purpose of "pursuing any and all available post-conviction remedies, including the investigation, preparation and prosecution of a motion for post-conviction relief pursuant to 28 U.S.C. § 2255."[4]  The order of appointment directed the Court Clerk to note the substitution of these attorneys as counsel of record upon the filing of their entries of appearance.  The order also directed Mr. Autry to obtain a complete copy of the record below and on appeal within fifteen (15) days of appointment.  In the event any delays were

---

[2]Certiorari was denied on March 17, 2008.

[3]Cr. Doc. 370.

[4]Cr. Doc. 371, at p. 1.

encountered, counsel were directed to make the court aware of those delays.  Further, Mr. Autry was instructed to submit his proposed litigation budget to the assigned magistrate judge within twenty (20) days after appointment.

On April 2 and 3, 2008, counsel filed their entries of appearance[5] and the clerk entered a minute order showing the substitution of counsel of record had occurred.[6]  On April 16, 2008, Mr. Autry filed *ex parte* his proposed preliminary litigation budget which the magistrate judge, by minute order on April 22, 2008, recommended be approved.  The magistrate judge further recommended that the court's sealed order dated March 27, 2008 should govern the payment for costs and attorneys' fees.[7]  This court formally adopted the magistrate judge's recommendation by written order on July 3, 2008.[8]

On February 9, 2009, the petitioner's counsel filed an Emergency Motion requesting this court to toll the statute of limitations.[9]  On February 11, 2009, a hearing was held on the petitioner's motion.  Although the parties were given additional time to submit authorities to the court in support of their motion, the court intimated that it was not comfortable tolling the statute, because of the implications if a reviewing court later held that the statute of limitations should not have been tolled, and advised counsel they should be prepared to

---

[5]*See*, Cr. Docs.  372 and 373, respectively.

[6]Cr. Doc. 374.

[7]Cr. Doc. 376.

[8]Cr. Doc. 377.

[9]Cr. Doc. 382.

timely file their motion to vacate.  On February 27, 2009, the court entered a written order denying the petitioner's request to toll the statute of limitations.[10]

On March 16, 2009, the defendant/petitioner filed a "Motion for Collateral Relief"[11] which requested this court to vacate his convictions and sentences.   This motion was not, however,  signed under penalty of perjury by the movant or any person authorized to sign on his behalf as required by Rule 2 of the Rules Governing § 2255 Motions.

Thereafter, on March 17, 2009, the petitioner filed a pleading entitled "Defendant's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial."[12]  This document contained a "modified" version of the declaration required by Rule 2 of the Rules Governing Section 2255 Motions.   This motion referenced the exhibits previously filed on March 16, 2009.  In this motion, the petitioner  raised seventeen (17) grounds for relief.  Specifically, the petitioner asserted the following errors entitled him to release from custody: (1) actions of the trial court in the appointment and compensation of counsel violated his rights to due process, effective assistance of counsel, cross-examination of witnesses and equal protection of the laws, statutes, and administrative guidelines for the appointment and compensation of counsel; (2) ineffective assistance of trial counsel; (3) denial of his constitutional rights of due process and equal protection of the laws and his right

---

[10]Cr. Doc. 397.

[11]Doc. 1.  *See also*, Cr. Doc. 403.  This Motion was 377 typewritten pages, excluding the table of contents and authorities.  Additionally, approximately 172 exhibits (in excess of 350 additional pages) were attached to said motion.  *See*, Doc. Nos. 1, 3, and  8 thru 43 (Exhibit. Nos. 1-36, 59-60, 71-135, 136A, 136B, 136C, 136D, 137-143, 144A, 144B, 145-146, 147A1, 147A2, 147A3, 147B1, 147B2, 147B3, 147C1, 147C2, 147D, 147E1, 147E2, 147F, 147G, 148-175, 176A, 176B, 176C1, 176C2, 177A, 177B, 178-180, 181A, 181B, 181C, 181D, and 182-195).

[12]Doc. 2.

to expert and investigative assistance under 18 U.S.C. § 3006A; (4) the use of false information in obtaining the no-knock warrant for his arrest, which was invalid, deprived the petitioner of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and appellate counsel was ineffective for failing to raise this issue on appeal; (5) the government's suppression of exculpatory evidence and knowing use of perjured testimony deprived the petitioner of his Fifth Amendment right to due process, his Sixth Amendment right to counsel and confrontation, and his Eighth Amendment right to a fair and reliable sentencing process; (6) violations of Fifth, Sixth and Eighth Amendment rights when court restricted use of the petitioner's statements to law enforcement at the time of his arrest; (7) the restraint of the petitioner during trial by the marshal violated his Fifth, Sixth and Eighth Amendment rights; (8) the petitioner was tried while incompetent in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution; (9) failure of the trial court to instruct on a lesser included homicide offense violated his Fifth, Sixth and Eighth Amendment rights and appellate counsel was ineffective for failing to raise this issue on direct appeal; (10) failure to instruct the jury that they could consider residual doubt as a mitigating factor violated the petitioner's Fifth, Sixth and Eighth Amendment rights; (11) improper excusal of a juror based upon her opinions about the death penalty violated his Fifth, Sixth and Eighth Amendment rights; (12) not requiring the jury to find that death was an appropriate punishment beyond a reasonable doubt violated the petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights; (13) the petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated due to the effects of drugs

he was given in jail and his removal from the courtroom during the second stage of trial; (14)

the federal death penalty, as administered, is disproportionately and unconstitutionally

applied according to the race of the victim thereby depriving him of due process, equal

protection and the right to be free from cruel and unusual punishment; (15) errors in the

indictment deprived the petitioner of his Fifth, Sixth, Eighth and Fourteenth Amendment

rights; (16) juror misconduct deprived him of his Fifth, Sixth, Eighth and Fourteenth

Amendment rights; and (17) the cumulative effect of the aforementioned errors warrant

vacating his sentence.[13]

On March 18, 2009, the court ordered the government to respond to the petitioner's

allegations by June 16, 2009.[14]  On May 29, 2009, the petitioner filed a Motion to Disqualify

and Recuse the undersigned judge from further participation in this matter.[15]  On June 11,

2009, the government filed two motions requesting an extension of time to respond.  In the

first motion for extension of time, the government sought an extension of thirty (30) days to

respond to the disqualification motion.[16]  The second motion for extension of time requested

an additional six months to respond to the amended motion to vacate.[17]  Neither motion was

---

[13]Throughout his Amended Motion to Vacate and Brief in Support the petitioner asserts violations of his Fourteenth Amendment rights.  The Fourteenth Amendment  does not, however,  apply to actions of the federal government.  *See*, *San Francisco Arts and Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 542, 107 S.Ct. 2971, 2984, 97 L.Ed.2d 527 (1987), n. 21.  As a result, even though this opinion refers to each claim as brought by petitioner, this court will not specifically comment on the Fourteenth Amendment as it addresses each of the issues herein.

[14]Doc. 44.

[15]Doc. 45.

[16]Doc. 47.

[17]Doc. 48.

opposed by the petitioner.  Subsequent thereto, this court entered minute orders granting the government until July 15, 2009 to respond to the disqualification motion and until September 16, 2009 to respond to the amended motion to vacate.[18]

On July 13, 2009, the government filed a response opposing the petitioner's motion to disqualify and on July 24, 2009 the government filed a motion to unseal certain proceedings in the underlying criminal case.[19]

On August 14, 2009, the petitioner filed a motion to file his response to the government's  motion to unseal certain documents out of time.[20]  On August 19, 2009, this court entered a minute order directing the petitioner to supplement his motion by 5:00 p.m., to include a statement regarding whether the government objected to the motion.  On August 19, 2009, the petitioner filed a Supplement to the Motion to File Response to Pleading Out of Time.[21]  Later that day, the court entered the following minute order:

> Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53) is hereby granted.  The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2555 Motion (Doc. #2) and that the Government's Motion to Unseal (Doc. #52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion.  To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their

---

[18]Docs. 49 and 50, respectively.

[19]Docs. 51 and 52, respectively.

[20]Doc. 53.

[21]Doc. 57 and 58, respectively.

current response deadlines on the § 2255 Motion.  Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52) and the Government shall be given until September 2, 2009, to Reply.

Doc. 60.

On August 26, 2009, the petitioner filed a Response opposing the government's motion to unseal claiming that the government had failed to establish "good cause" or "materiality;" the petitioner had not waived his attorney-client privilege; his protections under the work-product doctrine; and/or confidentiality of his mental health records. Additionally, the petitioner objected to the court ruling on the government's motion to unseal documents prior to ruling on the disqualification motion.[22]   On August 28, 2009, the government filed a reply thereto.[23]   On September 4, 2009, the government requested an additional month to file their response to the amended motion to vacate.[24]   This motion was not opposed by the petitioner and the government was given until October 16, 2009 to file their response.

On September 11, 2009, in a twenty-two page order, this court denied the petitioner's motion to recuse and/or disqualify.[25]   Additionally, on the same day, the court entered a fifteen page order ruling on the government's motion to unseal, or to gain full access to motions, orders, reports and proceedings which had occurred in the underlying criminal

---

[22]Doc. 61.

[23]Docs. 62.

[24]Doc. 63.

[25]Doc. 66.

case.[26]  To the extent the petitioner claimed that some of the requested items were protected by various privileges, the court gave the petitioner until September 22, 2009, to advise the court whether he was abandoning any of his claims in order to preserve those privileges.  On September 22, 2009, the petitioner filed a Notice of Intention not to abandon claims and a request for a protective order.[27]  Since the proposed protective order submitted by the petitioner implied that some of the documents sought to be governed by the protective order might have been previously disclosed, the court entered an order on September 23, 2009 requiring the petitioner to advise the court by September 30, 2009, if the particular documents identified in the September 11, 2009 order had previously been disclosed by either the Petitioner or his counsel.[28]

On September 25, 2009, the petitioner filed an Amended Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial.[29]  In this amended motion the petitioner raised nineteen (19) grounds for relief.  In addition to the grounds previously raised, the petitioner added a claim that his execution would violate the Eighth Amendment due to his "chronic and severe mental illness and organic brain impairments" and a separate claim of ineffective assistance of appellate counsel.  The petitioner also claims he should be allowed to conduct discovery "to fully develop and identify the facts supporting his

---

[26]Doc. 67.

[27]Doc. 68.

[28]Doc. 69.

[29]Doc. 70.

1778

[motion]" and "an evidentiary hearing to resolve any factual disputes" and "to establish the facts he alleges."[30]

On September 28, 2009, the respondent filed an Objection to the petitioner's proposed protective order.[31]  On September 29, 2009, this court entered an order setting the matter for a show cause hearing for the court to ascertain why an amendment should be allowed so long after the filing of the motion and the amended motion and a scheduling conference.[32]

On September 30, 2009, the petitioner filed a Memorandum in Response to the court's order regarding waiver of privileges and again sought a protective order concerning release of any documents.[33]  Thereafter, on October 2, 2009, the petitioner filed an Emergency Motion to Vacate Show Cause Order or Continue Hearing Date.[34]  By minute order on the same date, this court denied the petitioner's motion to vacate but waived the presence of co-counsel.  The  parties were also advised that the court intended to conduct a status and scheduling conference at the same time.  On October 5, 2009, the petitioner filed an "Objection to and Motion to Reconsider the Order filed on October 2, 2009, Motion to Continue Hearing, and Motion for Counsel to Appear by Telephone."[35]  On October 5, 2009,

---

[30]Doc. 95, at pp. 400-401.

[31]Doc. 73.

[32]Doc. 74.

[33]Doc. 75.

[34]Doc. 76.

[35]Doc. 78.

the court denied, by minute order, the petitioner's Motion to Reconsider and Motion to Continue Hearing, as well as other miscellaneous findings related to said filing.[36]

On October 6, 2009, after hearing comments of counsel, the court gave the petitioner until November 6, 2009, to refile his amended Motion to Vacate in compliance with the Rules Governing § 2255 Proceedings and until January 5, 2010 to file a Brief in Support.[37] These deadlines were subsequently extended.

On October 13, 2009, the petitioner filed a Writ of Mandamus in the Tenth Circuit Court of Appeals seeking "either the recusal of the district judge who presided over his federal criminal trial and now is hearing his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence, or, in the alternative, an evidentiary hearing before a different district judge on the facts underlying his recusal motion."[38] On October 16, 2009, the petitioner filed a Motion to Stay these proceedings pending disposition of the mandamus action by the circuit court.[39] On October 20, 2009, this court denied the petitioner's motion to stay.[40]

On December 3, 2009, this court entered a minute order setting a Show Cause Hearing for December 15, 2009 "for David Autry to show cause why he has failed to comply with this court's prior orders regarding submission of CJA vouchers."[41] Thereafter, on December

---

[36]Doc. 79.

[37]*See*, Doc. 81.

[38]Doc. 96.

[39]Doc. 86.

[40]Doc. 87.  On December 14, 2009, the Tenth Circuit denied the writ.  *See*, Doc. 96.

[41]Doc. 92.

13

4, 2009, the petitioner filed a Notice basically objecting to this court's handling of this matter and stating he was filing his amended motion as ordered by the court despite his disagreement with the court's order.[42] Additionally, on December 4, 2009, the petitioner filed his amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, pursuant to 28 U.S.C. § 2255.[43] Thereafter, on March 1, 2010, the petitioner filed his Brief in Support.[44]

On January 11, 2010, the government submitted a letter for *in camera* review to the court to determine whether the government should disclose the information contained therein to the petitioner. After reviewing the letter, the court entered a protective order finding that the government should disclose the subject-matter of said letter to counsel for the petitioner but preventing the information to be revealed to the petitioner or any person other than counsel of record for the petitioner and/or persons working for counsel for the petitioner in connection with these proceedings without prior approval and order.[45]

On February 18, 2010, the petitioner filed an Unopposed Motion to File Exhibits under Seal.[46] On February 26, 2010, this court entered an Order giving the petitioner until March 12, 2010 to advise the court how the records consisting of approximately 1,274 pages

---

[42]Doc. 94.

[43]Doc. 95.

[44]Doc. 149.

[45]Doc. 102.

[46]Doc. 110.

1781

were relevant to the issues contained within the motion.[47]   Following the petitioner's response, on March 30, 2010, the court granted the petitioner's motion to file his exhibits under seal.[48]

On March 1, 2010, the petitioner filed a Brief in support of his Motion, a Motion for Evidentiary Hearing, and Motion to Expand the Record.[49]  On March 3, 2010, the parties filed a joint motion to Modify the Protective Order entered on January 11, 2010.[50] Following a hearing on said Motion, the court orally amended the protective order.[51]  After receiving additional information from counsel for the government, the court denied the joint motion to Modify the Protective Order and the oral amendment made to the protective order was withdrawn.[52]

On May 17, 2010, the government filed their Response in Opposition to Petitioner's Motion to Vacate.[53]  On June 30, 2010, the petitioner requested leave to file an oversized

---

[47]Doc. 147.

[48]Doc. 161.

[49]Doc. Nos. 149, 150 and 151, respectively.  Since no answer had been filed to the Motion to Vacate, on March 29, 2010, this court denied the petitioner's Motion for Evidentiary Hearing.  Doc. 157.  On March 30, 2010, this court granted the petitioner's Motion to Expand the Record in order that the court could consider previously filed exhibits in support of the petitioner's motion without requiring the refiling of said exhibits and directed the court clerk to file two additional exhibits which had not previously been filed by the petitioner.  Doc. 161.

[50]Doc. 152.

[51]*See*, Doc. 164.

[52]Doc. 168.

[53]Doc. 175.

15

brief in Reply to the Government's Response which was granted.[54]  On July 1, 2010, the petitioner filed his Reply.[55]

On February 8, 2011, the petitioner filed two additional motions.  Specifically, the petitioner filed a Motion for Leave to Conduct Discovery and Brief in Support thereof.[56] The petitioner also filed a Motion to Modify Protective Orders and a Request for Hearing and Brief in Support thereof.[57]  Based upon the findings made in this opinion, this court denies the petitioner's Motion for Leave to Conduct Discovery and Motion to Modify Protective Order.  Petitioner has not established that any relevant information could be obtained by pursuing discovery herein.

---

[54]Doc. Nos. 176 and 177, respectively.

[55]Doc. 178.

[56]Doc. Nos. 186 and 187, respectively.

[57]Doc. Nos. 184 and 185, respectively.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act") delineates the circumstances under which a federal court may vacate a sentence.  Title 28, section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  A prisoner seeking post-conviction relief under this statute must allege as a basis for relief:  (1) lack of jurisdiction by the court entering judgment; (2)  an error of constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error of law or fact where the claimed error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

## TIMELINESS OF § 2255 PROCEEDINGS

Under the AEDPA, there is a one-year limitations period for filing a motion to vacate a federal criminal conviction which begins to run from the date on which a prisoner's conviction becomes final.  28 U.S.C. § 2255(f)(1).[58]  In this case, the petitioner's conviction became final on March 17, 2008, the date the United States Supreme Court denied *certiorari*

---

[58]There are a couple of other events which may extend the limitations period, but those events are not relevant to the facts of this case.

review of his direct appeal.  As a result, his one-year limitations period began to run on March 17, 2008.  As indicated previously, Petitioner had a verified motion to vacate on file on March 17, 2009.  On September 25, 2009, Petitioner filed a amended motion (Doc. 70) which arguably contained some new claims.

Fed.R.Civ.P. 15 allows a party to amend or supplement a pleading, subject to certain restrictions.  Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  In considering the effect of Rule 15(c) on a § 2255 motion to vacate, the Tenth Circuit has held an untimely amendment to a § 2255 motion

> which, by way of additional facts, clarifies or amplifies a claim or theory in the [original motion] may, in the District Court's discretion, relate back to the date of [the original motion] if and only if the [original motion] was timely filed and the proposed amendment does not seek to add a new claim or to insert a new theory into the case.

*United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)(citing *United States v. Thomas*, 221 F.3d 430, 431 (3rd Cir. 2000).

### GENERAL PRINCIPLES GOVERNING § 2255 ACTIONS

Section 2255 is not a substitute for an appeal and is not available to test the legality of matters which should have been challenged on appeal.  *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987), *cert. denied*, *Ali-Khan v. United States*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988).  As a result, "failure to raise an issue either at trial or on direct appeal imposes a procedural bar to habeas review." *United States v. Cervini*, 379 F.3d

987, 990 (10th Cir. 2004) (quoting *United States v. Barajas-Diaz*, 313 F.3d 1242, 1245 (10th Cir. 2002).  Failure to raise an issue on direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier, and that the court's failure to consider the claim would result in actual prejudice to his defense, . . ." *Id.*  Since a writ of habeas corpus is an equitable remedy, a court may consider the merits of the procedurally barred claim if the defendant alternatively demonstrates "that 'failure to consider the federal claims will result in a fundamental miscarriage of justice.'" *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings.[59]  A habeas petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue.  Where the omitted

---

[59]While the petitioner complains about this court leaving Mr. Hilfiger on as counsel for purposes of appeal, the United States Supreme Court has specifically recognized that "[a]ppellate counsel often need trial counsel's assistance in becoming familiar with a lengthy record on a short deadline, . . ." *Massaro v. United States*, 538 U.S. 500, 506, 123 S.Ct. 1690, 1695, 155 L.Ed.2d 714 (2003) (allowing defendant to raise claim of ineffective assistance of counsel on motion to vacate, even though he could have, but did not raise claim on direct appeal).

issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel. *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999). *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

## NECESSITY FOR AN EVIDENTIARY HEARING

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts. In this case, as previously indicated, the Petitioner has expanded the record to voluminous proportions. Without counting the one amendment that this court required to bring the motion in compliance with the federal rules governing these proceedings, he has filed multiple amendments to the motion and exhibits in support thereof. In addition, the extensive record in the criminal proceedings, including pleadings, pretrial and trial transcripts have been placed before and reviewed by this court.

Where the "record conclusively demonstrates that a defendant is entitled to no relief on his § 2255 motion to vacate, a full evidentiary hearing is not required." *Menzer v. United States*, 200 F.3d 1000, 1006 (7th Cir. 2000). *Accord*, *United States v. Marrs*, 856 F.2d 1471, 1472 (10th Cir. 1988). Additionally, no hearing is required where petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d

20

238, 240 (8th Cir. 1995).  Conclusory allegations contained within affidavits will not require a hearing.  *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971).  In an unpublished opinion, the Tenth Circuit stated that "[t]he district court is not required to hold an evidentiary hearing when a 2255 claim of ineffective assistance is based merely on conclusory allegations unsupported by specific facts."  *United States v. Scott*, 7 F.3d 1046, 1993 WL 389463, *2 (10th Cir. 1993)(citing *Eskridge, supra*.)

## STATEMENT OF THE FACTS

While the record in this case appears voluminous, other than being a death penalty proceeding this was not a complex case.  Because the defendant was tried twice in state court on state charges before being indicted in federal court,[60] the underlying facts of the criminal case were well known at the time the indictment was filed herein.  On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1082-1086 (10th Cir. 2007).  Therefore, this court will not reiterate them herein.  The court would note, however, that during the federal criminal trial, the government presented forty-one (41) witnesses during the guilt phase of trial; the defendant put on nine (9) witnesses and then the government called two (2) rebuttal witnesses.  Thereafter, during the penalty phase of trial, the government presented eleven (11) witnesses; the defendant called fourteen (14) witnesses and then the government put on five (5) rebuttal witnesses.

---

[60]*See*, *United States v. Barrett*, 496 F.3d 1079, 1086 (10th Cir. 2007).

## PETITIONER'S CLAIMS FOR RELIEF

### I. FUNDING CHALLENGES[61]

In Grounds 1 and 3, the petitioner claims he was deprived of his due process and equal protection rights when the trial court did not simply rubber stamp his budget requests. The Sixth Amendment to the United States Constitution provides, in pertinent part: "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. *See also*, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Rule 44(a) of the Federal Rules of Criminal Procedure grants a criminal defendant "who is unable to obtain counsel" the right to have counsel assigned to represent said defendant at every stage of the proceedings. *United States v. Reilley*, 948 F.2d 648, 650 (10th Cir. 1991). An indigent defendant does not, however, have the right to choose appointed counsel. *United States v. Nichols*, 841 F.2d 1485, 1504 (10th Cir. 1988).

Title 18 U.S.C. § 3005 governs appointment of counsel in capital cases. It provides, in pertinent part, as follows:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon defendant's request, assign 2 such counsel, *of whom at least 1 shall be learned in the law applicable to capital cases*, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or,

---

[61]To the extent that any information contained within this section would not generally be released under the provisions of 18 U.S.C. § 3006A, this court finds that the challenges made by the petitioner herein require disclosure of such information.

if no such organization exists in the district, of the Administrative Office of the United States Courts. . . . . . (italics added).

Despite the petitioner's conclusory allegations, there is no authority which indicates a court must approve all costs requested in a particular case or that the costs in every federal death penalty case will be identical. What may be necessary in a given case clearly depends upon the facts of that case, including the going rates for counsel in the area where the case is tried, the amount of investigation that has already been completed and the complexity of the issues involved. An indigent criminal defendant is, however, entitled to "the minimum assistance necessary to assure him 'a fair opportunity to present his defense' and 'to participate meaningfully in [the] judicial proceeding.'" *Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992). This does not mean that indigent defendants are entitled to all of the assistance that their wealthier counterparts might buy; they are only entitled to the "basic and integral tools" needed to present an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985) (citing *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)). Courts consider three factors in determining the minimum assistance required:

> (1) the effect on [the petitioner's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Moore v. Reynolds*, 153 F.3d 1086, 1112 (1998). *See also*, *Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001) (because petitioner did not show necessity, the district did not abuse its discretion in denying funding for an investigator or experts); *Moore v. Johnson*, 225 F.3d

23

495, 503 (5th Cir. 2000) (finding defendant does not lack 'an adequate opportunity to present [his] claims fairly' where he was denied a jury consultant since "[communicating] with the jury is a quintessential responsibility of counsel.")

As indicated in a previous order entered by this court on September 11, 2009, as Chief Judge, this court considered the recommendation of the Federal Public Defender and then decided to appoint John David Echols as lead counsel and Roger Hilfiger as co-counsel. *See*, Doc. 66, at pp. 17-18 regarding the reasons for this decision.[62]  On November 29, 2004, Mr. Echols filed his first Ex Parte Motion for an order concerning the funding of defense.[63]  In this motion, counsel advised the court he was requesting the court to approve expenditures between $55,000 and $82,000, exclusive of attorney fees.[64]

On November 30, 2004, this case was reassigned to the undersigned judge.[65]  On December 1, 2004, this court entered an order setting the matter for a budget conference before Magistrate Judge Steven P. Shreder.[66]  On December 8, 2004, co-counsel filed a motion requesting to be excused from the budget hearing before the magistrate judge due to

[62]This court respectfully disagrees with the Federal Defender for the Western District of Oklahoma's opinion that there were only two or three attorneys in the entire state of Oklahoma who were qualified to serve as lead counsel in a federal capital case, *see* Petitioner's Exhibit 54.  Additionally, to imply, as the Federal Defender does, that to be qualified to serve as lead counsel in a federal death penalty trial an attorney has to have agreed to serve and been approved "by a selection committee and the United States District Judges as qualified to serve as counsel in capital habeas cases initiated pursuant [to] Title 28, United States Code, Section 2254" is ludicrous.

[63]Cr. Doc. 16.

[64]This motion indicated that "[t]his is the first federal death penalty case for both of Mr. Barrett's appointed counsel . . . ."  This statement was, however, untrue.  Mr. Hilfiger, in addition to having previously been the United States Attorney for the Eastern District of Oklahoma, had previously been retained and actually tried a federal capital case in the Eastern District of Oklahoma in which the jury decided not to impose the death penalty against his client.  *See*, *United States v. James Norwood Hutching, et al.*, Case No. CR-92-32-FHS (E.D. Okla.).

[65]Cr. Doc. 17.

[66]Cr. Doc. 19.

a family member's prior scheduled surgery and this motion was granted on December 8, 2004.[67]  Additionally, on December 8, 2004 a scheduling conference was held.

On December 9, 2004, a budget conference/hearing was held before Magistrate Judge Shreder.  At that hearing, Mr. Echols discussed the reasons behind his various requests for expert assistance and the magistrate judge requested that Echols put together a proposed litigation budget.  Mr. Echols was told that his C.J.A. vouchers needed to be fairly specific in order for the court to ascertain that the requests were reasonable and necessary.[68]  On December 29, 2004, Mr. Echols filed his second Ex Parte Motion for Authorization to purchase a partial transcript of Mr. Barrett's 2004 State Court Jury Trial and third Ex Parte Motion for Approval of "Pre-Authorization" Budget.[69]  In the second motion, counsel requested $9,000-11,000.00 to purchase the second state court trial transcript, "excluding *voir dire*, opening statements, and closing statements, but including the testimony of all state's witnesses, the *in camera* testimony of Stephen Smith, hearings held during the course of the trial and the jury instruction conference."  Cr. Doc. 23, at pp. 2-3.  The third motion requested the court approve a "pre-authorization budget of $72,000.00."  Cr. Doc. 24, at pp. 3-5.  Despite the petitioner's allegations that this court failed to promptly act upon his requested litigation budget,[70] footnotes to some of the items requested in the various motions

---

[67]Cr. Doc. 20 and 21, respectively.

[68]Cr. Doc. 310, at pp. 40-42.

[69]Cr. Doc. 23 and 24, respectively.

[70]*See*, Doc. 95, at p. 10.

1792

indicated the approval of the items could be deferred until after rulings on jurisdictional motions. *Id.* On December 30, 2004, counsel filed a fourth "Ex Parte Motion for Authorization for Counsel to Travel to Washington, D.C., For Conference with the Attorney General's Representatives Concerning Authorization for Seeking the Death Penalty in this Case."[71] On the same day, this court entered a minute order granting counsel's request to travel to Washington, D.C.[72] Thereafter, counsel filed several motions in the case, which were, on January 14, 2005, referred to the magistrate judge for hearing.[73]

On January 19, 2005, United States Magistrate Judge Steven P. Shreder entered a detailed order advising counsel what was expected in terms of approval of a "Pre-Authorization" Budget.[74] At that time, counsel was advised to submit a proposed litigation budget covering the period from February 1, 2005, through June 30, 2005, setting forth:

> *separately and with specificity* the time each of the appointed attorneys anticipates spending on: (i) review of the record; (ii) investigation of claims; (iii) client interviews; (iv) consultation with experts and investigators; (v) legal research; (vi) preparation of pleadings; (vii) attendance at court proceedings; and, (viii) any other compensable activities undertaken in this matter.[75]

Additionally, counsel were directed to

> set forth *separately and with specificity* any expert witness counsel seeks to hire. A request shall: (i) identify the proposed expert and describe his credentials and experience; (ii) describe the subject matter to be covered by the

---

[71]Cr. Doc. 25.

[72]Cr. Doc. 26.

[73]See, Cr. Doc. Nos. 28, 29, 33, 34.

[74]Cr. Doc. 38.

[75]*Id.*, at pp. 1-2, ¶s 1 and 2.

expert; (iii) address why the expert is need, (sic) *i.e.*, explain both the facts indicating that further analysis is justified and the reason an expert witness is needed to interpret those facts; (iv) discuss the stage of the proceedings at which the expert is needed; and, (v) provide a specific time budget identifying the expert's billing rate and amount of time the expert anticipates spending on each portion of the investigation or analysis.[76]

Further, counsel were told to set forth

> *separately and with specificity* any investigator counsel seeks to hire. A request shall include a specification of the factual issues counsel intends to investigate, the facts suggesting that such an investigation is warranted, and an estimated time budget for each task. The time budget should be broken down into discrete portions of the investigation, so the Court may assess the reasonableness of each request. In the case of a request to hire a special purpose investigator, counsel shall identify the proposed investigator and describe his credentials and experience.[77]

Thereafter, on January 31, 2005, a fifth Ex Parte Motion concerning funding was filed. For the first time, defense counsel sought the court's approval of an overall budget of $407,875.00.[78] The motion further indicated if additional funds became necessary, counsel would supplement their budget request. This motion did not, however, comply with the order entered on January 19, 2005. As a result, on February 1, 2005, counsel was advised to submit a proposed defense budget in compliance with the court's earlier order.[79] At that time, counsel was advised that

---

[76]*Id.*, at p. 2, ¶ 3.

[77]*Id.*, at pp. 2-3, ¶ 4.

[78]Cr. Doc. 46. It should be noted that the "conclusion" paragraph of this motion indicated counsel was requesting approval of a budget of $406,350.00, but paragraph 6 of the motion indicated the total request, including attorney fees was $407,875.00.

[79]Cr. Doc. 47.

[t]he proposed defense budget *may not* simply project an arbitrary number of hours per week for a particular period, but must instead set forth the time each attorney anticipates spending on each of the listed activities, and describe in detail what each attorney anticipates doing with such time.[80]

On February 7, 2005, in response to this order, counsel submitted their sixth and seventh Ex Parte Motions regarding the Budget. The sixth motion requested court approval of $138,125.00 for various experts and miscellaneous and unforeseen expenses.[81] The seventh motion requested approval of $141,250.00 for lead counsel consisting of 1,130 hours at the rate of $125.00 per hour and $101,250.00 for co-counsel consisting of 810 hours at the rate of $125.00 per hour, for a grand total of $242,500.00 in attorney fees.[82] Thereafter, on February 11, 2005, an eighth Ex Parte Motion was filed requesting the court enter an order allowing transcription of the testimony of Clint Johnson and Juan Beal from a hearing held before the magistrate judge on January 26, 2005.[83]

After reviewing defense counsel's ex parte motions, on February 22, 2005, this court, instead of entering an order, sent a letter to defense counsel Echols asking counsel to address several questions which the court had in regard to the preliminary budget requests. Specifically, the court was interested in ascertaining the amount of compensation necessary to provide "fair compensation" in light of the fact Mr. Echols had previously defended Barrett in two state court proceedings arising out of the same factual scenario. As a result,

---

[80]*Id.*

[81]Cr. Doc. 50.

[82]Cr. Doc. 51.

[83]Cr. Doc. 57.

28

the court asked Echols to disclose the amounts paid for representation of the defendant in each of the two previous state trials, including the number of hours which were billed to the Oklahoma Indigent Defense System and the amounts paid for experts and investigators in each of those trials.[84]

Instead of responding directly to the court's inquiries, Mr. Echols advised this court that his budget was "in line with the time and fees expended in other federal capital prosecutions."[85] Additionally, counsel indicated the proposed budget had taken into account "the fact that [he] was not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts."[86] Counsel further advised this court that

> The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour. The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.
> I received approximately $72,229.00 for the first state court trial, although the bulk of this amount was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.[87]

---

[84] *See*, Sealed letter dated February 22, 2005.

[85] *See*, Sealed letter dated February 28, 2005.

[86] *Id.*

[87] *Id.*, at pp. 1-2.

Additionally, counsel advised this court that approximately $39,000 was expended on experts during the first trial even though several of these experts later refused to testify without payment of additional sums of money.  None of these individuals testified at trial.  During the second trial, additional sums of approximately $9,000 were paid for experts.  While counsel admitted the legal issues between the two state trials were similar, he indicated that he would be "in large part 'writing the book as we go'" and, therefore, the legal issues in the federal case would be substantially more demanding.[88]

Thereafter, this court entered an order authorizing a total of 1160 hours for attorneys at a rate of $125.00 per hour.  Additionally, the court approved a budget for investigative, experts and other services in the sum of $37,125.00 to 39,125.00.  While this order denied counsel's request for a copy of the second state court trial transcript, the court indicated it would reconsider the issue if defense counsel still felt like they needed the transcript and if it was relevant to the federal charges.  Finally, the court advised counsel they needed to advise the court in advance of incurring fees or costs not authorized by the budget that they were going to exceed said budget.[89]

On October 31, 2005, defense counsel filed a Motion to Modify the Order Approving the Budget of March 18, 2005.[90]  On November 4, 2005, this court entered a minute order

---

[88]*Id.*, at pp. 2-4.  It should be noted that Mr. Echols was the only attorney of record in the state court case.  *See*, Sequoyah County Court Records.

[89]Cr. Doc. 97.

[90]Cr. Doc. 232.

approving the modification of the budget as requested.[91]  At that time, the court indicated the total budget was not to exceed $192,007.00.

Further, despite counsel's innuendos that this court paid Mr. Hilfiger more money than Mr. Echols for nefarious reasons and as a way to develop a local capital defense panel, two observations are in order.  First, at the time of initial appointment of Mr. Echols and Mr. Hilfiger, the maximum hourly rate allowed for capital defense counsel was $125.00 per hour. 18 U.S.C. 3006A(d)(1).  At the time Mr. Echols withdrew, the maximum hourly rate allowed for capital defense counsel had been raised by Judicial Conference to $160.00 per hour.  *Id. See also*, CJA Memo from Administrative Office of the United States Courts dated January 28, 2005.  Second, the Criminal Justice Act does not require that the court pay counsel a specific hourly rate.  Rather, it sets the **maximum hourly rate** which can be authorized by a court.  *See*, 18 U.S.C. § 3006A(d)(1).  In light of Mr. Hilfiger assuming the role of lead counsel, this court raised his compensation to $150.00 per hour.  Additionally, when new counsel was appointed, this court encouraged counsel to submit an amended budget request solely because, unlike Mr. Echols, they were unfamiliar with the intimate details surrounding the previous state court trials.[92]

A review of the CJA vouchers approved in this case indicates trial counsel for Mr. Barrett were paid a total of $168,484.97, which does not include $3,903.17 paid by this court for the work done by the attorney who was appointed following the jury verdict to represent

---

[91]Cr. Doc. 244.

[92]Cr. Doc. 133.

Barrett at sentencing and who ultimately filed Barrett's notice of appeal and designation of record. Additionally, this court approved payment of $5,844.50 for state court transcripts and $11,067.50 for expert services obtained by the petitioner's counsel, for a total payment in relation to the trial itself of $185,396.97. An additional $24,585.43 was paid for transcripts related to the petitioner's appeal.

Furthermore, the record makes it clear that the budget was not carved in stone but was an estimate of what might reasonably be required. Until counsel has conducted some investigation and spoken with potential witnesses, it is not possible to ascertain the reasonableness of funding requests. Thus court, in carrying out its administrative functions in this case, attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation. Additionally, since the underlying incident had been the focus of two prior state court trials, counsel should have been able to utilize the factual investigations completed in the earlier cases to a large extent to reduce the overall amount of investigation necessary to defend the federal case. Once the court approved a budget, however, counsel were not prevented from approaching the court with additional facts and/or information to support a request for increasing any of the budgeted amounts and the court, on several occasions, encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.[93]

---

[93]*See*, Doc. 321, Transcript of Sealed Telephone conference held on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115 (court advised Mr. Hilfiger that it was granting Mr. Echols Motion to Withdraw and advised counsel he would be given an opportunity to inform the court of the effect of this decision on the trial schedule, the budget and anything else to do with the case); Doc. 318, Transcript of Sealed Ex Parte Budget Hearing held on October 3, 2005 in *United*

While the petitioner claims this court "expressed an interest in appointing less-qualified attorneys to represent [him],"[94] the record establishes the court followed the requirements of 18 U.S.C. § 3005 by considering the recommendation of the Federal Public Defender and appointing John Echols as lead counsel and appointing Roger Hilfiger as co-counsel.  The court considered both of these counsel to be "learned in the law applicable to capital cases," in that Mr. Echols had previously tried state capital cases and Mr. Hilfiger had previously tried a federal capital case.  While the court did not seek the Federal Public Defender's recommendation regarding who to appoint as co-counsel upon the withdrawal of Mr. Echols, the petitioner has failed to establish that the purpose of the statute, *i.e.*, to ensure the high-quality representation necessary in capital cases, was not fulfilled since Mr. Hilfiger was clearly "learned in the law applicable to capital cases" and Mr. Smith was a well-respected attorney who was admitted to practice in this court on April 3, 1992.  Additionally, both Mr. Hilfiger and Mr. Smith were active members of the CJA defense panel for the Eastern District of Oklahoma.

Simply because counsel did not use the entire budget as originally approved by this court for experts,[95] the petitioner can not, despite his many statements to the contrary,

---

*States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP (court advised defense counsel that after granting Mr. Echols Motion to Withdraw the court had indicated that an amended budget request would be considered but no amended budget was ever filed.  Counsel were again encouraged to advise the court of any supplemental budget requests they might have; but counsel advised the court that they felt the budget was sufficient for everything including all of the experts that they needed).  *See also*, Doc. No. 128, Order regarding funding issues filed on May 5, 2005 in *United States v. Kenneth Eugene Barrett*, Case No. CR-04-115-JHP.

[94]Doc. 95, at p. 9.

[95]Counsel modified his request on October 31, 2005, seeking an additional $7882.00, which this court approved.  Cr. Doc. 244.

33

establish that this court violated his constitutional rights by denying him expert and/or investigative funds.  On March 18, 2005, in approving counsel's budget, this court did indicate it would not pay for the transcript of a hearing held on January 26, 2005.  Counsel did not, however, submit a CJA 24 form to the court requesting authorization and/or payment of transcripts.  Also, counsel never asked this court to reconsider their motion for a copy of the transcript of January 26, 2005, or provided the court with any additional facts or law to support the request.  Finally, the petitioner has not shown that denial of this transcript deprived him of the necessary tools to mount a defense or to participate meaningfully in the judicial proceedings.  *Medina v. California*, *supra*.

The petitioner continually claims that he was not provided routine services provided to "similarly situated defendants."  Yet, the petitioner does not identify one service he was not able to obtain which prejudiced his case.  Furthermore, the court approved almost all of the vouchers submitted by defense counsel.  The only vouchers which were not approved as submitted were the first two vouchers submitted by Mr. Echols.  As previously indicated in this case, an adjustment of time was made to those vouchers, in part, because of "striking similarities between the substance of pleadings" filed in Petitioner's criminal case and the substance of pleadings filed in a state court case in which Mr. Echols was involved.[96]  Furthermore, the petitioner does not identify even one federal death penalty case which contains the same factual scenario as his case, *i.e.* two prior state criminal trials were held relating to the incident which formed the basis for the federal charges prior to the federal

---

[96]*See*, Cr. Doc. 106.

court trial.  Moreover, while this court did not approve separate payment for a jury consultant, the petitioner also complains because Mr. Hilfiger actually obtained the services of a private jury consultant and this court "expressed no concern or objection to Mr. Hilfiger's unauthorized retention" of this jury consultant.[97]  Counsel was free to obtain any services he desired and he had no duty to request reimbursement for any of the services he obtained.  Based upon the facts of this case, this court finds the petitioner has not shown that this court's administrative decisions regarding appointment of counsel or funding issues deprived him of his constitutional rights.[98]

Additionally, since a district court's attorney fee determination is not an appealable order, *United States v. French*, 556 F.3d 1091 (10th Cir. 2009), and because the budget approved by the court was not exhausted, this court finds appellate counsel was not ineffective in failing to challenge the administrative decisions of this court on appeal.

## II.   SUPPRESSION OF EXCULPATORY EVIDENCE

In his fifth ground for relief, the petitioner asserts he was deprived of his Fifth Amendment right to Due Process, his Sixth Amendment rights to counsel and confrontation, and his Eighth Amendment right to a fair and reliable capital sentencing process because the government suppressed exculpatory evidence, knowingly used perjured testimony and failed to correct false testimony.  Additionally, the petitioner claims newly discovered evidence

---

[97]Doc. 95, at pp. 24-25.

[98]Petitioner also claims this court engaged in improper *ex parte* communications with the government to bolster his argument that the court was biased against him and treated him unfairly.  This allegation was previously addressed by this court in the order ruling on the petitioner's Motion to Disqualify and Recuse, Doc. 66 at pp. 6-16, and will not be re-addressed herein.

entitles him to relief from his convictions and sentences.  The government argues they did not violate any disclosure requirements.  Further, the government asserts none of their actions amounted to prejudicial misconduct.  In reply, the petitioner claims evidence known to or in the possession of state or local law enforcement is imputed to the federal government.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . . " 373 U.S. at 87, 83 S.Ct. at 1196-1197.  There are three essential elements to a *Brady* claim: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued."  *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Thus, in order to establish a *Brady* violation, a habeas petitioner must prove the prosecution suppressed evidence, the evidence was favorable to petitioner, and the evidence was material.  *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993).  To show the evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United*

*States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). *See also*,

*Douglas v. Workman*, 560 F.3d 1156, 1173 (10ᵗʰ Cir. 2009). "The question is not whether

the defendant would more likely than not have received a different verdict with the evidence,

but whether in its absence he received a fair trial, understood as a trial resulting in a verdict

worthy of confidence." *Kyles*, 514 U.S. at 434, S.Ct. at 1566.

> A *Brady* claim fails if the existence of favorable evidence is merely suspected.
> That the evidence exists must be established by the defendant. *See United
> States v. Lopez*, 372 F.3d 1207 1209-11 (10ᵗʰ Cir. 2004) (because defendant
> failed to establish that government had promised leniency to prosecution
> witnesses, there could be no *Brady* violation in government's failure to turn
> over documentation of such promises); *United States v. Warren*, 454 F.3d 752,
> 759 (7ᵗʰ Cir. 2006) (defendant failed to establish existence of any document
> withheld by government, so "his *Brady* claim fails to get off the ground.").

*United States v. Erickson*, 561 F.3d 1150, 1163 (10ᵗʰ Cir. 2009).

"[T]he individual prosecutor has a duty to learn of any favorable evidence known to

the others acting on the government's behalf in the case, including the police." *Kyles*, U.S.

at 437, S.Ct. at 1567. While courts have refused to draw a distinction between different

agencies under the same government,[99] the Tenth Circuit has held where "there is no

indication that the investigation was a joint effort between the state and federal government,"

materials possessed by the state government will not be imputed to the federal government.

*United States v. Beers*, 189 F.3d 1297, 1303 (10ᵗʰ Cir. 1999). Other circuits have adopted

this same approach by defining the "prosecution team" as "the prosecutor or anyone over

whom he has authority." *Moon v. Head*, 285 F.3d 1301, 1309 (11ᵗʰ Cir. 2002).

---

[99] *See, United States v. Antone*, 603 F.2d 566, 569 (5ᵗʰ Cir. 1979).

. . . . knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Gambino*, 835 F.Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996).  Thus, in *United States v. Locascio*, 6 F.3d 924 (2d Cir.1993) ("*Locascio*"), cert. denied, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), we refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants." *Id.* at 949 ("We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.). In *United States v. Quinn*, 445 F.2d 940 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), we refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.' " *Id*. at 944.

*United States v. Avellino*, 136 F.3d 249, 255 -256 (2nd Cir. 1998).  *See also*, *Johnston v. Love*, 940 F.Supp. 738, 768-71 (E.D.Pa. 1996), *aff'd*, 128 F.3d 1576 (3rd Cir. 1997), *cert. denied*, 522 U.S. 972, 118 S.Ct. 425, 139 L.Ed.2d 326 (1997) (refused to impute to the state attorney the federal prosecutor's knowledge of a witness immunity agreement because the federal prosecutor was not an agent for the State, did not consult or obtain the consent of the State, and did not bind the State when he entered into the immunity agreement with the witness).  Where, however, state and federal governments pool their investigative energies to prosecute the defendants, courts have imputed information possessed by state investigators to the federal prosecutor.  *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) and *United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006).

In *Risha*, the Third Circuit held that a "case-by-case analysis" should be used when considering a federal prosecutor's constructive knowledge of information that was known by state agents. Courts addressing the issue of cross-jurisdiction have looked at:

> 1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; 2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and 3) whether the entity charged with constructive possession has 'ready access' to the evidence."

*Id.*, at 304. *See also*, *United States v. Reyeros*, 537 F.3d 270 (3rd Cir. 2008) (while Columbian government which acted at request of federal government and participated in a Columbian extradition proceeding, they did not function as agents of the United States government or act under its control).

In addition to invoking the due process protections of *Brady*, the petitioner asks this court to construe his suppression claims as newly discovered evidence under FED.R.CRIM.P. 33. The government, citing *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000), argues Rule 33 is meant to correct "factual injustice" as opposed to legal errors and that the petitioner's request for relief under Rule 33 is untimely. In his reply, the petitioner, citing *United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996), asserts the Tenth Circuit has recognized the viability of newly discovered evidence issues in § 2255 proceedings and, therefore, *Evans* is not applicable herein. There is no question that newly discovered evidence issues can be raised in § 2255 proceedings. *Hernandez* did not, however, contain any indication that the newly discovered evidence claims raised therein were or were not timely raised. In fact, the § 2255 proceeding was initially brought while the appeal was

39

pending.  Furthermore, Rule 33 of the Federal Rules of Criminal Procedure has been amended since the *Hernandez* case was decided to change the time for filing a motion for new trial from "within two years after final judgment"[100] to "within 3 years after the verdict or finding of guilt."[101]

In this case, the petitioner was found guilty on November 4, 2005.  The first § 2255 filing was not made until March 16, 2009, well after the expiration of time to seek relief under Rule 33 of the Federal Rules of Criminal Procedure.  As a result, this court finds the petitioner's request for relief under Rule 33 is untimely.

Petitioner claims the government suppressed exculpatory evidence about six civilian witnesses, three law enforcement witnesses, and one trial prosecutor.  In considering this claim, it is important to keep in mind that the United States government was not initially involved in seeking or obtaining the search warrant in this case.  Rather, this case was initiated solely by officers employed by the office of the District Attorney for the Twenty-Seventh (27th) Prosecutorial District Drug Task Force for the State of Oklahoma.[102]  During the motion to suppress hearing in this case, Darren Lane from the Drug Enforcement

---

[100]18 U.S.C. (1996), FED.R.CRIM.P. 33.

[101]FED.R.CRIM.P. 33.

[102]Petitioner's Exhibit No. 194, at p. 1 and Government's Exhibit No. 4, at p. 2 ¶ 5 and p. 3 ¶ 16.  *See also, United States v. Barrett*, 496 F.3d at 1082 and  Cr.Doc. 105, at p. 2 which indicates:

> Clint Johnson, an Oklahoma drug task force agent, secured a state court warrant to search the Defendant's home for drugs.  Agent Johnson had information that the Defendant had threatened "to kill the first cop through the door," and that there were guns around the house, so he sought the assistance of the Oklahoma Highway Patrol with entering and securing the Defendant's home.  The federal drug task force of the Drug Enforcement Agency also was notified because Agent Johnson anticipated there would be a methamphetamine lab to clean up at the scene, although the federal agents were not expected to participate in the raid itself.

Administration was designated as "case agent."[103]  At trial, the government designated

Special Agent Darren Lane with the Drug Enforcement Agency (DEA) and Special Agent

Ben Rosser with the Oklahoma Bureau of Investigation.[104]  Finally, it appears that as early

as March 24, 2004, the federal prosecutors were having difficulties communicating and/or

obtaining cooperation from the District 27 District Attorney's Office Drug Task Force.[105]

### *Claims involving Civilian Witnesses*

### A.  Charles Sanders

Initially, the petitioner attacks the use of the confidential informant, Charles Sanders,

alleging the government did not fully disclose Sander's complete criminal history and that

the government suppressed deals it made with Sanders in exchange for his testimony.

Despite the petitioner's assertions, the trial transcript establishes that the defense counsel was

aware of the state court charges which could be used to impeach Mr. Sanders at the time of

trial.[106]  Additionally, Sanders admitted to the jury his extensive history of drug abuse.

Assuming for purposes of argument that Sanders had additional state criminal convictions,

---

[103]Tr. of Hearing on Motions held on January 26, 2005, at p. 3.

[104]J.T.Tr. Vol. 1, at p. 3.  *See also*, J.T.Tr. Vol. 4, at p. 423.

[105]*See*, Government's Exhibit No. 4, at p. 4.

[106]Compare, J.T. Vol. 11, at pp. 2491-2494 and 2524-2534 with Government Exhibit 6 and with Petitioner's Exhibit Nos. 157-162, and 164-165.  Petitioner's Exhibit Nos. 157, 158, and 159 contain court pleadings in felony case numbers CF-97-9, CF-97-75, and CF-98-128, respectively but none of these exhibits contain a judgment and sentence rendered in the case, so they could not have been used to impeach Sanders at the time of trial.  *See*, F.R.E. 609.  Petitioner's Exhibit No. 163 contains court pleadings in a felony case number CF-2001-314 but it also does not contain a judgment and sentence.  Petitioner's Exhibit No. 166 contains court pleadings in a misdemeanor case which was ultimately dismissed costs to state on December 8, 2008. Petitioner's Exhibit No. 167 contains court pleadings in another misdemeanor case but does not contain a judgment and sentence. Petitioner's Exhibit No. 175 contains court pleadings in a felony case number CF-97-140, but again it does not appear that any judgment and sentence was ever filed in this case.  Absent a conviction, counsel simply would not have been able to use these exhibits to impeach Sanders.

41

there is no evidence to suggest the federal government was even aware of those convictions. The government generally does not have a duty under *Brady* to seek out information that is not in its possession, including a witness's criminal history. *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994) (holding "the prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find impeaching evidence"). Further, in light of Sanders extensive criminal history which was relayed to the jury, this court would find the petitioner has failed to show any additional criminal records concerning Sanders were material or that this court's confidence in the outcome of the trial is undermined by additional criminal history of this particular witness.

Furthermore, the trial transcript establishes that Sanders advised the jury of the agreement which he had with the federal government in the following colloquy with the federal prosecutor:

Q: And I advised you of any assistance that I would provide to yourself in relation - - for your cooperation, testimony in this case, haven't I?

A: Yes, sir.

Q: What did I tell you I would do in your behalf?

A: You tell - - you didn't make me no promises. You told me that you would talk to the prosecution upon completion. That - - no, you haven't guaranteed me nothing.

Q: In relation to talking to the prosecutors, the conviction you're serving now in Sequoyah County; is that correct?

A: Yes, sir.

42

Q: Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A: Yes, sir.

Q: And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A: Yes, sir.

Q: And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A: Yes, sir.

Q: Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A.'s Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A: Have you advised me of what now?

Q: Have I told you anything about what would happen to any sentence you have?

A: No.

Q: Has any promise been made in regards to your early release or anything that might happen in Tulsa County at all?

A: No, sir.

J.T. Vol. 11, at pp. 2494-2496. Despite Barrett's claims to the contrary, he has failed to show that any benefits Sanders received were inconsistent with what he told the jury. While some notation on a uncertified copy of a document purportedly filed in the District Court of Muskogee, Wagoner, Cherokee and Sequoyah Counties in which someone other than the

43

judge who signed the Order wrote "*per plea agreement with the feds, banish from Sequoyah County,"[107] this hearsay statement does not convince this court that any more was done in Sander's criminal cases than what was disclosed to the jury.  Barrett's allegations are purely speculative as to the actual reasons Sander's state cases were handled the way they were.  He has not presented any affidavits from state prosecutors or any other person which establish an agreement different from what Sanders testified to.  As a result, this court finds the petitioner has failed to establish a *Brady* violation in relation to Sanders.

## B.  Travis Crawford

Next, under the guise of a *Brady* claim, the petitioner asserts Travis Crawford lied on the stand and that he has since recanted his trial testimony.  Petitioner first relies on the hearsay accounts provided by his investigator and Crawford's parents of Crawford's purportedly unsworn statements.[108]  This court will not consider hearsay accounts of unsworn recantations.  *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) ("Sworn trial testimony is generally not refuted by unsworn repudiation of that testimony.")  *See also*, *Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) (federal habeas case noting that affidavits containing hearsay are "particularly suspect").

Petitioner also relies on Crawford's own declaration in which Crawford states, in pertinent part:

---

[107]*See*, Petitioner's Exhibit No. 160, at p. 88.  Copies of this same pleading appear at Petitioner's Exhibit Nos. 161, at p. 45; 162, at p. 61; 164, at p. 28; and 165, at p. 55.

[108]*See*, Petitioner's Exhibit Nos. 31, 91 and 92.

I testified falsely at Kenny's trial.  At the time I testified, I was living in so many places and was so strung out, I did whatever I was told to keep out of trouble.  I did methamphetamine all the time, every day.  When I testified against Kenny, I was high on speed; . . . .

When Mr. Littlefield interviewed me about Kenny, I was terrified of losing my freedom and said whatever I thought Mr. Littlefield wanted me to say.  Mr. Littlefield asked me if Kenny said he (Kenny) "was going down in a blaze of glory," and before I could answer, Mr. Littlefield told me all the bad things that would happen to me if I "lied."  I was so scared I said, "yes" that Kenny had said he would go down in a blaze of glory if the cops came.  I was panicking because I was afraid.  Mr. Littlefield said he knew things about me. I was so scared.

I never heard Kenny say he was going down in a blaze of glory. . . .

Petitioner's Exhibit No. 45, at p. 2.

Since the recantation is really just a ploy to obtain a new trial under Rule 33 and the petitioner's initial request for a new trial was not filed until four and a half months after the limitations set out in Rule 33 had expired,[109] this court finds this information was not timely filed.  However, even if the declaration had been timely filed, this court finds it is extremely suspicious in light of Crawford's actual trial testimony; the fact Crawford is Barrett's cousin; and because Crawford was persuaded by a defense investigator to recant in the presence of his mother and father.  At trial, Crawford testified, in pertinent part, as follows:

Q: . . . .What happened as that vehicle drove down the road in a westerly direction?

A: I seen my cousin going to the gate.

Q: When you say your cousin, who?

A: Kenneth.

---

[109]It should be noted that Crawford's declaration was not signed until June 3, 2009 and was not filed in this court until September 25, 2009, six months after the limitations had expired.

45

Q: Okay.  And where was the gate located?

A: Kind of the west side, right there by the road.

Q: Okay.  And when your - - and when did Kenneth Barrett go to the gate in relation to the white vehicle passing?  Was it before it got to there, or after it passed on by?

A: After it passed by, about past my mom's house.  It was right in about there, I guess.

Q: That's where the vehicle was?

A: Yeah.

Q: Okay.  And when Mr. Barrett went to the gate, what did he do?  What'd (sic) you see him doing?

A: I thought he'd closed the gate, but they said it was already closed.

Q: Okay.  You think he was closing the gate?

A: Yeah.

Q: Okay.  What did you do?

A: I just talked to him.

Q: Did you holler or go down there?

A: I walked down there to him, talked to him.

Q: Okay.  And what did Mr. Barrett say when you got down there, about that vehicle – the vehicle that went past?

A: That he knew those was laws.

Q: Did he say anything else?  What did you say when he said he knew that they were the law?

A: Yeah. I knew there was a warrant out for him. I said those probably right there – they're going to come back and serve that warrant.

Q: What did he say?

A: He said D.G.F.

Q: What do you mean by D.G.F.?

A: He just – I guess he was just tired of it all, said he didn't –

Q: What's D.G.F. mean?

A: Don't give a fuck.

Q: After Mr. Barrett said D.G.F., what did he say then?

A: He said he was going out in a blaze of glory. But he said that a thousand times, not just then.

J.T. Vol. III, at pp. 465-466. The prosecutor did not lead Crawford in any way to say what he said. Additionally, the prosecutor did not specifically ask Crawford if "Kenny said he (Kenny) 'was going down in a blaze of glory.'" Instead, the prosecutor asked what had been said and Crawford volunteered that Barrett said "he was going out in a blaze of glory." Crawford further stated Barrett had said this a thousand times. On cross-examination, Crawford indicated he had heard a million people, in the "dope world" say "I'm going out in a blaze of glory."[110] Finally, Crawford admitted that he had used a lot of dope over a period of approximately fifteen years and that his mind was "not sharp like it always has been."[111] Consequently, this court does not believe the recantation which was not made until

---

[110]J.T.Tr. Vol. 3, at p. 480.

[111]*Id.*, at pp. 457 and 468.

more than three years after Barrett's trial and after Barrett had already been sentenced to death.

Barrett also claims the government withheld evidence that Crawford spent two months in a military brig and had once cooperated with local law enforcement. He has not, however, established that the United States Attorney's office knew this information. *Brady* requires disclosure only of evidence within the actual or constructive possession of the prosecution and its investigative team. *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). In this case, the warrants executed on September 24, 1999 were not federal search warrants. The only involvement by the federal government in this matter was to assist in the execution of the search warrant after state agents had been involved in a fatal shooting at the location which was to be searched. *See*, Government's Exhibit No. 4. The investigative team for purposes of the federal charges was the United States Drug Enforcement Agency (DEA) and this court finds no evidence to suggest that either the DEA or the United States Attorney was aware of Crawford's involvement with local law enforcement. Similarly, there is no evidence to establish that the prosecution team knew that Crawford spent time in a military brig almost twenty years before this trial for an unknown reason that may or may not have reflected on his credibility. *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Jones*, *supra*. Furthermore, based upon the fact Crawford testified to his extensive drug use;[112] admitted on cross-examination

---

[112]*Id.*

his arrests for child support violations and hot checks after testifying on direct examination that he had never been arrested;[113] admitted that his drug use affected his memory;[114] and admitted that six years had passed since the events about which he was testifying and that he had never provided a written statement to law enforcement,[115] this court finds this "newly discovered evidence" would not have had a material effect on the verdict.

Next, Barrett claims the government knew or should have known that Crawford was a drug addict at the time he was interviewed by the prosecution and at the time he testified at trial and therefore, they had an obligation under *Brady* to disclose this information to the defense.  As previously stated, Crawford testified at trial about his extensive drug use; so despite the petitioner's allegations, defense counsel was aware that he was a drug addict. Further, Barrett claims, in light of Crawford's affidavit which indicates he "was high on speed" when he testified at trial,[116] the prosecution had an obligation to correct Crawford's allegedly false trial testimony that he had been off drugs for nine months prior to his testimony.[117]  Petitioner does not, however, present any evidence that the government actually knew Crawford was using drugs at the time of his testimony.  Conclusory or "purely speculative" allegations are insufficient to establish a *Brady* claim.  *Murphy v. Johnson*, 205 F.3d. 809, 814 (5th Cir. 2000).  If, as the petitioner alleges, it should have been obvious that

[113]*Id.*, at pp. 456 and 467-468.

[114]*Id.*, at pp. 468 and 472.

[115]*Id.*, at pp. 481-482.

[116]Petitioner's Exhibit No. 45, at p. 2.

[117]J.T.Tr. Vol. 3, at p. 457.

1816

Crawford was on drugs at the time of his testimony, there is no merit to this *Brady* claim because the defense would or should have known that he was on drugs.

Finally, the petitioner claims the government should have disclosed that threats were made to Crawford to secure favorable trial testimony. Again, the petitioner does not present any evidence that Crawford was actually threatened. Based on one statement in Crawford's affidavit in which Crawford says: ". . . Mr. Littlefield told me all the bad things that would happen to me if I 'lied,'"[118] the petitioner speculates that Crawford was threatened. While the prosecution may have encouraged Crawford to be honest, that does not establish that threats were made to Crawford to encourage him to testify untruthfully. Further, when asked at trial whether he had "been threatened with any sort of prosecution if you don't come up here and testify," Crawford stated: "No sir. I was just subpoenaed to be here. That's why I'm here doing this."[119] After reviewing all of the allegations against Travis Crawford, this court finds the petitioner has failed to establish that Travis Crawford testified falsely at trial. As a result, the petitioner has not shown that the prosecutor knew or should have known of any falsity in Crawford's testimony, a fact fatal to his *Brady* claim.

## C.  Cindy Crawford

Petitioner claims Cindy Crawford was coached and threatened by the prosecutor; that she was, contrary to her testimony, an active drug user and that she was either high or "coming down" from a high when she was interviewed by the government and when she

---

[118]Petitioner's Exhibit 45, at p. 2.

[119]J.T.Tr. Vol. 3, at p. 470.

50

testified at trial; that she suffered mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate; that she had regularly worked as an informant in the past and had received breaks on a Sequoyah County drug case; at the time of her testimony she was in violation of deferred sentence in Sequoyah County and that case was resolved in her favor after her testimony. Again, this court will not consider hearsay accounts of unsworn recantations. *See*, *United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000).

Petitioner also claims the government withheld evidence that Ms. Crawford was mentally ill and an active user of methamphetamine at the time of trial. In support of this claim, the petitioner attaches medical records of Ms. Crawford.[120] Petitioner does not, however, present any evidence which tends to establish the government knew, prior to cross-examination by defense counsel during the second stage of trial, that Ms. Crawford had been diagnosed with post-traumatic stress disorder. Similarly, the petitioner does not present any evidence which establishes that the government knew Ms. Crawford was using drugs at the time of her testimony. Conclusory allegations that evidence was known by the prosecution does not state a claim for relief. As previously indicated, *Brady* does not require a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002).

Further, the petitioner claims "it was well known in the community that [Ms. Crawford] acted on a regular basis as a snitch for local law enforcement" and that the

---

[120]Petitioner's Exhibit 144.

51

Government "or its agents" had to know this, yet they failed to disclose this information.[121]

This claim fails on two levels.  First, if it was "well known" within the community, defense counsel could have easily discovered the information.  "There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  Specifically, in this case, two of the three declarations submitted by the petitioner to establish the knowledge within the community, were provided by the petitioner's cousin, who indicates her brother is married to Ms. Crawford,[122] and the petitioner's uncle, the father of Travis Crawford.[123]  Travis Crawford's parents lived in close proximity to the petitioner's house.[124]  On the other hand, while these three declarant's claim Ms. Crawford was a police informant, Barrett fails to show that Ms. Crawford had, prior to her testimony in 2005, actually provided any documented assistance to law enforcement in exchange for favorable treatment.  Even assuming the petitioner's allegations that Ms. Crawford had worked for local law enforcement is true, "it is unrealistic to expect the federal prosecutors to know all information possessed by state officials affecting a federal case,

---

[121]Petitioner supports this statement with three declarations.  *See*, Petitioner's Exhibit No. 83, at p. 2 ("It is common knowledge in the community that Cindy Crawford has worked as a "snitch" for local law enforcement for a long time to get others in trouble and to avoid getting in trouble herself."); Petitioner's Exhibit No. 88, at 2 ("It is common knowledge in the community that Cindy Crawford has worked as an informant for the police for an extensive period of time. . . . ."); and Petitioner's Exhibit No. 92, at p. 1 ("I am aware that Cindy has worked as an informant for the local police around here . . . . . .").

[122]*See*, Petitioner's Exhibit No. 83, at p. 2.

[123]*See*, Petitioner's Exhibit No. 92, at p. 1.

[124]J.T.Tr., Vol. 3, at pp. 451-456.

especially when the information results from an unrelated state investigation." *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999). Therefore, this court finds no *Brady* violation occurred in relation to this information.

Additionally, the petitioner alleges that "Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day." Doc. 95, at p. 289. In support of this flowery statement, the petitioner alleges Crawford was charged in Sequoyah County on June 18, 2008 with first degree burglary and conspiracy and on December 15, 2008, more than three years after the petitioner's trial herein, received a two year deferred sentence on the first degree burglary charge and dismissal of the conspiracy charge. Barrett's conclusory allegations that the federal government has exerted and/or continues to exert influence in Ms. Crawford's state court proceedings are meritless. This statement, like many others contained within the petitioner's pleadings, is purely speculative. Again, speculative allegations are insufficient to state a *Brady* claim. *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

**D. Brandie Zane Price**

Next, the petitioner asserts the government or its agents knew or had reason to know that Ms. Price was involved in drug use and drug dealing at the time of her trial testimony despite her testimony, on October 26, 2005, that she had not been using illegal narcotics since 1999.[125] In support of this assertion, the petitioner submits court records from the

---

[125]At trial, Ms. Price was asked, "Since 1999 have you been using illegal narcotics?" She replied, "No, sir." J.T.Tr. Vol. 15, at p. 3488.

Eastern District of Oklahoma Case No. CR-07-016-RAW in which the grand jury returned an indictment on March 14, 2007 which alleged that "Beginning prior to approximately May, 2006, the exact date being unknown to the Grand Jury, and continuing until on or about February 20, 2007," Price and others were involved in a drug conspiracy.[126]  Subsequent to being indicted, Price pled guilty to a superseding Information to the crime of Possession of Methamphetamine with Intent to Distribute a mixture or substance containing a detectable amount of methamphetamine in excess of 500 grams.  The Information alleged the crime occurred "[f]rom approximately May, 2006 to on or about February 20, 2007."  Ultimately, Price received a sixty (60) month sentence in that case.  Barrett claims Ms. Price "received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial*."  *See*, Doc. 95, at pp. 290-291.  Further, Barrett "alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against [him] that she was involved in drug use and drug dealing."  *Id*., at p. 291.

Again, these claims are clearly speculative and this court fails to see how the government could or should have known about drug activity which was not alleged to have begun until more than six months after Price's testimony.  Further, even if the government subsequently considered Price's previous testimony in Barrett's case in requesting a downward departure, this does not establish that the government had any agreement with Ms. Price prior to her testimony in his case.  As the government points out, "Barrett provides no

---

[126]Petitioner's Exhibit No. 174.

theory as to how the government might have induced Price's cooperation by promising leniency in a prosecution it had not undertaken for a crime the witness had not yet committed." Doc. 175, at p. 193. As a result, this court finds the petitioner has failed to state a *Brady* claim in relation to the testimony of Ms. Price.

**E.  Karen Real**

As to the final civilian witness, the petitioner asserts the government misled the jury with respect to the assistance it was going to give Real in exchange for her testimony and that the government failed to disclose numerous state cases which were dismissed against Real, which could have been used to impeach her. The government argues Barrett has failed "to show that the benefit received by Real was not the one described by the witness in open court." Additionally, in regard to Barrett's claim regarding state cases, the government argues this portion of Barrett's claim is untimely because it was not raised until March 1, 2010, and without merit since Barrett has failed "to establish that the government possessed any material information about Real's state prosecutions."

a.  Statute of Limitations

In reviewing the petitioner's Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and For a New Trial filed herein on March 17, 2009, it is clear the only issue raised at that time regarding Ms. Real was

> . . . that the Government misled the jury with respect to the assistance it was
> going to give Real. The Government surely knew all along that it would ask
> that Real's sentence be reduced to time served based on her cooperation

against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. This Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).

Doc. 2, at p. 297.

As the government claims, the petitioner did not timely raise a *Brady* violation occurred because of failure to disclose to defense Real's criminal record, including pending state criminal cases. Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody which was filed herein on December 4, 2009, *see*, Doc. 95, at p. 293, this court finds it is barred by the statute of limitations.[127]

b. Sufficiency of claim regarding government assistance in exchange for Real's testimony

At trial, Ms. Real testified she had been convicted of "Conspiracy to manufacture, maintaining a house and a gun charge" and was serving a fourteen (14) year sentence in federal prison. Thereafter, the following colloquy occurred between the prosecutor and Ms. Real:

Q: And we visited previously to your being here, have we not?

---

[127]All of the state court cases which the petitioner claims should have been disclosed were dismissed by the State of Oklahoma prior to Real's testimony in this case. Furthermore, none of those cases resulted in a conviction.

A: Yes, sir.

Q: And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?

A: No, sir.

Q: Did I talk about anything I'd say to the Court?

A: Well, you just mentioned that, you know, you could tell the Judge, you know, what I did.  And then it would be up to the Judge.

Q: Okay.  Any relief from your sentence - - you're aware it's not going to come from me, its got to come for (sic) the court?

A: Yes.  The court.

J.T.Tr., Vol. 13, at pp. 3080-3081.  Ms. Real further advised the jury that she started using methamphetamine in 1994 or 1995, and she continued doing so until her arrest in 2000.  *Id*., at p. 3081.

Ms. Real testified in the petitioner's trial on October 24 and 25, 2005.  *See*, J.T.Tr., Vol. 13, pp. 3079-3092 and Vol. 14, 3098-3135.  On March 1, 2006, the government filed a Motion for Reduction of Sentence for Defendant Karen Jean Real Pursuant to Rule 35, in Case No. CR-00-21-FHS.  *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 9. The government's motion advised the court that a complaint had been filed against Barrett in September 2004.  The government indicated, in preparation for the Indictment, Ms. Real was writted to the Eastern District of Oklahoma from a federal correctional institution and asked about her associations with Barrett.  The government further advised the court when Ms. Real was told there was a possibility that she would be used as a witness against Barrett,

she "expressed a willingness to testify without hesitation or reluctance." Additionally, the

government indicated:

> While Ms. Real's testimony was delayed for a substantial period of time, Ms. Real presented the information at the earliest possible opportunity for her to assist the government. The government first presented this matter to a grand jury in November 2004. Ms. Real, at approximately that time, was first approached by the government regarding the knowledge she had involving Kenneth Eugene Barrett. At that time, Ms. Real spoke freely and continued to do so during the duration of her assistance to the government.
>
> While ultimately multiple civilian witnesses spoke of Barrett's drug dealing activities, his use of firearms, and his threats to law enforcement, Ms. Real was the first to do so. Her willingness to provide truthful testimony regarding Barrett's activities made it easier for the subsequent witnesses to come forward. She was the first and cooperated willingly and courageously. Her assistance was substantial and created an environment in which others could cooperate as well. She is clearly deserving of a reduction in her sentence in consideration of her efforts.

*Id.* Thereafter, on April 25, 2006, the Honorable Frank H. Seay entered an order reducing

Ms. Real's sentence to time served, with the original terms of supervised release being left

in effect. *See*, Petitioner's Exhibit No. 68 and Respondent's Exhibit No. 10.

Although Ms. Real did not advise the jury of the technical procedure that the

government would use to inform the judge of her assistance, (*i.e.*, filing of a Rule 35 Motion)

she clearly advised the jury that she anticipated that the government would make known to

the judge what she had done and then it would be up to the judge to decide what to do.

Based on the record in Ms. Real's case, this appears to be exactly what the government did.

Petitioner, or at least the petitioner's counsel, clearly knew or should have known of the

technical procedure for "informing a judge of a defendant's assistance." Thus, this court

finds petitioner has failed to establish a *Brady* violation as it relates to Karen Real.

58

**F. Randy Turman**

Petitioner states

[t]he Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case.

Doc. 95, at p. 294.

The testimony to which the petitioner refers, however, was elicited at trial by defense counsel. First, defense counsel asked: "So, you're real familiar with cooking dope; aren't you?" Turman responded: "Yes, sir, I've been arrested for cooking dope." Defense counsel then indicated they were "going to talk about that in a second."[128] A few questions later, the following colloquy occurred:

Q: . . . . you have manufactured dope within a thousand feet of a school; haven't you.

A: No, sir.

Q: You have manufactured dope in the presence of a minor child under the age of 12, haven't you?

A: No, sir.

Q: And, sir, you have manufactured dope while possessing a firearm?

A: Yes, sir.

---

[128]J.T.Tr. Vol. 4, at p. 433.

59

Q: In fact, you manufactured methamphetamine while possessing a firearm, an AK-47, that had the serial numbers obliterated; didn't you?

A: No, sir.

Q: Well, you've been charged with all those crimes; haven't you?

A: I have been charged with alternating a serial number on a firearm, it was a SKS where it was dropped and hit on a nine, and it looked like that it was tried to be changed, but it hadn't.

Q: And on that case, you're currently out on bond on another $100,000; aren't you?

A: No, 120,000.

Q: And the status of that case is what?

A: There's - - there's nothing, no status.  I've done been to court, and it's done been taken care of.

Q: It's over with?

A: As far as I know.

Q: Have you looked at the records?

A: No, sir.

Q: Do you want to look at them?

A: I don't know what good it would do me.

Q: I've got them right here.  I've looked at them.  You want to look at them?

A: I probably wouldn't understand them.

Q: It's not over with - -

A: The last time I went to court on that was two years ago, and I have never been - - made another court date. That was when Kelly Karnes was fired from the sheriff's department. He brought in bogus charges on me - -

J.T.Tr. Vol. 3, pp. 434-436.

. . . . *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose.

*Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (citations omitted).

Despite the petitioner's allegations, the record establishes the falsity of the allegations regarding Turman. The government did not elicit the testimony and, therefore, they could not have "let him give false testimony" nor did they "let [him] get away with another blatant falsehood when he stated the Government had nothing to hang over his head." Defense counsel was clearly aware of the essential facts surrounding Turman's pending criminal case and he took advantage of that information to cross-exam Turman. Furthermore, the petitioner's allegations that Turman "had worked or was working as a snitch" is another example of defense counsel's speculation which has no basis in fact. There is simply no merit to the petitioner's claim. As a result, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Randy Turman.

## G. Failure to disclose unknown witness

Barrett next asserts the government

. . . . had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders

would eventually testify in the penalty phase of Mr. Barrett's trial.  (Tr. 9/13/05 H'rg at 14, 17.)  [The Assistant United States Attorney] advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone. Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him. [The Assistant United States Attorney] told the court he had spoken with the woman himself, and she did not corroborate Sanders, although [the assistant] claimed he subjectively believed the woman's denial was motivated by fear.

Doc. 95, at p. 295.

Other than to cite to a transcript from a sealed hearing held on September 13, 2005, at pages 14 and 17, the petitioner does not cite the actual statements made by the government which establish that the government failed to disclose the identity of a person who purportedly "failed to corroborate Charles Sanders."  A review of that transcript convinces this court that this claim is without merit.  The entire colloquy between the court and prosecutors concerned witnesses to events that occurred at the petitioner's residence "during the months leading up to this particular incident." Tr. of September 13, 2005, at p. 9.  The prosecutor advised the court he expected "them to testify that Mr. Barrett knew there was an arrest warrant outstanding, he expected law enforcement to come to his residence at some point in time and advised that - - words to the effect of I'm going to shoot when they come." *Id.*, at pp. 9-10.  The court then engaged in the following colloquy with the prosecutors:

THE COURT: Haven't you in effect disclosed to counsel then essentially who they are by telling them what the testimony is?

MR. LITTLEFIELD: No, no, because - -

MR. SPERLING: Well, what the testimony is - -

MR. LITTLEFIELD: We have told them what the testimony - -

THE COURT: Once you have told them what the testimony is, if they talk with their client about it, isn't he going to be able to determine roughly who we are talking about?

MR. LITTLEFIELD: I don't believe so.

MR. SPERLING: Mike, hold on.  Excuse me just a second.

(OFF THE RECORD DISCUSSION BETWEEN MR. SPERLING AND MR. LITTLEFIELD)

MR. LITTLEFIELD: If - - Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no.  Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names.  No, because it is my belief that the defendant said that to many, many more people than those that we have found.  I have learned of one person, for example, who - - through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made.  I talked to that person.  That person refused to acknowledge it, I think in large measure because of the fear.

*Id.*, at pp. 11-12.  Simply because some other person did not acknowledge hearing petitioner make similar statements to what Sanders heard, does not establish that the person was even a participant to the conversation which Sanders described.  Sanders never claimed to know who Barrett was speaking to when he heard the statements he testified about.  Moreover, Sanders never testified he was in a woman's house when he overheard Barrett say "they had to identify the C.I. and get rid of him."  Rather, Sanders testified he was in jail when he overheard Barrett talking to someone on the telephone and Barrett made these comments to the person he was talking to.  See, J.T.Tr. Vol. 22, at pp. 4587-4588.

63

Shortly after being advised that the petitioner may have made threatening statements, the court advised counsel it was interested in hearing evidence to support the government's allegations that the witnesses' were in danger. *Id*., at p. 13. At that point, the following colloquy occurred:[129]

> MR. SPERLING: I think that our brief with regard to the defendant being reasonably believed to be dangerous, that if convicted he faces substantial sentences, that there may well be media coverage. . . I need not belabor that. I want to focus on, C, exactly why the Court should delay the production of certain witnesses in this case. We have identified each of these witnesses, Your Honor. Two of them are in prison; one in federal, one in state. Others live in and around Sequoyah County, which is the home county of the defendant. It is - - there is common knowledge, Your Honor, that guns and drugs go hand in hand and particularly in Sequoyah County, methamphetamine distributors are often armed. The defendant is a hero to certain drug traffickers, as at Doss Gann's residence. He was a federal defendant and was prosecuted here. In fact, Mr. Littlefield was the prosecutor in that case and Doss had a picture of the defendant on the wall with the inscription hero after the time of this incident, this shooting. Randy Turman and Brandie Price have explicitly expressed concern about intimidation, threats, and safety of family members. The confidential informant that has been identified in our pleading, Your Honor, stated such. He was at the house of defendant's associate and overheard the defendant speaking on the phone saying we have got to find out who the C.I. is and take care of him. Mr. Littlefield has spoken directly with that confidential informant, who is identified in our pleading by name.
>
> THE COURT: What is the time frame of that?
>
> MR. LITTLEFIELD: It was after the arrest, while Mr. Barrett was - - and I don't know - -
>
> THE COURT: In '99?

---

[129]Since the petitioner asserts evidence of his allegation is found on page 14 and 17 of the transcript of the September 13, 2005 hearing at pages 14 and 17, the court has included the entire colloquy between the court and the government beginning on page 13 to page 18.

MR. LITTLEFIELD: It would have been in the time frame of '99, early 2000 is my best guess. I didn't ask specifically because I - - but the informant was at someone's residence, a phone call was made, the informant was next to the person who was the recipient of the phone call, recognized Mr. Barrett's voice over the telephone and heard Mr. Barrett tell this associate that we need to find out who the confidential informant is and take care of him.

THE COURT: Okay. You may proceed.

MR. SPERLING: All right. I think the pleading speaks for itself with regard to Cindy Crawford and Randy Turman, but we would point out in particular that Randy Turman has explicitly stated to counsel that he seriously fears Jerry Graham, who is a very dangerous man, recently released from prison and believed involved in Sequoyah County drug activity. This is according to District Attorney Investigator Clint Johnson. Jerry Graham is a neighbor of Randy Turman's and several law enforcement officers, as we noted in our pleading, who are familiar with Jerry Graham advised that he is believed to have killed in the past.

There is another matter, another man by the name of Randy Weaver. We have set forth the substance of what we expect that he will testify to. Brandie Price is also an associate of the defendant, whom we have identified in our pleading as saying that as an associate of the defendant that the defendant told her the cops were going to come, bullets would fly and she should either grab a gun or stay low and that the defendant intended to kill as many of them as he could. She is often in Sequoyah County, although her marital relationship is on and off with a husband and when it's on they live in Van Buren or Fort Smith. She is often then with her mother or grandmother in Sequoyah County and is the object of substantial concern. And then there is Charles Sanders. He is the confidential informant. Early in this proceeding there were allegations by predecessor defense counsel that the C.I. was really fiction. He is not, he is real. We have identified him in this pleading. He knew that the defendant cooked meth. He had been there, smelled the odor of meth at the defendant's residence, had seen cooking items at the defendant's residence, knew that the defendant cooked crank at his residence at a time approximate to the charged murder, and this informant, Mr. Sanders, said that the defendant expected cops to come and said he was going to kill the first one through the door. There was other - - there were other allegations about interaction between the informant and the defendant and sometime after the defendant's arrest, the informant was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that

they needed to identify the informant and, quote, "take care of him," end quote.

There is also Travis Crawford and Travis Crawford is - - you know, this statement about taking care of someone - - I mean, I must admit that sometimes perception is reality and the Court needs to deal with reality rather than someone's unreal fears, but I don't believe in the context of this case that these concerns are unrealistic. Travis Crawford was in Kenneth Barrett's yard on the afternoon of the charged murder when there was an apparent drive-by by an unmarked police vehicle. Travis Crawford apparently was told by the defendant that the defendant recognized the Bronco as a cop car, expressed that he didn't give an explicitive (sic), that the law was coming in, and said that he was going to go out in a blaze of glory. As we have - -

THE COURT: When did that witness testify?

MR. LITTLEFIELD: He has not yet testified. Part of our concern too here is, Your Honor, these are not witnesses that have previously testified in state court. So does the defendant have some idea as to whom he interacted with at or about that time? Yes. Does he know about these specific people by name? No.

*Id.*, at pp. 13-18. As can be seen from the transcript of the proceedings, Barrett's claim that the government suppressed the identity of a witness who would have refuted Charles Sanders is a figment of defense counsel's imagination. There is simply no evidence in this record, to establish that some undisclosed witness was in a position to contradict Sanders claim that he had been threatened *after* the murder. The fact the government might have learned of a person who, "according to witnesses," would have been a participant in a conversation with Barrett in which statements concerning the confidential informant were made does not establish that the person the government interviewed was the actual person who was talking to Barrett when the confidential informant overheard Barrett speaking. As a result, this court finds the petitioner has failed to establish that a *Brady* violation occurred.

66

### *Claims involving credibility of Law Enforcement Personnel*

Petitioner next asserts the government suppressed exculpatory evidence favorable to the defense about four law enforcement officials involved in his case, *i.e.* Clint Johnson, Vickie Lyons, Assistant United States Attorney Mike Littlefield, and Sequoyah County Sheriff Johnny Philpott. Many of the allegations have no basis, involve post-trial misconduct about which the government could not have known at the time of trial, and/or concern matters which are clearly not relevant. This court will, however, attempt to address these allegations.

### A.  Clint Johnson

First, the petitioner claims "[t]he Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas." Doc. 95, at p. 297. Petitioner further asserts "[a]t the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office." *Id*. In support of most of these allegations, the petitioner relies on a "defense attorney's suggestions" during cross-examination in a criminal case against that defense attorney's client, Richard Gray. All of the documents which the petitioner submits in support of these allegations are blatant hearsay. Further, while the petitioner claims "[o]n November 23, 2005, Sheridan[130] noted

---

[130]Jeff Sheridan appears to have been an employee of Richard Gray, the District Attorney for Cherokee and Sequoyah Counties. Mr. Gray was indicted, following an Oklahoma multi-county grand jury investigation, in October, 2006 for embezzling money seized as evidence from drug investigations. While the charges were ultimately dismissed against Mr. Gray, no charges were ever filed against Mr. Johnson and the petitioner's statement that the charges against Gray were dismissed at the conclusion of the prosecution's case "based on defense counsel's scathing impeachment of Clint Johnson," is nothing more than speculation.

Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation," the petitioner does not submit any evidence that establishes Johnson was personally involved in any criminal activity or that an official investigation into Johnson's activities was being undertaken at the time of the petitioner's trial.[131]   The government, on the other hand, submitted an affidavit from Joel-lyn McCormick which indicates Ms. McCormick was responsible for prosecuting Mr. Gray's case and during her preparations for the trial in Mr. Gray's case, she investigated allegations of misconduct leveled against Mr. Johnson.  Ms. McCormick states, in reference to Petitioner's allegations that Mr. Johnson was writing hot checks in September 2005:

> . . . . I directed Attorney General Investigator Fred Ellis to verify an allegation that Mr. Johnson had written checks to a merchant on insufficient funds in September 2005.  As I understood the situation, the merchant had not perceived any fraudulent intent on Johnson's part.  However, I recall that an investigator from the District 27 District Attorney's Office contacted the merchant and urged him to turn the checks over to the DA's office for prosecution.

Respondent's Exhibit No. 2.  Additionally, Ms. McCormick indicates she became aware of an audit of confidential informant funds used by Clint Johnson's former employer, the

---

[131]Petitioner's Exhibit No. 181b  indicates, at p. 117,  that "During 2005, Johnson encountered several problems with operational procedures at the Drug Task Force.  One of the Assistant District Attorney's (A.D.A.) for the district had stolen "Crank" from a house during one of JOHNSON'S search warrants.  This A.D.A. was JANET BICKEL (phonetic).  JOHNSON told the District Attorney, RICHARD GRAY what had happened.  Nothing was done about the incident.  There were also other problems within the District Attorney's office and JOHNSON ended up having to testify before the Multi-County Grand Jury in Oklahoma City, Oklahoma.  JOHNSON told the truth to the Jury and several indictments were handed down against co-workers."  The interview in which this statement appears was conducted in late February, 2006.  Furthermore, it does not establish that Clint Johnson was personally involved in any criminal activities.  Finally, the A.D.A. Janet Bickel ultimately pled guilty "on September 8, 2006 in exchange for a five (5) year deferred sentence in Wagoner County District Court Case No. CF-2006-037 for offering false evidence in violation of 21 O.S. 453 and for Possession of Controlled Dangerous Substance in violation of 63 O.S. 2-402, and in Oklahoma County District Court Case No. CF-2006-597 for Perjury in violation of 21 O.S. 491."  *State ex rel. Oklahoma Bar Ass'n v. Phillips*, 175 P.3d 353, 353-354 (Okla. 2007).

District 27 Drug Task Force.  However,  Ms. McCormick states:  "The audit did not find Clint Johnson had misappropriated confidential informant funds." *Id.*

Finally, assuming the petitioner's allegations that the District Attorney's office had some "concern" over Johnson's inability to account for funds allegedly used for drug buys as early as November, 2005, the government's disclosure obligations under *Brady* do not extend to merely subjective assessments by the prosecutor of a witness's veracity.  *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999).  Moreover, mere suspicions of misconduct would not have been admissible to impeach Johnson's credibility.  *See*, Fed.R.Evid. 608 and 609.  Furthermore, this court finds that any evidence of a internal investigation within the state District Attorney's office was not in the actual or constructive possession of the federal government.  This finding is based upon the facts of this particular case, to-wit:  (1) the state District Attorney's office was not acting on behalf of the federal government or under its control; (2) the federal government apparently conducted its own investigation, interviewing and calling witnesses not previously called by the state prosecutor; (3)  a Federal Bureau of Investigation (FBI) visual information specialist spent two complete days at the scene, taking over 200 photographs to develop a model of the crime scene;[132] (4) the DEA performed drug analysis on physical evidence which was seized;[133] and

[132]J.T.Tr., Vol. 2, at pp. 241-300.

[133]J.T.Tr., Vol. 12, at pp. 2770-2820 and Vol. 13, at pp. 2827-2835, 2889-2920, 2929-3013*;* 3016-3057.  *See also*, Respondent's Exhibit No. 4, at p. 2 ¶s 5, 7, 10, 12, 13 and p. 3, at ¶s 15 and 16.

(5) as early as March 24, 2004, the federal government was having trouble in obtaining cooperation from the state District Attorney's office.[134]

Petitioner also claims Johnson mismanaged his personal finances, declared bankruptcy and gave materially false testimony regarding his knowledge of Charles Sanders's criminal activity before September 24, 1999.  While the petitioner speculates because of Johnson's bankruptcy filings he "mismanaged his personal finances," the petitioner submits no evidence establishing how or when Johnson mismanaged his personal finances.  Furthermore, in relation to Johnson's public bankruptcy filings, there was "really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  Additionally, the petitioner has not shown that disclosure of Johnson's bankruptcies which occurred more than four years prior to the petitioner's trial would have had any affect on the verdict in the petitioner's case.  *See*, *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008).  Finally, the petitioner claims "Johnson's testimony was false on a material matter" in relation to the confidential informant (Charles Sanders).  *See*, Doc. 95, at pp. 301-303.  Other than citing to the transcript from the hearing on the petitioner's motion to suppress in federal court, the petitioner does not provide **any** factual information which establishes that Johnson testified falsely.  Rather, this entire allegation is once again premised upon conjecture and speculation.  As a result, this court finds no *Brady* violation occurred in relation to Clint Johnson.

---

[134]Respondent's Exhibit No. 4, at p. 4.

**B.  Vickie Lyons**[135]

>   Petitioner makes the following allegations against Ms. Lyons:

>   Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. . . . .Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Doc. 95, at p. 297.  Petitioner also states ". . . . Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI."  *Id*., at p. 300. Petitioner submits absolutely no evidence of these allegations.  Rather, the petitioner relies upon suggestions made by Richard Gray's defense lawyer, Clark Brewster, in questioning Mr. Johnson.  Mr. Johnson, however, denied under oath that he had ever lived with Ms. Lyons.  Petitioner's Exhibit No. 181A, at p. 73.  This allegation is without any merit. Therefore, this court finds the petitioner has failed to establish a *Brady* violation as it relates to Vickie Lyons.

**C.  Johnny Philpot**

Next, the petitioner claims the government suppressed evidence that  Johnny Philpott visited his property and inspected his weapons less than a month before the murder.  In support of this allegation, the petitioner submits a declaration containing hearsay statements attributed to Johnny Philpott.  According to Barrett, this evidence would have allowed him to attack the validity of the no-knock nighttime warrant and would have discredited the snitch

---

[135]Although the petitioner refers to "Vickie Lyons", the court is unsure of the true spelling of Ms. Lyons first name. At the hearing on the motion to suppress, it was spelled "Vicky."  *See*, Tr. of hearing on Motions held on January 26, 2005, at p. 48.  *See also*, Petitioner's Exhibit No. 181A, at p. 75.  During trial, it was spelled "Vicki."  *See*, J.T.Tr., Vol. 9, at p. 1849.

1838

witnesses and undermined the government's proof of intent to kill any law enforcement officers entering his property.  Doc. 95, at pp. 307-310.  The government, however, submits a declaration from Philpott in which Philpott personally states, in part:

> 1.  I was the Sheriff of Sequoyah County, Oklahoma from November 12, 1996 to December 31, 2008.
>
> 2.  On July 29, 1998, I responded with some of my deputies, Shelton Fair (#826), Larry Lane (#824) and Walter Ross, Undersheriff (#821), to the home of Kenneth Eugene Barrett.  On that occasion, I spoke with Mr. Barrett, and some of my deputies inspected some rifles of Mr. Barrett's.  Though Mr. Barrett had an outstanding Sequoyah County misdemeanor warrant at that time, I did not arrest him or cause him to be arrested.
>
> 3.  Prior to Mr. Barrett's arrest in connection with the shooting death of David "Rocky" Eales, the July 29, 1998 incident described in paragraph 2, above was the last occasion on which I visited Mr. Barrett's home in Mr. Barrett's presence.

Doc. 175, Government's Exhibit 1.[136]

If, despite Philpott's declaration, Philpott was at Barrett's residence less than a month before the police raid and inspected Barrett's guns, this evidence would have been readily available to defense counsel from Barrett himself.  As a result, the petitioner has failed to establish a *Brady* violation in regard to Johnny Philpott.

## D.  Michael Littlefield

Finally, and perhaps most disturbing to this court, are the petitioner's allegations that the prosecution suppressed evidence that Assistant United States Attorney Michael Littlefield

---

[136]This exhibit contains another paragraph which says declarant is attaching a copy of the radio log from July 29, 1998 as Exhibit A; however, no such log is attached to the exhibit.  It should be noted that Philpott's declaration is consistent with the testimony given by Philpott at Petitioner's trial.  *See*, J.T.Tr., Vol. 8, at p. 1789-1790 and Vol. 22, at p. 4562.

was abusing his children around the time of this trial and disclosure of this exculpatory evidence would have demonstrated that this prosecutor likely threatened and intimidated witnesses to provide false testimony. Petitioner supplies no competent evidence of these allegations and it appears from exhibits filed under seal that the information submitted by the petitioner did not occur until approximately one and a half (1½) years after the petitioner's federal trial. Based upon the sensitivity of the information and the fact that release of this information would undermine previous state court proceedings, this court is entering a separate order under seal which more fully addresses this claim in light of the sensitive nature of the information. For purposes of this order, however, this court finds that the petitioner has failed to establish a *Brady* violation as it relates to Michael Littlefield.

After having reviewed all of the petitioner's *Brady* claims and thoroughly examining the exhibits cited in support thereof, this court finds the petitioner has failed to establish any *Brady* violations actually occurred in the petitioner's trial. Accordingly, this claim is denied.

### III.  VALIDITY OF SEARCH WARRANT

Petitioner argues, in his fourth ground for relief, that his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the use of false information in obtaining the search warrant and, as a result, the search warrant was invalid.  The government asserts the petitioner can not raise a Fourth Amendment search and seizure claim on collateral review because he had a full and fair opportunity to litigate this claim.  In reply, the petitioner argues the suppression of exculpatory evidence regarding the affiant's honesty as a law enforcement officer shows that he was denied a full and fair opportunity to litigate the search and seizure warrant.

In *United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993), the Tenth Circuit held "that Fourth Amendment violations are not reviewable in a § 2255 motion when the federal petitioner has had a full and fair opportunity to litigate the Fourth Amendment claim at trial and present issues on direct appeal."  (citations omitted).  In this case, it is clear that the petitioner had a full and fair opportunity to litigate his Fourth Amendment claims.  First, on January 12, 2005, the defendant filed a motion to suppress.[137]  On January 26, 2005, the magistrate judge held a hearing on the motion to suppress.  Thereafter, on April 1, 2005, the magistrate judge recommended that the motion to suppress be denied.[138]  On April 17, 2005, the defendant filed objections to the magistrate's report and recommendation regarding the motion to suppress and on April 26, 2005, the government filed a response to the defendant's

---

[137]Cr. Doc. 33.  *See also*, Cr. Doc. Nos. 33, 43, 56 and 63.

[138]Cr. Doc. 105.

objections.[139]    On May 5, 2005, this court adopted and affirmed the magistrate's recommendation.[140]

Shortly after the trial began, Charles Sanders testified he was Johnson's confidential informant and Barrett's attorneys orally re-urged their motion to suppress claiming it was based on a faulty affidavit.[141]  Thereafter, defense counsel filed a written motion re-urging their motion to suppress.[142]  This court entered a seven page written order denying the defendant's motion specifically finding:

> Having heard both the testimony of Clint Johnson and Charles Sanders in this trial, as well as the testimony of numerous other witnesses regarding the activities occurring at the defendant's residence during the time period in which Johnson was receiving information from Sanders, this Court finds there is absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful.  Specially, because the affiant accepted as true what he was told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was properly supported.  Furthermore, based upon the totality of testimony presented herein, this Court finds the defendant has not even established that the information provided in 1999 by the informant was untruthful or unreliable.  As such, the affiant's affidavit concerning that information could not have been made with deliberate or reckless disregard for the truth.  Accordingly, the defendant's motion to suppress is hereby overruled.

Cr. Doc. No. 253.

On appeal, the petitioner argued the district court erred in denying the motion to suppress, although the exact argument raised in his motion to vacate  was not presented on

---

[139]Cr. Doc. 117 and 122, respectively.

[140]Cr. Doc. 124.

[141]J.T.Tr., Vol. 12, at pp. 2667-2680.

[142]Cr. Doc. 228.  *See also*, Cr. Doc. No. 231, Government's Response to Defendant's Request to Reurge Defendant's Motion to suppress the Drug Search Warrant.

appeal.  *See*, *United States v. Barrett*, <u>496 F.3d 1079, 1088-1091</u> (10th Cir. 2007).   In rejecting the petitioner's argument, the Tenth Circuit held "there was no violation of Oklahoma state law, let alone a federal constitutional violation that would justify suppression of the evidence seized from Barrett's residence."  *Id.*, at 1090.

Since this court has previously found that the government did not suppress any exculpatory evidence about the affiant's honesty as a law enforcement officer, this court finds the petitioner had a full and fair opportunity to litigate his Fourth Amendment issues at trial.  Further, since his allegations concerning the affiant's honesty are nothing more than unfounded scandalous attacks on the affiant, this court finds appellate counsel was not ineffective in failing to raise these unfounded allegations on appeal.  Accordingly, this claim is denied.

## IV.  EVIDENTIARY ISSUES

Barrett's sixth ground for relief asserts his rights under the Fifth, Sixth, and Eighth Amendments were violated because of the trial court's restrictions on the use of statements he purportedly made at the time of his arrest and improper restrictions on the jury's consideration of the state-court verdict.  To overcome any procedural default, the petitioner asserts appellate counsel was ineffective in failing to raise the issue on appeal. The government argues the petitioner first raised his claim that the court improperly excluded evidence of his state court trial in a brief filed herein on March 1, 2010, well after the statute of limitations had expired.  As a result, the government asserts this portion of his claim is time barred.  Additionally, the government claims the petitioner has inadequately pled this

claim by failing to identify the judicial ruling which he is attacking and that the petitioner is procedurally barred from raising the claim because of his failure to raise the issue on appeal. The petitioner did not submit any reply to the government's response on this issue.

## A. Statute of Limitations

As previously indicated, the one-year limitations period ended on March 17, 2009. In reviewing the Motion filed herein on March 17, 2009, it is clear the only issue raised at that time regarding the restriction of the jury's consideration of the state-court verdict dealt with the court's exclusion of evidence during the penalty phase of the trial. *See*, Doc. 2 at pp. 323-327. As the government argues, the petitioner did not timely claim that this court erred in excluding, in the first stage of trial, evidence regarding the prior state court trials and verdict. Since this claim was not raised until the filing of the petitioner's brief in support of his Amended Motion to Vacate which was filed herein on March 1, 2010, *see*, Doc. 149 at p. 179, this court finds it is barred by the statute of limitations.

## B. Sufficiency of claim

While the petitioner claims his counsel sought to admit a "number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales,"[143] the petitioner identifies only one statement which he claims was erroneously excluded at trial. He does not, however, provide any citations to the ruling which purportedly excluded this statement or establish why the ruling was flawed in light of the facts and circumstances known at the time of the ruling. It is not this court's job to develop

---

[143]Doc. 149, at p. 176.

1844

the petitioner's claims where they are devoid of factual support. *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)) and *Hilliard v. United States*, 345 F.2d 252, 255 (10th Cir. 1965). Rather, it is the petitioner's responsibility to identify the specific rulings which he claims were erroneous and articulate why they were wrong. While the petitioner does provide legal authority for the proposition that statements of remorse may be considered as mitigating evidence, he does not pinpoint what the court's ruling that he is challenging was or explain why the specific ruling was erroneous.[144] Judges are not required to search for the proverbial needle in a haystack in order to ferret out facts to support allegations contained in a motion to vacate. Since the petitioner has not specifically identified the ruling which was erroneous, this court finds the petitioner has failed to establish that any error was made or that appellate counsel was ineffective in failing to raise the issue on appeal. Accordingly, this claim is denied.

## V.  USE OF STUN BELT

In his seventh ground for relief, the petitioner argues his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated because the trial court permitted the marshal to "place visible restraints on [him] during the trial. . . ." Doc. 95, at p. 326. In support of this assertion, the petitioner states "[t]he stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80.)"[145] *Id.*,

---

[144]Both Petitioner's mother and father were all allowed to testify during the second stage of trial that the defendant knew he made the wrong decision, that he would do things differently if he could, and that he was sorry it happened. *See*, Cr.Doc. 353, at pp. 5089 and 5114-5115.

[145]Exhibit 80 is a declaration by the petitioner's mother, Doris Barrett.

78

at p. 327.  No such statement, however, is contained in Petitioner's Exhibit 80.  In fact, no mention whatsoever is made in Exhibit 80 about the stun belt.  Rather, Exhibit 29[146] indicates trial counsel told appellate counsel that he did not believe the stun belt was visible to the jury.

The government argues the petitioner has procedurally defaulted this issue for failing to raise it on direct appeal.  To overcome the procedural default, the petitioner claims both trial and appellate counsel were ineffective for failing to preserve this issue or raise it on appeal.

In *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2007), the United States Supreme Court held on review of a trial conducted by the State of Missouri that the Constitution forbids

> the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion that they are justified by a state interest specific to a particular trial.  Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.,* 544 U.S., at 629, 125 S.Ct., at 2012.  Visible shackling has been deemed inherently prejudicial because 1) it undermines the presumption of innocence and the related fairness of the factfinding process; 2) it can interfere with a defendant's "ability to communicate" with his lawyer; and 3) it could undermine the dignity of the judicial process.  *Id*., 544 U.S., at 630-631, 125 S.Ct., at 2013.  In *United States v. Wardell*, 591 F.3d 1279, 1293-1294 (10th Cir. 2009), the Tenth Circuit recognized that "requiring a defendant in a criminal trial to wear

---

[146]Exhibit 29 is a declaration by appellate counsel, Mark Henricksen.

79

a *visible* stun belt, like restraining him with visible shackles, may erode a defendant's constitutional presumption of innocence." (Emphasis added)

Criminal defendants do not, however, enjoy an unqualified right to appear before a jury without restraints. Courts retain the discretion to take measures to maintain order and security within the courtroom. *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986). Where compelling reasons exist to justify the use of physical restraints, the general presumption against their use will "yield to the competing interests of courtroom participants for the safe conduct and orderly progress of the trial." *Id.* Furthermore, prejudice should not be presumed from the use of a stun belt, where there is no evidence that any juror actually observed it. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000).

In this case, the United States Marshal made a request of the court to authorize the use of a stun belt during the trial to ensure the security of the courtroom. Prior to reaching any decision on the matter, the court entered a sealed minute order ordering the parties to submit briefs on the issue and set the matter for an evidentiary hearing.[147] Following the entry of the sealed minute order, the government filed under seal a Brief in Support of the United States Marshal's request.[148] Attached to said brief was an affidavit by John W. Loyd, United States Marshal for the Eastern District of Oklahoma. In his affidavit, Mr. Loyd indicated "[t]he belt will not be visible to the jury and will not impede the defendant's normal physical

---

[147]Cr. Doc. 166. As indicated in the sealed minute order, the court decided to seal the minute order and all subsequent pleadings and court hearings on the stun belt issue in an effort to prevent any prejudicial inferences to be drawn against the defendant.

[148]Cr. Doc. 175.

1847

movements during trial." Cr. Doc. 175. Further, in advising the court of the advantages of using a stun belt over using leg irons, Marshal Loyd stated that "[s]tun belts are worn under a defendant's clothing and not visible to the jury." *Id*.

On August 30, 2005, the court conducted an evidentiary hearing at which Louisia Murrow, Supervisory Deputy Marshal for the Eastern District of Oklahoma, testified regarding why the United States Marshal's service considered Barrett an escape risk. Ms. Murrow testified that she had personally observed Barrett while he was in the marshal's holding cell attempting to tamper with his handcuffs. Specifically, Ms. Morrow testified:

> He was twisting them and pulling on them and he even went so far as to walk out of the camera vision and turn his back and face the wall so that I could not fully see what he was doing. You know, I could see the back of his arms moving and stuff and I could - - when he was seated in the cell block, I could watch him twisting his hands and attempting to tamper with the handcuffs.

Cr. Doc. 330, Tr. of Sealed Criminal Pretrial Hearing held on August 31, 2005, at pp. 10-11. Ms. Morrow indicated that the behavior of the defendant in the holding cell was very extraordinary. *Id.*, at p. 14. Additionally, Ms. Morrow testified the defendant had continuously been in custody since approximately September 24, 1999; that defendant, prior to coming into the custody of the United States Marshal, had been incarcerated in the maximum security portion of the Oklahoma State Penitentiary where the defendant had been on lockdown for 23 hours per day; and that other deputy marshals had reported to her that they felt the defendant was "checking out the exits more than a normal prisoner would do." *Id*., at pp. 11- 15. Finally, Ms. Morrow testified the charges pending against the defendant

81

indicated that the defendant had a propensity of violence. *Id.*, at pp. 53-54.  The government also admitted as Government Exhibit 1 a copy of the policy of the United States Marshal Service regarding the use of stun belts which indicated that, if used, the device was to be concealed from the general public.[149]  *Id.*, at p. 19.  Additional testimony indicated that the use of the stun belt had never prevented a defendant from consulting with his attorney or participating in his defense.  *Id.*, at pp. 21-22.

The defendant then called his stepmother, Doris Barrett, to rebut the government's testimony. Ms. Barrett testified that no restraints had been used on the defendant during state trial proceedings which occurred prior to defendant's indictment in federal court and that she never saw any type of threatening gesture by the defendant or any attempt or gesture by the defendant to escape.  *Id.*, at pp. 75-80.  Following the testimony, the court took the matter under advisement and on September 6, 2005, in a sealed order the court made specific findings of fact and conclusions of law  regarding why the court felt the use of the stun belt was appropriate in this case.[150]

Furthermore, this court observed the petitioner during his criminal trial.  The stun belt did not inhibit the petitioner's communications with his counsel.  Petitioner continually took notes and freely communicated with both of his counsel during his trial.  The stun belt was not visible to the jury.  The defendant was brought into the courtroom and seated at the

---

[149]The government also had Ms. Murrow put the stun belt around her waist to demonstrate for the court what such a device would look like if worn by the defendant under his clothes.

[150]Cr. Doc. 178.  In his Reply brief, the petitioner argues this order does not comply with *Deck* because there were no findings that the defendant "was dangerous, an escape risk, threatening or likely to cause any security problems."  Reply at p. 153.  The court's order, however, clearly establishes that the court allowed the use of the stun belt because of specific security concerns present in this particular case.  *See*, Cr. Doc. 178, at pp. 16-18.

defense table prior to the jury being escorted into the courtroom and the defendant remained seated and was not escorted out of the courtroom until the jury had left the courtroom. It is highly unlikely, based upon the way the jurors entered and existed the courtroom and the seating position of the defendant at the defense table, that any juror would have taken particular notice of petitioner's waist.[151] To the extent, however, that even one juror might have observed a bulge around the petitioner's waist, they could not have known what caused the bulge. In light of medical advances today, numerous medical devices could be placed on a person's waist and even if the jury observed a bulge around petitioner's waist, it is mere speculation to assume the jury would know that petitioner was wearing a stun belt for security reasons. Additionally, when the petitioner jumped out of his seat during the trial and demanded that the United States Attorney "get off his family," the United States deputy marshal in charge of the stun belt did not deploy the stun belt. As a result, this court finds there is no evidence in the record that any member of the jury in this case knew that the defendant was wearing a stun belt. Accordingly, based upon the record herein, this court finds this claim has no absolutely no merit and counsel were not ineffective for failing to raise this issue on appeal.

---

[151]It should also be noted that had the defendant been required to wear full restraints, which is standard practice in the Eastern District of Oklahoma when the United States Marshal brings a defendants from the secure holding facility down the public hallway into the courtroom, (*see*, Cr. Doc. 178, at p. 11) it is highly more likely, based upon the configuration and acoustics of the federal courthouse, that the jury would have become aware of those security measures. Specifically, the courthouse floor is marble; defendants are required to walk past the outside of the jury assembly room every time the court takes a recess, both on the way out of court and on the way back into court; and the clanking of the waist chains can be heard throughout the entire second floor of the courthouse where the courtroom and jury assembly room are located.

## VI.  COMPETENCY TO STAND TRIAL

In his eighth ground for relief, the petitioner asserts he was tried while incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The issue of a defendant's competency to stand trial centers on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a  rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).  "To prevail on a substantive due process competency claim, a petitioner must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000) (*overruled on other grounds*).

> The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.  The Constitution does not necessarily forbid trial of the mentally ill.  'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges.'  *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1996); *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ('[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.').

*Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997).

Since capacity to assist in one's defense is the main concern, where fitness is challenged post-trial "[e]vidence of a defendant's behavior and demeanor at trial are relevant

84

to the ultimate decision of competency to stand trial." *Id.* (citing *United States v. Prince*, 938 F.2d 1092, 1094 (10th Cir. 1991)).  To show entitlement to a hearing on a substantive competency claim, Petitioner must present "'clear and convincing evidence creating a real, substantial and legitimate doubt [about] his competence to stand trial.'  This standard of proof is high; and 'the facts must positively, unequivocally, and clearly generate the legitimate doubt.'"  *United States v. Battle*, 419 F.3d 1292, 1299 (11th Cir. 2005).

To support his substantive due process claim that he was tried while incompetent, the petitioner relies almost exclusively upon the declarations of two experts who examined him more than three years after his criminal trial.  Neither of these experts, however, appear to have consulted with former counsel, the psychologist who examined Petitioner at the time of trial or any of the other people who interacted on a daily basis with Petitioner during his federal trial such as federal marshals or Muskogee County Jail employees.[152]

The records in this case, however, contradict the findings by these experts.  Specifically, on August 31, 2005, this court held a pretrial hearing for the purpose of deciding whether the defendant would be required to wear a stun belt during the trial.  At said hearing, the petitioner's step-mother, Doris Barrett, testified that she had been in contact with the defendant.  When asked: "Did Kenny Barrett express to you that he realizes what is going

---

[152]The affidavit of Myla H. Young, Ph.D. indicates she did not even review any records from the Muskogee County Jail, the Oklahoma Department of Corrections or any other institutional records related to Mr. Barrett's incarceration from approximately 1999 to date nor did she talk with his any of his custodians either before or during his trial.  *See*, Petitioner's Exhibit 89 at ¶ 20.  The affidavit of George W. Woods, Jr., M.D. reveals that he looked at institutional records including "*available* academic, medical and custodial records."  Petitioner's Exhibit 117, at ¶ 14 (italics added).  His affidavit does not, however, indicate that he spoke with any of the persons who interacted on a daily basis with the petitioner during the trial herein.

on in this case?", she responded: "Yes, sir." She also indicated the defendant knew that his case was before the jury.[153]

Furthermore, this court's observations during the trial, as well as affidavits of the petitioner's trial counsel and the petitioner's own actions and comments during his trial, clearly indicate the defendant was competent during his trial. As discussed previously herein, this court observed the defendant taking notes and freely communicating with both of his trial attorneys. Additionally, during second stage closing arguments when the prosecutor[154] began to discuss testimony that his family members had given as mitigation, the defendant leapt from his chair and said:

> Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

Cr. Doc. 355, at p. 5421.[155]

Following this outburst, the defendant was, at his request, removed from the courtroom.[156] After the prosecutor had completed his closing remarks, even though defense counsel indicated the defendant did not desire to return to the courtroom, the court had Mr.

---

[153]Cr. Doc. 333, at p. 88.

[154]Mr. Sperling gave the second closing argument for the government. *See*, Cr. Doc. 355, at pp. 5418- 5421.

[155]This statement alone demonstrates the petitioner had a fairly sophisticated understanding of the proceedings. Further, the decision to leave the courtroom may be reflective of the defendant's anger and frustration with the judicial process, but they were not incoherent.

[156]*Id*., at pp. 5430-5434 for a discussion of the court and counsel's observations regarding the defendant's behavior. *See also*, p. 5438 in which the court advised the parties that "the marshal has also brought to my attention that the defendant has said if you force me to come to the court, I can give you some problems."

1853

Barrett brought to court outside the presence of the jury and the following colloquy between

the court and Mr. Barrett occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: Any questions of your attorneys?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (interrupted)
>
> MR. HILFIGER: One more. Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.
>
> MR. BARRETT: Yes, sir.

*Id*., at pp. 5438-5439.

Additionally, both trial counsel submitted declarations regarding their actual

interactions with Petitioner during the trial. Mr. Hilfiger stated, in relevant part:

> Mr. Barrett manifested a clear understanding of the trial proceedings. He was very involved in his defense. Mr. Barrett discussed witnesses, individual questions, and lines or areas of questions for certain witnesses. Because of the two prior State

87

court trials, Mr. Barrett also was able to identify inconsistencies between the evidence in the federal and state trials. Mr. Barrett wrote contemporaneous notes of the testimony and used those notes in later discussions with Mr. Smith and myself concerning testimony already covered. Mr. Barrett appeared very attentive during the trial and he avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.[157]

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

I cannot recall ever discussing with Mr. Echols any concern by him about Mr. Barrett's mental competence to stand trial, and I was never made aware of, by any conversations, or reports in the defense file, that Mr. Echols ever harbored a concern about Mr. Barrett suffering from a significant mental health condition. Similarly, none of the materials in the defense file raised a concern in my mind that Mr. Barrett was incompetent or suffered from a significant mental health condition unrelated to his use of drugs.

Both Bret Smith and I, jointly and individually, met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his father Ernest Barrett, his step-mother Doris Barrett, his brother Steven Barrett, his uncle Roger Barrett, and his son Toby Barrett. None of them reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial. In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett had suffered from a significant mental health condition.

. . . . Mr. Smith and I met with Jeanne Russell, at her office in Tulsa. Mr. Smith had more direct contacts with Dr. Russell

---

[157]Ms. Barrett's testimony at the pretrial hearing held on August 31, 2005, establishes that the petitioner was also active in similar ways in his two state trial proceedings. *See*, Cr. Doc. 333, at pp. 82-83 and 87.

concerning her contacts with Mr. Barrett, but she never indicated to me that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

Government's Exhibit 12, at ¶s 5, 7, 8, 9 and 10, respectively (footnote added).

Mr. Smith stated, in pertinent part:

Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had. He clearly understood the proceedings, and assisted Mr. Hilfiger and me in selecting witnesses, in suggesting questions, and in identifying inconsistencies between the evidence in the federal and state trials. He was very involved in his defense. He took notes and avoided unnecessarily interrupting his attorneys in court by writing messages, rather than by addressing us orally.

On occasion, I met with Mr. Barrett outside the presence of Mr. Hilfiger. Mr. Barrett would attend those meetings prepared with lists of points he wanted communicated to me and to Mr. Hilfiger.

Mr. Barrett believed he was being unfairly targeted by the government, but I did not find him to be unduly paranoid under the circumstances. During our initial meeting, which occurred soon after my appointment to the case, he was suspicious of my identity. But over the course of our initial few meetings, I found it easy to build a rapport with him. I did not observe him looking over his shoulder to see if anyone was listening to him or engaging in other behaviors that would have demonstrated irrational suspicion of his surroundings or an abnormal degree of paranoia.

In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

> I met with several of Mr. Barrett's relatives, including (but not limited to) his mother Gelene Dotson, his step-mother Doris Barrett, and his uncle Roger Barrett. No one, including the family members I interviewed, reported to me that Mr. Barrett had suffered significant head injuries or had exhibited any symptoms of mental illness that led me to question the defendant's competence to stand trial. In fact, none of the defendant's relatives provided me with any information that led me to believe Mr. Barrett suffered from a significant mental health condition.
>
> . . . . I met with Jeanne Russell, at her office, in the presence of Mr. Hilfiger. Dr. Russell never indicated to us that she had any concern about Mr. Barrett's mental competence to stand trial or suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health condition.

*Id.*, Exhibit 11 at ¶s 3, 4, 5, 6, 7, and 8, respectively. *See also*, Doc. 310, at p. 36 in which

Mr. Echols indicated the petitioner

> is far from retarded. He is very bright, not educated, but he is very bright. He will tell me things during the trial - - he recalls something being said in court. I will check ranscripts (sic) or computer files and all of this other stuff and low and behold it will turn out to be right almost all of the time.

Additionally, tests conducted by a psychologist named Faust Bianco, during the state court

proceedings, indicated Mr. Barrett did not have any "personality disorders or any indication

of any brain disfunction. (sic)." *Id.*

In light of this record, the petitioner's proffer of Dr. George W. Woods' opinion

(based upon his evaluation of Mr. Barrett more than three years after trial) that "Mr. Barrett

was unable rationally to assist his attorneys in the preparation of his trial.,"[158] does not

"'positively, unequivocally and clearly generate a real, substantial and legitimate doubt

---

[158]Doc. 72, Exhibit 117, at ¶ 81.

1857

concerning [Barrett's] mental capacity.'" *Foster v. Ward*, <u>182 F.3d 1177, 1191</u> (10th Cir. 1999) (citing *Nguyen v. Reynolds*, <u>131 F.3d 1340, 1346</u> (10th Cir. 1997)). *See also*, *Walker, supra* at 1229-1230 (holding several post-conviction affidavits, prepared over seven years after trial, regarding defendant's competence at time of trial were of little significance in light of other evidence). Therefore, this court finds the petitioner has failed to establish by clear and convincing evidence that he was incompetent at the time of trial.[159] Accordingly, this claim is denied.

## VII.  JURY INSTRUCTIONS

Barrett raises challenges to his jury instructions as three separate claims arguing that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by failure of this court to: 1) instruct on a lesser included homicide offense; 2) instruct the jury they could consider residual doubt as a mitigating factor; and 3) require the jury to find that death was an appropriate punishment beyond a reasonable doubt. Further, the petitioner asserts his rights to effective appellate counsel were violated due to appellate counsel's failure to raise the first and third issues on appeal. The government claims petitioner has procedurally defaulted the first and second claims and that he can not relitigate the third claim because it was raised on direct appeal.

As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. *Cupp v. Naughten*, <u>414 U.S. 141, 146</u>, <u>94 S.Ct. 396, 400</u>, <u>38 L.Ed.2d 368</u>

---

[159]*See also*, Cr. Doc. 237, Sealed Psychological Evaluation/Risk Assessment prepared by J. Randall Price on October 25, 2005, and the videotape of the interview of the petitioner conducted by Dr. Price and Cr. Doc. 265, Sealed Notice with disk of telephone calls from the Muskogee County Jail made by the petitioner between October, 2005 and November, 2005.

(1973).  In *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court indicated a federal inmate attempting to establish prejudice from an allegedly erroneous jury instruction has a heavy burden and must show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."

## A.  Lesser included offense

In *United States v. Keeble*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973), the Supreme Court stated: "[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater."  *See also*, *Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (holding that the verdict of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense where jury was not permitted to consider a verdict of guilt of a lesser included offense).  In *Schmuck v. United States*, 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court adopted the "elements approach" in determining when a lesser offense has been established by the evidence at trial.  "Under this test, one offense is  not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense."  *Id*.  Before a lesser offense will be deemed a "subset" of the greater offense, "the lesser [offense] must be such that it is impossible to commit the greater without first having committed the lesser."  *Id*., U.S. at 719, S.Ct. at 1452 (quoting *Giles v. United States*, 144 F.2d 860, 861 (9th Cir. 1944).  Thereafter, in *United States v. Chanthadara*, 230

F.3d 1237 (10th Cir. 2000), the Tenth Circuit Court set forth a four-part test for determining whether a lesser included offense instruction is warranted stating:

> [A] lesser included offense instruction is to be given when [1] there is a proper request for one; [2] the lesser included offense consists of some, but not all, the elements of the offense charged; [3] proof of the element or elements differentiating the lesser and greater offenses is a matter in dispute; and [4] a jury could rationally convict on the lesser offense and acquit on the greater offense.

*Id.*, at 1257.  Courts need not instruct on lesser offenses in capital cases when such offenses are not lesser included offenses of the charged crime.  *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998).  Accordingly, no instruction is to be given, when the lesser offense requires an element not required for the greater offense.  *Schmuck*, *supra*, U.S. at 716, S.Ct. at 1450.

In this case, both parties requested this court to instruct on voluntary manslaughter. The reason this request was made was due to the fact that the petitioner was charged with First Degree Murder in state court but was convicted of First Degree Manslaughter.  Here, however, Barrett was charged, in Count 1, with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j), and, in Count 2, with using and carrying a firearm during and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j).  While Petitioner recognizes that Counts 1 and 2 were "felony murder" counts, he nonetheless argues heat of passion would have negated the malice

93

1860

aforethought element.  In *Chanthadara*, *supra*, the Court indicated that to prove the malice aforethought element of first-degree felony murder, the prosecution need only show commission of the specified felony.  *Id.*, at 1258.  As a result, the Court held second degree murder was not a lesser included offense of felony murder under § 1111(a).  *Id.* Furthermore, since felony-murder does not necessarily entail a sudden quarrel or heat of passion, voluntary manslaughter is not a lesser included offense of felony murder.  *United States v. Miguel*, 338 F.3d 995, 1005-1006 (9th Cir. 2003).  Finally, it is important to remember that the petitioner was sentenced to life without the possibility of release on Counts 1 and 2.  As a result, this court finds no violation of the principles enunciated in *Beck* occurred in relation to these two counts.  *See also*, *Trujillo v. Sullivan*, 815 F.2d 597 (10th Cir. 1987) (finding that failure to give lesser included offense instructions was not constitutionally erroneous and therefore could not be reviewed on habeas where death penalty was sought but not imposed), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987).  Thus, appellate counsel was not ineffective for failing to raise this issue in relation to Counts 1 and 2.

As to Count 3 of the superseding indictment, Barrett was charged with Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of His Official Duties, in violation of 21 U.S. § 848(e)(1)(B).  Barrett's intent was an essential element of Count 3.  *United States v. Barrett*, 496 F.3d at 1112.  Therefore, to convict Barrett of Count 3, "the government had to prove,

94

as it did with respect to Count 2, that Barrett intentionally killed Eales." *Id.* (citations omitted).

In enacting § 848(e), Congress clearly chose to omit any grades of homicide lesser than intentional killing committed in furtherance of a felony drug crime. An examination of federal homicide offenses contained within Title 18 confirms that other federal homicide statutes such as voluntary manslaughter[160] and second degree murder[161] cannot serve as lesser included offenses because those offenses can only be prosecuted in federal court when committed within the maritime or territorial jurisdiction of the United States. Whereas, a killing under § 848(e)(1)(B) does not have to occur within federal territorial jurisdiction. The federal jurisdictional nexus of § 848(e)(1)(B) is met if the defendant is engaged in certain, enumerated federal drug crimes. *United States v. Beckford*, 966 F.Supp. 1415, 1418 (E.D.Va. 1997). Further, since there are no common law federal crimes, this court cannot imply lesser included homicide offenses to § 848(e)(1)(B). *Id.* Accordingly, this court finds voluntary manslaughter is not a lesser included offense of 21 U.S.C. § 848(e)(1)(B). As a result, appellate counsel was not ineffective in failing to raise this issue in relation to Count 3.

## B. Residual doubt

In his tenth ground for relief, the petitioner argues this court erred in not instructing the jury that they could consider residual doubt as a mitigating factor. Specifically, the

---

[160] 18 U.S.C. § 1111.

[161] 18 U.S.C. § 1112.

1862

petitioner argues he should have been allowed to introduce evidence and the court should have instructed the jury that it was appropriate for them to consider as a mitigating factor that "a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings." Doc. 149, at p. 199. The government argues the petitioner has procedurally defaulted this claim by failing to raise it on appeal.

Petitioner does not provide any legal authority for his argument that his constitutional rights were violated by this court not instructing the jury regarding doubts of a prior state court jury on completely different charges. Rather, the cases cited by the petitioner stand for the proposition that ". . . the Eighth Amendment to the United States Constitution does not require an instruction on "residual doubt" at the penalty phase. *Franklin v. Lynaugh*, 487 U.S. 164, 172-75, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)." *United States v. Honken*, 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); and *United States v. Davis*, 132 F.Supp.2d 455, 458 (E.D. La. 2001). The Tenth Circuit in *Sallahdin v. Gibson*, 275 F.3d 1211 (10ᵗʰ Cir. 2002) did not hold that a defendant has a constitutional right to an instruction regarding "residual doubts." Instead, it recognized where the first stage defense was "actual innocence," a residual doubt theory might have been a reasonable strategy for defense counsel to adopt. *Id.*, at 1240 n. 10. While the petitioner now argues the court erred in not allowing him to argue "residual doubt" to the jury by advising the jurors, during the penalty phase of trial, that the state court jury did not believe the defendant had intentionally killed Trooper Eales, the petitioner never claimed he was actually innocent. Further, the issue of "residual doubt"

was initially raised in this case not because of the federal jury having doubts over its own verdict, but this court's concern that the parties wanted to utilize the state court verdict based upon different charges to which the United States was not a party, to nullify the federal court jurors sworn duty to consider the facts presented to them in reaching a verdict, during the first stage of trial, regarding whether the actions of the defendant were intentional or, during the second stage of trial, entailed any of the statutory aggravating factors alleged in the case.[162]   The court clearly advised the parties, during pretrial proceedings, of its understanding of mitigating factors stating:

> . . . as to the mitigating factors, which are defined in 189 (sic) U.S.C. Section 3592, evidence is relevant if it tends logically to prove or disprove some fact or circumstance that could reasonably serve as a basis for a sentence less than death. Under the statute, such evidence may include factors in the defendant's background, record, or character, or any other circumstance of the offense. This Court does not find that evidence of prior proceedings against the defendant relates to the defendant's background, record, character, or offense in any way that could mitigate against the imposition of a death sentence. Such evidence is not relevant and Defendant shall therefore refrain from any mention of prior proceedings against this defendant in the sentencing stage of this trial.
>
> Defendant may, however, introduce his prior conviction and the resulting 30-year sentence as a mitigating factor. Due process and the Eighth Amendment mandate that when a defendant is not eligible for parole, and the government uses future dangerousness as an aggravating factor, the jury must be informed that if it does not sentence the defendant to death, he will spend the rest of his life in prison. The Court stresses that the defendant's use of this evidence is relevant and admissible solely on this point. The defendant may not use this evidence to raise residual doubts about the defendant's guilt or any - - or for any other purpose, because it does not relate to any aspect of the defendant's background, record, character or any other circumstance of the offense charged herein, and is, therefore, not relevant.

---

[162]*See*, Cr.Doc. 314, Tr. of September 26, 2005, at pp. 9-10.  *See also*, Cr.Doc. 317, Tr. of September 20, 2005, at pp. 4-5.

Cr. Doc. 314, *supra* at pp. 10-11.  Thereafter, during the sentencing phase of trial, the court

instructed the jury as follows regarding mitigating circumstances:

> You have found the defendant guilty of three capital crimes.  Your consideration of guilt or innocence has, therefore, been completed.  You must now determine an appropriate punishment.  In considering the appropriate punishment to impose, you are not to revisit the issue of guilt or innocence. All twelve jurors are bound by your verdict in the first portion of this case.
>
> Additionally, you are instructed that you must not speculate about the reasons for the jury's verdict or sentences in the Sequoyah County District Court case.  Only the charges and the evidence presented in this court are relevant to the task now before you.  The sentences in the Sequoyah County District Court case may, therefore, only be considered with regard to their mitigating effect, if any, on the defendant's sentence for the charges at issue in this federal court case.
>
> You must consider **any** mitigating circumstances you find to exist. Mitigating circumstances are facts about the defendant's character, background, or record, or the circumstances of the particular offenses, or other similar relevant factors, that may call for a penalty less than death.  However, any lingering doubt that you may have about the defendant's guilt is **not** a mitigating circumstance and cannot be considered by you in determining the appropriate punishment.

Cr. Doc. 257, Instruction No. 19 (bold in original).

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the

Supreme Court said:

> Our edict that, in a capital case, " 'the sentencer . . .[may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense,'" *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett*, 438 U.S., at 604, 98 S.Ct., at 2964), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt.  Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

98

*Id.*, U.S. at 174, S.Ct. at 2327.  In her concurring opinion, Justice O'Connor made this point

even clearer saying:

> Our cases do not support the proposition that a defendant who has been found
> to be guilty of a capital crime beyond a reasonable doubt has a constitutional
> right to reconsideration by the sentencing body of lingering doubts about his
> guilt. . . . as the plurality points out, we have approved capital sentencing
> procedures that preclude consideration by the sentencing body of 'residual
> doubts' about guilt.
>    Our decisions mandating jury consideration of mitigating circumstances
> provide no support for petitioner's claim because  'residual doubt' about guilt
> is not a mitigating circumstance. . . . 'Residual doubt' is not a fact about the
> defendant or the circumstances of the crime.  It is instead a lingering
> uncertainty about facts, a state of mind that exists somewhere between 'beyond
> a reasonable doubt' and 'absolute certainty.' . . . Nothing in our cases
> mandates the imposition of this heightened burden of proof at capital
> sentencing.

*Id.*, U.S. at 187-188, S.Ct. at 2334-2335 (citations omitted).  Thereafter, in *Oregon v. Guzek*,

546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006), the Court reaffirmed *Franklin*

finding no constitutional right to introduce residual doubt evidence at sentencing.

In this case, the defendant was not prevented from advising the jury that he had

already been convicted by a state court jury.  In fact, during the penalty phase of trial, the

defendant elicited testimony from Maudeen Vann, the First Deputy Court Clerk in Sequoyah

County, Oklahoma, that the defendant was originally charged by information in the District

Court of Sequoyah County with one count of first degree murder and three counts of shooting

with intent to kill.  The information was subsequently amended to include one count of first

degree murder, one count of shooting with intent to kill, and two counts of discharging a

firearm with intent to kill.[163]  Additionally, Ms. Vann went on to advise the jury of the state court jury verdict, telling them that the state court verdict form indicated that the defendant was found guilty by the state court jury on Count I of Manslaughter in the First Degree; on Count Two he was found guilty of the crime of Assault and Battery with a Dangerous Weapon; and on the two counts of discharging a firearm with intent to kill, he was found not guilty.[164]  Finally, Ms. Vann advised the jury of the sentence imposed on the two state court charges for which Mr. Barrett was convicted[165] and a copy of the state court judgment was admitted into evidence.[166]  While the petitioner claims counsel should have pointed out that the evidence of the prior conviction established the death was not caused in the manner in which the government claimed, the petitioner was not prohibited from introducing any evidence relating to the manner in which the death occurred and the petitioner does not now identify any evidence relating to the manner of the victim's death which was improperly excluded at trial.  Furthermore, the jury was actually advised in detail of the outcome of the prior state court proceedings.

Petitioner argues, however, that his jury should have been instructed it could consider "residual doubt" as a mitigating factor.  Since there is no constitutional right to such an instruction and the petitioner does not identify a statutory provision requiring such an

---

[163]J.T. Tr., Vol. 24 at pp. 4715-4721.  *See also*, Defendant's Trial Exhibit Nos. 230 and 231.

[164]J.T.Tr., Vol. 24 at pp. 4722-4724.

[165]*Id.*, at pp. 4724-4725.

[166]*See*, Govt. Exhibit 331.  *See also*, J.T.Tr., Vol. 24, at pp. 4726-4738 and Defendant's Trial Exhibit Nos. 230-235.

instruction, the petitioner has failed to establish that the court's instruction regarding mitigating circumstances violated due process.  Thus, he is not entitled to relief on this issue and neither trial or appellate counsel were ineffective in failing to raise this issue.

## C.  Jury not required to find appropriateness of death penalty beyond a reasonable doubt

Petitioner claims, in his twelfth ground for relief, that the court's instructions violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was not instructed that they had to find that death was an appropriate punishment beyond a reasonable doubt.  The government asserts the petitioner raised this issue on appeal and is, therefore, barred from relitigating this issue.  In reply, the petitioner claims the issue "was not raised or adequately resolved on appeal."  Doc. 178, at p. 179.

Although the petitioner claims appellate counsel did not properly raise the issue on appeal, a review of the Tenth Circuit decision leaves no doubt that the issue was addressed on appeal.  In fact, in reaching its decision regarding the constitutionality of 21 U.S.C. § 848's scheme for weighing of aggravating and mitigating factors, the court cites the same Supreme Court cases which Petitioner now attempts to utilize to support his expanded constitutionality argument saying:

> Barrett, effectively seeking to extend the Supreme Court's decision in *Ring*, argues that § 848 violated the Sixth Amendment because it does not require the jury to apply the reasonable doubt standard in weighing the aggravating and mitigating factors. According to Barrett, "[t]here is simply no functional difference between 'finding' and 'weighing,'" and thus "[t]he determination of whether aggravating circumstances outweigh mitigating

101

1868

circumstances is a factual determination which could lead to an increase to the ultimate penalty-death."

*United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007). Although the court indicated appellate counsel had not made as broad an argument on appeal as he had in the district court,[167] the court analyzed the issue in full and held a reasonable doubt standard is not required in the weighing process. *See also, United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008). Accordingly, the petitioner is barred from relitigating this issue and appellate counsel was not ineffective for failing, as the petitioner alleges, to raise this claim.

## VIII.  REMOVAL FROM COURTROOM

In his thirteenth ground for relief, the petitioner argues his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated when he was removed from the courtroom in the presence of the jury and that counsel were ineffective in not raising this issue on appeal. The government argues the petitioner procedurally defaulted this claim by not raising it on direct appeal. The government further asserts that because the claim lacks merit, appellate counsel were not ineffective for failing to raise the claim on appeal. Finally, the government argues that two of the subclaims raised are barred by the statute of limitations. Petitioner does not address the government's arguments in his Reply brief.

---

[167]*Id.*, n. 12.

The record is clear that the petitioner did not raise this issue on appeal.  Since the petitioner claims, however, appellate counsel were ineffective for failing to raise it on appeal, this court will proceed to the merits of the claim.

As indicated above, during the government's final penalty stage closing argument, the defendant got up from his chair and told the marshals to take him out of the courtroom. With the court's permission, the deputy United States Marshals walked the defendant out of the courtroom and the prosecutor completed his argument.[168]

Following completion of the government's argument, but prior to the jury leaving the courtroom, the court called counsel to the bench and had a hearing outside the presence of the jury in which the court asked if the defense had any requested instructions in regard to the defendant's outburst.  Counsel requested a recess to consider the issue further and the court granted that request.[169]  After a short recess, but still outside the presence of the jury, the court inquired of counsel if they had any requested instructions.  When both sides indicated they had none, the court advised the parties it was inclined to give the following instruction:

> Members of the jury: You are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them when rendering your verdict herein.

Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5435.  Counsel indicated they did not care whether the court gave this instruction or not because it "highlights it to an extent, but then it also, you

---

[168]Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5421.

[169]Cr. Doc. 355, at pp. 5426-5429.

know, cautions the jury." *Id.* Then, the court inquired as to whether the defendant needed to be brought to the courtroom for the court to inquire as to whether or not he wanted to be present during the remainder of the proceedings. Even though defense counsel advised the court that the defendant had specifically told them he did not want to be present, the court advised counsel he was going to have the marshal bring the defendant to the courtroom in minimum restraints outside the presence of the jury.[170] Defense counsel requested a chance to speak with their client before he was brought to the courtroom and so another short recess was taken. Thereafter, the defendant was brought into the courtroom, outside the presence of the jury, and the following colloquy occurred:

> THE COURT: Let the record reflect counsel for the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Do you have any questions of the Court about that?
>
> MR. BARRETT: No, sir.
>
> THE COURT: I'll ask the marshal to return - - (Interrupted)
>
> MR. HILFIGER: One more. Does that include the verdict?
>
> MR. BARRETT: Yes, Your Honor.
>
> THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

---

[170]Minimum restraints were allowed because the marshal advised the court that the defendant had said if he was forced to come to court, he could give them problems. *Id.*, at p. 5438.

104

MR. BARRETT: Yes, sir.

Cr. Doc. 355, J.T.Tr. Vol. 27, at pp. 5438-5439.  The court took a short recess for the defendant to be removed from the courtroom.  Thereafter, the jury was brought back into the courtroom and the court gave the cautionary instruction discussed above and the concluding instructions to the jury.  The jury then was placed in charge of the bailiff and taken to the jury room to begin their deliberations.  *Id.*, at pp. 5440-5444.

Petitioner now argues that he was not competent to waive his presence at trial and that this court violated his constitutional rights by:

> (a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr. Barrett to unnecessarily wear additional restraints; (c) failing to advise Mr. Barrett of his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett had in fact knowingly and voluntarily waived that right; and (e) failing to give the jury a curative instruction.

Doc. 149, at p. 240.  Additionally, the petitioner asserts that trial counsel acted unreasonably

> (a) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise him of the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court and Mr. Barrett's absence.

*Id.*, at pp. 240-241.

While the petitioner argues he has a fundamental right to be present at all stages of trial, the court did not, as the petitioner argues, remove the defendant without warning because of the defendant's outburst.  Rather, the defendant voluntarily requested to be removed from the proceedings and the court simply complied with his request.

Rule 43(c) of the Rules of Criminal Procedure provides, in pertinent part:

**(c) Waiving Continued Presence.**

> (1) **In General.**  A defendant who was initially present at trial, . . . . waives the right to be present under the following circumstances:

>> (A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial; . . . . . .

> (2) **Waiver's Effect.**  If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

Petitioner cites no authority to support his argument that when a defendant asks to be removed from the courtroom that he first must be advised that he has a constitutional right to be present before the court acquiesces to the request.  The plain language of Rule 43(c) of the Federal Rules of Criminal Procedure allows a defendant to voluntarily absent himself after the trial has begun without being advised that he has a obligation or constitutional right to remain.  Furthermore, while the petitioner argues *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), prevents his removal from the courtroom without a warning by the judge that he would be removed if he continued to exhibit disruptive behavior, the

106

defendant was not removed from the courtroom based upon his behavior. Rather, he was removed from the courtroom only after he personally requested to be taken from the courtroom. By simply acquiescing in his request, this court avoided drawing unnecessary attention to the situation. As soon as the prosecutor completed his closing argument, which was no more than 5 or 10 minutes after the defendant voluntarily absented himself from the courtroom, the jury left the courtroom.[171] Immediately thereafter, outside the presence of the jury, the court addressed the issue with counsel. After conferring with counsel and giving defense counsel an opportunity to consult with their client, the court had the defendant brought back into the courtroom, outside the presence of the jury, to ensure that the defendant's continued absence was voluntary and that the defendant was aware that he had a right to be present. The court also advised the defendant he could return to the courtroom at anytime if he chose to do so. *See, United States v. Sealander*, 91 F.3d 160, *15 (10th Cir. 1996) (court recognized a distinction between forcible removal and voluntary removal from proceedings). There is nothing in this record which indicates the defendant would have chosen to remain in the courtroom if the court had stopped the proceedings and addressed the defendant before he was allowed to leave the courtroom.

Further, this court is not aware of any authority which has held that a trial court must advise a defendant of his right to remain in the courtroom before allowing the defendant to leave. To the contrary, in a case where the defendant failed to return to court following a

---

[171]According to the courtroom deputy's log notes, the government's final closing argument took approximately 42 minutes (1:37:21 to 2:19:01), including the defendant's statements and removal, and the transcript of this portion of the trial consists of 25 pages. Less than six pages of this portion of the transcript occurred after the defendant left the courtroom.

107

lunch break and was, thereafter, convicted in absentia, the Supreme Court in rejecting the defendant's argument that "his mere voluntary absence from his trial cannot be construed as an effective waiver," the Supreme Court held:

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, entertained any doubts about his right to be present at every stage of his trial.  It seems equally incredible to us, as it did the Court of Appeals, 'that a defendant who flees from a courtroom in the midst of a trial-where judge, jury, witnesses and lawyers are present and ready to continue-would not know that as a consequence the trial could continue in his absence.'

*Taylor v. United States*, 414 U.S. 17, 20, 94 S.Ct. 194, 196, 38 L.Ed.2d 174 (1973) (internal citations omitted).  *See also*, *United States v. Newman*, 733 F.2d 1395, 1401 (10th Cir. 1984). While the defendant in this case was clearly not at liberty on bail, it is ludicrous to suggest that the defendant could demand to leave the courtroom during the prosecutor's closing argument but not recognize that the court would continue the trial in his absence.  Rule 43(c)(1)(A) permitted the defendant to waive his right to be present by requesting the court's permission to leave the courtroom without the court informing the defendant of his constitutional right to be present.  Further, the coherent statements by the defendant at the time of his request to leave the courtroom establish that he was fully aware of what he was doing.  Therefore, this court finds the petitioner was not deprived of any constitutional rights when he was allowed to leave the courtroom.

Petitioner does not provide any authority to support his argument that the court violated his rights by allowing additional restraints upon him prior to returning him to the courtroom outside of the jury's presence.  As previously indicated, courts retain the

discretion to take measures to maintain order and security in the courtroom.  *United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009), citing *Deck v. Missouri*, 544 U.S. 622, 632, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) and *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986).  Here, the record reflects the defendant had indicated he could cause trouble if he was returned to the courtroom.[172]  Thus, the additional restraints were appropriate to maintain order and security in the courtroom.  Further, these additional restraints could not have been observed by the jury as the defendant was brought into the courtroom outside of their presence.  As a result, this court finds the defendant's constitutional rights were not violated by the use of additional restraints.

To the extent this court has previously found the petitioner was competent to stand trial, the petitioner's arguments to the contrary will not be further addressed.  Additionally, since the record is clear that defense counsel consulted with their client and thereafter, the court made specific inquiries of the defendant regarding his not returning to the courtroom, after which a cautionary instruction was given to the jury regarding the incident, this court finds the petitioner's remaining arguments are  frivolous.

After having considered the merits of the arguments herein, this court finds appellate counsel was not ineffective for failing to raise these issues on appeal.  *See*, *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) ("An appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner.'") (quoting *United States v. Cook*, 45 F.3d 388, 394-95 (10th Cir. 1995).  Having failed to establish appellant

---

[172]*See* Cr. Doc. 355, J.T.Tr. Vol. 27, at p. 5438.

counsel rendered ineffective assistance of counsel on this issue, the petitioner is procedurally barred from raising this issue herein.

## IX.  CONSTITUTIONALITY OF FEDERAL DEATH PENALTY

Petitioner asserts in his fourteenth ground for relief that he was denied due process, equal protection, the right to be free from cruel and unusual punishment and the effective assistance of counsel because the federal death penalty, as administered, is "disproportionately and unconstitutionally applied according to the race of the victim, and trial and appellate counsel made no objection based on this fact."  Doc. 95, at p. 368. Petitioner bases his argument on a memorandum regarding "DOJ report on the Federal Death Penalty System" from Professor David Baldus to The Honorable Russell D. Feingold[173] and data compiled by Lauren Cohen Bell, Ph.D., in the death penalty case of Rejon Taylor.[174]

While recognizing that a racially disproportionate pattern of capital charging is insufficient to demonstrate purposeful discrimination on the basis of race, the petitioner argues it is sufficient to warrant discovery and an evidentiary hearing.  This court finds, however, that the petitioner's allegations are mere conclusory allegations based upon statistical data of questionable reliability.  Furthermore, the petitioner does not provide any authority for his theory that a defendant can establish an equal protection racial bias claim based upon the race of the victim as opposed to the race of the defendant.

---

[173]*See*, Petitioner's Exhibit 115.

[174]*See*, Petitioner's Exhibit 112.  This exhibit indicates the *curriculum vitae* of Dr. Cohen is attached to the exhibit.  It is not, however, attached to this exhibit.  Additionally, the data used by Dr. Cohen involved cases from 1989 to August 2008 and there is no way to extract the information from the relevant time frame herein.  The defendant in this case was tried in 2005.

In order to prevail on a selective prosecution claim, a defendant must show that the decision to prosecute had both a discriminatory purpose, *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967), and a discriminatory effect on him, *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). *See also*, *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996). Thus, the defendant must establish that "decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis in original). A discriminatory effect will be shown by establishing that "similarly situated individuals of a different race were not prosecuted."

*United States v. Armstrong*, *supra*.

> If the defendant seeks to obtain discovery to prove a claim for selective prosecution, he or she must first establish a 'colorable' claim of selective prosecution. In addition, the 'evidence [must be] specific to [the defendant's] own case that would support an inference that racial considerations played a part' in the prosecutor's decision to seek the death penalty.

*United States v. Cooper*, 91 F.Supp.2d 90, 115 (D.D.C. 2000) (citations omitted).

Just like the defendant in *McCleskey*, the petitioner offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence and the statistics he offers without more are insufficient to support an inference that the decisionmakers in his case acted with a discriminatory purpose. In fact, the statistics offered by the petitioner are less specific than those offered in *McCleskey*. For instance, the data used in the Baldus study which was considered in *McCleskey* was subjected "to an extensive analysis, taking account of 230 variables that could have explained the disparities

on nonracial grounds." In this case, the declaration of Lauren Cohen Bell indicates that she considered no variables which could have explained the discrepancies. Rather, she concludes solely on the numbers that ". . . it is my opinion to a reasonable degree of certainty that this correlation of more severe sentencing outcomes and white victims is unlikely to disappear even in the presence of other potentially explanatory variables." Petitioner's Exhibit No. 112, Doc. 72-61, at p. 7.[175] The other exhibits which the petitioner submits are similarly insufficient to establish a discriminatory intent by the federal prosecutors. The memorandum from David C. Baldus dated June 11, 2001 states, in part:

> Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas (sic) bargaining decisions, *one has no idea the extent to which similarly situated defendants were in fact treated comparably.*
>
> <div align="center">* * * * *</div>
>
> No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.
>
> The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. *The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are (sic) federal law enforcement agencies - are almost certainly nonconscious.* (italics added)

---

[175]The government asserts that the statistics relied upon by Dr. Bell and those generated by David Baldus are not reliable under the principles enunciated in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.  579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because petitioner has failed to show that the calculations have been tested, subjected to peer review, and/or published.

<div align="center">112</div>

Petitioner's Exhibit No. 115, Doc. 72-64, at pp. 6-7. One of the declarations of Kevin McNally[176] was prepared for use in the case of Rejon Taylor and contains references to information "captured in a report previously filed with the Court." However, no such report has previously been filed with this court.[177] The second declaration of Kevin McNally[178] contains statistics relating to filing of federal death penalty cases. After detailing those statistics, McNally states that he is attaching three graphs depicting the information;[179] however, once again, the information referenced is not attached. "Statistics at most may show only a likelihood that a particular factor entered into some decisions." *McCleskey*, U.S. at 308, S.Ct. at 1776.

Even if shown to be reliable under *Daubert*, petitioner's own exhibits do not establish a discriminatory intent to prosecute solely for racial reasons. The petitioner has not shown either the prosecutor in his case or the jury[180] acted with a discriminatory intent or purpose in deciding to seek and ultimately imposing the death penalty. All things considered, petitioner's proffer regarding selective prosecution contains nothing more than conclusory

---

[176]Petitioner's Exhibit No. 113, Doc. 72-62.

[177]This declaration also states that Lauren Cohen Bell's analysis is attached; however, it is not attached to the declaration. Finally, the declaration indicates the declarant "can testify about facts and circumstances of other cases involving the murder of government informant or witness which resulted in life sentence" and it refers to another declaration filed of record. No such document has been filed in this case.

[178]Petitioner's Exhibit No. 116, Doc. 72-65.

[179]Petitioner's Exhibit No. 116, Doc. 72-65, at p. 4 ¶ 9.

[180]As part of their verdict, all twelve jurors signed a certification which stated:
> By signing below, each juror certifies that consideration of race, color, religious beliefs, national origin, or gender of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin, or gender of the defendant or the victim.

Cr.Doc. 258.

allegations. Conclusory allegations are insufficient to state a claim under § 2255, and do not support a request for discovery.

> To earn the right to an evidentiary hearing, a movant is required to allege specific facts which, if true, would entitle him to relief. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997); Rule 4(b) of the Rules Governing Section 2255 Proceedings. The Rules Governing Section 2255 do not authorize fishing expeditions, and "'conclusory allegations unsupported by specifics' . . . will not entitle one to discovery or a hearing." *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977)).

*United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1118 (C.D.Cal. 1998). *See also*, *United States v. Rollow*, 357 Fed.Appx. 966 (10th Cir. 2009) and *United States v. Scott*, 7 F.3d 1046 (10th Cir. 1993) (citing *Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir. 1971)).

Systemic statistics alone-that is, discriminatory intent in a particular prosecution can not conclusively be inferred from system-wide findings suggestive of racially disparate impact. *United States v. Bin Laden*, 126 F.Supp.2d 256, 260 (S.D.N.Y. 2000). Furthermore, as previously stated, in order to prove discriminatory effect, petitioner must show that similarly situated individuals of a different race were treated differently. Statistics, in the context of capital sentencing, about the general operation of a death penalty scheme are insufficient to support conclusory allegations of a discriminatory purpose. In this case, the petitioner's conclusory allegations do not establish either a discriminatory intent or a discriminatory effect. Accordingly, this court finds the petitioner has failed to establish that the federal death penalty act as administered is unconstitutional.

114

Moreover, trial counsel did ask this court to declare the federal death penalty statute unconstitutional.[181]  In his motion, trial counsel specifically stated that "[th]e federal death penalty scheme, . . . . . results in arbitrary classifications based upon the race, sex and economic class of the victim and of the accused. . . . ."  Cr. Doc. 78, at p. 3.  Rather than focus on statistics dealing with an equal protection argument, however, counsel chose to use statistics to support his due process claim.  In addressing this portion of defendant's motion, the United States Magistrate Judge stated the following:

> The specific arguments made here by the Defendant would appear to arise under the Due Process Clause of the Fifth Amendment, not under the Eighth Amendment, but they lack merit nevertheless.  First, the federal death penalty is not unconstitutional simply because it may be erroneously imposed.  *See*, *e.g., Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("But we have also observed that '[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'  To conclude otherwise would all but paralyze our system for enforcement of the criminal law."), *quoting Patterson v. New York*, 432 U.S. 197, 208 (1977).  *See also United States v. Church*, 217 F.Supp.2d 700, 702 (W.D.Va. 2002) ("The Supreme Court's decision in *Herrera* thus forecloses the argument that the inherent fallibility of the criminal justice system supports a due process attack on the death penalty.").  In any event, the statistical evidence cited by the Defendant is irrelevant, as it is founded upon studies of state death penalty cases.  *See United States v. Denis*, 246 F.Supp.2d 1250, 1253 (S.D.Fla. 2002), *aff'd by* 107 Fed.Appx. 182 (11th Cir. May 13, 2004), *cert. denied*, 125 S.Ct. 640 (2004) ("[T]he use of statistics that apply to *state* death penalty cases *cannot* support a conclusion of that possibility in *federal* cases.  This use of statistics is inappropriate, not only because they can be easily manipulated, but because they relate to cases from states with different capital sentencing schemes.")[emphasis in original]; *United States v. Taylor*, 302 F.Supp.2d 901, 908 (N.D.Ill. 2003)("[T]he issue . . . is not the reliability of state death penalty prosecutions but rather federal capital prosecutions.").  *See also United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002), *cert. denied*, 540 U.S. 1051 (2003) (reversing a lower court decision accepting state

---

[181]*See* Cr. Doc. 78.

1882

statistical evidence as proof that the FDPA violates substantive due process). To the extent there is relevant statistical evidence, *i.e.*, evidence based upon studies of the federal death penalty scheme, such evidence suggests that the federal death penalty is not imposed arbitrarily, capriciously or unreliably. *See Taylor*, 302 F.Supp.2d, at 908 ("This Court follows other courts in finding that based on these statistics regarding the federal death penalty system, that the 'federal experience with death penalty cases certainly does not support an argument that the federal court system is likely to convict the truly innocent.'"), *quoting Church*, 217 F.Supp.2d, at 702; *Denis*, 246 F.Supp.2d, at 1253 ("Therefore, this Court agrees with the holding of [*Church*]").

Cr.Doc. 147, at pp. 3-5 (footnote omitted).  On July 18, 2005, this court adopted the Magistrate's Report and Recommendation.[182]

While petitioner now has the advantage of hindsight and can see that an attack based on the principles of due process was not effective, he chooses to change tactics and challenge the Federal Death Penalty Act on equal protection grounds.[183]  Since, however, no legal authority exists to suggest that a defendant can establish an equal protection racial bias claim based upon the race of the victim, as opposed to the race of the defendant, and statistics alone do not establish a discriminatory purpose, this court finds the petitioner has failed to establish that the absence of this specific claim, at trial or on appeal, deprived him of his Sixth Amendment right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

[182]Cr.Doc. 153.

[183]As indicated previously, the heading of the petitioner's Ground Fourteen claims a denial of due process of law as well as a deprivation of equal protection of the law.  His argument, however, focuses exclusively on the racial discrepancies that he perceives exist within the administration of the Federal Death Penalty Act.

116

## X.  SUFFICIENCY OF INDICTMENT

In his fifteenth ground for relief, the petitioner claims his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated because the indictment "made no mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase."  Doc. 149, at pp. 251-252.  Thus, the petitioner asserts "[t]he indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death."  *Id.*, at p. 252.  To support this argument, the petitioner relies upon *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed. 2d 311 (1999).  The government asserts petitioner has defaulted this claim by failing to properly raise it before this court or on appeal.  Alternatively, the government asserts that the petitioner was properly charged by superseding indictment.

## A.  Procedural Default

As previously indicated, failure to raise a claim either at trial or on direct appeal prevents a party from raising the issue in a § 2255 proceeding.  The two recognized exceptions to this rule are 1) the defendant can show good cause for failing to raise the issue earlier and that failure to consider the issue would result in actual prejudice to his defense, *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) ; and 2) if "failure to consider the claim would result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 l.Ed.2d 640 (1991).

Petitioner attempts to overcome his default by claiming ineffective assistance of appellate counsel. Where ineffective assistance of counsel is raised as cause for excusing procedural default, the court is required to look at the merits of the omitted issue. *Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002).

## B.  Sufficiency of superseding indictment

Petitioner fails to provide any legal authority for the proposition that non-statutory aggravating factors must be proven to a grand jury and alleged in the indictment. A review of the superseding indictment[184] reveals that the statutory aggravating factors, which made the defendant "death-eligible," were, despite the petitioner's assertions to the contrary, alleged in the superseding indictment. The government concedes the superseding indictment did not include allegations of any non-statutory aggravating factors, but asserts the superseding indictment was consistent with prevailing Supreme Court authority and, therefore, was sufficient.

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that [n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury." U.S. Const. amend.V.  Its purpose is to limit a defendant's jeopardy "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).  In addition, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[184]Cr. Doc. 52.

118

informed of the nature and cause of the accusation. U.S.Const. amend. VI. Together, these provisions of the constitution afford a defendant the right to notice of the charges against him in a sufficiently detailed manner that he is able to prevent double jeopardy following conviction or acquittal.

> . . . .an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2365, 147 L.Ed.2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.*, U.S. at 490, S.Ct. at 2362-2363. Thereafter, in *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002), the Court held that facts necessary to render a defendant eligible for a death sentence "operate as 'the functional equivalent of an element of a greater offense.'" While the Supreme Court has not specifically extended *Ring* to require grand jury findings of eligibility factors pursuant to the Indictment Clause of the Fifth Amendment, circuit courts examining the issue have consistently held that the eligibility factors – at least one threshold intent factor under § 3591(a)(2) or § 848(n)(1) and at least one statutory aggravating factor under § 3592(c) or § 848(2) to (12) – must be charged in the indictment and found by the grand jury. *See*, *e.g.*, *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005), *cert. denied*,

119

549 U.S. 975, 127 S.Ct. 433, 166 L.Ed.2d 307 (2006); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004), *cert. denied*, 543 U.S. 1005, 125 S.Ct. 623, 160 L.Ed.2d 466 (2004); and *United States v. Higgs*, 353 F.3d 281, 295-307 (4th Cir. 2003), *cert. denied*, 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

> 'There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence.' *Higgs*, 353 F.3d at 299. Non-statutory aggravating factors do not increase the maximum punishment to which a defendant is subject. They are neither sufficient nor necessary under the FDPA for a sentence of death. Their purpose is merely to aid the sentencer 'in selecting the appropriate sentence from the available options,' *id*. at 298, "'on the basis of the character of the [defendant] and the circumstances of the crime,'" *id*. (quoting *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)).

*United States v. Purkey*, *supra*. *See also*, *United States v. Fields*, 516 F.3d 923, 944 (10th Cir. 2008) ("non-statutory aggravators play no role in the eligibility determination under the FDPA, but are relevant only in the weighing process at the ensuing sentence-selection stage.").

Since non-statutory aggravating factors do not increase the maximum punishment a defendant is subjected to,  neither the Indictment Clause nor the Sixth Amendment require that they be alleged in an indictment  The weighing process contained within 18 U.S.C. § 3593(e) is simply a method for the jury to give individualized consideration regarding "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." *United States v. Purkey*, 428 F.3d, at 750.

A review of the superseding indictment shows it set forth the elements of the offenses charged and the functional equivalents sufficient to apprise Barrett of the charges against

him.  *See also*, *United States v. Barrett*, 496 F.3d 1079, 1091-1095 (10th Cir. 2007) (discussing sufficiency of indictment issues which appellate counsel raised).  In particular, the superseding indictment provided him with notice of the intent factor and the statutory aggravating factors upon which the government, during the penalty phase, ultimately relied. Therefore, this court finds the superseding indictment was legally sufficient and appellate counsel was not ineffective in failing to argue that the superseding indictment was insufficient because it did not allege the non-statutory aggravating factors.  As a result, this court finds the petitioner is procedurally barred from raising this claim.

## XI.  JURY ISSUES

Petitioner asserts in his eleventh proposition that his Fifth, Sixth, and Eighth Amendment constitutional rights were violated when the court improperly excused Juror 62 for cause.   In his sixteenth proposition, the petitioner claims he was deprived of his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights because of "juror misconduct."  The government argues each of these claims have been procedurally defaulted.

### A.  Juror excused for cause

Petitioner claims Juror 62 was excused "solely because of her conscientious scruples against the death penalty. . . ."  Doc. 95, at p. 345.  Respondent argues the petitioner defaulted this claim by not raising it on direct appeal.  Further, the respondent asserts the petitioner cannot establish that his attorneys were ineffective for failing to raise the issue on appeal and, as a result, the petitioner has failed to establish cause to excuse his default.

121

There can be no doubt that this claim relies on facts contained within the trial court record.[185]  As a result, the petitioner should have raised this claim on direct appeal.  Since the petitioner did not raise the claim on direct appeal, the claim is procedurally defaulted.  To overcome this default, the petitioner once again claims appellate counsel were ineffective for failing to raise the issue.  After a review of the transcript, this court finds that Juror 62 was properly removed for cause under the principles enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon*, the Supreme Court indicated prospective jurors must be "willing to consider all of the penalties provided by state law" and that a prospective juror can "not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings."  *Id.*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21.  In capital cases, not all prospective jurors who oppose the death penalty are subject to removal for cause.  Rather, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."  *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986).  In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court indicated a prospective juror may be excluded for cause when "the juror's views would 'prevent or substantially impair the

---

[185] *See* Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings held on Sept. 14, 2005, at pp. 819-829.

122

performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*., 469 U.S. at 424, 105 S.Ct. at 852; *see also Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007).

> [I]t is not necessary that prospective jurors would vote automatically against the death penalty or that their opinions on capital punishment would prevent them from rendering an impartial verdict.   If a prospective juror conscientiously disapproves of the death penalty, that juror can be eliminated if any of that person's jury duties would be "substantially impaired."

*Coleman v. Brown*, 802 F.2d 1227, 1231 (10th Cir. 1986).

Potential Juror 62 was extensively questioned by this court regarding her ability to follow the court's instructions and impartially consider both potential sentencing options in this case.  Initially, when asked by the court if she had an opinion about the death penalty the following colloquy occurred:

> Juror: I don't - - I could not do it.  I could not say anybody to be sentenced to death.
>
> Court: When you say you could not do it, do you mean you couldn't be the one that carried out the execution, or - -
>
> Juror: I couldn't even say that they deserve it, no.  I don't believe in it.
>
> Court: Okay.  Let me - - this question - - it's part question and part information to you.  But you heard me give you a little bit of the background of this case, and there's two parts of it, the guilt stage and the sentencing stage.  So, as to the sentencing, you realize that in this case you may be asked at some point to consider whether to impose a sentence of life in prison without the possibility of release or the death penalty?  Those two things are in play in this case.  Do you understand that?
>
> Juror: I do now.  I didn't then, but I do now.
>
> Court: They're both - -

123

Juror: Now that you say it again, yes.

Court: And you understand that as a juror, if you are selected as a juror in this case, you would have to follow the law and render a verdict within the law? Do you know that?

Juror: Yes, I do.

Court: I mentioned - - or I think I mentioned, or I intended to mention, issues about moral, religious, philosophical or personal opinions.  I said something about that, that I'd ask you a question about that.

Juror: Yes.

Court: There are really two questions.  And the first of those is: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a life sentence without the possibility of release?

Juror: I could do that.  I mean, I could do that.

Court: Okay.  Well, then, the second question, then: Do you have any moral, religious, philosophical, or personal opinions which would prevent you from considering the imposition of a death sentence?

Juror: Yes, I do.

Cr. Doc. 333, Tr. of Individual Juror Qualification for Purposes of Stage One Proceedings, at pp. 820 - 821.[186]  Following this colloquy, the court gave defense counsel an opportunity to rehabilitate the juror.  The juror advised counsel that she had held these views about the death penalty all of her adult life.  *Id.*, at p. 823.  Further questioning by defense counsel did not change this juror's responses.  Rather, this colloquy occurred:

------

[186]For ease of reading, in quoting from this portion of the transcript, the court has inserted the person speaking instead of simply using the "Q" and "A" contained in the transcript.

124

Mr. Smith: You understand, ma'am, that in a case like this, because [the death penalty] is an ultimate punishment, you have to be able to consider the facts as they come, not only from the Government but from the defendant, if he chose to put any forward, as to why his life might be spared.  And that what you would have to be eligible to do is to listen to the evidence that the Government would put on in a punishment phase, as to those aggravating reasons, those reasons why this particular murder is so heinous that, in fact, this should result in the imposition of a death sentence.  It is those factors that you must be able to listen to, hold them to a high standard of proof, but listen to them and give them due consideration.  Is that what you would be able to do or not be able to do?

Juror: Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

Mr. Smith: Yes, ma'am.  And that is what is required, is for your ability to be able to engage in this weighing process.  That is, to listen to the factors that the Government may present in aggravation, the reasons that they say the death penalty is warranted.  Those can be balanced.  The defendant can offer, if he chooses to, reasons why the death penalty is not an appropriate sanction, that, in fact, "I should be able to live and shouldn't have death."  But it's that weighing process that you would have to be able to engage in.  Do you think you could do that?

Juror: Well, I'm not for sure what you're asking me.  Do I think that I could give him the death penalty, if I thought the reasons were enough to do so?

Mr. Smith: Could you consider the Government's evidence as they presented it in support of the death penalty?

Juror: As long as I didn't say that he had to go - - had to be put to death, leave it to somebody else's decision what to do with him.  I could say he probably needed to or should, but I could not say that he - - myself, that he needs the death penalty.

Mr. Smith: Can you ever imagine a situation so heinous, a murder so heinous, when after having considered the Government's evidence, that you could find for the death penalty?

Juror: No.

125

Mr. Smith: Not under any circumstances?

Juror: I don't think I could do it under any circumstances.  I've never been asked to, but I don't think I could do it.

*Id.*, at pp. 823-825.

When the prosecutor attempted to follow-up, the juror became less sure of herself and began equivocating with the following colloquy occurring:

Mr. Sperling: . . . . . In this case, if the law permitted it and the evidence justified it, could you sign your name to a jury verdict form knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case?

Juror: If I thought the crime deserved it, I probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it.  I could not sign a paper that says the death penalty for him.

\* \* \* \* \*

Mr. Sperling: Do you understand that in this case it's not just a jury recommendation but it is a jury finding, and the judge would not change that recommendation.  That would be the penalty that would be imposed.  Do you understand that, ma'am?

Juror: I could not do that, huh-uh.

*Id.*, at pp. 825-826.  Thereafter, on further questioning by the court, Juror 62 equivocally stated she would "consider" the death penalty since that was her "duty" as juror. *Id.*, at pp. 826-829.  When asked by the prosecutor about her ambiguous responses, the juror made it clear that she was only responding the way she thought she should respond as opposed to what she really believed.  For instance, the prosecutor asked ". . . can you ever envision a situation in which you would sign your name to a death verdict?", and the juror stated: "If

126

the judge told me that that was my options, either the death or - - the death penalty and - - I would do that, yes.  That would be my duty.  I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes."  *Id*., at p. 830.  A few questions later, when asked "If [the judge] simply says, "This is your choice," at the end of the day, are you capable of returning a death verdict for this defendant?"  The juror said "I don't know whether I could or not" and that as a matter of "[personal] conviction, I would never do it."  *Id*., at pp. 830-831.  Further, the juror indicated there were limited circumstances in which she could ever consider the death penalty.  *Id.*, at pp. 832.  Additionally, when asked if she could live with herself if she were to sign a death verdict for a defendant she said no she could not sign it.  *Id*., at p. 834.

The court then made one last attempt to determine whether the juror's views would prevent or substantially impair the performance of her duties as a juror by asking the following:

> . . . if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions - - and I want to repeat those - - if they are, tell me - - your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

The juror responded as follows:

> Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to - - I think I could sign the death penalty, if I listened to the information and that it was bad enough, I - - and you told me that this was my duty and that this - - I probably could sign the death penalty.

127

*Id.*, pp. 835-836.  When asked if she could likewise consider the possible imposition of life imprisonment without the possibility of release, the juror simply said she "certainly could." *Id.*, at p. 836.

Prior to voir dire qualification, this potential juror completed a juror questionnaire in which she was asked certain questions which were relevant to this court's ultimate decision. Specifically, the juror was asked: "Do you have any political, social or philosophical beliefs that may affect your service as a juror?  Yes ☐ No ☐ If yes, please explain:" This juror placed an "X"in the box next to "Yes" and responded, "Couldn't use or Recommend Death Penalty."   She was also asked a couple of questions about her views and opinions regarding the death penalty, to-wit:

1.      Please describe your feelings about the death penalty in your own words.  Additionally, how strong are they and how long have you had them?"  and she responded,  "I couldn't sentence any one to die - as long as I can remember."

2.      Regarding the death penalty, which of the following statements most accurately represents the way you feel?  (You may check one or more than one of the choices):

☐      A.  If a person is convicted of murder and the death penalty is requested, I will always vote to impose it, regardless of the facts and the law in the case.

☐      B.  I am strongly in favor of the death penalty, and would have a difficult time voting against it, regardless of the facts and the law in the case.

☐      C.  I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

☐      D.  I am generally opposed to the death penalty, but I believe I can put aside my feelings against

128

☐     the death penalty and impose it if it is called for by the facts and law in the case.

☐     E.   I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it, regardless of the facts and the law in the case.

☐     F.   I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case.

☐     G.   I have no opinion either for or against the death penalty, and I could base a decision to impose it based on the facts and the law in the case.

Juror 62 responded to this question by marking the boxes next to both paragraphs "E" and "F." Finally, based upon the juror's questionnaire, the court was aware that this particular juror was 70 years old.

When requested by the prosecutor to excuse Juror 62 for cause, this court considered the juror's demeanor, in addition to her remarks both in the courtroom and on her juror questionnaire, in ruling that the juror was "substantially impaired" and was thus, not qualified to serve as a juror. Since appellate courts are required to give deference to a trial court's assessment of a juror's demeanor,[187] this court finds the petitioner has failed to establish that this issue would have been a "dead-bang winner"[188] if it had been raised on appeal. As a result, counsel was not ineffective for failing to raise this issue on appeal. Accordingly, this

---

[187]*Uttecht v. Brown*, 551 U.S. at 7, 127 S.Ct. at 2223, citing *Wainwright v. Witt*, 469 U.S. at 424-26, 105 S.Ct. at 852-853.

[188]Only omission of a "dead bang winner" can result in a finding of ineffective assistance of counsel on appeal. *U.S. v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) citing *U.S. v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995).

129

court finds the petitioner defaulted this claim and has not established cause to excuse the default.

## B.  Juror misconduct

Petitioner does not identify any facts which establish that any misconduct occurred. Rather, the petitioner relies solely on the fact that the jury was not sequestered during the trial to leap to his conclusory allegations that the jurors engaged in "improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case;" that the jurors gave "false or misleading responses on voir dire" and held "improper biases which infected [their] deliberations;" that the jury was improperly exposed to the prejudicial opinions of third parties and had "improper communications with third parties, and/or the trial judge;" and that the jurors improperly prejudged the guilt/innocence and penalty phases of Mr. Barrett's trial.  Doc. 95 at p. 376.  Petitioner does not identify even one matter which was improperly considered by the jury.  He does not identify any publicity which occurred during the trial of this matter, let alone publicity that might have had an influence on the jury.  He does not identify any juror who gave a false or misleading response on voir dire.  He does not identify any juror who improperly communicated with third parties or the judge during the trial proceedings held in this case. Finally, he does not articulate how the jurors improperly prejudged the guilt/innocence and/or penalty phases of his trial.

130

The government asserts this claim has been procedurally defaulted because it was not raised on appeal.[189]   To overcome the default, the petitioner claims appellate counsel were ineffective for failing to raise the issue on appeal.

Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings requires a motion to vacate to "state the facts supporting each ground."   Conclusory allegations are insufficient to support a §2255 claim.  *See*, *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994). To the extent the underlying claim lacks any specificity, as does the claim of ineffectiveness, the petitioner has failed to establish constitutionally-cognizable error on the part of counsel nor can he show legal cause for his default.  Furthermore, despite the government's argument that the petitioner failed to raise the issue on appeal, this court finds the petitioner raised the issue of juror misconduct on appeal actually identifying two particular instances of alleged misconduct and they were rejected by the appellate court.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1101-1102 (10th Cir. 2007).  Accordingly, this court finds this error is frivolous and denies relief thereon.

## XII.  CONSTITUTIONALITY OF PETITIONER'S EXECUTION

---

[189]The Government classifies the issue raised by Petitioner as being "failure to sequester the jury."  While Petitioner may be attempting to assert a claim that it was error not to sequester the jury, he provides no legal authority nor is this court aware of any legal authority that makes it mandatory that the jury be sequestered.  Furthermore, his claim is more appropriately classified as a claim of  "juror misconduct."   In fact, the heading of this claim in both the Motion to Vacate (Doc. 95) and the Brief in Support (Doc. 149) is "Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's rights . . . ." Petitioner then lists, without identifying any particular jurors or identifying any specific facts to support the allegation, what the misconduct consisted of as indicated above.  Only after generically listing the alleged juror misconduct without any particular facts to establish what actually occurred in his case, does Petitioner state "[t]he jury was not sequestered in such a way to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties. . . ." *See*, Doc. 95 at p. 376.  *See also*, Doc. 149 at p. 253.

Petitioner claims in his seventeenth ground for relief that executing him would violate the Eighth Amendment because he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379. Basically, the petitioner argues this court should expand the Eighth Amendment to include not only the mentally retarded and underage offenders, but to also include "mentally ill individuals." *Id*. The government argues 1) the claim is not ripe and 2) the claim is untimely. Even if the court were to consider the claim, the government argues because the claim lacks any basis in existing law, it would require the legally impossible, *i.e.* the retroactive application of a new rule of law. In his reply, the petitioner asserts this claim arises "under the need to continuously review the Eighth Amendment's 'evolving standards of decency' which in this case extend to Mr. Barrett a 'status' based on 'categorical rules' that define Eighth amendment standards . . . ." Doc. 178, at p. 208.

The ripeness doctrine was developed to ensure that courts decide only existing, substantial controversies, not hypothetical questions or possibilities. *In re Cassim*, 594 F.3d 432 (6th Cir. 2010). In the context of a competency to be executed claim, the courts have held that the claim does not become ripe until the execution is imminent. *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

In *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court held the Eighth Amendment prohibits a state from executing an insane inmate. Thereafter, in *Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), the Supreme Court held a competency to be executed claim which had been initially raised in a federal habeas petition but dismissed without prejudice as

premature, was not a "second or successive" petition, when the claim became ripe for review by the state obtaining a warrant for execution. The problem with treating the petitioner's claim as a competency to be executed claim and dismissing it as premature, however, is that the petitioner does not allege that he is incompetent.[190] Rather, he alleges he is "mentally ill." Neither the Supreme Court nor the Tenth Circuit Court of Appeals have ever held that execution of a mentally ill person is cruel and unusual punishment. Further, in *Stewart*, the Supreme Court indicated in a footnote that the "second or successive" rules might apply if the *Ford* claim was not raised in the initial habeas petition. *Id.*, U.S. at 645, S.Ct. at 1622.

Petitioner first raised this claim in his Amended Motion to Vacate filed on September 25, 2009. Doc. 70, at p. 413. Based upon the facts of this case, this court finds the claim was not timely filed. Further, the petitioner has totally failed to support his argument with any legal authority. In fact, existing Supreme Court precedent is directly contrary to the petitioner's argument. *Ford v. Wainwright*, *supra*. Since there is no basis for the petitioner's claim, neither trial or appellate counsel were ineffective in failing to raise this claim. Accordingly, the claim is denied.

## XIII.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's second ground for relief alleges he was denied effective assistance of counsel as guaranteed by 18 U.S.C. §§ 3005 and 3006 and the Sixth Amendment to the United States Constitution. Petitioner claims the following acts and/or omissions of trial

---

[190]In a separate ground for relief, Petitioner alleged he was incompetent to stand trial. In this particular claim, however, Petitioner alleges only that he has "chronic and severe mental illness and organic brain impairments." Doc. 95, at p. 379.

counsel fell below professional norms of capital defense practice: 1) conflict of trial counsel; 2) unreasonable omissions in relation to rearguing motion to suppress; 3) failure to investigate and present evidence of the petitioner's alleged diminished capacity; 4) failure to challenge the petitioner's competence; 5) failure to adequately investigate government's "snitch" witnesses; 6) failure to timely object to allegedly improper hearsay evidence of other bad acts; 7) failure to engage the services of an independent crime scene reconstruction expert; 8) failure to engage a expert on police tactics; 9) failure to impeach law enforcement witnesses with prior inconsistent statements from the state trials; 10) trial counsel unreasonably failed to call Toby Barrett, the petitioner's son, and Alvin Hahn, the petitioner's neighbor; 11) trial counsel unreasonably failed to introduce evidence concerning Barrett's lack of knowledge regarding outstanding warrant; 12) trial counsel unreasonably failed to contest the admission of the testimony of James Horn; 13) trial counsel failed to seek appropriate jury instructions during the first stage of trial; 14) trial counsel failed to make proper objections at trial to preserve issues for appeal, including alleged instances of prosecutorial misconduct; and 15) trial counsel failed to investigate, develop and present appropriate mitigation evidence during the second stage of trial.

In his eighteenth ground for relief, the petitioner asserts he was denied effective assistance of appellate counsel. Specifically, he claims appellate counsel unreasonably: 1) failed to raise the due process violation resulting from the court's *ex parte* communications with the government; 2) failed to raise the *Franks v. Delaware* issue; 3) failed to argue government's inappropriate use of hearsay evidence; 4) failed to challenge jury's exposure

to Horn's testimony; 5) failed to challenge improper prosecutorial conduct; 6) failed to challenge court's restrictions on use of Barrett's statements; 7) failed to appeal use of stun belt during trial; 8) failed to appeal denial of jury instructions on lesser included offenses; 9) failed to appeal denial of residual doubt instruction; 10) failure to challenge court's dismissal of juror 62; 11) failure to appeal lack of a jury instruction requiring proof beyond a reasonable doubt as a weighing factor necessary to impose a death sentence; 12) failed to challenge the removal of the petitioner from the courtroom; 13) failed to raise an issue regarding the allegedly unconstitutional racial bias in the administration of the death penalty; and 14) failed to raise allegedly unconstitutional deficiencies in the indictment.

Many of the allegations have previously been addressed in this opinion. To the extent this court has found no error in the substantive allegations, the court will not readdress counsel's performance, *i.e.* arguments relating to motion to suppress; competency; challenges to jury instructions; restriction on use of Barrett's statements; failure to challenge removal of juror 62; failure to challenge removal of defendant from courtroom; failure to challenge *ex parte* communication with court; failure to challenge the constitutionality of the federal death penalty act; and failure to challenge the sufficiency of the indictment, since the Petitioner could not have suffered prejudice. Where, however, additional allegations have been made, this court has attempted to address each of those allegations.

### *Legal Principles applicable to claims of ineffective assistance of counsel*

Petitioner's claim of ineffective assistance of counsel is governed by the familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104

135

S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms.  In order to establish that counsel's performance was deficient, the petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064.  It is important to remember that the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled."  *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994).  "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir. 2001)).

Second, the defendant must establish that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.  "Prejudice" in this context means "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*   In other words, the petitioner must prove that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2068).

136

Courts may address the performance and prejudice components in any order and need not address both if a defendant fails to make a sufficient showing of one. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Failure to establish either prong of the *Strickland* standard will result in a denial of the petitioner's Sixth Amendment claims. *Id.*, 466 U.S. at 696, 104 S.Ct. at 2069-2070.

In order to establish prejudice in the guilt stage, the defendant has to show "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. While at the penalty stage of a capital case, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.*

The United States Supreme Court has indicated that every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 1065. In addition, the Court indicated the conduct of counsel is "strongly presumed" to have been within the wide

137

range of reasonable professional assistance. *Id.* Further, the Court acknowledged that there are numerous ways to provide effective assistance in a particular case and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*., 466 U.S. at 690, 104 S.Ct. at 2066. As a result, in deciding ineffective assistance of counsel claims, this court is required to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." *Id.*

Prevailing norms of practice can be used as guides in determining what is reasonable, however, it must be remembered that they are only guides. *Id*., 466 U.S. at 689, 104 S.Ct. at 2065. As the Supreme Court has indicated, "'American Bar Association standards and the like' are 'only guides to what reasonableness means, not its definition.'" *Bobby v. Van Hook*, — U.S. —, 130 S.Ct. 13, 17, 175 L.Ed.2d 255 (2009).

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

*Strickland*, 466 U.S. at 688-689, 104 S.Ct. at 2065 (citation omitted). "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable

138

choices." *Bobby v. Van Hook*, 130 S.Ct. at 17 (2009)(citing *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

As will become obvious during the balance of this opinion, the petitioner spends a substantial portion of time in his motion and brief in support thereof complaining about defense counsel's failure to investigate.  In considering whether counsel should have conducted more investigation, it is important to remember that the underlying facts of this case were the subject of two prior state court trials which were conducted before an indictment was ever filed in this case.  Thus, a substantial amount of investigation had been undertaken during the state trial proceedings, including compilation of Mr. Barrett's medical, educational and mental health records, prior to the initiation of the federal proceedings.[191] Additionally, counsel had the benefit of having access to the prior state court trial transcripts and, therefore, substantially more information regarding what many of the government's witnesses were going to testify to than is generally available in a criminal trial.

### A.  *Ineffectiveness of Trial Counsel*

Since Petitioner has challenged the effectiveness of trial counsel during both stages of trial, this court will consider each stage of trial separately.

### **Petitioner's Challenge to Conviction**

Because the petitioner alleges the omissions and/or errors of his trial attorney deprived him of due process, this court will examine each of these errors for violations of constitutional significance.  If any of the errors alleged by the petitioner did, in fact, deprive

---

[191]Respondent's Exhibit No. 12.  *See also*, Doc. 310.

139

the petitioner of his constitutional right to a fair trial, the court must decide if the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

1.  Counsel acted under an "actual conflict" of interest

Petitioner claims that this "court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, . . . . created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense." Doc. 95, at p. 34.  An "actual conflict" for, Sixth Amendment purposes, "is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 1244, 152 L.Ed.2d 291 (2002), n. 5.  In *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998), the Court said,

> [a]n actual conflict of interests results if counsel was forced to make choices advancing other interests to the detriment of his client. *See Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994).  Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance. *See Thomas*, 818 F.2d at 481.  Indeed, '[t]o demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party.' *Danner*, 820 F.2d at 1169.

Although the petitioner attempts to create an actual conflict of interest from innuendos, speculation and suggestions, he does not allege any facts to support his conclusory allegations of conflict.  Conclusory allegations contained within affidavits do not

140

require a hearing. *Strong v. Johnson*, <u>495 F.3d 134, 139-40</u> (4th Cir. 2007). Many of the statements made in support of this artificially created conflict are not supported by the actual court record. Specifically, the orders in this case establish, at best, a desire to ensure that the funds requested were reasonably necessary and that the court did not authorize the hiring of experts who would later refuse to testify without additional funds, as was apparently done in state court.[192] Counsel was advised on several occasions to provide some specificity in regard to their proposed budget.[193] It became apparent very early in the budgeting of this case that Mr. Echols was attempting to be compensated for items that were improper. For instance, at the budget hearing when advised that the court generally paid one-half of the allowable hourly rate for travel expenses and treated the rest as overhead, Mr. Echols made the following comments:

> Mr. Echols: "Sometimes I - - my secretary acts more as a - - sort of an assistant. She goes with me to court. I'm a sole propractitioner, (sic) so when I'm in court, she is with me and my office has a voice mail system. Sometimes she travels with me and we will do things like she will read to me and this kind of thing. We will actually have some meaningful discussion. Do I note that separately, if that's appropriate?

> The Court: If you can do that, if you can show that you are working while you are driving, well, you can get the whole hourly rate, but most of the time it's just strictly windshield time and you don't get the full hourly rate for that. It is hard to give somebody the full hourly rate for driving.

> Mr. Echols: I couldn't agree more. That seems reasonable. One of the things I thought about, I have read these - - we have got all of these records that have got to be put back together. If I had Jan do it, is that something she

---

[192]*See*, Cr. Doc. 310, at p. 32.

[193]*See*, Doc. Nos. 38 and 47.

141

could charge like 25 bucks an hour for or do you just want to stay away from that?

The Court: The thing is, when you are talking about anything other than attorney time, it has to be your actual costs.

Mr. Echols: Okay.

The Court: So we can't just - - like, say, we normally bill somebody $25.00 an hour for legal assistant time, it has to be some - - it has to approximate what you actually spent on her doing that.

Mr. Echols: We will just leave that alone because we live together. We don't need to - - we don't need to go into that then.

*Id*., at pp. 42-44. Additionally, in reducing the number of hours which the Magistrate Judge recommended Mr. Echols be paid in regard to one of only two CJA vouchers submitted by Mr. Echols, the Magistrate Judge found duplication of effort and that there were "striking similarities between the substance of pleadings" which Mr. Echols had previously filed in another death penalty case. Doc. 106, at pp. 3-4. Surely due process does not demand that the court pay for work which is not performed in the specific case that is before the court.

Furthermore, as previously indicated herein, the court on numerous occasions urged defense counsel to submit additional budget requests if they felt the budget needed to be increased. Despite the record, the petitioner asserts because defense counsel never sought to amend the budget,[194] he has shown that defense counsel "were not exercising independent professional judgment on what was in their client's interests." Doc. 149, at p. 25. Such

---

[194]As previously indicated herein, on October 31, 2005, defense counsel did seek a modification of the budget which was granted by this court. *See*, Cr. Doc. Nos. 232 and 244, respectively.

142

conclusory allegations simply do not establish a conflict of interest.  Accordingly, this claim is denied.

### 2.  Failure to Investigate Evidence tending to show Diminished Capacity to Form Intent

Petitioner asserts trial counsel failed to fully investigate and present evidence, during the first stage of trial, that he suffered from mental illnesses that would have negated the government's showing of intent.  First, the petitioner claims counsel unreasonably failed to investigate and call eyewitnesses Toby Barrett and Alvin Hahn who would have rebutted the government's theory as to how the shooting occurred.[195]  Petitioner also claims counsel failed to investigate and/or call witnesses to establish that the actions of the Tact Team were reckless and unprofessional.[196]  Finally, the petitioner asserts trial counsel failed to obtain a proper mental health examination or to obtain testimony from readily available witnesses regarding Mr. Barrett's mental and emotional state.  Other than his two sentence statement about failing to call Toby Barrett, Alvin Hahn and some unknown witness about the actions of the Tact Team, the gist of this allegation against counsel revolves around the petitioner's mental health claims.

As the Supreme Court has indicated "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[195]Doc. 95, at p. 48.  Petitioner does not elaborate on this statement as it relates to his allegation of ineffective assistance of counsel for failing to investigate evidence of diminished capacity.  Rather, he later states that Toby Barrett and Alvin Hahn would have "corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers."  *Id.*, at p. 57.

[196]Petitioner also does not elaborate on this statement as it relates to a failure to investigate evidence of diminished capacity.  *See*, Doc. 95, at p. 48.

unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. "A reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998). To be effective, counsel is not required to "pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999). *See also*, *Lovett v. Florida.*, 627 F.2d 706, 708 (5th Cir. 1980). ". . . *Strickland's* approach toward investigation 'reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.' How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000), n. 22 (citation omitted). Counsel's actions are usually based, quite properly, upon information supplied by the defendant. *Strickland*, *supra*, 466 U.S. at 691, 104 S.Ct. at 2066.

Again, it is important to remember that this is not a case where **no** investigation was undertaken. Rather, the record reflects counsel had the work product of Mr. Echols, who had undertaken substantial investigation for use in two prior state court trials involving the same incident, as well as investigative materials assembled by the Oklahoma Indigent Defense

144

System (OIDS).[197]  Additionally, counsel was aware of the actual testimony in the prior two state court trials because he obtained copies of the transcripts from those trials.

Petitioner has failed to establish that counsel had any reason to suspect that the diagnoses proffered in the § 2255 Motion might have been available.  As this court has previously discussed, there was no indication that the petitioner was incompetent at the time of trial.  Petitioner acknowledges that defense counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] the risk assessment she had done in preparation for a second stage proceeding in state court."  Doc. 95, at pp. 48-49.  What the petitioner fails to acknowledge, however, is that defense counsel employed Dr. Russell for "mitigation and assistance on mental health questions."  *See*, CJA Voucher 060224000004 approved for payment by this court on February 24, 2006.  Furthermore, the documentation supporting this voucher indicates that defense counsel consulted with Dr. Russell "because she was consulted during the State trials as the mitigation expert.  She had accumulated a large amount of information on Kenneth Barrett, . . . ."  *Id.*  Dr. Russell revised her risk assessment concerning Mr. Barrett for use in the federal trial and discussed this information with defense counsel.  *Id.*  Also, on October 11, 2005, Dr. Russell visited Mr. Barrett in the Muskogee County Jail.[198]  Petitioner does not, however, provide any indication that Dr. Russell reported

---

[197]Respondent Exhibit No. 12, at ¶ 4.  Although Petitioner submits a declaration from an OIDS investigator which claims his investigative file was never picked up by Mr. Hilfiger or his staff (Petitioner's Exhibit No. 111), to the extent that OIDS delivered boxes of materials that they had from the state cases to Mr. Hilfiger's office, Petitioner has failed to show that counsel should have contacted Steve Leedy to obtain additional materials or that counsel's failure to do so was unreasonable.

[198]Respondent's Exhibit No. 5 reflects that Anita Russell/Norene Gay - psychologist - visited with Mr. Barrett on October 12, 2005.  Dr. Russell's billing statement indicates she interviewed Mr. Barrett on October 11, 2005.  *See*, supporting documentation accompanying CJA Voucher 060224000004.

anything to counsel that should have led a reasonably competent attorney to suspect neurological and/or psychiatric impairments so profound they would have negated the government's evidence of intent as it related to Count 3.[199]  Furthermore, none of the declarations submitted by lay witnesses[200] herein establish that counsel should have questioned the petitioner's capacity to form intent at the time of the crime involved herein. As a result, this court finds the petitioner has failed to establish that counsel's investigation of his mental health was unreasonable.

### 3.  Failure to Adequately Investigate Government's Civilian Witnesses

Petitioner claims he received ineffective assistance of counsel because his attorneys did not adequately investigate the seven government civilian witnesses.  Petitioner asserts that, upon learning the identities of these witnesses, counsel should have moved for a continuance of the trial.  Additionally, the petitioner argues his trial counsel should have identified and presented evidence to contradict the civilian witnesses testimony and to establish that the witnesses had poor reputations for truthfulness within the community.  The government argues that the petitioner has failed to show that his attorneys' conduct was unreasonable or prejudicial.

While the petitioner surmises this court would have granted a continuance if requested, since no motion was ever filed it is impossible to guess what might have happened.  Further,  to engage in speculation over what might have occurred would involve

---

[199]This court's discussion of lesser included offenses in relation to the felony murder counts addresses why this evidence would not have been important in relation to Counts 1 and 2.

[200]*See*, Petitioner's Exhibit Nos. 74, 78, 81, 86, 93, 96-99, 101 and 103.

the very type of hindsight that the Supreme Court has specifically cautioned against. *See*, *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Pursuant to 18 U.S.C. § 3432, the government was not required to provide the names of any of its witnesses until three days before trial. Additionally, the statute authorized the government to delay furnishing the names of its witnesses "if the court [found] by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Id*. While this court never ruled on the government's motion to delay disclosure of these witnesses' names, the government's disclosure of the names was, in fact, timely. *Barrett*, 496 F.3d at 1116-17.

Further, the petitioner cannot show that the timing of the disclosures prevented him from developing substantial evidence to impeach these witnesses. All of these witnesses were relatives and/or friends of Barrett. Moreover, Barrett was obviously familiar with the people and incidents about which they testified. Each of these witnesses testified to extremely limited events and/or aspects of their relationships with Barrett. Trial counsel believed they could effectively impeach the witnesses with the evidence they had[201] and based upon what this court observed, defense counsel did, in fact effectively, if not perfectly, cross-examine these witnesses. Specifically, counsel highlighted the fact that most of these witnesses had extensive criminal records and apparent motives for bias, because they stood to benefit from their testimony. Counsel also called one witness, Ron Baldwin, to counter Brandie Price's testimony that she had entered Barrett's property thru the ditch in July when they went to Barrett's house. This witness admitted, however, that he might have been with

---

[201]Respondent's Exhibit No. 12, at ¶ 14.

Brandie Price in July when he provided her with methamphetamine and that he had been using drugs heavily during that period of time.[202]   Counsel's decision not to search for additional character witnesses to establish that the government's witnesses did not have a character for truthfulness within the community was reasonable under the facts of this particular case.  The character flaws and questionable memories of these seven witnesses, due to their extensive use of drugs, was readily apparent following their cross-examination.[203]

Additionally, the omission of the character witnesses now identified, most of whom were related to the defendant or were drug associates of the defendant around the time the crimes were committed, would not have changed the jury's perception of the credibility of these seven witnesses.  Based upon the declarations submitted, however, some of these "newly discovered" witnesses could have been more detrimental and/or prejudicial to the defendant. For instance, one of the witnesses acknowledges that the reason he was at defendant's residence was to obtain drugs.[204]  Since the government was required to prove beyond a reasonable doubt that the Defendant was, in Count 1, engaged in drug trafficking crimes, calling this witness could have aided the government's case.  Moreover, unlike the government's witnesses, the witnesses now identified do not even corroborate each other on

---

[202]Cr. Doc. 346, J.T.Tr. Vol. 18, at pp. 4116-4140.

[203]*See*, testimony of: 1) Randy Turman, Cr. Doc. 324 and 325, J.T.Tr. Vol. 2, at pp. 363-392 and Vol. 3, at pp. 396-449; 2) Travis Crawford, Cr. Doc. 325, J.T.Tr. Vol. 3, at pp. 450-480; 3) Randall Weaver, Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1834-1849; 4) Charles Sanders, Cr. Doc. 339, 340 and 342, J.T.Tr. Vol. 11, at pp. 2488-2541; Vol. 12, at pp. 2579-2652; and Vol. 22, at pp. 4586-4590; 5) Cindy Crawford, Cr. 341 and 342, J.T.Tr. Vol. 13, at pp. 3058-3076 and Vol.  22, at pp. 4575-4585; 6) Karen Real, Cr. Doc. 341 and 342, J.T.Tr. Vol. 13, at pp. 3079-3092 and Vol. 14, at pp. 3098-3135; and 7) Brandie Price, Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3485-3511.

[204]*See*, Petitioner's Exhibit No. 90.

facts that the petitioner claims are relevant to establish that the government's witnesses were lying at trial. *Compare*, Petitioner's Exhibit No. 95 (Declarant claims Sanders "was never in Kenny's house because Kenny would never have let him in."), with Petitioner's Exhibit No. 13 (Declarant claims she was at defendant's residence on two or three occasions when Sanders was present.).

Further, while some of these declarant's now claim Barrett never made statements about wanting to kill cops or going out in a blaze of glory,[205] five of the government's witnesses offered testimony about Barrett's hostility towards police and/or these specific type of statements being made by Barrett.[206]   Additionally, at least one of the witnesses the petitioner claims should have been called, would have corroborated at least three of the government's  witnesses regarding the extensive drug use and distribution occurring at the petitioner's house.[207]

Furthermore, much of the evidence which the petitioner now proffers would not have been admissible during his trial to impeach these witnesses. In particular, collateral evidence to establish specific acts of misconduct by government witnesses, including acts of dishonesty and drug use, would not have been admissible to attack the witnesses' character

---

[205]*See*, Petitioner's Exhibit Nos. 95, 90, 77, and 37.

[206]*See*, trial testimony of:  1) Randy Turman (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 401 and 412); 2) Travis Crawford (Cr. Doc. 325, J.T.Tr. Vol. 3, at p. 466); 3) Charles Sanders (Cr. Doc. 339, J.T.Tr. Vol. 11, 2515); 4) Cindy Crawford (Cr. Doc. 341, J.T.Tr. Vol. 13, at pp. 3068-3069); and 5) Brandie Price (Cr. Doc. 343, J.T.Tr. Vol. 15, at pp. 3492-93).

[207]*See*, Petitioner's Exhibit No. 90 (Declarant claims to have done drugs at the petitioner's residence shortly before police raid and says many people were coming and going during the 33 hours he was at the petitioner's residence).

for truthfulness.  *See*, Fed.R.Evid. 608(b) and *Palmer v. City of Monticello*, 31 F.3d 1499, 1507 n. 11 (10th Cir. 1994).

Finally, it should be noted that although the petitioner obtained, almost five years after trial, declarations to establish that there were witnesses which might have been able to contradict testimony given at trial, the petitioner does not allege that he provided trial counsel with these specific witnesses' names or that he provided counsel with information regarding how to contact these witnesses during his trial and that counsel refused to issue subpoenas to them.  Thus, this court finds the petitioner has failed to establish ineffective assistance of counsel in regard to the investigation of the civilian witnesses.  Moreover, even if counsel did not adequately investigate these witnesses, the petitioner has failed to establish prejudice.

4.  Failure to make appropriate and timely objections to improper hearsay evidence of other bad acts

Next, the petitioner asserts his counsel failed to timely object to admission of evidence regarding statements made by the petitioner which were introduced  to establish hostility toward law enforcement and intent to engage them in violence if they came upon his property.  To the extent trial counsel did interpose objections under Federal Rule of Evidence 404(b), the petitioner claims his appellate attorneys were ineffective for failing to pursue the matters on appeal.  The government argues the petitioner failed to timely raise these arguments and therefore, the statute of limitations bars this court's consideration of the same. In his reply, the petitioner alleges because this particular claim is raised only as it relates to testimony offered by the government's civilian witnesses it relates back to his claim of

150

ineffectiveness of counsel in dealing with informant testimony.  To support this position, the petitioner cites *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

In *Mayle*, the court refused to allow relation back where the original petition raised a confrontation clause claim regarding the admission in his murder trial of videotaped testimony of a witness for the prosecution and his amended petition sought to challenge the admission of inculpatory statements he made during pretrial police interrogation under the privilege against self-incrimination.  Although both claims involved the admission of out-of-court statements during the prosecution's case in chief, the Court held the second ground for relief arose out of facts different in both time and type from those set forth in the original pleading.

Here, while both claims deal with ineffectiveness of counsel in dealing with the government's civilian witnesses, the petitioner made no attempt in his amended petition to tie these two claims together.  Even though the petitioner claims he raised the 404(b) issue timely by alluding to it in his first claim alleging that this court's actions violated his constitutional rights,[208] the petitioner never made any allegations that trial counsel were ineffective for failing to object to the testimony given at trial.  To the extent the allegations that counsel were ineffective for failing to investigate these witnesses occurred prior to trial and the failure to object to some of these witnesses' testimony occurred during the trial, this court finds the allegations arise out of different facts in time than those alleged in the original

---

[208] *See*, Doc. 2, at p. 38.

and/or first amended motion.[209]  *See*, *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (holding where original claim referred to admission of evidence and amended claim referred to trial testimony and cross-examination of witnesses, the claims were not similar enough to satisfy the "time and type" test nor did they arise out of the same set of operative facts).

Even if this court were to consider this claim, however, the petitioner would not prevail because counsel were not ineffective for failing to object to statements made by the petitioner or to statements which were intrinsic to the crime charged.  *See*, Fed.R.Evid. 801(d)(2)(A) (a statement is not hearsay if it is offered against a party and is the party's own statement) and Fed.R.Evid. 404(b) (evidence of prior drug transactions can be admissible to prove intent in drug prosecutions).  The statements which the petitioner now claims counsel should have objected to were statements made by the petitioner.[210]  While the petitioner argues his attorney should have objected to these statements because they were inadmissable under Fed.R.Evid. 404(b), this court finds each of the statements challenged were intrinsic evidence of the crimes charged.  *See*, *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999) (quoting *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) "It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime

---

[209]Despite the similarities in the "dump-it-all-in" approach which has been taken in this case with *pro se* filings, this is not a case in which the original and amended timely filed motions were filed by a *pro se* litigant and the subsequent amendment was filed after the statute of limitations expired.  Rather, all of the pleadings filed by the petitioner herein were filed by counsel who were presented to this court as "extremely well-qualified" in federal habeas litigation.  In the opinion of this court, many of the documents have not been submitted in a good faith attempt to direct the court to the legitimate issues in this case, but rather as a way to slow the disposition process.

[210]*See*, Doc. 95, at pp. 122-124.

152

charged, and that other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined."). Petitioner's statements regarding hostility toward law enforcement and/or what he intended to do if law enforcement came onto his property were all intrinsic evidence of the petitioner's express intent. Finally, whether the time frames of these statements, once challenged on cross-examination, were accurate was a question for the jury. Accordingly, this court finds counsel was not ineffective for failing to make objections which would not have been sustained. Similarly, appellate counsel was not ineffective in failing to raise this issue on appeal.

5. Failure to engage a crime scene reconstruction expert

Petitioner claims trial counsel were ineffective in failing to obtain the services of a crime scene expert, in particular Edward Hueske of Denton, Texas, to counter the testimony of Iris Dalley, who had appeared as a witness in Petitioner's two state court trials.[211] Petitioner argues that Dalley's analysis was critical to the jury's consideration of the issue of intent since the only other evidence was "the often conflicting accounts and compromised memories of the tactical team members who testified." Doc. 95, at p. 138. Ms. Dalley's presentation was not, however, critical or necessary for the jury to determine what had happened in this case nor did it ultimately assist the government, as the petitioner claims, in proving intent.

---

[211] Instead of hiring Hueske, defense counsel employed the services of an investigator who helped counsel in preparing questions to challenge the ballistics testimony. *See*, CJA Voucher 060208000004.

153

Specifically, despite the petitioner's allegations, the record establishes that defense counsel were prepared to meet Dalley's testimony. The transcript reveals defense counsel specifically asked some of the very questions which the petitioner's expert now uses to show the inadequacy of Dalley's reconstruction analysis. Dalley was unable to determine the position of the shooter or the position of the victim's vehicle for any of the trajectories.[212] Additionally, as the government's brief points out, trial counsel "effectively elicited [Dalley's] concession that she could not exclude the possibility that Barrett had fired every shot from inside his house, thus confirming the viability of the defense theory." Doc. 175, at p. 71. Furthermore, notwithstanding the petitioner's assertions to the contrary,[213] Dalley never testified Barrett was firing from the porch. Rather, as previously indicated, she consistently denied knowing the exact position of the shooter and the victim's vehicle. Moreover, Dalley only reached two significant conclusions: 1) the defendant could not have fired all of the shots from a prone position and 2) the wounds to Eales's flank and elbow were sustained after he exited his Bronco.[214]

As is amply demonstrated by this case, virtually every cross-examination can be reviewed in hindsight and criticized for failure to ask additional questions and no two criminal defense attorneys will defend a particular client in the same way. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. However, as previously stated, this court must make every

---

[212]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at p. 3175 and 3226.

[213]Doc. 95, at p. 128.

[214]*See*, Cr. Doc. 342, J.T.Tr. Vol. 14, at pp. 3228-3229, 3247, 3254-3255 and 3259.

154

effort to eliminate the distorting effects of hindsight.  *Id.*, <u>466 U.S. at 689</u>, <u>104 S.Ct. 2052</u>. Considering the totality of defense counsel's cross-examination of Ms. Dalley, the questioning constituted adversarial testing and maintained the viability of the defense theory, that Barrett was not shooting from the porch and, therefore, may have had trouble actually observing who was entering his property such that he may not have known that he was shooting at a law enforcement officer.  The relevant inquiry under *Strickland* is not what defense counsel could have done, "but rather whether the choices made by defense counsel were reasonable" under the facts of the specific case before the court.  *Babbitt v. Calderon*, <u>151 F.3d 1170, 1173</u> (9th Cir. 1998).  Furthermore, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.  To the extent defense counsel had the benefit of knowing exactly what Ms. Dalley's testimony would be, since she had previously testified in Petitioner's prior state court trials, this court finds the Petitioner has failed to establish that counsel's strategic decision to allow the testimony and then use it to further his client's defense was not unreasonable.  Therefore, this court finds the petitioner has failed to establish that counsel provided ineffective assistance of counsel by not hiring Mr. Hueske.

6.  <u>Failure of trial counsel to present independent expert on police tactics</u>

Petitioner also attacks counsel's failure to secure the testimony of an "independent" expert to establish that the raid on his house was "rife with tactical errors and poor planning"

155

and that these errors contributed to Trooper Eales's death.[215]   Again, the petitioner claims counsel should have hired a specific expert, George Kirkham.

Instead of hiring Kirkham, counsel relied upon the testimony of Chuck Choney, a former FBI agent, who had previously criticized the Tact Team's operation.  Petitioner claims counsel could not have made a reasonable decision to forego the testimony of Kirkham since counsel never consulted with him.  Trial counsel was not, however, required to try this case in the same way Echols would have tried the case.[216]   Decisions regarding what witnesses to call at trial are a matter of trial strategy.  *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).  The fact counsel called Choney to discuss the tactics was a reasonable trial strategy.  Choney's reluctance to testify for the defense and his association with the victim added to his credibility.  Whereas, a retained expert could have been impeached on the basis of his receiving payment from the defense for his testimony.

Further, Choney actually provided numerous criticisms of the Tact Team operation.[217]   While Kirkham might have provided more or different criticisms of the operation, the petitioner has failed to establish that his testimony would have altered the outcome of the trial.  As a result, this court finds the petitioner has failed to establish that counsel provided

---

[215]Doc. 95, at p. 139.

[216]The record reflects that Choney was actually perceived by former counsel as "the most honest and upright appearing and sounding and testifying witness you would ever want to see.  He used to run the swat team for the FBI in Oklahoma City.  He has worked all around the country.  He is now on the Indian Gaming Commission in Washington.  Just a super guy.  Credentials, you know, perfect."  Cr. Doc. 310, at p. 13.

[217]*See*, Cr. Doc. 345, J.T.Tr. Vol. 17, at pp. 3906-3909, 3919 and 3974-3975.

ineffective assistance of counsel for failing to retain Mr. Kirkham, because no prejudice has been shown.

7.  Failure to impeach law enforcement witnesses with prior inconsistent statements

Petitioner claims his trial counsel provided ineffective assistance of counsel by failing to adequately impeach the testimony of the Tact Team members regarding the circumstances of the shooting.  While the petitioner cites to some of the state court trial transcripts to establish differences in the witnesses' testimony between the state trials and the federal trial, despite submitting more than 3500 pages of exhibits herein, the petitioner has not provided this court with a copy of the pages of the state court transcripts which they have referenced.[218]  It is well-established that "counsel's decisions regarding how to best cross-examine witnesses presumptively arise from sound trial strategy." *Delozier v. Sirmons*, 531 F.3d 1306, 1326 (10th Cir. 2008).  "In hindsight, there are a few, if any, cross-examinations that could not be improved upon.  If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past (sic) muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

Petitioner has failed to establish that the strategy employed in this case was not sound. Specifically, a review of the cross-examination by counsel of the law enforcement witnesses establishes that counsel emphasized the areas which were of importance to the defense. Specifically, counsel demonstrated that the model created by the prosecution's witness did

---

[218]During the trial herein, this court attempted to obtain copies of the state court transcripts from the Sequoyah County Court Clerk's office.  At that time, the court was advised that the transcripts had never been filed in the Sequoyah County District Court.  *See*, Cr. Doc. 336, J.T.Tr. Vol. 8, at p. 1637.

not accurately reflect the house and furnishings as it existed in 1999, including the fact that heavy coverings were over the windows of the defendant's house (allowing counsel to argue it would have been hard for Barrett to see who was coming onto his property); nor did it contain all of the vegetation which existed on the defendant's property at the time of the raid.[219]

While the petitioner complains defense counsel did not impeach Johnson with his earlier state court testimony "that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road,"[220] it would have been counter-productive for defense counsel to have pointed this discrepancy out to the jury since Johnson testified on cross-examination during the federal trial that he was told to give the tact team a two minute headstart, which he did, and all he could see when he approached the residence was taillights on a vehicle turning into the residence.[221]  Additionally, Barrett claims trial counsel should have impeached Johnson's testimony by eliciting evidence regarding his initial statement to Investigator Jones.[222]  Counsel did, however, examine Johnson's statement to Jones, adducing Johnson's admission that he might not have told her about the lights.[223]  Even if inconsistencies occurred between Johnson's testimony regarding lighting, defense counsel made the most important point by establishing that Johnson had

---

[219]*See*, Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 277-294, 298-300.

[220]Doc. 95, at p. 145.

[221]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 343-344 and 349.

[222]Doc. 95, at pp. 145-146.

[223]Cr. Doc. 324, J.T.Tr. Vol. 2, at pp. 361-362.

absolutely no idea what lights were on at the time the shooting occurred because he was, at least two minutes behind the tact team and, therefore, he had no way of observing whether the lights were activated at the time of the shooting.[224]

Petitioner also claims counsel failed to challenge Trooper Poe's testimony that "he initially observed emergency lights when he saw the first Bronco come into view from the east" with prior testimony that "he first became aware of seeing emergency lights *after* he heard shooting break out." Doc. 95, at p. 145. During the federal trial Poe testified as soon as he got out of his car and started toward the fencepost, he heard gunfire. After Poe ascertained he was not the target of the shooting, he came up from behind the fencepost and looked toward the house. At that point he saw Hamilton's Bronco come into view from the east and it appeared the Bronco was taking gunfire.[225] On cross-examination, however, Poe explained that he didn't remember seeing emergency lights from the time he left his car until he reached his assigned position by the post.[226] Thus, the testimony was not inconsistent and counsel was not ineffective for not impeaching Poe with his prior testimony.

Petitioner also complains because counsel did not elicit testimony from Trooper Poe that "he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house." Doc. 95, at p. 146. The testimony at the federal trial, however, made it clear that from the time Trooper Poe exited his vehicle, he was focused

---

[224]Cr. Doc. 324, J.T.Tr. Vol. 2, at p. 351 (shooting was over when he arrived and Trooper Eales was being carried to Bronco).

[225]Cr. Doc. 329, J.T.Tr. Vol. 7, at pp. 1411-1413.

[226]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1444.

upon his own safety as well as the two other troopers who were closest to him. As a result, he took cover and did not really see anything at that point.[227] Thus, it was not unreasonable for defense counsel to rely on his testimony that other than hearing gunfire, he couldn't see anything.

Petitioner attacks counsel's failure to impeach Trooper Greninger's testimony with what he claims was "conflicting evidence between the second state trial and the federal trial regarding what lighting he observed." *Id.*, at p. 145. Petitioner states that Greninger testified in the federal trial that:

> Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights.

Doc. 95, at p. 145. Petitioner indicates this testimony conflicts with Greninger's testimony in the second state trial that "he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on." *Id.* The inconsistencies between these two accounts are insignificant and they certainly do not impeach the evidence that the emergency lights on Greninger's vehicle were activated shortly after the car turned from the roadway in front of Barrett's house. Additionally, defense counsel elicited from Greninger an admission that he did not recall precisely where his car was when the emergency lights on his vehicle were turned on and he did not know when

---

[227]Cr. Doc. 329, J.T.Tr. Vol. 7, at p. 1410.

160

Hash's lights were activated.[228]  Since Greninger admitted upon cross-examination that his memory was not clear, there was no need for counsel to use the prior slightly inconsistent statement as to who in the vehicle activated the lights and when.  As a result of Greninger's admission in the federal trial, counsel could argue that the lights were not on when Barrett first observed the vehicles coming onto his property.  Additionally, to the extent Greninger readily admitted that his memory of the events was imperfect, there would not be much value in trying to refresh the witness's memory about facts that could have been more damaging to the defense.  Thus, the omission was neither unreasonable nor prejudicial.

Petitioner attacks trial counsel saying he failed to impeach Trooper Hamilton's testimony regarding where his vehicle first began receiving gunfire.  During the federal trial, Hamilton testified that his vehicle was initially hit by gunfire "[s]hortly *after* we came out of the ditch."[229]  This appears to be consistent with the statement Petitioner attributes to Hamilton from the state court trial,  "that the shooting started as his vehicle was coming out of the ditch."  Doc. 95, at p. 147.  Further, since Hamilton's recollection supported the defense theory that the lead vehicle was closer to the house when the shooting began, counsel could reasonably have relied on Hamilton's testimony instead of exploring this issue with Greninger as Petitioner claims he should have done.

Petitioner also complains because trial counsel did not contrast Trooper Poe and Trooper Greninger's testimony about guns in the defendant's house with the fact that neither

---

[228]Cr. Doc. 326, J.T.Vol. 4, at p. 771.

[229]Cr. Doc. 325, J.T.Vol. 3, at p. 537.

testified to seeing any guns in the state trial.  Petitioner does not cite to any portion of the state court transcript and, therefore, it is impossible to know if they were even asked about guns in the prior trials.  Accordingly, this court finds the petitioner has not shown that the prior testimony was inconsistent with the testimony offered in federal court.

After thoroughly reviewing counsel's cross-examination, this court finds the petitioner has failed to establish that counsel's cross-examination was unreasonable or prejudicial. Therefore, the petitioner has failed to establish ineffective assistance of counsel.

8.  Failure to elicit testimony of son and neighbor

Petitioner next faults trial counsel for failing to call as defense witnesses his son, Toby Barrett, and his neighbor, Alvin Hahn.  Petitioner claims these two witnesses could have undermined evidence that emergency lighting had been turned on prior to the initial shots being fired.  Toby Barrett is the only one of these two witnesses who actually observed the police enter Barrett's property.[230]  The government argues neither of these witnesses would have meaningfully undermined the prosecution's case, and counsel's omission of their testimony was not prejudicial ineffectiveness.

As previously indicated, decisions regarding which witnesses to call are matters of trial strategy.  Again, based on the prior trials, there can be no question that defense counsel

---

[230]While the petitioner implies counsel did nothing to contradict testimony regarding Barrett's knowledge that the people attacking his property were law enforcement, the record establishes the falsity of this claim.  In particular, Gelene Dotson, the defendant's mother, testified that she heard a loud noise followed by some gunshots and she glanced out her kitchen window and saw headlights in her driveway.  She further testified that she did not see any flashing lights nor any kind of lights on that vehicle she would consider "emergency lights."  Also, she indicated she saw a lot of people milling about, answered her phone and then observed a patrol car come through the gate.  The patrol car she observed did not have any lights on, but as it pulled closer to the defendant's residence "it turned it (sic) lights on."  Cr.Doc. 346, J.T.Tr. Vol. 18, at pp. 4142-4145.  Additionally, Loyd Cobb, an investigator for the defense, testified that you would not have been able to see the three police cars coming through the ditch if you were inside the cabin.  *Id.*, at pp. 4145-4154.

was aware of the prior testimony of Toby Barrett.  Moreover, both Toby Barrett and Alvin

Hahn were originally listed as witnesses for the defendant.  In order to demonstrate prejudice

for failure to call a witness, the petitioner must prove that the witness's testimony would have

produced a different result. *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994).

In reviewing the declarations of Toby Barrett and Alvin Hahn submitted by the

petitioner, it becomes clear that neither of these witnesses' testimony would have changed

the outcome of the first stage of trial.  Specifically, as the petitioner acknowledges,

> a primary contention of the defense in the first stage of trial was that when Mr.
> Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware
> that it was a police vehicle, and was unaware that several police vehicles had
> driven onto his property.  It was undisputed that the lead vehicle driven by
> Hamilton, which the evidence showed struck Mr. Barrett's porch, had no
> emergency lights engaged and appeared to be a civilian vehicle.

Doc. 95, at pp. 149-150.

Petitioner states that Toby Barrett testified in the first state trial that "when the

shooting occurred, there were no police vehicles with emergency lights on at all that were

visible." Doc. 95, at p. 152.  Petitioner goes on to state that Toby's declaration is consistent

with his state court testimony.  *Id*.  The declaration indicates the following in regard to what

Toby Barrett actually observed:

> Just before they raided the place, the first thing I saw were taillights that
> went past the driveway and then a flash of light—maybe like the interior light
> of a car when somebody opened a door to get out.  Then an SUV and a Crown
> Vic went up my great grandma's driveway and then the Bronco turned toward
> the house and I yelled "Dad." I don't recall how many times I yelled it.  It all
> happened so fast.  I thought I saw dad come onto the porch for just a second,
> and then the Bronco was just coming over the ditch made a boom, like it

163

bottomed out, if that's where the sound came from. I looked at the porch again and my dad was already gone.

The Bronco's headlights were coming toward me at first. I know for sure that nothing hit the Bronco until it came to a stop in front of the house, because that's when the windshield exploded and a cop knocked me down and wouldn't let me look toward the house. There may well have been shots before that—again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop.

\* \* \* \* \*

The first police lights I seen was on the police car that crashed through the gate when the shooting was over. I'm sure of that. There was no vehicle near me. The cop who knocked me down must have come over Grandma's fence.

Petitioner's Exhibit No. 96.

Based upon Toby's relationship to the petitioner, there is no question that his testimony would have been susceptible to impeachment for bias. Further, Toby Barrett concedes that he had limited recall of what actually happened because it occurred so fast. However, if as Toby claims he could identify the "Crown Vic" coming onto the property, this testimony would have allowed the prosecutor to argue that the defendant, who was somewhat closer to the vehicles, should also have been able to identify the same vehicle. According to the testimony at trial, the "Crown Vic" observed by Toby had to be the marked police unit driven by Hash with the overhead light bar. Thus, the prosecution could easily have argued, based on Toby's testimony, that the defendant had to have observed the light bar regardless of whether the emergency lights were activated or not.

Even though Toby Barrett might have testified that the defendant didn't fire until the lead Bronco had stopped in front of the house, this testimony would have been undermined

164

by his testimony that he was not sure when the shooting actually began and, therefore, it could have occurred, as the officers testified, before the Bronco stopped. Furthermore, to the extent no witness was able to place the defendant on the front porch during the shooting, Toby's testimony would have allowed the government to argue the defendant was on the front porch when the shooting began.

Additionally, defense counsel have submitted declarations in which they both claim that the petitioner "wanted to minimize the amount of testimony elicited from his relatives, particularly his son, . . . though he understood that decision could work to his detriment."[231] To counter these declarations, the petitioner submits declarations from family members who claim trial counsel never told them that Barrett didn't want them involved in case and/or that Barrett never told them he didn't want them involved. *See*, Petitioner's Exhibit Nos. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, and 220. These declarations are full of hearsay. What the petitioner does not do, however, is submit his own declaration to refute counsel's declaration. Whether or not defense counsel advised Barrett's family of his conversations with Barrett and/or whether Barrett advised his family of his conversations with trial counsel are not the issue. Finally, to imply, as the petitioner does, that Toby Barrett's testimony was the difference between the more favorable results in the state court trials and the federal trial is nothing more than speculation and second-guessing in hindsight as to what might have been.

---

[231]*See*, Respondent's Exhibit Nos. 11 and 12.

While many of the facts between the two cases were the same, the state cases did not involve the same charges or all of the same witnesses as the federal case. Rather, in state court the petitioner was charged with murder and the evidence dealt solely with the raid and shooting which occurred during the raid. Whereas, in the federal case, Count 1 focused on the petitioner's using and carrying a firearm in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death; Count 2 focused on the petitioner's using and carrying a firearm in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, resulting in death; and Count 3 focused on intentional killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties. Thus, the jury heard much more evidence about the drug activities and/or associations with drug abusers which was occurring at Barrett's residence in the days and months shortly before the shooting. Further, the prosecutor would have been able to ask specific questions of Toby Barrett regarding the drug activities which were occurring on Barrett's property and, in light of the evidence which was seized from the travel trailer in which Toby supposedly lived, it would have been hard for him to deny knowing anything about those activities. As a result, this court finds defense counsel's decision not to call Toby Barrett was not unreasonable or prejudicial.

Petitioner also complains because trial counsel did not call Alvin Hahn to testify about what he saw approximately fifteen seconds after the shooting stopped. While the petitioner

166

claims Mr. Hahn would say "he saw only one vehicle with its police lights on,"[232] Mr. Hahn's declarations actually says "there was at least one vehicle with its police lights on."[233]  Mr. Hahn does not identify where that vehicle was located and certainly this statement does not preclude there having been several vehicles with emergency lighting on.  Furthermore, Mr. Hahn does not claim to have had an unobstructed view of the property such that he could have seen all of the vehicles.  Finally, to the extent Mr. Hahn could not testify about the lighting prior to the initiation of the shooting, it is unlikely his testimony would have altered the outcome of the jury's verdict.  As a result, this court finds counsel was not ineffective in failing to call Mr. Hahn as a witness nor was the petitioner prejudiced thereby.

9.  Failure of counsel to develop evidence that Barrett was not aware that there was an active felony arrest warrant outstanding

Petitioner asserts counsel provided ineffective assistance by not presenting evidence that he was unaware that the state court had issued a warrant for his arrest.  The government argues the petitioner failed to timely raise this argument and therefore, the statute of limitations bars this court's consideration of the same.

A review of the pleadings herein, convinces this court that the petitioner first raised this issue on September 25, 2009[234] and this court finds the allegations arise out of different facts in time than those alleged in the original and/or first amended motion.  Thus, the claim is barred by the statute of limitations.

---

[232]Doc. 95, at p. 153.

[233]Petitioner's Exhibit No. 75.

[234]*See*, Doc. 70, at pp. 173-174.

167

10. Failure of counsel to contest James Horn's testimony

Petitioner also complains trial counsel were ineffective for failing to prepare for James Horn's testimony and to interpose a *Daubert*[235] challenge to the testimony prior to trial. Additionally, the petitioner asserts trial counsel were ineffective for failing to obtain an adequate curative instruction and/or to seek a mistrial after they successfully moved to strike Horn's testimony. Finally, the petitioner argues his appellate attorneys were ineffective for failing to argue that the jury's exposure to Horn constituted plain error. The government contends trial counsel's successful motion to strike Horn's testimony moots his various complaints about counsel's alleged failures to prepare for the witness. Additionally, the government argues the jury's exposure to Horn's testimony was not a valid basis for mistrial or an appellate claim of plain error.

Despite the petitioner's assertions regarding counsel's lack of preparation, it is clear counsel was prepared for Horn's testimony because he had been allowed to testify in both of the prior state trials.[236] After hearing Horn's testimony, including some of the cross-examination questions posed by defense counsel, the court became concerned that while Horn might have expertise concerning traumatic events, he was not being called to discuss the specific facts in the defendant's case. Thereafter, defense counsel moved to strike the testimony.[237] Since defense counsel had not completed their cross-examination, the court

---

[235]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[236]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 942.

[237]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 938.

168

took the issue under advisement and allowed defense counsel an opportunity to complete their cross-examination.[238] After defense counsel obtained the admission of Horn that he was not there to discuss any specific individual comments which the Tact Team members had made to him, defense counsel renewed their motion to strike Horn's testimony.[239] The court gave the government an opportunity to rehabilitate the witness but after defense counsel pointed out that Horn could not express an opinion about any of the individuals involved, the court  made the following findings:

> Based upon the testimony before the Court, there is no way to challenge Mr. Horn's theories in an objective sense.  While Mr. Horn clearly has had real life experiences far in excess of an average person dealing with the issues he discussed, this Court is not convinced that his testimony has been subjected to or been scientifically tested in such a manner to make the evidence reliable under *Daubert*.  The Court would note, however, based upon defense counsel's questioning, that the subject of Mr. Horn's testimony aimes (sic) to have been the subject of peer review and publication.  Furthermore, it would appear that defense counsel made a strategic decision to allow the testimony and then challenge it before the jury in an effort to discredit the value of the testimony. Defense counsel did an admirable job in his cross examination of Mr. Horn. Generally, a trial court's focus should not be on the methodology employed in reaching those conclusions.  That's by Butler (sic) versus A.O. Smith, 391 F.3d 1114, at 1121, 10th Cir. 2005.
>
> This Court doesn't know what methodology was used, nor what conclusions Mr. Horn reached, if any, based upon the actual facts involved in this case.  Furthermore, as indicated earlier, this Court does not believe Mr. Horn's testimony will assist the tryer (sic) of fact in determining the issues herein.  At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue.  Additionally, my review of Mr. Horn's testimony leaves me with a definite conviction that Rule 702 only authorizes testimony by an expert in the form of an opinion, if, (1), the testimony is based on sufficient facts or data;

---

[238]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 949.

[239]Cr. Doc. 327, J.T.Tr. Vol. 5, at p. 958.

169

(2), the testimony is the product of reliable principles and methods; and (3), the witness has applied the principles and methods reliably to the facts of this case, and I emphasize the facts of this case. Mr. Horn did not testify regarding any opinions based on the underlying facts or data of this case or the individual responses of the officers involved. He did not offer an opinion regarding the specific facts of this case or identify any reliable principles or methods which he actually applied to the facts of this case. Rather, his testimony indicated that his focus was on helping the officers cope with the traumatic experience, not critiquing the differences in their memories or whether the differences were explained by the traumatic event they experienced.

Therefore, this Court finds Mr. Horn's testimony is neither reliable, nor will it assist the tryer (sic) of fact in determining an issue of fact in this case pursuant to Rules 702 and 1046 (sic) of the Federal Rules of Evidence. It should not have been admitted herein. Accordingly, I'm going to strike the testimony and admonish the jury to disregard it.

Cr. Doc. 336, J.T.Tr. Vol. 8, at pp. 1634-1636.

Later that day, the court advised the jury that it had struck Horn's testimony and instructed the jury as follows:

Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial. As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law. As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial. You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

*Id.*, at pp. 1739-1740.

Federal courts are to

presume that jurors will follow clear instructions to disregard evidence 'unless there is an overwhelming probability that the jury will be unable to follow the

170

> court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.' *United States v. Cabellero*, 377 F.3d 1235, 1243 (10th Cir. 2002) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)).

*United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008).

A careful review of Horn's testimony establishes that the testimony was potentially as helpful to the defendant as to the government in that defense counsel's cross-examination focused on the unreliability of witness testimony six years after the event providing opportunities for defense counsel to argue there was reasonable doubt about what occurred during the raid on Barrett's property.[240]  Because the testimony was potentially helpful to the defendant and because the jury was admonished to disregard the testimony in its entirety, this court finds the petitioner has failed to establish that defense counsel's strategy was unreasonable or that he was prejudiced by the jury hearing the testimony or trial counsel's failure to move for a mistrial following the court's striking of the testimony in its entirety. As a result, the petitioner's claim of ineffective assistance of counsel must fail.  Furthermore, since the petitioner was not prejudiced by trial counsel's actions, appellate counsel was not ineffective in failing to raise this issue on appeal.

11.  Trial counsel's failure to make "proper objections"

Next, the petitioner claims trial counsel were ineffective for omitting objections which resulted in the appellate court reviewing many of his appellate claims for "plain error."  Doc. 95, at pp. 178-180.  Barrett has not, however, established that he was prejudiced by the

---

[240]*See*, Cr. Doc. 326, J.T.Tr. Vol. 4, at pp. 863-889 and 891-917; and Cr. Doc. 327, J.T.Tr. Vol. 5, at pp. 950-957 and 972-975.

failure of trial counsel to object to any of the items which the Tenth Circuit reviewed for plain error.

Specifically, Barrett first argues trial counsel was ineffective for failing to object to "the prosecution's violation of Oklahoma state law requirements for nighttime search warrants." *Id.* In considering the merits of this claim, the Tenth Circuit found "there was no error on the part of the district court, let alone plain error." *United States v. Barrett*, 496 F.3d 1079, 1089 (10th Cir. 2007). Thus, the petitioner can not establish prejudice.

Second, Barrett claims trial counsel was ineffective for failing to object to "the improper execution of search warrants by federal officers" and "the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home." Doc. 95 at p. 178. In rejecting Barrett's challenge to the execution of the search warrants, the Tenth Circuit found it was permissible under Oklahoma law for the federal law enforcement officers mentioned in the search warrant to be involved in the execution of the warrant. *Barrett*, 496 F.3d, at p. 1090. Additionally, the Tenth Circuit found the warrant was not federal in character. *Id.*, at p. 1091. Therefore, the warrant was not subject to the requirements of Fed.R.Crim.P. 41. As a result, even if trial counsel had objected to federal officers being involved in the execution of the warrant, Barrett would not have prevailed on this claim.

Barrett also argues trial counsel was ineffective in failing to raise various objections to the indictment. Doc. 95 at p. 178. Again, although the Circuit Court reviewed Barrett's challenges to the indictment for plain error, the court made clear that there was no error in

172

the indictment. *See*, *e.g.*, *Barrett*, 496 F.3d at 1093 (". . . Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense . . ."); *id*. at 1094 ("As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense."); and *id*. at 1094-95 (rejecting *Ring*[241] claim because it did not apply to defendant's indictment). Additionally, in rejecting the defendant's multiplicity argument, the Tenth Circuit applied the same test to the indictment that would it would have utilized under *de novo* review, *i.e.*, the test established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The Tenth Circuit also rejected "Barrett's misjoinder arguments as wholly lacking in merit." Finally, a previously indicated herein, the superseding indictment was legally sufficient. As a result, this court finds trial counsel was not ineffective in failing to make futile objections to the indictment.

Further, Barrett challenges trial counsel's failure to object to the victim impact evidence. In reviewing this claim on appeal, the Tenth Circuit found:

> . . . . the victim impact testimony now objected to by Barrett was relevant and properly admitted by the district court to show Eales' uniqueness as an individual human being. . . . . . we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony.
>
> <div align="center">* * * * *</div>
>
> . . . it is clear that the district court did not violate the Federal Rules of Evidence in admitting the challenged testimony from Kelli Eales.

---

[241]*Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

<div align="center">173</div>

*Barrett*, 496 F.3d, at pp. 1099-1100. Additionally, as to the admission of four photographs of Trooper Eales, the Circuit Court held ". . . we are not persuaded that the district court committed any error, let alone plain error, in admitting these four photographs. *Id.*, at p. 1101. Given the Tenth Circuit's consideration of Barrett's challenges to the victim impact evidence, it is clear that a different result would not have been reached even if trial counsel had interposed objections to the victim impact evidence. As a result, Barrett was not prejudiced by trial counsel's lack of objections to this evidence.

Petitioner next challenges trial counsel's failure to object to "the prosecutor's use of racially motivated strikes in violation of *Batson*."[242] While the petitioner states "defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual,"[243] the petitioner presents no argument to support this conclusory statement. Further, the petitioner's *Batson* claim would have been rejected even if counsel had made contemporaneous objections to the government's peremptory strikes. *See*, *Barrett*, 496 F.3d, at 1105-1106. Thus, trial counsel was not ineffective for failing to raise a frivolous objection.

Petitioner also alleges trial counsel was ineffective for failing to challenge the constitutionality of the federal death penalty statutes. While the Tenth Circuit referred to the plain error standard in rejecting the challenges on appeal, it is clear that the same result would have been reached if the court had reviewed the claims *de novo*. Specifically, the

---

[242]*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[243]Doc. 95, at p. 179.

petitioner's challenge to the federal death penalty statute's use of non-statutory factors in aggravation was foreclosed by prior Tenth Circuit precedent, to-wit: *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006).  Similarly, the petitioner's challenge regarding proportionality review was governed by prior Supreme Court precedent, to-wit: *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).  Furthermore, even if trial counsel had argued that the court's use of "a relaxed standard for the admissibility of evidence" violated *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), it is clear this challenge would have not been successful.  *See*, *Barrett*, 496 F.3d, at 1109-1110 ("Although the Court in *Woodson* emphasized that it is constitutionally problematic for a jury in the sentencing phase of a capital case to be provided "unguided and unchecked . . . discretion," 428 U.S. at 302, 96 S.Ct. 2978, the sentencing phase evidentiary standard employed by the FDPA clearly does not afford the jury any such unbridled discretion.")  Finally, the petitioner would have faired no better if trial counsel had challenged  the "impermissibly vague aggravating factors,"[244] since the Tenth Circuit held ". . .it is clear that § 848's general allowance of non-statutory aggravating factors is constitutionally permissible," *Barrett*, 496 F.3d, at 1110, and the petitioner makes no attempt in his motion to vacate to address any particular non-statutory aggravating factor alleged in his case.  Furthermore, the petitioner still does not attempt "to explain how this alleged deficiency in § 848's sentencing scheme prejudiced him." *See*, *id*.  Therefore, this court finds trial counsel was not ineffective for failing to raise these arguments.

---

[244]Doc. 95, at p. 179.

175

Next, the petitioner has asserted that counsel was ineffective for failing to challenge "the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor." Doc. 95, at p. 179. In rejecting this claim on appeal, the Tenth Circuit held ". . Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3." *Barrett*, 496 F.3d, at 1111. As a result, this court finds counsel was not ineffective in failing to raise this objection.

Finally, the petitioner asserts trial counsel was ineffective for failing to object to "the Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill." Doc. 95 at p. 179. To the extent that the trial in Barrett's case did not commence until the jury voir dire began, *see*, *Barrett*, 496 F.3d, at 1115-1117, the government was not required, pursuant to 18 U.S.C. § 3432, to turn over the names of its witnesses until three days prior to Monday, September 26, 2005. The government disclosed these witnesses on September 19, 2005 or a full week before Petitioner's trial actually began. As a result, this court finds counsel was not ineffective in failing to raise this objection.

**Petitioner's Challenge to Second Stage of Trial**

Petitioner claims that trial counsel acted ineffectively in failing to present mitigating evidence regarding his dysfunctional childhood and that he suffered from bipolar syndrome and organic brain damage. Petitioner claims "trial counsel had a duty to retain a mitigation

176

1943

specialist to assist in preparation for the penalty phase" of trial and that trial counsel failed to consult with experts and/or counter the government's case.  Doc. 95 at p. 186.

In support of this allegation, the petitioner has submitted declarations from three attorneys who have opined as to the effectiveness of representation provided by trial counsel.[245]  Each of these declarations are laden with hearsay and contain no citations to the record of what actually occurred in this case.  The first affidavit is from John Echols regarding what he felt should have been done after he voluntarily requested permission to withdraw from the case.  *See*, Petitioner's Exhibit No. 34.  Despite Mr. Hilfiger's extensive federal criminal trial experience as well as prior experience trying a federal death penalty case in the Eastern District of Oklahoma, Mr. Echols states "Mr. Hilfiger was not qualified" to act as first chair in a federal capital case.  Further, it is interesting that Echols, who the Federal Public Defender represented as being qualified to try this case, claims several additional things needed to be done to adequately prepare for the second stage of a capital case.  However, based upon his own statements these things were not done for either of the two prior state court capital trials which he was responsible for trying.

Mark Hendricksen states:

> It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted.  There was effectively no second stage investigator for Mr. Barrett.

---

[245]Petitioner also cites to exhibits which have no discernable relevance to the allegations regarding ineffective assistance of trial counsel during the second stage of trial.  *See*, Petitioner's Exhibit Nos. 50 and 51.

Petitioner's Exhibit No. 29, at p. 1.

Finally, Julia O'Connell submits a declaration containing her "suspicions" and "impressions" regarding trial counsel as opposed to factual information. Further, without any knowledge as to what information counsel actually possessed or even when the trial was scheduled to start, she states "there was no time for an adequate second stage investigation." Petitioner's Exhibit No. 67.

Despite the petitioner's allegations that trial counsel did not secure the services of a mitigation specialist, the record in this case establishes that counsel did, in fact, retain a mitigation specialist.[246] This specialist, Dr. Jeanne Russell and another psychologist met with the petitioner in the jail[247] and Dr. Russell updated her information about the defendant and was prepared to talk about prison life and future dangerous.[248] Petitioner, however, did not want to present a case in mitigation that centered on sympathy for him or dwell on his family even though he was apprised by counsel that this could work to his disadvantage. *See*, Government's Exhibit Nos. 11 and 12. Additionally, as previously discussed herein, defense counsel met with several of the petitioner's relatives and none of them provided any information that led counsel to believe the petitioner suffered from a significant mental health condition. *Id.* Petitioner was cooperative, helpful and communicative with counsel. He was well behaved in trial and had a clear understanding of the proceedings. *Id.* While the

---

[246]*See*, CJA Voucher No. 06022A000004.

[247]*See*, Government Exhibit No. 5.

[248]*Id. See also*, letter from Roger Hilfiger attached to the CJA Voucher.

petitioner has produced documents and declarations establishing that his family is genetically predisposed to mental illness, he has not shown that this information was ever shared with trial counsel or that there were any documents in the files delivered to trial counsel that would have suggested a need to investigate the possibility of mental illness. Trial counsel have no memory of having received the report from Bill Sharp which the petitioner now claims should have informed trial counsel of the need to investigate the petitioner's mental health. *Id.* Petitioner has not presented any evidence to show counsel were ever provided this specific information. In fact, although OIDS had boxes of files delivered to Mr. Hilfiger, according to the declaration by Steve Leedy, at least one box of OIDS' files remained in his office.[249] Since counsel did not know of facts that should have alerted them to the need to conduct a mental health examination, their failure to investigate this issue further can not be considered deficient. *See*, *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003).

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Thus, competent counsel would choose to omit investigation of areas which they had no basis to suggest would be fruitful and focus on areas they knew would be important at trial.

Even assuming Petitioner's allegations that trial counsel provided ineffective assistance in the second stage were true, this court finds the petitioner has failed to establish

---

[249]Petitioner's Exhibit No. 111.

179

prejudice.  Specifically, defense counsel presented testimony during the second stage to establish that the defendant was a valuable member of his family and community who had been treated unfairly by the government.  Defense counsel made a strategic decision not to focus on Barrett's history of drug abuse because they felt it would not be well received by the jury.  *See*, Government's Exhibit Nos. 11 and 12.

As a result, counsel presented evidence that the defendant had already been punished for the death of Trooper Eales and the shooting of Trooper Hamilton and that the defendant had no prior felony convictions.[250]  Additionally, counsel presented evidence from the defendant's case manager[251] at the Oklahoma Department of Corrections to establish that the defendant was being treated differently than other inmates with the same security level based on a decision from top management.  According to the testimony, as a result of the administrative notice, the defendant would not be able to receive the normal good time credits allowed other inmates and he would be locked down at the Oklahoma State Penitentiary (a maximum security prison) twenty-three hours a day.[252]  The evidence also established the defendant had not engaged in any acts of misconduct while in prison and that he was considered moderately likely to succeed if provided with substance abuse treatment.[253]

---

[250]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4715-4782.

[251]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4794-4877.

[252]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4823-4827.

[253]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4828 and 4840-4843.

Counsel also presented evidence from several of the defendant's friends and relatives that gave the jury some insight into his upbringing. Basically, Kathy Trotter, the defendant's cousin, testified that she grew up with the defendant. While she moved away from the community when she was a senior in high school, Ms. Trotter testified she moved back and had been a process server for sixteen years and, therefore, she was very familiar with what happened in her community. Ms. Trotter testified she never knew of any violent actions on the part of the defendant, prior to September 1999, other than rumors about his marriage to Abby Stites. Ms. Trotter also testified that everyone in the defendant's family grew up around and always had guns.[254]

The defendant's brother, Steven Barrett, testified that the defendant is seven (7) years older than him and that they have another brother, Richard, who is two (2) years younger than the defendant. He also testified that his parents were divorced when he was approximately two years old and moved to Sallisaw when he was four years old. Further, he testified that the defendant was not a violent person; rather, he was just anti-social and preferred to be by himself. Steven admitted that the defendant had smoked marijuana when he was younger; but he was not aware of the defendant using any other drugs.[255]

Roger Crawford, the defendant's uncle and neighbor, testified that the defendant was a good neighbor who could always be counted upon if his uncle ever needed anything. Crawford testified he never felt threatened by the defendant and that he had been over to the

---

[254]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4783-4793.

[255]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5030-5051.

181

defendant's when the defendant overhauled an engine for him.  He indicated Barrett was a good hardworking mechanic and a good framer, carpenter.  While Crawford said he might have suspected the defendant used drugs, he had no personal knowledge that the defendant had ever used drugs.  Finally, Crawford testified that Barrett was "a good person," who had a good relationship with his son.[256]

Craig and Clyde Edgmon also indicated the defendant was a good neighbor and that they had never known him to be violent or make any kind of threats to anyone.  Further, they testified Barrett was a good mechanic and that he did a lot of mechanical work for them  for small sums of money and/or for free.[257]

The defendant's mother, Gelene Dotson, advised the jury that she lived in Illinois and New Jersey with her husband and three sons until she left her husband, Ernie Barrett, and moved back with her sons to Oklahoma.  She testified the defendant was 12 years old when she moved back to Oklahoma and that he went to school in Sallisaw.  She indicated the defendant was an average boy, but he was always hyper.  She also testified Barrett moved back to Indiana and lived with his dad for a year when he was in the 9th grade and then he came back to Oklahoma and lived with her.  When the defendant was 16 he quit school, after a disagreement with the superintendent over the length of his hair.  Once he quit school, Dotson indicated that the defendant went to work at Blue Ribbon Downs caring for horses for about a year.  After he turned 18, the defendant left home to work pipeline and oil rigs

---

[256]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5052-5070.

[257]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4920-4927 and 4929-4939.

in Western Oklahoma.  While working pipelines in Idaho, the defendant came back to Sallisaw around 1980 and married Abby Stites.  Dotson testified the defendant had a stormy relationship with his wife indicating, however, that there arguments were verbal not physical. After about 13 years of marriage, the defendant and his wife got a divorce.  At the time of the divorce, Dotson stated the defendant worked out of town all week and would come and stay at her house with her on the weekends.  Shortly thereafter, in about 1994, the defendant began building his cabin next door to her house.  Dotson denied ever seeing the defendant use drugs.  The defendant ate his meals and took showers at Dotson's house.  Dotson also told the jury that the defendant seemed calmer since the incident and that he knew he had made a wrong decision on the night of the shooting and if he could he would do it differently. Finally, Dotson advised the jury that although she had disagreements with the defendant over the years, he never touched her physically and she never feared that he would.[258]

Abby Stites, the defendant's ex-wife and mother of his son Toby, testified that she was married to the defendant for 14 years.  During the marriage, Stites admitted that the couple often engaged in mutual physical combat.  Stites indicated, however,  weapons were never used.  Stites further testified that she often observed the defendant boasting of a willingness to use violence, but she had never seen him act on those threats.  Finally, Stites mentioned the fact that she had participated in an effort to have Barrett committed to a

---

[258]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5071-5105.

hospital in 1986, because she felt like he needed "mental help."[259]  Following her divorce

from the defendant, she testified they shared joint custody of their son.[260]

Ernest Barrett, the defendant's father, also testified conceding that he did not have a

close relationship with his son until after this incident.  Mr. Barrett testified that he visits with

his son by phone, letter and that he had visited him every other week when he was in the

county jail.  Further, Mr. Barrett stated that he never knew the defendant to be violent

towards anyone.  Moreover, Mr. Barrett advised the jury that the defendant was sorry for

what had happened and that the defendant never really intentionally shot anybody; rather, all

he ever saw was a headlight.[261]  Finally, Doris Barrett, the defendant's step-mother testified.

She claimed that she had developed a very close relationship with the defendant following

the shooting incident.  She testified she cared for the defendant like her own son; that she was

very concerned about him; and she intended to maintain her relationship with him.[262]

Trial counsel tried to persuade the defendant to testify during the second stage, but

despite not having been in the courtroom to hear the evidence prior counsel John Echols,

through the defendant's step-mother, convinced the defendant that he should not testify.  *See*,

computer disk of telephone calls from Muskogee County Jail attached to Cr. Doc. 265.  In

this court's opinion, this decision had a negative effect on the jury who had witnessed the

---

[259]Although Stites claimed the defendant needed "mental help," records introduced by the defendant from the Oklahoma Department of Corrections indicated the defendant was inpatient at Eastern State Hospital for drug treatment in 1987. *See also*, Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4830-4831.

[260]Cr. Doc. 352, J.T.Tr. Vol. 24, at pp. 4877-4920.

[261]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5105-5119.

[262]Cr. Doc. 353, J.T.Tr. Vol. 25, at pp. 5119-5125.

184

defendant display absolutely no remorse by jumping out of his seat and verbally attacking the prosecutor during closing arguments and then requesting to be removed from the courtroom.     While the defense case was not ultimately successful, this court agrees with the government that, it was clearly persuasive.  After hearing the evidence and observing the defendant's own conduct, the jury unanimously found that the defendant was not likely to commit future acts of violence. Cr. Doc. 258.  Furthermore, the jury unanimously found the following mitigating factors: 1) the defendant, at the time of the incident, had no prior felony convictions; 2) the defendant was a father; 3) the defendant was a loved son and stepson; and 4) the defendant's death will impact his child, family and friends.  *Id.*  A majority of the jurors also found the defendant was a good neighbor and friend.  *Id.*  Additionally, five jurors found that the defendant had accepted responsibility for Eales's death from his prior conviction and that he had been punished and convicted for that death.  *Id.*  Finally, two jurors found as mitigating factors that the defendant did not constitute a future danger to society.  *Id.*

To the extent the petitioner now argues his counsel should have presented evidence that he was mentally ill and came from a dysfunctional family, he simply can not show that such evidence would have led to a more favorable outcome.  Many of the records contained within the petitioner's medical records could have been used by the government to totally negate the jury's findings that the petitioner was a loved son and stepson, a good neighbor and friend, or a person whose death would have an impact on his family and friends.  While the petitioner may have obtained a diagnosis of bipolar syndrome, post-traumatic stress

185

disorder and organic brain damage in 2009, the medical records which he has submitted

establish that medical professionals who saw him much closer to the murder observed that

the petitioner was a dangerous and assaultive drug addict. For instance, on October 8, 1986,

Abby Barrett, the Petitioner's ex-wife, executed a sworn statement in which she stated, in

part:

> Kenny Barrett has sexually abused me, he has threatened to kill me, he has
> threatened to kill himself. He has came and kidnapped my son, . . . . He has
> come in my house sliced up all my furniture, before he took everything and
> burned it in the front yard. Kenny is a very dangerous person to himself and
> others. He is abusing drugs, . . . .

Government Exhibit No. 13. The medical document prepared by the staff at Eastern State

Hospital that same day describes the petitioner has having no neurological impairment and

the petitioner denies he has had any head injuries. Government Exhibit No. 15. Another

document indicates the petitioner did not follow thru with his psychiatric regimen following

a prior suicide attempt and that the petitioner had a history of drug abuse. Government

Exhibit No. 16. The discharge summary nine days later, indicates, in part:

> Patient and his ex-wife are not getting along; ex-wife reports he sexually and
> physically assaulted her, not knowing if charges would be filed or not, and the
> mother of the patient petitioned for a commitment for treatment of the patient.
> . . . . Patient has been abusing different kinds of drugs since the age of 16, and
> admitted taking marijuana and downers.
>
> * * * * *
>
> PROGNOSIS:   Guarded, because of the unpredictability of his behavior,
> depending on the circumstances and depending on whether or not he is taking
> drugs at the time.

Government's Exhibit No. 16.

A report explaining the denial of a social security claim decided a few months after the petitioner's stay at Eastern State hospital summarized the petitioner's medical records as far back as 1980, concluding that the petitioner showed "no signs of a severe mental illness" and was able most of the time "to think clearly and carry out normal activities." Government's Exhibit No. 20.

In January of 1995, the petitioner was brought to the emergency room of the Sequoyah Memorial Hospital in an agitated state by his mother. He was treated with Haldol and received a provisional bi-polar diagnosis. Government's Exhibit 19. Three days later, however, the petitioner was discharged with a final diagnosis of organic effective disorder, polysubstance abuse, amphetamine dependence, urine drug screen positive for cannabis and marital conflicts. Government's Exhibit 18. According to the medical records, the petitioner reported "that he got into an argument with his wife and he was afraid that he was going to lose his temper and so he decided that he would leave home for a little while, come here and cool himself down." *Id.* Additionally, the treating doctor indicated that the petitioner

> did not appear anxious or depressed. . . .Petitioner reported that he was feeling calm, denying any suicidal/homicidal ideations, denying any auditory or visual hallucinations. Thought process was not paranoid or delusional. Patient's memory was intact in all three spheres. He had good attention and concentration span. . . . .

*Id.* Finally, at the time of the murder, a blood test established that the petitioner had used amphetamines and marijuana. Government's Exhibit No. 17.

As the government points out, "Barrett's records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs." Doc. 175, at p. 149. As

187

previously indicated, the petitioner's trial counsel did not believe the jury would be sympathetic to the petitioner's drug use[263] and the petitioner has failed to establish that the introduction of this evidence would not have been more negative than positive. To the extent that this evidence would have shown the petitioner was drug-dependent and violent towards his own family, this evidence would have strengthened the government's argument that he was a future danger to society.

Moreover, while the petitioner goes to great links to establish that many of his relatives suffered hardships or the effects of mental illness, he fails to establish any nexus between the suffering of his relatives and any viable theory of mitigation. Evidence that the petitioner had suffered a dysfunctional upbringing at the hands of mentally ill relatives could have also convinced the jury not only that the petitioner was a future danger but also that his family was too dysfunctional to have cared about him.

Finally, if the petitioner had introduced the evidence now offered, the government would have been able to introduce evidence from their mental health expert, which trial counsel was aware of, that would have portrayed the petitioner as a psychopath. *See*, Cr. Doc. 238. Thus, this court finds the omitted evidence could only have been submitted as an alternative theory to the mitigation case actually developed by trial counsel. Accordingly, this court finds the attack on trial counsel's strategy is based entirely upon the benefits of hindsight and, therefore, is inappropriate. Petitioner has completely failed to establish he was prejudiced by the omission of evidence regarding his alleged mental illness.

---

[263]Government's Exhibit Nos. 11 and 12.

Furthermore, if the defendant had called an expert to testify about his alleged mental deficiencies, the government would have countered that testimony with their own expert. *See*, Cr. Doc. 237. Just from the portion of the psychological report submitted to defense counsel, they had to have been concerned about Dr. Price potentially testifying that the defendant was a psychopath. *See*, Cr. Doc. 238. Moreover, since Dr. Russell had conducted and updated her risk assessment of the defendant, counsel made a tactical decision after consulting with Dr. Russell "that a mitigation expert would be more detrimental than advantageous"[264] to the defendant.

## B. *Ineffectiveness of Appellate Counsel*

Having found no merit to the allegations of ineffective assistance of trial counsel, this court finds no merit to those same claims raised as ineffective assistance of appellate counsel for failure to raise those issues on appeal. Accordingly, this claim is denied.

## XIV. CUMULATIVE EFFECT OF ERRORS

Petitioner alleges in his nineteenth ground for relief that the cumulative effect of the errors involved in his case "violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness" and, therefore, his conviction and sentence must be vacated. In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors – were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial." *United States*

---

[264]*See*, letter of Roger Hilfiger attached to CJA voucher # 060224000004.

*v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000).  Having reviewed the entire record in this case, this court finds the petitioner ultimately received a fundamentally fair trial.  Simply because the federal jury's sentence was different from the previous state court trials on different charges does not establish that Petitioner was denied a fair trial.  Accordingly, this claim is also denied.

## XV.  EVIDENTIARY HEARING

In his request for relief (Doc. 95 at pp. 400-401), the petitioner requests leave to conduct discovery and asks for an evidentiary hearing to resolve any factual disputes.  As the disposition of the petitioner's Motion does not require reference to any materials beyond those that are available and currently before the court, this court finds that: 1) the petitioner has failed to establish good cause to conduct discovery herein; and, 2) an evidentiary hearing is not necessary to resolve the issues raised in the petitioner's Motion to Vacate.  Accordingly, the petitioner's request for an evidentiary hearing is denied.

## CONCLUSION

For the reasons stated herein, the petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied.  Furthermore, this court finds the petitioner has failed to make a "substantial showing" of the denial of any constitutional rights. 28 U.S. § 2253(c)(2).  Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this court hereby declines to issue a certificate of appealability.

Finally, based upon the findings herein, this court hereby denies petitioner's motion to vacate or modify protective orders and request for hearing (Doc. 184), petitioner's motion

for leave to conduct discovery (Doc. 186), and petitioner's motion for reconsideration of

court's order of June 20, 2012 (Doc. 212).

**It is so ordered on this  16th  day of August, 2012.**


_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,              )
                                      )
            Petitioner,               )
                                      )
v.                                    )        Case No. 09-CV-105-JHP
                                      )
UNITED STATES OF AMERICA,            )
                                      )
            Respondent.               )

## JUDGMENT

This matter came before the Court for consideration of defendant's motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255. The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on his challenge to the legality of his sentence.

IT IS SO ORDERED this 16th day of August, 2012.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | DEATH PENALTY CASE |
| | ) | |
| vs. | ) | Case No. 6:09-cv-00105 JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
### (Doc. Nos. 214, 216) and BRIEF IN SUPPORT

DANIEL J. BRODERICK, #89424
Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion to Alter or Amend Judgment                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                         Case No. 6:09-cv-00105-JHP

1960

**TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STANDARD GOVERNING APPLICATION OF <u>FED. R. CIV. P. 59(e)</u> . . . . . . . . . . . . 3

III.  THE COURT'S OPINION DEMONSTRATES JUDGE PAYNE'S
      INABILITY TO ADJUDICATE CLAIMS WITHOUT BIAS OR
      PARTIALITY SUCH THAT HE SHOULD HAVE RECUSED
      HIMSELF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.   The Court Has Treated Mr. Barrett Different From Similarly
           Situated Litigants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.   The Court Evidenced Its Bias Towards Mr. Barrett In Its
           Written Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   THE COURT COMMITTED LEGAL ERROR BY ENGAGING IN
      SUBJECTIVE ANALYSIS AND NOT ALLOWING FOR FACTUAL
      DEVELOPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.   The Court Erred by Failing to Conduct an Evidentiary Hearing . . . . . . . . . . . . 10

      B.   Specific Examples of the Court's Wrongful Use of Subjective
           Analysis or its Own Recollection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           1.   Judicial Interference with Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.    THIS COURT ERRED BY DENYING MR. BARRETT A CERTIFICATE
      OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          -i-                            Case No. 6:09-cv-00105-JHP

1961

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abdul-Kabir v. Quarterman*, 553 U.S. 233 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Aron v. United States*, 291 F.3d 708 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Barefoot v. Estelle*, 463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Bracy v. Schomig*, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 1194 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . 3

*Ellis v. United States*, 313 F.3d 636 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

*Florida v. Nixon*, 543 U.S. 175 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fontaine v. United States*, 411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hicks v. Town of Hudson*, 390 F.2d 84 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Murchison*, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lavespere v. Niagra Machine & Tool Works*, 910 F.2d 167 (5th Cir. 1990) . . . . . . . . . . . . . . 3, 4

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) . . . . . . . . . . . . . . . . . . . . 16

*Liteky v. United States*, 510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Machibroda v. United States*, 368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Massaro v. United States*, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Moreno v. Dretke*, 450 F.3d 158 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Murchu v. United States*, 926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Petitioner's Motion to Alter or Amend Judgment                                    Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                 -ii-                    Case No. 6:09-cv-00105-JHP

1962

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Slack v. McDaniel*, 529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Smith v. Texas*, 543 U.S. 37 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stead v. United States*, 67 F. Supp. 2d 1064 (D.S.D. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Taylor v. Hayes*, 418 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Townsend v. Sain*, 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Tumey v. Ohio*, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Becker,* 109 Fed. Appx. 264, 268, 2004
          WL 1949154 at *3 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Duran-Salazar,* 307 Fed. Appx. 209, 211, 2009
          WL 74476 at *2 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Lopez*, 100 F.3d 113 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ringer*, 139 Fed. Appx. 969, 973, 2005
          WL 1666105 at * 4 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Weeks*, 653 F.3d 1188 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ward v. Village of Monroe*, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Warren v. American Bankers Insurance*, 507 F.3d 1239 (10th Cir. 2007) . . . . . . . . . . . . . . . . 3

Petitioner's Motion to Alter or Amend Judgment                                        Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          -iii-          Case No. 6:09-cv-00105-JHP

1963

*White v. New Hampshire Department of Employment Sec.*, <u>455 U.S. 445</u> (1982) . . . . . . . . . . . . 3

*Wiggins v. Smith*, <u>539 U.S. 510</u> (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Williams v. Taylor*, <u>529 U.S. 362</u> (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wilson v. Sirmons*, <u>536 F.3d 1064</u> (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wood v. Georgia*, <u>450 U.S. 261</u> (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

## FEDERAL STATUTES

<u>28 U.S.C. § 2253(c)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

<u>28 U.S.C. § 2254</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>28 U.S.C. § 2254(e)(2)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>28 U.S.C. §2255</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

<u>28 U.S.C. § 2255</u>, ¶ 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

<u>28 U.S.C. § 2255(b)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>28 U.S.C. § 2255</u>, filed December 24, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

<u>28 U.S.C. § 455(a)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Fed. R. Civ. P. 59</u> (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Petitioner's Motion to Alter or Amend Judgment                                      Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          -iv-                             Case No. 6:09-cv-00105-JHP

1964

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | DEATH PENALTY CASE |
| | ) | |
| vs. | ) | Case No. 6:09-cv-00105 JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
(Doc. Nos. 214, 216) and BRIEF IN SUPPORT**

Petitioner/Defendant, Kenneth Eugene Barrett, through undersigned counsel and pursuant to Fed. R. Civ. P. 59 (e), moves to alter or amend the Court's Opinion and Order (Doc. 214) and Judgment (Doc. 216)[1] entered in this case on August 16, 2012.  In support of this Motion, Mr. Barrett states the following:

## I.   INTRODUCTION

Contrary to this Court's assertion otherwise,[2] Mr. Barrett submits the Amended Motion to Vacate, Set Aside or Correct a Sentence Pursuant to 28 U.S.C § 2255, filed December 24, 2009, presented a myriad of factual and legal issues.  Mr. Barrett supported his factual averments with over 200 exhibits.  Pursuant to Rule 7 of the Rules Governing § 2255 Proceedings, this Court

---

[1]     Unless otherwise noted, cites to "Doc." refer to documents in Case No. 09-cv-105-JHP.

[2]     "While the record in this case appears voluminous, other than being a death penalty proceeding this was not a complex case."  (Doc. 214 at p. 21).

1965

expanded the record to include many of those exhibits.  Pursuant to the Court's order Mr. Barrett supported his Motion with legal arguments in a separately filed brief.  This Court's summary disposition of the claims overlooked or misapprehended issues of fact and law.   Therefore, it is appropriate that this Court reconsider, alter or amend its opinion and judgment.

This Court ruled on Mr. Barrett's Motion on August 16, 2012, in a 191 page Opinion. (Doc. 214).  In its Opinion, this Court failed to acknowledge or impartially evaluate the strength of evidence and argument presented by Mr. Barrett; instead, the Court made conclusory determinations that resulted in serious, substantial and troubling errors of law and fact.  In purporting to resolve without a hearing matters involving the District Judge's administrative actions, his motivations in carrying out those actions, and the influence of those actions on Mr. Barrett's counsel and defense, this Court lacked impartiality.

This Motion to Alter or Amend will focus on three areas.  First, the Motion will address Judge James H. Payne's demonstrated inability to judge impartially the credibility of witnesses who have testified in declarations about his off-the-record statements, and to address in other ways the motivations and effects of his own administrative actions.  Second, the Motion will discuss the Court's failure to allow for factual development of Mr. Barrett's claims as the law requires, instead engaging in a subjective analysis of the evidence presented.  This issue will be discussed along with the Court's wrongful denial of Mr. Barrett's request for an evidentiary hearing.  Finally, Mr. Barrett will address the Court's refusal to grant a Certificate of Appealability (COA),  pursuant to 28 U.S.C. § 2253(c), as to each of his claims,

Mr. Barrett submits, with respect to each of the claims discussed herein, that the Court has committed either manifest errors of law or fact or failed to recognize or fully consider the

arguments that Mr. Barrett presented in his § 2255 Motion. Mr. Barrett emphasizes, however, that in the instant Motion he is not addressing each and every claim that he set forth in his § 2255 Motion. Mr. Barrett continues to assert that all claims brought forth in his § 2255 are meritorious. Mr. Barrett's decision not to address any particular claim in this Motion constitutes neither a waiver nor a withdrawal of that claim.

## II.   STANDARD GOVERNING APPLICATION OF FED. R. CIV. P. 59(e)

The Supreme Court has noted that Fed. R. Civ. P. 59(e) was adopted "to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (internal quotations omitted); *see also Warren v. American Bankers Ins.,* 507 F.3d 1239, 1245 (10th Cir. 2007) ("the purpose of Rule 59 is to provide the district court an opportunity to correct its own errors"). A Rule 59(e) motion is appropriate "to correct manifest errors of law or to present newly discovered evidence." *Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.,* 680 F.3d 1194, 1200 (10th Cir. 2011) (citations omitted). A district court's failure to notice or consider arguments or authorities that justify relief also constitutes an appropriate ground to grant a motion to amend judgment if these failures affected the correctness of the court's decision. *See, e.g., Hicks v. Town of Hudson,* 390 F.2d 84, 87-88 (10th Cir. 1967).

A district court has broad discretion to grant a motion to alter or amend judgment. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 174 (5th Cir. 1990) (*overruled on other grounds*). Moreover, Rule 59(e) does not set forth any particular grounds for relief. *Id.* Rather,

Petitioner's Motion to Alter or Amend Judgment         Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support         Case No. 6:09-cv-00105-JHP
3

1967

Rule 59(e) relief is appropriately considered after weighing relevant circumstances on a case-by-case basis. *Id.*

### III.   THE COURT'S OPINION DEMONSTRATES JUDGE PAYNE'S INABILITY TO ADJUDICATE CLAIMS WITHOUT BIAS OR PARTIALITY SUCH THAT HE SHOULD HAVE RECUSED HIMSELF

Throughout these proceedings Mr. Barrett has objected to Judge Payne attempting to adjudicate claims that involve his administrative and other extra-judicial actions. These issues were documented in Mr. Barrett's Motion to Disqualify and Recuse filed on May 29, 2009. (Doc. 45). In that Motion, Mr. Barrett set forth his claims that the Court *inter alia*: 1) engaged in *ex parte* communications with prosecutors; 2) made administrative decisions to Mr. Barrett's disadvantage, including decisions regarding approval of funds for his case; and 3) relied on evidence outside of the record. The Court denied those allegations and denied Mr. Barrett's motion. (Doc. 66). In doing so, the Court stated that its earlier actions regarding counsel and defense resources did not reflect any prejudgment of Mr. Barrett's claims. *Id.* at 19. However, the Court's opinion rejecting Grounds 1 and 3 relies extensively on its prior rulings as virtually *ipso facto* dispositive of Mr. Barrett's allegations. Opinion (Doc. 214) at 22-34.

As stated in the opinion of Professor Monroe H. Freedman, appended hereto as Exhibit A, this Court's decision presents evidence that would cause any reasonable person to question its impartiality. Recusal was required prior to adjudication. 28 U.S.C. § 455(a). Professor Freedman is perhaps this Nation's foremost authority on the law of lawyers' and judicial ethics. *See* App. A to Exh. A. After reviewing the relevant allegations and this Court's manner of evaluating them, Professor Freedman concluded that recusal was required prior to adjudication. The opinion should be withdrawn.

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe*, 409 U.S. 57, 62 (1972).  In *In re Murchison*, 349 U.S. 133 (1955), the Supreme Court stated:

> A fair trial in a fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual bias in the trial of cases.  But our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way, "justice must satisfy the appearance of justice."

*Id.* at 136 (citations omitted).  So important is this constitutional guarantee that its denial is not subject to the harmless error rule.  *See, e.g., Tumey v. Ohio*, 273 U.S. 510 (1927); *Bracy v. Schomig*, 286 F.3d 406, 414 (7th Cir. 2002) ("There is no harmless error analysis relevant to the issue of judicial bias.").

Title 28 § 455(a) provides that disqualification of a United States judge is warranted not only when there is actual bias or prejudice but also when "his impartiality might reasonably be questioned."  The goal of Section 455(a) is to avoid even the appearance of partiality. *See Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995).  "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'"  *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (citations omitted); see also *United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994) (the statute imposes on the trial judge "a continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality").

Whether recusal is required is determined by an objective standard that considers what a reasonable person might believe.  As summarized by the Supreme Court:  "[W]hat matters is not the reality of bias or prejudice but its appearance.  Quite simply and quite universally, recusal was required [pursuant to § 455(a)] whenever 'impartiality might be questioned.'"  *Liteky v. United States*, 510 U.S. 540, 548 (1994) (citation omitted).  A judge has a continuing duty to recuse under § 455(a) if sufficient factual grounds exist to question the judge's impartiality.  *United States v. Pearson,* 203 F.3d 1243, 1277 (10th Cir. 2000) (*citing Cooley,* 1 F.3d at 992–93).

Here, recusal is required because a reasonable person would expect a court to treat all similarly situated litigants the same.  That has not happened in this case.  The Court has treated Mr. Barrett differently by erecting unreasonable barriers throughout the filing process and by exhibiting bias throughout the written opinion.

A.      **The Court Has Treated Mr. Barrett Different From Similarly Situated Litigants**

Mr. Barrett submits that this Court's recent evaluation, without a hearing, of witness accounts of off-the-record discussions with Judge Payne continues a well documented pattern of this Court making rulings on matters in which it has an unacknowledged interest or bias.  The decision is similar to the one vacated in *Murchu v. United States*, 926 F.2d 50, 57 (1st Cir. 1991), where the court held a sentencing judge should not adjudicate factual allegations involving off-the-record conversations with the judge.  *See also Ellis v. United States*, 313 F.3d 636, 641-42 (1st Cir. 2002) (trial judge was correct to recuse himself from consideration of 2255 motion's claim of judicial bias and improper conduct).

Among the indicia of bias in this Court's decision is the false and denigrating characterization of Mr. Barrett's claims, *e.g.*, Opinion (Doc. 214) at 22, and attacks on his counsel.  As shown in the material considered by Professor Freedman, these gestures are the culmination of a pattern.  Previously, this Court arbitrarily required that Mr. Barrett use the form proscribed by Rule 2(c) of the Rules Governing Section 2255 Proceedings to file his § 2255 Motion, file the Motion and Brief in Support separately, and ask leave of court to file pleadings in excess of 25 pages. These have not been imposed on other similarly situated persons.  *See* Exh. B (Decl. Tivon Schardl and Appendix thereto, attached).  While purporting to be concerned about the volume of Mr. Barrett's pleadings and the time consumed by amendments, this Court required months of unnecessary work splitting factual averments from legal arguments into two lengthy documents no other similarly situated person in this District was required to file for the preceding decade or more.  Reasonable people would consider the Court's contradictory actions evidence of partiality against Mr. Barrett or his counsel.

On September 25, 2009, Mr. Barrett filed an Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to § 2255.  (Doc. 70).  On September 29, 2009, this Court entered an order to show cause why the court should allow Mr. Barrett to amend his § 2255 Motion.  (Doc. 74).  On October 6, 2009, the Court conducted a hearing on its show cause order that began with the Court reading from a prepared statement detailing numerous criticisms of Mr. Barrett's pleadings and his counsel.  (Doc. 85, Tr. 10/6/09 Hr'g at pp. 3-13).  In particular, the Court chastised Mr. Barrett's counsel for failing to use a standard form to file the motion, for filing a pleading in excess of 25 pages without leave of court, for filing both the motion and brief in support in the same pleading, and for failing to use the exact language set forth in Rule 2 of the

Petitioner's Motion to Alter or Amend Judgment                                                                 Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                          7                     Case No. 6:09-cv-00105-JHP

1971

Rules Governing § 2255 Motions in the verification. *See id.* The Court also complained about the form of Mr. Barrett's requests to seal exhibits and requests for discovery and an evidentiary hearing. *See id.* The Court berated Mr. Barrett's counsel as follows:

> While this Court doesn't question the rules that require courts to construe *pro se* litigants complaints liberally due to their lack of legal training, this is not such a case. Rather, this Court appointed counsel who were represented to this Court as being well-qualified death penalty practitioners. If this Court were dealing with a *pro se* petitioner, it would understand that the petitioner had difficulty understanding the court rules and procedures. Yet, this Court is concerned that counsel does not seem to understand the implications of the statute of limitations issues, or that they must comply with the rules governing Section 2255 proceedings and the local rules of this court.

*Id.* at p. 7. The Court then ordered Mr. Barrett to re-file his § 2255 Motion in 20 days on the standard form and file a Brief in Support of the Motion 60 days thereafter. *See id.* at p. 11.

Mr. Barrett showed this Court's statements misrepresented the standard practice before this Court in the similarly situated context of capital habeas petitions filed pursuant to 28 U.S.C. § 2254. Exh. B.

This Court's CM/ECF treats § 2254 and § 2255 cases as the same. The practice of § 2254 petitioners represented by experienced counsel is consistent with the object and purpose of the drafters of the form who intended it as an "[a]dministrative convenience" that would minimize the number of "lengthy and often illegible petitions, arranged in no logical order" submitted by prison inmates who have no right to counsel. R. Gov. § 2254 Cases 2, Advisory Committee Notes. That the form is primarily intended for use by those proceeding *pro se* is confirmed in the instructions to the form available on this Court's website which cautions those under sentence of death that they are entitled to counsel, implying that they should not file the form on their own behalf.

Petitioner's Motion to Alter or Amend Judgment          Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support          8          Case No. 6:09-cv-00105-JHP

1972

There is no rationale explanation for the Court requiring Mr. Barrett to file his § 2255 Motion on the *pro se* form while not requiring others to do so.

**B.      The Court Evidenced Its Bias Towards Mr. Barrett In Its Written Opinion**

Mr. Barrett acknowledges that judicial rulings are in most instances immune from challenge under § 455.  *Liteky*, *supra*.  However, as in *Murchu*, where a judge purports to evaluate the credibility of witnesses – in this case including two third-parties, the Federal Defenders for the Northern and Western Districts of Oklahoma – without a hearing, there is at least an appearance of bias that requires recusal.  Exh. A.  In its Opinion, the Court continually disparages Mr. Barrett and his counsel.

First, the Court complains throughout the opinion regarding the fact that Mr. Barrett "expanded the record to voluminous proportions."  Opinion (Doc. 214) at p. 1, 20.  The Court stated:

> Despite the similarities in the "dump-it-all-in" approach which has been taken in this case with *pro se* filings, this is not a case in which the original and amended timely filed motions were filed by a *pro se* litigant and the subsequent amendment was filed after the statute of limitations expired.  Rather, all of the pleadings filed by the petitioner herein were filed by counsel who were presented to this court as "extremely well-qualified" in federal habeas litigation.  *In the opinion of this court, many of the documents have not been submitted in a good faith attempt to direct the court to the legitimate issues in this case, but rather as a way to slow the disposition process*.

(Doc. 214 at p. 152, n.209) (emphasis added).  This Court conversely required Mr. Barrett to file a petition and brief other similarly situated petitioners were not required to file.

There is no basis in the record for this Court's assertion that the case is simpler than other federal death penalty cases.  This is a federal death penalty case in which there were two prior state court jury trials.  The record of the federal jury trial below consists of almost 6000 pages,

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    9                    Barrett v. United States
                                                                              Case No. 6:09-cv-00105-JHP

1973

notwithstanding pretrial proceedings. Following the trial, there was an appeal in the United States Court of Appeals for the Tenth Circuit. Yet, despite this record, not only does the Court complain about the size of the pleadings, the Court is annoyed that Mr. Barrett failed to ask for leave to file his § 2255 Motion in excess of twenty-five pages. The Court's characterization of this case is evidence of bias against finding error in the administrative actions of Judge Payne prior to trial.

Recusal is required where a judge has become so embroiled in conflicts with counsel that a reasonable person would think compromised the judge's ability to be impartial. *Taylor v. Hayes*, 418 U.S. 488, 501 (1974). This Court previously required Mr. Barrett's counsel to perform tasks not required of similarly situated counsel. This Court required Mr. Barrett's counsel to file a lengthy brief justifying the filing of sealed documents or redactions. The Court accepted those documents for filing then found they or others were not filed in good faith. The Court's recent summary finding came without notice of specifics and with no prior notice of the concern or opportunity to be heard. Such a summary finding, alone or viewed together with the other examples described in the record, would lead a reasonable person to question this Court's impartiality.

IV.    **THE COURT COMMITTED LEGAL ERROR BY ENGAGING IN SUBJECTIVE ANALYSIS AND NOT ALLOWING FOR FACTUAL DEVELOPMENT**

A.    **The Court Erred by Failing to Conduct an Evidentiary Hearing**

Mr. Barrett requested an evidentiary hearing in this case in his § 2255 Motion (Doc. 95 at pp. 400-401) and then filed a separate request for an evidentiary hearing on March 1, 2010 (Doc.

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    10                    Barrett v. United States
Case No. 6:09-cv-00105-JHP

150), which the Court denied on March 29, 2010. (Doc. 157).  This Court's denial of an evidentiary hearing constituted a manifest error of law.

The standard for granting an evidentiary hearing in a § 2255 case is set out in 28 U.S.C. § 2255, which states:  "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255, ¶ 2; *accord United States v. Lopez,* 100 F.3d 113, 119 (10th Cir.1996).  As the plain text of the statute makes clear, there is a presumption in favor of holding an evidentiary hearing in a § 2255 proceeding: "*Unless* the motion and the files and the records of the case *conclusively show that the prisoner is entitled to no relief*, the court *shall . . .* grant a prompt hearing thereon . . .*" (emphasis added).

Indeed, Congress intended that the standard for obtaining an evidentiary hearing in a § 2255 proceeding be a liberal one, a fact which is borne out by the legislative history of this statute.  Prior to the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the standard governing the granting of evidentiary hearings in federal court for both §§ 2254 and 2255 proceedings was set out by *Townsend v. Sain*, 372 U.S. 293, 312 (1963):  "Where the facts are in dispute, the federal court in habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding."  (Emphasis added).

When Congress passed AEDPA, it made revisions to both § 2255 and § 2254, but those revisions differed as to the evidentiary hearing provisions of the respective statutes. With respect to § 2254 proceedings, Congress legislatively modified the *Townsend* standard and severely

limited a federal district court's discretion to even grant an evidentiary hearing on a § 2254 petition.  *See* 28 U.S.C. § 2254(e)(2).  The stated rationale for this change was that in a § 2254 proceeding, a petitioner has purportedly already had the opportunity for an evidentiary hearing as part of the state court post-conviction proceedings, so principles of comity and federalism required deference to findings of fact made by the state courts.

Congress however, placed no such similar limitations on the standard for granting an evidentiary hearing in § 2255 proceedings, as is evident by comparing the text of § 2254(e) with § 2255.  *See Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D.S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.").  As a result, Mr. Barrett's request for an evidentiary hearing is governed by the more liberal pre-AEDPA standard articulated in *Townsend*, which states that an evidentiary hearing must be granted if there are disputed issues of fact in the proceeding.  This is even more so on claims which ordinarily cannot be resolved on the extant record because the allegation involves events and occurrences that took place outside the courtroom.  *See Massaro v. United States*, 538 U.S. 500, 504-06 (2003).

The United States Supreme Court addressed the standard in this context in *Machibroda v. United States*, 368 U.S. 487 (1962).  There, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed.  *Id.* at 489.  The movant and the prosecutor filed conflicting affidavits on the factual

matter of whether such promises were made.  368 U.S. at 490-91, 492.  The district court decided

-- without a hearing -- that the movant's allegations were false and denied the § 2255 motion.  *Id.*

at 492.  The Supreme Court held that the district court did not act in conformity with the

provisions of § 2255.  As the Court stated:

> This was not a case where the issues raised by the motion were conclusively
> determined either by the motion itself or by the "files and records" in the trial
> court.  The factual allegations contained in the petitioner's motion and affidavit,
> and put in issue by the affidavit filed with the Government's response, related
> primarily to purported occurrences outside the courtroom and upon which the
> record could, therefore, cast no real light.  Nor were the circumstances alleged of a
> kind that the District Judge could completely resolve by drawing upon his own
> personal knowledge or recollection.

368 U.S. at 494-95.  The Court further noted:  "'The Government's contention that [movant's]

allegations are improbable and unbelievable cannot serve to deny him an opportunity to support

them by evidence.  On this record it is his right to be heard.'"  *Id.* at 495 (citation omitted); *see

also United States v. Weeks,* 653 F.3d 1188, 1206 (10th Cir. 2011) (overturning district court's

denial of evidentiary hearing because petitioner's allegations regarding the voluntariness of his

plea and effectiveness of counsel, taken as if true, would entitle him to relief); *United States v.

Duran-Salazar,* 307 Fed. Appx. 209, 211, 2009 WL 74476 at *2 (10th Cir. 2009) (overturning

district court's denial of evidentiary hearing, finding that "it may be that [defendant] cannot

ultimately prevail; however, the allegations in his motion coupled with the difficulty the jury had

in reaching a verdict are sufficient to entitle him to a hearing"); *United States v. Ringer*, 139 Fed.

Appx. 969, 973, 2005 WL 1666105 at * 4 (10th Cir. 2005) (overturning district court's denial of

evidentiary hearing, finding "it is impossible to tell whether [defendant] should prevail on his

ineffective assistance of counsel claim without the aid of an evidentiary hearing"); *United States v. Becker,* 109 Fed. Appx. 264, 268, 2004 WL 1949154 at *3 (10th Cir. 2004) (same).

Moreover, every inference must be drawn in Mr. Barrett's favor, particularly where, as here, Mr. Barrett has pled facts that, if true, would entitle him to relief, and yet, the district court has not granted an evidentiary hearing. See 28 U.S.C. § 2255 ¶ 2; *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (vacated for an evidentiary hearing where, on the record, the court could not conclude "with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255."); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege – not prove – reasonably specific, non-conclusory facts that, if true, would entitle him to relief.").

Consistent with all the aforementioned statutory authority and legal precedent, this Court must vacate its denial of the § 2255 motion, allow discovery and grant an evidentiary hearing or alternative means of factual development in order that a factual record can be made as to Mr. Barrett's claims.

**B.      Specific Examples of the Court's Wrongful Use of Subjective Analysis or its Own Recollection**

**1.      Judicial Interference with Defense**

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    14                    Barrett v. United States
                                                                                Case No. 6:09-cv-00105-JHP

1978

In denying Mr. Barrett's claim regarding judicial interference with defense counsel (Petitioner's Grounds 1 and 3), the Court found that Mr. Barrett did not show that the Court's decisions regarding appointment of counsel or funding deprived him of his constitutional rights. (Doc. 214 at p. 35). The Court gave no credence to the evidence Mr. Barrett submitted in support of this claim. Moreover, the Court improperly used its own subjective analysis or its own recollection in making this determination.

First, the Court addressed Mr. Barrett's claim that it showed preferential treatment to Mr. Hilfiger over Mr. Echols. The Court stated that it authorized a higher payment to Mr. Hilfiger because he was "assuming the role of lead counsel" and "this court encouraged [Mr. Hilfiger and Mr. Smith] to submit an amended budget request solely because, unlike Mr. Echols, they were unfamiliar with intimate details surrounding the previous state court trials." (Doc. 214 at p. 31).

The Court's reliance on these types of statements in denying Mr. Barrett's claim exceeds the scope of what it may properly rely upon in terms of its own recollections in adjudicating this claim. The underlying rationale is that a § 2255 court is empowered to take judicial notice of events that that same court observed in the course of presiding over the original criminal trial. However, this Court's explanations, or in its words, "observations," *id*., regarding its reasoning why it paid Mr. Hilfiger more money than Mr. Echols are not statements about events that did or did not occur at the trial, but rather findings that the Court is making about itself. These "observations" were never vetted in the record of the case, because the first time that the Court raised them was in its written Opinion. Mr. Barrett should be permitted to make appropriate inquiries of the Court so that this issue can be adequately developed on the record. This is the

Petitioner's Motion to Alter or Amend Judgment                                                                Barrett v. United States
(Doc. Nos. 214, 216) and Brief in Support                    15                    Case No. 6:09-cv-00105-JHP

1979

exact situation in which an evidentiary hearing is appropriate.  At such a hearing it would be inappropriate for Judge Payne to preside.  Exh. A; *Murcha, supra*.

This Court employed similarly flawed methods when discussing the budget for investigation: "[This] court, in carrying out its administrative functions in this case, attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation."  Opinion (Doc 214) at 32.  The Court is not relying on evidence in the record or even its own recollection; instead, the Court is giving an opinion or reason for its actions.  The Court is, in effect, testifying.  The extra-record accounts of witnesses to this Court's subjective views prior to trial, at a minimum, raise a material factual dispute as to whether Judge Payne's principle concern was financial as opposed to the interests of the defendant, *see Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864-65 (1988), and whether his expressed fiscal concern unduly influenced Mr. Hilfiger's acts and omissions, *see Wood v. Georgia*, 450 U.S. 261, 272-73 (1981).

Another example of this Court's erroneous reliance upon its subjective knowledge to adjudicate claims supported by the testimony of witnesses appears when it discusses why it made the decisions it did in appointing counsel.  Opinion (Doc 214) at 33 (stating, for example, that it considered that "Mr. Hilfiger and Mr. Smith were both active members of the CJA defense panel for the Eastern District of Oklahoma").  The Court is once again defending its actions rather than making factual determinations, and using its defense as a rationale for denying Mr. Barrett's claim.

Contrary to § 2255(b) and *Machibroda*, this Court either ignored or discredited the evidence Mr. Barrett presented in support of his claims without a hearing and, at times, in

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                          16                          Barrett v. United States
                                                                                          Case No. 6:09-cv-00105-JHP

reliance upon this Court's subjective view of its own motives. For example, Mr. Barrett submitted the declaration of Susan Otto, the Federal Public Defender for the Western District of Oklahoma (Doc. 95, Petitioner's Exh. 54). In her declaration, Ms. Otto set forth the qualifications necessary to serve as lead counsel for a defendant in a federal capital case and her interactions with the Court regarding appointment of counsel in this case. The Court summarily dismissed the Federal Defender's opinion as "ludicrous." (Doc. 214 at p. 24, n.62). This Court substituted its own opinion that "Mr. Hilfiger was clearly 'learned in the law applicable to capital cases,'" without stating a basis for that opinion. *Id.* at p. 24.

Mr. Barrett also submitted the declaration of John Echols. In a manner materially indistinguishable from the actions of the district court in *Machibroda,* this Court opined that Mr. Echols should have been able to try the case with little resources because "the underlying incident had been the focus of two prior state court trials, [so] counsel should have been able to utilize the factual investigations completed in the earlier cases." *Id.* at p. 32. The Court gave no indication that it considered Mr. Echols' statement:

> I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial. For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done. Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings. The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

(Doc 95, Petitioner's Exh. 34, Echols Decl. at p. 3).

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                                    17                    Barrett v. United States
                                                                                                    Case No. 6:09-cv-00105-JHP

1981

Similarly, the Court jumped to the conclusion or improperly inferred that "[i]t became apparent very early in the budgeting of this case that Mr. Echols was attempting to be compensated for items that were improper." Opinion (Doc. 214) at p. 141. The Court made no such finding on the record at the time. Rather, the Court apparently relied upon Mr. Echols' inquiry as to whether he could seek compensation for traveling time if his assistant is reading to him in the car. *Id.* at 141-42. The Court fails to explain, however, how Mr. Echols' inquiries to the Court as to what activities are reimbursable constitute "attempts at improper compensation." Indeed, it would seem that if Mr. Echols was attempting to obtain improper compensation, the last thing he would do is ask the Court whether it was a proper expense.

Nor does the Court recognize Mr. Echols' account of compensation, as recited in his declaration:

> For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

(Doc 95, Petitioner's Exh. 34, Echols Decl. at p. 5).

Mr. Barrett submitted declarations from expert counsel regarding the prevailing professional norms in federal death penalty cases, cited and quoted numerous standards adopted by bar organizations, and provided evidence of the norms for compensation in federal death penalty cases. Although this Court received the declarations in evidence pursuant to Rule 7 of the Rules Governing § 2255 Proceedings, it then refused to consider them on grounds that they contained hearsay and did not cite the record in this case. Opinion (Doc. 214) at 177. Neither of

those grounds has any basis in the law of ineffective assistance of counsel or § 2255(b).

Evaluation of ineffective-assistance claims requires consideration of objective evidence of

reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984).  This Court did not

mention these guidelines for reasonableness and instead appeared to rely upon one judge's

subjective view of what was reasonable for this case.

In addition, the Court based its determination regarding prejudice on a subjective,

incomplete, and false evaluation of the proffered mitigation evidence.  Opinion (Doc. 214) at

180-89.  Except in its application of the improper "nexus" requirement discussed *infra*, this

Court did not expressly consider the vast majority of the mitigation Mr. Barrett proffered.

Without addressing the substance of the evidence favorable to Mr. Barrett, the Court did discuss

a portion of the mental health evidence.  The Court states Mr. Barrett "failed to establish that the

introduction of this evidence [of his mental health problems] would not have been more negative

than positive," because it would have been accompanied by evidence of Mr. Barrett's drug use.

*Id.* at 188.  There is no evidence in the record that evidence of Mr. Barrett's drug use (a) would

have introduced anything the jury did not already know, or (b) would have been considered

negatively by jurors.  The Court appears to accept the proposition that the evidence would be

viewed negatively based upon the *ipse dixit* of the Government's lawyers, *id.* at 187, or the

conveniently stated opinion of trial counsel while simultaneously denying Mr. Barrett any

opportunity to cross-examine them.  *Id.* at 188.  As shown in the attached declaration of Scott E.

Sundby, the supposition that jurors would have placed negative value on evidence of Mr.

Barrett's drug use is demonstrably false.  Exh. C.

*Strickland* requires reviewing courts to "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to impose a death sentence. *Strickland*, <u>466 U.S. at 695</u>. The Supreme Court and Tenth Circuit have relied upon scientific studies of juror decisionmaking in similar situations to ascertain the probable value evidence proffered in post-conviction proceedings. *Florida v. Nixon*, <u>543 U.S. 175, 192</u> (2004); *Wilson v. Sirmons*, <u>536 F.3d 1064, 1095</u> n.4 (10th Cir. 2008).  This Court eschewed a search for objective evidence.

The Court also erroneously characterized the mitigation proffer as inconsistent, or in conflict, with the evidence presented at trial.  Opinion (Doc. 214) at 180.  The Court recounts the evidence presented at trial – omitting the damaging evidence the Government presented on cross-examination that Mr. Barrett diffused or rebutted in his post-conviction filings – and recounts the jurors' votes on mitigating circumstances.  *Id.* at 180-85.  Contrary to precedent requiring a cumulative evaluation of that evidence and the evidence Mr. Barrett proffered with his petition, *Williams v. Taylor*, <u>529 U.S. 362, 397-98</u> (2000), this Court's discussion of the post-conviction evidence it did consider (much was ignored) contains no cumulative weighing.  Opinion  (Doc. 214) at 185-89.  Rather, the Court states that many of the records that Mr. Barrett submitted "could have been used by the government to totally negate the jury's findings" in mitigation.  *Id.* at 185.  As Professor Sundby explains that analysis is based on an erroneous understanding of how jurors actually view such evidence.  Exh. C.

In addition, the Supreme Court has held it is unreasonable – even after affording the petitioner an evidentiary hearing – to conduct a prejudice analysis in the manner of this Court's analysis.  *Porter v. McCollum*, ___ U.S. ___, <u>130 S. Ct. 447, 455</u> (2009).  If it is unreasonable for

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    20                    Barrett v. United States
Case No. 6:09-cv-00105-JHP

1984

a state court to reduce to irrelevance mitigation proffered in post-conviction after supposedly "negative" evidence had been tested in an adversarial hearing, there can be no question of this Court's error, given that its decision was limited to whether "the motion and the files and records of the case conclusively show[ed]" Mr. Barrett was not entitled to relief.  28 U.S.C. § 2255(b).

The Supreme Court's decision in *Porter* pointed to the relevance of Eighth Amendment law in a *Strickland* prejudice analysis, in particular the requirement that a capital sentencing jury must be permitted to consider any relevant mitigating factor.  130 S. Ct. at 454-55.  This Court violated that principle when it faulted Mr. Barrett for failing "to establish any nexus between the suffering of his relatives and any viable theory of mitigation."  Opinion (Doc. 214) at 188.  As a factual matter, the assertion is refuted by the record including, *inter alia*, Pet. Exh. 117.  As a legal issue, the Supreme Court has held it is error for a court to require such a nexus when evaluating the mitigation value of evidence.  *Abdul-Kabir v. Quarterman*, 553 U.S. 233, 246 (2007); *Smith v. Texas*, 543 U.S. 37, 45 (2004) (citing rejection of nexus notion in *Tennard v. Dretke*, 542 U.S. 274, 287 (2004)).  To the extent this Court's reference to a "viable theory of mitigation" referred to the supposed relative value of Mr. Barrett's proffered evidence compared with evidence the Government might have argued, its decision was contrary to *Strickland* and *Porter*.  To the extent this Court had in mind distinguishing between the theories of mitigation Mr. Barrett proffered and some unspecified understanding of mitigation that this Court subjectively considers "viable" its analysis was contrary to *Strickland* and the Eighth Amendment law discussed in *Abdul-Kabir* and *Tennard*.  As Professor Sundby points out in his attached declaration, this Court's view of what constitutes a viable theory of mitigation has no basis in objective fact.  Exh. C.

Professor Sundby points out another assumption underlying this Court's opinion that is both legally and factually wrong. This Court repeatedly adverts to supposition about how "the jury" would view mitigation evidence in its deficient performance analysis, Opinion (Doc. 214) at 187-88, and in its prejudice analysis. *Id.* at 188. As Professor Sundby points out, both *Mills v. Maryland*, 486 U.S. 367 (1988) and empirical findings of the Capital Jury Project support considering whether any individual jurors would have been moved by mitigation evidence. Exh. C. *Strickland* progeny that this Court did not mention also plainly require reviewing courts to consider whether "there is a reasonable probability that at least one juror would have struck a different balance" based upon the cumulative effect of the mitigation evidence adduced at trial and in post-conviction proceedings. *E.g.*, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## V.    THIS COURT ERRED BY DENYING MR. BARRETT A CERTIFICATE OF APPEALABILITY

At the conclusion of its 191-page opinion, the Court states "petitioner has failed to make a 'substantial showing' of the denial of any constitutional rights. 28 U.S.C. § 2253 (c)(2). Therefore, pursuant to Rule 11 of the Rules Governing § 2255 Proceedings, this court declines to issue a certificate of appealability." (Doc. 214 at p. 190). The denial of a Certificate of Appealability (COA) under these circumstances violates the governing law.

Under the "substantial showing of the denial of a constitutional right" standard of 28 U.S.C. §2253(c)(2), a petitioner need only "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (internal citations and quotation marks omitted). The *Barefoot* standard

was reaffirmed in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) and in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). *Miller-El*, reaffirmed that a COA should be allowed when the petitioner's case is "debatable," or the issues could be "resolved in a different manner," or when the case "deserve[s] encouragement to proceed further." *See id.* at 336.

As illustrated above, the issues described herein are certainly debatable. Indeed, the Court wrote 191 pages to address the issues. Certainly, in those pages, this Court took on the "debate." Moreover, while this Court has yet to be convinced of the merits of any of Petitioner's claims, given this Court's treatment of the issues, it cannot say that "jurists of reason" could not resolve them differently.

And, in that regard, *Miller-El* is significant. It states that "a COA does not require a showing that the appeal will succeed.":

> The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner has already failed in that endeavor.
>
> <div align="center">***</div>
>
> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Miller-El*, 537 U.S. at 336-38 (internal quotation marks and citations omitted).

In capital cases, "the nature of the penalty is also a proper consideration in determining whether to issue a certificate of appealability." *Barefoot,* 463 U.S. at 893. Because this case

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                    23                    Barrett v. United States
                                                                                  Case No. 6:09-cv-00105-JHP

involves the death penalty, "any doubts as to whether a certificate of appealability should issue must be resolved in [petitioner's] favor." *Moreno v. Dretke*, 450 F.3d 158, 163 (5th Cir. 2006).

Given that this is a federal capital case and the issues presented are easily debatable among reasonable jurists, this Court committed error by failing to issue a COA on the claims Mr. Barrett brought in his § 2255 Motion.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Barrett requests that the Court provide the following relief:

1.   Enter an Order of Disqualification and Recusal and any other necessary Order so that this matter is assigned to another judge; or in the alternative,

2.   Order the Government to Respond to this Motion;

3.   Permit Mr. Barrett to file a Reply Memorandum;

4.   Entertain oral argument on this Motion, including the Recusal issue;

5.   Grant Mr. Barrett's request for leave to conduct discovery and for an evidentiary hearing to resolve any outstanding factual disputes in his § 2255 Motion;

6.   Alter or Amend its Judgment to award relief to Mr. Barrett by vacating his convictions or sentences on each of the above described grounds, individually or collectively; or,

7.   Should the Court not grant Mr. Barrett relief from his convictions and sentence, then Mr. Barrett requests that the Court award a COA to all the claims brought forth in his § 2255 Motion.

DATED: September 13, 2012.

Respectfully submitted,

/s/ David B. Autry
**DAVID B. AUTRY**, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support          24          Barrett v. United States
Case No. 6:09-cv-00105-JHP

1988

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
**TIVON SCHARDL**, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

/s/ Joan M. Fisher
**JOAN M. FISHER**, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant/Petitioner
**KENNETH EUGENE BARRETT**

## CERTIFICATE OF SERVICE

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was electronically filed on September 13, 2012. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jeffrey B. Kahan: jeffrey.kahan@usdoj.gov

Christopher J. Wilson: Chris.Wilson@usdoj.gov

/s/ Joan M. Fisher
Signature of Movant's Attorney

Petitioner's Motion to Alter or Amend Judgment
(Doc. Nos. 214, 216) and Brief in Support                25                Barrett v. United States
Case No. 6:09-cv-00105-JHP

1989

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

_____

**EXHIBITS IN SUPPORT OF**

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT**
**(Doc. Nos. 214, 216) and BRIEF IN SUPPORT**

_____

DANIEL J. BRODERICK, #89424
Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

DAVID B. AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: (405) 521-9600

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

1991

## INDEX OF EXHIBITS

Exhibit A       Opinion Letter from Monroe H. Freedman, September 7, 2012

                Appendix A - Curriculum Vitae

                Appendix B - Qualifications


Exhibit B       Declaration of Counsel in Support of Petitioner's Notice Regarding Amended
                Petition Filed Pursuant to Court Order

                Appendix A -  Capital Habeas Cases Filed in the Eastern District of
                            Oklahoma Between January 1, 1998 and March 2009


Exhibit C       Declaration of Scott E. Sundby, September 13, 2012

                Appendix A - Publications of Scott E. Sundby

Exhibits in Support of Petitioner's Motion to Alter          Barrett v. United States
or Amend Judgment (Doc. Nos. 214, 216) and                   Case No. 6:09-cv-00105-JHP
Brief in Support                             i

# EXHIBIT A

**Monroe H. Freedman**
**Professor of Law**
**Hofstra University Law School**
**320 West 38th Street, New York, NY 10018**

**lawmhf@hofstra.edu**                              **Telephone: 212-564-8111**
                                                    **Fax: 212-564-8877**

September 7, 2012


Tivon Schardl, Esquire
Trial & Habeas Counsel
Federal Defender for the Eastern District of California
801 I Street, 3rd Floor
Sacramento, CA 95814

Dear Mr. Schardl,

       This letter is in response to your request for an expert opinion regarding lawyers' and judges' ethical issues that have arisen in the §2255 petition in *Kenneth Eugene Barrett v. United States*.

<u>Introduction</u>

       My qualifications as an expert on lawyers' and judges' ethics are set forth in Appendix A to this letter, and a standard resume is in Appendix B.  In brief, I have qualified as an expert on lawyers' and judges' ethics in federal and state courts throughout the country; testified as an expert witness on behalf of the U.S. Department of Justice; written extensively on both lawyers' and judges' ethics, including judicial disqualification; and received the American Bar Association's Michael Franck Award, which is the highest award the ABA gives for professionalism.

<u>Facts</u>

       In preparing this opinion, I have reviewed the following documents relating to this case: Amended Motion for Collateral

Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial, pp. i-xxii, 1-21 (Filed 09/25/09); Declaration of Counsel in Support of Petitioner's Notice Regarding Amended Petition Filed Pursuant to Court Order (Executed 11/30/09); Petitioner's Brief in Support of Second Amended §2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion, pp. I-vii, 125-141 (Filed 03/01/10); Opinion and Order, pp. 2-35 (Filed 08/16/12); Notes for MHF prepared by Tivon Schardl, Esquire (Received by me 8/30/12); Capital Habeas Cases Filed in the Eastern District of Oklahoma Between January 1, 1998 and March 2009 (Received by me 9/5/12); United States v. Kenneth Barrett, E.D., Okl. Case No 04-cr-JHP Defense Expert & Investigative Resources (Received by me 9/5/12).

These documents reveal substantial factual disagreements among Judge James H. Payne, witnesses who spoke with Judge Payne off the record prior to trial, and present counsel for Mr. Barrett, on issues that are critical to this §2255 proceeding. These disagreements relate to whether Judge Payne has demonstrated partiality against counsel and/or their client, or has created the appearance of partiality against counsel and/or their client; whether Judge Payne's administrative decisions relating to the appointment, compensation, and provision of resources for defense counsel, John D. Echols and Roger Hilfiger, prejudiced Mr. Barrett because of an overriding concern for fiscal and administrative concerns, or appears to have done so; whether Judge Payne earlier demonstrated partiality against John D. Echols, who was Mr. Barrett's original lead counsel in his trial, or appears to have done so; whether Judge Payne improperly appointed Roger Hilfiger second chair and then lead counsel to represent Mr. Barrett in his trial, or appears to have done so; and whether Mr. Hilfiger had a conflict of interest and, as a result of that conflict, sought to curry favor with Judge Payne in ways that rendered his representation of Mr. Barrett incompetent and a denial of Mr. Barrett's Sixth Amendment right to the effective assistance of counsel.

2

It would not be appropriate for me to attempt to resolve those disputed facts and to render an opinion on the issues. That will require a hearing before an impartial judge in a §2255 hearing. What follows, therefore, is my opinion as an expert on judicial ethics regarding whether Judge Payne should have attempted to resolve those questions himself without a hearing; whether Judge Payne can preside at such a hearing; or whether the Federal Disqualification Statute, 28 U.S.C. §455, mandates his recusal.

## Opinion

In brief, it is my opinion that Judge Payne was required by 28 U.S.C. §455 to recuse himself from participating in this proceeding before attempting to adjudicate any of the disputes to which he is a party. My opinion is not based on a conclusion that Judge Payne has prejudiced Mr. Barrett's trial because of bias against Mr. Barrett and/or his counsel. That issue can only be decided by impartial resolution of disputed facts. It is not necessary to resolve any disputed facts, however, to conclude that (1) Judge Payne could not and cannot lawfully adjudicate whether he himself has prejudiced Mr. Barrett, and (2) Judge Payne could not and cannot lawfully adjudicate whether Mr. Hilfiger failed to provide Mr. Barrett with the effective assistance of counsel because of a desire to ingratiate himself with Judge Payne.

Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality *might* reasonably be *questioned*."[1] What the statute requires, therefore, is not that a reasonable person conclude that a judge is in fact partial, but that a

---

[1] Emphasis added. See also, Code of Conduct for U.S. Judges, Canon 3C(1): "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."

reasonable person might have questions about the judge's impartiality.  In discussing the perspective of a reasonable person, the Supreme Court has referred to both "the public" and to "the skeptic."[2]  A member of the public or, certainly, a skeptic, might question whether Judge Payne can impartially adjudicate a dispute to which he is a party.

Also, the Supreme Court has recognized that members of the public too often have "suspicions and doubts" about the integrity of judges.[3]  Congress enacted §455(a), the Court explained, to eliminate such suspicions and doubts and to avoid the appearance of impropriety "whenever possible."[4]   Moreover, under §455, the obligation of recusal is "upon the judge himself, rather than requiring recusal only in response to a party affidavit."[5]

The clearest instance of the appearance of impropriety is when a judge is, in effect, deciding his own case.  Moreover, as the Federal Judicial Center has said, "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced."[6]

---

[2] *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 and 865, n.12,  108 S.Ct. 2194, 2203 and 2205, n.12 (1988).

[3] *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 2205 (1988).

[4] *Id.* at 864-865 and 2205.

[5]*Liteky v. United States*, 510 U.S. 540 (1994).

[6] Federal Judicial Center, Judicial Disqualification: An Analysis of Federal Law 15 (2d ed., 2010).

4

For example, in *In re Murchison*[7] the Supreme Court reversed a conviction on due process grounds where a state judge had held a defendant guilty of contempt for conduct before a prior grand jury proceeding where the same judge had presided.  The judge had had no pecuniary interest in the case, nor was there any showing, or even any contention, that the judge had become embroiled in the case, or that he had been in any way biased.[8]  Nevertheless, the Supreme Court held that "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"[9]

That standard of the appearance of justice has since been enacted by Congress in §455(a).  The Federal Judicial Center has explained that "The justification for making *perceived* partiality a grounds for disqualification is at least twofold.  First, regardless of whether judges are partial in fact, *public perceptions* of partiality can undermine confidence in the courts.  Second, disqualifying judges for outward manifestations of what could reasonably be construed as bias obviates making subjective judgment calls about what is actually going on inside a judge's heart and mind."[10]

Accordingly, this opinion has not purported to determine "what is actually going on inside [Judge Payne's] heart and mind."  Rather, the issues here are whether there is an appearance of partiality in Judge Payne's having adjudicated critical factual disputes to which he is himself a party, without holding a hearing, and whether there

---

[7] 349 U.S. 133, 75 S.Ct. 623 (1955).

[8] 349 U.S. at 141, 75 S.Ct. at 623 (Reed, J., dissenting).

[9] 349 U.S. at 136, 75 S.Ct. at 625, quoting *Offutt v. United States*, 348 U.S. 11, 14.

[10]Federal Judicial Center, Judicial Disqualification: An Analysis of Federal Law 17 (2d ed., 2010) (emphasis added).

5

would be an appearance of partiality if Judge Payne were to adjudicate those critical factual disputes, to which he is himself a party, in a §2255 hearing.

## Conclusion

For the reasons given above, Judge Payne has been required by 28 U.S.C. §455(a) to avoid "suspicions and doubts" about his impartiality by recusing himself from participation in this §2255 proceeding, because a reasonable person might question Judge Payne's impartiality in resolving disputes to which he is himself a party.

Sincerely yours,

/s/
Monroe H. Freedman
Professor of Law

6

1998

# APPENDIX A

MONROE H. FREEDMAN

320 West 38th Street, #2523
New York, N.Y., 10018
212-564-8111

See also listings in WHO'S WHO IN AMERICA
WHO'S WHO IN AMERICAN LAW
WHO'S WHO IN THE WORLD

## EDUCATION

A.B., 1951, Harvard College (cum laude; honors thesis, magna cum laude)
LL.B., 1954, Harvard Law School
LL.M., 1956, Harvard Law School (Faculty Fellowship)

## FACULTY POSITIONS

Hofstra Law School, Dean, 1973-1977; Professor of Law, 1973-present
Hofstra Law School, Lichtenstein Distinguished Professor of Legal Ethics,
        1989-2003
Georgetown Law Center, Visiting Professor of Law, 2007-present
George Washington Law Center, Professor of Law, 1958-1973
Cleveland-Marshall Law School, Baker-Hostetler Professor of Law, 1992
Harvard Law School, Faculty Assistant and Faculty Fellow, 1954-1956
Harvard Law School, Lecturer on Legal Ethics and Trial Instructor, Trial
        Advocacy Workshop, 1978-2010

## GOVERNMENT POSITIONS

Executive Director, United States Holocaust Memorial Council, 1980-1982
        (Presidential appointment, under the chairmanship of The Honorable Elie
        Wiesel)
Consultant, United States Commission on Civil Rights, 1960-1964
Legislative Consultant, Senator John L. McClellan, 1959 (drafted major part of
        Landrum-Griffin Act)

[Continued]

**LAW PRACTICE AND PROFESSIONAL ACTIVITIES (SELECTED)**

Qualified as an expert witness in state and federal court proceedings and before
  Judiciary Committees of United States Senate and House of Representatives
Expert on legal ethics for the United States Department of Justice, 1978
Senior Fact-Finder, Rochester Institute of Technology (to investigate and report
  on CIA involvement at RIT) (1991)
Reporter, American Lawyer's Code of Conduct, 1979-1981
Associate, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, 1956-1958
Director, Stern Community Law Firm, Washington, D.C., 1970-1971
Director, Criminal Trial Institute, D.C., 1965-1966
Special Litigation Counsel, ACLU, 1971-1973
Consultant (litigation), Neighborhood Legal Services Program, 1970
Consultant, Association of the Bar of the City of New York, Special
Committee on Courtroom Conduct, 1972
Arbitrator, American Arbitration Association, 1964-present (Service Award,
  1986)
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Columnist ("Cases and Controversies"), American Lawyer newspapers, 1990-
  1996 (over 60 columns published)
Martindale Hubbell rating: a v
Television:  CBS 60 Minutes, CNN Moneyline, C-Span, CNN Late Edition, CNN
  Burden of Proof, CBS News/Dan Rather, Donahue, Court TV, The O'Reilly
  Factor, Hannity & Colmes, Fox News Live, Powerplay

Bar Admissions (Selected)

> Massachusetts, 1954
> Pennsylvania, 1957
> District of Columbia, 1960
> New York, 1978
> United States Court of Appeals for the
>   District of Columbia Circuit, 1960
> Second Circuit, 1968
> Ninth Circuit, 1982
> Eleventh Circuit, 1986
> Federal Circuit, 1987
> Supreme Court of the United States, 1960                    [Continued]

2

**OFFICES IN PROFESSIONAL AND CIVIC ASSOCIATIONS (Selected)**

Governing Board, District of Columbia of Bar, 1972-1973 (resigned upon
    moving to New York)
Chairman, Legal Ethics Committee, D.C. Bar, 1974-1976; member, 1974-1980
Chairman, Committee on Professional Responsibility, Society of American
    Law Teachers, 1974-1980
Chairman, Committee on Professional Disciplinary Standards and Procedures,
    Federal Bar Association, 1969-1970
Vice Chairman, Ethical Considerations Committee, ABA Criminal Justice
    Section, 1987-1990
Co-Chair, Ethics Advisory Committee, National Association of Criminal
    Defense Lawyers, 1991-1993
National Board, American Civil Liberties Union, 1971-1980
National Advisory Council, American Civil Liberties Union, 1980-present
Committee on Professional Responsibility, Association of the Bar of the City
    of New York, 1986-1990
Committee on Professional and Judicial Ethics, Association of the Bar of the
    City of New York, 1991-1992
Ethics Committee, Criminal Justice Section, New York State Bar Association,
    1990-1992
Committee on Legal Education and Admission to the Bar, New York State Bar
    Association, 1987-1989
Committee on Model Rules of Professional Conduct, D.C. Bar, 1983-1986
Executive Committee and Governing Board, Society of American Law
    Teachers, 1976-1979
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Ethics Advisory Committee, United States District Court for the Eastern District
    of New York, 1994-1996
Ethics Advisor to the Chair, ABA Criminal Justice Section, 1993-1995
Advisory Council, The Appleseed Foundation, 1996-present
Panel of Acadmic Contributors, Black's Law Dictionary, 2002-present
Members Consultative Group, ALI, Restatement of the Law Governing Lawyers,
    1989-1999
American Law Institute, (Elected) (Life Member)

[Continued]

3

**HONORS, GRANTS, AND LECTURESHIPS (SELECTED)**

ABA Michael Franck Award for Professional Responsibility (1998), for "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

Howard Lichtenstein Distinguished Professor of Legal Ethics, Hofstra University (1989-2003)

Martin Luther King Humanitarian Award (1986) (for "decades of work to advance human dignity and social justice")

Lehman-Laguardia Award for Civic Achievement (1996)

Baker-Hostetler Chair in Law, Cleveland-Marshall Law School (1992)

Annual Award, Black Law Students Association (1987)

Award of Merit, District of Columbia Bar (1979) (for "exceptional performance as a member of the Legal Ethics Committee")

First Annual Wickwire Lecturer on Legal Ethics and Professional Responsibility, Dalhousie Law School, Canada (1992)

President's Commendation Award, National Association of Criminal Defense Lawyers (1992)

Pope John XXIII Lecture, Catholic University Law School (1978)

Dedication of Symposium Issue of Hofstra Law Review, vol. 6, no. 3, part II (1978)

Dedication of Crystal, Professional Responsibility (2d ed., 2000) (Aspen Law & Business): "To Monroe Freedman, who has so often led the way."

Certificate of Merit, American Bar Association (1976) (for "distinguished contribution to public understanding of the American legal system")

Certificate of Special Acknowledgment, Wisconsin Department of Justice (1988)

Ford Foundation grant to establish and direct the Criminal Trial Institute, Washington, D.C. (1965-1966)

Stern Family Fund grant to establish and direct the Stern Community Law Firm, a public interest law firm, Washington, D.C. (1970-1971)

Ford Foundation Research Fellowship in Legal Ethics (1973)

Life Fellow, American Bar Foundation

Honorary Fellow, American Board of Criminal Lawyers (2003–)

Faculty Fellowship, Harvard Law School (1954-1956)

[Continued]

4

**HONORS (Continued)**

New York State Bar Association Sanford D. Levy Award "in recognition of your
   extraordinary contribution to the field of professional ethics through a
   body of work that spans four decades" (2005)

New York State Bar Association Award for Dedication to Legal Scholarship and
   Public Service (1997)

New York State Bar Association Award for Outstanding Contributions to
   Criminal Law Education (2006)

Distinguished Faculty Award, Hofstra University (2007)

**PUBLICATIONS**

**Books**

LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975) (ABA Gavel Award
   Certificate of Merit as an "outstanding" contribution to the field, 1976)

UNDERSTANDING LAWYERS' ETHICS (1st ed., 1990)

UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith)

CONTRACTS (West Pub. Co., 1973)

TEACHER'S MANUAL, CONTRACTS (265 pp.) (West, 1978) (with Professor  Alan
   Resnick)

CONTRACTS: AN INTRODUCTION TO LAW AND LAWYERING (photocopied)

GROUP DEFAMATION AND FREEDOM OF SPEECH (Greenwood, 1995) (ed., with
   Professor Eric Freedman)

**Articles Published In (Selected)**

| | |
|---|---|
| ABA Journal | NYU Law Review |
| Georgetown Law Journal | Ohio State Law Review |
| George Washington Law Review | Pennsylvania Law Review |
| Hofstra Law Review | Stanford Law Review |
| Journal of Legal Education | Texas Law Review |
| Journal of the Legal Profession | Yale Law Journal |
| Michigan Law Review | |

**PEER EVALUATIONS**

Lawrence Fox, Email to the ABA Board of Governors (2008)

   Monroe Freedman [is] the conscience of our profession.

[Continued]

5

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's] influence on discussions of legal ethics.

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events in the recent emergence of ethics as a subject of serious reflection by the bar.  Most likely, you would name the Watergate affair of 1974 and the appearance a few years earlier of an article by Monroe Freedman....  Of the two events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman.  He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

> If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

6

# APPENDIX B

**QUALIFICATIONS OF MONROE H. FREEDMAN
AS AN EXPERT WITNESS ON LAWYERS' AND JUDGES' ETHICS**

1. My name is Monroe H. Freedman. I am a Professor of Law, and the former Dean, of Hofstra University School of Law, Hempstead, New York, 11550.

2. My qualifications as an expert witness on lawyers' ethics are set forth more fully in paragraphs 3-34 below. In brief:

(a) I have qualified as an expert witness on lawyers' and judges' ethics in state and federal courts and before the Judiciary Committees of the United States Congress, and have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

(b) Honors that I have received include the American Bar Association's Michael Franck Award for Professional Responsibility. This is the highest award conferred by the ABA for professional responsibility, and was given for "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

(c) For over a third of a century, I have taught and consulted on lawyers' and judges' professional responsibilities. I currently teach lawyers' ethics at Hofstra Law School and, since 1978, have lectured annually on lawyers' ethics at Harvard Law School. I have also been a Visiting Professor of Law at Georgetown Law Center since 2008.

(d) My earlier book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The *Harvard Civil Rights/ Civil Liberties Law Review* called it one of the few "monumental contributions to legal education in the past generation."

(e) My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith). *The Professional Lawyer*, published by the ABA's Center for Professional Responsibility, called the 1990 edition "thoughtful and eloquent," "rich with practical examples," and "idealistic in the best sense of the word."

(f) My testimony, books, and/or articles have been relied upon by numerous courts, including the United States Supreme Court.

(g) An article in *The Journal of the Legal Profession* concludes:

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

Additional peer comments are in paragraph 34, below.

## QUALIFICATIONS AS AN EXPERT WITNESS

3. My name is Monroe H. Freedman. I am a Professor of Law, and the former Dean, at Hofstra University School of Law, Hempstead, New York, 11550.

4. I was Dean of the Hofstra University Law School from 1973-1977. From 1989 to 2003, I was the Lichtenstein Distinguished Professor of Legal Ethics at Hofstra Law School. I resigned the Lichtenstein Chair in 2003 so that my colleague in the ethics field could be appointed to it.

2

5. I have qualified as an expert witness on lawyers' ethics in federal and state proceedings throughout the country; before a Judicial Investigative Committee of the Eighth Circuit Judicial Council; before a Disciplinary Hearing Board of the United States Air Force; and before the Judiciary Committees of the United States Senate and House of Representatives.

6. I have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

7. I was the first Chairman of the Legal Ethics Committee of the District of Columbia Bar. By unanimous vote of the members of the Committee, I served as Chairman for two terms.

8. I have also been a member of the Committee on Legal Education and Admission to the Bar of the New York State Bar Association; a member of the Committee on Professional Responsibility of the Criminal Justice Section of the New York State Bar Association; Vice Chairman of the Ethical Considerations Committee of the ABA Section on Criminal Justice; Chairman of the Committee on Professional Responsibility of the Society of American Law Teachers (four terms); Chairman of the Committee on Professional Disciplinary Standards and Procedures of the Federal Bar Association; Co-Chairman of the Ethics Advisory Committee of the National Association of Criminal Defense Lawyers; Ethics Adviser to the Chair of the ABA Section on Criminal Justice; a member of the Committee on Professional Responsibility of the Association of the Bar of the City of New York; a member of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York; and a member of the Board of Governors of the District of Columbia Bar.

9. My first ethics book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The ABA Certificate refers to the book

3

as "outstanding" in its examination of "the most difficult ethical problems a lawyer faces." About three dozen favorable reviews of the book appeared, including those in the *ABA Journal* ("scholarly ... powerful"), *ABA Litigation* ("thorough and scholarly"), and the *George Washington Law Review* ("undoubtedly, the best book published in the field of legal ethics"). In the *Harvard Civil Rights/Civil Liberties Law Review*, Professor Norman Dorsen called the book one of the few "monumental contributions to legal education in the past generation."

10. My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith). It has been required reading at law schools including Harvard Law School, the University of California at Berkeley, and the Georgetown Law Center; is assigned and/or recommended at other law schools; has been used in training programs for the bar in Canada; and is being translated into Chinese. *The Professional Lawyer*, published by the ABA Center for Professional Responsibility, calls the book "thoughtful and eloquent" and "idealistic in the best sense of the word, pragmatic, but not cynical, and rich with practical examples." The *Massachusetts Law Review* adds that the book is "a 'must' for every desk, bench, and briefcase."

11. Selections from my writings on lawyers' ethics are part of the assigned reading at most law schools in the United States and in law schools in Canada.

12. My testimony, books and/or articles have been cited by numerous courts, including the Supreme Court of the United States, the New York Court of Appeals, the Supreme Courts of Alaska, Arizona, Colorado, Illinois, Maryland, and New Jersey, the Court of Appeals of New Mexico, the Court of Criminal Appeals of Texas, the District of Columbia Court of Appeals, the United States District Court for the Southern District of New York, and the United States Courts of Appeals for the First, Eighth, and Ninth Circuits.

4

2010

13.  My article on <u>The Professional Responsibility of the Criminal Defense Lawyer:  The Three Hardest Questions</u> has been excerpted and reprinted over four dozen times.

14.  The following is a partial list of my articles on lawyers' professional responsibilities:

<u>The Professional Responsibility of the Criminal Defense Lawyer:  The Three Hardest Questions</u>, 64 Mich. L. Rev. 1469 (1966)

    <u>Reprint or excerpt permission requested</u>:

    Hall & Kamisar, Modern Criminal Procedure (1966)
    Hazard & Koniak, The Law and Ethics of Lawyering (1989)
    Morgan & Rotunda, Professional Responsibility (all editions)
    Schwartz & Wydick, Problems in Legal Ethics (1988)
    Aronson, Devine & Fisch, Problems, Cases and Materials in Professional Responsibility (1985)
    Kamisar, LaFave & Israel, Criminal Procedure (1980)
    Countryman, Finman & Schneyer, The Law in Modern Society (1976)
    Bishin & Stone, Law, Language, and Ethics (1972)
    Kadish & Paulsen, Criminal Law and its Processes (1975)
    Kaufman, Problems in Professional Responsibility (1976)
    1 ABA Litigation 26 (Winter, 1975)
    National Conference on Teaching Professional Responsibility (1977)
    Kaplan, Criminal Justice (1978)
    Tanford, The Trial Process (1983)

5

Lempert & Saltzburg, A Modern Approach to Evidence (1984)

Arthur & Shaw, Readings in Philosophy of Law (1984)

Berch, Introduction to Legal Method (1985)

Allen & Kuhns, Constitutional Criminal Procedure (1985)

Summers et al., Law: Its Nature, Functions, and Limits (3d ed.,1986)

Elliston & Davis, Ethics and the Legal Profession (1986)

Delisle & Stuart, Learning Canadian Criminal Procedure (1986)

Katsh, Taking Sides (1986)

Schroder, Ethics and the Practice of Law (1988)

Callahan, Ethical Issues in Professional Life (1988)

Sharpe, Canadian Civil Procedure:  Cases and Materials (3d ed.,1988)

Shaw, Moral Issues in Business (1989)

Fairbanks, Fact, Value, Policy: Critical Thinking in Argument (1993)

Tuedio & Trujillo, Professional Ethics in a Free-Market System (1990)

The Legal Profession and Professional Responsibility (University of Pennsylvania Law School, Center on Professionalism, 1990)

D. Rhode, Professional Responsibility: Ethics by the Pervasive Method (1994)

Luban & Rhode, Legal Ethics (1995)

Zitrin & Langford, Legal Ethics in the Practice of Law (1995)

N. Crystal, Professional Responsibility in the Practice of Law (1995)

Wettick, Course Materials on Professional Responsibility (1997)

Swift, The Lawyer's Role in the American Legal System (1997)

6

Acker & Brody, Criminal Procedure: A Contemporary Perspective (1998)

Avery & Konefsky, Introduction to Law and Perspectives (1998)

Hazard, Koniak, & Cramton, The Law and Ethics of Lawyering (3d ed., 1999)

May, Snow & Bolte, Legal Philosophy: Multiple Perspectives (2000)

Hatch, Arguing in Communities: Reading and Writing Arguments in Context (2002)

Kaufman & Wilkins, Problems in Professional Responsibility (4th ed., 2002)

Koniak & Cohen

Moliterno, Cases and Materials on the Law Governing Lawyers (2d ed., 2003)

Holdstein, Challenging Perspectives (2005)

Coquillette, Real Ethics for Real Lawyers (2005)

Youngstown State Univ., Professional Ethics (2006)

Performances from "Oscar" Winning Litigators: Ethical Conundrums in Criminal Cases (N.Y. City Bar, 2007)

Moralnosc a Profesjonalizm (Morality and Professionalism), ed. Wlodzimierz Galewicz (Universitas Publishing House, Cracow, Poland, 2008)

Book Review: Carlin, Lawyers' Ethics: A Study of the New York  City Bar, 16 Amer. U.L. Rev. 177 (1966)

Professional Responsibility of the Prosecuting Attorney, 55 Geo. L. Jour. 1030 (1967)

Reprinted or excerpted:

3 Crim. L. Bull. 544 (1967)

7

Kaplan, Criminal Justice (1978)
Hall, Kamisar LaFave & Israel, Modern Criminal
        Procedure

Professional Responsibility of the Civil Practitioner: Teaching
Ethics in the Contracts Course, 21 Jour. Legal Ed. 569 (1969)

Reprinted or excerpted:

41 U. Colo. L. Rev. 303 (1969)
Education in the Professional Responsibilities of the
        Lawyer (ed., Weckstein) (1969)

Where the Bodies Are Buried:  The Adversary System and the
Obligation of Confidentiality, 10 Crim. L. Bull. 979 (1974)

Reprinted:

ABA, Adversarial Justice:  The American Approach to
        Adjudication (1988)
Shaw, Moral Issues in Business (1989)
Windt & Francis, Ethical Issues in the Professions
        (1989)
Shaw, Taking Sides: Clashing Views on Controversial
        Legal  Issues (1988)
J. Arthur & W.H. Shaw, Readings in Philosophy of Law
        (1984)
Berman & Geiner, The Nature and Functions of Law (4th
        ed., 1980)
Shaw & Shapiro, Readings in the Philosophy of Law
        (2013)

A Civil Libertarian Looks at Securities Regulation, 35 Ohio St.
L. Jour. 280 (1974)

8

Reprinted or excerpted:

Schwartz, Lawyers and the Legal Profession
    (1979)

Judge Frankel's Search for Truth, 123 U. Pa. L. Rev.1060
(1975)

Reprinted or excerpted:

National Conference on Teaching Professional
    Responsibility (1977)
Morgan & Rotunda, Professional Responsibility (all
    editions)
Schroeder, Ethics and the Practice of Law (1988)
Luban & Rhode, Legal Ethics (1995)
Levine, Doernberg, & Nelken, A Civil Procedure
    Anthology (1998)
P.G. Haskell, Why Lawyers Behave As They Do (1997)

Solicitation of Clients:  For the Poor, Not the Privileged,  Juris
    Doctor (Apr., 1971)

Advertising and Solicitation by Lawyers: A Proposed Redraft of
Canon 2 of the Code of Professional Responsibility, 4 Hofstra
L. Rev. 183 (1976)

Advertising and Solicitation: The Professional Obligation to
Chase Ambulances, LAWYERS' ETHICS IN AN ADVERSARY
SYSTEM (1975)

Reprinted:

Nader & Green,Verdicts on Lawyers (1976)
Callahan, Ethical Issues in Professional Life (1988)

9

Solomon, Martin, & Vaught, Ethics for Professionals (2009)

Counseling the Client: Refreshing Recollection or Prompting Perjury? ABA Litigation 35 (Spring, 1976)

Reprinted or excerpted:

ABA, The Litigation Manual (all editions)
Tanford, The Trial Process (1983)
Twerski & Henderson, Products Liability:  Problems and Process (Teacher's Guide) (3d ed., 1997)
Berke, Professional Responsibility of Criminal Law (1999)

The Life-Saving Exception to Confidentiality: Restating the Law Without the *Was*, the *Will Be*, or the *Ought to Be*, 29 Loyola (L.A.) L. Rev. 1631 (1996)

Are There Public Interest Limits on Lawyers' Advocacy?  11 Social Responsibility 31 (1976)

Reprinted:

2 Jour. Legal Prof. 47 (1977)

Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys, 29 Stan. L. Rev. 608 (1977) (with Janet Starwood)

Revised and reprinted:

Criminal Defense Techniques (Matthew Bender) (with S. Kahan)

10

For a New Rule [on the former government lawyer's conflict of interest], 63 ABA Jour. 724 (1977)

Reprinted or excerpted:

Morgan & Rotunda, Professional Responsibility (1984)

The Loss of Idealism -- By Whom, And When? 53 N.Y.U. L. Rev. 658 (1978)

Personal Responsibility in a Professional System, 27 Cath. U.L. Rev. 191 (1978) (Pope John XXIII Lecture)

Reprinted or excerpted:

7 ABA Human Rights 28 (1978)
Roscoe Pound/ATLA Found., Ethics and Advocacy (1978)
Wolfman & Holden, Ethical Problems in Federal Tax Procedure (1981)
Pirsig & Kirwin, Professional Responsibility (1984)
Luban, The Ethics of Lawyers (1994)
Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996)

Removal and Discipline of Federal Judges, 31 Mercer L. Rev. 681 (1980)

The Securities and Exchange Commission Enforcement Program, 38 Wash. & Lee L. Rev. 781 (1981) (with S. Sporkin)

The Kutak Model Rules vs. The American Lawyer's Code of Conduct, 26 Vill. L. Rev. 100 (1981)

11

Lawyer-Client Confidences and the Constitution, 90 Yale L. Jour. 1486 (1981)

Reprinted or excerpted:

Dorsen & Gillers, Regulation of Lawyers: Problems of Law and Ethics (1985)

Are the Model Rules Unconstitutional? 35 U. Miami L. Rev. 174 (1981)

Lawyer-Client Confidences -- The Model Rules' Radical Assault on Tradition, 68 ABA Jour. 428 (1982)

Reprinted:

26 Boston Bar Jour. 10 (April, 1982)

Arguing the Law in an Adversary System, 16 Ga. L. Rev. 821 (1982)

The Model Rules:  Improved but Unworthy of Adoption, 69 ABA Jour. 866 (1983)

Reprinted:

54 Okla. Bar Jour. 1681 (1983)

Confidentiality in the Lawyer-Client Relationship, The Neb. Humanist (Fall, 1984)

Lawyer-Client Confidences Under the Model Rules:  Ethical Rules Without Ethical Reason, 3 Crim. Justice Ethics 3 (Summer/Fall, 1984)

12

The Guilty Plea Problem, X Social Resp. 32, 37 (1984)

Undercover Operations Against Lawyers and Judges, 9 Jour. Legal Prof. 73 (1980)

Does Incrimination by Counsel Deny Effective Assistance? ABA Barrister 13 (Fall, 1985)

 Reprinted:

 Nat'l L. Jour. 13 (11/4/85)

The Professional Responsibility of the Law Professor: Three Neglected Questions, 39 Vand. L. Rev. 275 (1986)

 Reprinted or excerpted:

 Student Law News 8 (11/87)
 36 Law Rev. Dig. 26 (1986)
 86 L.A. Daily Jour. Rpt. 16 (8/22/86)

The Ethics of Advocacy in the Advocacy of Ethics, 1 New L. Book Rev. 1 (1986)

The Aftermath of Nix v. Whiteside: Slamming the Lid on Pandora's Box, 23 Crim. L. Bull. 25 (1987)

 Reprinted or adapted:

 __ Social Resp. (1986)
 1 Hofstra L. Mag. 8 (1987)
 Schwartz & Wydick, Problems in Legal Ethics (1988)

Advances in Prosecutors' Ethics, 1 ABA Crim. Just. __ (Winter, 1987)

13

Reprinted:

14 CACJ Forum 9 (July/Aug., 1987)

Legal Ethics and the Suffering Client, 36 Cath. U.L. Rev. 331
(1987)

Reprinted:

Paris & Taslitz, Introductory Constitutional Criminal
Procedure: A Lawyering Perspctive (Foundation
Press, 1997)

Two Fables for Lawyers, ABA Jour. 57 (May, 1, 1988)

Client Confidences and Client Perjury:  Some Unanswered
Questions, 136 U. Pa. L. Rev. 1939 (1988)

Reprinted:

1 Crim Prac. L. Rev. ____ (1989)
J.G. Carr, Criminal Law Review--1990
Hazard & Koniak, The Law and Ethics of Lawyering
(1990)

The Lawyer As Hired Gun, II Memphis Bar Forum 6 (1988)

Reprinted:

4 Wash. Lawyer 22 (Mar./Apr., 1990)
Ariz. Atty. 11 (Aug./Sept., 1990)
N.Y. State Bar Jour. 48 (Nov., 1990)
396 Laches 32 (Oakland Cty. Bar Assn., Mich. 1997)

14

The Need for a Rule 11 for Judges, 128 F.R.D. 437 (1990) (Delivered at the plenary session of the 1989 Federal Circuit Judicial Conference, Wash., D.C.)

Ethical Ends and Ethical Means, 41 Jour. Legal Education 55 (1991)

> Excerpted:
>
> > J. Levy & J.E. Moliterno, Ethics of the Lawyer's Work (1993)
> > J.E. Moliterno, Ethics of the Lawyer's Work (2003)

Law in the 21st Century, 60 Fordham L. Rev. 503 (1992)

Disqualification of Judges, 58 Brooklyn L. Rev. 1063, 1078 (1993)

Atticus Finch -- Right and Wrong, 45 Ala. L. Rev. 473 (1994)

> Reprinted:
>
> EBSCO (pub.), Critical Insights (2008)
>
> Excerpted:
>
> David R. Papke, et al., Law and Popular Culture (2007)
>
> Quoted:
>
> Malcolm Gladwell, The Courthouse Ring: Atticus Finch and the limits of Southern liberalism (Aug. 10, 2009)

Kaye Scholer -- Overzealous or Overblown? 35 S. Tex. L. Rev. 601 (1994)

15

John T. Noonan, Jr.:  Exemplar of Ethical Conduct, 11 Jour. of Law & Religion 1001 (1995)

But Only If You Know, Chapter 10 in R.J. Uphoff (ed.), Ethical Problems Facing the Criminal Defense Lawyer – Practical Answers to Tough Questions (ABA, 1995)

> Reviewed, ABA Criminal Justice: "There exists no better choice of authority [than Monroe Freedman] to help you answer the ethical dilemma(s) surrounding client perjury, and he delivers in this book."

> Translation into Japanese being prepared by the Japan Federation of Bar Associations for publication in Japan

The Lawyer's Moral Obligation of Justification, 74 Tex. L. Rev. 111 (1995)

Legal Ethics from a Jewish Perspective, 27 Tex. Tech. L. Rev. 1131 (1996)

> Reprinted:

> Baker & Floyd (eds.), Believing and Practicing: Meditations on Faith and the Law (1998)

The Life-Saving Exception to Confidentiality: Restating the Law Without the *Was*, the *Will Be*, or the *Ought to Be*, 29 Loyola (L.A.) L. Rev. 1631 (1996)

The Trouble with Postmodern Zeal, 38 Wm. & Mary L. Rev. 63 (1996)

16

<u>The Threat to Judicial Independence by Criticism of Judges</u> -- <u>A Proposed Solution to the Real Problem</u>, 25 Hofstra L. Rev. 729 (1997)

<u>Religion Is Not Totally Irrelevant to Legal Ethics</u>, 66 Fordham L. Rev. 1299 (1998)

<u>The Ethical Danger of "Civility" and "Professionalism,"</u> 6 Crim. Justice Jour. 17 (1998)

    <u>Reprinted</u>:

    396 Laches 22 (1999)

<u>Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements</u>, 26 Hofstra L. Rev. 641 (1998)

<u>Our Constitutionalized Adversary System</u>, 1 Chapman L. Rev. 57 (1998)

<u>Ethics, Truth, and Justice in Criminal Litigation</u>, 68 Fordham L. Rev. 1371 (2000)

<u>How Lawyers Act in the Interests of Justice</u>, 70 Ford. L. Rev. 1717 (2002)

<u>Professional Discipline of Prosecutors</u>, 30 Hofstra L. Rev. 121 (2002)

<u>The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases</u>, 31 Hofstra L. Rev. 1167 (2003)

    <u>Excerpted</u>:

17

D.J. Meador, T.E. Baker, & J.E. Steinman,
Appellate Courts – Structure, Function, Processes,
and Personnel

Duck-Blind Justice: Justice Scalia's Memorandum in the
*Cheney* Case, 18 Georgetown Jour. Legal Ed. 229 (2004)

An Ethical Manifesto for Public Defenders, 39 Valparaiso L.
Rev. 911 (2005)

In Praise of Overzealous Representation – Lying to Judges,
Deceiving Third Parties, and Other Ethical Conduct, 34 Hofstra
L. Rev. 771 (2006)

Henry Lord Brougham – Written by Himself, 19 Georgetown
Jour. Legal Eths. 1213 (2006)

Henry Lord Brougham and Zeal, 34 Hofstra L. Rev. 1319
(2006)

Erroneous Disclosure of Damaging Information, 14 Geo. Mason
L. Rev. 179 (2006)

Judicial Impartiality in the Supreme Court – The Troubling
Case of Justice Stephen Breyer, 30 Okla. City Univ. L. Rev. 513
[2007]

The Buried Bodies Case: Alive and Well after Thirty Years,
ABA, The Professional Lawyer, 2007 Symposium Issue

Henry Lord Brougham – Advocating at the Edge for Human
Rights, 36 Hofstra L. Rev. 311 (2007)

Reprinted:

18

Oregon Law Institute, Continuing Legal Education (2008)

Ethical Issues in Handling Veterans' Claims, 22 Vet. App. Reporter cxxvii (2008)

Getting Honest About Client Perjury, 21 Georgetown Jour. Legal Ethics 133 (2008)

Reprinted:

14 Verdict 21 (October, 2008)
Institute of Chartered Financial Analysts of India, Prosecutorial Misconduct (ed., Dr. G. Radha Kalyani) (2009)

What Ever Happened to the Search for Truth?, 60 Mercer L. Rev. 851 (2009)

Misunderstanding Lawyers' Ethics, 108 Mich. L. Rev. 925 (2010) (with Abbe Smith)

The Cooperating Witness Who Lies – A Challenge to Defense Lawyers, Prosecutors, and Judges, 2 Ohio State Jour. Crim. L. 739 (2010)

The Influence of the American Lawyers' Code of Conduct on ABA Rules and Standards, 38 Hofstra L. Rev. 927 (2010)

Client-Centered Lawyering – What It Isn't, 40 Hofstra.L. Rev. 349 (2011)

A Critique of Philosophizing About Lawyers' Ethics, 25 Georgetown Journal of Legal Ethics 91 (2012).

19

15.  From 1990-1996, I wrote a monthly column, *Cases and Controversies*, in the Legal Times and several other newspapers throughout the country.  Commenting in the Georgetown Journal of Legal Ethics, Professor Thomas Morgan called the columns "tough, imaginative essays."  Columns have been reprinted or excerpted in Gellhorn, Byse, Strauss, Rakoff & Schotland, Cases and Materials on Administrative Law (9th ed., 1995); The Lawyer As Professional (Eds., Floyd & Newton, 1991); D. Rhode, Legal Ethics by the Pervasive Method (1993); T.D. Morgan & R. Rotunda, Problems and Materials on Professional Responsibility (6th ed., 1995; 7th ed., 2000) (two columns); N. Crystal, Professional Responsibility in the Practice of Law (1995); Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996) (two columns); C.D. Johnson, Understanding to Kill a Mockingbird (1994); Zitrin & Langford, Legal Ethics in the Practice of Law (2d ed., 2001); and Rhode & Luban, Legal Ethics (3d ed., 2001) (two columns); and Professor Stephen Gillers has asked permission to reprint a column in Regulation of Lawyers: Problems of Law and Ethics.  In addition, two of the columns have been the subject of the *At the Bar* column in the New York Times, another has been reprinted in the Congressional Record, one was appended to a Pennsylvania Bar Ethics Opinion, and others have been quoted or cited in law reviews, including the Yale Law Journal.  Yale Professor Harold Bloom has reprinted one of my columns (on Atticus Finch) in his 2003 book on Harper Lee's To Kill a Mockingbird.

16. For forty-five years, I lectured annually on lawyers' professional responsibilities at Harvard Law School, where I also served as an instructor on litigation skills.

17.  I have taught a course and/or a seminar on lawyers' professional responsibilities for over 40 years, and am invited to speak several times each year on lawyers' and judges' ethics at bar association meetings, judicial conferences, and law schools throughout the United States and abroad.  Judicial conferences include:  the Federal

20

Circuit Judicial Conference; the New York State Judicial Conference; the District of Columbia Judicial Conference; the Council of State Intermediate Appellate Court Chief Justices; the Annual Conference of Judges in Tennessee; the Judicial Conference of the U.S. Court of Appeals for Veterans' Affairs, and the Annual Conference of Judges in Florida. I have also given the keynote address at several conferences, including an annual meeting of the National Organization of Bar Counsel, and have spoken innumerable times at American Bar Association conferences.

18. The Wisconsin Department of Justice retained me to give a three and one-half hour lecture to 160 state prosecutors, including the Attorney General of Wisconsin, on prosecutors' ethical responsibilities. Also, the Office of the United States Attorney for the Southern District of Florida and the Office of the State Attorney for Dade County retained me to chair a two-hour ethics seminar for federal and state prosecutors.

19. The Administrative Office of the Illinois Courts retained me to address (in two sessions) all 1,000 Illinois state judges, on judicial ethics.

20. I have been a Consultant on professional responsibility to the Special Committee on Courtroom Conduct of the Association of the Bar of the City of New York; Consultant on professional responsibility to the United States Legal Services Corporation; and was awarded a Ford Foundation Travel-Study Grant to study lawyers' professional responsibilities in the United States, Canada, Scotland, and England.

21. Although I had then been living in New York for ten years, I was appointed in 1983-1986 to serve on the District of Columbia Bar's Special Committee (the Jordan Committee) to make recommendations regarding adoption of the ABA's proposed <u>Model Rules of Professional Conduct</u>. I was also a member of the

21

Committee's Subcommittee on Special Rules for Prosecutors. In 1997, I was invited to address the Supreme Judicial Court of Massachusetts on the state's proposed new rules on confidentiality.

22. As Reporter to the Roscoe Pound Foundation, I was the principal draftsman of the American Lawyer's Code of Conduct. Parts of this code have been the basis for rules adopted in other codes, including the Rules of Professional Conduct in New York; the Rules of Professional Conduct in Washington, D.C., the ABA Standards Relating to the Prosecution Function, the ABA's Model Rules of Professional Conduct, and the ALI's Restatement of the Law Governing Lawyers.

23. I held the Baker-Hostetler Chair in Law at Cleveland-Marshall Law School during the spring semester of 1992, teaching a course and giving lectures on lawyers' and judges' ethics.

24. I delivered the Inaugural Annual Wickwire Lecture in Legal Ethics and Professional Responsibility at Dalhousie University, Nova Scotia, Canada, in 1992, and numerous bar lectures and keynote addresses throughout the United States.

25. I was the Director of the Criminal Trial Institute in Washington, D.C., in 1965-1966. In the Institute we used and developed techniques for training trial advocates that have since become standard in the National Institute for Trail Advocacy and similar programs. The Institute was the first such program to include lawyers' ethics as part of the training program.

26. I have conducted trial and appellate litigation in several state and federal courts and before administrative agencies.

27. I have been admitted to the bars of New York, the District of Columbia, Massachusetts, Pennsylvania, the Interstate Commerce Commission, the United States District Court for the District of

2028

Columbia, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, the United States Court of Appeals for the District of Columbia Circuit, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, the United States Court of Appeals for the Eleventh Circuit, the United States Court of Appeals for the Federal Circuit, and the Supreme Court of the United States.

28. I have been elected to membership in the American Law Institute, and served on its Consultative Group on the Law Governing Lawyers.

29. I served as an elected a Fellow of the American Bar Foundation. A Fellow is one whose "public and private career has demonstrated outstanding dedication to the welfare of the community [and] the traditions of the profession."

30. I have been elected an Honorary Fellow of the American Board of Criminal Lawyers.

31. I have received the 2005 Sanford D. Levy Award from the New York State Bar Association "in recognition of your extraordinary contribution to the field of professional ethics through a body of work that spans four decades"; a New York State Bar Association Award for Dedication to Legal Scholarship and Public Service (1997); a New York State Bar Association Award for Outstanding Contributions to Criminal Law Education (2006); an Award of Merit from the District of Columbia Bar; a President's Commendation Award from the National Association of Criminal Defense Lawyers; the Martin Luther King Humanitarian Award (1986); the Lehman-LaGuardia Award for Civic Achievement (1996); and the ABA's Michael Franck Award for Professional Responsibility (1998), which cited "outstanding contributions to the field of professional responsibility" and "a

23

lifetime of original and influential scholarship in the field of lawyers' ethics."

32.  I received an A.B., 1951, LL.B., 1954, and LL.M., 1956, at Harvard University.

33.  I have been listed for many years in Who's Who in American Law, Who's Who in America, and Who's Who in the World.

34. Peer comments on my work in lawyers' and judges' ethics include the following:

Lawrence Fox, in an email to the ABA House of Delegates (2008):

> Monroe Freedman [is] the conscience of our profession.

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ...
> have been the primary creative force in legal ethics today,
> both in the practice of law and in legal education.

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's]
> influence on discussions of legal ethics.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events
> in the recent emergence of ethics as a subject of serious
> reflection by the bar.  Most likely, you would name the
> Watergate affair of 1974 and the appearance a few years
> earlier of an article by Monroe Freedman....  Of the two

24

events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman.  He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

> If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

25

2031

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br><br>Petitioner,<br><br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br><br><br>Respondent. | 6:09-cv-00105-JHP |

## DECLARATION OF COUNSEL IN SUPPORT OF
## PETITIONER'S NOTICE REGARDING
## AMENDED PETITION FILED PURSUANT TO COURT ORDER

I, Tivon Schardl, declare the following:

1.      I am appointed co-counsel for Kenneth Eugene Barrett in this case.  As part of my responsibilities in the case, following the hearing held October 6, 2009, and in response to comments from the Court made during that hearing, I researched all capital habeas corpus cases filed in the Eastern District of Oklahoma since January 1, 1998.

2.      The purpose of this research was to determine whether I and lead counsel had understood Rule 2 of the Rules Governing § 2255 Proceedings, and the local rules, in a manner that was inconsistent with the understanding of other lawyers in capital cases in the Eastern District.

1

2033

3.      I identified all capital habeas corpus cases filed after January 1, 1998 by logging onto the Court's CM/ECF system using the Federal Defender's generic login.  I clicked the "query" button and entered search parameters under the second option on the query page as follows:

In this way, I believed I was querying the CM/ECF database for all cases filed under the same code as Mr. Barrett's case, and therefore for all similarly situated cases.

4.      That query produced a list of seventeen (17) cases, including Mr. Barrett's.  I entered each of those cases into the table appended to this declaration.  Insofar as the issues I was researching involved the application of the local rules, that Mr. Barrett's case was classified the same way as capital habeas cases filed under 28 U.S.C. § 2254, and that L.Cv.R. 9.2 treated §

2

2034

2255 and § 2254 cases identically, this list appeared to represent the complete set of relevant cases.

5.      I attempted to learn whether the petitions in the sixteen (16) cases other than Mr. Barrett's were different from his in the following respects:  (a) whether the petitions were filed on the form appended to the Rules Governing § 2254 Cases in the District Courts; (b) whether, if not, they contained "argument" and citations to law, i.e. whether they were in the form of a motion/brief; (c) whether, if the petitions were not filed on the form, they were longer than 25 pages; (d) whether the petitions sought various forms of relief including discovery or evidentiary hearings; and, (e) whether, if the answers to (a), (b), (c), or (d) were in the affirmative, the District Court had made an issue of it and requested the petitioners to modify their pleadings accordingly.

6.      In order to answer these questions, I first attempted to form at least an educated guess based upon the documents available through CM/ECF.  For nearly all the cases, the petitions and relevant orders, if any, were not available for download.  After reviewing the docket entries, and hypothesizing that no capital habeas petitioner on the list had used the form, or been faulted for failing to do so, I decided to conduct a telephone and e-mail survey of counsel in order to test that theory.  However, based on a review of the dockets, it appeared that one case, *Braun v. Keating*, Case No. 6:00-cv-00102-JHP-KEW, was a second or successive petition, and I therefore eliminated it from further inquiry.

7.      In ten (10) of the fifteen (15) similarly situated cases, counsel were current or former attorneys from the Capital Habeas Unit of the Federal Public Defender for the Western District of Oklahoma.  I spoke with some of these lawyers by telephone and then sent a

3

confirming e-mail regarding the five issues of concern.  Randy Bauman, Vicki Werneke, Kristi Christopher, and Scott Braden, lawyers I have known for many years, confirmed that the CHU had not in the past eleven years filed a petition on the form, had filed in the form of a motion/brief, that the petitions had exceeded 25 pages in length without seeking prior leave, and had sought evidentiary hearings (at least), and there had been no issue made of any of these things.  Mr. Braden reported, however, that in at least one case filed sometime before my survey period, he thought he recalled the Court requesting that a petition be refiled on the form.

8.      In addition to speaking with and/or e-mailing the CHU attorneys, I spoke by telephone with Steve Presson, Chris Eulberg, and Gregory Laird.  These attorneys represented the petitioners in four (4) of the five (5) cases not handled by CHU attorneys.  I asked them the same questions I had asked the CHU attorneys, and received the same responses.

9.      I resolved questions about the remaining case, *Wackerly v. Sirmons*, Case No. 6:01-cv-00567-FHS-KEW, by reviewing the District Court's opinion at 2007 WL 963210, and the opinion on appeal in *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009).

10.      Based on the records and recollections of counsel, and in some cases counsel's review of the petitions they filed, no capital habeas corpus petitioner in the Eastern District of Oklahoma for the eleven years preceding Mr. Barrett's application for habeas relief, has been required to file on the form, seek leave for filing a petition containing argument in excess of 25 pages, or been faulted for seeking an evidentiary hearing or other process in his prayer for relief. In the majority of cases, the Court denied relief after the parties filed their answer and reply, respectively.  The Court had allowed limited time for filing replies.  Thus, the orderly processing

2036

of capital habeas cases has appeared to rely upon argument being presented in the petitions themselves.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing five-page declaration is true and correct.

Executed by me this 30th day of November, 2009, in Sacramento County, California.

/s/ Tivon Schardl

5

# APPENDIX A

**CAPITAL HABEAS CASES FILED IN THE EASTERN DISTRICT OF OKLAHOMA
BETWEEN JANUARY 1, 1998 AND MARCH 2009**

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 1 | *Battenfield v. Ward*, 6:98-cv-00036-JHP<br>*Battenfield v. Gibson*, <u>236 F.3d 1215</u> (10th Cir. 2001). | 6/15/1998 (Doc. #16); Appendix filed 6/15/1998 (Doc. #17); denied without briefing, argument or hearing of any kind 5/5/1999 (Doc. #28) | No, per counsel, but contained all info req'd by form, contained brief, over 25 pages, appendix included exhibits | Robert Jackson Steve Presson 10-20-09 |
| 2 | *Johnson v. Gibson*, 6:98-cv-00072-FHS-JHP<br>*Johnson v. Gibson*, 10th Cir. Case No. 99-7089, <u>2000 WL 1158335</u> (10th Cir. 8/16/2000) | 7/16/98 (Doc. # 11); State court appendix filed separately 5/1/98 (Doc. 8); response filed 9/30/98 (Doc. 18); reply filed 11/2/98 (Doc. 22); petition denied 6/29/99 (Doc. 30) | No, per counsel. Separate motions for discovery & record expansion. Denied after reply w/o fact-development. | Randy Bauman, FDP CHU |
| 3 | *Johnson v. Gibson*, 6:98-cv-00331-FHS<br>*Johnson v. Gibson*, <u>254 F.3d 1155</u> (10th Cir. 2001) | Minute order of 12/1/98 says "all motions to be filed within petition" (Doc. 11); 2/1/99 petition filed (Doc. 12); brief filed separately 2/1/99 (Doc. 14); 3/23/99 response (Doc. 17); 6/30/99 reply (Doc. 24; 12/9/99 order denying (Doc. 30) [10th Cir. reversed and remanded] | No, per FPD CHU attorneys, no CHU case has been filed on form. | Stephen J. Greubel, FPD CHU |
| 4 | *Humphreys v. Gibson*, 6:98-cv-00568-FHS-JHP<br>*Humphreys v. Gibson*, <u>261 F.3d 1016</u> (10th Cir. 2001) | 5/18/1999 (Doc. #11); Order denying filed 3/30/2000 (Doc. #24) after response and reply | No, per counsel, cites cases, 81 pages | Chris Eulberg 405-232-3450 10-21-09 |
| 5 | *Cummings v. Gibson*, 6:99-cv-00447-FHS-KEW<br>*Cummings v. Sirmons*, <u>506 F.3d 1211</u> (10th Cir. 2007) | Denied 8/11/2006, <u>2006 WL 2434462</u> | Apparently not. Eulberg said he'd never used the form. Neither district court opinion nor 10th Cir. opinion mentions. | Chris Eulberg 405-232-3450 10-21-09 |
| 6 | *Snow v. Gibson*, 6:00-cv-00070-FHS<br>*Snow v. Sirmons*, <u>474 F.3d 693</u> (10th Cir. 2007) | 7/31/2000 (Doc. #13); with appendix filed same day (Doc. # 14). | No, per counsel. Not mentioned in 10th Circuit opinion. | Vicki Wernecki 10-20-09 |
| 7 | *Delozier v. Gibson*, 6:00-cv-00102- | 8/31/2000 (Doc. #18), withdrawn and | No, per counsel and docket entries | Randy Bauman |

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| | JHP-KEW<br>*Delozier v. Sirmons*, <u>532 F.3d 1306</u><br>(10th Cir. 2008) | supplemented on 10/10/2000 (Doc. # 23); appendix filed 10/10/2000 (Doc. #24); on 10/20/2003 JHP granted motion to amend with recent authority (Doc. ##48, 49) | on legal authority. Not mentioned in 10th Circuit opinion. | 10-20-09 |
| 8 | *Braun v. Keating*, 6:00-cv-00371-MB-JHP | 7/18/2000 (Doc. #3), appendix filed 7/18/2000 (Doc. 4) [This appears to have been a successor filed under warrant.] | n/a | Benjamin McCullar<br>405-214-2889 |
| 9 | *Phillips v. Gibson*, 6:01-cv-00045-JHP-KEW | 10/1/2001 (Doc. #18); Mot. Leave to Amend (post exhaustion) (Doc. #37); Order granting leave to amend (Doc. #40); Amendment to Pet. filed 4/15/2004 (Doc. #43) | No, counsel said it was a "brief" | Gregory W. Laird<br>405-632-6668<br>10-22-09 |
| 10 | *Taylor v. Workman*, 6:01-cv-00252-JHP-KEW<br>Opinion denying relief:  <u>2007 WL 778043</u><br>*Taylor v. Workman*, <u>554 F.3d 879</u> (10th Cir. 2009). | 11/29/2001 (Doc. #14)[included request for evidentiary hearing]; 3/12/2007 Order denying petition & request for hearing (without briefing) (Doc. #32).  Although District Court opinion notes it was improper under Rule 2 for petitioner to name Attorney General as respondent, there is no other mention of rule or form. <u>2007 WL 778043</u> at *1 | No, per Randy Bauman. | Randy Bauman |
| 11 | *Hammon v. Gibson*, 6:01-cv-00253-FHS-KEW | 12/18/2001 (Doc. #18); 12/18/2001 separate mot expand record (Doc. #19); 2/13/2002 response filed; [Case dismissed after petitioner sentenced to life based on *Atkins v. Virginia*] | No, per counsel. | Kristi Christopher, Scott Braden, Vicki Werneke |
| 12 | *Wackerly v. Sirmons*, 6:01-cv-00567-FHS-KEW<br>*Wackerly v. Workman*, <u>580 F.3d 1171</u> (10th Cir. 2009) | 5/7/2002 (Doc. #19), appendix filed same day (Doc. #20), mot. expand record filed same day (Doc. #22); 7/15/2002 order granting mot. to expand for purpose of determining whether P entitled to evid hr'g; 8/7/2002 response; 9/13/2002 reply | Not mentioned in opinion <u>2007 WL 963210</u>, or appeal. | James T. Rowan<br>405-239-2454<br>Joseph Wells<br>405-942-8800 |

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 13 | *Murphy v. Mullin*, 6:03-cv-00443-RAW-KEW | 3/5/1004 (Doc.14); Amended Petition Removing unexhausted claims filed 9/10/2004 (Doc. #34); 2nd Amendment filed 12/28/2005 (Doc. #54) [not on form; includes points and authorities; requests hearing & briefing; is 46 pages long; list of exhibits; no verification]; 8/1/2007 opinion denying relief does not mention form of petitions | No, per counsel | Kristi Christopher |
| 14 | *Duty v. Mullin*, 6:05-cv-00023-FHS-SPS | 7/28/2005 (Doc. #32) | No, per counsel | Randy Bauman |
| 15 | *Ryder v. Mullin*, 6:05-cv-00024-JHP-KEW | 9/13/2005 (Doc. #13); Suppl. Auth filed 3/21/2006 contains argument (Doc. 21) | No, per counsel | Randy Bauman |
| 16 | *Derosa v. Mullin*, 6:05-cv-00213-JHP-SPS | 12/23/2005 (Doc. #17); Attachments filed 12/23/2005 (Doc. #18); Response filed 3/22/2006 with attachments (Doc. #19). | No, per counsel | Patti Palmer Ghezzi (FPD) |
| 17 | *Barrett v. USA*, 6:09-cv-00105-JHP | | Yes, per order of the court. | |

# EXHIBIT C

**Declaration of Scott E. Sundby**

I, Scott E. Sundby, of Miami, Florida, do hereby swear and affirm the following:

1.      I am a Professor of Law and Dean's Distinguished Scholar at the University of Miami, School of Law in Miami, Florida.

2.      I have been involved as a primary investigator with the Capital Jury Project (CJP) since 1992.  The CJP is funded by the National Science Foundation as an ongoing study to determine how jurors in capital cases decide between life and death sentences.  The CJP has conducted in-depth standardized interviews (lasting on average three to four hours) with approximately 1200 jurors from 353 capital cases from 14 different states.

3.      Since its inception, CJP researchers have published over fifty articles and two books based on the data.  I personally have written one book (A LIFE AND DEATH DECISION: A JURY WEIGHS THE DEATH PENALTY) and six articles looking at various aspects of capital jury decision making.  I also have lectured widely to judges through the National Judicial College and other programs (such as Florida's Advanced Judicial Studies) about the death penalty, including the CJP's findings.  The CJP has been cited in a number of judicial opinions, including by the United States Supreme Court (Florida v. Nixon, 543 U.S. 175, 192 (2004)).

4.      In assessing the likely impact of mitigating evidence, the Capital Jury Project (CJP) has found that the critical inquiry is how the mitigation would fit into the overall "case for life" that would have been presented to the jury. Jurors are most likely to return a life sentence in cases where the defendant's life story is one where the defendant is seen as having ended up committing the murder because of events or influences that were largely beyond his control.  As a result, mitigating evidence such as mental illness or an abusive childhood that left a defendant without the guiding hand of an adult are particularly powerful because a juror is likely to find that such mitigation meant that the defendant lacked full control over his decision making and the events that eventually culminated in the murder.

One of the CJP's key findings, therefore, is that mitigating evidence cannot be evaluated in isolation or in the abstract, but must be assessed within the context of an overall case.  This finding is particularly important when it comes to mitigation that is sometimes described as "double-edged" mitigation on the theory that it might also have the potential to make a juror less sympathetic to the defendant.  A mitigating factor like drug abuse, for example, in the abstract might not appear to be a powerful mitigator because some jurors might see drug abuse as something that the defendant brought upon himself.

In fact, however, a defendant's drug abuse can be a critical component of a properly presented case for life.  If the defendant's drug use, for example, was an effort by the defendant to "self-medicate" because he suffered from mental illness and was not receiving adequate medical or psychiatric treatment, the drug use becomes an important part of the overall mitigation case by reinforcing the theme that the defendant was suffering from an untreated

mental illness.  Likewise, jurors have found drug abuse to be critical mitigating evidence in cases where the defendant is perceived as not having received the help from his family, community or medical facilities that could have helped him overcome the underlying causes of his actions.

5.      Based on the CJP's findings, therefore, an essential lesson for lawyers is to not exclude mitigation that would help establish the most powerful theme of a case for life (i.e., that a defendant was subjected to influences beyond his control) because it might also lead to evidence of "bad" behavior.  After hearing that a defendant grew up in a highly dysfunctional family, jurors are not surprised that the defendant then became involved with drugs or acted in a manner that resembles the dysfunction he grew up in.  Indeed, such evidence often critically reinforces for the jurors that the defendant was raised in circumstances that deprived him of the chance of ever choosing the "high road."  As noted earlier, jurors are most likely to vote for life in cases where a defendant is battling against circumstances not of his own making, such as mental illness and a dysfunctional family.  Moreover, and very importantly, this type of mitigation can often be developed through the testimony of non-expert witnesses (for instance, family members, teachers, coaches, etc), and these are the types of witnesses to which jurors respond most favorably, making expert testimony unnecessary.

6.      The CJP also has found that a case for life built primarily around "good character" evidence (e.g., the defendant was a good father or brother) is not very persuasive mitigating evidence.  Rather, such evidence generally becomes effective only in the context of showing that an individual who has been struggling against difficult circumstances (such as being raised in a dysfunctional household) still has managed to do some good and has the potential for positive acts in the future.  The failure of "good character" evidence to work as the primary theme of mitigation is not surprising when one considers that the jurors have just convicted the defendant of a terrible crime.  From the juror's perspective, therefore, a defendant's "good deeds" are rarely if ever going to outweigh the harm that has been caused.  Instead, what jurors are looking for is some reason to find that the defendant's actions were influenced by factors beyond his control (such as mental illness or an abusive childhood), such that the ultimate penalty of death is not deserved.  Now, if the jurors find that the defendant was battling against factors like mental illness, evidence that the defendant also has positive attributes to contribute if allowed to live can be helpful complementary evidence that the defendant should be allowed to live; as stand-alone mitigation, however, the evidence is unlikely to be fully persuasive on its own.

7.      Another aspect of mitigation that the CJP has found is that a particular piece of mitigation does not have to persuade all twelve jurors of its importance in order to have an impact on the sentence.  The United States Supreme Court has held that each individual juror must be allowed to assess for himself or herself whether a particular piece of mitigation is persuasive. Mills v. Maryland, <u>486 U.S. 367</u>(1988)(finding unconstitutional any requirement that jurors unanimously agree on a mitigating factor to give it effect).  The CJP data give strong support to this ruling.

Decl. Scott E. Sundby                                      Page 2 of  3                          Barrett v. United States
Case No. 6:09-cv-00105-JHP

2044

Individual jurors often react differently to the same evidence of mitigation in deciding how much weight it should be given.   Importantly, however, because of the nature of jury deliberations at the penalty phase, mitigation evidence that persuades only one or two jurors can still change the outcome from a death to life sentence.  This is because it generally takes only four or five jurors voting for life to dictate a life sentence for the entire jury, and, of course, the jurors voting for life may be doing so for different reasons.  See generally Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 403 (2011) (CJP data shows that only four to five jurors favoring life is the threshold that almost always produces a unanimous life sentence or a deadlocked jury); see also Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Studies 277 (2001) (finding similar threshold based on South Carolina death penalty juries).

As a result, mitigating evidence even if it was found to be persuasive by only one-third of the jurors, is evidence that carries with it the strong probability of producing a life sentence. Indeed, the distinct possibility exists that mitigating evidence that persuades even just a single juror to vote for life can tip the balance in a case from death to life if several other jurors are already leaning towards a life sentence.  Moreover, because jurors consider mitigating evidence as part of the "overall" case for life, the impact of any mitigating evidence should be assessed based on its contribution in conjunction with the other evidence in mitigation.  Thus, the likely effect on a juror of evidence that the defendant battled a drug abuse problem or mental illness must be considered in tandem with other mitigating evidence, such as evidence of a dysfunctional family.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 13, 2012.

/s/ _____
Scott E. Sundby

# APPENDIX A

Appendix

Publications of Scott E. Sundby

Presented by Counsel for Kenneth Barrett

## BOOKS

- A Life and Death Decision: A Jury Weighs the Death Penalty **(Palgrave Macmillan/St. Martin's Press** - April 2005; paperback October 2007); finalist for 2006 ABA Silver Gavel Award.

## ARTICLES/ESSAYS

- *Listening at the Jury Room Door*, Hofstra Law Review (2008) (with John Blume and Sheri Lynn Johnson). (Paper for Symposium in "Guidelines for Mitigation in Death Penalty Cases.")
- *Capital Punishment in the 21st Century*, Forthcoming 2008, (Book Chapter) (with William Bowers).
- *The Death Penalty's Future: Charting the Crosscurrents of Declining Death Sentences and the McVeigh Factor*, 84 Texas Law Review 1929 (2006) (Paper for Symposium on Punishment Law and Policy).
- *Protecting the Citizen Whilst He is Quiet: Suspicionless Searches, Special Needs and General Warrants*, 74 Mississippi Law Journal 501 (2005) (Paper for Symposium on The Tools to Interpret the Fourth Amendment, National Center for Justice and the Rule of Law, University of Mississippi).
- *Moral Accuracy and Wobble in Capital Sentencing*, 80 Indiana Law Journal 56 (2005) (Comments/Essay for Symposium on Toward a Model Death-**Penalty Code: The Massachusetts Governor's Council Report, Indiana University School of Law).**
- *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell Law Review 343 (2003). (Paper for Symposium on Victims and the Death Penalty.)
- *Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland*, 33 McGeorge Law Review 643 (2002). (Essay/Lecture for McGeorge Law School Distinguished Lecture Series).
- *Burden of Proof*, Encyclopedia of Crime and Justice, 2001 (with Barbara Underwood).
- *The Limits of Privacy*, 570 Annals of the American Academy of Political and Social Science 202 (2000). (Book review of Amitai Etzioni's *The Limits of Privacy*).
- *Mean Justice,* 1999 Trial 95 (Sept. issue) (book review of Edward Humes' *Mean Justice*).
- *An Ode to Probable Cause*, 72 St. John's Law Review 1133 (1998) (Paper for Symposium on the Thirtieth Anniversary of *Terry v. Ohio*).
- *The Jury and Absolution: The Intersection of Trial Strategy, Remorse and the Death Penalty*, 83 Cornell Law Review 1557 (1998) (Paper for Symposium on How the Death Penalty Works: Empirical Studies of the Modern Capital Sentencing System).
- *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert Testimony*, 83 Virginia Law Review 1109 (1997).
- *The Education of  Law Professor*, 1996 Virginia Lawyer 24 (April issue)
  *Everyman's Fourth Amendment: Privacy or Mutual Trust Between Government and Citizen?*, 94 Columbia Law Review 1751 (1994).
- *The Lockett Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing*, 38 U.C.L.A. Law Review 1147 (1991).
- *Is Abandoning State Action Asking Too Much of the Constitution?*, 17 Hastings Constitutional Law Quarterly 139 (1990) (Paper for Symposium on the California Constitution).
- *The Virtues of a Procedural View of Innocence - A Response to Professor Schwartz*, 41 Hastings Law Journal 161 (1989).
  *The Reasonable Doubt Rule and the Meaning of Innocence*, 40 Hastings L.J. 457 (1989).
- *A Return to Fourth Amendment Basics: Undoing the Mischief of Camara and Terry,* 72 Minnesota Law Review 383 (1988).
- *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell Law Review 446 (1985) (with Roth).